Exhibit A

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

FILED
ALAMEDA COUNTY

AUG 0 9 2016

CLERK OF THE SUPERIOR COURT
By _____
       D. OLIVER, Deputy

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                           COUNTY OF ALAMEDA

9  LUNELL GAMBLE                          )   Case No. RG-16 8 2 6 7 1 7
                                          )
10        Plaintiff                       )   **COMPLAINT FOR DAMAGES**
                                          )   (Employment discrimination)
11 vs.                                    )
                                          )
12 KAISER FOUNDATION HEALTH               )   **DEMAND FOR JURY TRIAL**
   PLAN, INC; KAISER FOUNDATION           )
13 HOSPITALS, INC.; and THE               )
   PERMANENTE MEDICAL GROUP;              )
14 all doing business as KAISER           )
   PERMANENTE MEDICAL CARE                )
15 PROGRAM                                )
                                          )
16        Defendants                      )
                                          )
17 _____        )

18                          **INTRODUCTION**

19     1.  This is an action for employment discrimination and retaliation against Kaiser

20 Permanente entities, arising out of a pattern and practice of race discrimination against

21 African American employees.  Plaintiff Lunell Gamble is an African American woman over

22 the age of 40, who was employed at Kaiser for more than 16 years.  Despite an exemplary

23 record in Kaiser's Human Resources Services Center (HRSC), during her employment Ms.

24 Gamble was subject to systemic discrimination and retaliation due to her race and age,

25 including a hostile work environment and retaliatory actions taken by her supervisors.  After

26 reaching the level of HR Specialist III in the Health and Welfare Department, without a

27 single prior incident of disciplinary action taken against her, Ms. Gamble was wrongfully

28 terminated by Kaiser in July 2014.

2.  Although a substantial percentage of Kaiser's workforce is comprised of African-American employees, due to systemic discrimination by a management that is predominately non-African-American, this class of employees are too often denied training, job reclassifications, positive performance reviews, transfers and  promotions, and they are disproportionately subjected to discipline and termination.  As a result, Kaiser's workforce is rigidly stratified with a disparate distribution by race and gender, with African-American and African-American women predominantly assigned to the lowest paying positions with the least chance of advancement, and predominantly excluded from higher paying and more secure supervisory and management positions – positions with the greatest influence and decision-making authority over reviews, promotions, retention, and termination.

3.  Plaintiff's claims are brought pursuant to the California Fair Employment and Housing Act (FEHA), Cal. Government Code §12940 *et seq.*  ,She seeks to end Kaiser's discriminatory practices and obtain monetary relief, including punitive damages.

**THE PARTIES**

4. Plaintiff Lunell Gamble is an African American woman who resides in California. She was employed at Kaiser Permanente from for more than 16 years, until her termination in July 2014.  Ms. Gamble worked initially as a temporary employee in the Human Resources department (then known as "Peoples Solutions"), and began permanent employment in July 1998 in that department, rising to the level of HR Specialist III.

5.  Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a health care service plan, headquartered in Alameda County.  Health Plan enrolls members in individual and group plans, and in Northern California, provides hospital and medical services for its members through separate contracts with Medical Group and Hospitals.

6.  Kaiser Foundation Hospitals, Inc., is a nonprofit corporation, headquartered in Alameda County; it operates hospitals and medical centers in California.  Hospitals receives its funding from Health Plan, and provides infrastructure and facilities for the benefit of Medical Group.

7.   The Permanente Medical Group is a group of physicians organized as a professional corporation under California law.  Medical Group is privately owned and managed by its physician shareholders.  Medical Group contracts with Health Plan to provide medical services (both outpatient and inpatient) for Health Plan members in Northern California.

8.  Medical Group, Hospitals, and Health Plan work in cooperation with each other to form the integrated medical care services program with the trade name, Kaiser Permanente Medical Care Program.  This enterprise is known to the general public, and is doing business as, "Kaiser Permanente."  Collectively, the three entities are referred to herein as "Kaiser."

## ADMINISTRATIVE PROCESS

9. Plaintiff previously and timely filed an administrative charge of discrimination against her employer with the Department of Fair Employment and Education ("DFEH").  In that process, plaintiff complained about discrimination and retaliation she experienced, leading up to her termination in July 2014.  Plaintiff was issued a right to sue letter on August 10, 2015 (although she did not receive it personally until much later).  This action is timely filed according to the date the letter was issued.

10.  Administrative and statutory claims of Ms. Gamble were tolled as a result of a class action that was filed against Kaiser, in Hill et al. v. Kaiser Foundation Health Plan, Case No. 3:10-cv-2833 LB, Northern District of California.  EEOC charges were filed by named plaintiffs in that case on September 25, 2007, and the action was pending until December 10, 2013.  During that time period, all limitation periods for filing administrative charges were tolled.

## PATTERN AND PRACTICE ALLEGATIONS

11.  Kaiser Permanente is one of the largest health maintenance organizations of its kind, providing a system of integrated health care to more than 8 million members in eight different regions nationwide, employing over 180,000 people.  In Northern California, Kaiser serves approximately 3.2 million members at 21 medical centers and 160 offices,

1  employing thousands of people in non-physician capacities.   Using a centralized

2  employment opportunity system, people external to Kaiser and current employees are able

3  to apply for open positions throughout Kaiser's operations, including by region.  Current

4  employees are told they will be provided with opportunities for employment that are not

5  available to external applicants, including access to job postings prior to their disclosure to

6  the general public, and a system by which employees may post their resumes for other

7  Kaiser departments to match to openings for hiring decisions.

8          12.  Kaiser maintains a unique business and organization structure, with regional

9  oversight of Northern California non-physician operations by a single executive

10  management hierarchy.  Within each division of Kaiser's operations, the employer has

11  created departmental hierarchies of similar nature and structure, including: entry level

12  positions, trained or skilled-level positions, team leaders and sub-leads, supervisors and

13  office-level managers, and divisional directors and assistant directors.  Kaiser also

14  maintains uniform employment and personnel policies applicable to all of its employees,

15  with centralized human resources, general counsel, payroll services, and labor and other

16  employment data.  Regardless of the department or division, there are uniform policies and

17  procedures for employee orientation, supervisory management, salary and incentive options,

18  job classifications, human resources, progressive discipline, rules of conduct, and

19  requirements for transfers, promotions and terminations.

20          13.  Within each department or function of Kaiser's operations, the employer has

21  developed its own unique procedures, information systems and business technologies

22  requiring specialized training and adaptive capabilities.  Employees are told they need

23  establish in their work performances that they are trained in and proficient with those

24  unique processes in order to be retained and/or promoted within Kaiser.  Access to that

25  training uniformly depends upon the discretion of divisional management, however,

26  including influence and decision-making at the supervisory and team management levels.

27  Similarly, performance reviews, job classification decisions, pay and salary structure

28  changes, and disciplinary actions all depend upon the discretion of that same divisional

1   management.  Few objective requirements or measurements are used for employment

2   decisions, which instead are largely based on subjective judgments of the supervisors and

3   managers within Kaiser's operations.

4        14.  Kaiser's executive and divisional managements for positions in EEO job groups

5   2F and 2G are predominately neither African-American nor African-American women.

6   African-Americans and African-American women are rarely promoted to supervisory or

7   management positions capable of influencing a significant proportion of the employer's

8   decision-making.  As a result, the decisions as to which employees receive specialized

9   training, particular assignments, job classifications, pay raises and incentives, transfer or

10  promotions, positive performance reviews and progressive disciplinary actions are made

11  and influenced principally by non-African-Americans.   Subjective judgments of Kaiser'

12  stratified supervisory and management system are often infected with conscious or

13  unconscious prejudices and race and/or race-gender based stereotypes, which explains why

14  so few African-American and African-American women out of Kaiser's large African-

15  American and African-American female employee population advance to supervisory and

16  management positions.

17       15.  This pattern of unequal training, assignments, classifications, pay, discipline and

18  advancement opportunities is not the result of random or non-discriminatory factors. Rather,

19  it is the result of an on-going and continuous pattern and practice of intentional race and

20  race-gender discrimination in training, assignments, classifications, pay, discipline,

21  performance reviews, terminations and promotions, and reliance on policies and practices

22  that have an adverse impact on African-American and African-American female employees

23  that cannot be justified by business necessity, and for which alternative policies and

24  practices with less discriminatory impact could be utilized that equally serve any asserted

25  justification. Plaintiff is informed and believes that such policies and practices include,

26  without limitation:

27       a.     Failure to consistently train African-American and African-American women

28             in the unique Kaiser processes and practices necessary for desirable

---

1    assignments and advancement.

2    b.    Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-

3          African-American managerial workforce in making assignments, training,

4          pay, performance review, discipline, promotion and termination decisions.

5          Even where Kaiser's policy states objective requirements, these requirements

6          are often applied in an inconsistent manner and ignored at the discretion of

7          management.

8    c.    Reliance on race and race-gender stereotypes in making employment

9          decisions such as assignments, promotions, pay and training.

10   d.    Pre-selection and "grooming" of non-African-American and non-African-

11         American women employees for advancement, favorable assignments and

12         training.

13   e.    Maintenance of largely race and race-gender segregated job categories and

14         departments.

15   f.    Deterrence and discouragement of African-American and African-American

16         female employees from seeking advancement, training, and favorable

17         assignments and pay.

18   g.    Giving African-American and African-American employees lower

19         compensation, lower job classifications and lower pay raise incentives than

20         similarly situated non-African-American and non-African-American women

21         employees.

22   h.    Providing unjustified negative performance reviews, false pretexts for

23         disciplinary action, omission of positive job performance recognition and

24         other adverse personnel actions to African-American and African-American

25         women employees, in disproportion to the same actions taken against non-

26         African-American employees.

27   i.    Providing less training and support to African-American and African-

28         American female employees and managers than that given to non-African-

1        American employees and managers.

2    j.      Providing less or refusing to make reasonable accommodations for disabilities

3        and sick leave policies with respect to African-American and African-

4        American female employees, and unlawfully discriminating against African-

5        American-employees due to their disabilities because of both their disabilities

6        and their race and/or race-gender.

7    k.      Harassing African-American and African-American female employees

8        interested in advancement and subjecting them to a hostile work environment.

9    l.      Maintaining and fostering a reputation for discriminatory conduct which

10       deters African-Americans and African-American females from pursuing

11       promotional opportunities with Kaiser;

12    m.     Establishing and maintaining arbitrary and subjective requirements for

13       discipline and promotions which have the effect of excluding qualified

14       African-Americans and African-American females and which have not been

15       shown to have any significant relationship to job performance or to be

16       necessary to the safe and efficient conduct of Kaiser's business;

17    n.      Failing and refusing to take adequate steps to eliminate the effects of its past

18       discriminatory practices; and

19    o.      Retaliating against African-American and African-American women

20       employees who complain of unequal treatment.

21    16.   Kaiser's racially stratified workforce and discriminatory patterns and practices

22 are propagated, entrenched and protected by centralized policies and practices directed at

23 the highest levels of Kaiser management. Although Kaiser operates many different

24 departments at many different locations throughout the Northern California Region, it has

25 centralized, company-wide policies and practices concerning supervisory training, human

26 resources, EEO reporting and compliance and Kaiser's response to EEO complaints. These

27 company-wide policies and practices include, among others:

28    a.      Directing, authorizing and training supervisors and directors to conceal

discriminatory actions and retaliate against those employees who might assist the disclosure of false or trivial discipline as pretext for discrimination, without regard to the specific facts and circumstances of the individual employee or supervisor.

b.  Directing, authorizing and assist supervisors and directors in their discriminatory and retaliatory employment actions, through a centralized human resources department and, ultimately, the office of the general counsel, in favor of supervisors and directors, and against the interests and complaints of African American employees, without regard to the specific facts and circumstances of the individual employee or supervisor, and in contravention of obligation of Human Resources and general counsel to protect employees from unlawful discrimination.

c.  Suppressing and falsifying information in connection with complaints over employment actions made internally and to administrative agencies and courts by African American employees, including unreasonable, one-sided, pre-determined internal investigations conducted by a select few individuals for the purpose of permitting, perpetuating and covering up discriminatory and retaliatory actions and patterns, without regard to the specific facts and circumstances of the individual employee or complaint.

f.  Concealing and entrenching discriminatory patterns and practices by making false and misleading representations and statements, and engaging in intentionally misleading conduct, to EEOC and OFCCP regarding its compliance with federal regulations, including the requirement that Kaiser conduct internal reviews and self-inquiry of statistical patterns, report disparities, propose remedial plans (including affirmative action plans) and monitor results over time.

g.  Misrepresent EEO practices and non-compliance to employees, government agencies, in the courts and to the public, included a public relations effort to

promote a diversity department that is knowingly, purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.     Retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.     Designating African American employees, and in particular, those employees who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.     Abusing administrative and judicial processes to further patterns and practices of racial discrimination and in retaliation against African American employees who complain about the violation of their civil rights, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the existence of substantial evidence of Kaiser's violations of law.

k.     Perpetuating, protecting and concealing unlawful discrimination and patterns of disparate treatment by requiring employees who raise civil rights claims to agree to confidentiality of the terms of settlement, without bargaining for such an agreement at arms length, and without justification in work product,

1    attorney client privilege, trade secret or other basis for confidentiality.

2    1.    Kaiser's stand-alone litigation policy and practice – adopted and applied by

3    general counsel in cases brought under anti-discrimination laws, without

4    regard to specific facts and circumstances – requiring, as a condition of

5    settlement, former employees to sign agreements not to work at Kaiser in the

6    future, is a violation of federal and state civil rights laws; including whether

7    plaintiff is entitled to a declaration that all such agreements are against public

8    policy, unenforceable and null and void.

9        17.  Because of its discriminatory policies and practices, Kaiser retains, promotes,

10   disciplines and terminates African Americans and African American women in statistically

11   significant disproportionate rates, based on the proportion of qualified African Americans

12   and African American women.  This in turn has the effect of diminishing the pool of

13   eligible African Americans and African American women for promotion to supervisory,

14   management and executive positions.  Kaiser's pattern and practice of discrimination is so

15   pervasive and entrenched throughout that race and race-gender discrimination and unlawful

16   retaliation can be said to be its modes of operations

17                                    **WRONGFUL TERMINATION**

18       18.  In 1997, plaintiff Gamble began working as a temporary employee (through a

19   company called Adecco), in Peoples' Solutions, then the name of the Human Resources

20   department for Kaiser.  On or about July 7, 1998, Ms. Gamble was hired as a permanent

21   employee in that department.  Like many other African American employees at Kaiser, she

22   performed her work according to the employer's needs, was well qualified and tried to

23   improve her employment position over the years.  By the time of her termination, she had

24   achieved the position of HR Specialist III, in the Benefits Department (the Health and

25   Welfare Department) of what had been renamed the HRSC.

26       19.  In July 2012, Kaiser reorganized its Benefits Department, and plaintiff began

27   receiving supervision from a new manager – Rosa Grajeda – who had been transferred from

28   the Leaves Department.

20. From the beginning of her long tenure at Kaiser, and until her termination, Ms. Gamble did not receive any warnings or disciplinary actions related to her exemplary employment. Despite her qualifications and excellent work performance, Ms. Gamble was subject to the pattern and practice of discrimination, based upon her race and age. These included, but are not limited to the following:

    a.    Ms. Gamble was one of the few African Americans to remain employed in the department, as other African American employees in that department, in Human Resources and throughout Kaiser were terminated for discriminatory reasons or forced to quit from dead-end positions at Kaiser. Ms. Gamble witnessed their replacement with younger, non-African American employees who were equally or less qualified to perform the work.

    b.    Despite a pool of African American employees qualified for supervisory and management positions, Ms. Gamble was subject to an employment hierarchy that was seemingly devoid of older, African American employees at the higher levels. During her employment in Kaiser's Human Resources department, Kaiser employed no African American directors in that department, and few African Americans were given "lead" positions.

    c.    After the departmental reorganization, Ms. Gamble was subject to constant harassment and unreasonable scrutiny by her manager, Ms. Grajeda. In October 2012, Ms. Grajeda followed plaintiff into the department's bathroom, and criticized plaintiff for not working as she spoke through the curtain in the vanity area. Plaintiff became both fearful of the manager, and appalled at her conduct, causing plaintiff to avoid using the department's bathroom from that point forward. Plaintiff complained to senior management, but no apology was made or corrective action taken.

    d.    In approximately February 2013, plaintiff was subject to ridicule and embarrassment by Ms. Grajeda, who falsely accused plaintiff of receiving complaints from the entire department over her perfume. After offering to

1   communicate with her department over the matter, Ms. Grajeda admitted it
2   was only she that had complained.

3   e.    In Approximately March 2014, plaintiff was singled out from non-African
4        American employees and loudly scolded for laughing at work. This was done
5        openly to embarrass plaintiff in front of co-workers. Even though Kaiser
6        officially recognizes laughter as a part of its medical focus, and even though
7        other, non-African American employees are seen laughing, plaintiff was
8        criticized and made to feel inferior. Plaintiff was so upset by this incident that
9        she was required to leave her manager by the desk, and she was later called
10       into the manager's office for further criticism.

11  f.    Constant harassment and false criticism of work performance continued on a
12       nearly daily basis. Ms. Grajeda lacked the knowledge and experience
13       working in the Benefits department – knowledge and experience that plaintiff
14       had gained. And yet, in managing plaintiff's work performance, the lack of
15       understanding by the manager led to empty, false criticisms of the work.

16  g.    Throughout this period, Ms. Grajeda treated plaintiff and other older African
17       American employees with disparate treatment, including refused to assign
18       work to plaintiff commensurate with plaintiff's knowledge and skill levels,
19       criticisms of work by African American employees that were not made
20       against the same or even less quality work by younger, non-African
21       Americans, and overlooking transgressions or mistakes by younger, non-
22       African American employees.

23  21.  On July 18, 2014, plaintiff was given a "final written warning" threatening her
24  with termination, even though she had not received a prior written warning or any of the
25  progressive discipline Kaiser requires. Included in the written warning were false claims
26  regarding Ms. Gamble's work performance, including false accusations plaintiff had
27  "falsified" work records, and had acted with hostile aggression towards Ms. Grajeda. Each
28  claim was mere pretext for Kaiser's discrimination against older, African Americans.

---

1    22.  Pursuant to its pattern and practice of discrimination, Kaiser had already

2  determined to terminate plaintiff's employment.  Following the final written warning,

3  plaintiff attempted to perform her work and meet with senior management over her

4  discipline.  Rather than providing an honest opportunity to perform the work, Kaiser set

5  plaintiff up for ultimate termination, which occurred on July 29, 2014.

6                                           **DAMAGES**

7    23. The hostile environment grew so intolerable that plaintiff suffered mental

8  distress. Following plaintiff's attempt to address her unequal and unlawful treatment at

9  Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

10 policies and practices, including designation of plaintiff as not eligible for rehire;

11 unreasonable, pre-determined one-sided investigations conducted outside the standards for

12 workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

13 and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

14 by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

15 to never apply to work at Kaiser again in the future.

16    24. As a direct and proximate result of defendants' actions as alleged herein,

17 defendants have breached their duties imposed on all employers as established by statute.

18    25. As a direct and proximate result of the refusal to promote plaintiff's employment,

19 plaintiff has suffered and will continue to suffer lost wages, salary increases, earnings

20 capacity and other benefits of employment, in an amount to be proven at trial.

21    26. As a further proximate result of defendants' unlawful actions, plaintiff has

22 suffered emotional pain, humiliation, mental anguish, and emotional distress.

23    27. The conduct of all of the defendants alleged above was deliberate, wilful and

24 malicious.  Further, the actions taken against plaintiff were carried out with reckless

25 disregard to the truth and the rights of plaintiff, and were despicable actions taken without

26 privilege or justification.

27

28

## CAUSE OF ACTION
### (Violation of California Government Code 12940, et seq., California Fair Employment and Housing Act)

16. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 15 of this complaint, as though fully set forth herein.

17. Defendant Kaiser is an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

18. Plaintiff is a member of a protected class as set forth in Government Code 12940 et seq.

19. The harms alleged herein occurred within the jurisdiction of this Court and the amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

20. The discriminatory treatment of plaintiff's employment and retaliatory actions, as set forth herein, were done with discriminatory motive, in violation of public policy and was based on the fact that plaintiff was over the age of 45, is African American and is a woman, and had complained about management's Equal Employment practices.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays for judgement against defendants, and each of them as follows:

1. For general and special damages, in an amount to be determined at trial;

2. For back pay and wages and loss of other benefits due as a result of the wrongful conduct of defendants, in an amount to be determined at trial;

3. For an order instating plaintiff to the position denied her and ordering defendant to cease engaging in a pattern and practice of discrimination,

4. For statutory interest on plaintiff's past wage loss;

5. For damages of pain and suffering and emotional distress;

6. For exemplary and punitive damages in an amount to be determined at trial;

7. For reasonable attorney fees and costs of suit; and

8. For other such relief as the Court may deem just and proper.

Respectfully submitted,

Dated: August 9, 2016                  LAW OFFICE OF JEREMY L. FRIEDMAN

                                       By: _____
                                           Jeremy L. Friedman
                                           Attorney for plaintiff Lunell Gamble


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

Dated: ~~July 8, 2016~~ Aug 9 2016       LAW OFFICE OF JEREMY L. FRIEDMAN

                                       By: _____
                                           Jeremy L. Friedman
                                           Attorney for plaintiff Lunell Gamble

*14550252*

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jeremy L. Friedman, CA Bar No. 142659
2801 Sylhowe Road, Oakland, CA 94602

TELEPHONE NO.: 510 530 9060    FAX NO.: 510 530 9087
ATTORNEY FOR *(Name):* Plaintiff Lunell Gamble

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
Lunell Gamble v. Kaiser Foundation Health Plan, et al.

**FILED**
**ALAMEDA COUNTY**
AUG 0 9 2016
CLERK OF THE SUPERIOR COURT
By *Darnekia Cha*
D. OLIVER, Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: RG-16826717 |
|---|---|---|---|
| ✓ Unlimited (Amount demanded exceeds $25,000) | Limited (Amount demanded is $25,000 or less) | Counter   Joiner<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [✓] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action *(specify):* One
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 9, 2016

Jeremy L. Friedman
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com



*14550260*

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, Inc., and the Permanente Medical Group, Inc., all doing business as Kaiser Permanente Medical Care Program

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Lunell Gamble

```
FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
ALAMEDA COUNTY

AUG 0 9 2016

CLERK OF THE SUPERIOR COURT
By _____
    D. OLIVER, Deputy
```

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court for County of Alamenda<br>1225 Fallon Street, Oakland, CA 94612 | CASE NUMBER:<br>*(Número del Caso):* **16826717** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jeremy L. Friedman, Attorney at Law, 2801 Sylhowe Road, Oakland, CA 94602 (510) 530-9060

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* AUG 0 9 2016 | **Chad Finke** | Clerk, by<br>*(Secretario)* _____ | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602____

## Superior Court of California, County of Alameda

| | |
|---|---|
| Gamble<br>                         **Plaintiff/Petitioner(s)**<br>**VS.**<br><br>Kaiser Foundation Health Plan, Inc<br>                         **Defendant/Respondent(s)**<br>(Abbreviated Title) | No. <u>RG16826717</u><br><br>**NOTICE OF CASE MANAGEMENT<br>CONFERENCE AND ORDER**<br>Unlimited Jurisdiction |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**
Notice is given that a Case Management Conference has been scheduled as follows:

| | | |
|---|---|---|
| Date:  **12/22/2016**<br>Time:  **09:15 AM** | Department: **15**<br>     Location: **Administration Building**<br>          **Third Floor**<br>          **1221 Oak Street, Oakland  CA  94612**<br><br>     Internet: **www.alameda.courts.ca.gov** | Judge:  **Ioana Petrou**<br>Clerk:  **Pamela Drummer-<br>Williams**<br>Clerk telephone:  **(510) 267-6931**<br>E-mail:<br>**Dept.15@alameda.courts.ca.gov**<br>Fax:  **(510) 267-1503** |

### ORDERS

1. **Plaintiff** must:

    a. **Serve** all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)); and

    b. **Give notice** of this conference to all other parties and file proof of service.

2. **Defendant must** respond as stated on the summons.

3. **All parties who have appeared before the date of the conference** must:

    a. **Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724;

    b. **File and serve** a completed *Case Management Statement* on Form CM-110  at least **15** days before the Case Management Conference (Cal. Rules of Court, rule 3.725); and

    c. **Post jury fees** as required by Code of Civil Procedure section 631.

4. If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30.  Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

5. You are further ordered to appear in person or through your attorney of record at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed. You may be able to appear at Case Management Conferences by telephone.  Contact CourtCall, an independent vendor, at least three business days before the scheduled conference.  Call 1-888-882-6878, or fax a service request to (888) 882-2946.  The vendor charges for this service.

6. You may file *Case Management Conference Statements* by E-Delivery.  Submit them directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to *www.alameda.courts.ca.gov/ff*.

7. The judge may place a *Tentative Case Management Order* in your case's on-line register of actions before the conference.  This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration.  Check the website of each assigned department for procedures regarding tentative case management orders at *www.alameda.courts.ca.gov/dc*.

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 08/11/2016.

By _Michelle Bank_
Digital

_____
Deputy Clerk

Form Approved for Mandatory Use
Superior Court of California, County
of Alameda
ALA CIV-100 [Rev. 07-01-2015]

NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER

*Superior Court of California, County of Alameda*



*Notice of Assignment of Judge for All Purposes*

Case Number: RG16826717
Case Title:      Gamble VS Kaiser Foundation Health Plan, Inc
Date of Filing: 08/09/2016

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:**

|  |  |
|---|---|
| **Judge:** | **Ioana Petrou** |
| **Department:** | **15** |
| **Address:** | **Administration Building** |
| | **1221 Oak Street** |
| | **Oakland  CA  94612** |
| **Phone Number:** | **(510) 267-6931** |
| **Fax Number:** | **(510) 267-1503** |
| **Email Address:** | **Dept.15@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

## General Procedures

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, George E. McDonald Hall of Justice, 2233 Shoreline Drive, Alameda, California, 94501 and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

<div align="center">

ASSIGNED FOR ALL PURPOSES TO
JUDGE Ioana Petrou
DEPARTMENT 15

</div>

All parties are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1)  and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference.  The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days".  Plaintiff received that form in the ADR information package at the time the complaint was filed.  The court's Web site also contains this form and other ADR information.  If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

Contacts with Dept. 15 should be by email to Dept. 15@alameda.courts.ca.gov. You must provide copies of all email communications to each party (or their attorneys, if represented) at the same time you send the email to the Court and you must show that you have done so in your email. When a copy of a document must be transmitted to court staff, an email attachment is preferable to fax. Use of an email attachment or fax, however, is not a substitute for filing of pleadings or other documents. Inclusion of available email addresses in the caption of all filed papers, as required by CRC 2.111(1) is required.

Parties/attorneys must confer before scheduling a hearing date. Counsel are expected to be familiar and comply with the Statement of Professionalism and Civility, Alameda County Bar Association www.acbanet.org.

Counsel should consider and recommend creative, efficient approaches to valuing and resolving their case (CRC §3.724).

## Schedule for Department 15

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held:  Unless otherwise advised, both court and jury trials are Mondays through Thursdays at 10:00 am through 4:30 pm; expect to be in the courtroom from 9:00 am to 5:00 pm. Cases may "trail" a trial in progress.

- Case Management Conferences are held:  Mondays through Thursdays at 9:15 am and Fridays at 9:30 am. Timely filed and complete case management conference statements are required and may eliminate the need for a hearing.

- Law and Motion matters are heard:  Tuesdays, Wednesdays & Thursdays at 9:00 am. Email Dept. 15 for reservations. Include case name & number, title of motion and identity of moving party. Courtesy copies of all Law & Motion pleadings are to be submitted directly to Dept. 15.

- Settlement Conferences are heard:  As scheduled by the Judge. Court resources are limited, and counsel should consider other ADR alternatives. Conferences will be specially set when deemed appropriate.

- Ex Parte matters are heard:  The applicant must contact the clerk for a hearing date and provide CRC 3.1203(a) notice to all parties.  The applicant must appear, in person or by phone if allowed, unless it is a stipulation for an order or otherwise allowed under CRC 3.1207.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Email:        Dept.15@alameda.courts.ca.gov

  The parties should check the tentative rulings on the court's website and notify the courtroom clerk and all other parties of plans to contest by 4:00 pm the day before the hearing.

- Ex Parte Matters
  Email:        Dept15@alameda.courts.ca.gov

## Tentative Rulings

The court may issue tentative rulings in accordance with the Local Rules.  Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website:  www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 15

- Phone:  1-866-223-2244

Dated:  08/10/2016

_____
Presiding Judge,
Superior Court of California, County of Alameda

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 08/11/2016

By      *Michelle Bank*
                                        Digital
                                    Deputy Clerk

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>                    Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Kaiser Foundation Health Plan, Inc<br>                    Defendant/Respondent(s)<br>                    (Abbreviated Title) | No. <u>RG16826717</u><br><br>Case Management Order<br><br>Complaint - Other Employment |

ORDER re: CASE MANAGEMENT

FURTHER CONFERENCE

The Case Management Conference currently scheduled for 12/22/2016 is VACATED and continued to
01/05/2017 at 09:15 AM in Dept. 15.

Plaintiff is reminded that California Rule of Court 3.110(b) provides that "The complaint must be
served on all named defendants and proofs of service on those defendants must be filed with the court
within 60 days after the filing of the complaint."  Failure to comply may result in an order to show
cause re sanctions.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council
Form CM-110, must be filed no later than 12/21/2016. If the foregoing date is a court holiday or a
weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to
self-represented parties of record by mail.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of
sanctions pursuant to CCP 177.5.

Dated:  11/10/2016

_____
Judge Ioana Petrou

---

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number:  RG16826717
Case Management Conference Order of 11/10/2016

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 11/15/2016.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:      (916) 448-0159
6    Facsimile:      (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:      (415) 397-2823
10   Facsimile:      (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.,
12   KAISER FOUNDATION HOSPITALS, and THE
     PERMANENTE MEDICAL GROUP

13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                         Case No. RG16826717

19              Plaintiff,                  **DEFENDANTS' NOTICE OF DEMURRER
                                            TO PLAINTIFF'S COMPLAINT;
20        v.                                MEMORANDUM OF POINTS AND
                                            AUTHORITIES IN SUPPORT THEREOF**
21   KAISER FOUNDATION HEALTH PLAN, INC.;
     KAISER FOUNDATION HOSPITALS; and THE   Hearing Date:   February 7, 2017
22   PERMANENTE MEDICAL GROUP; all doing    Time:           9:00 a.m.
     business as KAISER PERMANENTE MEDICAL  Dept.:          15
23   CARE PROGRAM,                          Judge:          Ioana Petrou

24              Defendants.
                                            Reservation number:  R-1802056
25

26

27

28

     ENDORSED
     FILED
     ALAMEDA COUNTY

     NOV 2 2 2016

     CLERK OF THE SUPERIOR COURT
     By _____
          JAMIE THOMAS, Deputy

─────────────────────────────────────────────────────────
     DEFENDANTS' NOTICE OF DEMURRER TO PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND
                          AUTHORITIES IN SUPPORT THEREOF
     35890240v.2

TO PLAINTIFF AND HER ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on Tuesday, February 2, 2017 at 9:00 a.m., or as soon thereafter as counsel may be heard, in Department 15 of the above-entitled Court located at 1211 Oak Street, Oakland, California, Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation Hospitals ("KFH"), and The Permanente Medical Group ("TPMG") (collectively "Defendants"), will and hereby do demur to Plaintiff Lunell Gamble's ("Plaintiff") unverified Complaint, pursuant to California Code of Civil Procedure section 430.10(f), on the grounds that the Complaint is uncertain, seeking an order sustaining, without leave to amend, the demurrer to Plaintiff's Complaint, and the single cause of action contained therein.

DATED: November 22, 2016

Respectfully submitted,

SEYFARTH SHAW LLP

By: _____
Kristina M. Launey
Julie Yap
Bethany A. Vasquez
Tiffany T. Tran
Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN,
INC., KAISER FOUNDATION
HOSPITALS, and THE PERMANENTE
MEDICAL GROUP

1

35890240v.2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff, "an African American woman over the age of 40," asserts this action "for employment discrimination and retaliation against Kaiser Permanente entities, arising out of a pattern and practice of race discrimination against African American employees." (Compl. ¶ 1.)  While Plaintiff's factual allegations are voluminous, she pleads only a single cause of action for "Violation of California Government Code 12940, et seq., California Fair Employment and Housing Act."  Plaintiff fails to specify:  (1) whether the cause of action is based upon alleged discrimination, retaliation, or other asserted violation of the FEHA; (2) upon which of the various protected classifications mentioned it is asserted (age, gender or race); and (3) against which of the three named Defendants it is asserted.  As such, Plaintiff's cause of action, as pled, is ambiguous, uncertain, and unintelligible, and does not provide Defendants with sufficient information to reasonably respond.  Indeed, because it is unclear on what bases Plaintiff is seeking relief, Defendants cannot determine whether Plaintiff has exhausted all causes of action she seeks to bring—Plaintiff only exhausted claims based on alleged race and/or age discrimination.

Defendants' request is simple.  Defendants seek a Complaint that clearly sets forth, in separate causes of action: (1) each alleged violation, (2) the asserted basis (age, gender, or race) for each alleged violation, and (3) the Defendant(s) who purportedly engaged in such violation.  Such clarification is necessary for Defendants to understand and respond to the allegations against them, including challenging any purported causes of action based on failure to exhaust administrative remedies.  Defendants thus respectfully request that the Court sustain its demurrer to Plaintiff's Complaint and limit Plaintiff's causes of action to those in her administrative charges.

### II.    ALLEGATIONS IN THE COMPLAINT AND PROCEDURAL BACKGROUND

On October 6, 2016, Plaintiff served Defendants with her Complaint asserting a single cause of action for "Violation of California Government Code 12940, et seq., California Fair Employment and Housing Act."  Compl. ¶¶ 16-20.  Specifically, Plaintiff pleads as follows:

The discriminatory treatment of plaintiff's employment and retaliatory actions, as set forth herein, were done with discriminatory motive, in violation of public policy and was

1

35890240v.2

based on the fact that plaintiff was over the age of 45, is African American and is a woman, and had complained about management's Equal Employment practices.

Compl. ¶ 20.  Plaintiff also imprecisely alleges that she is "a member of a protected class as set forth in Government Code 12940 et seq." Compl. ¶ 18.  Plaintiff's single cause of action *does not*: (1) specify against which of the three named Defendants it is asserted; (2) specify if it is a discrimination claim or a retaliation claim; or (3) specify upon which of the protected classifications mentioned it is based.

On October 26, October 28, November 14, and November 16, 2016, counsel for the parties engaged in meet and confer communications pursuant to Code of Civil Procedure section 430.41(a) to discuss the grounds underlying Defendants' contemplated demurrer to Plaintiff's Complaint.  (*See* Vasquez Decl., ¶¶ 5, 6, 8, 9.)  Plaintiff refused to amend her Complaint.  (*Id.* at ¶ 9.)  Accordingly, Defendants filed the instant Demurrer.

## III.   LEGAL ARGUMENT

### A.    Plaintiff's Complaint Should Be Dismissed For Uncertainty

While courts generally construe pleadings liberally, a complaint must not be unfairly vague or leave anything to surmise.  *See e.g.*, *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 616 (1993), *Ankeny v. Lockheed Missiles & Space Co.*, 88 Cal. App. 3d 531, 537 (1979).  Another court has commented:

> It is hornbook law that the 'purpose of a complaint is to furnish the defendants with certain definite charges which can be intelligently met. . . . The point is that the accuser must place his finger squarely and directly upon whatever dereliction is relied upon [by plaintiff].'  General and indefinite assertions of liability are not sufficient compliance with the rules of pleading. . . .

*Zumbrum v. Univ. of Southern Cal.*, 25 Cal. App. 3d 1, 8 (1972) (quoting *Lavine v. Jessup*, 161 Cal. App. 2d 59, 69 (1958)).

A demurrer tests the legal sufficiency of the complaint and may be used to challenge defects appearing on the face of the complaint.  Code Civ. Proc. § 430.30(a).  A complaint is subject to demurrer when the pleading is uncertain, ambiguous, or unintelligible.  Code Civ. Proc. § 430.10(f).  A demurrer for uncertainty may lie if the failure to label the parties and claims renders the complaint so

35890240v.2

1    confusing defendant cannot tell what the defendant is supposed to respond to. *Williams v. Beechnut*

2    *Nutrition Corp.*, 185 Cal. App. 3d 135, 139 (1986).

3        California Rules of Court, rule 2.112 requires Plaintiff to separately state each purported cause of

4    action, its number, its nature, and the party or parties to whom it is directed. (Cal. Rules of Court, rule

5    2.112.) Moreover, "[p]leadings which jumble together several distinct 'causes of action' may be subject

6    to demurrer for uncertainty." Weil & Brown, Cal. Practice Guide: Cal. Civ. Proc. Before Trial (2016)

7    Ch. 6-B, § 6:104; *see id.* § 6:35 ("Each cause of action... should be separately stated, must be separately

8    numbered, and must identify... the claim and against whom it is asserted.") (citing California Rule of

9    Court 2.112). Such a demurrer will be sustained when a defendant cannot reasonably determine what he

10   is required to respond to, as when a plaintiff joins multiple causes of action as one, or fails to properly

11   identify each cause of action. Justice Eileen C. Moore, Michael Paul Thomas, Esq., California Civil

12   Practice § 9.4 (2004); *see Craig v. City of Los Angeles* (1941) 44 Cal. App. 2d 71, 73 (complaint was

13   subject to demurrer on the grounds of uncertainty and unintelligibility because "it attempts to state

14   numerous causes of action in a very loose and rambling manner without any attempt at separately stating

15   them.").

16       Here, Plaintiff's Complaint asserts a single cause of action for "Violation of California

17   Government Code 12940." The cause of action is uncertain, ambiguous, and unintelligible with regard

18   to which of the Defendants against whom Plaintiff asserts this claim. Moreover, the single cause of

19   action is uncertain, ambiguous, and unintelligible with respect to whether it is asserted as a

20   discrimination claim or a retaliation claim (or another type of claim), and upon which of the various

21   protected classifications (age, gender or race) it is asserted. The uncertainty in the Complaint requires

22   Defendants to guess what specific violations of the FEHA Plaintiff alleges Defendants (and which of the

23   various Defendants) have violated. This uncertainty is compounded by haphazard numbering of the

24   Complaint, which repeats certain enumerated paragraphs (*i.e.*, there are two paragraphs numbered 16,

25   17, 18, 19, and 20).

3

35890240v.2

Defendants cannot possibly be expected to respond in a meaningful way to the Complaint as presently constituted.[1]

**B.    Any Causes of Action For Hostile Work Environment or Discrimination On The Basis Of Gender Or For Retaliation Are Barred For Failure To Exhaust Administrative Remedies.**

While, as set forth above, it is unclear on what bases Plaintiff brings her single cause of action,[2] Plaintiff cannot bring any causes of action for a hostile working environment or discrimination on the basis of disability or gender or based on retaliation because she failed to exhaust administrative remedies regarding these claims.[3] *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1613 (1995) (trial court had no jurisdiction to hear retaliation cause of action where DFEH charge did not mention retaliation).  Although the Complaint conspicuously omits allegations about the scope of Plaintiff's charge concurrently filed with the EEOC and DFEH, (Compl. ¶ 9), her administrative complaint asserts claims solely based on race and age, omitting any reference to retaliation or discrimination on the basis of sex, disability, or any other protected category.[4]  (*See* RJN, Ex. 1)  Just as in *Okoli*, Plaintiff's new claims are barred, and the Court has no jurisdiction to hear them now.  *See also Hobson v. Raychem Corp.*, 73 Cal. App. 4th 614, 631 (1999) (cause of action for *mental* disability discrimination barred where DFEH charge only alleged *physical* disability discrimination), disapproved of by on other grounds by *Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019 (2003); *Rodriguez v. Airborne Express*, 265 F.3d 890, 897 (9th Cir. 2001) (DFEH charge for race discrimination

---

[1] While Defendants have propounded preliminary discovery upon Plaintiff regarding the factual allegations in her Complaint as well as her purported damages, Plaintiff's uncertain Complaint creates obstacles to the efficient and effective use of discovery.

[2] The uncertainty raised by Plaintiff's cause of action confuses even this demurrer, as it is unclear on what bases Plaintiff brings her complaint.  For example, in the Complaint's introduction, Plaintiff alleges she was "subject to systemic discrimination and retaliation due to her *race* and *age*." (Compl. ¶ 1.)  Elsewhere, Plaintiff vaguely alleges discrimination on the basis of disability.  (*Id.* ¶ 15.j.)  However, in her cause of action, she asserts that the alleged "discriminatory motive" for Defendants' actions were based on the fact that "plaintiff was over the age of 45, is African American and is a woman, and had complained about management's Equal Employment practices."  (*Id.* ¶ 20.)  Defendants are willing to meet and confer further on these issues, but reached an impasse after Plaintiff's counsel asserted that the causes of action were clear.

[3] Plaintiff was also required to timely file her DFEH charge, obtain a right-to-sue letter, and file suit within one year from the date of notice of that letter.  *Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479, 492 (1996); Gov. Code § 12965(b).  Defendants do not raise those requirements as bases for dismissal at this time, but do not waive such a challenge once the bases for Plaintiff's causes of action are clarified.

[4] These administrative records are judicially noticed under Evidence Code Section 452(c) and the Court need not accept Plaintiff's allegations as true where they are inconsistent with or contradict her DFEH charges.  *El Rancho Unified School Dist. v. National Education Assn.*, 33 Cal. 3d 946, 950 (1983); *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1474 (2014).

4

---

DEFENDANTS' NOTICE OF DEMURRER TO PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

35890240v.2

1  could not be construed to include claim of disability discrimination); *Stallcop v. Kaiser Foundation*

2  *Hospitals*, 820 F.2d 1044, 1051 (9th Cir. 1987) (age and sex discrimination claims barred where plaintiff

3  failed to include any allegations of age or sex discrimination).

4        Similarly, though it is unclear against which Defendants any cause of action is brought, Plaintiff

5  cannot assert claims against Defendants not named in her charges. *Cole v. Antelope Valley Union High*

6  *School Dist.* 47 Cal. App. 4th 1505, 1511 (1996) (plaintiff barred from suing individual defendants for

7  failure to name them in the DFEH charge); *Romain v. Kurek*, 772 F.2d 281, 283 (6th Cir. 1985) ("[A]

8  party not named in an EEOC charge may not be sued under title VII.")

9        Thus, to the extent the Court allows amendment, the Court should also limit any amended

10  complaint to causes of action properly exhausted.

11  **IV.   CONCLUSION**

12        For the foregoing reasons, Defendants respectfully request that their demurrer to Plaintiff's

13  Complaint be sustained without leave to amend.

14  DATED: November 22, 2016

    Respectfully submitted,

15      SEYFARTH SHAW LLP

17  By: _____
18      Kristina M. Launey
    Julie Yap
19      Bethany A. Vasquez
    Tiffany T. Tran
20      Attorneys for Defendants
    Kaiser Foundation Health Plan, Inc., Kaiser
21      Foundation Hospitals, and The Permanente
    Medical Group

5

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:      (916) 448-0159
6    Facsimile:      (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:      (415) 397-2823
10   Facsimile:      (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.;
12   KAISER FOUNDATION HOSPITALS, INC.; and THE
     PERMANENTE MEDICAL GROUP
13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                         COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                   **DECLARATION OF BETHANY A.
                                             VASQUEZ IN SUPPORT OF
20        v.                                 DEFENDANTS' DEMURRER TO
                                             PLAINTIFF'S COMPLAINT**
21   KAISER FOUNDATION HEALTH PLAN, INC.;
     KAISER FOUNDATION HOSPITALS, INC.; and  Hearing Date:    February 7, 2107
22   THE PERMANENTE MEDICAL GROUP; all       Time:            9:00 a.m.
     doing business as KAISER PERMANENTE     Dept.:           15
23   MEDICAL CARE PROGRAM,                   Judge:           Ioana Petrou

24              Defendants.
                                             Reservation number:  R-1802056
25

26

27

28

─────────────────────────────────────────────────────────────────────
VASQUEZ DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT
35898121v.1

ENDORSED
FILED
ALAMEDA COUNTY

NOV 2 2 2016

CLERK OF THE SUPERIOR COURT
By _____
      JAMIE THOMAS, Deputy

I, Bethany A. Vasquez, declare as follows:

1.      I have personal knowledge of the facts contained in this declaration, and if called as a witness, I could and would testify as to their accuracy.

2.      I am an attorney admitted to practice in the State of California and I am counsel in the law firm of Seyfarth Shaw LLP. I am one of the lawyers responsible for representing Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation Hospitals ("KFH") and The Permanente Medical Group ("TPMG") (collectively "Defendants").

3.      I make this declaration in support of Defendants' Demurrer to Plaintiff's Complaint.

4.      On October 6, 2016, Plaintiff Lunell Gamble ("Plaintiff") served Defendants with Plaintiff's Complaint.

5.      On October 26, 2016, I conferred with counsel for Plaintiff, Jeremy Friedman, pursuant to Code of Civil Procedure section 430.41 regarding the allegations set forth in Plaintiff's Complaint and Defendants' request that Plaintiff file an amended Complaint with additional clarity regarding the alleged cause or causes of action Plaintiff was pursuing in this litigation. I memorialized our conversation, via email correspondence, that same day. A true and correct copy of the October 26, 2016 email correspondence is attached hereto as **Exhibit A**.

6.      On October 28, 2016, Mr. Friedman requested, via email, further written correspondence regarding Defendants' bases for any demurrer. A true and correct copy of the October 26, 2016 email correspondence is attached hereto as **Exhibit B**.

7.      On November 2, 2016, I spoke with Mr. Friedman, and he agreed to grant Defendants an additional 15 (fifteen) days to file a responsive pleading. Defendants' responsive pleading is due November 22, 2016. Counsel confirmed this agreement via email that same day. A true and correct copy of the November 2, 2016 email correspondence is attached hereto as **Exhibit C**.

8.      On November 14, 2016, in response to his request, I sent Mr. Friedman an email informing him that that Defendants intended to file a demurrer to the Complaint on uncertainty grounds pursuant to Code of Civil Procedure 430.10(f). I also requested that Plaintiff amend her complaint to set forth, in separate causes of action, the alleged violations she seeks relief on and to identify, for each

1

1    cause of action, which Defendant(s) she alleges the cause of action against.  A true and correct copy of

2    the November 14, 2016 email correspondence is attached hereto as **Exhibit D**.

3          9.        Plaintiff's counsel responded to my email on November 16, 2016, and Mr. Friedman and

4    I met and conferred by telephone that same day.  Mr. Friedman stated that he was unwilling to amend

5    the Complaint, and I stated that Defendants would proceed with filing their demurrer.

6          Executed this 22nd day of November, 2016, at San Francisco, California.

7

8

9                                                    Bethany A. Vasquez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VASQUEZ DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT
35898121v.1

# EXHIBIT A

**Vasquez, Bethany A.**

| | |
|---|---|
| **From:** | Vasquez, Bethany A. |
| **Sent:** | Wednesday, October 26, 2016 4:35 PM |
| **To:** | Jeremy L. Friedman (jlfried@comcast.net) |
| **Cc:** | Launey, Kristina; Rowley, Christian; Yap, Julie G. |
| **Subject:** | Gamble v. Kaiser |

Jeremy -

As we discussed during our telephone conversation earlier this afternoon, my firm has been retained to represent Kaiser in the Gamble v. Kaiser Foundation health Plan, Inc. et al. matter pending in Alameda Superior Court (Case No. RG 16826717).

As I mentioned during our conversation, pursuant to Code of Civil Procedure section 430.10 et seq. Defendants would like to meet and confer regarding the allegations set forth in Plaintiff's Complaint.  It is unclear from the face of Plaintiff's Complaint whether Plaintiff is asserting a single cause of action under FEHA or if Plaintiff is alleging multiple violations of FEHA, and the specific bases for that cause, or causes, of action.  Defendants require clarification of Plaintiff's claims in order prepare their responsive pleading.

We look forward to your prompt response.

Best regards,

Bethany

# EXHIBIT B

**Vasquez, Bethany A.**

| | |
|---|---|
| **From:** | Jeremy Friedman <jlfried@comcast.net> |
| **Sent:** | Friday, October 28, 2016 10:23 AM |
| **To:** | Vasquez, Bethany A. |
| **Cc:** | Launey, Kristina; Rowley, Christian; Yap, Julie G.; Jeremy Friedman |
| **Subject:** | Re: Gamble v. Kaiser |

Hi Bethany

To clarify, in our telephone conversation, I asked if you could write to me about the basis for the meet and confer, including the bases for any demurrer. In your email, you do not present any bases for such a motion. Contrary to your assumption, the allegations in the complaint are clear and unambiguous. If you have any particular questions, or any statutory basis to object to the complaint, please provide that to me prior to our meet and confer.

I think I mentioned to you I am out of my office until Monday. I will be available next week to confer. Please provide me times on Tuesday and/or Wednesday, and I will confirm.

Thank you.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** "Bethany A. Vasquez" <BVasquez@seyfarth.com>
**To:** "Jeremy L. Friedman (jlfried@comcast.net)" <jlfried@comcast.net>
**Cc:** "Kristina Launey" <KLauney@seyfarth.com>, "Christian Rowley" <CRowley@seyfarth.com>, "Julie G. Yap" <JYap@seyfarth.com>
**Sent:** Wednesday, October 26, 2016 4:35:22 PM
**Subject:** Gamble v. Kaiser

Jeremy -

As we discussed during our telephone conversation earlier this afternoon, my firm has been retained to represent Kaiser in the Gamble v. Kaiser Foundation health Plan, Inc. et al. matter pending in Alameda Superior Court (Case No. RG 16826717).

As I mentioned during our conversation, pursuant to Code of Civil Procedure section 430.10 et seq. Defendants would like to meet and confer regarding the allegations set forth in Plaintiff's Complaint. It is unclear from the face of Plaintiff's Complaint whether Plaintiff is asserting a single cause of action under FEHA or if Plaintiff is alleging multiple violations of FEHA, and the specific bases for that cause, or causes, of action. Defendants require clarification of Plaintiff's claims in order prepare their responsive pleading.

We look forward to your prompt response.

Best regards,

Bethany

**Bethany A. Vasquez** | Seyfarth Shaw LLP
560 Mission Street | 31st Floor | San Francisco, California 94105-2930
Direct: +1-415-732-1153
bvasquez@seyfarth.com | www.seyfarth.com



The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

# EXHIBIT C

**Vasquez, Bethany A.**

| | |
|---|---|
| **From:** | Jeremy Friedman <jlfried@comcast.net> |
| **Sent:** | Wednesday, November 02, 2016 3:54 PM |
| **To:** | jlfried@comcast.net; Vasquez, Bethany A. |
| **Subject:** | RE: Gamble v. Kaiser |

Bethany, I confirm our agreement on additional time for the response.

Jeremy


Sent from XFINITY Connect Mobile App


-----Original Message-----

From: BVasquez@seyfarth.com
To: jlfried@comcast.net
Cc: CRowley@seyfarth.com,JYap@seyfarth.com,KLauney@seyfarth.com
Sent: 2016-11-02 3:36:50 PM
Subject: RE: Gamble v. Kaiser

Jeremy -

I write to confirm our agreement to continue to meet and confer to attempt to reach an agreement that would resolve our objections to the pleading and obviate the need for filing a demurrer.

I also write to confirm our stipulation pursuant to California Rule of Court 3.110(d) that Defendants have an additional 15 days to file and serve their responsive pleading. As such, Defendants' responsive pleading is now due on November 22, 2016. Thank you for your professional courtesy in this regard.

Please confirm receipt of this email.

Best regards,
Bethany


**Bethany A. Vasquez** | Seyfarth Shaw LLP
560 Mission Street | 31st Floor | San Francisco, California 94105-2930
Direct: +1-415-732-1153
bvasquez@seyfarth.com | www.seyfarth.com



The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

**From:** Jeremy Friedman [mailto:jlfried@comcast.net]
**Sent:** Friday, October 28, 2016 10:23 AM

**To:** Vasquez, Bethany A.
**Cc:** Launey, Kristina; Rowley, Christian; Yap, Julie G.; Jeremy Friedman
**Subject:** Re: Gamble v. Kaiser

Hi Bethany

To clarify, in our telephone conversation, I asked if you could write to me about the basis for the meet and confer, including the bases for any demurrer. In your email, you do not present any bases for such a motion.  Contrary to your assumption, the allegations in the complaint are clear and unambiguous.  If you have any particular questions, or any statutory basis to object to the complaint, please provide that to me prior to our meet and confer.

I think I mentioned to you I am out of my office until Monday.  I will be available next week to confer.  Please provide me times on Tuesday and/or Wednesday, and I will confirm.

Thank you.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** "Bethany A. Vasquez" <BVasquez@seyfarth.com>
**To:** "Jeremy L. Friedman (jlfried@comcast.net)" <jlfried@comcast.net>
**Cc:** "Kristina Launey" <KLauney@seyfarth.com>, "Christian Rowley" <CRowley@seyfarth.com>, "Julie G. Yap" <JYap@seyfarth.com>
**Sent:** Wednesday, October 26, 2016 4:35:22 PM
**Subject:** Gamble v. Kaiser

Jeremy -

As we discussed during our telephone conversation earlier this afternoon, my firm has been retained to represent Kaiser in the Gamble v. Kaiser Foundation health Plan, Inc. et al. matter pending in Alameda Superior Court (Case No. RG 16826717).

As I mentioned during our conversation, pursuant to Code of Civil Procedure section 430.10 et seq. Defendants would like to meet and confer regarding the allegations set forth in Plaintiff's Complaint.  It is unclear from the face of Plaintiff's Complaint whether Plaintiff is asserting a single cause of action under FEHA or if Plaintiff is alleging multiple violations of FEHA, and the specific bases for that cause, or causes, of action.  Defendants require clarification of Plaintiff's claims in order prepare their responsive pleading.

We look forward to your prompt response.

2

Best regards,

Bethany

**Bethany A. Vasquez** | Seyfarth Shaw LLP
560 Mission Street | 31st Floor | San Francisco, California 94105-2930
Direct: +1-415-732-1153
bvasquez@seyfarth.com | www.seyfarth.com



The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

# EXHIBIT D

**Vasquez, Bethany A.**

| | |
|---|---|
| **From:** | Vasquez, Bethany A. |
| **Sent:** | Monday, November 14, 2016 11:24 AM |
| **To:** | 'Jeremy Friedman' |
| **Cc:** | Yap, Julie G.; Launey, Kristina; Rowley, Christian |
| **Subject:** | RE: Gamble v. Kaiser |

Jeremy -

We write to further meet and confer pursuant to CCP § 430.41.

Defendants intend to specially demur to Plaintiff's Complaint on uncertainty grounds pursuant to CCP § 430.10(f). Rule of Court 2.112 requires that each cause of action be numbered separately and its nature stated (e.g., First Cause of Action for Discrimination). In addition, where there is more than one defendant (as there is in this case) the names of the defendants against whom the cause of action is asserted must appear (e.g., against all Defendants). Rule of Court 2.112. Plaintiff's Complaint falls short of this standard.

Plaintiff's Complaint asserts a single cause of action for "Violation of California Government Code 12940." Plaintiff's Complaint is uncertain with regard to which of the Defendants against whom Plaintiff asserts this claim. Moreover, the single cause of action is uncertain and ambiguous with respect to whether it is asserted as a discrimination claim or a retaliation claim, and upon which of the various protected classifications (age, gender or race) it is asserted.

A demurrer for uncertainty will lie if the failure to label the parties and claims renders the complaint so confusing defendant cannot tell what he or she is supposed to respond. *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 139 (1986); *Khoury v. Maly's of Calif., Inc.*, 14 Cal. App. 4th 612, 616 (1993). Moreover, "[p]leadings which jumble together several distinct 'causes of action' may be subject to demurrer for uncertainty." Cal. Practice Guide: Cal. Civ. Proc. Before Trial (2016) Ch. 6-B, § 6:104. Such a demurrer will be sustained when a defendant cannot reasonably determine what he is required to respond to, as when a plaintiff joins multiple causes of action as one, or fails to properly identify each cause of action. Justice Eileen C. Moore, Michael Paul Thomas, Esq., California Civil Practice § 9.4 (2004); *Williams*, 185 Cal. App. 3d at 139.

The uncertainty in the Complaint requires Defendants to guess what specific violations of the FEHA Plaintiff alleges Defendants (and which of the various Defendants) have violated. It is also unclear if Plaintiff is asserting violations based on any other statute, common law, or code section. For example, if Plaintiff is seeking to assert a cause of action for retaliation in violation of the FEHA and a cause of action for discrimination in violation of the FEHA, each of those causes of action should be asserted separately. Similarly, if Plaintiff is seeking to assert a cause of action for discrimination on the basis of age in violation of the FEHA and discrimination on the basis of gender in violation of the FEHA, each of those causes of action should be asserted separately. As currently drafted, Defendants cannot determine what violations or causes of action Plaintiff is seeking to press through the single cause of action asserted in the Complaint.

In light of the uncertainty of Plaintiff's Complaint, Defendants cannot reasonably determine how to respond. Defendants request that Plaintiff amend her Complaint to set forth, in separate causes of

action, the alleged violations she seeks relief on and to identify, for each cause of action, which Defendant(s) she alleges the cause of action against.

Best regards,
Bethany

---

**From:** Jeremy Friedman [mailto:jlfried@comcast.net]
**Sent:** Friday, October 28, 2016 10:23 AM
**To:** Vasquez, Bethany A.
**Cc:** Launey, Kristina; Rowley, Christian; Yap, Julie G.; Jeremy Friedman
**Subject:** Re: Gamble v. Kaiser

Hi Bethany

To clarify, in our telephone conversation, I asked if you could write to me about the basis for the meet and confer, including the bases for any demurrer. In your email, you do not present any bases for such a motion. Contrary to your assumption, the allegations in the complaint are clear and unambiguous. If you have any particular questions, or any statutory basis to object to the complaint, please provide that to me prior to our meet and confer.

I think I mentioned to you I am out of my office until Monday. I will be available next week to confer. Please provide me times on Tuesday and/or Wednesday, and I will confirm.

Thank you.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** "Bethany A. Vasquez" <BVasquez@seyfarth.com>
**To:** "Jeremy L. Friedman (jlfried@comcast.net)" <jlfried@comcast.net>
**Cc:** "Kristina Launey" <KLauney@seyfarth.com>, "Christian Rowley" <CRowley@seyfarth.com>, "Julie G. Yap" <JYap@seyfarth.com>
**Sent:** Wednesday, October 26, 2016 4:35:22 PM
**Subject:** Gamble v. Kaiser

Jeremy -

As we discussed during our telephone conversation earlier this afternoon, my firm has been retained to represent Kaiser in the Gamble v. Kaiser Foundation health Plan, Inc. et al. matter pending in Alameda Superior Court (Case No. RG 16826717).

As I mentioned during our conversation, pursuant to Code of Civil Procedure section 430.10 et seq. Defendants would like to meet and confer regarding the allegations set forth in Plaintiff's Complaint. It is unclear from the face of Plaintiff's Complaint whether Plaintiff is asserting a single cause of action under FEHA or if Plaintiff is alleging multiple violations of FEHA, and the specific bases for that cause, or causes, of action. Defendants require clarification of Plaintiff's claims in order prepare their responsive pleading.

We look forward to your prompt response.

Best regards,

Bethany

**Bethany A. Vasquez** | Seyfarth Shaw LLP
560 Mission Street | 31st Floor | San Francisco, California 94105-2930
Direct: +1-415-732-1153
bvasquez@seyfarth.com | www.seyfarth.com



The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:    (916) 448-0159
6    Facsimile:    (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:    (415) 397-2823
10   Facsimile:    (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.;
12   KAISER FOUNDATION HOSPITALS; and THE
     PERMANENTE MEDICAL GROUP
13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                         COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                   **REQUEST FOR JUDICIAL NOTICE IN
                                             SUPPORT OF DEFENDANTS'
20        v.                                 DEMURRER TO PLAINTIFF'S
                                             COMPLAINT**
21   KAISER FOUNDATION HEALTH PLAN, INC.;
     KAISER FOUNDATION HOSPITALS, INC.; and   Hearing Date:   February 7, 2017
22   THE PERMANENTE MEDICAL GROUP; all       Time:           9:00 a.m.
     doing business as KAISER PERMANENTE     Dept.:          15
23   MEDICAL CARE PROGRAM,                   Judge:          Ioana Petrou

24              Defendants.
                                             Reservation number:  R-1802056
25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' DEMURRER TO COMPLAINT
35968940v.1

ENDORSED
FILED
ALAMEDA COUNTY

NOV 2 2 2016

CLERK OF THE SUPERIOR COURT
By _____
        JAMIE THOMAS, Deputy

Pursuant to California Evidence Code sections 452 and 453, and California Rules of Court 3.1113(l) and 3.1306(c), Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation Hospitals ("KFH"), and The Permanente Medical Group ("TPMG") (collectively "Defendants"), respectfully request that this Court take notice of the following documents in support of Defendants' Demurrer to Plaintiff's Complaint:

1.    A copy of documents provided by the EEOC including the November 8, 2014, "Notice of Filing of Discrimination Complaint - Response Requested, DFEH Number 340711-121071, EEOC Number 37A-2015-00305-C," and accompanying "EEOC Notice of Charge of Discrimination in Jurisdictions Where an FEP Agency Will Initially Process."

DATED: November 22, 2016

Respectfully submitted,

SEYFARTH SHAW LLP

By: _____
Kristina M. Launey
Julie Yap
Tiffany T. Tran
Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN,
INC.; KAISER FOUNDATION
HOSPITALS; and THE PERMANENTE
MEDICAL GROUP

2

35968940v.1



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                ACTING DIRECTOR ANNMARIE BILLOTTI
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 08, 2014

Kaiser National HRSC Health and Welfare Department
1451 Harbor Bay Pkwy
Alameda, CA 94502

**Respondent:**
Kaiser National HRSC Health and Welfare Department

RE:    **Notice of Filing of Discrimination Complaint - Response Requested**
DFEH Number: 340711-121071
EEOC Number: 37A-2015-00305-C
Gamble / Kaiser National HRSC Health And Welfare Dept

To All Listed Respondents:

Enclosed is a copy of a complaint filed with the Department of Fair Employment and Housing (DFEH). The enclosed complaint, in which you have been named a Respondent or Co-Respondent, alleges unlawful discrimination pursuant to Government Code section 12960.

The DFEH serves as a neutral fact-finder and represents the state of California rather than the complaining party. The merits of this complaint have not been determined. It was, however, subjected to a screening process, and the allegations, if proven, could support a finding of discrimination.

Government Code Section 12940, subdivision (f) or 12955 (f), prohibits any retaliatory action against a person because he or she has filed a complaint, has opposed any practices forbidden under the Fair Employment and Housing Act, or has assisted in any proceeding before the DFEH.

California Government Code section 12946 requires that all employment records (or union membership and referral records) be retained for a minimum of two (2) years. When a discrimination complaint has been served, the records must be kept until the DFEH closes its inquiry and until any resulting law suit or appeal has been terminated.

This complaint has also been filed with the U. S. Equal Employment Opportunity Commission (EEOC). You need not reply to EEOC unless that agency specifically requests a response.

**You must submit a response to the questions below and on the attached supplemental sheet <u>within thirty (30) days</u> of the date of this letter.**

1. State the legal name of your business and any other name(s) under which you do or have done business in California.

2. State your business address. Please note that you are required to notify the DFEH in writing

of any change of address and the effective date of such change while the complaint is under investigation and throughout any administrative adjudication. (California Code of Regulations, title 2, sections 7403 and 7411).

3. State type of legal business entity (i.e., corporation, partnership, limited partnership, sole proprietorship, etc.).

4. Does your company have a current contract(s) for the provisions of goods, services or public works with the State of California or receive federal funds? If so, name the awarding agency.

5. Please respond to the Supplement Question attached.

Your response can be submitted by mail. In all mailed correspondence, please include your DFEH number **340711-121071** and mail it to DFEH, 2218 Kausen Drive, Suite 100, Elk Grove, CA 95758.

If you are interested in discussing a possible settlement of this complaint, please contact me immediately. This will avoid unnecessary delay and limit any potential liability. All settlement discussions are confidential, and not subject to disclosure. All discussions referring to evidence or information which has a bearing on determining the merits of this complaint will not be considered part of a settlement discussion unless confidentiality is acknowledged by the DFEH. If a settlement is reached which is mutually acceptable to the parties, submission of the requested information may not be necessary.

If you have any questions, please contact me.

Sincerely,

Cathy Ray
Consultant II
213.337.4479
Enclosure
CERTIFIED MAIL: 7014015000063211852

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | PERSON FILING CHARGE<br>Lunell Gamble |
|---|---|
|  | THIS PERSON (CHECK ONE)<br>__X__  Claims to be aggrieved<br>___  Is filing on behalf of other person(s) |
| Lunell Gamble<br>vs.<br>Kaiser National HRSC Health And Welfare Dept | DATE OF ALLEGED VIOLATION<br><span style="font-size:small">Earliest        Most Recent</span><br>Oct 11, 2012  Jul 18, 2014 |
|  | PLACE OF ALLEGED VIOLATION<br>California, County of |
|  | EEOC CHARGE NUMBER<br>37A-2015-00305-C |
|  | FEPA CHARGE NUMBER (if known)<br>340711-121071 |

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTIONS WHERE AN FEP AGENCY WILL INITIALLY PROCESS
*(See EEOC "Rules and Regulations" for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

x    Title VII of the Civil Rights Act of 1964

x    The Age Discrimination in Employment Act of 1967 (ADEA)

☐    The Americans with Disabilities Act of 1990 (ADA)

HAS BEEN RECEIVED BY

☐    The EEOC and sent for initial processing to _____
                                                                            (FEP Agency)

☒    The <u>CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING</u> and sent to the EEOC for dual filing purposes.

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true. ı

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

☒    As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provision of Title VII and the ADEA as explained on the reverse side of this form apply.

For further correspondence on this matter, please use the charge number(s) shown.

☐    An Equal Pay Act investigation (29 U.S.C. 209(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

☒    Enclosure: Copy of the Charge

### BASIS OF DISCRIMINATION:

x  RACE        ☐ COLOR      ☐ SEX      ☐ RELIGION      ☐ NATIONAL ORIGIN      x AGE      ☐ OTHER

☐ DISABILITY      ☐ RETALIATION

### CIRCUMSTANCES OF ALLEGED VIOLATION:
See attached complaint.

| DATE<br>November 08, 2014 | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL<br>Michael Baldonado | SIGNATURE<br>*Michael Baldonado* |
|---|---|---|

EEOC FORM 131-A

# INFORMATION SHEET ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 EEOC's Procedural Regulations provides that persons charged with employment discrimination, such as yourself, may submit a statement of position or evidence with respect to the allegations contained in this charge.

The Commission's Recordkeeping and Reporting Requirements are set forth in Title 29, Code of Federal Regulations (CFR), Part 1602 (see particularly Section 1602.14 below) for the Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge (for ADEA charges, this notice constitutes the written request set out in Part 1627 for respondents to preserve records relevant to the charge -- the records to be retained are as described in Section 1602.14, as cited below, and should be kept for the periods described in that section). Parts 1602, 1620 and 1627 also prescribe record retention periods -- generally, three years for basic payroll records and one year for personnel records. Questions regarding retention periods and the types of records to be retained should be resolved by reference to the regulations.

Section 1602.14 Preservation of records made or kept . . . Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the employer shall preserve all personnel records relevant to the charge or the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of "final disposition of the charge or the action" means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court, or where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation was terminated.

## NOTICE OF NON-RETALIATION REQUIREMENT

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it shall be an unlawful employment practice for an employer to discriminate against any of his/her employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because s/he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title. The Equal Pay Act of 1963 contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with any person because s/he has exercised or enjoyed, or aided or encouraged others in their exercise of employment, or rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING PRESENTATION BY ATTORNEYS

Although it is not necessary that you be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you are represented by an attorney we request that you provide the Commission with your attorney's name, address, and telephone number, and that you ask your attorney to write to the Commission confirming such representation.

Reverse side of EEOC Form 131/131-A (Test 10/94)

Termination:

1. State the reason(s) complainant was terminated.

2. List the names of all persons involved in making the specific decisions to which the complainant objects. State each person's job title and responsibility as it relates to the issues raised by the complainant.

3. Provide all documentation to support your reasons for the termination, i.e., counseling notices, written reprimands, attendance records, etc.

4. Provide a copy of the policy which governed complainant's termination.

5. Provide a copy of any written notice(s) to complainant regarding the termination and explain how the policy was applied to the complainant.

6. List the names of all person(s) involved in the decision to terminate complainant. State each person's job title, race and age and responsibility as it relates to the decision to terminate complainant.

7. Describe your company's practices regarding discipline and dismissal of employees in complainant's classification and work unit, including a description of the disciplinary steps required prior to termination for cause. Provide copies of any written policies.

8. State how this policy was applied to complainant.

9. Provide a copy of the job description for complainant. If no written description exists describe the duties and responsibilities.

10. List all employees, including the complainant, who were supervised by the same person supervising complainant during the past two years. Identify each person's race and age, job classification and provide the current home address, telephone      (protected class) number and work number. Provide copies of any reprimands, counseling notices and evaluations for each employee for the past two years. If evaluations are not available, provide a statement with copies of substantiating documentation, describing how well each person performed his/her duties.

11. Identify which of these employees were discharged for the same or equally serious reason as the complainant. Provide supporting documentation.

12. Explain how the policy governing termination was applied to these employees and provide supporting documentation.

13. List the names of all employees who were discharged by the same decision maker(s) who terminated complainant during the past two years. For each, state _ race and age, job classification, date of hire date and reason for termination. Include supporting documenting such as termination notice, reprimands, attendance records, etc.

14. Provide the name, race and age, job classification, date of hire and salary of Complainant's replacement.

15. Complainant asserts that Dian Mendez_ committed the same or similar work infractions to those of the complainant but he/she/they was/were not similarly terminated. Please respond to these allegations and provide documentation which supports your position.

16. List (by name) all employees who filed an internal or external complaint of discrimination the past three years and copy of each employee's complaint. For each employee listed provide their starting and ending dates of employment. If employee was terminated, state reasons for termination and date of termination.

17. Provide a copy of all warnings, reprimands, counseling issued to the complainant and all (similarly situated employee/s) for the past 3 years.

18. Provide copies of the performance reviews for the complainant and all (similarly situated employees/s) for the past two (2) years.

1   SEYFARTH SHAW LLP
    Kristina M. Launey (SBN 221335)
2   klauney@seyfarth.com
    Julie Yap (SBN 243450)
3   jyap@seyfarth.com
    Tiffany T. Tran (SBN 294213)
4   ttran@seyfarth.com
    400 Capitol Mall, Suite 2350
5   Sacramento, California 95814-4428
    Telephone:    (916) 448-0159
6   Facsimile:     (916) 558-4839

7   SEYFARTH SHAW LLP
    Bethany A. Vasquez (SBN 209423)
8   bvasquez@seyfarth.com
    560 Mission Street, 31st Floor
9   San Francisco, CA 94105-2930
    Telephone:    (415) 397-2823
10  Facsimile:     (415) 397-8549

11  Attorneys for Defendants
    KAISER FOUNDATION HEALTH PLAN, INC.;
12  KAISER FOUNDATION HOSPITALS; and THE
    PERMANENTE MEDICAL GROUP

13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        COUNTY OF ALAMEDA

17

18  LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                  **[PROPOSED] ORDER SUSTAINING
                                            DEFENDANTS' DEMURRER TO
20         v.                               PLAINTIFF'S COMPLAINT**

21  KAISER FOUNDATION HEALTH PLAN, INC.;
    KAISER FOUNDATION HOSPITALS, INC.; and
22  THE PERMANENTE MEDICAL GROUP; all       Reservation number:  R-1802056
    doing business as KAISER PERMANENTE
23  MEDICAL CARE PROGRAM,

24              Defendants.

25

26

27

28

    [PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT
    35969547v.1

1       The Demurrer of Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation

2   Hospitals ("KFH"), and The Permanente Medical Group ("TPMG") (collectively "Defendants") to

3   Plaintiff's Complaint came on for hearing on February 7, 2017, at 9:00 a.m., before this Court in

4   Department 15.  After full consideration of the Parties' motion and opposition papers and the matters

5   presented by counsel, and good cause appearing therefore:

6       IT IS HEREBY ORDERED that the Court sustains the Demurrer on all causes of action against

7   Defendants on the grounds that the Complaint is uncertain .  The Court therefore dismisses the

8   Complaint with prejudice.

9

10

11       IT IS SO ORDERED.

12

13   Dated: _____   _____

14                              Honorable Ioana Petrou
                           JUDGE OF THE SUPERIOR COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT

35969547v.1

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:    (916) 448-0159
6    Facsimile:    (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:    (415) 397-2823
10   Facsimile:    (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.;
12   KAISER FOUNDATION HOSPITALS; and THE
     PERMANENTE MEDICAL GROUP

13

14

15                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                                COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                          Case No. RG16826717

19               Plaintiff,                  PROOF OF SERVICE RE DEFENDANTS'
                                             DEMURRER TO PLAINTIFF'S
20          v.                               COMPLAINT

21   KAISER FOUNDATION HEALTH PLAN, INC.;    Hearing Date:    February 7, 2017
     KAISER FOUNDATION HOSPITALS, INC.; and  Time:            9:00 a.m.
22   THE PERMANENTE MEDICAL GROUP; all       Dept.:           15
     doing business as KAISER PERMANENTE     Judge:           Ioana Petrou
23   MEDICAL CARE PROGRAM,

24               Defendants.                 Reservation number:  R-1802056

25

26

27

28

ENDORSED
FILED
ALAMEDA COUNTY

NOV 2 2 2016

CLERK OF THE SUPERIOR COURT
By _____
    JAMIE THOMAS, Deputy

_____
              PROOF OF SERVICE RE DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT
35968940v.1

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California 94105. On November 22, 2016, I served the within document(s):

**DEFENDANTS' NOTICE OF DEMURRER TO PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**DECLARATION OF BETHANY A. VASQUEZ IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT'**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT**

**[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT**

**PROOF OF SERVICE RE DEFENDANT'S DEMURRER TO PLAINTIFF'S COMPLAINT**

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☐ by placing the document(s) listed above in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

☐ electronically by using the Court's ECF/CM System.

Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on November 22, 2016, at San Francisco, California.

_____
Lisa Rivers

PROOF OF SERVICE

26899555v.1

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                                    Honorable   Ioana Petrou                    , Judge

Cause called for Case Management Conference on January 23, 2017.

Prior to the hearing, the Court issued a Tentative Case Management Order.  The parties did not contest the tentative order, and it is affirmed as set forth below.

ORDER re: CASE MANAGEMENT

FURTHER CONFERENCE

The Case Management Conference currently scheduled for 01/23/2017 is VACATED and continued to 03/17/2017 at 09:30 AM in Dept. 15 given the demurrer hearings scheduled for February 7, 2017.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council Form CM-110, must be filed no later than 03/02/2017. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to self-represented parties of record by mail.

Minutes of     01/23/2017
Entered on     01/23/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By     *Tom B Williams*
Digital

Deputy Clerk

**Minutes**

M11112098

Attorney at Law                              Kaiser Foundation Health Plan, Inc
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602_____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>               Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Kaiser Foundation Health Plan, Inc<br>           Defendant/Respondent(s)<br>       (Abbreviated Title) | No. <u>RG16826717</u><br><br>Case Management Order<br><br>Complaint - Other Employment |

ORDER re: CASE MANAGEMENT

FURTHER CONFERENCE

The Case Management Conference currently scheduled for 01/23/2017 is VACATED and continued to 03/17/2017 at 09:30 AM in Dept. 15 given the demurrer hearings scheduled for February 7, 2017.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council Form CM-110, must be filed no later than 03/02/2017. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to self-represented parties of record by mail.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

Dated:  01/23/2017

facsimile

_____
Judge Ioana Petrou

---

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Case Management Conference Order of 01/23/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 01/26/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

**FILED**
ALAMEDA COUNTY

JAN 25 2017

CLERK OF THE SUPERIOR COURT
By_____ Deputy
Tania Pierce

6
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                           COUNTY OF ALAMEDA
8

9  LUNELL GAMBLE                          )    Case No. RG16826717
                                          )
10       Plaintiff                        )    **OPPOSITION TO DEMURRER**
                                          )
11 vs.                                    )
                                          )
12 KAISER FOUNDATION HEALTH               )
   PLAN, INC; KAISER FOUNDATION           )    Date: February 7, 2017
13 HOSPITALS, INC.; and THE               )    Time: 9:00 a.m.
   PERMANENTE MEDICAL GROUP;              )    Dept: 15
14 all doing business as KAISER           )
   PERMANENTE MEDICAL CARE                )
15 PROGRAM                                )
                                          )
16       Defendants                       )
   _____       )

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  FACTUAL ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5      I. The Complaint is Not Uncertain, Especially in Light of the 1973 Code

6          Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7      II. Defendant Misrepresents Plaintiff's Charge Filed with DFEH . . . . . . . . . . . . . . 10

8  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9  PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Cases

3

*Adelman v. Associated Int'l Ins. Co.* (2001) 90 CA4th 352 . . . . . . . . . . . . . . . . . . . . . . . . . 8

4

*Aubry v. Tri-City Hosp. Dist.* (1992) 2 Cal.4th 962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5

*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861  . . . . . . . . . . . . . . 7

6

*Garris v. Mitchell* (1935) 7 Cal. App.2d 430   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

*Kaplan v. International Alliance of Theatrical and Stage Employees* (9th Cir. 1975)
525 F.2d 1354   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8

*Keiffer v. Bechtel Corp.* (1998) 65 Cal.App.4th 893  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9

*Khoury v. Maly's of Calif., Inc.* (1993) 14 Cal. App. 4th 612  . . . . . . . . . . . . . . . . . . . . . . 8

10

*Lewin v. Merck & Co.* (1962) 209 Cal. App.2d 131   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11

*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 . . . . . . . . . . . . . . . . . . . . . . . 11

12

*Price v. Briggs* (1958) 160 Cal. App. 2d 524   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

*Quelimane Co., Inc. v. Stewart Title Guar. Co.* (1998) 19 Cal.4th 26   . . . . . . . . . . . . . . . 8

14

*Sanchez v. Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455 . . . . . . . . . . . . . . . . . 10, 11

15

*Sandhu v. Lockheed Missiles and Space Co.* (1994) 26 Cal.App.4th 846 . . . . . . . . . . . 10, 11

16

*Serrano v. Priest* (1971) 5 Cal.3d 584 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17

*Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992 . . . . . . . . . . . . . . . . . . . . . . 8

18

*Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal. App. 3d 135 . . . . . . . . . . . . . . . . . . 8

19

Statutes

20

21

Code of Civil Procedure §425.20  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

22

Code of Civil Procedure §430.10(f)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

23

24

25

26

27

28

**INTRODUCTION**

1

2      This is an action for employment discrimination against Kaiser Permanente, arising

3 out of a pattern and practice of race discrimination against African American employees.

4 Plaintiff Lunell Gamble is an African American woman employed at Kaiser for more than

5 16 years. Despite an exemplary record in Kaiser's Human Resources Services Center

6 (HRSC), during her employment Ms. Gamble was subject to systemic discrimination and

7 retaliation due to her race and age, including a hostile work environment and retaliatory

8 actions taken by her supervisors.  After reaching the level of HR Specialist III in the Health

9 and Welfare Department, without a single prior incident of disciplinary action taken against

10 her, Ms. Gamble was wrongfully terminated by Kaiser in July 2014.

11      Kaiser raises two grounds for its demurrer, neither one based in fact or law. In both

12 instances, Kaiser's attorneys purposely misstate the nature and support for its claims.  First,

13 Kaiser argues the complaint is "uncertain," because Ms. Gamble, allegedly, combines

14 different claims against different defendants in her single cause of action. Following on the

15 heels of a class race discrimination action against Kaiser (Hill et al. v. Kaiser Foundation

16 Health Plan, Case No. 3:10-cv-2833 LB, Northern District of California), however, plaintiff

17 alleges with great particularity the facts of Kaiser's "pattern and practice" discrimination

18 against African-American employees, as well as the circumstances of Ms. Gamble's

19 exposure to that discrimination. She also alleges that all three Kaiser entities acted as one

20 business, with a centralized predominately non-African American  management, that too

21 often denies training and positive performance reviews to African-American employees,

22 and disproportionately subjects them to discipline and termination.

23      Further, Kaiser's argument is frivolous in light of the 1973 amendment to CCP

24 §425.20.  That amendment removed the requirement that plaintiff plead separate causes of

25 action for each theory presented in the lawsuit.  Kaiser's attorneys' citation to pre-1973 law

26 to support its arguments – without mention of the code change – is therefore blatantly

27 misleading.  Moreover, Ms. Gamble's claims arise from a common nucleus of facts, and

28 therefore even under pre-1973 law separate causes of action would not be required.

1       Second, Kaiser argues plaintiff failed to exhaust administrative remedies.  In

2   particular, Kaiser asserts that Ms. Gamble – in her DFEH charge – failed to allege hostile

3   work environment, retaliation and discrimination on the basis of gender.  In making this

4   argument, defense counsel ask for judicial notice of a select portion of files from DFEH,

5   including a notice that was sent to Kaiser along with the administrative charge, and the

6   pages that follow the notice and charge with instructions to the complaining party.

7   Curiously, in making this argument to the Court, Kaiser omitted the actual DFEH charge

8   signed and filed by Ms. Gamble.  This document – perhaps the only relevant document in

9   the DFEH file – demonstrates that Ms. Gamble clearly raised her claims of harassment and

10  retaliation.  Kaiser's shameless misrepresentation of the record is inexcusable.

11      Moreover, Kaiser misstates plaintiff's claim with respect to "gender" discrimination.

12  A plain reading of Ms. Gamble's complaint makes clear that Kaiser's discrimination against

13  African-Americans, as a class, included discrimination against African-American women,

14  as a subclass.  Plaintiff's race-gender claims – a subset of Kaiser's discrimination on the

15  basis of race – were clearly within the scope of the DFEH investigation.  Under the rules for

16  exhaustion of DFEH administrative remedies, there is no basis to bar that claim.

17                           **FACTUAL ALLEGATIONS**

18      Plaintiff Lunell Gamble is an African American woman over the age of 40, residing

19  in California. She was employed at Kaiser Permanente from for more than 16 years, until

20  her termination in July 2014.  Ms. Gamble worked initially as a temporary employee in the

21  Human Resources department (then known as "Peoples Solutions"), and began permanent

22  employment in July 1998 in that department.  Complaint, ¶4.

23      Like many other African American employees at Kaiser, Ms. Gamble performed her

24  work according to the employer's needs, she was well qualified and she tried to improve her

25  employment position over the years (¶18).  By the time of her termination, she had achieved

26  the position of HR Specialist III, in the Benefits Department (the Health and Welfare

27  Department) of what had been renamed the HRSC.  In July 2012, Kaiser reorganized its

28  Benefits Department, assigning plaintiff a new supervisor, Rosa Grajeda (¶19)

1    From the beginning of her long tenure at Kaiser, and until her termination, Ms.

2  Gamble did not receive any warnings or disciplinary actions related to her exemplary

3  employment.  Despite her qualifications and excellent work performance, Ms. Gamble was

4  subject to the pattern and practice of discrimination, based upon her race and age, as

5  described in detail in ¶20 of the complaint:

6    a.    Ms. Gamble was one of the few African Americans to remain employed in
          the department, as other African American employees in that department, in
7          Human Resources and throughout Kaiser were terminated for
          discriminatory reasons or forced to quit from dead-end positions at Kaiser.
8          Ms. Gamble witnessed their replacement with younger, non-African
          American employees who were equally or less qualified to perform the
9          work.

10   b.    Despite a pool of African American employees qualified for supervisory
          and management positions, Ms. Gamble was subject to an employment
11         hierarchy that was seemingly devoid of older, African American employees
          at the higher levels.  During her employment in Kaiser's Human Resources
12         department, Kaiser employed no African American directors in that
          department, and few African Americans were given "lead" positions.
13
     c.    After the departmental reorganization, Ms. Gamble was subject to constant
14         harassment and unreasonable scrutiny by her manager, Ms. Grajeda.  In
          October 2012, Ms. Grajeda followed plaintiff into the department's
15         bathroom, and criticized plaintiff for not working as she spoke through the
          curtain in the vanity area.  Plaintiff became both fearful of the manager, and
16         appalled at her conduct, causing plaintiff to avoid using the department's
          bathroom from that point forward.  Plaintiff complained to senior
17         management, but no apology was made or corrective action taken.

18   d.    In approximately February 2013, plaintiff was subject to ridicule and
          embarrassment by Ms. Grajeda, who falsely accused plaintiff of receiving
19         complaints from the entire department over her perfume.  After offering to
          communicate with her department over the matter, Ms. Grajeda admitted it
20         was only she that had complained.

21   e.    In Approximately March 2014, plaintiff was singled out from non-African
          American employees and loudly scolded for laughing at work.  This was
22         done openly to embarrass plaintiff in front of co-workers.  Even though
          Kaiser officially recognizes laughter as a part of its medical focus, and even
23         though other, non-African American employees are seen laughing, plaintiff
          was criticized and made to feel inferior.  Plaintiff was so upset by this
24         incident that she was required to leave her manager by the desk, and she
          was later called into the manager's office for further criticism.
25
     f.    Constant harassment and false criticism of work performance continued on
26         a nearly daily basis.  Ms. Grajeda lacked the knowledge and experience
          working in the Benefits department – knowledge and experience that
27         plaintiff had gained.  And yet, in managing plaintiff's work performance,
          the lack of understanding by the manager led to empty, false criticisms of
28         the work.

g.   Throughout this period, Ms. Grajeda treated plaintiff and other older African American employees with disparate treatment, including refused to assign work to plaintiff commensurate with plaintiff's knowledge and skill levels, criticisms of work by African American employees that were not made against the same or even less quality work by younger, non-African Americans, and overlooking transgressions or mistakes by younger, non-African American employees.

On July 18, 2014, plaintiff was given a "final written warning" threatening her with termination, even though she had not received a prior written warning or any of the progressive discipline Kaiser requires. Included in the written warning were false claims regarding Ms. Gamble's work performance, including false accusations plaintiff had "falsified" work records, and had acted with hostile aggression towards Ms. Grajeda. Each claim was mere pretext for Kaiser's discrimination against older, African Americans (¶21).

Kaiser had already determined to terminate plaintiff's employment. Following the final written warning, Ms. Gamble attempted to perform her work and meet with senior management over her discipline. Rather than providing an honest opportunity to perform the work, Kaiser set her up for termination, which occurred on July 29, 2014 (¶22).

Kaiser terminated Ms. Gamble's employment pursuant to a larger pattern and practice of systemic discrimination at Kaiser. As alleged in the complaint, Kaiser maintains a unique business and organization structure, with regional oversight by a single executive management hierarchy. Within each division, Kaiser has departmental hierarchies of similar nature and structure. Kaiser maintains uniform employment and personnel policies, with centralized human resources – where Ms. Gamble worked – as well as general counsel, payroll services, and labor and other employment data (¶12).

Within each department, the employer has its own unique procedures, information systems and business technologies requiring specialized training and adaptive capabilities. Employees are told they need establish in their work performances that they are trained in and proficient with those unique processes in order to be retained and/or promoted. Access to that training uniformly depends upon the discretion of divisional management, however, including influence and decision-making at the supervisory and team management levels. Similarly, performance reviews, job classification decisions, pay and salary structure

1 changes, and disciplinary actions all depend upon the discretion of that same divisional

2 management. Few objective requirements or measurements are used for employment

3 decisions, which are largely based on subjective judgments (¶13).

4       Kaiser's executive and divisional management positions are filled predominately by

5 neither African-American nor African-American women. African-Americans and African-

6 American women are rarely promoted to supervisory or management positions capable of

7 influencing a significant proportion of the employer's decision-making. As a result,

8 important employment decisions are made and influenced principally by non-African-

9 Americans.  Subjective judgments of Kaiser' stratified supervisory and management system

10 are often infected with conscious or unconscious prejudices and race and/or race-gender

11 based stereotypes, which explains why so few African-American and African-American

12 women out of Kaiser's large African-American and African-American female employee

13 population advance to supervisory and management positions (¶14).

14 This pattern of unequal training, assignments, classifications, pay, discipline and
advancement opportunities is not the result of random or non-discriminatory

15 factors. Rather, it is the result of an on-going and continuous pattern and practice
of intentional race and race-gender discrimination in training, assignments,

16 classifications, pay, discipline, performance reviews, terminations and promotions,
and reliance on policies and practices that have an adverse impact on African-

17 American and African-American female employees that cannot be justified by
business necessity, and for which alternative policies and practices with less

18 discriminatory impact could be utilized that equally serve any asserted
justification. Plaintiff is informed and believes that such policies and practices

19 include, without limitation:

20   a.     Failure to consistently train African-American and African-American
women in the unique Kaiser processes and practices necessary for desirable

21         assignments and advancement.

22   b.     Reliance upon vague, arbitrary and subjective criteria utilized by a nearly
non-African-American managerial workforce in making assignments,

23         training, pay, performance review, discipline, promotion and termination
decisions. Even where Kaiser's policy states objective requirements, these

24         requirements are often applied in an inconsistent manner and ignored at the
discretion of management.

25

26   c.     Reliance on race and race-gender stereotypes in making employment
decisions such as assignments, promotions, pay and training.

27   d.     Pre-selection and "grooming" of non-African-American and non-African-
American women employees for advancement, favorable assignments and

28         training.

e.    Maintenance of largely race and race-gender segregated job categories and departments.

f.    Deterrence and discouragement of African-American and African-American female employees from seeking advancement, training, and favorable assignments and pay.

g.    Giving African-American and African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and non-African-American women employees.

h.    Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and African-American women employees, in disproportion to the same actions taken against non-African-American employees.

i.    Providing less training and support to African-American and African-American female employees and managers than that given to non-African-American employees and managers.

j.    Providing less or refusing to make reasonable accommodations for disabilities and sick leave policies with respect to African-American and African-American female employees, and unlawfully discriminating against African-American-employees due to their disabilities because of both their disabilities and their race and/or race-gender.

k.    Harassing African-American and African-American female employees interested in advancement and subjecting them to a hostile work environment.

l.    Maintaining and fostering a reputation for discriminatory conduct which deters African-Americans and African-American females from pursuing promotional opportunities with Kaiser;

m.    Establishing and maintaining arbitrary and subjective requirements for discipline and promotions which have the effect of excluding qualified African-Americans and African-American females and which have not been shown to have any significant relationship to job performance or to be necessary to the safe and efficient conduct of Kaiser's business;

n.    Failing and refusing to take adequate steps to eliminate the effects of its past discriminatory practices; and

o.    Retaliating against African-American and African-American women employees who complain of unequal treatment. [¶15.]

Kaiser's racially stratified workforce and discriminatory practices are propagated, entrenched and protected by centralized policies directed at the highest levels of management. Although Kaiser operates many different departments, it has centralized, company-wide policies and practices concerning supervisory training, human resources,

1  EEO reporting and compliance and Kaiser's response to EEO complaints. In ¶16(a)-(l),

2  plaintiff details several company-wide policies and practices through which Kaiser

3  maintains centralized responsibility for the systemic discrimination in its workforce.

4      Because of its discriminatory policies and practices, Kaiser retains, promotes,

5  disciplines and terminates African Americans and African American women in statistically

6  significant disproportionate rates, based on the proportion of qualified African Americans

7  and African American women. Kaiser's pattern and practice of discrimination is so

8  pervasive and entrenched throughout that race and race-gender discrimination and unlawful

9  retaliation can be said to be its modes of operations (¶17).

10     Employment conditions grew so intolerable, Ms. Gamble suffered mental distress.

11  Moreover, following plaintiff's attempt to address her unequal and unlawful treatment at

12  Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

13  policies and practices, including designation of plaintiff as not eligible for rehire;

14  unreasonable, pre-determined one-sided investigations conducted outside the standards for

15  workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

16  and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

17  by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

18  to never apply to work at Kaiser again in the future (¶23).

19     As a direct and proximate result of defendants' actions, defendants breached duties

20  imposed on all employers, and caused Ms. Gamble to suffer, and continue to suffer, lost

21  wages, salary increases, earnings capacity and other benefits of employment, as well as

22  emotional pain, humiliation, mental anguish, and emotional distress. In addition, because

23  defendant's conduct was deliberate, wilful and malicious, plaintiff will be entitled to

24  exemplary damages (¶¶24-27).

25                              **ARGUMENT**

26     "To survive a demurrer, the complaint need only allege facts sufficient to state a

27  cause of action; each evidentiary fact that might eventually form part of the plaintiff's proof

28  need not be alleged." *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th

1  861, 872. Any valid cause of action overcomes a demurrer. Plaintiff may be mistaken as to

2  the nature of the case, or the legal theory on which she can prevail, but if the essential facts

3  of some valid cause of action are alleged, the complaint is good against a general demurrer.

4  *Quelimane Co., Inc. v. Stewart Title Guar. Co.* (1998) 19 Cal.4th 26, 38-39; *Adelman v.*

5  *Associated Int'l Ins. Co.* (2001) 90 CA4th 352, 359; *Sheehan v. San Francisco 49ers, Ltd.*

6  (2009) 45 Cal.4th 992, 998.

7  **I. The Complaint is Not Uncertain, Especially in Light of the 1973 Code Amendment**

8        Although "uncertainty" is a basis for demurrer under CCP §430.10(f), a demurrer on

9  this ground is seldom sustained. A demurrer for uncertainty may be sustained only where

10  the complaint is so ambiguous and unintelligible that defendant cannot reasonably respond

11  – *i.e.*, it cannot reasonably determine what issues must be admitted or denied, or what

12  counts or claims are directed against it. *Khoury v. Maly's of Calif., Inc.* (1993) 14 Cal. App.

13  4th 612, 616. As Kaiser admits, a demurrer for uncertainty may lie only if the plaintiff

14  "labels" claims in such a fashion as to make it too confusing to respond; failure to label

15  each cause is not grounds for demurrer if the complaint contains enough facts to apprise

16  defendant of the issues it is being asked to meet. *Williams v. Beechnut Nutrition Corp.*

17  (1986) 185 Cal. App. 3d 135, 139 fn. 2.

18        Kaiser's argument is that plaintiff's complaint is uncertain because she allegedly

19  combines more than one claim in one cause of action, by alleging race, age and race-gender

20  discrimination against all three Kaiser entities in her single cause.  Kaiser's attorneys fail to

21  mention that CCP §425.20 – requiring the separate pleading of each cause of action – was

22  deleted in 1973. *See* Notes on 1973 Amendment ("(1) Deleted former subd (e) which read:

23  '(e) Causes of action are not separately stated as required by Section 425.20'"). Citing pre-

24  1973 cases, Kaiser raises the argument anyways. *See* Demurrer, at 3.  As amended, it is no

25  longer the combination of "claims" that renders a complaint uncertain.  Under *Williams*, a

26  demurrer lies only when the failure to plead separate causes of action makes the complaint

27  incomprehensible to defendant.  Here, Ms. Gamble is clear as to the nature and extent of her

28  claims against her former employer.

1    Moreover, even under pre-1973 law, Ms. Gamble would not be required to plead

2  separate causes of action on her claims against Kaiser, based upon the various possible

3  discriminatory motivations. In her complaint, plaintiff identifies Kaiser as the defendant,

4  and she pleads the particulars of the discriminatory acts she suffered. Whether Kaiser acted

5  on discriminatory animus against race, race-gender, race-age, or in retaliation for her efforts

6  to remedy such discrimination, they all relate to the same common nucleus of facts. Cases

7  decided before the 1973 Code change held plaintiff need not separate such claims. *See Price*

8  *v. Briggs* (1958) 160 Cal. App. 2d 524 (special demurrers were not well taken, where single

9  cause of action pleaded on dissolution of partnership concerned rights under facts without

10  regard to defendants' motives); *Lewin v. Merck & Co.* (1962) 209 Cal. App.2d 131

11  (Reference in complaint to "rates" and "services," did not disclose existence of separate

12  causes of action which had to be separately stated); *Garris v. Mitchell* (1935) 7 Cal. App.2d

13  430 (Where complaint is in one count, and sets forth cause of action in ordinary and concise

14  language, there is no merit in defendant's special demurrers based on uncertainty,

15  unintelligibility and ambiguity, or on ground that several causes of action were improperly

16  united, or were not separately stated).

17    Ms. Gamble's pleading is therefore not uncertain, ambiguous or unintelligible.

18  Although Kaiser claims ambiguity, it is defense counsel's arguments, not Ms. Gamble's

19  pleading, that seek to confuse. In her detailed complaint, Ms. Gamble sets forth specific and

20  precise facts which, if proven at trial, would entitle her to relief under FEHA. Any

21  complaint over the scope of plaintiff's allegations must await further proceedings.[1]

22

23    [1]Because the demurrer admits the truth of all material facts properly pleaded, Ms.
Gamble's allegations must be assumed to be true – with all inferences read in plaintiff's
favor, *Aubry v. Tri-City Hosp. Dist.* (1992) 2 Cal.4th 962, 966-967; *Serrano v. Priest* (1971)
24  5 Cal.3d 584, 591. As such, plaintiff's allegations that all three Kaiser entities "work in
cooperation with each other to form the integrated medical care services program with the
25  trade name, Kaiser Permanente Medical Care Program" (¶8) must be taken as true. Further,
Ms. Gamble alleges (¶¶11-17) throughout its Northern California region, Kaiser uses a
26  "centralized employment opportunity system," maintaining a "unique business and
organization structure, with regional oversight by a single executive management hierarchy."
27  Access to training and promotion depends upon the discretion of "divisional management."
Ms. Gamble states Kaiser's racially stratified workforce and discriminatory patterns and
28  practices are propagated, entrenched and protected by centralized policies and practices
directed at the highest levels of Kaiser management (¶15).

## II. Defendant Misrepresents Plaintiff's Charge Filed with DFEH

Kaiser's other argument is that plaintiff failed to exhaust administrative remedies, stating in the demurrer that plaintiff failed to raise hostile work environment, retaliation or gender discrimination in her DFEH charge. Surprisingly, Kaiser asks the Court to take judicial notice of Ms. Gamble's administrative charge, but it fails to include a copy of that charge in its request. Indeed, Kaiser asks the Court to take notice of DFEH's November 8, 2014 "Notice of Filing of Discrimination Complaint – Response Requested," a "notice of Charge" with the same date, an information sheet on EEOC rules and regulations, and a two-page attachment of instructions for termination. *See* Request, at 3-8. Kaiser did *not* include a copy of the actual charge, even though that document is referenced in the notices to Kaiser. Counsel for defendant intentionally withheld a copy of the charge because, therein, Ms. Gamble clearly asserts claims of harassment and retaliation. *See* Exh. to Friedman Declaration. Kaiser's argument is thus frivolous.

Moreover, Ms. Gamble's allegations in her initial charge were sufficient to trigger an investigation into any and all of the claims raised in her complaint, including discrimination against the sub-class of African-American women. So long as plaintiff identifies the defendant and the discriminatory acts against her, she satisfies the exhaustion requirement. See *Keiffer v. Bechtel Corp.* (1998) 65 Cal.App.4th 893, 898 (jurisdiction satisfied as long as claimant files a charge with agency which names the defendant and specifies the discriminatory act; claims regarding the proper scope of the charge are subject to equitable doctrines); *Kaplan v. International Alliance of Theatrical and Stage Employees* (9th Cir. 1975) 525 F.2d 1354, 1359 ("[t]he administrative charge ... does not demand procedural exactness. It is sufficient that the [administrative agency] be apprised [sic], in general terms, of the alleged discriminating parties and the alleged discriminatory acts" ). *See also Sanchez v. Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455, 462 ("Surely the only procedural requirement" confronting claimant is that he state facts "sufficient to trigger" an investigation); *Sandhu v. Lockheed Missiles and Space Co.* (1994) 26 Cal.App.4th 846, 858

1  (initial charge need only be sufficient to "trigger the investigatory and conciliatory

2  procedures" of the agency).[2]

3      In sum, Ms. Gamble exhausted her administrative charge for the harassment and

4  termination claimed in her complaint.  Kaiser's argument to the contrary ignores her actual

5  charge, which Kaiser's attorneys thought to withhold. They also ignore relaxed legal

6  standards for understanding the scope of DFEH charges.  As such, Kaiser's demurrer is

7  frivolous, and should be denied.

8  <div align="center">**CONCLUSION**</div>

9      For the foregoing reasons, Kaiser's demurrer should be denied.

10

11  Dated: January 25, 2017          Respectfully submitted,

12

13

14  Jeremy L. Friedman
   Attorney for plaintiff Lunell Gamble

15

16

17

18

19

20

21

22

23

24

25  _____

26      [2]"[A]dministrative exhaustion ... is satisfied if the allegations of the civil action are within the scope of ... any investigation that might reasonably have been expected to grow

27  out of the charge. *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 266 (citations omitted). Moreover, employees in the administrative process often "are not fully aware of the

28  employer's motivation" when they experience adverse employment actions.  *See Sanchez v. Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455, 462.  As such, Ms. Gamble need not allege each and every suppressed discriminatory animus in her administrative charge.

1

## PROOF OF SERVICE

2    Jeremy L. Friedman declares and states:

3    I have an office in Alameda county. I am over the age of eighteen years. My business

4 address is 2801 Sylhowe Road, Oakland, CA, 94602.

5    I declare that on this day I served a copy of:

6    **Opposition to Demurrer and Motion to Strike**

7 by placing it in an envelope, addressed to the following address, and providing it to a

8 service for next day delivery:

9    Seyfarth Shaw LLP
     Bethany A. Vasquez
10   560 Mission Street, 31st Floor
     San Francisco, CA 94105-2930
11

12    I declare under penalty of perjury that the foregoing is true and correct. Executed

13 this 25th day of January, 2017, in Oakland, CA.

14
                                    /s/ Jeremy L. Friedman
15                                  Jeremy L. Friedman

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Jeremy L. Friedman. CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

**FILED**
**ALAMEDA COUNTY**

JAN 25 2017

CLERK OF THE SUPERIOR COURT
By
Tania Puentes  Deputy

6

SUPERIOR COURT OF THE STATE OF CALIFORNIA

7
8                    COUNTY OF ALAMEDA

9  LUNELL GAMBLE                          )   Case No. RG16826717
                                          )
10         Plaintiff                      )   **DECLARATION OF COUNSEL IN**
                                          )   **SUPPORT OF OPPOSITION TO**
11  vs.                                   )   **DEMURRER**
                                          )
12  KAISER FOUNDATION HEALTH              )
    PLAN, INC; KAISER FOUNDATION          )
13  HOSPITALS, INC.; and THE              )   Date: February 7, 2017
    PERMANENTE MEDICAL GROUP;             )   Time: 9:00 a.m.
14  all doing business as KAISER          )   Dept: 15
    PERMANENTE MEDICAL CARE               )
15  PROGRAM                               )
                                          )
16         Defendants                     )
                                          )
17  _____      )

18      I, Jeremy L. Friedman, declare and state:

19      1. I am attorney for plaintiff Lunell Gamble in this action.  I make this declaration in

20  support of the opposition to defendant's demurrer, based upon my own personal knowledge.

21  If called as a witness hereto, I would and could testify competently to the following.

22      2. Attached to this declaration is a true and accurate copy of the DFEH Charge filed

23  by Ms. Gamble in this case.  This document was provided to Kaiser by DFEH along with its

24  notice of Ms. Gamble's administrative filing; but it was omitted by Kaiser's attorneys in the

25  request for judicial notice accompanying the charge.

26      I declare under penalty of perjury that the foregoing is true and correct. Executed

27  this 25th day of January, 2017, in Oakland, CA.

28                              /s/ Jeremy L. Friedman
                                Jeremy L. Friedman

1

**PROOF OF SERVICE**

2      Jeremy L. Friedman declares and states:

3      I have an office in Alameda county. I am over the age of eighteen years. My business

4  address is 2801 Sylhowe Road, Oakland, CA, 94602.

5      I declare that on this day I served a copy of:

6  **Declaration of Counsel in Support of Opposition to Demurrer**

7  by placing it in an envelope, addressed to the following address, and providing it to a

8  service for next day delivery:

9      Seyfarth Shaw LLP
       Bethany A. Vasquez
10     560 Mission Street, 31st Floor
       San Francisco, CA 94105-2930

11

12     I declare under penalty of perjury that the foregoing is true and correct. Executed

13  this 25th day of January, 2017, in Oakland, CA.

14
                              /s/Jeremy L. Friedman
15                            Jeremy L. Friedman

16

17

18

19

20

21

22

23

24

25

26

27

28

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

## BEFORE THE STATE OF CALIFORNIA

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

In the Matter of the Complaint of
Lunell Gamble, Complainant.

DFEH No. 340711-121071
EEOC No.

vs.

Kaiser National HRSC Health And Welfare Dept
Respondent.
1451 Harbor Bay Pkwy
Alameda, California 94502

Complainant alleges:

1. Respondent **Kaiser National HRSC Health And Welfare Dept** is a **Other** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Complainant believes respondent is subject to the FEHA.

2. Complainant may be ignorant of the true names and capacities of co-respondents. The Department of Fair Employment and Housing may amend this complaint to allege their true names and capacities when ascertained. (Complainant is informed and believes and thereon alleges that the respondent and each co-respondent is responsible in some manner for the occurrences herein alleged, and that complainant's injuries as herein alleged were proximately caused by the aforementioned respondent(s).)

3. On or around **Jul 18, 2014**, complainant alleges that respondent took the following adverse actions against them: **Discrimination, Harassment, Retaliation Terminated** . Complainant believes respondent committed these actions because of their: **Age – 40 and over, Color, Race** . The alleged unlawful employment practice(s) occurred in **Alameda, California.**

4. Complainant **Lunell Gamble** resides in the City of **Richmond**, State of **CA**. If complaint includes co-respondents please see page 2.

-2-
*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Co-Respondents:**
Kaiser National HRSC Health And Welfare Dept
Shibioan O'Conner
1451 Harbor Bay Parkway
Alameda  California 94502

Kaiser National HRSC

1451 Harbor Bay Parkway
Alameda  California 94502

*Complaint – DFEH No. 340711-121071*

DFEH 902-1

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2   VERIFICATION

3   I, **Lunell Gamble**, am the **Complainant** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

4

5   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

6                                                                                              **Richmond Ca**
                                                                                               **Lunell Gamble**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DFEH 902-1

-4-

*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

*14971848*

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:     (916) 448-0159
6    Facsimile:      (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:     (415) 397-2823
10   Facsimile:      (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.;
12   KAISER FOUNDATION HOSPITALS; and THE
     PERMANENTE MEDICAL GROUP

13

14

15            SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                    COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                    Case No. RG16826717

19           Plaintiff,             **REPLY IN SUPPORT OF DEFENDANTS'**
                                    **DEMURRER TO PLAINTIFF'S**
20       v.                           **COMPLAINT**

21   KAISER FOUNDATION HEALTH PLAN, INC.;
     KAISER FOUNDATION HOSPITALS, INC.; and    Hearing Date:    February 7, 2017
22   THE PERMANENTE MEDICAL GROUP; all      Time:            9:00 a.m.
     doing business as KAISER PERMANENTE       Dept.:           15
23   MEDICAL CARE PROGRAM,           Judge:          Ioana Petrou

24          Defendants.           Reservation number:   R-1802056

25

26

27

28

---

36851213v.3

---

FILED
ALAMEDA COUNTY

JAN 3 1 2017

CLERK OF THE SUPERIOR COURT
By Tania Puente Deputy

## I.   INTRODUCTION

Plaintiff's Opposition does nothing to correct the deficiencies in her Complaint and it fails to refute the authority supporting Defendants' Demurrer.  Defendants are prejudiced by not knowing what claims Plaintiff is pursuing and against which Defendant(s); such confusion will cause discovery to be more costly, and judicial resources will be wasted as Defendants try to clarify issues that should be clearly delineated in the Complaint.  The Court can avoid such prejudice and waste by ordering Plaintiff to amend her Complaint now to cure these defects.

Plaintiff similarly cannot refute that she failed to exhaust her administrative remedies for any claims she might assert based on gender.  For these reasons, Defendants' Demurrer should be sustained.

## II.   LEGAL ARGUMENT

### A.   Plaintiff Concedes That She Brings Multiple Causes of Action Under One Claim That is Undeniably Confusing

Plaintiff's Opposition, which is largely a regurgitation of the voluminous factual allegations set forth in the Complaint, does little to explain or clarify the inherent uncertainty of her Complaint.  It is not only that Plaintiff captioned multiple causes of action as a single "Cause of Action" (which she does not dispute)—Plaintiff has absolutely failed to state whom she is suing, for what, and why.  Defendants are entitled to such basic information.

While Plaintiff acknowledges that "uncertainty" is a basis for demurrer under CCP § 430.10(f), Plaintiff completely fails to address California Rule of Court 2.112 which states:

Each separately stated cause of action, count, or defense must specifically state:
(1) Its number (e.g., "first cause of action");
(2) Its nature (e.g., "for fraud");
(3) The party asserting it if more than one party is represented on the pleading (e.g., "by Plaintiff Jones"); and
(4) The party or parties to whom it is directed (e.g., "against defendant Smith")."

As such, Plaintiff does not (and cannot) show that her Complaint complies with the basic requirements set forth in the California Rules of Court.  Instead, Plaintiff's Opposition focuses almost exclusively on the 1973 amendments to Code of Civil Procedure section 425.20 which eliminated a previous requirement that all causes of action be separately stated.  Whether "under pre-1973 law, Ms. Gamble would not be required to plead separate causes of action on her claims" as Plaintiff argues, **is irrelevant**

1

36851213v.3

—

1   to this Demurrer.  The 1973 amendments do not give Plaintiff a free pass to plead an uncertain and

2   ambiguous Complaint.  Code Civ. Proc. 431.10(f); *see also* Weil & Brown, *Cal. Prac. Guide Civ. Pro.*

3   *Before Trial,* Ch. 6-B, ¶6:105 (Rutter Group 2016) ("[P]leadings which jumble together several distinct

4   causes of action may be subject to a demurrer for uncertainty.").

5        The cases Plaintiff relies on for the proposition that she may combine all causes of action into

6   one are distinguishable.  All involved instances where the same primary right was allegedly invaded,

7   i.e., they involved a single cause of action.  For example, in *Price v. Briggs*, 160 Cal. App. 2d 524, 527-

8   28 (1958), the plaintiffs brought suit against their former partners asserting causes of action for breach

9   of contract and fraud for refusing them access to the records of the partnership.  The Court of Appeal

10  held that the allegations did not give rise to separate causes of action; rather, the single cause of action

11  properly pled was the right to inspect the records without regard to the alleged contractual or fraudulent

12  bases underlying that right.  *Id.*  Likewise, in *Garris v. Mitchell*, 7 Cal. App. 2d 430, 435 (1935), the

13  Court of Appeal held that the complaint contained only one cause of action and was sufficient to

14  withstand demurrer because the single right allegedly invaded was for fraud and misapplication of

15  funds, in which all the defendants purportedly participated.  Similarly, in *Lewin v. Merck & Co.*, 209

16  Cal. App. 2d 131, 132 (1962), plaintiff did not need to allege separate causes of action for each instance

17  of alleged underpayment for shipping services, which was the primary right asserted in the complaint.

18       In contrast, Plaintiff's single cause of action for alleged violations of the Fair Employment and

19  Housing Act ("FEHA") asserts multiple alleged violations of separate rights.  In *Skrbina v. Fleming*

20  *Companies, Inc.*, 45 Cal. App. 4th 1353, 1364-65 (1996), the Court held that the right to be free of

21  employment discrimination based on national origin is a **separate right** from the right to be free of

22  employment discrimination based on age and from the right to be free of employment discrimination

23  based on disability.  *Id.* (although captioned as a single FEHA cause of action, plaintiff's age, race and

24  disability discrimination allegations actually constituted multiple FEHA causes of action).  Accordingly,

25  to the extent Plaintiff is asserting multiple bases for a FEHA violation, each of these is a separate

26  primary right, and to avoid uncertainty, must be alleged as separate causes of action.  *See id.*

27       In declining, after extensive meet and confer, to file an amended complaint, Plaintiff suggests

28  that it is better to ferret out the many uncertainties present in her Complaint through discovery.  Such an

36851213v.3

1   approach maximizes her ability to obfuscate and keep her position fluid regarding the extent and scope

2   of what causes of action she actually brings. But this approach prejudices Defendants and is sure to

3   waste judicial resources, requiring unnecessary discovery and increasing the likelihood of otherwise

4   unnecessary discovery motions.

5        "The primary function of a pleading is to give the other party notice so that it may prepare its

6   case...." *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 240 (2014). Plaintiff has not done so, and

7   therefore Defendants' demurrer should be sustained.

8      **B.**     **Plaintiff Fails To Show That She Exhausted Her Administrative Remedies For Any
          Cause of Action Based on Gender**

9

10       As an initial matter, Defendants did not "intentionally with[o]ld a copy of the charge." (Opp.

11  10:11.) Defendants attached to the Request for Judicial Notice ("RJN") **the entire package it received**

12  **from the DFEH**. *See* Declaration of Robyn Sembenini in Support of Defendants' Demurrer to

13  Plaintiff's Complaint, ¶ 4, Ex. A (filed herewith). Moreover, Plaintiff did not attach a copy of the DFEH

14  charge to her Complaint, and has not yet responded to Defendants' discovery.

15      Nevertheless, neither the EEOC Notice of Charge of Discrimination (attached to Defendants'

16  RJN) nor Plaintiff's DFEH Charge (attached to the Declaration of Counsel in Support of Opposition to

17  Demurrer) raise complaints of discrimination or harassment based on sex/gender. Accordingly, Plaintiff

18  is barred from asserting such claims.

19      Plaintiff confuses whether, as a general matter, she may bring a FEHA cause of action after

20  properly obtaining a right-to-sue letter on her DFEH charge (which she can) with whether she may now

21  bring FEHA causes of action that were not included in her DFEH charge (she cannot).[1] Indeed,

22  notwithstanding Plaintiff's selective quotations of "jurisdictional" language, this distinction is

23  recognized by the very cases Plaintiff cites. Indeed, in each case, the court assessed whether the scope

24  of the plaintiff's previously-filed administrative charge permitted the particular claims brought in the

25  plaintiff's later-filed civil complaint. *See, e.g., Keiffer v. Bechtel Corp.* 65 Cal. App. 4th 893, 899-900

26

27  [1] Plaintiff's DFEH and EEOC charges are judicially noticeable administrative records under Evidence Code Section 452(c), and the Court need not accept Plaintiff's allegations as true where they are inconsistent with or contradict her charges. *El*
28  *Rancho Unified School Dist. v. National Education Assn*, 33 Cal. 3d 946, 950 (1983); *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1474 (2014).

REPLY IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT

36851213v.3

1   (1998) (filing of DFEH charge and receipt of right-to-sue notice satisfied jurisdictional prerequisites for

2   civil suit, but "the *scope* of the civil action permitted by a right-to-sue notice" was a different question

3   altogether) (emphasis in original).[2]  None of these authorities support Plaintiff's assertion that her DFEH

4   charge was "sufficient to trigger an investigation into any and all of the claims raised in her complaint,

5   including discrimination against the sub-class of African-American women." (Opp. 10:14-16.)  Indeed,

6   Plaintiff does not even attempt to show how her DFEH charge encompasses a claim for discrimination

7   or harassment based on sex/gender.  It does not.

8        Plaintiff has not demonstrated that she is permitted to proceed on a cause of action for

9   harassment or discrimination based on sex/gender, and the Demurrer should be sustained accordingly.

10  **III.   CONCLUSION**

11       Plaintiff's Complaint is vague and uncertain, fails to clearly identify each cause of action and

12  against which Defendant(s) they are asserted, and pursues a cause of action that is barred by Plaintiff's

13  failure to exhaust administrative remedies.  On these grounds, Defendants' respectfully request that the

14  Court grant its demurrer.

15  DATED: January 31, 2017                    Respectfully submitted,

16                                             SEYFARTH SHAW LLP

17

18                                             By: _____
                                                   Kristina M. Launey
19                                                 Julie Yap
                                                   Bethany A. Vasquez
20                                                 Tiffany T. Tran
                                                   Attorneys for Defendants
21                                                 KAISER FOUNDATION HEALTH PLAN,
                                                   INC.; KAISER FOUNDATION
22                                                 HOSPITALS; and THE PERMANENTE
                                                   MEDICAL GROUP
23

24

25  [2] *See also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462-463 (5th Cir. 1970) (allegations in plaintiff's civil suit fell
    within the scope of her initial and amended charges); *Kaplan v. International Alliance of Theatrical and Stage Emp. And*
26  *Motion Picture Mach. Operators of U.S. and Canada*, 525 F.2d 1354, 1359 (9th Cir. 1975) (information contained in
    plaintiff's EEOC charge permitted plaintiff to name one of the defendants in the civil suit); *Sandhu v. Lockheed Missiles &*
27  *Space Co.*, 26 Cal. App. 4th 846, 859 (1994) (failure to check national origin box on EEOC charge was not fatal where
    plaintiff complained of disparate treatment because he was Asian); *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243
28  (2009) (failure to check box for harassment on DFEH complaint was not fatal where employee expressly claimed to be the
    victim of constant harassment in his pre-complaint questionnaire).

                                                        4

36851213v.3

**PROOF OF SERVICE**

1

2     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California 94105.

3     On January 31, 2017, I served the within document(s):

4     **REPLY IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT**

5     ☐ I sent such document from facsimile machines (415) 397-8549 on January 31, 2017. I certify that said transmission was completed and that all pages were received and that a report was

6     generated by said facsimile machine which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in

7     sealed envelope(s) addressed to the parties listed below.

8     ☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

9

10    ☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

11    ☒ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on

12    account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

13

14    ☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

15    ☐ electronically by using the Court's ECF/CM System.

16

17    Jeremy L. Friedman, Esq.
      Law Offices of Jeremy L. Friedman

18    2801 Sylhowe Road
      Oakland, CA 94610

19    Telephone: (510) 530-9060
      Facsimile: (510) 530-9087

20

21    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with

22    postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day

23    after date of deposit for mailing in affidavit.

24    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

25    Executed on January 31, 2017, at San Francisco, California.

26

27                                                          Lisa Rivers

28

PROOF OF SERVICE
CASE NO. RG16826717

35084131v.1

*14971876*

1  SEYFARTH SHAW LLP
   Kristina M. Launey (SBN 221335)
2  klauney@seyfarth.com
   Julie Yap (SBN 243450)
3  jyap@seyfarth.com
   Tiffany T. Tran (SBN 294213)
4  ttran@seyfarth.com
   400 Capitol Mall, Suite 2350
5  Sacramento, California 95814-4428
   Telephone:    (916) 448-0159
6  Facsimile:    (916) 558-4839

7  SEYFARTH SHAW LLP
   Bethany A. Vasquez (SBN 209423)
8  bvasquez@seyfarth.com
   560 Mission Street, 31st Floor
9  San Francisco, CA 94105-2930
   Telephone:    (415) 397-2823
10 Facsimile:    (415) 397-8549

11 Attorneys for Defendants
   KAISER FOUNDATION HEALTH PLAN, INC.;
12 KAISER FOUNDATION HOSPITALS; and THE
   PERMANENTE MEDICAL GROUP

13

14

FILED
ALAMEDA COUNTY

JAN 3 1 2017

CLERK OF THE SUPERIOR COURT
By _____
                    Deputy

15                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                              COUNTY OF ALAMEDA

17

18 | LUNELL GAMBLE,                          | Case No. RG16826717
19 |              Plaintiff,                  | **DECLARATION OF ROBYN SEMBENINI
20 |      v.                                  | IN SUPPORT OF DEFENDANTS'
   |                                          | DEMURRER TO PLAINTIFF'S
21 | KAISER FOUNDATION HEALTH PLAN, INC.;     | COMPLAINT**
   | KAISER FOUNDATION HOSPITALS, INC.; and   |
22 | THE PERMANENTE MEDICAL GROUP; all        | Hearing Date:   February 7, 2017
   | doing business as KAISER PERMANENTE      | Time:           9:00 a.m.
23 | MEDICAL CARE PROGRAM,                    | Dept.:          15
   |                                          | Judge:          Ioana Petrou
24 |              Defendants.                  |
25 |                                          | Reservation number:  R-1802056
26

27

28

DECLARATION OF ROBYN SEMBENINI IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S
COMPLAINT

36884122v.1

1

## DECLARATION OF ROBYN SEMBENINI

2     I, Robyn Sembenini, declare and state as follows:

3         1.      I make this declaration in support of Defendants Kaiser Foundation Health Plan, Inc.

4     ("KFHP"), Kaiser Foundation Hospitals ("KFH"), and The Permanente Medical Group's ("TPMG")

5     (collectively "Defendants") Demurrer to Plaintiff's Complaint.  I have personal, first-hand knowledge of

6     the matters set forth below, and, if called upon to testify, I could and would do so competently.

7         2.      I am currently the Manager of Northern California's Equal Employment Opportunity and

8     Human Resources National Function Investigations ("Manager NCAL EEO and HRNF Investigations").

9     I have been employed by KFHP since 2008.

10        3.      In my role as Manager NCAL EEO and HRNF Investigations, I review incoming EEO

11    complaints and assign them for internal investigation.  I have access to the database that contains all

12    correspondence and materials received from the Department of Fair Employment and Housing

13    ("DFEH") or the U.S. Equal Employment Opportunity Commission ("EEOC").

14        4.      Attached hereto as Exhibit A is a true and correct copy of all of the correspondence and

15    materials KFHP received related to Lunell Gamble's EEO Complaint, DFEH Number: 340711-121071;

16    EEOC Number: 37A-2015-00305-C.

17        I declare under penalty of perjury under the laws of the State of California and the United States

18    of America and that the foregoing is true and correct.

19        Executed at Oakland, California on January 30, 2017.

20

21                                                    Robyn Sembenini

22

23

24

25

26

27

28

2

Exhibit A

EXHIBIT A



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

ACTING DIRECTOR ANNMARIE BILLOTTI

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 08, 2014

Kaiser National HRSC Health and Welfare Department
1451 Harbor Bay Pkwy
Alameda, CA 94502

**Respondent:**
Kaiser National HRSC Health and Welfare Department

RE: **Notice of Filing of Discrimination Complaint - Response Requested**
     DFEH Number: 340711-121071
     EEOC Number: 37A-2015-00305-C
     Gamble / Kaiser National HRSC Health And Welfare Dept

To All Listed Respondents:

Enclosed is a copy of a complaint filed with the Department of Fair Employment and Housing (DFEH). The enclosed complaint, in which you have been named a Respondent or Co-Respondent, alleges unlawful discrimination pursuant to Government Code section 12960.

The DFEH serves as a neutral fact-finder and represents the state of California rather than the complaining party. The merits of this complaint have not been determined. It was, however, subjected to a screening process, and the allegations, if proven, could support a finding of discrimination.

Government Code Section 12940, subdivision (f) or 12955 (f), prohibits any retaliatory action against a person because he or she has filed a complaint, has opposed any practices forbidden under the Fair Employment and Housing Act, or has assisted in any proceeding before the DFEH.

California Government Code section 12946 requires that all employment records (or union membership and referral records) be retained for a minimum of two (2) years. When a discrimination complaint has been served, the records must be kept until the DFEH closes its inquiry and until any resulting law suit or appeal has been terminated.

This complaint has also been filed with the U. S. Equal Employment Opportunity Commission (EEOC). You need not reply to EEOC unless that agency specifically requests a response.

**You must submit a response to the questions below and on the attached supplemental sheet within thirty (30) days of the date of this letter.**

1. State the legal name of your business and any other name(s) under which you do or have done business in California.

2. State your business address. Please note that you are required to notify the DFEH in writing



of any change of address and the effective date of such change while the complaint is under investigation and throughout any administrative adjudication. (California Code of Regulations, title 2, sections 7403 and 7411).

3.  State type of legal business entity (i.e., corporation, partnership, limited partnership, sole proprietorship, etc.).

4.  Does your company have a current contract(s) for the provisions of goods, services or public works with the State of California or receive federal funds? If so, name the awarding agency.

5.  Please respond to the Supplement Question attached.

Your response can be submitted by mail. In all mailed correspondence, please include your DFEH number **340711-121071** and mail it to DFEH, 2218 Kausen Drive, Suite 100, Elk Grove, CA 95758.

If you are interested in discussing a possible settlement of this complaint, please contact me immediately. This will avoid unnecessary delay and limit any potential liability. All settlement discussions are confidential, and not subject to disclosure. All discussions referring to evidence or information which has a bearing on determining the merits of this complaint will not be considered part of a settlement discussion unless confidentiality is acknowledged by the DFEH. If a settlement is reached which is mutually acceptable to the parties, submission of the requested information may not be necessary.

If you have any questions, please contact me.

Sincerely,

Cathy Ray
Consultant II
213.337.4479
Enclosure
CERTIFIED MAIL: 7014015000063211852

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | PERSON FILING CHARGE |
|---|---|
| | Lunell Gamble |
| | THIS PERSON (CHECK ONE)<br>_X_ Claims to be aggrieved<br>___ Is filing on behalf of other person(s) |
| **Lunell Gamble**<br>**vs.**<br>**Kaiser National HRSC Health And Welfare Dept** | DATE OF ALLEGED VIOLATION<br><small>Earliest        Most Recent</small><br>Oct 11, 2012  Jul 18, 2014 |
| | PLACE OF ALLEGED VIOLATION<br>California, County of |
| | EEOC CHARGE NUMBER<br>37A-2015-00305-C |
| | FEPA CHARGE NUMBER (if known)<br>340711-121071 |

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTIONS WHERE AN FEP AGENCY WILL INITIALLY PROCESS
*(See EEOC "Rules and Regulations" for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

- x  Title VII of the Civil Rights Act of 1964

- x  The Age Discrimination in Employment Act of 1967 (ADEA)

- ☐  The Americans with Disabilities Act of 1990 (ADA)

HAS BEEN RECEIVED BY

- ☐  The EEOC and sent for initial processing to _____
      (FEP Agency)

- ☒  The CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING and sent to the EEOC for dual filing purposes.

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

- ☒  As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provision of Title VII and the ADEA as explained on the reverse side of this form apply.

For further correspondence on this matter, please use the charge number(s) shown.

- ☐  An Equal Pay Act investigation (29 U.S.C. 209(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

- ☒  Enclosure: Copy of the Charge

---

BASIS OF DISCRIMINATION:

x RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN   x AGE   ☐ OTHER

☐ DISABILITY   ☐ RETALIATION

---

CIRCUMSTANCES OF ALLEGED VIOLATION:
    See attached complaint.

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| November 08, 2014 | Michael Baldonado | *[signature]* |

EEOC FORM 131-A

## INFORMATION SHEET ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 EEOC's Procedural Regulations provides that persons charged with employment discrimination, such as yourself, may submit a statement of position or evidence with respect to the allegations contained in this charge.

The Commission's Recordkeeping and Reporting Requirements are set forth in Title 29, Code of Federal Regulations (CFR), Part 1602 (see particularly Section 1602.14 below) for the Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA.    These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge (for ADEA charges, this notice constitutes the written request set out in Part 1627 for respondents to preserve records relevant to the charge -- the records to be retained are as described in Section 1602.14, as cited below, and should be kept for the periods described in that section).  Parts 1602, 1620 and 1627 also prescribe record retention periods -- generally, three years for basic payroll records and one year for personnel records.  Questions regarding retention periods and the types of records to be retained should be resolved by reference to the regulations.

Section 1602.14 Preservation of records made or kept . . . Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the employer shall preserve all personnel records relevant to the charge or the action.  The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected.  The date of "final disposition of the charge or the action" means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court, or where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation was terminated.

### NOTICE OF NON-RETALIATION REQUIREMENT

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it shall be an unlawful employment practice for an employer to discriminate against any of his/her employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because s/he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.  The Equal Pay Act of 1963 contains similar provisions.  Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with any person because s/he has exercised or enjoyed, or aided or encouraged others in their exercise of employment, or rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.  Note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING PRESENTATION BY ATTORNEYS

Although it is not necessary that you be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you.  If you are represented by an attorney we request that you provide the Commission with your attorney's name, address, and telephone number, and that you ask your attorney to write to the Commission confirming such representation.

Reverse side of EEOC Form 131/131-A (Test 10/94)

Termination:

1. State the reason(s) complainant was terminated.
2. List the names of all persons involved in making the specific decisions to which the complainant objects. State each person's job title and responsibility as it relates to the issues raised by the complainant.
3. Provide all documentation to support your reasons for the termination, i.e., counseling notices, written reprimands, attendance records, etc.
4. Provide a copy of the policy which governed complainant's termination.
5. Provide a copy of any written notice(s) to complainant regarding the termination and explain how the policy was applied to the complainant.
6. List the names of all person(s) involved in the decision to terminate complainant. State each person's job title, race and age and responsibility as it relates to the decision to terminate complainant.
7. Describe your company's practices regarding discipline and dismissal of employees in complainant's classification and work unit, including a description of the disciplinary steps required prior to termination for cause. Provide copies of any written policies.
8. State how this policy was applied to complainant.
9. Provide a copy of the job description for complainant. If no written description exists describe the duties and responsibilities.
10. List all employees, including the complainant, who were supervised by the same person supervising complainant during the past two years. Identify each person's race and age, job classification and provide the current home address, telephone     (protected class) number and work number. Provide copies of any reprimands, counseling notices and evaluations for each employee for the past two years. If evaluations are not available, provide a statement with copies of substantiating documentation, describing how well each person performed his/her duties.
11. Identify which of these employees were discharged for the same or equally serious reason as the complainant. Provide supporting documentation.
12. Explain how the policy governing termination was applied to these employees and provide supporting documentation.
13. List the names of all employees who were discharged by the same decision maker(s) who terminated complainant during the past two years. For each, state _ race and age, job classification, date of hire date and reason for termination. Include supporting documenting such as termination notice, reprimands, attendance records, etc.
14. Provide the name, race and age, job classification, date of hire and salary of Complainant's replacement.
15. Complainant asserts that Dian Mendez_ committed the same or similar work infractions to those of the complainant but he/she/they was/were not similarly terminated. Please respond to these allegations and provide documentation which supports your position.
16. List (by name) all employees who filed an internal or external complaint of discrimination the past three years and copy of each employee's complaint. For each employee listed provide their starting and ending dates of employment. If employee was terminated, state reasons for termination and date of termination.

17. Provide a copy of all warnings, reprimands, counseling issued to the complainant and all (similarly situated employee/s) for the past 3 years.

18. Provide copies of the performance reviews for the complainant and all (similarly situated employees/s) for the past two (2) years.

**PROOF OF SERVICE**

   I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 560 Mission Street, 31st Floor, San Francisco, California  94105. On January 31, 2017, I served the within document(s):

**DECLARATION OF ROBYN SEMBENINI IN SUPPORT OF DEFENDANTS' DEMURRER TO PLAINTIFF'S COMPLAINT**

☐ I sent such document from facsimile machines (415) 397-8549 on January 31, 2017.  I certify that said transmission was completed and that all pages were received and that a report was generated by said facsimile machine which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

☐ electronically by using the Court's ECF/CM System.

Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA  94610
Telephone: (510) 530-9060
Facsimile:  (510) 530-9087

   I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

   Executed on January 31, 2017, at San Francisco, California.

Lisa Rivers

PROOF OF SERVICE
CASE NO. RG16826717

35084131v.1

1  SEYFARTH SHAW LLP
   Kristina M. Launey (SBN 221335)
2  klauney@seyfarth.com
   Julie Yap (SBN 243450)
3  jyap@seyfarth.com
   Tiffany T. Tran (SBN 294213)
4  ttran@seyfarth.com
   400 Capitol Mall, Suite 2350
5  Sacramento, California 95814-4428
   Telephone:    (916) 448-0159
6  Facsimile:    (916) 558-4839

7  SEYFARTH SHAW LLP
   Bethany A. Vasquez (SBN 209423)
8  bvasquez@seyfarth.com
   560 Mission Street, 31st Floor
9  San Francisco, CA 94105-2930
   Telephone:    (415) 397-2823
10 Facsimile:    (415) 397-8549

11 Attorneys for Defendants
   KAISER FOUNDATION HEALTH PLAN, INC.;
12 KAISER FOUNDATION HOSPITALS; and THE
   PERMANENTE MEDICAL GROUP

13

14

15                SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                          COUNTY OF ALAMEDA

17

18 LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                 **NOTICE OF NEW AUTHORITY**

20      v.                                 Hearing Date:   February 7, 2017
                                           Time:           9:00 a.m.
21 KAISER FOUNDATION HEALTH PLAN, INC.;    Dept.:          15
   KAISER FOUNDATION HOSPITALS, INC.; and  Judge:          Ioana Petrou
22 THE PERMANENTE MEDICAL GROUP; all
   doing business as KAISER PERMANENTE
23 MEDICAL CARE PROGRAM,                   Reservation number:  R-1802056

24              Defendants.

25

26

27

28

─────────────────────────────────────────────────
                       NOTICE OF NEW AUTHORITY
36969386v.1

1        Pursuant to California Rule of Court 8.254, Defendants Kaiser Foundation Health Plan, Inc.

2    ("KFHP"), Kaiser Foundation Hospitals ("KFH"), and The Permanente Medical Group's ("TPMG")

3    (collectively "Defendants") hereby submit the January 31, 2017, Order issued by the Honorable Judge

4    Jo-Lynne Q. Lee in the matter captioned *Sheila Kennedy v. Kaiser Foundation Health Plan, Inc; Kaiser*

5    *Foundation Hospitals, Inc.; and The Permanente Medical Group; all doing business as Kaiser*

6    *Permanente Medical Care Program*, Case No. RG16822544 ("the Kennedy Order"), pending in the

7    Alameda Superior Court, which addresses the issue of whether a complaint is uncertain for failure to

8    comply with the requirements of California Rules of Court, rule 2.112.  The Order was issued after the

9    date of the filing of Defendants Demurrer to Plaintiff's Complaint and after Defendants filed their

10    reply.[1]

11        The Kennedy Order on Defendants' Demurrer and Motion to Strike Complaint Sustained, No.

12    RG16822544 is attached hereto as Exhibit A.

13        The Kennedy Complaint which was subject to Demurrer is attached as Exhibit B.

14

15    DATED: February 3, 2017            Respectfully submitted,

16                            SEYFARTH SHAW LLP

17

18                            By:

19                            Kristina M. Launey

20                            Julie Yap
                        Bethany A. Vasquez

21                            Tiffany T. Tran
                        Attorneys for Defendants

22                            KAISER FOUNDATION HEALTH PLAN,
                        INC.; KAISER FOUNDATION
HOSPITALS; and THE PERMANENTE
MEDICAL GROUP

23

24

25

26

27

28    _____
[1] The Order was signed the same date as Defendants' reply, but Defendants had already filed their reply when the Order was issued.

NOTICE OF NEW AUTHORITY

36969386v.1



**EXHIBIT A**

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602____

Miller Law Group
Attn: Miller, Michele Ballard
111 Sutter Street
Suite 700
San Francisco, CA  94101

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Kennedy. | No. RG16822544 |
| Plaintiff/Petitioner(s) | Order |
| VS. | Demurrer and Motion to Strike Complaint |
| Kaiser Foundtion Health Plan, Inc. | Sustained |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

The Demurrer and Motion to Strike Complaint was set for hearing on 01/31/2017 at 03:00 PM in Department 18 before the Honorable Jo-Lynne Q. Lee. The Tentative Ruling was published and was contested.

Opposing Party Sheila Kennedy appeared by counsel Jeremy L. FriedmanMoving Party Kaiser Foundtion Health Plan, Inc. appeared by counsel Gal Gressel and Kerry Freeman

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows: The demurrer and motion to strike by Defendants The Permanente Medical Group, Inc., ("TPMG"), Kaiser Foundation Health Plan, Inc., ("Health Plan"), and Kaiser Foundation Hospitals ("Hospitals" and collectively "Defendants") directed at the Complaint by Plaintiff Sheila Kennedy ("Plaintiff") is ruled upon as follows:

Defendants demurrer is SUSTAINED WITH LEAVE TO AMEND based on uncertainty. Plaintiff's Complaint alleges one cause of action for Violation of Government Code 12940, et seq., California Fair Employment and Housing Act ("FEHA"). FEHA prohibits numerous practices but Plaintiff fails to identify the FEHA provisions on which she relies. Plaintiff also alleges that she is a member of a protected class, but does not allege which protected class supports her claims under FEHA. The way in which the First Cause of Action is set out serves no purposes except to obfuscate the basis for Plaintiff's claims, and makes it unreasonably difficult for Defendants to reasonably respond or for the court to determine whether the claims asserted are adequately supported by the facts alleged. (See California Rules of Court, rule 2.112.)

The demurrer by Defendants Health Plan and Hospitals on the ground that Plaintiff had not stated a cause of action against them is SUSTAINED WITH LEAVE TO AMEND. Plaintiff alleges that Health Plan is a licensed health care service plan that enrolls members in individual and group plans, and provides medical services through TPMG and Hospitals. She alleges that Hospitals operates hospitals that provide facilities and infrastructure for Health Plan. Plaintiff alleges that TPMG is a group of physicians owned by its physician shareholders that contracts with Health Plan to provide medical services for Health Plan members. Plaintiff alleges that TPMG, Hospitals, and Health Plan are an integrated medical care services program that operates under the trade name, Kaiser Permanente Care Program, known to the public as Kaiser Permanente.



Health Plan and Hospitals contend that Plaintiff was employed by TPMG only. The court takes judicial notice of the fact a Request for Wages by Plaintiff was sent by the California Employment Development Department to TPMG in January 2016, because Plaintiff had listed TPMG as his employer. Health Plan and Hospitals contend that the facts alleged are not sufficient to allow the court to ignore the separate existence of TPMG, Health Plan, and Hospitals, and view them as a single entity for purposes of Plaintiff's claims in this action. Defendants contend that Plaintiff fails to allege facts showing that the court should ignore the separate existence of affiliated entities. In Laird v. Capital Cities/ABC, Inc. (1988) 68 Cal.App.4th 727, 737, 742, the court held that the plaintiff must allege that the distinct entities operate as a single entity, and that treating them as separate legal entities would cause inequitable results. In Gopal v. Kaiser Foundation Health Plan, Inc. (2016) 248 Cal.App.4th 425, 431, ("Gopal"), the court held that two conditions are generally required for the application of joint enterprise liability: (1) such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise; and (2) an inequitable result if the acts in question are treated as those of one corporation alone.

Health Plan and Hospitals also contend that Plaintiff cannot allege that they and TPMG are a joint enterprise, as a matter of law, because Health Plan, as a health care service plan within the meaning of Health & Safety Code sec. 1345(q), and TPMG and Hospitals, as "providers" within the meaning of Health & Safety Code sec. 1345(i), are "each responsible for their own acts or omissions, and are not liable for the act or omissions of, or the costs of defending, others," under Health & Safety Code sec. 1371.25. In Gopal, supra, 248 Cal.App.4th at p. 432, the court ruled that application of liability based on joint enterprise in that case was not appropriate, because the Knox-Keene Act (Health & Safety Code sec. 1340, et seq.) explicitly allows a health plan to directly own and directly operate hospitals and contract with physicians to provide care to its members (Health & Safety Code, sec. 1395(c)), and because Plaintiff did not show it was inequitable to require her to look to the medical providers who allegedly caused her personal injuries.

Plaintiff contends that her allegation that the Kaiser entities work in cooperation with each other to form the integrated medical care services program known to the public as "Kaiser Permanente" is sufficient to support a "joint enterprise" claim, but the provisions of the Knox-Keene Act and the case law cited by Defendants do not support that conclusion. Leave to amend is granted to allege facts that support the requirements for stating a joint enterprise claim against health care services plans and health care providers under the Knox-Keene Act, consistent with the holdings in Gopal and Laird.

Defendants also contend that any claims based on the protected categories of disability, race, age, or gender are barred because the DFEH charge Plaintiff filed did not mention hostile working environment or discrimination based on disability, age, or gender. Plaintiff responds that she filed a second administrative complaint claiming hostile work environment, failure to accommodate, and disability caused by race discrimination, and that claim is pending. Plaintiff also contends that her initial DFEH claim was sufficient to apprise the Department of Fair Employment and Housing of the alleged discriminatory acts and the discriminating parties. In light of the court's ruling that Plaintiff's claims under FEHA are too uncertain to enable the court to ascertain what claims are being pled, the court is not required to resolve this issue. However, Plaintiff may only plead claims reflected in administrative complaints filed with FEHA, for which FEHA has issued a "right-to-sue" letter. (See Okoli v. Lockheed Technical Operations Co. (1995) 36 Cal.App.4th 1607, 1613; Hobson v. Raychem Corp. (1999) 73 Cal.App.4th 614, 631.) If Plaintiff has a pending administrative complaint, she may seek leave to amend to add claims based on those pending complaints upon receipt of a right-to-sue letter.

It is also unnecessary to address Defendants' contention that Plaintiff has failed to state claims based on race and gender discrimination, disability discrimination, age discrimination, retaliation, or hostile working environment, and it is not clear whether she intended to do so. Plaintiff is admonished to carefully review the requirements for these claims under FEHA and to allege facts supporting the elements of those separate causes of action.

Defendants' motion to strike para. 1, lines 19-20, the phrase "arising out of a pattern of race discrimination against its African American employees," the word "systemic" in para. 1, line 22, the entirety of para. 2, and paras. 11-17 in their entirety on the ground that these allegations are irrelevant to the Complaint is GRANTED WITHOUT LEAVE TO AMEND. In these allegations, Plaintiff contends that Kaiser has a widespread pattern and practice of discriminating against African-Americans, including excluding them from higher paying supervisory and management positions. Defendants contend that these allegations are irrelevant, because claims of class-wide discrimination are

---

Order




applicable to class action claims based on disparate impact, and are not applicable to suits by individuals claiming discrimination in a particular instance. (Alch v. Superior Court (2004) 122 Cal.App.4th 339, 379 [a class action is, by definition, a "pattern and practice" claim].)

In opposition, Plaintiff contends that although the court in Alch noted that pattern and practice allegations are the basis for class actions, it did not hold that allegations of pattern and practice are irrelevant in individual actions. Plaintiffs assert that statistical evidence can create an inference of discrimination based on disparate treatment that supports individual claims.

Plaintiff's arguments about the potential admissibility of pattern and practice evidence do not support the conclusion that such allegations are permissible in the complaint, in which Plaintiff is not seeking relief on behalf of a class. Allegations about discrimination against other employees are not part of the elements of any individual claims under FEHA. The court makes no ruling at this time about the scope of permissible discovery or the admissibility of evidence of disparate treatment at trial.

Defendants' request for judicial notice of the Notice of Charge of Discrimination dated August 12, 2014 and the Corrected Complaint of Employment Discrimination dated July 11, 2014, filed with the California Department of Fair Employment and Housing is GRANTED.

Defendants' request for judicial notice of the Amended Complaint of Employment Discrimination dated July 10, 2014, filed with the California Department of Fair Employment and Housing is GRANTED.

Defendants' request for judicial notice of the content of the Request for Wages on California Employment Development Department Form DE 1919, Rev. 6 (4-12), mailed by the Employment Development Department to The Permanente Medical Group, Inc., on January 29, 2016, is GRANTED.

Plaintiff shall file and serve her First Amended Complaint by April 7, 2017. Defendants shall file and serve a responsive pleading within 20 days after service of the First Amended Complaint, plus any additional time provided by Code of Civil Procedure section 1013(a).

Dated: 01/31/2017

_____
Judge Jo-Lynne Q. Lee

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number:  RG16822544
Order After Hearing Re: of 01/31/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 02/01/2017.
Chad Finke  Executive Officer / Clerk of the Superior Court

By  _Debbie Sheets_

Deputy Clerk



1    Jeremy L. Friedman, CA Bar No. 142659
     LAW OFFICE OF JEREMY L. FRIEDMAN
2    2801 Sylhowe Road.
     Oakland, Ca. 94610
3    Tel: (510) 530-9060
     Fax: (510) 530-9087

4

   Attorney for plaintiff Sheila Kennedy

5

**F I L E D**

**ALAMEDA COUNTY**

JUL 08 2016

CLERK OF THE SUPERIOR COURT
By_____
                       Deputy

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                    COUNTY OF ALAMEDA

8

   SHEILA KENNEDY             )   Case No. RG16822544
9
       Plaintiff                )   **COMPLAINT FOR DAMAGES**
10                               )   (Employment discrimination)
   vs.                               )
11                               )
   KAISER FOUNDATION HEALTH     )   **DEMAND FOR JURY TRIAL**
12    PLAN, INC; KAISER FOUNDATION   )
   HOSPITALS, INC.; and THE         )
13    PERMANENTE MEDICAL GROUP;    )
   all doing business as KAISER       )
14    PERMANENTE MEDICAL CARE     )
   PROGRAM                         )
15                               )
       Defendants              )
16   _____ )

17                        **INTRODUCTION**

18        1. This is an action for employment discrimination and retaliation against Kaiser

19   Permanente entities, arising out of a pattern and practice of race discrimination against its

20   African American employees. Plaintiff Sheila Kennedy is an African American woman

21   who was employed at Kaiser for more than 18 years. Throughout her employment, Ms.

22   Kennedy was subject to systemic discrimination and retaliation due to her race and

23   disability, including hostile work environment and denial of numerous employment

24   opportunities, in the Chemical Dependency and Rehabilitation Department (CDRD) where

25   she had worked since 2002, and throughout the Kaiser Northern California organization.

26   Plaintiff's administrative charge of discriminatory termination is pending with the

27   Department of Fair Employment and Housing, and an amended complaint will be filed here

28   if that claim is not resolved in the administrative process.

1    2.  Although a substantial percentage of Kaiser's workforce is comprised of African-

2  American employees, due to systemic discrimination by a management that is

3  predominately non-African-American, this class of employees are too often denied training,

4  job reclassifications, positive performance reviews, transfers and  promotions, and they are

5  disproportionately subjected to discipline and termination.  As a result, Kaiser's workforce

6  is rigidly stratified with a disparate distribution by race and gender, with African-American

7  and African-American women predominantly assigned to the lowest paying positions with

8  the least chance of advancement, and predominantly excluded from higher paying and more

9  secure supervisory and management positions – positions with the greatest influence and

10  decision-making authority over reviews, promotions, retention, and termination.

11    3.  Plaintiff's claims are brought pursuant to the California Fair Employment and

12  Housing Act (FEHA), Cal. Government Code §12940 *et seq.* ,She seeks to end Kaiser's

13  discriminatory practices and obtain monetary relief, including punitive damages.

14                              **THE PARTIES**

15    4. Plaintiff Sheila Kennedy is an African American woman who resides in

16  California.  She was employed at Kaiser Permanente from for more than 18 years, until her

17  termination in February 2016.  Ms. Kennedy worked in various positions, including CPRD

18  related positions of intern, substance abuse counselor, and instructor at the domestic

19  violence program, among others.

20    5.  Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a

21  health care service plan, headquartered in Alameda County.  Health Plan enrolls members in

22  individual and group plans, and in Northern California, provides hospital and medical

23  services for its members through separate contracts with Medical Group and Hospitals.

24    6.  Kaiser Foundation Hospitals, Inc., is a nonprofit corporation, headquartered in

25  Alameda County; it operates hospitals and medical centers in California.  Hospitals receives

26  its funding from Health Plan, and provides infrastructure and facilities for the benefit of

27  Medical Group.

28

1    7.  The Permanente Medical Group is a group of physicians organized as a

2   professional corporation under California law.  Medical Group is privately owned and

3   managed by its physician shareholders.  Medical Group contracts with Health Plan to

4   provide medical services (both outpatient and inpatient) for Health Plan members in

5   Northern California.

6    8.  Medical Group, Hospitals, and Health Plan work in cooperation with each other

7   to form the integrated medical care services program with the trade name, Kaiser

8   Permanente Medical Care Program.  This enterprise is known to the general public, and is

9   doing business as, "Kaiser Permanente."  Collectively, the three entities are referred to

10  herein as "Kaiser."

## ADMINISTRATIVE PROCESS

12    9. Plaintiff previously and timely filed an administrative charge of discrimination, as

13  well as an amended charge, against her employer with the Department of Fair Employment

14  and Education ("DFEH").  In that process, plaintiff complained about discrimination and

15  retaliation she experienced prior to her termination, including denial of promotions.

16  Plaintiff received her right to sue letter on that charge.  Subsequent to the issuance of the

17  right to sue letter, plaintiff was terminated from Kaiser.  Plaintiff filed a subsequent charge

18  with DFEH over the termination.  If the matter is not resolved in the administrative process,

19  plaintiff will amend this Complaint at the appropriate time.

20    10.  Administrative and statutory claims of Ms. Kennedy were tolled as a result of a

21  class action that was filed against Kaiser, in Hill et al. v. Kaiser Foundation Health Plan,

22  Case No. 3:10-cv-2833 LB, Northern District of California.  EEOC charges were filed by

23  named plaintiffs in that case on September 25, 2007, and the action was pending until

24  December 10, 2013.  During that time period, all limitation periods for filing administrative

25  charges were tolled.

## PATTERN AND PRACTICE ALLEGATIONS

27    11. Kaiser Permanente is one of the largest health maintenance organizations of its

28  kind, providing a system of integrated health care to more than 8 million members in eight

1  different regions nationwide, employing over 180,000 people. In Northern California,

2  Kaiser serves approximately 3.2 million members at 21 medical centers and 160 offices,

3  employing thousands of people in non-physician capacities. Using a centralized

4  employment opportunity system, people external to Kaiser and current employees are able

5  to apply for open positions throughout Kaiser's operations, including by region. Current

6  employees are told they will be provided with opportunities for employment that are not

7  available to external applicants, including access to job postings prior to their disclosure to

8  the general public, and a system by which employees may post their resumes for other

9  Kaiser departments to match to openings for hiring decisions.

10      12.  Kaiser maintains a unique business and organization structure, with regional

11  oversight of Northern California non-physician operations by a single executive

12  management hierarchy. Within each division of Kaiser's operations, the employer has

13  created departmental hierarchies of similar nature and structure, including: entry level

14  positions, trained or skilled-level positions, team leaders and sub-leads, supervisors and

15  office-level managers, and divisional directors and assistant directors. Kaiser also

16  maintains uniform employment and personnel policies applicable to all of its employees,

17  with centralized human resources, general counsel, payroll services, and labor and other

18  employment data. Regardless of the department or division, there are uniform policies and

19  procedures for employee orientation, supervisory management, salary and incentive options,

20  job classifications, human resources, progressive discipline, rules of conduct, and

21  requirements for transfers, promotions and terminations.

22      13.  Within each department or function of Kaiser's operations, the employer has

23  developed its own unique procedures, information systems and business technologies

24  requiring specialized training and adaptive capabilities. Employees are told they need

25  establish in their work performances that they are trained in and proficient with those

26  unique processes in order to be retained and/or promoted within Kaiser. Access to that

27  training uniformly depends upon the discretion of divisional management, however,

28  including influence and decision-making at the supervisory and team management levels.

1   Similarly, performance reviews, job classification decisions, pay and salary structure

2   changes, and disciplinary actions all depend upon the discretion of that same divisional

3   management. Few objective requirements or measurements are used for employment

4   decisions, which instead are largely based on subjective judgments of the supervisors and

5   managers within Kaiser's operations.

6        14. Kaiser's executive and divisional managements for positions in EEO job groups

7   2F and 2G are predominately neither African-American nor African-American women.

8   African-Americans and African-American women are rarely promoted to supervisory or

9   management positions capable of influencing a significant proportion of the employer's

10   decision-making. As a result, the decisions as to which employees receive specialized

11   training, particular assignments, job classifications, pay raises and incentives, transfer or

12   promotions, positive performance reviews and progressive disciplinary actions are made

13   and influenced principally by non-African-Americans. Subjective judgments of Kaiser'

14   stratified supervisory and management system are often infected with conscious or

15   unconscious prejudices and race and/or race-gender based stereotypes, which explains why

16   so few African-American and African-American women out of Kaiser's large African-

17   American and African-American female employee population advance to supervisory and

18   management positions.

19        15. This pattern of unequal training, assignments, classifications, pay, discipline and

20   advancement opportunities is not the result of random or non-discriminatory factors. Rather,

21   it is the result of an on-going and continuous pattern and practice of intentional race and

22   race-gender discrimination in training, assignments, classifications, pay, discipline,

23   performance reviews, terminations and promotions, and reliance on policies and practices

24   that have an adverse impact on African-American and African-American female employees

25   that cannot be justified by business necessity, and for which alternative policies and

26   practices with less discriminatory impact could be utilized that equally serve any asserted

27   justification. Plaintiff is informed and believes that such policies and practices include,

28   without limitation:

a.    Failure to consistently train African-American and African-American women in the unique Kaiser processes and practices necessary for desirable assignments and advancement.

b.    Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-African-American managerial workforce in making assignments, training, pay, performance review, discipline, promotion and termination decisions. Even where Kaiser's policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

c.    Reliance on race and race-gender stereotypes in making employment decisions such as assignments, promotions, pay and training.

d.    Pre-selection and "grooming" of non-African-American and non-African-American women employees for advancement, favorable assignments and training.

e.    Maintenance of largely race and race-gender segregated job categories and departments.

f.    Deterrence and discouragement of African-American and African-American female employees from seeking advancement, training, and favorable assignments and pay.

g.    Giving African-American and African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and non-African-American women employees.

h.    Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and African-American women employees, in disproportion to the same actions taken against non-African-American employees.

i.    Providing less training and support to African-American and African-American female employees and managers than that given to non-African-American employees and managers.

j.    Providing less or refusing to make reasonable accommodations for disabilities and sick leave policies with respect to African-American and African-American female employees, and unlawfully discriminating against African-American-employees due to their disabilities because of both their disabilities and their race and/or race-gender.

k.    Harassing African-American and African-American female employees interested in advancement and subjecting them to a hostile work environment.

l.    Maintaining and fostering a reputation for discriminatory conduct which deters African-Americans and African-American females from pursuing promotional opportunities with Kaiser;

m.    Establishing and maintaining arbitrary and subjective requirements for discipline and promotions which have the effect of excluding qualified African-Americans and African-American females and which have not been shown to have any significant relationship to job performance or to be necessary to the safe and efficient conduct of Kaiser's business;

n.    Failing and refusing to take adequate steps to eliminate the effects of its past discriminatory practices; and

o.    Retaliating against African-American and African-American women employees who complain of unequal treatment.

16.    Kaiser's racially stratified workforce and discriminatory patterns and practices are propagated, entrenched and protected by centralized policies and practices directed at the highest levels of Kaiser management.  Although Kaiser operates many different departments at many different locations throughout the Northern California Region, it has centralized, company-wide policies and practices concerning supervisory training, human resources, EEO reporting and compliance and Kaiser's response to EEO complaints.  These

1    company-wide policies and practices include, among others:

2        a.    Directing, authorizing and training supervisors and directors to conceal

3    discriminatory actions and retaliate against those employees who might assist

4    the disclosure of false or trivial discipline as pretext for discrimination,

5    without regard to the specific facts and circumstances of the individual

6    employee or supervisor.

7        b.    Directing, authorizing and assist supervisors and directors in their

8    discriminatory and retaliatory employment actions, through a centralized

9    human resources department and, ultimately, the office of the general counsel,

10   in favor of supervisors and directors, and against the interests and complaints

11   of African American employees, without regard to the specific facts and

12   circumstances of the individual employee or supervisor, and in contravention

13   of obligation of Human Resources and general counsel to protect employees

14   from unlawful discrimination.

15       c.    Suppressing and falsifying information in connection with complaints over

16   employment actions made internally and to administrative agencies and courts

17   by African American employees, including unreasonable, one-sided, pre-

18   determined internal investigations conducted by a select few individuals for

19   the purpose of permitting, perpetuating and covering up discriminatory and

20   retaliatory actions and patterns, without regard to the specific facts and

21   circumstances of the individual employee or complaint.

22       f.    Concealing and entrenching discriminatory patterns and practices by making

23   false and misleading representations and statements, and engaging in

24   intentionally misleading conduct, to EEOC and OFCCP regarding its

25   compliance with federal regulations, including the requirement that Kaiser

26   conduct internal reviews and self-inquiry of statistical patterns, report

27   disparities, propose remedial plans (including affirmative action plans) and

28   monitor results over time.

g.  Misrepresent EEO practices and non-compliance to employees, government agencies, in the courts and to the public, included a public relations effort to promote a diversity department that is knowingly, purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.  Retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.  Designating African American employees, and in particular, those employees who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.  Abusing administrative and judicial processes to further patterns and practices of racial discrimination and in retaliation against African American employees who complain about the violation of their civil rights, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the existence of substantial evidence of Kaiser's violations of law.

k.  Perpetuating, protecting and concealing unlawful discrimination and patterns of disparate treatment by requiring employees who raise civil rights claims to

1    agree to confidentiality of the terms of settlement, without bargaining for such

2    an agreement at arms length, and without justification in work product,

3    attorney client privilege, trade secret or other basis for confidentiality.

4    1.    Kaiser's stand-alone litigation policy and practice – adopted and applied by

5    general counsel in cases brought under anti-discrimination laws, without

6    regard to specific facts and circumstances – requiring, as a condition of

7    settlement, former employees to sign agreements not to work at Kaiser in the

8    future, is a violation of federal and state civil rights laws; including whether

9    plaintiff is entitled to a declaration that all such agreements are against public

10    policy, unenforceable and null and void.

11    17. Because of its discriminatory policies and practices, Kaiser retains, promotes,

12    disciplines and terminates African Americans and African American women in statistically

13    significant disproportionate rates, based on the proportion of qualified African Americans

14    and African American women.  This in turn has the effect of diminishing the pool of

15    eligible African Americans and African American women for promotion to supervisory,

16    management and executive positions.  Kaiser's pattern and practice of discrimination is so

17    pervasive and entrenched throughout that race and race-gender discrimination and unlawful

18    retaliation can be said to be its modes of operations

19    **DENIAL OF EMPLOYMENT OPPORTUNITIES**

20    18. Plaintiff Kennedy began working at Kaiser in October of 1997.  Like many other

21    African American employees at Kaiser, she performed her work according to the

22    employer's needs, was well qualified and tried to improve her employment position over the

23    years.  In 2002, Ms. Kennedy began working at Kaiser's Chemical Dependency and

24    Rehabilitation Program (CDRP), where she learned the department's particular procedures

25    and processes.  In September 2003, complainant took responsibility for conducting bi-

26    monthly educational presentations for Day Treatment.

27    19. Despite her qualifications and excellent work performance, complainant was

28    denied promotions, transfers, pay raises and other employment benefits that were given to

1  non-African American employees.  Since being employed at Kaiser, complainant has

2  applied at many different positions at Kaiser, within and outside the CDRP.  These

3  included, but are not limited to the following:

4      a.    In 2004, complainant enrolled in a certification program for the California

5            Association of Alcohol and Drug Abuse Counselors (CAADAC) at UC

6            Berkeley extension, which included a requirement of 500 hours internship.

7            Ms. Kennedy was denied the opportunity to perform her internship at Vallejo,

8            CDRP.  Kaiser management falsely informed complainant that it was not

9            possible for employees and prior patients to perform internships as it would be

10           "confusing" to patients.  In fact, several non-African American employees

11           who had been patients were permitted to perform their internships at Kaiser.

12     b.    In 2004, complainant fulfilled her 500 hour internship requirement at a

13           residential recovery program, receiving a diploma.  Kaiser failed to provide

14           assistance to complainant, as it had provided other non-African American

15           employees with internships.  Kaiser not only failed to provide equal

16           assistance, it purposefully mandated complainant appear for work outside her

17           schedule, interfering with her ability to complete her program and obtain

18           advancement.

19     c.    Complainant in 2006 gained even more qualifications, performing a total of

20           1500 hours to become a CAADAC-II at an all womens' treatment facility.

21           Thereafter, she began applying for openings at Kaiser within the CDRP

22           department, but was denied.  Denial of these employment opportunities was

23           based on complainant's race.  Such positions were awarded to non-African

24           American employees with less qualifications and training.  For example, in

25           2007, the position was given to a Registered Nurse without the credentials,

26           training or education possessed by Ms. Kennedy.

27     d.    In 2009, after 6 years conducting the Domestic Violence program, including a

28           class that she herself had developed, Kaiser told complainant that she could

1    no longer conduct the class.  Instead, she was instructed to train a white

2    employee how to conduct the class.

3    e.    Ms. Kennedy continued to improve her training and education, but Kaiser

4    continued to deny her advancement.  In 2010, complainant obtained a total of

5    2,000 hours required to become a CAADAC-I.  In 2012, she had a total of

6    6,000 hours, and passed a written and oral exam.  During these times,

7    complainant continued to apply for open positions at Kaiser pertaining to

8    Substance Abuse Counselors.  Kaiser denied each application, refusing to

9    even grant an interview.

10    f.    Complainant was finally granted an opportunity to interview for positions in

11    2014, but the employment opportunities were denied by Kaiser on account of

12    her race.  An interview for a position in Walnut Creek was granted in Mach

13    2014, and for a position in Sacramento in August 2014.  These positions were

14    either not filled, or given to non-African American employees.

15    g.    Throughout this period, including times after Ms. Kennedy filed her initial

16    administrative charge with DFEH, complainant and other African American

17    employees have been denied advancement on account of race.  This has been

18    a continuing practice at Kaiser for at least 15 years.

19                              **HOSTILE WORK ENVIRONMENT**

20    20.  Throughout her employment, plaintiff was  supervised by individuals who were

21    not African-American or African-American woman. While under the supervision of non-

22    African American women, plaintiff was subject to a hostile work environment, was denied

23    promotions along her chosen career paths, was threatened, retaliated against and terminated

24    because of her race and disability and the fact they made complaints regarding the

25    employer's non-compliance with civil rights laws.  This included false negative comments

26    on performance reviews, inferior job assignments, denial of promotions to better paying

27    jobs and supervisory positions, termination and denial of reasonable accommodation. The

28    discriminatory treatment was manifested by plaintiff being treated differently by the

1  employer compared with similarly-situated employees who are not African American

2  women, African born and/or not disabled.

3      21. The hostile environment grew so intolerable that plaintiff suffered mental

4  distress leading to a psychological disability, requiring plaintiff to take medical leave from

5  Kaiser.  Plaintiff and her treating psychologist informed Kaiser of the psychological

6  disability, and requested reasonable accommodation, including assignment to a department

7  which did not reflect Kaiser's culture of race discrimination.  Kaiser refused to accomodate,

8  and it denied Ms. Kennedy access to its internal employment application process.

9      22. Following plaintiff's attempt to address her unequal and unlawful treatment at

10  Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

11  policies and practices, including designation of plaintiff as not eligible for rehire;

12  unreasonable, pre-determined one-sided investigations conducted outside the standards for

13  workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

14  and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

15  by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

16  to never apply to work at Kaiser again in the future.

17                            **DAMAGES**

18      23. As a direct and proximate result of defendants' actions as alleged herein,

19  defendants have breached their duties imposed on all employers as established by statute.

20      24. As a direct and proximate result of the refusal to promote plaintiff's employment,

21  plaintiff has suffered and will continue to suffer lost wages, salary increases, earnings

22  capacity and other benefits of employment, in an amount to be proven at trial.

23      25. As a further proximate result of defendants' unlawful actions, plaintiff has

24  suffered emotional pain, humiliation, mental anguish, and emotional distress.

25      26. The conduct of all of the defendants alleged above was deliberate, wilful and

26  malicious.  Further, the actions taken against plaintiff were carried out with reckless

27  disregard to the truth and the rights of plaintiff, and were despicable actions taken without

28  privilege or justification.

<center>CAUSE OF ACTION</center>
<center>(Violation of California Government Code 12940, et seq.,<br>California Fair Employment and Housing Act)</center>

16. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 15 of this complaint, as though fully set forth herein.

17. Defendant Kaiser is an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

18. Plaintiff is a member of a protected class as set forth in Government Code 12940 et seq.

19. The harms alleged herein occurred within the jurisdiction of this Court and the amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

20. The discriminatory treatment of plaintiff's employment and retaliatory actions, as set forth herein, were done with discriminatory motive, in violation of public policy and was based on the fact that plaintiff was over the age of 45, is African American and is a woman, and had complained about management's Equal Employment practices.

<center>PRAYER FOR RELIEF</center>

Wherefore, plaintiff prays for judgement against defendants, and each of them as follows:

1. For general and special damages, in an amount to be determined at trial;

2. For back pay and wages and loss of other benefits due as a result of the wrongful conduct of defendants, in an amount to be determined at trial;

3. For an order instating plaintiff to the position denied her and ordering defendant to cease engaging in a pattern and practice of discrimination,

4. For statutory interest on plaintiff's past wage loss;

5. For damages of pain and suffering and emotional distress;

6. For exemplary and punitive damages in an amount to be determined at trial;

7. For reasonable attorney fees and costs of suit; and

8. For other such relief as the Court may deem just and proper.

<center>PLAINTIFF'S COMPLAINT FOR DAMAGES – Page 14</center>

1

2

Respectfully submitted,

3  Dated: July 8, 2016                    LAW OFFICE OF JEREMY L. FRIEDMAN

4

5                                  By: _____
                                       Jeremy L. Friedman
6                                      Attorney for plaintiff Sheila Kennedy

7

8

9                              **DEMAND FOR JURY TRIAL**

10      Plaintiff hereby demands a jury trial on all issues.

11  Dated: July 8, 2016                    LAW OFFICE OF JEREMY L. FRIEDMAN

12

13                                 By: _____
                                       Jeremy L. Friedman
14                                     Attorney for plaintiff Sheila Kennedy

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California 94105. On February 3, 2017, I served the within document(s):

**NOTICE OF NEW AUTHORITY**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☒ by placing the document(s) listed above in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

☐ electronically by using the Court's ECF/CM System.

Jeremy L. Friedman
Law Offices of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 3, 2017, at San Francisco, California.

Lisa Rivers

PROOF OF SERVICE

36285424v.1

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                         Honorable   Ioana Petrou                      , Judge

Cause called for Motion: February 07, 2017.

Prior to the hearing, the Court issued a tentative ruling, which was not contested and was affirmed as set forth below.

Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff.  Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants. Defendants shall have 30 days thereafter to respond.

Minutes of     02/07/2017
Entered on     02/07/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By     Digital

_____
Deputy Clerk

Attorney at Law                                        Kaiser Foundation Health Plan, Inc
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>                                   Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Kaiser Foundation Health Plan, Inc<br>                                   Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Demurrer to Complaint<br>Sustained |

The Demurrer to Complaint was set for hearing on 02/07/2017 at 09:00 AM in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff.  Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

---

Dated:  02/07/2017

_facsimile_

_____

Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 02/07/2017

# DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 02/08/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

ENDORSED
FILED
ALAMEDA COUNTY

FEB - 8 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1   SEYFARTH SHAW LLP
    Kristina M. Launey (SBN 221335)
2   klauney@seyfarth.com
    Julie Yap (SBN 243450)
3   jyap@seyfarth.com
    Tiffany T. Tran (SBN 294213)
4   ttran@seyfarth.com
    400 Capitol Mall, Suite 2350
5   Sacramento, California 95814-4428
    Telephone:     (916) 448-0159
6   Facsimile:     (916) 558-4839

7   SEYFARTH SHAW LLP
    Bethany A. Vasquez (SBN 209423)
8   bvasquez@seyfarth.com
    560 Mission Street, 31st Floor
9   San Francisco, CA 94105-2930
    Telephone:     (415) 397-2823
10  Facsimile:     (415) 397-8549

11  Attorneys for Defendants
    KAISER FOUNDATION HEALTH PLAN, INC.;
12  KAISER FOUNDATION HOSPITALS; and THE
    PERMANENTE MEDICAL GROUP

13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                         COUNTY OF ALAMEDA

17

18  LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                  **NOTICE OF ENTRY OF ORDER
                                            SUSTAINING DEMURRER TO
20       v.                                 COMPLAINT**

21  KAISER FOUNDATION HEALTH PLAN, INC.;    Hearing Date:   February 7, 2017
    KAISER FOUNDATION HOSPITALS, INC.; and  Time:           9:00 a.m.
22  THE PERMANENTE MEDICAL GROUP; all       Dept.:          15
    doing business as KAISER PERMANENTE     Judge:          Ioana Petrou
23  MEDICAL CARE PROGRAM,

24              Defendants.                 Reservation number:   R-1802056

25

26

27

28

_____
              NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT
37047650v.1

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on February 7, 2017, the Court entered the Order Sustaining Demurrer to Complaint.  A true and correct copy of the filed Order is attached as Exhibit A

DATED: February 8, 2017

Respectfully submitted,

SEYFARTH SHAW LLP

BY: _____
Kristina M. Launey
Julie Yap
Bethany A. Vasquez
Tiffany T. Tran
Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; and THE PERMANENTE MEDICAL GROUP

1

NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT

37047650v.1

Attorney at Law                                    Kaiser Foundation Health Plan, Inc
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>                      Plaintiff/Petitioner(s)<br><br>          VS.<br><br>Kaiser Foundation Health Plan, Inc<br>                    Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16826717<br><br>Order<br><br>Demurrer to Complaint<br>Sustained |

The Demurrer to Complaint was set for hearing on 02/07/2017 at 09:00 AM in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff.  Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

Dated: 02/07/2017

_____
facsmile
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 02/07/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 02/08/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____
                              Deputy Clerk

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California 94105. On February 8, 2017, I served the within document(s):

**NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT**

☐ I sent such document from facsimile machines (415) 397-8549 on February 8, 2017. I certify that said transmission was completed and that all pages were received and that a report was generated by said facsimile machine which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☒ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610
Telephone: (510) 530-9060
Facsimile: (510) 530-9087

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 8, 2017, at San Francisco, California.

Lisa Rivers

PROOF OF SERVICE

37047951v.1

MC–050

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Bethany A. Vasquez (SBN 209423)<br>Seyfarth Shaw LLP<br>560 Mission Street, 31st Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415-397-2823    FAX NO. *(Optional):* 415-397-8549<br>E-MAIL ADDRESS *(Optional):* bvasquez@seyfarth.com<br>ATTORNEY FOR *(Name):* The Permanente Medical Group | ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>FEB - 9 2017<br><br>CLERK OF THE SUPERIOR COURT<br>By: ERICA BAKER, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

CASE NAME:
Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al.

| SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | CASE NUMBER:<br>RG16826717 |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name):* _____ makes the following substitution:

1. **Former legal representative**   ☐ Party represented self   ☑ Attorney *(name):* Bethany A. Vasquez
2. **New legal representative**   ☐ Party is representing self*   ☑ Attorney
   a. Name: Heather Ann Morgan    b. State Bar No. *(if applicable):* 177425
   c. Address *(number, street, city, ZIP, and law firm name, if applicable):*
      Grube Brown & Geidt LLP, 633 West 5th Street, Suite 3330, Los Angeles, CA 90071

   d. Telephone No. *(include area code):* 213-358-2810
3. The party making this substitution is a   ☐ plaintiff  ☑ defendant  ☐ petitioner  ☐ respondent  ☐ other *(specify):*
   The Permanente Medical Group

---

**\*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

| • Guardian | • Personal Representative | • Guardian ad litem |
| • Conservator | • Probate fiduciary | • Unincorporated |
| • Trustee | • Corporation | association |

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

---

**NOTICE TO PARTIES WITHOUT ATTORNEYS**
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

---

4. I consent to this substitution.
   Date: February 1, 2017
   The Permanente Medical Group
   _____
   (TYPE OR PRINT NAME)                    ▶ *(signature)*
                                           (SIGNATURE OF PARTY)

5. ☑ I consent to this substitution.
   Date: February 1, 2017
   Bethany A. Vasquez
   _____
   (TYPE OR PRINT NAME)                    ▶ *(signature)*
                                           (SIGNATURE OF FORMER ATTORNEY)

6. ☑ I consent to this substitution.
   Date: February 1, 2017
   Heather Ann Morgan
   _____
   (TYPE OR PRINT NAME)                    ▶ *(signature)*
                                           (SIGNATURE OF NEW ATTORNEY)

*(See reverse for proof of service by mail)*                                    Page 1 of 2

| Form Adopted For Mandatory Use<br>Judicial Council of California<br>MC-050 [Rev. January 1, 2009] | SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | Code of Civil Procedure, §§ 284(1), 285;<br>Cal. Rules of Court, rule 3.1362<br>www.courtinfo.ca.gov |

MC–050

| CASE NAME: | CASE NUMBER: |
|---|---|
| Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al. | RG16826717 |

## PROOF OF SERVICE BY MAIL
### Substitution of Attorney—Civil

**Instructions:** *After having all parties served by mail with the Substitution of Attorney—Civil, have the person who mailed the document complete this Proof of Service by Mail. An* <u>unsigned</u> *copy of the Proof of Service by Mail should be completed and served with the document. Give the Substitution of Attorney—Civil and the completed Proof of Service by Mail to the clerk for filing. If you are representing yourself, someone else must mail these papers and sign the Proof of Service by Mail.*

1. I am over the age of 18 and **not a party to this cause.** I am a resident of or employed in the county where the mailing occurred. My residence or business address is *(specify):*

2. I served the Substitution of Attorney—Civil by enclosing a true copy in a sealed envelope addressed to each person whose name and address is shown below and depositing the envelope in the United States mail with the postage fully prepaid.

    (1) Date of mailing:                    (2) Place of mailing *(city and state):*

3. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____        _____
(TYPE OR PRINT NAME)                              (SIGNATURE)

### NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED

4.  a. Name of person served:
    b. Address *(number, street, city, and ZIP):*

    c. Name of person served:
    d. Address *(number, street, city, and ZIP):*

    e. Name of person served:
    f. Address *(number, street, city, and ZIP):*

    g. Name of person served:
    h. Address *(number, street, city, and ZIP):*

    i. Name of person served:
    j. Address *(number, street, city, and ZIP):*

☐ List of names and addresses continued in attachment.

1

**PROOF OF SERVICE**

2    I am a resident of the State of California, over the age of eighteen years, and not a party to the
within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California 94105.
3    On February 9, 2017, I served the within document(s):

4    **SUBSTITUTION OF ATTORNEY**

5    ☐ I sent such document from facsimile machines (415) 397-8549 on February 9, 2017. I certify
that said transmission was completed and that all pages were received and that a report was
6    generated by said facsimile machine which confirms said transmission and receipt. I, thereafter,
mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in
7    sealed envelope(s) addressed to the parties listed below.

8    ☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid,
in the United States mail at San Francisco, California, addressed as set forth below.
9

10    ☒ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth
below.

11    ☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a
sealed envelope or package provided by an overnight delivery carrier with postage paid on
12    account and deposited for collection with the overnight carrier at San Francisco, California,
addressed as set forth below.

13
☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth
14    below.

15    Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman
16    2801 Sylhowe Road
Oakland, CA 94610
17    Telephone: (510) 530-9060
Facsimile: (510) 530-9087
18

19    I am readily familiar with the firm's practice of collection and processing correspondence for
mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with
20    postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party
served, service is presumed invalid if postal cancellation date or postage meter date is more than one day
21    after date of deposit for mailing in affidavit.

22    I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.
23

24    Executed on February 9, 2017, at San Francisco, California.

25                                                                    Lisa Rivers

26

27

28

37047951v.1

MC–050

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Bethany A. Vasquez (SBN 209423)<br>Seyfarth Shaw LLP<br>560 Mission Street, 31st Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415-397-2823   FAX NO. *(Optional):* 415-397-8549<br>E-MAIL ADDRESS *(Optional):* bvasquez@seyfarth.com<br>ATTORNEY FOR *(Name):* Kaiser Foundation Health Plan, Inc. | *ENDORSED*<br>*FILED*<br>*ALAMEDA COUNTY*<br><br>FEB – 9 2017<br><br>CLERK OF THE SUPERIOR COURT<br>By: ERICA BAKER, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

CASE NAME:
Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al.

| SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | CASE NUMBER:<br>RG16826717 |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name):*          makes the following substitution:

1. **Former legal representative**  ☐ Party represented self  ☑ Attorney *(name):* Bethany A. Vasquez
2. **New legal representative**  ☐ Party is representing self*  ☑ Attorney
   a. Name: Heather Ann Morgan     b. State Bar No. *(if applicable):* 177425
   c. Address *(number, street, city, ZIP, and law firm name, if applicable):*
      Grube Brown & Geidt LLP, 633 West 5th Street, Suite 3330, Los Angeles, CA  90071

   d. Telephone No. *(include area code):* 213-358-2810
3. The party making this substitution is a  ☐ plaintiff  ☑ defendant  ☐ petitioner  ☐ respondent  ☐ other *(specify):*
   Kaiser Foundation Health Plan, Inc.

---

**\*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

| • Guardian | • Personal Representative | • Guardian ad litem |
|---|---|---|
| • Conservator | • Probate fiduciary | • Unincorporated |
| • Trustee | • Corporation |   association |

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

---

**NOTICE TO PARTIES WITHOUT ATTORNEYS**
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

---

4. I consent to this substitution.
   Date: February __1__, 2017
   Kaiser Foundation Health Plan, Inc.
   _____  ▶ _____
   (TYPE OR PRINT NAME)  (SIGNATURE OF PARTY)

5. ☑  I consent to this substitution.
   Date: February __1__, 2017
   Bethany A. Vasquez
   _____  ▶ _____
   (TYPE OR PRINT NAME)  (SIGNATURE OF FORMER ATTORNEY)

6. ☑  I consent to this substitution.
   Date: February ____, 2017
   Heather Ann Morgan
   _____  ▶ _____
   (TYPE OR PRINT NAME)  (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)  Page 1 of 2

MC–050

| CASE NAME: | CASE NUMBER: |
|---|---|
| — Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al. | RG16826717 |

## PROOF OF SERVICE BY MAIL
### Substitution of Attorney—Civil

**Instructions:** *After having all parties served by mail with the Substitution of Attorney—Civil, have the person who mailed the document complete this Proof of Service by Mail. An* <u>unsigned</u> *copy of the Proof of Service by Mail should be completed and served with the document. Give the Substitution of Attorney—Civil and the completed Proof of Service by Mail to the clerk for filing. If you are representing yourself, someone else must mail these papers and sign the Proof of Service by Mail.*

1. I am over the age of 18 and **not a party to this cause.** I am a resident of or employed in the county where the mailing occurred. My residence or business address is *(specify):*

2. I served the Substitution of Attorney—Civil by enclosing a true copy in a sealed envelope addressed to each person whose name and address is shown below and depositing the envelope in the United States mail with the postage fully prepaid.

   (1 ) Date of mailing:                    (2) Place of mailing *(city and state):*

3. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____                    _____
(TYPE OR PRINT NAME)                                          (SIGNATURE)

### NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED

4.  a. Name of person served:
    b. Address *(number, street, city, and ZIP):*


    c. Name of person served:
    d. Address *(number, street, city, and ZIP):*


    e. Name of person served:
    f. Address *(number, street, city, and ZIP):*


    g. Name of person served:
    h. Address *(number, street, city, and ZIP):*


    i. Name of person served:
    j. Address *(number, street, city, and ZIP):*


☐   List of names and addresses continued in attachment.

**SUBSTITUTION OF ATTORNEY—CIVIL**
**(Without Court Order)**

<div align="center">

**PROOF OF SERVICE**

</div>

1

2          I am a resident of the State of California, over the age of eighteen years, and not a party to the
within action. My business address is 560 Mission Street, 31st Floor, San Francisco, California  94105.

3    On February 9, 2017, I served the within document(s):

4

<div align="center">

**SUBSTITUTION OF ATTORNEY**

</div>

5    ☐    I sent such document from facsimile machines (415) 397-8549 on February 9, 2017.  I certify
          that said transmission was completed and that all pages were received and that a report was

6          generated by said facsimile machine which confirms said transmission and receipt.  I, thereafter,
          mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in

7          sealed envelope(s) addressed to the parties listed below.

8    ☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid,
          in the United States mail at San Francisco, California, addressed as set forth below.

9

10   ☒    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth
          below.

11   ☐    by placing the document(s) listed above, together with an unsigned copy of this declaration, in a
          sealed envelope or package provided by an overnight delivery carrier with postage paid on

12         account and deposited for collection with the overnight carrier at San Francisco, California,
          addressed as set forth below.

13

14   ☐    by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth
          below.

15        Jeremy L. Friedman, Esq.
          Law Offices of Jeremy L. Friedman

16        2801 Sylhowe Road
          Oakland, CA  94610

17        Telephone: (510) 530-9060
          Facsimile:  (510) 530-9087

18

19        I am readily familiar with the firm's practice of collection and processing correspondence for
mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with

20   postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party
served, service is presumed invalid if postal cancellation date or postage meter date is more than one day

21   after date of deposit for mailing in affidavit.

22        I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

23

24        Executed on February 9, 2017, at San Francisco, California.

25                                                                          Lisa Rivers

26

27

28

<div align="center">

PROOF OF SERVICE

</div>

MC-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Bethany A. Vasquez (SBN 209423)<br>Seyfarth Shaw LLP<br>560 Mission Street, 31st Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415-397-2823    FAX NO. *(Optional)*: 415-397-8549<br>E-MAIL ADDRESS *(Optional)*: bvasquez@seyfarth.com<br>ATTORNEY FOR *(Name)*: Kaiser Foundation Hospitals | *ENDORSED*<br>*FILED*<br>ALAMEDA COUNTY<br><br>FEB - 9 2017<br><br>CLERK OF THE SUPERIOR COURT<br>By: ERICA BAKER, Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA |
|---|
| STREET ADDRESS: 1225 Fallon Street |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: Oakland, CA 94612 |
| BRANCH NAME: Rene C. Davidson Alameda County Courthouse |

| CASE NAME: |
|---|
| Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al. |

| SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | CASE NUMBER:<br>RG16826717 |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name)*:                                    .makes the following substitution:

1. **Former legal representative** ☐ Party represented self ☑ Attorney *(name)*: Bethany A. Vasquez
2. **New legal representative** ☐ Party is representing self* ☑ Attorney
   a. Name: Heather Ann Morgan        b. State Bar No. *(if applicable)*: 177425
   c. Address *(number, street, city, ZIP, and law firm name, if applicable)*:
      Grube Brown & Geidt LLP, 633 West 5th Street, Suite 3330, Los Angeles, CA 90071

   d. Telephone No. *(include area code)*: 213-358-2810
3. The party making this substitution is a ☐ plaintiff ☑ defendant ☐ petitioner ☐ respondent ☐ other *(specify)*:
   Kaiser Foundation Hospitals

---

**\*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

- Guardian
- Conservator
- Trustee

- Personal Representative
- Probate fiduciary
- Corporation

- Guardian ad litem
- Unincorporated association

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

---

**NOTICE TO PARTIES WITHOUT ATTORNEYS**

A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

---

4. I consent to this substitution.
   Date: February ___, 2017
   Kaiser Foundation Hospitals
   _____
   (TYPE OR PRINT NAME)                                      ► _____ (SIGNATURE OF PARTY)

5. ☑ I consent to this substitution.
   Date: February ___, 2017
   Bethany A. Vasquez
   _____
   (TYPE OR PRINT NAME)                                      ► _____ (SIGNATURE OF FORMER ATTORNEY)

6. ☑ I consent to this substitution.
   Date: February ___, 2017
   Heather Ann Morgan
   _____
   (TYPE OR PRINT NAME)                                      ► _____ (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)                                                           Page 1 of 2

MC—050

| CASE NAME: | CASE NUMBER: |
|---|---|
| Lunell Gamble v Kaiser Foundation Health Plan, Inc., et al. | RG16826717 |

**PROOF OF SERVICE BY MAIL**
**Substitution of Attorney—Civil**

**Instructions:** *After having all parties served by mail with the Substitution of Attorney—Civil, have the person who mailed the document complete this Proof of Service by Mail. An <u>unsigned</u> copy of the Proof of Service by Mail should be completed and served with the document. Give the Substitution of Attorney—Civil and the completed Proof of Service by Mail to the clerk for filing. If you are representing yourself, someone else must mail these papers and sign the Proof of Service by Mail.*

1. I am over the age of 18 and **not a party to this cause.** I am a resident of or employed in the county where the mailing occurred. My residence or business address is *(specify):*

2. I served the Substitution of Attorney—Civil by enclosing a true copy in a sealed envelope addressed to each person whose name and address is shown below and depositing the envelope in the United States mail with the postage fully prepaid.

   (1) Date of mailing:                         (2) Place of mailing *(city and state):*

3. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____              _____
    (TYPE OR PRINT NAME)                              (SIGNATURE)

**NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED**

4.  a. Name of person served:
    b. Address *(number, street, city, and ZIP):*


    c. Name of person served:
    d. Address *(number, street, city, and ZIP):*



    e. Name of person served:
    f. Address *(number, street, city, and ZIP):*



    g. Name of person served:
    h. Address *(number, street, city, and ZIP):*



    i. Name of person served:
    j. Address *(number, street, city, and ZIP):*



    ☐  List of names and addresses continued in attachment.

MC-050 [Rev. January 1, 2009]            **SUBSTITUTION OF ATTORNEY—CIVIL**            Page 2 of 2
                                              **(Without Court Order)**

1

## PROOF OF SERVICE

2   I am a resident of the State of California, over the age of eighteen years, and not a party to the
within action.  My business address is 560 Mission Street, 31st Floor, San Francisco, California  94105.

3 On February 9, 2017, I served the within document(s):

4

### SUBSTITUTION OF ATTORNEY

5 ☐ I sent such document from facsimile machines (415) 397-8549 on February 9, 2017.  I certify
that said transmission was completed and that all pages were received and that a report was

6   generated by said facsimile machine which confirms said transmission and receipt.  I, thereafter,
mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in

7   sealed envelope(s) addressed to the parties listed below.

8 ☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid,
in the United States mail at San Francisco, California, addressed as set forth below.

9

10 ☒ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth
below.

11 ☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a
sealed envelope or package provided by an overnight delivery carrier with postage paid on

12   account and deposited for collection with the overnight carrier at San Francisco, California,
addressed as set forth below.

13

14 ☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth
below.

15 Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman

16 2801 Sylhowe Road
Oakland, CA  94610

17 Telephone: (510) 530-9060
Facsimile:  (510) 530-9087

18

19   I am readily familiar with the firm's practice of collection and processing correspondence for
mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with

20 postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party
served, service is presumed invalid if postal cancellation date or postage meter date is more than one day

21 after date of deposit for mailing in affidavit.

22   I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

23

24   Executed on February 9, 2017, at San Francisco, California.

25           Lisa Rivers

26

27

28

37047951v.1

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA 94602_____

Kaiser Foundation Health Plan, Inc

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| Gamble | | No. <u>RG16826717</u> |
|---|---|---|
| | Plaintiff/Petitioner(s) | Case Management Order |
| | VS. | Complaint - Other Employment |
| Kaiser Foundation Health Plan, Inc | | |
| | Defendant/Respondent(s) | |
| | (Abbreviated Title) | |

ORDER re: CASE MANAGEMENT

FURTHER CONFERENCE

The Case Management Conference currently scheduled for 03/17/2017 is VACATED and continued to 05/26/2017 at 09:30 AM in Dept. 15.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council Form CM-110, must be filed no later than 05/11/2017. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to self-represented parties of record by mail.

The Court orders counsel and/or self-represented parties to obtain a copy of this order from the court's website http://www.alameda.courts.ca.gov/domainweb.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

Dated: 03/01/2017

_____
Judge Ioana Petrou

---

Order

1 │ Jeremy L. Friedman, CA Bar No. 142659
    LAW OFFICE OF JEREMY L. FRIEDMAN
2 │ 2801 Sylhowe Road.
    Oakland, Ca. 94610
3 │ Tel: (510) 530-9060
    Fax: (510) 530-9087
4 │
    Attorney for plaintiff Lunell Gamble
5 │

**FILED**
ALAMEDA COUNTY

MAR 1 0 2017

CLERK OF THE SUPERIOR COURT
By _____
                              DEPUTY

6 │
7 │         SUPERIOR COURT OF THE STATE OF CALIFORNIA
8 │                    COUNTY OF ALAMEDA

9 │ LUNELL GAMBLE                    )   Case No. RG16826717
10 │         Plaintiff               )   **FIRST AMENDED**
                                     )   **COMPLAINT FOR DAMAGES**
11 │ vs.                            )   (Employment discrimination)
12 │ KAISER FOUNDATION HEALTH        )
     PLAN, INC; KAISER FOUNDATION    )   **DEMAND FOR JURY TRIAL**
13 │ HOSPITALS, INC.; and THE        )
     PERMANENTE MEDICAL GROUP;       )
14 │ all doing business as KAISER    )
     PERMANENTE MEDICAL CARE         )
15 │ PROGRAM                         )
                                     )
16 │         Defendants              )
                                     )
17 │ _____ )
18 │                    **INTRODUCTION**

19 │    1.  This is an action for employment discrimination and retaliation against Kaiser
20 │ Permanente entities, arising out of a pattern and practice of race discrimination against
21 │ African American employees.  Plaintiff Lunell Gamble is an African American woman over
22 │ the age of 40, who was employed at Kaiser for more than 16 years.  Despite an exemplary
23 │ record in Kaiser's Human Resources Services Center (HRSC), during her employment Ms.
24 │ Gamble was subject to systemic discrimination and retaliation due to her race and age,
25 │ including a hostile work environment and retaliatory actions taken by her supervisors.  After
26 │ reaching the level of HR Specialist III in the Health and Welfare Department, without a
27 │ single prior incident of disciplinary action taken against her, Ms. Gamble was wrongfully
     terminated by Kaiser in July 2014.
28 │

1    2.  Although a substantial percentage of Kaiser's workforce is comprised of African-

2    American employees, due to systemic discrimination by a management that is

3    predominately non-African-American, this class of employees are too often denied training,

4    job reclassifications, positive performance reviews, transfers and  promotions, and they are

5    disproportionately subjected to discipline and termination.  As a result, Kaiser's workforce

6    is rigidly stratified with a disparate distribution by race and gender, with African-American

7    and African-American women predominantly assigned to the lowest paying positions with

8    the least chance of advancement, and predominantly excluded from higher paying and more

9    secure supervisory and management positions – positions with the greatest influence and

10   decision-making authority over reviews, promotions, retention, and termination.

11   3.  Plaintiff's claims are brought pursuant to the California Fair Employment and

12   Housing Act (FEHA), Cal. Government Code §12940 *et seq*.  ,She seeks to end Kaiser's

13   discriminatory practices and obtain monetary relief, including punitive damages.

14   **THE PARTIES**

15   4. Plaintiff Lunell Gamble is an African American woman who resides in California.

16   She was employed at Kaiser Permanente from for more than 16 years, until her termination

17   in July 2014.  Ms. Gamble worked initially as a temporary employee in the Human

18   Resources department (then known as "Peoples Solutions"), and began permanent

19   employment in July 1998 in that department, rising to the level of HR Specialist III.

20   5.  Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a

21   health care service plan, headquartered in Alameda County.  Health Plan enrolls members in

22   individual and group plans, and in Northern California, provides hospital and medical

23   services for its members through separate contracts with Medical Group and Hospitals.

24   6.  Kaiser Foundation Hospitals, Inc., is a nonprofit corporation, headquartered in

25   Alameda County; it operates hospitals and medical centers in California.  Hospitals receives

26   its funding from Health Plan, and provides infrastructure and facilities for the benefit of

27   Medical Group.

28

1    7.   The Permanente Medical Group is a group of physicians organized as a

2    professional corporation under California law.  Medical Group is privately owned and

3    managed by its physician shareholders.  Medical Group contracts with Health Plan to

4    provide medical services (both outpatient and inpatient) for Health Plan members in

5    Northern California.

6    8.  Medical Group, Hospitals, and Health Plan work in cooperation with each other

7    to form the integrated medical care services program with the trade name, Kaiser

8    Permanente Medical Care Program.  This enterprise is known to the general public, and is

9    doing business as, "Kaiser Permanente."  Collectively, the three entities are referred to

10   herein as "Kaiser."

11                              **ADMINISTRATIVE PROCESS**

12   9. Plaintiff previously and timely filed an administrative charge of discrimination

13   against her employer with the Department of Fair Employment and Education ("DFEH").

14   In that process, plaintiff complained about discrimination and retaliation she experienced,

15   leading up to her termination in July 2014. A copy of plaintiff's DFEH charge is attached as

16   an exhibit to this complaint. Plaintiff was issued a right to sue letter on August 10, 2015

17   (although she did not receive it personally until much later).  This action is timely filed

18   according to the date the letter was issued.

19   10.  Administrative and statutory claims of Ms. Gamble were tolled as a result of a

20   class action that was filed against Kaiser, in Hill et al. v. Kaiser Foundation Health Plan,

21   Case No. 3:10-cv-2833 LB, Northern District of California.  EEOC charges were filed by

22   named plaintiffs in that case on September 25, 2007, and the action was pending until

23   December 10, 2013.  During that time period, all limitation periods for filing administrative

24   charges were tolled.

25                           **PATTERN AND PRACTICE ALLEGATIONS**

26   11.  Kaiser Permanente is one of the largest health maintenance organizations of its

27   kind, providing a system of integrated health care to more than 8 million members in eight

28   different regions nationwide, employing over 180,000 people.  In Northern California,

---

1  Kaiser serves approximately 3.2 million members at 21 medical centers and 160 offices,

2  employing thousands of people in non-physician capacities.   Using a centralized

3  employment opportunity system, people external to Kaiser and current employees are able

4  to apply for open positions throughout Kaiser's operations, including by region.  Current

5  employees are told they will be provided with opportunities for employment that are not

6  available to external applicants, including access to job postings prior to their disclosure to

7  the general public, and a system by which employees may post their resumes for other

8  Kaiser departments to match to openings for hiring decisions.

9       12.  Kaiser maintains a unique business and organization structure, with regional

10  oversight of Northern California non-physician operations by a single executive

11  management hierarchy.  Within each division of Kaiser's operations, the employer has

12  created departmental hierarchies of similar nature and structure, including: entry level

13  positions, trained or skilled-level positions, team leaders and sub-leads, supervisors and

14  office-level managers, and divisional directors and assistant directors.  Kaiser also

15  maintains uniform employment and personnel policies applicable to all of its employees,

16  with centralized human resources, general counsel, payroll services, and labor and other

17  employment data.  Regardless of the department or division, there are uniform policies and

18  procedures for employee orientation, supervisory management, salary and incentive options,

19  job classifications, human resources, progressive discipline, rules of conduct, and

20  requirements for transfers, promotions and terminations.

21       13.  Within each department or function of Kaiser's operations, the employer has

22  developed its own unique procedures, information systems and business technologies

23  requiring specialized training and adaptive capabilities.  Employees are told they need

24  establish in their work performances that they are trained in and proficient with those

25  unique processes in order to be retained and/or promoted within Kaiser.  Access to that

26  training uniformly depends upon the discretion of divisional management, however,

27  including influence and decision-making at the supervisory and team management levels.

28  Similarly, performance reviews, job classification decisions, pay and salary structure

1  changes, and disciplinary actions all depend upon the discretion of that same divisional

2  management.  Few objective requirements or measurements are used for employment

3  decisions, which instead are largely based on subjective judgments of the supervisors and

4  managers within Kaiser's operations.

5      14.  Kaiser's executive and divisional managements for positions in EEO job groups

6  2F and 2G are predominately neither African-American nor African-American women.

7  African-Americans and African-American women are rarely promoted to supervisory or

8  management positions capable of influencing a significant proportion of the employer's

9  decision-making.  As a result, the decisions as to which employees receive specialized

10 training, particular assignments, job classifications, pay raises and incentives, transfer or

11 promotions, positive performance reviews and progressive disciplinary actions are made

12 and influenced principally by non-African-Americans.   Subjective judgments of Kaiser'

13 stratified supervisory and management system are often infected with conscious or

14 unconscious prejudices and race and/or race-gender based stereotypes, which explains why

15 so few African-American and African-American women out of Kaiser's large African-

16 American and African-American female employee population advance to supervisory and

17 management positions.

18     15.  This pattern of unequal training, assignments, classifications, pay, discipline and

19 advancement opportunities is not the result of random or non-discriminatory factors. Rather,

20 it is the result of an on-going and continuous pattern and practice of intentional race and

21 race-gender discrimination in training, assignments, classifications, pay, discipline,

22 performance reviews, terminations and promotions, and reliance on policies and practices

23 that have an adverse impact on African-American and African-American female employees

24 that cannot be justified by business necessity, and for which alternative policies and

25 practices with less discriminatory impact could be utilized that equally serve any asserted

26 justification. Plaintiff is informed and believes that such policies and practices include,

27 without limitation:

28

a.      Failure to consistently train African-American and African-American women in the unique Kaiser processes and practices necessary for desirable assignments and advancement.

b.      Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-African-American managerial workforce in making assignments, training, pay, performance review, discipline, promotion and termination decisions. Even where Kaiser's policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

c.      Reliance on race and race-gender stereotypes in making employment decisions such as assignments, promotions, pay and training.

d.      Pre-selection and "grooming" of non-African-American and non-African-American women employees for advancement, favorable assignments and training.

e.      Maintenance of largely race and race-gender segregated job categories and departments.

f.      Deterrence and discouragement of African-American and African-American female employees from seeking advancement, training, and favorable assignments and pay.

g.      Giving African-American and African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and non-African-American women employees.

h.      Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and African-American women employees, in disproportion to the same actions taken against non-African-American employees.

i.   Providing less training and support to African-American and African-American female employees and managers than that given to non-African-American employees and managers.

j.   Providing less or refusing to make reasonable accommodations for disabilities and sick leave policies with respect to African-American and African-American female employees, and unlawfully discriminating against African-American-employees due to their disabilities because of both their disabilities and their race and/or race-gender.

k.   Harassing  African-American and African-American female employees interested in advancement and subjecting them to a hostile work environment.

l.   Maintaining and fostering a reputation for discriminatory conduct which deters African-Americans and African-American females from pursuing promotional opportunities with Kaiser;

m.   Establishing and maintaining arbitrary and subjective requirements for discipline and promotions which have the effect of excluding qualified African-Americans and African-American females and which have not been shown to have any significant relationship to job performance or to be necessary to the safe and efficient conduct of Kaiser's business;

n.   Failing and refusing to take adequate steps to eliminate the effects of its past discriminatory practices; and

o.   Retaliating against African-American and African-American women employees who complain of unequal treatment.

16.   Kaiser's racially stratified workforce and discriminatory patterns and practices are propagated, entrenched and protected by centralized policies and practices directed at the highest levels of Kaiser management.  Although Kaiser operates many different departments at many different locations throughout the Northern California Region, it has centralized, company-wide policies and practices concerning supervisory training, human resources, EEO reporting and compliance and Kaiser's response to EEO complaints.  These

1  company-wide policies and practices include, among others:

2      a.    Directing, authorizing and training supervisors and directors to conceal
3            discriminatory actions and retaliate against those employees who might assist
4            the disclosure of false or trivial discipline as pretext for discrimination,
5            without regard to the specific facts and circumstances of the individual
6            employee or supervisor.

7      b.    Directing, authorizing and assist supervisors and directors in their
8            discriminatory and retaliatory employment actions, through a centralized
9            human resources department and, ultimately, the office of the general counsel,
10           in favor of supervisors and directors, and against the interests and complaints
11           of African American employees, without regard to the specific facts and
12           circumstances of the individual employee or supervisor, and in contravention
13           of obligation of Human Resources and general counsel to protect employees
14           from unlawful discrimination.

15     c.    Suppressing and falsifying information in connection with complaints over
16           employment actions made internally and to administrative agencies and courts
17           by African American employees, including unreasonable, one-sided, pre-
18           determined internal investigations conducted by a select few individuals for
19           the purpose of permitting, perpetuating and covering up discriminatory and
20           retaliatory actions and patterns, without regard to the specific facts and
21           circumstances of the individual employee or complaint.

22     f.    Concealing and entrenching discriminatory patterns and practices by making
23           false and misleading representations and statements, and engaging in
24           intentionally misleading conduct, to EEOC and OFCCP regarding its
25           compliance with federal regulations, including the requirement that Kaiser
26           conduct internal reviews and self-inquiry of statistical patterns, report
27           disparities, propose remedial plans (including affirmative action plans) and
28           monitor results over time.

g.   Misrepresent EEO practices and non-compliance to employees, government agencies, in the courts and to the public, included a public relations effort to promote a diversity department that is knowingly, purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.   Retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.   Designating African American employees, and in particular, those employees who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.   Abusing administrative and judicial processes to further patterns and practices of racial discrimination and in retaliation against African American employees who complain about the violation of their civil rights, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the existence of substantial evidence of Kaiser's violations of law.

k.   Perpetuating, protecting and concealing unlawful discrimination and patterns of disparate treatment by requiring employees who raise civil rights claims to

agree to confidentiality of the terms of settlement, without bargaining for such an agreement at arms length, and without justification in work product, attorney client privilege, trade secret or other basis for confidentiality.

l.    Kaiser's stand-alone litigation policy and practice – adopted and applied by general counsel in cases brought under anti-discrimination laws, without regard to specific facts and circumstances – requiring, as a condition of settlement, former employees to sign agreements not to work at Kaiser in the future, is a violation of federal and state civil rights laws; including whether plaintiff is entitled to a declaration that all such agreements are against public policy, unenforceable and null and void.

17.  Because of its discriminatory policies and practices, Kaiser retains, promotes, disciplines and terminates African Americans and African American women in statistically significant disproportionate rates, based on the proportion of qualified African Americans and African American women.  This in turn has the effect of diminishing the pool of eligible African Americans and African American women for promotion to supervisory, management and executive positions.  Kaiser's pattern and practice of discrimination is so pervasive and entrenched throughout that race and race-gender discrimination and unlawful retaliation can be said to be its modes of operations

**WRONGFUL TERMINATION**

18.  In 1997, plaintiff Gamble began working as a temporary employee (through a company called Adecco), in Peoples' Solutions, then the name of the Human Resources department for Kaiser.  On or about July 7, 1998, Ms. Gamble was hired as a permanent employee in that department.  Like many other African American employees at Kaiser, she performed her work according to the employer's needs, was well qualified and tried to improve her employment position over the years.  By the time of her termination, she had achieved the position of HR Specialist III, in the Benefits Department (the Health and Welfare Department) of what had been renamed the HRSC.

19.  In July 2012, Kaiser reorganized its Benefits Department, and plaintiff began receiving supervision from a new manager – Rosa Grajeda – who had been transferred from the Leaves Department.

20. From the beginning of her long tenure at Kaiser, and until her termination, Ms. Gamble did not receive any warnings or disciplinary actions related to her exemplary employment.  Despite her qualifications and excellent work performance, Ms. Gamble was subject to the pattern and practice of discrimination, based upon her race and age.  These included, but are not limited to the following:

a.    Ms. Gamble was one of the few African Americans to remain employed in the department, as other African American employees in that department, in Human Resources and throughout Kaiser were terminated for discriminatory reasons or forced to quit from dead-end positions at Kaiser.  Ms. Gamble witnessed their replacement with younger, non-African American employees who were equally or less qualified to perform the work.

b.    Despite a pool of African American employees qualified for supervisory and management positions, Ms. Gamble was subject to an employment hierarchy that was seemingly devoid of older, African American employees at the higher levels.  During her employment in Kaiser's Human Resources department, Kaiser employed no African American directors in that department, and few African Americans were given "lead" positions.

c.    After the departmental reorganization, Ms. Gamble was subject to constant harassment and unreasonable scrutiny by her manager, Ms. Grajeda.  In October 2012, Ms. Grajeda followed plaintiff into the department's bathroom, and criticized plaintiff for not working as she spoke through the curtain in the vanity area.  Plaintiff became both fearful of the manager, and appalled at her conduct, causing plaintiff to avoid using the department's bathroom from that point forward.  Plaintiff complained to senior management, but no apology was made or corrective action taken.

d.    In approximately February 2013, plaintiff was subject to ridicule and embarrassment by Ms. Grajeda, who falsely accused plaintiff of receiving complaints from the entire department over her perfume. After offering to communicate with her department over the matter, Ms. Grajeda admitted it was only she that had complained.

e.    In Approximately March 2014, plaintiff was singled out from non-African American employees and loudly scolded for laughing at work. This was done openly to embarrass plaintiff in front of co-workers. Even though Kaiser officially recognizes laughter as a part of its medical focus, and even though other, non-African American employees are seen laughing, plaintiff was criticized and made to feel inferior. Plaintiff was so upset by this incident that she was required to leave her manager by the desk, and she was later called into the manager's office for further criticism.

f.    Constant harassment and false criticism of work performance continued on a nearly daily basis. Ms. Grajeda lacked the knowledge and experience working in the Benefits department – knowledge and experience that plaintiff had gained. And yet, in managing plaintiff's work performance, the lack of understanding by the manager led to empty, false criticisms of the work.

g.    Throughout this period, Ms. Grajeda treated plaintiff and other older African American employees with disparate treatment, including refused to assign work to plaintiff commensurate with plaintiff's knowledge and skill levels, criticisms of work by African American employees that were not made against the same or even less quality work by younger, non-African Americans, and overlooking transgressions or mistakes by younger, non-African American employees.

21.    On July 18, 2014, plaintiff was given a "final written warning" threatening her with termination, even though she had not received a prior written warning or any of the progressive discipline Kaiser requires. Included in the written warning were false claims

---

1  regarding Ms. Gamble's work performance, including false accusations plaintiff had

2  "falsified" work records, and had acted with hostile aggression towards Ms. Grajeda.  Each

3  claim was mere pretext for Kaiser's discrimination against older, African Americans.

4      22.  Pursuant to its pattern and practice of discrimination, Kaiser had already

5  determined to terminate plaintiff's employment.  Following the final written warning,

6  plaintiff attempted to perform her work and meet with senior management over her

7  discipline.  Rather than providing an honest opportunity to perform the work, Kaiser set

8  plaintiff up for ultimate termination, which occurred on July 29, 2014.

9                                    **DAMAGES**

10     23. The hostile environment grew so intolerable that plaintiff suffered mental

11  distress. Following plaintiff's attempt to address her unequal and unlawful treatment at

12  Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

13  policies and practices, including designation of plaintiff as not eligible for rehire;

14  unreasonable, pre-determined one-sided investigations conducted outside the standards for

15  workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

16  and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

17  by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

18  to never apply to work at Kaiser again in the future.

19     24. As a direct and proximate result of defendants' actions as alleged herein,

20  defendants have breached their duties imposed on all employers as established by statute.

21     25. As a direct and proximate result of the refusal to promote plaintiff's employment,

22  plaintiff has suffered and will continue to suffer lost wages, salary increases, earnings

23  capacity and other benefits of employment, in an amount to be proven at trial.

24     26. As a further proximate result of defendants' unlawful actions, plaintiff has

25  suffered emotional pain, humiliation, mental anguish, and emotional distress.

26     27. The conduct of all of the defendants alleged above was deliberate, wilful and

27  malicious.  Further, the actions taken against plaintiff were carried out with reckless

28  disregard to the truth and the rights of plaintiff, and were despicable actions taken without

1  privilege or justification.

2                          FIRST CAUSE OF ACTION
                  (Violation of California Government Code 12940, *et seq.*,
3            California Fair Employment and Housing Act – Race Discrimination )

4      28. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through

5  27 of this complaint, as though fully set forth herein.

6      29. All three Kaiser entities acting together as a single employer comprise an entity

7  subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant

8  regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

9      30. Plaintiff is a member of a protected class as set forth in Government Code 12940

10 *et seq.*, based on her race, and color, as she is an African-American.  Plaintiff is also a

11 member of a protected subclass based on race, and color, as she is an African-American

12 woman.

13     31. The harms alleged herein occurred within the jurisdiction of this Court and the

14 amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

15     32. The discriminatory treatment of plaintiff's employment and harassment, as set

16 forth herein, were done with discriminatory motive, based on race, as well as a racial

17 subclass of race/gender, in violation of FEHA and public policy.

18                          SECOND CAUSE OF ACTION
                  (Violation of California Government Code 12940, *et seq.*,
19           California Fair Employment and Housing Act – Age Discrimination )

20     33. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through

21 27 of this complaint, as though fully set forth herein.

22     34. All three Kaiser entities acting together as a single employer comprise an entity

23 subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant

24 regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

25     35. Plaintiff is a member of a protected class as set forth in Government Code 12940

26 *et seq.*, based on her age, as she is over the age of 40.

27     36. The harms alleged herein occurred within the jurisdiction of this Court and the

28 amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

1    37. The discriminatory treatment of plaintiff's employment and harassment, as set

2  forth herein, were done with discriminatory motive, based on age, in violation of FEHA and

3  public policy.

4                                    THIRD CAUSE OF ACTION
                          (Violation of California Government Code 12940, *et seq*.,
5                        California Fair Employment and Housing Act – Retaliation )

6    38. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through

7  27 of this complaint, as though fully set forth herein.

8    39. All three Kaiser entities acting together as a single employer comprise an entity

9  subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant

10  regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

11    40. Plaintiff is a member of a protected class as set forth in Government Code 12940

12  *et seq*., based on her efforts and anticipated efforts to remedy the discrimination set forth in

13  this complaint, as well as her membership in the protected classes and subclasses of African

14  Americans, African American Women, and older individuals, as described herein.  Such

15  efforts include complaints internal to Kaiser regarding her treatment by Kaiser, her efforts

16  to remedy the hostile environment that Kaiser creates for protected employees, her

17  complaint to DFEH, and the filing, and/or anticipated filing, of this lawsuit.

18    41. The harms alleged herein occurred within the jurisdiction of this Court and the

19  amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

20    42. The discriminatory treatment of plaintiff's employment, harassment and

21  retaliatory actions, as set forth herein, were done with discriminatory motive, based on the

22  fact that plaintiff engaged in protected activity, and on the anticipation and expectation of

23  all three defendants, acting as a single employer, with regard to plaintiff's remedial actions,

24  in violation of FEHA and public policy.

25                                     PRAYER FOR RELIEF

26    Wherefore, plaintiff prays for judgement against defendants, and each of them as

27  follows:

28

1.  For general and special damages, in an amount to be determined at trial;

2.  For back pay and wages and loss of other benefits due as a result of the wrongful conduct of defendants, in an amount to be determined at trial;

3.  For an order instating plaintiff to the position denied her and ordering defendant to cease engaging in a pattern and practice of discrimination,

4.  For statutory interest on plaintiff's past wage loss;

5.  For damages of pain and suffering and emotional distress;

6.  For exemplary and punitive damages in an amount to be determined at trial;

7.  For reasonable attorney fees and costs of suit; and

8.  For other such relief as the Court may deem just and proper.

Respectfully submitted,

Dated: March 10, 2017                LAW OFFICE OF JEREMY L. FRIEDMAN


By:  _____
     Jeremy L. Friedman
     Attorney for plaintiff Lunell Gamble


**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues.

Dated: March 10, 2017                LAW OFFICE OF JEREMY L. FRIEDMAN


By:  _____
     Jeremy L. Friedman
     Attorney for plaintiff Lunell Gamble

FIRST AMENDED COMPLAINT FOR DAMAGES – Page 16

**EXHIBIT – Plaintiff's DFEH Charge**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

## BEFORE THE STATE OF CALIFORNIA

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

In the Matter of the Complaint of                    DFEH No. 340711-121071
Lunell Gamble, Complainant.                          EEOC No.

vs.

 Kaiser National HRSC Health And Welfare Dept
Respondent.
1451 Harbor Bay Pkwy
Alameda,  California 94502

Complainant alleges:

1. Respondent **Kaiser National HRSC Health And Welfare Dept** is a **Other** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).  Complainant believes respondent is subject to the FEHA.

2. Complainant may be ignorant of the true names and capacities of co-respondents.  The Department of Fair Employment and Housing may amend this complaint to allege their true names and capacities when ascertained. (Complainant is informed and believes and thereon alleges that the respondent and each co-respondent is responsible in some manner for the occurrences herein alleged, and that complainant's injuries as herein alleged were proximately caused by the aforementioned respondent(s).)

3. On or around **Jul 18, 2014,** complainant alleges that respondent took the following adverse actions against them: **Discrimination, Harassment, Retaliation Terminated** .  Complainant believes respondent committed these actions because of their: **Age - 40 and over, Color, Race** .  The alleged unlawful employment practice(s) occurred in **Alameda**, **California**.

4. Complainant **Lunell Gamble** resides in the City of **Richmond**, State of **CA**. If complaint includes co-respondents please see page 2.

**DFEH 902-1**

-2-
*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2    **Co-Respondents:**
     Kaiser National HRSC Health And Welfare Dept
3    Shibioan O`Conner
     1451 Harbor Bay Parkway
4    Alameda  California 94502

5    Kaiser National HRSC

6    1451 Harbor Bay Parkway
     Alameda  California 94502

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

-3-
*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2   VERIFICATION

3   I, **Lunell Gamble**, am the **Complainant** in the above-entitled complaint.  I have read the foregoing complaint
    and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are
4   therein alleged on information and belief, and as to those matters, I believe it to be true.

5   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

6                                                                                    **Richmond Ca**
                                                                                     **Lunell Gamble**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DFEH 902-1
                                            -4-
                            *Complaint – DFEH No. 340711-121071*

    Date Filed: Aug 13, 2014
    Date Corrected: October 25, 2014

**PROOF OF SERVICE**

Jeremy L. Friedman declares and states:

I have an office in Alameda county. I am over the age of eighteen years. My business address is 2801 Sylhowe Road, Oakland, CA, 94602.

I declare that on this day I served a copy of:

**First Amended Complaint**

by placing it in an envelope, addressed to the following address, with postage pre-paid for First Class mail, and depositing into a United States mailbox:

Amanda Bolliger Crespo, Esq.
Grube, Brown and Geidt, LLP
633 W. Fifth Street, Suite 3330
Los Angeles, CA 90071

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of March, 2017, in Oakland, CA.

/s/Jeremy L. Friedman
Jeremy L. Friedman

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Kaiser Foundation Health Plan, Inc

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble | No. <u>RG16826717</u> |
| Plaintiff/Petitioner(s) | |
| VS. | Case Management Order |
| | Complaint - Other Employment |
| Kaiser Foundation Health Plan, Inc | |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

OTHER ORDERS

Defendants may have until April 27, 2017 to respond to the amended complaint.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 06/20/2017 at 09:15 AM in Dept. 15.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council Form CM-110, must be filed no later than 06/05/2017. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to self-represented parties of record by mail.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

Dated:  04/08/2017

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Case Management Conference Order of 04/08/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 04/10/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

1     GRUBE BROWN & GEIDT LLP
2     HEATHER A. MORGAN (SB# 177425)
      AMANDA BOLLIGER CRESPO (SB# 250292)
3     heathermorgan@gbgllp.com
      amandacrespo@gbgllp.com
4     601 Montgomery Street, Suite 1150
      San Francisco, CA 94111
5     Telephone: (415) 603-5000
      Facsimile: (415) 840-7210

6     Attorneys for Defendants,
7     KAISER FOUNDATION HEALTH PLAN, INC.;
      KAISER FOUNDATION HOSPITALS; and
      THE PERMANENTE MEDICAL GROUP
8

**ENDORSED
FILED
ALAMEDA COUNTY**

**APR 2 7 2017**

CLERK OF THE SUPERIOR COURT
By _____
JANIE THOMAS, Deputy

9         SUPERIOR COURT OF THE STATE OF CALIFORNIA

10           IN AND FOR THE COUNTY OF ALAMEDA

11

12     LUNELL GAMBLE,

13           Plaintiff,

14        vs.

15     KAISER FOUNDATION HEALTH PLAN,
      INC; KAISER FOUNDATION
16     HOSPITALS, INC; and THE
      PERMANENTE MEDICAL GROUP; all
17     doing business as KAISER PERMANENTE
      MEDICAL CARE PROGRAM,
18

19           Defendants.

Case No. RG16826717

ASSIGNED FOR ALL PURPOSES TO
JUDGE IOANA PETROU
DEPARTMENT 15

**DEFENDANTS KAISER
FOUNDATION HOSPITALS AND THE
PERMANENTE MEDICAL GROUP'S
NOTICE OF DEMURRER AND
DEMURRER TO PLAINTIFF'S FIRST
AMENDED COMPLAINT**

Date:      May 31, 2017
Time:      9:00 a.m.
Judge:    Hon. Ioana Petrou
Dept.:     15

**Reservation No. R-1844959**

Complaint Filed:     August 9, 2016

20

21

22

23

24

25

26

27

28

1   **NOTICE OF DEMURRER**

2   TO PLAINTIFF LUNELL GAMBLE AND TO HER ATTORNEYS OF RECORD:

3           PLEASE TAKE NOTICE THAT on May 31, 2017, at 9:00 a.m., or as soon thereafter as

4   the matter may be heard, in Department 15 of the above-entitled court, located at 1221 Oak

5   Street, Oakland, California 94612, Defendants KAISER FOUNDATION HOSPITALS

6   ("Hospitals") and THE PERMANENTE MEDICAL GROUP ("Medical Group") will and hereby

7   do demur to the First Amended Complaint for Damages ("FAC") filed by Plaintiff Lunell Gamble

8   ("Plaintiff"), pursuant to sections 430.10 and 430.30 of the California Code of Civil Procedure,

9   on the grounds that (1) Plaintiff's failure to exhaust her administrative remedies against Hospitals

10  and Medical Group deprives this Court of jurisdiction to hear Plaintiff's Fair Employment and

11  Housing Act ("FEHA") claims against Hospitals and Medical Group in her First, Second and

12  Third Causes of Action; and (2) the Complaint fails to state facts sufficient to constitute a FEHA

13  cause of action against Hospitals and Medical Group because Plaintiff does not – and cannot –

14  allege facts establishing that either Hospitals or Medical Group ever employed her.

15          This Demurrer is based on this Notice of Demurrer and Demurrer; the supporting

16  Memorandum of Points and Authorities, Declaration of Amanda Bolliger Crespo, and Request for

17  Judicial Notice filed concurrently herewith; all other papers and pleadings on file in this matter;

18  and any oral and documentary evidence as may be presented prior to, or at the time of, the

19  hearing on this matter.

20  **DEMURRER**

21          Hospitals and Medical Group demur to all three of Plaintiff's Causes of Action in the

22  FAC, in which Plaintiff seeks to recover damages from Hospitals and Medical Group under

23  FEHA, on the following grounds:

24          The Court lacks jurisdiction to hear any FEHA claim against Hospitals or Medical Group,

25  including Plaintiff's First, Second, and Third Causes of Action, because Plaintiff failed to name

26  Hospitals or Medical Group in the only administrative charge she filed with the Department of

27  Fair Employment & Housing ("DFEH").

28

-1-
DEFTS' NOTICE OF DEMURRER AND DEMURRER TO FIRST AMENDED COMPLAINT;
MPA ISO THEREOF

1    Plaintiff's First, Second, and Third Causes of Action also fail to state facts sufficient to

2  support a FEHA cause of action against Hospitals and Medical Group because (1) judicially

3  noticeable records establish that Plaintiff was employed by Defendant Kaiser Foundation Health

4  Plan, Inc. ("KFHP"), not Hospitals or Medical Group; (2) California law mandates the separate

5  existence of health care service plans, like KFHP, and medical providers, like Hospitals and

6  Medical Group, thereby foreclosing Plaintiff's "single employer" theory; and (3) Plaintiff fails to

7  allege facts in the FAC sufficient to proceed on a single employer theory in any event.

8    Plaintiff cannot remedy any of the foregoing defects. As such, the demurrer should be

9  sustained without leave to amend, and Hospitals and Medical Group should be dismissed from

10 this case with prejudice.

11

DATED:  April 27, 2017                    GRUBE BROWN & GEIDT LLP

12

13

BY: *Amanda Bolliger Crespo*

14                                   AMANDA BOLLIGER CRESPO

15                                   Attorneys for Defendants
                                     KAISER FOUNDATION HEALTH PLAN,
16                                   INC; KAISER FOUNDATION HOSPITALS;
                                     and THE PERMANENTE MEDICAL
17                                   GROUP

18

19

20

21

22

23

24

25

26

27

28

-2-
DEFTS' NOTICE OF DEMURRER AND DEMURRER TO FIRST AMENDED COMPLAINT;
MPA ISO THEREOF

1
2

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

I.    INTRODUCTION ................................................................................. 1

II.   ALLEGED AND JUDICIALLY NOTICEABLE FACTS SUPPORTING
      DEMURRER AND PROCEDURAL BACKGROUND ........................... 2

III.  THE COURT SHOULD DISMISS HOSPITALS AND MEDICAL GROUP
      WITH PREJUDICE. ............................................................................. 4

      A.    Plaintiff's Failure to Exhaust Her Administrative Remedies Against
            Hospitals and Medical Group Deprives This Court of Jurisdiction Over
            Plaintiff's FEHA Claims Against Those Defendants............................. 4

      B.    Hospitals and Medical Group Did Not Employ Plaintiff and Should Be
            Dismissed With Prejudice. ....................................................... 6

            1.    Judicially-Noticeable Evidence Establishes that KFHP – Not
                  Hospitals or Medical Group – Employed Plaintiff. ..................... 6

            2.    Plaintiff's "Single Employer" Theory Is Not Viable as to
                  Defendants. ................................................................. 8

            3.    Plaintiff's Conclusory "Single Employer" Allegation Fails to Meet
                  the Single Enterprise Test in Any Event. ................................. 10

      C.    Plaintiff Cannot Amend the Complaint to Cure the Jurisdictional Defect
            and Legal Deficiencies of Her Claims Against Hospitals and Medical
            Group. ......................................................................... 11

IV.   CONCLUSION ................................................................................. 12

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Aguilera v. Heiman,*
   174 Cal. App. 4th 590 (2009) ................................................... 6

5

*Blank v. Kirwan,*
   39 Cal. 3d 311 (1985) ............................................................. 11

6

*Cansino v. Bank of America,*
   224 Cal. App. 4th 1462 (2014) ................................................. 7

7

8

*Cole v. Antelope Valley Union High Sch. Dist.,*
   47 Cal. App. 4th 1505 (1996) ................................................... 5

9

*Cooper v. Leslie Salt Co.,*
   70 Cal. 2d 627 (1969) ............................................................. 11

10

11

*El Rancho Unified School Dist. v. National Education Assn.,*
   33 Cal. 3d 946 (1983) ............................................................... 7

12

*Evans v. City of Berkeley,*
   38 Cal. 4th 1 (2006) .................................................................. 6

13

14

*Fontenot v. Wells Fargo Bank, N.A.,*
   198 Cal. App. 4th 256 (2011) ................................................... 7

15

*Friends of Shingle Springs Interchange, Inc. v. Cnty. of El Dorado,*
   200 Cal. App. 4th 1470 (2011) ................................................. 4

16

17

*Gopal v. Kaiser Foundation Health Plan, Inc.,*
   248 Cal. App. 4th 425 (2016) ............................................. 10, 11

18

*Hoffman v. Smithwoods RV Park, LLC,*
   179 Cal. App. 4th 390 (2009) ................................................... 6

19

20

*Kelly v. Methodist Hosp. of S. Cal.,*
   22 Cal. 4th 1108 (2000) ............................................................ 6

21

*Kennedy v. Kaiser Foundation Health Plan, Inc.*
   (Super. Ct. Alameda County, 2016, No. RG16822544) .................... 3, 10

22

23

*Laird v. Capital Cities/ABC, Inc.,*
   68 Cal. App. 4th 727 (1998) ............................................... 10, 11

24

*McCaskey v. California State Auto. Assn.,*
   189 Cal. App. 4th 947 (2010) ................................................... 5

25

26

*McDonald v. Antelope Valley Community College Dist.,*
   45 Cal. 4th 88 (2008) ............................................................... 4

27

28

-ii-

# TABLE OF AUTHORITIES

## (cont'd)

Page(s)

*Medix Ambulance Service, Inc. v. Superior Court*,
97 Cal. App. 4th 109 (2002) .............................................................................. 5

*Okoli v. Lockheed Technical Operations Co.*,
36 Cal. App. 4th 1607 (1995) ............................................................................ 5

*Reyes v. Healthcare Serv. Grps.*,
No. 2:15-cv-07177-CAS-KLS, 2015 WL 6551870 (C.D. Cal. Oct. 26, 2015) ......... 5

*Rhodes v. Sutter Health*,
949 F. Supp. 2d 997 (E.D. Cal. 2013) ................................................................ 9

*Rojo v. Kliger*,
52 Cal. 3d 65 (1990) .......................................................................................... 4

*Satten v. Webb*,
99 Cal. App. 4th 365 (2002) .............................................................................. 4

*Scott v. JPMorgan Chase Bank, N.A.*,
214 Cal. App. 4th 743 (2013) ......................................................................... 6, 8

*Theiler v. Ventura Cnty. Community College Dist.*,
198 Cal. App. 4th 852 (2011) ............................................................................ 7

*Watanabe v. Cal. Physicians' Serv.*,
169 Cal. App. 4th 56 (2008) ............................................................................ 10

*Watson v. Los Altos Sch. Dist., Santa Clara Cnty.*,
149 Cal. App. 2d 768 (1957) ............................................................................. 6

**Statutes**

Civ. Proc. Code § 430.30(a) ........................................................................... 6, 7

Evid. Code § 452(h) .......................................................................................... 7

Govt. Code § 12926 ..................................................................................... 6, 11

Govt. Code § 12928 ........................................................................................ 1, 7

Govt. Code § 12960(b) ...................................................................................... 4

Health & Safety Code § 1345(f)(i) ..................................................................... 9

Health & Safety Code § 1345(i) ....................................................................... 10

Health & Safety Code § 1345(q) ........................................................................ 9

Health & Safety Code § 1371.25 ........................................................................ 9

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      Plaintiff's misguided attempt to assert unexhausted FEHA claims against Hospitals and

4    Medical Group – two entities that never employed Plaintiff – should not proceed any further than

5    the demurrer pleadings stage.  Causes of Action One through Three fail as a matter of law as to

6    Hospitals and Medical Group.

7      All three of Plaintiff's Causes of Action assert FEHA claims against KFHP, Hospitals and

8    Medical Group (collectively, "Defendants").  Plaintiff's sole DFEH charge does not name

9    Hospitals or Medical Group.  Because Plaintiff failed to exhaust any FEHA claims against

10   Hospitals or Medical Group, she cannot meet California's jurisdictional prerequisite to bring

11   FEHA claims against them.  This jurisdictional defect alone requires dismissal of Hospitals and

12   Medical Group with prejudice.

13     Even if Plaintiff could establish that she exhausted FEHA claims against Hospitals and

14   Medical Group, her FEHA claims would fail as a matter of law because the FAC does not – and

15   cannot – allege facts establishing that Hospitals or Medical Group ever employed her.  First,

16   judicially noticeable records – including Plaintiff's unemployment insurance claim and a wage

17   statement from the DFEH's file – establish that Plaintiff was employed by KFHP, not Hospitals

18   or Medical Group.  Plaintiff's W-2 also identifies KFHP, abbreviated as "Kaiser Foundation HP,"

19   meaning that KFHP is presumed to be Plaintiff's employer pursuant to California Government

20   Code section 12928.

21     Second, Plaintiff's theory that KFHP, Hospitals and Medical Group "act[ed] together as a

22   single employer .…" (*see* FAC ¶¶ 29, 34, 39) fails as a matter of law.  Plaintiff does not allege in

23   the FAC that any parent-subsidiary relationship exists between Defendants; she instead alleges

24   that KFHP is a "health care service plan" that "provides hospital and medical services for its

25   members through separate contracts with [Medical Group] and [Hospitals]."  FAC ¶¶ 5-7.

26     Courts applying California law have declined to extend the single employer test outside

27   the context of a parent-subsidy relationship.  Further, California law governing the practice of

28   medicine mandates the separate relationship between KFHP, as a non-profit foundation, and

-1-

Hospitals and Medical Group, as medical providers.  The Knox-Keene Health Care Services Act of 1975 ("Knox-Keene") under which Defendants operate also precludes the imposition of vicarious liability as between KFHP, as a health care service plan, and Hospitals and Medical Group, as medical providers.  In short, Plaintiff's single employer theory is not viable as to Defendants.

Finally, even if Plaintiff could assert a single employer theory against Defendants, she alleges no facts to overcome the heavy burden that California law imposes on a plaintiff who seeks to ignore the separate legal existence of affiliated entities.  Plaintiff fails to state viable FEHA claims against Hospitals and Medical Group.

The shortcomings identified in this demurrer are irreparable and cannot be fixed by an amendment.  Thus, Hospitals and Medical Group respectfully request that the Court sustain their demurrer without leave to amend and dismiss them with prejudice from this case.

## II.    ALLEGED AND JUDICIALLY NOTICEABLE FACTS SUPPORTING DEMURRER AND PROCEDURAL BACKGROUND

Plaintiff was employed by KFHP.  *See* Request for Judicial Notice dated April 10, 2017 ("RJN"), Ex. A (unemployment insurance request sent by California state agency, the Employment Development Department, to KFHP, abbreviated as "Kaiser Foundation Health," stating that Plaintiff "has listed you as his/her most recent employer"); Ex. B (paystub produced by California state agency, the DFEH, in response to a public records request, reflecting KFHP, abbreviated as "Kaiser Foundation HP," as Plaintiff's employer); Ex. C (W-2 identifying KFHP, abbreviated as "Kaiser Foundation HP").[1]  Plaintiff alleges that she was terminated on July 29, 2014.  FAC ¶ 22.

---

[1] The Court may take judicial notice on demurrer of records and files of state administrative agencies and other records whose accuracy is capable of immediate determination.  *See* Section III.B.1.  Further, the Court need not accept Plaintiff's allegations as true where they are inconsistent with or contradict matters that are judicially noticeable.  *See id.*

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1    Plaintiff filed a DFEH Charge on August 13, 2014.  Declaration of Amanda Bolliger

2   Crespo In Support Of Defendants' Demurrer ("Crespo Decl."), Ex. 2.  Plaintiff's DFEH Charge

3   does not name Hospitals or Medical Group as Respondents.  *Id.*

4    Plaintiff filed this lawsuit against KFHP, Hospitals and Medical Group on August 9, 2016.

5   Crespo Decl. ¶ 3.  Plaintiff's initial Complaint asserted a single cause of action, without

6   specifying against which of the three Defendants the claim was being asserted, and without

7   providing enough detail to determine what type of claim(s) Plaintiff alleged, among other defects.

8   *Id.*  Accordingly, on November 22, 2016, Defendants filed a Demurrer arguing that the Complaint

9   should be dismissed for uncertainty. *Id.*

10    On January 31, 2017, the court in another case filed by Plaintiff's counsel against the

11   same three Defendants held that the plaintiff's "allegation that the Kaiser entities work in

12   cooperation with each other to form the integrated medical care services program known to the

13   public as 'Kaiser Permanente' [was not] sufficient to support a 'joint enterprise' claim." *Kennedy*

14   *v. Kaiser Foundation Health Plan, Inc., et al.*, No. RG16822544 ("*Kennedy*"), Ex. E to

15   Defendants' Request for Judicial Notice ("RJN").  On February 3, 2017, Defendants advised the

16   Court and Plaintiff of the *Kennedy* ruling via a Notice of New Authority attaching the *Kennedy*

17   court's order.  Crespo Decl. ¶ 4.

18    On February 7, 2017, this Court sustained Defendants' Demurrer, granting Plaintiff leave

19   to amend.  The Court reserved ruling on Defendants' argument that Plaintiff cannot assert FEHA

20   claims against Defendants not named in a DFEH charge, and ordered Plaintiff to "attach any

21   administrative complaints she filed with the EEOC or DFEH about the incidents that are the

22   subject of this action as an attachment to her First Amended Complaint."  Crespo Decl., Ex. 1.

23    Plaintiff filed her FAC on March 10, 2017.  On March 24, 2017, April 3, 2017, April 22,

24   2017, April 25, 2017, and April 26, 2017, counsel for the parties engaged in written and

25   telephonic meet and confer communications pursuant to Code of Civil Procedure section

26   430.41(a) to discuss the grounds underlying Hospitals' and Medical Group's contemplated

27   demurrer to Plaintiff's FAC.  *See* Crespo Decl. ¶¶ 7-8.  Plaintiff refused to dismiss Hospitals and

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1  Medical Group from this case. *Id.* ¶ 9.  Accordingly, Hospitals and Medical Group filed the

2  instant Demurrer.

3  **III.    THE COURT SHOULD DISMISS HOSPITALS AND MEDICAL GROUP WITH**

4  **PREJUDICE.**

5      "[A] jurisdictional defense appearing on the face of the complaint, or based upon

6  judicially noticeable facts, is appropriately addressed on demurrer. *Satten v. Webb*, 99 Cal. App.

7  4th 365, 374 (2002) (citation omitted).  A demurrer also is proper when a complaint fails to state

8  facts sufficient to constitute a cause of action. *Friends of Shingle Springs Interchange, Inc. v.*

9  *Cnty. of El Dorado*, 200 Cal. App. 4th 1470, 1482 (2011).  Here, Plaintiff's FEHA claims against

10  Hospitals and Medical Group fail for multiple reasons, including the Court's lack of jurisdiction

11  to hear FEHA claims that Plaintiff failed to exhaust as to Hospitals or Medical Group and

12  Plaintiff's inability and failure to establish that Hospitals or Medical Group ever employed her.

13  Because Plaintiff cannot remedy these violations with an amendment, the demurrer should be

14  sustained without leave to amend.

15      **A.    Plaintiff's Failure to Exhaust Her Administrative Remedies Against Hospitals**

16  **and Medical Group Deprives This Court of Jurisdiction Over Plaintiff's**
   **FEHA Claims Against Those Defendants.**

17      A plaintiff "must exhaust the FEHA administrative remedies before bringing suit on a

18  cause of action under [FEHA] or seeking the relief provided [by FEHA] ...." *Rojo v. Kliger*, 52

19  Cal. 3d 65, 88 (1990).  The California Supreme Court has described FEHA's administrative

20  requirements:

21          Employees who believe they have been discriminated against
           generally have one year in which to file an administrative complaint
22          with the DFEH ....  The DFEH is obligated to investigate each
           complaint and decide whether to file an accusation.  If it has not
23          filed an accusation within 150 days, it must offer the employee a
           right-to-sue letter on request; if it has not filed an accusation within
24          one year, it must issue the employee a right-to-sue letter as a matter
           of right.
25

26  *McDonald v. Antelope Valley Community College Dist.*, 45 Cal. 4th 88, 106 (2008).  The

27  administrative complaint must be in writing and verified, and must "***state the name and address***

28

-4-

1  *of the person, employer, labor organization or employment agency alleged to have committed*

2  *the unlawful practice complained of* ....."  Govt. Code § 12960(b) (emphasis added); *see also*

3  *Cole v. Antelope Valley Union High Sch. Dist.*, 47 Cal. App. 4th 1505, 1511 (1996).

4       "[I]n the absence of a timely administrative complaint, any civil action alleging a violation

5  of FEHA will be subject to dismissal for failure to exhaust administrative remedies." *McCaskey*

6  *v. California State Auto. Assn.*, 189 Cal. App. 4th 947, 976 (2010).  "[I]n the context of the

7  FEHA, exhaustion of the administrative remedy is a ***jurisdictional prerequisite*** to resort to the

8  courts." *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1613 (1995)

9  (emphasis added).  "[T]he trial court had no jurisdiction to hear Okoli's retaliation cause of action

10  [as] [the plaintiff] never filed a charge with the DFEH mentioning retaliation." *Id.* at 1612.

11       Here, Plaintiff's sole DFEH Charge attached to the FAC does not name Hospitals or

12  Medical Group.  Crespo Decl. Ex. 2.  Accordingly, Plaintiff cannot assert FEHA claims against

13  Hospitals or Medical Group.

14       *Medix Ambulance Service, Inc. v. Superior Court*, 97 Cal. App. 4th 109 (2002), is on

15  point.  There, the California Court of Appeal held that the trial court erred by failing to sustain a

16  demurrer as to two defendants where the plaintiff "neither listed them in the administrative charge

17  as an 'employer' or 'person' against whom the claim was made, nor did she name them in the

18  body of the complaint form as the alleged perpetrators." *Id.* at 118.

19       The Central District of California recently reached a similar result in *Reyes v. Healthcare*

20  *Serv. Grps.*, No. 2:15-cv-07177-CAS-KLS, 2015 WL 6551870 (C.D. Cal. Oct. 26, 2015).  In

21  *Reyes,* the plaintiff asserted FEHA claims against an entity that she failed to name in her DFEH

22  charge.  *Id.* at *3.  The court granted that entity's motion to dismiss the plaintiff's FEHA claims.

23  The court rejected the plaintiff's arguments of equitable tolling based on a "misidentification" of

24  employers and found no other exception to the exhaustion limitations period applied.  *Id.* at *3-6.

25       As in *Medix* and *Reyes*, Plaintiff's failure to exhaust her administrative remedies by filing

26  a DFEH charge that named Hospitals or Medical Group strips the Court of jurisdiction to hear

27  FEHA claims against those Defendants.  Plaintiff's three FEHA claims against Hospitals and

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1    Medical Group must be dismissed with prejudice for this reason alone.

2          **B.      Hospitals and Medical Group Did Not Employ Plaintiff and Should Be
                     Dismissed With Prejudice.**
3

4          A demurrer is properly sustained where the pleaded facts are insufficient, as a matter of

5    law, to state a cause of action under any legal theory. *Aguilera v. Heiman*, 174 Cal. App. 4th 590,

6    595 (2009). Such is the case here.

7          As noted above Plaintiff brings all three of her Causes of Action against Hospitals and

8    Medical Group under FEHA. FEHA "predicates potential ... liability on the status of the

9    defendant as an 'employer.'" *Kelly v. Methodist Hosp. of S. Cal.*, 22 Cal. 4th 1108, 1116 (2000)

10   (quoting Cal. Gov't Code § 12926). Plaintiff's FAC does not – and cannot – state facts sufficient

11   to establish that Hospitals or Medical Group were her "employer." *Id.* at 1116. Accordingly,

12   Hospitals and Medical Group should be dismissed with prejudice from this case.

13         **1.      Judicially-Noticeable Evidence Establishes that KFHP – Not Hospitals
                     or Medical Group – Employed Plaintiff.**
14

15         In ruling on a demurrer, the Court may rely on the face of the complaint or on "any matter

16   of which the court is required to or may take judicial notice." Civ. Proc. Code § 430.30(a). A

17   demurrer "may be sustained where judicially noticeable facts render the pleading defective, and

18   allegations in the pleading may be disregarded if they are contrary to facts judicially noticed."

19   *Scott v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 743, 751-52 (2013), citing *Evans v. City

20   of Berkeley*, 38 Cal. 4th 1, 6 (2006); *see also Hoffman v. Smithwoods RV Park, LLC*, 179 Cal.

21   App. 4th 390, 400 (2009) ("False allegations of fact, inconsistent with annexed documentary

22   exhibits [citation] or contrary to facts judicially noticed [citation], may be disregarded...." in

23   sustaining a demurrer) (citation omitted). Indeed, it is "well settled" that even "a complaint

24   otherwise good on its face is nevertheless subject to demurrer when facts judicially noticed render

25   it defective." *Watson v. Los Altos Sch. Dist., Santa Clara Cnty.*, 149 Cal. App. 2d 768, 771

26   (1957).

27   //

28

-6-

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1    The Court may take judicial notice of records and files of state administrative agencies

2  and other records whose accuracy is capable of immediate determination.  Civ. Proc. Code §

3  430.30(a).  Judicially noticeable matters "include the orders, regulations, decisions and records of

4  state administrative agencies."  *El Rancho Unified School Dist. v. National Education Assn.*, 33

5  Cal. 3d 946, 950, n.6 (1983) (party demurring to a complaint "properly invoking judicial notice of

6  [administrative] proceedings" before the Public Employees Relations Board).  The Court also

7  may take judicial notice of "facts and propositions that are not reasonably subject to dispute and

8  are capable of immediate and accurate determination by resort to sources of reasonably

9  indisputable accuracy."  Evid. Code § 452(h); *see also Cansino v. Bank of America*, 224 Cal.

10  App. 4th 1462, 1474 (2014) (sustaining demurrer and rejecting complaint allegations that were

11  "inconsistent with the loan documents judicially noticed by the trial court showing plaintiffs'

12  borrowing history").  Thus, "courts have taken judicial notice not only of the existence and

13  recordation of recorded documents but also a variety of matters that can be deduced from the

14  documents."  *Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 264-66 (2011) (holding

15  that, in sustaining demurrer, trial court properly took judicial notice of recorded documents that

16  clarified and to some extent contradicted plaintiff's allegations).

17    Here, the fact that KFHP – not Hospitals or Medical Group – employed Plaintiff is easily

18  ascertained by reference to Plaintiff's own claim for unemployment benefits, wage statement and

19  W-2, all of which identify KFHP (abbreviated as Kaiser Foundation Health or Kaiser Foundation

20  HP) as Plaintiff's employer and none of which identify Hospitals or Medical Group.  RJN, Exs.

21  A, B and C.  Therefore, judicial notice is proper.  *Fontenot*, 198 Cal. App. 4th at 265; *Theiler v.*

22  *Ventura Cnty. Community College Dist.*, 198 Cal. App. 4th 852, 855 n.2 (2011) (granting party's

23  request for judicial notice of collective bargaining agreement).

24    Further, because Plaintiff's W-2 identifies KFHP, the Court may take judicial notice that

25  KFHP is presumed to be Plaintiff's employer.  *See* Govt. Code § 12928 ("[T]here is a rebuttable

26  presumption that 'employer,' as defined by subdivision (d) of Section 12926, includes any person

27  or entity identified as the employer on the employee's Federal Form W-2 (Wage and Tax

28

-7-

1    Statement")); *see also Scott*, 214 Cal. App. 4th at 755 (judicial notice may properly be taken of

2    the legal effect of certain documents presented to the court).

3                    **2.      Plaintiff's "Single Employer" Theory Is Not Viable as to Defendants.**

4           In the FAC, Plaintiff alleges that KFHP, Hospitals and Medical Group "act[ed] together as

5    a single employer …." FAC ¶¶ 29, 34, 39. However, Plaintiff's "single employer" theory – also

6    known as the "single enterprise" test – is not viable as to Defendants.

7           Notably, Plaintiff does not allege in the FAC that a parent-subsidiary relationship exists

8    between Defendants. Nor can she. KFHP is "a nonprofit corporation, licensed as a health care

9    service plan … that enrolls members in individual and group plans …." FAC ¶ 5. By contrast,

10   Hospitals and Medical Group are medical providers. *See* FAC ¶ 6 (alleging that Hospitals

11   "operates hospitals and medical centers in California"); *see also* FAC ¶ 7 (alleging that the

12   Medical Group is "a group of physicians organized as a professional corporation under California

13   law"). Instead, Plaintiff alleges that KFHP "provides hospital and medical services for its

14   members through separate contracts with Medical Group and Hospitals." FAC ¶ 5.

15          No published California decision has extended the single enterprise theory outside the

16   context of parent/subsidiary corporations, much less to a nonprofit health plan that contracts with

17   medical providers to provide medical services to patients. In fact, the Eastern District of

18   California reached the opposite conclusion and rejected a FEHA plaintiff's attempt to apply the

19   single enterprise theory to another nonprofit foundation that contracted to provide medical

20   services:

21              In *Laird*, the California Court of Appeal adopted the integrated
                enterprise test in a FEHA and wrongful termination case to
22              determine whether a parent corporation could be liable for the acts
                of its subsidiary—the plaintiff's employer—as a single employer
23              without discussion of statutory minimums or any act requirement.
                *See Laird*, 68 Cal. App. 4th at 737. Instead, [the *Laird* case] simply
24              noted that, "[b]ecause California's Fair Employment and Housing
                Act has the same nature and purpose as the federal law, California
25              courts frequently look to federal case law for guidance in
                interpreting the FEHA." *Id*. The *Laird* court articulated the test in
26              a narrow fashion, framing it in terms of whether a corporate *parent*
                could be held liable for the acts of its *subsidiary*. **Courts applying**
27              **California law have generally followed suit, limiting the test's**

28

                                                  -8-
─────────────────────────────────────────────────────────────
MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

*application to determining whether corporations having a parent-subsidy relationship are interrelated.*

*Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1006 (E.D. Cal. 2013) (emphasis added) (compiling case law).  In contrast to single enterprise cases involving parent-subsidiary relationships, the *Rhodes* court found that "***it would be an untenable notion for a corporate entity to face potential liability for another entity's discriminatory acts simply because the one contracted to provide services to the other***." *Id.* at 1008 (emphasis added).  "It would also be difficult to know where to draw the line amidst contractual relationships once this court extended the test beyond the parent-subsidiary relationship." *Id.*  The same rationale applies here.

As in *Rhodes*, Plaintiff seeks to "extend application of the integrated enterprise test to the relationship between ... a nonprofit corporation [i.e., KFHP] and a medical group" (i.e., Hospitals and Medical Group).  *Id.* at 1007.  California law mandating the separateness of nonprofit health plans – like KFHP – and medical providers – like Hospitals and Medical Group – forecloses Plaintiff's theory.

As the *Rhodes* court explained: "While the nonprofit [i.e., KFHP] may provide facilities or technical components of care, such as non-physician staff and equipment, under [Cal. Health & Safety Code] section 1206(1), it must form an arm's length relationship with physicians solely responsible for medical care [i.e., Hospitals and Medical Group] because California prohibits the corporate practice of medicine." *Id.* at 1007.  In other words, "the relationship" between KFHP, as a non-profit foundation, and Hospitals and Medical Group, as medical providers, is "dictated by California law governing the practice of medicine and that their relationship is distinct from a parent-subsidiary relationship." *Id.*

Moreover, Knox-Keene regulates Defendants.  Under Knox-Keene, KFHP, as a health care service plan, and Hospitals and Medical Group, as providers, are "each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others."[2]  Health & Safety Code § 1371.25.  Thus, Knox-Keene is "unmistakably clear in

---

[2] The term "plan" refers to health care service plans.  Health & Safety Code § 1345(q).  A "health care services plan" includes "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees."  Health & Safety Code § 1345(f)(1).  By contrast, a

-9-

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1    precluding the imposition of vicarious liability." *Watanabe v. Cal. Physicians' Serv.*, 169 Cal.

2    App. 4th 56, 64 (2008).

3            In short, Plaintiff's single enterprise theory is not viable as to Defendants.  *See Gopal v.*

4    *Kaiser Foundation Health Plan, Inc.*, 248 Cal. App. 4th 425, 431 (2016) ("[A]ppellants rely on an

5    enterprise theory of liability, arguing that Health Plan, Kaiser Hospitals and SCPMG constitute a

6    single enterprise, and, thus, Health Plan is liable for all acts and omissions of the other

7    components of the enterprise"; "[t]he trial court rejected this theory as a matter of law, and we

8    agree that it fails.").  Plaintiff therefore cannot rely on that theory to establish that Hospitals or

9    Medical Group employed her, and her FEHA claims against those entities fail as a matter of law.

10            **3.      Plaintiff's Conclusory "Single Employer" Allegation Fails to Meet the
           Single Enterprise Test in Any Event.**

11

12            Even if Plaintiff could assert a single enterprise theory against Defendants, the FAC fails

13    to allege facts sufficient to survive this demurrer.  California law imposes a "heavy burden" on a

14    plaintiff who seeks to ignore the separate legal existence of affiliated entities.  *Laird v. Capital*

15    *Cities/ABC, Inc*., 68 Cal. App. 4th 727, 742 (1998) (parent of subsidiary was not an employer

16    under the integrated enterprise test where, among other matters, there was no evidence that it

17    exercised day-to-day control over subsidiary's employment decisions in general, or that it

18    exercised any control over the subsidiary's decisions with respect to the employee in question).

19    Plaintiff fails to meet that heavy burden here.

20            Plaintiff alleges no facts to support her conclusory assertion that Defendants acted as a

21    "single employer."  This omission is surprising, in that Plaintiff filed the FAC more than one

22    month *after* the *Kennedy* court ordered Plaintiff's counsel to "allege facts that support the

23    requirements for stating a joint enterprise claim against health care services plans and health care

24

25

26    _____

27    provider is any "professional person, organization, health facility or other person or institution
      licensed by the state to deliver or furnish health care services."  Health & Safety Code § 1345(i).

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1   providers under the Knox-Keene Act, consistent with the holdings in *Gopal* and *Laird*."[3]  *See*

2   *Kennedy* Order attached to Defendants' Notice of New Authority filed on February 3, 2017.

3       Despite being apprised of the *Kennedy* case on February 3, 2017, Plaintiff's "single

4   employer" allegation includes only the following conclusory assertion: "All three Kaiser entities

5   acting together as a single employer comprise an entity subject to suit under the Fair Employment

6   and Housing Act (FEHA) in that defendant regularly employees [sic] five or more persons,

7   pursuant to Govt. Code 12926(d)."  FAC ¶¶ 29, 34, 39.  This conclusory statement does not come

8   close to meeting Plaintiff's "heavy burden" to establish a single enterprise theory under *Laird*,

9   and her FEHA claims against Hospitals and Medical Group should be dismissed.

10      **C.**   **Plaintiff Cannot Amend the Complaint to Cure the Jurisdictional Defect and**
            **Legal Deficiencies of Her Claims Against Hospitals and Medical Group.**

11

12      A demurrer may be sustained without leave to amend where there is no "reasonable

13  possibility that the defect can be cured by amendment."  *Blank v. Kirwan*, 39 Cal. 3d 311, 318

14  (1985) (on appeal, the decision of the trial court to sustain a demurrer without leave to amend will

15  be affirmed if there is not a reasonable possibility that a defect can be cured by amendment).

16  "The burden of proving such a reasonable possibility is squarely on the plaintiff."  *Id.*, citing

17  *Cooper v. Leslie Salt Co.*, 70 Cal. 2d 627, 636 (1969).

18      Here, Plaintiff cannot cure her failure to exhaust any FEHA claims against Hospitals or

19  Medical Group with an amendment.  As noted above, Plaintiff alleges that she was terminated on

20  July 29, 2014.  FAC ¶ 22.  Therefore, the last day for her to file a DFEH charge to exhaust FEHA

21  claims was **July 29, 2015**, well over two years ago.

22      Nor can Plaintiff cure the deficiencies in her "single employer" or "single enterprise"

23  theory through amendment.  As set forth above, Plaintiff cannot add any allegation of fact that

24  would enable her to apply the single employer theory to Defendants, who lack the required

25  parent-subsidiary relationship and instead must maintain a separate arm's-length existence under

26

27  _____

28  [3] Citing *Gopal*, 248 Cal. App. 4th at 431 and *Laird*, 68 Cal. App. 4th at 742.

-11-

1   California law.  Further, Plaintiff already was apprised of the need to allege facts supporting a

2   single enterprise theory before she filed the FAC.  She failed to do so because no such facts exist.

3          As such, the Court should sustain Hospitals' and Medical Group's demurrer as to all three

4   Causes of Action, without leave to amend.

5   **IV.    CONCLUSION**

6          For all the foregoing reasons, Hospitals and Medical Group respectfully request that the

7   Court sustain their demurrer and dismiss them with prejudice from this case, without granting

8   Plaintiff leave to amend.

9   DATED:  April 27, 2017                    GRUBE BROWN & GEIDT LLP

10

11                                            BY: *Amanda Bolliger Crespo*

12                                               AMANDA BOLLIGER CRESPO

13                                            Attorneys for Defendants
                                              KAISER FOUNDATION HEALTH PLAN,
                                              INC; KAISER FOUNDATION HOSPITALS;
14                                            and THE PERMANENTE MEDICAL
                                              GROUP
15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEMURRER TO FIRST AMENDED COMPLAINT

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA 94111
   Telephone: (415) 603-5000
5  Facsimile: (415) 840-7210

6  Attorneys for Defendants,
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10               IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13              Plaintiff,                  ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14       vs.                                DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **DECLARATION OF AMANDA
    INC; KAISER FOUNDATION                  BOLLIGER CRESPO IN SUPPORT OF
16  HOSPITALS, INC; and THE                 DEFENDANTS KAISER
    PERMANENTE MEDICAL GROUP; all           FOUNDATION HOSPITALS AND THE
17  doing business as KAISER PERMANENTE     PERMANENTE MEDICAL GROUP'S
    MEDICAL CARE PROGRAM,                   DEMURRER TO FIRST AMENDED
18                                          PLAINTIFF'S COMPLAINT**
                Defendants.
19                                          Date:    May 31, 2017
                                           Time:    9:00 a.m.
20                                          Judge:   Hon. Ioana Petrou
                                           Dept.:   15
21
                                           **Reservation Nos. R-1844959**
22
                                           Complaint Filed:    August 9, 2016
23

24

25

26

27

28

───────────────────────────────────────────────
        CRESPO DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER

I, Amanda Bolliger Crespo, declare as follows:

1.      I am an attorney duly licensed to practice before this Court and before all of the Courts of the State of California.  I am an Associate at the law firm of Grube Brown & Geidt LLP, and counsel of record for Defendants Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals, and The Permanente Medical Group in this action.  I have personal knowledge of the matters set forth in this declaration or know of them based on my review of documents maintained in the ordinary course of business by Grube Brown & Geidt LLP and if called as a witness, could and would testify as to their accuracy.

2.      I make this Declaration in support of Defendants Kaiser Foundation Hospitals' and The Permanente Medical Group's Demurrer (the "Demurrer").

3.      Plaintiff filed this lawsuit on August 9, 2016.  Plaintiff's initial Complaint asserted a single cause of action, without providing enough detail to determine what type of claim(s) Plaintiff alleged, among other defects.  On November 22, 2016, Defendants filed a Demurrer arguing that the Complaint should be dismissed for uncertainty.

4.      On February 3, 2017, Defendants filed a Notice of New Authority advising the Court and Plaintiff that another court held that the plaintiff's "allegation that the Kaiser entities work in cooperation with each other to form the integrated medical care services program known to the public as 'Kaiser Permanente' [was not] sufficient to support a 'joint enterprise' claim" in a case filed by Plaintiff's counsel against the same three Defendants in the case of *Kennedy v. Kaiser Foundation Health Plan, Inc.*, No. RG16822544 ("*Kennedy*"), currently pending before the County of Alameda Superior Court.   A true and correct copy of the *Kennedy* ruling is attached to Defendants' Request for Judicial Notice In Support of Defendants Demurrer and Motion to Strike ("RJN") as Exhibit E.

5.      On February 7, 2017, this Court sustained Defendants' Demurrer, granting Plaintiff leave to amend.  A true and correct copy of the Notice of Entry of Order Sustaining Demurrer to Complaint is attached to this Declaration as Exhibit 1.

- 1 -
CRESPO DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER

6.      Plaintiff filed her First Amended Complaint ("FAC") on March 10, 2017. Only one administrative charge was attached to the FAC. That charge is attached to this Declaration as Exhibit 2.

7.      On March 24, 2017, my office sent a detailed meet and confer letter to Plaintiffs' counsel regarding the grounds underlying the Demurrer. A true and correct copy of that letter is attached to this Declaration as Exhibit 3.

8.      I engaged in further conferral with Plaintiffs' counsel via telephone and email on April 3, 2017, April 22, 2017, April 25, 2017, and April 26, 2017. A true and correct copy of emails that I exchanged with Plaintiff's counsel regarding the Demurrer is attached to this Declaration as Exhibit 4.

9.      On April 26, 2017, Plaintiff's counsel advised me that Plaintiff would not dismiss Defendants Kaiser Foundation Hospitals or The Permanente Medical Group.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th of April, 2017, at Los Angeles, California.

AMANDA BOLLIGER CRESPO

- 2 -

Exhibit 1

ENDORSED
FILED
ALAMEDA COUNTY

FEB - 8 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1    SEYFARTH SHAW LLP
     Kristina M. Launey (SBN 221335)
2    klauney@seyfarth.com
     Julie Yap (SBN 243450)
3    jyap@seyfarth.com
     Tiffany T. Tran (SBN 294213)
4    ttran@seyfarth.com
     400 Capitol Mall, Suite 2350
5    Sacramento, California 95814-4428
     Telephone:    (916) 448-0159
6    Facsimile:    (916) 558-4839

7    SEYFARTH SHAW LLP
     Bethany A. Vasquez (SBN 209423)
8    bvasquez@seyfarth.com
     560 Mission Street, 31st Floor
9    San Francisco, CA 94105-2930
     Telephone:    (415) 397-2823
10   Facsimile:    (415) 397-8549

11   Attorneys for Defendants
     KAISER FOUNDATION HEALTH PLAN, INC.;
12   KAISER FOUNDATION HOSPITALS; and THE
     PERMANENTE MEDICAL GROUP

13

14

15                SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                          COUNTY OF ALAMEDA

17

18   LUNELL GAMBLE,                          Case No. RG16826717

19              Plaintiff,                   **NOTICE OF ENTRY OF ORDER
                                             SUSTAINING DEMURRER TO
20         v.                                COMPLAINT**

21   KAISER FOUNDATION HEALTH PLAN, INC.;    Hearing Date:   February 7, 2017
     KAISER FOUNDATION HOSPITALS, INC.; and  Time:           9:00 a.m.
22   THE PERMANENTE MEDICAL GROUP; all       Dept.:          15
     doing business as KAISER PERMANENTE     Judge:          Ioana Petrou
23   MEDICAL CARE PROGRAM,

24              Defendants.                  Reservation number: R-1802056

25

26

27

28

─────────────────────────────────────────────────────────
              NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT
37047650v.1

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 7, 2017, the Court entered the Order Sustaining Demurrer to Complaint.  A true and correct copy of the filed Order is attached as Exhibit A

DATED: February 8, 2017

Respectfully submitted,

SEYFARTH SHAW LLP

BY:
Kristina M. Launey
Julie Yap
Bethany A. Vasquez
Tiffany T. Tran
Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; and THE PERMANENTE MEDICAL GROUP

Attorney at Law                                    Kaiser Foundation Health Plan, Inc
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br>                 Plaintiff/Petitioner(s)<br><br>       VS.<br><br>Kaiser Foundation Health Plan, Inc<br>             Defendant/Respondent(s)<br>        (Abbreviated Title) | No. RG16826717<br><br>Order<br><br>Demurrer to Complaint<br>Sustained |

The Demurrer to Complaint was set for hearing on 02/07/2017 at 09:00 AM in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff. Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

---

Dated:  02/07/2017

facsimile

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 02/07/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 02/08/2017.
Chad Finke  Executive Officer / Clerk of the Superior Court

By _____
                                              Deputy Clerk

1

**PROOF OF SERVICE**

2     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 560 Mission Street, 31st Floor, San Francisco, California  94105.

3     On February 8, 2017, I served the within document(s):

4     **NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT**

5     ☐ I sent such document from facsimile machines (415) 397-8549 on February 8, 2017.  I certify that said transmission was completed and that all pages were received and that a report was

6     generated by said facsimile machine which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in

7     sealed envelope(s) addressed to the parties listed below.

8     ☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

9

10    ☒ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

11    ☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on

12    account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

13

14    ☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

15    Jeremy L. Friedman, Esq.
      Law Offices of Jeremy L. Friedman

16    2801 Sylhowe Road
      Oakland, CA  94610

17    Telephone: (510) 530-9060

18    Facsimile:  (510) 530-9087

19    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with

20    postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day

21    after date of deposit for mailing in affidavit.

22    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

23

24    Executed on February 8, 2017, at San Francisco, California.

25    _____
                                  Lisa Rivers

26

27

28

PROOF OF SERVICE

37047951v.1

Exhibit 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

## BEFORE THE STATE OF CALIFORNIA

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

In the Matter of the Complaint of                    DFEH No. 340711-121071
Lunell Gamble, Complainant.                          EEOC No.

vs.

Kaiser National HRSC Health And Welfare Dept
Respondent.
1451 Harbor Bay Pkwy
Alameda,  California 94502

Complainant alleges:

1. Respondent **Kaiser National HRSC Health And Welfare Dept** is a **Other** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Complainant believes respondent is subject to the FEHA.

2. Complainant may be ignorant of the true names and capacities of co-respondents. The Department of Fair Employment and Housing may amend this complaint to allege their true names and capacities when ascertained. (Complainant is informed and believes and thereon alleges that the respondent and each co-respondent is responsible in some manner for the occurrences herein alleged, and that complainant's injuries as herein alleged were proximately caused by the aforementioned respondent(s).)

3. On or around **Jul 18, 2014,** complainant alleges that respondent took the following adverse actions against them: **Discrimination, Harassment, Retaliation Terminated** . Complainant believes respondent committed these actions because of their: **Age – 40 and over, Color, Race** . The alleged unlawful employment practice(s) occurred in **Alameda**, **California**.

4. Complainant **Lunell Gamble** resides in the City of **Richmond**, State of **CA**. If complaint includes co-respondents please see page 2.

DFEH 902-1

-2-
*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2    **Co-Respondents:**
     Kaiser National HRSC Health And Welfare Dept
3    Shibioan O`Conner
     1451 Harbor Bay Parkway
4    Alameda  California 94502

5    Kaiser National HRSC

6    1451 Harbor Bay Parkway
     Alameda  California 94502

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

                                    -3-
                        *Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2    VERIFICATION

3    I, **Lunell Gamble**, am the **Complainant** in the above-entitled complaint.  I have read the foregoing complaint
     and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are
4    therein alleged on information and belief, and as to those matters, I believe it to be true.

5    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

6                                                                        **Richmond Ca**
                                                                         **Lunell Gamble**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DFEH 902-1                                       -4-
                              *Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

Exhibit 3



GRUBE BROWN & GEIDT LLP

**SAN FRANCISCO**
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
tel: 415.603.5000 | fax: 415.840.7210

**LOS ANGELES**
633 West 5th Street, Suite 3330
Los Angeles, CA 90071
tel: 213.358.2810 | fax: 213.995.6382

Please reply to the Los Angeles office
Email: amandacrespo@gbgllp.com
Direct: 213.358.2812

**Via Email [jlfried@comcast.net] and U.S. Mail**

March 24, 2017

Jeremy L. Friedman
Law Office of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610

Re:    *Lunell Gamble v. Kaiser Foundation Health Plan, Inc. et al.*
       Alameda Superior Court, Case No. RG16826717

Dear Mr. Friedman:

I write to meet and confer regarding Plaintiff's improper claims against Defendants Kaiser Foundation Hospitals ("Hospitals") and The Permanente Medical Group ("Medical Group") asserted in Plaintiff's First Amended Complaint filed on March 10, 2017 (the "FAC"). All of the FEHA claims that Plaintiff has asserted against Hospitals and Medical Group are barred because Plaintiff failed to exhaust her administrative remedies against those entities and because neither Hospitals nor Medical Group ever employed Plaintiff. So that the parties do not waste resources and Court time on unnecessary motion practice, we request that Plaintiff dismiss with prejudice all three Causes of Action against Hospitals and Medical Group.

**<u>Plaintiff Failed to Exhaust Her Administrative Remedies Against Hospitals and Medical Group</u>**

As you know, a plaintiff "must exhaust the FEHA administrative remedies before bringing suit on a cause of action under [FEHA] or seeking the relief provided [by FEHA] ...." *Rojo v. Kliger*, 52 Cal. 3d 65, 88 (1990). The California Supreme Court has described FEHA's administrative requirements:

> Employees who believe they have been discriminated against generally have one year in which to file an administrative complaint with the DFEH .... The DFEH is obligated to investigate each complaint and decide whether to file an accusation. If it has not filed an accusation within 150 days, it must offer the employee a right-to-sue letter on request; if it has

Jeremy L. Friedman
March 24, 2017
Page 2

> not filed an accusation within one year, it must issue the employee
> a right-to-sue letter as a matter of right.

*McDonald v. Antelope Valley Community College Dist.*, 45 Cal.4th 88, 106 (2008). The administrative complaint must be in writing and verified, and must "state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful practice complained of ...." Cal. Govt. Code § 12960(b); *see also Cole v. Antelope Valley Union High Sch. Dist.*, 47 Cal.App.4th 1505, 1511. Exhaustion of these procedures is a mandatory prerequisite to bringing a lawsuit, and a plaintiff may not proceed in court without meeting the procedures. *McDonald*, 45 Cal.4th at 106. Therefore, "in the absence of a timely administrative complaint, any civil action alleging a violation of FEHA will be subject to dismissal for failure to exhaust administrative remedies." *McCaskey v. California State Auto. Assn.*, 189 Cal. App. 4th 947, 976 (2010).

Here, the Court ordered Plaintiff to "attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint." Exhibit A to Notice of Entry of Order Sustaining Demurrer to Complaint dated February 8, 2017.

The sole administrative complaint that Plaintiff attached to the FAC – a DFEH charge filed on August 13, 2014 – neither names nor states addresses for Hospitals or Medical Group. *See* Exhibit to FAC. Accordingly, Plaintiff cannot assert FEHA claims against Hospitals or Medical Group based on that DFEH charge.[1] *See, e.g., Medix Ambulance Service, Inc. v. Superior Court*, 97 Cal. App. 4th 109, 118 (2002) (finding trial court erred by failing to sustain demurrer as to two defendants where the plaintiff "neither listed them in the administrative charge as an 'employer' or 'person' against whom the claim was made, nor did she name them in the body of the complaint form as the alleged perpetrators"); *Reyes v. Healthcare Serv. Grps.*, No. 2:15-cv-07177-CAS-KLS, 2015 WL 6551870, *3-6 (C.D. Cal. Oct. 26, 2015) (granting motion to dismiss FEHA claims against an entity that the plaintiff failed to name in her DFEH charge, rejecting the plaintiff's arguments of equitable tolling and finding no other exception to the exhaustion limitations period applied).

Plaintiff cannot cure her failure to exhaust any FEHA claims against Hospitals or Medical Group with an amendment. Plaintiff alleges that she was terminated on July 29, 2014. FAC ¶ 22. Therefore, the last day for her to file a DFEH charge to exhaust FEHA claims was July 29, 2015, well over two years ago. All of Plaintiff's FEHA claims against Hospitals and Medical Group must be dismissed with prejudice for this reason alone.

---

[1] Defendants do not concede that Plaintiff has otherwise properly exhausted her administrative remedies for bringing FEHA claims; for simplicity, however, this letter focuses on Plaintiff's claims against Hospitals and Medical Group.

Jeremy L. Friedman
March 24, 2017
Page 3


## Hospitals and Medical Group Did Not Employ Plaintiff

Even if Plaintiff could establish that she exhausted FEHA claims against Hospitals and Medical Group, her FEHA claims would fail as a matter of law because neither Hospitals nor Medical Group ever employed her.

Judicially noticeable records establish that Plaintiff was employed by Defendant Kaiser Foundation Health Plan ("KFHP"), not Hospitals or Medical Group.  *See* Exhibit A (unemployment insurance request sent by California state agency, the Employment Development Department, to KFHP stating that Plaintiff "has listed you as his/her most recent employer"); Exhibit B (paystub produced to this office by California state agency, the DFEH, in response to a public records request, reflecting KFHP as Plaintiff's employer).[2]  Plaintiff's W-2 also identifies KFHP.  Exhibit C.  Thus, KFHP is presumed to be Plaintiff's employer pursuant to California Government Code section 12928.

In the FAC, Plaintiff alleges that all three Defendants "act[ed] together as a single employer …." FAC ¶¶ 29, 34, 39.  But Plaintiff alleges no facts to support this conclusory assertion.  This omission is surprising, in that Plaintiff filed the FAC more than one month *after* your client in another purported "single employer" case filed against the same three Defendants was ordered to "allege facts that support the requirements for stating a joint enterprise claim against health care services plans and health care providers under the Knox-Keene Act, consistent with the holdings in *Gopal* [*Gopal v. Kaiser Foundation Health Plan, Inc.*, 248 Cal. App. 4th 425, 431 (2016)] and *Laird* [*Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 737-38, 742 (1998)]."  *See Kennedy v. Kaiser Foundation Health Plan, Inc.*, No. RG16822544, Order dated January 31, 2017 ("*Kennedy*") (rejecting the plaintiff's allegations that "her allegation that the Kaiser entities work in cooperation with each other to form the integrated medical care services program known to the public as 'Kaiser Permanente' is sufficient to support a 'joint enterprise' claim").  Given its clear application to this case, Defendants filed the *Kennedy* case in their Notice of New Authority filed on February 3, 2017.  Despite being apprised of the *Kennedy* case, Plaintiff's "single employer" allegation includes only the following conclusory assertion:  "All three Kaiser entities acting together as a single employer comprise an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees [sic] five or more persons, pursuant to Cal. Govt. Code 12926(d)."  FAC ¶¶ 29, 34, 39.

---

[2]  As you know, the Court may take judicial notice on demurrer of records and files of state administrative agencies and other records whose accuracy is capable of immediate determination.  CCP § 430.30(a); *El Rancho Unified Sch. Dist. v. Nat'l Educ. Assn.*, 33 Cal. 3d 946, 950 (1983); *Theiler v. Ventura Cty. Cmty. Coll. Dist.*, 198 Cal. App. 4th 852, 855 n.2 (2011) (granting party's request for judicial notice of collective bargaining agreement); *Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 265 (2011) ("[C]ourts have taken judicial notice not only of the existence and recordation of recorded documents but also a variety of matters that can be deduced from the documents.").  Further, the Court need not accept Plaintiff's allegations as true where they are inconsistent with or contradict matters that are judicially noticeable. *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1474 (2014).

Jeremy L. Friedman
March 24, 2017
Page 4

Plaintiff cannot cure the deficiencies in her "single employer" or "single enterprise" theory through amendment in any event. Notably, Plaintiff does not allege in the FAC that there is a parent-subsidiary relationship between KFHP and Hospitals or Medical Group, nor can she. KFHP is "a nonprofit corporation, licensed as a health care service plan … that enrolls members in individual and group plans …" (FAC ¶ 5). By contrast, Hospitals and Medical Group are medical providers. *See* FAC ¶ 6 (alleging that Hospitals "operates hospitals and medical centers in California"); *see also* FAC ¶ 7 (alleging that the Medical Group is "a group of physicians organized as a professional corporation under California law"). Plaintiff alleges that KFHP "provides hospital and medical services for its members through separate contracts with Medical Group and Hospitals." FAC ¶ 5.

No published California decision of which we are aware has extended the single enterprise theory outside the context of parent/subsidiary corporations, much less to a nonprofit health plan that contracts with medical providers to provide medical services to patients. In fact, the Eastern District of California reached the opposite conclusion and rejected a FEHA plaintiff's attempt to apply the single enterprise theory to another nonprofit foundation that contracted to provide medical services:

> In *Laird*, the California Court of Appeal adopted the integrated enterprise test in a FEHA and wrongful termination case to determine whether a parent corporation could be liable for the acts of its subsidiary—the plaintiff's employer—as a single employer without discussion of statutory minimums or any act requirement. *Laird*, 68 Cal. App. 4th at 737. Instead, the *Laird* case simply noted that, "[b]ecause California's Fair Employment and Housing Act has the same nature and purpose as the federal law, California courts frequently look to federal case law for guidance in interpreting the FEHA." *Laird*, 68 Cal. App. 4th at 737. The *Laird* court articulated the test in a narrow fashion, framing it in terms of whether a corporate parent could be held liable for the acts of its subsidiary. Courts applying California law have generally followed suit, limiting the test's application to determining whether corporations having a parent-subsidy relationship are interrelated.

*Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1006 (E.D. Cal. 2013) (compiling case law). In contrast to single enterprise cases involving parent-subsidiary relationships, the *Rhodes* court found that "it would be an untenable notion for a corporate entity to face potential liability for another entity's discriminatory acts simply because the one contracted to provide services to the other." *Id.* at 1008. "It would also be difficult to know where to draw the line amidst contractual relationships once this court extended the test beyond the parent-subsidiary relationship." *Id.* The same rationale applies here.

As in *Rhodes*, Plaintiff seeks to "extend application of the integrated enterprise test to the relationship between ... a nonprofit corporation [i.e., KFHP] and a medical group" (i.e., Hospitals

Jeremy L. Friedman
March 24, 2017
Page 5

and Medical Group).  *Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1007 (E.D. Cal. 2013).
California law mandating the separateness of nonprofit health plans – like KFHP – and medical
providers – like Hospitals and Medical Group – forecloses Plaintiff's theory.

As the *Rhodes* court explained: "While the nonprofit [i.e., KFHP] may provide facilities or
technical components of care, such as non-physician staff and equipment, under [Cal. Health &
Safety Code] section 1206(1), it must form an arm's length relationship with physicians solely
responsible for medical care [i.e., Hospitals and Medical Group] because California prohibits the
corporate practice of medicine."  *Id.* at 1007.  In other words, "the separate relationship" between
KFHP, as a non-profit foundation, and Hospitals and Medical Group, as medical providers, is
"dictated by California law governing the practice of medicine; their relationship is distinct from
a parent-subsidiary relationship."  *Id.*

Moreover, under Knox-Keene, KFHP, as a health care service plan, and Hospitals and Medical
Group, as providers, are "each responsible for their own acts or omissions, and are not liable for
the acts or omissions of, or the costs of defending, others."[3]  Health & Safety Code § 1371.25.
Thus, Knox-Keene is "unmistakably clear in precluding the imposition of vicarious liability."
*Watanabe v. Cal. Physicians' Serv.*, 169 Cal. App. 4th 56, 64 (2008).  In short, Plaintiff's single
enterprise theory is not viable as to the Defendants in this case.  *Gopal v. Kaiser Foundation
Health Plan, Inc.*, 248 Cal. App. 4th 425, 431 (2016).

Even if Plaintiff could assert a single employer theory against Defendants, she fails to meet the
"heavy burden" that California law imposes on a plaintiff who seeks to ignore the separate legal
existence of affiliated entities.  *Laird*, 68 Cal. App. 4th at 742 (parent of subsidiary was not an
employer under the integrated enterprise test where, among other matters, there was no evidence
that it exercised day-to-day control over subsidiary's employment decisions in general, or that it
exercised any control over the subsidiary's decisions with respect to the employee in question).

Because neither Hospitals nor Medical Group employed Plaintiff, Plaintiff has no viable FEHA
claim against them.  Govt. Code § 12940(a).

## Conclusion

For the reasons stated above, we ask that Plaintiff dismiss with prejudice all claims against
Hospital and Medical Group.  If Plaintiff refuses to do so, Hospital and Medical Group will file a
general demurrer.

---

[3] The term "plan" refers to health care service plans.  Health & Safety Code § 1345(q).  A
"health care services plan" includes "[a]ny person who undertakes to arrange for the provision of
health care services to subscribers or enrollees."  Health & Safety Code § 1345(f)(1).  By
contrast, a provider is any "professional person, organization, health facility or other person or
institution licensed by the state to deliver or furnish health care services."  Health & Safety Code
§ 1345(i).

Jeremy L. Friedman
March 24, 2017
Page 6


Please provide Plaintiff's positions on the issues raised in this letter such that they are **received by this office** by the close of business on **Friday, March 31, 2017**.  If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

*Amanda Bolliger Crespo*

Amanda Bolliger Crespo
for Grube Brown & Geidt LLP

Attachments

cc:  Heather Morgan

Exhibit A

EMPLOYMENT DEVELOPMENT DEPARTMENT   #0060
P.O. BOX 80800
LOS ANGELES     CA  90009-0800

**EDD** Employment
Development
Department
State of California

THIS NOTICE WAS MAILED TO THE EMPLOYER/ADDRESS LISTED BELOW ON:  **08/04/14**

lldudullldoudulldulddulllduudulddllududll
**KAISER FOUNDATION HEALTH**
**PO BOX 23020**
**OAKLAND**          **CA  94623-2302**

New Claim:     **X**

Additional Claim:

EDD Telephone Number: 1-800-300-5616
TTY (Non-Voice):      1-800-815-9387

### IMPORTANT:  NOTICE OF UNEMPLOYMENT INSURANCE CLAIM FILED

This is a notice that a claim for unemployment insurance benefits has been filed. Forward it immediately to persons within your
organization who are responsible for handling claims.  **The time limit for replying is 10 days from the mail date shown above.**
**Failure to respond may result in an increased Employment Tax Rate.**

The claimant provided us with the following information and listed you as his/her last employer:

| Claimant's Name | Social Security Number | Effective Date of Claim: | 07/27/14 |
|---|---|---|---|
| **LUNELL     C GAMBLE** | REDACTED-6502 | Last Date Worked: | 07/28/14 |

Reason for Separation:
**BEEN EMPLOYED 16 YEARS, AND ALL OF SUDDEN I'M GIVEN FINAL WRITTEN AND TERMINATE**
**D FOR MISCONDUCT**

### I. EXPLANATION AND INSTRUCTIONS FOR EMPLOYERS

You have received this form because the individual shown above has filed a claim for unemployment insurance benefits and has listed
you as his/her most recent employer prior to filing this claim.  **No reply is required if the claimant was laid off due to lack of work and**
**no other eligibility issue has been identified.**   For detailed information on employer responsibilities in the unemployment insurance
program, our DE 44,  California Employer's Guide, is available upon request.

### II. REPORTING FACTS - Respond in writing by completing Sections A, B, C on the reverse of this form.

**The law requires an employer to submit any facts in his/her possession which may affect a claimant's eligibility for benefits.**
**Furnish information if this claimant:**

- Voluntarily quit
- Was discharged or fired for reasons other than lack of work.
- Left work because of a trade dispute.
- Is receiving a pension based on his/her prior work.
- Is working on a full-time basis, or has earnings payable
  over $25.99, covering any time on or after the effective date
  of this claim as shown on the reverse side of this form.
- Is not able to work, available for, or seeking work.
- Has refused employment.

- Is not legally entitled to work in the U.S.
- Performed services as a sports or athletic participant and has
  reasonable assurance of performing such services in the next season.
- Made false statements or withheld material information in filing for
  benefits.
- If you are a school employer, also furnish information if the claimant
  has a contract for or reasonable assurance of returning to work.

**Important:**  Make your response as complete as possible; these facts
will be used in determining the claimant's eligibility.

A Department representative may contact you for further eligibility information.  If a representative is unable to reach you, he/she may leave
a message for you to return the telephone call. If after 48 hours no response has been received, the Department is required to make an
eligibility decision based on available information.

### III. TIME LIMITS FOR REPLYING

**Submit facts in writing to the field office shown at the top of this form within 10 days of the mail date shown above.**  If your
mailing is late, explain your reasons for delay as the time limit may be extended only for good cause.  You may reply on this form in the
space provided in Section IV, on additional sheets as needed, or by separate letter.  Always include your **State Employer Account**
**Number** and include the claimant's Social Security Number as it appears on the claim and in your payroll records.

If you submit facts in a timely manner, a determination will be issued concerning the claimant's eligibility. In addition, if facts are sub-
mitted regarding a quit or discharge, a ruling will be issued advising an employer with a reserve account as to whether his/her account
will be subject to changes resulting from benefits paid. To obtain a ruling on any prior quit or discharge involving this claimant, you must
furnish facts within 10 days of the mail date shown above.

ADDITIONAL INFORMATION ON EMPLOYER RESPONSIBILITIES IS SHOWN ON THE REVERSE.
Mail your response to the EDD office shown in the above upper left-hand corner.

(OVER)

DE 1101C/Z/ Rev. 5 (9-07) EMPLOYER NOTICE                                           CU-PA217

**IV.  REPORTING ELIGIBILITY INFORMATION:  Do not return this form unless Sections A or B are completed. It is necessary to complete Section C for all responses.**

A.  REPORTING FACTS:

_____

_____

_____

_____

Claimant Social Security Number  __ __ __ - __ __ - __ __ __ __    Date Last Worked was: __ __ - __ __ - __ __ __ __
(from your payroll records)                            (Month    Day    Year)

B.  OTHER COMPENSATION:

Complete the following if you paid or will pay any compensation, aside from regular salary, covering any time on or after the effective date of this claim. No entry is required if the claimant has been separated from your employ for any indefinite period and has or will receive only vacation pay.

Amount $ _____  Type of Payment _____  for period from _____ through _____

C.  EMPLOYER CERTIFICATION: THE ABOVE STATEMENTS WERE TAKEN FROM BUSINESS RECORDS OR ARE BASED ON KNOWLEDGE OF THE UNDERSIGNED.

PRINT name of person to contact for further information:

Name of contact:_____  Telephone No. ( __ __ __ ) __ __ __ - __ __ __ __  Ext. _____

Employer:_____  Date: _____

STATE EMPLOYER
ACCOUNT NO.:  __ __ __ - __ __ __ __    Signed By: _____

**V.  ELIGIBILITY DETERMINATION**

It may be necessary to contact you by telephone or letter for eligibility information if an issue is identified by the field office.  Regardless of whether such contact is made however, **unless you respond to the notice by mail as described in this notice, you will not be entitled to a written notice of the Department's decision.**

IMPORTANT:

- Section 1327 of the UI Code provides for an extension of the 10-day response period if, after the 10-day period, you acquire knowledge of facts that may affect the eligibility of the claimant and facts could not reasonably have been known within the period.  However, you must provide the Department with these facts within 10 days of acquiring them.

- Section 1142(a) provides that an employer who willfully makes a false statement or representation, or willfully fails to report a material fact in connection with a separation issue may be assessed a penalty of up to 10 times the claimant's weekly benefit amount. Section 1142(b) provides that an employer who willfully makes a false statement or representation or willfully fails to report a material fact in submitting a written statement concerning reasonable assurance of a claimant's reemployment, as defined in Section 1253.3(g), may be assessed a penalty of up to 10 times the claimant's weekly benefit amount.

- Section 2101 of the UI Code provides that it is a misdemeanor to willfully make a false statement or knowingly fail to disclose a material fact to obtain, increase, reduce, or defeat any payment of benefits.

**PLEASE MAIL YOUR RESPONSE TO THE EDD OFFICE AND ADDRESS SHOWN IN THE UPPER LEFT-HAND CORNER ON THE REVERSE SIDE OF THIS FORM.**

DE 1101C/Z/ Rev. 5 (9-07) EMPLOYER NOTICE                                        CU-PB217

| Received | UE Office | Period | Benefit Week | Number of Weeks | B.Y.B. | Amount | Media |
|----------|-----------|--------|--------------|-----------------|--------|--------|-------|
| 07/18/16 | 8888 | 2016 / 02 | | | 10/25/15 | 300.00 | Magnetic Tape |
| 04/19/16 | 8888 | 2016 / 01 | | | 10/25/15 | 1,737.00 | Magnetic Tape |
| 01/21/16 | 8888 | 2015 / 04 | | | 10/25/15 | 869.00 | Magnetic Tape |
| 04/22/15 | 8888 | 2015 / 01 | | | 07/27/14 | 2,250.00 | Magnetic Tape |
| 01/20/15 | 8888 | 2014 / 04 | | | 07/27/14 | 6,300.00 | Magnetic Tape |
| 10/20/14 | 8888 | 2014 / 03 | | | 07/27/14 | 3,150.00 | Magnetic Tape |

Frequency: Quarterly                          Charges To Date:      $14,606.00

Exhibit B

Lunell Gamble
**REDACTED**

| | | | | |
|---|---|---|---|---|
| **KAISER FOUNDATION HP, INC** | | | **TAX DATA:** | Federal | State |
| Empl ID: REDACTED | | | Marit. Status: | Exempt | Exempt |
| Dept: 9205    Loc: CN0753 | | | Allowances: | | |
| Base Rate: 23.565928 Hourly | | | Addl. Allowan.: | | |
| Workweek Start: Saturday 22.00.00 | | | Addl. Amt.: | | |

Pay Group:  P10
Busin. Unit:  10308
Pay Beg Dt:  07/20/2014   Check#:  REDACTED4739
Pay End Dt:  08/02/2014   Check Dt:  07/28/2014

### HOURS AND EARNINGS

| Description | Begin Dt | End Dt | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|---|---|
| Regular | | | 23.5659 | 8.00 | 188.53 | 959.21 | 22,604.68 |
| Admin Time Worked | | | 23.5659 | 48.00 | 1,131.16 | 48.00 | 1,131.16 |
| Float Holiday | | | 23.5659 | 8.00 | 188.53 | 32.00 | 754.12 |
| VAC/PTO/ETO Payoff | | | 23.5659 | 8.81 | 207.62 | 8.81 | 207.62 |
| FLEX CREDT | | | | | 0.00 | | 623.98 |
| LEGAL HOL | | | | | 0.00 | 32.00 | 754.12 |
| VAC PTO | | | | | 0.00 | 192.28 | 4,531.25 |
| DLY OT 1.5 | | | | | 0.00 | 0.86 | 30.39 |
| WEEKLY OT | | | | | 0.00 | 0.39 | 13.78 |
| NQ DP OFF | | | | | 0.00 | | 20.15 |
| REWARDS | | | | | 0.00 | | 1,232.19 |

### TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 0.00 | 378.16 |
| Fed MED/EE | 24.88 | 490.47 |
| Fed OASDI/EE | 106.38 | 2,007.17 |
| CA Withholding | 0.00 | 57.43 |
| CA OASDI/EE | 17.16 | 334.75 |
| **Total:** | 148.42 | 3,357.98 |

### EMPLOYER PAID BENEFITS

| | Current | YTD |
|---|---|---|
| ER Svngs Plan | 85.79 | 1,501.35 |
| DP/RBR Sup Md | 0.00 | 45.22 |
| Medical | 0.00 | 6,560.68 |
| Dental | 0.00 | 795.90 |
| Supp Med | 0.00 | 85.82 |
| DP/RBR Medicl | 0.00 | 4,656.96 |
| DP/RBR Dental | 0.00 | 369.74 |
| DP/RBR Sup Md* | 0.00 | 45.22 |
| DP/RBR Medicl* | 0.00 | 4,656.96 |
| DP/RBR Dental* | 0.00 | 369.74 |
| Life Insure* | 0.00 | 350.00 |

**Total:**  HRS WRK CUR 56.00 YTD 1008.46    72.81    1,715.84 / 1,273.55    31,503.44

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| TSA Employee | 85.79 | 467.29 |
| Medical | 0.00 | 1,059.80 |
| Dental | 0.00 | 12.72 |
| DP/RBR Medicl | 0.00 | 684.22 |
| DP/RBR Dental | 0.00 | 41.58 |
| Life Insure | 0.00 | 231.00 |
| OTHERS | 0.00 | 1,347.67 |
| **Total:** | 85.79 | 3,967.32 |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| TSA Loan 1 | 0.00 | 541.88 |
| Plan B Loan 1 | 0.00 | 1,283.80 |
| Dep AD&D | 0.00 | 9.80 |
| Dependent Life | 0.00 | 66.08 |
| **Total:** | 0.00 | 1,911.56 |

* Taxable

### TOTAL GROSS / FED TAXABLE GROSS / TOTAL TAXES / TOTAL DEDUCTIONS / NET PAY

| | Total Gross | Fed Taxable Gross | Total Taxes | Total Deductions | Net Pay |
|---|---|---|---|---|---|
| Current: | 1,715.84 | 1,630.05 | 148.42 | 85.79 | 1,481.63 |
| YTD: | 31,503.44 | 33,358.04 | 3,357.98 | 5,878.88 | 22,666.58 |

### Leave Accruals

| Description | Current Earned | Bal |
|---|---|---|
| SICK/ESL | | 151.59 |
| VAC/PTO/ETO | | |
| FLOAT HOLIDAY | | |

### NET PAY DISTRIBUTION

Check REDACTED4739    1,481.63

**Total:**    1,481.63

ORIGINAL DOCUMENT HAS TRUE WATERMARK, CHEMICAL REACTIVE PAPER, MICROPRINTING, COLOR VOID PANTOGRAPH, FLUORESCENT FIBERS - HEAT SENSITIVE INK.

HEAT SENSITIVE INK

PRESS OR RUB WITH FINGER
IF ROSE COLORED SPOT DISAPPEARS,
THIS DOCUMENT IS AUTHENTIC.



**KAISER PERMANENTE.**
KAISER FOUNDATION HP, INC
One Kaiser Plaza
Oakland, CA. 94612

Wells Fargo Bank, N.A.
115 Hospital Drive
Van Wert, OH. 45891

56-383
412

Check No.
REDACTED4739

Date:    07/28/2014    Pay Amount:    ********$1,481.63
Void After 6 Months

PAY  One thousand four hundred eighty one and 63/100 Dollars
REDACTED9205

TO THE
ORDER OF    LUNELL C GAMBLE
**REDACTED**

**REDACTED**

2069⅃⁰

Exhibit C

**FORM W-2 Wage and Tax Statement**
Dept. of the Treasury - Internal Revenue Service

Copy C For EMPLOYEE'S RECORDS (See notice on second page)

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

These substitute W-2 Wages and Tax Statements are acceptable for filing with your Federal, State and Local Income Tax Returns.
If you worked in multiple locations, or had several forms of special compensation, you may receive more than one of these documents.

All copies of your W-2 are on this page. Copy 2 and Copy B are for your tax return. Copy C is for your records. General instructions for these forms, including an explanation of the letter codes used in box 12 are on the second page.

**W-2 Helpline 1-888-813-9292**
**Email: NPS-W2-Helpline@kp.org**

**Government Required Notifications:**

You may be eligible to receive the earned income tax credit from the federal government. The earned income tax credit is a refundable federal income tax credit for low-income working individuals and families. The earned income tax credit has no effect on certain welfare benefits. Be sure to fill out the earned income tax credit form, in the federal income tax return booklet. For information regarding your eligibility to receive the earned income tax credit, contact the IRS at 1-800-829-3676 or go to www.irs.gov and look up IRS Notice 797.

Box 12 DD on your W-2 contains the total dollar value of your health-care benefits - the combination of both your contributions and your employer's contributions to your health-care benefits for the 2014 tax year. This amount is required to appear on your W-2 by the Patient Protection and Affordable Care Act of 2010 for reporting purposes only. This dollar amount does not affect your taxes.

| | | |
|---|---|---|
| D. CONTROL NUMBER — This information is being furnished to the Internal Revenue Service | 2014 OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED 0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED 6502 | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY TAX WITHHELD 2097.17 |

C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE
KAISER FOUNDATION HP, INC
ONE KAISER PLAZA
OAKLAND CA 94612

| | |
|---|---|
| 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| 9 | 10 DEPENDENT CARE BENEFITS |

13 Statutory Employee / Retirement Plan [X] / Third-Party Sick Pay

E. EMPLOYEE'S FIRST NAME AND INITIAL    LAST NAME    SUFF.
LUNELL C GAMBLE
REDACTED

| 11 NONQUALIFIED PLANS | 12 a-d |
|---|---|
| | C 350.00 |
| 14 OTHER | E 467.29 |
| CASDI 334.75 | DD 7706.23 |
| DOMPT 5071.92 | |

F. EMPLOYEE'S ADDRESS AND ZIP CODE

| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED 229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

FOLD AND TEAR ALONG PERFORATION

---

| | | |
|---|---|---|
| D. CONTROL NUMBER — This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED 0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED 6502 | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY TAX WITHHELD 2097.17 |

C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE
KAISER FOUNDATION HP, INC
ONE KAISER PLAZA
OAKLAND CA 94612

| | |
|---|---|
| 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| 9 | 10 DEPENDENT CARE BENEFITS |

E. EMPLOYEE'S FIRST NAME AND INITIAL    LAST NAME    SUFF.
LUNELL C GAMBLE
REDACTED

| 11 NONQUALIFIED PLANS | 12 a-d |
|---|---|
| | C 350.00 |
| 14 OTHER | E 467.29 |
| CASDI 334.75 | DD 7706.23 |
| DOMPT 5071.92 | |

13 Statutory Employee / Retirement Plan [X] / Third-Party Sick Pay

F. EMPLOYEE'S ADDRESS AND ZIP CODE

| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED 229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy 2   To be Filed with Employee's STATE, CITY or LOCAL tax return    2014    Dept. of the Treasury - Internal Revenue Service
FORM W-2 Wage and Tax Statement
FOLD AND TEAR ALONG PERFORATION

---

| | | |
|---|---|---|
| D. CONTROL NUMBER — This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED 0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED 6502 | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY TAX WITHHELD 2097.17 |

C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE
KAISER FOUNDATION HP, INC
ONE KAISER PLAZA
OAKLAND CA 94612

| | |
|---|---|
| 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| 9 | 10 DEPENDENT CARE BENEFITS |

E. EMPLOYEE'S FIRST NAME AND INITIAL    LAST NAME    SUFF.
LUNELL C GAMBLE
REDACTED

| 11 NONQUALIFIED PLANS | 12 a-d |
|---|---|
| | C 350.00 |
| 14 OTHER | E 467.29 |
| CASDI 334.75 | DD 7706.23 |
| DOMPT 5071.92 | |

13 Statutory Employee / Retirement Plan [X] / Third-Party Sick Pay

F. EMPLOYEE'S ADDRESS AND ZIP CODE

| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED 229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy 2   To be Filed with Employee's STATE, CITY or LOCAL tax return    2014    Dept. of the Treasury - Internal Revenue Service
FORM W-2 Wage and Tax Statement
FOLD AND TEAR ALONG PERFORATION

---

| | | |
|---|---|---|
| D. CONTROL NUMBER — This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED 0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED 6502 | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY TAX WITHHELD 2097.17 |

C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE
KAISER FOUNDATION HP, INC
ONE KAISER PLAZA
OAKLAND CA 94612

| | |
|---|---|
| 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| 9 | 10 DEPENDENT CARE BENEFITS |

E. EMPLOYEE'S FIRST NAME AND INITIAL    LAST NAME    SUFF.
LUNELL C GAMBLE
REDACTED

| 11 NONQUALIFIED PLANS | 12 a-d |
|---|---|
| | C 350.00 |
| 14 OTHER | E 467.29 |
| CASDI 334.75 | DD 7706.23 |
| DOMPT 5071.92 | |

13 Statutory Employee / Retirement Plan [X] / Third-Party Sick Pay

F. EMPLOYEE'S ADDRESS AND ZIP CODE

| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED 229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy B   To be Filed with Employee's FEDERAL tax return    2014    Dept. of the Treasury - Internal Revenue Service
FORM W-2 Wage and Tax Statement
FOLD AND TEAR ALONG PERFORATION

Visit www.irs.gov for e-file details.

# W-2 AND WAGE SUMMARY

**Notice to Employee**

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, visit www.irs.gov/eitc . Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2014 and more than $7,254 in social security, and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee below.)

**Instructions for Employee** *(Also see Notice to Employee)*

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report this amount on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove a smaller amount with adequate records. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will figure the Social Security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record(used to figure your benefits).

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan. Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth deferrals (codes D, E, F, and S) are generally limited to a total of $17,500 ($12,000 if you only have S MPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule Explained in Pub. 571). Deferrals under code G are limited to $17,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age.

Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** *If a year follows code D through H, S, Y, AA, BB, or EE you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.*

**A-** Uncollected social security or RRTA tax on tips. Include this on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B-** Uncollected Medicare tax on tips. Include this on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C-** Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D-** Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a S MPLE retirement account that is part of a section 401(k) arrangement.

**E-** Elective deferrals under a section 403(b) salary reduction agreement.

**F-** Elective deferrals under a section 408(k)(6) salary reduction SEP

**G-** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H-** Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J-** Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K-** 20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L-** Substantiated employee business expense reimbursements (nontaxable)

**M-** Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N-** Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P-** Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q-** Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R-** Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S-** Employee salary reduction contributions under a section 408(p) S MPLE (not included in box 1)

**T-** Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V-** Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5).
See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W-** Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y-** Deferrals under a section 409A nonqualified deferred compensation plan

**Z-** Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA-** Designated Roth contributions under a section 401(k) plan

**BB-** Designated Roth contributions under a section 403(b) plan

**DD-** Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE-** Designated Roth contributions under a governmental section 457 (b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590 Individual Retirement Arrangements(IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier I tax, Tier II tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note.** *Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.*

Exhibit 4

| | |
|---|---|
| **From:** | Amanda Crespo |
| **Sent:** | Wednesday, April 26, 2017 7:24 PM |
| **To:** | Jeremy L. Friedman |
| **Cc:** | Heather Morgan; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' |
| **Subject:** | RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300] |

Jeremy,

Following on our call today, we believe that California Govt. Code sections 12928 and 12960 foreclose Plaintiff's argument below that she "did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge."

As the California Supreme Court pointed out in *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798 (2001), these provisions were "enacted (see Stats. 1999, ch. 797, § 2) in response to concern that 'the employee is not always able to determine the precise name or the identity of his or her employer.'"   The Court went on to explain:

> The problem occurs, for example, where there are parent and subsidiary corporations with similar names, but the employee is unaware of any distinction between the two entities. Very often these distinct entities are housed in the same facility which further complicate[s] identification of the proper party to be named. [¶] If the employee inadvertently misidentifies the employer in the original [Department of Fair Employment and Housing (Department)] complaint, the real employer may later claim that the employee has failed to exhaust his or her administrative remedies prior to suit within the time prescribed by law and is barred from proceeding with litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 211 (1999–2000 Reg. Sess.) as amended Sept. 1, 1999, p. 4.) Accordingly, the Legislature provided for "a \*827 rebuttable presumption \*\*\*109 that 'employer,' as defined by [the FEHA,] includes any person or entity identified as the employer on the employee's Federal Form W 2 (Wage and Tax Statement)" (§ 12928; see Stats.1999, ch. 797, § 1) and extended the one-year statute of limitations an additional year in the event that presumption is rebutted "to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (§ 12960.)

*Richards*, 26 Cal. 4th at 826-27.  Here, that exception does not apply because Plaintiff's W-2s did not identify Defendants Kaiser Foundation Hospital or The Permanente Medical Group.  "Plainly, the Legislature is capable of expanding the statutory period when it perceives the need." *Id.*  The Legislature did not create an exception to exhaustion or extend the statute of limitations to address a plaintiff's alleged confusion based on the purported EEO filings of an unexhausted defendant.  Therefore, that argument is unavailing.

This email also confirms your statement today that Plaintiff does not presently have any authorities supporting her positions stated in your email below aside from those cited in the *Kennedy* briefing.  As I noted today, if Plaintiff does locate additional authorities, I hope you will provide those for our consideration so that we can complete our conferral in good faith.

Since you confirmed today that Plaintiff will not voluntarily dismiss the unexhausted defendants from this case or amend her complaint to omit the pattern or practice allegations discussed in my March 29, 2017 conferral letter, we will proceed with filing the demurrer and motion to strike tomorrow.

Regards,

Amanda

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Wednesday, April 26, 2017 9:49 AM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. Please call me at 10, if that still works for you.

Thanks.

Jeremy

510 530 9060

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Tuesday, April 25, 2017 7:13 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks for your email, Jeremy.

We respectfully disagree that any of the arguments raised in our conferred letters are frivolous.  On the contrary, we
have provided Plaintiff with multiple cases and detailed arguments supporting Defendants' positions, both on the
exhaustion issues and on Plaintiff's pattern and practice theory of liability.

Does Plaintiff have any authority to support the positions set forth in your email below?  If so, I hope you will give us the
opportunity to review it so that we can confer in good faith on these issues.

Similarly, if Plaintiff believes we misunderstood the court's decision in the Kennedy case, please direct us to the portion
of that ruling (or the hearing transcript) that supports Plaintiff's interpretations.

To complete the conferral process, I suggest that we schedule a call for 10am tomorrow.  Please let me know if that
works for you, or if another time would be better.

Regards,

Amanda

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Saturday, April 22, 2017 2:12 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Dear Amanda

I apologize for not getting back to you a couple days ago.

After reviewing your letters concerning the amended complaint, I have the following response on behalf of Ms. Gamble:

1) Kaiser's attempt to raise these issues in response to plaintiff's amended complaint is improper. Unlike the situation in *Kennedy*, Kaiser failed to raise these arguments in the demurrer to Ms. Gamble's complaint. Kaiser cannot now rely upon another court's ruling in a different case to demand relief that was never requested.

2) In our case, the trial judge made specific rulings on what was required to correct the pleadings. None of the issues you raise are appropriate at the pleading stage.

3) Ms. Gamble did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge. Kaiser is a single entity with respect to its EEO reporting, and DFEH would know this. Please show me one case where the employee correctly named an employer, but not a related corporate form, and was held to have failed to exhaust.

4) You completely misunderstand the ruling in *Kennedy* and the nature of Ms. Gamble's complaint, in arguing for dismissal of two Kaiser entities. Those rules apply to vicarious liability, not to various corporate forms which are part of a single employer with single EEO reporting and compliance responsibilities.

5) Kaiser's pattern and practice of discriminating against African American employees is clearly relevant, and it is frivolous for Kaiser to contend otherwise. It would be even more frivolous to contend this was the basis for the ruling in *Kennedy*.

6) Pattern and practice is a method of proving intentional discrimination. Kaiser's claim that Ms. Gamble needs to convert her case to a class action in order to rely upon that method of proof is without merit. It also makes no sense, economically or with respect to judicial resources.  If Kaiser in this case is going to make that claim, it should do so directly. Arguing over the "relevancy" of these allegations as a back door way of attacking plaintiff's legal theories is improper.

7) Ms. Gamble did not need to exhaust "pattern and practice" allegations in the administrative process. Please show me one case where the employee was required to plead, in her administrative charge, the method by which she was going to prove her race discrimination for termination.

I hope this at least explains our position. I will be available to confer by telephone after Tuesday.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Friday, April 21, 2017 8:14 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thank you, Jeremy.  I have fairly good availability today if you would like to schedule a conferral call.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 20, 2017 7:41 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. I have not had a chance to look at the correspondence in any detail, yet, but will try to do so and get back to you tomorrow.

Thanks.

Jeremy

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 13, 2017 11:45 AM
**To:** 'Amanda Crespo' <amandacrespo@gbgllp.com>
**Cc:** 'Heather Morgan' <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks, Amanda. It is on my calendar, and I should be able to look the letters over by then, and give you some response.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Thursday, April 13, 2017 10:25 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Good morning Mr. Friedman,

I write to follow up on our efforts to confer on the issues raised in my letters dated (1) March 24, 2017, regarding Defendants Kaiser Foundation Hospital's and The Permanente Medical Group's intention to file a demurrer as to the FEHA claims stated in Plaintiff's First Amended Complaint ("FAC"); and (2) March 29, 2017, regarding Defendants' intention to move to strike certain "pattern and "practice" allegations in the FAC.

So that we have time to confer with our client and file Defendants' response to the FAC (no due April 27, 2017), we ask that you please provide Plaintiff's positions on the issues raised in these letters such that they are received by this office by the close of business on Thursday April 20, 2017.  If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

Amanda

---



**Amanda Bolliger Crespo**, Senior Associate
amandacrespo@gbgllp.com · www.gbgllp.com
tel 213.358.2812 · fax 213.995.6382
U.S. Bank Tower, 633 West 5th Street, Suite 3330
Los Angeles, California 90071

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

APR 2 7 2017

1
2
3
4
5
6
7
8            SUPERIOR COURT OF THE STATE OF CALIFORNIA
9               IN AND FOR THE COUNTY OF ALAMEDA
10
11   LUNELL GAMBLE,                          Case No. RG16826717
12            Plaintiff,                     ASSIGNED FOR ALL PURPOSES TO
                                             JUDGE IOANA PETROU
13       vs.                                 DEPARTMENT 15

14   KAISER FOUNDATION HEALTH PLAN,          **[PROPOSED] ORDER GRANTING**
     INC; KAISER FOUNDATION                  **DEFENDANTS KAISER**
15   HOSPITALS, INC; and THE                 **FOUNDATION HEALTH PLAN, INC;**
     PERMANENTE MEDICAL GROUP; all           **KAISER FOUNDATION HOSPITALS;**
16   doing business as KAISER PERMANENTE     **AND THE PERMANENTE MEDICAL**
     MEDICAL CARE PROGRAM,                   **GROUP'S DEMURRER TO**
17                                           **PLAINTIFF'S FIRST AMENDED**
            Defendants.                      **COMPLAINT**
18
19                                           Date:      May 31, 2017
                                             Time:      9:00 a.m.
20                                           Judge:     Hon. Ioana Petrou
                                             Dept.:     15
21
22                                           **Reservation No. R-1844959**

23                                           Complaint Filed:     August 9, 2016
24
25
26
27
28
          [PROPOSED] ORDER GRANTING DEFENDANTS' DEMURRER

1

**<u>ORDER</u>**

2  On May 31, 2017, before the Honorable Ioana Petrou, the Demurrer to Plaintiff's First

3  Amended Complaint filed by Defendants KAISER FOUNDATION HOSPITALS ("Hospitals")

4  and THE PERMANENTE MEDICAL GROUP ("Medical Group") ("Demurrer") came on for

5  hearing.  All parties were represented at the hearing by their attorneys of record.  The Court,

6  having fully considered the papers, evidence, and argument presented by the parties' counsel,

7  HEREBY FINDS AND ORDERS as follows:

8      1.  The Court lacks jurisdiction to hear any Fair Employment and Housing Act

9         ("FEHA") claim against Hospitals or Medical Group, including Plaintiff's First,

10         Second, and Third Causes of Action, because Plaintiff failed to name Hospitals or

11         Medical Group in the only administrative charge she filed with the Department of

12         Fair Employment & Housing.

13      2.  Plaintiff's First, Second, and Third Causes of Action also fail to state facts

14         sufficient to support a FEHA cause of action against Hospitals and Medical Group

15         because (1) judicially noticeable records establish that Plaintiff was employed by

16         Defendant Kaiser Foundation Health Plan, Inc. ("KFHP"), not Hospitals or

17         Medical Group; (2) California law mandates the separate existence of health care

18         service plans, like KFHP, and medical providers, like Hospitals and Medical

19         Group, thereby foreclosing Plaintiff's "single employer" theory; and (3) Plaintiff

20         fails to allege facts in the First Amended Complaint sufficient to proceed on a

21         single employer theory in any event.

22      3.  Plaintiff cannot remedy any of the foregoing defects.

23    Accordingly, the Demurrer is SUSTAINED WITHOUT LEAVE TO AMEND, and

24  Plaintiff's First, Second, and Third Causes of Action against Hospitals and Medical Group are

25  //

26  //

27  //

28

-2-
[PROPOSED] ORDER GRANTING DEFENDANTS' DEMURRER

1    HEREBY DISMISSED from this case WITH PREJUDICE.

2         IT IS SO ORDERED.

3    DATED: _____

4

5                                          _____
                                                        Hon. Ioana Petrou
6                                                   Judge of the Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING DEFENDANTS' DEMURRER

GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendants,
KAISER FOUNDATION HEALTH PLAN, INC.;
KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

ENDORSED
FILED
ALAMEDA COUNTY

APR 27 2017

CLERK OF THE SUPERIOR COURT
By _____
JANIE THOMAS, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE,<br><br>Plaintiff,<br><br>vs.<br><br>KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM,<br><br>Defendants. | Case No. RG16826717<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU<br>DEPARTMENT 15<br><br>**DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  May 31, 2017<br>Time:  9:00 a.m.<br>Judge:  Hon. Ioana Petrou<br>Dept.:  15<br><br>**Reservation No. R-1844960**<br><br>Complaint Filed:  August 9, 2016 |

-1-
DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1    TO PLAINTIFF LUNELL GAMBLE AND TO HER ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on May 31, 2017, at 9:00 a.m., or as soon thereafter as the

3    matter may be heard, in Department 15 of the above entitled court located at 1221 Oak Street,

4    Oakland, California 94612, the Honorable Ioana Petrou presiding, Defendants KAISER

5    FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; and THE

6    PERMANENTE MEDICAL GROUP ("Defendants") will and hereby do move the Court for an

7    order striking portions of the First Amended Complaint ("FAC") filed by Plaintiff Lunell Gamble

8    ("Plaintiff").  In particular, Defendants move to strike the following allegations pursuant to

9    sections 431.10(b) and 436 of the California Code of Civil Procedure:

10   • The following language from Paragraph 1, lines 19-20: "arising out of a pattern and
11        practice of race discrimination against African American employees."

12   • The following language from Paragraph 1, line 23: "systemic"

13   • Paragraphs 2, 10, 12, 13, 14, 15 (including the subparagraphs numbered 15a through 15o),
14        16 (including the subparagraphs numbered 16a-16l) and 17, in their entirety.

15   • The following language from Paragraph 11, lines 2-8: "Using a centralized employment
16        opportunity system, people external to Kaiser and current employees are able to apply for
17        open positions throughout Kaiser's operations, including by region.  Current employees
18        are told they will be provided with opportunities for employment that are not available to
19        external applicants, including access to job postings prior to their disclosure to the general
20        public, and a system by which employees may post their resumes for other Kaiser
21        departments to match to openings for hiring decisions."

22   • The following language from Paragraph 20, lines 7: "the pattern and practice of"

23   • The following language from Paragraph 22, lines 4: "Pursuant to its pattern and practice
24        of discrimination"

25   • The following language from Paragraph 30, lines 10-12: "Plaintiff is also a member of a
26        protected subclass based on race, and color, as she is an African-American woman."

27   • The following language from Paragraph 32, lines 16-17: "as well as a racial subclass of
28        race/gender."

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1   •   The following language from Paragraph 40, line 13: "and subclasses."

2   •   The following language from Paragraph 40, line 14: "African American Women."

3   •   The following language from the Prayer for Relief at Paragraph 3, line 5: "and ordering

4       defendant to cease engaging in a pattern and practice of discrimination."

5       As set forth in the concurrently filed memorandum of points and authorities, all of the

6   aforementioned allegations (the "Pattern and Practice Allegations") are irrelevant because they

7   are "neither pertinent to nor supported by an otherwise sufficient claim or defense." Code Civ.

8   Proc. § 431.10(b). In particular, Plaintiff's sweeping and conclusory allegations of a "systemic"

9   "pattern and practice" of discrimination have no place in a single-plaintiff discrimination and

10  retaliation case such as this one. They bear no discernible connection to Plaintiff's allegations

11  concerning her own employment, or her individual wrongful discharge claims, are not essential or

12  pertinent to any claim or defense in this case, and should be stricken from the FAC as irrelevant.

13      Moreover, the Pattern and Practice Allegations – which Plaintiff incorporates by reference

14  in each of her three Causes of Action under the Fair Employment and Housing Act ("FEHA") –

15  include claims that Plaintiff failed to exhaust in any administrative charge with the Department of

16  Fair Employment and Housing ("DFEH"). This Court lacks jurisdiction to hear these

17  unexhausted claims. They should be stricken from the FAC as irrelevant, false, and/or improper.

18      This Motion is based on this Notice of Motion and Motion; supporting Memorandum of

19  Points and Authorities, Request for Judicial Notice, and Declaration of Amanda Bolliger Crespo

20  filed concurrently herewith; all other papers and pleadings on file in this matter; and any oral and

21  documentary evidence as may be presented prior to, or at the time of, the hearing on this matter.

22  DATED: April 27, 2017                   GRUBE BROWN & GEIDT LLP

23

24                                  BY: _Amanda Bolliger Crespo_

25                                AMANDA BOLLIGER CRESPO

26                                Attorneys for Defendants
                                KAISER FOUNDATION HEALTH PLAN,
                                INC; KAISER FOUNDATION HOSPITALS;

27                                and THE PERMANENTE MEDICAL
                                GROUP

28

-3-

1

2                                    **Table of Contents**

3

I.      INTRODUCTION .................................................................................................. 1

II.     COMPLAINT ALLEGATIONS AND PROCEDURAL BACKGROUND ..................... 3

III.    THE COURT SHOULD GRANT DEFENDANTS' MOTION TO STRIKE THE
        PATTERN AND PRACTICE ALLEGATIONS BECAUSE THEY ARE
        IRRELEVANT. ....................................................................................................... 5

        A.    Plaintiff's Class-Based Pattern and Practice Theory Cannot Proceed In This
              Single-Plaintiff Disparate Treatment Case. ............................................ 5

              1.    Plaintiff's "Pattern and Practice" Theory Is Not Available in This
                    Single-Plaintiff Case. ................................................................... 5

              2.    Unlike Cases Permitting Pattern and Practice Evidence in a Single-
                    Plaintiff Case, Plaintiff's Pattern and Practice Allegations Have No
                    Connection to Her Individual Claims. ........................................... 6

        B.    The Pattern and Practice Allegations Are Irrelevant and Improper Because
              the Court Lacks Jurisdiction to Hear Them. ............................................ 8

              1.    A Plaintiff's Failure to Exhaust FEHA Claims Deprives the Court of
                    Jurisdiction to Hear Such Claims. ................................................ 8

              2.    The Pattern and Practice Allegations – Incorporated by Reference in
                    Plaintiff's FEHA Causes of Action – Add Claims Neither Like Nor
                    Reasonably Related to Plaintiff's DFEH Charge. .......................... 9

IV.     CONCLUSION ..................................................................................................... 11

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1

## Table of Authorities

2
Page(s)

3 **Cases**

4 *Alch v. Superior Court,*
5    122 Cal. App. 4th 339 (2004) ................................................................ 5, 6

6 *Bacon v. Honda of America Mfg., Inc.,*
   370 F.3d 565 (6th Cir. 2004)..................................................................... 6

7 *Celestine v. Petroleos de Venezuella SA,*
   266 F.3d 343 (5th Cir. 2001)..................................................................... 6
8
*Chin v. Port Authority of New York & New Jersey,*
9    685 F.3d 135 (2d Cir. 2012)...................................................................... 6

10 *Cooper v. Fed. Reserve Bank of Richmond,*
   467 U.S. 867 (1984) .................................................................................. 5
11
*Davis v. Coca-Cola Bottling Co. Consol.,*
12    516 F.3d 955 (11th Cir. 2008)................................................................... 6

13 *Frommhagen v. Board of Supervisors of Santa Cruz County,*
   197 Cal. App. 3d 1292 (1987)................................................................... 4
14
*Gilty v. Village of Oak Park,*
15    919 F.2d 1247 (7th Cir. 1990)................................................................... 6

16 *Hobson v. Raychem Corp.,*
   73 Cal. App. 4th 614 (1999) ................................................................... 11
17
*Johnson v. United Cerebral Palsy/Spastic Children's Foundation of*
18    *Los Angeles and Ventura Counties,*
   173 Cal. App. 4th 740 (2009) ............................................................ 6, 7, 8
19
*Kennedy v. Kaiser Foundation Health Plan, Inc.,*
20    (Super. Ct. Alameda County, 2016, No. RG16822544) ...................... 1, 3, 4

21 *Lowery v. Circuit City Stores, Inc.,*
   158 F.3d 742 *vacated on other grounds,* 527 U.S. 1031 (1999)................ 6
22
*McCaskey v. California State Auto. Assn.,*
23    189 Cal. App. 4th 947 (2010) ................................................................... 9

24 *Okoli v. Lockheed Technical Operations Co.,*
   36 Cal. App. 4th 1607 (1995) ............................................................. 8, 10
25
*Rojo v. Kliger,*
26    52 Cal. 3d 65 (1990) ............................................................................. 8, 9

27 *Semsroth v. City of Wichita,*
   304 Fed. Appx. 707 (10th Cir. 2008) ....................................................... 6

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

# <u>Table of Authorities</u>

<u>Page(s)</u>

*Stallcop v. Kaiser Foundation Hospitals*,
  820 F.2d 1044 (9th Cir. 1987)................................................................................................. 11

*Wills v. Superior Court*,
  195 Cal. App. 4th 143 (2011) ............................................................................................... 9

**Statutes**

Code Civ. Proc. § 430.41(a)..................................................................................................... 4

Code Civ. Proc. § 431.10(b)................................................................................................. 1, 5

Code Civ. Proc. § 436 ............................................................................................................. 5

Code Civ. Proc. § 437(a) ........................................................................................................ 4

Evid. Code § 452(d) ................................................................................................................ 4

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

      This is a single-plaintiff wrongful termination case alleging individual claims of race- and age-based discrimination and retaliation in violation of FEHA.  The factual allegations that Plaintiff asserts in support of her wrongful termination claims span a total of *three* pages.  *See* "WRONGFUL TERMINATION" allegations at FAC ¶¶ 18-22.  In contrast to those discrete factual allegations, the FAC devotes some *seven* pages to a veritable kitchen sink of "PATTERN AND PRACTICE ALLEGATIONS" (*see* FAC ¶¶ 1, 10-11, 13-17) implicating every possible employment practice by all three Defendants and involving a boundless "class" of African Americans (as well as a "subclass" of African American women).  These irrelevant Pattern and Practice Allegations are "neither pertinent to nor supported by an otherwise sufficient claim or defense" in this case and should be stricken from the FAC as irrelevant.  Code Civ. Proc. § 431.10(b).

      <u>First</u>, Plaintiff's allegations of a "systemic" "pattern and practice" of discrimination might be germane if this were a class action, but they have no place in this single-plaintiff discrimination and retaliation case.  Indeed, another court recently struck nearly identical "pattern and practice" allegations in a single-plaintiff case filed by Plaintiff's counsel against the same three Defendants, finding such allegations were "irrelevant" to the plaintiff's complaint.  *Kennedy v. Kaiser Foundation Health Plan, Inc., et al.*, No. RG16822544 ("*Kennedy*"), Ex. E to Defendants' Request for Judicial Notice ("RJN").[1]  The same result should apply here.

      Defendants recognize that so-called "pattern and practice" allegations at times can appropriately be asserted in a single-plaintiff civil complaint when the allegations rationally relate to Plaintiff's individual claims.  That is not the case here.  Plaintiff's Pattern and Practice Allegations bear no discernible connection to Plaintiff, her former managers, where Plaintiff

---

[1] Plaintiff was aware of the *Kennedy* decision when she filed this FAC because Defendants filed the *Kennedy* decision with their Notice of New Authority on February 3, 2017, more than one month before Plaintiff filed the FAC.  Nevertheless, the FAC makes nearly identical allegations to what the *Kennedy* case struck as irrelevant.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

worked, nor to any of the factual allegations or practices that Plaintiff references concerning her own employment and discharge. The Pattern and Practice allegations are irrelevant to the facts and claims at issue in this case and should be stricken.

Second, the Pattern and Practice Allegations include a host of claims and legal theories that Plaintiff never exhausted in her sole DFEH Charge. Plaintiff's DFEH Charge only references race- and age-based harassment and discrimination, retaliation, and Plaintiff's termination, limited to a single location (Alameda, California) and a single date (July 18, 2014). Plaintiff mentions no patterns or practices, continuing violation, or other employees in her DFEH Charge. In contrast to Plaintiff's DFEH Charge, the Pattern and Practice Allegations include sex-based discrimination claims, sex-based harassment claims, disability discrimination and failure to accommodate claims, class-based disparate impact claims, and allegedly discriminatory compensation, promotion, training and other decisions on unspecified dates and involving a class (and subclass) of unspecified individuals that appear nowhere in Plaintiff's DFEH Charge. These claims and theories are barred by FEHA's exhaustion of remedies doctrine because they neither are like nor reasonably related to Plaintiff's DFEH Charge claims and were not likely to be uncovered in the course of the DFEH's investigation of Plaintiff's DFEH Charge. This Court lacks jurisdiction to hear these unexhausted claims. As such, the Pattern and Practice Allegations are irrelevant and should be stricken from the FAC.

Defendants do not bring this Motion lightly and have no wish to take up the Court's time arguing over semantics at the pleading stage. Unfortunately, the problems presented by Plaintiff's Pattern and Practice Allegations go well beyond semantics. Considering relative page counts alone, the FAC positions Plaintiff's irrelevant "Pattern and Practice Allegations" as the tail that wags the dog in this otherwise straight-forward "Wrongful Termination" case (FAC ¶¶ 18-22). Permitting this case to proceed as currently pled will only invite confusion and endless discovery disputes, when Plaintiff inevitably seeks discovery on Pattern and Practice Allegations that – as a matter of law – have no proper place before this Court or in this case. Plaintiff's irrelevant Pattern and Practice Allegations should be stricken from the FAC as irrelevant, false and/or improper.

## II.    COMPLAINT ALLEGATIONS AND PROCEDURAL BACKGROUND

This case arises out of the termination of Plaintiff's employment with Defendant Kaiser Foundation Health Plan, Inc. ("KFHP").[2]  *See* FAC ¶¶ 18-22 (Plaintiff's factual allegations captioned "WRONGFUL TERMINATION").  Plaintiff alleges that she was terminated on July 29, 2014.  FAC ¶ 22.

Plaintiff filed her sole DFEH Charge on August 13, 2014.  *See* Ex. 2 to the Declaration of Amanda Bolliger Crespo In Support of Motion to Strike ("Crespo Decl.") (the "DFEH Charge"). In her DFEH Charge, Plaintiff states that "[o]n or around Jul [sic] 18, 2014," Respondent took the following adverse actions against her: "Discrimination, Harassment, Retaliation, Terminated." *Id*.  Plaintiff's DFEH Charge further alleges that Respondent committed these actions because of her "Age – 40 and over, Color, Race."  *Id.*  Plaintiff's DFEH Charge further states that "the alleged unlawful employment practices occurred in Alameda, California."  *Id.*

Plaintiff filed this lawsuit on August 9, 2016.  *See* Crespo Decl. ¶ 3.  Plaintiff's initial Complaint asserted a single cause of action, without providing enough detail to determine what type of claim(s) Plaintiff alleged, among other defects.  *Id.*  On November 22, 2016, Defendants filed a Demurrer arguing that the Complaint should be dismissed for uncertainty.  *Id.*

On January 31, 2017, another court granted Defendants' motion to strike "pattern and practice" allegations in a case filed by Plaintiff's counsel against the same Defendants.  Ex. E to RJN ("Defendants' motion to strike para. 1, lines 19-20, the phrase 'arising out of a pattern of race discrimination against its African-American employees,' the word 'systemic' in para. 1, line 22, the entirety of para. 2 and paras. 11-17 in their entirety on the ground that these allegations are irrelevant to the Complaint is GRANTED WITHOUT LEAVE TO AMEND.").  On February 3, 2017, Defendants advised the Court and Plaintiff of the *Kennedy* ruling via a Notice of New Authority attaching the *Kennedy* court's order.  Crespo Decl. ¶ 4.

---

[2] Although Plaintiff asserts FEHA claims against all three Defendants, Plaintiff was employed by KFHP, not Defendants Kaiser Foundation Hospitals or The Permanente Medical Group.  *See* Defendants Kaiser Foundation Hospitals' and The Permanente Medical Group's Demurrer to First Amended Complaint, filed concurrently herewith.

1    On February 7, 2017, this Court sustained Defendants' Demurrer, granting Plaintiff leave

2    to amend.  Crespo Decl., Ex. 1.  The Court ordered Plaintiff to "allege separate causes of action

3    for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories

4    of liability, and a separate cause of action for retaliation (if she is also alleging retaliation as a

5    basis for Defendants' liability)."  *Id.*  The Court noted that "combining these disparate theories of

6    liability into a single unspecified cause of action renders the Complaint uncertain."  *Id.*  The

7    Court further ordered Plaintiff to "attach any administrative complaints she filed with the EEOC

8    or DFEH about the incidents that are the subject of this action as an attachment to her First

9    Amended Complaint."  *Id*.

10    Plaintiff filed her FAC on March 10, 2017.  The FAC contains the same "pattern and

11    practice" allegations that the *Kennedy* court struck as irrelevant.  *Compare* FAC ¶¶ 1-2, 11-17

12    *with* Request for Judicial Notice ("RJN"), Ex. D (*Kennedy* Complaint), ¶¶ 1-2, 11-17.[3]  Plaintiff

13    attached only one administrative complaint as an Exhibit to the FAC, the DFEH Charge described

14    above.  Plaintiff's Pattern and Practice Allegations within the FAC embed multiple claims that are

15    not mentioned anywhere in her DFEH Charge, including gender and disability discrimination and

16    class-based disparate impact claims.

17    On March 29, 2017, April 3, 2017, April 22, 2017, April 25, 2017, and April 26, 2017,

18    counsel for the parties engaged in written and telephonic meet and confer communications

19    pursuant to Code of Civil Procedure section 430.41(a) to discuss the grounds underlying

20    Defendants' contemplated motion to strike.  *See* Crespo Decl. ¶¶ 8-9.  Plaintiff refused to amend

21    her FAC.  *Id.* at ¶ 10.  Accordingly, Defendants filed the instant Motion.

22

23

24

25

26    [3] In ruling on this Motion, the Court may look to the face of the FAC and any matter that is the
proper subject of judicial notice.  *See* Code Civ. Proc. § 437(a).  The Court may take judicial
notice of the Complaint from the *Kennedy* case as a court record.  *See* Evid. Code § 452(d); *see*
27    *also Frommhagen v. Board of Supervisors of Santa Cruz County*, 197 Cal. App. 3d 1292, 1299
(1987) (court took judicial notice of complaint in prior action in determining whether to sustain
28    demurrer based on *res judicata*).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

III.    **THE COURT SHOULD GRANT DEFENDANTS' MOTION TO STRIKE THE PATTERN AND PRACTICE ALLEGATIONS BECAUSE THEY ARE IRRELEVANT.**

On Defendants' motion, the Court may "[s]trike out any irrelevant, false, or improper matter inserted in any pleading," and/or strike "all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." Code Civ. Proc. § 436(a)-(b). Allegations are irrelevant where they are "neither pertinent to nor supported by an otherwise sufficient claim or defense." Code Civ. Proc. § 431.10(b).

Here, the Pattern and Practice Allegations consist of improper conclusory allegations that have no relevance to Plaintiff's individual disparate treatment claims and unexhausted claims which the Court lacks jurisdiction to hear. Because Plaintiff cannot remedy these defects by amending the Pattern and Practice Allegations, Defendants' Motion should be granted in its entirety, without leave to amend.

A.    **Plaintiff's Class-Based Pattern and Practice Theory Cannot Proceed In This Single-Plaintiff Disparate Treatment Case.**

Plaintiff devotes 32 paragraphs and seven pages of the FAC to a series of conclusory allegations that she has labeled "PATTERN AND PRACTICE ALLEGATIONS." *See* FAC ¶¶ 1, 10-17 (the "Pattern and Practice Allegations"). These allegations are irrelevant because Plaintiff cannot proceed on a pattern and practice theory of discrimination in this single-plaintiff case. Accordingly, the Pattern and Practice allegations are "neither pertinent to nor supported by an otherwise sufficient claim or defense." Code Civ. Proc. § 431.10(b).

1.    **Plaintiff's "Pattern and Practice" Theory Is Not Available in This Single-Plaintiff Case.**

While Plaintiff's allegations of a systemic pattern and practice of discrimination may be germane in a class action, they have no place in a single-plaintiff discrimination and retaliation case such as this. *See Alch v. Superior Court*, 122 Cal. App. 4th 339, 379 (2004) ("Pattern-or-practice suits, by their very nature, involve claims of classwide discrimination."); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of

-5-

1  discrimination is manifest."). As the Second Circuit explained:[4] "*[T]he pattern-or-practice*

2  *method of proof is not available to nonclass, private plaintiffs . . . .*" *Chin v. Port Authority of*

3  *New York & New Jersey*, 685 F.3d 135, 149-50 (2d Cir. 2012) (emphasis added).[5]

4      For this reason, as noted above, another court already struck nearly identical "pattern and

5  practice" allegations in a single-plaintiff case filed by Plaintiff's counsel against the same three

6  Defendants. *See* RJN, Ex. E ("Defendants' motion to strike para. 1, lines 19-20, the phrase

7  'arising out of a pattern of race discrimination against its African-American employees,' the word

8  'systemic' in para. 1, line 22, the entirety of para. 2 and paras. 11-17 in their entirety on the

9  ground that these allegations are irrelevant to the Complaint is GRANTED WITHOUT LEAVE

10  TO AMEND."). The "pattern and practice" allegations here must likewise be stricken.

11          **2.      Unlike Cases Permitting Pattern and Practice Evidence in a Single-**
                       **Plaintiff Case, Plaintiff's Pattern and Practice Allegations Have No**
12                     **Connection to Her Individual Claims.**

13      Defendants recognize that so-called "pattern and practice" allegations at times can

14  appropriately be asserted in a single-plaintiff civil complaint when the allegations are *relevant* to

15  Plaintiff's individual claims. The case of *Johnson v. United Cerebral Palsy/Spastic Children's*

16  *Foundation of Los Angeles and Ventura Counties*, 173 Cal. App. 4th 740 (2009) is illustrative.

17  There, a single plaintiff complaint alleged:

18          … that Linda Jones (Jones) participated in the termination after
            Jones was informed that plaintiff's pregnancy condition required
19          medical leave, and . . . that Jones had a discriminatory animus
            against pregnant women and a pattern and practice of engaging in
20          adverse treatment of them such that she would create a justification
            for their termination.
21

22  ─────────────
    [4] When interpreting FEHA, California courts look to federal law and how courts have interpreted
23  Title VII claims. *Alch*, 122 Cal. App. 4th at 379.

24  [5] Every federal Circuit court that has addressed the issue has joined the Second Circuit in
    rejecting application of a pattern or practice theory of liability for employment discrimination
25  claims brought by nonclass, private plaintiffs. *See, e.g., Davis v. Coca-Cola Bottling Co. Consol.*,
    516 F.3d 955, 967-69 (11th Cir. 2008) (Title VII does not permit individual plaintiff pattern and
26  practice claims, in part for protection of unnamed class members who could be affected by *res
    judicata* and issue preclusion); *see also Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761,
    *vacated on other grounds*, 527 U.S. 1031 (1999); *Celestine v. Petroleos de Venezuella SA*, 266
27  F.3d 343, 355-56 (5th Cir. 2001); *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th
    Cir. 2004); *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Semsroth v. City of*
28  *Wichita*, 304 Fed. Appx. 707, 715 (10th Cir. 2008).

─────────────
-6-

1    *Id.* at 747. The court determined that "me too" declarations from employees who "worked at the

2    same facility where plaintiff worked [and] were supervised by the same people that supervised

3    plaintiff" supported the plaintiff's disparate treatment discrimination claim. *Id.* at 759. In so

4    holding, the court specifically noted that the "factual scenarios related by [the] former employees

5    . . . [we]re sufficiently similar to the one presented by the plaintiff concerning her own

6    discharge . . . ." *Id.* at 767.

7        Here, the FAC includes some purported "pattern and practice" allegations that arguably

8    could present "factual scenarios . . . sufficiently similar to the one presented by the plaintiff

9    concerning her own discharge" to be permitted in a single-plaintiff case. *Id.*; *see* FAC ¶ 20g

10   (alleging that "Throughout this period, [Plaintiff's former supervisor] Ms. Grajeda treated

11   plaintiff and other older African American employees with disparate treatment, including refused

12   to assign work to plaintiff commensurate with plaintiffs [sic] knowledge and skill levels,

13   criticisms of work by African American employees that were not made against the same or even

14   less quality work by younger, non-African Americans, and overlooking transgressions or

15   mistakes by younger, non-African American employees."). Defendants do not seek to strike

16   these or similar allegations that, as pled, at least arguably rationally relate to Plaintiff's individual

17   discrimination and retaliation claims against Defendants.

18       However, the conclusory and breathtakingly broad Pattern and Practice Allegations –

19   focused as they are on a boundless "class" of African Americans (and a subclass of African

20   American women) – stand in stark contrast to the sorts of allegations that courts have found to be

21   appropriate and relevant in a single-plaintiff case. They bear no discernible connection to

22   Plaintiff, her former managers, where Plaintiff worked, nor to any of the facts that Plaintiff

23   alleges concerning her own employment and discharge. Instead, they consist of conclusory,

24   generalized allegations about alleged compensation, promotion, training, and investigation

25   practices. These practices have no relevance to Plaintiff's individual discrimination and

26   retaliation claims, which contain no reference anywhere to Plaintiff's compensation, denial of any

27   promotions or training, and instead focus solely on an alleged wrongful discharge. *See* further

28   discussion in Section III.B.2 below. As such, they are not "sufficiently similar to the [factual

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1    scenarios] by [Plaintiff] concerning her own discharge" to be relevant to Plaintiff's claims.

2    *Johnson*, 173 Cal. App. 4th at 767.

3    **B.    The Pattern and Practice Allegations Are Irrelevant and Improper Because**
     **the Court Lacks Jurisdiction to Hear Them.**

4

5    **1.    A Plaintiff's Failure to Exhaust FEHA Claims Deprives the Court of**
         **Jurisdiction to Hear Such Claims.**

6    All three of Plaintiff's Causes of Action allege violations of FEHA.  A plaintiff "must

7    exhaust the FEHA administrative remedies before bringing suit on a cause of action under

8    [FEHA] or seeking the relief provided [by FEHA] . . . ."  *Rojo v. Kliger*, 52 Cal. 3d 65, 88 (1990).

9    "The purpose of FEHA's administrative exhaustion requirement is to ensure DFEH is provided

10   the opportunity to resolve disputes and eliminate unlawful employment practices through

11   conciliation."  *Wills v. Superior Court*, 195 Cal. App. 4th 143, 156 (2011).  "[T]he exhaustion

12   requirement serves the important policy interests embodied in the act of resolving disputes and

13   eliminating unlawful employment practices by conciliation [citation], as well as the salutory goals

14   of easing the burden on the court system, maximizing the use of administrative agency expertise

15   and capability to order and monitor corrective measures, and providing a more economical and

16   less formal means of resolving the dispute [citation]."  *Id.*, citing *Rojo* at 83.

17   "[I]n the absence of a timely administrative complaint, any civil action alleging a violation

18   of FEHA will be subject to dismissal for failure to exhaust administrative remedies."  *McCaskey*

19   *v. California State Auto. Assn.*, 189 Cal. App. 4th 947, 976 (2010).  In particular, "claims that

20   [are] neither like nor reasonably related to [a plaintiff's] DFEH claim and were not likely to be

21   uncovered in the course of a DFEH investigation, . . . are barred by the exhaustion of remedies

22   doctrine."  *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1617 (1995).

23   "[I]n the context of the FEHA, exhaustion of the administrative remedy is a jurisdictional

24   prerequisite to resort to the courts."  *Id*. at 1613.  "[T]he trial court had no jurisdiction to hear

25   Okoli's retaliation cause of action [as] [the plaintiff] never filed a charge with the DFEH

26   mentioning retaliation."  *Id*. at 1612.  In other words, Plaintiff's failure to exhaust her

27   administrative remedies by filing a DFEH charge mentioning each of her claims strips the Court

28   of jurisdiction to hear those claims.

-8-

2.    **The Pattern and Practice Allegations – Incorporated by Reference in Plaintiff's FEHA Causes of Action – Add Claims Neither Like Nor Reasonably Related to Plaintiff's DFEH Charge.**

Plaintiff's sole DFEH Charge does not reference adverse actions against any employee other than Plaintiff. It also is limited to Plaintiff's worksite in Alameda, California. It further does not reference gender or disabilities. Instead, it only identifies alleged discrimination on the basis of age and race and retaliation. It also identifies only two adverse actions – harassment and "terminat[ion]" – and states that all alleged adverse actions occurred on a single date (i.e., "[o]n or around Jul [sic] 18, 2014"). The FAC's recitation of factual allegations paints the same picture of a straightforward single-plaintiff wrongful termination case. *See* FAC ¶¶ 18-22.

In contrast to Plaintiff's "Wrongful Termination" allegations (FAC ¶¶ 18-22) and Plaintiff's DFEH Charge, the Pattern and Practice Allegations include a host of claims and legal theories that Plaintiff never exhausted in her DFEH Charge:[6]

- Sex discrimination claims. *See, e.g.*, FAC ¶ 32 (alleging that "The discriminatory treatment of plaintiff's employment and harassment were done with discriminatory motive, based on . . . a racial subclass of race/gender").

- Sex-based harassment claims. *See* FAC ¶ 15k (alleging that unspecified persons "[h]arass[ed] . . . African-American female employees interested in advancement and subject[ed] them to a hostile work environment").

- Disability discrimination and failure to accommodate claims. *See* FAC ¶ 15j (alleging that unspecified persons "discriminat[ed] against African-American employees due to their disabilities because of both their disabilities and their race and/or race-gender" and "[p]rovid[ed] less or refus[ed] to make reasonable accommodations for disabilities and sick leave policies" at unspecified times).

- Class-based disparate impact claims. *See, e.g.*, FAC ¶ 15 (alleging that Defendants' "policies and practices . . . have an adverse impact on African-American and African-American female employees that cannot be justified by business necessity, and for which

---

[6] Plaintiff's causes of action incorporate the Pattern and Practice Allegations by reference. The FAC states that "Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 27 of this complaint as though fully set forth herein." FAC ¶¶ 28, 33 and 38.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1    alternative policies and practices with [sic] less discriminatory impact could be utilized

2    that equally serve any asserted justification"); *see also* FAC ¶¶ 15a-o (listing such alleged

3    "policies and "practices").

4    •    Allegedly discriminatory compensation, promotion, training and other decisions on

5    unspecified dates and involving a class (and subclass) of unspecified individuals.  *See,*

6    *e.g.*, FAC ¶ 2 (alleging that "conscious or unconscious prejudices and race and/or race-

7    gender based stereotypes . . . explain[] why so few African-American and African-

8    American women . . . advance to supervisory and management positions"); *see also*

9    FAC ¶ 10 (referring to a class action lawsuit against "Kaiser" that "was pending until

10    December 10, 2013" – i.e., that ended before the alleged adverse actions referenced in

11    Plaintiff's DFEH Charge); FAC ¶ 15g (alleging that unspecified persons gave "African-

12    American employees lower compensation, lower job classifications and lower pay raise

13    incentives").

14    Unlike the sweeping allegations described above, Plaintiff's DFEH Charge contains no

15    reference whatsoever to (1) any policy or practice, much less one allegedly having an adverse

16    impact; (2) sex or disability as a motive for discrimination or harassment; (3) any alleged

17    disability, request for, or denial of an accommodation.  Further, Plaintiff's DFEH Charge

18    identifies no claims before July 18, 2014 – much less any compensation, promotion, training or

19    other alleged "practice" referenced in the Pattern and Practice Allegations.  Nor does Plaintiff's

20    DFEH Charge allege any continuous pattern of discrimination, harassment or retaliation.

21    Since the Pattern and Practice Allegations "add[] claims that were neither like nor

22    reasonably related to [her] DFEH claim and were not likely to be uncovered in the course of a

23    DFEH investigation, [such] claims are barred by the exhaustion of remedies doctrine."  *Okoli*, 36

24    Cal. App. 4th at 1617; *see also Hobson v. Raychem Corp.*, 73 Cal. App. 4th 614, 631 (1999)

25    (cause of action for mental disability discrimination barred where DFEH charge only alleged

26    physical disability discrimination); *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1051

27    (9th Cir. 1987) (age and sex discrimination claims barred where plaintiff failed to include any

28    allegations of age or sex discrimination).

-10-

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1       The Court lacks jurisdiction to hear the unexhausted claims that Plaintiff has embedded in

2   her Pattern and Practice Allegations and incorporated by reference in her Causes of Action.  As

3   such, the Pattern and Practice Allegations are irrelevant and improper and should be stricken from

4   the FAC.

5   **IV.    CONCLUSION**

6       For all the foregoing reasons, Defendants respectfully requests that the Court grant its

7   motion to strike the Pattern and Practice Allegations.

8

9   DATED:  April 27, 2017                    GRUBE BROWN & GEIDT LLP

10

11                                           BY: *Amanda Bolliger Crespo*

12                                               AMANDA BOLLIGER CRESPO

13                                           Attorneys for Defendants
                                             KAISER FOUNDATION HEALTH PLAN,
                                             INC; KAISER FOUNDATION HOSPITALS;
14                                           and THE PERMANENTE MEDICAL
                                             GROUP

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE; SUPPORTING MEMORANDUM

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA  94111
   Telephone:  (415) 603-5000
5  Facsimile:  (415) 840-7210

6  Attorneys for Defendants,
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13            Plaintiff,                    ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14       vs.                                DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **DECLARATION OF AMANDA**
    INC; KAISER FOUNDATION                  **BOLLIGER CRESPO IN SUPPORT OF**
16  HOSPITALS, INC; and THE                 **DEFENDANTS KAISER**
    PERMANENTE MEDICAL GROUP; all           **FOUNDATION HEALTH PLAN, INC;**
17  doing business as KAISER PERMANENTE     **KAISER FOUNDATION HOSPITALS;**
    MEDICAL CARE PROGRAM,                   **AND THE PERMANENTE MEDICAL**
18                                          **GROUP'S MOTION TO STRIKE**
              Defendants.                   **ALLEGATIONS IN PLAINTIFF'S**
19                                          **FIRST AMENDED COMPLAINT**

20                                          Date:      May 31, 2017
                                            Time:      9:00 a.m.
21                                          Judge:     Hon. Ioana Petrou
                                            Dept.:     15
22
                                            **Reservation Nos. R-1844960**
23
                                            Complaint Filed:    August 9, 2016
24

25

26

27

28

   ─────────────────────────────────────────────────────────────
          CRESPO DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE

1    I, Amanda Bolliger Crespo, declare as follows:

2        1.    I am an attorney duly licensed to practice before this Court and before all of the

3    Courts of the State of California.  I am an Associate at the law firm of Grube Brown & Geidt

4    LLP, and counsel of record for Defendants Kaiser Foundation Health Plan, Inc.; Kaiser

5    Foundation Hospitals, and The Permanente Medical Group ("Defendants") in this action.  I have

6    personal knowledge of the matters set forth in this declaration or know of them based on my

7    review of documents maintained in the ordinary course of business by Grube Brown & Geidt LLP

8    and if called as a witness, could and would testify as to their accuracy.

9        2.    I make this Declaration in support of Defendants' Motion to Strike.

10        3.    Plaintiff filed this lawsuit on August 9, 2016.  Plaintiff's initial Complaint asserted

11    a single cause of action, without providing enough detail to determine what type of claim(s)

12    Plaintiff alleged, among other defects.  On November 22, 2016, Defendants filed a Demurrer

13    arguing that the Complaint should be dismissed for uncertainty.

14        4.    On February 3, 2017, Defendants filed a Notice of New Authority advising the

15    Court and Plaintiff that another court had granted Defendants' motion to strike "pattern and

16    practice" allegations in a case filed by Plaintiff's counsel against the same three Defendants in the

17    case of *Kennedy v. Kaiser Foundation Health Plan, Inc*., No. RG16822544 ("*Kennedy*"),

18    currently pending before the County of Alameda Superior Court.  A true and correct copy of the

19    *Kennedy* ruling is attached to Defendants' Request for Judicial Notice In Support of Defendants

20    Demurrer and Motion to Strike ("RJN") as Exhibit E.

21        5.    On February 7, 2017, this Court sustained Defendants' Demurrer, granting

22    Plaintiff leave to amend.  A true and correct copy of the Notice of Entry of Order Sustaining

23    Demurrer to Complaint is attached to this Declaration as Exhibit 1.

24        6.    Plaintiff filed her First Amended Complaint ("FAC") on March 10, 2017.  Only

25    one administrative charge was attached to the FAC.  That charge is attached to this Declaration as

26    Exhibit 2.

27

28

CRESPO DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER AND MOTION TO STRIKE

7.    I have reviewed the Complaint from the *Kennedy* case, which is attached to the RJN as Exhibit D.  Based on my review, Plaintiff's FAC contains the same "pattern and practice" allegations that the *Kennedy* court struck as irrelevant.

8.    On March 29, 2017, my office sent a detailed meet and confer letter to Plaintiffs' counsel regarding the grounds underlying Defendants' Motion to Strike.  A true and correct copy of that letter is attached to this Declaration as Exhibit 3.

9.    I engaged in further conferral with Plaintiffs' counsel via telephone and email on April 3, 2017, April 22, 2017, April 25, 2017, and April 26, 2017.  A true and correct copy of emails that I exchanged with Plaintiff's counsel regarding Defendants' contemplated Motion to Strike is attached to this Declaration as Exhibit 4.

10.    On April 26, 2017, Plaintiff's counsel advised me that Plaintiff would not voluntarily amend the FAC to address the issues we discussed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th day of April, 2017, at Los Angeles, California.

AMANDA BOLLIGER CRESPO

- 2 -

CRESPO DECLARATION IN SUPPORT OF DEFENDANTS' DEMURRER AND MOTION TO STRIKE

Exhibit 1

ENDORSED
FILED
ALAMEDA COUNTY

FEB - 8 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1   SEYFARTH SHAW LLP
    Kristina M. Launey (SBN 221335)
2   klauney@seyfarth.com
    Julie Yap (SBN 243450)
3   jyap@seyfarth.com
    Tiffany T. Tran (SBN 294213)
4   ttran@seyfarth.com
    400 Capitol Mall, Suite 2350
5   Sacramento, California 95814-4428
    Telephone:    (916) 448-0159
6   Facsimile:    (916) 558-4839

7   SEYFARTH SHAW LLP
    Bethany A. Vasquez (SBN 209423)
8   bvasquez@seyfarth.com
    560 Mission Street, 31st Floor
9   San Francisco, CA 94105-2930
    Telephone:    (415) 397-2823
10  Facsimile:    (415) 397-8549

11  Attorneys for Defendants
    KAISER FOUNDATION HEALTH PLAN, INC.;
12  KAISER FOUNDATION HOSPITALS; and THE
    PERMANENTE MEDICAL GROUP

13

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        COUNTY OF ALAMEDA

17

18  LUNELL GAMBLE,                        Case No. RG16826717

19              Plaintiff,               **NOTICE OF ENTRY OF ORDER
                                         SUSTAINING DEMURRER TO
20         v.                            COMPLAINT**

21  KAISER FOUNDATION HEALTH PLAN, INC.;  Hearing Date:  February 7, 2017
    KAISER FOUNDATION HOSPITALS, INC.; and Time:          9:00 a.m.
22  THE PERMANENTE MEDICAL GROUP; all     Dept.:         15
    doing business as KAISER PERMANENTE   Judge:         Ioana Petrou
23  MEDICAL CARE PROGRAM,

24              Defendants.               Reservation number: R-1802056

25

26

27

28

_____
            NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT
37047650v.1

1    TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on February 7, 2017, the Court entered the Order Sustaining

3    Demurrer to Complaint.  A true and correct copy of the filed Order is attached as Exhibit A

4

5    DATED: February 8, 2017                    Respectfully submitted,

6                                               SEYFARTH SHAW LLP

7

8                                               BY:

9                                               Kristina M. Launey
                                                Julie Yap
10                                              Bethany A. Vasquez
                                                Tiffany T. Tran
11                                              Attorneys for Defendants
                                                KAISER FOUNDATION HEALTH PLAN,
12                                              INC.; KAISER FOUNDATION
                                                HOSPITALS; and THE PERMANENTE
13                                              MEDICAL GROUP

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                               1

Attorney at Law                                    Kaiser Foundation Health Plan, Inc
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602_____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br>Kaiser Foundation Health Plan, Inc<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16826717<br><br>Order<br><br>Demurrer to Complaint<br>Sustained |

---

The Demurrer to Complaint was set for hearing on 02/07/2017 at 09:00 AM in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff. Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

---

Dated: 02/07/2017

_facsimile_

_____

Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 02/07/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 02/08/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 560 Mission Street, 31st Floor, San Francisco, California  94105.  On February 8, 2017, I served the within document(s):

**NOTICE OF ENTRY OF ORDER SUSTAINING DEMURRER TO COMPLAINT**

☐    I sent such document from facsimile machines (415) 397-8549 on February 8, 2017.  I certify that said transmission was completed and that all pages were received and that a report was generated by said facsimile machine which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☒    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐    by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Francisco, California, addressed as set forth below.

☐    by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

Jeremy L. Friedman, Esq.
Law Offices of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA  94610
Telephone: (510) 530-9060
Facsimile:  (510) 530-9087

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 8, 2017, at San Francisco, California.

Lisa Rivers

PROOF OF SERVICE

37047951v.1

Exhibit 2

1

2

3

4

5

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

## BEFORE THE STATE OF CALIFORNIA

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

6

7

In the Matter of the Complaint of                    DFEH No. 340711-121071
Lunell Gamble, Complainant.                          EEOC No.

8

vs.

9

10

11

Kaiser National HRSC Health And Welfare Dept
Respondent.
1451 Harbor Bay Pkwy
Alameda,  California 94502

12

Complainant alleges:

13

14

1. Respondent **Kaiser National HRSC Health And Welfare Dept** is a **Other** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).  Complainant believes respondent is subject to the FEHA.

15

16

17

2. Complainant may be ignorant of the true names and capacities of co-respondents.  The Department of Fair Employment and Housing may amend this complaint to allege their true names and capacities when ascertained. (Complainant is informed and believes and thereon alleges that the respondent and each co-respondent is responsible in some manner for the occurrences herein alleged, and that complainant's injuries as herein alleged were proximately caused by the aforementioned respondent(s).)

18

19

20

3. On or around **Jul 18, 2014,** complainant alleges that respondent took the following adverse actions against them: **Discrimination, Harassment, Retaliation Terminated** .  Complainant believes respondent committed these actions because of their: **Age – 40 and over, Color, Race** .  The alleged unlawful employment practice(s) occurred in **Alameda**, **California**.

21

22

4. Complainant **Lunell Gamble** resides in the City of **Richmond**, State of **CA**. If complaint includes co-respondents please see page 2.

DFEH 902-1

-2-
*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2     **Co-Respondents:**
      Kaiser National HRSC Health And Welfare Dept
3     Shibioan O`Conner
      1451 Harbor Bay Parkway
4     Alameda  California 94502

5     Kaiser National HRSC

6     1451 Harbor Bay Parkway
      Alameda  California 94502

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

-3-

*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

1

2    VERIFICATION

3    I, **Lunell Gamble**, am the **Complainant** in the above-entitled complaint.  I have read the foregoing complaint
     and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are
4    therein alleged on information and belief, and as to those matters, I believe it to be true.

5    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

6                                                                                          **Richmond Ca**
                                                                                          **Lunell Gamble**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DFEH 902-1

*Complaint – DFEH No. 340711-121071*

Date Filed: Aug 13, 2014
Date Corrected: October 25, 2014

Exhibit 3

GBG

GRUBE BROWN & GEIDT LLP

| | |
|---|---|
| **SAN FRANCISCO** | **LOS ANGELES** |
| 601 Montgomery Street, Suite 1150 | 633 West 5th Street, Suite 3330 |
| San Francisco, CA 94111 | Los Angeles, CA 90071 |
| tel: 415.603.5000 | fax: 415.840.7210 | tel: 213.358.2810 | fax: 213.995.6382 |

**Via Email [jlfried@comcast.net] and U.S. Mail**

Please reply to the Los Angeles office
Email:  amandacrespo@gbgllp.com
Direct:  213.358.2812

March 29, 2017

Jeremy L. Friedman
Law Office of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610

Re:     *Lunell Gamble v. Kaiser Foundation Health Plan, Inc. et al.*
        Alameda Superior Court, Case No. RG16826717

Dear Mr. Friedman:

I write to meet and confer regarding numerous deficiencies in Plaintiff's First Amended Complaint filed on March 10, 2017 (the "FAC").  Specifically, the FAC includes multiple improper conclusory allegations that were not exhausted and have no relevance to Plaintiff's individual claims.

So that the parties do not waste resources and Court time on unnecessary motion practice, we request that Plaintiff file an amended complaint that omits the following allegations:

- The following language from Paragraph 1, lines 19-20: "arising out of a pattern and practice of race discrimination against African American employees."

- The following language from Paragraph 1, line 23: "systemic"

- Paragraphs 2, 10, 12, 13, 14, 15 (including the subparagraphs numbered 15a through 15o), 16 (including the subparagraphs numbered 16a-16l) and 17, in their entirety.

- The following language from Paragraph 11: "Using a centralized employment opportunity system, people external to Kaiser and current employees are able to apply for open positions throughout Kaiser's operations, including by region.  Current employees are told they will be provided with opportunities for employment that are not available to external applicants, including access to job postings prior to their disclosure to the general public, and a system by which employees may post their resumes for other Kaiser departments to match to openings for hiring decisions."

Jeremy L. Friedman
March 29, 2017
Page 2

- The following language from Paragraph 20: "the pattern and practice of"

- The following language from Paragraph 22: "Pursuant to its pattern and practice of discrimination"

- The following language from Paragraph 30: "Plaintiff is also a member of a protected subclass based on race, and color, as she is an African-American woman."

- The following language from Paragraph 32: "as well as racial subclass of race/gender."

- The following language from Paragraph 40, line 13: "and subclasses."

- The following language from Paragraph 40, line 14: "African American Women."

- The following language from the Prayer for Relief at Paragraph 3, line 5: "and ordering defendant to cease engaging in a pattern and practice of discrimination."

## I.    Plaintiff's "Pattern and Practice Allegations" Are Irrelevant.

Plaintiff devotes 32 paragraphs and 7 pages of the FAC to a series of conclusory allegations that she has labeled "PATTERN AND PRACTICE ALLEGATIONS." *See* FAC ¶¶ 1, 10-11, 13-17 (the "Pattern and Practice Allegations"). These allegations are irrelevant because they are "neither pertinent to nor supported by an otherwise sufficient claim or defense." CCP § 431.10(b).

As you know, another court already struck nearly identical "pattern and practice" allegations in a case filed by your office against the same three Defendants. *See Kennedy v. Kaiser Foundation Health Plan, Inc.*, No. RG16822544, Order dated January 31, 2017 ("*Kennedy*") ("Defendants' motion to strike para. 1, lines 19-20, the phrase 'arising out of a pattern of race discrimination against its African-American employees,' the word 'systemic' in para. 1, line 22, the entirety of para. 2 and paras. 11-17 in their entirety on the ground that these allegations are irrelevant to the Complaint is GRANTED WITHOUT LEAVE TO AMEND.").[1]

The "pattern and practice" allegations here must likewise be stricken. While Plaintiff's allegations of a systemic pattern and practice of discrimination may be germane in a class action, they have no place in a single-plaintiff disparate treatment case such as this one. *See Alch v. Superior Court*, 122 Cal. App. 4th 339, 379 (2004) ("Pattern-or-practice suits, by their very nature, involve claims of classwide discrimination."); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("The crucial difference between an individual's claim of

---

[1] Plaintiff was aware of the *Kennedy* decision when she filed this FAC because Defendants filed the *Kennedy* decision with their Notice of New Authority on February 3, 2017, more than one month before Plaintiff filed the FAC. Nevertheless, the FAC makes identical allegations to what the *Kennedy* case struck as irrelevant.

Jeremy L. Friedman
March 29, 2017
Page 3

discrimination and a class action alleging a general pattern or practice of discrimination is manifest.").  As the Second Circuit explained:[2]

> *[T]he pattern-or-practice method of proof is not available to nonclass, private plaintiffs in cases such as the one before us.* Evidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim. Outside the class context, however, private plaintiffs may not invoke the *Teamsters* method of proof as an independent and distinct method of establishing liability.

*Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 149-50 (2d Cir. 2012) (emphasis added).[3]

Defendants recognize that so-called "pattern and practice" allegations at times can appropriately be asserted in a single-plaintiff civil complaint when the allegations are relevant to Plaintiff's individual claims.  The case of *Johnson v. United Cerebral Palsy/Spastic Children's Found. Of Los Angeles and Ventura Counties*, 173 Cal. App. 4th 740 (2009) is illustrative.  There, a single plaintiff complaint alleged:

> … that Linda Jones (Jones) participated in the termination after Jones was informed that plaintiff's pregnancy condition required medical leave, and . . . that Jones had a discriminatory animus against pregnant women and a pattern and practice of engaging in adverse treatment of them such that she would create a justification for their termination.

*Id.* at 747.  The court determined that "me too" declarations from employees who "worked at the same facility where plaintiff worked [and] were supervised by the same people that supervised

---

[2] When interpreting FEHA, California courts look to federal law and how courts have interpreted Title VII claims.  *Alch*, 122 Cal. App. 4th at 379.

[3] Based on our research, every federal Circuit court that has addressed the issue has joined the Second Circuit in rejecting application of a pattern or practice theory of liability for employment discrimination claims brought by nonclass, private plaintiffs.  *See, e.g., Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 967-69 (11th Cir. 2008) (Title VII does not permit individual plaintiff pattern and practice claims, in part for protection of unnamed class members who could be affected by *res judicata* and issue preclusion); *see also Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761, *vacated on other grounds,* 527 U.S. 1031 (1999); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355-56 (5th Cir. 2001); *Bacon v. Honta of Am. Mfg.*, 370 F.3d 365, 375 (6th Cir. 2004); *Gilty v. Vill. Of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Semsroth v. City of Wichita*, 304 Fed. Appx. 707, 715 (10th Cir. 2008).  If Plaintiff is aware of contrary authority, please provide it for our consideration.

Jeremy L. Friedman
March 29, 2017
Page 4

plaintiff" supported the plaintiff's disparate treatment discrimination claim.  *Id.* at 759.  In so holding, the court specifically noted that "the factual scenarios related by [the] former employees . . . [we]re sufficiently similar to the one presented by the plaintiff concerning her own discharge . . . ."  *Id.* at 767.

Here, the FAC includes some purported "pattern and practice" allegations that arguably could present "factual scenarios . . . sufficiently similar to the one presented by the plaintiff concerning her own discharge" to be permitted in a single-plaintiff case.  *Id.*; *see* FAC ¶ 20g (alleging that "Throughout this period, [Plaintiff's former supervisor] Ms. Grajeda treated plaintiff and other older African American employees with disparate treatment, including refused to assign work to plaintiff commensurate with plaintiffs [sic] knowledge and skill levels, criticisms of work by African American employees that were not made against the same or even less quality work by younger, non-African Americans, and overlooking transgressions or mistakes by younger, non-African American employees.").  Defendants do not seek to strike these or similar allegations that, as pled, at least arguably rationally relate to Plaintiff's individual discrimination and retaliation claims against Defendants.

However, the conclusory and breathtakingly broad Pattern and Practice Allegations – focused as they are on a boundless "class" of African Americans (and a subclass of African American women) – stand in stark contrast to the sorts of allegations that courts have found to be appropriate and relevant in a single-plaintiff case.  They bear no discernible connection to Plaintiff, her former managers, where Plaintiff worked, nor to any of the facts that Plaintiff alleges concerning her own employment and discharge.  Instead, they consist of conclusory, generalized allegations about alleged compensation, promotion, training, and investigation practices.  These practices have no relevance to Plaintiff's individual discrimination and retaliation claims, which contain no reference anywhere to Plaintiff's compensation, denial of any promotions or training, and instead focus solely on an alleged wrongful discharge.  *See* further discussion in Section II below.  As such, they are not "sufficiently similar to the [factual scenarios] by [Plaintiff] concerning her own discharge" to be relevant to Plaintiff's claims.  *Johnson*, 173 Cal. App. 4th at 767.

## II.    Plaintiff's Failure to Exhaust the Pattern and Practice Claims Deprives the Court of Jurisdiction to Hear Such Claims

As you know, a plaintiff "must exhaust the FEHA administrative remedies before bringing suit on a cause of action under [FEHA] or seeking the relief provided [by FEHA] . . . ."  *Rojo v. Kliger*, 52 Cal. 3d 65, 88 (1990).  "The purpose of FEHA's administrative exhaustion requirement is to ensure DFEH is provided the opportunity to resolve disputes and eliminate unlawful employment practices through conciliation."  *Id.* at 83.  "[T]he exhaustion requirement serves the important policy interests embodied in the act of resolving disputes and eliminating unlawful employment practices by conciliation [citation], as well as the salutory goals of easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving the dispute [citation]."  *Id.*

Jeremy L. Friedman
March 29, 2017
Page 5

"[I]n the absence of a timely administrative complaint, any civil action alleging a violation of FEHA will be subject to dismissal for failure to exhaust administrative remedies."  *McCaskey v. California State Auto. Assn*., 189 Cal. App. 4th 947, 976 (2010).  "[I]n the context of the FEHA, exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts." *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1613, 1617 (1995) ("[T]he trial court had no jurisdiction to hear Okoli's retaliation cause of action [as] [the plaintiff] never filed a charge with the DFEH mentioning retaliation" and where the plaintiff's lawsuit complaint "added claims that were neither like nor reasonably related to [her] DFEH claim and were not likely to be uncovered in the course of a DFEH investigation").  In other words, Plaintiff's failure to exhaust her administrative remedies by filing a DFEH charge mentioning each of her claims strips the court of jurisdiction to hear those claims.

Here, the Court ordered Plaintiff to "attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint."  Exhibit A to Notice of Entry of Order Sustaining Demurrer to Complaint dated February 8, 2017.  Plaintiff attached only one administrative complaint as an Exhibit to the FAC, a DFEH charge filed on August 13, 2014 (the "DFEH Charge").

Plaintiff's DFEH Charge states that "[o]n or around Jul [sic] 18, 2014," Respondent took the following adverse actions against her: "Discrimination, Harassment, Retaliation, Terminated." DFEH Charge, Ex. to FAC, at 2.  Plaintiff's DFEH Charge further alleges that Respondent committed these actions because of her "Age – 40 and over, Color, Race."  *Id.*  Plaintiff's DFEH Charge further states that "the alleged unlawful employment practices occurred in Alameda, California."  *Id.*

Plainly, the DFEH Charge does not reference adverse actions against any employee other than Plaintiff.  It also is limited to Plaintiff's worksite in Alameda, California.  It further does not reference gender or disabilities.  Instead, it only identifies age, race and retaliation.  It also identifies only two adverse actions – harassment and "terminat[ion]" – and states that all alleged adverse actions occurred on a single date (i.e., "[o]n or around Jul [sic] 18, 2014").  The FAC's recitation of factual allegations paints the same picture of a straightforward single-plaintiff wrongful termination case.  Captioned "WRONGFUL TERMINATION," it spans a total of 12 paragraphs and three pages.  FAC ¶¶ 18-22.

In contrast to Plaintiff's "Wrongful Termination" allegations (FAC ¶¶ 18-22) and Plaintiff's DFEH Charge, the Pattern and Practice Allegations include a host of claims and legal theories that Plaintiff never exhausted in her DFEH Charge:[4]

---

[4] Plaintiff's causes of action incorporate the Pattern and Practice Allegations by reference.  The FAC states that "Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 27 of this complaint as though fully set forth herein."  FAC ¶¶ 28, 33 and 38.  Accordingly, Plaintiff's causes of action incorporate the Pattern and Practice Allegations.

Jeremy L. Friedman
March 29, 2017
Page 6

- Sex discrimination claims. *See, e.g.*, FAC ¶ 32 (alleging that "The discriminatory treatment of plaintiff's employment and harassment were done with discriminatory motive, based on . . . a racial subclass of race/gender."

- Sex-based harassment claims. *See* FAC ¶ 15k (alleging that unspecified persons "[h]arass[ed] . . . African-American female employees interested in advancement and subject[ed] them to a hostile work environment").

- Disability discrimination and failure to accommodate claims. *See* FAC ¶ 15j (alleging that unspecified persons "discriminat[ed] against African-American employees due to their disabilities because of both their disabilities and their race and/or race-gender" and "[p]rovid[ed] less or refusing to make reasonable accommodations for disabilities and sick leave policies" at unspecified times).

- Class-based disparate impact claims. *See, e.g.*, FAC ¶ 15 (alleging that Defendants' "policies and practices . . . have an adverse impact on African-American and African-American female employees that cannot be justified by business necessity, and for which alternative policies and practices with [sic] less discriminatory impact could be utilized that equally serve any asserted justification"); *see also* FAC ¶¶ 15a-o (listing such alleged "policies and "practices").

- Allegedly discriminatory compensation, promotion, training and other decisions on unspecified dates and involving a class (and subclass) of unspecified individuals. *See, e.g.*, FAC ¶ 2 (alleging that "conscious or unconscious prejudices and race and/or race-gender based stereotypes . . . explain[] why so few African-American and African-American women . . . advance to supervisory and management positions"); *see also* FAC ¶ 10 (referring to a class action lawsuit against "Kaiser" that "was pending until December 10, 2013" – i.e., that ended before the alleged adverse actions referenced in Plaintiff's DFEH Charge); FAC ¶ 15g (alleging that unspecified persons gave "African-American employees lower compensation, lower job classifications and lower pay raise incentives").

In contrast to the sweeping allegations described above, Plaintiff's DFEH Charge contains no reference whatsoever to (1) any policy or practice, much less one allegedly having an adverse impact; (2) sex or disability as a motive for discrimination or harassment; (3) any alleged disability, request for, or denial of an accommodation, much less any alleged failure to accommodate. Further, Plaintiff's DFEH Charge identifies no claims before July 18, 2014 – much less any compensation, promotion, training or other alleged "practice" referenced in the Pattern and Practice Allegations. Nor does Plaintiff's DFEH Charge allege any continuous pattern of discrimination, harassment or retaliation.

Since the Pattern and Practice Allegations "add[] claims that were neither like nor reasonably related to [her] DFEH claim and were not likely to be uncovered in the course of a DFEH investigation, [such] claims are barred by the exhaustion of remedies doctrine." *Okoli*, 36 Cal. App. 4th at 1617; *see also Hobson v. Raychem Corp.*, 73 Cal. App. 4th 614, 631 (1999) (cause of

Jeremy L. Friedman
March 29, 2017
Page 7

action for mental disability discrimination barred where DFEH charge only alleged physical disability discrimination), *disapproved of on other grounds by Colmenares v. Braemar Country Club*, Inc., 29 Cal. 4th 1019 (2003); *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1051 (9th Cir. 1987) (age and sex discrimination claims barred where plaintiff failed to include any allegations of age or sex discrimination). The Court lacks jurisdiction to hear the unexhausted claims that Plaintiff has embedded in her Pattern and Practice Allegations and incorporated by reference in her causes of action. As such, the Pattern and Practice Allegations are irrelevant and should be stricken from the FAC.

## III.    CONCLUSION

We understand from your prior correspondence that you are not available to confer until "early April." So that we have time to confer with our client and file Defendants' response to the FAC (due April 10, 2017), we ask that you please provide Plaintiff's positions on the issues raised in this letter such that they are **received by this office** by the close of business on **Monday, April 3, 2017**. If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

*Amanda Bolliger Crespo*

Amanda Bolliger Crespo
for Grube Brown & Geidt LLP

cc:    Heather Morgan

Exhibit 4

**From:**      Amanda Crespo
**Sent:**      Wednesday, April 26, 2017 7:24 PM
**To:**        Jeremy L. Friedman
**Cc:**        Heather Morgan; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
**Subject:**   RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Jeremy,

Following on our call today, we believe that California Govt. Code sections 12928 and 12960 foreclose Plaintiff's argument below that she "did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge."

As the California Supreme Court pointed out in *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798 (2001), these provisions were "enacted (see Stats. 1999, ch. 797, § 2) in response to concern that 'the employee is not always able to determine the precise name or the identity of his or her employer.'"   The Court went on to explain:

> The problem occurs, for example, where there are parent and subsidiary corporations with similar names, but the employee is unaware of any distinction between the two entities. Very often these distinct entities are housed in the same facility which further complicate[s] identification of the proper party to be named. [¶] If the employee inadvertently misidentifies the employer in the original [Department of Fair Employment and Housing (Department)] complaint, the real employer may later claim that the employee has failed to exhaust his or her administrative remedies prior to suit within the time prescribed by law and is barred from proceeding with litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 211 (1999–2000 Reg. Sess.) as amended Sept. 1, 1999, p. 4.) Accordingly, the Legislature provided for "a *827 rebuttable presumption ***109 that 'employer,' as defined by [the FEHA,] includes any person or entity identified as the employer on the employee's Federal Form W 2 (Wage and Tax Statement)" (§ 12928; see Stats.1999, ch. 797, § 1) and extended the one-year statute of limitations an additional year in the event that presumption is rebutted "to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (§ 12960.)

*Richards*, 26 Cal. 4th at 826-27.  Here, that exception does not apply because Plaintiff's W-2s did not identify Defendants Kaiser Foundation Hospital or The Permanente Medical Group.  "Plainly, the Legislature is capable of expanding the statutory period when it perceives the need." *Id.*  The Legislature did not create an exception to exhaustion or extend the statute of limitations to address a plaintiff's alleged confusion based on the purported EEO filings of an unexhausted defendant.  Therefore, that argument is unavailing.

This email also confirms your statement today that Plaintiff does not presently have any authorities supporting her positions stated in your email below aside from those cited in the *Kennedy* briefing.  As I noted today, if Plaintiff does locate additional authorities, I hope you will provide those for our consideration so that we can complete our conferral in good faith.

Since you confirmed today that Plaintiff will not voluntarily dismiss the unexhausted defendants from this case or amend her complaint to omit the pattern or practice allegations discussed in my March 29, 2017 conferral letter, we will proceed with filing the demurrer and motion to strike tomorrow.

Regards,

Amanda

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Wednesday, April 26, 2017 9:49 AM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. Please call me at 10, if that still works for you.

Thanks.

Jeremy

510 530 9060

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Tuesday, April 25, 2017 7:13 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks for your email, Jeremy.

We respectfully disagree that any of the arguments raised in our conferred letters are frivolous.  On the contrary, we
have provided Plaintiff with multiple cases and detailed arguments supporting Defendants' positions, both on the
exhaustion issues and on Plaintiff's pattern and practice theory of liability.

Does Plaintiff have any authority to support the positions set forth in your email below?  If so, I hope you will give us the
opportunity to review it so that we can confer in good faith on these issues.

Similarly, if Plaintiff believes we misunderstood the court's decision in the Kennedy case, please direct us to the portion
of that ruling (or the hearing transcript) that supports Plaintiff's interpretations.

To complete the conferral process, I suggest that we schedule a call for 10am tomorrow.  Please let me know if that
works for you, or if another time would be better.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Saturday, April 22, 2017 2:12 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Dear Amanda

I apologize for not getting back to you a couple days ago.

After reviewing your letters concerning the amended complaint, I have the following response on behalf of Ms. Gamble:

1) Kaiser's attempt to raise these issues in response to plaintiff's amended complaint is improper. Unlike the situation in *Kennedy*, Kaiser failed to raise these arguments in the demurrer to Ms. Gamble's complaint. Kaiser cannot now rely upon another court's ruling in a different case to demand relief that was never requested.

2) In our case, the trial judge made specific rulings on what was required to correct the pleadings. None of the issues you raise are appropriate at the pleading stage.

3) Ms. Gamble did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge. Kaiser is a single entity with respect to its EEO reporting, and DFEH would know this. Please show me one case where the employee correctly named an employer, but not a related corporate form, and was held to have failed to exhaust.

4) You completely misunderstand the ruling in *Kennedy* and the nature of Ms. Gamble's complaint, in arguing for dismissal of two Kaiser entities. Those rules apply to vicarious liability, not to various corporate forms which are part of a single employer with single EEO reporting and compliance responsibilities.

5) Kaiser's pattern and practice of discriminating against African American employees is clearly relevant, and it is frivolous for Kaiser to contend otherwise. It would be even more frivolous to contend this was the basis for the ruling in *Kennedy*.

6) Pattern and practice is a method of proving intentional discrimination. Kaiser's claim that Ms. Gamble needs to convert her case to a class action in order to rely upon that method of proof is without merit. It also makes no sense, economically or with respect to judicial resources. If Kaiser in this case is going to make that claim, it should do so directly. Arguing over the "relevancy" of these allegations as a back door way of attacking plaintiff's legal theories is improper.

7) Ms. Gamble did not need to exhaust "pattern and practice" allegations in the administrative process. Please show me one case where the employee was required to plead, in her administrative charge, the method by which she was going to prove her race discrimination for termination.

I hope this at least explains our position. I will be available to confer by telephone after Tuesday.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Friday, April 21, 2017 8:14 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thank you, Jeremy. I have fairly good availability today if you would like to schedule a conferral call.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 20, 2017 7:41 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. I have not had a chance to look at the correspondence in any detail, yet, but will try to do so and get back to you tomorrow.

Thanks.

Jeremy

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 13, 2017 11:45 AM
**To:** 'Amanda Crespo' <amandacrespo@gbgllp.com>
**Cc:** 'Heather Morgan' <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks, Amanda. It is on my calendar, and I should be able to look the letters over by then, and give you some response.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Thursday, April 13, 2017 10:25 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Good morning Mr. Friedman,

I write to follow up on our efforts to confer on the issues raised in my letters dated (1) March 24, 2017, regarding Defendants Kaiser Foundation Hospital's and The Permanente Medical Group's intention to file a demurrer as to the FEHA claims stated in Plaintiff's First Amended Complaint ("FAC"); and (2) March 29, 2017, regarding Defendants' intention to move to strike certain "pattern and "practice" allegations in the FAC.

So that we have time to confer with our client and file Defendants' response to the FAC (no due April 27, 2017), we ask that you please provide Plaintiff's positions on the issues raised in these letters such that they are received by this office by the close of business on Thursday April 20, 2017.  If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

Amanda

4

_____



**Amanda Bolliger Crespo**, Senior Associate
amandacrespo@gbgllp.com · www.gbgllp.com
tel 213.358.2812 · fax 213.995.6382
U.S. Bank Tower, 633 West 5th Street, Suite 3330
Los Angeles, California 90071

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

1   GRUBE BROWN & GEIDT LLP
    HEATHER A. MORGAN (SB# 177425)
2   AMANDA BOLLIGER CRESPO (SB# 250292)
    heathermorgan@gbgllp.com
3   amandacrespo@gbgllp.com
    601 Montgomery Street, Suite 1150
4   San Francisco, CA 94111
    Telephone: (415) 603-5000
5   Facsimile: (415) 840-7210

6   Attorneys for Defendants,
    KAISER FOUNDATION HEALTH PLAN, INC.;
7   KAISER FOUNDATION HOSPITALS; and
    THE PERMANENTE MEDICAL GROUP

8

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

**APR 27 2017**

CLERK OF THE SUPERIOR COURT
By _____
        JANIE THOMAS, Deputy

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13          Plaintiff,                       ASSIGNED FOR ALL PURPOSES TO
                                             JUDGE IOANA PETROU
14          vs.                              DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **REQUEST FOR JUDICIAL NOTICE
    INC; KAISER FOUNDATION                   IN SUPPORT OF DEFENDANTS
16  HOSPITALS, INC; and THE                  KAISER FOUNDATION HEALTH
    PERMANENTE MEDICAL GROUP; all            PLAN, INC; KAISER FOUNDATION
17  doing business as KAISER PERMANENTE      HOSPITALS; AND THE
    MEDICAL CARE PROGRAM,                    PERMANENTE MEDICAL GROUP'S
18                                           DEMURRER AND MOTION TO
            Defendants.                      STRIKE ALLEGATIONS IN
19                                           PLAINTIFF'S FIST AMENDED
                                             COMPLAINT**
20
                                             Date:      May 31, 2017
21                                           Time:      9:00 a.m.
                                             Judge:     Hon. Ioana Petrou
22                                           Dept.:     15

23                                           **Reservation Nos. R-1844959 and
                                             1844960**
24
                                             Complaint Filed:    August 9, 2016
25

26

27

28

        RJN IN SUPPORT OF DEFENDANTS' DEMURRER AND MOTION TO STRIKE

1  Pursuant to California Evidence Code sections 451-453, Defendants KAISER

2  FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; and THE

3  PERMANENTE MEDICAL GROUP ("Defendants"), by and through its counsel of record,

4  hereby submits this Request for Judicial Notice in support of its Demurrer and Motion to Strike

5  the complaint filed by Plaintiff Lunell Gamble ("Plaintiff").  Specifically, Defendants request that

6  the Court take judicial notice of the following:

7       1.    Unemployment insurance request sent by California state agency, the Employment

8              Development Department, sent to KFHP, abbreviated as "Kaiser Foundation

9              Health," stating that Plaintiff "has listed you as his/her most recent employer," a

10             true and correct copy of which is attached hereto as Exhibit "A."[1]

11      2.    Paystub produced by California state agency, the DFEH, in response to a public

12             records request, reflecting KFHP, abbreviated as "Kaiser Foundation HP," as

13             Plaintiff's employer, a true and correct copy of which is attached hereto as Exhibit

14             "B."

15      3.    W-2 identifying KFHP, abbreviated as "Kaiser Foundation HP," a true and correct

16             copy of which is attached hereto as Exhibit "C."

17      4.    Complaint filed on July 8, 2016 in the case of *Kennedy v. Kaiser Foundation

18             Health Plan, Inc*., No. RG16822544, currently pending before the County of

19             Alameda Superior Court ("*Kennedy*"), a true and correct copy of which is attached

20             hereto as Exhibit "D."

21      5.    Order issued on January 1, 2017 in *Kennedy*, a true and correct copy of which is

22             attached here to as Exhibit "E."

23      Judicial notice of the above-listed items is proper under California Evidence Code section

24  452.  California Evidence Code section 452(h) permits the Court to take judicial notice of "[f]acts

25  and propositions that are not reasonably subject to dispute and are capable of immediate and

26

27      [1] Exhibits A, B and C have been redacted to protect Plaintiff's personal identifying
    information.

28

-2-

RJN IN SUPPORT OF DEFENDANTS' DEMURRER AND MOTION TO STRIKE

1    accurate determination by resort to sources of reasonably indisputable accuracy." Here, the

2    documents and facts for which Defendants seeks judicial notice fall squarely within the definition

3    set forth in Section 452(h) – they are not reasonably subject to dispute and their accuracy is

4    capable of immediate determination by referencing Defendants' business records or the California

5    Secretary of State's public records.  Thus, judicial notice of these materials is proper.  *See, e.g.,*

6    *Theiler v. Ventura Cty. Cmty. Coll. Dist.*, 198 Cal. App. 4th 852, 855 n.2 (2011) (granting party's

7    request for judicial notice of collective bargaining agreement); *El Escorial Owners' Ass'n v. DLC*

8    *Plastering, Inc.*, 154 Cal. App. 4th 1337, 1367 (2007) (granting request for judicial notice of

9    California Secretary of State's certificate regarding party's "corporate status"); *Scott v. JPMorgan*

10   *Chase Bank, N.A.*, 214 Cal. App. 4th 743, 753 (2013) (judicial notice of publicly recorded

11   Purchase and Assumption agreement properly noticed by court because it was a matter of public

12   record); *Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 265 (2011) ("[C]ourts have

13   taken judicial notice not only of the existence and recordation of recorded documents but also a

14   variety of matters that can be deduced from the documents.").

15        The Court may take judicial notice of the Complaint and Order from the *Kennedy* case as

16   court records.  *See* Evid. Code § 452(d); *see also Frommhagen v. Board of Supervisors of Santa*

17   *Cruz County*, 197 Cal. App. 3d 1292, 1299 (1987) (court took judicial notice of complaint in prior

18   action in determining whether to sustain demurrer based on *res judicata*).

19        Moreover, where, as here, a party requesting judicial notice of facts or documents "[g]ives

20   each adverse party sufficient notice of the request, through the pleadings or otherwise," and

21   "[f]urnishes the court with sufficient information to enable it to take judicial notice of the matter,"

22   the Court "*shall* take judicial notice" of the matters, as requested.  Cal. Evid. Code § 453

23   (emphasis added).

24   //

25   //

26   //

27   //

28

1    Based on the foregoing, Defendants respectfully requests that the Court take judicial

2  notice of the documents listed above and attached hereto.

3  DATED:  April 27, 2017                    GRUBE BROWN & GEIDT LLP

4

5                                            BY: *Amanda Bolliger Crespo*

6                                            AMANDA BOLLIGER CRESPO

7                                            Attorneys for Defendants
                                             KAISER FOUNDATION HEALTH PLAN,
                                             INC; KAISER FOUNDATION HOSPITALS;
8                                            and THE PERMANENTE MEDICAL
                                             GROUP
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN IN SUPPORT OF DEFENDANTS' DEMURRER AND MOTION TO STRIKE

Exhibit A

**EDD**
Employment
Development
Department
State of California

EMPLOYMENT DEVELOPMENT DEPARTMENT   #0060
P.O. BOX 80800
LOS ANGELES   CA  90009-0800

THIS NOTICE WAS MAILED TO THE EMPLOYER/ADDRESS LISTED BELOW ON:   08/04/14

 Illululullmulullmululllullmuululullmulmll
**KAISER FOUNDATION HEALTH**
**PO BOX 23020**
**OAKLAND        CA  94623-2302**

New Claim:        X

Additional Claim:

EDD Telephone Number: 1-800-300-5616
TTY (Non-Voice):        1-800-815-9387

## IMPORTANT:  NOTICE OF UNEMPLOYMENT INSURANCE CLAIM FILED

This is a notice that a claim for unemployment insurance benefits has been filed. Forward it immediately to persons within your organization who are responsible for handling claims. **The time limit for replying is 10 days from the mail date shown above. Failure to respond may result in an increased Employment Tax Rate.**

The claimant provided us with the following information and listed you as his/her last employer:

| Claimant's Name | Social Security Number | Effective Date of Claim: | 07/27/14 |
|---|---|---|---|
| **LUNELL     C GAMBLE** | REDACTED-6502 | Last Date Worked: | 07/28/14 |

Reason for Separation:

**BEEN EMPLOYED 16 YEARS, AND ALL OF SUDDEN I'M GIVEN FINAL WRITTEN AND TERMINATED D FOR MISCONDUCT**

### I. EXPLANATION AND INSTRUCTIONS FOR EMPLOYERS

You have received this form because the individual shown above has filed a claim for unemployment insurance benefits and has listed you as his/her most recent employer prior to filing this claim.  **No reply is required if the claimant was laid off due to lack of work and no other eligibility issue has been identified.**   For detailed information on employer responsibilities in the unemployment insurance program, our DE 44,  California Employer's Guide, is available upon request.

### II. REPORTING FACTS - Respond in writing by completing Sections A, B, C on the reverse of this form.

**The law requires an employer to submit any facts in his/her possession which may affect a claimant's eligibility for benefits. Furnish information if this claimant:**

- Voluntarily quit
- Was discharged or fired for reasons other than lack of work.
- Left work because of a trade dispute.
- Is receiving a pension based on his/her prior work.
- Is working on a full-time basis, or has earnings payable over $25.99, covering any time on or after the effective date of this claim as shown on the reverse side of this form.
- Is not able to work, available for, or seeking work.
- Has refused employment.

- Is not legally entitled to work in the U.S.
- Performed services as a sports or athletic participant and has reasonable assurance of performing such services in the next season.
- Made false statements or withheld material information in filing for benefits.
- If you are a school employer, also furnish information if the claimant has a contract for or reasonable assurance of returning to work.

**Important:**  Make your response as complete as possible; these facts will be used in determining the claimant's eligibility.

A Department representative may contact you for further eligibility information.  If a representative is unable to reach you, he/she may leave a message for you to return the telephone call. If after 48 hours no response has been received, the Department is required to make an eligibility decision based on available information.

### III. TIME LIMITS FOR REPLYING

**Submit facts in writing to the field office shown at the top of this form within 10 days of the mail date shown above.**  If your mailing is late, explain your reasons for delay as the time limit may be extended only for good cause.  You may reply on this form in the space provided in Section IV, on additional sheets as needed, or by separate letter.  **Always include your State Employer Account Number** and include the claimant's Social Security Number as it appears on the claim and in your payroll records.

If you submit facts in a timely manner, a determination will be issued concerning the claimant's eligibility. In addition, if facts are submitted regarding a quit or discharge, a ruling will be issued advising an employer with a reserve account as to whether his/her account will be subject to changes resulting from benefits paid. To obtain a ruling on any prior quit or discharge involving this claimant, you must furnish facts within 10 days of the mail date shown above.

ADDITIONAL INFORMATION ON EMPLOYER RESPONSIBILITIES IS SHOWN ON THE REVERSE
Mail your response to the EDD office shown in the above upper left-hand corner.

(OVER)

DE 1101C/Z/ Rev. 5 (9-07) EMPLOYER NOTICE                                         CU-PA217

**IV. REPORTING ELIGIBILITY INFORMATION: Do not return this form unless Sections A or B are completed. It is necessary to complete Section C for all responses.**

A. REPORTING FACTS:

_____
_____
_____
_____

Claimant Social Security Number  __ __ __ - __ __ - __ __ __ __    Date Last Worked was: __ __ - __ __ - __ __ __ __
(from your payroll records)                                                    (Month       Day       Year)

B. OTHER COMPENSATION:

Complete the following if you paid or will pay any compensation, aside from regular salary, covering any time on or after the effective date of this claim. No entry is required if the claimant has been separated from your employ for any indefinite period and has or will receive only vacation pay.

Amount $ _____  Type of Payment _____  for period from _____ through _____

C. **EMPLOYER CERTIFICATION: THE ABOVE STATEMENTS WERE TAKEN FROM BUSINESS RECORDS OR ARE BASED ON KNOWLEDGE OF THE UNDERSIGNED.**

PRINT name of person to contact for further information:

Name of contact:_____  Telephone No. ( __ __ __ ) __ __ __ - __ __ __ __    Ext. _____

Employer:_____  Date: _____

**STATE EMPLOYER
ACCOUNT NO.:** __ __ __ - __ __ __ __    Signed By: _____

**V. ELIGIBILITY DETERMINATION**

**It may be necessary to contact you by telephone** or letter for eligibility information if an issue is identified by the field office. Regardless of whether such contact is made however, **unless you respond to the notice by mail as described in this notice, you will not be entitled to a written notice of the Department's decision.**

IMPORTANT:

- Section 1327 of the UI Code provides for an extension of the 10-day response period if, after the 10-day period, you acquire knowledge of facts that may affect the eligibility of the claimant and facts could not reasonably have been known within the period. However, you must provide the Department with these facts within 10 days of acquiring them.

- Section 1142(a) provides that an employer who willfully makes a false statement or representation, or willfully fails to report a material fact in connection with a separation issue may be assessed a penalty of up to 10 times the claimant's weekly benefit amount. Section 1142(b) provides that an employer who willfully makes a false statement or representation or willfully fails to report a material fact in submitting a written statement concerning reasonable assurance of a claimant's reemployment, as defined in Section 1253.3(g), may be assessed a penalty of up to 10 times the claimant's weekly benefit amount.

- Section 2101 of the UI Code provides that it is a misdemeanor to willfully make a false statement or knowingly fail to disclose a material fact to obtain, increase, reduce, or defeat any payment of benefits.

**PLEASE MAIL YOUR RESPONSE TO THE EDD OFFICE AND ADDRESS SHOWN IN THE UPPER LEFT-HAND CORNER ON THE REVERSE SIDE OF THIS FORM.**

| Received | UE Office | Period | Benefit Week | Number of Weeks | B.Y.B. | Amount | Media |
|----------|-----------|--------|--------------|-----------------|--------|--------|-------|
| 07/18/16 | 8888 | 2016 / 02 | | | 10/25/15 | 300.00 | Magnetic Tape |
| 04/19/16 | 8888 | 2016 / 01 | | | 10/25/15 | 1,737.00 | Magnetic Tape |
| 01/21/16 | 8888 | 2015 / 04 | | | 10/25/15 | 869.00 | Magnetic Tape |
| 04/22/15 | 8888 | 2015 / 01 | | | 07/27/14 | 2,250.00 | Magnetic Tape |
| 01/20/15 | 8888 | 2014 / 04 | | | 07/27/14 | 6,300.00 | Magnetic Tape |
| 10/20/14 | 8888 | 2014 / 03 | | | 07/27/14 | 3,150.00 | Magnetic Tape |

Frequency: Quarterly                    Charges To Date:      $14,606.00

Exhibit B

Lunell Gamble

**REDACTED**

| | | |
|---|---|---|
| **KAISER FOUNDATION HP, INC** | | |
| Empl ID: REDACTED | | |
| Dept: 9205 Loc: CN0753 | | |
| Base Rate: 23.565928 Hourly | | |
| Workweek Start: Saturday 22.00.00 | | |

| TAX DATA: | Federal | State |
|---|---|---|
| Marit. Status: | Exempt | Exempt |
| Allowances: | | |
| Addl. Allowan.: | | |
| Addl. Amt.: | | |

| | | | | |
|---|---|---|---|---|
| Pay Group: P10 | Busin. Unit: | 10308 | | |
| Pay Beg Dt: 07/20/2014 | Check#: | REDACTED 4739 | | |
| Pay End Dt: 08/02/2014 | Check Dt: | 07/28/2014 | | |

## HOURS AND EARNINGS

| Description | Begin Dt | End Dt | Rate | Current Hours | Earnings | Hours | YTD Earnings |
|---|---|---|---|---|---|---|---|
| Regular | | | 23.5659 | 8.00 | 188.53 | 959.21 | 22,604.68 |
| Admin Time Worked | | | 23.5659 | 48.00 | 1,131.16 | 48.00 | 1,131.16 |
| Float Holiday | | | 23.5659 | 8.00 | 188.53 | 32.00 | 754.12 |
| VAC/PTO/ETO Payoff | | | 23.5659 | 8.81 | 207.62 | 8.81 | 207.62 |
| FLEX CREDT | | | | | 0.00 | | 623.98 |
| LEGAL HOL | | | | | 0.00 | 32.00 | 754.12 |
| VAC PTO | | | | | 0.00 | 192.28 | 4,531.25 |
| DLY OT 1.5 | | | | | 0.00 | 0.86 | 30.39 |
| WEEKLY OT | | | | | 0.00 | 0.39 | 13.78 |
| NQ DP OFF | | | | | 0.00 | | 20.15 |
| REWARDS | | | | | 0.00 | | 1,232.19 |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 0.00 | 378.16 |
| Fed MED/EE | 24.88 | 490.47 |
| Fed OASDI/EE | 106.38 | 2,007.17 |
| CA Withholding | 0.00 | 57.43 |
| CA OASDI/EE | 17.16 | 334.75 |
| | | |
| | | |
| **Total:** | 148.42 | 3,357.98 |

### EMPLOYER PAID BENEFITS

| | | |
|---|---|---|
| ER Svngs Plan | 85.79 | 1,501.35 |
| DP/RBR Sup Md | 0.00 | 45.22 |
| Medical | 0.00 | 6,560.68 |
| Dental | 0.00 | 795.90 |
| Supp Med | 0.00 | 85.82 |
| DP/RBR Medicl | 0.00 | 4,656.96 |
| DP/RBR Dental | 0.00 | 369.74 |
| DP/RBR Sup Md* | 0.00 | 45.22 |
| DP/RBR Medicl* | 0.00 | 4,656.96 |
| DP/RBR Dental* | 0.00 | 369.74 |
| Life Insure* | 0.00 | 350.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Total:** | HRS WRK CUR 56.00 YTD 1008.46 | | 72.81 | 1,715.84 | 1,273.55 | 31,903.44 |

## BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS

| Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|
| TSA Employee | 85.79 | 467.29 | TSA Loan 1 | 0.00 | 511.88 |
| Medical | 0.00 | 1,059.80 | Plan B Loan 1 | 0.00 | 1,283.80 |
| Dental | 0.00 | 132.73 | Dep AD&D | 0.00 | 9.80 |
| DP/RBR Medicl | 0.00 | 687.22 | Dependent Life | 0.00 | 66.08 |
| DP/RBR Dental | 0.00 | 41.58 | | | |
| Life Insure | 0.00 | 231.00 | | | |
| OTHERS | 0.00 | 1,347.67 | | | |
| **Total:** | 85.79 | 3,967.32 | **Total:** | 0.00 | 1,911.56 |

\* Taxable

## TOTAL GROSS / FED TAXABLE GROSS / TOTAL TAXES / TOTAL DEDUCTIONS / NET PAY

| | Current | YTD | | | |
|---|---|---|---|---|---|
| Current: | 1,715.84 | 1,630.05 | 148.42 | 85.79 | 1,481.63 |
| YTD: | 31,903.44 | 33,358.04 | 3,357.98 | 5,878.88 | 22,666.58 |

| Leave Accruals | Current Earned | Balance |
|---|---|---|
| SICK/ESL | 151.59 | |
| VAC/PTO/ETO | | |
| FLOAT HOLIDAY | | |

### NET PAY DISTRIBUTION

| | |
|---|---|
| Check REDACTED 4739 | 1,481.63 |
| **Total:** | 1,481.63 |

ORIGINAL DOCUMENT HAS TRUE WATERMARK, CHEMICAL REACTIVE PAPER, MICROPRINTING, COLOR VOID PANTOGRAPH, FLUORESCENT FIBERS - HEAT SENSITIVE INK.

---

HEAT SENSITIVE INK

PRESS OR RUB WITH FINGER
IF ROSE COLORED SPOT DISAPPEARS,
THIS DOCUMENT IS AUTHENTIC.



**KAISER PERMANENTE.**
KAISER FOUNDATION HP, INC
One Kaiser Plaza
Oakland, CA. 94612

Wells Fargo Bank, N.A.
115 Hospital Drive
Van Wert, OH. 45891

16-383
412

**Check No.**
REDACTED 4739

Date:    07/28/2014

**Pay Amount:**    ********$1,481.63
Void After 6 Months

PAY   One thousand four hundred eighty one and 63/100 Dollars
REDACTED 9205

TO THE
ORDER OF    LUNELL C GAMBLE

**REDACTED**

**REDACTED**

2069⊥⊫

Exhibit C

**FORM W-2 Wage and Tax Statement**

Copy C For EMPLOYEE'S RECORDS (See notice on second page)

Dept. of the Treasury - Internal Revenue Service

This information is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

These substitute W-2 Wages and Tax Statements are acceptable for filing with your Federal, State and Local Income Tax Returns. If you worked in multiple locations, or had several forms of special compensation, you may receive more than one of these documents.

All copies of your W-2 are on this page. Copy 2 and Copy B are for your tax return. Copy C is for your records. General instructions for these forms, including an explanation of the letter codes used in box 12 are on the second page.

**W-2 Helpline 1-888-813-9292**
**Email: NPS-W2-Helpline@kp.org**

**Government Required Notifications:**

You may be eligible to receive the earned income tax credit from the federal government. The earned income tax credit is a refundable federal income tax credit for low-income working individuals and families. The earned income tax credit has no effect on certain welfare benefits. Be sure to fill out the earned income tax credit form, in the federal income tax return booklet. For information regarding your eligibility to receive the earned income tax credit, contact the IRS at 1-800-829-3676 or go to www.irs.gov and look up IRS Notice 797.

Box 12 DD on your W-2 shows the total dollar value of your health-care benefits - the combination of both your contributions and your employer's contributions to your health-care benefits for the 2014 tax year. This amount is required to appear on your W-2 by the Patient Protection and Affordable Care Act of 2010 for reporting purposes only. This dollar amount does not affect your taxes.

| D. CONTROL NUMBER | This information is being furnished to the Internal Revenue Service | 2014 OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
|---|---|---|---|---|
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED6502 | | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY WITHHELD 2097.17 |
| C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE KAISER FOUNDATION HP, INC ONE KAISER PLAZA OAKLAND CA 94612 | | | 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| | | 13 Statutory Employee / Retirement Plan ☒ / Third-Party Sick Pay | 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| E. EMPLOYEE'S FIRST NAME AND INITIAL   LAST NAME   SUFF. LUNELL C GAMBLE | | | 9 | 10 DEPENDENT CARE BENEFITS |
| REDACTED | | | 11 NONQUALIFIED PLANS | 12 a-d C 350.00 E 467.29 DD 7706.23 |
| | | | 14 OTHER CASDI 334.75 DOMPT 5071.92 | |
| F. EMPLOYEE'S ADDRESS AND ZIP CODE | | | | |
| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

FOLD AND TEAR ALONG PERFORATION

| D. CONTROL NUMBER | This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
|---|---|---|---|---|
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED-6502 | | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY WITHHELD 2097.17 |
| C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE KAISER FOUNDATION HP, INC ONE KAISER PLAZA OAKLAND CA 94612 | | | 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| | | | 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| | | | 9 | 10 DEPENDENT CARE BENEFITS |
| E. EMPLOYEE'S FIRST NAME AND INITIAL   LAST NAME   SUFF. LUNELL C GAMBLE | | | 11 NONQUALIFIED PLANS | 12 a-d C 350.00 E 467.29 DD 7706.23 |
| REDACTED | | | 14 OTHER CASDI 334.75 DOMPT 5071.92 | 13 Statutory Employee / Retirement Plan ☒ / Third-Party Sick Pay |
| F. EMPLOYEE'S ADDRESS AND ZIP CODE | | | | |
| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy 2  To be Filed with Employee's  STATE, CITY or LOCAL tax return  **2014**   Dept. of the Treasury - Internal Revenue Service
FORM  **W-2 Wage and Tax Statement**    FOLD AND TEAR ALONG PERFORATION

| D. CONTROL NUMBER | This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
|---|---|---|---|---|
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED-6502 | | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY WITHHELD 2097.17 |
| C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE KAISER FOUNDATION HP, INC ONE KAISER PLAZA OAKLAND CA 94612 | | | 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| | | | 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| | | | 9 | 10 DEPENDENT CARE BENEFITS |
| E. EMPLOYEE'S FIRST NAME AND INITIAL   LAST NAME   SUFF. LUNELL C GAMBLE | | | 11 NONQUALIFIED PLANS | 12 a-d C 350.00 E 467.29 DD 7706.23 |
| REDACTED | | | 14 OTHER CASDI 334.75 DOMPT 5071.92 | 13 Statutory Employee / Retirement Plan ☒ / Third-Party Sick Pay |
| F. EMPLOYEE'S ADDRESS AND ZIP CODE | | | | |
| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy 2  To be Filed with Employee's  STATE, CITY or LOCAL tax return  **2014**   Dept. of the Treasury - Internal Revenue Service
FORM  **W-2 Wage and Tax Statement**    FOLD AND TEAR ALONG PERFORATION

| D. CONTROL NUMBER | This information is being furnished to the Internal Revenue Service | OMB NO. 1545-0008 | 1 WAGES, TIPS, OTHER COMPENSATION 33358.04 | 2 FEDERAL INCOME TAX WITHHELD 378.16 |
|---|---|---|---|---|
| B. EMPLOYER IDENTIFICATION NUMBER REDACTED0523 | A. EMPLOYEE'S SOCIAL SECURITY NUMBER REDACTED-6502 | | 3 SOCIAL SECURITY WAGES 33825.33 | 4 SOCIAL SECURITY WITHHELD 2097.17 |
| C. EMPLOYER'S NAME, ADDRESS AND ZIP CODE KAISER FOUNDATION HP, INC ONE KAISER PLAZA OAKLAND CA 94612 | | | 5 MEDICARE WAGES AND TIPS 33825.33 | 6 MEDICARE TAX WITHHELD 490.47 |
| | | | 7 SOCIAL SECURITY TIPS | 8 ALLOCATED TIPS |
| | | | 9 | 10 DEPENDENT CARE BENEFITS |
| E. EMPLOYEE'S FIRST NAME AND INITIAL   LAST NAME   SUFF. LUNELL C GAMBLE | | | 11 NONQUALIFIED PLANS | 12 a-d C 350.00 E 467.29 DD 7706.23 |
| REDACTED | | | 14 OTHER CASDI 334.75 DOMPT 5071.92 | 13 Statutory Employee / Retirement Plan ☒ / Third-Party Sick Pay |
| F. EMPLOYEE'S ADDRESS AND ZIP CODE | | | | |
| 15 STATE CA | EMPLOYER'S STATE I.D. NO. REDACTED229-4 | 16 STATE WAGES, TIPS, ETC. 33358.04 | 17 STATE INCOME TAX 57.43 | 18 LOCAL WAGES, TIPS, ETC. | 19 LOCAL INCOME TAX | 20 LOCALITY NAME |

Copy B  To be Filed with Employee's  FEDERAL tax return  **2014**   Dept. of the Treasury - Internal Revenue Service
FORM  **W-2 Wage and Tax Statement**    FOLD AND TEAR ALONG PERFORATION

Visit www.irs.gov for e-file details.

# W-2 AND WAGE SUMMARY

**Notice to Employee**

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, visit **www.irs.gov/eitc** . Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at **www.socialsecurity.gov**.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2014 and more than $7,254 in social security, and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee below.)

**Instructions for Employee** *(Also see Notice to Employee)*

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report this amount on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove a smaller amount with adequate records. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will figure the Social Security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record(used to figure your benefits).

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan. Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you only have S IMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule Explained in Pub. 571). Deferrals under code G are limited to $17,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age.

Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** *If your salary follows code D through H, S, Y, AA, BB, or EE you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.*

**A-** Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B-** Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C-** Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D-** Elective deferrals under a section 401(k) cash or deferred arrangement. Also includes deferrals under a S MPLE retirement account that is part of a section 401(k) arrangement.

**E-** Elective deferrals under a section 403(b) salary reduction agreement.

**F-** Elective deferrals under a section 408(k)(6) salary reduction SEP

**G-** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H-** Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J-** Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K-** 20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L-** Substantiated employee business expense reimbursements (nontaxable)

**M-** Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N-** Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P-** Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q-** Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R-** Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S-** Employee salary reduction contributions under a section 408(p) S MPLE (not included in box 1)

**T-** Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V-** Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5).

**W-** Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y-** Deferrals under a section 409A nonqualified deferred compensation plan

**Z-** Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA-** Designated Roth contributions under a section 401(k) plan

**BB-** Designated Roth contributions under a section 403(b) plan

**DD-** Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE-** Designated Roth contributions under a governmental section 457 (b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590 Individual Retirement Arrangements(IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier I tax, Tier II tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note.** *Keep Copy C* of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Exhibit D

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Sheila Kennedy
5

**FILED**
**ALAMEDA COUNTY**

JUL 0 8 2016

CLERK OF THE SUPERIOR COURT
By_____
                          Deputy

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                        COUNTY OF ALAMEDA

8
   SHEILA KENNEDY                        )   Case No. RG 1 6 8 2 2 5 4 4
9                                        )
            Plaintiff                    )   **COMPLAINT FOR DAMAGES**
10                                       )   (Employment discrimination)
   vs.                                   )
11                                       )
   KAISER FOUNDATION HEALTH              )   **DEMAND FOR JURY TRIAL**
12 PLAN, INC; KAISER FOUNDATION          )
   HOSPITALS, INC.; and THE              )
13 PERMANENTE MEDICAL GROUP;             )
   all doing business as KAISER          )
14 PERMANENTE MEDICAL CARE               )
   PROGRAM                               )
15                                       )
            Defendants                   )
16 _____ )

17                        **INTRODUCTION**

18        1.  This is an action for employment discrimination and retaliation against Kaiser

19 Permanente entities, arising out of a pattern and practice of race discrimination against its

20 African American employees.  Plaintiff Sheila Kennedy is an African American woman

21 who was employed at Kaiser for more than 18 years.  Throughout her employment, Ms.

22 Kennedy was subject to systemic discrimination and retaliation due to her race and

23 disability, including hostile work environment and denial of numerous employment

24 opportunities, in the Chemical Dependency and Rehabilitation Department (CDRD) where

25 she had worked since 2002, and throughout the Kaiser Northern California organization.

26 Plaintiff's administrative charge of discriminatory termination is pending with the

27 Department of Fair Employment and Housing, and an amended complaint will be filed here

28 if that claim is not resolved in the administrative process.

1    2.  Although a substantial percentage of Kaiser's workforce is comprised of African-

2  American employees, due to systemic discrimination by a management that is

3  predominately non-African-American, this class of employees are too often denied training,

4  job reclassifications, positive performance reviews, transfers and  promotions, and they are

5  disproportionately subjected to discipline and termination.  As a result, Kaiser's workforce

6  is rigidly stratified with a disparate distribution by race and gender, with African-American

7  and African-American women predominantly assigned to the lowest paying positions with

8  the least chance of advancement, and predominantly excluded from higher paying and more

9  secure supervisory and management positions – positions with the greatest influence and

10  decision-making authority over reviews, promotions, retention, and termination.

11    3.  Plaintiff's claims are brought pursuant to the California Fair Employment and

12  Housing Act (FEHA), Cal. Government Code §12940 *et seq.*  ,She seeks to end Kaiser's

13  discriminatory practices and obtain monetary relief, including punitive damages.

14                              **THE PARTIES**

15    4. Plaintiff Sheila Kennedy is an African American woman who resides in

16  California.  She was employed at Kaiser Permanente from for more than 18 years, until her

17  termination in February 2016.  Ms. Kennedy worked in various positions, including CPRD

18  related positions of intern, substance abuse counselor, and instructor at the domestic

19  violence program, among others.

20    5.  Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a

21  health care service plan, headquartered in Alameda County.  Health Plan enrolls members in

22  individual and group plans, and in Northern California, provides hospital and medical

23  services for its members through separate contracts with Medical Group and Hospitals.

24    6.  Kaiser Foundation Hospitals, Inc., is a nonprofit corporation, headquartered in

25  Alameda County; it operates hospitals and medical centers in California.  Hospitals receives

26  its funding from Health Plan, and provides infrastructure and facilities for the benefit of

27  Medical Group.

28

7. The Permanente Medical Group is a group of physicians organized as a professional corporation under California law. Medical Group is privately owned and managed by its physician shareholders. Medical Group contracts with Health Plan to provide medical services (both outpatient and inpatient) for Health Plan members in Northern California.

8. Medical Group, Hospitals, and Health Plan work in cooperation with each other to form the integrated medical care services program with the trade name, Kaiser Permanente Medical Care Program. This enterprise is known to the general public, and is doing business as, "Kaiser Permanente." Collectively, the three entities are referred to herein as "Kaiser."

## ADMINISTRATIVE PROCESS

9. Plaintiff previously and timely filed an administrative charge of discrimination, as well as an amended charge, against her employer with the Department of Fair Employment and Education ("DFEH"). In that process, plaintiff complained about discrimination and retaliation she experienced prior to her termination, including denial of promotions. Plaintiff received her right to sue letter on that charge. Subsequent to the issuance of the right to sue letter, plaintiff was terminated from Kaiser. Plaintiff filed a subsequent charge with DFEH over the termination. If the matter is not resolved in the administrative process, plaintiff will amend this Complaint at the appropriate time.

10. Administrative and statutory claims of Ms. Kennedy were tolled as a result of a class action that was filed against Kaiser, in Hill et al. v. Kaiser Foundation Health Plan, Case No. 3:10-cv-2833 LB, Northern District of California. EEOC charges were filed by named plaintiffs in that case on September 25, 2007, and the action was pending until December 10, 2013. During that time period, all limitation periods for filing administrative charges were tolled.

## PATTERN AND PRACTICE ALLEGATIONS

11. Kaiser Permanente is one of the largest health maintenance organizations of its kind, providing a system of integrated health care to more than 8 million members in eight

---

1  different regions nationwide, employing over 180,000 people. In Northern California,

2  Kaiser serves approximately 3.2 million members at 21 medical centers and 160 offices,

3  employing thousands of people in non-physician capacities. Using a centralized

4  employment opportunity system, people external to Kaiser and current employees are able

5  to apply for open positions throughout Kaiser's operations, including by region. Current

6  employees are told they will be provided with opportunities for employment that are not

7  available to external applicants, including access to job postings prior to their disclosure to

8  the general public, and a system by which employees may post their resumes for other

9  Kaiser departments to match to openings for hiring decisions.

10        12. Kaiser maintains a unique business and organization structure, with regional

11  oversight of Northern California non-physician operations by a single executive

12  management hierarchy. Within each division of Kaiser's operations, the employer has

13  created departmental hierarchies of similar nature and structure, including: entry level

14  positions, trained or skilled-level positions, team leaders and sub-leads, supervisors and

15  office-level managers, and divisional directors and assistant directors. Kaiser also

16  maintains uniform employment and personnel policies applicable to all of its employees,

17  with centralized human resources, general counsel, payroll services, and labor and other

18  employment data. Regardless of the department or division, there are uniform policies and

19  procedures for employee orientation, supervisory management, salary and incentive options,

20  job classifications, human resources, progressive discipline, rules of conduct, and

21  requirements for transfers, promotions and terminations.

22        13. Within each department or function of Kaiser's operations, the employer has

23  developed its own unique procedures, information systems and business technologies

24  requiring specialized training and adaptive capabilities. Employees are told they need

25  establish in their work performances that they are trained in and proficient with those

26  unique processes in order to be retained and/or promoted within Kaiser. Access to that

27  training uniformly depends upon the discretion of divisional management, however,

28  including influence and decision-making at the supervisory and team management levels.

1   Similarly, performance reviews, job classification decisions, pay and salary structure

2   changes, and disciplinary actions all depend upon the discretion of that same divisional

3   management.  Few objective requirements or measurements are used for employment

4   decisions, which instead are largely based on subjective judgments of the supervisors and

5   managers within Kaiser's operations.

6        14.  Kaiser's executive and divisional managements for positions in EEO job groups

7   2F and 2G are predominately neither African-American nor African-American women.

8   African-Americans and African-American women are rarely promoted to supervisory or

9   management positions capable of influencing a significant proportion of the employer's

10  decision-making.  As a result, the decisions as to which employees receive specialized

11  training, particular assignments, job classifications, pay raises and incentives, transfer or

12  promotions, positive performance reviews and progressive disciplinary actions are made

13  and influenced principally by non-African-Americans.   Subjective judgments of Kaiser'

14  stratified supervisory and management system are often infected with conscious or

15  unconscious prejudices and race and/or race-gender based stereotypes, which explains why

16  so few African-American and African-American women out of Kaiser's large African-

17  American and African-American female employee population advance to supervisory and

18  management positions.

19       15.  This pattern of unequal training, assignments, classifications, pay, discipline and

20  advancement opportunities is not the result of random or non-discriminatory factors. Rather,

21  it is the result of an on-going and continuous pattern and practice of intentional race and

22  race-gender discrimination in training, assignments, classifications, pay, discipline,

23  performance reviews, terminations and promotions, and reliance on policies and practices

24  that have an adverse impact on African-American and African-American female employees

25  that cannot be justified by business necessity, and for which alternative policies and

26  practices with less discriminatory impact could be utilized that equally serve any asserted

27  justification. Plaintiff is informed and believes that such policies and practices include,

28  without limitation:

---

a.  Failure to consistently train African-American and African-American women in the unique Kaiser processes and practices necessary for desirable assignments and advancement.

b.  Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-African-American managerial workforce in making assignments, training, pay, performance review, discipline, promotion and termination decisions. Even where Kaiser's policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

c.  Reliance on race and race-gender stereotypes in making employment decisions such as assignments, promotions, pay and training.

d.  Pre-selection and "grooming" of non-African-American and non-African-American women employees for advancement, favorable assignments and training.

e.  Maintenance of largely race and race-gender segregated job categories and departments.

f.  Deterrence and discouragement of African-American and African-American female employees from seeking advancement, training, and favorable assignments and pay.

g.  Giving African-American and African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and non-African-American women employees.

h.  Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and African-American women employees, in disproportion to the same actions taken against non-African-American employees.

1      i.    Providing less training and support to African-American and African-
2            American female employees and managers than that given to non-African-
3            American employees and managers.
4      j.    Providing less or refusing to make reasonable accommodations for disabilities
5            and sick leave policies with respect to African-American and African-
6            American female employees, and unlawfully discriminating against African-
7            American-employees due to their disabilities because of both their disabilities
8            and their race and/or race-gender.
9      k.    Harassing African-American and African-American female employees
10           interested in advancement and subjecting them to a hostile work environment.
11     l.    Maintaining and fostering a reputation for discriminatory conduct which
12           deters African-Americans and African-American females from pursuing
13           promotional opportunities with Kaiser;
14     m.    Establishing and maintaining arbitrary and subjective requirements for
15           discipline and promotions which have the effect of excluding qualified
16           African-Americans and African-American females and which have not been
17           shown to have any significant relationship to job performance or to be
18           necessary to the safe and efficient conduct of Kaiser's business;
19     n.    Failing and refusing to take adequate steps to eliminate the effects of its past
20           discriminatory practices; and
21     o.    Retaliating against African-American and African-American women
22           employees who complain of unequal treatment.
23     16.   Kaiser's racially stratified workforce and discriminatory patterns and practices
24   are propagated, entrenched and protected by centralized policies and practices directed at
25   the highest levels of Kaiser management.  Although Kaiser operates many different
26   departments at many different locations throughout the Northern California Region, it has
27   centralized, company-wide policies and practices concerning supervisory training, human
28   resources, EEO reporting and compliance and Kaiser's response to EEO complaints.  These

1 | company-wide policies and practices include, among others:

2     a.    Directing, authorizing and training supervisors and directors to conceal

3            discriminatory actions and retaliate against those employees who might assist

4            the disclosure of false or trivial discipline as pretext for discrimination,

5            without regard to the specific facts and circumstances of the individual

6            employee or supervisor.

7     b.    Directing, authorizing and assist supervisors and directors in their

8            discriminatory and retaliatory employment actions, through a centralized

9            human resources department and, ultimately, the office of the general counsel,

10          in favor of supervisors and directors, and against the interests and complaints

11          of African American employees, without regard to the specific facts and

12          circumstances of the individual employee or supervisor, and in contravention

13          of obligation of Human Resources and general counsel to protect employees

14          from unlawful discrimination.

15     c.    Suppressing and falsifying information in connection with complaints over

16          employment actions made internally and to administrative agencies and courts

17          by African American employees, including unreasonable, one-sided, pre-

18          determined internal investigations conducted by a select few individuals for

19          the purpose of permitting, perpetuating and covering up discriminatory and

20          retaliatory actions and patterns, without regard to the specific facts and

21          circumstances of the individual employee or complaint.

22     f.    Concealing and entrenching discriminatory patterns and practices by making

23          false and misleading representations and statements, and engaging in

24          intentionally misleading conduct, to EEOC and OFCCP regarding its

25          compliance with federal regulations, including the requirement that Kaiser

26          conduct internal reviews and self-inquiry of statistical patterns, report

27          disparities, propose remedial plans (including affirmative action plans) and

28          monitor results over time.

g.   Misrepresent EEO practices and non-compliance to employees, government agencies, in the courts and to the public, included a public relations effort to promote a diversity department that is knowingly, purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.   Retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.   Designating African American employees, and in particular, those employees who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.   Abusing administrative and judicial processes to further patterns and practices of racial discrimination and in retaliation against African American employees who complain about the violation of their civil rights, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the existence of substantial evidence of Kaiser's violations of law.

k.   Perpetuating, protecting and concealing unlawful discrimination and patterns of disparate treatment by requiring employees who raise civil rights claims to

1    agree to confidentiality of the terms of settlement, without bargaining for such

2    an agreement at arms length, and without justification in work product,

3    attorney client privilege, trade secret or other basis for confidentiality.

4    l.    Kaiser's stand-alone litigation policy and practice – adopted and applied by

5        general counsel in cases brought under anti-discrimination laws, without

6        regard to specific facts and circumstances – requiring, as a condition of

7        settlement, former employees to sign agreements not to work at Kaiser in the

8        future, is a violation of federal and state civil rights laws; including whether

9        plaintiff is entitled to a declaration that all such agreements are against public

10       policy, unenforceable and null and void.

11    17.  Because of its discriminatory policies and practices, Kaiser retains, promotes,

12 disciplines and terminates African Americans and African American women in statistically

13 significant disproportionate rates, based on the proportion of qualified African Americans

14 and African American women.  This in turn has the effect of diminishing the pool of

15 eligible African Americans and African American women for promotion to supervisory,

16 management and executive positions.  Kaiser's pattern and practice of discrimination is so

17 pervasive and entrenched throughout that race and race-gender discrimination and unlawful

18 retaliation can be said to be its modes of operations

19                    **DENIAL OF EMPLOYMENT OPPORTUNITIES**

20    18.  Plaintiff Kennedy began working at Kaiser in October of 1997.  Like many other

21 African American employees at Kaiser, she performed her work according to the

22 employer's needs, was well qualified and tried to improve her employment position over the

23 years.  In 2002, Ms. Kennedy began working at Kaiser's Chemical Dependency and

24 Rehabilitation Program (CDRP), where she learned the department's particular procedures

25 and processes.  In September 2003, complainant took responsibility for conducting bi-

26 monthly educational presentations for Day Treatment.

27    19. Despite her qualifications and excellent work performance, complainant was

28 denied promotions, transfers, pay raises and other employment benefits that were given to

1   non-African American employees.  Since being employed at Kaiser, complainant has

2   applied at many different positions at Kaiser, within and outside the CDRP.  These

3   included, but are not limited to the following:

4       a.      In 2004, complainant enrolled in a certification program for the California

5               Association of Alcohol and Drug Abuse Counselors (CAADAC) at UC

6               Berkeley extension, which included a requirement of 500 hours internship.

7               Ms. Kennedy was denied the opportunity to perform her internship at Vallejo,

8               CDRP.  Kaiser management falsely informed complainant that it was not

9               possible for employees and prior patients to perform internships as it would be

10              "confusing" to patients.  In fact, several non-African American employees

11              who had been patients were permitted to perform their internships at Kaiser.

12      b.      In 2004, complainant fulfilled her 500 hour internship requirement at a

13              residential recovery program, receiving a diploma.  Kaiser failed to provide

14              assistance to complainant, as it had provided other non-African American

15              employees with internships.  Kaiser not only failed to provide equal

16              assistance, it purposefully mandated complainant appear for work outside her

17              schedule, interfering with her ability to complete her program and obtain

18              advancement.

19      c.      Complainant in 2006 gained even more qualifications, performing a total of

20              1500 hours to become a CAADAC-II at an all womens' treatment facility.

21              Thereafter, she began applying for openings at Kaiser within the CDRP

22              department, but was denied.  Denial of these employment opportunities was

23              based on complainant's race.  Such positions were awarded to non-African

24              American employees with less qualifications and training.  For example, in

25              2007, the position was given to a Registered Nurse without the credentials,

26              training or education possessed by Ms. Kennedy.

27      d.      In 2009, after 6 years conducting the Domestic Violence program, including a

28              class that she herself had developed, Kaiser told complainant that she could

1   no longer conduct the class.  Instead, she was instructed to train a white

2   employee how to conduct the class.

3   e.   Ms. Kennedy continued to improve her training and education, but Kaiser

4   continued to deny her advancement.  In 2010, complainant obtained a total of

5   2,000 hours required to become a CAADAC-I.  In 2012, she had a total of

6   6,000 hours, and passed a written and oral exam.  During these times,

7   complainant continued to apply for open positions at Kaiser pertaining to

8   Substance Abuse Counselors.  Kaiser denied each application, refusing to

9   even grant an interview.

10  f.   Complainant was finally granted an opportunity to interview for positions in

11  2014, but the employment opportunities were denied by Kaiser on account of

12  her race.  An interview for a position in Walnut Creek was granted in Mach

13  2014, and for a position in Sacramento in August 2014.  These positions were

14  either not filled, or given to non-African American employees.

15  g.   Throughout this period, including times after Ms. Kennedy filed her initial

16  administrative charge with DFEH, complainant and other African American

17  employees have been denied advancement on account of race.  This has been

18  a continuing practice at Kaiser for at least 15 years.

19  **HOSTILE WORK ENVIRONMENT**

20  20.  Throughout her employment, plaintiff was  supervised by individuals who were

21  not African-American or African-American woman. While under the supervision of non-

22  African American women, plaintiff was subject to a hostile work environment, was denied

23  promotions along her chosen career paths, was threatened, retaliated against and terminated

24  because of her race and disability and the fact they made complaints regarding the

25  employer's non-compliance with civil rights laws.  This included false negative comments

26  on performance reviews, inferior job assignments, denial of promotions to better paying

27  jobs and supervisory positions, termination and denial of reasonable accommodation.  The

28  discriminatory treatment was manifested by plaintiff being treated differently by the

1   employer compared with similarly-situated employees who are not African American

2   women, African born and/or not disabled.

3       21. The hostile environment grew so intolerable that plaintiff suffered mental

4   distress leading to a psychological disability, requiring plaintiff to take medical leave from

5   Kaiser.  Plaintiff and her treating psychologist informed Kaiser of the psychological

6   disability, and requested reasonable accommodation, including assignment to a department

7   which did not reflect Kaiser's culture of race discrimination.  Kaiser refused to accomodate,

8   and it denied Ms. Kennedy access to its internal employment application process.

9       22. Following plaintiff's attempt to address her unequal and unlawful treatment at

10   Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

11   policies and practices, including designation of plaintiff as not eligible for rehire;

12   unreasonable, pre-determined one-sided investigations conducted outside the standards for

13   workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

14   and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

15   by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

16   to never apply to work at Kaiser again in the future.

17                            **DAMAGES**

18       23. As a direct and proximate result of defendants' actions as alleged herein,

19   defendants have breached their duties imposed on all employers as established by statute.

20       24. As a direct and proximate result of the refusal to promote plaintiff's employment,

21   plaintiff has suffered and will continue to suffer lost wages, salary increases, earnings

22   capacity and other benefits of employment, in an amount to be proven at trial.

23       25. As a further proximate result of defendants' unlawful actions, plaintiff has

24   suffered emotional pain, humiliation, mental anguish, and emotional distress.

25       26. The conduct of all of the defendants alleged above was deliberate, wilful and

26   malicious.  Further, the actions taken against plaintiff were carried out with reckless

27   disregard to the truth and the rights of plaintiff, and were despicable actions taken without

28   privilege or justification.

## CAUSE OF ACTION
(Violation of California Government Code 12940, et seq.,
California Fair Employment and Housing Act)

16. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 15 of this complaint, as though fully set forth herein.

17. Defendant Kaiser is an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

18. Plaintiff is a member of a protected class as set forth in Government Code 12940 et seq.

19. The harms alleged herein occurred within the jurisdiction of this Court and the amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

20. The discriminatory treatment of plaintiff's employment and retaliatory actions, as set forth herein, were done with discriminatory motive, in violation of public policy and was based on the fact that plaintiff was over the age of 45, is African American and is a woman, and had complained about management's Equal Employment practices.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays for judgement against defendants, and each of them as follows:

1. For general and special damages, in an amount to be determined at trial;

2. For back pay and wages and loss of other benefits due as a result of the wrongful conduct of defendants, in an amount to be determined at trial;

3. For an order instating plaintiff to the position denied her and ordering defendant to cease engaging in a pattern and practice of discrimination,

4. For statutory interest on plaintiff's past wage loss;

5. For damages of pain and suffering and emotional distress;

6. For exemplary and punitive damages in an amount to be determined at trial;

7. For reasonable attorney fees and costs of suit; and

8. For other such relief as the Court may deem just and proper.

1

Respectfully submitted,

2

3    Dated: July 8, 2016              LAW OFFICE OF JEREMY L. FRIEDMAN

4

5                                By: _____

6                                    Jeremy L. Friedman
                                     Attorney for plaintiff Sheila Kennedy

7

8

9                            **DEMAND FOR JURY TRIAL**

10       Plaintiff hereby demands a jury trial on all issues.

11
     Dated: July 8, 2016              LAW OFFICE OF JEREMY L. FRIEDMAN
12

13                               By: _____

14                                   Jeremy L. Friedman
                                     Attorney for plaintiff Sheila Kennedy
15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

PLAINTIFF'S COMPLAINT FOR DAMAGES – Page 15

Exhibit E

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Miller Law Group
Attn:  Miller, Michele Ballard
111 Sutter Street
Suite 700
San Francisco, CA   94101

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Kennedy<br><br>                 Plaintiff/Petitioner(s)<br><br>      VS.<br><br><br>Kaiser Foundtion Health Plan, Inc.<br>             Defendant/Respondent(s)<br>      (Abbreviated Title) | No. <u>RG16822544</u><br><br>Order<br><br>Demurrer and Motion to Strike Complaint<br>Sustained |

The Demurrer and Motion to Strike Complaint was set for hearing on 01/31/2017 at 03:00 PM in Department 18 before the Honorable Jo-Lynne Q. Lee.  The Tentative Ruling was published and was contested.

Opposing Party Sheila Kennedy appeared by counsel Jeremy L. FriedmanMoving Party Kaiser Foundtion Health Plan, Inc. appeared by counsel Gal Gressel and Kerry Freeman

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  The demurrer and motion to strike by Defendants The Permanente Medical Group, Inc., ("TPMG"), Kaiser Foundation Health Plan, Inc., ("Health Plan"), and Kaiser Foundation Hospitals ("Hospitals" and collectively "Defendants") directed at the Complaint by Plaintiff Sheila Kennedy ("Plaintiff") is ruled upon as follows:

Defendants demurrer is SUSTAINED WITH LEAVE TO AMEND based on uncertainty.  Plaintiff's Complaint alleges one cause of action for Violation of Government Code 12940, et seq., California Fair Employment and Housing Act ("FEHA").   FEHA prohibits numerous practices but Plaintiff fails to identify the FEHA provisions on which she relies.  Plaintiff also alleges that she is a member of a protected class, but does not allege which protected class supports her claims under FEHA.  The way in which the First Cause of Action is set out serves no purposes except to obfuscate the basis for Plaintiff's claims, and makes it unreasonably difficult for Defendants to reasonably respond or for the court to determine whether the claims asserted are adequately supported by the facts alleged. (See California Rules of Court, rule 2.112.)

The demurrer by Defendants Health Plan and Hospitals on the ground that Plaintiff had not stated a cause of action against them is SUSTAINED WITH LEAVE TO AMEND.  Plaintiff alleges that Health Plan is a licensed health care service plan that enrolls members in individual and group plans, and provides medical services through TPMG and Hospitals.  She alleges that Hospitals operates hospitals that provide facilities and infrastructure for Health Plan.  Plaintiff alleges that TPMG is a group of physicians owned by its physician shareholders that contracts with Health Plan to provide medical services for Health Plan members.  Plaintiff alleges that TPMG, Hospitals, and Health Plan are an integrated medical care services program that operates under the trade name, Kaiser Permanente Care Program, known to the public as Kaiser Permanente.

Health Plan and Hospitals contend that Plaintiff was employed by TPMG only.  The court takes judicial notice of the fact a Request for Wages by Plaintiff was sent by the California Employment Development Department to TPMG in January 2016, because Plaintiff had listed TPMG as his employer.  Health Plan and Hospitals contend that the facts alleged are not sufficient to allow the court to ignore the separate existence of TPMG, Health Plan, and Hospitals, and view them as a single entity for purposes of Plaintiff's claims in this action.  Defendants contend that Plaintiff fails to allege facts showing that the court should ignore the separate existence of affiliated entities.  In Laird v. Capital Cities/ABC, Inc. (1988) 68 Cal.App.4th 727, 737, 742, the court held that the plaintiff must allege that the distinct entities operate as a single entity, and that treating them as separate legal entities would cause inequitable results.  In Gopal v. Kaiser Foundation Health Plan, Inc. (2016) 248 Cal.App.4th 425, 431, ("Gopal"), the court held that two conditions are generally required for the application of joint enterprise liability: (1) such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise; and (2) an inequitable result if the acts in question are treated as those of one corporation alone.

Health Plan and Hospitals also contend that Plaintiff cannot allege that they and TPMG are a joint enterprise, as a matter of law, because Health Plan, as a health care service plan within the meaning of Health & Safety Code sec. 1345(q), and TPMG and Hospitals, as "providers" within the meaning of Health & Safety Code sec. 1345(i), are "each responsible for their own acts or omissions, and are not liable for the act or omissions of, or the costs of defending, others," under Health & Safety Code sec. 1371.25.  In Gopal, supra, 248 Cal.App.4th at p. 432, the court ruled that application of liability based on joint enterprise in that case was not appropriate, because the Knox-Keene Act (Health & Safety Code sec. 1340, et seq.) explicitly allows a health plan to directly own and directly operate hospitals and contract with physicians to provide care to its members (Health & Safety Code, sec. 1395(c)), and because Plaintiff did not show it was inequitable to require her to look to the medical providers who allegedly caused her personal injuries.

Plaintiff contends that her allegation that the Kaiser entities work in cooperation with each other to form the integrated medical care services program known to the public as "Kaiser Permanente" is sufficient to support a "joint enterprise" claim, but the provisions of the Knox-Keene Act and the case law cited by Defendants do not support that conclusion.  Leave to amend is granted to allege facts that support the requirements for stating a joint enterprise claim against health care services plans and health care providers under the Knox-Keene Act, consistent with the holdings in Gopal and Laird.

Defendants also contend that any claims based on the protected categories of disability, race, age, or gender are barred because the DFEH charge Plaintiff filed did not mention hostile working environment or discrimination based on disability, age, or gender.  Plaintiff responds that she filed a second administrative complaint claiming hostile work environment, failure to accommodate, and disability caused by race discrimination, and that claim is pending.  Plaintiff also contends that her initial DFEH claim was sufficient to apprise the Department of Fair Employment and Housing of the alleged discriminatory acts and the discriminating parties.  In light of the court's ruling that Plaintiff's claims under FEHA are too uncertain to enable the court to ascertain what claims are being pled, the court is not required to resolve this issue. However, Plaintiff may only plead claims reflected in administrative complaints filed with FEHA, for which FEHA has issued a "right-to-sue" letter.  (See Okoli v. Lockheed  Technical Operations Co. (1995) 36 Cal.App.4th 1607, 1613; Hobson v. Raychem Corp. (1999) 73 Cal.App.4th 614, 631.)  If Plaintiff has a pending administrative complaint, she may seek leave to amend to add claims based on those pending complaints upon receipt of a right-to-sue letter.

It is also unnecessary to address Defendants' contention that Plaintiff has failed to state claims based on race and gender discrimination, disability discrimination, age discrimination, retaliation, or hostile working environment, and it is not clear whether she intended to do so.    Plaintiff is admonished to carefully review the requirements for these claims under FEHA and to allege facts supporting the elements of those separate causes of action.

Defendants' motion to strike para. 1, lines 19-20, the phrase "arising out of a pattern of race discrimination against its African American employees," the  word "systemic" in para. 1, line 22, the entirety of para. 2,and paras. 11-17 in their entirety on the ground that these allegations are irrelevant to the Complaint is GRANTED WITHOUT LEAVE TO AMEND.  In these allegations, Plaintiff contends that Kaiser has a widespread pattern and practice of discriminating against African-Americans, including excluding them from higher paying supervisory and management positions. Defendants contend that these allegations are irrelevant, because claims of class-wide discrimination are

applicable to class action claims based on disparate impact, and are not applicable to suits by individuals claiming discrimination in a particular instance.  (Alch v. Superior Court (2004) 122 Cal.App.4th 339, 379 [a class action is, by definition, a "pattern and practice" claim].)

In opposition, Plaintiff contends that although the court in Alch noted that pattern and practice allegations are the basis for class actions, it did not hold that allegations of pattern and practice are irrelevant in individual actions.  Plaintiffs assert that statistical evidence can create an inference of discrimination based on disparate treatment that supports individual claims.

Plaintiff's arguments about the potential admissibility of pattern and practice evidence do not support the conclusion that such allegations are permissible in the complaint, in which Plaintiff is not seeking relief on behalf of a class.   Allegations about discrimination against other employees are not part of the elements of any individual claims under FEHA. The court makes no ruling at this time about the scope of permissible discovery or the admissibility of evidence of disparate treatment at trial.

Defendants' request for judicial notice of the Notice of Charge of Discrimination dated August 12, 2014 and the Corrected Complaint of Employment Discrimination dated July 11, 2014, filed with the California Department of Fair Employment and Housing is GRANTED.

Defendants' request for judicial notice of the Amended Complaint of Employment Discrimination dated July 10, 2014, filed with the California Department of Fair Employment and Housing is GRANTED.

Defendants' request for judicial notice of the content of the Request for Wages on California Employment Development Department Form DE 1919, Rev. 6 (4-12), mailed by the Employment Development Department to The Permanente Medical Group, Inc., on January 29, 2016, is GRANTED.

Plaintiff shall file and serve her First Amended Complaint by April 7, 2017.  Defendants shall file and serve a responsive pleading within 20 days after service of the First Amended Complaint, plus any additional time provided by Code of Civil Procedure section 1013(a).

Dated:  01/31/2017

_____

Judge Jo-Lynne Q. Lee

---

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16822544
Order After Hearing Re: of 01/31/2017

# DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 02/01/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

APR 2 7 2017

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE, | Case No. RG16826717 |
| Plaintiff, | ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU DEPARTMENT 15 |
| vs. | |
| KAISER FOUNDATION HEALTH PLAN. INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM, | **[PROPOSED] ORDER GRANTING DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Defendants. | |

Date:        May 31, 2017
Time:        9:00 a.m.
Judge:       Hon. Ioana Petrou
Dept.:       15

**Reservation No. R-1844960**

Complaint Filed:        August 9, 2016

[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STRIKE

# ORDER

On May 31, 2017, before the Honorable Ioana Petrou, the Motion to Strike filed by Defendants KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; and THE PERMANENTE MEDICAL GROUP ("Defendants") came on for hearing.  All parties were represented at the hearing by their attorneys of record.  The Court, having fully considered the papers, evidence, and argument presented by the parties' counsel, HEREBY FINDS AND ORDERS as follows:

Defendants' Motion to Strike is GRANTED, and the Court HEREBY STRIKES as irrelevant, false, and improper pursuant to sections 431.10(b) and 436 of the California Code of Civil Procedure the following portions of Plaintiff's Complaint, WITHOUT LEAVE TO AMEND:

1. The following language from Paragraph 1, lines 19-20: "arising out of a pattern and practice of race discrimination against African American employees."

2. The following language from Paragraph 1, line 23: "systemic"

3. Paragraphs 2, 10, 12, 13, 14, 15 (including the subparagraphs numbered 15a through 15o), 16 (including the subparagraphs numbered 16a-16l) and 17, in their entirety.

4. The following language from Paragraph 11, lines 2-8: "Using a centralized employment opportunity system, people external to Kaiser and current employees are able to apply for open positions throughout Kaiser's operations, including by region. Current employees are told they will be provided with opportunities for employment that are not available to external applicants, including access to job postings prior to their disclosure to the general public, and a system by which employees may post their resumes for other Kaiser departments to match to openings for hiring decisions."

5. The following language from Paragraph 20, lines 7: "the pattern and practice of"

6. The following language from Paragraph 22, lines 4: "Pursuant to its pattern and practice of discrimination"

7.  The following language from Paragraph 30, lines 10-12: "Plaintiff is also a member of a protected subclass based on race, and color, as she is an African-American woman."

8.  The following language from Paragraph 32, lines 16-17: "as well as a racial subclass of race/gender."

9.  The following language from Paragraph 40, line 13: "and subclasses."

10. The following language from Paragraph 40, line 14: "African American Women."

11. The following language from the Prayer for Relief at Paragraph 3, line 5: "and ordering defendant to cease engaging in a pattern and practice of discrimination."

IT IS SO ORDERED.

DATED: _____

_____
Hon. Ioana Petrou
Judge of the Superior Court

-3-
[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STRIKE

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA  94111
   Telephone:  (415) 603-5000
5  Facsimile:  (415) 840-7210

6  Attorneys for Defendants,
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                         Case No. RG16826717

13           Plaintiff,                     ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14      vs.                                 DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,         **PROOF OF SERVICE**
    INC; KAISER FOUNDATION
16  HOSPITALS, INC; and THE                Judge:     Hon. Ioana Petrou
    PERMANENTE MEDICAL GROUP; all          Complaint Filed:     August 9, 2016
17  doing business as KAISER PERMANENTE
    MEDICAL CARE PROGRAM,
18
             Defendants.
19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

**PROOF OF SERVICE**

I am employed in the City of San Francisco and County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

On April 27, 2017, I served a copy of the within document(s):

1. **DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE PERMANENTE MEDICAL GROUP'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;**

2. **DECLARATION OF AMANDA BOLLIGER CRESPO IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;**

3. **[PROPOSED] ORDER GRANTING DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

4. **DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**

5. **DECLARATION OF AMANDA BOLLIGER CRESPO IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT;**

6. **PROPOSED] ORDER GRANTING DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT**

7. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S DEMURRER AND MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT;**

on the interested parties:

☐    VIA FAX: By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

- 1 -

1   ☒    VIA U.S. MAIL:  I am readily familiar with the firm's practice of collection and
2        processing of correspondence for mailing.  Under that practice such sealed
         envelope(s) would be deposited with the U.S. postal service on the above date with
3        postage thereon fully prepaid, at San Francisco, California.

4   ☐    VIA OVERNIGHT SERVICE:  By placing the document(s) listed above in a sealed
         _____ envelope and affixing a pre-paid air bill, and causing the envelope to be
5        delivered to a _____ agent for delivery.

6   ☐    VIA PERSONAL SERVICE:  By causing to be delivered the document(s) listed
         above to the person(s) at the address(es) set forth below.
7

8   ☒    VIA E-MAIL:  By transmitting a PDF version of the document(s) by e-mail to the
         person(s) set forth below using the e-mail address(es) indicated, pursuant to the
9        parties' electronic service agreement.

10

11  Jeremy L. Friedman                    Telephone:  510-530-9060
    Law Office of Jeremy L. Friedman       Facsimile:  510-530-9087
12  2801 Sylhowe Road                      Email: jlfried@comcast.net
    Oakland, CA 94610

13

14       I declare under penalty of perjury under the laws of the State of California that the above

15  is true and correct.

16       Executed on April 27, 2017, at San Francisco, California.

17                                         _____
18                                                 Janet Gogna

19

20

21

22

23

24

25

26

27

28

- 2 -
PROOF OF SERVICE

GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendants,
KAISER FOUNDATION HEALTH PLAN, INC.;
KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

ENDORSED
FILED
ALAMEDA COUNTY

MAY 15 2017

CLERK OF THE SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE,<br><br>    Plaintiff,<br><br>    vs.<br><br>KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM,<br><br>    Defendants. | Case No. RG16826717<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU DEPARTMENT 15<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE**<br><br>Date:       May 16, 2017<br>Time:       10:00 a.m.m<br>Judge:      Hon. Ioana Petrou<br>Dept:       15<br><br>Complaint Filed:       August 9, 2016 |

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    I.      **INTRODUCTION**

2           Plaintiff's *ex parte* request to continue the hearing date and extend the deadline for her to

3    respond to Defendants' Demurrer to Plaintiff's First Amended Complaint ("Demurrer") and

4    Motion to Strike Allegations in Plaintiff's First Amended Complaint ("Motion to Strike")

5    portions of her First Amended Complaint should be denied.  Plaintiff Lunell Gamble ("Gamble")

6    has had ample time to prepare responses to the issues raised in the Demurrer and Motion to

7    Strike, as the actual history of this matter shows.  Further delay is simply not warranted.

8           Defendants filed their Demurrer and Motion to Strike the First Amended Complaint on

9    April 27, 2017, but Plaintiff received notice of all issues raised in Defendants' Demurrer and

10   Motion to Strike 49 days before her current response deadline of May 17, 2017, via two detailed

11   conferral letters that Defendants sent on March 24 and March 29, 2017, respectively.  Plaintiff's

12   contention in her Motion that she could not timely prepare responses because Plaintiff's counsel

13   has briefs or hearings set in other cases set on *two* days during that 49-day time period should be

14   rejected.  Two date conflicts from other cases does not provide a basis to extend the statutory

15   deadlines governing the Demurrer and Motion to Strike, nor does it provide good cause to further

16   delay the parties and Court from reaching a final operative complaint in this matter.

17          Defendants already agreed to a 17-day extension on Defendants' response to Plaintiff's

18   First Amended Complaint, in order to give Plaintiff's counsel additional time to review and

19   respond to the Demurrer and Motion to Strike arguments stated in the March 24, 2017 and March

20   28, 2017 conferral letters.  Plaintiff stipulated to that extension without suggesting any of the

21   conflicts referenced in this Motion.

22          Although Plaintiff contends she cannot attend the May 31, 2017 hearing on Defendants'

23   Demurrer and Motion to Strike, she identifies no actual conflict that prevents her counsel from

24   attending that hearing.  That Plaintiff's counsel has a deadline to file a brief in another matter that

25   same day should not preclude him from attending the hearing when his office and this Court are

26   located in the same city.

27          Plaintiff's employment ended nearly three years ago, and this case has been pending for

28

- 1 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    several months following Defendants' first successful Demurrer to the Complaint.  Defendants

2    have a legitimate interest in avoiding further delays that could diminish witness memories and the

3    availability of other evidence needed to defend against this case, and in moving the case forward

4    expeditiously to minimize Plaintiff's alleged damages.

5         A continuance will prejudice Defendants because it would further delay a determination

6    as to what the operative complaint in this case will be.  Counsel for Plaintiff has advised

7    Defendants' counsel that Plaintiff may decide to file a class action complaint in lieu of her

8    currently pleaded individual claims depending on the outcome of the Motion to Strike in

9    particular.  Defendants cannot fairly conduct discovery (including deposing Plaintiff), prepare

10   their defenses, or identify and gather evidence supporting those defenses until the Court rules on

11   their Demurrer and Motion to Strike so that they know the scope of Plaintiff's claims.

12   **II.    PLAINTIFF'S REPEATED EXTENSION REQUESTS HAVE DELAYED
         PROSECUTION OF THIS CASE.**

13

14        Plaintiff's termination – the subject of this lawsuit – took place nearly three years ago, in

15   July 2014.  First Am. Compl. ¶ 1.  Plaintiff filed this lawsuit more than two years later, on

16   August 9, 2016.  This lawsuit itself has now been pending for nine months.

17        The Court sustained Defendants' first demurrer to the Complaint on February 7, 2017.

18   Declaration of Amanda Bolliger Crespo In Opposition To Plaintiff's *Ex Parte* Motion to Continue

19   Hearings on Demurrer and Motion to Strike ("Crespo Decl.") ¶ 3.  In so ruling, the Court ordered

20   that "Plaintiff shall have 30 days to amend" and that "Defendants shall have 30 days thereafter to

21   respond."  Ex. 1.[1]  Plaintiff filed her First Amended Complaint on March 10, 2017, making

22   Defendants' response thereto due on April 10, 2017.  *Id*. ¶ 4.

23        The undersigned firm substituted into this case as counsel for Defendants on

24   February 9, 2017.  Crespo Decl. ¶ 3.  In the roughly three months since that time, Plaintiff has

25   asked Defendants to agree to three different extensions.  *Id.* ¶ 5.  Defendants have agreed to two

26   of those requested extensions.  *Id.*

27   _____

28   [1] All cited Exhibits are attached to the Crespo Declaration filed concurrently herewith.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    First, Defendants agreed to Plaintiff's request to extend discovery motion deadlines so that

2    Plaintiff could prioritize conferral on the First Amended Complaint instead of supplementing her

3    discovery responses.  In particular, on March 9, 2017, Defendants' counsel sent Plaintiff's

4    counsel a meet and confer letter regarding Plaintiff's failure to produce a single document in

5    response to Defendant Kaiser Foundation Health Plan, Inc.'s Request for Production (Set One)

6    (the "Requests") and other deficiencies in Plaintiff's discovery responses.  *Id.* ¶ 5.  Defendants'

7    counsel requested that Plaintiff produce all responsive documents and correct the other

8    deficiencies by March 16, 2017.  *Id.*  On March 13, 2017, Plaintiff's counsel stated he was

9    working on an appellate brief so had been unable to substantively review the letter, and asked

10   Defendants to agree to postpone Plaintiff's deadline to supplement her discovery responses and

11   Defendants' related motion to compel so the parties could instead focus on conferral and

12   resolution of any disputes concerning Plaintiff's First Amended Complaint.  Ex. 2.  Defendants

13   agreed to Plaintiff's proposal, and the parties agreed to extend the motion to compel deadline

14   from March 21, 2017 through June 1, 2017.  *Id.*

15   Second, Defendants agreed to extend their own deadline to respond to Plaintiff's First

16   Amended Complaint based on unavailability of Plaintiff's counsel to confer on the issues raised

17   in Defendants' Demurrer and Motion to Strike.  On March 24, 2017, Defendants' counsel sent

18   Plaintiff's counsel a detailed letter regarding the arguments and case law supporting their

19   Demurrer to the First Amended Complaint.  Crespo Decl. ¶ 6.  Defendants' counsel requested that

20   Plaintiff's counsel provide Plaintiff's positions on the issues raised in the letter by March 31,

21   2017, so that Defendants could timely respond to the First Amended Complaint.  *Id.*  On March

22   24, 2017, Plaintiff's counsel advised Defendants' counsel that he would "be unable to address

23   [the] substance" of that conferral letter until the beginning of April, stating that he was "working

24   on an appellate brief due March 31."  Ex. 3 at pp. 2-3.  On March 29, 2017, Defendants' counsel

25   sent Plaintiff's counsel a detailed letter regarding the arguments and case law supporting

26   Defendants' Motion to Strike.  Crespo Decl. ¶ 7.  Defendants' counsel acknowledged the

27   scheduling limitations previously cited by Plaintiff's counsel and requested that Plaintiff provide

28

- 3 -

her position on the issues raised in both conferral letters by April 3, 2017. *Id.*

On April 3, 2017, Plaintiff's counsel reported that he "still ha[d] not had a chance to review [the conferral] correspondence" due to another appellate brief deadline. Ex. 3. Plaintiff's counsel requested that Defendants agree to extend their own deadline to respond to the First Amended Complaint to permit Plaintiff's counsel additional time to review and confer on Defendants' anticipated Demurrer and Motion to Strike. Crespo Decl. ¶ 7.

In response, Defendants' counsel advised Plaintiff's counsel that Defendants were anxious to finalize the pleadings so that the parties could move forward with discovery. *Id.* However, as a courtesy to accommodate Plaintiff's counsel, Defendants advised Plaintiff that they would not oppose a request from Plaintiff to extend the response deadline from April 10 to April 27, 2017. Ex. 3 at pp. 1-3. During that conferral process, Plaintiff's counsel did not mention any time that the conflicts cited in the instant Motion or indicate that he would have difficulty complying with the new hearing and related briefing deadlines flowing from the new April 27, 2017 response deadline. Crespo Decl. ¶ 7. The Court granted Plaintiff's unopposed extension request on April 8, 2017. Ex. 4 at p. 1.

On April 13, 2017, Defendants' counsel again attempted to confer with Plaintiff's counsel regarding Defendants' Demurrer and Motion to Strike. Crespo Decl. ¶ 8. Plaintiff's counsel finally provided a written response to Defendants' detailed conferral letters on April 22, 2017, but the response consisted of a brief email that cited no case law in support of Plaintiff's positions on the Demurrer and Motion to Strike. Ex. 5 at pp. 6-7.

The parties conferred telephonically on Defendants' Demurrer and Motion to Strike on April 26, 2017, the day before they were due. Crespo Decl. ¶ 9. During that call, Plaintiff's counsel stated that Plaintiff may decide to file a class action complaint – in lieu of the individual claims asserted in the First Amended Complaint – if the Court grants Defendants' Motion to Strike Plaintiff's "pattern and practice" allegations from the First Amended Complaint. *Id.* Plaintiff's counsel further relayed that he *might* not be available to attend the noticed hearing on May 31, 2017, but stated that he was unable to provide a different suggested date to reschedule

- 4 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

the hearing.  *Id.*  Defendants' counsel relayed Defendants' understanding that May 31, 2017, was the last date that Defendants could notice the hearing on their Demurrer, given the 35-day deadline by which a Demurrer must be heard after being filed.  *Id.*  The parties agreed that Defendants would proceed with filing their Demurrer and Motion to Strike with the previously noticed hearing date of May 31, 2017, and that Plaintiff's counsel would confirm whether he could attend the May 31, 2017, hearing and, if not, would provide firm alternate dates of availability.  *Id.*

Defendants filed their Demurrer and Motion to Strike on April 27, 2017.  On May 1, 2017, Plaintiff's counsel advised Defendants' counsel that he was "going to need to move the [May 31, 2017] hearing date" due to an "opening brief" deadline on that date set by the Ninth Circuit.  Ex. 5 at p. 4.  Plaintiff's counsel identified only two other dates when he had purported conflicts between April 27, 2017 and May 31, 2017 – i.e., a Ninth Circuit oral argument on May 17, 2017, and another brief due on May 26, 2017.  Nevertheless, Plaintiff's counsel requested that Defendants agree to continue the May 31, 2017 hearing a full *28 days*, until June 28, 2017.  *Id.*

In response, Defendants' counsel pointed out that Plaintiff's counsel did not actually appear to have a conflict on May 31, 2017 that prevented him from physically attending the hearing.  *Id.*  Defendants' counsel reiterated that Defendants were anxious to move forward with finalizing the pleadings so that they could move forward with discovery and preparing their defenses of the case.  *Id.*  Nevertheless, as a courtesy, Defendants' counsel offered to reschedule and postpone the hearing by up to 2 weeks, provided that the parties retain the same briefing schedule.  *Id.*  Plaintiff's counsel rejected that proposal and advised Defendants' counsel for the first time that he needed the 28-day extension "in order to respond to the pending motions."  *Id.*

On May 4, 2017, Defendants' counsel attempted to confer with Plaintiff's counsel about the instant Motion.  Crespo Decl. ¶ 10.  Defendants' counsel advised Plaintiff's counsel of her unavailability due to a prescheduled vacation from May 9, 2017, through May 17, 2017, and requested that Plaintiff's counsel provide the grounds supporting the Motion at his earliest convenience to enable conferral and appropriate planning before that vacation.  Ex. 5 at pp. 1-3.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    In response, Plaintiff's counsel provided no new information beyond what he relayed on

2    May 1, 2017 – i.e., the three days during which he had other deadlines or hearings set between

3    April 27, 2017, and May 31, 2017. *Id.* Instead, Plaintiff's counsel accused Defendants' counsel

4    of "bad faith" and "defy[ing] [her] professional responsibility [by] oppos[ing] [his] request for

5    time needed to respond to [Defendants'] motion." *Id.* The instant Motion followed.

6    **III.    NO GOOD CAUSE EXISTS TO CONTINUE THE HEARING ON DEFENDANTS'**
       **DEMURRER AND MOTION TO STRIKE**

7

8          If both a demurrer and motion to strike are to be filed, they must be filed together and

9    noticed for hearing at the same time. Cal. Rule Ct. 3.1322 ("A notice of motion to strike must be

10   given within the time allowed to plead, and if a demurrer is interposed, concurrently therewith,

11   and must be noticed for hearing and heard at the same time as the demurrer."). A demurrer "must

12   be set for hearing not more than 35 days following the filing of the demurrer or on the first date

13   available to the court thereafter." Cal. Rule Ct. 3.1320(d). "All papers opposing a [demurrer or

14   motion to strike] must be filed with the court and served on each party at least nine court days . . .

15   before the hearing." Civ. Proc. Code § 1005(b). A party seeking additional time beyond that

16   allotted by the California Code of Civil Procedure (including California Code of Civil Procedure

17   section 1005(b)), must show "good cause" for the requested extension. Civ. Proc. Code

18   § 1054(a). "An application for an order extending time must disclose in writing the nature of the

19   case and what extensions, if any, have previously been granted by order of court or stipulation of

20   counsel." Cal. Rule Ct. 2.20(b). Here, Plaintiff does not and cannot show good cause to further

21   delay a resolution on Defendants' Demurrer and Motion To Strike. Her Motion should be denied.

22         **A.    That Plaintiff's Counsel Has Three Briefs Or Hearings In Other Cases Does**
              **Not Provide Good Cause To Continue The May 31, 2017 Hearing on**
              **Defendants' Demurrer and Motion to Strike.**
23

24         Plaintiff bases her Motion on two principal factors: that Plaintiff's counsel has a brief due

25   in another matter on May 31, 2017; and that Plaintiff's counsel has other briefing deadlines or

26   hearing dates in other matters on May 17, 2017 and May 26, 2017. None of these purported

27   conflicts constitutes good cause either to continue the May 31, 2017 hearing or to further delay a

28

- 6 -

1    ruling on Defendants' Demurrer and Motion to Strike.

2         First, the fact that Plaintiff's counsel has a brief due in another matter on the same day as

3    the May 31, 2017 hearing, does not preclude him from attending the May 31, 2017 hearing.  The

4    caption to the instant Motion reflects that Plaintiff's counsel maintains his office in Oakland, the

5    same city where this Court is located.  Plaintiff does not explain in her Motion why it would not

6    be possible for Plaintiff's counsel to attend the hearing in this case the morning of May 31, 2017,

7    for example, and then file his briefing in the other matter that afternoon.

8         Similarly, the fact that Plaintiff's counsel has other hearings on May 17, 2017, and

9    May 26, 2017, respectively, does not preclude Plaintiff from timely responding to Defendants'

10   Demurrer and Motion to Strike.  Based on the currently set hearing date of May 31, 2017,

11   Plaintiff's Oppositions to the Demurrer and Motion to Strike are due on May 17, 2017.  It is

12   unclear how a May 26, 2017 hearing would impact Plaintiff's submission of responses on

13   May 17, 2017, at all.  In any case, Plaintiff received notice of the issues raised in Defendants'

14   Demurrer and Motion to Strike at least *49 days* before the May 17, 2017 deadline, via the detailed

15   meet and confer letters that Defendants' counsel sent on March 24 and March 29, 2017.  Even if

16   Plaintiff's counsel is not available to work on the Oppositions *on* May 17, 2017 (the only other

17   alleged conflict identified between April 27, 2017 and May 17, 2017), Plaintiff provides no

18   explanation why her counsel could not prepare responsive arguments and briefing at some other

19   point in the previous *48 days*.

20        In sum, while Defendants recognize that the press of business may constitute good cause

21   for additional time, that is not the case here.  Rather, the record clearly shows that Plaintiff has

22   had an adequate opportunity to respond to Defendants' Demurrer and Motion to Strike.  That

23   Plaintiff's counsel has a handful of other commitments in other cases does not justify a

24   continuance.

25        **B.    A Continuance Will Prejudice Defendants.**

26        Plaintiff's employment ended nearly three years ago, and this case has been pending for

27   several months.  Plaintiff's counsel has made clear that a ruling on Defendants' Motion to Strike

28

- 7 -

1    may result in further attempts by Plaintiff to amend the operative complaint to potentially add

2    representative class claims.  Defendants cannot fairly depose Plaintiff, conduct other discovery,

3    prepare their defenses, or identify and collect evidence needed to support them until they know

4    the scope of the operative complaint.  Defendants have a legitimate interest in avoiding further

5    delays that could diminish witness memories and the availability of other evidence that may be

6    needed to defend against this case once the scope of Plaintiff's claims are known.  Defendants

7    also have an interest in moving the case forward expeditiously to minimize Plaintiff's alleged

8    damages, including any backpay claim flowing from Plaintiff's alleged wrongful termination in

9    July 2014.

10        **C.**     **<u>Professional Responsibility Standards Do Not Provide Good Cause For A</u>**

11               **<u>Continuance.</u>**

12       Defendants and their counsel respect, appreciate and abide by professional responsibility

13    standards, including the Court's civility rules.  Defendants have done their utmost to

14    accommodate the schedule of Plaintiff's counsel since the undersigned firm substituted into this

15    case three months ago, including agreeing to extend the deadline on Defendants' motion to

16    compel further discovery responses from Plaintiff so that Plaintiff's counsel could focus on

17    resolving disputes concerning the pleadings.  Crespo Decl. ¶ 5.  On April 3, 2017, Defendants

18    also agreed not to oppose Plaintiff's request to extend the deadline for Defendants' response to

19    the First Amended Complaint due to purported unavailability of Plaintiff's counsel to confer on

20    Defendants' Demurrer and Motion to Strike and to allow further time for Plaintiff's counsel to

21    consider and respond to Defendants' arguments.  *Id.* ¶ 7.

22       Defendants are not arbitrarily or unreasonably withholding consent to Plaintiff's request

23    for a continuance.  A continuance of the hearing on the Demurrer and Motion to Strike will

24    prejudice Defendants' ability to proceed with discovery, investigation and preparation of their

25    defenses and will cause further delay after a prior continuance.

26    //

27    //

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE**

IV.  **IN THE ALTERNATIVE, IF EVEN IF THE COURT WERE TO CONTINUE TO HEARING DATE, THE ORIGINAL BRIEFING SCHEDULE SHOULD BE PRESERVED**

Should the Court decide to grant Plaintiff's request to continue the May 31, 2017, hearing date, Defendants submit that the current briefing schedule — with Plaintiff's Oppositions due on May 17, 2017 – remain in place.  Just as there is no good cause for an extension of time for the hearing, there is no good cause to extend the briefing schedule.

V.  **CONCLUSION**

For the foregoing reasons, Defendants respectfully requests that the Court deny Plaintiff's Motion and *Ex Parte* Application to Continue the Hearing on Defendants' Demurrer and Motion to Strike.  In the alternative, should the Court grant the request to continue the May 31, 2017 hearing, Defendants request that the current briefing schedule be preserved.

DATED:  May 15, 2017                          GRUBE BROWN & GEIDT LLP

BY: _____
                                        AMANDA BOLLIGER CRESPO

Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; and THE PERMANENTE MEDICAL GROUP

- 9 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA  94111
   Telephone:  (415) 603-5000
5  Facsimile:  (415) 840-7210

6  Attorneys for Defendants,
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP
8

ENDORSED
FILED
ALAMEDA COUNTY

MAY 15 2017

CLERK OF THE SUPERIOR COURT

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,

13          Plaintiff,

14      vs.

15  KAISER FOUNDATION HEALTH PLAN,
    INC; KAISER FOUNDATION
16  HOSPITALS, INC; and THE
    PERMANENTE MEDICAL GROUP; all
17  doing business as KAISER PERMANENTE
    MEDICAL CARE PROGRAM,
18
            Defendants.
19

20

21

22

23

24

25

26

27

28

Case No. RG16826717

ASSIGNED FOR ALL PURPOSES TO
JUDGE IOANA PETROU
DEPARTMENT 15

**DECLARATION OF AMANDA
BOLLIGER CRESPO IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION AND *EX
PARTE* APPLICATION TO
CONTINUE HEARING DATE ON
DEFENDANTS' DEMURRER AND
MOTION TO STRIKE**

Date:       May 16, 2017
Time:       10:00 a.m.
Judge:      Hon. Ioana Petrou
Dept:       15

Complaint Filed:      August 9, 2016

CRESPO DECLARATION ISO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE*
APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    I, Amanda Bolliger Crespo, hereby declare as follows:

2        1.    I am an associate with the law firm of Grube Brown & Geidt LLP, counsel of

3    record for Defendants Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; and The

4    Permanente Medical Group ("Defendants") in the above-captioned action.  I have personal

5    knowledge of the facts set forth in this Declaration or know of them by review of documents

6    maintained by office in the ordinary course of business, and, if called upon to do so, I could and

7    would testify competently thereto.

8        2.    I make this declaration in support of Defendants' Opposition to Plaintiff's Motion

9    And *Ex Parte* Application To Continue Hearing Date On Defendants' Demurrer And Motion To

10   Strike, filed in the lawsuit initiated by Plaintiff Lunell Gamble ("Plaintiff").

11       3.    On February 9, 2017, I caused to be filed Substitutions of Attorney and appeared

12   in the above-captioned action as the legal representative for Defendants Kaiser Foundation Health

13   Plan, Kaiser Foundation Hospitals, and The Permanente Medical Group ("Defendants").  At that

14   time, this case had been pending since August 9, 2016, and the Court had already sustained

15   Defendants' first demurrer to the Complaint on February 7, 2017.  A true and correct copy of the

16   Court's Order – Demurrer to Complaint Sustained is attached to this declaration as Exhibit 1.

17       4.    Plaintiff filed her First Amended Complaint on March 10, 2017, making

18   Defendants' response thereto due on April 10, 2017.

19       5.    In the roughly three months since my firm substituted into this case as counsel for

20   Defendants, Plaintiff has asked Defendants to agree to three different extensions.  Defendants

21   have agreed to two of those requested extensions.  First, Defendants agreed to Plaintiff's request

22   to extend discovery motion deadlines so that Plaintiff could prioritize conferral on the First

23   Amended Complaint instead of supplementing her discovery responses.  In particular, on March

24   9, 2017, I sent Plaintiff's counsel a five-page meet and confer letter after I discovered that

25   Plaintiff had failed to produce a single document in response to Defendant Kaiser Foundation

26   Health Plan, Inc.'s Request for Production (Set One) (the "Requests"), among other deficiencies

27   in Plaintiff's discovery responses.  I asked that Plaintiff produce all responsive documents and

28

- 1 -

CRESPO DECLARATION ISO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE*
APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    correct the other deficiencies by March 16, 2017.  On March 13, 2017, I received an email from

2    Plaintiff's counsel stating that he was working on an appellate brief so had been unable to

3    substantively review the letter, and asked Defendants to agree to postpone Plaintiff's deadline to

4    supplement her discovery responses and Defendants' related motion to compel so the parties

5    could instead focus on conferral and resolution of any disputes concerning Plaintiff's First

6    Amended Complaint.  Defendants agreed to Plaintiff's proposal, and the parties agreed to extend

7    the motion to compel deadline from March 21, 2017 through June 1, 2017.  A true and correct

8    copy of that email exchange is attached to this Declaration as Exhibit 2.

9         6.    Second, Defendants agreed to extend their own deadline to respond to Plaintiff's

10   First Amended Complaint based on unavailability of Plaintiff's counsel to confer on the issues

11   raised in Defendants' Demurrer to Plaintiff's First Amended Complaint ("Demurrer") and Motion

12   to Strike Allegations in Plaintiff's First Amended Complaint ("Motion to Strike").  Specifically,

13   on March 24, 2017, I sent Plaintiff's counsel a detailed six-page letter with attachments regarding

14   the arguments, case law, and judicially noticeable facts supporting Defendants' Demurrer.  I

15   requested that Plaintiff's counsel provide Plaintiff's positions on the issues raised in my letter by

16   March 31, 2017, so that Defendants could timely respond to the First Amended Complaint.  On

17   March 24, 2017, I received an email from Plaintiff's counsel stating that he would "be unable to

18   address [the] substance" of that conferral letter until the beginning of April, stating that he was

19   "working on an appellate brief due March 31."  A true and correct copy of an email string

20   between Plaintiff's counsel and me on this subject is attached to this Declaration as Exhibit 3, and

21   the above referenced discussion is at pp. 2-3.

22        7.    On March 29, 2017, I sent Plaintiff's counsel a detailed letter regarding the

23   arguments and case law supporting Defendants' Motion to Strike.  In my letter, I acknowledged

24   the scheduling limitations previously cited by Plaintiff's counsel and requested that Plaintiff

25   provide her position on the issues raised in both of my conferral letters by April 3, 2017.  On

26   April 3, 2017, I received an email from Plaintiff's counsel reporting that he "still ha[d] not had a

27   chance to review [the conferral] correspondence" due to another appellate brief deadline.  *See*

28

CRESPO DECLARATION ISO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE*
APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE

Exhibit 3 at 3.  Plaintiff's counsel further requested that Defendants agree to extend their own deadline to respond to the First Amended Complaint to permit Plaintiff's counsel additional time to review and confer on Defendants' anticipated Demurrer and Motion to Strike.  In response, I advised Plaintiff's counsel that Defendants were anxious to finalize the pleadings so that the parties could move forward with discovery.  *See* Exhibit 3 at pp. 1-3.  However, as a courtesy to accommodate Plaintiff's counsel, Defendants advised Plaintiff that they would not oppose a request from Plaintiff to extend the response deadline from April 10 to April 27, 2017.  I also spoke with Plaintiff's counsel regarding Plaintiff's extension request via telephone.  Plaintiff's counsel never mentioned the conflicts cited in the instant Motion or indicated that he would have difficulty complying with the new hearing and related briefing deadlines flowing from the new April 27, 2017 response deadline.  I received an email from the Court granting Plaintiff's unopposed extension request on April 8, 2017.  A true and correct copy of that email is attached to this Declaration as Exhibit 4, and the above referenced discussion is at p. 1.

8.      On April 13, 2017, I again attempted to confer with Plaintiff's counsel regarding Defendants' Demurrer and Motion to Strike.  Plaintiff's counsel finally provided a written response to my detailed conferral letters on April 22, 2017, but the response consisted of a brief email that cited no case law in support of Plaintiff's positions on the Demurrer and Motion to Strike.  A true and correct copy of an email string between Plaintiff's counsel and me on this subject is attached to this Declaration as Exhibit 5, and the above referenced discussion is at pp. 6-7.

9.      I conferred telephonically with Plaintiff's counsel regarding Defendants' Demurrer and Motion to Strike on April 26, 2017, the day before they were due.  During that call, Plaintiff's counsel stated that Plaintiff may decide to file a class action complaint – in lieu of the individual claims asserted in the First Amended Complaint – if the Court grants Defendants' Motion to Strike Plaintiff's "pattern and practice" allegations from the First Amended Complaint.  Plaintiff's counsel further relayed that he *might* not be available to attend the noticed hearing on May 31, 2017, but stated that he was unable to provide a different suggested date to reschedule

- 3 -

1    the hearing. I relayed my understanding that May 31, 2017, was the last date that Defendants

2    could notice the hearing on their Demurrer, given the 35-day deadline by which a Demurrer must

3    be heard after being filed. Plaintiff's counsel and I agreed that Defendants would proceed with

4    filing their Demurrer and Motion to Strike with the previously noticed hearing date of May 31,

5    2017, and that Plaintiff's counsel would confirm whether he could attend the May 31, 2017,

6    hearing and, if not, would provide firm alternate dates of availability.

7        10.    Defendants filed their Demurrer and Motion to Strike on April 27, 2017. On

8    May 1, 2017, Plaintiff's counsel advised me that he was "going to need to move the [May 31,

9    2017] hearing date" due to an "opening brief" deadline on that date set by the Ninth Circuit. *See*

10   Exhibit 5 at p. 4. I attempted to confer with Plaintiff's counsel regarding that request via email

11   between May 1 and May 4, 2017. *See* Exhibit 5 at pp. 1-3. Plaintiff's counsel provided no

12   information supporting Plaintiff's request to continue the hearing on Defendants' Demurrer and

13   Motion to Strike beyond what appears in Exhibit 5.

14       I declare under penalty of perjury of the laws of the State of California that the foregoing

15   is true and correct.

16       Executed this 10th day of May, 2017, at New York, New York.

17

18                                        _____

19                                        AMANDA BOLLIGER CRESPO

20

21

22

23

24

25

26

27

28

CRESPO DECLARATION ISO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND *EX PARTE*
APPLICATION TO CONTINUE HEARING DATE ON DEMURRER AND MOTION TO STRIKE

Exhibit 1

Attorney at Law                                          Kaiser Foundation Health Plan, Inc
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

# Superior Court of California, County of Alameda
# Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>          Plaintiff/Petitioner(s)<br><br>   VS.<br><br>Kaiser Foundation Health Plan, Inc<br>          Defendant/Respondent(s)<br>   (Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Demurrer to Complaint<br>Sustained |

The Demurrer to Complaint was set for hearing on 02/07/2017 at 09:00 AM in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  Defendants' Demurrer to Plaintiff's Complaint is SUSTAINED, WITH LEAVE TO AMEND.

In amending, Plaintiff shall allege separate causes of action for discrimination on the basis of age, race, and gender (if she is indeed alleging all three theories of liability), and a separate cause of action for retaliation (if she is also alleging retaliation as a basis for Defendants' liability.)  If Plaintiff alleges a cause of action for retaliation, she shall clearly identify the protected activity in which she engaged that forms the basis for that cause of action.  Discrimination based on age, race, and gender are properly alleged as separate causes of action (see, e.g. Skrbina v. Fleming Companies (1996) 45 Cal.App.4th 1353, 1364-1365), and combining these disparate theories of liability into a single unspecified cause of action renders the Complaint uncertain.  (See The Rutter Group's California Practice Guide:  Civil Procedure Before Trial, section 6:104.)

In amending, Plaintiff shall also clearly indicate against which Defendant(s) each cause of action is directed, as required by California Rules of Court, Rule 2.112(4).  If Plaintiff contends that all three named Defendants are liable for each cause of action, she shall so indicate that in her First Amended Complaint.

Finally, Plaintiff shall attach any administrative complaints she filed with the EEOC or DFEH about the incidents that are the subject of this action as an attachment to her First Amended Complaint.  The Court will reserve ruling on whether Plaintiff has exhausted her administrative remedies as to any causes of action pled in this case until after Plaintiff clarifies what causes of action are being pled in her First Amended Complaint.

Defendants' Request for Judicial Notice is GRANTED.  However, the can only take judicial notice of what documents were provided to the Defendants by the EEOC.  That is not necessarily determinative of, or identical to, the issue of what administrative complaints Plaintiff filed with the DFEH and/or EEOC.

The Court will prepare the Order.  Defendants shall serve Notice of Entry of Order on Plaintiff. Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

Dated:  02/07/2017

_fac:simile_

_____

Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 02/07/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 02/08/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

Exhibit 2

| | |
|---|---|
| **From:** | Jeremy L. Friedman <jlfried@comcast.net> |
| **Sent:** | Monday, March 13, 2017 5:25 PM |
| **To:** | Amanda Crespo |
| **Cc:** | Heather Morgan; Preston Thomas; 'Jeremy L. Friedman' |
| **Subject:** | RE: Gamble v. Kaiser, et al - Agreements re Electronic Service & Extension of Motion to Compel Deadline |

Confirmed.  Thank you.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Monday, March 13, 2017 1:33 PM
**To:** jlfried@comcast.net
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; Preston Thomas <prestonthomas@gbgllp.com>
**Subject:** Gamble v. Kaiser, et al - Agreements re Electronic Service & Extension of Motion to Compel Deadline

Thanks, Jeremy.

We agree to your electronic service proposal.  Please be sure to copy both Heather Morgan and me on all such communications.

My assistant Preston will send a PDF readable version of last week's letter, and we would be happy to provide our correspondence to your office in that format going forward if you could please do the same for our office.

Lastly, thank you for getting back to me about my discovery conferral letter from last week.  We agree to your proposal to address the issues in that letter closer to the May 26, 2017 Case Management Conference.   To that end, please confirm Plaintiff's agreement to extend the deadline for Defendant Kaiser Foundation Health Plan, Inc. ("Kaiser") to move to compel further responses to Kaiser's Request for Production, Set One ("RFPs"); Kaiser's Form Interrogatories – Employment Law ("Form Rogs") and Kaiser's Special Interrogatories, Set One ("Special Rogs") (collectively, the "Discovery Requests") from the current deadline of March 21, 2017, through and including **June 1, 2017**.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto: jlfried@comcast.net ]
**Sent:** Monday, March 13, 2017 11:13 AM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>; Preston Thomas <prestonthomas@gbgllp.com>
**Cc:** 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>; Heather Morgan <heathermorgan@gbgllp.com>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Request for Courtesy Copy of First Amended Complaint

Hi Preston and Amanda

Here is a PDF file copy of the First Amended Complaint, per your request.  I too appreciate the offer of exchanging electronic copies, and would agree to accept electronic service of documents in this case, with the stipulation of the

same impact on time calculations as if they were put in the mail.  I also note that the letter you sent me last week was not a PDF readable copy, and would prefer in the future that the documents be provided in readable format.

With respect to the letter on discovery, I mentioned to Preston that I have not had a chance to review it substantively, yet.  I would agree to more time to address any discovery disputes.  I have a motion due in another matter later this week, and will be working on an appellate brief due in the Eleventh Circuit at the end of the month.  It might make sense for us to take a look at the pleading and CMC issues and work out a time to address discovery disputes closer to the new CMC date.

Thanks.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Monday, March 13, 2017 10:50 AM
**To:** Preston Thomas <prestonthomas@gbgllp.com>; jlfried@comcast.net
**Cc:** Kaiser Permanente _ Gamble_ Lunell E_Mails <{F5300}.GBGLLP@bb6f1.imanage.work>; Heather Morgan <heathermorgan@gbgllp.com>
**Subject:** RE: Request for Courtesy Copy of First Amended Complaint

Mr. Friedman,

We appreciate your courtesy in this regard and, of course, would be happy to reciprocate that courtesy going forward.

Regards,

Amanda

---

**From:** Preston Thomas
**Sent:** Monday, March 13, 2017 9:42 AM
**To:** jlfried@comcast.net
**Cc:** Amanda Crespo <amandacrespo@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** Request for Courtesy Copy of First Amended Complaint

Mr. Friedman,

Hi. This is Preston Thomas from Grube Brown & Geidt. I am writing to confirm our request for a courtesy e-copy of the First Amended Complaint in the Gamble v. Kaiser matter. Thank you for your time!

Best,
Preston

_____



**Preston Thomas**, Administrative Assistant
prestonthomas@gbgllp.com · www.gbgllp.com
tel 213.358.2819 · fax 213.995.6382
633 West 5th St., Suite 3330 · Los Angeles, California 90071

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

Exhibit 3

**From:**        Jeremy L. Friedman <jlfried@comcast.net>
**Sent:**        Friday, April 07, 2017 11:57 AM
**To:**          Amanda Crespo
**Cc:**          Heather Morgan; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'; 'Jeremy L. Friedman'
**Subject:**     RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. [IWOV-GBGLLP.FID5300]

Thank you Amanda.

After communicating with Dept. 18 (not our department 15) in the other Kaiser case, with a similar request, we were informed that a stipulation is required.  That is probably true in this case, since the court's order set the date for Kaiser's response. We received an email back from Dept. 18, saying we could send an email with the stip, and even enter nunc pro tunc. Kaiser's counsel was willing to draft that stipulation, even though it was an extension of time for the filing of the amended complaint.

I am pretty sure we will need to do the same in our case, but sending an email with the request may get a similar response.  Given that this is an extension of time for you to file the motion, it seems very petty to me to insist that I do the drafting and requesting. But we do not have much time to argue over such things.

How about this for an email:

Dear Dept. 15

Following the demurrer on plaintiff's complaint in the above-referenced case, the parties agreed to permit plaintiff 30 days to file an amended complaint, and defendants 30 days to respond.  Defendant's response is due April 10, 2017. Plaintiff's counsel has been unavailable to meet and confer with defendants regarding the amended complaint, and plaintiff now requests – with defendants' agreement – that defendants be provided an additional 17 days – until April 27, 2017 – in which to respond to the amended complaint.

Because both parties agree that the date for responding to the amended complaint should be extended, we were hoping that this extension could be entered as a result of this email communication.  If a formal stipulation is required, would it be possible to forward a stipulation to the department by way of email?

Thank you for your consideration of this matter.  Please contact me directly if I can provide any additional information.

Please let me know what you think.  I will copy you on the email, and we can talk about drafting when we get a respond. I will not send unless you authorize.

Thanks.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Thursday, April 06, 2017 3:41 PM

**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. [IWOV-GBGLLP.FID5300]

Good afternoon Jeremy,

Following on our conversation yesterday, we understand that Plaintiff wishes to advise the court via email of her request for an extension of the deadline for Defendants to respond to Plaintiff's First Amended Complaint due to unavailability of your office to confer regarding the issues that we identified in my meet and confer letters dated March 24 and March 29, 2017.

Subject to our review of the proposed email that you intend to send the court so that we can confirm our agreement with its contents, Defendants will not oppose a request to extend the response deadline by 17 days (i.e., up to and including April 27, 2017).

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Monday, April 3, 2017 11:08 AM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. [IWOV-GBGLLP.FID5300]

Thank you for your email, Amanda.  I still have not had a chance to review your correspondence, as my appellate brief deadline was moved from last Friday to this Friday, April 7. I am not sure whether a meet and confer will resolve the matters you raise, but I am sure I do not have time to confer with you before April 10.

Given these circumstances, we would be willing to stipulate to an extension of time for Kaiser's response, and we might be able to get that date moved through an email to the department clerk.

Thanks again.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Monday, April 03, 2017 10:10 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. [IWOV-GBGLLP.FID5300]

Mr. Friedman,

I write to follow up on my efforts to confer with you concerning the issues raised in my letters dated (1) March 24, 2017, regarding Defendants Kaiser Foundation Hospital's and The Permanente Medical Group's intention to file a demurrer as

to the FEHA claims stated in Plaintiff's First Amended Complaint ("FAC"); and (2) March 29, 2017, regarding Defendants' intention to move to strike certain "pattern and "practice" allegations in the FAC.

We understand from your email below that you would not be available to confer about these issues until "the beginning of April." So that we have time to confer with our client and file Defendants' response to the FAC (due April 10, 2017), we ask that you please provide Plaintiff's positions on the issues raised in these letters such that they are received by this office by the close of business today. If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

Amanda

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Friday, March 24, 2017 3:39 PM
**To:** Janet Gogna <janetgogna@gbgllp.com>
**Cc:** Amanda Crespo <amandacrespo@gbgllp.com>; Heather Morgan <heathermorgan@gbgllp.com>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al.

Hello Counsel

I am in receipt of the email and attached letter, but will be unable to address its substance until after I have completed work on an appellate brief due March 31. I will send you an email in the beginning of April in response.

Thanks.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

**From:** Janet Gogna [mailto:janetgogna@gbgllp.com]
**Sent:** Friday, March 24, 2017 3:36 PM
**To:** jlfried@comcast.net
**Cc:** Amanda Crespo <amandacrespo@gbgllp.com>; Heather Morgan <heathermorgan@gbgllp.com>
**Subject:** Gamble v. Kaiser Foundation Health Plan, Inc., et al.

Mr. Friedman:

Please see attached correspondence.

Janet Gogna

_____



**Janet Gogna**, Legal Secretary · janetgogna@gbgllp.com
www.gbgllp.com · tel 415.603.5013 · fax 415.840.7210
601 Montgomery St., Suite 1150 · San Francisco, California 94111

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

Exhibit 4

| | |
|---|---|
| **From:** | Dept. 15, Superior Court <dept15@alameda.courts.ca.gov> |
| **Sent:** | Saturday, April 08, 2017 3:19 PM |
| **To:** | 'Jeremy L. Friedman'; Dept. 15, Superior Court; 'Amanda Crespo' |
| **Cc:** | 'Heather Morgan'; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' |
| **Subject:** | RE: Gamble v. Kaiser Foundation Health Plan, Inc., Case No. RG16826717 / Request to Continue Case Management Conference [IWOV-GBGLLP.FID5300] |

The below order has issued:

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

OTHER ORDERS

Defendants may have until April 27, 2017 to respond to the amended complaint.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 06/20/2017 at 09:15 AM in Dept. 15.

Updated Case Management Statements in compliance with Rule of Court 3.725, on Judicial Council Form CM-110, must be filed no later than 06/05/2017. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

NOTICES

Clerk is directed to serve endorsed-filed copies of this order, with proof of service, to counsel and to self-represented parties of record by mail.

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Friday, April 07, 2017 2:26 PM
**To:** Dept. 15, Superior Court; 'Amanda Crespo'
**Cc:** 'Heather Morgan'; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'; 'Jeremy L. Friedman'
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., Case No. RG16826717 / Request to Continue Case Management Conference [IWOV-GBGLLP.FID5300]

Dear Dept. 15

Following the demurrer on plaintiff's complaint in the above-referenced case, the parties agreed to permit plaintiff 30 days to file an amended complaint, and defendants 30 days to respond. Defendant's response is due April 10, 2017. Plaintiff's counsel has been unavailable to meet and confer with defendants regarding the amended complaint, and plaintiff now requests – with defendants' agreement – that defendants be provided an additional 17 days – until April 27, 2017 – in which to respond to the amended complaint.

Because both parties agree that the date for responding to the amended complaint should be extended, we were hoping that this extension could be entered as a result of this email communication.  If a formal stipulation is required, would it be possible to forward a stipulation to the department by way of email?

Thank you for your consideration of this matter.  Please contact me directly if I can provide any additional information.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** Dept. 15, Superior Court [mailto:dept15@alameda.courts.ca.gov]
**Sent:** Wednesday, March 01, 2017 2:48 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>; Dept. 15, Superior Court <dept15@alameda.courts.ca.gov>
**Cc:** jlfried@comcast.net; Heather Morgan <heathermorgan@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., Case No. RG16826717 / Request to Continue Case Management Conference [IWOV-GBGLLP.FID5300]

The CMC has been vacated and reset to May 26, 2016 at 9:30 am. We are not mailing notice. It is available on line on Domain Web.

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Wednesday, March 01, 2017 2:32 PM
**To:** Dept. 15, Superior Court
**Cc:** jlfried@comcast.net; Heather Morgan; Kaiser Permanente _ Gamble_ Lunell E_Mails
**Subject:** Gamble v. Kaiser Foundation Health Plan, Inc., Case No. RG16826717 / Request to Continue Case Management Conference [IWOV-GBGLLP.FID5300]

Good afternoon:

On behalf of all parties, I write to request a continuance of the Case Management Conference currently scheduled for March 17, 2017 at 10:00 a.m.  Case Management Conference Statements currently are due tomorrow, March 2, 2017.

The parties jointly request that the Case Management Conference be continued to a date convenient to the Court on or after May 18, 2017, for the following reasons:

- Plaintiff's amended complaint is due to be filed on March 10, 2017, and Defendants' response thereto is due April 10, 2017.
- The parties need time to confer on any remaining issues pertaining to those pleadings before the next Case Management Conference.
- Plaintiff's counsel has scheduling conflicts that preclude Plaintiff from attending a Case Management Conference during the first 2 weeks of May.  Defendants' counsel have conflicts between May 15 and May 17, 2017.

Please let us know if this written request suffices to continue the Case Management Conference or if the parties should file a Stipulation and Proposed Order requesting a continuance.

Best regards,

Amanda



 **Amanda Bolliger Crespo**, Senior Associate
amandacrespo@gbgllp.com · www.gbgllp.com
tel 213.358.2812 · fax 213.995.6382
U.S. Bank Tower, 633 West 5th Street, Suite 3330
Los Angeles, California 90071

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

Exhibit 5

| | |
|---|---|
| **From:** | Jeremy Friedman <jlfried@comcast.net> |
| **Sent:** | Friday, May 05, 2017 7:12 AM |
| **To:** | Amanda Crespo |
| **Cc:** | {F5300}.GBGLLP@bb6f1.imanage.work; jlfried@comcast.net; Heather Morgan |
| **Subject:** | Re: Gamble v. KFHP et al - Notice of Vacation and Extension Conferral [IWOV-GBGLLP.FID5300] |

Amanda.

I am out of town. I will be filing an ex parte application for the extension, as you know. You already know the bases, and it is bad faith for you to ask otherwise. I find it absurd that you would act in such bad faith, and then ask for me to accommodate your vacation, so you can defy your professional responsibility and oppose my request for time needed to respond to your motion.

Jeremy


Sent from XFINITY Connect Mobile App


-----Original Message-----

From: amandacrespo@gbgllp.com
To: jlfried@comcast.net
Cc: heathermorgan@gbgllp.com,{F5300}.GBGLLP@bb6f1.imanage.work
Sent: 2017-05-04 5:13:03 PM
Subject: Gamble v. KFHP et al - Notice of Vacation and Extension Conferral [IWOV-GBGLLP.FID5300]

Good afternoon Jeremy,

Following on my voicemail just now, please note that I will be traveling out of the country and on vacation from next Tuesday May 9th through Wednesday May 17th.  While out I will have only intermittent access to email and voicemail.

I am the primary attorney on this case and we have a small office, so I will need to prepare any opposition to a motion for extension before I leave.

So that I can plan accordingly before I leave for vacation, I would appreciate it if you would please advise at your earliest convenience (1) whether Plaintiff intends to proceed with filing a motion for extension on the demurrer and motion to strike briefing and/or hearing date; and (2) if Plaintiff does intend to file a motion for extension, the grounds supporting it.

I appreciate your anticipated courtesy in helping me plan appropriately for this vacation, as I would do for you.

Best regards,

Amanda

---

**From:** Amanda Crespo
**Sent:** Tuesday, May 2, 2017 12:23 PM
**To:** 'Jeremy L. Friedman' <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'

<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Good afternoon Jeremy,

We respectfully disagree with the positions stated in your email.  We have considered and responded in good faith to Plaintiff's requests for extension in this case and have granted Plaintiff's requests for extensions where doing so would not prejudice the interests of our clients.

This is Plaintiff's third extension request since our firm joined this case less than three months ago.  We have already agreed to two of those requested extensions:  (1) agreeing to extend Defendants' motion to compel deadline to June 1, 2017, based on your alleged unavailability to confer on issues raised in my March 9, 2017, meet and confer letter regarding deficiencies in Plaintiff's discovery responses; and (2) agreeing to extend Defendants' deadline to respond to the First Amended Complaint from April 10 to April 27, 2017, based on your alleged unavailability to confer on issues raised in my March 24, 2017 and March 29, 2017, letters regarding Defendants' demurrer and motion to strike.

In response to Plaintiff's third request for extension that is presently at issue, we advised you that we are willing to postpone the hearing on Defendants' demurrer and motion by up to two weeks based on your representation that you are not available to attend the hearing on May 31st.   If the reason for Plaintiff's request to postpone the hearing is not, in fact, any unavailability issue with regard to the hearing date, but instead so that Plaintiff can obtain additional time beyond that allowed by the relevant procedural rules to prepare her response to Defendants' demurrer and motion, we cannot agree to that request.

Plaintiff has had notice of the issues raised in Defendants' demurrer and motion since late March (via the March 24 and March 29, 2017 conferral letters noted above).  Plaintiff's employment ended nearly three years ago and this case has been pending for several months.  Defendants have a legitimate interest in moving this case forward as expeditiously as possible.  Resolution on Defendants' demurrer and motion to strike already was delayed once when we agreed to extend the deadlines on the First Amended Complaint response by over two weeks.  We cannot agree to any further delays at this time based on alleged unavailability of your office to respond to briefing or conferral efforts, as doing so would prejudice our clients.

Best regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Monday, May 1, 2017 5:49 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda.

I would hardly say we are on the same page.

And I would guess, in the end, my prediction was right, when I spoke to you last. You and all the other outside law firms Kaiser can hire can sound very professional and courteous, until you get your marching orders.  At this point, since I am not speaking to the person who is actually making these ridiculous, gamesmanship decisions, I can only speak to you.

As you know, none of your proposals are satisfactory. I will need until the extension I mentioned in order to respond to the pending motions.

If you will not grant the professional courtesy I think you are obligated to do as an officer of the court, then I guess I will have to make a motion to continue the hearing date. I hope the Court will be more courteous than Kaiser.

Jeremy

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Monday, May 01, 2017 5:15 PM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Jeremy, following on my email below, just to be sure that we are on the same page, we are willing to agree to postpone the hearing date as noted, but Defendants cannot agree to extend the *briefing* deadlines on the demurrer and motion to strike.

Thus, we would expect that Plaintiff's opposition briefing still would be due May 17th and Defendants' reply briefs still would be due May 23rd.

Regards,

Amanda

---

**From:** Amanda Crespo
**Sent:** Monday, May 1, 2017 4:46 PM
**To:** 'Jeremy L. Friedman' <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Good afternoon Mr. Friedman,

We previously discussed whether Kaiser would agree to continue the hearing if you were unavailable on May 31st. I note that your email below does not actually indicate that you are unavailable to attend the hearing on May 31st, only that you have another deadline on May 31st.

That said, as a courtesy we would be willing to agree to reschedule and continue the hearing by up to 2 weeks (i.e., on any date between June 1st and June 14th). Your email does not indicate that you are unavailable on any specific dates between June 1st and June 14th.

Thus, we hope this will suffice to accommodate your scheduling request while still permitting the parties to move forward with finalizing the pleadings within a reasonable time, which we are anxious to do so that we can move forward with discovery and preparing our defense of this case.

Regards,

Amanda

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Monday, May 1, 2017 2:25 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda

As we talked about, I am going to need to move the hearing date for Kaiser's motion, set for May 31. In fact, right after we spoke, the Ninth Circuit set May 31 as a deadline for an opening brief. In addition, I have an oral argument in the Ninth Circuit May 17, and a brief due in another matter May 26. In addition, I have hearings set on June 14 (in the Kennedy matter) and June 21 (in the District of Massachusetts), plus some brief travel days in early June. Looking at my calendar, a 28 day continuance to June 28 is the earliest day that would work for me. I do not know if it is available with the Court, but if Kaiser agrees, I will send an email to the Department, copying you, stating our agreement to move the deadline. I think they will be able to take care of it without a formal filing (at least, that is how it was handled before).

Please let me know.

Thanks.

Jeremy

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Wednesday, April 26, 2017 7:25 PM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Jeremy,

Following on our call today, we believe that California Govt. Code sections 12928 and 12960 foreclose Plaintiff's argument below that she "did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge."

As the California Supreme Court pointed out in *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798 (2001), these provisions were "enacted (see Stats. 1999, ch. 797, § 2) in response to concern that 'the employee is not always able to determine the precise name or the identity of his or her employer.'"   The Court went on to explain:

> The problem occurs, for example, where there are parent and subsidiary corporations with similar names, but the employee is unaware of any distinction between the two entities. Very often these distinct entities are housed in the same facility which further complicate[s] identification of the proper party to be named. [¶] If the employee inadvertently misidentifies the employer in the original [Department of Fair Employment and Housing (Department)] complaint, the real employer may later claim that the employee has failed to exhaust his or her administrative remedies prior to suit within the time prescribed by law and is barred from proceeding to litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 211 (1999–2000 Reg. Sess.) as amended Sept. 1, 1999, p. 4.) Accordingly, the Legislature provided for "a *827 rebuttable presumption ***109 that 'employer,' as defined by [the FEHA,] includes any person or entity identified as the employer on the employee's Federal Form W 2 (Wage and Tax Statement)" (§ 12928; see Stats.1999, ch. 797, § 1) and extended

the one-year statute of limitations an additional year in the event that presumption is rebutted "to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (§ 12960.)

*Richards*, 26 Cal. 4th at 826-27.  Here, that exception does not apply because Plaintiff's W-2s did not identify Defendants Kaiser Foundation Hospital or The Permanente Medical Group.  "Plainly, the Legislature is capable of expanding the statutory period when it perceives the need." *Id.*  The Legislature did not create an exception to exhaustion or extend the statute of limitations to address a plaintiff's alleged confusion based on the purported EEO filings of an unexhausted defendant.  Therefore, that argument is unavailing.

This email also confirms your statement today that Plaintiff does not presently have any authorities supporting her positions stated in your email below aside from those cited in the *Kennedy* briefing.  As I noted today, if Plaintiff does locate additional authorities, I hope you will provide those for our consideration so that we can complete our conferral in good faith.

Since you confirmed today that Plaintiff will not voluntarily dismiss the unexhausted defendants from this case or amend her complaint to omit the pattern or practice allegations discussed in my March 29, 2017 conferral letter, we will proceed with filing the demurrer and motion to strike tomorrow.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Wednesday, April 26, 2017 9:49 AM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. Please call me at 10, if that still works for you.

Thanks.

Jeremy

510 530 9060

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Tuesday, April 25, 2017 7:13 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails' <{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks for your email, Jeremy.

We respectfully disagree that any of the arguments raised in our conferred letters are frivolous.  On the contrary, we have provided Plaintiff with multiple cases and detailed arguments supporting Defendants' positions, both on the exhaustion issues and on Plaintiff's pattern and practice theory of liability.

Does Plaintiff have any authority to support the positions set forth in your email below?  If so, I hope you will give us the opportunity to review it so that we can confer in good faith on these issues.

Similarly, if Plaintiff believes we misunderstood the court's decision in the Kennedy case, please direct us to the portion of that ruling (or the hearing transcript) that supports Plaintiff's interpretations.

To complete the conferral process, I suggest that we schedule a call for 10am tomorrow.  Please let me know if that works for you, or if another time would be better.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Saturday, April 22, 2017 2:12 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Dear Amanda

I apologize for not getting back to you a couple days ago.

After reviewing your letters concerning the amended complaint, I have the following response on behalf of Ms. Gamble:

1) Kaiser's attempt to raise these issues in response to plaintiff's amended complaint is improper. Unlike the situation in *Kennedy*, Kaiser failed to raise these arguments in the demurrer to Ms. Gamble's complaint. Kaiser cannot now rely upon another court's ruling in a different case to demand relief that was never requested.

2) In our case, the trial judge made specific rulings on what was required to correct the pleadings. None of the issues you raise are appropriate at the pleading stage.

3) Ms. Gamble did not need to know or name all of the corporate forms of the single Kaiser employer at the time she filed her administrative charge. Kaiser is a single entity with respect to its EEO reporting, and DFEH would know this. Please show me one case where the employee correctly named an employer, but not a related corporate form, and was held to have failed to exhaust.

4) You completely misunderstand the ruling in *Kennedy* and the nature of Ms. Gamble's complaint, in arguing for dismissal of two Kaiser entities. Those rules apply to vicarious liability, not to various corporate forms which are part of a single employer with single EEO reporting and compliance responsibilities.

5) Kaiser's pattern and practice of discriminating against African American employees is clearly relevant, and it is frivolous for Kaiser to contend otherwise. It would be even more frivolous to contend this was the basis for the ruling in *Kennedy*.

6) Pattern and practice is a method of proving intentional discrimination. Kaiser's claim that Ms. Gamble needs to convert her case to a class action in order to rely upon that method of proof is without merit. It also makes no sense, economically or with respect to judicial resources.  If Kaiser in this case is going to make that claim, it should do so directly. Arguing over the "relevancy" of these allegations as a back door way of attacking plaintiff's legal theories is improper.

7) Ms. Gamble did not need to exhaust "pattern and practice" allegations in the administrative process. Please show me one case where the employee was required to plead, in her administrative charge, the method by which she was going to prove her race discrimination for termination.

I hope this at least explains our position. I will be available to confer by telephone after Tuesday.

Jeremy

*Jeremy L. Friedman*
*Attorney at Law*
*2801 Sylhowe Road*
*Oakland, CA 94602*
*510 530 9060*
*jlfried@comcast.net*

---

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Friday, April 21, 2017 8:14 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thank you, Jeremy.  I have fairly good availability today if you would like to schedule a conferral call.

Regards,

Amanda

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 20, 2017 7:41 PM
**To:** Amanda Crespo <amandacrespo@gbgllp.com>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Hi Amanda. I have not had a chance to look at the correspondence in any detail, yet, but will try to do so and get back to you tomorrow.

Thanks.

Jeremy

---

**From:** Jeremy L. Friedman [mailto:jlfried@comcast.net]
**Sent:** Thursday, April 13, 2017 11:45 AM
**To:** 'Amanda Crespo' <amandacrespo@gbgllp.com>
**Cc:** 'Heather Morgan' <heathermorgan@gbgllp.com>; 'Kaiser Permanente _ Gamble_ Lunell E_Mails'
<{F5300}.GBGLLP@bb6f1.imanage.work>; 'Jeremy L. Friedman' <jlfried@comcast.net>
**Subject:** RE: Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Thanks, Amanda. It is on my calendar, and I should be able to look the letters over by then, and give you some response.

Jeremy

**From:** Amanda Crespo [mailto:amandacrespo@gbgllp.com]
**Sent:** Thursday, April 13, 2017 10:25 AM
**To:** Jeremy L. Friedman <jlfried@comcast.net>
**Cc:** Heather Morgan <heathermorgan@gbgllp.com>; Kaiser Permanente _ Gamble_ Lunell E_Mails
<{F5300}.GBGLLP@bb6f1.imanage.work>
**Subject:** Gamble v. Kaiser Foundation Health Plan, Inc., et al. - FAC Conferral [IWOV-GBGLLP.FID5300]

Good morning Mr. Friedman,

I write to follow up on our efforts to confer on the issues raised in my letters dated (1) March 24, 2017, regarding Defendants Kaiser Foundation Hospital's and The Permanente Medical Group's intention to file a demurrer as to the FEHA claims stated in Plaintiff's First Amended Complaint ("FAC"); and (2) March 29, 2017, regarding Defendants' intention to move to strike certain "pattern and "practice" allegations in the FAC.

So that we have time to confer with our client and file Defendants' response to the FAC (no due April 27, 2017), we ask that you please provide Plaintiff's positions on the issues raised in these letters such that they are received by this office by the close of business on Thursday April 20, 2017.  If Plaintiff needs additional time to respond, please let us know as soon as possible.

Regards,

Amanda

_____



**Amanda Bolliger Crespo**, Senior Associate
amandacrespo@gbgllp.com · www.gbgllp.com
tel 213.358.2812 · fax 213.995.6382
U.S. Bank Tower, 633 West 5th Street, Suite 3330
Los Angeles, California 90071

*IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.*

*This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.*

MAY 1 5 2017

1   GRUBE BROWN & GEIDT LLP
    HEATHER A. MORGAN (SB# 177425)
2   AMANDA BOLLIGER CRESPO (SB# 250292)
    heathermorgan@gbgllp.com
3   amandacrespo@gbgllp.com
    601 Montgomery Street, Suite 1150
4   San Francisco, CA  94111
    Telephone:  (415) 603-5000
5   Facsimile:  (415) 840-7210

6   Attorneys for Defendants,
    KAISER FOUNDATION HEALTH PLAN, INC.;
7   KAISER FOUNDATION HOSPITALS; and
    THE PERMANENTE MEDICAL GROUP

8

9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13              Plaintiff,                  ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14      vs.                                 DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          [PROPOSED] ORDER DENYING
    INC; KAISER FOUNDATION                  PLAINTIFF'S MOTION AND EX
16  HOSPITALS, INC; and THE                 PARTE APPLICATION TO
    PERMANENTE MEDICAL GROUP; all           CONTINUE HEARING DATE ON
17  doing business as KAISER PERMANENTE     DEFENDANTS' DEMURRER AND
    MEDICAL CARE PROGRAM,                   MOTION TO STRIKE
18
                Defendants.                 Date:    May 16, 2017
19                                          Time:    10:00 a.m.
                                            Judge:   Hon. Ioana Petrou
20                                          Dept:    15

21                                          Complaint Filed:    August 9, 2016

22

23

24

25

26

27

28

    [PROPOSED] ORDER DENYING PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
    HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1    On May 16, 2017, before the Honorable Ioana Petrou, Plaintiff Lunell Gamble

2  ("Plaintiff") came before this Court *ex parte* to apply for an Order continuing the briefing

3  schedules and hearings on Defendants Kaiser Foundation Health Plan, Inc.; Kaiser Foundation

4  Hospitals; and The Permanente Medical Group's ("Defendants") Demurrer and Motion to Strike

5  Allegations of Plaintiff's Complaint ("Application").

6    Having reviewed the Application and considered all papers submitted in support of and in

7  opposition to, and the entire record in this action, and the matter having been duly heard, the

8  Court hereby rules that:

9    ☐    Plaintiff's Application is DENIED;

10    -or-

11    ☐    In the alternative, the hearings on the Demurrer and Motion to Strike are continued

12  to _____, 2017, at _____, with the original briefing schedule preserved.

13    IT IS SO ORDERED.

14   DATED:  May __, 2017

15

16    _____

17    Hon. Ioana Petrou
   Judge of the Superior Court

18

19

20

21

22

23

24

25

26

27

28

- 1 -

[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION AND *EX PARTE* APPLICATION TO CONTINUE
HEARING DATE ON DEMURRER AND MOTION TO STRIKE

1   GRUBE BROWN & GEIDT LLP
    HEATHER A. MORGAN (SB# 177425)
2   AMANDA BOLLIGER CRESPO (SB# 250292)
    heathermorgan@gbgllp.com
3   amandacrespo@gbgllp.com
    601 Montgomery Street, Suite 1150
4   San Francisco, CA 94111
    Telephone: (415) 603-5000
5   Facsimile: (415) 840-7210

6   Attorneys for Defendants,
    KAISER FOUNDATION HEALTH PLAN, INC.;
7   KAISER FOUNDATION HOSPITALS; and
    THE PERMANENTE MEDICAL GROUP

8

9                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13          Plaintiff,                      ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14          vs.                             DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **PROOF OF SERVICE**
    INC; KAISER FOUNDATION
16  HOSPITALS, INC; and THE                 Date:     May 16, 2017
    PERMANENTE MEDICAL GROUP; all           Time:     10:00 a.m.
17  doing business as KAISER PERMANENTE     Judge:    Hon. Ioana Petrou
    MEDICAL CARE PROGRAM,                   Dept:     15
18
            Defendants.                     Complaint Filed:   August 9, 2016
19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────────────
                        PROOF OF SERVICE

**PROOF OF SERVICE**

I am employed in the City of San Francisco and County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

On May 16, 2017, I served a copy of the within documents:

1. **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE;**

2. **DECLARATION OF AMANDA BOLLIGER CRESPO IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE;**

3. **[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE**

on the interested parties:

☐ VIA FAX: By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ VIA U.S. MAIL: I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on the above date with postage thereon fully prepaid, at San Francisco, California.

☐ VIA OVERNIGHT SERVICE: By placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☒ VIA PERSONAL SERVICE: By causing to be delivered the document(s) listed above to the person(s) at the address(es) set forth below.

☐ VIA E-MAIL: By transmitting a PDF version of the document(s) by e-mail to the person(s) set forth below using the e-mail address(es) indicated, pursuant to the parties' electronic service agreement.

Jeremy L. Friedman                          Telephone: 510-530-9060
Law Office of Jeremy L. Friedman            Facsimile: 510-530-9087
c/o Alameda Superior Court, Dept. 15        Email: jlfried@comcast.net
Oakland, CA 94610

- 1 -
PROOF OF SERVICE

1         I declare under penalty of perjury under the laws of the State of California that the above

2    is true and correct.

3         Executed on May 16, 2017, at San Francisco, California.

4

5                             KATHERINE C. HUIBONHOA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

Jeremy L. Friedman, CA Bar No. 142659
LAW OFFICE OF JEREMY L. FRIEDMAN
2801 Sylhowe Road.
Oakland, Ca. 94610
Tel: (510) 530-9060
Fax: (510) 530-9087

Attorney for plaintiff Lunell Gamble

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE | Case No. RG16826717 |
| Plaintiff | **EX PARTE APPLICATION TO CONTINUE HEARING ON SECOND DEMURRER AND MOTION TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC.; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM | Date: May 16, 2017<br>Time: 10:00 a.m.<br>Dept: 15 |
| Defendants | Reservation Number R-1853477 |

**APPLICATION**

Pursuant to Rule 3.1201 of the California Rules of Court, plaintiff Lunell Gamble files this *ex parte* application to continue the hearing on Kaiser defendants' demurrer and motion to strike portions of plaintiff's amended complaint. Hearing on defendants' motions is currently set for May 31, 2017, which would require plaintiff's opposition by May 17. Through this application, plaintiff seeks to continue the hearing on Kaiser's motions until June 29, 2017, or the first hearing date after June 29 when the matter may be heard.

**NOTICE**

Plaintiff's counsel provided notice of this application pursuant to Rule 3.1204, and served Kaiser with these moving papers by electronic communication the day before the hearing. Counsel was informed that the application will be opposed.

**MEMORANDUM**

This is an employment action against three Kaiser entities which act as a single employer for purposes of laws and regulations against unlawful discrimination in employment. Herein, Lunell Gamble alleges Kaiser defendants engage in systemic discrimination against African American employees, and a sub-class of African American women. Rather than sue upon a single, individual instance of discrimination, plaintiff will prove discrimination against African Americans at Kaiser is so pervasive, and so ingrained in the management structure, that the Court will conclude race discrimination is a mode of its business operation.

At this point, plaintiff does not assert class claims on behalf of similarly situated individuals. Kaiser does discriminate against African Americans, as a class, however, and Ms. Gamble intends to prove her individual claim of discrimination by establishing a pattern and practice of discrimination at Kaiser. *See Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S. 324. Plaintiff's lawsuit follows the filing and confidential settlement of a putative class race discrimination action against these three Kaiser entities – brought by the same undersigned attorney representing Ms. Gamble here. Brenda Hill, *et al.*, v. Kaiser Foundation Health Plan, *et al.*, Case No. 3:10-cv-02833-LB. Disputes over attorneys fees in that case is currently pending in the Ninth Circuit, Case No. 15-16952.

Represented by Seyfarth, Shaw, LLP, Kaiser filed a demurrer to plaintiff's initial complaint, raising administrative exhaustion and objections to the combining of causes of action. On February 7, 2017, the demurrer was sustained with leave to amend. In the order, the Court directed plaintiff to amend the complaint, to specify each basis for discrimination in separate causes of action, and to identify which Kaiser entities are named as defendants on which claims. On March 10, 2017, plaintiff filed her amended complaint.

After the demurrer was brought and resolved, Kaiser substituted attorneys, with lawyers from Grube Brown & Geidt LLP now appearing. Attorney Heather Morgan of Grube Brown also represented Kaiser in the *Hill* class action. After the substitution, new counsel corresponded with plaintiff regarding the amended complaint.

1    To provide more time for the parties to meet and confer, plaintiff agreed to an
2  extension of time for Kaiser to respond to the amended complaint. On April 8, 2017, the
3  Court issued a case management order, giving Kaiser until April 27.

4    On April 27, Kaiser filed a second demurrer, and a motion to strike portions of the
5  amended complaint. Therein, Kaiser raised issues and arguments it could have raised in the
6  initial demurrer, but the prior law firm had failed to make. Although proof of service shows
7  that Kaiser's attorneys posted the paper pleadings on April 27, they did not arrive at
8  counsel's office until May 10. Kaiser's demurrer included a 12-page memorandum, with 26
9  case citations; and its motion to strike included an 11-page memorandum, with 18 case
10  citations. Both motions include substantial declarations with numerous exhibits and requests
11  for judicial notice.

12    Kaiser did not consult with plaintiff prior to selecting the May 31 hearing date. In
13  fact, it was quite the opposite. Prior to the filing of the motions, plaintiff's counsel asked
14  Kaiser's attorneys if there had been a date selected for the hearing. Kaiser's attorney stated
15  that the hearing was going to be set for May 31. Both sides express surprise over the early
16  hearing date. Plaintiff's counsel explained that he would be unavailable between the filing
17  of the motions and May 31 to work on the opposition, and asked Kaiser's lawyers to set the
18  hearing for a later date. Not wanting to have repeated back-and-forth communications,
19  however, Kaiser opted to keep the May 31 date, saying it would work with counsel after the
20  motions were on file over any changes in the date.

21    Although Kaiser's retained counsel expressed a reasonable approach to time
22  deadlines (saying the firm does not use time pressures to squeeze opposing counsel on the
23  substantive issues in the litigation), after consulting with Kaiser, the law firm changed its
24  position. Not only would Kaiser refused to continue the hearing more than 2 weeks, it
25  insisted that plaintiff's oppositions to the two motions would remain May 17. As a result,
26  plaintiff's counsel notified Kaiser that this *ex parte* application would be filed.

27    Plaintiff requests that the hearing on the demurrer and motion to strike be continued
28  to a date after June 29, 2017. Plaintiff provides the following grounds:

1.    A substantial amount of work will be required to oppose the demurrer and motion to strike. Kaiser cites to multiple case authorities that will require research and a response. Plaintiff's counsel estimates he will need approximately two weeks of time, during a period when he can give the matters relatively undivided attention, to adequately respond.

2.    Kaiser's motions raise issues that are very important to this litigation. Because they involve matters beyond the pleading, additional work will be required of plaintiff's counsel. Resolution of Kaiser's motion to strike may require plaintiff to convert the case to a class action, which would impact the course of this litigation going forward.

3.    Kaiser had 8 months to prepare pleadings over these issues. Plaintiff filed her initial complaint in August 2016. Each of these arguments could have been raised by Kaiser in its initial demurrer, filed November 22, 2016. Kaiser's previous lawyers did not raise these issues, however.

4.    Plaintiff's counsel has been unavailable to work on the motions, and will be until at least the end of May. As Kaiser knew when it set the hearing date, and refused to stipulate to a continuance, counsel has a Ninth Circuit argument on May 17; a reply brief due in the District of Massachusetts on May 26, and an opening Ninth Circuit brief in the *Hill* matter on May 31. In addition, counsel was traveling out of town on two separate occasions in May.

5.    Plaintiff's counsel has a hearing set in the District of Oregon for June 9, and a hearing on a motion to stay proceedings on June 14 in Department 18, in Kennedy v. Kaiser Foundation Health Plan, Case No. RG16822544. He would not be able to complete the work required prior to June 16.

6.    Kaiser's refusal to stipulate to this continuance is in bad faith. Kaiser's retained attorneys in this case and in *Kennedy* both represented to plaintiff's counsel that they do not withhold consent to reasonable extensions in order to gain litigation advantages; but after consulting with the Kaiser client, both have refused extensions. In *Kennedy*, the parties were close to a stipulation to

1    stay the action pending further DFEH proceedings on a related charge, but at

2    the last minute, Kaiser withdrew consent and required a motion. In *Hill*,

3    Kaiser opposed a request for the brief to be filed in late June, causing the

4    Court to set May 31 as the date for opening brief and excerpts of record.

5    Kaiser has no justification for requiring this application. It had 8 months to write

6    these motions, and it wants plaintiff's counsel to oppose them *seven days* after receipt of the

7    mailed copies, at a time when counsel was out of town, and while he must simultaneously

8    prepare for Ninth Circuit argument. No prejudice will result from a continuance.

9                                **CONCLUSION**

10    For the foregoing reasons, plaintiff asks that the hearing on Kaiser's demurrer and

11    motion to strike be continued to June 29, 2017, or an available date thereafter.

12    Dated: May 15, 2017                        Respectfully submitted,

13

14                                    _____

15                                    Jeremy L. Friedman
                                      Attorney for plaintiff Lunell Gamble

16

17

18

19

20

21

22

23

24

25

26

27

28

1
**PROOF OF SERVICE**

2        Jeremy L. Friedman declares and states:

3        I have an office in Alameda county. I am over the age of eighteen years. My business

4  address is 2801 Sylhowe Road, Oakland, CA, 94602.

5        I declare that on this day I served a copy of:

6  **Opposition to Demurrer and Motion to Strike**

7  by electronic transmission before midnight on this day to:

8  Grube Brown & Geidt LLP
   Heather A. Borgan
9  Amanda Bolliger Crespo
   601 Montgomery Street, Suite 1150
10 San Francisco, CA 94111
   Kaiser Permanente_ Gamble_ Lunell E_Mails
11 <{F5300}.GBGLLP@bb6f1.imanage.work>

12
        I declare under penalty of perjury that the foregoing is true and correct. Executed
13 this 15th day of May, 2017, in Oakland, CA.

14

15                                /s/Jeremy L. Friedman
                                  Jeremy L. Friedman
16

17

18

19

20

21

22

23

24

25

26

27

28

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

6
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                            COUNTY OF ALAMEDA
8

9  LUNELL GAMBLE                        )   Case No. RG16826717
                                        )
10       Plaintiff                      )   **[PROPOSED] ORDER
                                        )   CONTINUING HEARING ON
11 vs.                                  )   DEMURRER AND MOTION TO
                                        )   STRIKE**
12 KAISER FOUNDATION HEALTH             )
   PLAN, INC; KAISER FOUNDATION         )
13 HOSPITALS, INC.; and THE             )
   PERMANENTE MEDICAL GROUP;            )   Date: May 16, 2017
14 all doing business as KAISER         )   Time: 10:00 a.m.
   PERMANENTE MEDICAL CARE              )   Dept: 15
15 PROGRAM                              )
                                        )
16       Defendants                     )   Reservation Number R-1853477
   _____        )
17
              Pursuant to the opposed *ex parte* application of plaintiff, and for good cause
18
   showing, the Court hereby continues the hearing on defendant's demurrer to the first
19
   amended complaint and motion to strike, until _____, with a corresponding
20
   extension of time for the response and reply.
21
   IT IS SO ORDERED
22
   Dated: May __, 2017
23

24                                 _____
                                   JUDGE OF THE SUPERIOR COURT
25

26

27

28

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                                Honorable   Ioana Petrou                    , Judge

Cause called for Hearing Re: Application Re: Continuance of Hearing: 05/16/2017

Plaintiff Lunell Gamble represented by Friedman, Jeremy L..

Defendant Kaiser Foundation Health Plan, Inc represented by Huibonhoa, Kathy

Defendant Kaiser Foundation Hospitals, Inc, represented by Huibonhoa, Kathy

Defendant The Permanente Medical Group represented by Huibonhoa, Kathy

IT IS ORDERED THAT Plaintiff's Application Re: Continuance of Hearing is granted.
Hearing is continued to July 6, 2017 Department 15 at 9:00 a.m.

Hearing Vacated: Case Management Conf Continuance 06/20/2017 09:15 AM D-15.

Scheduled Hearing of 09:00 AM on 05/31/2017 in Department 15, Civil Law and Motion, was reset to
09:00 AM on 07/06/2017 in Department 15, Civil Law and Motion, Administration Building, 1221 Oak
Street, Oakland.


Civil Jury Trial scheduled on 06/04/2018 10:00 AM in Department 15, Administration Building, 1221
Oak Street, Oakland.


Case Management Conf Continuance scheduled on 05/25/2018 09:30 AM in Department 15,
Administration Building, 1221 Oak Street, Oakland.


Civil Pre-Trial Settlement Conference scheduled on 05/11/2018 09:30 AM in Department 1A, Rene C.
Davidson Alameda County Courthouse, 1225 Fallon Street, Oakland.

Minutes of     05/16/2017
Entered on     05/16/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By     *Tom B Williams*
                                                Deputy Clerk

---

**Minutes**

M11367337

Attorney at Law                                    Kaiser Foundation Health Plan, Inc
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

Gamble

             Plaintiff/Petitioner(s)

VS.

Kaiser Foundation Health Plan, Inc

            Defendant/Respondent(s)
         (Abbreviated Title)

No. RG16826717

Application Re: Continuance of
Hearing Granted

Date: 05/16/2017
Time: 10:00 AM
Dept: 15

---

IT IS ORDERED THAT Plaintiff's Application Re: Continuance of Hearing is granted.
Hearing is continued to July 6, 2017 Department 15 at 9:00 a.m.

Dated: 05/16/2017

                       _facsimile_

_____
                 Judge Ioana Petrou

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

## RELEASE OF CIVIL FUNDS and
## OVERPAYMENTS FOR ALL DIVISIONS

**Gamble,**
Plaintiff
     Vs.

**Kaiser Foundation Health Plan, Inc,**
Defendant

Case Name: **RG16826717**

FILED

MAY 1 7 2017

CLERK OF THE SUPERIOR COURT
By _____
                         Deputy

Orig. Amount: **$ 60.00**      Receipt #: **RCD#722246**      Date: **5/15/2017**

Mode of Pmt.: **CHECK**

**Reason for Release of Funds:**      **Amount to be Released/Refunded:**

|   |                                                                  |          |
|---|------------------------------------------------------------------|----------|
|   | Release of Deposit for Stay of Execution[1]                      | $        |
| X | Overpayment of $10 or more (any division)[2]                     | $ 40.00  |
| ☐ | Exoneration of Bail – Civil, Family Law, Small Claims, Probate   | $        |
| ☐ | Small Claims Judgment Paid to Court [3]                          | $        |
|   | Filing Fee (Fee Type) [4]                                        | $        |
|   | Other (explain)[5]                                               | $        |

Payee: (Please print)  **JEREMY L FRIEDMAN, ESQUIRE**
                                    **2801 Sylhowe Rd**
                                    **Oakland, CA 94602-3565**

                                                 **By:  C. Clark**

---

**I verify that to the best of my knowledge this release of funds complies with the appropriate statutes referenced above.**

Approved by: _____      Date: **5/17/17**
              Division Chief/Designee

---

[1] CCP 1176
[2] GC 29375.1
[3] CCP 116.860
[4] At the discretion of the authorized approver
[5] At the discretion of the authorized approver

09/15/06



Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse
1225 Fallon Street
Oakland, CA  94612

Receipt Nbr: 722246
Clerk: cclark
Date: 05/15/2017

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Filing | RG16826717 | Continuance of Hearing | $20.00 |

Total Amount Due:    $20.00
Prior Payment:
Current Payment:     $60.00
Balance Due:         $.00
Overage:
Excess Fee:          $40.00
Change:

Payment Method:
Cash:
Check:               $60.00

GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendants,
KAISER FOUNDATION HEALTH PLAN, INC.;
KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

ENDORSED
FILED
ALAMEDA COUNTY

MAY 19 2017

CLERK OF THE SUPERIOR COURT
By: D. OLIVER, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE,<br><br>    Plaintiff,<br><br>    vs.<br><br>KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM,<br><br>    Defendants. | Case No. RG16826717<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU DEPARTMENT 15<br><br>**PROOF OF SERVICE**<br><br>Date:    May 16, 2017<br>Time:    10:00 a.m.<br>Judge:   Hon. Ioana Petrou<br>Dept:    15<br><br>Complaint Filed:    August 9, 2016 |

PROOF OF SERVICE

**PROOF OF SERVICE**

I am employed in the City of San Francisco and County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

On May 16, 2017, I served a copy of the within documents:

1. **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE;**

2. **DECLARATION OF AMANDA BOLLIGER CRESPO IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE;**

3. **[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION AND EX PARTE APPLICATION TO CONTINUE HEARING DATE ON DEFENDANTS' DEMURRER AND MOTION TO STRIKE**

on the interested parties:

☐   VIA FAX: By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐   VIA U.S. MAIL: I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on the above date with postage thereon fully prepaid, at San Francisco, California.

☐   VIA OVERNIGHT SERVICE: By placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☒   VIA PERSONAL SERVICE: By causing to be delivered the document(s) listed above to the person(s) at the address(es) set forth below.

☐   VIA E-MAIL: By transmitting a PDF version of the document(s) by e-mail to the person(s) set forth below using the e-mail address(es) indicated, pursuant to the parties' electronic service agreement.

Jeremy L. Friedman          Telephone: 510-530-9060
Law Office of Jeremy L. Friedman    Facsimile: 510-530-9087
c/o Alameda Superior Court, Dept. 15   Email: jlfried@comcast.net
Oakland, CA 94610

1        I declare under penalty of perjury under the laws of the State of California that the above

2    is true and correct.

3        Executed on May 16, 2017, at San Francisco, California.

4     

5                          KATHERINE C. HUIBONHOA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

20101839

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

**FILED**
ALAMEDA COUNTY

MAY 3 1 2017

CLERK OF THE SUPERIOR COURT
By _____
        JANIE THOMAS, Deputy

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                        COUNTY OF ALAMEDA

9  LUNELL GAMBLE                    )    Case No. RG16826717
                                    )
10        Plaintiff                 )    NOTICE OF POSTING JURY FEES
                                    )
11 vs.                             )
                                    )
12 KAISER FOUNDATION HEALTH        )
   PLAN, INC; KAISER FOUNDATION    )
13 HOSPITALS, INC.; and THE        )
   PERMANENTE MEDICAL GROUP;       )
14 all doing business as KAISER    )
   PERMANENTE MEDICAL CARE         )
15 PROGRAM                         )
                                    )
16        Defendants                )
                                    )
17 _____ )

18 TO THE COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

19         PLEASE TAKE NOTICE that plaintiff Lunell Gamble hereby submits a jury fee

20 deposit in the amount of $150 in the above-entitled action pursuant to California Code of

21 Civil Procedure Section 631(b).

22 Dated: May 31, 2017                    Respectfully submitted,

23

24

25                                        Jeremy L. Friedman
                                          Attorney for plaintiff Lunell Gamble
26

27

28

FILED BY FAX

## PROOF OF SERVICE

Jeremy L. Friedman declares and states:

I have an office in Alameda county. I am over the age of eighteen years. My business address is 2801 Sylhowe Road, Oakland, CA, 94602.

I declare that on this day I served a copy of:

**Notice of Posting Jury Fees**

by electronic transmission before midnight on this day to:

    Grube Brown & Geidt LLP
    Heather A. Borgan
    Amanda Bolliger Crespo
    601 Montgomery Street, Suite 1150
    San Francisco, CA 94111
    Kaiser Permanente   Gamble_ Lunell E_Mails
    <{F5300}.GBGLLP@bb6f1.imanage.work>

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of May, 2017, in Oakland, CA.

                        /s/Jeremy L. Friedman
                        Jeremy L. Friedman

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

6
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                            COUNTY OF ALAMEDA
8

9  LUNELL GAMBLE                        )   Case No. RG16826717
                                        )
10         Plaintiff                    )   **OPPOSITION TO DEFENDANTS'**
                                        )   **SECOND DEMURRER**
11 vs.                                  )
                                        )
12 KAISER FOUNDATION HEALTH             )
   PLAN, INC; KAISER FOUNDATION         )   Date: July 6, 2017
13 HOSPITALS, INC.; and THE             )   Time: 9:00 a.m.
   PERMANENTE MEDICAL GROUP;            )   Dept: 15
14 all doing business as KAISER         )
   PERMANENTE MEDICAL CARE              )
15 PROGRAM                              )
                                        )
16         Defendants                   )
   _____     )
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    Plaintiff Gamble Properly Pleads Her Case Against Three Corporate Entities Acting
      as A Single Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Plaintiff Need Not Name All Corporate Forms in DFEH Charge . . . . . . . . . . . . . . 10

III.  In the Alternative, Ms. Gamble Should be Granted Leave to Amend to Plead claims
      Under 42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Adelman v. Associated Int'l Ins. Co.* (2001) 90 CA4th 352 . . . . . . . . . . . . . . . . . . . . . . . . . 6

4

*Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . 7

5

*Battistone v. Sam Jon Corp.* (E.D. PA 2002) 2002 U.S. Dist. LEXIS 19399 . . . . . . . . . . 11

6

*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861 . . . . . . . . . . . . . 6

7

*Childs v. Local 18, Int'l Brotherhood of Electrical Workers*, 719 F.2d 1379 . . . . . . . . . . 7

8

*Deloney v. Tri-County Metro. Transp. Dist.* (D. Or. 2012) 2012 U.S. Dist. LEXIS
153437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9

10

*EEOC v. American National Bank* (4th Cir. 1981) 652 F.2d 1176 . . . . . . . . . . . . . . . . . . 11

11

*EEOC v. Occidental Life Ins. Co. of California* (9th Cir. 1976) 535 F.2d 533 . . . . . . . . . 11

12

*Gopal v. Kaiser Foundation Health Plan, Inc.* (2016) 248 Cal.App.4th 425 . . . . . . . . . . . 6

13

*Jarred v. Walters Indus. Elecs* (W.D. Mo. 2001) 153 F. Supp. 2d 1095 . . . . . . . . . . . . . . 11

14

*Khan v. United Recovery Sys.* (S.D. Tex. 2005) 2005 U.S. Dist. LEXIS 4980 . . . . . . . . . 10

15

*Knowlton v. Teltrust Phones, Inc.* (10th Cir. 1999) 189 F.3d 1177 . . . . . . . . . . . . . . . . . . 10

16

*Laird v. Capital Cities /ABC, Inc* (1998) 68 Cal.App.4th 727 . . . . . . . . . . . . . . . . . . . . . 6, 7

17

*Maddock v. KB Homes, Inc.* (C.D. Cal. 2007) 631 F. Supp. 2d 1226 . . . . . . . . . . . . . . . . . 7

18

*Morgan v. Safeway Stores, Inc.* (9th Cir. 1989) 884 F.2d 1211 . . . . . . . . . . . . . . . . . . . . . 7

19

*Morrow v. City of Oakland* (N.D. CA 2012) 2012 U.S. Dist. LEXIS 81318 . . . . . . . . . . . 11

20

*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474 . . . . . . . . . . . . . . . . . . . . . . . 7, 8

21

*Quelimane Co., Inc. v. Stewart Title Guar. Co.* (1998) 19 Cal.4th 26 . . . . . . . . . . . . . . . . 6

22

*Rhodes v. Sutter Health* (E.D. CA 2013) 949 F.Supp. 2d 997 . . . . . . . . . . . . . . . . . . . . . . . 6

23

*Sedlacek v. Hach* (8th Cir. 1985) 752 F.2d 333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24

*Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992 . . . . . . . . . . . . . . . . . . . . . . . 6

25

*Taylor v. Shippers Transp. Express, Inc.* (C.D. CA 2014) 2014 U.S. Dist. LEXIS 180061 . 9

26

*Trosper v. Stryker Corp.* (N.D. CA 2014) 2014 U.S. Dist. LEXIS 56719 . . . . . . . . . . . . . 9

27

*Vernon v. State of California* (2004) 116 Cal.App.4th 114 . . . . . . . . . . . . . . . . . . . . . . 8, 9

28

*Wells v. Skynet Digital, LLC* (D. Idaho 2015) 2015 U.S. Dist. LEXIS 91481 . . . . . . . . . 11

Statutes

42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

1

**INTRODUCTION**

2        This is an action for discrimination against Kaiser Permanente, arising out of its

3   systemic discrimination in the employment of African Americans. It follows a putative class

4   action filed in federal court (Hill v. Kaiser Foundation Health Plan, Northern District of

5   California, Case No. 3:10-cv-2833-LB), which revealed that Kaiser entities – acting as a

6   single employer for EEO purposes  – engage in a pattern and practice of discrimination

7   against African American employees in terms of termination and retaliation. After that case

8   settled without prejudice to putative class members' rights to bring their own actions,

9   plaintiff Lunell Gamble timely filed her administrative charge with Department of Fair

10  Employment and Housing (DFEH), and timely commenced her action in this Court.

11       This is Kaiser's second demurrer. Represented by a different law firm, Kaiser

12  demurred to the initial complaint. There, Kaiser raised specific issues, including failure to

13  specify which  Kaiser entities were named as  defendants to which claims (race, age,

14  gender), and failure to exhaust administrative remedies. This Court granted the demurrer

15  with leave to amend, and plaintiff dutifully complied.

16       Subsequent to the Court's order, Kaiser changed law firms. It is now represented by

17  attorneys who defended Kaiser in the *Hill* case. Kaiser now demurrers again, raising issues

18  that its first law firm could have raised previously, but did not. In this demurrer, Kaiser –

19  without citing the relevant cases – argues erroneously that plaintiff cannot sue the Kaiser

20  entities together, even though they act as a single employer for purposes of the Fair

21  Employment and Housing Act (FEHA). As demonstrated herein, plaintiff's complaint

22  identifies the three entities as a single employer under the same test developed by state and

23  federal courts under FEHA and Title VII. At best, Kaiser's arguments must be addressed on

24  the evidence, in a contested motion for summary judgment or at trial.

25       Kaiser argues also that Ms. Gamble failed to exhaust administrative remedies against

26  two of the three corporate entities that constitute the single employer. As it must admit,

27  however, Ms. Gamble *did* timely file a charge with the DFEH naming the Kaiser entity that

28  is on her W-2 form. Kaiser argues that Ms. Gamble should have *also* named the other

1  corporate forms that make up the single employer. Such an express delineation of her

2  employer's corporate forms is unnecessary in the administrative context. Indeed, in light of

3  the *Hill* case, as well as the evidence plaintiff will be able to offer in this case, the three

4  Kaiser entities, the EEOC and the DFEH all knew, and know, that Kaiser acts as a single

5  employer through all three corporate forms. Rules of administrative exhaustion do not

6  require plaintiff to name the two other forms after filing a charge against one.

7      In the event the Court determines plaintiff was required to name the other Kaiser

8  entities, Ms. Gamble seeks leave to amend her complaint again, and assert claims against

9  the other two entities under 42 U.S.C. §1981. Such claims do not have an exhaustion

10  requirement, and would be timely under the four-year statute of limitations.

11      This is not a case where the plaintiff named the wrong employer, or seeks to impose

12  vicarious liability on one corporate form for the wrongs of another. This is a case about

13  three corporate entities acting as a single employer, with interrelated operations, common

14  management, centralized control of labor relations, and common financial control. Ms.

15  Gamble timely filed and completed the administrative process. As such, the demurrer

16  should be overruled.

17                          **FACTUAL ALLEGATIONS**

18      Plaintiff Lunell Gamble is an African American woman over the age of 40, residing

19  in California. She was employed at Kaiser Permanente from for more than 16 years, until

20  her termination in July 2014.  Ms. Gamble worked initially as a temporary employee in the

21  Human Resources department (then known as "Peoples Solutions"), and began permanent

22  employment in July 1998 in that department.  Amended Complaint, ¶4.

23      Like many other African American employees at Kaiser, Ms. Gamble performed her

24  work according to the employer's needs, she was well qualified and she tried to improve her

25  employment position over the years (¶18).  By the time of her termination, she had achieved

26  the position of HR Specialist III, in the Benefits Department (the Health and Welfare

27  Department) of what had been renamed the HRSC.  In July 2012, Kaiser reorganized its

28  Benefits Department, assigning plaintiff a new supervisor, Rosa Grajeda (¶19).

1    From the beginning of her long tenure at Kaiser, and until her termination, Ms.

2   Gamble did not receive any warnings or disciplinary actions related to her exemplary

3   employment.  Despite her qualifications and excellent work performance, Ms. Gamble was

4   subject to the pattern and practice of discrimination, based upon her race and age. Factual

5   allegations related to the specific actions taken against Ms. Gamble (¶¶20-22), as well as

6   those specific to Kaiser's pattern and practice of discrimination (¶¶12-15), are detailed in

7   plaintiff's opposition to Kaiser's motion to strike, to be heard concurrently with this motion.

8    In her amended complaint, Ms. Gamble identifies the three Kaiser entity defendants:

9   Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente

10  Medical Group (¶¶5-7). She also alleges that the three entities act as a single employer:

11      Medical Group, Hospitals, and Health Plan work in cooperation with each other to
        form the integrated medical care services program with the trade name, Kaiser
12      Permanente Medical Care Program.  This enterprise is known to the general
        public, and is doing business as, "Kaiser Permanente."  Collectively, the three
13      entities are referred to herein as "Kaiser." [¶8.]

14

15   While this allegation is sufficient for pleading a single employer, Ms. Gamble does

16  more. She alleges that Kaiser's racially stratified workforce and discriminatory practices are

17  propagated, entrenched and protected by centralized policies directed at the highest levels of

18  management. Although Kaiser operates many different departments, it has centralized,

19  company-wide policies and practices concerning supervisory training, human resources,

20  EEO reporting and compliance and Kaiser's response to EEO complaints.

21   In ¶16(a)-(l), plaintiff details several company-wide policies and practices through

22  which Kaiser maintains centralized responsibility for the systemic discrimination in its

23  workforce. This includes:

24      a.    Directing, authorizing and training supervisors and directors to conceal

25            discriminatory actions and retaliate against those employees who might assist

26            the disclosure of false or trivial discipline as pretext for discrimination,

27            without regard to the specific facts and circumstances of the individual

28            employee or supervisor.

b.   Directing, authorizing and assist supervisors and directors in their discriminatory and retaliatory employment actions, through a centralized human resources department and, ultimately, the office of the general counsel, in favor of supervisors and directors, and against the interests and complaints of African American employees, without regard to the specific facts and circumstances of the individual employee or supervisor, and in contravention of obligation of Human Resources and general counsel to protect employees from unlawful discrimination.

c.   Suppressing and falsifying information in connection with complaints over employment actions made internally and to administrative agencies and courts by African American employees, including unreasonable, one-sided, pre-determined internal investigations conducted by a select few individuals for the purpose of permitting, perpetuating and covering up discriminatory and retaliatory actions and patterns, without regard to the specific facts and circumstances of the individual employee or complaint.

f.   Concealing and entrenching discriminatory patterns and practices by making false and misleading representations and statements, and engaging in intentionally misleading conduct, to government agencies regarding its compliance with federal regulations, including the requirement that Kaiser conduct internal reviews and self-inquiry of statistical patterns, report disparities, propose remedial plans and monitor results over time.

g.   Misrepresent EEO practices and non-compliance to employees, government agencies, in the courts and to the public, included a public relations effort to promote a diversity department that is knowingly, purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.   Retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.   Designating African American employees, and in particular, those employees who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.   Abusing administrative and judicial processes to further patterns and practices of racial discrimination and in retaliation against African American employees who complain about the violation of their civil rights, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the existence of substantial evidence of Kaiser's violations of law.

k.   Perpetuating, protecting and concealing unlawful discrimination and patterns of disparate treatment by requiring employees who raise civil rights claims to agree to confidentiality of the terms of settlement, without bargaining for such an agreement at arms length, and without justification in work product, attorney client privilege, trade secret or other basis for confidentiality.

l.   Kaiser's stand-alone litigation policy and practice – adopted and applied by general counsel in cases brought under anti-discrimination laws, without regard to specific facts and circumstances – requiring, as a condition of settlement, former employees to sign agreements not to work at Kaiser in the

1      future, is a violation of federal and state civil rights laws; including whether

2      plaintiff is entitled to a declaration that all such agreements are against public

3      policy, unenforceable and null and void.

4    Because Kaiser operates as a single entity with respect to EEO responsibilities and

5 FEHA violations, proof of this case will not be broken down into various corporate forms.

6 Ms. Gamble does not seek to impose liability on one entity for the wrongs of another;

7 instead, she properly asserts claims against all three entities acting as a single employer.

8 <center>**ARGUMENT**</center>

9    "To survive a demurrer, the complaint need only allege facts sufficient to state a

10 cause of action; each evidentiary fact that might eventually form part of the plaintiff's proof

11 need not be alleged." *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th

12 861, 872. Any valid cause of action overcomes a demurrer. Plaintiff may be mistaken as to

13 the nature of the case, or the legal theory on which she can prevail, but if the essential facts

14 of some valid cause of action are alleged, the complaint is good against a general demurrer.

15 *Quelimane Co., Inc. v. Stewart Title Guar. Co.* (1998) 19 Cal.4th 26, 38-39; *Adelman v.*

16 *Associated Int'l Ins. Co.* (2001) 90 CA4th 352, 359; *Sheehan v. San Francisco 49ers, Ltd.*

17 (2009) 45 Cal.4th 992, 998.

18 **I.    Plaintiff Gamble Properly Pleads Her Case Against Three Corporate Entities Acting as A Single Employer**

19

20    In its demurrer, Kaiser cites inapposite cases where the plaintiff sought to impose

21 vicarious liability on a parent corporation for the wrongs of its subsidiary. *Laird v. Capital*

22 *Cities /ABC, Inc* (1998) 68 Cal.App.4th 727; *Rhodes v. Sutter Health* (E.D. CA 2013) 949

23 F.Supp. 2d 997. Elsewhere, it cites to *Gopal v. Kaiser Foundation Health Plan, Inc.* (2016)

24 248 Cal.App.4th 425, where a personal injury plaintiff sought to skirt the limitations on

25 medical malpractice suits by suing the plan for the wrongs of the hospital. None of these cases applies to the one at bar.

26    Instead, under clear authority adopted from the Title VII context, an "employer"

27 under FEHA can be more than one entity, when those multiple entities act as a single

28 employer for purposes of the Act.

1
2
3
4
5

Two corporations may be treated as a single employer for purposes of liability under title VII of the federal 1964 Civil Rights Act (42 U.S.C. § 2000e *et seq.*). (*Morgan v. Safeway Stores, Inc*. (9th Cir. 1989) 884 F.2d 1211, 1213.) Because California's Fair Employment and Housing Act (Gov. Code., § 12900 *et seq.*) (FEHA) has the same nature and purpose as the federal law, California courts frequently look to federal case law for guidance in interpreting the FEHA. [*Laird*, 68 Cal.App. 4th, at 737 (citation omitted).]

6
7
8
9
10
11
12

    In *Morgan*, the Ninth Circuit spelled out the test for determining single employer:

This court follows the predominant trend for determining whether businesses should be treated as a single employer for title VII purposes, and applies the four-part test promulgated by the National Labor Relations Board. *See Childs v. Local 18, Int'l Brotherhood of Electrical Workers*, 719 F.2d 1379, 1382 (9th Cir. 1983); *see also Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir. 1977). Thus this court treats two entities as one if they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Childs*, 719 F.2d at 1382. [*Morgan*, 884 F.2d at 1213.]

13
14
15

"Courts consider the four factors of the integrated enterprise test together, but they often deem the third factor, centralized control of labor relations, the most important." *Maddock v. KB Homes, Inc.* (C.D. Cal. 2007) 631 F. Supp. 2d 1226, 1240-1241.

16
17
18
19

    In its demurrer, Kaiser does not cite the applicable California Supreme Court decision, *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474. In *Patterson*, the Court looked at whether a franchisor was also the employer of its franchisee's employees, using traditional concepts of agency and respondeat superior.

20
21
22
23
24

There are few California cases defining an 'employer' under the FEHA provisions invoked here. But, it appears, traditional common law principles of agency and respondeat superior supply the proper analytical framework under FEHA, as they do for franchising generally. Courts in FEHA cases have emphasized 'the control exercised by the employer over the employee's performance of employment duties.'  This standard requires 'a comprehensive and immediate level of "day-to-day" authority' over matters such as hiring, firing, direction, supervision, and discipline of the employee. [Patterson, 60 Cal.4th at 499. (Citations omitted).]

25
26
27
28

    In *Patterson*, the Supreme Court scrutinized the contract provisions establishing the franchisor-franchisee relationship and noted that the franchisee was solely responsible for managing its employees. The court also considered how closely actual practices reflected the contract model. The franchisee hired new employees who were exposed to orientation

1   materials provided by the franchisor. However, with regard to sexual harassment training,

2   the franchisee was in control and the franchisor had no mechanism for monitoring sexual

3   harassment complaints. *See id.*, at 500-503. The court concluded that a franchisor "becomes

4   potentially liable for actions of the franchisee's employees, only if it has retained or

5   assumed a general right of control over factors such as hiring, direction, supervision,

6   discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the

7   franchisee's employees." *Id.*, at 497-498. The court upheld the grant of a summary

8   judgment in favor of the franchisor because "[n]o reasonable inference can be drawn that

9   Domino's, through Lee, retained or assumed the traditional right of general control an

10  'employer' or 'principal' has over factors such as hiring, direction, supervision, discipline,

11  discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's

12  employees. Hence, there is no basis on which to find a triable issue of fact that an

13  employment or agency relationship existed ... ." *Id.*, at 503.

14      Patterson identified *Vernon v. State of California* (2004) 116 Cal.App.4th 114  as a

15  leading case identifying the characteristics of an employer for FEHA purposes. In that case

16  the issue was whether the State of California was a joint employer of a firefighter employed

17  by the City of Berkeley. The firefighter argued that because "the State has 'thoroughly

18  dictated the City's employment policies' through the adoption of mandatory employment

19  regulations and the refusal to grant an exemption to his direct employer, liability for the

20  discriminatory effect of the CAL-OSHA regulations may be imposed upon the State as an

21  indirect or joint employer under section 12940, subdivisions (a) and (d) even without a

22  'direct employment relationship.'" The appellate court concluded that "the State does not

23  fall within the scope of the definition under any recognized test or standards." *Id*, 120-124.

24      Vernon listed a number of circumstances potentially relevant to identifying a

25  person's employer, including "payment of salary or other employment benefits and Social

26  Security taxes, the ownership of the equipment necessary to performance of the job, the

27  location where the work is performed, the obligation of the defendant to train the employee,

28  the authority of the defendant to hire, transfer, promote, discipline or discharge the

1  employee, the authority to establish work schedules and assignments, the defendant's

2  discretion to determine the amount of compensation earned by the employee, the skill

3  required of the work performed and the extent to which it is done under the direction of a

4  supervisor, whether the work is part of the defendant's regular business operations, the skill

5  required in the particular occupation, the duration of the relationship of the parties, and the

6  duration of the plaintiff's employment." *Id.*, at 125.  "'Of these factors, the extent of the

7  defendant's right to control the means and manner of the workers' performance is the most

8  important.'" *Id.*, at 126.

9     As can see from the discussion of the applicable cases, the question of single

10  employer must be answered by looking to the facts established by the evidence. It is not

11  appropriate to determine the matter on the pleadings, particularly Ms. Gamble's complaint.

12  In several cases – again not cited by Kaiser's attorneys – courts have denied summary

13  judgment to an employer based upon the disputed facts. *See, e.g.,Taylor v. Shippers Transp.*

14  *Express, Inc.* (C.D. CA 2014) 2014 U.S. Dist. LEXIS 180061, *45-60 (evaluating the four

15  factors listed in *Morgan*, finding sufficient evidence to support plaintiff's claim of a single

16  employer, particularly under "common control of labor operations" which is "widely

17  considered to be the most important factor in the joint enterprise analysis"); *Trosper v.*

18  *Stryker Corp.* (N.D. CA 2014) 2014 U.S. Dist. LEXIS 56719, *8-41 (same).

19     As far as Ms. Gamble's complaint is concerned, there can be little doubt that her

20  pleadings are sufficient to survive Kaiser's second demurrer.[1] She alleges a single

21  employer, operating through a centralized human resources department, and perpetuating

22  and suppressing evidence of its systemic discrimination. Kaiser's obligations to protect

23  against racial discrimination is not divided between corporate entities, and government

24  agencies that watchdog Kaiser do not pay attention to them. Indeed, proof of plaintiff's

25  pattern and practice allegations will not track Kaiser's corporate forms.

26

27     [1]Kaiser cites to the unreported, now-stayed case of *Kennedy v. Kaiser Foundation*

28  *Health Plan*, in Department 18, which is addressed at length in opposition to Kaiser's motion
to strike; but that order is unhelpful to it here. Indeed, Kaiser had a different law firm
representing it in that case, and the lawyers in this case failed to raise these issues here.

## II.    Plaintiff Need Not Name All Corporate Forms in DFEH Charge

Although it must admit Ms. Gamble satisfied administrative exhaustion requirements with respect to Kaiser Foundation Health Plan, it argues Ms. Gamble was required to name the other corporate entities that make up her single employer in her DFEH charge. It cites no case authority for the proposition. Indeed, the cases that it can cite all demonstrate Ms. Gamble timely filed a charge against her employer, and received her right to sue.

No authority supports Kaiser's claim that Ms. Gamble was responsible for knowing and naming other entities – in addition to the one she named – in her DFEH charge. The purpose of the administrative filing is to give the Department (or EEOC) the opportunity to address these issues with the employer before the matter is filed in court. Here, Kaiser is required to report to DFEH and EEOC about its employment practices, and those reports are not broken down according to Kaiser's corporate forms. Indeed, all of Kaiser's employment processes cross those forms, without regard to the corporate entity that issues the W-2. As such, DFEH was well aware of the single employer, and there was no need for Ms. Gamble – unrepresented by undersigned counsel at the time – to say so.

Kaiser does not cite any authority, because all of the cases are against its position. *See, e.g.*, *Khan v. United Recovery Sys.* (S.D. Tex. 2005) 2005 U.S. Dist. LEXIS 4980, *16-18 ("If the unnamed party was provided with adequate notice of the charge and given an opportunity to participate in conciliation proceedings on its own behalf, it is unnecessary for the plaintiff to file an additional charge against the unnamed party. Further, a suit may proceed against a party that is not named in the charge if there is a clear "identity of interest" between the unnamed and named parties. This "identity of interest" exception serves the basic Title VII purposes of giving the defendant notice of the charge and allowing the defendant an adequate opportunity to resolve the complaint") (citations omitted); *Knowlton v. Teltrust Phones, Inc.* (10th Cir. 1999) 189 F.3d 1177, 1185 (holding that the identity of interest exception was met where jury determined that two defendants omitted from the charge and the party named in the charge functioned as a single employer"); *Sedlacek v. Hach* (8th Cir. 1985) 752 F.2d 333, 336 (holding that where

1  defendants were found to constitute a single employer, "notice to one was notice to the

2  other"); *Jarred v. Walters Indus. Elecs* (W.D. Mo. 2001) 153 F. Supp. 2d 1095, 1101-02

3  (same); *EEOC v. American National Bank* (4th Cir. 1981) 652 F.2d 1176, 1185-86 (claims

4  based on actions in different branches all owned by a single defendant); *Lucky Stores, Inc.*

5  *v. E.E.O.C.* (9th Cir. 1983) 714 F.2d 911, 912 (identical claims of discrimination at different

6  facilities of a single defendant); *EEOC v. Occidental Life Ins. Co. of California* (9th Cir.

7  1976) 535 F.2d 533 (allowing additional charges of different types of discrimination against

8  a single employer where the additional charges arose from the reasonable investigation of

9  discrimination alleged in employee's EEOC charge); *Wells v. Skynet Digital, LLC* (D. Idaho

10  2015) 2015 U.S. Dist. LEXIS 91481 ("Title VII charges can be brought against persons not

11  named in an E.E.O.C. complaint as long as they were involved in the acts giving rise to the

12  E.E.O.C. claims"); *Battistone v. Sam Jon Corp.* (E.D. PA 2002) 2002 U.S. Dist. LEXIS

13  19399, *13 ("Even if Mr. Battistone had named the other related corporations as defendants

14  without filing complaints against them with the EEOC, he would not necessarily be

15  foreclosed from invoking the single-employer doctrine. Courts have established an

16  exception to the rule requiring exhaustion of administrative remedies if the party not named

17  in an EEOC complaint has a clear identity of interest with a party that had been named in

18  such an action").

19  **III.      In the Alternative, Ms. Gamble Should be Granted Leave to Amend to Plead claims Under 42 U.S.C. §1981**

20  

21          In the event that the Court agrees with Kaiser's argument over exhaustion of

22  administrative remedies with respect to the two non-named entities, Ms. Gamble should be

23  given the opportunity to plead claims against them for wrongful termination under 42

24  U.S.C. §1981. That federal civil rights statute does not have an exhaustion requirement, and

25  Ms. Gamble has four years from termination to bring suit. *See Morrow v. City of Oakland*

26  (N.D. CA 2012) 2012 U.S. Dist. LEXIS 81318, *27-28; *Deloney v. Tri-County Metro.*

27  *Transp. Dist.* (D. Or. 2012) 2012 U.S. Dist. LEXIS 153437, *8-9.

28

1

## CONCLUSION

2      For the foregoing reasons, Kaiser's demurrer should be denied.

3    Dated: June 22, 2017                    Respectfully submitted,

4

5                                          /s/Jeremy L. Friedman
                                           Jeremy L. Friedman
6                                          Attorney for plaintiff Lunell Gamble

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2        Jeremy L. Friedman declares and states:

3        I have an office in Alameda county. I am over the age of eighteen years. My business

4 address is 2801 Sylhowe Road, Oakland, CA, 94602.

5        I declare that on this day I served a copy of:

6        **Opposition to Demurrer**

7 by electronic communication (per agreement) to:

8  Grube Brown & Geidt, LLP
    Heather Morgan

9  601 Montgomery Street, Suite 1150
    San Francisco, CA 941111

10

11

12        I declare under penalty of perjury that the foregoing is true and correct. Executed

this 22nd day of June, 2017, in Oakland, CA.

13

14                   /s/Jeremy L. Friedman
                    Jeremy L. Friedman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

6
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                            COUNTY OF ALAMEDA
8

9  LUNELL GAMBLE                        )  Case No. RG16826717
                                        )
10        Plaintiff                     )  **OPPOSITION TO DEFENDANTS'**
                                        )  **MOTION TO STRIKE**
11 vs.                                  )
                                        )
12 KAISER FOUNDATION HEALTH             )
   PLAN, INC; KAISER FOUNDATION         )  Date: July 6, 2017
13 HOSPITALS, INC.; and THE             )  Time: 9:00 a.m.
   PERMANENTE MEDICAL GROUP;            )  Dept: 15
14 all doing business as KAISER         )
   PERMANENTE MEDICAL CARE              )
15 PROGRAM                              )
                                        )
16        Defendants                    )
   _____)
17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5  I.     Plaintiff is Entitled to Plead Pattern and Practice Allegations . . . . . . . . . . . . . . . . . . 9

6  II.    Reliance on Judge Lee's Order in *Kennedy* is Misplaced . . . . . . . . . . . . . . . . . . . 12

7  III.   Ms. Gamble's Pattern and Practice Allegations Relate to Her DFEH Charge . . . . . 13

8  IV.    This Case Should Be Reclassified as a Complex Case . . . . . . . . . . . . . . . . . . . . . . . 14

9  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10  DECLARATION OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11  PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Cases

*Alch v. Superior Court* (2004) 122 Cal. App. 4th 339 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bacon v. Honda of Am. Mfg., Inc*. (6th Cir. 2004) 370 F.3d 565 . . . . . . . . . . . . . . . . . . . . . 12

*Davis v. Coca-Cola Bottling Co. Consol.* (11th Cir. 2008) 516 F.3d 955 . . . . . . . . . . . . . 12

*Diaz v. AT&T* (9th Cir. 1985) 752 F.2d 1356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Egbukichi v. Wells Fargo Bank, NA* (D. Or. Mar. 29, 2017) 2017 U.S. Dist. LEXIS 47731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gay v. Waiters' & Dairy Lunchmen's Union* (9th Cir. 1982) 694 F.2d 531 . . . . . . . . . . . 10

*Green v. State of California* (2007) 42 Cal. 4th 254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Heagney v. University of Washington*, 642 F.2d 1157 (9th Cir. 1981), *overruled on other grounds*, *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987) . . . . . . . . . . 10

*Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S. 324 . . . . . . . . . . . . . . . . . . . 10, 12

*Life Technologies Corp. v. Superior Court* (2011) 197 Cal. App. 4th 640 . . . . . . . . . . . . 10

*Lowery v. Circuit City Stores, Inc.* (4th Cir. 1998) 158 F.3d 742 *vacated on other grounds*, 527 U.S. 1031 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lyons v. England* (9th Cir. 2002) 307 F.3d 1092 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Maduka v. Sunrise Hosp.*(9th Cir. 2004) 375 F.3d 909 . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rutherford v. Owens-Illinois, Inc.* (1997) 16 C4th 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Statutes

Code of Civil Procedure §431.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rules

California Rules of Court, Standards of Jud. Admin., Standard 3.10. . . . . . . . . . . . . . . . . 14

**INTRODUCTION**

This is an action for discrimination against Kaiser Permanente, arising out of its systemic discrimination in the employment of African Americans. It follows a putative class action filed in federal court (Hill v. Kaiser Foundation Health Plan, Northern District of California, Case No. 3:10-cv-2833-LB), which revealed that Kaiser entities engage in a pattern and practice of discrimination against African American employees in terms of termination and retaliation. After that case settled without prejudice to putative class members' rights to bring their own actions, plaintiff Lunell Gamble commenced her action in this court, seeking to prove what was shown in *Hill*, but then sealed from the public through a confidential settlement with named plaintiffs.

The motion was filed along with Kaiser's second demurrer. Represented by a different law firm, Kaiser demurred to Ms. Gamble's initial complaint. There, Kaiser raised specific issues having to do with plaintiff's claims, including failure to specify which Kaiser entities were named as  defendants to which claims (race, age, gender), and failure to exhaust administrative remedies. It did not seek to strike pattern and practice allegations. This Court granted the demurrer with leave to amend, and plaintiff dutifully complied

At the time Kaiser's first attorneys brought the first demurrer, they also could have moved to strike plaintiff's "pattern and practice" allegations, but they failed to do so. Instead, Kaiser – represented by yet another law firm – had filed a motion to strike pattern and practice allegations in a different case, pending in Department 18. Kennedy v. Kaiser Foundation Health Plan, Case No. RG16822544. After a ruling in that case, Kaiser filed a copy of the order in this case, hoping to bootstrap on a motion it did not bring. Under new attorneys, it has now filed on this issue as a separate motion to strike.

This Court need not – and plaintiff argues should not – reach the merits of Kaiser's claim at this time. Whether or not plaintiff can establish a pattern and practice of discrimination and avail herself of the "*Teamsters*" burden-shifting presumption must await another day. As Judge Lee stated in the *Kennedy* case – which is now stayed – a plaintiff's allegations of systemic discrimination are clearly germane to her FEHA action. As such,

1    there is no basis in the law to strike them from the complaint. Instead, the Court should

2    determine whether or not Ms. Gamble can establish the predicate for the *Teamsters*

3    presumption after she has had a chance to undertake discovery.

4            Kaiser's motion, however, does raise a question as to the reclassification of this

5    litigation as a complex case. Kaiser asserts that plaintiff's pattern and practice allegations

6    should be stricken because Ms. Gamble does not plead a class action. Plaintiff contends that

7    position is wrong, as Ninth Circuit and California cases clearly permit individual plaintiffs

8    to allege, and prove, systemic discrimination. It makes no sense from the perspective of

9    judicial resources, or those of Ms. Gamble, to require her to take up a representative action

10   to avail herself of the legal standards for proving discrimination. Plaintiff need not satisfy

11   the requirements of a class action simply because the evidence she will obtain in this case

12   will also establish Kaiser's violation of the civil rights of others. Indeed, plaintiff intends to

13   bring a motion for partial summary judgment, establishing that evidence and her entitlement

14   to a *Teamsters* presumption. Other victims of Kaiser's discrimination will have access to

15   that proof, and can bring their own individual actions as they see fit.

16           To the extent that the Court agrees with Kaiser, plaintiff would likely re-plead this

17   case as a class action. In such a case, the action should be reclassified as complex, to permit

18   the parties sufficient time to conduct the litigation in stages. But even if the case goes

19   forward as an individual "pattern and practice" case, it is now apparent to plaintiff's counsel

20   it should appropriately be treated as a complex case. Substantial time and effort will be

21   required to establish plaintiff's complaint, and based on prior experiences, it will not be

22   feasible to complete this litigation on the ordinary case timeline. Indeed, the parties have not

23   yet resolved pleading issues, and the Court set a trial date in June 2018.

24           Plaintiff therefore requests that the Court deny the motion to strike, defer questions

25   over the *Teamsters*' presumption until a later date, and reclassify this case as a complex

26   case. Plaintiff will pay the fee for the reclassification. At that point, the Court should

27   schedule a case management conference, and the parties may meet and confer regarding

28   proposed schedule for staged litigation.

**FACTUAL ALLEGATIONS**

Plaintiff Lunell Gamble is an African American woman over the age of 40, residing in California. She was employed at Kaiser Permanente from for more than 16 years, until her termination in July 2014.  Ms. Gamble worked initially as a temporary employee in the Human Resources department (then known as "Peoples Solutions"), and began permanent employment in July 1998 in that department.  Amended Complaint, ¶4.

Like many other African American employees at Kaiser, Ms. Gamble performed her work according to the employer's needs, she was well qualified and she tried to improve her employment position over the years (¶18).  By the time of her termination, she had achieved the position of HR Specialist III, in the Benefits Department (the Health and Welfare Department) of what had been renamed the HRSC.  In July 2012, Kaiser reorganized its Benefits Department, assigning plaintiff a new supervisor, Rosa Grajeda (¶19)

From the beginning of her long tenure at Kaiser, and until her termination, Ms. Gamble did not receive any warnings or disciplinary actions related to her exemplary employment.  Despite her qualifications and excellent work performance, Ms. Gamble was subject to the pattern and practice of discrimination, based upon her race and age. Factual , as described in detail in ¶20 of the complaint:

a.    Ms. Gamble was one of the few African Americans to remain employed in the department, as other African American employees in that department, in Human Resources and throughout Kaiser were terminated for discriminatory reasons or forced to quit from dead-end positions at Kaiser. Ms. Gamble witnessed their replacement with younger, non-African American employees who were equally or less qualified to perform the work.

b.    Despite a pool of African American employees qualified for supervisory and management positions, Ms. Gamble was subject to an employment hierarchy that was seemingly devoid of older, African American employees at the higher levels.  During her employment in Kaiser's Human Resources department, Kaiser employed no African American directors in that department, and few African Americans were given "lead" positions.

c.    After the departmental reorganization, Ms. Gamble was subject to constant harassment and unreasonable scrutiny by her manager, Ms. Grajeda.  In October 2012, Ms. Grajeda followed plaintiff into the department's

bathroom, and criticized plaintiff for not working as she spoke through the curtain in the vanity area. Plaintiff became both fearful of the manager, and appalled at her conduct, causing plaintiff to avoid using the department's bathroom from that point forward. Plaintiff complained to senior management, but no apology was made or corrective action taken.

d.    In approximately February 2013, plaintiff was subject to ridicule and embarrassment by Ms. Grajeda, who falsely accused plaintiff of receiving complaints from the entire department over her perfume. After offering to communicate with her department over the matter, Ms. Grajeda admitted it was only she that had complained.

e.    In Approximately March 2014, plaintiff was singled out from non-African American employees and loudly scolded for laughing at work. This was done openly to embarrass plaintiff in front of co-workers. Even though Kaiser officially recognizes laughter as a part of its medical focus, and even though other, non-African American employees are seen laughing, plaintiff was criticized and made to feel inferior. Plaintiff was so upset by this incident that she was required to leave her manager by the desk, and she was later called into the manager's office for further criticism.

f.    Constant harassment and false criticism of work performance continued on a nearly daily basis. Ms. Grajeda lacked the knowledge and experience working in the Benefits department – knowledge and experience that plaintiff had gained. And yet, in managing plaintiff's work performance, the lack of understanding by the manager led to empty, false criticisms of the work.

g.    Throughout this period, Ms. Grajeda treated plaintiff and other older African American employees with disparate treatment, including refused to assign work to plaintiff commensurate with plaintiff's knowledge and skill levels, criticisms of work by African American employees that were not made against the same or even less quality work by younger, non-African Americans, and overlooking transgressions or mistakes by younger, non-African American employees.

On July 18, 2014, plaintiff was given a "final written warning" threatening her with termination, even though she had not received a prior written warning or any of the progressive discipline Kaiser requires. Included in the written warning were false claims regarding Ms. Gamble's work performance, including false accusations plaintiff had "falsified" work records, and had acted with hostile aggression towards Ms. Grajeda. Each claim was mere pretext for Kaiser's discrimination against older, African Americans (¶21).

1    Kaiser had already determined to terminate plaintiff's employment.  Following the

2   final written warning, Ms. Gamble attempted to perform her work and meet with senior

3   management over her discipline.  Rather than providing an honest opportunity to perform

4   the work, Kaiser set her up for termination, which occurred on July 29, 2014 (¶22).

5    Kaiser terminated Ms. Gamble's employment pursuant to a larger pattern and

6   practice of systemic discrimination at Kaiser. As alleged in the complaint, Kaiser maintains

7   a unique business and organization structure, with regional oversight by a single executive

8   management hierarchy. Within each division, Kaiser has departmental hierarchies of similar

9   nature and structure. Kaiser maintains uniform employment and personnel policies, with

10  centralized human resources – where Ms. Gamble worked – as well as general counsel,

11  payroll services, and labor and other employment data (¶12).

12    Within each department, the employer has its own unique procedures, information

13  systems and business technologies requiring specialized training and adaptive capabilities.

14  Employees are told they need establish in their work performances that they are trained in

15  and proficient with those unique processes in order to be retained and/or promoted. Access

16  to that training uniformly depends upon the discretion of divisional management, however,

17  including influence and decision-making at the supervisory and team management levels.

18  Similarly, performance reviews, job classification decisions, pay and salary structure

19  changes, and disciplinary actions all depend upon the discretion of that same divisional

20  management. Few objective requirements or measurements are used for employment

21  decisions, which are largely based on subjective judgments (¶13).

22    Kaiser's executive and divisional management positions are filled predominately by

23  neither African-American nor African-American women. African-Americans and African-

24  American women are rarely promoted to supervisory or management positions capable of

25  influencing a significant proportion of the employer's decision-making. As a result,

26  important employment decisions are made and influenced principally by non-African-

27  Americans.  Subjective judgments of Kaiser' stratified supervisory and management system

28  are often infected with conscious or unconscious prejudices and race and/or race-gender

based stereotypes, which explains why so few African-American and African-American women out of Kaiser's large African-American and African-American female employee population advance to supervisory and management positions (¶14).

This pattern of unequal training, assignments, classifications, pay, discipline and advancement opportunities is not the result of random or non-discriminatory factors. Rather, it is the result of an on-going and continuous pattern and practice of intentional race and race-gender discrimination in training, assignments, classifications, pay, discipline, performance reviews, terminations and promotions, and reliance on policies and practices that have an adverse impact on African-American and African-American female employees that cannot be justified by business necessity, and for which alternative policies and practices with less discriminatory impact could be utilized that equally serve any asserted justification. Plaintiff is informed and believes that such policies and practices include, without limitation:

a.     Failure to consistently train African-American and African-American women in the unique Kaiser processes and practices necessary for desirable assignments and advancement.

b.     Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-African-American managerial workforce in making assignments, training, pay, performance review, discipline, promotion and termination decisions. Even where Kaiser's policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

c.     Reliance on race and race-gender stereotypes in making employment decisions such as assignments, promotions, pay and training.

d.     Pre-selection and "grooming" of non-African-American and non-African-American women employees for advancement, favorable assignments and training.

e.     Maintenance of largely race and race-gender segregated job categories and departments.

f.     Deterrence and discouragement of African-American and African-American female employees from seeking advancement, training, and favorable assignments and pay.

g.     Giving African-American and African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and non-African-American women employees.

h.    Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and African-American women employees, in disproportion to the same actions taken against non-African-American employees.

i.    Providing less training and support to African-American and African-American female employees and managers than that given to non-African-American employees and managers.

j.    Providing less or refusing to make reasonable accommodations for disabilities and sick leave policies with respect to African-American and African-American female employees, and unlawfully discriminating against African-American-employees due to their disabilities because of both their disabilities and their race and/or race-gender.

k.    Harassing African-American and African-American female employees interested in advancement and subjecting them to a hostile work environment.

l.    Maintaining and fostering a reputation for discriminatory conduct which deters African-Americans and African-American females from pursuing promotional opportunities with Kaiser;

m.    Establishing and maintaining arbitrary and subjective requirements for discipline and promotions which have the effect of excluding qualified African-Americans and African-American females and which have not been shown to have any significant relationship to job performance or to be necessary to the safe and efficient conduct of Kaiser's business;

n.    Failing and refusing to take adequate steps to eliminate the effects of its past discriminatory practices; and

o.    Retaliating against African-American and African-American women employees who complain of unequal treatment. [¶15.]

Kaiser's racially stratified workforce and discriminatory practices are propagated, entrenched and protected by centralized policies directed at the highest levels of management. Although Kaiser operates many different departments, it has centralized, company-wide policies and practices concerning supervisory training, human resources, EEO reporting and compliance and Kaiser's response to EEO complaints. In ¶16(a)-(l), plaintiff details several company-wide policies and practices through which Kaiser maintains centralized responsibility for the systemic discrimination in its workforce.

1    Because of its discriminatory policies and practices, Kaiser retains, promotes,

2  disciplines and terminates African Americans and African American women in statistically

3  significant disproportionate rates, based on the proportion of qualified African Americans

4  and African American women. Kaiser's pattern and practice of discrimination is so

5  pervasive and entrenched throughout that race and race-gender discrimination and unlawful

6  retaliation can be said to be its modes of operations (¶17).

7    Employment conditions grew so intolerable, Ms. Gamble suffered mental distress.

8  Moreover, following plaintiff's attempt to address her unequal and unlawful treatment at

9  Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory

10  policies and practices, including designation of plaintiff as not eligible for rehire;

11  unreasonable, pre-determined one-sided investigations conducted outside the standards for

12  workplace investigations for the purpose of covering up Kaiser's violations; unreasonable

13  and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts

14  by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree

15  to never apply to work at Kaiser again in the future (¶23).

16    As a direct and proximate result of defendants' actions, defendants breached duties

17  imposed on all employers, and caused Ms. Gamble to suffer, and continue to suffer, lost

18  wages, salary increases, earnings capacity and other benefits of employment, as well as

19  emotional pain, humiliation, mental anguish, and emotional distress. In addition, because

20  defendant's conduct was deliberate, wilful and malicious, plaintiff will be entitled to

21  exemplary damages (¶¶24-27).

22                                    **ARGUMENT**

23    Under Code of Civil Procedure §431.10(a), Ms. Gamble is entitled to plead material

24  allegations, defined as those "essential to her claim." Under subsection (b), Kaiser is

25  entitled to strike Ms. Gamble's allegations only if they are immaterial – i.e., they are not

26  essential to the claim, and if striking them does not leave her claims insufficient. Such

27  immaterial allegations must be"not essential," or not "pertinent" to or "supported by" Ms.

28  Gamble's otherwise sufficient claim. "Pertinent" is equated with relevant.

## I.    Plaintiff is Entitled to Plead Pattern and Practice Allegations

Kaiser challenges Ms. Gamble's allegations of systemic, class-wide discrimination against African American employees. Based on a claim never recognized by California courts under FEHA, or in the Ninth Circuit under Title VII, Kaiser argues "pattern and practice" allegations cannot be pleaded in a non-class, individual discrimination action. This defense is legally infirm, and resolution over standards of proof must await another day.

In the first instance, Ms. Gamble need not plead the *prima facie* elements set forth in the burden-shifting standards of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, adopted for FEHA under *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352. In *Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506, 510-12, the Supreme Court made clear the "*prima facie* case under *McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement."

> This Court has never indicated that the requirements for establishing a *prima facie* case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss. ... [U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a *prima facie* case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("The McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination"). ... It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered. Moreover, the precise requirements of a *prima facie* case can vary depending on the context and were "never intended to be rigid, mechanized, or ritualistic." Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required *prima facie* case in a particular case. Given that the *prima facie* case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases. [*Id*. (citations omitted).]

Kaiser also ignores the California case it cites, which follows this rule under FEHA. *See Alch v. Superior Court* (2004) 122 Cal. App. 4th 339, 381-82 (citing *Swierkiewicz*, and stating: "While the pleading standard is stricter in California, the plaintiff is required only to set forth the essential facts of his case 'with particularity sufficient to acquaint a defendant

1    with the nature, source and extent of his cause of action'") (citations omitted).

2        *See also Green v. State of California* (2007) 42 Cal. 4th 254, 275 (Werdegar, J.,

3    dissenting) (*McDonnell Douglas* test is vehicle used to "assure that the 'plaintiff [has] his

4    day in court despite the unavailability of direct evidence.' It does not define the elements of

5    the cause of action and 'does not apply in every employment discrimination case. For

6    instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail

7    without proving all the elements of a prima facie case'"); *Maduka v. Sunrise Hosp.*(9th Cir.

8    2004) 375 F.3d 909, 911-12 (applying *Swierkiewicz* in every situation where *McDonnell*

9    *Douglas* test might be applied); *Life Technologies Corp. v. Superior Court* (2011) 197 Cal.

10    App. 4th 640, 649-51 (describing use of statistical proof in disparate impact and disparate

11    treatment cases under FEHA).

12        There is no authority precluding an individual victim of discrimination in California

13    from establishing discriminatory intent through a pattern and practice of discrimination.

14    *Alch* notes the availability of pattern and practice allegations in class actions, but it does not

15    preclude such allegations in individual actions. In the Ninth Circuit, individual plaintiffs

16    may use statistical evidence to establish a generalized pattern of discrimination. *See*

17    *Heagney v. University of Washington* (9th Cir. 1981) 642 F.2d 1157, 1164 ("Generalized

18    statistics are ... undoubtedly relevant in cases alleging disparate treatment," including proof

19    of pattern of discrimination, giving rise to an inference of discrimination in the individual

20    employment decision at issue under *Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S.

21    324), *overruled on other grounds*, *Atonio v. Wards Cove Packing Co.* (9th Cir. 1987) 810

22    F.2d 1477; *Gay v. Waiters' & Dairy Lunchmen's Union* (9th Cir. 1982) 694 F.2d 531, 550

23    (error for the district court to ignore evidence of a pattern of discrimination as proof of

24    individual claims. "We have clearly held that, if reliable, generalized statistical data is

25    relevant and admissible at the *prima facie* case stage of a disparate treatment employment

26    discrimination lawsuit"); *Diaz v. AT&T* (9th Cir. 1985) 752 F.2d 1356, 1363 ("statistical

27    data is relevant because it can be used to establish a general discriminatory pattern in an

28    employer's hiring or promotion practices. Such a discriminatory pattern is probative of

1    motive and can therefore create an inference of discriminatory intent with respect to the

2    individual employment decision at issue. ... In some cases, statistical evidence alone may be

3    sufficient to establish a *prima facie case*. ... Even when not sufficient to establish a *prima*

4    *facie* case, statistical evidence is helpful in showing that an employer's articulated reason

5    fro the employment decision is pretextual").[1]

6        In a recent case in jurisdiction of the Ninth Circuit, the district court expressly

7    considered, and rejected, the argument that "pattern and practice" allegations should be

8    stricken from an individual's discrimination complaint.

9        The Court disagrees that this allegation is irrelevant or impertinent. Plaintiffs
10       allege that they are African-American and that they were qualified for a HAMP
         loan modification but were denied on the basis of their race. Plaintiffs also allege
11       that "white applicants of similar qualifications" were approved for loan
         modifications around the same time that Plaintiffs were denied. The alleged fact
12       that the white applicants were as similarly qualified for a HAMP modification as
         Plaintiffs makes them similarly situated to Plaintiffs for purposes of Plaintiffs'
13       claims. The allegation that the white applicants were approved while Plaintiffs
         were denied is relevant to Plaintiffs' allegation that Defendant discriminated
14       against them on the basis of race. [*Egbukichi v. Wells Fargo Bank, NA* (D. Or.
         Mar. 29, 2017) 2017 U.S. Dist. LEXIS 47731, *7.]
15

16        Kaiser's citation to cases from other jurisdictions is to no avail. Although other

17   circuits foreclose access to the *Teamsters* presumption in individual cases, that is not true in

18   the Ninth Circuit, or under FEHA. *Teamsters* itself was a non-class case. Moreover, the

19   better rule is the one followed in the Ninth Circuit, where systemic discrimination supports

20   proof of discriminatory intent. *See generally* 28 *Nova L.R.* Art. 14 "The Use of Pattern-and-

21   Practice by Individuals in Non-class Claims" (2004). Even in the circuits that decline access

22   to the *Teamsters* presumption, individual plaintiffs may nonetheless rely on statistical

23   proofs. *See Lowery v. Circuit City Stores, Inc.* (4th Cir. 1998) 158 F.3d 742 ("such plaintiffs

24   may use evidence of a pattern or practice of discrimination to help prove claims of

25

26       [1] *Lyons v. England* (9th Cir. 2002) 307 F.3d 1092, 1107 involved individual plaintiffs in
     a discrimination action. The Ninth Circuit expressly stated: "We do not mean to suggest that
27   ... plaintiff would be precluded from bringing a class-wide pattern-or-practice claim based on
     a series of discrete acts." *Id.*, at n.8. Because plaintiffs had "produced substantial evidence of
28   the kind typically used to prove a pattern or practice of discrimination," the Ninth Circuit
     directed the district court to consider whether the individual plaintiffs should be granted
     leave to "amend their complaint to include a pattern-or-practice claim." *Id.*

1    individual discrimination within the *McDonnell Douglas* framework"), *vacated on other*

2    *grounds*, 527 U.S. 1031 (1999); *Bacon v. Honda of Am. Mfg., Inc.* (6th Cir. 2004) 370 F.3d

3    565, 575 ("pattern-or-practice evidence may be relevant to proving an otherwise-viable

4    individual claim for disparate treatment under the *McDonnell Douglas* framework").[2]

5         In sum, it is well established in the Ninth Circuit and under Supreme Court precedent

6    that Ms. Gamble may allege pattern or practice discrimination, and support her individual

7    claims by proof of systemic bias. No class certification is required unless plaintiffs seek

8    representational status and equitable relief on behalf of absent class members. Whether

9    pattern or practice discrimination supports plaintiffs' *prima facie* claims and proof of

10   pretext under *McDonnell Douglas*, or whether individual plaintiffs are thereby entitled to

11   the *Teamsters* presumption, allegations made in the complaint properly support this action.

12   **II.    Reliance on Judge Lee's Order in *Kennedy* is Misplaced**

13        Kaiser relies heavily on the Order from Department 18 in the *Kennedy* matter. Such

14   reliance is seriously misplaced. Kaiser presumably has access to the hearing transcript on its

15   motion to strike Ms. Kennedy's allegations, which on this point was contested. During the

16   hearing, Judge Lee made clear that the plaintiff's allegations of systemic discrimination

17   were relevant to the case. Adopting the flawed argument of Kaiser in that case – not one

18   made here or even supported by the law – Judge Lee thought these relevant allegations were

19   not essential.

20        At page 5 of the transcript, the court stated it had no disagreement with plaintiff's

21   claim to "pattern and practice" proof, and it did not "doubt" that plaintiff "might have the

22   ability to" prove such facts. "[W]ith that kind of case, that would be admissible at trial."

23

24        [2]*Davis v. Coca-Cola Bottling Co. Consol.* (11th Cir. 2008) 516 F.3d 955 is completely

25   off-point. In stark contrast to plaintiff in this action, *Davis* plaintiffs sought broad declaratory
     and injunctive relief without pursuing class certification. *See id.*, at 963 & 969. Unlike
     plaintiffs here, no *Davis* employee was victimized by the pattern and practice of

26   discrimination. *Id.*, at 964 ("The complaint contains no count in which a plaintiff alleges that
     he was, or is, a victim of one or more specific features of the above pattern or practice of race

27   discrimination"). By the time the district court considered plaintiffs' pattern and practice
     claims, each individual's claim had been dismissed on grounds of timeliness. As a result, the

28   Eleventh Circuit did not decide the *Teamsters*' presumption, described at length in its
     footnote 31. *See id.* at 970.

1   At page 12, the court stated it would strike the allegations, but that its ruling should

2   not be considered a rejection on the basis of relevance.

3   THE COURT:· I haven't stricken it as irrelevant for purposes of evidence.· The
    only question is whether it is necessary and needed in the pleading itself, right? So
4   I haven't said it's irrelevant evidence or that it's not calculated to lead to --
    reasonably calculated to lead to the discovery of relevant evidence.
5

6   Subsequent to this hearing, the court granted Ms. Kennedy time to consider class

7   action allegations, and to check with DFEH on the status of her pending charge. Thereafter,

8   Ms. Kennedy determined to ask Department 18 for a stay of proceedings while DFEH

9   completed its investigation of a second, related charge. After a contested motion, the court

10  granted Ms. Kennedy a stay, and the matter is now with DFEH.

11  **III.    Ms. Gamble's Pattern and Practice Allegations Relate to Her DFEH Charge**

12  As an alternative to its argument that individual plaintiffs cannot plead "pattern and

13  practice" allegations, Kaiser argues Ms. Gamble's allegations are not related to her

14  individual claim, including the claim she asserted in the administrative process. There is no

15  merit to this argument.

16  Ms. Gamble's pattern and practice allegations do not raise sex discrimination claims.

17  Indeed, she is clear that there is a subclass of race for race/gender claims. Kaiser not only

18  discriminates against African Americans, but it also discriminates against African American

19  women. While Kaiser may have made strides in promoting women through its ranks – and

20  therefore plaintiff does not allege sex discrimination – it does not treat African Amercian

21  women with the same practice. Indeed, in proving disparity, Ms. Gamble intends to rely

22  upon statistics which compare Kaiser's actions against African American women to its

23  actions towards non-African American women. Such a claim is not a *gender* based

24  discrimination, but discrimination on the basis of race, shown more clearly when looking at

25  the race/gender subclass.

26  Kaiser's argument that Ms. Gamble was required to allege "pattern and practice" in

27  her DFEH charge is absurd. The *Teamsters* presumption is a method of proving race

28  discrimination; it is not a separate claim that must be exhausted administratively.

**IV.    This Case Should Be Reclassified as a Complex Case**

If Kaiser is correct, and Ms. Gamble is not permitted to prove her case of systemic discrimination on the basis of race as an individual – a position that plaintiff believes is contrary to the law – then she will consider refiling as a class action. In such a case, plaintiff will likely want to convert the case to a class action. But even as an individual action predicated on "pattern and practice" allegations, the case is a complex one, and it should be reclassified as such.

Complex cases will frequently be exempt from case management deadlines, but must be monitored with the goal of assuring disposition within 3 years after filing. Such cases must be assigned to a single judge, who must determine time limits for various phases of the litigation. CRC Standards of Jud. Admin., Standard 3.10. The complex litigation procedure is intended to facilitate pretrial resolution of evidentiary and other issues, and to minimize the time and expense of lengthy or multiple trials. *Rutherford v. Owens-Illinois, Inc.* (1997) 16 C4th 953, 966.

At the *ex parte* hearing on plaintiff's continuance request, the Court held an initial case management conference, and set trial for June of 2018. After that hearing, and in connection with discussions over a class action, plaintiff's counsel came to understand that the complex case procedure is appropriate here. Plaintiff is willing to pay the additional filing fee, and would confer with Kaiser regarding a staged proceeding. This would allow sufficient time for plaintiff to obtain discovery of Kaiser on its systemic discrimination, and to move for determination of Kaiser's breach of FEHA as a mode of its business, before reaching trial on plaintiff's damages.

## CONCLUSION

For the foregoing reasons, Kaiser's motion to strike should be denied, and the Court should consider reclassifying this action as a complex case.

Dated: June 22, 2017                              Respectfully submitted,

/s/Jeremy L. Friedman
Jeremy L. Friedman
Attorney for plaintiff Lunell Gamble

# DECLARATION OF COUNSEL

I, Jeremy L. Friedman, declarate and state:

Attached hereto as an exhibit is a true and accurate copy of the transcript from the January 31, 2017 Hearing in the referenced *Kennedy* matter. I note that the caption erroneously states the wrong department. I have contacted the court reporter, and expect to have a corrected caption by the time of the hearing.

I declare under penalty of perjury that the foregoing is true and correct of my own knowledge. Executed this 22nd of June, 2017.


/s/Jeremy L. Friedman
Jeremy L. Friedman

# PROOF OF SERVICE

Jeremy L. Friedman declares and states:

I have an office in Alameda county. I am over the age of eighteen years. My business address is 2801 Sylhowe Road, Oakland, CA, 94602.

I declare that on this day I served a copy of:

**Opposition to Motion to Strike and Declaration**

by electronic communication (per agreement) to:

Grube Brown & Geidt, LLP
Heather Morgan
601 Montgomery Street, Suite 1150
San Francisco, CA 941111


I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of June, 2017.


/s/Jeremy L. Friedman
Jeremy L. Friedman

**In the Matter Of:**

SHEILA KENNEDY vs. KAISER FOUNDATION, et al.,

---

**KENNEDY HEARING**

*January 31, 2017*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland** ◆ **San Francisco** ◆ **San Jose** ◆ **Los Angeles**

877.451.1580

www.aikenwelch.com



1            SUPERIOR COURT OF CALIFORNIA.

2                 COUNTY OF ALAMEDA

3       BEFORE THE HONORABLE DENNIS HAYASHI

4                 1221 OAK STREET

5                 DEPARTMENT 13

6                   ---oOo---

7    SHEILA KENNEDY,

8          Plaintiff,

9    vs.                        No. RG16822544

10   KAISER FOUNDATION HEALTH PLAN,
     INC.; et al.,
11
          Defendants.
12   _____/

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16       Taken before MARIA L. BRACKEN

17             CSR No. 11741

18            January 31, 2017

19

20

21

22

23        Aiken Welch Court Reporters
          One Kaiser Plaza, Suite 250
24        Oakland, California 94612
          (510) 451-1580/(877) 451-1580
25          Fax:  (510) 451-3797
               www.aikenwelch.com

Page 2

```
1  APPEARANCE OF COUNSEL:
2
3  For the Plaintiff:
4      JEREMY L. FRIEDMAN
        Law Office of Jeremy L. Friedman
5       2801 Sylhowe Road
        Oakland, California  94602
6       (510) 530-9060
7  For the Defendants:
8      GAL GRESSEL
        KERRY McINERNEY FREEMAN
9       Miller Law Group
        111 Sutter Street, Suite 700
10      San Francisco, California  94104
        (415) 464-4300
11      ggressel@millerlawgroup.com
        kmf@millerlawgroup.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1          P R O C E E D I N G S
2      Tuesday, January 31, 2017 - 3:11 p.m.
3              ---oOo---
4      THE COURT:  Hearing on the demurrer of Kennedy
5  versus Kaiser Foundation, Case No. RG16822544.
6      Let me have appearances, please.
7      MR. FRIEDMAN:  Good afternoon, your Honor.
8      Jeremy Friedman, the attorney for plaintiff.
9      THE COURT:  Okay.
10     MR. GRESSEL:  Good afternoon, your Honor.
11     Gal Gressel and Kerry Freeman on behalf of the
12 defendants.
13     THE COURT:  Thank you.
14     All right.  So I understand that this tentative
15 ruling was contested by plaintiff on -- and particularly
16 on the Court's ruling with respect to granting without
17 leave to amend the motion to strike the paragraph and
18 lines relating to the pattern of racial discrimination.
19 And then you wanted some additional guidance, perhaps, on
20 the other issues.
21     MR. FRIEDMAN:  Thank you, your Honor.
22     THE COURT:  Which would you like to address
23 first, the motion -- the grant without leave to amend?
24     MR. FRIEDMAN:  Yes, your Honor.
25     Systemic employment discrimination against
```

Page 4

```
1  African-Americans is a serious problem in our country and
2  it's a very real problem at Kaiser.
3      Kaiser is one of the largest employers that
4  hires a lot of African-American employees, but
5  African-American employees are not promoted, they're not
6  given the training, they're put in dead-end job
7  positions, they're singled out for discipline and they're
8  not retained, and as a result, they have a racially
9  stratified workplace.
10     THE COURT:  All right.
11     MR. FRIEDMAN:  The allegations of systemic
12 discrimination against African-Americans is the heart of
13 plaintiff's allegations.  Striking them from the
14 complaint fundamentally alters the claim that plaintiff
15 is trying to raise.
16     In paragraphs 11 through 17, we set forth the
17 way in which Kaiser as a whole, for all three different
18 Kaiser entities, controls, perpetrates and preserves this
19 pattern of discrimination.
20     Now, Kaiser would like it if the EEOC, the DFEH,
21 and the courts looked at all these cases in a vacuum as
22 if they were just one little individual case, but proving
23 individual discrimination in that context can be
24 impossible.  And that's why courts permit proof of
25 discrimination through various means, including pattern
```

Page 5

```
1  and practice discrimination.
2      THE COURT:  I don't doubt that you might have
3  that ability to do that with that kind of case that would
4  be admissible at trial.
5      MR. FRIEDMAN:  And not only --
6      THE COURT:  So I don't have any disagreement
7  with that.
8      MR. FRIEDMAN:  If it's admissible at trial, it's
9  important that we include the allegations in the
10 complaint.
11     THE COURT:  Well, that's the question.  Why?
12     MR. FRIEDMAN:  Because these are the
13 allegations, they're relevant -- they're directly
14 relevant to what she's claiming.  They form the proof of
15 intent and motive.  They also form the basis for the
16 punitive damage claim that's requested.
17     And it's important to know that the pattern and
18 practice discrimination cases are not just in class
19 actions.  Teamsters itself is not a class action.  And
20 the Nova law review article that I cited in the papers
21 discusses this at length and discusses the various
22 jurisdictions.  Even those jurisdictions that don't allow
23 you access to the Teamsters presumption still allow you
24 to plead systemic discrimination and prove systemic
25 discrimination as part of the case.
```

Page 6

1    The Ninth Circuit cases specifically say that if
2  you don't plead a pattern and practice claim, that you're
3  not entitled to -- you're not entitled to get that
4  pattern of practice evidence, the statistical evidence,
5  and to prove discriminatory intent by relating it to the
6  other claims.
7    So striking those claims would -- under the
8  Ninth Circuit cases that I cite, Higaney (phonetically),
9  Gay Waiters, Diaz, and Lyons versus England.  These are
10  all found on pages 13 and 14 of the opposition.
11    Now, this is not a cakewalk, Judge.  Proving
12  systemic discrimination is kind of hard because you have
13  to prove it's their mode of operation.  I wouldn't be
14  asking my client to take on a burden if it wasn't
15  necessary.  And litigating many cases against Kaiser,
16  this is exactly what's necessary in order to unearth the
17  pattern of discrimination against the African-Americans.
18    Now, there's also a FEHA case that I've cited in
19  Footnote 11, the Lifenet Technology case.  It talks about
20  the use of statistical proof and (inaudible) treatment
21  cases.
22    Now, the plaintiff must show discrimination
23  against African-Americans as a class, but that doesn't
24  mean she should have to bring a class action.  And
25  Ms. Kennedy would like to avoid having to plead class

Page 7

1  actions, to satisfy those class elements just to serve
2  her cause of action.
3    It's particularly appropriate against Kaiser,
4  because Kaiser has a centralized process for all three
5  entities by which you apply for employment, and the
6  standards and the guidelines by which -- how you get your
7  promotions.  They have centralized management,
8  centralized human resources.
9    And most important, Kaiser, all three entities,
10  has a centralized responsibility to track and report the
11  disparate treatment that they have towards
12  African-Americans.  They have to make reports to the EEOC
13  and the federal agencies, including assessing affirmative
14  action.
15    So when we have all of those elements here at
16  Kaiser, it's important that plaintiff be able to plead
17  those elements and include them in her case.  That's why
18  it's important and that's why we've appeared today.
19    And given that they're relevant, there is no
20  basis to strike the allegations.
21    THE COURT:  Okay.  Let me hear from defense
22  counsel on that issue.
23    MR. GRESSEL:  Thank you, your Honor.
24    Your Honor, there's a big difference between
25  relevance and the essential elements of the case.  As we

Page 8

1  all know, the standard for discovery is broad.  That's
2  the standard for relevance.  The standard on a motion to
3  strike raises the question of whether the allegations are
4  essential to the claims that are pled in the complaint
5  and cause of action itself.
6    There is no cause of action for pattern and
7  practice -- for a pattern and practice claim in an
8  individual case.  Plaintiff hasn't cited one.  There's
9  been a reference to the Teamsters case as a nonclass
10  case, but if we really dig into the Teamsters case, it
11  shows us why pattern and practice has never been applied
12  to an individual case.
13    The interest was the government bringing the
14  case on behalf of a number of employees against the
15  defendant employer.  The provision that the government
16  relied on was a provision under Title VII that
17  specifically lays out the ability to bring a pattern and
18  practice claim.  It's in the statute itself.  There's no
19  such text in any of the statutes that allow individuals
20  to proceed on discrimination claims, whether you look
21  under federal law or state law.  Plaintiff hasn't cited
22  them.  I'm not aware of any that exist.
23    The cases that the plaintiff has cited don't
24  stand for the proposition that you can bring a pattern
25  and practice case in the context of an individual

Page 9

1  plaintiff alone.
2    For example, the three Ninth Circuit cases, the
3  Higaney and Diaz cases were both individual cases that
4  adhered to the McDonnell Douglas framework requiring the
5  plaintiff to show discrimination against him or herself.
6  The Gay vs. Waiters case was, in fact, a class action
7  case.  It wasn't an individual case.
8    But all three cases do suggest that statistical
9  evidence can be relevant and perhaps admissible, but none
10  of them suggest that it's permissible to proceed on a
11  theory of pattern and practice in an individual case.
12  Because what happens is, it impermissibly shifts the
13  burden of proof and persuasion that the plaintiff is
14  required to present and to meet.  Under a pattern and
15  practice case, it's enough to just show that there's some
16  sort of policy or procedure that's discriminatory.  Then
17  the burden shifts to the defendant to show that it's
18  non-discriminatory.
19    That conflicts with repeated Supreme Court
20  holdings that holds that the individual plaintiff in an
21  individual case must always carry the burden of
22  persuasion.  In one of the cases we cited in our brief,
23  Chin versus New York and New Jersey Port Authority, lays
24  this out, goes into statutory history, and sort of
25  encompasses all of those issues.

Page 10

1    Plaintiff is asking for essentially a class
2  action case without the work of doing what it takes to
3  certify a class, without going through the procedural
4  safeguards that are there for all of the parties for the
5  unnamed numbers, et cetera. That's just not -- that's
6  not -- that has no support of the law and that's not the
7  way that it works, and we don't think that the Court
8  should adopt that here today.
9    THE COURT:  Let's address, then, the second
10 question you had, Counsel.  Maybe I didn't understand it,
11 but you sent an e-mail indicating that, with  respect to
12 the filing of an amended complaint, giving leave to file
13 an amended complaint as to the Kaiser (inaudible), do you
14 have a question about the manner in which to leave -- to
15 include these others entities, or what was it exactly
16 that you said, Counsel?
17   MR. FRIEDMAN:  Can I respond to a couple of the
18 points that he made?
19   THE COURT:  Sure.
20   MR. FRIEDMAN:  But I will go right to your
21 question after that.
22   THE COURT:  Yes.
23   MR. FRIEDMAN:  It's not true that the McDonnell
24 Douglas tests are the essential elements of the case.  In
25 fact, the McDonnell Douglas test is the burden of

Page 11

1  proof-shifting formula.  And the cases that I cite in my
2  opposition that were not discussed at all by counsel for
3  Kaiser show that you don't need McDonnell Douglas, you
4  use those standards to prove the elements.
5    In the cases that I cite, Mr. Gressel is wrong
6  about the individual cases.  The federal Ninth Circuit
7  cases are individual cases.  There's no case that says
8  you're not allowed to prove your individual case through
9  pattern and practice.  The case -- not from this
10 jurisdiction.
11   And the cases that I cite, including Teamsters,
12 show that you can.  Teamsters was brought by the
13 government, but now that -- it was brought on behalf of
14 an individual.  It was not seeking class-wide relief.
15 And in the Nova law review article, they go into great
16 detail about where the EEOC gets its authority to bring
17 these lawsuits, and it explains directly how pattern and
18 practice are specific elements of a claim that they're
19 allowed to bring on behalf of the individual.
20   THE COURT:  Let me ask you, Counsel.
21 Assuming that I went ahead and affirmed my tentative
22 ruling,you -- I'm not saying that at the time of trial
23 that you -- or during discovery, you could not get
24 discovery that proves the claim through -- your
25 individual client's claim, through statistical evidence

Page 12

1  or pattern and practice and so forth, and I think that
2  you don't -- you're not -- you're not precluded in order
3  to do so.
4    I think your argument may be (inaudible) easier
5  to get that discovery so you don't have to be fighting
6  about it as such.
7    MR. FRIEDMAN:  Not only that, we're entitled to
8  it, if it's in the complaint, at least entitled to ask
9  for it.  I mean, under the law, we would be entitled to
10 take discovery on any relevant information --
11   THE COURT:  Sure.
12   MR. FRIEDMAN:  -- and to strike this as
13 irrelevant, would leave us in a very big --
14   THE COURT:  I haven't stricken it as irrelevant
15 for purposes of evidence.  The only question is whether
16 it is necessary and needed in the pleading itself, right?
17 So I haven't said it's irrelevant evidence or that it's
18 not calculated to lead to -- reasonably calculated to
19 lead to the discovery of relevant evidence.  It may be.
20 I thought I was trying to make that very specific in the
21 tentative ruling.
22   MR. FRIEDMAN:  I understand that, your Honor,
23 but --
24   THE COURT:  I do understand, though, that if
25 it's an allegation, it certainly makes the discovery --

Page 13

1  perhaps makes the discovery a little bit easier to
2  obtain.
3    MR. FRIEDMAN:  And it's not only just -- yes,
4  your Honor.
5    And, in addition, it also, as I said, these
6  allegations about the problems at Kaiser form the heart
7  of the complaint and to remove them from the complaint
8  leaves the complaint without what we contend to be the
9  essential allegations against Kaiser.  Whether or not we
10 are correct on the elements of proof, whether or not the
11 burdens, those can be addressed and should be addressed
12 at a later stage, not at a pleading stage.
13   And it certainly doesn't shift the burden away
14 from us.  We would still have to meet that very heavy
15 burden.
16   On the vicarious liability question --
17   THE COURT:  Yes.
18   MR. FRIEDMAN:  -- my question was that we
19 have facts of direct liability, not just vicarious
20 liability.
21   THE COURT:  Okay.
22   MR. FRIEDMAN:  And so I just wanted to make
23 sure, if the Court is going to ask us to replead that --
24   THE COURT:  Yes.
25   MR. FRIEDMAN:  -- we can replead elements to

Page 14

1  show vicarious liabilities, but I'd like to know that I
2  can still plead direct elements.  And I would point out
3  that Health and Safety Code Section 1371.35 --
4          THE COURT:  Yes.
5          MR. FRIEDMAN:  -- the one that I cited,
6  specifically does not -- expressly does not foreclose
7  liability under statutes in common law.  And under FEHA,
8  all three of those entities could be defined as the
9  employer.  So I'd like to have that opportunity to define
10  them as such.
11          THE COURT:  You go ahead and leave to amend and
12  let's see what (inaudible) when we get the amended
13  complaint.
14          MR. FRIEDMAN:  Okay.
15          THE COURT:  But, yeah, I'm not foreclosing
16  amending whatever way you think is appropriate --
17          MR. FRIEDMAN:  Okay.
18          THE COURT:  -- to meet the standards.
19          MR. FRIEDMAN:  And then the last thing,
20  your Honor, was the question about time --
21          THE COURT:  Yes.
22          MR. FRIEDMAN:  -- in terms of amending the
23  complaint.
24          THE COURT:  Sure.
25          MR. FRIEDMAN:  If, in fact, she's not going to

Page 15

1  be able to use pattern and practice allegations, then we
2  would need to consider making this into a class action.
3          THE COURT:  All right.
4          MR. FRIEDMAN:  And then also be in touch with
5  the DFEH about her second charge.
6          THE COURT:  Sure.
7          MR. FRIEDMAN:  And if I could be given enough
8  time to file one amended complaint, I might able to
9  both add the class allegations, if that's going to be
10  required as a result of the Court's order, and also
11  potentially get the DFEH charge out of the administrative
12  process.
13          THE COURT:  Right.
14          MR. FRIEDMAN:  So I would ask, if possible, for
15  60 days, until April, for the amended complaint.
16          THE COURT:  Any objection, Counsel?  I don't
17  have any problem with giving him additional time.  I'm
18  sure you'll need additional time to get that.
19          MR. GRESSEL:  No objection.
20          THE COURT:  Okay.  So, let's see -- I'm trying
21  to see where I indicated -- I'm trying to look for it.
22  I'm going to amend my tentative ruling, since I gave you
23  that 60 days to file an amended complaint regarding the
24  situation here.  I should set forth on that.  Usually it
25  showed when the amended complaint should be filed, but 60

Page 16

1  days is fine.
2          So I will include it in a paragraph on that.
3          All right.  60 days is going to be sufficient.
4          Let's take a look at the dates on the calendar.
5  How about by April 7?
6          Counsel, does that work?
7          MR. FRIEDMAN:  Thank you, your Honor.
8          THE COURT:  Very good.  And then you can decide
9  what you're going to do in that regard.
10          By April 7th.
11          Thank you.
12          MR. GRESSEL:  Just a housekeeping matter.
13          THE COURT:  Yes.
14          MR. GRESSEL:  Should we still plan on a CMC as
15  scheduled?
16          THE COURT:  Let's take a look at that date here,
17  and probably not.  I'm sure you'll need additional time
18  here.  So let's move that CMC.  It was February.  Let's
19  move it back to sometime in mid April.  Well, actually,
20  how about April -- let's just do it the end of the month,
21  April 24th -- that's a Monday -- at 3:00 p.m., and we
22  will send you a new order in that regard.
23          Okay.  April 24, 3:00 p.m.
24          MR. FRIEDMAN:  3:00 p.m.
25          MR. GRESSEL:  Thank you, your Honor.

Page 17

1  THE COURT:  Very good.  Good luck.
2  (Whereupon the proceedings were concluded at
3  3:30 p.m. and continued to April 24, 2017 at
4  3:00 p.m.)

```
 1                    REPORTER'S CERTIFICATE
 2
 3          I, MARIA L. BRACKEN, a Shorthand Reporter, State
 4   of California, do hereby certify:
 5          That said proceeding was taken before me at said
 6   time and place, and was taken down in shorthand by me, a
 7   Certified Shorthand Reporter of the State of California,
 8   and was thereafter transcribed into typewriting, and that
 9   the foregoing transcript constitutes a full, true and
10   correct report of said proceeding that took place;
11          IN WITNESS WHEREOF, I have hereunder subscribed
12   my hand this 13th day of February 2017
13
14
             MARIA L. BRACKEN, CSR NO. 11741
15
16
17
18
19
20
21
22
23
24
25
```

ENDORSED
FILED
ALAMEDA COUNTY

JUN 2 7 2017

SUE PESKO
By _____

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA 94111
   Telephone: (415) 603-5000
5  Facsimile: (415) 840-7210

6  Attorneys for Defendants
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                        Case No. RG16826717

13        Plaintiff,                      ASSIGNED FOR ALL PURPOSES TO
                                          JUDGE IOANA PETROU
14        vs.                             DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,        REPLY IN SUPPORT OF
    INC; KAISER FOUNDATION              DEFENDANTS KAISER
16  HOSPITALS, INC; and THE             FOUNDATION HOSPITALS AND THE
    PERMANENTE MEDICAL GROUP; all        PERMANENTE MEDICAL GROUP'S
17  doing business as KAISER PERMANENTE  DEMURRER TO PLAINTIFF'S FIRST
    MEDICAL CARE PROGRAM,               AMENDED COMPLAINT
18
          Defendants.                    Date:     July 6, 2017
19                                       Time:     9:00 a.m.
                                         Judge:    Hon. Ioana Petrou
20                                       Dept.:    15

21                                       Reservation No. R-1844959

22                                       Complaint Filed:   August 9, 2016

23

24

25

26

27

28

REPLY ISO DEFTS' DEMURRER TO FIRST AMENDED COMPLAINT

I.  **INTRODUCTION**

Nothing in Plaintiff's Opposition cures the fatal procedural and legal deficiencies in her First Amended Complaint ("FAC").  The Court should sustain the Demurrer without leave to amend.

Plaintiff concedes she failed to name Defendants Kaiser Foundation Hospitals ("Hospitals") or The Permanente Medical Group ("Medical Group") in her DFEH charge.  This Court consequently lacks jurisdiction over her FEHA claims against those two entities.  None of Plaintiffs' arguments remedies her failure to exhaust:

- Plaintiff contends she was not required to know the names of Hospitals or Medical Group when she filed her DFEH charge, but that says too little.  The California Legislature already determined that when a plaintiff does not know which entity to name as her employer in a charge, she can obtain relief from FEHA's exhaustion requirements.  Cal. Govt. Code §§ 12928, 12960 (extending FEHA charge time limit by one year for plaintiffs whose W-2 identified wrong entity).  Even assuming that exception applied, Plaintiff had two years from her termination in July 2014 to file a charge naming Hospitals and Medical Group.  She did not.

- Plaintiff's "single employer" theory does not excuse her failure to name Hospitals and Medical Group, either.  The California Court of Appeals rejected a plaintiff's attempt to avoid compliance with FEHA's exhaustion requirements based on an analogous theory that unnamed defendants were "alter egos" with the named defendants.  *See Medix Ambulance Service, Inc. v. Superior Court*, 97 Cal. App. 4th 109, 116 (2002).

- The *federal* cases cited in Plaintiff's Opposition are wholly inapposite to whether Plaintiff properly exhausted FEHA claims under *California* law.  California law imposes different exhaustion requirements and recognizes different exceptions to exhaustion, which Plaintiff's federal cases fail to address or apply.

Because Plaintiff has not exhausted any FEHA claims against Hospitals or Medical Group, all three of her Causes of Action must be dismissed against those entities.

-1-

1     Even if Plaintiff had properly exhausted her claims against Hospitals and Medical Group,

2   she cites no California decisions permitting her to apply a theory of "single employer" or single

3   enterprise liability to Defendants.  First, Plaintiff's reliance on cases applying a single enterprise

4   theory of liability to parent-subsidiaries is misplaced because the FAC does not allege any such

5   relationship.  FAC ¶¶5-8 (Defendants contract with each other to provide services and facilities).

6   Second, California laws aimed at prohibiting the corporate practice of medicine mandate that

7   Defendant Kaiser Foundation Health Plan, Inc. ("KFHP") – the health care service plan that

8   undisputedly employed Plaintiff – maintain a separate legal existence from medical providers,

9   like Hospitals and Medical Group.  Given that unique relationship, Hospitals and Medical Group

10  challenged Plaintiff to identify a single California decision extending single enterprise liability to

11  a health care service plan and medical providers.  She has not done so.  Instead, she relies on

12  cases that either do not address single enterprise liability at all, or do so only in the context of

13  parent-subsidiaries.  Only one case identified by the parties in this Demurrer briefing addresses

14  the applicability of a single enterprise theory to a nonprofit foundation and a medical group:

15  *Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1006 (E.D. Cal. 2013).  The *Rhodes* court

16  determined as a matter of law that the single enterprise theory has no application outside the

17  context of parent-subsidiaries.  Plaintiff identifies no reason why this Court should reach a

18  different result.

19     Even if Plaintiff could proceed with a single enterprise theory as to Defendants, the FAC

20  fails to allege any facts sufficient to support that theory.  She merely alleges that Defendants

21  "work in cooperation with each other."  FAC ¶ 8.  This conclusory allegation does not suffice

22  even at the pleading stage, as court in *Kennedy v. Kaiser Found. Health Plan, Inc.* already held

23  when faced with a nearly identical allegation.  Demurrer to FAC ("Demurrer") at 10-11.

24     Plaintiff does not and cannot identify any amendment that would cure the fatal

25  deficiencies in her three FEHA claims against Hospitals and Medical Group.  Instead, Plaintiff

26  requests to add a different federal race discrimination claim.  That request must be presented to

27  the Court via a separate, properly-noticed motion that complies with California Rule of Court

28

REPLY ISO DEFTS' DEMURRER TO FIRST AMENDED COMPLAINT

1    ("CRC") 3.1324(a)-(b).  Even if Plaintiff is permitted to add a federal claim, however, the *FEHA*

2    claims at issue in this Demurrer should be dismissed with prejudice and without leave to amend.

3    **II.    <u>PLAINTIFF FAILS TO SHOW THAT SHE EXHAUSTED HER FEHA CLAIMS AGAINST HOSPITALS AND MEDICAL GROUP</u>**

4

5    Plaintiff concedes that she failed to name Hospitals or Medical Group in any DFEH

6    charge.  Opp'n to Demurrer to FAC ("Opp'n") at 11 (describing them as "non-named entities").

7    However, Plaintiff argues that she was not required to name Hospitals and Medical Group

8    because they allegedly "make up her single employer" and Plaintiff should not be "responsible

9    for knowing and naming other entities … in addition to the one she named."  Opp'n at 10.  This

10    argument is without merit.

11    **A.    <u>Plaintiff's "Single Employer" Exhaustion Argument Finds No Support In – And In Fact Contradicts – California Law.</u>**

12

13    Plaintiff cites no California law supporting her exhaustion argument.  Nor can she.  The

14    California Legislature already addressed what exceptions to FEHA exhaustion should apply to a

15    plaintiff who does not know which entity to name in a charge:

16          [T]he employee is not always able to determine the precise name or the identity of his or her employer.  The problem occurs, for

17          example, where there are parent and subsidiary corporations with similar names, but the employee is unaware of any distinction

18          between the two entities.  Very often these distinct entities are housed in the same facility which further complicate[s]

19          identification of the proper party to be named.

20    Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 211 (1999–2000 Reg.

21    Sess., as amended Sept. 1, 1999), p. 4.  The Legislature consequently provided for "a rebuttable

22    presumption that 'employer,'… includes any person or entity identified as the employer on the

23    employee's Federal Form W-2" (Govt. Code § 12928) and extended the statute of limitations an

24    additional year if the presumption is rebutted "to allow … a substitute identification of the actual

25    employer."  Govt. Code § 12960(d)(2).  Even assuming that exception applied, Plaintiff had until

26    July 29, 2016 – two years after her July 29, 2014 termination (FAC ¶ 22) – to file a charge that

27    added Hospitals and Medical Group as alleged employers.  She failed to do so.

28

1    Plainly, the Legislature is capable of relaxing FEHA's exhaustion requirements when it

2    perceives the need. It could have further extended the exhaustion time period in the case of a

3    plaintiff not knowing her employers' entities or it could have relaxed FEHA exhaustion for

4    plaintiffs who contend they were employed by a "single enterprise," but did not. Reading further

5    exceptions into FEHA exhaustion violates fundamental principles of statutory construction. *See*

6    *Andrus v. Glover Const., Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly

7    enumerates certain exceptions to a general prohibition, additional exceptions are not to be

8    implied, in the absence of a contrary legislative intent.").

9    After the exhaustion exception embodied in sections 12928 and 12960 was enacted, a

10    plaintiff argued that another exception to FEHA exhaustion should be made based on the alleged

11    relationship between named and unnamed defendants. *Medix Ambulance Service, Inc. v.*

12    *Superior Court*, 97 Cal. App. 4th 109 (2002), is instructive. In *Medix*, the plaintiff argued that

13    she should have been excused from naming two defendants in a DFEH charge based on her

14    theory that they were "alter egos" of the defendant whom she did name. The court rejected that

15    argument: "Nor is there any authority for plaintiff's unsupported argument that the doctrine of

16    alter ego somehow obviates compliance with the statutory requirements." *Id.* at 116. Plaintiff's

17    argument here that her "single employer" theory should somehow excuse her failure to exhaust

18    FEHA claims as to Hospitals and Medical Group is no different from the "alter ego" theory that

19    *Medix* rejected. Plaintiff makes no effort to even discuss – much less distinguish – *Medix*.

20    **B.    The Federal Cases That Plaintiff Does Cite Are Unavailing.**

21    As noted above, Plaintiff cites no California law in support of her exhaustion argument.

22    Instead, she relies on a string-cite of federal cases. Plaintiff's federal cases – most of which are

23    out-of-Circuit – have no bearing on the FEHA exhaustion issue before this Court.[1] None of

24    

25    [1] The only Ninth Circuit cases that Plaintiff cites address whether the EEOC's investigation of individual claims provided sufficient notice to pursue other claims against the same named employer. *Lucky Stores, Inc. v. EEOC*, 714 F.2d 911, 911-13 (9th Cir. 1983) (EEOC's investigation of one warehouse provided sufficient notice of claims arising from other warehouses); *EEOC v. Occidental Life Ins. Co. of Cal.*, 535 F.2d 533 (9th Cir. 1976) (EEOC could pursue claims not specified in the original charge, but discovered during EEOC's investigation of that charge). Neither case involved unnamed defendants; they have no bearing

26    

27    

28    

-4-

1  Plaintiff's federal cases account for the narrow exception to exhaustion carved out by the

2  California Legislature (Section II.A above), nor do they discuss or apply the *Medix* case.

3        California law and federal law also require different components for a plaintiff to exhaust

4  discrimination claims.  California law expressly requires a plaintiff to "*state the name and*

5  *address of the person, employer, labor organization or employment agency alleged to have*

6  *committed the unlawful practice complained of ...*" (Govt. Code § 12960(b)) (emphasis added) in

7  order to exhaust a FEHA claim.  Federal law imposes no such requirement.  Instead, a Title VII

8  charge filed with the EEOC need only include "a written statement *sufficiently precise to identify*

9  *the parties*, and to describe generally the action or practices complained of."  29 CFR

10  § 1601.12(b) (emphasis added) (EEOC regulation establishing contents of a charge).

11        Plaintiff points to no authority showing that California courts follow federal law when it

12  comes to exhaustion standards.  Indeed, California courts have shown independence in

13  articulating their own exhaustion standards.  For example, failure to exhaust creates a

14  jurisdictional defect in California that precludes the Court from hearing the claim (*see* Demurrer

15  at 5), whereas it provides only an affirmative defense in federal court.  *Zipes v. Trans World*

16  *Airlines, Inc.*, 455 U.S. 385, 393 (1982).  The California Supreme Court also declined to apply

17  Ninth Circuit standards for the continuing violation exception to exhaustion of a FEHA claim.

18  *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823 (2001) (adopting hybrid version of test

19  articulated by Ninth Circuit and other Circuits); *see also Johnson v. United Continental Holdings,*

20  *Inc.*, 2013 WL 1758760, *3 (N.D. Cal. Apr. 24, 2013) (granting plaintiffs leave to amend Title

21  VII claim to meet federal exceptions to exhaustion where they failed to name a defendant in their

22  administrative charge, but dismissing the FEHA claims with prejudice without leave to amend).

23        Further, even federal district courts applying FEHA have not permitted a plaintiff to evade

24  FEHA's exhaustion requirements merely by attributing "single employer" status to an unnamed

25  defendant.  In *Johnson*, the plaintiffs named wholly-owned subsidiaries as alleged wrongdoers in

26  _____

27  on this Demurrer.  In contrast to the other out-of-Circuit cases cited by plaintiff, courts in the
Ninth Circuit have rejected exhaustion arguments based on the "identity of interest" concept
because "[t]he Ninth Circuit has not adopted this test."  *Nowick v. Gammell*, 351 F. Supp. 2d

28  1025, 1036 n.30 (D. Haw. 2004).

1   their charges but failed to name their holding company.  2013 WL 1758760 at *2-3.  The

2   unnamed holding company moved to dismiss the plaintiffs' FEHA and Title VII claims.  *Id.*  In

3   response, the plaintiffs argued that the unnamed holding company and the named subsidiaries

4   were a "single employer" under the "integrated enterprise test" that shared "common

5   management, … common control of labor relations, and common ownership and financial

6   control" with the named defendants.  *Id.* at *1-2.  Applying *Medix*, the court granted the unnamed

7   holding company's motion to dismiss the FEHA claims, without leave to amend.  *Id.* at *3.  Here,

8   as in *Johnson*, Plaintiff's allegation that Defendants acted as a "single employer" or "integrated

9   enterprise" does not alter the exhaustion analysis.

10       In short, no legal authority holds that by naming one entity in a DFEH charge a plaintiff

11   exhausts her administrative remedies with entirely separate legal entities so long as she labels

12   them a "single employer" or "integrated enterprise."  Indeed, California and federal case law

13   precludes making such an end-run around exhaustion requirements.  *Medix*, 97 Cal. App. 4th at

14   116 (rejecting "alter ego" theory to evade exhaustion); *Johnson*, 2013 WL 1758760 at *3-4

15   (finding no exhaustion despite plaintiff's "single employer/integrated enterprise" theory).

16   Plaintiff is asking this Court to establish new law broadly changing the strict requirements of

17   FEHA exhaustion.  This Court should decline that invitation.

18   **III.    PLAINTIFF'S SINGLE ENTERPRISE THEORY FAILS IN ANY EVENT**

19       **A.    Plaintiff Effectively Concedes That California Law Mandates A Separate**
           **Existence Between Defendants.**
20

21       In their Demurrer, Hospitals and Medical Group submitted judicially noticeable evidence

22   that KFHP is the entity that employed Plaintiff.  Demurrer at 2-3.  Plaintiff does not dispute, and

23   thereby concedes, these judicially noticeable facts.

24       Plaintiff acknowledges, as she must, that her FAC alleges a very specific relationship

25   between Defendants.  KFHP is "a nonprofit corporation, licensed as a health care service plan …

26   that enrolls members in individual and group plans," while Hospitals and Medical Group are

27

28

-6-

1   medical providers.  *See* FAC ¶¶ 5-7.  That relationship carries specific and mandatory

2   consequences under California law in order to avoid the corporate practice of medicine:

3           … [w]hile the nonprofit [i.e., KFHP] may provide facilities or
            technical components of care, such as non-physician staff and
4           equipment, under [Cal. Health & Safety Code] section 1206(1), it
            must form an arm's length relationship with physicians solely
5           responsible for medical care [e.g., Medical Group] because
            California prohibits the corporate practice of medicine.
6

7   *Rhodes*, 949 F. Supp. 2d at 1007.

8       **B.    Plaintiff Cites No California Decision Applying Single Enterprise Theory
                Outside The Parent-Subsidiary Context, Much Less To A Health Plan And
9               To Medical Providers That Must Remain Legally Separate.**

10          In their Demurrer, Hospitals and Medical Group challenged Plaintiff to identify a single

11  California decision that has extended a single employer or a single enterprise theory to a nonprofit

12  health plan (KFHP) that contracts with medical providers (Hospitals and Medical Group) to

13  provide medical services to patients.  Plaintiff fails to do so in her Opposition.

14          Instead, Plaintiff relies on federal cases discussing the federal "integrated enterprise" test.

15  As the Ninth Circuit explained, the "integrated enterprise" test "does not determine *joint liability*

16  ... but instead determines whether a defendant can meet the statutory criteria of an 'employer' for

17  Title VII applicability," specifically, the statutory requirement that an "employer" have 15 or

18  more employees.  *Anderson v. Pac. Maritime Ass'n*, 336 F.3d 924, 928-29 (9th Cir. 2003)

19  (emphasis added).  Where a plaintiff's employer has at least 15 employees, the "integrated

20  enterprise test is inapplicable." *Id.*  Here, "there is no dispute that [each Defendant] has fifteen or

21  more employees," and thus Plaintiff's "reliance on the integrated enterprise test is misplaced."

22  *Johnson*, 2013 WL 1758760, at *2.

23          Even if Plaintiff could invoke the single enterprise theory, the cases she cites either fail to

24  address the single enterprise test as a theory of liability at all or fail to apply the theory outside the

25  context of parent-subsidiary relationships.  *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211 (9th

26  Cir. 1989), did not involve any claims under California law, nor did it address the impact of

27  California's laws mandating a separate existence for Defendants on Plaintiff's single enterprise

28

-7-
REPLY ISO DEFTS' DEMURRER TO FIRST AMENDED COMPLAINT

theory. *Vernon v. State*, 116 Cal. App. 4th 114 (2004), did not address the single employer or single enterprise theory at all, but rather held that the State of California was not an "indirect or joint employer" of a firefighter employed by the City of Berkeley. *Id.* at 127, 134. *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474 (2014), also did not address the single enterprise theory, but in Plaintiff's words, "looked at whether a franchisor was also the employer of its franchisee's employees, using traditional concepts of agency and respondeat superior." Opp'n at 7.

All of the other cases cited in Plaintiff's Opposition involve parent-subsidiaries, rendering these cases wholly inapposite. *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1230 (2007) (nationwide seller of homes in community developments was not a joint employer, alter ego, or integrated enterprise with its subsidiary); *Taylor v. Shippers Transport Exp., Inc.*, 2014 WL 7499046, *1 (C.D. Cal. Sept. 30, 2014) (addressing "the interrelation" between a trucking company and another subsidiary of the same parent company); *Trosper v. Stryker Corp.*, 2014 WL 1619052, *1-2 (N.D. Cal. Apr. 22, 2014) (same).

The cases cited by Plaintiff thus involve fundamentally different relationships than what Plaintiff alleges here. As set forth above, Plaintiff alleges that Defendants contract with each other to provide services and facilities and "work in cooperation with each other." FAC ¶¶ 5-8. Plaintiff does *not* allege that any franchise or parent-subsidiary relationship exists between Defendants. In contrast to Defendants, California law does not *mandate* that franchisees and franchisors or parent-subsidiaries maintain a separate legal existence.

As set forth in the Demurrer, the *Rhodes* court as a matter of law declined to apply the single enterprise theory outside of the parent-subsidiary context and *specifically* declined to apply this theory to contractual relationships involving non-profit health plans and medical service providers. 949 F. Supp. 2d at 1008 ("It would … be difficult to know where to draw the line amidst contractual relationships once this court extended the test beyond the parent-subsidiary relationship."). Of all the cases cited by the parties, only *Rhodes* addresses the specific question before this Court: whether a plaintiff may "extend application of the integrated enterprise test to the relationship between … a nonprofit corporation [i.e., KFHP] and a medical group." *Id.* at

1007. *Rhodes* answered that question in the negative, supported by thorough reasoning. Plaintiff

identifies no valid reason to reach a different result here.[2]

### C.   Plaintiff's Conclusory Allegations Fail To Meet The "Single Enterprise" Test In Any Event.

The FAC fails to allege facts sufficient to meet California's single enterprise test in any

event. Plaintiff's reliance on *Patterson* and *Maddock* to establish her single enterprise theory is

misplaced. As noted above, both cases involved *joint* employer theories.[3] By contrast, the FAC

and Plaintiff's Opposition allege that Defendants are a "single employer." FAC ¶ 29. As set

forth in the Demurrer, *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727 (1998), *overruled*

*on other grounds in Reid v. Google, Inc.*, 50 Cal. 4th 512 (2010), provides the relevant test for

single enterprise liability under California law.

Plaintiff fails to allege facts meeting that test in the FAC. She alleges no facts showing

that Hospitals or Medical Group exercised day-to-day control over Plaintiff's employment or

KFHP's employment decisions in general. *Laird*, 68 Cal. App. 4th at 742. Plaintiff merely

attributes all conduct to Defendants as a single entity that "work[s] in cooperation with each

other." FAC ¶ 8. This conclusory allegation falls far short of a single enterprise claim.

Implicitly acknowledging these fatal deficiencies, Plaintiff alleges that "the question of

single employer must be answered by looking to the facts established by the evidence." Opp'n at

9. Plaintiff cites no case that supports this proposition. On the contrary, California courts

routinely resolve the question of whether a complaint sufficiently alleges employment status on

demurrer. *Vernon* – which Plaintiff characterizes as "a leading case identifying the characteristics

of an employer for FEHA purposes" (Opp'n at 8) – held that the lower court properly granted the

---

[2] Plaintiff mislabels *Rhodes* as "inapposite" because it purportedly involved a plaintiff's attempt "to impose vicarious liability on a parent corporation for the wrongs of its subsidiary." Opp'n at 6. Plaintiff is mistaken. *Rhodes* involved directly analogous entities – a nonprofit foundation providing services and facilities to a medical provider. 949 F. Supp 2d at 1007-08.

[3] Even if Plaintiff were proceeding under a "joint employer" theory, the FAC fails to allege facts supporting that theory. The FAC does not allege that Hospitals or Medical Group "retained or assumed the traditional right of general control an 'employer' or 'principal' has over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." *Patterson*, 60 Cal. 4th at 742.

-9-

1    State of California's demurrer where the plaintiff failed to allege any facts supporting her joint

2    employer theory. *Vernon*, 116. Cal. App. 4th at 130-31. The same result should obtain here.

3                D.    **Plaintiff Cannot Amend The Complaint To Cure The Jurisdictional Defect**
                       **And Legal Deficiencies Of Her Claims Against Hospitals And Medical Group.**

4

5           Plaintiff identifies no possible amendment that would enable her to cure the fatal

6    deficiencies in her FEHA claims against Hospitals and Medical Group. Instead, she requests to

7    add a race discrimination claim against Hospitals and Medical Group under 42 U.S.C. § 1981 on

8    the ground that such claim "does not have an exhaustion requirement." Opp'n at 11. Plaintiff

9    should be required to file a formal motion to amend a pleading and declaration that: (1) include a

10   copy of the proposed amendment or amended pleading; (2) state what allegations in the previous

11   pleading are proposed to be added or deleted, if any, and where, by page, paragraph, and line

12   number, the deleted or added allegations are located; (3) specify the effect of the amendment; (4)

13   state why the amendment is necessary and proper; (5) state when the facts giving rise to the

14   amended allegations were discovered; and (6) state the reasons why the request for amendment

15   was not made earlier. CRC 3.1324(a)-(b). Whether or not Plaintiff is permitted to add a federal

16   claim, her *FEHA* claims against Hospitals and Medical Group still cannot proceed past this

17   Demurrer and should be dismissed at this time without leave to amend.

18   IV.    **CONCLUSION**

19          For all the foregoing reasons, Hospitals and Medical Group respectfully request that the

20   Court sustain their demurrer and dismiss them with prejudice from this case, without granting

21   Plaintiff leave to amend.

22   DATED: June 28, 2017                        GRUBE BROWN & GEIDT LLP

23

24                                    BY: *Amanda Bolliger Crespo/KCH*
                                          AMANDA BOLLIGER CRESPO

25
                                          Attorneys for Defendants
26                                        KAISER FOUNDATION HEALTH PLAN,
                                          INC; KAISER FOUNDATION HOSPITALS;
27                                        and THE PERMANENTE MEDICAL
                                          GROUP

28
                                          -10-

**PROOF OF SERVICE**

1

2       I am employed in the City of San Francisco and County of San Francisco, State of

3 California. I am over the age of eighteen years and not a party to the within-entitled action. My

4 business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

5       On June 28, 2017, I served a copy of the within document(s):

6 **REPLY IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HOSPITALS AND
THE PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST
7 AMENDED COMPLAINT**

8 on the interested parties:

9     ☐   VIA FAX: By transmitting via facsimile the document(s) listed above to the fax
10           number(s) set forth below on this date before 5:00 p.m.

11     ☐   VIA U.S. MAIL: I am readily familiar with the firm's practice of collection and
          processing of correspondence for mailing. Under that practice such sealed
12           envelope(s) would be deposited with the U.S. postal service on the above date with
          postage thereon fully prepaid, at San Francisco, California.
13

14     ☒   VIA OVERNIGHT SERVICE: By placing the document(s) listed above in a sealed
          UPS envelope and affixing a pre-paid air bill, and causing the envelope to be
15           delivered to a UPS agent for delivery.

16     ☐   VIA PERSONAL SERVICE: By causing to be delivered the document(s) listed
          above to the person(s) at the address(es) set forth below.
17

18     ☒   VIA E-MAIL: By transmitting a PDF version of the document(s) by e-mail to the
          person(s) set forth below using the e-mail address(es) indicated.

19

20 Jeremy L. Friedman               Telephone: 510-530-9060
Law Office of Jeremy L. Friedman      Facsimile: 510-530-9087
21 2801 Sylhowe Road              Email: jlfried@comcast.net
Oakland, CA 94610

22

23       I declare under penalty of perjury under the laws of the State of California that the above

24 is true and correct.

25       Executed on June 28, 2017, at San Francisco, California.

26

27                                 _____
                                  Janet Gogna

28

- 1 -
PROOF OF SERVICE

ENDORSED
FILED
ALAMEDA COUNTY

JUN 2 7 2017

SUE PESKO

By _____

1   GRUBE BROWN & GEIDT LLP
    HEATHER A. MORGAN (SB# 177425)
2   AMANDA BOLLIGER CRESPO (SB# 250292)
    heathermorgan@gbgllp.com
3   amandacrespo@gbgllp.com
    601 Montgomery Street, Suite 1150
4   San Francisco, CA 94111
    Telephone: (415) 603-5000
5   Facsimile: (415) 840-7210

6   Attorneys for Defendants
    KAISER FOUNDATION HEALTH PLAN, INC.;
7   KAISER FOUNDATION HOSPITALS; and
    THE PERMANENTE MEDICAL GROUP

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13          Plaintiff,                      ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14      vs.                                 DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **REPLY IN SUPPORT OF**
    INC; KAISER FOUNDATION                  **DEFENDANTS KAISER**
16  HOSPITALS, INC; and THE                 **FOUNDATION HEALTH PLAN, INC;**
    PERMANENTE MEDICAL GROUP; all           **KAISER FOUNDATION HOSPITALS;**
17  doing business as KAISER PERMANENTE     **AND THE PERMANENTE MEDICAL**
    MEDICAL CARE PROGRAM,                   **GROUP'S MOTION TO STRIKE**
18                                          **ALLEGATIONS IN PLAINTIFF'S**
            Defendants.                     **FIRST AMENDED COMPLAINT**
19
20                                          Date:    July 6, 2017
                                            Time:    9:00 a.m.
21                                          Judge:   Hon. Ioana Petrou
                                            Dept.:   15
22
                                            **Reservation No. R-1844960**
23
                                            Complaint Filed:    August 9, 2016
24

25

26

27

28

─────────────────────────────────────────────
REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

1    I.    **INTRODUCTION**

2        Plaintiff wants to have her cake and eat it, too.  She has chosen to bring an individual

3    discrimination case solely on her own behalf.  Yet, she makes sweeping Pattern and Practice

4    Allegations in her First Amended Complaint ("FAC").  In doing so, Plaintiff wants all the

5    benefits of a class action – class-wide discovery, complex designation, and all – without the

6    attendant procedural and proof burdens.  Moreover, she seeks to rely on the legal framework

7    applicable to pattern-or-practice claims and thereby evade the ultimate burden of persuasion she

8    carries on her individual claims.  The Court should not permit Plaintiff these shortcuts.

9        Plaintiff offers two rationales for the sweeping Pattern and Practice Allegations in her

10   FAC: (1) they support a pattern-or-practice theory of liability; and (2) she may submit statistical

11   evidence in support of her individual wrongful termination claims.  Neither of these has merit.

12       First, there is no authority – California or federal – permitting a pattern-or-practice theory

13   of liability in a single-plaintiff case.  To the contrary, the California Supreme Court, U.S.

14   Supreme Court, and seven different district courts all recognize that "[p]attern-or-practice suits,

15   *by their very nature*, involve claims of classwide discrimination."  *Alch v. Sup. Ct.*, 122 Cal. App.

16   4th 339, 379 (2004) (emphasis added).

17       Second, Plaintiff's argument that statistical evidence can be relevant in an individual

18   employment case misses the point.   Neither the FAC nor Plaintiff's Opposition identifies any

19   basis to find Plaintiff's Pattern and Practice Allegations "sufficiently similar" to the "factual

20   scenarios … presented by … [P]laintiff concerning her own discharge" to be relevant or essential

21   to Plaintiff's claims. *Johnson v. United Cerebral Palsy*, 173 Cal. App. 4th 740, 767 (2009).  That

22   Plaintiff may later introduce statistics that are factually tied to her individual claims does not alter

23   the analysis.  The court in *Kennedy v. Kaiser Found. Health Plan* recognized that principle and

24   still struck nearly identical pattern-or-practice allegations.  This Court should do the same.

25       Plaintiff suggests that Defendants should be foreclosed from making this Motion to Strike

26   because the issue was not raised in their prior demurrer.  This argument is baseless.  Plaintiff does

27   not cite to any authority supporting her waiver theory.  As Defendants noted in the first

28   Demurrer, they could not formulate a response or defenses to Plaintiff's claims because the

-1-

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

1   initial complaint failed to specify which causes of action she was asserting, against whom, and on

2   what basis. *See* Compl. ¶¶ 16-20. Defendants reasonably waited for Plaintiff to file the FAC

3   specifying her claims before assessing whether the "Pattern and Practice Allegations" related to

4   those claims. Moreover, Defendants' challenge to Plaintiff's Pattern and Practice Allegations is

5   legal in nature and not waivable. *Unruh v. Truck Ins. Exch.*, 7 Cal. 3d 616, 622 (1972) (defenses

6   that "the complaint fails to state facts sufficient to constitute a cause of action and that the court

7   lacked jurisdiction … are not waivable and may even be asserted for the first time on appeal").

8           Plaintiff's Opposition confirms that the intended effect of the Pattern and Practice

9   Allegations at issue in this Motion To Strike is to prosecute this case as a class action without

10  meeting class certification requirements developed to protect the due process rights of unnamed

11  class members and defendants, and without carrying her burden of proof on her discrimination

12  claim. Plaintiff's extraordinary suggestion that this single-plaintiff case be designated as

13  "complex" – a designation reserved for class actions and other complex litigation matters – only

14  underscores that this is her objective. Defendants' Motion to Strike should be granted.

15  **II.    PLAINTIFF FAILS TO SHOW HOW HER PATTERN AND PRACTICE
        ALLEGATIONS ARE MATERIAL, ESSENTIAL, OR PERTINENT TO HER**
16      **INDIVIDUAL CLAIMS**

17          In her Opposition, Plaintiff concedes that Defendants are "entitled to strike [Plaintiff's]

18  allegations … if they are immaterial," "not 'pertinent' to or 'supported by' [Plaintiff's] otherwise

19  sufficient claim," or otherwise not "essential to her claim[s]." Opp'n at 8. Plaintiff argues that

20  her Pattern and Practice Allegations meet this standard because (1) Plaintiff may assert

21  "allegations of systemic, class-wide discrimination against African American employees" (Opp'n

22  at 9:2-3); (2) Plaintiff may "support her individual claims by proof of systemic bias" (Opp'n at

23  12:6-7); and (3) the *Kennedy* case held that nearly identical allegations "were not essential," but

24  did not find the allegations "irrelevant" (Opp'n at 12:18-19). Each of these arguments fails.

25      **A.    Whether Plaintiff May Rely On A *Teamsters* Theory Of Liability In This
            Individual Discrimination Case Is A Purely Legal Issue That This Court Can**
26          **– And Should – Decide Now.**

27          Plaintiff has not brought a class action. Nevertheless, Plaintiff confirms that she intends

28  to make "allegations of systemic, *class-wide* discrimination against African American

-2-

employees." Opp'n at 9:2-3 (emphasis added). In so doing, Plaintiff seeks to avoid her burden of proof to establish that her termination was the product of intentional discrimination and to instead shift the burden of proof to Defendants. *See Int'l Bro. of Teamsters v. U.S.*, 431 U.S. 324, 360 (1977) (upon a showing by the government that the employer had a regular procedure or policy of unlawful discrimination, the government was not required to offer evidence of discrimination for each person; instead, the burden shifted to the employer to defeat the prima facie showing).

Plaintiff asserts that whether she will be entitled to such a *Teamsters* presumption cannot be resolved at the pleading stage. Opp'n at 1:25-27. She is wrong. This is a pure question of law, and this Court has authority to "[s]trike out all or any part of any pleading not drawn or filed in conformity with the laws of this state" via a motion to strike or "at any time." CCP § 436.

Waiting until *after* discovery and completion of summary judgment briefing to resolve this question – as Plaintiff suggests – would undercut judicial efficiency and due process principles that entitle Defendants to notice of what claims they are defending. Plaintiff's recitation in her Opposition of the procedural history from the *Kennedy* case (Opp'n at 12-13) only underscores this point. In *Kennedy*, after the Court struck nearly identical pattern-or-practice allegations, it granted the plaintiff time "to consider class action allegations." Opp'n at 13:6-7. Plaintiff's counsel likewise advised this Court that Plaintiff likely would seek to amend her complaint yet again if she is not permitted to pursue her pattern-or-practice theory.

If Plaintiff were to lose the pattern-or-practice theory argument at summary judgment – a likely result given the clear case law (*see* Sections II.B-C below) – she would seek to amend her complaint with a class claim at that time. If granted, that would mean restarting this case from ground zero, *after* the parties already had completed depositions, written and document discovery on Plaintiff's individual claims, and summary judgment briefing. By contrast, forcing Plaintiff to choose now whether she will pursue this case as a class or individual action permits the parties to tailor their discovery, deposition, and other litigation strategies appropriately so that depositions and discovery need not be repeated to address the divergent issues presented by a class action as opposed to an individual case. The sequence of events that Plaintiff suggests also flips California class action procedure on its head, which generally requires that plaintiffs *first* establish the

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

1   requirements to certify a class *before* obtaining class-wide merits discovery. *See, e.g.*, *CVS*

2   *Pharmacy, Inc. v. Sup. Ct.*, 241 Cal. App. 4th 300, 312-13 (2015) (trial court abused its discretion

3   in FEHA class action by allowing precertification discovery regarding putative class members

4   impacted by an allegedly discriminatory termination policy where plaintiff "was never a member

5   of the class she sought to represent" in that she "was [not] a victim of the alleged termination

6   policy" challenged in the class action); *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D.

7   Cal. 2014) ("Generally at the pre-class certification stage, discovery in a putative class action is

8   limited to certification issues such as the number of class members, the existence of common

9   questions, typicality of claims, and the representative's ability to represent the class.").

10  **B.    California Law Does Not Support – But In Fact Rejects – Plaintiff's Attempt**
    **To Invoke A Pattern-Or-Practice Theory Of Liability To Prove Her**
11  **Individual Claims.**

12      Plaintiff concedes this is a single-plaintiff case, not a class action.  She also recognizes

13  that the only reported California case involving pattern-or-practice allegations – *Alch* – addressed

14  "the availability of pattern and practice allegations in class actions" only.  Opp'n at 10:14.

15  Nevertheless, Plaintiff contends that *Alch* "does not preclude such allegations in individual

16  actions." *Id.* at 10:14-15.  That argument ignores the California Supreme Court's statement in

17  *Alch* itself that "[p]attern-or-practice suits, by their very nature, involve claims of classwide

18  discrimination." 122 Cal. App. 4th at 379.  Aside from acknowledging *Alch*, Plaintiff does not

19  and cannot cite a single decision from California permitting her to pursue pattern-or-practice

20  liability without satisfying California's procedural requirements to certify a class.

21  **C.    The Federal Cases Plaintiff Cites Are Inapposite; Federal Courts Uniformly**
    **Have Rejected Applying A Pattern-Or-Practice Theory To Individual**
22  **Discrimination Claims.**

23      As noted above, Plaintiff cites no California law in support of her pattern-or-practice

24  argument.  Instead, she relies on federal cases, many of which are out of Circuit.  These cases

25  have no bearing on the FEHA liability issue before this Court.  None of Plaintiff's federal cases

26  addresses the narrow definition of pattern-or-practice suits the California Supreme Court

27  articulated in *Alch*, or shows that California courts follow federal law when it comes to pattern-

28  or-practice claims.  Even if Plaintiff could invoke federal liability rules for her FEHA claims,

-4-

1    neither *Teamsters* nor federal cases applying *Teamsters* permit a plaintiff to pursue a pattern-or-

2    practice theory of liability in a single-plaintiff case.

3            **1.    Plaintiff's Interpretation Of *Teamsters* Conflicts With Case Law From
                 The U.S. Supreme Court And All Seven Circuit Courts That Actually
4                Have Addressed Her Argument.**

5        In her Opposition, Plaintiff mislabels *Teamsters* as a "non-class case." Opp'n at 11:18.  In

6    *Teamsters*, the U.S. government brought suit against the defendant employer on behalf of a *class*

7    of employees, alleging that the employer had engaged in a "pattern and practice of employment

8    discrimination against Negroes and Spanish-surnamed" employees, for whom the government

9    sought redress.  431 U.S. at 328-29.  Plainly, *Teamsters* does not apply to a single-plaintiff case

10   brought by a private litigant, such as Plaintiff.

11       The U.S. Supreme Court confirmed the narrow reach of *Teamsters* a few years later, in

12   *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984).  There, the Court expressly

13   recognized that, "The crucial difference between an individual's claim of discrimination and a

14   class action alleging a general pattern or practice of discrimination is manifest." *Id.* at 876.

15       In fact, as set forth in the Motion to Strike, *every* federal Circuit court that actually has

16   addressed the issue – including the Second, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh

17   Circuits – has rejected applying a pattern-or-practice theory to employment discrimination claims

18   brought by nonclass, private plaintiffs.  Motion at n.5.  The Second Circuit explained why:

19               Permitting private plaintiffs to use the pattern-or-practice method of
                proof outside the class action context would require us to extend
20              this method beyond its current application.  This we decline to do.
                Such an extension would allow nonclass private plaintiffs who have
21              shown a pattern or practice of discrimination (but have not made
                out a disparate impact claim) to shift the burden to employers to
22              prove that they did not discriminate against a particular individual.
                But this would conflict with the Supreme Court's oft-repeated
23              holding in the context of disparate-treatment, private nonclass
                litigation that "[t]he ultimate burden of persuading the trier of fact
24              that the defendant intentionally discriminated against the plaintiff
                remains at all times with the plaintiff." [*Tex. Dep't of Cmty. Affairs
25              v. Burdine*, 450 U.S. 248, 253 (1981).]  To be sure, proof that an
                employer engaged in a pattern or practice of discrimination may be
26              of substantial help in demonstrating an employer's liability in the
                individual case.  But such proof cannot relieve the plaintiff of the
27              need to establish each element of his or her claim.

28

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 141, 149 (2d Cir. 2012) (district court erred in submitting pattern-or-practice disparate treatment theory to jury in private, nonclass action).

### 2.    Plaintiff Does Not And Cannot Cite To Any Ninth Circuit Case That Applies A *Teamsters* Presumption to Individual Claims.

Plaintiff concedes "other Circuits foreclose access to the *Teamsters* presumption in individual cases," but asserts "that is not true in the Ninth Circuit." Opp'n at 11.  Not so.

Plaintiff does not and cannot cite any Ninth Circuit decision that applies a *Teamsters* presumption in a single-plaintiff case.  The language Plaintiff quotes from *Lyons v. England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002) – a multi-plaintiff case involving four plaintiffs – is *dicta* discussing what *limitations* period *would* apply to a "class-wide pattern-or-practice claim based on a series of discrete acts," a question that the Ninth Circuit expressly "d[id] not consider" in *Lyons*.  *Diaz v. AT&T*, 752 F.2d 1356, 1363 (9th Cir. 1985), merely acknowledged that statistical evidence may be probative in an individual case.  It did not hold that an individual plaintiff may proceed on a pattern-or-practice theory of liability.[1]

In short, no legal authority holds that an individual plaintiff may pursue a *Teamsters* theory of liability or assert class-wide pattern and practice claims without certifying a class.  Indeed, California and federal case law preclude that result.  Plaintiff is asking this Court to establish new law broadly changing the burdens of proof applicable to individual FEHA claims.  This Court should decline that invitation.

### D.    Plaintiff Identifies No Factual Similarity Between Her Pattern and Practice Allegations And Her Individual Claims.

In her Opposition, Plaintiff criticizes Defendants for "argu[ing] 'pattern and practice' allegations cannot be pleaded in a non-class, individual discrimination action." Opp'n at 9:4-5.  Plaintiff misunderstands Defendants' position.  On the contrary, "Defendants recognize that so-

---

[1] The other Ninth Circuit cases Plaintiff cites predate the U.S. Supreme Court's decision in *Cooper* clarifying the difference between individual claims and class-wide pattern-or-practice claims.  *Heagney v. Univ. of Wash*, 642. F.2d 1157, 1158-59 (9th Cir. 1981), also did not hold that an individual plaintiff may proceed on a pattern-or-practice theory of liability; it merely recognized that some statistical evidence was relevant to that plaintiff's individual discriminatory pay claim.  *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982), was a class action case and has no bearing on Plaintiff's ability to assert a pattern-or-practice theory in a single-plaintiff case.  *Egbukichi v. Wells Fargo Bank*, 2017 U.S. Dist. LEXIS 47731 (D. Or. Mar. 29, 2017) is a consumer lending case, not an employment matter, and has no bearing here.

called 'pattern and practice' allegations at times can appropriately be asserted in a single-plaintiff civil complaint when the allegations are *relevant* to Plaintiff's individual claims" (Motion at 6) – *i.e.*, provided that the "factual scenarios … are sufficiently similar to the one presented by the plaintiff concerning her own discharge." *Johnson*, 173 Cal. App. 4th at 767.  Plaintiff cites no authority to the contrary.[2]  Thus, Plaintiff's Pattern and Practice Allegations are pled appropriately only if they are material and "essential" to her individual claims.  They are not.

Here, the vast majority of Plaintiff's sweeping Pattern and Practice Allegations – including allegations concerning promotions, compensation, trainings, disabilities, accommodations, and unspecified policies that allegedly create a disparate impact – have no discernible connection to her individual claims.  Motion at 7-10.  None of these subjects appears anywhere in the FAC's discussion of Plaintiff's individual claims or employment history.  *Id.*  Plaintiff had the opportunity to explain in her Opposition how these immaterial Pattern and Practice Allegations relate to her individual claims.  She has not done so.

Instead, Plaintiff concedes that the effect – if not the purpose – of her Pattern and Practice Allegations is to "establish [Defendants'] violation of the civil rights of *others*."  Opp'n at 2:11-12.  In other words, Plaintiff wants to use the Pattern and Practice Allegations to obtain discovery aimed at establishing the merits of discrimination claims for an undefined class of other employees.  If Plaintiff wishes to pursue discrimination claims for other employees, she must first identify and certify a class.  *McCullah v. So. Cal. Gas*, 82 Cal. App. 4th 495, 498 (2000) (plaintiff pursuing FEHA claims on class-wide basis must "establish the existence of an ascertainable class and a well-defined community of interest among the class members" which requires "(1)

---

[2] As noted in Sections II.B and II.C above, Plaintiff cites no California law in support of her pattern and practice argument.  None of the Ninth Circuit cases that Plaintiff cites involves or addresses FEHA claims or the application of *Alch* to a plaintiff's attempt to insert pattern and practice allegations into an individual FEHA case.  Nor do they discuss the pleading standards that apply to "pattern and practice" allegations even for federal discrimination claims.  The only decision cited in this Motion to Strike briefing that addresses that question is the *Kennedy* case.  The *Kennedy* court found nearly identical pattern and practice allegations were not "essential" or "necessary" to a plaintiff's individual discrimination claims and struck them.  *See* Section II.E.

1  predominant common questions of law or fact; (2) class representatives with claims or defenses

2  typical of the class; and (3) class representatives who can adequately represent the class").[3]

3          E.        **The *Kennedy* Court Decision Confirms Defendants' Position.**

4          As set forth in the Motion to Strike, the *Kennedy* court struck nearly identical "pattern and

5  practice" allegations in another single-plaintiff case filed by Plaintiff's counsel against the same

6  three Defendants.  Motion at 3-4.  Plaintiff contends in her Opposition that this Court should not

7  rely on *Kennedy* because that ruling "should not be considered a rejection [of pattern and practice

8  allegations] on the basis of relevance."  Opp'n at 13:1-5.  Plaintiff's argument lacks merit.

9          As noted above, Defendants do not dispute that some so-called pattern-or-practice

10  evidence may be relevant to individual claims – *i.e.*, if that evidence is sufficiently similar to the

11  factual scenarios underlying the individual claims.  In *Kennedy*, the allegations "were not

12  essential" to that individual plaintiff's claims and the court, accordingly, struck them from the

13  complaint.  Opp'n at 12:18-19, 13:1.  The same is true here.

14          F.        **Plaintiff Concedes That She Failed to Exhaust Most Claims Embedded In
                      Her Pattern And Practice Allegations.**

15

16          As set forth in the Motion to Strike, the Court lacks jurisdiction to hear the vast majority

17  of Plaintiff's sweeping Pattern and Practice Allegations – including allegations concerning gender

18  discrimination, sex-based harassment, disabilities, accommodations, unspecified policies that

19  allegedly create a disparate impact, promotions, compensation, and trainings – because they were

20  not exhausted in any DFEH Charge.  Motion at 8-10.  Nothing in Plaintiff's Opposition explains

21  how her Pattern and Practice Allegations relate to what she asserted in her DFEH Charge.

22          Instead, Plaintiff alleges that she need not exhaust a sex discrimination claim because she

23  is alleging "discriminat[ion] against African-American women" as a "race/gender subclass."

24  Plaintiff cites no authority for this argument.  Defendants are not aware of a single instance where

---

25          [3] Plaintiff could not possibly meet these requirements for the boundless "class" of
26  employees referenced in her Pattern and Practice Allegations – for which Plaintiff provides no
    boundaries based on adverse action, business group, decision maker, or even entity – given that
27  her employment history described in the FAC evidences no connection to the promotion, training,
    investigation, disability, or other practices she apparently wishes to challenge.  *See CVS*
28  *Pharmacy, Inc.*, 241 Cal. App. 4th at 307 ("[T]the named plaintiff in a class action must be a
    member of the class he or she purports to represent.").

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

a plaintiff has been allowed to proceed with an unexhausted gender claim, regardless of whether it is characterized as a "subclass" of a different demographic feature. The Ninth Circuit held that FEHA-based sex discrimination claims were barred where the plaintiff failed to include them in her DFEH charge. *Stallcop v. Kaiser Found. Hosp.*, 820 F.2d 1044, 1051 (9th Cir. 1987).

Next, Plaintiff claims she was not "required to allege 'pattern and practice' in her DFEH charge" because "a method of proving race discrimination … is not a separate claim that must be exhausted administratively." Opp'n 13:26-27. Plaintiff again cites no authority to support this proposition. The Northern District of California reached the opposite conclusion in *Johnson v. United Continental Holdings, Inc.*, 2013 WL 1758760 (N.D. Cal. Apr. 24, 2013). There, the court dismissed plaintiffs' FEHA disparate impact claims without leave to amend where the plaintiffs premised such claims on alleged practices that they failed to identify in their DFEH charges. *Id.* at *11-13; *see also Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.* 226 Cal. App. 4th 886, 895 (2014) (plaintiff must separately plead disparate impact and disparate treatment claims). As in *Johnson*, Plaintiff did not reference any "patterns or practices" whatsoever in her DFEH Charge, much less any specific practices that could support a disparate impact claim. Plaintiff likewise did not reference any issue with trainings, promotions, disabilities or accommodations in her DFEH Charge. The Court consequently lacks jurisdiction to hear them. *See Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1617 (1995).

## III.  **THIS SINGLE-PLAINTIFF WRONGFUL DISCHARGE CASE IS NOT "COMPLEX."**

Plaintiff asserts that this case should be designated "complex" even if she proceeds with the matter as a single-plaintiff action. As an initial matter, Plaintiff's request is premature. If Plaintiff is permitted to add a federal race discrimination claim under 42 U.S.C. § 1981 (as she suggested in opposition to the pending demurrer), it is unclear whether Defendants will exercise their right to remove this case to federal court based on federal question jurisdiction.

Further, Defendants object to any such designation. A "complex case" is an action that requires "exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

1    making by the court, the parties and counsel." CRC 3.400(a).  Factors considered in deciding

2    whether a case is "complex," include whether the action is likely to involve numerous pretrial

3    motions raising difficult or novel issues that will be time-consuming to resolve; management of a

4    large number of witnesses or substantial documentary evidence; management of a large number

5    of separately represented parties; coordination with related actions pending in one or more courts

6    in other counties, states, or in federal court; or substantial postjudgment judicial supervision.

7    CRC 3.400(b); *see First State Ins. Co. v. Superior Court*, 79 Cal. App. 4th 324, 332 (2000).

8          This is a single-plaintiff case involving three individual FEHA claims, all arising from the

9    same alleged adverse action (a wrongful termination).  Plaintiff's factual allegations about her

10   employment span approximately three pages in the FAC.[4]  Her suggestion that this unremarkable

11   single-plaintiff case should somehow warrant a "complex" designation only confirms that

12   Plaintiff seeks to enjoy the special judicial resources applicable to class actions, without holding

13   herself to the procedural and proof requirements applicable to class actions.

14   **IV.    CONCLUSION**

15         For all the foregoing reasons, Defendants respectfully requests that the Court grant their

16   Motion To Strike the Pattern and Practice Allegations.

17   DATED:  June 28, 2017                            GRUBE BROWN & GEIDT LLP

18

19                                               BY: _Amanda Bolliger Crespo/KCH_

20                                                   AMANDA BOLLIGER CRESPO

21                                               Attorneys for Defendants
                                                 KAISER FOUNDATION HEALTH PLAN,
22                                               INC; KAISER FOUNDATION HOSPITALS;
                                                 and THE PERMANENTE MEDICAL
23                                               GROUP

24

25

26   _____
         [4] Plaintiff's discussions of the *Hill* class action lawsuit (Opp'n at 1) – in which Plaintiff's
27   counsel of record also was counsel of record – do not alter the analysis and are irrelevant to the
     issues before the Court.  That lawsuit settled in 2013, but is still being actively litigated because
28   after the *Hill* plaintiffs signed a settlement agreement, Plaintiff's counsel in this case sued his
     clients to obtain additional attorneys' fees.

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

## **PROOF OF SERVICE**

I am employed in the City of San Francisco and County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

On June 28, 2017, I served a copy of the within document(s):

**REPLY IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT**

on the interested parties:

☐ VIA FAX: By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ VIA U.S. MAIL: I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on the above date with postage thereon fully prepaid, at San Francisco, California.

☒ VIA OVERNIGHT SERVICE: By placing the document(s) listed above in a sealed UPS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a UPS agent for delivery.

☐ VIA PERSONAL SERVICE: By causing to be delivered the document(s) listed above to the person(s) at the address(es) set forth below.

☒ VIA E-MAIL: By transmitting a PDF version of the document(s) by e-mail to the person(s) set forth below using the e-mail address(es) indicated.

Jeremy L. Friedman
Law Office of Jeremy L. Friedman
2801 Sylhowe Road
Oakland, CA 94610

Telephone: 510-530-9060
Facsimile: 510-530-9087
Email: jlfried@comcast.net

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 28, 2017, at San Francisco, California.

_____
Janet Gogna

- 1 -
PROOF OF SERVICE

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                          Honorable   Ioana Petrou              , Judge

Cause called for Motion: July 06, 2017.

Moving Party Kaiser Foundation Health Plan, Inc appeared by counsel Bollinger Crespo, Amanda
Moving Party Kaiser Foundation Hospitals, Inc, appeared by counsel Bollinger Crespo, Amanda
Moving Party The Permanente Medical Group appeared by counsel Bollinger Crespo, Amanda
Opposing Party Lunell Gamble appeared by counsel Friedman, Jeremy L..

Certified Court Reporter Michele Lucas CSR#4017
AikenWelch Court Reporters
(877) 451-1580
mlucas@aikenwelch.com

Prior to the hearing, the Court issued a tentative ruling which was contested and the matter is argued, and submitted.

Ruling on Motion to Strike Complaint Taken Under Submission

Minutes of    07/06/2017
Entered on    07/06/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By    _Tom Williams_ Digital
                                        Deputy Clerk

**Minutes**

M11475006

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                    Honorable   Ioana Petrou              , Judge

Cause called for Motion: July 06, 2017.

Moving Party Kaiser Foundation Health Plan, Inc appeared by counsel Bollinger Crespo, Amanda
Moving Party Kaiser Foundation Hospitals, Inc, appeared by counsel Bollinger Crespo, Amanda
Moving Party The Permanente Medical Group appeared by counsel Bollinger Crespo, Amanda
Opposing Party Lunell Gamble appeared by counsel Friedman, Jeremy L..

Certified Court Reporter Michele Lucas CSR#4017
AikenWelch Court Reporters
(877) 451-1580
mlucas@aikenwelch.com

Prior to the hearing, the Court issued a tentative ruling which was contested and the matter is argued, and
submitted.

Ruling on Demurrer and Motion to Strike Complaint Taken Under Submission

Minutes of    07/06/2017
Entered on    07/06/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By    _Tom B Williams_
                                        Deputy Clerk

**Minutes**

M11474999

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                          Honorable   Ioana Petrou_____ , Judge

Cause called for Motion: July 06, 2017.

Moving Party Kaiser Foundation Health Plan, Inc appeared by counsel Bollinger Crespo, Amanda
Moving Party Kaiser Foundation Hospitals, Inc, appeared by counsel Bollinger Crespo, Amanda
Moving Party The Permanente Medical Group appeared by counsel Bollinger Crespo, Amanda
Opposing Party Lunell Gamble appeared by counsel Friedman, Jeremy L..

Certified Court Reporter Michele Lucas CSR#4017
AikenWelch Court Reporters
(877) 451-1580
mlucas@aikenwelch.com

Prior to the hearing, the Court issued a tentative ruling which was contested and the matter is argued, and
submitted.

Ruling on Demurrer and Motion to Strike Complaint Taken Under Submission

Minutes of    07/06/2017
Entered on    07/06/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

Digital
By    _Tom 3 Williams_____

Deputy Clerk

**Minutes**

M11474999

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | No. RG16826717 |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                     Honorable   Ioana Petrou                    , Judge

Cause called for Motion: July 06, 2017.

Moving Party Kaiser Foundation Health Plan, Inc appeared by counsel Bollinger Crespo, Amanda
Moving Party Kaiser Foundation Hospitals, Inc, appeared by counsel Bollinger Crespo, Amanda
Moving Party The Permanente Medical Group appeared by counsel Bollinger Crespo, Amanda
Opposing Party Lunell Gamble appeared by counsel Friedman, Jeremy L..

Certified Court Reporter Michele Lucas CSR#4017
AikenWelch Court Reporters
(877) 451-1580
mlucas@aikenwelch.com

Prior to the hearing, the Court issued a tentative ruling which was contested and the matter is argued, and submitted.

Ruling on Motion to Strike Complaint Taken Under Submission

Minutes of     07/06/2017
Entered on     07/06/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By     *Tom 3Williams*   Digital
                                                    Deputy Clerk

**Minutes**

M11475006

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA  94602____

Grube Brown & Geidt LLP
Attn: Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>           Plaintiff/Petitioner(s)<br><br>   VS.<br><br>Kaiser Foundation Health Plan, Inc<br>           Defendant/Respondent(s)<br>   (Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Motion to Strike Complaint |

The Motion to Strike Complaint filed for The Permanente Medical Group and Kaiser Foundation Hospitals, Inc, and Kaiser Foundation Health Plan, Inc was set for hearing on 07/06/2017 at 09:00:00 in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and was contested.

IT IS HEREBY ORDERED THAT:

Defendants' Demurrer to, and Motion to Strike Portions of, Plaintiff's First Amended Complaint are both CONTINUED to July 13, 2017 at 9:00 a.m. in Department 15.

By no later than July 13, the parties are directed to delivery directly to Department 15 copies of all federal cases cited in their briefs and at argument, pursuant to California Rules of Court, Rule 3.1113(i).  Plaintiff shall deliver copies of all federal cases cited in her opposition papers, and of any cases cited at oral argument that were not mentioned in her briefs.  Defendants shall deliver copies of all federal cases cited in their moving and reply papers.  The parties' submissions shall include a table of contents and be properly tabbed as required by Rule 3.1113(i).

No appearance shall be required, and no oral argument permitted, on July 13.  Instead, the Court will take these motions under submission after receiving the parties' copies of federal cases.

Dated:  07/06/2017

_facsimile_

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 07/06/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

    Executed on 07/06/2017.

        Chad Finke  Executive Officer / Clerk of the Superior Court

                         Digital

           By  _Tom B Williams_____

                                 Deputy Clerk

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Grube Brown & Geidt LLP
Attn:  Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA    90071

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>                              Plaintiff/Petitioner(s)<br><br>               VS.<br><br><br>Kaiser Foundation Health Plan, Inc<br>                             Defendant/Respondent(s)<br>                  (Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Demurrer and Motion to Strike Complaint |

The Demurrer and Motion to Strike Complaint filed for The Permanente Medical Group and Kaiser Foundation Hospitals, Inc, and Kaiser Foundation Health Plan, Inc was set for hearing on 07/06/2017 at 09:00:00 in Department 15 before the Honorable Ioana Petrou.  The Tentative Ruling was published and was contested.

IT IS HEREBY ORDERED THAT:

Defendants' Demurrer to, and Motion to Strike Portions of, Plaintiff's First Amended Complaint are both CONTINUED to July 13, 2017 at 9:00 a.m. in Department 15.

By no later than July 13, the parties are directed to delivery directly to Department 15 copies of all federal cases cited in their briefs and at argument, pursuant to California Rules of Court, Rule 3.1113(i).  Plaintiff shall deliver copies of all federal cases cited in her opposition papers, and of any cases cited at oral argument that were not mentioned in her briefs.  Defendants shall deliver copies of all federal cases cited in their moving and reply papers.  The parties' submissions shall include a table of contents and be properly tabbed as required by Rule 3.1113(i).

No appearance shall be required, and no oral argument permitted, on July 13.  Instead, the Court will take these motions under submission after receiving the parties' copies of federal cases.

Dated:  07/06/2017

_facsimile_

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 07/06/2017

# DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

    Executed on 07/06/2017.

        Chad Finke  Executive Officer / Clerk of the Superior Court

                      Digital
            By  _Tom 3Williams_____

                                   Deputy Clerk

GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC.;
KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

ENDORSED
FILED
ALAMEDA COUNTY

JUL 1 3 2017

CLERK OF THE SUPERIOR COURT
By _____
JAIME THOMAS, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE,<br><br>Plaintiff,<br><br>vs.<br><br>KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM,<br><br>Defendants. | Case No. RG16826717<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU DEPARTMENT 15<br><br>**TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Date: July 13, 2017<br>Time: 9:00 a.m.<br>Judge: Hon. Ioana Petrou<br>Dept.: 15<br><br>**Reservation No. R-1844960**<br><br>Complaint Filed: August 9, 2016 |

TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' DEMURRER TO
PLAINTIFF'S FIRST AMENDED COMPLAINT

1  TO THE COURT, PLAINTIFF LUNELL GAMBLE AND TO HER ATTORNEYS OF

2  RECORD:

3          Pursuant to the Court's Order dated July 6, 2017, and Rule 3.1113(i) of the California

4  Rules of Court, Defendants KAISER FOUNDATION HOSPITALS and THE PERMANENTE

5  MEDICAL GROUP hereby lodge the following federal authorities cited in their Memorandum of

6  Points and Authorities in Support of Demurrer to Plaintiff's First Amended Complaint filed on

7  April 27, 2017 and their Reply in Support of Demurrer to Plaintiff's First Amended Complaint

8  filed on June 28, 2017.

9

| Tab | Authority | Brief / Page |
|---|---|---|
| 1. | *Anderson v. Pac. Maritime Ass'n,*<br>336 F.3d 924 (9th Cir. 2003) | Reply: p. 7 |
| 2. | *Andrus v. Glover Const., Co.,*<br>446 U.S. 608 (1980) | Reply: p. 4 |
| 3. | *EEOC v. Occidental Life Ins. Co. of Cal.*<br>535 F.2d 533 (9th Cir. 1976) | Reply: p. 4 |
| 4. | *Johnson v. United Continental Holdings, Inc.,*<br>2013 WL 1758760 (N.D. Cal. Apr. 24, 2013) | Reply: pp, 5, 6, 7 |
| 5. | *Lucky Stores, Inc. v. EEOC,*<br>714 F.2d 911 (9th Cir. 1983) | Reply: p. 4 |
| 6. | *Maddock v. KB Homes, Inc.,*<br>631 F. Supp. 2d 1226 (2007) | Reply: pp. 8, 9 |
| 7. | *Morgan v. Safeway Stores, Inc.,*<br>884 F.2d 1211 (9th Cir. 1989) | Reply: p. 7 |
| 8. | *Nowick v. Gammell,*<br>351 F. Supp. 2d 1025 (D. Haw. 2004) | Reply: p. 5 |
| 9. | *Reyes v. Healthcare Serv. Grps.,*<br>2015 WL 6551870 (C.D. Cal. Oct. 26, 2015) | Demurrer: p. 5 |
| 10. | *Rhodes v. Sutter Health,*<br>949 F. Supp. 2d 997 (E.D. Cal. 2013) | Demurrer: p. 9<br>Reply: pp. 2, 7,8, 9 |

TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' DEMURRER TO
PLAINTIFF'S FIRST AMENDED COMPLAINT

| Tab | Authority | Brief / Page |
|---|---|---|
| 11. | *Taylor v. Shippers Transport Exp., Inc.*, 2014 WL 7499046 (C.D. Cal. Sept. 30, 2014) | Reply: p. 8 |
| 12. | *Trosper v. Stryker Corp.*, 2014 WL 1619052 (N.D. Cal. Apr. 22, 2014) | Reply: p. 8 |
| 13. | *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982) | Reply: p. 5 |

DATED:  July 13, 2017                    GRUBE BROWN & GEIDT LLP


                                         BY: *Amanda Bolliger Crespo*
                                            AMANDA BOLLIGER CRESPO

                                         Attorneys for Defendants
                                         KAISER FOUNDATION HEALTH PLAN,
                                         INC; KAISER FOUNDATION HOSPITALS;
                                         and THE PERMANENTE MEDICAL
                                         GROUP

TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' DEMURRER TO
PLAINTIFF'S FIRST AMENDED COMPLAINT

Tab 1

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 451 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

336 F.3d 924
United States Court of Appeals,
Ninth Circuit.

Richard ANDERSON; Isaac Oliver; Ted Farrison;
O.J. Jenkins; Albert Collins, Plaintiffs–Appellants,
and
Quentin Chambers, John Does 1–300, Plaintiffs,
v.
PACIFIC MARITIME
ASSOCIATION, Defendant–Appellee,
and
Locals 19, 23, 52 International Longshoremen's
and Warehousemen's Union, Locals 19, 23, 52
and 98; American President Lines, Ltd.; Eagle
Marine Services, Ltd.; Maersk, Inc.; NOL, Inc.;
Mitsui OSK Lines (America), Inc.; OOCL (USA),
Inc.; Hanjin Shipping Company, LTD.; Sea Star
Stevedore, Co.; Marine Terminal Corporation;
Kawasaki Kisen Kaisha, Ltd.; Matson Navigation
Company; Matson Terminals, Inc.; Jones
Stevedoring Company, Local 23, ILWU, Defendants.

No. 00–35457.
|
Argued and Submitted Nov. 6, 2001.
|
Filed July 17, 2003.

Longshoremen brought race discrimination action under
Title VII against employers' association, which served
as bargaining agent for employers. The United States
District Court for the Western District of Washington, J.
Kelley Arnold, United States Magistrate Judge, entered
summary judgment for association. Longshoremen
appealed. The Court of Appeals, Tallman, Circuit Judge,
held that association could not be held liable, pursuant
to indirect-employer theory, for any race discrimination
against longshoremen.

Affirmed.

Betty B. Fletcher, Circuit Judge, dissented and filed
opinion.

**Attorneys and Law Firms**

**\*925** Bradley R. Marshall, Marshall Wheeler Zaug,
PLLC, Seattle, WA, for the plaintiffs-appellants.

Clemens H. Barnes, Perkins Coie, LLP, Seattle, WA,
Clifford D. Sethness, Morgan, Lewis & Bockius, LLP, Los
Angeles, CA, for the defendant-appellee.

Appeal from the United States District Court for the
Western District of Washington; J. Kelley Arnold, U.S.
Magistrate Judge, Presiding. D.C. No. CV–98–05343–
JKA.

Before: REAVLEY, [*] B. FLETCHER, and TALLMAN,
Circuit Judges.

**Opinion**

Opinion by Judge TALLMAN; Dissent by Judge BETTY
B. FLETCHER.

TALLMAN, Circuit Judge.

This case presents a cause of action in search of a
defendant. The Plaintiffs, a group of longshoremen
working on the docks in Seattle and Tacoma, allege that
they were subject to a racially hostile work environment
in violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e, as well Washington's Law Against
Discrimination, Wash. Rev.Code § 49.60. [1] But the sole
defendant left before us on appeal, Pacific Maritime
Association ("PMA"), is not the employer of any of the
Plaintiffs. Rather, PMA is a non-profit association of
the stevedoring and shipping companies that do employ
the Plaintiffs. **\*926** The district court granted summary
judgment to PMA, holding that PMA could not be liable
for discrimination because PMA was not the Plaintiffs'
employer. We agree and affirm.

I

A

The Plaintiffs are all African American. They allege that
they were subjected to a racially hostile work environment
while employed on the waterfront in Seattle and Tacoma.
For purposes of reviewing a summary judgment order,

Case 4:17-cv-06621-YGR  Document 1-1  Filed 11/16/17  Page 452 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

we assume these facts could be established in favor of the Plaintiffs. *Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002). Their allegations paint a horrific and pervasive picture of racial animosity and discrimination on the waterfront of the Pacific Northwest.

For instance, the Plaintiffs allege that they have been referred to as "nigger," "spook," "nigger gang," "boy," and "son," as well as other racial slurs. They assert that racial innuendos and jokes are common on the docks. Furthermore, they allege that longshoremen training materials employ terms such as "nigger lips" and "nigger heads." The Plaintiffs allege that they were even subject to direct, racially charged physical threats.

The members of PMA ("member-employers") are the various companies that employ the longshoremen. The Board of Directors of PMA is primarily composed of executives from these stevedoring companies. The member-employers grant PMA the authority to establish and negotiate labor contracts and policies with the International Longshoremen's and Warehousemen's Union ("Union").

PMA, as the bargaining agent for the member-employers, entered into a Collective Bargaining Agreement ("CBA") with the Union, as bargaining agent for its local affiliates. Under the CBA, the member-employers and their walking bosses and foremen—but not PMA—have the responsibility to "supervise, place or discharge men and to direct the work and activities of longshoremen on the job in a safe, efficient and proper manner." The member-employers—but not PMA—also retain the right to discipline any longshoreman for "in-competence, insubordination or failure to perform the work as required in conformance with the provisions of [the CBA]." The CBA lays out an extensive system for maintaining discipline, safety, and conformity with the master labor agreement on the docks, but these provisions place the burden of meeting these standards on the longshoremen, the Union, and the member-employers and their supervisors—not PMA.

Specifically, the CBA prohibits illegal discrimination, and provides a detailed procedure for reporting and curing alleged discrimination. Under this procedure, all grievances regarding discrimination must first be referred to a longshoreman's supervisor. If the supervisor cannot settle the grievance, it is referred to one official designated

by the Union and one official designated by the member-employers. If the grievance still is not settled, it is referred to a Joint Committee made up of six members. Three members of the Joint Committee are appointed by the Union and three are appointed by the member-employers. If the Joint Committee fails to resolve the dispute, the CBA provides for binding arbitration.

Although PMA has the general responsibility for ensuring that member-employers comply with the terms of the CBA, PMA has no direct role in this formal procedure for resolving discrimination complaints. Under the CBA, PMA is not responsible for handling, collecting, or investigating grievances, let alone mediating or resolving **\*927** the grievances. Those tasks, under the plain terms of the CBA, are left to managers employed by the member-employers and the Joint Committee appointed by the member-employers and the Union.[2]

In 1997, the Union and PMA agreed to an expedited grievance procedure to address both discrimination and the problems associated with the length of time needed to complete the formal procedure. This expedited procedure is a supplement to, and not a replacement of, the formal grievance procedure described in the CBA. Under this new expedited procedure, a longshoreman alleging racial or sexual discrimination is required to fill out a form—copies of which are posted around the work site—describing the discrimination. The longshoreman is then required to send a copy of the form to the area manager of PMA and to the president of the local chapter of the Union. Both the PMA area manager and the local-chapter president then have the discretion to call for a meeting or series of meetings in order to mediate the dispute. If this is unsuccessful, the worker can then require that the parties enter into arbitration.

PMA also performs a variety of other organizational tasks for its member companies. Together with the Union, it operates a dispatch hall[3] where longshoremen receive their work assignments from the member-employers. It also provides a payroll service for its member-employers. PMA keeps track of where everyone works each day, but the member-employers actually pay the longshoremen.

Equally important to our analysis is what PMA does not control. It does not supervise the longshoremen. It has no power to hire or fire longshoremen. It has no power to discipline longshoremen. It does not supervise the work

Case 4:17-cv-06621-YGR  Document 1-1  Filed 11/16/17  Page 453 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

sites of its member-employers. It is undisputed that the monitoring and control over those sites, as well as the control of the employees, is within the *sole* province of the member-employers.[4]

**\*928 B**

The Plaintiffs filed their original complaint in the United States District Court for the Western District of Washington. It named as defendants the shipping and stevedoring companies that hired the Plaintiffs and for whom the Plaintiffs worked each day, plus four local chapters of the Union, and PMA. The original complaint asserted claims for hostile work environment on the waterfront, disparate impact and treatment, breach of the duty of fair representation against the Union, breach of contract, outrage, and civil RICO violations.

For reasons that have never been satisfactorily explained to us by their counsel, the Plaintiffs then filed an amended complaint naming only the Union and PMA as defendants, dropping the shipping and stevedoring companies from the lawsuit. The Plaintiffs subsequently voluntarily dismissed all of their remaining claims against the Union except for a single claim against one of the Union's local chapters. The district court entered summary judgment for the Union on this claim and the Plaintiffs have not appealed that decision. The district court also entered summary judgment for PMA on the Plaintiffs' hostile work environment claim. The court held that even though a genuine issue of material fact existed as to whether the Plaintiffs were subject to a hostile work environment, PMA could not be held liable for that environment. The Plaintiffs' appeal before us concerns only their hostile work environment claim against PMA.

**II**

We review grants of summary judgment de novo. *Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998).

**A**

Below, the Plaintiffs hinged the viability of their hostile work environment claim against PMA on the applicability

of the "integrated enterprise" test. We apply this four-part test to determine if two or more employers are so interrelated that they form an integrated enterprise. *See, e.g., Herman v. United Bhd. of Carpenters,* 60 F.3d 1375, 1383–84 (9th Cir.1995).

The Plaintiffs argued that PMA is an integrated enterprise with its member-employers and therefore liable for the hostile work environment at the member-employers' work sites. The district court, noting the likely inapplicability of the test to this case, nevertheless found that PMA is not an integrated enterprise with its member-employers. Both parties on appeal continued to frame the issue as whether PMA can be liable under the integrated enterprise test.

**[1]** The district court's reluctance was justified. The test does not determine joint *liability* as the parties suggest, but instead determines whether a defendant *can meet the statutory criteria* of an "employer" for Title VII applicability.

**[2]** Title VII applies to an employer only if that employer employs 15 or more **\*929** employees. 42 U.S.C. § 2000e(b); *see also Clackamas Gastroenterology Assocs., P.C. v. Wells,* 538 U.S. 440, 123 S.Ct. 1673, 1676 n. 1, 155 L.Ed.2d 615 (2003). A plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15–employee minimum standard. We use the integrated enterprise test to judge the magnitude of interconnectivity for determining statutory coverage. *See Kang v. U. Lim. Am., Inc.,* 296 F.3d 810, 815–16 (9th Cir.2002) (applying the integrated enterprise test "for purposes of Title VII coverage" when the plaintiff's direct employer only had six employees but a related subsidiary had more than 50 employees); *Herman,* 60 F.3d at 1383 (applying the integrated enterprise test to determine whether the plaintiff's direct employer—who employed only seven employees—could be an employer for purposes of the Age Discrimination in Employment Act when that Act requires 20 employees to meet the definition of employer and when the direct employer was a union that was affiliated with a much larger union, which did meet the minimum employee standard for the Act); *Childs v. Local 18, Int'l Bhd. of Elec. Workers,* 719 F.2d 1379, 1382 (9th Cir.1983) (applying the integrated enterprise test "for purposes of jurisdiction under Title

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 454 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

VII" when the plaintiff's direct employer employed less than 15 employees).

Here, PMA does not dispute that it employs at least 15 employees.[5] Because this places PMA within Title VII's statutory coverage as an "employer," the integrated enterprise test is inapplicable.

### B

PMA's status as an employer in its own right does not mean that a claim by the Plaintiffs, who were not PMA's employees, is cognizable under Title VII. The dissent argues that a claim against PMA for the hostile work environment occurring on the docks may properly be brought based on the doctrine articulated in *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973), and cases which have followed it in our circuit. We disagree.

In *Sibley,* the defendant-hospital ran a nursing office where patients would request the services of a private duty nurse. *Id.* at 1339. The nursing office would then contact various outside referral sources and request that a private nurse be sent to the hospital to work with the patient. *Id.* These private nurses were employees of the patient, not the hospital. *Id.* The plaintiff, a male private nurse, alleged that on at least two occasions supervisory nurses at the hospital rejected him upon arrival because the requesting patients were female and he was male. *Id.* at 1339–40.

The plaintiff sued the hospital under Title VII. *Id.* at 1340. The hospital moved to dismiss or for summary judgment, arguing that the lack of an employer-employee relationship prevented jurisdictional coverage of the claim under Title VII. *Id.* The district court denied the hospital's motion and, without affording the hospital a chance to answer on the merits, *sua sponte* entered summary judgment for the plaintiff. *Id.*

**\*930** On appeal, the D.C. Circuit noted that one of Title VII's goals was to equalize access to job opportunities. *Id.* Additionally, Title VII did not explicitly require a direct employer-employee relationship. *Id.* But that did not mean that no relationship was required for a claim to fall under Title VII. The court stated:

We think it significant that [Title VII] has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies—institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged ... [the hospital] is so circumstanced, and its daily operations are of such a character as to have such a nexus to the third parties in this case....

*Id.* at 1342. Nevertheless, because the hospital had not answered on the merits, the district court's summary judgment in favor of the plaintiff was reversed. *Id.* at 1344.

We first addressed the viability of *Sibley* indirect-employer liability in *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980). There, we noted that for Title VII to apply, "there must be some connection with an employment relationship," though the "connection ... need not necessarily be direct." *Lutcher,* 633 F.2d at 883. Citing *Sibley,* we explained that "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Lutcher,* 633 F.2d at 883 n. 3.

Later, in *Gomez v. Alexian Brothers Hospital,* 698 F.2d 1019 (9th Cir.1983), we applied *Sibley* with full force. The plaintiff in *Gomez* was a Hispanic physician working for a corporation named AES. 698 F.2d at 1020. On behalf of AES, the plaintiff submitted a proposal to the defendant-hospital, offering AES's services to operate the hospital's emergency room. *Id.* The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.*

The plaintiff sued under Title VII. The district court granted summary judgment to the hospital on the grounds that the plaintiff lacked standing under Title VII because under the proposed contract the plaintiff would still have been an employee of AES, not of the hospital, and AES would have been just an independent contractor for the hospital. *Id.*

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 455 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

We reversed. *Id.* at 1022. We held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between the plaintiff and AES. *Id.* at 1021. Additionally, we noted the perverse result if an employer in the hospital's position were allowed "to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so" with its own employees. *Id.* (citation omitted).

In *Association of Mexican–American Educators v. California,* 231 F.3d 572 (9th Cir.2000) (en banc), we explained the rationale behind indirect-employer liability under Title VII. In that case, the plaintiffs were a class of Mexican–American, Asian–American, and African American prospective and current teachers who challenged California's use of a skills test—which was a prerequisite to employment in the state's public schools—under Title VII. *Id.* at 577. The plaintiffs alleged that the test had a disparate impact on minorities. *Id.* at 578.

We held, relying on *Sibley* as well as our decisions in *Lutcher* and *Gomez,* that Title VII covered the plaintiffs' claims. *Ass'n of* **\*931** *Mexican–American Educators,* 231 F.3d at 580–84. We agreed with the district court that the allegedly racially discriminatory test "interfered" with the plaintiffs' relationship with their future employers —the school districts—because it dictated whom those employers could and could not hire. *Id.* at 581–82. We emphasized that "[o]ur conclusion is dictated by the peculiar degree of control that [California] exercises over local school districts." *Id.* at 581.

 **[3]**   When we apply the principles articulated in these precedents to the case before us, it is clear that PMA cannot be liable to the Plaintiffs under Title VII. All of our cases employing *Sibley's* rationale—and indeed *Sibley* itself—have done so in instances where the indirect employer was the entity performing the discriminatory act. In *Sibley,* it was the hospital which refused to allow the male nurse to see the patient; in *Gomez,* it was the hospital that refused to hire the company with Hispanic doctors; and in *Association of Mexican–American Educators,* it was the state that required applicants to take a test with disparate impacts on minorities.

Here, on the other hand, the hostile work environment did not occur at any facility controlled by PMA, but instead

at the docks and waterfront facilities controlled by the member-employers that actually employ and supervise the Plaintiffs and their putative harassers on the job site. [6]

In a circumstance like this, the considerations justifying liability under Title VII no longer apply. *Sibley* and its progeny extended Title VII coverage to indirect employers when those employers discriminated against and interfered with the employees' relationship with their employers. PMA is not interfering in any sense with the employees' relationship with their employers because it was those employers, not PMA, that allowed the allegedly hostile work environment at the sites controlled by the member-employers.

The dissent places much weight on the fact that PMA had some involvement in the grievance procedures. We think this involvement too attenuated to constitute "interference" and thus insufficient to impose liability based on a *Sibley* analysis. First, PMA had no authority under the formal procedures to correct any harassment at the waterfront. The grievances under the formal procedures were never referred to PMA. Second, even under the expedited procedures, PMA's role was limited to that of a *discretionary* mediator. It was not empowered to fire or even discipline longshoremen for harassment. It was not empowered to conduct investigations and to implement new work site rules to curb harassment. [7] Third, PMA's authority to act as a mediator is not directly related to the facts of this case. The majority of grievances the Plaintiffs made were filed under the formal procedures, where PMA had no role. And the Plaintiffs have not presented any evidence that a written grievance was made under the expedited procedures that would invoke PMA's discretionary role to conduct meetings **\*932** in order to attempt to settle the dispute.

In light of these facts, we think the imposition of indirect-employer liability under Title VII inappropriate. *Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory "interference" by the indirect employer and where the indirect employer had some peculiar control over the employee's relationship with the direct employer. Here, there was no such interference by PMA. It did not cause the hostile work environment. And its power to stop the hostile work environment was so limited that it cannot be said to have "interfered" by failing to take corrective measures to stop the harassment

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 456 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

when the power to take those measures belonged to the member-employers.

### III

The Plaintiffs may have been the victims of severe racial discrimination and rightly sought to redress their wrongs in federal court. Their employers and the Union were the obvious defendants and were initially named in the Plaintiffs' complaint. The Plaintiffs' decision to drop the employers and the Union as defendants from this case is a mystery to us. All that remains, a cause of action alleging a hostile work environment against PMA, is not cognizable against this defendant under Title VII. PMA was not the one illegally discriminating; PMA did not exercise control over the waterfront work environment the Plaintiffs claim was hostile; and PMA's purported failure to remedy the situation on the docks did not amount to interference with the Plaintiffs' employment relationship with the stevedoring and shipping companies. The district court properly granted summary judgment in favor of PMA.

AFFIRMED.

BETTY B. FLETCHER, Circuit Judge, dissenting.
I respectfully dissent. The majority commences with the statement that this is a cause of action in search of a defendant. I accept their assertion that there is a cause of action because I have found the defendant, and it is PMA.

The district court found appellants' evidence of harassment sufficient to raise an inference that a hostile work environment existed on the waterfronts of Seattle and Tacoma, Washington, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* (1994), and the Washington Law Against Discrimination, Wash. Rev.Code § 49.60 *et seq.* (2002). However, erroneously relying on the integrated enterprise test, the district court entered summary judgment in favor of the Pacific Maritime Association ("PMA") as to all claims, including hostile work environment. The majority acknowledges the district court's error in relying on the integrated enterprise test but nonetheless affirms summary judgment in favor of PMA finding that the *Sibley* [1] rule is inapplicable to this case. The majority holding is simply wrong. To highlight

the error in the majority's analysis, I must start with a recital of the relevant facts omitted from the majority opinion to give the full flavor of racial discrimination on the waterfront and the role PMA plays. Summary judgment is simply unwarranted.

### I.

#### A. Factual Background

The appellants, Richard Anderson, Albert Collins, O.J. Jenkins, Ted Farrison, and Isaac Oliver, African American longshoremen and foremen, work on the waterfronts *933 of Seattle and Tacoma, Washington; they are union members of local affiliates of the International Longshoremen's and Warehousemen's Union ("ILWU"). Because none of them holds a steady position with any of the member companies represented by the PMA, each must report daily to a central hiring hall, jointly maintained and operated by the PMA and the unions, through which each is then dispatched to an area work site. The PMA and the ILWU established the hiring hall system through collective bargaining; because the workload for each of PMA's member companies is sporadic, the hiring hall promotes consistent employment for union workers and ensures that work assignments will be allocated according to the terms of the collective bargaining agreement ("CBA"). The CBA governs the terms and conditions of employment for longshore workers and includes a provision prohibiting race discrimination. [2]

The PMA, a nonprofit association of maritime employers and shipping companies, serves, among other roles, as the agent of its member companies in collective bargaining negotiations with the ILWU. The PMA employs a managerial staff, including area manager for the Pacific Northwest, Craig Johnson, and assistant area manager, Joseph Webber, that is responsible for collecting information regarding the day-to-day operation of the docks and for ensuring that the individual companies operate in compliance with the CBA, including the antidiscrimination provision.

The member companies select representatives to serve on the PMA Board of Directors ("Board"), and the Board appoints from among its directors the Coast Executive Committee. The Coast Executive Committee

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 457 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)
92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

resolves major questions of labor policy for the PMA, subject to the Board's approval. PMA's bylaws provide for the creation of the Coast Steering Committee, composed of terminal managers [3] and empowered by the Coast Executive Committee to perform "the day-to-day administration and enforcement of shoreside and offshore collective bargaining agreements," including the antidiscrimination provisions of the CBA. Contrary to the majority's assertion, the Board is authorized to punish and discipline member-employers who are found responsible for harassment by suspending or excluding from membership in the PMA any companies that have violated the terms of the CBA.[4]

**\*934** As noted by the majority, Section 17 of the CBA establishes a grievance and appeal procedure through which longshore workers may pursue discrimination claims. Pursuant to the CBA, the PMA and the ILWU locals are required to form the Joint Labor Relations Committee ("Joint Committee") to investigate and adjudicate labor grievances.[5] Member companies are permitted to discipline workers violating the terms of the CBA by remanding them to the hiring hall. Any worker against whom a claim is pending before the Joint Committee may not be dispatched to a member company until that claim has been resolved.

The majority states that "PMA has no direct role" in Section 17 CBA grievance procedures, while recognizing that "PMA has the general responsibility for ensuring that member-employers comply with the terms of the CBA." Despite the majority's assertion that the right to discipline workers belongs to the individual employers, the PMA plays a critical role in ensuring that member companies do not turn a blind eye to harassment through its power to discipline employers who fail to enforce the anti-discrimination provisions of the CBA. Because the PMA, through subcommittees, establishes the policies that determine how the CBA is administered on a day-to-day basis, it is uniquely positioned to discipline or threaten to discipline employers that fail to address incidents of work site discrimination and harassment. The PMA is empowered to exclude companies from membership that violate the terms of the CBA, thereby denying them access to the trained and experienced union labor force. Conversely, the union cannot unilaterally withdraw from its contractual obligations to an employer

because of complaints that it receives regarding workplace discrimination.

As part of PMA's role in administering the CBA, it serves as a liaison between the union and its member employers in grievance matters where one employee complains about the conduct of another employee. Union officials and dock workers relied upon the PMA to ensure compliance by member companies with the requirements of the CBA and to facilitate the resolution of conflicts that arise between individual workers and between labor and management. For example, Union representative Mason testified that he would respond to a PMA official instead of a foreman regarding allegations of racial discrimination. In addition, the union faces a potential conflict of interest whenever it addresses race and sex-based grievances in which multiple union members require representation as adverse parties in interest. This is especially true where, as in the present case, the president of the union local charged with pursuing the rights of minority foremen is himself alleged to have made numerous racist and threatening comments. As a practical matter, the PMA held itself out as more than the bargaining representative for the employer, serving more broadly as the companies' agent in the resolution of labor-management disputes related to complaints of discrimination.

**\*935** By the PMA's own admission, over twenty race discrimination grievances were filed under procedures established by the CBA from 1997 to January 2000, several of which resulted in disciplinary action against employees found guilty of using racial slurs. Appellants testified that they have personally filed numerous grievances with the Joint Committee, but that the contractual grievance process was slow and, ultimately, failed to resolve their complaints.

In 1994, the ILWU recognized the African American Longshore Coalition ("Coalition"), created for the precise purpose of providing assistance to African American longshore workers suffering racial discrimination. The Coalition has filed grievances on behalf of appellants and other black longshore workers with the union and the Joint Committee, alleging various claims of racial discrimination and harassment. Coalition representative Bennie Jeffries has testified not only that the filing of Section 17 grievances has failed to resolve racial discrimination on the waterfront, but that "some of the

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 458 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

persons that sat on the grievance committees themselves had used racial slurs or clearly were insensitive to the plight of Blacks." This testimony was corroborated by Gene Heidal, operations manager for one of the member companies in Tacoma, who testified that as a foreman's committee member he heard other committee members using racial slurs. It was also corroborated by transcript testimony from a previous litigation, involving a different group of plaintiffs, in which Robert Frazier, a class A longshoreman and former member of the Joint Committee, testified that in the late–1980s he overheard PMA area manager Johnson telling racial jokes and using racial slurs, at committee meetings.

Following a settlement agreement entered in a previous discrimination lawsuit,[6] the PMA and the ILWU established the expedited procedure for processing race and sex-based discrimination complaints and instituted "sensitivity" training.[7] The PMA occupies a pivotal position in this process; within ten days of any incident, the aggrieved party must complete a written form and deliver a copy to the PMA area manager. The PMA area manager then has the authority to convene all parties to the dispute and to act as mediator.

### B. Allegations of racial harassment

Appellants' allegations of racial harassment include the use of racial slurs on an almost daily basis at the docks. For example, some of the instrumentalities of longshore work as well as certain types of work were commonly referred to as "nigger-rigging," "nigger-heads," "nigger-lips," and "nigger work." Some of these terms were included in operating manuals published by the PMA. Several appellants testified that racist graffiti littered the walls of restrooms on almost every pier along the Seattle–Tacoma waterfront and that some of this graffiti was threatening in nature.[8] This testimony was corroborated by operations manager Heidal who admitted to having seen "numerous" examples of racist graffiti. Heidal testified that the sensitivity training he received from the **\*936** PMA did not require that he report the graffiti to an official of PMA or that he take steps to remove it.

As a foreman whose work assignments required him to alternate work sites and employers, appellant Oliver intercepted radio communications between his supervisees referring to him as "that nigger from Seattle" and his employers' supervisors frequently referred to him as "boy."[9] On one occasion, he was even asked by a coworker if he had a tail.

Appellant Collins testified that he overheard conversations between dock workers in which they remarked that "niggers" were complaining about everything. Collins was told personally by former president of Local 98,[10] Don Miniken, that "niggers" wanted everything, including to work at all the docks. Miniken also stated that he would not put any "nigger" on the payroll. Following the murder of an Ethiopian man by racist skinheads in Oregon, appellant Jenkins overheard Miniken to have said, "That's good. I like to see that. We need to teach these niggers a lesson."

Appellants testified that their supervisory authority as foremen was frequently undermined by both the employers and the unions, as well as by their subordinates. To that effect, appellant Oliver testified that when he was placed on a list of foremen to receive supercargo training, derogatory cartoons were placed on his desk. Appellant Jenkins testified that, when he fired white employees, both the employers and the unions interceded to have them reinstated without inquiring into Jenkins' reasons for their discharge. He maintained that no similar resistance was given to the firing of black longshoremen.

Finally, appellants' allegations of harassment include threats of violence made by coworkers. Dockworkers routinely use radios to communicate at maritime work sites. After appellants filed suit, appellant Farrison overheard another worker say over one of the channels, "We should get together tonight and kill us a couple of these niggers and maybe they won't be wanting to sue us." Appellant longshoreman Anderson testified that, while he was still a casual in 1995, he found himself in an altercation with another, white casual after the latter referred to his Ghanaian wife as a "black jungle bunny bitch." This altercation took place in the hiring hall, within earshot of the dispatchers who were on duty there. Immediately thereafter, Anderson confronted the alleged harasser outside the hiring hall, where the latter brandished a nine-millimeter pistol and threatened him with it. Anderson testified that he reported this incident to union representatives, but that no response was taken. On another occasion, Anderson brought his minor son to the hiring hall, was verbally harassed by a dispatcher as a result and ordered not to bring his son to the hall again,

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 459 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2005)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

even though white dockworkers frequently brought their children to the hall without reprimand.

The PMA denies that appellants ever informed PMA officials directly of any of the alleged incidents of harassment forming the basis of their lawsuit. However, appellants have provided ample testimony in the record to rebut such allegations. First, they presented written and oral reports of numerous incidents of racial discrimination and harassment to both union and employer representatives; second, they reported grievances to PMA officials directly. Most notably, appellants Jenkins and Oliver testified that they spoke with PMA area manager Johnson regarding the **\*937** pervasiveness of racist graffiti and racial slurs at the terminals and Miniken's statements following the Oregon hate crime.

Johnson, the PMA area manager, testified during his deposition that "numerous individuals" had come to his office "numerous times" to complain about racial discrimination and harassment at the Seattle and Tacoma ports. Johnson specifically included appellants Jenkins and Farrison as among the persons who made verbal complaints to him. Johnson recalled that at least a few of those complaints were made since 1997, when the expedited grievance procedure was put in place. He recalled that through those procedures and other lawsuits he became aware of the use of racial slurs on the waterfront. However, Johnson did not keep notes or written records of any kind regarding complaints that were brought to him personally. He testified that, hypothetically, if he were confronted with complaints of racial harassment by African–American foremen, he would direct such persons to the contractual grievance process and he would attempt to speak directly with the accused parties. However, he could not recall a single occasion when he had done either in response to a complaint of harassment made directly to him. Contrary to the representations of the expedited grievance procedure made by Miniace and Mason, Johnson denied that there was any established procedure for how he ought to deal with such complaints. In fact, in his deposition testimony, Johnson suggested that he had no obligation to pursue these complaints.

Contrary to the majority's assertion, PMA plays an active role in both the formal and informal grievance procedures. PMA administers the CBA on a daily basis. As part of

this administration, it has the authority to convene parties and mediate disputes involving racial discrimination allegations such as the ones raised by appellants to Johnson. Moreover, the PMA has the authority to remove member organizations that fail to take actions to reprimand employees involved in discriminatory acts. If the PMA fails to investigate grievances or alert member companies, then alleged perpetrators have no incentive to stop harassing their victims. Moreover, the PMA establishes labor policy affecting the entire waterfront and has the ability to take measures to curb discriminatory acts such as the racist graffiti, as well as incidents at the hiring hall.

## II.

The district court initially denied defendant's motion for summary judgment on appellants' hostile work environment claims, finding that genuine questions of fact remained concerning whether the alleged harassing conduct and racist graffiti were " 'sufficiently severe or pervasive to alter the conditions of the victim[s'] employment and create an abusive working environment.' " *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). However, the magistrate judge ultimately decided, despite this ruling, that the PMA is not the proper defendant to hold liable for a hostile work environment on the waterfront. The magistrate judge first considered whether the PMA forms an "integrated enterprise" with its member companies, apparently presuming that, if an integrated enterprise were to exist, then the PMA would be vicariously liable for the discriminatory conduct of its member companies. The magistrate judge concluded that the PMA and its members did not form a single, integrated enterprise and further surmised that, even if they had, the PMA could not face **\*938** hostile work environment liability, because appellants failed to show that it "controll[ed] the day-to-day working environment encountered by the longshore workers."

We requested supplemental briefing as to the applicability of *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973), and its progeny. I agree with the majority's conclusion that the district court erred in applying the integrated enterprise test to find that PMA is

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 460 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

not a proper defendant. That issue is behind us. However, I disagree with the majority's finding that Title VII is inapplicable to PMA's role here. Under our circuit's precedent, the PMA may be liable under Title VII for failure to take action and to respond to complaints and harassment, failure to discipline member companies and their employees, and for the conduct of its own employees because of (1) its general supervision of the waterfront, (2) its direct control over the hiring hall, (3) its involvement in racial grievance procedures, and (4) its capacity to discipline members who violate the anti-discrimination policies of the CBA.

As the majority acknowledges, the PMA does not dispute its eligibility for statutory coverage as an employer under Title VII, 42 U.S.C. § 2000e(n); rather, it disputes whether it is the proper entity to be held liable for acts of hostile work environment harassment occurring on the waterfront where its member companies conduct business. We have concluded from the diversity of entities covered by the statute "that Congress intended to close any loopholes in Title VII's coverage and to extend the statute's coverage to entities with actual '[c]ontrol over access to the job market,' whether or not they are direct employers." *Ass'n of Mex.–Am. Educators v. State of California,* 231 F.3d 572, 581 (9th Cir.2000) (en banc) (quoting *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973)). The statute's coverage of employers and their agents should be interpreted in terms of this overarching purpose. *See Trevino v. Celanese Corp.,* 701 F.2d 397, 403 (5th Cir.1983) (stating that "[t]he term 'employer' as used in Title VII ... was meant to be liberally construed"). Though we require " 'some connection with an employment relationship for Title VII protections to apply,' "that connection" " 'need not necessarily be direct.' " " *Ass'n of Mex.–Am. Educators,* 231 F.3d at 580 (quoting *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980)).

Our circuit follows the rationale of the D.C. Circuit in *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973), with respect to indirect employer liability under Title VII. The D.C. Circuit held that the hospital could be held liable under Title VII for sex discrimination, even though it was not the plaintiff's direct employer, because it interfered on invidious grounds with his ability to form third-party employment relationships. *Id.* at 1342. The court noted that Title VII extends its protection from "unlawful employment practices" to "any individual" and

not "only an employee of an employer." [11] *Id.* (citing **\*939** 42 U.S.C. § 2000e–2(a)(1)). The court concluded that the hospital maintained control over the plaintiff's access to private patients and control over the premises on which he provided his services, thereby forming "a highly visible nexus" between the hospital's services and "the creation and continuance of direct employment relationships between third parties." *Id.* at 1342. The hospital's exercise of its control over these opportunities exposed it to Title VII liability.

We have adopted a broad interpretation of *Sibley,* with the caveat that "there must be some connection with an employment relationship for Title VII protections to apply." *Lutcher,* 633 F.2d at 883; *see also Bender,* 159 F.3d at 189 (adopting the Ninth Circuit's modification of *Sibley* ). In *Gomez v. Alexian Bros. Hosp.,* 698 F.2d 1019 (9th Cir.1983) (per curiam), we applied the modified *Sibley* rule to the case of an Hispanic medical practitioner who asserted claims of national origin discrimination against the defendant hospital and its president arising out of his attempt to secure a contract on behalf of his employer, American Emergency Services Professional Corporation Medical Group ("AES"), to operate the hospital's emergency room. *Id.* at 1020. We found that the plaintiff had provided sufficient evidence that "defendants' discrimination against him based on his national origin denied him the opportunity to be employed by AES as director of defendants' emergency room." *Id.* at 1021. Although Gomez continued to work for AES after the incident, we concluded that "[t]he conditions of plaintiff's employment are different than they would have been had he not been discriminated against." *Id.* Thus, our decision in *Gomez* extended *Sibley* beyond cases where an employer fails to refer the plaintiff for an employment opportunity with a third party, to include any interference with the terms and conditions of an individual's employment whether or not resulting in a complete loss of employment.

Most recently, we have applied the *Sibley* rule to a class-action lawsuit brought by minority educators against the State of California. In *Association of Mexican–American Educators v. State of California,* we held that the state could be held liable for "requiring, implementing, and administering" a qualifying examination for teacher certification that had a discriminatory impact on minority applicant teachers. 231 F.3d at 581. We held that the state could assume liability for the adverse impact caused by

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 461 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2005)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

the test, even though the minority plaintiffs' prospective employer was not the state but individual local school districts. We based our conclusion on the state's "peculiar degree of control ... over the local school districts," due to the California legislature's plenary authority to regulate public education and the state government's funding obligations to local public schools, which affect their "day-to-day" operations. *Id.* By requiring the challenged test, the state had "created a limited list of candidates from which local public school districts may hire," thereby influencing the employment policies and practices of its local school districts. *Id.* at 582.

Our broad application of *Sibley* demonstrates that indirect employer liability may attach when an employer's interference with the plaintiff's third-party employment relationship adversely affects the terms **\*940** and conditions of the plaintiff's employment, and not just in cases where the employer discriminatorily refuses to refer the plaintiff for a job. The question central to this line of cases, and which must be answered in this case, is whether PMA committed any acts or failed to commit any acts, peculiar to its control over the waterfront and its relations with member companies and their employees, that adversely interfered with the terms and conditions of the appellants' employment with the member companies. Viewed in the light most favorable to appellants, I conclude that a genuine issue of material fact exists that defeats summary judgment.

The magistrate judge's reliance upon the integrated enterprise test led it to ignore evidence in the record of PMA's role and conduct that may expose it to Title VII liability. There is no doubt that the PMA exercises special control over employment conditions and opportunities with its member companies. Dockworkers depend upon the PMA for the receipt of their paychecks, for the administration of the hiring-hall dispatch system through which they receive their work assignments, for the labor policies that bind all member employers, and for the administration of the expedited grievance procedure available for complaints of discrimination. The magistrate judge considered only whether the PMA could be held liable for the conduct of its members, in which it was not directly implicated. The magistrate judge did not consider (1) what conduct by PMA officials might subject it to liability or (2) whether it should be held liable for harassing conduct committed by its member companies or their employees in any area over which PMA exercises

control. Appellants allege *inter alia* that PMA officials, charged with the crucial responsibility of investigating and mediating discrimination complaints, failed to process numerous complaints of racial discrimination and hostile work environment harassment; that a hostile work environment persisted on the waterfront despite these complaints; that the PMA continued to retain companies within its membership against which complaints had been lodged and to refer appellants to job assignments with those companies; that the PMA failed to exercise its authority to set labor policy on the waterfront in order to curb the harassment; that harassing conduct also occurred in the hiring hall operated by the PMA; and that PMA and union officials charged with the responsibility of prosecuting and mediating discrimination grievances themselves were motivated by racial animus. Appellants argue that the PMA should be held liable for the hostile work environment on the waterfronts of Seattle and Tacoma. Appellants do not confine their allegations of a hostile work environment to any specific terminal site or group of sites managed by a particular company or group of companies. Rather, appellants depict a pattern of intimidation and harassment pervading the entire waterfront work area, including the hiring hall.

The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to 'economic' or 'tangible' discrimination and that it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and citations omitted). Rather, the Court has stated that "[t]he phrase 'terms, conditions, or privileges of employment' [as used in 42 U.S.C. § 2000e–2(a)(1) ] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or **\*941** abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [12] *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (internal quotation marks and citations omitted).

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 462 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2005)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

Because the Supreme Court has held that hostile work environment harassment affects the terms and conditions of an individual's employment, interference by an indirect employer that causes an individual's employment opportunities to be tainted by a hostile work environment will expose the employer to liability under the *Sibley* rule. This conclusion is consistent with our hostile work environment precedent generally. First, our precedent does not require that the accused harasser be an employee of the defendant. To the contrary, we have held that "employers are liable for harassing conduct by non-employees 'where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.' " *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 968 (9th Cir.2002) (quoting *Folkerson v. Circus Circus Enters., Inc.,* 107 F.3d 754, 756 (9th Cir.1997)); *see, e.g. id.* (holding that an employer may be liable for hostile work environment harassment when an employee is raped by a corporate client while on a business dinner outing); *see also Trent v. Valley Elec. Ass'n,* 41 F.3d 524, 526–527 (9th Cir.1994) (reversing summary judgment denying plaintiff's retaliation claim based on defendant's discharge of plaintiff for reporting harassing conduct by nonemployee trainer hired to train defendant's employees). It is equally clear that an employer can be liable for harassing conduct by its own employees perpetrated against an employee of another company who is assigned to work on the defendant's premises. *See, e.g., Diana v. Schlosser,* 20 F.Supp.2d 348, 352–53 (D.Conn.1998) (holding defendant radio station potentially liable for hostile work environment harassment of plaintiff employee of third-party on-air traffic-report provider based on conduct by station's on-air talent and that defendant radio station "substantially controlled" her employment opportunities with her employer); *Moland v. Bil–Mar Foods,* 994 F.Supp. 1061, 1074–75 (N.D.Iowa 1998) (holding that non-employer defendant processing plant could face liability for a hostile work environment affecting the former employee of trucking company who was harassed while assigned to work temporarily at the plant); *King v. Chrysler Corp.,* 812 F.Supp. 151, 153–54 (E.D.Mo.1993) (denying summary judgment for defendant car manufacturer on plaintiff's hostile work environment claim, even though plaintiff merely worked in a cafeteria on defendant's business premises and defendant was not her direct employer).

Second, we describe Title VII liability as "direct, not derivative," *Swenson v. Potter,* 271 F.3d 1184, 1191 (9th Cir.2001), meaning that "[a]n employer is responsible for its own actions or omissions" and not vicariously liable for the conduct of others, *id.* at 1191–92. When no concrete employment action has been taken, we determine **\*942** whether an employer can be held liable for workplace harassment by evaluating the promptness and the adequacy of the employer's attempts to remedy the harassment. *See Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 875–76 (9th Cir.2001); *Fuller v. City of Oakland,* 47 F.3d 1522, 1528 (9th Cir.1995); *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir.1991). To that end, we have held that, "[i]f the employer fails to take corrective action after learning of an employee's ... harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have 'adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.' " *Swenson,* 271 F.3d at 1192 (quoting *Faragher,* 524 U.S. at 789, 118 S.Ct. 2275). Where, as in the present case, a group of employers have delegated the responsibility of collecting, investigating, and mediating complaints of workplace discrimination to one, central agent, that agent cannot then disavow this obligation and refuse to investigate employee complaints without incurring liability for the harassment that persists as a result of its failure to take prompt and appropriate action. Moreover, where harassment occurs in the hiring hall, over which the PMA has direct control, the PMA cannot assert that it lacks authority to take appropriate action. [13]

The Supreme Court's treatment of similar issues in the area of union liability is instructive. In *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the Court upheld the judgment of the district court, following a bench trial, that the plaintiffs' unions had discriminated against them because of race through their deliberate choice not to prosecute grievances of racial discrimination on behalf of black employees and their tacit encouragement of racial harassment in the workplace. [14] The Court's ruling did not turn upon a finding by the district court that racial animus had motivated the unions' conduct. Rather, the Court held that the unions were liable for their intentional discrimination "against blacks seeking a remedy for disparate treatment based on their race." *Id.* at 669, 107 S.Ct. 2617. The unions had argued they lacked the intent to discriminate because their refusal to file discrimination grievances was calculated to avoid

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

making the employer defensive during labor negotiations in which the union sought other benefits for its members. *Id.* at 668. The Court rejected this argument, reasoning that the unions' categorical refusal "to file any and all grievances filed by a black person" could not be excused by its potentially contravening duties to its membership. *Id.* at 669.

Following the Supreme Court's rationale in *Goodman,* the PMA may be liable under Title VII if it declines to file and investigate discrimination claims brought by African–American dockworkers "because of race." If the PMA declined to pursue these claims because of the complainants' race or because the complaints involved claims of racial discrimination which the PMA found divisive and potentially damaging to its membership, then it may be held **\*943** liable for disparate treatment. An employer's association, delegated the responsibility of investigating employee discrimination grievances, which refuses to process racial grievances because of race is no different in this sense from a hospital that refuses to refer private nurses to hospital patients because of sex.

Our decision should be driven not only by evidence of the PMA's responsibility for past conduct but also by the fact that it is a necessary party to any effective future remedy. The PMA, through the myriad services that it provides to its membership, forms a "highly visible nexus with the creation and continuance of direct employment relationships" between the membership and its labor force. *Sibley,* 488 F.2d at 1342. Dockworkers, such as appellants, who are not permanently employed by a particular employer are likely to have more regular interaction with the PMA as their surrogate employer than they have with any particular member company.

### III.

Appellants have raised genuine issues of fact regarding whether the PMA had assumed the responsibility of receiving, investigating, and mediating discrimination complaints on behalf of the member companies and whether PMA officials refused to investigate such complaints or to pursue them seriously. Dockworkers were told to bring their complaints to PMA officials because the normal grievance procedure established for dockworkers to bring complaints through their union representatives to the Joint Committee was exceedingly time-consuming and had been proved ineffective insofar as complaints of discrimination were concerned. Although dock-workers were technically employees of the member companies, the period in which a dockworker would serve as an employee of any particular company was brief and unpredictable, changing potentially on a day-to-day basis. If hostile work conditions existed at numerous sites simultaneously, in part because all employers were sharing workers who were guilty of engaging in harassing conduct and in part because at least some employers were remiss in their handling of the problem, should appellants have been required to complain to each employer whenever they happened to be assigned to its workforce? The expedited procedure did not require this, and, indeed, it appears ridiculous under the circumstances to suggest that workers should have grieved in this way.

The fact that the PMA does not have the authority to discharge employees who have committed harassment does not absolve the PMA of liability.[15] Through its supervisory powers, the PMA was charged with ensuring that its member companies complied with the CBA, which included ensuring that employers do not discriminate on the basis of race. We have stated that "[t]he most significant immediate measure an employer can take in response to a ... harassment complaint is to launch a prompt investigation to determine whether the complaint is justified," and that such an investigation "can itself be a powerful factor in deterring future harassment." *Swenson,* 271 F.3d at 1193. The PMA was capable of taking prompt and effective remedial action on complaints of racial harassment on the waterfront without itself removing individual harassers. The PMA following an investigation could recommend such a course of action to an employer, just as it could mediate disputes between dockworkers to bring about remedial **\*944** accommodations in employee work schedules or exercise its ultimate authority to exclude companies from its membership that fail to comply with the antidiscrimination provisions of the CBA.

The PMA exposes itself to Title VII liability if it fails or refuses to investigate and process complaints of racial harassment by its members or their employees. *Sibley* counsels that because "control over access to the job market may reside ... in a labor organization, an employment agency, or an employer ... Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 464 of 898

Anderson v. Pacific Maritime Ass'n, 336 F.3d 924 (2003)

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

grounds, access by any individual to employment opportunities otherwise available to him." *Sibley,* 488 F.2d at 1341. In the current action, the PMA has a duty to receive, investigate, and mediate worker grievances as part of a special grievance procedure in which all member companies participate. Having accepted this responsibility, it makes no difference whether the PMA is classified as an employer, an agent of an employer, or as a collective bargaining representative with certain duties analogous to those of a union. As the Supreme Court has stated, "a collective-bargaining agent cannot, without violating Title VII ... follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks." *Goodman,* 482 U.S. at 668–69, 107 S.Ct. 2617.

PMA, as the moving party, did not meet its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. On the contrary, the appellants have established that there are genuine issues of material fact. There is no dispute that a hostile work environment and rampant harassment of blacks exist on the waterfront. The issue is whether PMA can be held responsible under Title VII under the authority of the *Sibley* doctrine. Did it commit or fail to commit acts in its role as manager of the waterfront (dispatch of longshoremen, enforcement of the CBA against member employers, participation in grievance procedures, waterfront management) that could subject it to Title VII liability? I conclude that there is more than ample evidence submitted by appellants to require remand for trial.

**All Citations**

336 F.3d 924, 92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454, 03 Cal. Daily Op. Serv. 6284, 2003 Daily Journal D.A.R. 7943

Footnotes

*   Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1   Washington's Law Against Discrimination tracks federal law, and thus our analysis will cite only federal law, but applies with equal force to the Plaintiffs' claim under Washington law. *See, e.g., Payne v. Children's Home Soc'y of Washington, Inc.,* 77 Wash.App. 507, 892 P.2d 1102, 1105–06 (1995).

2   Specifically, the CBA commands the Joint Committee to "investigate and adjudicate all grievances and disputes" and instructs that the Joint Committee—not PMA—has "the power and duty to investigate and adjudicate" any grievance before it. The Joint Committee is independent of PMA and PMA has no role in selecting the members of the Joint Committee or reviewing the Joint Committee's conclusions. In light of these facts and the clear language of the CBA, we think erroneous the dissent's factual conclusion—critical to its analysis—that the member-employers "delegated the responsibility of collecting, investigating, and mediating complaints of workplace discrimination to one, central agent [PMA]."

3   Contrary to the implication contained in the dissent, the vast majority of acts constituting the alleged hostile work environment occurred at the docks controlled by the member-employers, not at the hiring hall jointly operated by the Union and PMA. Viewing the facts in the light most favorable to the Plaintiffs, they simply have not alleged that the hiring hall, in and of itself, constituted a hostile work environment.

4   Our colleague in dissent places much weight on the fact that PMA's bylaws afford PMA the power to discipline member-employers who violate terms of contracts entered into by PMA on behalf of the member-employers. But this discretion retained by PMA cannot be viewed in a vacuum. The contract in question here—the CBA—places the burdens of monitoring, investigating, and resolving grievances squarely *and only* on the member-employers and the Union. PMA is not directly involved. Thus, we do not think that the power conferred to PMA in its own bylaws vests PMA with the power to, as the dissent suggests, make wholly independent grievance investigations and fashion appropriate remedies when that is not the procedure the CBA contemplates. Indeed, if the general supervisory power contained in the bylaws acted as the vast bastion of responsibility and liability that the dissent suggests, PMA would be liable for *any* deviation from the CBA by any of its member-employers if PMA did not suspend or expel the offending member-employer from PMA.

    If this reasoning were adopted it would rob the CBA grievance procedures of any real meaning because, according to the dissent's logic, PMA would *always* have *a duty independent of the CBA* to conduct its own investigation and resolution because of its power under PMA bylaws to monitor compliance with the rules and policies established by the CBA. This is not what the CBA and PMA bylaws state, let alone contemplate, and thus we reject this creative

judicial attempt—not even presented by the Plaintiffs—to impose blanket responsibility on PMA when in fact no such responsibility exists.

5   Because the parties' initial briefs focused exclusively on the applicability of the integrated enterprise test, we *sua sponte* ordered supplemental briefing on the possible liability of PMA under the theory espoused by our colleague in dissent. In response, PMA conceded that it was an "employer" of its own employees for Title VII purposes, but not of the Plaintiffs or other longshoremen.

6   The dissent's characterization of PMA's power of "*general supervision* on the waterfront" (emphasis added) is unsupported by the record. It is undisputed that, other than at the hiring hall, all other facilities and work sites where racial harassment allegedly took place are controlled and supervised by the member-employers.

7   The dissent's statement that PMA not only had the power, but the "*duty* to receive, investigate, and mediate worker grievances" (emphasis added), is simply wrong under the relevant documents which created the organization and defined its relationship to the employers, the Union, and the longshoremen.

1   *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973).

2   Section 13 of the CBA provides that "in accordance with the provisions of Title VII of the 1964 Civil Rights Act, the Employers and the Union are forbidden to discriminate because of race, religion, age, sex or national origin and that the parties are also forbidden to limit, segregate or classify employees in any way that would tend to discriminate."

3   The Coast Steering Committee is composed of representatives of the American flag operator group, the foreign line operator group, and the stevedore and terminal group.

4   Article XI, Section 5 of the PMA bylaws provides in relevant part:

If any member shall violate, directly or indirectly, any rule or policy established by this corporation, or procure, encourage or assist in any such violation by any other person, whether a member of this corporation or not, or shall, directly or indirectly, violate any provision of any contract or agreement made by the corporation on its behalf with any longshoremen or other employees ashore or unions thereof, or with any seamen or unions thereof, or procure or encourage or assist in any such violation by any other person ... the Board of Directors shall have the power, in its discretion, to *suspend* any such member for such period of time as the Board of Directors shall prescribe or to *expel such member from membership in this corporation.*

(emphasis added).

5   The majority's analysis fails to acknowledge that the PMA plays a key role in the grievance procedures set forth in the CBA. Section 17 of the CBA provides that the "[t]he *parties* shall establish and maintain ... a Joint Labor Relations Committee for each port or area affected by this Agreement." (emphasis added). The parties to the contract include various locals of the ILWU and *the PMA*. Although the parties dispute whether the PMA is individually represented on the Joint Committee, it is undisputed that individual member companies are not individually represented. Rather, the CBA provides for the employers' interests to be represented collectively by a select group of representatives.

6   The facts of this lawsuit were not made a part of the record in this case.

7   PMA's President and CEO Miniace also testified that the PMA exercised substantial input in the establishment of internal grievance procedures by the member companies.

8   Appellants in their deposition testimony provided examples such as "We need to kill all niggers," "We need tonight to kill a couple of these niggers so they will understand that this is a might—white man's world," "All niggers should be shipped back to Africa in wooden boxes," and "The only good nigger's a dead nigger."

9   Oliver is not the only appellant who testified to being called "boy."

10   Local 98 is the foremen's union to which several of the appellants belong.

11   Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge *any individual,* or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). The D.C. Circuit found no good reason "to confine the meaning of 'any individual' to include only former employees and applicants for employment, in addition to present employees." *Sibley,* 488 F.2d at 1341. The statute separately provides that an employer may not "limit, segregate, or classify *his employees or applicants for employment* in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2) (emphasis added). Since Congress has shown the ability to specify its meaning by adopting specific language, there is no good reason to confine its meaning where it otherwise adopts broad language.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 466 of 898

92 Fair Empl.Prac.Cas. (BNA) 417, 2003 A.M.C. 2849, 84 Empl. Prac. Dec. P 41,454...

12    "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2074 n. 10, 153 L.Ed.2d 106 (2002).

13    The majority opinion acknowledges that incidents of harassment occurred in areas controlled by the PMA, but finds that hiring hall incidents are not sufficient to constitute hostile work environment. Even with the narrow view that the PMA would be liable only for events that occurred at the hiring hall, the majority fails to consider appellants' contentions that they were discriminated against through the dispatch procedure administered by the PMA at the hiring hall.

14    Title VII provides that a union may not "discriminate against any individual because of race," 42 U.S.C. § 2000e–2(c)(1), or "cause or attempt to cause an employer to discriminate," 42 U.S.C. § 2000e–2(c)(3).

15    As discussed above, the PMA did have the authority to exclude member companies from the CBA based on their violation of the terms of the CBA or their violation of any policy set by the association.

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 2

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 468 of 898

Andrus v. Glover Const. Co., 446 U.S. 608 (1980)

100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

100 S.Ct. 1905
Supreme Court of the United States

Cecil D. ANDRUS, Secretary of
the Interior, et al., Petitioners,
v.
GLOVER CONSTRUCTION COMPANY.

No. 79–48.
|
Argued March 24, 1980.
|
Decided May 27, 1980.

Non-Indian contractor brought suit to challenge the Bureau of Indian Affairs' award of a road construction contract to an Indian-owned construction company without complying with the advertising requirements of Title III of the Federal Property and Administrative Services Act. The United States District Court for the Eastern District of Oklahoma, 451 F.Supp. 1102, rendered summary judgment in favor of the non-Indian contractor. The United States Court of Appeals for the Tenth Circuit, 591 F.2d 554, affirmed and certiorari was granted. The Supreme Court, Mr. Justice Stewart, held that the Buy Indian Act, which permits the Secretary of Interior to purchase "the products of Indian industry * * * in open market," did not authorize the Bureau of Indian Affairs to enter into road construction contracts with Indian-owned companies without first advertising for bids pursuant to Title III of the FPASA.

Affirmed.

**1906 *608 Syllabus*

Held : The Buy Indian Act, which permits the Secretary of the Interior to purchase "the products of Indian industry . . . in open market," does not authorize the Department of the Interior's Bureau of Indian Affairs (BIA) to enter into road construction contracts with Indian-owned companies without first advertising for bids pursuant to Title III of the Federal Property and Administrative Services Act of 1949 (FPASA). There is no such authority even if the Buy Indian Act's language "the products of Indian industry" could be construed to embrace road construction, since, while negotiated

procurements "otherwise authorized by law" are one of the specified exceptions to Title III's broad directive in 41 U.S.C. § 252(c) that all procurement by the covered executive agencies (including the BIA) proceed through advertising, such exception is omitted from the list of the exceptions specified in § 252(e) to the requirement that § 252(c) not be construed to permit any road construction contract to be negotiated without advertising. From this omission only one inference can be drawn: Congress meant to bar the negotiation of road construction projects under the authority of laws like the Buy Indian Act. Pp. 1908–1911.

591 F.2d 554, affirmed.

Attorneys and Law Firms

Andrew J. Levander, Washington, D. C., *pro hac vice*, by special leave of Court, for petitioners.

D. D. Hayes, Muskogee, Okl., for respondent.

Opinion

*609 Mr. Justice STEWART delivered the opinion of the Court.

The Buy Indian Act, 35 Stat. 71, as amended, 25 U.S.C. § 47, directs the Secretary of the Interior to employ Indian labor "[s]o far as may be practicable," and permits him to purchase "the products of Indian industry . . . in open market." [1] The question presented in this case is whether the Bureau of Indian Affairs (BIA) of the Department of the Interior [2] may, on the authority of this legislation, enter into road construction contracts with Indian-owned companies without first advertising for bids pursuant to Title III of the Federal Property and Administrative Services Act of 1949 (FPASA), 63 Stat. 393, as amended, 41 U.S.C. §§ 251–260.

I

In 1976, the BIA formally adopted the procurement policy that "all [BIA] purchases or contracts be made or entered into with qualified Indian contractors to the maximum practicable extent." [3] To effectuate **1907 this objective, the BIA announced that in every procurement situation it would consider dealing with non-

Indian contractors only after it had determined that there were "no qualified Indian contractors within the normal competitive area that can fill or are interested in filling the procurement requirement."[4]

**\*610**  In early 1977, the BIA invited three Indian-owned construction companies to submit bids for the repair and improvement of a 5-mile segment of road in Pushmataha County, Okla. The road, commonly called the Honobia Road, is located within an area subject to BIA jurisdiction. The respondent, a non-Indian corporation engaged as a general contractor in roadbuilding and other forms of heavy construction, was not afforded an opportunity to bid.[5]  On May 25, 1977, BIA awarded the contract to Indian Nations Construction Co., a corporation owned and controlled exclusively by Indians and the only Indian-owned company to have bid on the project. The final negotiated contract price amounted to approximately $1.2 million.[6]

The respondent then filed the present suit in the United States District Court for the Eastern District of Oklahoma, naming as defendants the Secretary of the Interior, the Department of the Interior, BIA, and the BIA contracting officer on the Honobia Road project (petitioners here). The respondent alleged that the petitioners were required by § 3709 of the Revised Statutes, 41 U.S.C. § 5, and Title III of the FPASA to advertise publicly for bids on the Honobia Road project. The respondent further claimed that the actions of the petitioners had denied it due process and equal protection in contravention of the Fifth Amendment of the United States Constitution. As relief, the respondent requested **\*611**  the District Court to set aside the Honobia Road contract and to enjoin the petitioners from engaging in the unadvertised negotiation of contracts on the purported authority of the Buy Indian Act.

After the completion of discovery, the District Court granted summary judgment to the respondent. 451 F.Supp. 1102. The court concluded that the procedure followed by the petitioners in awarding the Honobia Road project to the Indian Nations Construction Co. violated the advertising requirements of the FPASA, in particular 41 U.S.C. §§ 252(e) and 253. 451 F.Supp., at 1106. The court rejected the Secretary's contrary administrative construction as inconsistent with the plain language of the FPASA. Id., at 1106–1108. Deciding in favor of the respondent on these statutory grounds, the District Court

found it unnecessary to reach the respondent's alternative arguments under the Constitution. Id., at 1108. The court thereupon declared the road construction contract that had been entered into between the petitioners and the Indian Nations Construction Co. to be null and void, and permanently enjoined the petitioners from circumventing the advertising requirements of 41 U.S.C. § 253 in connection with the remainder of the Honobia Road project and future road construction projects. 451 F.Supp., at 1112.[7]

**\*\*1908**  A divided panel of the Court of Appeals for the Tenth Circuit affirmed the judgment. 591 F.2d 554. Relying in large part on the analysis of the District Court, the Court of Appeals held that, whatever might arguably be the breadth of the Buy Indian Act standing alone, it had been pre-empted by the advertising requirements of the FPASA with respect **\*612**  to the procurement of road construction projects. Id., at 557–559. Alternatively, the Court of Appeals observed that it would "require a considerable 'stretch of the imagination' to conclude that the Congress intended the Buy-Indian Act to apply to road construction projects." Id., at 560. The appellate court believed, in short, that the Act's preference for Indian "products" could not easily be read to include the performance of a roadway construction contract by an Indian-owned firm. Id., at 562. In response to the petitioners' contention that the Buy Indian Act should be construed liberally to effectuate its remedial purpose, the court observed that "a primary, significant remedial feature of the advertisement and competitive bidding requirements of the [FPASA] is to obtain the best and lowest bid for the benefit of the American taxpayers in 'high cost' construction categories." Ibid. (emphasis deleted). We granted certiorari, 444 U.S. 962, 100 S.Ct. 448, 62 L.Ed.2d 374 to decide a question of importance in the proper exercise by the BIA of its procurement responsibilities.

## II

**[1]**  The Buy Indian Act was enacted in 1910 as part of legislation that subjected the purchase of Indian supplies by the Department of the Interior to the strictures of § 3709 of the Revised Statutes.[8]  Section 3709, which had been in existence **\*613**  since 1861,[9]  required agencies subject to its provisions to advertise for bids on all but

Andrus v. Glover Const. Co., 446 U.S. 608 (1980)

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 470 of 898

100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

a few Government procurements. [10] The purpose of the Buy Indian Act was clear. Purchases by the Department of the Interior of "the products of Indian industry" were to be exempt from any requirement of advertising for bids imposed by § 3709 of the Revised Statutes. [11]

The legislation of which the Buy Indian Act was a part was amended from time to time between 1910 and 1965, but none of these changes affected the substance of **1909 what had been enacted in 1910. The BIA was, as was true of most other departments of the Government, continued to operate under a general mandate that contracts for supplies and services be let in conformity with § 3709 of the Revised Statutes. [12] Section *614 3709, in turn, was recodified (41 U.S.C. § 5) and amended, but its basic mandate remained the same. [13] Government procurement was to proceed through advertising for bids unless excepted by § 3709 or "otherwise provided" by laws such as the Buy Indian Act. [14]

In 1965, the law affecting BIA procurement was substantially modified. The regime of detailed contracting requirements contained in Title III of the FPASA, theretofore applicable only to the General Services Administration and to certain special procurements, [15] was extended to cover the purchasing procedures of the BIA and most other executive *615 agencies. [16] See 41 U.S.C. § 252(a); 40 U.S.C. §§ 472(a), 474. For covered agencies, one consequence of this legislation was to substitute the advertising requirements set out in Title III of the FPASA for those contained in § 3709 of the Revised Statutes. See 41 U.S.C. § 260; S.Rep. No. 274, 89th Cong., 1st Sess., 1, 5 (1965); H.R.Rep. No. 1166, 89th Cong., 1st Sess., 7, 9 (1965), U.S.Code Cong. & Admin.News 1965, p. 4217; 111 Cong.Rec. 27198 (1965) (Rep. Brooks).

Under Title III of the FPASA, the BIA must now adhere to the broad statutory mandate that "[a]ll purchases and contracts for property and services shall be made by advertising . . . ." 41 U.S.C. § 252(c). From this directive, the statute specifically excepts only 15 types of procurements, the 15th covering situations where negotiated procurements are "otherwise authorized by law. . . ." § 252(c)(15) (subsection (c)(15)).

The Buy Indian Act is clearly a "law" within the contemplation of subsection (c)(15). As 41 U.S.C. § 260 expressly states: "Any provision of law which authorizes an executive agency . . . to procure any property or services without advertising or without regard to [§ 3709 of the Revised Statutes, 41 U.S.C. § 5] shall be construed to authorize the procurement of such property **1910 or services pursuant to section 252(c)(15) of this title without regard to the advertising requirements of . . . this title." See also S.Rep. No. 274, supra, at 5; H.R.Rep. No. 1166, supra, at 8; U.S.Code Cong. & Admin.News 1965, p. 4217. As noted above, the Buy Indian Act has from its inception authorized the BIA to "purchas[e] the products of Indian industry" without regard to the advertising requirements of § 3709 of the Revised Statutes.

Relying on subsection (c)(15) and § 260, the petitioners argue that the BIA proceeded correctly in awarding the Honobia Road contract to the Indian Nations Construction Co. without prior public advertising for bids. They assert that *616 a road constructed or repaired by an Indian-owned corporation is a "product of Indian industry" within the meaning of the Buy Indian Act and, accordingly, that the Honobia Road project was exempt from the FPASA's advertising rules by operation of subsection (c)(15).

[2]   It is fairly debatable, we think, simply as a matter of language, whether a road constructed or repaired by an Indian-owned enterprise is a "product of Indian industry" within the meaning of the Buy Indian Act. But even if that Act could in isolation be construed to embrace road construction or repair, the petitioners' argument must still be rejected because of another provision of Title III of the FPASA expressly relating to contracts of the sort at issue here. Title 41 U.S.C. § 252(e) (subsection (e)) states that § 252(c) "shall not be construed to . . . permit any contract for the construction or repair of . . . roads . . . to be negotiated without advertising . . ., unless . . . negotiation of such contract is authorized by the provisions of paragraphs (1), (2), (3), (10), (11), (12), or (14) of subsection (c) of this section." [17] Not contained in this list of exceptions is subsection (c)(15). From this omission only one inference can be drawn: Congress meant to bar the negotiation of road construction and repair projects under the authority of laws like the Buy Indian Act. ==Where Congress explicitly enumerates certain exceptions to a *617 general prohibition, additional exceptions are not to be implied, in the absence of evidence==

100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

of a contrary legislative intent. See *Continental Casualty Co. v. United States*, 314 U.S. 527, 533. [18]

In an attempt to avoid the obvious import of subsection (e), the petitioners argue that the subsection does not apply at all to cases in which the Buy Indian Act is involved. The petitioners reason that subsection (e) is concerned solely with procurement contracts whose negotiation is "permitted" by § 252, and that the negotiation authority afforded by the Buy Indian Act does not fit this description because that Act is a statute which of its own force operates independently of the FPASA.

**\*\*1911** We read the pertinent statutes differently. In the absence of subsection (c)(15), the Buy Indian Act could independently confer no authority on the BIA to avoid public advertising for competitive bids. Title 40 U.S.C. § 474 provides that "[t]he authority conferred by [the FPASA] shall be in addition and *paramount* to *any* authority conferred by any other law and shall not be SUBJECT TO THE PROVISIONS OF *ANY* LAW INCONSISTENT HEREWITH . . . ." (emphasis supplied.) In view of § 252's broad directive that all procurement proceed **\*618** through advertising, the Buy Indian Act's contrary mandate would not have survived the 1965 amendments to the FPASA had Title III of the FPASA not contained subsection (c)(15). In short, § 252(c) "permits" negotiation pursuant to the Buy Indian Act and, therefore, such negotiation is limited by the special rule applicable to road construction contained in subsection (e). [19]

**[3]**  We are, nonetheless, urged to disregard the plain meaning of subsection (e) because of the axiom that repeals by implication of longstanding statutory

provisions are not favored. See *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n*, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334. The maxim is said to be particularly compelling here because the older statute is "remedial" legislation for the benefit of Indians. See *Morton v. Mancari*, 417 U.S. 535, 549–551, 94 S.Ct. 2474, 2482–2483, 41 L.Ed.2d 290. The 1965 amendments to the FPASA did not, however, "repeal" the Buy Indian Act. With the exception of the limited class of contracts enumerated in subsection (e), the FPASA did not in any manner displace the provisions of the Buy Indian Act. Moreover, "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a **\*619** clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari, supra*, at 551, 94 S.Ct., at 2483. And, although the "rule by which legal ambiguities are resolved to the benefit of the Indians" is to be given "the broadest possible scope," "[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent." *DeCoteau v. District County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300.

For the reasons stated, the judgment of the Court of Appeals is affirmed. [20]

*It is so ordered.*

## All Citations

446 U.S. 608, 100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

## Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

1  Title 25 U.S.C. § 47 provides in full:

> "So far as may be practicable Indian labor shall be employed, and purchases of the products of Indian industry may be made in open market in the discretion of the Secretary of the Interior."

2  The Secretary of the Interior has delegated his responsibilities and powers under the Act to the Commissioner of the BIA.

3  20 BIAM Bull. 1 (Mar. 3, 1976). See also 25 CFR § 162.5a (1978); 41 CFR § 14H–3.215–70 (1977). The Bulletin defined "Indian contractor" as a legal entity that is 100% Indian owned and controlled. An "Indian" was defined as a member of an Indian tribe or as a person otherwise considered to be an Indian by the tribe with which affiliation is claimed.

4  The Bulletin admonished that, in all events, the contract price must be "fair and reasonable."

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 472 of 898

100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

5    At the time, the respondent was on the list of available contractors maintained by the BIA. Previously, the respondent had competitively bid on and been awarded the contract covering another five miles of the Honobia Road.

In procurement parlance, contracts for which bids are publicly invited in advance are said to be let pursuant to "advertising." See 41 U.S.C. § 253; 41 CFR §§ 1–2.101, 1–2.203–1, 1–2.203–2 (1979). All other contacts are "negotiated." See 41 U.S.C. §§ 252(c), 254; 41 CFR § 1–1.301–3 (1979).

6    The BIA's area road engineer had earlier estimated that the job would cost $963,117.48.

7    The court denied the respondent's request that Indian Nations Construction Co. be made to refund the amounts it had been paid for work already performed on the Honobia Road project before the court's entry of judgment. 451 F.Supp., at 1109, 1112. In this connection, the District Court noted that 9.7% of the construction contract had been completed and paid for at the time of its decision. *Id.*, at 1109.

8    The Act of June 25, 1910, ch. 431, § 23, 36 Stat. 861, provided:

"That hereafter the purchase of Indian supplies shall be made in conformity with the requirements of section thirty-seven hundred and nine of the Revised Statutes of the United States: *Provided*, That so far as may be practicable Indian labor shall be employed, and purchases of the products of Indian industry may be made in open market in the discretion of the Secretary of the Interior. All Acts and parts of Acts in conflict with the provisions of this section are hereby repealed."

The origins of this legislation lay in a series of Appropriations Acts concerning the Indian Department of the Department of the Interior. Each of these annual Acts contained a provision whose language was similar to that of the present Buy Indian Act. See, *e. g.*, Act of Apr. 30, 1908, ch. 153, 35 Stat. 70; Act of Mar. 1, 1907, ch. 2285, 34 Stat. 1015.

9    See Act of Mar. 2, 1861, ch. 84, § 10, 12 Stat. 220.

10   In 1910, § 3709 of the Revised Statutes provided in pertinent part:

"All purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals."

11   The structure of § 23 of the Act of June 25, 1910, evidences this intent. See n.8, *supra*. So does the Act's legislative history. The House Report explained that "[w]ith the exceptions noted in the proviso," the Buy Indian Act, § 23 "will bring the Indian Service, like all other branches of the public service, under the provisions of section 3709 of the Revised Statutes. . . ." H.R. Rep. No. 1135, 61st Cong., 2d Sess., 12 (1910). See also 45 Cong.Rec. 6097 (1910) (Rep. Burke).

12   In 1926, § 23 of the 1910 Act was split into two parts for codification purposes. The language that required the BIA to adhere to the advertising rules contained in § 3709 of the Revised Statutes was placed in 25 U.S.C. § 93. The proviso respecting the purchase of Indian goods was located in 25 U.S.C. § 47. No contemporaneous suggestion was made that this separation was intended to affect the substance of either segment of the original Act.

In 1940, a further change occurred. As part of an effort to eliminate redundant provisions respecting the operation of federal agencies, 25 U.S.C. § 93 was repealed and 41 U.S.C. § 6a(g) enacted in its place. See Act of Oct. 10, 1940, ch. 851, §§ 2(g), 4(a), 54 Stat. 1110, 1111, 1112. This rearrangement made "no changes in existing law." H.R.Rep. No. 2647, 76th Cong., 3d Sess., 1 (1940). See S.Rep. No. 2135, 76th Cong., 3d Sess., 2 (1940). Then, in 1951, 41 U.S.C. § 6a(g) was repealed. See Act of Oct. 31, 1951, ch. 654, § 1(107), 65 Stat. 705. Obsolescence seems to have led to the demise of 25 U.S.C. § 93 and 41 U.S.C. § 6a(g). See H.R.Rep. No. 1105, 82d Cong., 1st Sess., 2–3 (1951). By 1951, § 3709 of the Revised Statutes had been amended to require advertising in all cases except where small purchases were involved, where a specific exemption in § 3709 applied, or where "otherwise provided in . . . other law." See 41 U.S.C. § 5 (1946 ed.).

13   In 1964, 41 U.S.C. § 5 (1964 ed.) read in pertinent part:

"Unless otherwise provided in the appropriation concerned or other law, purchases and contracts for supplies or services for the Government may be made or entered into only after advertising a sufficient time previously for proposals, except (1) when the amount involved in any one case does not exceed $2,500, (2) when the public exigencies require the immediate delivery of the articles or performance of the service, (3) when only one source of supply is available and the Government purchasing or contracting officer shall so certify, or (4) when the services are required

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 473 of 898

Andrus v. Glover Const. Co., 446 U.S. 608 (1980)
100 S.Ct. 1905, 64 L.Ed.2d 548, 27 Cont.Cas.Fed. (CCH) P 80,420

> to be performed by the contractor in person and are (A) of a technical and professional nature or (B) under Government supervision and paid for on a time basis."

14    Since its codification in 1926 in 25 U.S.C. § 47, the Buy Indian Act has undergone no change in phraseology.

15    See 41 U.S.C. § 252(a) (1964 ed.).

16    79 Stat. 1303.

17    Title 41 U.S.C. § 252(e) provides in full:

> "This section shall not be construed to (A) authorize the erection, repair, or furnishing of any public building or public improvement, but such authorization shall be required in the same manner as heretofore, or (B) permit any contract for the construction or repair of buildings, roads, sidewalks, sewers, mains, or similar items to be negotiated without advertising as required by section 253 of this title, unless such contract is to be performed outside the continental United States or unless negotiation of such contract is authorized by the provisions of paragraphs (1), (2), (3), (10), (11), (12), or (14) of subsection (c) of this section."

No contention has been made that paragraphs (1), (2), (3), (11), (12), or (14) of subsection (c) authorized negotiation of the Honobia Road project. As to paragraph (10), see n. 20, *infra*.

18    Nothing in the legislative history of the 1965 amendments to the FPASA points in a different direction than does the plain language of the statute. The petitioners cite the following passage found in several of the congressional Committee Reports that accompanied the 1949 version of the FPASA:

> "For clarity [subsection (e)] provides that [41 U.S.C. § 252] does not authorize or change the existing requirements for authorization for the erection or repair of buildings, roads, sidewalks, or similar items." H.R.Rep. No. 670, 81st Cong., 1st Sess., pt. 1, p. 23 (1949); S.Rep. No. 338, 81st Cong., 1st Sess., 20 (1949); S.Rep. No. 475, 81st Cong., 1st Sess., 25 (1949).

This statement, however sheds no light on the proper disposition of the instant case. It referred to the provisions of the FPASA at a time when that legislation governed no more than the General Services Administration and a few special procurements.

19    Alternatively, the petitioners contend that subsection (e) does not govern here because of § 252(a)(2). That provision states that §§ 251 through 260 of Title 41 "d[o] not apply . . . when [those sections are] made inapplicable pursuant to section 474 of title 40 or any other law . . . ." According to the petitioners, the Buy Indian Act is an "other law" within the intendment of § 252(a)(2).

We disagree, reading subsection (a)(2) to refer exclusively to statutory provisions that—unlike the Buy Indian Act—in express terms exempt procurements from §§ 251 through 260 of Title 41 or from the FPASA in its entirety. Any broader reading of subsection (a)(2) would render subsection (c)(15) superfluous and would also substantially undermine Congress' desire that the requirements of § 254 apply "to contracts negotiated by executive agencies under *any* law, not only title III." S.Rep. No. 274, 89th Cong., 1st Sess., 2 (1965); H.R.Rep. No. 1166, 89th Cong., 1st Sess., 2 (1965), U.S.Code Cong. & Admin.News 1965, pp. 4217, 4218. (Emphasis added.) See *id.*, at 2–3, U.S.Code Cong. & Admin.News, 1965, pp. 4217, 4218.

20    The petitioners have requested that, if their basic arguments are rejected, this case, nonetheless, be remanded to the Court of Appeals for further consideration in light of 41 U.S.C. § 252(c)(10), which authorizes the negotiation of Government contracts "for property or services for which it is impracticable to secure competition." The petitioners, however, did not rely on this statutory provision in defending this lawsuit in the District Court, and the Court of Appeals did not consider it. Our affirmance of the judgment of the Court of Appeals does not preclude the petitioners from seeking relief from the outstanding injunction on this ground or any other. See *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 165, n. 30, 95 S.Ct. 1504, 1523, 44 L.Ed.2d 29. See also Fed.Rule Civ.Proc. 60(b).

---

**End of Document**                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

E.E.O.C. v. Occidental Life Ins. Co. of California, 535 F.2d 533 (1976)

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 475 of 898

535 F.2d 533
United States Court of Appeals,
Ninth Circuit.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff-Appellant,

v.

OCCIDENTAL LIFE INSURANCE COMPANY
OF CALIFORNIA, Defendant-Appellee.

No. 75-1705.
|
May 11, 1976.

Equal Employment Opportunity Commission brought action charging employer with violating Civil Rights Act of 1964 by engaging in allegedly discriminatory employment practices. The United States District Court for the Central District of California, A. Andrew Hauk, J., dismissed action, and plaintiff appealed. The Court of Appeals, Eugene A. Wright, Circuit Judge, held that although a civil action by the charging party is barred for 180 days following filing of charges, the 180-day period is not a limitation on right of the Equal Employment Opportunity Commission to bring suit as long as the charging party has not done so, that neither claim by the EEOC for injunctive relief nor claim for back pay are subject to state limitations periods and that although in her original charge the complainant, a married woman, alleged that employer refused to provide her with maternity leave and related benefits, charges that employer discriminated against unmarried females as regards "pregnancy benefits" and against male employees in administration of retirement system were proper subject of suit where they were discovered during a reasonable investigation of the underlying charges and employer received adequate notice during administrative investigation of the substance of such charges.

Reversed and remanded for further proceedings.

**Attorneys and Law Firms**

**\*535** John Schmelzer, EEOC, Washington, D. C. (argued), for plaintiff-appellant.

Dennis H. Vaughn (argued), Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant-appellee.

OPINION

Before WRIGHT, KILKENNY and TRASK, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In this Title VII action the Equal Employment Opportunity Commission (EEOC) appeals from the district court's order of dismissal. We reverse and remand.

I.

PROCEEDINGS BELOW

On December 27, 1970, Tamar Edelson filed with the EEOC a charge against Occidental Life Insurance Company (Occidental), alleging that she had been discriminated against because of her sex. She specified that "the most recent date on which this discrimination took place" was October 1, 1970, the date of her discharge by Occidental.

The EEOC referred the charge to the California Fair Employment Practices Commission, in accordance with the provisions of Section 706(c) (42 U.S.C. s 2000e-5(c)). When that agency took no action, the charge was formally filed with the EEOC on March 9, 1971.

The EEOC undertook an investigation and, on February 25, 1972, its District Director issued Findings of Fact that Occidental had discriminated against Ms. Edelson and also had discriminated against many other employees through a variety of practices and policies. Occidental filed exceptions to the findings on March 23, 1972. The EEOC issued its "Reasonable Cause" Determination on February 8, 1973 and during the following year, held a conciliation meeting with Occidental.

When that effort proved unsuccessful, the EEOC filed this action in district court on February 22, 1974.

That court granted Occidental's motion to dismiss, finding that:
1. The EEOC has no authority to file suit more than 180 days after the filing of the underlying charge, or where, as here, the charge was filed prior to the 1972 amendments

to Title VII of the Civil Rights Act of 1964, more than 180 days after the effective date of such amendments;

2. Alternatively, the EEOC was barred from filing this suit by the California statute of limitations;

3. Alternatively, the EEOC was barred from proceeding on paragraphs 8(b) and 9(c) of its complaint because the allegations contained therein were outside the scope of the underlying charge; and

4. In any event, the EEOC was barred from seeking back pay for any alleged violations occurring more than two years prior to the filing of the underlying charge.

By its appeal herein, the EEOC challenges only the first three findings by the court.

We hold:

(1) The 180-day language of Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)) does not constitute a limitation upon the EEOC's ability to sue in its own name;

(2) This action is not barred by any state limitations period; and

(3) The EEOC properly included subparagraphs 8(b) and 9(c) in its complaint.

**\*536** II.

THE 180-DAY LANGUAGE OF SECTION 706(F)(1)

[1] Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)) states in pertinent part: [1]

. . . (I)f within one hundred and eighty days from the filing of such charge . . . the (EEOC) has not filed a civil action under this section . . . the (EEOC) . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the (EEOC), by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.
The district court found that the above statute precluded the EEOC from bringing this action.

The statute on its face contains no express limitation upon suit by the EEOC. Rather, it precludes civil action by the charging party for 180 days so that the EEOC may during that period pursue conciliation. [2] If, after 180 days, the EEOC has neither filed a civil action nor achieved conciliation, the charging party may demand a "right-to-sue" letter. On receipt of it, the charging party has 90 days within which to sue. Should such private action be filed, the EEOC would apparently be restricted to intervention. [3]

However, should the person concerned choose not to sue during the allotted 90 days, the EEOC is not prohibited from suing thereafter. The statute in no way limits the time within which it must sue, so long as the charging party has not done so. [4]

This issue has been before the Courts of Appeals for the Third, Fourth, Fifth, Sixth, Eighth and Tenth Circuits. All have ruled that Section 706(f)(1) ( 42 U.S.C. s 2000e-5(f)(1)) does not preclude suit by the EEOC after the 180-day period has run. [5]

Finding this avalanche of authority most persuasive, we adopt the rule that the 180-day language of Section 706(f)(1) does not constitute a limitation upon the EEOC's ability to sue in its own name. We conclude that the district court erred in barring this suit on the basis of the 180-day language in Section 706(f)(1).

III.

APPLICABILITY OF RELEVANT
STATE LIMITATIONS PERIOD

The district court held alternatively that the EEOC suit was barred by the one-year California statute of limitations found in California Code of Civil Procedure s 340(3).

We have already determined that Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)) does not require the EEOC to file suit within 180 **\*537** days of the date the private charge is filed with that agency. There being no other portion of Title VII susceptible of interpretation as a limitation on the time within which the EEOC must bring suit, we find that there is simply no governing federal limitations

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 477 of 898

E.E.O.C. v. Occidental Life Ins. Co. of California, 535 F.2d 533 (1976)

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

period. See Equal Employment Opportunity Comm'n v. Griffin Wheel Co., 511 F.2d 456, 458, aff'd on rehearing, 521 F.2d 223 (5th Cir. 1975).

**[2]** It is well established that in a private civil rights action, where Congress has not provided a statute of limitations, the state statute applied to similar litigation will be applied to the federal action. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295, 302-03 (1975), and cases cited therein; Griffin v. Pacific Maritime Ass'n, 478 F.2d 1118, 1119 (9th Cir. 1973).

**[3]** In its complaint the EEOC seeks both injunctive relief and back pay. By its prayer for injunctive relief the EEOC promotes public policy and seeks to vindicate rights belonging to the United States as sovereign. Thus, the EEOC's request for injunctive relief is not subject to any state limitations period. Griffin Wheel, supra, 511 F.2d at 459; Kimberly-Clark, supra,511 F.2d at 1359-60. Cf. United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940). The district court erred insofar as it barred EEOC's request for injunctive relief on the basis of the California limitations period. [6]

We consider the request for back pay. Occidental argues that, even though the EEOC is party plaintiff, "(i)nsofar as the . . . suit constitutes a proper legal conduit for the recovery of sums due individual citizens rather than the treasury, it is a private and not a public action." United States v. Georgia Power, 474 F.2d 906, 923 (5th Cir. 1973), quoted in Griffin Wheel, supra, 511 F.2d at 458.

Since we cannot agree that EEOC's request for back pay must be treated as "private" in nature, we believe the district court erred in applying the California limitations period to bar the back pay request.

Our starting point is the recent statement of the Supreme Court in Franks v. Bowman Transp. Co., —– U.S. —–, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 USLW 4356 (1976): "(C)laims under Title VII involve the vindication of a major public interest . . . ." Id. at 1251 n.40, 96 S.Ct. at 1271, 47 L.Ed.2d at 469, 44 USLW at 4365 n.40, quoting Section-By-Section Analysis, accompanying the Equal Employment Opportunity Act of 1972 Conference Report, 118 Cong.Rec. 7166, 7168 (1972).

The Court in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), discussed in some detail the nature of Title VII claims for back pay: As the Court observed in Griggs v. Duke Power Co., 401 U.S. (424), at 429-430, 91 S.Ct. 849, at 853, 28 L.Ed.2d 158, 163, the primary objective (of Title VII) was a prophylactic one:

> "It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."

Backpay has an obvious connection with this purpose. If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that "provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (CA8 1973).

It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.

Id. at 417-18, 95 S.Ct. at 2371, 45 L.Ed.2d at 297. (Emphasis added.)

**\*538** That an award of back pay promotes the primary statutory objective of deterrence [7] was also noted by the Sixth Circuit in Meadows v. Ford Motor Company, 510 F.2d 939, 948 (6th Cir. 1975).

The Moody Court noted that "(t)he backpay provision (of Title VII) was expressly modeled on the backpay provision of the National Labor Relations Act." 422 U.S. at 419 and n.11, 95 S.Ct. at 2372, 45 L.Ed.2d at 297. It is established doctrine that a back pay order under Section 10(c) of the National Labor Relations Act (29 U.S.C. s 160(c)) " 'is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice.' " National Labor Relations Board v. J. H. Rutter-Rex

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 478 of 898

E.E.O.C. v. Occidental Life Ins. Co. of California, 535 F.2d 533 (1976)

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405, 410 (1969), quoting Nathanson v. National Labor Relations Board, 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23, 28-29 (1952).

It is true, of course, that whenever a party obtains relief under a federal statute, public policy is vindicated even though direct, immediately cognizable benefits may flow only to the individual. Thus, for example, private action under Title 42 U.S.C. s 1981 is subject to state limitations periods despite the fact that each recovery may be said to promote the public policy embodied in the statute. See Johnson, supra, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

But certain federal acts, such as the National Labor Relations Act, are intended to be broadly prophylactic as well as remedial. See Section 1 (29 U.S.C. s 151). Several circuits, including our own, have recognized that back pay orders promote the prophylactic as well as the remedial purposes of the National Labor Relations Act. [8]

The National Labor Relations Board (NLRB) does not pursue the "adjudication of private rights." Rather, it "acts in a public capacity to give effect to the declared public policy of the Act . . . ." National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 362, 60 S.Ct. 569, 576, 84 L.Ed. 799, 810 (1940). "The fact that these proceedings (may) operate to confer an incidental benefit on private persons does not detract from this public purpose." Nabors v. National Labor Relations Board, 323 F.2d 686, 688-89 (5th Cir. 1963).

Accordingly, the NLRB, as an agency of the United States seeking enforcement of public rights, is not bound by state limitations statutes even when seeking back pay. Nabors, supra, at 688. See also J. H. Rutter-Rex Mfg. Co. v. National Labor Relations Board, 399 F.2d 356, 358, 362, 364 (5th Cir. 1968), rev'd on other grounds, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969). [9]

The Civil Rights Act of 1964 grew out of Congressional awareness of the continued, pervasive discrimination against minorities, particularly Negroes, in voting, access to public facilities, public education and employment. As the Committee on the Judiciary of the House of Representatives reported:

Considerable progress has been made in eliminating discrimination in many areas . . . . Nevertheless, in the last decade *539 it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. . . . (This Act) is designed as a step toward eradicating significant areas of discrimination on a nationwide basis. It is general in application and national in scope.

H.Rep.No.914, 1964 U.S.Code Cong. & Admin.News, pp. 2391, 2393 (1964).

Thus, despite the existence in 1964 of such remedial statutes as the Civil Rights Acts of 1866, 1870 and 1871 (42 U.S.C. ss 1981-88), Congress believed that some additional federal action was necessary to further the public objective of elimination of nationwide discrimination. [10] It decided that this objective could best be pursued by federal agency enforcement.

The original Section 706 of the Civil Rights Act of 1964, 78 Stat. 259-61, established an enforcement scheme to be implemented primarily by the EEOC. In 1972 Congress made it even more clear that "the vast majority of complaints will be handled through the offices of the EEOC or the Attorney General. . . . " Section-by-Section Analysis, supra, 118 Cong.Rec. at 7168.

The basic function of the EEOC, as with the NLRB, is to prevent and eliminate unlawful employment "practices and devices," primarily through "conference, conciliation, and persuasion." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017-18, 39 L.Ed.2d 147, 155-56 (1974); Section 706(a) & (b) (42 U.S.C. s 2000e-5(a) & (b)). The EEOC has the power to investigate, promote voluntary compliance, and bring suit upon failure of conciliation efforts. [11]

The EEOC vindicates public policy by suing in federal court, as does the NLRB by seeking enforcement of its orders in the courts of appeals. This is so regardless of the type of relief sought by either. As in labor law, so in Title VII law, the fact that private parties may benefit from public agency action does not detract from the public nature of those proceedings.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 479 of 898

E.E.O.C. v. Occidental Life Ins. Co. of California, 535 F.2d 533 (1976)

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

We are aware that the Fifth Circuit has reached a contrary result in at least two cases. Griffin Wheel, supra, 511 F.2d at 458-59; Georgia Power, supra, 474 F.2d at 922-23. We decline to follow its lead.

Both of those cases were decided before the Supreme Court decisions in Moody, supra, and Franks, supra. Moreover, the court in Georgia Power, 474 F.2d at 921, relied on the decision of the Supreme Court in Rutter-Rex, supra, but ignored the Court's statement therein that "back pay . . . is . . . designed to vindicate . . . public policy . . . ." 396 U.S. at 263, 90 S.Ct. at 420, 24 L.Ed.2d at 410.

Occidental directs our attention to the Court's decision in Johnson, supra. The Court there held that a federal cause of action under Title 42 U.S.C. s 1981 was governed by "the most appropriate (limitation period) provided by state law." 421 U.S. at 462, 95 S.Ct. at 1721, 44 L.Ed.2d at 302. However, Johnson involved a private claimant litigating under Section 1981, while this case involves a public agency enforcing Title VII rights.

Also, the Johnson Court did not qualify its holding according to the type of relief sought. Indeed, by discussing the availability under Section 1981 of "both equitable and legal relief," 421 U.S. at 460, 95 S.Ct. at 1720, 44 L.Ed.2d at 301, the Court intimated that state limitations periods would apply to private actions brought under Section 1981, regardless of the type of relief sought.

Earlier in this opinion we joined the Fifth and Sixth Circuits, in Griffin Wheel and Kimberly-Clark respectively, in ruling that state limitations periods do not govern the EEOC's request for injunctive relief. *540 Nothing in Johnson dictates a contrary conclusion. Similarly, Johnson does not preclude us from concluding that a request by the EEOC for back pay, in vindication of public policy, is likewise immune from state limitations [12] periods. [13]

[4] There are sound practical considerations in support of our conclusion. First, subjecting the EEOC to state limitations periods, often as short as one year, [14] would frustrate its attempts to resolve disputes by means of administrative "conference, conciliation, and persuasion," (42 U.S.C. s 2000e-5(b)), rather than by court action. [15]

Second, it would be cumbersome to determine the applicability of state limitations statutes according to the type of relief sought. As the Sixth Circuit stated in Meadows, supra, 510 F.2d at 945-46:

> "(Back pay) may not properly be viewed as a mere adjunct of some more basic equity. It is properly viewed as an integral part of the whole of relief which seeks not to punish the respondent but to compensate the victim of discrimination."

It is unreasonable to give the EEOC an open ticket for equitable relief, but to impose time constraints on back pay claims even though they are "an integral part of the whole of relief" sought.

Third, Section 706(g) (42 U.S.C. s 2000e-5(g)) provides: "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission (EEOC)." Thus, an employer need not produce past employment records except for the period of time the charge is pending, and the preceding two years.

[5] Finally, despite the absence of a controlling federal limitations period, at least two factors are at work to minimize EEOC dalliance. First, the charging party may demand a right-to-sue letter should the EEOC fail to obtain voluntary compliance or to sue within 180 days of the original filing. Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)); Johnson, supra, 421 U.S. at 458, 95 S.Ct. at 1719, 44 L.Ed.2d at 300. Second, in extreme cases a federal district court could compel agency action. See Sections 6(b) and 10e(A) of the Administrative Procedure Act (5 U.S.C. ss 555(b), 706(1)). Cf. National Labor Relations Board v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 266 & n.3, 90 S.Ct. 417, 421-22, 24 L.Ed.2d 405, 412 (1969) (dictum).

We conclude that the district court erred insofar as it barred the EEOC's back pay claim on the basis of the California limitations period.

IV.

SCOPE OF THE EEOC'S COMPLAINT

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 480 of 898

E.E.O.C. v. Occidental Life Ins. Co. of California, 535 F.2d 533 (1976)
12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

**[6]** **[7]** **[8]** **[9]** In her original charge filed with the EEOC, Ms. Edelson alleged that Occidental refused, on account of sex, to provide her with maternity leave, other pregnancy benefits, insurance, vacation benefits and seniority rights.

In the course of its investigation the EEOC discovered apparent discrimination against unmarried female employees in the distribution of "pregnancy-related benefits." It also discovered apparent discrimination **\*541** against male employees in the administration of the retirement system. Although these forms of alleged discrimination were not mentioned in the original charge, the EEOC included them in subparagraphs 8(b) and 9(c) of its complaint. Occidental argued successfully below that these charges should be dismissed as being outside the scope of the original charge.

As amended in 1972, Section 710 of Title VII provides:

> For the purpose of all hearings and investigations conducted by the (EEOC) or its duly authorized agents or agencies, section 11 of the National Labor Relations Act (49 Stat. 455; 29 U.S.C. s 161) shall apply.

(86 Stat. 109; 42 U.S.C. s 2000e-9)

While the investigation in this case preceded the 1972 amendment of Section 710, it is clear that the prior statute was similar in scope. See Motorola, Inc. v. McLain, 484 F.2d 1339, 1342-44 (7th Cir. 1973); Graniteville Co. v. Equal Employment Opportunity Comm'n, 438 F.2d 32, 39 (4th Cir. 1971).

Section 11(1) of the National Labor Relations Act (29 U.S.C. s 161(1)) provides in part that the NLRB may gain access to "any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question." This language was given a broad reach in National Labor Relations Board v. Wyman-Gordon Co., 394 U.S. 759, 768, 89 S.Ct. 1426, 1430-31, 22 L.Ed.2d 709, 716 (1969).

Section 709(a) of Title VII (42 U.S.C. s 2000e-8(a)) today provides, as it did in 1964:

> In connection with any investigation of a charge filed under section 706,

the Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this title and is relevant to the charge under investigation.

Had Occidental believed that the EEOC's investigation exceeded the permissible statutory scope, it could have refused the EEOC's demand for access and sought adjudication of its rights.[16] Occidental did not do so. Thus we can only conclude that the EEOC investigation was reasonable and that the information supporting the allegations in subparagraphs 8(b) and 9(c) was acquired during that reasonable investigation.

In Equal Employment Opportunity Comm'n v. General Electric Co., 532 F.2d 359, 366 (4th Cir. 1976), the Fourth Circuit held:

> So long as (discovery of) the new discrimination arises out of the reasonable investigation of the charge filed, it can be the subject of a "reasonable cause" determination, to be followed by an offer by the Commission of conciliation, and, if conciliation fails, by a civil suit, without the filing of a new charge on such claim of discrimination. In other words, the original charge is sufficient to support action by the EEOC as well as a civil suit under the Act for any discrimination stated in the charge itself or (discovered) in the course of a reasonable investigation of that charge, provided such discrimination was included in the reasonable cause determination of the EEOC and was followed by compliance with the conciliation procedures fixed in the Act.

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

(Emphasis in original.) Accord, Equal Employment Opportunity Comm'n v. Huttig Sash & Door Co., 511 F.2d 453, 455 (5th Cir. 1975); Equal Employment Opportunity Comm'n v. Kimberly-Clark Corp., 511 F.2d 1352, 1363 (6th Cir. 1975). We agree with **542 the reasoning of the Fourth, Fifth and Sixth Circuits. [17]

In this case, Occidental received adequate notice during administrative investigation of the substance of the issues subsequently raised in subparagraphs 8(b) and 9(c) of the EEOC's complaint. Reference was made to those issues in both the District Director's Findings of Fact (February 25, 1972), and the EEOC's Determination of Reasonable Cause (February 8, 1973). Thus the EEOC complied with the statute by presenting these issues for conciliation. See Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)).

We note that the EEOC itself could independently bring charges based upon the information it reasonably acquired during the investigation of Ms. Edelson's charge. See Section 706(b) (42 U.S.C. s 2000e-5(b)). To require the EEOC to pursue that route, rather than allowing it to include the new charges along with the original one in a single Determination of Reasonable Cause, would be to champion form over substance and to generate "an inexcusable waste of valuable administrative resources" and "intolerable delay," in violation of statutory purpose. General Electric, supra, 532 F.2d at 365, 11 C.C.H. Empl.Prac.Dec. at 6614.

It remains true that Ms. Edelson would not have had "standing" to charge Occidental with discrimination against unmarried female employees (Ms. Edelson was married), or against male employees with respect to retirement. However, as we have discussed earlier, the EEOC is charged with the vindication of public policy, not merely with the enforcement of private rights. In this case, enforcement by the EEOC of the objectives of Title VII should not be frustrated because a private charging party may not have had "standing" to make a particular claim.

Finally, it is argued that "amendment" by the EEOC of the original charge may operate to the detriment of the charging party. In this case such a result is speculative. In any case, the charging party should be able to intervene in either the administrative or judicial proceeding to insure that his or her rights are fully protected. See Section 706(f)(1) (42 U.S.C. s 2000e-5(f)(1)).

For the above reasons, we conclude that the district court erred in dismissing subparagraphs 8(b) and 9(c) of the EEOC's complaint.

V.

CONCLUSION

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.

**All Citations**

535 F.2d 533, 12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

Footnotes

1   Before the 1972 amendment of Section 706(f)(1), the relevant time periods were 30 days for both the filing of the charge with the EEOC, and filing suit after receipt of a right-to-sue letter.

2   The charging party may sue before the 180-day period has run if:
    (a) The EEOC finds no reasonable cause during that time period (42 U.S.C. s 2000e-5(b)); or
    (b) The EEOC dismisses the charge during that time period (42 U.S.C. s 2000e-5(f)(1)).

3   H.R.Rep.No.92-238, 92nd Cong., 1st Sess. 12 (1971), 1972 U.S.Code Cong. & Admin.News, p. 2148, quoted in Equal Employment Opportunity Comm'n v. Duval Corp., 528 F.2d 945, 948 n.4 (10th Cir. 1976).

4   The sole exception is that the EEOC must wait 30 days from the filing of the charge before filing suit. (42 U.S.C. s 2000e-5(f)(1)).

5   Equal Employment Opportunity Comm'n v. Duval Corp., 528 F.2d 945, 947 (10th Cir. 1976); Equal Employment Opportunity Comm'n v. Meyer Bros. Drug Co., 521 F.2d 1364, 1365 (8th Cir. 1975); Equal Employment Opportunity Comm'n v. E. I. duPont de Nemours and Co., 516 F.2d 1297 (3rd Cir. 1975); Equal Employment Opportunity Comm'n v. Kimberly-Clark Corp., 511 F.2d 1352, 1356-59 (6th Cir. 1975); Equal Employment Opportunity Comm'n v. Louisville and Nashville R. R., 505 F.2d 610 (5th Cir. 1974); Equal Employment Opportunity Comm'n v. Cleveland Mills, 502 F.2d

12 Fair Empl.Prac.Cas. (BNA) 1300, 11 Empl. Prac. Dec. P 10,954

153 (4th Cir. 1974). See also Equal Employment Opportunity Comm'n v. Local 41, Bartenders' International Union, 369 F.Supp. 827, 829-31 (N.D.Cal.1973).

6    We express no opinion as to which, if any, state limitations statute would apply had an individual or a class, rather than the EEOC, been party plaintiff.

7    The Court in Moody stated that
    "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."
    422 U.S. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 299. (Emphasis added.)

8    Marriott Corp. v. National Labor Relations Board, 491 F.2d 367, 371 (9th Cir. 1974); National Labor Relations Board v. United Marine Division, Local 33, National Maritime Union, AFL-CIO, 417 F.2d 865, 868 (2nd Cir. 1969); Trinity Valley Iron & Steel Co. v. National Labor Relations Board, 410 F.2d 1161, 1168 (5th Cir. 1969); Nabors v. National Labor Relations Board, 323 F.2d 686, 688-89 (5th Cir. 1963).

9    In Rutter-Rex, after ruling that state limitations statutes did not apply to the NLRB's action, the Fifth Circuit modified the Board's order because of inordinate administrative delay to the prejudice of defendant. The Supreme Court reversed and ordered enforcement of the back pay order in its entirety. In doing so, the Court assumed the inapplicability of state limitations periods.

10   In Johnson, supra, the Court made clear the "separate, distinct and independent" remedies available under Title 42 U.S.C. s 1981 on the one hand, and Title VII on the other. 421 U.S. at 461, 95 S.Ct. at 1720-21, 44 L.Ed.2d at 302.

11   Unlike the NLRB, the EEOC has no adjudicative powers. Yet the NLRB must itself seek court enforcement of its orders.

12   It appears that the EEOC would likewise be immune from the defense of laches. Cf. United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283, 1285-86 (1940); Nabors v. National Labor Relations Board, 323 F.2d 686, 688 (5th Cir. 1963). But see Griffin Wheel, supra, 511 F.2d at 459 n.5; Georgia Power, supra, 474 F.2d at 923. However, since the issue was not raised herein, we need not address it.

13   The court in Kimberly-Clark seemed to so conclude, although it did not make clear what type of relief was at issue. 511 F.2d at 1359-60.

14   See, e. g., Johnson, supra, 421 U.S. at 462 & n.7, 95 S.Ct. at 1721, 44 L.Ed.2d at 302-03; Griffin Wheel, supra, 511 F.2d at 459.

15   Clearly the cause of action "accrues" on the last date on which the allegedly unlawful act or practice occurs. Collins v. United Airlines, Inc., 514 F.2d 594, 596 & n.2 (9th Cir. 1975); Griffin Wheel, supra, 511 F.2d at 459 n.6. Cf. Johnson, supra, 421 U.S. at 462, 95 S.Ct. at 1721, 44 L.Ed.2d at 302-03.

16   See Local No. 104, Sheet Metal Workers International Ass'n v. Equal Employment Opportunity Comm'n, 439 F.2d 237, 241-43 (9th Cir. 1971); Circle K Corp. v. Equal Employment Opportunity Comm'n, 501 F.2d 1052 (10th Cir. 1974); Joslin Dry Goods Co. v. Equal Employment Opportunity Comm'n, 483 F.2d 178 (10th Cir. 1973); Motorola, Inc. v. McLain, supra; Graniteville Co., supra.

17   In so agreeing we do not depart in any respect from our recent decision in Oubichon v. North American Rockwell Corp., 482 F.2d 569 (9th Cir. 1973), in which we stated:
    "When an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC."
    Id. at 571.
    Oubichon involved the complaint of a private party, he being subject to traditional notions of standing. We deal here with a complaint filed by a public agency seeking vindication of public rights.

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 4

2013 WL 1758760
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Eldridge JOHNSON, et al., Plaintiffs,

v.

UNITED CONTINENTAL
HOLDINGS, INC., et al., Defendants.

No. C–12–2730 MMC.
|
April 24, 2013.

**Attorneys and Law Firms**

Dow Wakefield Patten, Lauren Kubota, Spencer
Freeman Smith, Smith Patten, San Francisco, CA, for
Plaintiffs.

Donna Dangelo Melby, Jennifer Stivers Baldocchi,
Melinda A. Gordon, Paul Hastings LLP, Los Angeles,
CA, Gary T. Lafayette, Lafayette & Kumagai LLP, San
Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION TO DISMISS;
DENYING DEFENDANTS' MOTION TO
STRIKE; AFFORDING PLAINTIFFS LEAVE
TO FILE THIRD AMENDED COMPLAINT**

MAXINE M. CHESNEY, District Judge.

**\*1** Before the Court are two motions filed February
15, 2013 by defendants United Airlines, Inc. ("United"),
United Continental Holdings, Inc. ("UCH"), and
Continental Airlines, Inc. ("Continental"): (1) Motion
to Dismiss Second Amended Complaint With Prejudice;
and (2) Motion to Strike. Plaintiffs have filed opposition
to each motion; defendants have filed a reply to each
opposition. Having read and considered the papers filed
in support of and in opposition to the motions, the Court
rules as follows.[1]

**BACKGROUND**

Plaintiffs are twenty-three African–Americans, nineteen
of whom are employed by United as Captains, two of
whom are employed by Continental as Captains, and
two of whom are employed by United as Operations
Supervisors. Plaintiffs allege defendants violated (1) Title
VII, (2) 42 U.S.C. § 1981, and (3) the California Fair
Housing and Employment Act ("FEHA"), by failing to
promote plaintiffs on account of plaintiffs' race. Plaintiffs
also allege defendants violated Title VII and FEHA by
failing to promote eleven of the plaintiffs, in retaliation
for those plaintiffs' having engaged in protected activity.
Plaintiffs further allege defendants violated Title VII and
FEHA by subjecting one plaintiff to a hostile work
environment on account of said plaintiff's race.

Specifically, the operative complaint, the Second
Amended Complaint ("SAC"), contains seven causes of
action, as follows:

(1) First Claim, titled "Retaliation in Violation of [Title
VII]";

(2) Second Claim, titled "Retaliation in Violation of
[FEHA]";

(3) Third Claim, titled "Race Discrimination in Violation
of Title VII";

(4) Fourth Claim, titled "Violation of [FEHA]," in which
plaintiffs allege race discrimination;

(5) Fifth Claim, titled "Violation of 42 U.S.C. § 1981," in
which plaintiffs allege race discrimination;

(6) Sixth Claim, titled "Harassment in Violation of [Title
VII]"; and

(7) Seventh Claim, titled "Harassment in Violation of
[FEHA]."

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of
Civil Procedure can be based on the lack of a cognizable
legal theory or the absence of sufficient facts alleged under
a cognizable legal theory. *See Balistreri v. Pacifica Police
Dep't,* 901 F.2d 696, 699 (9th Cir.1990). Rule 8(a)(2),
however, "requires only 'a short and plain statement of

the claim showing that the pleader is entitled to relief.' " *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Fed.R.Civ.P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *See id.* Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See *id.* (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly,* 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *See Iqbal,* 556 U.S. at 678 (internal quotation and citation omitted).

**\*2** Additionally, a "court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." *See* Fed.R.Civ.P. 12(f).

## DISCUSSION

### A. Motion to Dismiss
Defendants argue that all claims, with the exception of the Sixth Claim, are subject to dismissal against all defendants. Additionally, defendants argue UCH should be dismissed from the action for reasons specific to said defendant, which argument the Court considers first.

### 1. All Claims: UCH
Each of plaintiffs' seven claims pertains to alleged wrongdoing by an employer. Defendants argue plaintiffs have failed to allege any facts to support a finding that UCH is plaintiffs' employer, and, with respect to the

Title VII and FEHA claims, that plaintiffs have failed to exhaust their administrative remedies as against UCH.

#### a. Sufficiency of Factual Allegations
Plaintiffs do not allege UCH employs any plaintiff, but, rather, that United and Continental are "wholly-owned subsidiaries" of UCH, which itself is a "holding company." (*See* SAC ¶ 29.) In their opposition, plaintiffs rely on their allegations that UCH shares "common management," as well as "common control of labor relations" and "common ownership and financial control," with United and Continental (*see* SAC ¶¶ 33, 35, 36), and argue that such allegations are sufficient to support a claim that UCH and its two subsidiaries constitute a "single employer" under the "integrated enterprise" test. *See Anderson v. Pacific Maritime Ass'n,* 336 F.3d 924, 928 (9th Cir.2003) (discussing purpose and application of "integrated enterprise" test).

As the Ninth Circuit has explained, the "integrated enterprise" test "does not determine joint liability, but instead determines whether a defendant can meet the statutory criteria of an 'employer' for Title VII applicability," *see id.,* specifically, the statutory requirement that an "employer" have fifteen or more employees, *see id.* at 929. Under the "integrated enterprise" test, a "plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15–employee minimum standard." *See id.* Where a plaintiff's employer has at least fifteen employees, however, the "integrated enterprise test is inapplicable." *See id.* Here, there is no dispute that United has fifteen or more employees and that Continental has fifteen or more employees. Consequently, plaintiffs' reliance on the integrated enterprise test is misplaced.

In sum, there being no factual allegations in the SAC to support a finding that UCH employs any plaintiff or is otherwise liable to any plaintiff, the claims in the SAC against UCH are subject to dismissal.

In their opposition, plaintiffs seek leave to amend in the event the Court finds any claim is subject to dismissal for failure to state a claim. With respect to their claims against UCH, plaintiffs rely on a declaration submitted by one of the named plaintiffs, and argue, based thereon, that

plaintiffs can allege UCH "participated in the unlawful employment practices set forth in the [SAC]." (*See* Pls.' Opp to Defs.' Mot. to Dismiss, filed March 1, 2013 ["Pls.' Opp."], at 20:16–19.) In the cited paragraphs of said declaration, the declarant states he met with Continental's "senior management" during 2010, and that an individual named "Fred Abbott" stated at one such meeting that "none of the persons in the 'Minter group' would ever get promotions because they had decided to go the litigation route." (*See* Sherman Decl. ¶ 12.) [2]

**\*3** Although plaintiffs fail to explain how the statement allegedly made by such individual is attributable to UCH or how UCH "participated" in any unlawful act, the Court will afford plaintiffs leave to amend their Title VII and § 1981 claims against UCH to plead, if they can do so, such additional facts. [3] In any such amended pleading, if plaintiffs wish to pursue claims against UCH, plaintiffs shall include sufficient factual allegations that, if true, would support a claim that UCH can itself be held liable. Moreover, in any amended pleading, plaintiffs shall clearly identify the specific claims, and the specific plaintiffs, for which plaintiffs seek to hold UCH liable. [4]

### b. Failure to Exhaust

Defendants correctly point out that none of the plaintiffs identified UCH as an alleged wrongdoer in their respective administrative charges filed with the Equal Employment Opportunity Commission ("EEOC") or the Department of Fair Employment and Housing ("DFEH"). Based on said omission, defendants seek dismissal of the Title VII and FEHA claims against UCH for failure to exhaust administrative remedies. [5]

As a "general rule," Title VII plaintiffs "may sue only those named in the EEOC charge." *See Sosa v. Hiraoka,* 920 F.2d 1451, 1458 (9th Cir.1990). The Ninth Circuit, however, has identified exceptions to the general rule, such as where an entity named in the EEOC charge and an unnamed entity are "substantially identical parties." *See id.* at 1459–60 (holding where defendants unnamed in EEOC charge were trustees who "governed" employer named in charge, plaintiff's claims against trustees were not subject to dismissal at pleading stage, as it appeared "trustees and the [named entity] could well be 'substantially identical parties' "). Although plaintiffs herein fail to identify any such exception, the Court will

afford plaintiffs leave to do so, in the event they amend to allege a Title VII claim against UCH.

With respect to FEHA, however, California courts have adopted the rule that if a defendant is not "listed in the administrative charge as an 'employer' or 'person' against whom the claim [is] made" or is not named "in the body of the [FEHA] complaint as the alleged perpetrator[ ]," the plaintiff has failed to exhaust administrative remedies with respect to such defendant. *See Medix Ambulance Service, Inc. v. Superior Court,* 97 Cal.App.4th 109, 115–18, 118 Cal.Rptr.2d 249 (2002) (citing California court cases applying said rule). Here, UCH was not mentioned in any administrative charge submitted by any of the plaintiffs. (*See* Baldocchi Decl. ¶ 5, Exs. A–W.) Accordingly, plaintiffs' FEHA claims, to the extent they are alleged against UCH, are subject to dismissal without leave to amend for failure to exhaust administrative remedies.

### 2. Retaliation Claims: United

Plaintiffs allege that eleven plaintiffs engaged in protected activity and that thereafter United retaliated against those eleven plaintiffs, specifically, Sal Crocker ("Crocker"), Annette Gadson ("Gadson"), Richard John ("John"), Eldridge Johnson ("Johnson"), Johnnie E. Jones, Jr. ("Jones"), Karl Minter ("Minter"), Ken Montgomery ("Montgomery"), Paul C. Noble ("Noble"), Glen Roane ("Roane"), Lester Tom ("Tom"), and Darryl Wilson ("Wilson"). In the First Claim, plaintiffs allege such conduct violated Title VII, and, in the Second Claim, plaintiffs allege such conduct violated FEHA.

**\*4** Defendants argue the retaliation claims are subject to dismissal for failure to state a claim and, additionally, that certain portions of the claims are subject to dismissal for failure to exhaust administrative remedies.

### a. Sufficiency of Factual Allegations

To state a prima facie claim for retaliation under Title VII or FEHA, a plaintiff must allege: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer subjected the plaintiff to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Thomas v. City of Beaverton,* 379 F.3d 802, 811 (9th Cir.2004) (setting forth elements of prima facie Title VII retaliation claim); *Flait v. North American Watch Corp.,* 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d

522 (1992) (setting forth elements of prima facie FEHA retaliation claim).

Plaintiffs allege that the above-identified eleven plaintiffs engaged in protected activity when (1) in 2010, each filed an EEOC charge against United "related to discrimination in promotions" (*see* SAC at 15:1–4), (2) after the filing of his/her respective 2010 EEOC charge, each "traveled to the Northern District of California to meet with United's executives to challenge United's discriminatory practices" (*see* SAC ¶¶ 6–16; *see also, e.g .,* SAC ¶¶ 81, 96, 236), and (3) at some point thereafter, ten of the plaintiffs "continued to pursue changes ... by meeting with mid and upper level management in order to establish protocols that would assist in the eradication of racial disparity in the promotional practices at [United]" (*see* SAC ¶¶ 82, 97, 109, 123, 141, 164, 178, 191, 205, 220).

Defendants do not argue that plaintiffs have failed to sufficiently allege protected activity. Rather, defendants argue, plaintiffs have failed to give fair notice of the scope of each plaintiff's retaliation claim, given the SAC's failure to identify the particular adverse employment action(s) challenged by each plaintiff, and the SAC's failure to sufficiently allege a causal link between the protected activity and any adverse employment action. As discussed below, the Court agrees.

**(i) Causal Link**
Taking the issue of causation first, the Court observes that causation can be inferred from the proximity of the date the decision-maker learns of the protected activity and the date on which the adverse employment action occurs, *see, e.g., Yartzoff v. Thomas,* 890 F.2d 1371, 1376 (9th Cir.1987) (holding causation element established where adverse employment action occurred "less than three months" after plaintiff filed administrative claim), or from the decision-maker's having engaged in a "pattern of antagonism following the protected conduct," *see Porter v. California Dep't of Corrections,* 419 F.3d 885, 895–96 (9th Cir.2005) (holding causal link established where supervisors who knew of plaintiff's protected activity had, prior to subjecting plaintiff to adverse employment action, engaged in "pattern of antagonism," including "sneers," "intimidating glares," and "spitting" in plaintiff's food).

**\*5** Here, plaintiffs do not rely on temporal proximity or a pattern of antagonism. Rather, plaintiffs argue they have pleaded direct evidence of a causal link, and, in

support thereof, rely on their allegation that some of the plaintiffs were told that a "Senior Vice President" had stated, "No one from the original United Coalition who filed EEOC complaints in 2010 will get promoted at UAL ." (*See* SAC ¶¶ 110, 124, 142, 165, 179, 192, 221; [6] *see also* SAC ¶¶ 83, 206 (similar comments).) As defendants point out, however, plaintiffs fail to allege the "Senior Vice President" or any other individual overheard to make a similar comment had a connection to any alleged adverse employment action; plaintiffs do not allege, for example, that any such speaker played a role in any decision not to promote a plaintiff. *Cf. Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998) (holding, in context of motion for summary judgment on gender discrimination claim, plaintiff created triable issue of fact where decision-maker stated he "did not want to deal with another female" and then hired male for position at issue).

Accordingly, plaintiffs have failed to sufficiently allege a causal link exists between the protected activity and any adverse employment action.

**(ii) Adverse Employment Actions**
In their Title VII retaliation claim, plaintiffs allege that United has "withheld all promotions and special assignments" from the eleven named plaintiffs "since February 2011." (*See* SAC ¶ 344.) In an attempt to set forth the factual basis for such conclusory assertion, plaintiffs incorporate by reference 336 paragraphs alleged earlier in the SAC. (*See* SAC ¶ 337.) In so doing, plaintiffs appear to rely primarily on two sections of the SAC, specifically, the section titled "Allegations of Individual Plaintiffs," in which plaintiffs set forth allegations specific to each named plaintiff, including allegations identifying at least one promotion for which each named plaintiff unsuccessfully applied (*see* SAC ¶¶ 76–336), and the section titled "Statement of Facts Applicable to All Claims,' in which plaintiffs set forth allegations that, generally, apply to all plaintiffs, including a list of fifty-three promotions and special assignments for which plaintiffs contend they "were precluded from applying" (*see* SAC ¶¶ 44–75). [7]

By incorporating the "Allegations of Individual Plaintiffs" section into their retaliation claims, plaintiffs have given sufficient notice as to the promotions identified in that section for which the eleven named plaintiffs unsuccessfully applied. Defendants do not argue to the

contrary. Defendants do, however, correctly observe that in the "Individual" allegations applicable to plaintiff Gadson, plaintiffs fail to identify any promotion for which Gadson unsuccessfully applied after she engaged in protected activity (*see* SAC ¶¶ 230–36), and, consequently, challenge any retaliation claim Gadson is basing thereon.

**\*6** Additionally, defendants challenge, in its entirety, the sufficiency of plaintiffs' incorporation of the "Statement of Facts Applicable to All Claims" section into the retaliation claims, and, in particular, plaintiffs' incorporation of the list of fifty-three promotions and special assignments as to which plaintiffs were allegedly "precluded from applying" because the positions either were not posted as open positions or were posted for short periods of time. (*See* SAC ¶¶ 71–74.) With respect to said incorporation, defendants argue, plaintiffs fail to give sufficient notice as to which plaintiffs were "precluded" from applying for which positions. The Court agrees.

Plaintiffs imply in the SAC that each plaintiff was qualified for each of the listed fifty-three positions and that each plaintiff wished to apply for each such position; no such inference, however, can reasonably be drawn.[8] Contrary to plaintiffs' argument, plaintiffs, by relying on the "the hundreds of years of combined experience the[ ] [p]laintiffs have" (*see* Pls.' Opp. at 15:16–20), cannot avoid alleging facts necessary to support a finding that each of the named plaintiffs is or was qualified for a particular position. Moreover, some of the fifty-three positions were open before any plaintiff had engaged in protected activity and, consequently, a decision not to post those positions when they became open cannot have been motivated by retaliation. (*See, e.g.,* SAC ¶ 74 (identifying "Area Manager" position available in 2009 at Dulles, Virginia).) As to other positions, plaintiffs fail to provide any dates or other facts to support a finding that the position became or remained open after plaintiffs had engaged in protected activity. (*See, e.g., id.* (identifying "Shift Manager Station Operations" position filled at Dulles, Virginia on unspecified date).)

As stated above, plaintiffs seek leave to amend any claim found to be deficiently pleaded. The Court will afford plaintiffs leave to amend their retaliation claims, with the one exception set forth in the following subsection, specifically, Johnson's claim under FEHA. In any amended pleading, if plaintiffs wish to pursue retaliation claims, plaintiffs shall identify the adverse employment action(s) to which each plaintiff asserts he or she was subjected because of retaliatory animus, and shall allege sufficient facts to support a causal link between each such adverse employment action and each plaintiff's protected activity.

**b. Exhaustion**

Defendants argue that certain of plaintiffs' retaliation claims have not been exhausted, and, consequently, that such retaliation claims are subject to dismissal without leave to amend. The Court considers in turn each such category identified by defendants.

First, defendants seek dismissal of plaintiff Johnson's FEHA retaliation claim in its entirety. The DFEH has "certif[ied]" that Johnson failed to submit an administrative charge to the DFEH. (*See* Baldocchi Decl. Ex. I). Consequently, Johnson's retaliation claim, to the extent such claim is brought under FEHA, is subject to dismissal without leave to amend. *See Rojo v. Kliger,* 52 Cal.3d 65, 83, 276 Cal.Rptr. 130, 801 P.2d 373 (1990) (holding "exhaustion of the FEHA administrative remedy is a precondition to bringing a civil suit on a statutory cause of action").

**\*7** Second, defendants seek dismissal of all retaliation claims to the extent such claims are based on failures to receive "special assignments." (*See* SAC ¶ 344.) Defendants correctly point out that each of the plaintiffs on whose behalf such retaliation claims are brought had alleged in his/her respective administrative charge that he/she failed to receive one or more "promotions" or "positions" (*see, e.g.,* Baldocchi Decl. Ex. M (Minter's EEOC charge alleging he had unsuccessfully applied for "promotions" to nine specified "positions"), *id.* Ex. R (Roane's EEOC intake questionnaire alleging he unsuccessfully applied for "24 positions")), but that no plaintiff had alleged in his/her administrative charge that such plaintiff failed to receive a "special assignment." As the Ninth Circuit has held, however, "incidents of discrimination not included in an EEOC charge" may be considered in a civil action where the "new claims are like or reasonably related to the allegations contained in the EEOC charge." *See Sosa,* 920 F.2d at 1456; *see also Sandhu v. Lockheed Missiles & Space Co.,* 26 Cal.App.4th 846, 859, 31 Cal.Rptr.2d 617 (1994) (adopting, for purposes of FEHA, Title VII's "like or reasonably related" standard). In the SAC, plaintiffs allege that by failing to select them for "special assignments," defendants have

denied plaintiffs the "opportunity for advancement" (*see* SAC ¶ 65), and, in their opposition, plaintiffs assert that defendants require "special assignment experience for management employees" (*see* Pls.' Opp. at 12:3). Although such additional assertion is not pleaded in the SAC, plaintiffs may be able to allege facts showing failures to receive special assignments are "like or reasonably related to," *see Sosa,* 920 F.2d at 1456, the allegations made in plaintiffs' respective administrative charges. Consequently, plaintiffs will be afforded leave to amend plaintiffs' retaliation claims based on failures to receive special assignments. [9]

Third, defendants seek dismissal of the retaliation claims to the extent they are based on adverse employment actions that occurred after each plaintiff filed his or her administrative charge, which actions, given the timing thereof, could not have been alleged in an administrative charge. Contrary to defendants' argument, however, there is no bar to basing a civil action on adverse employment actions that occur after the filing of an administrative charge. Rather, a plaintiff may base a civil action on later-occurring adverse employment actions as long as they are "like or reasonably related to the allegations contained in the EEOC charge." *See Lyons v. England,* 307 F.3d 1092, 1104 (9th Cir.2002) (internal quotation and citation omitted). [10] Here, plaintiffs' administrative charges arguably can be read as alleging United's continuing denial of promotions based on the same retaliatory animus that motivated the denials identified in their administrative charges, and, consequently, it would not necessarily be futile for plaintiffs to base their retaliation claims on adverse employment actions occurring after plaintiffs filed their respective administrative charges. *See, e.g., id.* at 1104–05 (holding, where plaintiffs alleged in 1996 administrative charge that defendant "systematically restricted the access of African–American employees to positions at the GS–13 level or above," plaintiffs could proceed in civil action with claims based on 1997 failures to promote them to available GS–13 positions).

**\*8** Lastly, defendants seek dismissal of the retaliation claims to the extent they are based on actions that occurred "before the relevant Title VII and FEHA limitations period began." (*See* Defs.' Mot. at 20:16.) Defendants are correct that a plaintiff cannot base a retaliation claim on an adverse employment action that occurred outside the relevant limitations period. *See*

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that unless plaintiff files timely administrative charge identifying "discrete retaliatory or discriminatory act," plaintiff will "lose the ability to recover for it"). At this stage of the proceedings, however, defendants' argument is premature; as discussed above, the SAC does not make clear which adverse employment actions are being asserted on behalf of each plaintiff, and, further, the dates on which some of the adverse employment actions occurred are not set forth in the SAC.

In sum, with the exception of Johnson's FEHA claim, the Court will not preclude plaintiffs from amending their retaliation claims. In any such amended pleading, however, to the extent plaintiffs base their retaliation claims on adverse employment actions not identified in an administrative charge, plaintiffs must set forth allegations sufficient to support a finding that each such adverse action is like or reasonably related to the allegations made in the administrative charge submitted by each plaintiff who is basing a retaliation claim thereon.

### 3. Disparate Treatment: United and Continental

In the Third, Fourth, and Fifth Claims, plaintiffs include a claim of "disparate treatment" (*see* SAC ¶ 382), specifically, that United and Continental subjected plaintiffs to adverse employment actions, such as failing to promote them to managerial positions, on account of discriminatory animus based on plaintiffs' race. Said claims are brought on behalf of the above-identified eleven plaintiffs, and, additionally, on behalf of Odie Briscoe ("Briscoe"), Mario Ecung ("Ecung"), Ken Haney ("Haney"), Terence Hartsfield ("Hartsfield"), Terry Haynie ("Haynie"), Anthony Manswell ("Manswell"), Leon Miller ("Miller"), Xavier Palmer ("Palmer"), David Ricketts ("Ricketts"), Fredrick Robinson ("Robinson"), Leo Sherman ("Sherman"), and Erwin Washington ("Washington"). In the Third Claim, plaintiffs allege such conduct violated Title VII, in the Fourth Claim, plaintiffs allege such conduct violated FEHA, and, in the Fifth Claim, plaintiffs allege such conduct violated § 1981.

Defendants argue the disparate treatment claims are subject to dismissal for failure to state a claim and, additionally, that certain portions of the claims are subject to dismissal for failure to exhaust administrative remedies.

**a. Sufficiency of Factual Allegations**

In order to sufficiently state a claim for intentional discrimination, a plaintiff must allege facts sufficient to give the defendant "fair notice of what [the plaintiff's] claims are and the grounds upon which they rest." *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Applying this standard, the Supreme Court has held that a plaintiff alleging he was terminated due to discrimination on the basis of his age and national origin provided sufficient notice to the defendant and "state[d] claims upon which relief could be granted under Title VII and the ADEA," where the "complaint detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," *see id.,* specifically, the age and national origin of the decision-maker and the person to whom "the bulk" of the plaintiff's responsibilities had been transferred, *see id.* at 995–95.

**\*9** Here, in support of their Title VII disparate treatment claim, plaintiffs allege defendants have "engaged in a pattern and practice of intentional discrimination against [p]laintiffs and the classes in promotions, assignments, and compensation" (*see* SAC ¶ 383),[11] and immediately prior to such allegation, plaintiffs incorporate by reference the prior paragraphs of the SAC (*see* SAC ¶ 382).[12] The FEHA and § 1981 disparate treatment claims are pleaded in a manner substantially similar to the Title VII claim. (*See* SAC ¶¶ 404–05, 407, 410.)

With one exception, discussed below, the Court finds the prior paragraphs on which plaintiffs rely do not provide sufficient notice to defendants of the factual basis for their disparate treatment claims.

First, to the extent plaintiffs, by alleging they were subjected to disparate treatment with respect to "compensation" (*see* SAC ¶¶ 383, 405, 410), intend to state a distinct claim for relief, plaintiffs have failed to do so, for the reason that plaintiffs allege no facts in support of such a theory.[13]

Second, to the extent the disparate treatment claims are based on each plaintiffs' failure to receive one or more of the fifty-three promotions and special assignments listed in the "Statement of Facts Applicable to All Claims" section of the SAC and as to which plaintiffs claim they

were "precluded" from applying (*see* SAC ¶¶ 71–74), the Court, for the reasons stated above with respect to plaintiffs' retaliation claims, finds plaintiffs have failed to give sufficient notice as to which plaintiffs were "precluded" from applying for particular positions for which they were qualified.

Lastly, in the sections of the SAC in which allegations specific to each of the twentythree plaintiffs are set forth, plaintiffs fail, with one exception, to include sufficient facts to state a disparate treatment claim on behalf of any plaintiff. As to some plaintiffs, the SAC fails to identify even one position or special assignment for which that plaintiff applied. (*See, e.g.,* SAC ¶¶ 331–36 (alleging facts specific to Sherman, but not alleging he applied for any promotion or special assignment).) Further, even in those instances in which the SAC identifies a specific promotion for which a plaintiff unsuccessfully applied, the SAC includes no facts to provide fair notice as to the basis of the claim that any such failure to select was on account of intentional racial discrimination; rather, the SAC includes only conclusory allegations of discrimination. (*See, e.g.,* SAC ¶¶ 84, 87 (alleging Johnson unsuccessfully applied for five positions and that he "is informed and believes that he was passed over for the five positions he applied for in 2011 as a result of race discrimination").)

As noted above, one exception exists. In the section of the SAC specific to Montgomery, plaintiffs allege that, in September 2011, said plaintiff applied and was interviewed for a position as Hub Operations Area Manager at Dulles, Virginia, but that three other persons, identified by name, were selected, two of whom are "Caucasian individuals with no tenure, less education than [ ] Montgomery, and minimal experience." (*See* SAC ¶ 225.) The Court finds such allegations are sufficient to give defendants "fair notice" of the basis of Montgomery's disparate treatment claims as based on said failure to promote, and are sufficient to state a "claim[ ] upon which relief could be granted." *See Swierkiewicz,* 534 U.S. at 514.

**\*10** Accordingly, with the exception of Montgomery's claim based on United's failure to promote him to the above-referenced position at Dulles, Virginia, plaintiffs have failed to allege sufficient facts to state a disparate treatment claim.

The Court will afford plaintiffs leave to amend their disparate treatment claims, with the one exception set

forth in the following subsection, specifically, Johnson's claim under FEHA. If plaintiffs wish to pursue disparate treatment claims in any such amended pleading, plaintiffs shall identify the adverse employment action or actions to which each plaintiff asserts he or she was subjected, and shall allege sufficient facts to provide fair notice of the basis of plaintiffs' allegation that any such adverse employment action was on account of discriminatory animus.

### b. Exhaustion

Defendants argue that claims based on certain of the alleged adverse employment actions have not been exhausted, and, consequently, that plaintiffs' Title VII and FEHA disparate treatment claims, to the extent based thereon, are subject to dismissal without leave to amend.

As an initial matter, as discussed above with respect to plaintiffs' retaliation claims, the Court will dismiss, without leave to amend, Johnson's disparate treatment claim under FEHA, for the reason that Johnson failed to submit an administrative charge to the DFEH. *See Rojo,* 52 Cal.3d at 83, 276 Cal.Rptr. 130, 801 P.2d 373.

Next, also as discussed above, to the extent defendants challenge plaintiffs' failure to identify in their administrative charges either adverse employment actions occurring after the filing of the charges or special assignments, the Court will afford plaintiffs leave to amend, as it appears plaintiffs may be able to allege such actions are like or reasonably related to the allegations contained in their administrative charges. Additionally, as discussed above, to the extent defendants contend plaintiffs cannot base their claims on actions occurring outside the applicable limitations period, the Court finds their argument premature.

Lastly, with respect to defendants' challenge to any claim based on disparate compensation, the Court, as discussed above, finds the SAC is ambiguous as to whether plaintiffs are asserting claims based on disparate compensation. To the extent plaintiffs wish to proceed with any such claim, plaintiffs, given that they did not allege any facts in their administrative filings concerning the existence of unequal compensation for like work, must include in their next amended complaint factual allegations sufficient to show that any alleged discrimination based on such disparate compensation is like or reasonably related to the

allegations in the administrative charge of any plaintiff on whose behalf such claim is alleged.

In sum, with the exception of Johnson's FEHA claim, the Court will not preclude plaintiffs from amending their Title VII and FEHA disparate treatment claims.

### 4. Disparate Impact: United and Continental

**\*11** The Third, Fourth, and Fifth Claims also include a claim of disparate impact. Defendants argue said claims are subject to dismissal for failure to state a claim and, additionally, that certain portions thereof are subject to dismissal for failure to exhaust.

### a. Sufficiency of Factual Allegations

"[D] isparate-i m pact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon v. Hernandez,* 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (internal quotation and citation omitted). To sufficiently state a disparate impact claim, a plaintiff must "allege facts identifying a specific, facially neutral employment policy," as well as facts "to show a causal relationship between such a practice and its adverse impact on [a protected group]." *See Hines v. California Public Utilities Comm'n,* 467 Fed. Appx. 639, 641 (9th Cir.2012).

Defendants argue plaintiffs have failed to give sufficient notice of the basis for their disparate impact claims. As discussed below, the Court agrees.

In the SAC, plaintiffs list two "policies and practices" upon which, it appears, the disparate impact claims are based: [14]

[1] Failure to consistently post job and promotional openings to ensure that all African–American Captains and African–American Operations Supervisors have notice of and opportunity to seek advancement, higher compensation, overtime, or more desirable assignments and training; [and]

Reliance upon unweighted, arbitrary and subjective criteria (used by a nearly all non-African-American upper-managerial workforce) in making

job assignments, compensation, and promotion decisions. Even where [d]efendants' policies state objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

(*See* SAC ¶¶ 375(a)–375(b).)

The first of the above-quoted "policies and practices" does not identify a specific policy. Rather, as pleaded, and particularly in light of plaintiffs' allegations that defendants allow employees to apply for "permanent mid or upper-level management position[s]" through the "Taleo system" (*see* SAC ¶ 66), plaintiffs are merely alleging that some open positions are posted and others are not. Noticeably absent from the SAC is the identification of a policy governing the circumstances under which certain jobs are posted and others are not. Additionally, plaintiffs fail to plead any facts to support their conclusory allegation that African–Americans are adversely affected by the non-posting of some positions, and such effect is not self-evident. Indeed, as one district court has observed, "[f]ailure to post a job would seem to make all applicants, regardless of race ..., unaware of the specific opening." *See Collette v. St. Luke's Roosevelt Hospital,* 132 F.Supp.2d 256, 278 (S.D.N.Y.2001) (holding plaintiff failed to state disparate impact claim based on employer's "failure to post available job openings" for management positions).

**\*12** The second of the above-quoted "policies and practices" is that persons who make employment decisions use subjective criteria and that such decision-makers "often" ignore defendants' "objective requirements" or apply those requirements in an "inconsistent" manner. (*See* SAC ¶ 70(b).) The Court finds said allegation is too vague to identify a specific employment practice. Indeed, as pleaded, plaintiffs appear to be alleging that individual decision-makers are, at least in part, *not* following defendants' stated policies.

Consequently, plaintiffs have failed to allege sufficient facts to state a disparate impact claim, and the Court will afford plaintiffs leave to amend their disparate impact claims, with the exceptions set forth in the following subsection, specifically, certain plaintiffs' disparate impact claims under Title VII or FEHA. In any amended pleading, if plaintiffs wish to pursue disparate impact claims, plaintiffs shall identify the specific facially neutral employment policy or practice being challenged and shall allege facts sufficient to show the existence of a causal

relationship between such policy or practice and an adverse impact on African–Americans.

**b. Exhaustion**

Defendants argue that no plaintiff has exhausted a disparate impact claim, and, consequently, the Title VII and FEHA disparate impact claims are subject to dismissal without leave to amend.

As plaintiffs correctly point out in their opposition, some of the plaintiffs did include in their administrative charges and/or their EEOC intake questionnaires allegations challenging defendants' failure to post "all" open positions and/or defendant's selection of persons for open positions "by a tap on the shoulder" or "hand-pick[ing]" without allowing others to apply. (*See, e.g.,* Baldocchi Decl. Exs. E, L, M.) Such allegations were made by the following thirteen plaintiffs in their respective EEOC charges and/or EEOC intake questionnaires, as well as in their respective DFEH charges: Briscoe, Ecung, Haney, Hartsfield, Manswell, Miller, Minter, Palmer, Ricketts, Robinson, Sherman, Washington, and Wilson. (*See id.* Exs. A, C, E, F, K, L, M, P, Q, S, T, V, W.) [15] As discussed above, plaintiffs are basing their disparate impact claims, at least in part, on defendants' not posting all open positions, and the Court has afforded plaintiffs leave to amend their disparate impact claims to, *inter alia,* specify the facially neutral practice or practices being challenged. Consequently, the Court finds, as to the above-identified thirteen plaintiffs, it is premature to determine whether they have exhausted their federal and state administrative remedies with respect to a disparate impact claim.

Equivalent allegations as to failures to post were made by an additional two plaintiffs, specifically, Haynie and Tom, but those allegations were made only in their respective EEOC charges and/or questionnaires, and not in their respective DFEH charges; [16] rather, in their respective DFEH charges, said two plaintiffs only alleged claims of intentional discrimination based on their respective failures to receive positions for which they did apply and were not selected. Plaintiffs have not argued that their allegations of intentional discrimination with respect to specified positions for which a plaintiff unsuccessfully applied are "like or reasonably related to," *see Lyons,* 307 F.3d at 1104, a disparate impact claim based on facially neutral policies pertaining to the staffing of positions that are not posted. Consequently, Haynie and Tom have

failed to exhaust their state administrative remedies with respect to plaintiffs' disparate impact claims, and further amendment of the FEHA disparate impact claim on their behalf would be futile. *See Schlosser v. Potter,* 248 Fed. Appx. 812, 818 (9th Cir.2007) (holding proposed amended complaint was "futile" where plaintiff "failed to exhaust his administrative remedies").

**\*13** The remaining eight plaintiffs, specifically, Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane, did not allege in their respective EEOC charges, EEOC intake questionnaires, or DFEH charges that defendants failed to post open positions and/or filled unposted positions by a "tap on the shoulder" system; nor did any of those eight plaintiffs include therein any other language indicating they were challenging a failure to obtain a position for which they did not apply. [17] Rather, in their administrative filings, said eight plaintiffs only alleged claims of intentional discrimination based on their respective failures to receive specific positions for which they did apply and were not selected. Consequently, for the reasons stated above, Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane have failed to exhaust either their federal or state administrative remedies with respect to plaintiffs' disparate impact claims, and further amendment of the Title VII or FEHA disparate impact claim on their behalf would be futile. *See id.*

In sum, with the exception of (1) the Title VII and FEHA claims of Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane, and (2) the FEHA claims of Haynie and Tom, the Court will afford plaintiffs leave to amend their Title VII and FEHA disparate impact claims.

#### 5. FEHA: Application to Nonresidents of California

In reliance on the principle that FEHA does not apply to "nonresidents employed outside the state when the tortious conduct did not occur in California," *see Campbell v. Arco Marine, Inc.,* 42 Cal.App.4th 1850, 1860, 50 Cal.Rptr.2d 626 (1996), defendants argue that any FEHA claims brought on behalf of plaintiffs who do not reside in California must be dismissed because plaintiffs have failed to sufficiently allege that the non-California plaintiffs were subjected to tortious conduct in California.

Plaintiffs' FEHA claims are asserted in the Second Claim, which alleges retaliation and is brought on behalf of eleven plaintiffs, the Fourth Claim, which alleges disparate treatment and disparate impact and is brought on behalf of all twenty-three plaintiffs, and the Seventh Claim, which alleges harassment and is brought on behalf of Haynie only. As discussed above, plaintiffs' retaliation, disparate treatment, and disparate impact claims, to the extent such claims are brought under FEHA, have been dismissed, with the sole exception of Montgomery's disparate treatment claim as based on his failure to receive a promotion in 2011 to a position at Dulles, Virginia. The Seventh Claim is based on allegations that Haynie was subjected to a hostile work environment during the course of his employment (*see* SAC ¶¶ 276, 281–87), and has not been addressed earlier herein. Consequently, the Court next considers defendants' argument only to the extent it is made as to said remaining disparate treatment and harassment claims under FEHA.

In their opposition, plaintiffs state their FEHA claims "only deal with promotions and special assignments in the State of California." (*See* Pls.' Opp. at 19:12–13.) As pleaded, however, the FEHA disparate treatment claim incorporates by reference all prior allegations in the SAC, including the allegations pertaining to Montgomery's failure to receive a promotion in Virginia. In light of plaintiffs' above-quoted representation as to the scope of their FEHA claims, however, the Court will dismiss without leave to amend the FEHA claim brought on behalf of Montgomery pertaining to his failure to receive a promotion in Virginia.

**\*14** The Seventh Claim includes no facts suggesting that any allegedly harassing behavior occurred in California; indeed, the only geographic locations identified in the claim are outside California. (*See* SAC ¶ 278 (alleging, "Throughout his career [p]laintiff Haynie has worked in the Chicago region and the Northeast Region in various positions.").) Consequently, the Seventh Claim is subject to dismissal, and the Court will afford plaintiffs leave to amend, if they intend to proceed with the Seventh Claim, to allege the harassing conduct occurred in California.

Finally, to the extent plaintiffs include in any amended pleading a FEHA claim on behalf of other non-California residents, plaintiffs must include sufficient facts to support a finding that any such plaintiff is challenging tortious conduct occurring in California.

## B. Motion to Strike

As noted above, "redundant, immaterial, impertinent, or scandalous matter" may be stricken from a complaint. *See* Fed.R.Civ.P. 12(f). Defendants argue that certain allegations in the SAC are immaterial or impertinent and, consequently, should be stricken. The Court considers the challenged allegations in turn.

First, defendants argue that all references to promotions or special assignments should be stricken to the extent plaintiffs did not exhaust their administrative remedies and/or to the extent plaintiffs fail to identify one or more plaintiffs who applied for said positions or would have applied for said positions if posted. The claims remaining in the SAC, however, are Montgomery's disparate treatment claims under Title VII and § 1981 based on his failure to receive a specific promotion in Virginia in 2011, and Haynes' Title VII harassment claim, which was not challenged in defendants' motion to dismiss other than the inclusion therein of UCH as a defendant; both claims have been exhausted and are sufficiently alleged. Moreover, any argument that a claim is insufficiently pleaded must be made pursuant to Rule 12(b)(6), not Rule 12(f). *See Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 971, 974–75 (9th Cir.2010) (holding Rule 12(f) does not authorize district courts to strike claims on the ground they are "precluded as a matter of law").

Second, defendants argue that all allegations in the SAC pertaining to earlier incidents of discrimination by defendants should be stricken. Said allegations are that (1) defendants' current CEO stated, in 2010 at an event where an aircraft was named after an African–American pilot, that he was "not proud" of Continental's having failed to hire said pilot "because of the color of his skin" (*see* SAC ¶ 58), and that (2) United, as a result of a lawsuit filed in 1973, was subject to a "consent order" until 1995, at which time the consent decree was "terminated" without a finding that "employment discrimination" was "no longer a problem at United" (*see* SAC ¶ 49, 56; *see also* SAC ¶¶ 44–55 (alleging, as background, federal case in which consent decree was entered and subsequent lawsuit in which United was alleged to have violated terms of consent decree)). Irrespective of whether evidence to support such allegations ultimately will be held admissible at trial on the claims remaining in the SAC, or on any of the the dismissed claims if properly realleged, *see, e.g.,*

Fed.R.Civ.P. 403, 404, the Court declines to find at the pleading stage that the background allegations identified above should be stricken as immaterial or impertinent. Under some circumstances, prior practices, even those occurring many years in the past, could conceivably shed some light on present practices. *See, e.g., Pullman– Standard v. Swint,* 456 U.S. 273, 277–280, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (observing that district court, in resolving Title VII claims alleged in complaint filed in 1971, made findings of fact as to workplace and union practices occurring 30 years prior, and determined challenged practice "grew out of historical circumstances" unrelated to discrimination).

**\*15** Accordingly, the motion to strike will be denied.

## CONCLUSION

For the reasons stated above:

1. Defendants' motion to dismiss is hereby GRANTED in part and DENIED in part, as follows:

a. The First Claim is DISMISSED in its entirety, with leave to amend.

b. The Second Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is brought (i) on behalf of Johnson and (ii) against UCH.

c. The Third Claim is DISMISSED, with the exception of Montgomery's disparate treatment claim based on his failure to receive a promotion to Hub Operations Area Manager at Dulles, Virginia, in September 2011. Such dismissal is with leave to amend, except to the extent the claim is based on a theory of disparate impact and is brought on behalf of Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane.

d. The Fourth Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is (i) based on Montgomery's failure to receive a promotion to Hub Operations Area Manager at Dulles, Virginia, in September 2011, (ii) based on a theory of disparate impact and is brought on behalf of Crocker, Gadson, Haynie, John, Jones, Montgomery, Noble, Roane, and Tom, (iii) brought on behalf of Johnson, and (iv) brought against UCH.

e. The Fifth Claim is DISMISSED, with the exception of Montgomery's disparate treatment claim based on the failure to be promoted to Hub Operations Area Manager at Dulles, Virginia, in September 2011. Such dismissal is with leave to amend.

f. The Sixth Claim is DISMISSED to the extent it is alleged against UCH, with leave to amend.

g. The Seventh Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is brought against UCH.

2. Defendants' motion to strike is hereby DENIED.

3. Any Third Amended Complaint shall be filed no later than May 20, 2013. In any Third Amended Complaint, plaintiffs may amend to cure the deficiencies noted in any or all of the claims identified above that have been dismissed with leave to amend. Plaintiffs may not, however, add new claims, new plaintiffs, or new defendants without leave of court. *See* Fed.R.Civ.P. 15(a) (2).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1758760

Footnotes

1    By order filed March 20, 2013, the Court took the matters under submission.

2    In what appears to be a typographical error, the declarant states the meeting at which Fred Abbott allegedly made the above-referenced comment occurred in November 2011 (*see id.*); other paragraphs in the declaration appear to indicate the meeting occurred in 2010 (*see id.* ¶¶ 11, 13).

3    As discussed below, it would be futile for plaintiffs to amend their FEHA claims against UCH.

4    The portions of the declaration on which plaintiffs rely appear, at best, to pertain to plaintiffs' retaliation claims.

5    Defendants do not seek dismissal of the § 1981 claim on this ground. *See Surrell v. California Water Service Co.,* 518 F.3d 1097, 1103 (9th Cir.2008) (holding Title VII requires exhaustion of administrative remedies "whereas § 1981 has no such requirement") (internal quotations and citation omitted).

6    One plaintiff allegedly heard about the above-referenced statement from "another [p]laintiff" (*see* SAC ¶ 110), and four allegedly heard about it from "another Captain" (*see* SAC ¶¶ 124, 142, 179, 192); other plaintiffs who allegedly heard about the statement do not identify the source in any fashion.

7    Plaintiffs' FEHA retaliation claim is pleaded in a manner substantially similar to their Title VII retaliation claim. (*See* SAC ¶¶ 347, 354.)

8    For example, there are no factual allegations in the SAC to suggest that Gadson, who presently works as an Airport Operation Supervisor, is qualified for the position of Assistant Chief Pilot, or that any plaintiff who is a Captain is qualified to be an Area Manager of an airport.

9    Defendants also seek dismissal of the retaliation claims to the extent they are based on "retaliatory compensation practices," noting the administrative charges do not identify such practices. (*See* Defs.' Mot. at 20:15.) The retaliation claims, however, are not based, at least as presently pleaded, on a theory that plaintiffs were subjected to "retaliatory compensation practices."

10   Defendants argue the Ninth Circuit's decision in *Lyons* is in error, and that the Court should instead follow an Eighth Circuit decision that rejects the reasoning set forth in *Lyons.* The Court, however, is bound by Ninth Circuit precedent.

11   The instant action is not brought on behalf of a putative class and, consequently, plaintiffs' reference to "the classes" is unclear.

12   In ¶ 382 of the SAC, plaintiffs state they are incorporating, in their Title VII claim, "paragraphs 1 through 321." (*See id.*) The reference to "321," however, appears to be a typographical error; the correct number would appear to be "381."

13   The SAC could be read to allege disparate compensation as an element of damages, as opposed to a distinct adverse employment action. In their opposition, plaintiffs refer only once to their allegations regarding "compensation" (*see* Pls.' Opp. at 15:10–11), and, in so doing, provide no clarity as to whether they are alleging differences in "compensation" as damages or an independent adverse employment action.

14   In a section of the SAC in which plaintiffs combine allegations of "intentional race discrimination" and "discriminatory impact," plaintiffs identify six "policies and practices." *See* SAC ¶ 375.) Four of said alleged policies are not facially neutral, specifically, '[r]eliance on racial stereotypes in making employment decisions," "[p]re-selection and grooming of non-

African-Americans for promotions," "[m]aintenance of largely raciallysegregated job categories and departments," and "[d]eterrence and discouragement of African–American Captains and African–American Operations Supervisors from seeking advancement" (*see* SAC ¶ 375(c)–375(f)), and thus appear to pertain solely to plaintiffs' claims for intentional race discrimination.

15    Wilson's allegations were made in his EEOC charge, which charge Wilson requested the EEOC file with the DFEH (*see id.* Ex. W); the Court will assume, in the absence of a showing to the contrary, said charge was sent to the DFEH. *See Downs v. Dep't of Water & Power,* 58 Cal.App.4th 1093, 1097, 68 Cal.Rptr.2d 590 (1997) ("The EEOC and the DFEH [have] each designated the other as its agent for receiving charges and agreed to forward to the other agency copies of all charges potentially covered by the other agency's statute.").

16    Neither Haynie nor Tom requested that the EEOC send his EEOC charge to the DFEH. Rather, Haynie requested his EEOC charge be sent to a Connecticut state agency (*see* Baldocchi Decl. Ex. G), and Tom requested his EEOC charge be sent to an Illinois state agency (*see id.* Ex. U).

17    As discussed above, Johnson did not file a DFEH charge; all other plaintiffs did.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 5

714 F.2d 911
United States Court of Appeals,
Ninth Circuit.

LUCKY STORES, INC., Petitioner,

v.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Respondent.

No. 82-4678.
|
Argued and Submitted June 14, 1983.
|
Decided Aug. 30, 1983.

The EEOC filed a civil action alleging the exclusion and unfair termination of women from warehouse positions at the employer's three warehouse facilities. The employer sought partial summary judgment to eliminate two facilities from the action as being beyond the scope of the EEOC's administrative charge and conciliation efforts, which mentioned only one facility. The United States District Court for the Eastern District of California, Raul A. Ramirez, J., denied the motion. Employer brought an interlocutory appeal. The Court of Appeals, Canby, Circuit Judge, held that, where the facility named in the EEOC charge and conciliation efforts was a successor to the two facilities added in the amended complaint, the employer received adequate notice that the two facilities added to the amended complaint were part of the investigation.

Affirmed.

## Attorneys and Law Firms

**\*911** Lawrence K. Rockwell, Oakland, Cal., for petitioner.

Mark S. Flynn, Washington, D.C., for respondent.

Appeal from the United States District Court for the Eastern District of California.

Before ALARCON, CANBY and REINHARDT, Circuit Judges.

## Opinion

CANBY, Circuit Judge:

The EEOC filed a civil action alleging the exclusion and unfair termination of women from warehouse positions at Lucky facilities in Vacaville, Sacramento, and San Leandro, California. Lucky sought partial summary judgment to eliminate the Sacramento and San Leandro facilities from the action as being beyond the scope of the EEOC's administrative charge and conciliation efforts, which mentioned only the Vacaville warehouse. The district court denied the motion; Lucky now brings an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and this court's order of November 30, 1982. We affirm.

### FACTS

Lucky opened its warehouse facilities in Vacaville in January, 1978, with a skeleton staff; full operations began in June. Vacaville is 40 miles southwest of Sacramento and some 60 miles northeast of San Leandro, the locations of Lucky's pre-existing warehouses in the area. After the Vacaville facility began full operations, Lucky closed its Sacramento warehouse and reduced the activities at its San Leandro location. Of the 296 employees at Vacaville in June, 1978, 203 had transferred from Sacramento **\*912** or San Leandro; 195 had seniority dates of November, 1977 or before. Based on these facts, the district court found that the Vacaville facility was created, at least in part, from the consolidation of operations and transfer of employees and jobs from Sacramento and San Leandro. The district court also found common ownership and control by Lucky over the three warehouses.

A black woman employed at Vacaville filed a charge with the EEOC in 1979 alleging race and sex discrimination as the reason for Lucky's refusal to rehire her after a lockout in 1978. The EEOC determined that reasonable cause existed to believe that Lucky "exclud[ed] women from warehouse positions prior to 1979 because of sex" as well as that Lucky improperly failed to recall women because of sex after the lockout. Conciliation efforts failed, and the EEOC filed its complaint alleging sex discrimination in hiring and firing at Vacaville. Five days later, the EEOC amended its complaint to allege similar sex-based discrimination at the other two warehouses prior to the transfer and consolidation of operation in 1978.

Lucky Stores, Inc. v. E.E.O.C., 714 F.2d 911 (1983)
32 Fair Empl.Prac.Cas. (BNA) 1281, 32 Empl. Prac. Dec. P 33,798

### ANALYSIS

In *EEOC v. Occidental Life Ins. Co. of California,* 535 F.2d 533 (9th Cir.1976), *aff'd on other grounds,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), and *EEOC v. Hearst Corp., Seattle Post-Intelligence Division,* 553 F.2d 579 (9th Cir.1976) (per curiam), this court allowed the EEOC to litigate allegations of different types of discrimination discovered during investigations of other charges of discrimination. The court in *Occidental Life* allowed the new claims because the information supporting them came from a reasonable investigation of the charges filed. *Occidental Life,* 535 F.2d at 541 (quoting *EEOC v. General Electric Co.,* 532 F.2d 359, 366 (4th Cir.1976)). Occidental received adequate notice of the new claims during the administrative investigation. The EEOC referred to those new issues in both the District Director's findings of fact and the EEOC's determination of reasonable cause. "Thus the EEOC complied with the statute by presenting these issues for conciliation," as required by 42 U.S.C. § 2000e-5(f)(1). 535 F.2d at 542. In *Hearst,* the court similarly allowed the EEOC to bring a civil suit alleging discrimination unlike that alleged by the charging party. The defendant had received adequate notice of the "new" charges during the administrative proceedings. *Hearst,* 553 F.2d at 581.

The district court described this case as involving identical claims of discrimination at different facilities of the same defendant, facilities that Lucky merged into the named facility prior to the filing of the original charge. The court found that, despite the EEOC's not specifically naming the Sacramento and San Leandro facilities, Lucky received "adequate notice that its general warehouse hiring and firing practices were being investigated," and that this notice satisfied the requirements of *Occidental Life* and *Hearst.* The district court found additional support for its conclusion in *EEOC v. American National Bank,* 652 F.2d 1176 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

In *American National Bank,* the EEOC sought to include two branches of a bank in its complaint although the EEOC determination letter found reasonable cause at only one branch. The district court concluded that the charges relating to the second branch involved "new

discrimination" that could not be made part of the suit. The Fourth Circuit, in a split decision, reversed:

> The question was not whether the court had jurisdiction over "new" charges of discrimination brought for the first time by the EEOC in its civil complaint. The crucial issue was instead whether the district court had jurisdiction over the same charges of discrimination against a single defendant, expanded to include the same practices at all its branch offices when the original charge and investigation focused on one city but where there was common ownership and control over branches in both that city and a nearby **\*913** city, and where the challenged hiring practices for all branches were similar.

*Id.* at 1185. The Fourth Circuit found that the bank received adequate notice and that the charges had been part of the administrative process to a sufficient extent. The court noted that the bank, a single employer operating at multiple locations, had "similar" hiring procedures at both branches, *id.* at 1182 n. 3, so that changes in procedures at one branch would "logically and necessarily" have been made at the other. *Id.* at 1185. The case involved a charge of racial discrimination in hiring at two branch offices subject to unified supervision and control. Moreover, the original charge filed with the EEOC was sent to the branch manager at one office but acknowledged by a vice-president from the other, and the bank's attorney, a participant in the conciliation effort, "presumably represented" not just one branch but the entire organization. *Id.* at 1186.

We need not decide here whether to accept the rule of *American National Bank* that unified operation and control of separate plants is itself sufficient to permit their inclusion in the litigation. The facts here are even less favorable to the employer's argument than those in *American National Bank.* First, in the determination letter to the American National Bank, the EEOC stated that statistics from the second branch were not relevant to its investigation of the first branch, a fact heavily relied on by the dissent. *See* 652 F.2d at 1206, 1208 (Russell, J., dissenting). Even more important is the

**Lucky Stores, Inc. v. E.E.O.C., 714 F.2d 911 (1983)**
32 Fair Empl.Prac.Cas. (BNA) 1281, 32 Empl. Prac. Dec. P 33,798

fact that here the EEOC seeks relief for alleged sex discrimination at Sacramento and San Leandro prior to the opening of the Vacaville warehouse. Two-thirds of the employees at Vacaville transferred from the other two facilities and brought their seniority dates with them. The prior practices at San Leandro and Sacramento could form part of the discrimination alleged at Vacaville, the successor facility. The EEOC has challenged only that alleged discrimination at San Leandro which affected operations and positions later transferred to Vacaville. Lucky notes that operations at the three facilities overlapped, the applicant pool differed, different unions represented employees at each facility, and different persons were responsible for hiring at each. Nonetheless, Lucky does not dispute that Vacaville is essentially a consolidation of the Sacramento and San Leandro operations. The facilities share far more similarities and are far more related than the branches in *American National Bank.* Because Vacaville is the successor of those facilities added to the amended complaint, Lucky received "adequate notice during administrative investigation of the substance of the issue subsequently raised...." *Occidental Life,* 535 F.2d at 542.

AFFIRMED.

**All Citations**

714 F.2d 911, 32 Fair Empl.Prac.Cas. (BNA) 1281, 32 Empl. Prac. Dec. P 33,798

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 6

631 F.Supp.2d 1226
United States District Court,
C.D. California,
Western Division.

Regina MADDOCK, on behalf of herself
and others similarly situated, Plaintiffs,

v.

KB HOMES, INC., Defendant.

Case No. CV–06–05241 CAS (JTLx).
|
Oct. 18, 2007.

**Synopsis**

**Background:** Employee who worked directly for subsidiary brought action in state court against parent corporation, alleging failure to pay overtime, failure to provide meal and rest breaks, and other violations of the Fair Labor Standards Act (FLSA) and California labor laws. Action was removed to federal court. Employee moved to amend the complaint and to compel arbitration, and defendant moved for summary judgment.

**Holdings:** The District Court, Christina A. Snyder, J., held that:

[1] parent corporation was not joint employer of subsidiary's employee, under the FLSA;

[2] parent corporation and its subsidiary were not an "integrated enterprise," as would establish parent corporation's liability for employee's claims, under California law;

[3] parent corporation was not alter ego of subsidiary, as would allow piercing of corporate veil; and

[4] employee was not entitled to amend complaint to add subsidiary as defendant.

Defendant's motion granted, and employee's motions denied.

**Attorneys and Law Firms**

**\*1230** Darren M. Cohen, Elana R. Levine, Eric B. Kingsley, George R. Kingsley, Kingsley and Kingsley, Encino, CA, for Plaintiffs.

Anna-Mary E. Gannon, Janel Royce Ablon, Margaret Hart Edwards, Paul Robert Lynd, Philip Lane Ross, Littler Mendelson, San Francisco, CA, Joshua Z. Feldman, Littler Mendelson, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** (filed 09/12/07)

**ORDER DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT** (filed 09/18/07)

**ORDER DENYING PLAINTIFF'S MOTION TO COMPEL ARBITRATION** (filed 09/24/07)

CHRISTINA A. SNYDER, District Judge.

**I. INTRODUCTION**

On August 21, 2006, defendant KB Home (erroneously sued as "KB Homes, Inc.") removed plaintiff's first amended complaint from the Los Angeles County Superior Court to this Court, On September 29, 2006, pursuant to stipulation, plaintiff, on behalf of herself and others similarly situated, filed a second amended complaint ("SAC"), alleging claims for (1) unfair business practices, pursuant to Cal. Bus. & Prof.Code § 17200, et seq., premised upon a violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"); (2) unpaid overtime pursuant to Cal. Lab.Code §§ 1194, 1199; (3) failure to provide meal breaks in violation of Cal. Lab.Code § 226.7; (4) failure to allow rest breaks in violation of Cal. Lab.Code § 226.7; (5) waiting time penalties pursuant to Cal. Lab.Code § 203; (6) penalties pursuant to Cal. Lab.Code § 2699; and (7) unfair business practices, pursuant to Cal. Bus. & Prof.Code § 17200 et seq., premised upon violations of the California Labor Code. On July 9, 2007, 248 F.R.D. 229 (C.D.Cal.2007), the Court denied plaintiffs motion for class certification.

==KB Home is a nationwide seller of homes in community developments. KB Home has several subsidiaries in California, including KB Home Greater Los Angeles,==

Inc., KB Home Coastal, Inc., KB Home Sacramento, Inc., KB Home South Bay, Inc., and KB Home Central Valley, Inc. The subsidiaries are divided into divisions, and build and sell homes in various KB Home communities. Plaintiff alleges that she was formerly employed as a "commissioned salesperson" or "sales agent" by KB Home Greater Los Angeles, Inc. ("KBLA"), from June 6, 2005, to December 6, 2005. Plaintiff contends that she worked at the sales office in the Wild Rose community, where she gave prospective buyers tours of model homes, and helped buyers purchase homes in the community.

Plaintiff alleges that KB Home improperly classified her as exempt under federal and state labor laws and that KB Home has a consistent policy of failing to pay wages to commissioned salespersons for all hours worked, failing to provide meal and rest breaks, and failing to pay overtime. Plaintiff seeks compensatory damages for unpaid overtime; missed meal and rest periods; penalties pursuant to Cal. Lab Code §§ 203 and 2699; restitution; attorneys' fees; and costs. Plaintiff further seeks a mandatory injunction requiring KB Home to provide plaintiff with proper compensation and breaks. Additionally, pursuant to Cal. Lab.Code § 232(a), plaintiff seeks a mandatory injunction prohibiting KB Home from preventing her from disclosing her salary and commission.

**\*1231** On September 12, 2007, KB Home filed the instant motion for summary judgment. Plaintiff filed an opposition thereto on October 1, 2007. KB Home filed a reply on October 5, 2007.

On September 18, 2007, plaintiff filed the instant motion to amend complaint and to substitute KBLA in place of KB Home as the defendant herein. The proposed third amended complaint ("proposed TAC"), alleges claims against KBLA on her own behalf and on behalf of others similarly situated. The claims against KBLA in the proposed TAC are identical to those alleged against KB Home in plaintiff's SAC, with the exception that it does not allege against KBLA a claim for unfair business practices, pursuant to Cal. Bus. & Prof.Code § 17200, et seq., premised upon a violation of the FLSA. On October 1, 2007, KB Home filed an opposition to plaintiff's motion to amend complaint. On October 10, plaintiff filed a reply.

On October 4, 2007, plaintiff filed a "notice of errata," stating that the proposed TAC was not intended to include class allegations against KBLA. Plaintiff submitted as an exhibit to the notice of errata a modified proposed TAC that alleges identical individual claims against KBLA in place of the class claims alleged against KBLA in the proposed TAC. On October 9, 2007, KB Home filed an opposition to and motion to strike plaintiff's notice of errata. On October 10, 2007, plaintiff filed an opposition to KB Home's motion to strike plaintiff's notice of errata.

On September 24, 2007, plaintiff filed the instant motion to compel arbitration. KB Home filed an opposition to plaintiff's motion to compel arbitration on October 1, 2007. On October 4, 2007, plaintiff filed a reply thereto.

The Court heard oral argument on October 15, 2007, and took these motions under submission. After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**[1] [2]** If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. *See* Fed.R.Civ.P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). *See also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. *See also Abromson v. American Pacific Corp.,* 114 F.3d 898, 902 (9th Cir.1997).

**[3]**   In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *See T.W.* **\*1232** *Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.,* 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

**B. Leave to Amend**

**[4]**   Generally, Federal Rule of Civil Procedure 15(a) liberally permits amendments of pleadings. However, where a pretrial scheduling order has established a timetable for amending the pleadings, a request to amend the pleadings made after the deadline has expired is properly addressed pursuant to Federal Rule of Civil Procedure 16. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294 (9th Cir.2000) (*citing Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607–09 (9th Cir.1992)). Pursuant to Federal Rule of Civil Procedure 16(b), a plaintiff seeking to amend his complaint must show good cause for not having amended his complaint prior to the deadline set forth in the scheduling order. *Id.* The Ninth Circuit has explained that "[t]his standard 'primarily considers the diligence of the party seeking the amendment.' " *Id.* (*quoting Johnson,* 975 F.2d at 609).

**III. DISCUSSION**

**A. Summary Judgment**

KB Home's motion for summary judgment is predicated on its assertion that KB Home was never plaintiff's employer, and therefore that KB Home is not properly a party defendant in this case. Instead, KB Home contends that plaintiff's sole employer was KBLA. In response, plaintiff maintains that there remain genuine issues of material fact in dispute as to whether KB Home was her employer or should be otherwise liable on an alter

ego theory. As such, plaintiff argues, summary judgment should not be granted.

**1. Whether KB Home Was Plaintiffs Employer Under the FLSA**

**a. Considerations in Determining Whether a Party Is a Joint Employer Under the FLSA**

In order for the FLSA to apply to the instant case, KB Home must be plaintiff's "employer" within the meaning of the FLSA. This determination is a question of law. *Bonnette v. Cal. Health and Welfare Agency,* 704 F.2d 1465 (9th Cir.1983), *disapproved of on other grounds in Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). Two or more employers may jointly employ an employee and be individually liable under the FLSA. *See* 29 C.F.R. 791.2(a).

The Ninth Circuit has stated that the concept of joint employment should be defined expansively under the FLSA. *Torres–Lopez v. May,* 111 F.3d 633, 639 (9th Cir.1997). On the other hand, "Taken literally and applied in this context [too expansive a definition of 'employer'] would make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages or other employees. It makes more sense, ..., to interpret the language as intended to prevent **\*1233** employers from shielding themselves from responsibility for the acts of their agents." *Baird v. Kessler,* 172 F.Supp.2d 1305, 1311 (E.D.Cal.2001) (*quoting Donovan v. Agnew,* 712 F.2d 1509, 1513 (1st Cir.1983)).

**[5]**   To determine whether a defendant is a joint employer, courts look to the "economic reality" behind the relationship and typically consider the following four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[1] *Bonnette,* 704 F.2d at 1470. "[J]oint employment will generally be considered to exist when (1) the employers

are not 'completely disassociated' with respect to the employment of the individuals and (2) where one employer is controlled by another or the employers are under common control." *Chao v. A–One Med. Servs., Inc.,* 346 F.3d 908, 918 (9th Cir.2003) (*citing* 29 C.F.R. § 791.2(b)).

**[6]**   Courts have also considered factors derived from the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–1872, in determining whether a joint employment relation exists, including the following:

(1) whether the work was a "specialty job on the production line;"

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without "material changes;"

(3) whether the "premises and equipment" of the employer are used for the work;

(4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another;"

(5) whether the work was "piecework" and not work that required "initiative, judgment or foresight;"

(6) whether the employee had an "opportunity for profit or loss depending upon [the alleged employee's] managerial skill;"

(7) whether there was "permanence [in] the working relationship;" and

(8) whether "the service rendered is an integral part of the alleged employer's business."

*Torres–Lopez v. May,* 111 F.3d 633, 640 (9th Cir.1997) (citations omitted); *see Zhao v. Bebe Stores, Inc.,* 247 F.Supp.2d 1154, 1157–61 (C.D.Cal.2003) (applying the *Bonnette* and *Torres–Lopez* factors in determining whether the defendant was a joint employer under the FLSA); *accord Flores v. Albertson's Inc.,* 2003 WL 24216269, *2–5, 2003 U.S. Dist. LEXIS 26857, *8–18 (C.D.Cal.2003). All of these factors are meant to guide a court's analysis, and the ultimate determination must be based "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Bonnette,* 704 F.2d at 1470 ("The four factors ... provide a useful framework for

analysis ... but they are not etched in stone and will not be blindly applied.").

The parties have not addressed the *Torres–Lopez* factors in their briefs, focusing instead on the four *Bonnette* factors. On the record before the Court, it appears that the *Torres–Lopez* factors are irrelevant or, at best, carry neutral weight on **\*1234** the question of whether KB Home was plaintiff's joint employer. The *Bonnette* factors are more pertinent to the determination of the economic reality of the employer-employee relationship in this case. The Court now turns to the consideration of these factors as they bear on the evidence presented by the parties.

### b. Evidence Bearing on the Bonnette Factors

**[7]**   KB Home argues that undisputed evidence demonstrates that the first three factors of the "economic reality" test have not been met. As to the first factor, KB Home asserts that KB Home's subsidiaries, including KBLA, had the power to hire and fire its agents. Raae–Nielsen Depo. at 32:25–33:4 (statement by the Vice President of Sales and Marketing of the Inland Valley division of KBLA that she is authorized to hire sales agents and is not required to clear hiring decisions); Abboud Depo. at 48:18–49:1 (statement by the Director of Sales for the Orange County division of KB Home Coastal, Inc. that he recruits, interviews, and hires sales agents). Further, KBLA personnel made the final decision to hire plaintiff. Perez Decl. at ¶ 2. Plaintiff does not dispute that the first factor has not been met.

As to the third factor, KB Home maintains that the subsidiaries determined the rate of compensation for their sales agents. Burnstein Depo. at 63:10–64:3, 65:4–18, 66:2–24 (stating that sales agents are paid a commission based upon a percentage of the general revenue of a community, which is broken down to a per unit amount, and varies by community and by sales agent). According to KBLA's Vice President of Sales and Marketing, she decided what plaintiff would be paid, and KB Home "had no role" in determining what plaintiff was paid. Perez Decl. at ¶ 2. Plaintiff does not dispute that the third factor has not been met.

The parties agree that the fourth factor—the maintenance of employment records—is satisfied in that KB Home maintains a database of information on employees of

KB Home subsidiaries and KBLA uses KB Home's shared payroll services. The Court is persuaded by KB Home's argument, however, that these facts alone are as a matter of law insufficient to establish that KB Home was plaintiff's employer under the economic reality test. *See Catani v. Chiodi,* 2001 WL 920025, *7 (D.Minn.2001) (holding that the fact that the defendant maintained employment records was insufficient to establish that she was a joint employer under the economic reality test).

Thus, the crux of the matter is whether the second factor in the economic reality test—whether KB Home supervised and controlled plaintiff's work schedule or conditions of employment—has been satisfied. *Cf. Wheeler v. Hurdman,* 825 F.2d 257, 270 (10th Cir.1987) (applying a version of the economic reality test and noting, "the extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor to review."). The Court finds and concludes that this factor has not been satisfied.

As to *Bonnette* 's second factor, KB Home asserts that its subsidiaries controlled the work schedules of its sales agents and that KBLA set plaintiff's schedule. Perez Decl. at ¶ 2 (KB Home had no role in deciding plaintiffs work hours); Burnstein Depo. at 44:22–45:7 (the regional sales manager typically sets the schedules for sales agents); Coykendall Depo. at 37:24–38:11 (sales agents work with regional sales managers in setting their schedules). With regard to the question of KB Home's control of plaintiff's conditions of employment, KB Home asserts **\*1235** that KBLA determined and administered what training would be given to employees. Perez Decl. at ¶ 5. Additionally, KB Home points to salesperson employment agreements that plaintiff signed with KBLA that expressly provide the terms and conditions for plaintiff's employment with KBLA.

In response, plaintiff argues that the evidence that KB Home directed and provided training materials, procedures, and guidelines to sales agents at its subsidiaries, including KBLA, demonstrates that KB Home supervised and controlled her employment conditions. Plaintiff notes that uniform training materials and policies—including the ethics policy and a "structured selling document"—were conveyed to sales agents via KB University, KB Home's online training program, Raae–Nielsen Depo. at 60:16–24; Mayhue Depo. at 13:7–10. Plaintiff further notes that the Vice President of

Sales and Marketing for KB Home's Riverside Division, Daniel Loth, confirmed that he sometimes receives new procedures from KB Home. Loth Depo. 28:11–18. Loth also testified that KB Home provides him with information, the nature of which Loth could not recall, that is then sometimes presented at meetings with sales agents. Loth Dep. at 29:2–13. Plaintiff cites to the deposition of Vanessa Linn, who testified that, as Vice President of Sales for KB Home Coastal, Inc., she sometimes received from KB Home information to pass on to the sales agents, such as "hints on how to sell" or new training. Linn Depo. at 27:10–28:5. However, Linn stated that she did not have to pass on this information to the sales agents. Linn Depo. at 27:18–19.

Plaintiff further notes that Robin Stewart, Regional Human Resources Director for KB Home, testified that the duties of this position included providing "strategic human resource guidance, direction, and support to division presidents, region manager [sic] and their leadership team." Stewart Depo. at 11:17–12:3. Plaintiff also highlights Stewart's testimony that Stewart works with personnel from the divisions to complete a "strategic plan" for each division. *Id.* at 36:5–9. This process involves the completion of numerous forms, including an "organizational chart, development plans, [a] performance summary, [a] succession planning document, a performance potential grid, [and] a business priorities chart." *Id.* at 34:19–35:5. [2]

### c. Analysis

In finding that the second *Bonnette* factor has been satisfied, courts have required a showing of facts demonstrating a greater level of control on the part of an alleged joint employer than that which plaintiff has presented. In *Bonnette,* the court found that the control factor had been satisfied by the showing that the defendants, though not responsible for the day-to-day supervision of the plaintiffs, made the final determination as to the number of hours the plaintiffs would work and exactly what tasks they would perform, and where the defendants would intervene when problems arose between the plaintiffs and their employers. *Bonnette v. Cal. Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983).

In *Tumulty v. Fedex Ground Package Svs.,* 2005 U.S. Dist. LEXIS 26215 (D.Wash.2005), the court held that *Bonnette*

**\*1236**  's "control" factor had been met and that the
defendant was the joint employer of the plaintiff class
of delivery drivers. The court noted that the defendant's
managers held weekly meetings with the plaintiffs, that
these managers would comment on the plaintiffs' uniforms
and check to see if they delivered packages, and that
the defendant would assign the plaintiffs extra work,
order them to drive different routes, and suggest how
many hours per day it wanted the plaintiffs on the road.
*Id.* at 11. On these facts, the court concluded, "while
individually the uncontested actions may not support
a 'joint employment' relationship, taken together they
demonstrate that [the defendant] exercised significant
control over the Drivers daily routine." *Id.* at 12.

By contrast, in *Zhao v. Bebe Stores, Inc.,* 247 F.Supp.2d
1154 (C.D.Cal.2003), in concluding that the defendant
was not liable under the FLSA as a joint employer, the
court found that there was no showing that the defendant
controlled working conditions at the plaintiffs' work
facility. The court noted that the defendant provided on-
site personnel to ensure that the defendant received quality
goods from plaintiff's employer and to handle quality
control problems there. *Id.* at 1160. Nonetheless, the
court found that the defendant did not control plaintiffs
work conditions because the employer's supervisors, not
the defendant's personnel, were primarily responsible for
the day-to-day management of the employees in that it
was they who managed employee assignments, shifts, and
work hours. *Id.*

Unlike the facts present in *Bonnette* and *Tumulty,* plaintiff
has failed to show that KB Home has controlled plaintiff's
employment conditions. In *Bonnette, Tumulty,* and *Zhao,*
the determination of whether the "control" factor had
been met turned in significant part on whether it had
been shown that the alleged joint employers determined
the number of hours that the plaintiffs worked. Here, as
in *Zhao,* and unlike *Bonnette* and *Tumulty,* plaintiff has
pointed to no evidence to rebut KB Home's showing that
it was KBLA, not KB Home, that controlled plaintiff's
work hours.

Additionally, *Bonnette, Tumulty,* and *Zhao* emphasized
the extent to which the alleged joint employers determined
the nature of the plaintiffs' work. While in *Bonnette*
and *Tumulty,* the determination that the defendants were
joint employers rested, in part, on the showing that
they determined the plaintiffs' work duties or how the

plaintiffs were to do their jobs from day-to-day, in this
case, plaintiff has not adduced facts showing that KB
Home enjoyed or exercised any such level of control
over the nature of plaintiff's work. Rather, plaintiff has
shown only that KB Home, from time to time, conveyed
training materials, procedures, and other information to
management personnel in its subsidiaries, and that these
personnel would sometimes pass along this information
to sales agents such as plaintiff. Plaintiff has made no
showing that the subsidiaries were required by KB Home
to pass these materials along to their sales agents. [3] In fact,
 **\*1237** one deponent, Vanessa Linn, specifically testified
that she was not required to do so. See also Mayhue Decl.
¶ 6 (statement by the Vice President of KB University that
KB University does not have any control over the day-
to-day work of any salesperson employed by KB Home's
subsidiaries).

Even if it were shown that KB Home mandated the
dissemination of these training materials to sales agents
such as plaintiff, it is doubtful that this would suffice
to establish the requisite level of control called for
under *Bonnette. Cf. Evans v. McDonald's Corp.,* 936 F.2d
1087, 1090 (10th Cir.1991) (in a case involving claims
under Title VII, that franchisor provided training for
franchise employees, stringently controlled its franchisee's
operations, and conducted frequent inspections did not
suffice to establish control under the four factor economic
reality test). Plaintiff has provided no evidence that
the training provided to sales agents such as plaintiff
effectively controlled plaintiffs working conditions for the
purposes of the economic reality test. [4]

Plaintiff relies on the statement by KB Home's regional
human resources director that his job duties included
providing "strategic human resource guidance direction,
and support to division presidents, region manager [sic]
and their leadership team," as well as his reference to
the "strategic plan" that he completes in conjunction
with various divisions. These facts perhaps support
the assertion that KB Home possesses influence over
management personnel at KB Home's subsidiaries. They
do not permit the further inference, however, that
KB Home supervised and controlled the scheduling or
working conditions of sales agents such as plaintiff.

As in *Zhao,* the undisputed evidence shows that it
was plaintiffs supervisors at KBLA, not KB Home,
who were responsible for the day-to-day management

of their employees. Plaintiff has produced no evidence to refute KB Home's assertions that KBLA, not KB Home, supervised and determined the duties of their sales agents in accordance with the salesperson employment agreements signed by plaintiff. As such, the Court concludes that the second factor in the *Bonnette* test weighs in favor of KB Home's position, as do the first and third factors. The overall circumstances thus indicate that, for the purposes of the FLSA, the economic reality of the situation was that KBLA was plaintiff's employer and KB Home was not. Consequently, plaintiff cannot maintain an action against KB Home under the FLSA on the theory that KB Home was her joint employer.

### 2. Whether KB Home Was Plaintiff's Employer Under California Law

Plaintiff's state law claims are predicated on the showing that there was an employer-employee relationship between *1238 plaintiff and KB Home. Under California law, only an "employer" is liable for failing to provide an employee with meal or rest periods. Cal. Labor Code § 226.7. Similarly, only an "employee" may bring an action to recover unpaid overtime compensation. Cal. Labor Code § 1194. Additionally, plaintiff's claim for unfair competition pursuant to Cal. Bus. & Prof.Code § 17200 is grounded in plaintiffs allegations that KB Home violated Cal. Labor Code § 90.5(a), pertaining to California's policy of vigorously enforcing minimum labor standards for employees, and Cal. Labor Code § 232, which prohibits employers from requiring that their employees refrain from disclosing their wages.

The California Supreme Court has suggested that the federal definition of "employer" is inapplicable under California law. *See Reynolds v. Bement,* 36 Cal.4th 1075, 1088, 32 Cal.Rptr.3d 483, 116 P.3d 1162 (2005) ("where the language or intent of state and federal labor laws substantially differ[s], reliance on federal regulations or interpretations to construe state regulations is misplaced. While the FLSA contains an express definition of 'employer,' section 1194 [of the California Labor Code] does not."); *Singh v. 7–Eleven, Inc.,* 2007 WL 715488, *6 (N.D.Cal. Mar. 8, 2007). Thus, a different test must be applied. [5]

**[8]**    The parties focus their arguments on the "integrated enterprise" test. *See Laird v. Capital Cities/ABC, Inc.,*

68 Cal.App.4th 727, 737, 80 Cal.Rptr.2d 454 (1998). Under this test, in determining whether entities are liable as a single employer or an integrated enterprise, the following four factors are considered: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Id.* This test has most often been applied in the context of claims arising under Title VII and the California Fair Employment and Housing Act ("FEHA"). *See e.g. Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211, 1213 (9th Cir.1989) (applying the test's factors to determine whether businesses should be treated as a single employer for Title VII purposes); *Laird,* 68 Cal.App.4th at 737, 80 Cal.Rptr.2d 454 (applying the test in adjudicating claims arising under FEHA). Courts, however, have also applied this test in the context of claims arising from alleged violations of the California Labor Code. *See Huse v. Auburn Honda,* 2005 WL 1398521, *3, 2005 U.S. Dist. LEXIS 45494, *8 (E.D.Cal.2005) (employing the integrated enterprise test to determine whether a defendant was an employer within the meaning of the California Labor Code); *Serrano v. 180 Connect, Inc.,* 2006 WL 2348888, *2, 2006 U.S. Dist. LEXIS 61035, *8 (N.D.Cal.2006) (employing the integrated enterprise test in an action arising from alleged California Labor Code violations), *rev'd on other grounds* 478 F.3d 1018 (9th Cir.2007).

**[9]    [10]**    In applying the integrated enterprise test, the Court notes *Laird*'s observations that

> *1239    [a]n employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single employer has a heavy burden to meet under both California and federal law. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result. In particular, there is a strong presumption that a parent company is not the employer of its subsidiary's employees.

*Laird,* 68 Cal.App.4th at 737–38, 80 Cal.Rptr.2d 454 (internal citations omitted).

**[11]** KB concedes factors two and four, but argues that these factors are of diminished significance. As to the second factor—common management—KB Home concedes that "5 or 6" KBLA officers are also officers of KB Home, but nonetheless argues that this is of little consequence because, according to KB Home, there is no evidence that any of these officers controls day-to-day employment decisions at KBLA. As to the fourth factor —common ownership—KB Home concedes that it owns KBLA, but argues that this fact is not dispositive in light of *Laird* 's holding that "common ownership or control alone is never enough to establish parent liability." *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454.

The parties dispute whether the factors one and three of the integrated enterprise test—relating to interrelation of operations and centralized control of labor relations, respectively—have been met.

### a. Interrelation of Operations

**[12]** **[13]** "To make a sufficient showing of 'interrelation of operations' on summary judgment, the plaintiff must do more than merely show that officers of the subsidiary report to the parent corporation or that the parent benefits from the subsidiary's work. Since these facts exist in every parent-subsidiary situation, such a showing would create a triable issue of material fact in every case." *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454. "What the plaintiff must show, rather, is that the parent has exercised control 'to a degree that exceeds the control normally exercised by a parent corporation.' " *Id.* (*quoting Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993)).

In support of her contention that she has established the interrelated operations prong of the integrated enterprise test, plaintiff asserts that KB Home, not KBLA, issued her paychecks. Plaintiff asserts that KB Home provides unspecified information to its subsidiaries for their sales meetings. Plaintiff further asserts that KB Home's structured selling overview is given to all sales agents through KB University, KB Home's virtual training program. Additionally, plaintiff points to evidence that employees in training receive a "binder" produced by KB Home that contains "links" to the KB University website. Coykendall Depo. at 26:15–27:3. Plaintiff also

maintains that information about new employees is sent to KB Home.[6]

**\*1240** KB Home argues in response that plaintiff has not shown that there is any interrelatedness of operations beyond that which is normal between a parent and a subsidiary. KB Home further argues that plaintiff has only adduced evidence that relates to conditions at KB Home subsidiaries other than KBLA, such that plaintiff has failed to demonstrate any interrelatedness between KBLA and KB Home.

In *Laird,* the court held that the interrelation of operations prong had not been satisfied where the plaintiff failed to show that the defendant parent corporation exercised greater control over the subsidiary's operations than that which a parent would normally exercise over its subsidiary. *Laird,* 68 Cal.App.4th at 739, 80 Cal.Rptr.2d 454. The court noted that the plaintiff could have met this standard, but failed to do so, by showing that the defendant kept the subsidiary's books, issued its paychecks, or paid its bills, or that the two companies had shared employees, headquarters, or office space. *Id.* The court further found that the plaintiff's showing that the defendant publicly took credit for the subsidiary's operations and that the subsidiary's managers instructed their employees to use the defendant's name when dealing with the public did not suffice to establish the interrelatedness factor. *Id.*

In support of her contention that KB Home issued her paychecks, plaintiff provides an earning statement that she received, which bears the KB Home logo. Maddock Depo. at Ex. 24. KB Home argues that the presence of the KB Home logo on the earnings statement does not establish that KB Home issued her paychecks. KB Home directs the Court's attention to another document, a "salesperson commission request statement," that also bears the KB Home logo, although it was allegedly issued to plaintiff by KBLA. Perez Decl. at ¶¶ 2–3, Ex. 1 (submitted with Def's Opp. to Pl.'s Mot. to Amend). Thus, it is not clear that the earning statement proffered by plaintiff is probative as to whether KB Home issued plaintiff's paychecks. Plaintiff provides no other evidence; such as deposition testimony, declarations, or financial records; to support her assertion that KB Home issued her paychecks. Although KB Home concedes that it provided payroll processing services to its subsidiaries, this does not establish that KB Home financed the paychecks for

its subsidiaries' employees. Plaintiff, therefore, has not provided an evidentiary foundation for her assertion that KB Home issued her paychecks.

Plaintiff offers no other evidence tending to show interrelation between KB Home and KBLA. Plaintiff's evidence that KB Home provides certain training materials for use by its subsidiaries falls short of establishing that KB Home exercises abnormal influence over the personnel decisions of these subsidiaries. Moreover, KB Home's retention of certain payroll and personnel information relating to its sales agents does not indicate a degree of control over its subsidiaries that would constitute interrelation of operations. Plaintiff has pointed to none of the sort of evidence that indicates this heightened level of control. Accordingly, the interrelation of operations factor of the integrated enterprise test has not been satisfied.

### b. Centralized Control of Labor Relations

[14] [15] Courts consider the four factors of the integrated enterprise test together, bug they often deem the third factor, centralized control of labor relations, the most important. **\*1241** *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454. "The critical question is 'what entity made the final decisions regarding employment matters related to the person claiming discrimination?' A parent's broad general policy statements regarding employment matters are not enough to satisfy this prong. To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary." *Id.* (quoting *Frank v. U.S. West. Inc.,* 3 F.3d 1357, 1363 (10th Cir.1993)); *Cellini v. Harcourt Brace & Co.,* 51 F.Supp.2d 1028, 1034 (S.D.Cal.1999) ("although a court must consider each of the factors [in the integrated enterprise test], the critical inquiry requires an examination of which entity made the final decisions regarding employment matters."); *cf. Singh v. 7–Eleven, Inc.,* 2007 WL 715488 \*7 (N.D.Cal.2007) ("California courts have consistently recognized that 'the principle test for determining employment relationships is the right of control over the manner or means of accomplishing the result desired.").

In support of her contention that KB Home had centralized control of labor relations at KBLA, plaintiff points to the depositions of Vanessa Linn, Vice President

of Sales for KB Home Coastal, Inc.; Daniel Loth, Vice President of Sales and Marketing for KB Home's Riverside Division; and Robin Stewart, Regional Human Resources Director for KB Home. Linn testified that she sometimes received from KB Home information to pass on to the sales agents, such as "hints on how to sell" or new training. Linn Depo. at 27:10–28:5. Loth, confirmed that he sometimes receives new procedures from KB Home. Loth Depo. at 28:11–18. Loth also testified that KB Home provides him with information, the nature of which Loth could not recall, which he was instructed to present at meetings. Loth Dep. 29:2–13. Robin Stewart testified that the duties of the regional human resources director for KB Home include providing "strategic human resource guidance, direction, and support to division presidents, region manager [sic] and their leadership team." Stewart Depo. at 11:17–12:3. Plaintiff also highlights Stewart's testimony that he works with personnel from the divisions to complete a "strategic plan" for each division. *Id.* at 36:5–9. This process involves the completion of numerous forms, including an "organizational chart, development plans, [a] performance summary, [a] succession planning document, a performance potential grid, [and] a business priorities chart." *Id.* at 34:19–35:5.

In *Cellini v. Harcourt Brace & Co.,* 51 F.Supp.2d 1028 (S.D.Cal.1999), the court found that the control prong of the integrated enterprise test had not been satisfied because the plaintiff had produced no evidence that the defendant parent corporation exercised control over its subsidiary's employment decisions. *Id.* at 1035. The court reached this determination in spite of the showing that the defendant issued a code of conduct that applied to the subsidiary's employees and even though the defendant provided employee benefits programs and sexual harassment seminars to these employees. *Id.* at 1034. Because the evidence demonstrated that the subsidiary's day-to-day employment decisions—such as hiring, performance evaluations, and work assignments— were conducted by the subsidiary without the defendant's involvement, the court held that the control factor had not been met. *Id.* at 1034.

Here, plaintiff has not produced evidence to establish that KB Home exercised or enjoyed the sort of day-to-day control over KBLA's employment decisions that would satisfy the control prong of the integrated enterprise test. Plaintiff's argument that KB Home controlled KBLA's employment decisions rests on evidence that KB

Home disseminated training materials to its subsidiaries and their **\*1242** sales agents and provided strategic human resource guidance, direction, and support to the management of these subsidiaries. As in *Cellini,* where the facts that the parent provided to its subsidiary's employees a code of conduct and sexual harassment seminars did not establish that the parent controlled the personnel decisions of the subsidiary, so too, the evidence that KB Home provided training materials to sales agents such as plaintiff does not establish that KB Home controlled KBLA's personnel decisions. Furthermore, as discussed supra in the Court's discussion of the economic reality test, the evidence that KB Home provided unspecified guidance to management personnel at its subsidiaries and helped them to complete a "strategic plan" does not demonstrate that KB Home had any involvement in the day-to-day personnel decisions of these subsidiaries. *Cf. Lockard v. Pizza Hut,* 162 F.3d 1062, 1071 (10th Cir.1998) (that franchisee utilized policies promulgated by the franchisor did not establish that the franchisor had centralized control of labor relations where no evidence indicated what role, if any, the franchisor played in implementing or effecting these policies). Because the record contains no evidence that KB Home had such influence, the Court finds and concludes that the third factor in the integrated enterprise test has not been met.

### c. Conclusion

Plaintiff has failed to establish the first factor and the paramount third factor of the integrated enterprise test. Given the strong presumption under California law that a parent company is not the employer of its subsidiary's employees, the Court concludes that these deficiencies are fatal to plaintiff's integrated enterprise theory of liability. Plaintiff cannot maintain an action against KB Home for violations of the California Labor Code on the theory that KB Home and KBLA constituted a single employer or an integrated enterprise.

### 3. Plaintiff Has Not Shown That KB Home Is The Alter Ego of KBLA

**[16]** **[17]** **[18]** In considering whether to pierce the corporate veil in a suit arising under federal law, a court must apply federal substantive law, though it may look to state law for guidance. *Bd. of Trustees v. Valley Cabinet &*

*Mfg. Co.,* 877 F.2d 769, 772 (9th Cir.1989) (*citing Seymour v. Hull & Moreland Eng'g,* 605 F.2d 1105, 1109 (9th Cir.1979)). The Ninth Circuit has stated that "[a]n alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations." *Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001). "To demonstrate that the parent and subsidiary are 'not really separate entities' and satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice?' " *Id.; quoting Am. Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996). The first prong requires a showing that the parent controls the subsidiary "to such a degree as to render the latter the mere instrumentality of the former." *Doe,* 248 F.3d at 926.

**[19]** **[20]** Under California law, "[w]hether alter ego applies is a question of fact which necessarily varies according to the circumstances of each case." *Inst. of Veterinary Pathology, Inc. v. Cal. Health Labs., Inc.,* 116 Cal.App.3d 111, 119, 172 Cal.Rptr. 74 (1981). California's alter ego standard is similar to the federal standard: "[t]he trier of fact must consider whether (1) such a unity of interest in ownership exists so as to dissolve the separate corporate personalities of the parent and the subsidiary, relegating the latter to **\*1243** the status of merely an instrumentality, agency, conduit or adjunct of the former, and (2) an inequitable result will occur if the conduct is treated as that of the subsidiary alone." *Id.* In other words, the plaintiff must show "specific manipulative conduct by the parent toward the subsidiary which relegates the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former." *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App.4th 727, 742, 80 Cal.Rptr.2d 454 (1998) (*quoting Veterinary Pathology,* 116 Cal.App.3d at 119–120, 172 Cal.Rptr. 74).

**[21]** Plaintiff argues that KBLA is KB Home's alter ego, such that KB Home is liable for the federal and state law violations upon which plaintiff's claims are premised. First, plaintiff argues that there is a unity of interest between KBLA and KB Home in that KB Home directs KBLA "in regards to its regular operations," KBLA "could not and would not exist without constant oversight from [KB Home]," and KB Home's California

divisions take "much guidance" from KB Home. Pl.'s Opp. at 13–14. Plaintiff asserts that KB Home provides uniform training, policies, and procedures to all of its employees; that identical employment agreements govern the employment of all sales agents; that KB Home and KBLA share management personnel; and that KB Home and its subsidiaries share payroll services, employee records and other information. Plaintiff does not cite to evidence to support these assertions. She appears to rely on substantially the same evidence that she relies upon to argue that KB Home was a joint employer and that KB Home and KBLA were an integrated enterprise.

Second, plaintiff argues that because KB Home created the "unlawful policies" that are at the core of plaintiffs claims, it would be unjust for KB Home to escape liability for the harm that these policies caused.

Plaintiff has not satisfied either prong of the alter ego test. First, plaintiff has not shown a unity of interest between KB Home and KBLA. In arguing that the alter ego doctrine applies, plaintiff relies almost entirely on evidence that the Court has already found insufficient to meet the "less exacting integrated enterprise test." *See Laird,* 68 Cal.App.4th at 742, 80 Cal.Rptr.2d 454. Similarly, as discussed supra, plaintiff has not shown that KB Home controlled KBLA's internal affairs or daily operations, much less that KBLA is a mere instrumentality of KB Home. *See Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001), Moreover, though plaintiff notes that KB Home and KBLA have common directors, this does not necessarily imply that there is a unity of interest. *See Instit. of Veterinary Pathology, Inc. v. Cal. Health Labs., Inc.,* 116 Cal.App.3d 111, 120, 172 Cal.Rptr. 74 (1981) ("Interlocking directorates ... is not, in and of itself, sufficient without direct evidence of specific manipulative conduct to warrant the piercing of the corporate veil."). Plaintiff also notes that KB Home and KBLA have designated the same agent for service of process, but this fact, without more, does not establish a unity of interest. Accordingly, plaintiff has failed to satisfy the first prong of the alter ego standard, which suffices to foreclose her argument that KBLA is the alter ego of KB Home.

Second, plaintiff has not demonstrated that fraud, injustice, or some other inequity would result if the corporate veil is not pierced. Plaintiff contends that KB Home should not be allowed to escape liability

because it created the policies that led to plaintiff's injuries. Plaintiff alleges claims for missed meal and rest breaks, unpaid overtime, and for being prevented from disclosing her wages. However, plaintiff has adduced no evidence that KB Home's policies caused these harms to plaintiff. Consequently, there is no basis for plaintiffs **\*1244** contention that fraud, injustice, or inequity would result unless the corporate veil is pierced. The second requirement of the alter ego doctrine has not been satisfied.

Having satisfied neither of the required prongs of the alter ego standard, plaintiff's alter ego theory must fail. Therefore, plaintiff may not hold KB Home liable for her claims under an alter ego theory.

#### 4. Conclusion

As discussed supra, plaintiff has not shown that KB Home was her employer under federal or California law. Additionally, plaintiff has not demonstrated KB Home's liability for her claims under an alter ego theory. Plaintiff has raised no other bases for KB Home's liability. Accordingly, the Court GRANTS KB Home's motion summary judgment.

### B. Leave to Amend

**[22]** Plaintiff moves for leave to file a third amended complaint alleging claims against KBLA, rather than KB Home. Except in two respects, the claims in plaintiff's proposed third amended complaint ("proposed TAC") are identical to those alleged in the second amended complaint ("SAC"). First, the claims differ in that they are brought in her individual capacity, rather than as class claims. [7] Second, in the proposed TAC, plaintiff does not allege a claim for unfair business practices, pursuant to Cal. Bus. & Prof.Code § 17200, et seq., premised upon a violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. [8]

KB Home argues that, pursuant to Federal Rule of Civil Procedure 16(b), plaintiff **\*1245** must show good cause for adding KBLA as a party after the cutoff date of December 15, 2006 for adding parties. KB Home contends that the Court should not grant plaintiff leave to file the proposed TAC because plaintiff cannot show good cause for failing to add KBLA prior to the cutoff date. KB

Home maintains that plaintiff knew that KBLA was her employer when she worked there. Additionally, KB Home notes that plaintiff's first filed complaint in this action named KBLA as party defendant and described KBLA as her employer.[9] Moreover, KB Home asserts that as of October 30, 2006, when KB Home filed its answer to the SAC, plaintiff was on notice of KB Home's intention to defend on the ground that it was not plaintiff's employer. KB Home thus argues that plaintiff was on notice as to the possibility that KB Home may have been an improper defendant well before the cutoff date for adding parties. Accordingly, KB Home argues that plaintiff's failure to add or substitute KBLA as party defendant prior to the cutoff date displays a lack of the sort of diligence required for her to make a showing of good cause under Rule 16(b).[10]

Plaintiff responds that she can show good cause for seeking to add KBLA as party defendant after the cutoff date for adding parties. While apparently conceding that she could have maintained an action against KBLA from the beginning, plaintiff contends that she held the reasonable belief that KB Home was her employer and she "proceeded accordingly."[11]   **\*1246** PL's Reply at 5. Plaintiff argues that she could not have determined that KB Home was not legally her employer until the Court denied her motion for class certification. Plaintiff further argues that following the issuance of this order, plaintiff was diligent in filing the instant motion to amend complaint that would add KBLA as party defendant. Plaintiff appears to argue that because she moved diligently to add KBLA as a defendant when she learned that this would be necessary to preserve her claims, she has shown good cause for her delay, as required under Rule 16(b).

Plaintiff's argument that she was diligent in proceeding against KBLA once she discovered that KB Home was an improper defendant is not convincing. Plaintiff contends that she made this discovery when the Court issued its on July 9, 2007 order that denied her motion for class certification. However, plaintiff did not file the instant motion to amend complaint until September 18, 2007—after KB Home filed the instant motion for summary judgment on September 12, 2007. Plaintiff contends that she "could not possibly have acted more swiftly" in moving to amend her complaint because, under Local Rule 7–3, she was required to meet and confer with KB

Home at least twenty days prior to the filing of her motion to amend complaint.[12] PL's Reply at 4. However, plaintiff waited considerably longer than twenty days after the Court's July 9, 2007 order to file the instant motion to amend complaint, and she does not argue that KB Home prevented her from scheduling an earlier Rule 7–3 conference. Contrary to plaintiffs stated reasons for filing the instant motion to amend complaint, the circumstances suggest that plaintiff filed this motion in response to KB Home's filing of its motion for summary judgment.

In any event, plaintiff's argument that she acted diligently in attempting to allege claims against the correct party, KBLA, is unconvincing. Plaintiff's contention that she did not learn that KB Home was improperly a defendant in the instant action until the Court issued its order denying class certification does not explain why plaintiff did not allege claims against KBLA prior to the cutoff date for adding parties. Plaintiff does not contend that she ever mistakenly believed that KBLA was not her employer or that KBLA was for some other reason an improper defendant to this action. It does not appear that plaintiff could reasonably make this argument, given the undisputed evidence that plaintiff signed salesperson employment agreements with KBLA, named KBLA as party defendant when she commenced this action, and described KBLA as her employer in her first filed complaint. Further, plaintiffs concession that the decision to pursue KB Home, and not its subsidiaries including, but not limited to, KBLA, demonstrates that the earlier decision to dismiss KBLA was a tactical decision. Accordingly, plaintiff has not shown that she was mistaken in proceeding  **\*1247** against KB Home or diligent in seeking to add KBLA.

Therefore, plaintiff has not shown good cause for her delay in seeking to add KBLA, as required under Rule 16(b). Accordingly, the Court DENIES plaintiffs motion to amend complaint.

### C. Motion to Compel Arbitration

**[23]**   Plaintiff moves for an order compelling the parties to arbitrate plaintiffs claims. The Court today grants KB Home's motion for summary judgment, which disposes of plaintiff's claims against KB Home. Accordingly, the Court DENIES plaintiff's motion to compel arbitration as moot.[13]

## IV. CONCLUSION

In accordance with the foregoing, the Court GRANTS KB Home's motion for summary judgment. The Court DENIES plaintiff's motion to amend complaint. The Court DENIES plaintiff's motion to compel arbitration as moot.

IT IS SO ORDERED.

**All Citations**

631 F.Supp.2d 1226

## Footnotes

1    Contrary to plaintiff's unsupported assertion, the "economic reality" test is not disjunctive. As the *Bonnette* court noted, courts have considered these factors "[i]n varying combinations" to determine whether a joint employment relationship exists. *Bonnette,* 704 F.2d at 1470.

2    Plaintiff further asserts that KB Home gives sales agents in California "identical paperwork to be completed ... (which is created and generated by KB), and consistent daily and weekly reports to confirm standardization in the operation of all community sales offices, and to confirm company-wide goals." Pl's Opp. at 4. While plaintiff states that these assertions are supported by the deposition testimony of Vanessa Linn, neither the portion of Linn's testimony to which plaintiff cites, nor the remainder of the record, appears to support these assertions.

3    The Court notes the deposition testimony of Marc Burnstein, Vice President of Sales and Marketing of KB Home South Bay, Inc., that "everybody within the company is expected to at least understand and take advantage of the material that is [on the KB University website]." Burnstein Depo. at 24:13–18. Plaintiff does not rely on this testimony. Even if one assumes that Burnstein meant that KB Home expected its agents to use the KB University website, it would still be far from clear whether this "expectation" amounted to a directive from KB Home. Moreover, it does not appear that a directive to "understand and take advantage of" the KB University materials could ever determine the day-to-day working conditions of individual sales agents such as plaintiff

4    In support of her argument that KB Home controlled plaintiffs work conditions, plaintiff submits two documents the "structured selling overview" document and the "Kaufman and Broad Home Policies and Procedures Manual"—both of which, according to plaintiff, KB Home provides to all KB Home subsidiaries. Because these documents bear dates of 2003 and 1997, respectively, and therefore, precede the date on which plaintiffs employment commenced, their relevance to plaintiff's argument is tenuous. Additionally, the structured selling overview document, which includes steps and tips for selling a home, as well as "action items" for the implementation of each step of the sale, appears to be more of an informational source, rather than a uniform, comprehensive training program and contains no information on the scheduling of sales agents. The Kaufman and Broad Home Policies and Procedures Manual does not contain information pertaining to the scheduling or work conditions of sales agents. Accordingly, these documents do not advance plaintiff's argument.

5    Another decision from this Circuit applied the economic reality test, discussed supra, to determine whether the defendant was liable as a joint employer for alleged violations of the California Labor Code. *Rios v. Airborne Express Inc.,* 2006 WL 2067847, *1–2, 2006 U.S. Dist. LEXIS 54570, *4–5 (N.D.Cal.2006). The *Rios* court did so in reliance on *Bureerong v. Uvawas,* 922 F.Supp. 1450 (C.D.Cal.1996), which found that California courts would likely adopt the federal FLSA's broad definition of "employment" and would likely focus on the "economic realities" of the relationship. *Bureerong,* 922 F.Supp. at 1470. The California Supreme Court's subsequent language in *Reynolds,* casting doubt on these views, suggests that the economic reality test does not provide the proper analysis for determining whether KB Home was plaintiff's employer within the meaning of the California Labor Code.

6    Plaintiff's assertion that KB Home sends "many directives" to division heads, who in turn send the directives to sales agents within the division, is not supported by the evidence. To bolster this assertion, plaintiff cites to vague testimony from Diana Coykendall, Director of Sales for the KB Home Central Valley division. During this deposition, after Coykendall's statement that KB Home does *not* direct sales agents to view the KB University website, plaintiff's counsel asked Coykendall, "[i]s that because the directives come from corporate through division? Is it because the people in charge at your division are the ones that determine what the sales reps should use?" Coykendall answered in response, "[t]hey are sent to us and we send it to them." Even if one reads this testimony in the light most favorable to plaintiffs position, it is not apparent that it has any relevance to whether KBLA's operations are interrelated with KB Home's because Coykendall's testimony relates only to practices at her division, KB Home Central Valley. Plaintiff provides no facts that indicate that KBLA employs any such practices. Accordingly, plaintiff's assertion does not find support in the record.

7    Along with her motion to amend complaint, plaintiff initially submitted a proposed TAC that alleged class claims against KBLA. After defendant filed its opposition to the motion to amend complaint, plaintiff filed, on October 4, 2007, a "notice of errata," stating that she had mistakenly submitted a proposed TAC that alleged class claims. Plaintiff attached as an exhibit to this notice of errata a modified proposed TAC that alleged claims against KBLA in plaintiff's individual capacity in place of the class claims. On October 9, 2007, KB Home filed a so-called opposition to and motion to strike plaintiff's notice of errata. On October 10, 2007, plaintiff filed an opposition to KB Home's motion to strike plaintiff's notice of errata.

    KB Home argues that the Court should deem plaintiff's modified proposed TAC alleging claims in her individual capacity a nullity because plaintiff submitted it in an improper attempt to avoid the effect of arguments that KB Home set forth in its opposition to plaintiff's motion to amend complaint. KB Home further argues that it would be prejudiced were the Court to give effect to plaintiff's modified proposed TAC because it is essentially a new motion to file an amended complaint as to which KB Home did not receive 24 days' notice, as required under Local Rule 6–1.

    While it is mindful of KB Home's concerns, the Court is not convinced that plaintiff filed her notice of errata in bad faith or that KB Home will be unduly prejudiced if it considers plaintiff's modified proposed TAC. The Court shall consider the proposed TAC that alleges claims against KBLA in plaintiff's individual capacity in determining whether to grant the instant motion to amend complaint.

8    Granting plaintiff's motion for leave to file an amended complaint so as to remove the sole federal claim in the instant action would not deprive this Court of subject matter jurisdiction. "If a claim 'arising under' federal law existed at the time of removal, the federal court has jurisdiction to adjudicate even though the federal claim has been dropped from the case and only state law claims remain." Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 2:1067 (The Rutter Group 2007). Remand in such a case is discretionary. Although 28 U.S.C. § 1447(c) provides, "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded," this does not compel remand where federal question jurisdiction existed at the time of removal and the federal claim is later dismissed. *Albingia Versicherungs A.G. v. Schenker Int'l Inc.,* 344 F.3d 931, 936 (9th Cir.2003) (court had discretion to exercise supplemental jurisdiction over state law claims after federal claim dismissed). The same holds true when a complaint is amended to remove any federal claim. *See Behlen v. Merrill Lynch,* 311 F.3d 1087, 1095 (11th Cir.2002); *Pantazis v. Fior D'Italia, Inc.,* 1994 WL 519469, *2, 1994 U.S. Dist. 13622, *5–6 (N.D.Cal.1994).

9    Plaintiff's initial complaint, filed in Los Angeles County Superior Court on June 22, 2006, names KBLA as party defendant. Decl. of Margaret Hart ("Hart Decl.") at Ex. 5. Plaintiffs first amended complaint, filed in Los Angeles County Superior Court on July 13, 2006, adds KB Home as party defendant in place of KBLA. Hart Decl. at Ex. 6.

10   KB Home further directs the Court's attention to a class action captioned *McNeely v. KB Home Greater Los Angeles, Inc.,* Case No. BC374272, which plaintiff's counsel filed in the Los Angeles County Superior Court on July 16, 2007. This class action alleges nearly identical claims to those in plaintiff's proposed TAC, with the difference that the claims in the proposed TAC are alleged in plaintiff's individual capacity. Additionally, KB Home asserts that the named plaintiffs in *McNeely,* Stacey McNeeley and Heather Reyes, were putative class members in the instant action until the Court denied class certification. KB Home maintains that these individuals provided declarations in support of plaintiff's motion for class certification. Additionally, the plaintiffs in *McNeely* represent a purported class consisting of

    All persons who are employed or have been employed, and who have worked as salespersons at [KBLA] in the State of California since four (4) years prior to the filing of this action, and have been paid commission on a flat fee basis.
Hart Decl. at Ex. 12. KB Home maintains that plaintiff is a member of this class as so defined. KB Home asserts that KBLA filed an answer in the *McNeely* action on September 12, 2007, and that discovery in this action has commenced. Plaintiff responds that the existence of the *McNeely* action should not cause the Court to abstain from hearing the claims plaintiff alleges in the proposed TAC. Plaintiff contends that she is not properly a class member in the *McNeely* action because her litigation in the instant action is pending. Additionally, plaintiff argues that she "seeks redress in this matter and desires to see it through to conclusion on the merits." Finally, plaintiff asserts that she would opt out of the *McNeely* class in any event.

11   At the October 15, 2007 hearing herein, counsel for plaintiff argued that he had dismissed KBLA earlier in this action because he would have been precluded from proceeding on a classwide basis by the arbitration clause in the KBLA salesperson employment agreement, and that in any event, had he joined KBLA he would have been required to join other subsidiaries of KB Home, which in turn would have exposed plaintiff to claims of misjoinder. It thus appears that counsel's decision to pursue KB Home, as opposed to KBLA, was a knowing, tactical decision.

12   Plaintiff asserts that she waited for an unspecified "twenty-one day safe harbor period" before filing the instant motion to amend complaint. Although is unclear to what safe harbor period plaintiff refers, the Court construes plaintiff's assertion

as an imprecise reference to the Local Rule 7–3's requirement that a conference of counsel occur at least twenty days prior to the filing of a motion that must be filed within a specified period of time.

13    Although the Court does not expressly reach the question of whether this dispute is arbitrable, it notes that KB Home does not appear to be a party to the arbitration agreement between plaintiff and KBLA and, in any event, plaintiff's failure to demand arbitration at the commencement of this proceeding is a waiver of her rights to arbitration. *See St. Agnes Medical Center v. PacifiCare of California,* 31 Cal.4th 1187, 1196, 8 Cal.Rptr.3d 517, 82 P.3d 727 (2003); *Van Ness Townhouses v. Mar Indus. Corp.,* 862 F.2d 754, 759 (9th Cir.1988).

---

**End of Document**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 7

884 F.2d 1211
United States Court of Appeals,
Ninth Circuit.

Cynthia MORGAN, Plaintiff–Appellant,

v.

SAFEWAY STORES, INC., and Safeway Arizona
Federal Credit Union, Defendants–Appellees.

No. 88–1785.
|
Argued and Submitted Feb. 6, 1989.
|
Decided Sept. 6, 1989.

Employee brought Title VII action against employer and
employer-sponsored credit union, alleging discriminatory
denial of credit disability benefits which excluded
disability resulting from pregnancy or childbirth. The
United States District Court for the District of Arizona,
Richard M. Bilby, Chief Judge, entered summary
judgment in favor of employer and credit union.
Employee appealed. The Court of Appeals, Goodwin,
Chief Circuit Judge, held that: (1) employer and credit
union could not be treated as single employer for Title
VII purposes, and (2) employer was not liable on agency
theory for credit union's denial of benefits.

Affirmed.

Nelson, Circuit Judge, filed dissenting opinion.

**Attorneys and Law Firms**

**\*1212** Grace McIlvain and Dennis P. McLaughlin,
Miller & Pitt, Tucson, Ariz., for plaintiff-appellant.

William R. Hayden and Tibor Nagy, Jr., Snell & Wilmer,
Phoenix, Ariz., for defendants-appellees.

Susan M. Freeman and Richard S. Cohen, Safeway
Arizona Federal Credit Union, Phoenix, Ariz., for
defendants-appellees.

Appeal from the United States District Court for the
District of Arizona.

Before GOODWIN, Chief Judge, ALARCON
and NELSON, Circuit Judges.

**Opinion**

GOODWIN, Chief Circuit Judge:

Cynthia Morgan appeals a summary judgment in favor
of her employer, Safeway Stores, Inc. ("Safeway") and
her credit union, Safeway Arizona Federal Credit Union
("SAFCU"). She sued both defendants under Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§ 2000e–2 (1982), for the discriminatory denial of credit
disability benefits.

*I. Background*

Safeway is an employer for title VII purposes. It
provides its employees traditional compensation and
fringe benefits, such as medical insurance and disability
programs. In addition, it offers its employees the
opportunity to join SAFCU.

SAFCU is a federal credit union organized under 12
U.S.C. §§ 1751–95 (1982 & Supp. IV 1986). To assure
that members share a "common bond of occupation or
association" or reside in a "well-defined neighborhood,
community, or rural district," *id.* § 1759, an application
for a federal credit union charter must contain a
proposed "field of membership," *id.* § 1753. SAFCU
listed Safeway and its affiliates as its field of membership.
Throughout the period relevant to this action, SAFCU's
field of membership consisted only of employees and their
families of Safeway and SAFCU. By law, SAFCU's board
of directors controls its affairs and, more specifically,
establishes its lending policies. *See id.* § 1761b.

Morgan works for Safeway, and through her employment,
is a member of SAFCU. In 1976, Morgan secured a
SAFCU loan, and opted for SAFCU's credit disability
policy. This policy excludes disability resulting from
pregnancy or childbirth. Morgan became pregnant twice,
and, pursuant to this policy, twice was denied credit
disability benefits, once on May 25, 1979, and then again
in April of 1982. Having filed timely charges with the
EEOC, and having received a right-to-sue letter from the
EEOC, Morgan commenced this title VII action.

Morgan moved for partial summary judgment on three
issues: (1) both defendants **\*1213** were "employers"
under title VII, (2) the availability of the credit disability

50 Fair Empl.Prac.Cas. (BNA) 1339, 51 Empl. Prac. Dec. P 39,314, 58 USLW 2210

insurance policies at issue was a form of "compensation" or a "term, condition or privilege" of employment, and (3) the exclusions in those policies were discriminatory under title VII. Safeway and SAFCU cross-moved for summary judgment. The district court denied Morgan's motion for partial summary judgment and granted defendants' cross-motion for summary judgment on the ground that Safeway had no control over SAFCU's management or personnel decisions generally, or over SAFCU's disability credit insurance policy in particular. This appeal followed.

## II. *Supplementation of the Record*

**[1]** Preliminarily, we dispose of a procedural question. Prior to argument, Morgan moved to supplement the record with newly discovered evidence, namely a Safeway employee magazine distributed in December of 1988. She claims the magazine contains evidence that Safeway provided substantial office support services to SAFCU and an admission by Safeway that SAFCU membership is an employee benefit. We deny the motion for two reasons. First, Morgan has made no showing that the evidence concerning support services is in fact newly discovered. The fact such evidence is contained in a newly discovered publication does not explain why Morgan could not have obtained the same kind of evidence at an earlier date. Second, evidence that Safeway recently described SAFCU membership as an employee benefit is not probative of the degree of Safeway's control or influence over the SAFCU program challenged here. In any case, the purported new evidence does not add to the record. The original papers established that Safeway described SAFCU membership in its handbook as an employee benefit.

## III. *Title VII Claim*

**[2]** In 1978, Congress amended title VII "to prohibit sex discrimination on the basis of pregnancy." Pub.L. 95–555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k)). Thus an employer who treats pregnancy-related conditions less favorably than other medical conditions for purposes of employment benefits violates title VII. *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 684, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983). Congress, however, has added no similar provision to the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (1982), the act prohibiting discrimination by creditors.

Thus Morgan believes her only avenue of relief is title VII. Unfortunately, that title provides no relief here.

Title VII makes it unlawful for an "employer" or an "employment agency" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §§ 2000e–2(a) & (b). In this case, the discriminatory policy was offered not by Morgan's employer, Safeway, but by a third party, SAFCU. Standing alone, SAFCU is not an "employer" within the meaning of title VII because it employs fewer than fifteen persons. *See* 42 U.S.C. § 2000e(b). Morgan contends, however, that the entity that discriminated against her was an "employer" within the meaning of title VII, consisting either of (1) the single employing entity composed of Safeway and SAFCU or (2) SAFCU alone which acted as the agent or instrumentality of Safeway.

### A. *Consolidation*

**[3]** This court follows the predominant trend for determining whether businesses should be treated as a single employer for title VII purposes, and applies the four-part test promulgated by the National Labor Relations Board. *See Childs v. Local 18, Int'l Brotherhood of Electrical Workers,* 719 F.2d 1379, 1382 (9th Cir.1983); *see also Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 392 (8th Cir.1977). Thus this court treats two entities as one if they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Childs,* 719 F.2d at 1382.

**\*1214** Assuming it is appropriate to apply the *Childs* test in this case, Morgan cannot prevail on a theory of consolidation. To establish common management, Morgan argued that members of SAFCU's board of directors were all Safeway employees. But she does not dispute the assertion that Safeway has no control over SAFCU's selection of board members, and that there are no overlapping directors. To establish centralized control of labor relations, Morgan argued that SAFCU employees are entitled to various insurance policies through Safeway and to profit sharing with Safeway employees. But Morgan presented no evidence disputing the affidavit of SAFCU's president that Safeway has no control over SAFCU's personnel decisions. Finally, Morgan presented no evidence of common ownership or financial control.

50 Fair Empl.Prac.Cas. (BNA) 1339, 51 Empl. Prac. Dec. P 39,314, 58 USLW 2210

Thus Morgan failed to present evidence sufficient to create a genuine issue of material fact whether Safeway and SAFCU should be consolidated for title VII purposes.

**B.** *Agency*

Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties." *City of Los Angeles v. Manhart,* 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 1380 n. 33, 55 L.Ed.2d 657 (1978). An employer, however, cannot avoid title VII liability by delegating discriminatory programs to third parties. Title VII specifically applies to "any agent" of a covered employer. *Id.*

The parties dispute the proper construction of "agency" for title VII purposes. Appellees argue that agency under title VII must be tested against the traditional indicia of an agency relationship, namely consent by one person that the other act on its behalf and the understanding that the principal is to control the undertaking. *See Restatement (Second) of Agency* § 1 (1958). Control, they argue, was absent here. Morgan counters that just as courts liberally construe the term "employer" for title VII purposes in order to advance the policy of that title, so too should they liberally construe the term "agent." Thus, she argues, control by the principal is not required; it is sufficient to establish cooperation, participation and interaction between the employer and the third party.

Even if the term "agent" is entitled to a liberal construction, and even if full control by the principal over the discriminatory program is not required, we find no authority to support the construction Morgan would require to prevail.

**[4]** To establish employer responsibility for the discriminatory programs of third parties, the employer must be more than a broker, or other intermediary, that simply enables its employees to enter into arrangements with third parties; the employer must affirmatively, actively participate in the third-party program. *See, e.g., EEOC v. Colby College,* 589 F.2d 1139, 1141 (1st Cir.1978).

Courts basing employer liability on participation in the third-party program have emphasized the fact that the employer had some control over the terms of the program, and thus can be said to have perpetuated the

discrimination. For example, in affirming a decision of this court holding an employer vicariously liable for a discriminatory deferred compensation plan administered by a third party, the Supreme Court emphasized the fact that the employer entered into a contract with the third party governing the terms by which the benefits would be provided. *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 1088–91, 103 S.Ct. 3492, 3501–03, 77 L.Ed.2d 1236 (1983). [1] In finding **\*1215** an employer could be held liable for a similar discriminatory program, the First Circuit emphasized the fact that though a third party administered the program, premiums were determined by a formula established by the employer based on salary and position, and participation in the program was made mandatory by the employer. *EEOC v. Colby College,* 589 F.2d at 1141; *see also Spirt v. Teachers Insurance & Annuity Association,* 475 F.Supp. 1298, 1308 n. 16 (S.D.N.Y.1979) (same), *aff'd in part, rev'd in part on other grounds,* 691 F.2d 1054 (2d Cir.1982), *cert. granted and judgment vacated,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *on remand, judgment reinstated with modification on other ground,* 735 F.2d 23 (2d Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984). Finally, in stating that a parent corporation would have been vicariously liable for the discriminatory employment practices of a subsidiary, had it not been liable in its own right, the middle district of North Carolina noted that the parent and subsidiary shared a hiring office and coordinated employment policies. *Hairston v. McLean Trucking Co.,* 62 F.R.D. 642, 663 (M.D.N.C.1974), *vacated and remanded for further relief to plaintiffs,* 520 F.2d 226 (4th Cir.1975). Moreover, because the parent applied the companies' mutual no-rehire and no-transfer policies to employees of the subsidiary, it perpetuated the discrimination practiced by the subsidiary of which it had knowledge. *Id.* at 662–63. *Cf. also Crowder v. Fieldcrest Mills, Inc.,* 569 F.Supp. 825, 827 (M.D.N.C.1983) (insurance company that served as adviser to employer in latter's administration of health insurance program but who exercised no control over employer's insurance program not liable as agent of employer).

**[5]** To support her argument that Safeway "participated" in SAFCU's discriminatory program, Morgan notes that Safeway sponsored SAFCU; Safeway promoted membership in SAFCU by offering such membership to its employees and their families; Safeway included

SAFCU membership applications in its hiring handbook and listed SAFCU membership as a "benefit;" Safeway provided SAFCU with the benefits of a payroll deduction program for loan payments; Safeway provided SAFCU employees with the benefits of its own employee benefit programs; Safeway shared its interoffice mail system with SAFCU; Safeway knew that SAFCU offered credit disability insurance, and at least by 1979 when Morgan filed her first charge of discrimination, knew that SAFCU offered that insurance on a discriminatory basis.

Absent from the above facts is evidence of participation by Safeway in establishing or maintaining SAFCU's credit disability policy. Safeway did not specify the terms of that program by contract, *see Norris, supra;* it did not require its employees to secure credit disability insurance, *see Spirt, supra; Colby College, supra;* it did not establish any conditions for receiving SAFCU benefits, *see id.;* and it did not develop the terms of SAFCU's program in coordination with SAFCU, *see Hairston, supra.* By including applications in its handbook, Safeway no doubt facilitated membership in SAFCU, but such facilitation is insufficient to hold Safeway legally responsible for the terms of SAFCU's lending policies. By furnishing an interoffice mail system, Safeway facilitated to some degree the general operations of SAFCU, but such faciliation falls far short of active participation in the challenged program. Further, payroll deductions by employers to facilitate employee payments are common, but do not prove that the employer has or exercises any influence over the policy of the payee. Finally, even if we agreed that economic leverage over a credit union could constitute the necessary control for purposes of agency under title VII, the fact that Safeway sponsored SAFCU and supplied some support services would not justify a trier of fact in finding that after its launching by Safeway, SAFCU **\*1216** would have collapsed if Safeway had withdrawn its sponsorship.

We therefore conclude the district court correctly found SAFCU was not the agent of Safeway for title VII purposes.

AFFIRMED.

NELSON, Circuit Judge, dissenting:
I dissent because I believe that an employer cannot escape the reach of Title VII by delegating its responsibility for the evenhanded provision of fringe benefits to a third party whom the employer knows will discriminate on the basis of pregnancy. I find this case particularly troubling in light of the substantial overlap in operations between Safeway and SAFCU.

Although I agree with the majority's conclusion that the overlap between Safeway and SAFCU is insufficient to satisfy the "single employer" test set forth in *Childs,* that test does not govern Morgan's action against Safeway. In *Childs,* the plaintiff attempted to hold the international union liable for an alleged discriminatory firing by the local union of the local's own employee. *Childs v. Local 18, International Brotherhood of Electrical Workers,* 719 F.2d 1379 (9th Cir.1983). The court adopted the "single employer" test formulated by the NLRB to determine whether to hold the international responsible for the local's labor policies on the ground that the local was the alter ego of the international. *See id.* at 1382; *see also Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir.1977) (adopting the single employer test to determine whether the radio station's licenseholder and the licenseholder's provider of management services were liable for the station's alleged discrimination in hiring).

In this case, in contrast, Morgan does not seek to hold Safeway liable for SAFCU's employment policies vis a vis SAFCU's own employees. Rather, Morgan argues that Safeway is liable for the manner in which SAFCU provides fringe benefits promised by Safeway to Safeway employees. When an employer delegates responsibility for the provision of a fringe benefit to a third party, liability does not turn on the alter ego or single employer analysis. *See Norris,* 463 U.S. 1073, 1089, 103 S.Ct. 3492, 3501, 77 L.Ed.2d 1236 (1983) ("Since employers are ultimately responsible for the 'compensation, terms, conditions, [and] privileges of employment' provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination."); *Norris v. Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans,* 671 F.2d 330, 334 (9th Cir.1982), *aff'd in part, rev'd in part,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (holding that when an employer adopts a fringe benefit plan, "[t]he fact that the plan is operated by a private insurance company rather than Arizona does not render [relevant

50 Fair Empl.Prac.Cas. (BNA) 1339, 51 Empl. Prac. Dec. P 39,314, 58 USLW 2210

Title VII authority] less controlling."); *Spirt v. Teachers Insurance and Annuity Association,* 475 F.Supp. 1298, 1308 (S.D.N.Y.1979) ("Educational institutions such as LIU have delegated their responsibility for and control over employee annuity plans to TIAA and CREF. To hold that discrimination in that aspect of employee compensation cannot be fully remedied under Title VII because of such delegation would impair the effectiveness of the Act."), *aff'd in part, rev'd in part on other grounds,* 691 F.2d 1054 (2d Cir.1983), *cert. granted and judgment vacated,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *on remand, judgment reinstated with modification on other ground,* 735 F.2d 23 (2d Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984).

In the area of delegated fringe benefits, courts have evaluated the extent of the employer's "participation" in the discriminatory program on a continuum in order to determine liability. At one end of the continuum lies the employer who merely acts as a broker or intermediary, enabling its employees to enter into third party arrangements. *See EEOC v. Colby College,* 589 F.2d 1139, 1141 (1st Cir.1978); *see also* **\*1217** *City of Los Angeles v. Manhart,* 435 U.S. 702, 717, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 ("Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market."). At the other end of the continuum is the employer who actively participates in the provision of mandatory discriminatory benefits by knowingly contracting with a third party for the provision of benefits in a discriminatory manner. *See, e.g., Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 1088–89, 103 S.Ct. 3492, 3501–02, 77 L.Ed.2d 1236 (1983) ("Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the state, the state cannot disclaim responsibility for the discriminatory features of the insurers' options".)

Safeway's sponsorship of SAFCU in providing fringe benefits for Safeway's employees and its active promotion of membership in the credit union even after it became aware of SAFCU's discriminatory credit disability program places Safeway's participation in SAFCU's program in the area of the continuum in which liability attaches.

Safeway acted as much more than a mere broker or intermediary between its employees and SAFCU. Safeway essentially caused SAFCU to come into being in order to provide financial services to Safeway's employees. At the time of the discrimination, Safeway was SAFCU's only sponsor and the membership of SAFCU consisted solely of current and former Safeway employees and their families. Without Safeway's continued support, SAFCU probably would have ceased to exist. *See Colby College,* 589 F.2d at 1141 (citing as support for its finding that the university was more than a broker or intermediary the fact that "an educational institution's adoption of [an insurance association] 'constitutes affirmative active participation,' without which 'the challenged program could not operate,' " *citing Spirt v. Teachers Insurance and Annuity Association of America,* 416 F.Supp. 1019, 1021–22 (S.D.N.Y.1976)).

Safeway affirmatively and actively promoted the credit union. It encouraged membership in SAFCU by listing SAFCU membership as a benefit of Safeway employment, including SAFCU membership applications in its hiring handbook, allowing SAFCU to use its interoffice mail system, and arranging for presentations by SAFCU representatives to discuss the benefits of SAFCU membership. Safeway facilitated the discriminatory credit disability policy in particular by providing employees with the option of direct payroll deductions for their disability insurance payments and for their payments on the loans that the credit disability program insured. *Cf. Norris,* 463 U.S. at 1077, 103 S.Ct. at 3495 ("The State bears the cost of making the necessary payroll deductions and of giving employees time off to attend group meetings to learn about the plan....")

Most importantly, Safeway continued to sponsor SAFCU and to provide its employees with benefits through SAFCU even after Safeway became aware of the credit disability policy's discriminatory terms. Safeway's sponsorship and promotion of SAFCU despite its knowledge of the discriminatory terms render Safeway as culpable for discrimination as an employer who contracts with a third party for the provision of benefits on a discriminatory basis. The majority opinion attempts to distinguish Safeway's conduct from that of a "contracting employer" on the ground that Safeway lacks control over

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 523 of 898

**Morgan v. Safeway Stores, Inc., 884 F.2d 1211 (1989)**

50 Fair Empl.Prac.Cas. (BNA) 1339, 51 Empl. Prac. Dec. P 39,314, 58 USLW 2210

the terms of the discriminatory program. Yet Safeway has the same "control" over the discriminatory program as would a contracting employer; just as a dissatisfied contracting employer may select a different supplier of the benefit program, Safeway may refuse to do business with SAFCU unless the discriminatory terms are deleted. In fact, as SAFCU's only sponsor, Safeway has even more control over SAFCU than would an ordinary contracting employer because a revocation of sponsorship **\*1218** would jeopardize SAFCU's very existence. For this reason I cannot concur in an opinion holding that Title VII liability turns on an employer's "actual" control over the fringe benefit program.

I also cannot join an opinion that hinges liability on whether the employer was a party to a contract that included discriminatory terms. This reasoning allows a delegating employer to hide behind intentionally broad contractual language. Unlike the use of gender specific actuarial tables, most types of discrimination will not be readily apparent from the terms of the contract.

The linchpin of liability should be the employer's awareness that the third party is administering the program on a discriminatory basis. At that point, the employer's continued promotion and sponsorship of the program constitutes ratification of the discriminatory conduct. This court should reverse and remand this case to the district court for further proceedings to determine the extent of Safeway's knowledge of the discriminatory credit disability program.

### All Citations

884 F.2d 1211, 50 Fair Empl.Prac.Cas. (BNA) 1339, 51 Empl. Prac. Dec. P 39,314, 58 USLW 2210

### Footnotes

1    Morgan points to this court's opinion in *Norris* to support her view that "participation" does not mean the employer must have taken an active role in the third-party program specifically challenged. *Norris v. Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans,* 671 F.2d 330 (9th Cir.1982). Our opinion in *Norris,* however, does not support this view. In *Norris,* we noted Arizona could not successfully distinguish cases holding employers vicariously liable for third-party programs on the basis that the employers in those cases took an active role in administering or developing the program, because given the facts in *Norris,* Arizona's adoption of the plan constituted active participation in that plan. *Id.* at 334. Those facts included entering into a contract governing the terms of the plan. Thus no matter who developed the terms, Arizona specifically agreed to those terms by contract. Such active participation is absent here.

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 8

351 F.Supp.2d 1025
United States District Court,
D. Hawai'i.

Cynthia NOWICK, Plaintiff,

v.

Dave GAMMELL; Adventure Resorts Realty,
Inc., general partner in Mauna Loa Vacation
Ownership, a partnership; Westpro Development,
Inc., a limited partner in Mauna Loa Vacation
Ownership; Kona Hawaiian Vacation
Ownership, LLC; Shell Vacations Explorer,
Inc.; and Fairfield Resorts, Inc., Defendants.

No. CIV.02–00833 ACK/KSC.
|
Aug. 24, 2004.

**Synopsis**

**Background:** Employee brought action against limited
partnership, as employer, employee, general partner, and
limited partner, seeking punitive damages and alleging
hostile work environment and retaliation in violation of
Title VII, and negligent supervision, negligent corrective
response, and battery under state law. Employer brought
motion to dismiss. Limited partner brought motion
to dismiss and associated limited partnership brought
motion for summary judgment.

**Holdings:** The District Court, Kay, J., held that:

[1] Hawaii limited partnership law precluded liability on
behalf of limited partner for alleged discrimination by co-
employee;

[2] Title VII harassment or retaliation claim could not be
brought in lawsuit against associated limited partnership
which was not named in Equal Employment Opportunity
Commission (EEOC) complaint;

[3] Court retained subject matter jurisdiction over
employee's state law claims against associated limited
partnership; and

[4] employee could not establish prima facie case
of negligent supervision against associated limited
partnership.

Motions granted.

**Attorneys and Law Firms**

**\*1028** David F. Simons, The Law Offices of David F.
Simons, Honolulu, HI, for Plaintiff.

Dennis W. King, William J. Deeley, Charles R. Prather,
Deeley King & Pang, Nadine Y. Ando, David J.
Minkin, Wendy F. Hanakahi, McCorriston Miller Mukai
MacKinnon LLP, Honolulu, HI, for Defendants.

*ORDER (1) GRANTING DEFENDANT WESTPRO*
*DEVELOPMENT, INC.'S MOTION TO DISMISS*
*AND (2) GRANTING DEFENDANT KONA*
*HAWAIIAN VACATION OWNERSHIP LLC'S*
*MOTION FOR SUMMARY JUDGMENT*

KAY, District Judge.

*BACKGROUND*

The matters before this Court arise on a motion
to dismiss[1] filed by Defendant **\*1029** Westpro
Development, Inc. ("Westpro") and a motion for
summary judgment filed by Defendant Kona Hawaiian
Vacation Ownership LLC ("KHVO") in Title VII
lawsuit. The facts are largely undisputed, and the
Court summarizes them as follows. Between January
1999 and June 4, 2000 Plaintiff was employed by
Mauna Loa Vacation Ownership ("MLVO"),[2] a Hawaii
Limited Partnership[3] that marketed timeshare interests
in property.[4] During this time, Defendant Adventure
Resorts Realty, Inc. ("Adventure Resorts")[5] was the
general partner in MLVO, and Defendant Westpro[6] was
the limited partner.[7]

Plaintiff asserts that between August 1999 and her
termination in June 2000, she was sexually harassed
by her co-worker, Defendant David Gammell. Plaintiff
**\*1030** states that although she felt frightened, and the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

harassment severely interfered with her job performance, her supervisors refused to intervene, despite her repeated requests for assistance. She asserts that in early June 2000, she "blew her top" at Linda Beauchamp, one of her supervisors, with whom she had a number of discussions regarding Defendant Gammell's behavior. Plaintiff alleges that after she had an argument with a co-worker on June 4, 2000, she was terminated by Beauchamp, even though her co-worker was not. [8]

On November, 20, 2001, Plaintiff filed a charge of discrimination with the Hawaii Civil Rights Commission ("HCRC") and Equal Employment Opportunity Commission ("EEOC"). In her HCRC/EEOC Complaint, which was filed only against MLVO, Plaintiff asserted that she was subjected to intolerable sexual harassment and "retaliation harassment," and that no corrective action was taken, even though her supervisors were aware of the harassment. She further asserted that she was terminated by her supervisor Linda Beauchamp on June 4, 2000 for "misconduct and use of profanity," even though she was not the one yelling or using profanity and was the only one fired.

After receiving her Notice of Right to Sue dated November 11, 2002, Plaintiff filed a Complaint in this Court on December 27, 2002. She named the following as defendants: (1) Dave Gammell; (2) Adventure Resorts; (3) Westpro; (4) Shell Vacations Explorer, Inc. ("Shell Vacations"); [9] and (5) Fairfield, [10] and asserted the following claims: (1) Hostile Work Environment; [11] (2) Retaliation; [12] (3) Negligent Supervision; [13] (4) Negligent Corrective Response; [14] (5) Battery; [15] and (6) Punitive Damages. Plaintiff subsequently added KHVO [16] as a defendant in her Second Amended Complaint that was filed on November 7, 2003.

Defendants Adventure Resorts and Westpro filed their Second Amended Answer on March 15, 2004. Defendant KHVO filed its Answer on December 19, 2003, along with its Cross–Claim against **\*1031** Defendants Adventure Resorts and Westpro.

Defendant Westpro filed its pending Motion to Dismiss on March 29, 2004, and Defendant KHVO filed its Motion for Summary Judgment on May 10, 2004. [17] Plaintiff filed her Oppositions to both motions on July 29,

2004. [18] Defendants Westpro and KHVO each filed their Reply on August 5, 2004.

## STANDARD

### I. *Motion to Dismiss*

In reviewing a motion to dismiss, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.1978). The Court must therefore determine whether it appears to a certainty under existing law that no relief can be granted under the set of facts pleaded in support of plaintiff's claims. *E.g., id.*

Dismissal is appropriate if the complaint (1) fails to state a cognizable legal theory or (2) fails to allege sufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

The Court will accept a plaintiff's well-pleaded allegations as true and view them in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir.1986). Accordingly, the complaint must stand unless it appears beyond doubt that a plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Balistreri,* 901 F.2d at 699.

The Court is not bound to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Nor will the Court "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated ... laws in ways that have not been alleged." *Associated Gen. Contrs. of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

[1] Where the district court goes beyond the pleadings to resolve an issue, the motion properly is treated as one for summary judgment. [19] Fed.R.Civ.P. 12(b); *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir.1989).

**\*1032  II.** *Motion for Summary Judgment*

 **[2]**   The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [20]  Fed.R.Civ.P. 56(c).

 **[3]**   "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [21]  *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by " 'showing'— that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

 **[4]**   Once the moving party satisfies its burden, however, the nonmoving party **\*1033**  cannot simply rest on the pleadings or argue that any disagreement or

"metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348; *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.,* 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence" in support. *T.W. Elec. Serv.,* 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. [22]  *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## DISCUSSION

**I.** *Defendant Westpro's Motion to Dismiss* [23]

 **[5]**   Defendant Westpro asks the Court to dismiss Plaintiff's claims against it because Westpro is a limited partner in MLVO, Plaintiff's employer, and therefore cannot be held liable to Plaintiff.

During the time of Plaintiff's employment with MLVO, Hawaii Revised Statutes ("H.R.S.") § 425D–303(a) [24]  provided that

> Except as provided in subsection (d), [25]  a limited partner is not liable for the obligations of a limited partnership unless the limited partner is also a general partner or, in addition to the exercise of the limited partner's rights and powers as a limited partner, the limited partner participates in the control of the business. However, if the limited partner participates in the control of the business, the limited partner is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner.

In her Second Amended Complaint, Plaintiff does not allege that Defendant Westpro "participate[d] in the control of [MLVO]," and thus does not overcome Westpro's protection from responsibility for obligations incurred by MLVO set forth under H.R.S. § 425D–

303. However, in her Opposition to Defendant Westpro's motion to dismiss, Plaintiff asserts that two legal bases exist upon which Defendant **\*1034** Westpro may be liable, notwithstanding its status as limited partner.

**[6]** **[7]** **[8]** **[9]** First, Plaintiff argues that Westpro formed part of an "integrated enterprise" with her employer, MLVO, and must therefore be considered her joint employer and accordingly is subject to liability under Title VII. Although the Ninth Circuit "adopted [the] four-part [integrated enterprise] test [26] to determine whether two employing entities constitute a single employer for purposes of Title VII," *Herman v. United Bhd. of Carpenters & Joiners of Am.,* 60 F.3d 1375, 1383 (9th Cir.1995) (citing *Childs v. Elec. Workers,* 719 F.2d 1379, 1382 (9th Cir.1983)), "[t]he test does not determine joint *liability* ..., but instead determines whether a defendant *can meet the statutory criteria* of an "employer" for Title VII applicability." [27] *Anderson v. Pac. Maritime Ass'n,* 336 F.3d 924, 928–29 (9th Cir.2003). Here, there is no question that MLVO, Plaintiff's direct employer, qualified as an employer under Title VII. *See* (Second Amended Complaint ¶ 9) (stating that her shift had approximately fifty persons). Thus, the integrated enterprise test is not applicable in this case. [28] *E.g., Anderson,* 336 F.3d at 929.

**\*1035** Furthermore, Plaintiff does not assert in her Second Amended Complaint that Westpro was the entity that performed the discriminatory acts alleged, and does not assert that Westpro controlled the workplace where the alleged acts occurred. The Court therefore finds it inappropriate to apply the doctrine articulated in *Sibley Mem. Hosp. v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973), and its Ninth Circuit progeny, which "extended Title VII coverage to indirect employers when those employers discriminated against and interfered with the employees' relationship with their employers." *Anderson,* 336 F.3d at 931.

**[10]** Second, Plaintiff argues that Defendant Westpro may be liable under H.R.S. 378–2(3) for "advising" MLVO on the decision to terminate Plaintiff's employment. [29] *See* (Plaintiff's Opposition to Defendant Westpro's Motion (citing *Schefke v. Reliable Collection Agency. Ltd.,* 96 Hawai'i 408, 32 P.3d 52, 85–86 (2001))). However, Plaintiff does not assert in her Second Amended Complaint that Westpro exerted any control over MLVO in contravention of its status as limited

partner. Furthermore, Plaintiff does not allege in her Second Amended Complaint that John Stevens, Ron Stevens, Brenda LeClair, or Alan Dickler, Adventure Resorts's officers and directors, actually advised or made the decision to terminate Plaintiff, and does not allege in her Second Amended Complaint that they acted in their capacity as officers and directors of Westpro. Morever, even assuming that the officers and directors made the decision to terminate Plaintiff, they "cannot 'be liable for aiding and abetting [themselves].' " *White v. Pac. Media Group,* 322 F.Supp.2d 1101, 1115 (D.Haw.2004) (quoting *Mukaida v. Hawaii,* 159 F.Supp.2d 1211, 1240 (D.Haw.2001)). Thus Plaintiff does not allege sufficient facts in her Second Amended Complaint that would establish Defendant Westpro's liability under H.R.S. § 378–2(3).

Accordingly, viewing the pleadings in the light most favorable to Plaintiff, the Court finds that her Second Amended Complaint fails to either state a cognizable legal theory or allege sufficient facts under a cognizable legal theory that would circumvent Westpro's protection under H.R.S. § 425D–303 against liability as a limited partner in MLVO. The Court therefore GRANTS Defendant Westpro's Motion to Dismiss.

## II. *Defendant KHVO's Motion for Summary Judgment*

Defendant KHVO requests the Court to grant its motion for summary judgment as to Plaintiff's Title VII claims because she did not name KHVO in her EEOC/HCRC charge and therefore failed to exhaust her administrative remedies, and KHVO was not Plaintiff's employer and therefore cannot be liable for Plaintiff's claims. Plaintiff counters that it was unnecessary for her to name KHVO in her EEOC/HCRC charge, and genuine issues of fact exist as to whether KHVO was Plaintiff's joint employer with MLVO.

### A. *Title VII Claims (Hostile Work Environment, Retaliation)*

**[11]** **[12]** Plaintiff did not name KHVO in her EEOC/HCRC charge that she filed **\*1036** on November 20, 2000. Generally, Title VII claimants "may only sue [parties] named in the EEOC charge because only those [parties] named had an opportunity to respond to the charges during the administrative proceedings." *Sosa v. Hiraoka,* 920 F.2d 1451, 1458 (9th Cir.1990). However, the

Ninth Circuit has recognized a number of exceptions to the general rule that could apply to the present case. [30]

**[13]** First, Title VII claims may be brought in a lawsuit against persons not named in an EEOC complaint "as long as they were involved in the acts giving rise to the EEOC claims." *Wrighten v. Metro. Hosp., Inc.,* 726 F.2d 1346, 1352 (9th Cir.1984); *Chung,* 667 F.2d 788, 792 (9th Cir.1982). Plaintiff does not allege or bring forth evidence that KHVO was directly involved with her harassment claim or her retaliation claim. Moreover, even though Adventure Resorts and Westpro were the sole members of both KHVO and MLVO, KHVO is a legal entity distinct from its members. Haw.Rev.Stat. § 428–201. The Court therefore finds this exception inapplicable.

**[14]** Second, a Title VII claimant may also sue an unnamed party if "facts in the EEOC charge are alleged from which it could be inferred that the unnamed party violated Title VII." *Wangler v. Haw. Elec. Co.,* 742 F.Supp. 1458, 1462 (D.Hawai'i 1990) (citing *Bernstein v. Aetna Life & Casualty,* 843 F.2d 359, 362 (9th Cir.1988)); *Bratton v. Bethlehem Steel Corp.,* 649 F.2d 658, 666 (9th Cir.1980). Plaintiff's EEOC charge does not mention KHVO, or even hint that KHVO is involved in the underlying facts, but rather asserts that she was sexually harassed at work by Dave Gammell and retaliated against by her supervisor, Linda Beauchamp, who were both employees of MLVO. Thus, Plaintiff does not allege facts in her EEOC charge from which it can be inferred that KHVO violated Title VII, and the Court accordingly finds that this exception does not apply.

**[15]** Third, "if the respondent named in the EEOC charge is a principal or agent of the unnamed party, or if they are 'substantially identical parties,' suit may proceed against the unnamed party." *Sosa,* 920 F.2d at 1460 (quoting 2 A. Larson, Employment Discrimination § 49.11(c)(2)). Here, the Notice of Charge of Discrimination was addressed to Ms. Edye Morehouse, Director of Human Resources at MLVO. Plaintiff does not bring forth evidence that either Ms. Morehouse or MLVO was a principal or agent of KHVO. Furthermore, the circumstances under which the Ninth Circuit has applied the "substantially identical" exception are not analogous to those here. As the Ninth Circuit explained in *Sosa v. Hiraoka:*

> [W]e have previously applied the exception for "substantially

identical" parties when in *Chung* we permitted suit against doctors not named in the EEOC charge and whose only apparent role in the denial of promotions was as directors of the hospital named in the charge. *See Chung,* 667 F.2d at 790, 792; *see also Kaplan v. Int'l Alliance of Theatrical & Stage Employees & Motion Picture Machine Operators,* 525 F.2d [1354,] 1359 [ (9th Cir.1975) ] (international union was subject to Title VII suit where EEOC charge identified only the union local as a respondent). In Sosa's case, the trustees govern the District, **\*1037** the entity Sosa named as respondent in his EEOC charge, just as the director-doctors governed the hospital named as respondent in Chung's EEOC charge. *See* Cal. Educ.Code. § 72200. Therefore the trustees and the District could well be "substantially identical parties," thus exposing the trustees to Sosa's court action. The district court therefore erred in dismissing Sosa's claims against the individually-named trustees.

920 F.2d at 1459–60. Plaintiff does not bring forth evidence that KHVO governed the operations of MLVO, and thus does not establish that the Court should apply the "substantially identical" exception to this case.

**[16]** Fourth, "if the unnamed party had notice of the EEOC conciliation efforts and participated in the EEOC proceedings, the suit may proceed against the unnamed party." *Id.* (citing 2 A. Larson at § 49.11(c) (2)). However, KHVO did not participate in the EEOC proceedings. As discussed *supra,* even though Adventure Resorts and Westpro were the sole members of both KHVO and MLVO, KHVO is a separate legal entity from its members. Thus, this exception does not apply to this case.

**[17]** **[18]** Fifth, "where the EEOC or the [previously unnamed] defendants themselves 'should have anticipated' that the claimant would name those defendants in a Title VII suit, the court has jurisdiction

over those defendants even though they were not named in the EEOC charge." *Sosa,* 920 F.2d at 1459 (quoting *Chung v. Pomona Valley Community Hosp.,* 667 F.2d 788, 792 (9th Cir.1982)). As discussed *supra,* none of the other exceptions apply to this case. Furthermore, Plaintiff does not establish a direct or indirect employment relationship with KHVO. [31] Even though Plaintiff asserts that she provided telemarketing services for KHVO during the time of the alleged harassment, she does not bring forth any evidence of the primary factor in determining whether an employment relationship exists —"the extent of [KHVO's] right to control the means and manner of the worker's performance." *Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1293 (9th Cir.1999) (citing *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980)). She does not assert or bring forth evidence that KHVO discriminated against her and interfered with her employment relationship with MLVO, *see Anderson,* 336 F.3d at 931, and does not bring forth any evidence [32] that establishes any special circumstances that would allow attribution of MLVO's alleged liability under Title VII to KHVO. *Cf. supra* note 28 (discussing the attribution of MLVO's alleged liability to Defendant Westpro). The Court accordingly finds that neither the EEOC nor KHVO should have anticipated that Plaintiff would name KHVO in a Title VII lawsuit and therefore finds this exception inapplicable.

Thus, viewing the facts in the light most favorable to Plaintiff, the Court finds that none of the exceptions enumerated by the Ninth Circuit applies to the present case. Moreover, as discussed *supra,* Plaintiff **\*1038** does not show the existence of a direct or indirect employment relationship with Defendant KHVO and thus cannot establish that Title VII even applies to KHVO in this case. *E.g., Adcock,* 166 F.3d at 1292 (quoting *Lutcher,* 633 F.2d at 883) (citing *Baker v. McNeil Island Corr. Ctr.,* 859 F.2d 124, 127 (9th Cir.1988)). The Court accordingly finds that no genuine issues of material fact exist, and that Defendant is entitled to judgment as a matter of law that (1) Plaintiff failed to exhaust her administrative remedies against KHVO and is thus barred from bringing her Title VII claims against KHVO; and (2) Plaintiff does not establish the applicability of Title VII to KHVO in the instant matter. The Court therefore GRANTS Defendant KHVO's Motion for Summary Judgment as to Plaintiff's Title VII claims.

## B. *State Law Claims (Hostile Work Environment, Retaliation, Negligent Supervision, Negligent Corrective Response)* [33]

**[19]** **[20]** Plaintiff also raises a number of state law claims against Defendant KHVO, which include claims based on H.R.S. ch. 378, which corresponds to Title VII, and claims based on negligence. Defendant KHVO asks the Court to dismiss these claims for lack of subject matter jurisdiction. However, the Court has not dismissed Plaintiff's federal law claims against Defendant Adventure Resorts, and therefore retains jurisdiction over Plaintiff's state law claims against Defendant KHVO, as they arise from the same transaction or occurrence. Nevertheless, because Defendant KHVO requested summary judgment as to all Plaintiff's claims, the Court discusses her state law claims against KHVO.

**[21]** First, with respect to Plaintiff's H.R.S. ch. 378 claims, the above discussion of her failure to name KHVO in her EEOC/HCRC charge applies to these claims, and the Court therefore finds that Plaintiff is similarly barred from bringing her H.R.S. ch. 378 claims against KHVO. [34] *See White,* 322 F.Supp.2d at 1115.

**[22]** Second, as to Plaintiff's negligent supervision claim, she does not establish the existence of any employment relationship, as discussed *supra.* Lacking an employment relationship, Plaintiff cannot establish a prima facie case of negligent supervision against KHVO. *Cf. Fraser v. County of Maui* 855 F.Supp. 1167, 1184 (D.Haw.1994) ("The relationship of employer and employee may, under certain circumstances, create a duty on the employer to control the conduct of the employee." (quoting *Abraham v. S.E. Onorato Garages,* 50 Haw. 628, 50 Haw. 639, 446 P.2d 821, 826 (Hawai'i 1968))).

**\*1039** **[23]** Third, as to Plaintiff's negligent corrective response claim, the Court initially notes that this "claim" actually comprises an essential element of her claim of hostile environment claim. *E.g. Swinton v. Potomac Corp.,* 270 F.3d 794, 803 (9th Cir.2001) (explaining that where "a harasser is ... a co-worker, the plaintiff must prove that the employer was negligent, i.e., that the employer knew or should have known of the harassment but did not take adequate steps to address it." (citing *Nichols v. Azteca Restaurant Enters.,* 256 F.3d 864, 875 (9th Cir.2001))). Moreover, Hawaii law has not recognized negligent corrective response as an independent tort. Finally, even if

such a claim was recognized, it would necessarily require showing that an employment relationship existed, and as with Plaintiff's negligent supervision claim, Plaintiff could not set forth her prima facie case. Accordingly, the Court finds that Plaintiff cannot establish that she is entitled to relief under this claim.

Thus, viewing the facts in the light most favorable to Plaintiff, the Court finds that no genuine issues of material fact exist and that Defendant KHVO is entitled to judgment as a matter of law that Plaintiff (1) failed to exhaust her administrative remedies and is therefore barred from raising her H.R.S. ch. 378 claims against Defendant KHVO; (2) cannot establish a prima facie case of negligent supervision against Defendant KHVO; and (3) cannot show that she is entitled to relief under a claim for negligent corrective response. The Court thus GRANTS Defendant KHVO's Motion for Summary Judgment as to Plaintiff's state law claims.

### C. *Punitive Damages*

As the Court has granted Defendant KHVO's Motion for Summary Judgment as to Plaintiff's Title VII and state law claims, no basis exists for her claim for punitive damages under either federal or state law. The Court therefore GRANTS Defendant KHVO's Motion for Summary Judgment as to Plaintiff's punitive damages claim.

### *CONCLUSION*

For the foregoing reasons, the Court (1) GRANTS Defendant Westpro's Motion to Dismiss,[35] and (2) GRANTS Defendant KHVO's Motion for Summary Judgment.

The Court notes that the following claims remain:

(1) Plaintiff's Hostile Work Environment claim under Title VII and H.R.S. ch. 378 against Defendants Adventure Resorts Realty, Inc., Shell Vacations Explorer, Inc., and Fairfield resorts, Inc.;

(2) Plaintiff's Retaliation claim under Title VII and H.R.S. ch. 378 against Defendants Adventure Resorts Realty, Inc., Shell Vacations Explorer, Inc., and Fairfield resorts, Inc.;

(3) Plaintiff's Negligent Supervision claim under state law against Defendants Adventure Resorts Realty, Inc., Shell Vacations Explorer, Inc., and Fairfield resorts, Inc.;

(4) Plaintiff's Negligent Corrective Response claim under Title VII and H.R.S. ch. 378 against Defendants Adventure Resorts Realty, Inc., Shell Vacations Explorer, Inc., and Fairfield resorts, Inc.;

(5) Plaintiff's Battery claim under state law against Defendant Gammell;

(6) Plaintiff's Punitive Damages claim under federal and state law against Defendants Adventure Resorts Realty, Inc., Shell Vacations Explorer, Inc., and Fairfield Resorts, Inc.; and

**\*1040** (7) Defendant Kona Hawaiian Vacation Ownership, LLC's cross-claim against Defendants Adventure Resorts Realty, Inc. and Westpro Development, Inc.

IT IS SO ORDERED.

### All Citations

351 F.Supp.2d 1025

### Footnotes

1    The Court initially notes that Defendant Westpro's Motion to Dismiss, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is technically untimely, because it was filed after Westpro answered the complaint. Wright & Miller, Fed. Prac. & Proc. § 1361 (2d ed. 1990 & Supp.2004) (Timing of Rule 12(b) Motions). However, for a number of reasons, the Court will still consider the motion as a 12(b)(6) motion, rather than construe it as 12(c) motion for judgment on the pleadings.

First, Defendant Westpro stated in its Answer, as its first defense, that "[t]he Complaint fails to state a claim against Defendants upon which relief can be granted." *Id.* (stating that "federal courts have allowed untimely motions if the defense has been previously included in the answer"). Second, F.R.C.P. 12(h)(2) "expressly preserves[, inter alia] the [12(b)(6) defense of failure to state a claim for relief]" against waiver during the pleading, motion, discovery, and trial

stages of the action." Wright & Miller, Fed. Prac. & Proc. § 1392 (2d ed. 1990 & Supp.2004) (Rule 12(h)(2)). Third, if a 12(b)(6) defense is raised in a 12(c) motion, the district court should "apply the same standards for granting the appropriate relief or denying the motion as it would have employed had the motion been brought prior to the defendant's answer." Wright & Miller, Fed. Prac. & Proc. § 1367 (2d ed. 1990 & Supp.2004) (Judgment on the Pleadings—In General) (explaining that "[t]he mere fact that these procedural defects are raised in the guise of a Rule 12(c) motion should not affect the manner by which [a] court determines what essentially are Rule 12(b) matters").

2    Plaintiff does not name MLVO as a defendant in this case.

3    The Court notes that the parties occasionally incorrectly refer to MLVO as a limited liability company.

4    On July 22, 2002, MLVO sold its time share inventory. Although Plaintiff asserts in her Second Amended Complaint that Defendant Shell Vacations Explorer, Inc. ("Shell Vacations") purchased the MLVO inventory, Defendants Adventure Resorts and Westpro assert that Defendant Fairfield Resorts, Inc. ("Fairfield") purchased the MLVO inventory. The Court notes that this discrepancy is not germane to the pending motions, and therefore does not create a genuine issue of material fact.

5    Adventure Resorts is a Hawaii corporation, owned entirely by John R. Stevens. Its officers are John R. Stevens (President), Ron L. Stevens (Vice–President), and Brenda L. LeClair (Secretary/Treasurer). Adventure Resorts is controlled by John R. Stevens as CEO, Alan Dickler as COO, and Steve Dickson as Broker.

6    Westpro is a Nevada corporation, owned by John R. Stevens (97%) and Ron L. Stevens (3%). Its officers are Alan Dickler (President), Ron L. Stevens (Vice–President), and Brenda L. LeClair (Secretary/Treasurer). Westpro is controlled by John R. Stevens as Chairman, Alan Dickler, and Ron L. Stevens.

7    MLVO filed its Certificate of Limited Partnership with the Hawaii Department of Commerce and Consumer Affairs ("DCCA") on November 30, 1995, which listed Mauna Loa Enterprises as general partner and Woodbine Investors, Inc. as limited partner. *See* (Exh. "A" to Defendant Westpro's Motion to Dismiss).

On September 26, 1997, MLVO filed a Certificate of Limited Partnership with the DCCA, which changed the general partner to Mauna Loa Village Resort, Inc., and changed the limited partner to Westpro Development, Inc. *See* (Exh. "B" to Defendant Westpro's Motion to Dismiss).

At some later time, the general partner was changed to Adventure Resorts Realty, Inc.

8    Plaintiff claims that Defendant Gammell's harassment continued after her termination, and that she was forced to obtain a temporary restraining order against him.

9    Plaintiff has not served Shell Vacations.

10   Plaintiff has not served Fairfield.

11   Plaintiff asserts her hostile work environment claim under both Title VII and H.R.S. § 378–2 against all Defendants except Defendant Gammell.

12   Plaintiff asserts her retaliation claim under both Title VII and H.R.S. § 378–2 against all Defendants except Defendant Gammell.

13   Plaintiff asserts her state law claim of negligent supervision against all Defendants except Defendant Gammell.

14   Plaintiff asserts her negligent corrective response claim against all Defendants except Defendant Gammell. As discussed *infra,* this claim actually comprises an essential element of her hostile work environment claim under Title VII and H.R.S. § 378–2. Furthermore, Hawaii courts have not recognized it as a separate cause of action.

15   Plaintiff asserts her state law battery claim only against Defendant Gammell.

16   KHVO is a Limited Liability Corporation that was formed on December 20, 1999. Its original members were Mauna Loa Resorts, Inc. (a Montana corporation), and Defendant Westpro (a Nevada corporation).

At some time between December 20, 1999 and February 22, 2001, Mauna Loa Resorts, Inc. was replaced by Defendant Adventure Resorts (a Hawaii corporation), who was then listed as KHVO's managing member.

On July 25, 2002, Defendants Adventure Resorts and Westpro sold their interest in KHVO to Defendant Fairfield (a Delaware corporation).

17   Although the motions were originally consolidated for hearing on June 14, 2004, the motions were continued until August 16, 2004 because of the suspension of Plaintiff's then-attorney.

18   Defendant KHVO filed its Statement of No Position as to Defendant Westpro's Motion to Dismiss on July 29, 2004; Defendant Westpro filed its Statement of No Position as to Defendant KHVO's Motion for Summary Judgment on August 2, 2004.

19   The Court confined its factual investigation to the allegations stated in the Second Amended Complaint and, therefore does not convert Defendant Westpro's motion into a motion for summary judgment. *See, e.g., Keams v. Tempe Tech. Inst., Inc.,* 110 F.3d 44, 46 (9th Cir.1996).

Although Defendant Westpro attached copies of its Certificate of Limited Partnership filed November 30, 1985 and Certificate of Amendment of Limited Partnership filed September 27, 1997 to its Motion to Dismiss, the Court need not rely on this evidence, as Plaintiff acknowledged in the caption of her Second Amended Complaint that Defendant Adventure Resorts is general partner in MLVO and Defendant Westpro is a limited partner in MLVO. Moreover, even if the Court were to consider this evidence, "[f]ederal courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss." *Davis v. Bayless,* 70 F.3d 367, 372 n. 3 (5th Cir.1995) (citing *Cinel v. Connick,* 15 F.3d 1338, 1343 n. 6 (5th Cir.1994)).

The Court further notes that although Plaintiff referenced and incorporated portions of her Concise Statement of Facts filed with her Opposition to Defendant KHVO's Motion for Summary Judgment, her counsel represented at the hearing that this was done to show an example of facts which show she is entitled to proceed. The Court does not rely on Plaintiff's CSF in deciding Defendant Westpro's Motion to dismiss, and therefore finds that converting the Motion to Dismiss into a Motion for Summary Judgment is not warranted. *E.g., Davis,* 70 F.3d at 372 n. 3 (citing *Ware v. Associated Milk Producers, Inc.,* 614 F.2d 413, 415 (5th Cir.1980)). In any event, the facts set forth in the CSF do not appear to show that Plaintiff is entitled to proceed. Moreover, at the hearing, counsel for Plaintiff requested that the Court not convert Westpro's motion to dismiss in to a summary judgment motion.

20 Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

21 Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1478 (9th Cir.1986).

22 When the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on the motion for summary judgment." *UA Local 343 of the United Ass'n of Journeymen & Apprentices v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994). Upon showing a prima facie case, it becomes "incumbent on [the nonmoving party] to 'set forth specific facts showing that there is a genuine issue for trial,' by evidence cognizable under that rule." *Id.* (quoting Fed.R.Civ.P. 56(e)).

23 The Court again notes that it did not convert Westpro's motion to dismiss into a motion for summary judgment. *See supra* note 19.

24 H.R.S. § 425D–303 was repealed and replaced by § 425E–303 as of July 1, 2004.

25 The Court notes that this exception is inapplicable to the facts of the present case, as H.R.S. § 425D–303(d) provides that: A limited partner who knowingly permits the limited partner's name to be used in the name of the limited partnership, except under circumstances permitted by section 425D–102, is liable to creditors who extend credit to the limited partnership without actual knowledge that the limited partner is not a general partner.

26 A court applying this test must examine the following four factors: " '(1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control.' " *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 815 (9th Cir.2002) (quoting *Childs v. Local 18, Int'l Bhd. of Elec. Workers,* 719 F.2d 1379, 1382 (9th Cir.1983)). "The third factor, centralized control of labor relations, is the 'most critical.' " *Id.* (citing *Hukill v. Auto Care, Inc.,* 192 F.3d 437, 442 (4th Cir.1999); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995); *Childs,* 719 F.2d at 1382).

27 The Ninth Circuit explained that Title VII applies to an employer only if that employer employs 15 or more employees. A plaintiff with an *otherwise cognizable Title VII claim* against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15–employee minimum standard. We use the integrated enterprise test to determine the magnitude of interconnectivity *for determining statutory coverage.*
*Anderson v. Pac. Maritime Ass'n,* 336 F.3d 924, 928–29 (9th Cir.2003) (citations omitted) (emphasis added) (citing 42 U.S.C. § 2000e(b); *Clackamas Gastroenterology Assocs., P.C. v. Wells,* 538 U.S. 440, 441 n. 1, 123 S.Ct. 1673, 1676 n. 1, 155 L.Ed.2d 615 (2003); *Kang,* 296 F.3d at 815–16; *Herman,* 80 F.3d at 1383; *Childs,* 719 F.2d at 1382).

28 Although other Circuits have used the integrated enterprise test to establish the liability of a parent company for a subsidiary's violation of Title VII, *e.g., Knowlton v. Teltrust Phones, Inc.,* 189 F.3d 1177, 1185 (10th Cir.1999), the Ninth Circuit has not done so, and the Court declines to extend the application of the test here.
Furthermore, "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary." *Watson v. Gulf & W. Indus.,* 650 F.2d 990 (9th Cir.1981) (citing *Hassell v. Harmon Foods, Inc.,* 336 F.Supp. 432 (W.D.Tenn.1971), *aff'd* 454 F.2d 199 (6th Cir.1972); *Lottice v. Ingersoll–Rand Co.,* 14 Fair Empl. Prac. Cas. 708 (N.D.Cal.1977)), *quoted in Ass'n of Mexican–Am. Educators ("AMAE") v. California,* 231

F.3d 572, 582 (9th Cir.2000); *see also United States v. Bestfoods,* 524 U.S. 51, 69–70, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (explaining, in a CERCLA case, that "[i]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts" (citing *Am. Protein Corp. v. AB Volvo,* 844 F.2d 56, 57 (2d Cir.1988); *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.,* 31 F.2d 265, 267 (2d Cir.1929); Henn & Alexander, Laws of Corporations 355 (3d ed.1983))), *quoted in Doe v. Unocal Corp.,* 248 F.3d 915, 925–26 (9th Cir.2001). Here, similarly to *Watson,* Plaintiff does not assert in her Second Amended Complaint that "[Westpro] participated in or influenced the employment policies of [MLVO], or [that Westpro and Adventure Resorts] had undercapitalized [MLVO] in a way that defeated potential recovery by a Title VII plaintiff." *Watson,* 650 F.2d at 993; *AMAE,* 231 F.3d at 582 (quoting *Watson,* 650 F.2d at 993). Thus, Plaintiff does not allege any special circumstances in her Second Amended Complaint that would allow attribution of MLVO's alleged liability under Title VII to Westpro.

29    H.R.S. § 378–2(3) prohibits "any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so."

30    Although Plaintiff argues that the Court should apply the "identity of interest" test used by the Second Circuit in determining whether a Title VII suit may proceed against unnamed defendants, *e.g., Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir.1995); *Johnson v. Palma,* 931 F.2d 203 (2d Cir.1991), the Ninth Circuit has not adopted this test, and the Court declines to apply it here.

31    As discussed with respect to Defendant Westpro, the integrated enterprise test does not apply here. *See supra* Discussion Section I.

32    Although Plaintiff asserts in her Answers to Defendant KHVO's First Interrogatories that "I was doing telesales for [KHVO]," and that "[t]here was an obvious connection between MLVO and KHVO," uncorroborated allegations and self-serving testimony do not suffice to create a genuine issue of material fact. *Villiarimo,* 281 F.3d at 1061; *T.W. Elec. Serv.,* 809 F.2d at 630. The Court further reiterates that legal memoranda and oral argument are not evidence and do not create issues of fact. *British Airways Bd.,* 585 F.2d 946.

33    Defendant KHVO asserts that no diversity jurisdiction exists because it is a citizen of Hawaii, the same as Plaintiff's. Although considerations of diversity are not relevant to this case, because Defendant Adventure Resorts is incorporated in Hawaii, thus destroying diversity, the Court nevertheless notes that because KHVO is a limited liability *company,* its citizenship is that of its member(s), not its place of formation. *See Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 124 S.Ct. 1920, 1932 n. 1, 158 L.Ed.2d 866 (2004); Wright et al., Fed. Prac. & Proc. § 3630 (2d ed. 1984 & Supp.2004) (Unincorporated Associations). The Court further notes that although at the time Plaintiff filed her original Complaint, KHVO's member, Fairfield, was incorporated in Delaware, the parties have not set forth Fairfield's principal places of business, and therefore the Court cannot fully determine its citizenship and consequently cannot determine KHVO's citizenship.

34    The Court nevertheless notes that its discussion of the applicability of H.R.S. § 378–2(3) with respect to Defendant Westpro would also apply to Defendant KHVO. *See supra* Discussion Section I.

35    The Court grants Plaintiff thirty days leave to seek to amend her complaint.

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 9

2015 WL 6551870
United States District Court,
C.D. California.

Nancy Reyes
v.
Healthcare Services Groups, Inc, et al.

Case No. 2:15-cv-07177-CAS-KLS
|
Filed 10/26/2015

**Attorneys and Law Firms**

Attorneys Present for Plaintiffs: Jay Rothman.

Attorneys Present for Defendants: Aaron Colby, Matthew Peterson.

**Proceedings:** DEFENDANTS' MOTION TO DISMISS (Dkt. 11, filed September 18, 2015)

The Honorable CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

**\*1 I. INTRODUCTION**

On August 13, 2015, plaintiff Nancy Reyes ("Reyes") filed this action in Los Angeles County Superior Court against defendants Healthcare Services Group, Inc. ("HCSG"), and Does 1 through 50 (collectively, "defendants"). Dkt. 1-1. Defendants removed this action to this Court on September 11, 2015. Dkt. 1. The complaint asserts claims for: (1) quid pro quo sexual harassment, in violation of the Fair Employment and Housing Act ("FEHA"), California Government Code § 12940, et seq; (2) hostile work environment in violation of FEHA; (3) discrimination on the basis of sex in violation of FEHA; (4) retaliation in violation of FEHA; (5) failure to prevent discrimination, harassment, and retaliation in violation of FEHA; and (6) intentional infliction of emotional distress. Id. In brief, the complaint alleges that one of defendants' employees sexually harassed plaintiff by offering her employment in exchange for sexual intercourse.

On September 18, 2015, defendants filed a motion to dismiss the complaint. Dkt. 11. On October 5, 2015, plaintiff filed an opposition, Dkt. 13, and on October 9, 2015, defendants filed a reply, Dkt. 14. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

**II. BACKGROUND**

The complaint alleges the following facts: HCSG is a Pennsylvania corporation that provides housekeeping and laundry services to senior living centers and nursing homes throughout the country. Compl. ¶ 2. HCSG contracts with Country Villa Sheraton and Nursing Rehab Center ("Country Villa") to perform janitorial work at Country Villa facilities. Id. ¶ 9. Plaintiff contends that Brian Dehart ("Dehart") is employed by HCSG as its hiring manager and that in this position he is responsible for hiring various employees for HCSG, including for janitorial positions at Country Villa facilities. See Id. ¶¶ 6, 10.

On or about August 29, 2013, plaintiff contacted Dehart on Facebook regarding a janitorial position at a Country Villa facility he had posted on Facebook. Id. ¶¶ 9, 10. Plaintiff was in desperate need of employment and asked Dehart, via Facebook, whether she could apply for the position. Id. ¶ 11. She informed Dehart that she was not born in the United States and had recently applied for a visa and work permit, but that she would not receive these documents for several months. Id. Dehart responded to plaintiff that he was in charge of the hiring for the position and that if she wanted the job she would need to do "whatever he wants." Id. ¶¶ 11-12. Specifically, he told her that if she had sexual intercourse with him she would be hired for the position. Id. ¶ 12. He also told her to "wear something sexy" and to come to one of the Country Villa facilities the following morning. Id. Following their Facebook conversation, Dehart sent plaintiff text messages promising to hire her in return for sexual intercourse. Id. ¶ 13.

On or about August 30, 2013, plaintiff went to a Country Villa facility in North Hills, California and met with Dehart. Id. ¶ 14. Plaintiff filled out a job application, with Dehart's assistance, and then had sexual intercourse with him. Id. Notwithstanding Dehart's promise, approximately two to three weeks later, plaintiff had heard nothing from either Dehart or HCSG regarding the position at the Country Villa facility. Id. ¶ 16. Accordingly, plaintiff once again reached out to Dehart. Id. Dehart informed plaintiff that he had been moved to another Country Villa facility in Sylmar, California. Id. Dehart told plaintiff to come to the Sylmar facility to

complete a new job application and again told her that if she had sex with him she would be hired. Id. ¶ 17.

**\*2** Sometime in November 2013, plaintiff went to the Country Villa facility in Sylmar, California. Id. ¶ 18. Plaintiff filled out another job application and then had sexual intercourse with Dehart. Id. This was plaintiff's "last encounter" with Dehart. Id. ¶ 19. Since then plaintiff has not received any response, nor has she been offered employment, from either Dehart or HCSG. Id. Plaintiff asserts that she would not have had sexual intercourse with Dehart in either August or November of 2013 but for his representation that he would hire her. Id. ¶¶ 15, 18.

On March 3, 2014, plaintiff filed a complaint with the California Department of Fair Employment and Housing ("DFEH") regarding these events. Compl. Ex. A. Plaintiff requested an immediate right to sue from DFEH and received one on the same day she filed her complaint. Id. On October 28, 2014, plaintiff filed a lawsuit in Los Angeles County Superior Court against Dehart and Country Villa asserting claims for violation of FEHA and intentional infliction of emotional distress. See Compl. ¶ 5,6; Request For Judicial Notice ("RJN") Ex. 1.[1] That action is still pending. Compl. ¶ 5,6.

On August 7, 2015, plaintiff ammended her DFEH complaint to add HCSG as a respondent. Compl. Ex. A. In her amendment, plaintiff stated: "It has been discovered that Mr. Dehart was an employee of [HCSG] at the time he harassed me and that [Country Villa] contracted with [HCSG] to do its housekeeping and janitorial services. As such, [HCSG] is also responsible for the conduct of Dehart." Compl. Ex. A. On August 13, 2015, plaintiff filed this action naming HCSG as a defendant. See generally Compl.

## III. LEGAL STANDARD

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.' " Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

**\*3** Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); see Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when

"the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV. ANALYSIS

### A. Plaintiff's Claims under FEHA

Plaintiff's first five claims are based on alleged violations of FEHA. Defendants contend that all of plaintiff's claims brought under FEHA must be dismissed because plaintiff failed to timely exhaust her administrative remedies. Mot., at 3. Before a plaintiff can file a civil action based on violations of FEHA she must exhaust her administrative remedies "by filing a complaint with the Department of Fair Employment and Housing," and obtaining from DFEH "a notice of right to sue." Morgan v. Regents of the Univ. of California, 88 Cal. App. 4th 52, 63 (2000) (citing Cal. Gov. Code § 12960). The FEHA provides that "[n]o complaint may be filed [with DFEH] after the expiration of one year from the date upon which the alleged unlawful practice ... occurred." Cal. Gov. Code § 12960(d).

Here, plaintiff alleges that her "last encounter" with Dehart occurred in November of 2013. Compl. ¶ 19. However, she did not file her amended complaint with DFEH naming HCSG as a defendant until August 7, 2015, more than one year after defendants' alleged violations of FEHA. Compl. Ex. A. Accordingly, absent an exception or a valid grounds for tolling the one-year limitations period, plaintiff did not timely exhaust her administrative remedies and her FEHA claims must be dismissed.

Section 12960 contains four statutory exceptions to the one year limitations period. See Cal. Gov. Code §§ 12960(d)(1)-(4). However, in her opposition, plaintiff only argues that the limitations period should be extended pursuant to section 12960(d)(2).[2] Section 12960(d)(2) provides for an extension of up to one year, "following a rebutted presumption of the identity of the person's employer under [California Government Code] section 12928, in order to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." Pursuant to section 12928, "there is a rebuttable presumption that "employer," ... includes any person or entity identified as the employer on the employee's Federal Form W-2 (Wage and Tax Statement)."

*4 Plaintiff appears to argues that the section 12960(d)(2) extension should apply broadly to cases where a plaintiff misidentifies an employer. Opp'n., at 3. Here, plaintiff contends that she misidentified Dehart's employer as Country Villa as opposed to HCSG. Id. The California Supreme Court has explained the section 12960(d)(2) extension as "a one-year extension in certain instances of delayed discovery of the identity of the actual employer." McDonald v. Antelope Valley Cmty. Coll. Dist., 45 Cal. 4th 88, 106 (2008) (emphasis added). Accordingly, "[s]ection 12960(d)(2) does not toll the § 12960(d) one year limitations period in all circumstances, but does so once the presumption of Government Code § 12928 is rebutted." Rascon v. Diversified Maint. Sys., 2014 WL 1572554, at *7 (E.D. Cal. Apr. 17, 2014). Here, plaintiff does not allege that she was ever hired by HCSG or Country Villa, let alone that she received a W-2 from either of these companies. Nor does she allege that she mistakenly sued Country Villa because they were misidentified as the employer on Dehart or any other person's W-2. Accordingly, the Court finds that the section 12960(d)(2) exception is inapplicable in this case. See also Richards v. CH2M Hill, Inc., 94 Cal. Rptr. 2d 228, 237, n.9 (2000) (finding applicability of section 12960(d)(2) exception irrelevant "[s]ince this appeal does not involve the misidentification of an employer based on a misidentification of the employer on the employee's W-2 form").[3]

Plaintiff also argues that the doctrine of "equitable tolling" should apply in this case. Opp'n., at 3. Broadly speaking, the doctrine of equitable tolling applies under California law " '[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one.' " Elkins v. Derby, 12 Cal. 3d 410, 414 (1974) (quoting Myers v. Cnty. of Orange, 6 Cal. App. 3d 626, 634 (1970)). By "alleviating the fear of claim forfeiture, [equitable tolling] affords grievants the opportunity to pursue informal remedies ... without compromising defendants' significant 'interest in being promptly apprised of claims against them in order that they may gather and preserve evidence' because that notice interest is satisfied by the filing of the first proceeding that gives rise to tolling." McDonald, 45 Cal. 4th at 100 (quoting Elkins, 12 Cal. 3d at 417-18) (citations omitted).

In McDonald v. Antelope Valley Community College District, the California Supreme Court addressed the

applicability of equitable tolling to claims brought under FEHA. 45 Cal. 4th at 111. In McDonald, the plaintiff, who worked for a community college, was advised by her employer to pursue an internal grievance proceeding with the community college chancellor's office after she was not hired for a position, purportedly on the basis of her race. Id. at 97-98. While her internal proceeding was ongoing, the plaintiff filed a complaint with DFEH, alleging violations of FEHA. Id. at 98. The California Supreme Court held that the statute of limitations on her FEHA claims could be equitably tolled while her internal grievance proceeding was ongoing. Id. at 114-15. After engaging in a lengthy discussion of general equitable tolling principles, the court held that "FEHA does not preclude equitable tolling *during the voluntary pursuit of internal administrative remedies.*" Id. at 111. (emphasis added).

 **\*5** In Acuna v. San Diego Gas & Electrice Company, the California Court of Appeals applied the holding of Mcdonald. 217 Cal. App. 4th 1402, 1416-17 (2013). The Court noted that "equitable tolling generally requires a showing that the plaintiff is seeking an alternate remedy in an established procedural context." Id. at 1416. However, because the plaintiff did "not allege any facts showing she was pursuing an alternate remedy that excused her from timely filing her administrative claim and/or from filing her lawsuit," the court held that her FEHA claims were time-barred. Id. Moreover, the court stated that "the equitable tolling doctrine is inapplicable once the employee is on notice that his or her rights had been violated and that her alternate remedies will be unsuccessful." Id.

Similarly, here plaintiff has alleged no facts indicating that she was pursuing "internal administrative remedies" or any other alternate remedy based on defendants alleged violation of FEHA. [4] The party seeking to invoke equitable tolling to avoid a limitations bar bears the burden of proving the applicability of the doctrine. See In re Marriage of Zimmerman, 183 Cal. App. 4th 900, 912 (2010). Therefore, where, as here, "the action appears barred by the statute of limitations" on the face of the complaint, "plaintiff has an obligation to anticipate the defense and plead facts to negative the bar." Aubry v. Goldhor, 201 Cal. App. 3d 399, 407 (1988) (citations omitted). Moreover, even assuming that plaintiff was pursuing an alternative remedy, it would seem that at a minimum when plaintiff filed her original

DFEH complaint she was "on notice that ... her alternate remedies [would] be unsuccessful." See Acuna, 217 Cal. App. 4th, at 1414-15 ("By retaining counsel and filing a DFEH complaint, [plaintiff] manifested an understanding that further attempts at informal, rather than formal, resolution ... would not be successful and were futile."). Accordingly, the Court finds that the doctrine of equitable tolling is inapplicable in plaintiff's case.

Finally, defendants argue that the untimely amendment of plaintiff's DFEH complaint should not "relate back" to the filing of her original complaint on March 3, 2014. Mot., at 6. Plaintiff does not contend, in either her complaint or her opposition, that her amended complaint should relate back to the filing of her original complaint. "[T]he relation-back doctrine is available in appropriate circumstances to render timely an otherwise untimely amendment to a charge under FEHA." Rodriguez v. Airborne Express, 265 F.3d 890, 898 (9th Cir. 2001). However, "in the FEHA context, [courts] apply 'the familiar rule' that a complaint may not be amended to add a previously unnamed defendant after the statute of limitations has run." Ortiz v. Sodexho, Inc., 2011 WL 3204842, at * 5 (S.D. Cal. July 26, 2011) (citing McGhee Street Prods. v. WCAB, 108 Cal.App.4th 717, 722 (2003)); Williams, 2014 WL 4771667, at *3.

 **\*6** Here, plaintiff did not name HCSG in her original complaint; rather, she named Dehart and Country Villa. See Compl. Ex. A. Then in August 2015, 21 months after plaintiff's FEHA claims accrued, she amended her complaint naming HCSG as an additional defendant. See id. Accordingly, because plaintiff amended her complaint "to add a previously unnamed defendant after the statute of limitations ha[d] run," the relation-back doctrine does not apply.

Furthermore, even if plaintiff's amended complaint did relate back, her FEHA claims would still be time-barred. A plaintiff must commence a civil action under FEHA "within one year from the date of [DFEH's right to sue] notice." Cal. Gov't Code § 12965(b). Failure to file suit within the requisite time gives rise to a statute of limitations defense. Downs v. Dep't of Water & Power of Los Angeles, 58 Cal. App. 4th 1093, 1102 (1997). Plaintiff filed her original complaint with DFEH and received her right to sue notice on March 3, 2014, but she did not initiate this action until August 13, 2015. See Compl. Ex. A. Accordingly, even assuming plaintiff's amended

complaint did relate back to the filing of her original complaint, her FEHA claims would still be untimely because she did not initiate this action within one year of receiving her right to sue notice.

Accordingly, because plaintiff did not timely exhaust her administrative remedies the Court GRANTS defendants motion to dismiss as to plaintiff's FEHA-based claims.

### B. Plaintiff's Claim for Intentional Infliction of Emotional Distress

Plaintiff's sixth claim is for intentional infliction of emotional distress. A claim for intentional infliction of emotional distress consists of: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Christensen v. Superior Court, 54 Cal.3d 868, 903 (1991); see also Dove v. PNS Stores, Inc., 982 F.Supp. 1420, 1424 (C.D.Cal.1997).

Here, while plaintiff asserts her claim for intentional infliction of emotional distress against all defendants, all of the allegations in plaintiff's complaint which form the basis for her claim concern the conduct of HCSG's employee, Dehart. Accordingly, plaintiff is in effect attempting to hold HCSG liable for the conduct of one of it's employees. Under California law, "[a]n employer is not vicariously liable for an employee's conduct if the employee substantially deviates from his or her course of duty so as to amount to a complete departure." Jacobus v. Krambo Corp., 78 Cal. App. 4th 1096, 1101-02 (2000). Plaintiff alleges that HCSG's employee, Dehart, promised her employment in exchange for sexual intercourse. See Compl. ¶¶ 70-81. "The cases have consistently held that under the doctrine of respondeat superior, sexual misconduct falls outside the course and scope of employment." Jacobus, 78 Cal. App. 4th at 1102 (collecting cases).

In Farmers Insurance Group v. County of Santa Clara, plaintiff sued her employer based on the sexual misconduct of her supervisor. 11 Cal. 4th 992 (1995). The plaintiff alleged that her supervisor had sexually harassed her while he was training her and that, in particular, he had told her "that in order to 'get off training,' she would have to 'give him head.' " Id. at 998. The California Supreme Court found that the employee's actions "were motivated for strictly personal reasons unrelated to [his job duties]" and were not "reasonably necessary to his comfort, convenience, health, and welfare while at work." Id. at 1007. Accordingly, the Court found that "an employer will not be held vicariously liable where, as here, it clearly appears that neither directly nor indirectly could [the employee] have been serving his employer. " Id. at 1008 (citations omitted).

**\*7** Here, plaintiff has alleged no facts suggesting that Dehart's conduct could have been in service of HCSG or in furtherance of his job duties. Moreover, plaintiff has alleged no facts indicating that Dehart's conduct was "reasonably necessary to his comfort, convenience, health, and welfare while at work." Rather, as in Farmers, it appears that Dehart's conduct was motivated for "strictly personal reasons" and therefore HCSG cannot be held vicariously liable for his sexual misconduct.

Accordingly, the Court GRANTS defendants' motion to dismiss plaintiff's claim for intentional infliction of emotional distress.

### V. CONCLUSION

In accordance with the foregoing, the Court GRANTS defendants' motion to dismiss plaintiff's complaint without prejudice. Plaintiff is hereby granted 30 days to file an amended complaint addressing the defects identified herein. Failure to do so may result in dismissal of her complaint with prejudice.

IT IS SO ORDERED

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6551870, 2015 Fair Empl.Prac.Cas. (BNA) 355,057

---

Footnotes

1    Defendants request that the Court take judicial notice of the complaint in Reyes v. Country Villa Sheraton Nursing and Rehab Center, Los Angeles Superior Court Case Number BC562102, plaintiff's state court action against Dehart

and Country Villa. Dkt. 12, RJN. "[U]nder Federal Rule of Evidence 201, a court may take judicial notice of matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). Court's regularly take judicial notice of documents filed in Court proceedings. See, e.g. United States ex rel. Robinson Rancheria Citizens Council v. Borneo, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted). Accordingly, the Court grants defendants request for judicial notice.

2    The other three exceptions included in California Government Code § 12960 do not appear to apply in this case:

Pursuant to section (d)(1), "if a person allegedly aggrieved by an unlawful practice first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence," a plaintiff may obtain an extension of the limitations period "not to exceed 90 days following the expiration of that year. Here, plaintiff acknowledges that she was aware of the underlying "unlawful practice"—Dehart's acts of sexual harassment. See generally Compl. However, even if the exception did apply, plaintiff filed her amended complaint with DFEH more than 90 days after the expiration of the one year limitations period. See Compl. Ex. A.

Pursuant to section (d)(3), a plaintiff may obtain an extension of up to three years in the event of a violation of California Civil Code § 51.7, which addresses violence, or intimidation by threat of violence. Here, the complaint contains no allegations regarding a potential violation of California Civil Code § 51.7.

Pursuant to section (d)(4), a plaintiff who was below the age of majority at the time of the allegedly unlawful practice may obtain an extension "not to exceed one year from the date that ... [she] attains the age of majority." Here, there are no allegations in the complaint that plaintiff was below the age of majority at the time defendants allegedly violated FEHA.

3    California law also recognizes that a complaint for violation of FEHA filed more than one year after the alleged unlawful activity may not be untimely if the "continuing violation doctrine" applies. Under the continuing violation doctrine, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period." Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1056 (2005). However, here, even assuming HCSG's conduct constituted a "continuing violation," plaintiff alleges that her "last encounter" with Dehart occurred in November 2013. Compl. ¶ 19. Accordingly, to the extent plaintiff was subjected to a continuing violation of FEHA, that violation concluded in November 2013, more than one year before she filed her amended complaint against HCSG.

4    Plaintiff does not assert that her pending state court action against Dehart and Country Villa constitutes an alternate remedy which would justify equitable tolling. However, in any event, as explained by the California Supreme Court, in the FEHA context equitable tolling appears to apply solely to non-judicial remedies. See also Williams v. Gyrus ACMI, LP, 2014 WL 4771667, at *5 (N.D. Cal. Sep. 24, 2014) ("This rule, however, does not extend so far as to toll the statute of limitations during the pendency of a different lawsuit, brought on Plaintiff's behalf as the real party in interest, against a completely different party. Equitable tolling exists to permit a plaintiff to pursue non-judicial remedies when such remedies are available, while not prejudicing said plaintiff from seeking judicial recourse if those remedies prove inadequate.")

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 10

949 F.Supp.2d 997
United States District Court,
E.D. California.

Beth A. RHODES, M.D., Plaintiff,

v.

SUTTER HEALTH, a California Corporation,
Sutter Gould Medical Foundation, a California
Corporation, the Gould Medical Group,
Inc., a California Corporation, Defendants.

No. CIV. 2:12–0013 WBS DAD.
|
Feb. 1, 2013.

**Synopsis**

**Background:** Female radiologist brought action against employer and operator of healthcare clinics alleging retaliation in violation of False Claims Act, gender harassment, gender discrimination, and failure to prevent discrimination in violation of California Fair Employment and Housing Act (FEHA), violation of California statute prohibiting retaliation against physicians, constructive discharge, defamation, and intentional infliction of emotional distress. Operator moved for summary judgment and moved to strike declaration from witness.

**Holdings:** The District Court, William B. Shubb, J., held that:

[1] operator was not radiologist's joint employer under FEHA;

[2] integrated enterprise test did not apply to determine whether operator and medical group were single employer; and

[3] radiologist's failure to identify potential witness in initial disclosures was not harmless.

Motion for summary judgment granted in part and motion to strike denied.

**Attorneys and Law Firms**

**\*999** Stephen M. Murphy, Law Offices of Stephen M. Murphy, San Francisco, CA, for Plaintiff.

**\*1000** Benjamin J. Schnayerson, Carla J. Hartley, Dillingham & Murphy, LLP, Maiko Nakarai–Kanivas, Maureen E. McClain, Littler Mendelson, PC, San Francisco, CA, for Defendants.

*MEMORANDUM AND ORDER RE:
MOTIONS FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, PARTIAL
SUMMARY JUDGMENT AND TO STRIKE*

WILLIAM B. SHUBB, District Judge.

Plaintiff Beth A. Rhodes brought this action against Sutter Health, Sutter Gould Medical Foundation ("SGMF"), and The Gould Medical Group, Inc. ("GMG") alleging unlawful retaliation, constructive discharge, gender harassment, gender discrimination, failure to prevent discrimination, violation of California Business and Professions Code section 2056, defamation, and intentional infliction of emotional distress. Presently before the court is SGMF's motion for summary judgment or, alternatively, partial summary judgment, as to plaintiff's fourth through eleventh causes of action pursuant to Federal Rule of Civil Procedure 56. Also before the court is SGMF's motion to strike pursuant to Federal Rule of Civil Procedure 37.

I. *Factual and Procedural Background*

**[1]** SGMF is a nonprofit corporation that operates healthcare clinics and a clinical research department in California's Central Valley. (Sanders Decl. ¶¶ 2–3 (Docket No. 71).) California prohibits the corporate practice of medicine, which precludes SGMF from employing its own physicians to provide medical services to its patients. [1] (*See* Gordon Decl. Ex. B at 2 (Docket No. 73).) Therefore, pursuant to the structure set forth in California Health and Safety Code section 1206(1), SGMF contracts with GMG, a medical group, for the services of its physicians. (Sanders Decl. ¶¶ 3–4, 13.) Their relationship is governed by the terms of their Professional Services Agreement ("PSA"), which is usually renegotiated on an annual basis. (*Id.* ¶ 4.)

GMG enters into individual employment or independent contractor agreements with each physician. (*Id.* ¶ 5.) Plaintiff was employed by GMG as a radiologist specializing in breast and body imaging from January 2008 through May 2011. (First Am. Compl. ("FAC") ¶ 14 (Docket No. 30); McClain Decl. in Supp. of Summ. J. Ex. C ("Rhodes Dep.") at 20:1, 40:4–7 (Docket No. 78–2).) Plaintiff provided care to patients at SGMF's healthcare clinics in Modesto and Stockton. (FAC ¶¶ 14–15.)

On April 30, 2010, plaintiff attended a meeting with Dr. Paul Stadelman ("Dr. Stadelman"), Chairman of the Radiology Department, Melinda Knox, another GMG doctor, and Robrta Edge ("Edge"), the SGMF Director of Imaging. (Purtill Decl. Ex. B ("Rhodes Dep. II") at 189–90 (Docket No. 85:1–3), Ex. C ("Edge Dep.") at 201:22–202:21, 298:3–15 (Docket No. 86–1).) At the meeting, plaintiff and Dr. Knox discussed plaintiff's concerns about Dr. Knox's performance, but there was tension between them. (*See* Rhodes Dep. II at 189–90.) After the meeting, plaintiff **\*1001** received a letter from Dr. Stadelman stating that she had acted unprofessionally and that any further "unprofessional behavior" would "be grounds for [her] immediate termination." (Purtill Decl. Ex. S; *see also* Rhodes Dep. II at 63:14–16.)

Following that meeting, several incidents involving plaintiff and SGMF staff occurred. [2] First, a nurse eavesdropped on plaintiff and a patient and the nurse was reprimanded for that action. (Edge Dep. 298:3–15; Ex. 53 to Edge Dep. at Sealed 28–30 (Docket No. 82).) Second, another nurse, Kathy Davis ("Davis"), harmed an eighty-five-year-old patient, Sara Grantski, by disobeying plaintiff's standing order to hold pressure at Grantski's breast biopsy site for fifteen minutes and thereby causing her to develop a painful hematoma. (Rhodes Decl. ¶¶ 2–3.) Davis also changed the pain score that Grantski had reported from "zero" to "one." (*Id.* ¶ 2.)

Third, a technician, Carolyn Plante, performed a "Crown–Rump Length Measurement" incorrectly. (*Id.* ¶ 6.) When plaintiff confronted her about it, Plante said, " 'That's the way we measure it here. Why don't you ask a radiologist?' " (*Id.*) Plaintiff believes that Plante and Davis did these things so that plaintiff would have an inappropriate outburst in response and be fired. (*Id.* ¶¶ 2, 6.) As a result of these incidents, plaintiff felt anger, outrage, anxiety, and humiliation. (*Id.* ¶¶ 2, 7.) She internalized those

feelings and believes that they were a substantial factor in causing her to go on medical disability on or about December 16, 2010. (*Id.* ¶¶ 4, 8.)

Plaintiff brings claims against three defendants: GMG, SGMF, and Sutter Health. Plaintiff's FAC contains claims for (1) retaliation in violation of the federal False Claims Act, (2) retaliation in violation of the California False Claims Act, (3) violation of California Business and Professions Code section 2056, (4) gender harassment in violation of the California Fair Employment and Housing Act ("FEHA"), (5) sex discrimination in violation of FEHA, (6) retaliation for reporting patient abuse in violation of FEHA, (7) retaliation in violation of FEHA, (8) failure to prevent discrimination in violation of FEHA, (9) constructive discharge in violation of public policy, (10) defamation, and (11) intentional infliction of emotional distress. (Docket No. 30.)

On May 22, 2012, 2012 WL 1868697, the court dismissed all of plaintiff's claims against Sutter Health and plaintiff's first through third claims against SGMF. (Docket No. 51.) The parties then stipulated to dismiss claim six with prejudice as to all defendants. (Docket No. 37.) SGMF now moves for summary judgment on claims four through eleven and contends that plaintiff is not entitled to punitive damages. (Docket No. 68.)

## II. *Request for Judicial Notice*

**[2]** SGMF requests that the court take judicial notice of the legislative history of Assembly Bill 2279, Chapter 133, Statutes of 1980, which amended California Health and Safety Code section 1206. (Req. for Judicial Notice ("RJN") Ex. A (Docket No. 79).) Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of the legislative history of state statutes. *See Chaker v. Crogan,* 428 F.3d 1215, 1223 (9th Cir.2005) (taking judicial notice of legislative history of California statute); *Louie v. McCormick & Schmick Rest. Corp.,* 460 F.Supp.2d 1153, 1155 n. 4 (C.D.Cal.2006) (same). Accordingly, **\*1002** the court takes judicial notice of the legislative history of Assembly Bill 2279, Chapter 133, Statutes of 1980.

## III. *Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).[3] A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...." *Id.*

IV. *Claims Four Through Nine*

 **[3]**   **[4]**   SGMF requests summary judgment on five claims (excluding claim 6, which has been dismissed) that require plaintiff to demonstrate either an employment relationship or an alternate basis for liability. Claims four through eight are all brought under FEHA, "which predicates potential ... liability on the status of the defendant as an 'employer.' " *Kelly v. Methodist Hosp. of S. Cal.,* 22 Cal.4th 1108, 1116, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000) (quoting Cal. Gov't Code § 12926).

Claim nine is a claim for wrongful termination in violation of public policy, and "only an employer can be liable for the tort of wrongful discharge." *Khajavi v. Feather River Anesthesia Med. Grp.,* 84 Cal.App.4th 32, 38, 100 Cal.Rptr.2d 627 (3d Dist.2000).

Plaintiff alleges in her FAC and has repeatedly stated under oath that only GMG was her employer. (*See, e.g.,* FAC § 14 (Docket No. 30); Rhodes Dep. at 19:24–20:4, 30:7–21, 31:1–11.) She gave no indication that she intended to argue that SGMF is her joint employer until her opposition to SGMF's motion for summary judgment repeatedly used the term and **\*1003** referred to the integrated enterprise test as one to determine joint employment. The integrated enterprise test, however, determines whether two separate corporate entities should be considered a *single* employer. At oral argument, plaintiff's counsel nevertheless asserted that plaintiff is indeed arguing that SGMF was her joint employer. Accordingly, the court considers both whether SGMF was plaintiff's joint employer and whether SGMF and GMG constitute plaintiff's single employer under the integrated enterprise test.

A. *Joint Employer Test*

 **[5]**   In determining whether a defendant is a joint employer under the FEHA, courts consider the totality of the circumstances bearing on the nature of the work relationship of the parties, with an emphasis on the extent to which the defendant controls the plaintiff's performance of employment duties. *Hall v. Apartment Inv. & Mgmt. Co.,* Civ. No. 08–03447, 2011 WL 940185, at *5 (N.D.Cal. Feb. 18, 2011); *Vernon v. State,* 116 Cal.App.4th 114, 124, 10 Cal.Rptr.3d 121 (1st Dist.2004). Factors to be taken into account include:

> [P]ayment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine

the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the at work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment.

*Vernon,* 116 Cal.App.4th at 125, 10 Cal.Rptr.3d 121.

**[6]  [7]**  " 'Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important.' " *Vernon,* 116 Cal.App.4th at 126, 10 Cal.Rptr.3d 121 (quoting *Lee v. Mobile Cnty. Comm'n,* 954 F.Supp. 1540, 1546 (S.D.Ala.1995)). " 'A finding of the right to control employment requires ... a comprehensive and immediate level of "day-to-day" authority over employment decisions.' " *Doe I v. Wal–Mart Stores, Inc.,* 572 F.3d 677, 682 (9th Cir.2009) (quoting *Vernon,* 116 Cal.App.4th at 127–28, 10 Cal.Rptr.3d 121).

**[8]**  Here, it is undisputed that GMG paid plaintiff's salary. (*See* Pl.'s Stmt. of Genuine Issues & Disputed Facts at 14 (Docket No. 89); *see also* McClain Decl. in Supp. of Summ. J. Exs. G at 216 (employment contract between GMG and plaintiff, setting plaintiff's salary), K (payroll stub), O, P, Q, R (Docket Nos. 78–4, 78–5).) Although this factor is not dispositive, it "is at least strong evidence that an employment relationship did not exist." *Vernon,* 116 Cal.App.4th at 126, 10 Cal.Rptr.3d 121. Plaintiff does not contend that SGMF "hired [plaintiff], set h[er] compensation, or maintained any personnel records for [her]." [4]  **\*1004** *Id.* at 127, 10 Cal.Rptr.3d 121. Rather, it is undisputed that GMG determined the amount of plaintiff's compensation, as well as the benefits she would receive, and hired her. (Pl.'s Stmt. of Genuine Issues & Disputed Facts at 13–15.)

Except for the fact that SGMF owns the location where plaintiff works, none of the other facts pointed to by plaintiff provide indicia that SGMF exercised an "immediate level of 'day-to-day' authority," *Vernon,* 116 Cal.App.4th at 128, 10 Cal.Rptr.3d 121, so as to create

an employment relationship between it and plaintiff. It is undisputed that Dr. Stadelman, a GMG employee, gave plaintiff her work assignments. (Pl.'s Stmt. of Genuine Issues & Disputed Facts at 13–15.) Moreover, as a physician, plaintiff practiced under her own license and did not have a supervisor. (Rhodes Dep. 54:19–55:10.) She also has the authority to make independent, as well as final, decisions regarding patient care. (Sanders Decl. ¶¶ 6,10,12; *id.* Ex. 2 Art. 1.1(a), 2.12, 9.1 (Docket No. 81).) In contrast, GMG physicians may supervise SGMF employees and require their removal from foundation sites. (Purtill Decl. Ex. G at 238:20–239:9.)

SGMF also "had no apparent authority or discretion to discipline, promote, transfer, or terminate" plaintiff. *Id.* The disciplinary warning plaintiff received was from Dr. Stadelman. (Rhodes Dep. 63:10–65:8.) At most, one SGMF staff member provided evaluations, at the request of GMG, of plaintiff's performance on such issues as timeliness and her demeanor with patients and staff. (*See* Purtill Decl. Exs. M, O (Docket Nos. 87–3, 87–4.)) Plaintiff points to the fact that Edge reviewed documents relating to incidents between plaintiff and other staff, but this was at the request of Dr. Steven Mitnik, the Medical Director of GMG. (Edge Dep. 291:15; Sanders Decl. ¶ 6.) She also suggests that Edge "was part of the 'leadership' team responsible for the sham investigation to develop cause to terminate plaintiff." (Pl.'s Stmt. of Genuine Issues & Disputed Facts at 5; *see, e.g.,* Purtill Decl. Ex. R (records of interviews with SGMF staff regarding GMG physicians) (Docket No. 87–4).) Edge assisted with interviewing her staff to determine if they had any problems with GMG doctors, however, because Dr. Mitnick again requested that she do so. (Edge Dep. 157:19–25.) Plaintiff's harassment and gender discrimination complaints were also conducted as a "joint investigation" by GMG and SGMF. (Purtill Decl. Ex. F at 27:15–17, 108:22–23 (Docket No. 86–4).) Evidence that an employer provided assistance with discrimination complaints and even supported such departments as benefits, diversity, and labor relations for another employer, however, is insufficient to find that it exercised day-to-day control over another employer's employment decisions in general or exercised any control with respect to plaintiff. *Ruiz v. Sysco Corp.,* Civ. No. 09–1824–H MDD, 2011 WL 3300098, at \*4 (S.D.Cal. July 29, 2011) (applying integrated enterprise theory).

The only other factor that might even suggest that SGMF had control over the manner and means of plaintiff's performance of her job is the SGMF–GMG joint operating policies. Plaintiff was especially concerned with SGMF's policy that patients be scheduled for a surgical consult prior to any needle biopsy of the breast. (Purtill Decl. Ex. N (Docket No. 87–3).) **\*1005** In the case of that policy, however, it was developed by GMG doctors and approved by Dr. Stadelman, the Chair of Imaging Services. (McClain Decl. in Supp. of Reply Ex. F at 14:25–15:23, G at 237:13–239:8 (Docket No. 97).) While the policy was in name SGMF's, it was just as much GMG's policy. The other policies that plaintiff points to were also joint operating policies, such as those for "Patients['] Rights and Responsibilities and Medical Ethics" and "Zero Tolerance and the Prevention of Workplace Violence." (Purtill Decl. Exs. J.K.) These joint policies do not show that SGMF exerted control over GMG to require GMG employees to follow its own policies, but rather that the two entities, which work together to provide patient care, jointly created policies that would apply to the employees of each. *Cf. Hall,* 2011 WL 940185, at \*7 (inquiring whether plaintiff was subject to alleged joint employer's independent personnel policies). Ultimately, SGMF did not assert "significant" control over plaintiff such that would " 'justify the belief on the part of an aggrieved employee that the [alleged co-employer] is jointly responsible for the acts of the immediate employer.' " *Hall,* 2011 WL 940185, at \*6 (quoting *Vernon,* 116 Cal.App.4th at 126, 10 Cal.Rptr.3d 121). [5]

B. *Applicability of the Integrated Enterprise Test to Claims Under the FEHA and Claims for Wrongful Termination*

**[9]**   Under the integrated enterprise test, a parent and subsidiary may be considered a single employer. *Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211, 1213 (9th Cir.1989). When applying the test, courts consider four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 815 (9th Cir.2002); *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App.4th 727, 737, 80 Cal.Rptr.2d 454 (3rd Dist.1998). The test was originally developed by the National Labor Relations Board ("NLRB") to determine whether it may decide a particular labor dispute. *Nesbit v. Gears Unlimited,*

*Inc.,* 347 F.3d 72, 85 (3d Cir.2003). It is useful for that purpose because, "[i]f the work forces of two affiliated corporations are integrated, there is an argument for a single bargaining unit covering both of them, and also an argument that they should be combined for purposes of determining whether the effect on commerce is substantial enough to justify the Board in asserting jurisdiction." *Papa v. Katy Indus., Inc.,* 166 F.3d 937, 942 (7th Cir.1999).

Some federal courts have adopted the integrated enterprise test to determine whether separate corporate entities are a single employer for purposes of liability under statutes prohibiting discrimination, including Title VII. *See, e.g., Sandoval v. Am. Bldg. Maint. Indus., Inc.,* 578 F.3d 787, 796 (8th Cir.2009) ("[T]he traditional four-factor standard is the means by which plaintiffs demonstrate corporate dominance over a subsidiary's operations and establish affiliate liability."); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995) ("We believe that the **\*1006** appropriate test under Title VII for determining when parent companies may be considered employers of a subsidiary's employees is the four-part [NLRB] test adopted by the Fifth, Sixth, and Eighth circuits."). California courts have applied the integrated enterprise test in FEHA and wrongful termination cases for the same purpose. *See, e.g., Laird,* 68 Cal.App.4th at 737–38, 80 Cal.Rptr.2d 454 (applying test to claims arising under FEHA and a claim for wrongful termination).

**[10]** **[11]** **[12]**   The Ninth Circuit, however, uses the test for a more limited purpose. Under its formulation, "[a] plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15–employee minimum standard [necessary to hold an employer liable under Title VII]." *Anderson v. Pac. Mar. Ass'n,* 336 F.3d 924, 929 (9th Cir.2003). In other words, "[t]he test does not determine joint liability ..., but instead determines whether a defendant can meet the statutory criteria of an 'employer' for Title VII applicability." *Id.* at 928. If an employer meets the statutory minimum independently, the test is inapplicable. *Id.* at 929. Employed in this limited manner, the integrated employer test advances the anti-discrimination purpose behind Title VII by preventing employers from artificially dividing themselves into organizations with fewer than fifteen employees in

order to escape liability. *E.E.O.C. v. Falls Vill. Ret. Cmty., Ltd.,* Civ. No. 5:05–1973, 2007 WL 756803, at *8 (N.D.Ohio Mar. 7, 2007).

Other courts have recognized the limitations of the test for determining liability in the discrimination context. In declining to apply the integrated enterprise to determine whether two entities should together be liable under Title VII, the Seventh Circuit explained that "[i]f the work forces of two affiliated corporations are integrated, ... there is no argument for making one affiliate liable for the other's independent decision to discriminate." *Papa,* 166 F.3d at 942. "The basic principle of affiliate liability is that an affiliate forfeits its limited liability only if it acts to forfeit it-as by ... configuring the corporate group to defeat statutory jurisdiction, or commanding the affiliate to violate the right of one of the affiliate's employees." *Id.* at 941. "The claim that a group of affiliated corporations is 'integrated,' the sort of claim that the four-factor test might be thought to support, not only is vague, but is unrelated to the act requirement ... or to the policy behind the exemption for employers that have very few employees." *Id.* at 942.

In *Laird,* the California Court of Appeal adopted the integrated enterprise test in a FEHA and wrongful termination case to determine whether a parent corporation could be liable for the acts of its subsidiary—the plaintiff's employer—as a single employer without discussion of statutory minimums or any act requirement. *See Laird,* 68 Cal.App.4th at 737, 80 Cal.Rptr.2d 454. Instead, it simply noted that, "[b]ecause California's Fair Employment and Housing Act has the same nature and purpose as the federal law, California courts frequently look to federal case law for guidance in interpreting the FEHA." *Id.* The *Laird* court articulated the test in a narrow fashion, framing it in terms of whether a corporate *parent* could be held liable for the acts of its *subsidiary.* Courts applying California law have generally followed suit, limiting the test's application to determining whether corporations having a parent-subsidy relationship are interrelated.[6] *See, e.g., Maddock v.* **\*1007** *KB Homes, Inc.,* 631 F.Supp.2d 1226, 1237–39 (C.D.Cal.2007); *Kang,* 296 F.3d at 815–16; *Cellini v. Harcourt Brace & Co.,* 51 F.Supp.2d 1028, 1034–35 (S.D.Cal.1999); *Hernandez v. AutoNation USA Corp.,* No. G030743, 2003 WL 22977576, at *8–9 (Cal.App.4th Dist. Dec. 19, 2003); *Navarrete v. Telemundo Group, Inc.,* No. B142066, 2002 WL 1752821, at *7–8 (Cal.App.2d Dist. July 30, 2002).

Plaintiff does not contend that there is a parent-subsidiary relationship between SGMF and GMG. Instead, she asks that the court extend application of the integrated enterprise test to the relationship between SGMF and GMG, a nonprofit corporation and a medical group. (*See* Sanders Decl. ¶¶ 2–5.) SGMF's relationship with GMG is designed to comply with California Health and Safety Code section 1206(1), which provides multispeciality clinical groups (known as "foundations") an exemption to licensing requirements. (*Id.* ¶ 2; Gordon Decl. at 2–3.) While the nonprofit may provide facilities or technical components of care, such as non-physician staff and equipment, under section 1206(1), it must form an arm's length relationship with physicians solely responsible for medical care because California prohibits the corporate practice of medicine.[7] (Gordon Decl. at 2–3.) To comply with section 1206(1), GMG's doctors provide medical services to SGMF pursuant to the PSA contract, (Sanders Decl. ¶¶ 4–5), which may be terminated by either party with or without cause, (*id.* ¶ 10). Plaintiff does not dispute that the relationship between SMGH and GMG is dictated by California law governing the practice of medicine and that their relationship is distinct from a parent-subsidiary relationship. (*See* Pl.'s Stmt. of Genuine Issues & Disputed Facts at 10–11.)

**[13]** Plaintiff provides no rationale for extending the integrated enterprise test from affiliated corporations to two separate corporate entities that have merely a **\*1008** contractual relationship. The court believes it would be an untenable notion for a corporate entity to face potential liability for another entity's discriminatory acts simply because the one contracted to provide services to the other. It would also be difficult to know where to draw the line amidst contractual relationships once this court extended the test beyond the parent-subsidiary relationship. As the court in *Miller v. Swiss Re Underwriters Agency, Inc.,* Civ. No. 09–09551, 2010 WL 935697 (C.D.Cal. Mar. 15, 2010), noted when considering plaintiff's request to apply the integrated enterprise test to a corporation that she alleged shared a common parent and management structure, use of the test for that broader purpose was "misplaced." *See Miller,* 2010 WL 935697 at *2–3 (applying the test anyway and noting that it "hinges on whether one entity exercises an unusual degree of *control* over another legally separate, but related entity").

**[14]** As explained above, the foundation model is intended to create an arm's length relationship between the nonprofit clinic and medical group practice because corporations cannot practice medicine. (Gordon Decl. at 3.) The policy behind imposing liability under the integrated enterprise test is the " 'fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship.' " *Bowoto v. Chevron Texaco Corp.,* 312 F.Supp.2d 1229, 1237–38 (N.D.Cal.2004) (quoting *Murray v. Miner,* 74 F.3d 402, 405 (2d Cir.1996)). Plaintiff does not dispute that the relationship between the parties is organized under that law, nor does she explain why the other tests used by California courts to determine liability under FEHA are insufficient to capture a situation in which the nonprofit group does not in fact have an arm's length relationship with a physicians' group and is actually operating as an employer of a physician. *See Bishop v. Wyndham Worldwide Corp.,* Nos. A122517, A123449, 2011 WL 576571, at *33–34 (Cal.App. 1st Dist. Feb. 18, 2011) (alter ego, agency, equitable estoppel, "totality of the working relationship," and joint employer tests used in FEHA cases to determine an employer).

For this same reason, the court declines plaintiff's invitation to adopt a new test—what she fashions the "integral enterprise test"—to apply in the specific context of the foundation model. Plaintiff argues that SGMF and GMG not only operate jointly, but are dependent on each other to deliver health care. (Opp'n at 8.) She also notes the legislative history of California Health and Safety Code section 1206(1) explains that foundations operating under the aegis of that statute "should be treated like physicians' offices" and "function like group practices of physicians." (RJN at 7, 14; *see* Opp'n at 11.) That two entities interact to meet a common end—in this case the provision of healthcare—is not sufficient within itself to hold both liable for each's discriminatory acts when their relationship is merely contractual. Moreover, here there is no question that each employer, SGMF and GMG, is obligated to comply with FEHA for its own employees, as would a physician's office for its employees. Thus, there is no "back door to exempt the [foundations] from their [FEHA] obligations for violations of discrimination laws." (Opp'n at 8:24–25.) If an employee working for a foundation operating under section 1206(1) and facing adverse employment action believes he or she is jointly employed or another employer may be liable for adverse actions against her under a different theory, she may argue

as much. Plaintiff did so here and, in addition, she has sought relief against SGMF employees that she believes contributed to her harm under state tort law.

**\*1009** **[15]** **[16]** Plaintiff's request also brings to the fore a fundamental tension in her position. As discussed above, California prohibits corporations from employing physicians to provide medical services. This ban extends even to nonprofit corporations because the danger of lay control attends all types of corporations. *See Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal.App.4th 1506, 1516, 78 Cal.Rptr.3d 646 (1st Dist.2008) (noting that the ban protects patients). "The restriction is meant 'to protect the professional independence of physicians and to avoid the divided loyalty inherent in the relationship of a physician employee to a lay employer.' " *Id.* at 1514, 78 Cal.Rptr.3d 646 (quoting *Cal. Med. Ass'n, Inc. v. Regents of Univ. of Cal.,* 79 Cal.App.4th 542, 550, 94 Cal.Rptr.2d 194 (2d Dist.2000)). By arguing that SGMF is her employer—under either the joint employer, integrated enterprise, or "integral enterprise" tests—plaintiff wants the benefit of potentially holding SGMF liable for her claims. But plaintiff cannot adopt this position without also suggesting that she was complicit in relinquishing her professional independence to lay control and compromising her loyalty to her patients. *See* Cal. Bus. & Prof. Code § 2264 (prohibiting "[t]he employing, directly or indirectly, the aiding, or the abetting of any unlicensed person ... to engage in the practice of medicine or any other mode of treating the sick or afflicted which requires a license to practice constitutes unprofessional conduct"). This court has not been presented with a compelling reason to let plaintiff receive the benefits of an employment relationship without accepting the consequences such employment entails. Furthermore, doing so would chip away at a legislatively built wall intended to allow nonprofit corporations to work with medical groups to deliver healthcare without relinquishing physician control to those corporations.

Moreover, as discussed above, the grounds for applying the integrated enterprise test to determine liability under employment discrimination statutes are infirm in the first place. The test was not created to determine whether an entity had control over a particular employee or directed any discrimination. There is also no indication that the reason the test was imported from Title VII into FEHA case law was to enable plaintiffs to meet the

statutory minimums of FEHA. The *Laird* court adopted it explicitly to determine liability rather than coverage. *See* 68 Cal.App.4th at 737–41, 80 Cal.Rptr.2d 454. FEHA's statutory minimum is a mere five employees; this significantly lessens the concern that firms can organize themselves to avoid liability. *See* Cal. Gov't Code § 12926(d). There are no allegations here that SGMF and GMG are organized under section 1206(1) for such a purpose.

[17] Finally, also cutting against extension of the test, is the presumption that separate corporate entities have distinct identities. *Laird,* 68 Cal.App.4th at 737, 80 Cal.Rptr.2d 454. As the *Laird* court noted in regard to a parent and subsidiary, plaintiffs bear a heavy burden under both California and federal law when they seek to rebut this presumption and hold multiple corporate entities liable as a single employer. *Id. A fortiori,* corporate entities that are unaffiliated and connected only through contract should not be joined as a single employer without a persuasive reason for doing so. This court discerns none. Without direction from California courts, the court is not inclined to extend the test outside of the parent-subsidiary relationship and does not do so. Accordingly, the court must grant SGMF's motion for summary judgment as to plaintiff's fourth through ninth claims (excluding claim six) for FEHA violations and wrongful termination.

**\*1010** V. *Claim Ten for Defamation*
Plaintiff concedes that her claim for defamation should be dismissed with respect to SGMF. (Opp'n at 3:9–10.) Accordingly, the court will dismiss plaintiff's claim for defamation with prejudice as to SGMF.

VI. *Motion to Strike*
[18] In support of her opposition to SGMF's motion for summary judgment, plaintiff submitted a declaration from Carol Frazier ("Frazier"). (Docket No. 93.) Plaintiff failed, however, to identify Frazier as a witness in her initial disclosures under Federal Rule of Civil Procedure 26. (Mot. to Strike at 2:4–5 Docket No. 101].) SGMF moves to strike Frazier's declaration on this ground.

[19] Rule 26(a) requires parties to disclose the names and contact information of individuals "likely to have discoverable information" that the disclosing party may use to support its claims or defenses, as well as the subject of the information known by the

individuals. Fed.R.Civ.P. 26(a). Rule 37 gives teeth to that requirement, providing in relevant part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Penn.,* 673 F.3d 1240, 1246 (9th Cir.2012).

Although Frazier's name appears to have come up only once in the documents produced by plaintiff (albeit her maiden name), (Mot. to Strike at 4:5–6), she was repeatedly mentioned in the various depositions of other witnesses when discussing plaintiff's contention that a nurse had intentionally harmed Frazier's mother. For example, plaintiff stated during her deposition that she "spoke with the patient and her daughter and they signed something saying that what Ms. Davis had put was incorrect." (Purtill Decl. in Opp'n to Mot. to Strike Ex. A at 150:3–5; *see id.* at 135:20–136:8, Ex. C at 328:1–25, Ex. D at 232:4–233:17 (Docket No. 102–1).) Plaintiff also referred to the incident involving Frazier's mother in her FAC as a basis of her defamation and intentional infliction of emotional distress claims. (*See* FAC ¶¶ 144, 156).

[20] Plaintiff represents that her failure to disclose Frazier as a potential witness was an honest mistake. (Purtill Decl. in Opp'n to Mot. to Strike ¶ 8 (Docket No. 102–1).) The court has no reason to doubt that representation. Nevertheless, the court cannot find that her failure to do so was harmless. Parties, aware of the "self-executing" and "automatic" nature of Rule 37(c) (1) sanctions, have a right to expect that only disclosed witnesses will be used to support the disclosing party's claims and defenses. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001) (citing Fed.R.Civ.P. 37 advisory committee's note (1993)). They should be able to rely on Rule 26 disclosures and not be required to second guess whether a disclosing party has purposefully omitted a potential witness or done so accidently. Thus, even though Frazier had been referenced in the depositions of other witnesses, SGMF was not on sufficient notice that she possessed information that supported plaintiff's claims or defenses such that it could

make an informed decision about whether to pursue discovery as to Frazier.

The district court has wide discretion to issue sanctions under Rule 37(c)(1). *Yeti by Molly, Ltd.,* 259 F.3d at 1106; Fed.R.Civ.P. 37(c)(1)(C) (providing that, in addition **\*1011** to or instead of excluding a witness, the court "may impose other appropriate sanctions"). It is this court's practice not to decide motions on procedural technicalities when defects can be remedied by other, less drastic sanctions, such as permitting the opposing party to depose the previously undisclosed witness. The court will therefore deny SGMF's motion to strike on the condition that SGMF have an opportunity to depose Frazier, if it chooses to do so, at plaintiff's expense.

**[21]** Because Frazier's declaration bears only on SGMF's motion for summary judgment with respect to plaintiff's claims for intentional infliction of emotional distress and punitive damages, [8] it will be a sufficient remedy if SGMF is allowed to file an amended reply to plaintiff's opposition to its motion for summary judgment with respect to those two claims after being afforded the opportunity to take Frazier's deposition. The court will accordingly withhold ruling on those claims until SGMF has had the opportunity to exercise that option.

IT IS THEREFORE ORDERED that defendant SGMF's motion for summary judgment be, and the same hereby is, GRANTED as to claims four, five, seven, eight, and nine;

IT IS FURTHER ORDERED that plaintiff's tenth claim for defamation be, and the same hereby is, DISMISSED with prejudice as to SGMF;

AND IT IS FURTHER ORDERED that SGMF's motion to strike the declaration of Carol Frazier be, and the same hereby is, DENIED, on the condition that within twenty days of this Order, plaintiff shall make available witness Frazier and bear the costs for SGMF to depose her and receive transcripts of the deposition. Within fourteen days after completion of the deposition, SGMF may file an amended reply to plaintiff's opposition to SGMF's motion for summary judgment with respect to plaintiff's claims for intentional infliction of emotional distress and punitive damages. If SGMF elects not to depose Frazier, it shall so inform the court within twenty days of this Order, and the court will decide plaintiff's intentional infliction of emotional distress and punitive damages claims on the present record.

**All Citations**

949 F.Supp.2d 997

Footnotes

1    In California, " '[i]t is an established doctrine that a corporation may not engage in the practice of such professions as law, medicine or dentistry.' " *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal.App.4th 1506, 1514, 78 Cal.Rptr.3d 646 (1st Dist.2008) (quoting *People ex rel. State Bd. of Med. Examiners v. Pac. Health Corp.,* 12 Cal.2d 156, 158, 82 P.2d 429 (1938)). This "restriction on the corporate practice of medicine finds statutory expression in California, where the practice of medicine without a license is prohibited and corporations have 'no professional rights, privileges or power.' " *Id.* (quoting Bus. & Prof. Code § 2400).

2    The court recounts these events in the light most favorable to plaintiff. *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 772 (9th Cir.2002). SGMF vigorously contests plaintiff's version of these events and objects to the evidence used to support her contentions. SGMF's evidentiary objections are addressed below.

3    Federal Rule of Civil Procedure 56 was revised and rearranged effective December 1, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

4    In a letter to Medicare, SGMF represented that plaintiff was its employee and that it would be billing for plaintiff under its tax I.D. number. (Purtill Decl. Ex. BB (Not docketed).) However, plaintiff does not dispute that GMG determined which benefits plaintiff would receive. (*See* Pl.'s Stmt. of Genuine Issues & Disputed Facts at 15.) That SGMF facilitated plaintiff's enrollment in Medicare does not alter the court's conclusion that SGMF was not plaintiff's joint employer.

      Plaintiff also states that SGMF represented that she was an employee of SGMF to the Department of Health Care Services and Memorial Hospital. (*See* Purtill Decl. Exs. Z (Not docketed), CC (Docket No. 88–1).) The court has reviewed these documents, however, and they do not identify plaintiff as an employee. Likewise, Dr. Mitnik is not

identified as the authorized agent of SGMF for the "NDNP Query" for plaintiff, but rather is identified as an "authorized submitter." (*See* Ex. 157 to Mitnik Dep. at Sealed 60–62 (Docket No. 82).)

5    The other facts offered by plaintiff to show that SGMF was plaintiff's joint employer are not probative of whether SGMF exercised substantial control over the manner and means of plaintiff's performance of her job, including: (1) GMG members sometimes identified themselves as SGMF employees and/or identified plaintiff as an "SGMF/GMG" employee; (2) the Physician Recruitment Director who recruited plaintiff held herself out as an employee of SGMF/GMG; (3) plaintiff's treating orthopedist identified her as a radiologist at SGMF/GMG; and (4) SGMF letterhead was used by GMG doctors in communications with plaintiff.

6    Initially, the court notes that it may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir.2003). The court found several such unpublished cases that have not insisted on the parent-subsidiary relationship as a prerequisite for the test. They are distinguishable or unpersuasive, however. In *Nelson v. Fog City Diner, Inc.,* No. A095951, 2002 WL 31259512 (Cal.App. 1st Dist. Oct. 9, 2002), the separate entities had common ownership. *Nelson,* 2002 WL 31259512, at *3; *see id.* at *11; *see also Goldstein v. Hanson,* No. G033321, 2005 WL 775421, at *1, *3–4 (Cal.App.4th Dist. Apr. 5, 2005) (applying integrated enterprise test to separate entities owned by the same person). In *Martinucci v. S. Cal. Permanente Med. Grp.,* No. B215453, 2011 WL 1020043 (Cal.App.2d Dist. Mar. 23, 2011), the court applied the test to determine whether the entity that contracted for medical services from plaintiff's employer, a medical group, was a single employer. *Martinucci,* 2011 WL 1020043, at *17–18. The court, however, applied the test without any analysis of its applicability beyond a parent-subsidiary relationship. *Id.*

7    Plaintiff notes in the "Introduction" to her opposition "that she has raised a genuine issue of fact with regard to whether or not SGMF violated the [section 1206(1) ] exemption [SGMF] base[s] [its] argument on (i.e., need a foundation because they cannot practice medicine)" because a policy she contested was a SGMF policy and because SGMF shredded the personal medical records of patients to prevent the fraud behind that policy from being revealed. (Opp'n at 1:13–25 (Docket No. 90).) The court addressed the SGMF policy as it relates to whether SGMF was plaintiff's joint employer above. Moreover, whether or not these assertions are well-founded or show that SGMF and GMG violated section 1206(1), SMGF and GMG's compliance with the statute does not bear on whether the court should extend the integrated enterprise test to entities operating under section 1206(1). The court construes this argument as plaintiff's identification of additional facts to suggest that because SGMF was engaging in actions that touch on the practice of medicine by GMG, the entities are interrelated under the integrated enterprise test.

8    "In California there is no separate cause of action for punitive damages." *McLaughlin v. Nat'l Union Fire Ins. Co.,* 23 Cal.App.4th 1132, 1164, 29 Cal.Rptr.2d 559 (1994). To obtain punitive damages, a plaintiff must first prove that there was a tortious act that gave rise to actual, presumed, or nominal damages. *Id.* Because plaintiff's claim for punitive damages will depend upon whether she may proceed with her intentional infliction of emotional distress claim, the court will decide the motion for summary judgment on plaintiff's punitive damages claim along with the motion on her intentional infliction of emotional distress claim.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 11

2014 WL 7499046
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Grayling TAYLOR et al.

v.

SHIPPERS TRANSPORT EXPRESS, INC. et al.

No. CV 13–02092 BRO (PLAx).
|
Signed Sept. 30, 2014.

**Attorneys and Law Firms**

Conrado Joe Sayas, Jr., C. Joe Sayas Jr. Law Offices,
Karl Patrick Romero Evangelista, Law Offices of C. Joe
Sayas Jr., Glendale, CA, Matthew B. Hayes, Kye Douglas
Pawlenko, Hayes Pawlenko LLP, Pasadena, CA, Grace
A. Kim, U.S. Department of Labor, Los Angeles, CA, for
Grayling Taylor et al.

Stacey M. Cooper, Tara Jill Gillman, Erik T. Johnson,
Gordon Anrd Rees LLP, San Diego, CA, Marc M.
Seltzer, Steven G. Sklaver, Susman Godfrey LLP, Lisa
Ann Hill, Gordon and Rees LLP, Los Angeles, CA, Ian
M. Gore, Susman Godfrey LLP, New York, NY, for
Shippers Transport Express Inc. et al.

**ORDER GRANTING PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
[93] AND DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [151]**

BEVERLY REID O'CONNELL, District Judge.

**\*1**  Renee A. Fisher, Deputy Clerk.

**I. INTRODUCTION**
Pending before the Court are the Parties' cross-motions
for summary judgment. (Dkt.Nos.93, 151.) The Court has
previously certified Plaintiffs as a class of truck drivers
(the "Drivers") who worked for Defendant Shippers
Transport Express, Inc. ("STE"). (Dkt. No. 71.) Moving
forward, a central issue in this class action-and the only
issue raised in Plaintiffs' motion-is whether the Drivers
were properly characterized by STE as independent
contractors, as Defendants assert as an affirmative

defense, or whether they were actually employees. For
the following reasons, the Court finds Plaintiffs have
successfully carried their burden of proof and **GRANTS**
Plaintiffs' motion for partial summary judgment.

Defendants' motion for summary judgment raises two
issues. First, Defendant SSA Marine, Inc. ("SSA
Marine") argues that it cannot, as a matter of law,
be considered a joint employer of the Drivers and
therefore cannot be liable in this class action. Second,
both Defendants STE and SSA Marine argue that
the Federal Aviation Authorization Administration Act
("FAAAA") preempts Plaintiffs' claims brought under
the California Labor Code. For the following reasons,
the Court rejects Defendants' arguments and therefore
**DENIES** Defendants' motion for summary judgment.

**II. BACKGROUND**

  **A. The Parties**
Plaintiffs represent a class of STE truck drivers operating
out of STE's yards in Carson and Oakland, California.
(Dkt. No. 71.) During the relevant time period in this
dispute, Plaintiffs worked for STE under agreements
stating that they were independent contractors. (*See*
Defs.' Reply to Pls.' Statement of Genuine Issues of
Material Fact (Dkt. No. 165–2) ("DSUF") ¶¶ 59–60.)
STE's logistical operations, however, such as scheduling
the pick-up and delivery of the containers, are performed
by regular employees. (Dkt. No. 32 at 1.)

Defendant STE is a trucking and logistics company
providing land transportation services for ocean
containers to and from international ports in Los Angeles
and Oakland. (Pls.' Statement of Uncontroverted Facts
(Dkt. No. 96) ("PSUF") ¶¶ 1–4.) It is owned by a company
called Inland Services, Inc. ("Inland Services"), which
is a subsidiary of Carrix, Inc. ("Carrix"). (DSUF ¶¶ 1,
3.) Defendant SSA Marine operates marine container
terminals in the Long Beach–Los Angeles area and in
Oakland. (DSUF ¶ 6.) Like Inland Services, SSA Marine
is a subsidiary of Carrix. (DSUF ¶ 1.) SSA Marine also
owns a subsidiary called SSA Containers, Inc. ("SSA
Containers"), which operates marine terminals in the
Long Beach–Los Angeles area and in Oakland. (DSUF ¶
40.)

There is much dispute about the interrelation between
Defendants STE and SSA Marine, and this issue is at

the heart of Defendants' motion for summary judgment. (Dkt. No. 151–1.) Some facts, however, are undisputed. For example, it is undisputed that Edward DeNike serves as the President of STE, the Executive Vice President of SSA Marine, and the President of SSA Containers. (DSUF ¶¶ 2, 3, 40.) The similarities or differences between these roles, however, are the subject of much dispute between the parties. Although Defendants concede that SSA Marine and STE share some officers and directors, they maintain that the day-to-day management of the two companies is "quite distinct." (DSUF ¶ 16.) Plaintiffs disagree. The Parties also disagree over the extent to which SSA Marine had control over employment decisions at STE, (DSUF ¶¶ 21–25), and whether the two companies are financially independent from each other, (DSUF ¶¶ 26–31). Given the factual nature of Defendants' motion, the Court will discuss these factual disputes in greater detail below.

**B. Procedural Background**

**\*2** Plaintiffs first initiated this lawsuit against STE on January 31, 2012 in the Superior Court of California, County of Los Angeles. (Dkt. No. 1–1.) On February 15, 2013, Plaintiffs filed a First Amended Complaint ("FAC") in order to add Defendant SSA Marine. (Dkt. No. 1–1.) The First Amended Complaint, which remains the operative complaint in this matter, alleges seven state causes of action for: (1) failure to pay minimum wage under California Labor Code sections 1194, 1194.2, 1197; (2) failure to reimburse for business expenses under California Labor Code section 2802; (3) unlawful coercion under California Labor Code section 450; (4) failure to provide accurate itemized wage statements under California Labor Code section 226; (5) waiting time penalties under California Labor Code section 203; (6) unfair business practices under California Business & Professions Code sections 17200 *et seq* . ("UCL"); and (7) civil penalties under California Labor Code sections 2698 *et seq.* (Dkt. No. 1–1.)

On March 22, 2013, SSA Marine removed the underlying action to this Court pursuant to 28 U.S.C. §§ 1441, 1446, and 1453, alleging diversity subject matter jurisdiction under 28. U.S.C. § 1332(d). (Dkt. No. 1–1.) Plaintiffs then moved for class certification on September 23, 2013, (Dkt. No. 32), which the Court granted on March 10, 2014, (Dkt. No. 71). Shortly thereafter, Plaintiffs sought leave to file a Second Amended Complaint, (Dkt. No. 73), but the Court denied this request, (Dkt. No. 82). The central issue

in dispute for purposes of evaluating Plaintiffs' allegations is whether Plaintiffs are properly characterized as STE's employees or as independent contractors.

**C. The Parties' Cross–Motions for Partial Summary Judgment**

On April 28, 2014, Plaintiffs filed a motion for partial summary judgment. (Dkt. No. 93.) The sole issue raised by this motion is Plaintiffs' argument that STE cannot, as a matter of law, satisfy its burden of establishing that the class members are independent contractors, as STE alleges in its Second Affirmative Defense. (Dkt. No. 93–1.) STE opposed this motion on June 16, 2014, (Dkt. No. 124), and Plaintiffs replied (pursuant to this Court's order) on July 16, (Dkt. No. 145). On August 8, 2014, Defendants filed a motion for summary judgment. (Dkt. No. 151.) Plaintiffs opposed this motion on September 8, 2014, (Dkt. No. 159), and Defendants replied on September 15, 2014, (Dkt. No. 165). The Court then heard oral argument on both motions on September 29, 2014.

## III. EVIDENTIARY OBJECTIONS

Plaintiffs and Defendants both object to evidence offered by the other party in support of and in opposition to the Parties' cross-motions. (Dkt.Nos.124–12, 139, 165–3.) Plaintiffs make numerous objections to declarations submitted by Defendants of the following witnesses: Kevin Baddeley, Juan Carlos Alvarez, Edward DeNike, Guy Sanderson, Joe Salinas, and Ana Berganza. Defendants object to various "undisputed facts" proposed by Plaintiffs on the basis that they mischaracterize or misstate the testimony. Defendants also object to evidence submitted by Plaintiffs in opposition to Defendants' motion on the basis that the evidence represents an improper expert opinion, is speculative or lacks foundation, is irrelevant, violates the Best Evidence Rule, is vague or ambiguous, or does not comply with Federal Rule of Civil Procedure 26(a)(2).

**A. Plaintiffs' Objections**

**\*3** Many of Plaintiffs' objections are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Doe v. Starbucks, Inc.,* No. 08–0582, 2009 WL 5183773, at \*1 (C.D.Cal. Dec.18, 2009). The Court will therefore aggregate Plaintiffs' numerous objections to the declarations into categories for expediency. Plaintiffs

object to the declarants' testimony on the grounds that it: (1) lacks foundation, (2) is improper lay witness opinion testimony, (3) is irrelevant, (4) is conclusory, (5) violates the Best Evidence Rule, (6) constitutes hearsay, and (7) contradicts the declarant's deposition testimony.

### 1. Foundation

First, Plaintiffs object to numerous statements made by these declarants on the grounds that they lack foundation. These statements primarily concern the shipping industry as a whole, as well as STE's business and its interactions with its drivers. Federal Rule of Evidence 602 requires that a witness have personal knowledge as to any testimony he or she gives. Fed.R.Evid. 602. The declarants whose testimony Plaintiffs object to are all employees or executives of STE. As such, each of them has personal knowledge of both the shipping industry and STE's individual business. The majority of Plaintiffs' objections on this basis to their testimony (including Plaintiffs' objections to the entirety of each declaration) are therefore **OVERRULED.**

There are some instances, however, in which the declarants speculate as to the reasons behind the decisions of certain drivers, or when they interpret the requirements of certain federal regulations. While the Court agrees with Plaintiffs that such speculative testimony lacks foundation, the Court does not consider this testimony in making its determination. These objections are therefore **OVERRULED** as moot.

### 2. Improper Lay Witness Testimony

Second, Plaintiffs object to certain testimony as improper lay witness testimony. Rule 701 requires that non-expert witnesses restrict their testimony to opinions that are rationally based on their perception, helpful to understanding their testimony or to determining a fact at issue, and not based on specialized knowledge. Fed.R.Evid. 701.

Here, the majority of the declarants' testimony concerns their own perceptions of STE's operations and of the shipping industry, which does not violate Rule 701. To the extent that these declarants provide testimony that goes beyond the scope of Rule 701—for instance, their testimony regarding what federal laws require of STE-the Court does not consider such testimony in making

its determination. Plaintiffs' objections on this basis are therefore **OVERRULED** as moot.

### 3. Relevance

Third, Plaintiffs' relevance objections are baseless, as all of the testimony provided by STE concerns (at least in part) STE's relationship with its Drivers or how and why STE conducts its business in the way that it does. This testimony is relevant to whether STE has properly characterized its Drivers as independent contractors. Moreover, relevance is a very low threshold to overcome in determining the admissibility of evidence. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("[Rule 402]'s basic standard of relevance ... is a liberal one ."). Plaintiffs' objections based on relevance are therefore **OVERRULED.**

### 4. Conclusory Statements

**\*4** Fourth, Plaintiffs object to statements made by the declarants that they characterize as "conclusory." "Conclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir.2008); *accord Robinson v. City of San Die go,* 954 F.Supp.2d 1010, 1015 (S.D.Cal.2013) ("[U]nsupported conjecture or conclusory statements are insufficient to defeat summary judgment."). The Court agrees with Plaintiffs that the declarants' testimony at times makes reference to legal terms such as "employ" or "independent contractor," and that their legal conclusions regarding such terms should not be assigned any weight. Because the Court does not consider such statements in making its decision, however, Plaintiffs' objections on this basis are moot and therefore **OVERRULED.**

### 5. Best Evidence Rule

Fifth, Plaintiffs object to various statements on the basis that they violate the Best Evidence Rule, which requires a party to provide the original document when it is being offered to prove the content of the document. Fed.R.Evid. 1002. Primarily, the declarants' statements to which Plaintiffs object on this ground concern the requirements of certain federal regulations. While this is not the appropriate ground on which to object to the declarants' interpretations of federal regulations, the Court does not consider such testimony in making its

decision. These objections are thus **OVERRULED** as moot.

Plaintiffs also object that the Best Evidence Rule should preclude testimony by the declarants regarding the contents of agreements and forms that were provided by STE and executed by the Drivers. Plaintiffs properly argue that these documents should speak for themselves. Plaintiffs' objections as to the contents of documents such as the transportation agreements and the workers' compensation waiver forms are therefore **SUSTAINED.**

### 6. Hearsay

Next, Plaintiffs object to various statements as hearsay. Some of these statements concern the declarants' interpretations of federal regulations. Again, the Court does not consider these statements, and these objections are therefore **OVERRULED** as moot. Plaintiffs' other hearsay objections principally concern the declarants' personal knowledge of STE's internal disciplinary system. These statements are not hearsay, and Plaintiffs' hearsay objections to these statements are thus **OVERRULED.**

In some instances, however, Plaintiffs' hearsay objections are well-taken. For instance, Mr. Alvarez states in his declaration that Drivers participating in the lease program have contacted him to tell him that they like the program's flexibility. He also asserts that everyone involved with the management of STE with whom Mr. Alvarez has spoken agrees with him that the Drivers are independent contractors rather than employees. Similarly, Mr. DeNike states in his declaration that he has "been advised" that STE's policy is adhered to in practice. And both Mr. Sanderson and Mr. Salinas make several references to statements made to or questions asked of them by Drivers relating to their employment. To the extent that these statements are being offered to prove the truth of the communications described, they are inadmissible hearsay. Plaintiffs' objections to these statements are thus **SUSTAINED.**

### 7. Contradiction of Deposition Testimony

**\*5** Finally, Plaintiffs object on the basis that certain declarants contradict their deposition testimony in their declarations. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991).

First, Plaintiffs object to Mr. Baddeley's statement that Drivers are not required to appear at any particular time. (Dkt. No. 139 at 9.) Mr. Baddeley stated in his deposition that Drivers have to arrive within a given timeframe in order to lease a truck overnight. Mr. Baddeley's declaration does not contradict that testimony, as his statement refers to the fact that Drivers who wish to lease a truck may do so during given timeframes. Plaintiffs' objection takes one sentence out of context. Accordingly, this objection is **OVERRULED.**

Second, Plaintiffs object to Mr. Alvarez's statement that STE's "[safety] meetings are not mandatory, are infrequent, and drivers suffer no repercussions if they do not attend." (Dkt. No. 139 at 22.) Mr. Alvarez stated in his deposition that the Drivers attended a safety meeting that occurred on January 8, 2011. Mr. Alvarez's later testimony in his declaration does not contradict that assertion. In his declaration, Mr. Alvarez is clearly referring to safety meetings in general, over the course of several years, whereas his deposition testimony is limited to one meeting in January 2011. Plaintiffs' objection is therefore **OVERRULED.**

Third, Plaintiffs object to Mr. Alvarez's assertion that STE "does not reprimand drivers for safety issues, such as only offering a driver day loads versus night loads." (Dkt. No. 139 at 23.) Plaintiffs argue that this contradicts the fliers that he admitted during his deposition to distributing to the Drivers. Indeed, the fliers, which are lodged as Exhibit 18 to Mr. Alvarez's deposition, state: "After multiple warnings and notices about pre-trip inspections & damaged chassis, it seems we are still having issues daily.... If the chassis is painted with white/neon green paint, you will be moved to days for bringing unsafe chassis' to the yard." (Dkt. No. 95–4 at 77.) Mr. Alvarez's statement that STE does not reprimand its drivers for safety issues by threatening to restrict Drivers to day loads appears contradictory to his earlier admission that he distributed the fliers to the Drivers. Thus, to the extent that Mr. Alvarez's statement contradicts his earlier testimony, Plaintiffs' objection to this statement is **SUSTAINED.**

### B. Defendants' Objections

Defendants raise objections to evidence submitted by Plaintiffs both in support of Plaintiffs' motion for partial

summary judgment and in opposition to Defendants' motion for summary judgment. (Dkt.Nos.124–12, 165–3.)

### 1. Defendants' Objections to Plaintiffs' Evidence Submitted in Support of Plaintiffs' Motion for Partial Summary Judgment

**\*6** In opposition to Plaintiffs' motion for partial summary judgment, Defendants object to numerous statements contained in Plaintiffs' separate statement of facts. (Dkt. No. 124–12.) The sole ground for STE's objections is that these statements either mischaracterize or misstate testimony. To the extent that Plaintiffs' briefs or separate statement (as to either of the cross-motions) summarize or describe witness testimony, the Court does not rely on these characterizations in making its decision.[1] STE's objections are therefore **OVERRULED** as moot.

### 2. Defendants' Objections to Plaintiffs' Evidence Submitted in Opposition to Defendants' Motion for Summary Judgment

In support of their own motion for summary judgment, Defendants object to evidence submitted by Plaintiffs that Defendants argue (1) represents an improper expert opinion, (2) does not comply with Federal Rule of Civil Procedure 26(a)(2), (3) is speculative or lacks foundation, (4) is irrelevant, (5) is vague or ambiguous, or (6) violates the Best Evidence Rule. (*See* Dkt. No. 165–3.)

First, Defendants argue that several of the statements made by various witnesses and offered by Plaintiffs represent improper expert opinion testimony regarding the employment status of the Drivers, the issue of deductions and damages, or the economic strength of STE. Because the Court does not rely on the declarants' opinions of such matters, Defendants' objections are OVERRULED as moot.

Second, Defendants object to the declaration of Plaintiffs' expert witness, Karl Schulze. Specifically, Defendants argue that the declaration fails to comply with Federal Rule of Civil Procedure 26(a)(2) because it has failed to identify Mr. Schulze's authored publications over the past ten years, a list of cases in which he has testified, and a statement of compensation specifying the amount he is to be paid for his services, as required by Federal Rule of Civil Procedure 26(a)(2)(iv)-(vi).[2]

Indeed, although Mr. Schulze's declaration states that he attached as Exhibit A his curriculum vitae detailing his qualifications, no such exhibit was attached. Nevertheless, in response to an order to show cause issued by the Court, Plaintiffs have provided the Court with the necessary information regarding Mr. Schulze's expert retention and qualifications. (Dkt. No. 175.) Moreover, the Court finds Plaintiffs' earlier omission to be substantially justified owing to the short amount of time allotted to Plaintiffs to retain a rebuttal expert before their opposition to Defendants' motion was due. Accordingly, Defendants' objection on this basis is OVERRULED, and the Court's order to show cause is hereby DISCHARGED.

Third, Defendants argue that certain statements lack foundation and/or call for speculation. These include statements made by Mr. Brown in his deposition, Mr. DeNike in his deposition, Mr. Karl Schulze in his declaration, and Plaintiffs' counsel, Mr. Joe Sayas, in his declaration. To begin, the Court does not rely on the statement of Mr. Brown or the statements of Mr. Sayas. As a result, Defendants' objections to these statements are **OVERRULED** as moot. Next, in Mr. DeNike's deposition, he testified as to "meetings among corporate officers of STE" and that "We haven't felt it was necessary to have official board meetings or recordkeeping for STE." Defendants objected on the basis that Mr. DeNike is only an executive officer and not a board member, and thus that he lacks foundation to discuss such matters. But Mr. DeNike's statements do not pertain solely to board meetings; rather, they refer to "meetings *among corporate officers* of STE," and he is clearly a corporate officer. Moreover, as a corporate officer, Mr. DeNike very likely had personal knowledge about STE's recordkeeping practices. Defendants' objection to this statement is therefore **OVERRULED.** As for Mr. Schulze's declaration, Defendants object to his opinion that STE is undercapitalized on the bases that the documents he evaluated include information that Defendants believe he failed to consider, that the documents do not provide insight into liquidation value or depreciation, and that he failed to include the documents in his list of reviewed documents. The Court does not rely on STE's capitalization in reaching its decision, however, so Defendants' objections on this basis are **OVERRULED** as moot at this stage.

**\*7** Next, to the extent that testimony is either irrelevant or vague and ambiguous, the Court does not rely on such

statements. These objections by Defendants are therefore **OVERRULED** as moot. And finally, Defendants object to Mr. Sayas's characterization in his declaration of the deposition testimony of SSA Marine's officers on the basis that the deposition transcripts are the best evidence. The Court agrees. Defendants' objection is therefore **SUSTAINED** under Federal Rule of Evidence 1002.

## IV. LEGAL STANDARD

Summary judgment is appropriate when, after adequate discovery, the evidence demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A disputed fact is material where its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id.* The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may satisfy that burden by showing "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

Once the moving party has met its burden, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the non-moving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 587. Only genuine disputes over facts that might affect the outcome of the lawsuit will properly preclude the entry of summary judgment. *Anderson, All* U.S. at 248; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (holding that the non-moving party must present specific evidence from which a reasonable jury could return a verdict in its favor). A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000).

A court may consider the pleadings, discovery, and disclosure materials, as well as any affidavits on file. Fed.R.Civ.P. 56(c) (2). Where the moving party's version of events differs from the non-moving party's version, a

court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Although a court may rely on materials in the record that neither party cited, it need only consider cited materials. Fed.R.Civ.P. 56(c)(3). Therefore, a court may properly rely on the non-moving party to identify specifically the evidence that precludes summary judgment. *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996).

 **\*8** "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty. Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir.2001). A court may not assume that because each side moves for summary judgment there are no disputed issues of material fact; it must make that determination by reviewing the parties' arguments. *United States v. Fred A. Arnold Inc.,* 573 F.2d 605, 606 (9th Cir.1978).

Finally, the evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson,* 477 U.S. at 253.

## V. FAAAA PREEMPTION

As a threshold matter, Defendants argue that Plaintiffs' claims under the California Labor Code are preempted by the FAAAA. They acknowledge, however, that the Ninth Circuit recently rejected this argument in *Dilts v. Penske Logistics, LLC,* 12–55705, 769 F.3d 637, 2014 WL 4401243 (9th Cir. Sept.8, 2014). In *Dilts,* the Ninth Circuit engaged in a thorough discussion of the FAAAA in finding that laws related to California's meal and rest-break laws are not preempted:

> In light of the FAAAA preemption principles outlined above, California's meal and rest break laws plainly

are not the sorts of laws "related to" prices, routes, or services that Congress intended to preempt. They do not set prices, mandate or prohibit certain routes, or tell motor carriers what services they may or may not provide, either directly or indirectly. They are "broad law[s] applying to hundreds of different industries" with no other "forbidden connection with prices[, routes,] and services." They are normal background rules for almost all employers doing business in the state of California. And while motor carriers may have to take into account the meal and rest break requirements when allocating resources and scheduling routes-just as they must take into account state wage laws, or speed limits and weight restrictions-the laws do not "bind" motor carriers to specific prices, routes, or services. Nor do they "freeze into place" prices, routes, or services or "determin[e] (to a significant degree) the [prices, routes, or] services that motor carriers will provide."

*Id.* at \*7 (alteration in original) (quoting *Air Transp. Ass'n of Am. v. City & Cnty. of S.F.,* 266 F.3d 1064, 1072 (9th Cir.2001); *Am. Trucking Ass'ns, Inc. v. City of L.A.,* 660 F.3d 384, 397 (9th Cir.2011); *Rowe v. N.H. Motor Transp. Ass'n,* 552 U.S. 364, 372, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008)). [3]

**\*9** In light of *Dilts,* the Court finds that Plaintiffs' claims alleged in their First Amended Complaint are not sufficiently "related to" prices, routes, or services to be preempted by the FAAAA. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

## VI. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Next, the Court will discuss Plaintiffs' motion for partial summary judgment. (Dkt. No. 93.) The sole issue in Plaintiffs' motion is whether, as a matter of law, the Drivers should be considered employees, and not independent contractors. At the outset, the Court notes that, while this is typically a factual inquiry that should not be determined on summary judgment, *see, e.g., Global Hawk Ins. Co. v. Le,* 225 Cal.App.4th 593, 603, 170 Cal.Rptr.3d 403 (Cal.Ct.App.2014) ("Whether one is an employee or independent contractor is usually a question of fact."), "if only one inference may be drawn from all the facts, the question is one of law," *Torres v. Reardon,* 3 Cal.App.4th 831, 838, 5 Cal.Rptr.2d 52 (Cal.Ct.App.1992). The Court also recognizes both that

the transportation agreements that the Drivers signed state that the Drivers are independent contractors, and that the Drivers also appear to have signed forms acknowledging that they were independent contractors. Nevertheless, "[t]hat the Drivers here had contracts 'expressly acknowledging that they were independent contractors' is simply not dispositive under California's test of employment." *Narayan v. EGL, Inc.,* 616 F.3d 895, 903 (9th Cir.2010); *Dalton v. Lee Publ'ns, Inc.,* 08CV1072 BTMNLS, 2011 WL 1045107, at \*3 (S.D.Cal. Mar.22, 2011); *accord Alexander v. FedEx Ground Package Sys., Inc.,* 12–17458, 765 F.3d 981, 2014 WL 4211107, at \*16 (9th Cir. Aug.27, 2014) (Trott, J., concurring) ("Bottom line? Labeling the drivers 'independent contractors' in FedEx's Operating Agreement does not conclusively make them so when viewed in the light of (1) the entire agreement, (2) the rest of the relevant 'common policies and procedures' evidence, and (3) California law.").

For causes of action arising under California Labor Code section 1194, California courts apply the definitions established in the California Industrial Welfare Commission's ("IWC") regulations-known as "wage orders"-in determining whether an employment relationship exists. *See Martinez v. Combs,* 49 Cal.4th 35, 52, 109 Cal.Rptr.3d 514, 231 P.3d 259 (Cal.2010). [4] Under this definition, employment means: "(1) to exercise control over wages, hours or working conditions, (2) to suffer or permit to work, or (3) to engage, thereby creating a common law employment relationship." *Carrillo v. Schneider Logistics Trans–Loading & Distrib., Inc.,* 2:11–CV–8557–CAS, 2014 WL 183956, at \*15 (C.D.Cal. Jan.14, 2014) (quoting *Martinez,* 49 Cal.4th at 64, 109 Cal.Rptr.3d 514, 231 P.3d 259) (internal quotation marks omitted). A plaintiff may establish an employment relationship through any one of these three definitions.

The California Supreme Court, however, recently declined to decide "what application, if any, the wage order tests for employee status might have to wage and hour claims." *Ayala v. Antelope Valley Newspapers, Inc.,* 59 Cal.4th 522, 531, 173 Cal.Rptr.3d 332, 327 P.3d 165 (Cal.2014). Finding that the case could be determined solely on the basis of the common law employment test, the court did not apply the other *Martinez* tests. *Id.* As in *Ayala,* the Court need not consider the applicability of *Martinez* because Plaintiffs have carried their burden of establishing an employment relationship through California's common law test. *See Martinez,* 49

Cal.4th at 64, 109 Cal.Rptr.3d 514, 231 P.3d 259 (stating that the IWC's definition of employment "incorporates the common law definition as one alternative").

### A. Plaintiffs Have Established a Prima Facie Case of Employment

 **\*10**  Before considering the common law test for employment, the Court must acknowledge a special circumstance applicable to this analysis under California law. In California, "once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan,* 616 F.3d at 900; *accord Robinson v. George,* 16 Cal.2d 238, 242, 105 P.2d 914 (Cal.1940) ("The rule ... is that the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary."). Thus, at trial, if Plaintiffs can establish a prima facie case of employment, the burden would shift to Defendants, who must then establish that the Drivers were independent contractors. *Narayan,* 616 F.3d at 900; *Alexander,* 765 F.3d 981, 2014 WL 4211107, at \*9 ("California courts have recognized that 'the burden of proof is on the party attacking the employment relationship ....' " (quoting *Bemis v. People,* 109 Cal.App.2d 253, 263–64, 240 P.2d 638 (Cal.Ct.App.1952))).

Clearly, the drivers here have provided services for STE by hauling loads for STE from ports to various storage facilities in Southern California and in Oakland. Plaintiffs have therefore established a prima facie showing of employment. Nevertheless, as the moving party, Plaintiffs maintain the burden of establishing that there is no disputed issue of material fact as to whether, at trial, STE could demonstrate that the Drivers are independent contractors rather than employees.

### B. California's Common Law Test for Employment

California's common law test for determining a worker's employment status was set forth in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations,* 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399 (Cal.1989). Under *Borello,* the "principal test of an employment relationship" is "[w]hether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Id.* at 350, 256 Cal.Rptr.

543, 769 P.2d 399; *accord Tieberg v. Unemployment Ins. Appeals Bd., 2* Cal.3d 943, 950 (Cal.1970) ("The right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship and the other matters enumerated constitute merely 'secondary elements.' ").

While control is paramount in the *Borello* analysis, the court also recognized several other "secondary indicia" of employment that may also be considered. *Borello,* 48 Cal.3d at 350, 256 Cal.Rptr. 543, 769 P.2d 399. The court noted, for instance, that "strong evidence in support of an employment relationship is the right to discharge at will, without cause." *Id.* at 350, 256 Cal.Rptr. 543, 769 P.2d 399 (internal modification omitted). There are also other "[a]dditional factors," including:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

 **\*11** *Id.* at 351, 256 Cal.Rptr. 543, 769 P.2d 399. These factors are not to be applied "mechanically as separate tests"; rather, "they are intertwined and their weight depends often on particular combinations." *Id.* Moreover, "[e]ven if one or two of the individual factors might suggest an [independent contractor] relationship, summary judgment is nevertheless proper when ... all the factors weighed and considered as a whole establish ... an [employment] and not an [independent contractor relationship.]" *Alexander,* 765 F.3d 981, 2014 WL

4211107, at *5 (alterations in original) (quoting *Arnold v. Mut. of Omaha Ins. Co.,* 202 Cal.App.4th 580, 590, 135 Cal.Rptr.3d 213 (Cal.Ct.App.2011)).

### C. Plaintiffs Have Established that the Drivers Were Employees Under the *Borello* Common Law Analysis

Both Parties go to great lengths to argue many of the factors described in *Borello.* Although STE takes issue with Plaintiffs' characterization of many of the facts pertinent to this analysis, the Court finds that the undisputed facts in the record exhibit an employment relationship between STE and its Drivers.

#### 1. STE Exercises Significant Control over the Drivers

Under *Borello,* the degree of control exercised by STE over its Drivers is the principal inquiry for determining the Drivers' employment status. "Significantly, what matters under the common law is not how much control a hirer exercises, but how much control the hirer retains the *right* to exercise." *Ayala,* 59 Cal.4th at 533, 173 Cal.Rptr.3d 332, 327 P.3d 165; *accord Ruiz v. Affinity Logistics Corp.,* No. 12–56589, 754 F.3d 1093, 1102 (9th Cir.2014) ("[W]hat matters [under *Borello* ] only is whether Affinity had the right to control the drivers' work."). The Court will therefore focus its analysis on the amount of control that STE has retained the right to exercise over its Drivers. "Whether a right of control exists may be measured by asking 'whether or not, if instructions were given, they would have to be obeyed' on pain of at-will 'discharge for disobedience.' " *Ayala,* 59 Cal.4th at 533, 173 Cal.Rptr.3d 332, 327 P.3d 165 (quoting *Toyota Motor Sales U.S.A., Inc. v. Superior Court,* 220 Cal.App.3d 864, 875, 269 Cal.Rptr. 647 (Cal.Ct.App.1990)).

#### a. The Right to Discharge

To begin, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " *Ayala,* 59 Cal.4th at 531, 173 Cal.Rptr.3d 332, 327 P.3d 165 (second modification in original) (quoting *Malloy v. Fong,* 37 Cal.2d 356, 370, 232 P.2d 241 (Cal.1951)). Here, the Parties dispute whether STE retains this right to terminate the Drivers without cause. Plaintiffs argue that the operative agreements provide no restrictions on STE's ability to terminate the Drivers, rendering the

company able to fire the Drivers at will. In response, STE contends that (1) in practice, Drivers are not terminated unless they materially breach their obligations, and (2) the agreements' fixed duration and notice requirements support a finding of independent contractor status.

**\*12** In support of its first argument, STE provides declarations by its employees giving their understanding of the transportation agreements. (*See, e.g.,* Dkt. No. 124–2 at 3 ("These Agreements are each for a fixed duration and can only be terminated for a material breach.").) But it is the *right* to terminate at will-and not the practice of doing so-that creates an employment relationship. *See Ayala,* 59 Cal.4th at 533, 173 Cal.Rptr.3d 332, 327 P.3d 165. And the employees' interpretations of the transportation agreements are not admissible as evidence for what the agreements actually state. Fed.R.Evid. 1002. Instead, the Court will rely on the express language of the agreements, which states:

> 8.1.... This Agreement shall be automatically renewed for succeeding terms of ninety (90) days each unless, at least thirty (30) calendar days before expiration of any term, either party shall give written notice to the other of its intention not to renew this Agreement. *Nothing in this Agreement shall be interpreted as requiring either party to renew or extend this Agreement.*

> 8.2. If either party defaults on the performance of this Agreement or breaches any of its provisions, the other party may terminate this agreement immediately by giving written notification.

(Dkt. No. 125–1 at 23 (emphasis added).) Clearly, STE retains the right under these provisions to terminate a Driver immediately if he or she breaches any provisions of the transportation agreement. But STE also retains the right not to renew or extend the agreement without needing any justification for doing so. Thus, STE effectively retains the right to terminate any Driver's agreement without cause provided it gives the Driver thirty days' notice.

STE's second argument relies on two cases for the proposition that the agreements support a finding of independent contractor status. The first case, *Arnold v. Mutual of Omaha Insurance Co.,* 202 Cal.App.4th 580, 589, 135 Cal.Rptr.3d 213 (Cal.Ct.App.2011), stands for the general proposition that "a termination at-will clause for both parties may properly be included in an

independent contractor agreement, and is not by itself a basis for changing that relationship to one of an employee." While this is true, the presence of such a clause remains persuasive evidence of control. *See Alexander,* 765 F.3d 981, 2014 WL 4211107, at *12. The second case, *Fleming v. Foothill–Montrose Ledger,* 71 Cal.App.3d 681, 687, 139 Cal.Rptr. 579 (Cal.Ct.App.1977), speaks more directly to the facts at issue here. In *Fleming,* the court found an employer's right of discharge to be "sufficiently limited" to preclude a finding of an employment relationship where the contract between the parties provided for two weeks' notice prior to dismissal by either side, stating: "So long as the right of discharge cannot be invoked capriciously, as here where it can only be invoked if the newscarrier's services are 'unsatisfactory,' it is not conclusive evidence negating independence of the person performing work for another." *Id.* (internal modifications omitted). While the court in *Fleming* indicated that the notice period limited the employer's right of discharge, it also conditioned its holding on the finding that discharge could not be invoked capriciously, noting that the contract at issue required the employer to find the worker's services to be "unsatisfactory." Here, there is no such limitation on STE's right not to renew the Drivers' contracts; rather, STE may decide not to renew the contract for any reason or for no reason at all.

 **\*13** Moreover, other cases involving contracts with required notice periods for discharge rights have clarified the impact of this limitation. In *Narayan v. EGL, Inc.,* 616 F.3d 895, 902–03 (9th Cir.2010), for instance, the Ninth Circuit addressed contracts between a transportation company and its truck drivers that are very similar to the ones at issue here. In doing so, the court stated: "Significantly, the contracts signed by the plaintiff Drivers contained automatic renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of the agreement. *Such an agreement is a substantial indicator of an at-will employment relationship." Id.* (emphasis added). A number of other cases have come to similar conclusions. *See, e.g., Dalton v. Lee Publ'ns, Inc.,* 08CV1072 BTMNLS, 2011 WL 1045107, at *3 (S.D.Cal. Mar.22, 2011) (noting that "evidence of an employment relationship can be found in Defendant's ability to terminate distributors without cause with thirty days notice or with cause if subscriber complaints about delivery service exceed 1.5 complaints per one thousand newspapers delivered"); *Antelope Valley Press v. Poizner,* 162 Cal.App.4th 839, 854, 75 Cal.Rptr.3d 887

(Cal.Ct.App.2008) (stating that termination with a thirty-day notice requirement "clearly" gives the employer the right to discharge at will without cause); *Estrada v. FedEx Ground Package Sys., Inc.,* 154 Cal.App.4th 1, 6, 11, 64 Cal.Rptr.3d 327 (Cal.Ct.App.2007) (finding an agreement providing for termination with thirty days' notice to constitute evidence of at-will employment); *Gonzalez v. Workers' Comp. Appeals Bd.,* 46 Cal.App.4th 1584, 1593, 54 Cal.Rptr.2d 308 (Cal.Ct.App.1996) (holding that a contract with a two-week notice termination provision constituted at-will employment where the contract provided no consequences for employers' failure to give notice).

As in these cases, the transportation agreements at issue here provided that STE could terminate (or refuse to renew) a Driver's contract either with thirty days' notice without cause or immediately with cause. And as in these cases, the Court finds that this power evidences a right to control that is "a substantial indicator of an at-will employment relationship." *Narayan,* 616 F.3d at 902–03.

### b. Other Indicia of Control

In addition to the right to discharge, other important indicia of control include any factors that demonstrate whether STE had the "right to control the manner and means of accomplishing the result desired." *Borello,* 48 Cal.3d at 350, 256 Cal.Rptr. 543, 769 P.2d 399. Defendants argue that STE did not have the right to control the manner and means of the Drivers' job for several reasons, including: (1) the Drivers may choose which loads they wish to haul, they may reject loads, they may negotiate with STE for higher rates, and they may negotiate with customers either to increase rates or to obtain work for certain areas; (2) STE does not set schedules or require the Drivers to show up or work on any certain days; (3) STE does not have the right to control or monitor how the Drivers perform their jobs; (4) STE does not actively monitor the Drivers aside from occasional safety checks to ensure that the Drivers are driving under the speed limit or to inquire as to why a customer has not received a load; and (5) to the extent that STE does control the Drivers, that control is mandated by federal law.[5] (Dkt. No. 124 at 19–21.) Each of these arguments, however, is contradicted by the undisputed facts of the record.

**\*14**  First, despite Defendants' contentions that the Drivers could choose which loads to accept and that they are involved in the process of determining rates, the evidence in the record directly refutes these propositions. For instance, STE's "OFF–ROUTE, CALL IN & SEALED LOADS" policy explicitly states that Drivers "need to contact [their] dispatcher daily, to see when and where [they] are needed." (Dkt. No. 95–5 at 53.) Thus, even if in practice Drivers are given leniency as to which loads they wish to haul, the policy expressly reserves the right to control when and where Drivers work on a daily basis, and it is the *right* to control that is relevant. *See Ayala,* 59 Cal.4th at 533, 173 Cal.Rptr.3d 332, 327 P.3d 165.

Similarly, in spite of Defendants' contention that the Drivers may negotiate either with STE or with customers to secure higher rates, this privilege is nowhere expressed in the record. Rather, Defendants simply state that to be the case in their opposition to Plaintiffs' motion. (Dkt. No. 124 at 20.) And as Plaintiffs point out, "unsupported conjecture or conclusory statements are insufficient to defeat summary judgment." *Robinson,* 954 F.Supp.2d at 1015. In fact, this contention seems to be not only conjecture, but also untrue. Multiple STE employees testified during their depositions that the Drivers' rates are predetermined and not subject to change. For example, STE's Southern California General Manager Kevin Baddeley stated in his deposition that their compensation structure for Drivers has "been the same for quite sometime [sic]." (Dkt. No. 95–1 at 33.) STE's Oakland General Manager, Guy Sanderson, also testified that the Drivers' rates rarely change, noting that the rates have been the same in almost every single instance since he started there: "Out of, say, a hundred different rates, different locations, there may have been three or four that have changed." (Dkt. No. 95–3 at 27–29.) Mr. Sanderson also testified that, aside from one time, he is not aware of any instances in which rates were increased in response to complaints by Drivers. (Dkt. No. 95–3 at 31.)

Second, STE's argument that it does not set schedules or require the Drivers to show up or work on any certain days is likewise contradicted by the record. STE's "OFF–ROUTE, CALL IN & SEALED LOADS" policy states not only that Drivers "need to contact [their] dispatcher daily, to see when and where [they] are needed," but also that they must "be there *on time* when required." (Dkt.

No. 95–5 at 53.) While the transportation agreements reserve to the Drivers the right to refuse work, (Dkt. No. 125–1 at 19), the language of this policy appears to impose an affirmative duty to check in daily. In fact, it states that, "If you are not able to make yourself available for work, contact dispatch and let them know, so they can make proper arrangements to cover whatever loads are available. (Dkt. No. 95–5 at 53.) The policy also makes clear that a Driver's failure to comply with the policy will result in termination of the Driver's contract with STE. Specifically, it states: "The following policy is so important that should you fail to abide by it, your contract with *Shippers Transport Express* will be terminated immediately." (Dkt. No. 95–5 at 53.) It also states in all caps, "YOUR CONTRACT WILL BE TERMINATED FOR VIOLATING THIS POLICY." (Dkt. No. 95–5 at 53.) Similarly, STE leases its trucks to the Drivers, who must arrive during a certain timeframe in order to lease a truck. (*See* Dkt. No. 95–1 at 29 ("Well, we stop issuing trucks at 5:30. So they have to be there before 5:30.").) Thus, Defendants' contention that STE does not have schedules or require the Drivers to show up at specific times is belied by the record. And "[s]uch regular schedules are consistent with employee status and reflect employer control." *Alexander,* 765 F.3d 981, 2014 WL 4211107, at \* 10 (quoting *Air Couriers Int'l v. Emp't Dev. Dep't,* 150 Cal.App.4th 923, 937, 59 Cal.Rptr.3d 37 (Cal.Ct.App.2007)).

**\*15**  Third, Defendants' claim that STE does not monitor how the Drivers perform their jobs-for example, by monitoring their routes-is similarly unsupported. The same "OFF–ROUTE, CALL IN & SEALED LOADS" policy provides that STE may terminate a Driver's contract (and even charge a Driver with a felony for stealing the company's vehicle) if the Driver, without STE's authorization, "take[s] a trailer off route," "deviate[s] from a known truck route," "take[s] a load, empty or chassis to [his or her] house (even if only for a minute)," or leaves it "outside a secured location." (Dkt. No. 95–5 at 53.) Regardless of whether Drivers have actually been terminated or charged with a felony for such actions is immaterial; STE has retained the right to do so.[6]

Fourth, Defendants maintain that STE does not actively monitor the Drivers aside from occasional safety checks to ensure that the Drivers are driving under the speed limit or to inquire as to why a customer has not received his

or her load. Again, however, it is the *right* to control that STE has retained, and not the actual exercise of control, which drives this analysis. And Defendants do not dispute that STE has the capacity (which it sometimes exercises) to track the speed of the Drivers using GPS. (Dkt. No. 124–12 at 10–11.) STE also concedes that it has, on occasion, sent out employees to observe Drivers in order to ensure that they are driving safely or to follow up on a customer's complaint. (Dkt. No. 95–4 at 16–17.)

Finally, Defendants argue that, to the extent that STE does exercise control over the Drivers, it does so only to comply with Federal Motor Carrier Safety Regulations ("FMCSRs"). As a motor carrier involved in foreign or interstate commerce, STE is required to comply with federal regulations regarding safety measures and recordkeeping. *See* 49 C.F.R. §§ 390–396. And as Defendants argue, observance of "mandatory lease provisions do[es] not transform an agreed upon independent contractor relationship between the carrier and truck owner/operator into an employee relationship under state law." *Amerigas Propane, LP v. Landstar Ranger, Inc.,* 184 Cal.App.4th 981, 999, 109 Cal.Rptr.3d 686 (Cal.Ct.App.2010). Nevertheless, many of the aforementioned control rights retained by STE over the Drivers are not mandated by federal law. For example, Defendants have not suggested any federal regulations mandating that STE (1) require Drivers to contact dispatch on a daily basis, (2) install GPS devices in the trucks leased by the Drivers, or (3) prohibit qualified Drivers who are contracted with STE to ride with other Drivers. Thus, STE's case is distinguishable from those Defendants cite in their opposition where the employer exerted only the control necessary to comply with federal regulations.

After considering the undisputed facts in the record, the Court determines that the degree of control exercised by STE over the Drivers demonstrates that it has "retained all necessary control over the drivers' work." *Ruiz,* 754 F.3d at 1103; *accord id.* (citing *JKH Enters., Inc. v. Dep't of Indus. Relations,* 142 Cal.App.4th 1046, 48 Cal.Rptr.3d 563 (Cal.Ct.App.2006), where the court found that "obtaining clients and providing workers" was "sufficient to establish right of control"). Because the "principal test of an employment relationship" is "[w]hether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired," *Borello,* 48 Cal.3d at 350, 256 Cal.Rptr.

543, 769 P.2d 399, Plaintiffs have satisfied their burden of establishing an employment relationship with STE.

### 2. The "Secondary Indicia" Also Indicate the Existence of an Employment Relationship Between STE and the Drivers

**\*16** Although the most important aspect of the *Borello* analysis is control, consideration of the "secondary indicia" from *Borello* does not support STE's position. Because these factors are "intertwined and their weight depends often on particular combinations," *Borello,* 48 Cal.3d at 351, 256 Cal.Rptr. 543, 769 P.2d 399, the Court finds it helpful to analogize to a factually similar case that applied these secondary *Borello* factors.

Despite Defendants' attempts to distinguish the case, the Court finds *Air Couriers International v. Employment Development Department,* 150 Cal.App.4th 923, 59 Cal.Rptr.3d 37 (Cal.Ct.App.2007), to be instructive in applying these factors. In *Air Couriers,* the California Court of Appeal upheld the trial court's determination that a courier business's drivers were employees rather than independent contractors as a matter of law. Applying the secondary *Borello* factors in great detail, the court rejected a number of the same arguments that have been raised by Defendants here. *Id.* at 938–39, 59 Cal.Rptr.3d 37. For example, the court in *Air Couriers* concluded that the following established facts "point to a finding of employee status":

- some drivers had worked for the courier company for a number of years, which was "another factor inconsistent with independent contractor status";

- the drivers were performing an integral and entirely essential aspect of the courier company's business;

- the drivers were required to use the company's forms in order to be paid; the drivers were paid on a regular schedule;

- the courier company sent the drivers to each delivery, provided deadlines, and required them to notify the dispatchers when the delivery was completed;

- the courier company provided placards for the drivers' vehicles;

- the drivers delivered to the courier company's customers, rather than to their own customers; and

• the courier company set the rates that were charged to the customers, billed the customers, and collected the payment.

*Id.* As a result of these secondary factors-and in addition to finding that the company retained the right to control the drivers-the court upheld the lower court's decision. *Id.*

Each of these facts is similarly present in this case. For example, Defendants do not dispute PSUF No. 81, which asserts that some of the Drivers have been working continuously for STE for over two years. PSUF ¶ 81.) Similarly, Defendants do not and cannot reasonably dispute that the Drivers are performing an integral and entirely essential aspect of STE's business. Cf. Alexander, 765 F.3d 981, 2014 WL 4211107, at *14 ("The work that the drivers perform, the pickup and delivery of packages, is 'essential to FedEx's core business.' " (quoting Estrada, 154 Cal.App.4th at 9, 64 Cal.Rptr.3d 327)). Defendants also do not dispute that the Drivers must fill out their forms in order to receive payment (although they contend that STE uses these forms to comply with federal regulations). (PSUF ¶¶ 56o61.) And while Defendants argue that "[t]here is no guarantee of weekly payments to the Drivers," they also concede that STE regularly issues payment to Drivers once a week. (Dkt. No. 124 at 14.)

**\*17** Next, it is undisputed that STE's dispatchers-and not the customers-assign the Drivers which loads to haul and where to deliver them. (P (PSUF ¶¶ 16o17.) Moreover, while the Drivers may lease their own trucks, it appears that the vast majority (if not all) of the Drivers use STE trucks bearing STE's labeling. (PSUF ¶ 24.) It is also undisputed that the customers to whom the Drivers deliver loads are exclusively STE's customers, and not those of the Drivers. (PSUF ¶ 18.) Cf. Alexander, 765 F.3d 981, 2014 WL 4211107, at *10 (considering to be evidence of an employment relationship the fact that "Drivers deliver packages to FedEx's customers, not to their own customers" and that "FedEx sets the rates charged to customers, bills the customers, and collects payment" (internal modifications omitted)). Finally, although Defendants point out that at least on one occasion a Driver's rate negotiations have resulted in an increase in the rate, (*see* Defs.' Response to PSUF ¶¶ 4o5) they cannot dispute Mr. Sanderson's deposition testimony that the Drivers' rates rarely change, nor that, aside from that one time, he is not aware of any instances

in which rates were increased in response to complaints by Drivers. (Dkt. No. 95–3 at 27o29.)

While there are undoubtedly some factual discrepancies between *Air Couriers* and the case at bar, the Court nonetheless finds that the secondary indicia from *Borello* militate in favor of finding an employment relationship to exist between STE and the Drivers.

## VII. SSA MARINE AS A CO–EMPLOYER

In their First Amended Complaint, Plaintiffs seek to hold SSA Marine liable as either a single or a joint employer of the Drivers. (FAC ¶¶ 6–7.) In general, "[a]n employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single employer has a heavy burden to meet under both California and federal law. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result." *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App.4th 727, 737, 80 Cal.Rptr.2d 454 (Cal.Ct.App.1998), *overruled on other grounds by Reid v. Google,* 50 Cal.4th 512, 113 Cal.Rptr.3d 327, 235 P.3d 988 (Cal.2010). In their motion for summary judgment, Defendants argue that, as a matter of law, SSA Marine cannot qualify as a joint employer. For the following reasons, the Court finds that there is a genuine issue of material fact and DENIES Defendants' motion.

### A. The Court Applies the Integrated Enterprise Test

Both parties contend that the Court should apply the "integrated enterprise" test in determining whether SSA Marine may be liable as a joint employer. Indeed, "California courts as well as federal courts in the Ninth Circuit have applied the 'integrated enterprise' test to claims arising from alleged violations of the California Labor Code." *Trosper v. Stryker Corp.,* 13–CV–0607–LHK, 2014 WL 1619052, at *3 (N.D.Cal. Apr.22, 2014); *accord Huse v. Auburn Honda,* No. 04–0227, 2005 WL 1398521, at *3 (E.D.Cal. June 10, 2005) (applying integrated enterprise test to determine whether a defendant was an employer within the meaning of the California Labor Code); *Serrano v. 180 Connect, Inc.,* No. 06–1363, 2006 WL 2348888, at *2 (N.D.Cal. Aug.11, 2006) (same), *rev'd on other grounds,* 478 F.3d 1018 (9th Cir.2007). "Courts have also applied the integrated enterprise test in the context of addressing UCL claims predicated upon California Labor Code violations."

*Trosper,* 2014 WL 1619052, at *3; *accord Maddock v. KB Homes, Inc.,* 631 F.Supp.2d 1226, 1238 (C.D.Cal.2007). The Court thus agrees with the parties that the "integrated enterprise" test is applicable in this situation.[7]

### B. Defendants Cannot Establish as a Matter of Law that SSA Marine Is Not a Joint Employer Under the Integrated Enterprise Test

**\*18** Under the integrated enterprise test, the Court must consider four factors to determine whether SSA Marine should be considered a joint or single employer for purposes of liability: (1) interrelation of operations; (2) common management; (3) common control of labor relations; and (4) common ownership or financial control. *See Laird,* 68 Cal.App.4th at 737, 80 Cal.Rptr.2d 454. "The first three factors carry the most weight and particularly significant is the common control of labor." *L.A. Marine Hardware Co., Div. of Mission Marine Assocs. v. N.L.R.B.,* 602 F.2d 1302, 1305 (9th Cir.1979); *accord J.M. Tanaka Constr., Inc. v. N.L.R.B.,* 675 F.2d 1029, 1034 (9th Cir.1982) ("The most important single factor is centralized control of labor relations."). Nevertheless, "[n]o factor is controlling and all need not be present." *J.M. Tanaka,* 675 F.2d at 1033. The Court will therefore consider each of these factors in determining whether SSA Marine may be considered a joint employer for purposes of liability.

### 1. Interrelation of Operations

The first factor considers whether the two corporate entities share interrelation of operations. "To make a sufficient showing of 'interrelation of operations' on summary judgment, the plaintiff must do more than merely show that officers of the subsidiary report to the parent corporation or that the parent benefits from the subsidiary's work." *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454. Rather, the plaintiff must demonstrate that "the parent has exercised control 'to a degree that exceeds the control normally exercised by a parent corporation.' " *Id.* (quoting *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993));[8] *Trosper,* 2014 WL 1619052, at *7 (quoting *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454). To do so, the plaintiff may submit evidence demonstrating interrelated operations, such as "combined accounting records, bank accounts, lines of credit, payroll preparation, telephone lines, or offices, and interchange of employees." *Van Norman*

*v. Harmon Mgmt. Corp.,* C93–2880 MHP, 1995 WL 803508, at *4 (N.D.Cal. July 6, 1995); *accord E.E.O.C. v. Con–Way, Inc.,* CV 06–1337–MO, 2007 WL 2610367, at *3 (D.Or. Sept.4, 2007) ("Evidence of interrelated operations can include common offices, long distance shipping, bank accounts, payroll preparation, and shared facilities." (citing *NLRB v. Transcon. Theaters Inc.,* 568 F.2d 125, 129–30 (9th Cir.1978))).

Defendants argue that SSA Marine and STE are not interrelated because the companies occupy distinct roles in the industry and are separate corporate entities. Specifically, Defendants argue that while SSA Marine operates terminals and provides stevedoring services through its own subsidiaries, STE provides trucking and storage services directly to consignees, including other port terminals and storage yards. Defendants also claim that the companies "are each independently incorporated (in different states), do not own equity in one another, engage in separate advertising, maintain different websites, have separate and distinct physical locations, implement their own policies and procedures, and engage in arm's length transactions when contracting for each other's services." (Dkt. No. 151–1 at 20 (citing DSUF ¶¶ 13*o*15, 18).)

**\*19** In opposition, however, Plaintiffs dispute Defendants' characterization of this autonomy between the companies, arguing instead that SSA Marine employees handle all of STE's key operations. For example, Plaintiffs contend that "SSA Marine manages STE's cash flow, accounts payable, accounts receivable, accounting, payroll, benefits, leaves of absence, and tax reporting, and SSA Marine requires and maintains personnel records on STE's employees." (Dkt. No. 159 at 22.) Plaintiffs also argue that SSA Marine pays for all of these services without any written management or service agreement between the parties. Further, Plaintiffs claim: that STE officers work out of SSA Marine's office and are paid by SSA Marine rather than STE; that the companies use the same information technology infrastructure and hardware; that the companies borrow from and contribute to a common bank account; that SSA Marine pays STE's expenses; and that SSA Marine prepared STE's new hire policies and handbook. (Dkt. No. 159 at 22.) Defendants deny these characterizations. (Dkt. No. 165.)

While the parties clearly dispute many of the facts underlying this inquiry, the undisputed record makes

certain facts plain. For example, Mr. DeNike, Vice President of SSA Marine and President of STE, testified that he created STE specifically to support the terminal operations of other Carrix subsidiaries such as SSA Marine and SSA Containers. (Dkt. No. 160–2 at 27.) Similarly, although Defendants claim in their brief that STE "[d]oes not share a principal place of business with SSA Marine, but has as its principal place of business as [sic] the Carson facility," (Dkt. No. 165 at 5), STE's response to Plaintiffs' interrogatories states that its principal place of business is the same address in Seattle, Washington where SSA Marine is also located, (Dkt. Nos. 160–7 at 51, 160–10 at 4–5). [9] And SSA Marine's Vice President of Accounting and Benefits testified that certain STE employees work at SSA Marine's headquarters. (Dkt. No. 160–7 at 51, 52.) While the companies appear to have different bank accounts, STE responded in a supplemental discovery response that, "due to their relationship to Carrix, [STE and SSA Marine] each participate in individual accounts that comprise a series of accounts that have a cash sweep feature. This means that the series of accounts borrow from and contribute to one account as working capital is needed or is in excess." (Dkt. No. 160–6 at 4.) The companies also share various officers, (Dkt. No. 160–6 at 6), and there is substantial deposition testimony from SSA Marine executives indicating that SSA Marine manages STE's accounts payable, accounts receivable, and all other accounting operations, (*see, e.g.,* Dkt. Nos. 160–2 at 28–29, 160–3 at 9, 160–7 at 37), as well as STE's payroll and benefits, (*see, e.g.,* Dkt. Nos. 160–3 at 22, 160–4 at 9).

Based on all of this evidence in the record, a reasonable jury could find that the operations between SSA Marine and STE are highly interrelated. This factor thus weighs in favor of Plaintiffs.

### 2. Common Management

**\*20** Under the common management factor, the Court must consider "whether the entities have common officers, directors, and managers ." *Con–Way, Inc.,* 2007 WL 2610367, at \*5. But "[o]ne common manager is insufficient to establish a disputed material fact under this prong of the integrated enterprise test." *Frank,* 3 F.3d at 1364. Rather, the plaintiff must provide evidence that individuals served as a manager of both corporations, that at least one manager of the parent corporation made or influenced "day-to-day managerial decision [s]" for the subsidiary,

or that certain managers were transferred from one corporation to the other. *Laird,* 68 Cal.App.4th at 740, 80 Cal.Rptr.2d 454; *Trosper,* 2014 WL 1619052, at \*8. Without any such showing, the plaintiff cannot create an issue of fact regarding common management between the two entities.

In support of their motion, Defendants acknowledge that SSA Marine and STE share certain officers, such as Mr. DeNike-who is the Executive Vice President of SSA Marine and the President of STE-but maintain that these officers occupy very different roles in each company. For example, Defendants repeatedly argue that Mr. DeNike wears a different "hat" when serving SSA Marine than he wears when serving STE. (*See, e.g.,* Dkt. Nos. 151–1 at 21, 165 at 8.) And, as Defendants point out, "officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). But a dispute exists between the Parties regarding the role of Mr. DeNike at his two companies. While Defendants argue that he relies on STE's General Managers for all STE decisions, Mr. DeNike testified that he has "been in charge" of STE "from the very beginning" and that he "tr[ies] to direct STE as to how [it] should operate so that [it] can be financially responsible." (Dkt. No. 160–1 at 6, 7.) Moreover, Mr. DeNike is not the only officer that the two companies have in common. Rather, STE identified seven officers, executives, or managers who work for both companies, including STE's (1) Chief Executive Officer ("CEO"); (2) President; (3) Executive Vice President; (4) Vice President, General Counsel, and Secretary; (5) Vice President of Finance and Accounting; (6) Vice President of Finance; and (7) Vice President of Tax. (Dkt. No. 160–6 at 9.) Each company's board of directors is also comprised of the same two individuals. (Dkt. No. 160–1 at 56.)

Given the substantial overlap between SSA Marine and STE's directors and officers, and particularly given that Mr. DeNike serves as a manager to both corporations, this factor also weighs in favor of Plaintiffs.

### 3. Common Control of Labor Operations

Whether two entities share a common control of labor operations is widely considered to be the most important factor in the joint enterprise analysis. *See, e.g., J.M. Tanaka,* 675 F.2d at 1034; *LA. Marine Hardware,* 602

F.2d at 1305; *Trosper,* 2014 WL 1619052, at *4. "The critical question is, what entity made the final decisions regarding employment matters related to the [plaintiffs]?" *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454 (internal citations, quotation marks, and modifications omitted). As with the previous factors, there is great dispute between the Parties as to what control SSA Marine exercises over STE's employment matters. At the outset, it is undisputed that SSA Marine and STE are not in a typical parent-subsidiary relationship. Rather, SSA Marine is a subsidiary of Carrix, and STE is a subsidiary of a subsidiary of Carrix. Nevertheless, STE's President testified that STE was created specifically to support the terminal operations of other Carrix subsidiaries such as SSA Marine and SSA Containers, so there is clearly a connection between the two subsidiaries. (Dkt. No. 160–2 at 27.) To establish that the companies share common control of labor operations, Plaintiffs must demonstrate that SSA Marine "directly interfered with [STE's] hiring, firing, and other employment practices." *Con–Way,* 2007 WL 2610367, at *6.

**\*21** Defendants acknowledge that SSA Marine and STE share payroll services and "some human resource functions for administrative staff," but they argue that such overlap is insufficient to demonstrate common control of labor operations. (Dkt. No. 151–1 at 19 (citing *Con–Way,* 2007 WL 2610367, at *5 ("[S]hared payroll and other administrative services are typical of parent-subsidiary relationships so long as the subsidiary pays for those services."); *Burnett v. Intercon Sec. Ltd.,* 97 C 3385, 1998 WL 142395, at *7 (N.D.Ill. Mar.24, 1998) ("[S]haring the same commercial payroll service does not show that accounting or bookkeeping was singular or that the hundreds of employees employed by the three entities were lumped into one."); *Richard v. LaSalle Talman Bank,* 94 C 1799, 1995 WL 234633, at *11 (N.D.Ill. Apr.19, 1995) (finding evidence demonstrating that subsidiaries shared a single employee benefit plan, a bank resources policy manual, and one central computer that processes human resources information insufficient "to establish even a tentative inference that the two subsidiaries operate in concert").) Defendants further contend that the Drivers entered into their operating leases with STE without any interference by SSA Marine, and that SSA Marine has no involvement in selecting the Drivers or in disciplining, managing, or paying them. (Dkt. No. 151–1 at 19; DSUF ¶¶ 20–22.)

By contrast, Plaintiffs dispute these contentions and maintain that SSA Marine, and in particular Mr. DeNike, plays a significant role in STE's labor relations. Indeed, Mr. DeNike testified that he handles serious disciplinary issues confronting STE. (Dkt. No. 160–1 at 36.) Although Defendants argue that Mr. DeNike is acting solely on behalf of STE in this capacity, Mr. DeNike also testified that he is paid solely by SSA Marine for his various positions working for Carrix subsidiaries. (Dkt. No. 160–1 at 17.) Moreover, despite Defendants' attempts to minimize the overlap in human resources between the companies, the testimony of SSA Marine's Vice President of Accounting and Benefits, Theresa Bicknell, makes clear that SSA Marine's benefits department handles many of STE's human resources issues. For example, Ms. Bicknell testified that SSA Marine's benefits department handles all STE employee leave issues under the Family and Medical Leave Act ("FMLA"), (Dkt. No. 160–7 at 18–23), including issues of eligibility, (Dkt. No. 160–7 at 33–34), and communications regarding the need for FMLA leave, (Dkt. No. 160–7 at 30–32, 141). Ms. Bicknell also testified that SSA Marine retains the hiring documents of STE's employees in their files. (Dkt. No. 160–7 at 13–14.) Plaintiffs also note that STE uses the same new hire packet that was created by SSA Marine, as well as the same employee handbook that was created by SSA Marine's CEO and Benefits Manager in conjunction with outside counsel. (Dkt. No. 160–7 at 6–8, 24–25.)

Although it remains unclear exactly how much control SSA Marine exercises over STE-and the Parties vigorously dispute this issue-the testimony of various SSA Marine executives suggests that SSA Marine is not the "distant cousin" to STE that Defendants claim in their motion. Rather, the record establishes that SSA Marine has at least some control over the labor relations at STE. As a result, there is a material issue of fact, which is enough to defeat summary judgment.

### 4. Common Ownership or Financial Control

**\*22** Finally, although this factor "alone is never enough to establish ... liability," the Court will nevertheless consider whether the two entities share common ownership or financial control. *Laird,* 68 Cal.App.4th at 738, 80 Cal.Rptr.2d 454; *accord Trosper,* 2014 WL 1619052, at *9 ("Courts have recognized this factor as being the least important of the four."). It is undisputed that both SSA Marine and STE are entirely owned by

Carrix. While this factor is likely the least important in this analysis, it, too, favors Plaintiffs.

Based on the foregoing analysis under the joint enterprise test, there clearly remain disputed issues of fact as to whether SSA Marine qualifies as a joint employer for purposes of liability. Accordingly, Defendants' motion for summary judgment as to Defendant SSA Marine is **DENIED.**

## VIII. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is **GRANTED,** and Defendants' motion for summary judgment is **DENIED.**

## IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 7499046

## Footnotes

1   The Court notes, however, that Defendants have failed to provide the Court with much of the testimony to which they refer. For instance, in their objections, Defendants cite excerpts of the depositions of Messrs. Alvarez, Baddeley, and Sanderson, as well as of Ms. Berganza, that have not been lodged with the Court either by Plaintiffs or by Defendants.

2   There is an exception to this written report requirement for "individuals who are employed by a party and whose duties do not regularly involve giving expert testimony." *Torres v. City of L.A.,* 548 F.3d 1197, 1214 (9th Cir.2008). Mr. Schulze, however, is not employed by a party to this action and thus does not fall under this exception. Rather, Mr. Schulze has been "retained or specially employed to provide expert testimony in the case."

3   The California Supreme Court also recently concluded that the FAAAA does not preempt claims brought under the UCL. *See People ex rel. Harris v. Pac Anchor Transp., Inc.,* 59 Cal.4th 772, 787, 174 Cal.Rptr.3d 626, 329 P.3d 180 (Cal.2014).

4   Although this case involves causes of action under other sections of the California Labor Code in addition to section 1194, California courts have applied the *Martinez* definition of employment to causes of action arising under other sections as well. *See, e.g., Futrell v. Payday Cal., Inc.,* 190 Cal.App.4th 1419, 1430, 119 Cal.Rptr.3d 513 (Cal.Ct.App.2010) ("To answer the question whether Payday acted as Futrell's employer for purposes of [sections 203, 226, 510, and 1194 of the California Labor Code], we see no reason to apply any other definition than the *Martinez* definition ...."); *see also Taylor v. Waddell & Reed Inc.,* 09–CV–02909 AJB WVG, 2013 WL 435907, at *3 (S.D.Cal. Feb.1, 2013) (applying the *Martinez* definition of "employment" to causes of action brought under Cal. Lab.Code §§ 201, 202, 203, 204, 218.5, 218.6, 226, 226.7, 2698 *et seq.,* 510, 1182.12, 1194, 1194.2, 1197; Cal. Bus. & Prof.Code § 17200 *et seq.;* and Wage Order Nos. 4–2001 §§ 3(A), 4(A)).

5   Defendants also rebut Plaintiffs' argument that STE reclassified "employee" Drivers to independent contractors in 2010. The Court finds this issue largely irrelevant in determining whether the Drivers are employees or independent contractors.

6   Moreover, whether STE closely monitored the Drivers' routes is not particularly important given "the simplicity of the work (take this package from point A to point B) [, which makes] detailed supervision, or control, unnecessary." *Air Couriers,* 150 Cal.App.4th at 937, 59 Cal.Rptr.3d 37; *accord Alexander,* 765 F.3d 981, 2014 WL 4211107, at *7 (rejecting defendant's argument that it did not control its drivers because it did not require them to follow certain routes, noting that "the right-to-control test does not require absolute control"). Rather, what is important is that STE "retained all necessary control over the overall delivery operation." *Id.*

7   The other two tests that courts have applied in this context are the alter ego test and the California common law test. Each of these tests, however, requires analysis of similar factors to those considered by the integrated enterprise test and would undoubtedly compel the same result. *See Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 838–40, 26 Cal.Rptr. 806 (Cal.Ct.App.1962) (identifying the many factors to be considered in the alter ego test); *Futrell v. Payday Cal., Inc.,* 190 Cal.App.4th 1419, 1429, 119 Cal.Rptr.3d 513 (Cal.Ct.App.2010) (discussing the common law factors). The Court thus does not deem it necessary to discuss these theories at length.

8   At oral argument, counsel for Defendants argued that the language from *Frank* is dispositive on this issue. In *Frank,* the Tenth Circuit rejected the plaintiffs' argument that a parent company was a joint employer with its subsidiary merely because "the chain of command over Plaintiffs ... crossed subsidiary lines and led ultimately to [the parent company's] president." 3 F.3d at 1362. Here, by contrast, Plaintiffs are not asserting simply that STE is ultimately accountable to SSA Marine; rather, Plaintiffs argue that SSA Marine manages many of STE's key operations, making the two companies' operations highly interrelated. In fact, the court in *Frank* specifically noted that the plaintiffs had failed to produce "the

type of evidence routinely used to show interrelated operations," and that evidence closely resembles the evidence submitted by Plaintiffs here. *Id.* at 1363 (citing *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987) (holding that a parent's operations were interrelated with those of its subsidiary where parent kept subsidiary's books, issued its paychecks, and paid its bills); *Perry v. Manocherian,* 675 F.Supp. 1417, 1426 (S.D.N.Y.1987) (finding operations to be interrelated where the parent and subsidiary had common employees, the same headquarters, and common advertising, and where the parent rented its properties to the subsidiary); *E.E.O.C. v. Fin. Assurance, Inc.,* 624 F.Supp. 686, 689 (W.D.Mo.1985) (finding operations interrelated where parent and subsidiary shared services, equipment, employees, and office space, and where parent controlled subsidiary's payroll and benefit programs)).

9   SSA Marine's Vice President of Accounting and Benefits also testified that "[w]e consider Carson to be [STE's] headquarters," (Dkt. No. 160–7 at 51), but this executive's impression of another company's headquarters is insufficient to overcome that company's own representations in its discovery responses.

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 12

22 Wage & Hour Cas.2d (BNA) 968

2014 WL 1619052
United States District Court,
N.D. California,
San Jose Division.

Tanner Trosper, on behalf of himself, individually,
and all others similarly situated, Plaintiff,
v.
Stryker Corporation, Howmedica Osteonics
Corporation and Does 1-10, inclusive, Defendants.

Case No.: 13–CV–0607–LHK
|
Signed April 22, 2014

**Attorneys and Law Firms**

Kristen Marquis Fritz, Kristen M. Fritz, Esq., Orange, CA, Louis Michael Marlin, Marlin & Saltzman, Irvine, CA, Hanna Betty Raanan, Frandzel Robins Bloom and Csato, L.C., Los Angeles, CA, Walter Lewis Haines, United Employees Law Group, P.C., Huntington Beach, CA, for Plaintiff.

Andrew Marc Paley, Seyfarth Shaw LLP, Los Angeles, CA, Andrew More McNaught, Soo-Hyun Cho, Seyfarth Shaw LLP, San Francisco, CA, for Defendants.

ORDER DENYING DEFENDANT
STRYKER CORPORATION'S MOTION
FOR SUMMARY JUDGMENT

LUCY H. KOH, United States District Judge

**\*1** Plaintiff Tanner Trosper ("Trosper") filed this putative class action against his former employers, Stryker Corporation ("Stryker") and Howmedica Osteonics Corporation ("Howmedica"), alleging that he had not been indemnified for employment-related expenses in violation of California Labor Code § 2802 and California's Unfair Competition Law (Bus. and Prof.Code § 17200 *et seq* ) ("UCL"). Before the Court is Defendant Stryker's Motion for Summary Judgment. *See* ECF No. 34. Pursuant to Civil Local Rule 7–1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing on this Motion set for May 1, 2014, at 1:30 p.m. The Case Management Conference scheduled for May 1, 2014, at 1:30 p.m.

remains as set. The Court, having considered the record in this case, applicable law, and parties' briefs, DENIES Stryker Corporation's Motion for Summary Judgment.

**I. BACKGROUND**

**A. Factual Background**

Trosper was employed by Howmedica as a Sales Representative from approximately November 2008 [1] until May 2011. ECF No. 1, ¶ 9 (Complaint, hereinafter "Compl."). Trosper worked in the Stryker Craniomaxillofacial division ("Stryker CMF") of Howmedica. ECF No. 36–1 ("Trosper Depo.") at 52:12–15. Howmedica is a wholly-owned subsidiary of Stryker, and both corporations are in the business of manufacturing and marketing medical devices. Compl. ¶¶ 10–11; ECF No. 34–1 ¶ 4. In the Complaint, Trosper claims he incurred numerous expenses in the course of his employment and for the benefit of his employer, including costs associated with operating his personal vehicle and mobile phone; use of a fax machine, landlines, office space, office supplies, internet access, storage, entertainment; dining with clients; and travel expenses (such as airfare, lodging, and local transportation). Compl. ¶¶ 20–21.

Trosper alleges that during the Class Period [2] Stryker and Howmedica did not have a policy providing for the reimbursement of expenses to putative class employees, and Defendants' existing policy expressly prohibited employee reimbursement for business expenses. *Id.* ¶ 24. Trosper alleges that in February 2011 and October 2012, Defendants changed their policy to allow reimbursement of certain expenses to some employees. *Id.* ¶¶ 25–26. The putative class consists of "all person who have been, or currently are, employed by Defendants in California during the Class Period as 'Sales Representatives.' " *Id.* ¶ 1.

**\*2** Trosper contends that Defendants' policy prohibiting expense reimbursement violated California Labor Code § 2802, which provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." *Id.* ¶¶ 23, 39–40. Moreover, Trosper alleges that Defendants' policy constituted an "unfair" and "unlawful" business practice in violation of the UCL. *Id.* ¶¶ 45–48.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 574 of 898
Trosper v. Stryker Corporation, Not Reported in F.Supp.2d (2014)
22 Wage & Hour Cas.2d (BNA) 968

### B. Procedural History

Trosper filed his Complaint against Howmedica and Stryker on February 12, 2013. ECF No. 1. Defendants answered on March 29, 2013, ECF No. 16. On October 28, 2013, the parties filed a joint statement indicating that they disagreed as to whether Stryker was a properly named defendant and that Defendants planned on filing a motion for summary judgment seeking to dismiss Stryker from the case. ECF No. 31. Stryker filed the instant motion on January 23, 2014, ECF No. 34 ("Mot."), and Trosper filed his opposition on February 6, 2014. ECF No. 35 ("Opp'n"). On February 13, 2014, Stryker filed a reply. ECF No. 36 ("Reply"). The parties also filed various declarations in support of their arguments. In support of its motion for summary judgment and its reply, Stryker filed the Michelle Shinevare Declaration, ECF No. 34–1 ("Shinevare Decl."), and the Soo Cho Declaration, ECF No. 36–1 ("Soo Cho Decl."). In support of Plaintiff's opposition, Plaintiff filed the Trosper Declaration, ECF No. 35–3 ("Trosper Decl."), and the Hanna Raanan Declaration, ECF No. 35–1 ("Raanan Decl.").

## II. LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the court may grant summary judgment. *Id.* at 249–50 (citation omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559–60 (2006).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex,* 477 U.S. at 323. To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence

of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party has satisfied its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103.

## III. DISCUSSION

### A. Stryker's Evidentiary Objections to Trosper's Opposition

In its Reply in support of the instant Motion, Stryker raises various evidentiary objections to exhibits introduced by Trosper in support of his opposition. *See generally* Reply. The Court addresses each of Stryker's objections throughout the analysis below.

### B. Whether Stryker is Liable as Trosper's Employer under the "Integrated Enterprise" Test

**\*3** Stryker moves for summary judgment on all of Trosper's claims on the basis that Trosper has failed to produce evidence demonstrating the existence of an employment relationship between Trosper and Stryker. Mot. at 1–2. Stryker argues that if no employment relationship existed between Stryker and Trosper, Stryker cannot be held liable. *Id.* Construing all the evidence in favor of Trosper, the non-moving party, as this Court must do at the summary judgment stage, the Court concludes that Trosper's evidence presents a genuine issue of material fact regarding the existence of an employment relationship between Trosper and Stryker. The Court rejects Stryker's argument that Stryker is, as a matter of law, not Trosper's employer and thus not liable for Howmedica's acts because Trosper has produced evidence sufficient to support a finding by a reasonable jury that Stryker was in fact Trosper's employer. Accordingly, the Court DENIES Stryker's Motion for Summary Judgment.

Trosper alleges that Stryker and Howmedica, collectively as his employers, violated California Labor Code § 2802, which provides that that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code ¶ 2802; Compl. ¶¶ 39–40. California courts have held that inherent in raising such a claim is the requirement that a plaintiff sue his or her actual employer. *See, e.g., Estrada v. FedEx*

*Ground Package Sys., Inc.,* 154 Cal.App. 4th 1, 10 (2007) (determining whether employment relationship existed between plaintiff and defendant prior to adjudicating a § 2802 claim).[3]

Trosper argues that Stryker is liable as his employer under the "integrated enterprise" test as set forth in *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App. 4th 727 (1998), *overruled on other grounds by Reid v. Google,* 50 Cal.4th 512 (2010). Opp'n at 6. Under the "integrated enterprise" test, two corporations, here Stryker and its subsidiary Howmedica, may be treated as a single employer for purposes of liability. *Laird,* 68 Cal.App. 4th at 737. While "this test is most often applied in the context of claims arising under Title VII and the California Fair Employment and Housing Act," and while California law is unsettled as to what precise test regarding the existence of an employer-employee relationship applies to claims under California Labor Code § 2802, California courts as well as federal courts in the Ninth Circuit have applied the "integrated enterprise" test to claims arising from alleged violations of the California Labor Code. *See, e.g., Kenny v. Regis Corp.,* No. 06–07521, 2008 WL 686710, at *3 (N.D.Cal. Mar. 10, 2008); *Huse v. Auburn Honda,* No. 04–0227, 2005 WL 1398521, at *3 (E.D. Cal. June 10, 2005) (employing the integrated enterprise test to determine whether a defendant was an employer within the meaning of the California Labor Code); *Serrano v. 180 Connect, Inc.,* No. 06–1363, 2006 WL 2348888, at *2 (N.D.Cal. Aug. 11, 2006) (employing the integrated enterprise test in an action arising from alleged California Labor Code violations), *rev'd on other grounds* 478 F.3d 1018 (9th Cir. 2007). Courts have also applied the integrated enterprise test in the context of addressing UCL claims predicated upon California Labor Code violations. *See Maddock v. KB Homes, Inc.,* 631 F.Supp.2d 1226, 1238 (C.D.Cal.2007).

**\*4** Under *Laird,* in determining whether two entities are liable as a single employer or an "integrated enterprise," courts consider four factors: (1) centralized control of labor relations; (2) interrelation of operations; (3) common management; and (4) common ownership or financial control. *Laird,* 68 Cal.App. 4th at 737. "Under this test, common ownership or control alone is never enough to establish parent liability." *Id.* at 738. Because corporate entities are presumed to exist separately, "the corporate existence form will be disregarded only when the ends of justice require this result." *Id.* at 737. As a result,

"an employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single employer has a heavy burden to meet[.]" *Id.*[4]

Below, the Court analyzes each of the *Laird* factors, and concludes that Trosper has presented sufficient evidence for a reasonable trier of fact to conclude that Stryker and Howmedica are "integrated enterprises" and thus that Stryker was Trosper's employer.

### 1. Centralized Control of Labor Relations

The Court first considers the "centralized control of labor relations" factor. "Although courts consider the four factors together, [and no one factor is dispositive], they often deem centralized control of labor relations to be most important." *Id.* at 738. "The critical question is, [w]hat entity made the final decisions regarding employment matters related to the [clamaint]? ... To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary." *Id.* (internal quotation marks and citations omitted). In *Laird,* the court held that this factor weighed greatly in favor of the defendant parent company, given that the subsidiary's control over its own employment decisions was "essentially undisputed." *Id.* at 739. The court noted that all of the plaintiff's employment paperwork designated her employer to be the subsidiary, not the parent. *Id.* The employee handbooks the plaintiff received explicitly stated she was a subsidiary employee. *Id.* Furthermore, the subsidiary provided all of her W–2 forms. *Id.* Finally, the plaintiff admitted in her deposition that the supervisors who fired her were employees of the subsidiary, not the parent company. *Id.* Below, the Court considers the evidence relevant to this factor and concludes Trosper has presented evidence that raises a genuine issue of material fact as to whether this first factor weighs in favor of a finding that Stryker is Trosper's employer.

In its motion for summary judgment, Stryker argues it did not participate in any of the day-to-day employment decisions affecting Trosper or any putative class members, and that Stryker "does not employ any Sales Representatives in California." Mot. at 2; *id.* at 3 ("Stryker does not currently, and has not ever during the putative liability period, employed any Sales

Representatives in California."); Shinevare Decl. ¶¶ 8–10, 12. [5] Stryker also claims that Howmedica is a completely separate legal entity, with separate headquarters, finances, accounting departments, payrolls, W–2 forms, and federal tax identification numbers. Mot. at 3 (citing Shinevare Decl. ¶¶ 6–7). Stryker further notes that Stryker CMF, the division in which Trosper was employed, is a division of Howmedica, not Stryker. Mot. at 2–3; Shinevare Decl. ¶ 5, 10. Howmedica employees are paid from Howmedica funds, not Stryker funds. Mot. at 3; Shinevare Decl. ¶ 7. Trosper's employment offer letter stated that he was hired to work for Stryker CMF. Shinevare Decl. Ex. 1 at 1 (noting he would be a "Stryker CMF" employee). His employment agreement stated it was between "Howmedica Leibinger, Inc, [doing business as] Stryker CMF" and Trosper, and that Trosper was bound to Stryker CMF's policies. *Id.* Ex. 3 at 1, 4. Stryker CMF conducts its own performance review of its employees, *see* Mot. at 3; Shinevare Decl. Ex. 4 (Stryker CMF Sales Employee Performance Review); Shinevare Decl. ¶ 10, and Stryker CMF implemented a Business Travel and Entertainment Expenses Policy in October 2012 to sales representatives working in the State of California, Mot. at 4; Shinevare Decl. Ex. 5("Stryker CMF T & E Reimbursement Policy for All Sales Reps working in the State of California"); Shinevare Decl. ¶ 11 (stating that this policy was implemented by Stryker CMF and not Stryker). Finally, Stryker claims Howmedica makes all decisions related to hiring, disciplining, and terminating its employees. Mot at 3; Shinevare Decl. ¶ 10.

**\*5** Stryker's arguments notwithstanding, the Court finds Trosper's evidence presents a genuine issue of material fact as to whether the "centralized control of labor relations" factor supports a finding that Stryker was Trosper's employer. First and foremost, Trosper has cited to a Western District of Michigan case filed by Stryker and Howmedica as joint plaintiffs against former Stryker CMF employees. [6] Raanan Decl. Ex. K (Michigan Complaint, hereinafter "Mich. Compl."); Opp'n at 3. In the Michigan Complaint, Stryker explicitly holds itself out as the employer of former Stryker CMF sales representatives and managers in Louisiana and New York. Mich. Compl. at 1 (noting that allegations would refer to Stryker and Howmedica "collectively" as "Stryker" throughout the complaint); ¶¶ 34–35 ("[Defendant] began *working for Stryker* ... as a Sales Representative in the New Orleans territory-East Division. Prior to [Defendant's]

*employment with Stryker,* [Defendant] executed the Agreement ...") (emphases added). Further, it is worth noting that in the Michigan Complaint, Stryker, along with Howmedica, brought breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and tortious interference with contract claims against its former employees based, in part, on alleged violations of one of the very agreements that Trosper signed in this case—the Stryker "Employee Confidentiality and Intellectual Property Agreement." *See* Mich. Complaint ¶¶ 67–68; Trosper Decl. Ex. A. [7] [8] While Stryker is correct that "there is a strong presumption that one corporate entity is not the employer of a separate, related entity's employees," Mot. at 5 (citing *Laird,* 68 Cal.App. 4th at 737), *Laird* goes on to hold that the corporate form can and should be disregarded "when the ends of justice require this result." *Laird,* 68 Cal.App.4th at 737; *accord Mesler v. Bragg Management Co.,* 39 Cal.3d 290, 300 (1985). In this case, a reasonable jury could find that Stryker's concession in the Michigan case that Stryker "employ [ed]" Stryker CMF sales representatives should be viewed as one consideration weighing heavily in favor of the conclusion that Stryker was Trosper's employer. This is because a jury could find that justice would not be served if Stryker were allowed to wield its parent corporation resources in another forum against Stryker CMF employees but simultaneously use the separate parent-subsidiary corporate form as a shield against liability in a lawsuit by a similarly situated Stryker CMF employee in California. Accordingly, the Court finds the Michigan Complaint to be probative evidence raising a genuine issue of material fact as to whether Stryker is the employer of Stryker CMF sales representatives such as Trosper. [9]

**\*6** In addition to the Michigan Complaint, the Court finds that other evidence also raises a genuine issue of material fact as to whether Stryker controlled the day-to-day employment decisions at Howmedica and specifically its Stryker CMF subdivision. *Laird,* 68 Cal.App. 4th at 738. The Court acknowledges that Michelle Shinevare, the Senior Manager of Human Resources and Payroll Shared Services for Stryker, testified in her declaration that "Howmedica and its various divisions maintain their own employee handbooks, trainings, and internal employment policies," Shinevare Decl. ¶ 10. The Court also notes the existence in the record of the "Stryker Orthopaedics Employee Handbook," which is a Howmedica policy. [10]

However, Trosper has introduced multiple policies that were applicable to Trosper and related to his employment that appear to have been promulgated by Stryker directly, not Howmedica or Stryker CMF. For example, Trosper was required to sign a "Stryker Corporation Code of Conduct" policy as a condition of his employment. Trosper Decl. Ex. B (also signed by the CEO of Stryker). The Code of Conduct states it "establishes policies and procedures that are intended to guide employees in the performance of their duties and responsibilities and ensure compliance with the Company's commitment to ethical and lawful conduct." *Id.* at 1. [11] Notably, Trosper's signature indicated that he "underst[ood] that compliance with the Code of Conduct is a condition of [his] continued employment *with Stryker Corporation* and [he] will abide by and support the policies set forth in [Stryker's] Code of Conduct." *Id.* at 4 (emphasis added). On the signature page for the Code of Conduct, Trosper provided his "division" as "CMF," without any reference to Howmedica. *Id.* at 4. Trosper also signed an Employee Confidentiality and Intellectual Property Agreement between "Stryker Corporation, including its subsidiaries, operating divisions, and affiliates" and Trosper, which suggests Stryker had a key role at least in defining Trosper's confidentiality obligations as he carried out his work duties. *Id.* Ex. A. Trosper also signed a "Notice to All Employees" from "Stryker Corporation" regarding Stryker's affirmative action policy benefitting veterans. *Id.* Ex. C. Finally, Trosper has introduced "Corporate Accounting Policy # 12, Business Travel and Entertainment Expenses," effective April 1, 2007, signed by Stryker's six managing executives. Raanan Decl. Ex. G. This policy "sets forth minimum guidelines for Stryker divisions and subsidiaries to follow when authorizing and reimbursing business travel and entertainment expenses." *Id.* [12] The aforementioned policies all prominently feature either the Stryker logo or the words "Stryker Corporation," not the words "Stryker CMF" or the Stryker CMF logo present on some of Trosper's other employment paperwork. *See, e.g.,* Shinevare Decl. Exs. 1 (offer letter); 2 (termination letter); 5 ("Stryker CMF T & E Reimbursement Policy for All Sales Reps working in the State of California"). The Court concludes that these policies, in combination, provide a basis for a reasonable jury to conclude that Stryker controlled day-to-day employment decisions at Howmedica. [13]

**\*7** Stryker minimizes the impact of these policies, first arguing they "are actually Howmedica policies," and second that the policies do not reveal that Stryker management had any control over Howmedica's day-to-day employment decisions. Reply at 6, 9. The Court disagrees with Stryker's characterization of the evidence. First, it is not at all clear, as Stryker argues, that the policies are "Howmedica" policies because as noted above, many of the policies prominently feature either a Stryker logo or the words "Stryker Corporation" throughout the policy. *See, e.g.,* Trosper Decl. Ex. A (Stryker Employee Confidentiality and Intellectual Property Agreement); *id.* Ex. B (Stryker Corporation Code of Conduct); *id.* Ex. C (Stryker Corporation Notice to All Employees); Raanan Decl. Ex. G (Stryker Corporate Accounting Policy # 12). Second, the Court is not convinced by Stryker's implicit suggestion that only decisions involving hiring, firing, and compensation—and *not* decisions regarding expense reimbursement policies, confidentiality agreements, or "codes of conduct"—are the types of decisions that are relevant to the "centralized control of labor relations" factor. Mot. at 10; Reply at 6–7. Stryker has not cited any binding authority mandating such a "narrow" view regarding what kinds of specific employment decisions are relevant to a court's evaluation of the first factor.

In light of the representations made by Stryker in the Michigan Complaint and Trosper's evidence regarding policies promulgated by Stryker specifically, the Court concludes Trosper has raised a genuine issue of material fact as to whether the "centralized control of labor relations" factor weighs in favor of finding Stryker is Trosper's employer. A reasonable jury could conclude this factor weighs in favor of finding that Stryker and Howmedica are integrated enterprises such that Stryker can be held liable as Trosper's employer.

### 2. Interrelation of Operations

The Court now addresses the second factor—i.e., interrelation of operations. To make a sufficient showing of "interrelation of operations" on a defendant's summary judgment motion, the plaintiff must show that the parent company has exercised control over the subsidiary "to a degree that exceeds the control normally exercised by a parent corporation." *Laird,* 68 Cal.App. 4th at 738 (quoting *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 578 of 898

Cir. 1993)). Plaintiff must do more than demonstrate that the parent "benefits from the subsidiary's work" because "such a showing would create a triable issue of material fact in every case." *Id.* at 739. In *Laird,* the court found Laird had failed to introduce evidence to satisfy this prong, and provided examples of evidence that would help to show that the operations of the parent and subsidiary were interrelated: "She did not show, for instance, that the [the parent corporation] kept [the subsidiary's] books, issued its paychecks, or paid its bills," or that "the two operations share employees, ... headquarters, or office space." *Id.* Below, the Court concludes Trosper has presented evidence that raises a genuine issue of material fact as to whether this factor weighs in favor of finding that Stryker is Trosper's employer.

First, with respect to evidence of keeping the subsidiary's "books," Stryker *concedes* that it provides human resources support such as payroll processing services and administrative data entry for Stryker CMF. Mot. at 4; Shinevare Decl. ¶ 13. Stryker's additional concession that it is *not* compensated for performing these duties, Reply at 5 n.5, further supports a finding of interrelatedness of operations between Stryker and Howmedica. *C.f. Kenny,* 2008 WL 686710, *4 (noting, in support of its conclusion that Plaintiff had shown no evidence of "interrelation of operations" between the subsidiary and parent, that "[subsidiary] is charged for all services provided by [the parent corporation's] employees."). Although the Court agrees with Strkyer that this evidence is not dispositive of the Court's "integrated enterprise" inquiry in light of the uncontroverted evidence that Stryker and Howmedica otherwise maintain separate finances, *see* Reply at 5; Shinevare Decl. ¶¶ 6–7, the Court nonetheless considers the existence of this payroll processing relationship to be at least evidence probative of an "interrelation of operations" between Stryker and Howmedica.

**\*8** Second, there is some evidence that Stryker and Stryker CMF may share "employees, headquarters, or office space." *Laird,* 68 Cal.App. 4th at 739. Notably, the evidence raises at least a plausible inference that the two companies share two managing-level employees. First, it appears that Mike VanVleet may be a shared employee of Stryker CMF and Stryker. Notably, Trosper's termination letter—specifically referencing his termination from *Stryker CMF*—is signed by Mike VanVleet in his capacity as "Director, Human Resources and Kalamazoo Operations" with a return address in

Portage, Michigan. [14] Shinevare Decl. Ex. 2 (termination letter). Stryker is headquartered in Kalamazoo, Michigan, *see* Shinevare Decl. ¶¶ 3–4, while the record suggests Stryker CMF is headquartered in Portage, Michigan. *See id.* Exs. 1, 2 (Trosper's employment offer letter and termination letter *from Stryker CMF* indicating a return address in Portage, Michigan). There is thus evidence that Mike VanVleet is both a Stryker CMF employee (because he signed the letter referencing termination of Trosper's employment from *Stryker CMF* from Portage, Michigan) *and* a Stryker employee, for he is Director of "Kalamazoo Operations" (Kalamazoo is where the *Stryker* headquarters is located). While the Court acknowledges that this evidence does not conclusively prove that VanVleet is a shared employee, Stryker has not presented any evidence clarifying VanVleet's role at Stryker or Stryker CMF, or clarifying whether Stryker CMF also operates out of Kalamazoo, Michigan like Stryker does. Stryker, the moving party on summary judgment, has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 323. There is also evidence suggesting Associate Human Resources Manager Melissa Lewis [15] is a "shared employee" of Stryker and Stryker CMF. Notably, there is evidence Lewis is a Stryker employee, as Trosper testifies that Lewis signed and executed Trosper's Confidentiality Agreement between Trosper and "Stryker Corporation, including its subsidiaries," and testifies that she did so on behalf of "Stryker Corporation." *See* Trosper Decl. ¶ 3; *id.* Ex. A at 1, 5 (confidentiality agreement between Trosper and "Stryker Corporation, including its subsidiaries") (Lewis' signature on confidentiality agreement); Opp'n at 2, 8. Indeed, the Confidentiality Agreement itself states that Trosper had "read this agreement and ha[d] had an opportunity to ask *representatives of Stryker* questions about it." Trosper Decl. Ex. A at 5 (emphasis added). Presumably, Lewis, who signed and executed the agreement, was the Stryker representative to whom Trosper could direct his questions about the agreement. However, there is also evidence that Lewis was an employee of Stryker CMF and Howmedica. Trosper testified Lewis had signed Trosper's employment offer letter *from Stryker CMF* and did so in her capacity as associate manager for Human Resources for Howmedica. Opp'n at 2; Trosper Decl. ¶ 3. [16] Indeed, the offer letter itself shows that Lewis signed the letter in her capacity as "Associate Manager, Human Resources" "[o]n behalf of Stryker CMF"). Shinevare Decl. Ex. 1 at 1–2.

The Court thus finds that Trosper has presented evidence that raises a genuine issue of material fact as to whether this factor weighs in favor of finding that Stryker is Trosper's employer.

### 3. Common Management

The Court now addresses the third factor under the integrated enterprise test—common management. The *Laird* court held that Laird had failed to show the parent and subsidiary had any degree of common management, as she had "offered no evidence that anyone served as a manager of both corporations." *Laird,* 68 Cal.App. 4th at 740. The court also reasoned Laird should have introduced evidence that at least one manager of the parent corporation made or influenced a "day-to-day managerial decision" of the subsidiary, and further noted, "[n]or did [Laird] show that any manager from either corporation was ever transferred to the other." *Id.* Below, the Court considers the evidence relevant to this factor and concludes Trosper has presented sufficient evidence that raises a genuine issue of material fact as to whether this factor weighs in favor of finding that Stryker is Trosper's employer.

Trosper has introduced evidence similar to what the *Laird* court envisioned as satisfying this prong of the "integrated enterprise" test. *See Laird,* 68 Cal.App. 4th at 740. First, Trosper has offered evidence that at least two people served as a manager of both Howmedica and Stryker. In her deposition, Senior Manager of Human Resources and Payroll Shared Services for Stryker, Michelle Shinevare, identifies David Furgason and Jeanne Blondia as officers of Howmedica. Raanan Decl. Ex. J, 26:24–28:6 (identifying Ferguson as Vice President of Tax at Howmedica and identifying Blondia as an "officer"). Yet Furgason is *also* listed on the "Stryker Management" page for Stryker's website, www.stryker.com, as "Vice President, Tax", and Blondia is *also* listed as "Vice President and Treasurer." *Id.* Ex. L; Raanan Decl. ¶ 7.[17][18] Further, there is evidence in the record, *see supra* Part III.B.2, to support the inference that Mike VanVleet and Melissa Lewis— as managers of the parent corporation Stryker—made or influenced "day-to-day managerial decision[s]" of Howmedica. *Laird,* 68 Cal.App. 4th at 740. As noted above, Mike VanVleet has the title of "Director, Human Resources and Kalamazoo Operations," suggesting he is a *Stryker* director because Kalamazoo, Michigan is the place where the *Stryker* headquarters is located, while the record suggests Howmedica is headquartered in New Jersey[19] and Stryker CMF is headquartered in Portage, Michigan. Yet VanVleet signed the letter which references Trosper's employment termination from *Stryker CMF.* The combination of these circumstances suggests that Stryker may have had at least some part in influencing or making certain managerial decisions at Stryker CMF. Similarly, Associate Human Resources Manager Melissa Lewis, who apparently has authority to act as a *Stryker* representative, as she did when signing and executing the Confidentiality Agreement with Trosper, also signed Trosper's employment offer letter which discusses his employment with *Stryker CMF.* This too suggests that representatives from Stryker had at least some part in influencing or making certain managerial decisions at Stryker CMF, or at the very least that human resources functions at Stryker and Stryker CMF were intermingled to a certain extent.[20][21]

**\*9** In light of the foregoing, the Court finds Trosper has presented sufficient evidence for a reasonable jury to conclude that this factor weighs in favor of finding that Stryker is Trosper's employer under the "integrated enterprise" test.[22]

### 4. Common Ownership or Financial Control

Finally, the Court addresses the fourth and final factor—common ownership or financial control. The mere fact of common ownership or financial control, without more, is insufficient to raise a triable issue of fact under the integrated enterprise test and thus hold that a parent corporation must be liable for the illegal acts of its subsidiary on the theory that the two corporate entities constitute a single employer. *Laird,* 68 Cal App. 4th at 739–40. Courts have recognized this factor as being the least important of the four. *See, e.g., Pearson v. Component Tech Corp.,* 247 F.3d 471, 494 (3rd Cir. 2001) (noting that common ownership is "typically referred to as the 'least important' of the factors"); *Serrano,* 2006 WL 2348888, *5. Further, because this factor is not dispositive of the existence of an integrated enterprise, courts have even refrained from addressing this factor entirely. *See, e.g., Ruiz,* 2011 WL 3300098, at *3–4.

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 580 of 898
Trosper v. Stryker Corporation, Not Reported in F.Supp.2d (2014)
22 Wage & Hour Cas.2d (BNA) 968

Here, as in *Laird* where the existence of common ownership was not denied by the parent corporation, Stryker does not deny that Howmedica is a wholly-owned subsidiary of Stryker, and thus does not deny that Stryker and Howmedica are commonly owned. However, Stryker does provide persuasive evidence that Stryker does not exercise any financial control over Howmedica. Stryker HR Director Michelle Shinevare testifies that the two corporations have separate accounting departments, maintain separate financial records, maintain separate payroll records, issue separate W–2 forms, and have separate federal tax identification numbers. *See* Shinevare Decl. ¶¶ 6–7; *see also* Mot. at 3. Howmedica employees are paid from Howmedica funds, not Stryker funds. *Id.* at 7. Trosper does not appear to contest whether Stryker exercises any financial control over Howmedica. Opp'n at 8. The Court concludes the record supports a finding of common ownership, but does not support a finding of common financial control. However, because this Court, like other courts, concludes that this factor is minimally probative of whether Stryker and Howmedica are "integrated enterprises," Stryker's evidence demonstrating no common financial control between Howmedica and Stryker does not convince the Court to conclude as a matter of law that Stryker is not Trosper's employer under the "integrated enterprise" test. Rather, the Court simply finds that Stryker's concession of common ownership provides at least some support for the Court's conclusion that a reasonable jury could find Stryker was in fact Trosper's employer. The jury will be entitled to consider Stryker's evidence of no common financial control at trial when deciding whether this fourth factor weighs in favor of finding an employment relationship between Trosper and Stryker.

### 5. Conclusion

**\*10** The Court finds that Trosper has introduced evidence sufficient to create a genuine issue of material fact as to the existence of an employment relationship between Trosper and Stryker. In support of the first and most important prong of the integrated enterprise test—centralized control of labor relations—Trosper has introduced not only a judicial admission by Stryker that it is a direct employer of Howmedica employees in the same sales position as Trosper, but also points to multiple policies, promulgated by Stryker, that bind employees like Trosper. This included the Code of Conduct which required Trosper to sign and acknowledge that he "underst[ood] that compliance with the Code of Conduct is a condition of [his] continued *employment with Stryker Corporation* and [he] will abide by and support the policies set forth in [Stryker's] Code of Conduct." Trosper Decl. Ex. B at 4 (emphasis added). Trosper also introduced evidence sufficient to satisfy the second prong of the integrated enterprise test—interrelation of operations—by pointing out common officers and payroll functions. A reasonable jury could also find that the third factor of the integrated enterprise test, common management, weighs in Trosper's favor, as it appears that Howmedica and Stryker not only shared common executives, but also potentially shared managers in charge of employment and termination decisions. Finally, Howmedica and Stryker are commonly owned. A reasonable jury could find an employer-employee relationship between Stryker and Trosper based on these four factors of the integrated enterprise test. [23] [24]

### IV. CONCLUSION

For the foregoing reasons, the Court DENIES Stryker Corporation's Motion for Summary Judgment.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 1619052, 22 Wage & Hour Cas.2d (BNA) 968

---

Footnotes

1    Trosper's declaration states he was an employee from April 2007 until May 2011. ECF No. 35–3 ("Trosper Decl.") ¶ 1. Trosper's opposition also states his employment began in April 2007. ECF No. 35, Opp'n at 1. This factual discrepancy between the Complaint, on the one hand, and Trosper's declaration and opposition on the other, is not dispositive of the matters at issue in Stryker's motion.

2    Trosper defines the Class Period as "four years preceding the filing of this complaint through the date that Defendants changed their reimbursement policies to comply with California law." Compl. ¶ 2.

3    Trosper also alleges that Stryker violated the unfair and unlawful prongs of the UCL. Compl. ¶ 46. Stryker moves for summary judgment on the UCL claim also on the basis that an employer-employee relationship must be shown. Mot. at 1–2. Stryker is correct that an employer-employee relationship must be shown for Trosper to sue Stryker on the UCL claim. With respect to the UCL's "unlawful" prong, that prong makes violations of *other* laws actionable under the UCL. *Herskowitz v. Apple, Inc.,* 940 F.Supp.2d 1131, 1145 (N.D.Cal.2013). Thus, because a violation of California Labor Code § 2802 is a predicate for stating a cause of action under the UCL's unlawful prong, an employer-employee relationship need be shown to bring the UCL claim against Stryker. With respect to the UCL's "unfair" prong, the unfair practice alleged in this case—an *employer's* failure to compensate an employee for expenses incurred in the course of employment– requires that an employer-employee relationship exists to prove the "injury in fact" and "lost money or property" required to bring any claim under the UCL. Cal. Bus. & Prof.Code § 17204.

4    In *Laird,* the California Court of Appeal for the Third Appellate District affirmed summary judgment for a defendant parent corporation that was sued by Anne Laird—the former employee of the parent company's wholly owned subsidiary —for violations of California's Fair Housing and Employment Act ("FHEA"). *Laird,* 68 Cal.App. 4th at 741. The court determined the parent corporation was not Laird's employer after evaluating four factors of the "integrated enterprise" test: (1) centralized control of labor relations; (2) interrelation of operations; (3) common management; and (4) common ownership or financial control. *Id.*

5    Michelle Shinevare is the Senior Manager of Human Resources and Payroll Shared Services for Stryker. Shinevare Decl. ¶ 1.

6    Stryker objects to Trosper's introduction of the Michigan Complaint under Federal Rules of Evidence 402 and 901. Reply at 1 n.2. First, Stryker argues that the compliant is "unrelated to, and not probative as to the existence of, an employment relationship between Stryker and any California Sales Representatives." *Id.* The Court disagrees. In the Michigan Complaint, Stryker makes multiple references to the former Stryker CMF employees as "Stryker employees," and the defendants in that case appear to be employed in the same Stryker CMF division as Trosper, but in different states. These facts easily clear the very low bar for relevancy set forth in Rule 402. Second, Stryker claims the Complaint is improperly authenticated per Rule 901. The Court disagrees. The Michigan Complaint is available via Internet search and on PACER, a reliable, publicly accessible repository for federal court documents. Furthermore, the Michigan Complaint has been prepared by the same law firm representing Stryker in this case, which suggests that Stryker should be certain as to the veracity of this filing. Court documents are subject to judicial notice. *See Holder v. Holder,* 305 F.3d 854, 866 (9th Cir. 2002) (taking judicial notice of court documents already in the public record and documents filed in other courts). Stryker also objects on procedural grounds, arguing that Trosper should have filed a Request for Judicial Notice with respect to the Complaint. However, this Court has discretion to sua sponte judicially notice documents. Fed.R.Evid. 201(c)(1) ("The court may take judicial notice on its own").

7    Furthermore, although in the action pending before this Court Stryker describes Stryker CMF as a division of Howmedica, *see* Mot. at 1–2, Stryker describes Stryker CMF in the Michigan Complaint as a "division" of "Stryker," which the Michigan Complaint defines as the collective word for both Stryker and Howmedica. *See* Mich. Compl. ¶ 24 ("Stryker, through its CMF division and NSE business unit, is a global leader in the development, manufacture, and sale of medical devise sales."); *id.* at 1 (referring to Stryker and Howmedica "collectively" as "Stryker"). At the very least, this description in the Michigan Complaint casts doubt on Stryker's claim in this case that Stryker and Stryker CMF are "completely separate entit[ies]." Mot. at 2.

8    Stryker's statements regarding the existence of an employment relationship with Stryker CMF employees in the Michigan Complaint are considered judicial admissions in the Michigan case under both Sixth Circuit and Ninth Circuit law. *See United States. v. Burns,* 109 Fed.Appx. 52, 58 (6th Cir. 2004) ("We have discretion to consider a statement made in a brief to be a judicial admission, binding on both this court and the trial court.") (citing *Gospel Missions of Am. v. City of L.A.,* 328 F.3d 548, 557 (9th Cir. 2003)); *see also Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."). The Court finds that Stryker's admission in the Michigan case is highly probative at the very least as to whether Stryker has essentially conceded in the instant case that any person who signed the Employee Confidentiality and Intellectual Property Agreement was a Stryker employee.

9    As an aside, the Court notes that the fact that Stryker sought to enforce, through the Michigan Complaint, its ability to control employees' access to Stryker's confidential documents and intellectual property suggests that Stryker exercises a level of control over Howmedica that extends beyond the typical distant relationship between a parent and subsidiary. *See Laird,* 68 Cal.App. 4th at 738 ("What a plaintiff must show, rather, is that the parent has exercised control 'to a degree that exceeds the control normally exercised by a parent corporation.' ") (internal citations omitted).

10   The Court agrees with Stryker that the "Stryker Orthopaedics Employee Handbook," introduced by Trosper, is a
     Howmedica policy, not a *Stryker* policy. Reply at 4. Stryker HR Director Michelle Shinevare stated in her deposition that
     Stryker Orthopaedics and Howmedica Osteonics are different names for the same entity. *See* Raanan Decl. Ex. J, 30:1–
     4; Reply at 4. The Court overrules Stryker's evidentiary objections under Rules 402 and 701 to Trosper's statement,
     Trosper Decl. ¶ 5, that "During [his] time at Stryker CMF, [he] understood that Howmedica Osteonics was a division
     of Stryker Corporation and synonymous with Stryker Corporation's Orthopedic Division" because Trosper's statement
     mirrors Stryker manager Michelle Shinevare's own deposition testimony. Reply at 4 n.4.

11   The Code notes that "company officers ... will be required periodically to confirm in writing that ... they are not aware
     of any violations of these policies or have properly reported all violations.... Violation of a policy, retaliation against any
     individual for reporting a violation, or failure to otherwise comply with these policies will not be tolerated and will result in
     disciplinary action, including termination of employment where appropriate." *Id.*at 3.

12   The sole substantive claim in this case centers on reimbursement of employee expenses. The Court notes that Stryker
     has failed to present any evidence that Howmedica actually controlled "day-to-day" decisions with respect to employee
     expense reimbursement during Trosper's employment. The only policy in the record promulgated by Stryker CMF or
     Howmedica that speaks directly to the issue of employee expense reimbursement was issued in October 2012, over
     one year *after* Trosper stopped working for Stryker CMF and thus is inapplicable to him. *See* Shinevare Decl. Ex. 5
     ("Stryker CMF T & E Reimbursement Policy for All Sales Reps working in the State of California"); Shinevare Decl. Ex.
     2 (termination letter indicating his job was terminated as of May 19, 2011). On the other hand, Trosper has presented
     evidence of at least two Stryker–promulgated expense reimbursement policies that very well may have been in existence
     during the course of his employment, *see, e.g.,* Raanan Decl. Ex. G (Corporate Accounting Policy # 12 effective April
     2007); Compl. ¶ 1 (Trosper began working at Stryker CMF in approximately November 2008); *see also* Trosper Decl.
     ¶ 7 and Ex. F (powerpoint presentation Trosper testified he was given in training session regarding Stryker's policies
     regarding expense reimbursement policies for business events with healthcare providers). The powerpoint notes that
     employees were expected to know these policies. Trosper Decl. Ex. F at 2.

13   The Court further notes that the record includes a newsletter titled "West Region News" apparently sent out by Stryker
     (because the Stryker logo is on the document), in which Stryker congratulated its Sales team on a good year, and
     specifically congratulated Trosper as the number one salesperson. Trosper Decl. Ex. E; Trosper Decl. ¶ 6. Even if this
     evidence does not suggest Stryker was controlling the day-to-day employment decisions at Stryker CMF, it at least
     suggests that Stryker was involved in overseeing the work achievements of sales representatives like Trosper. Stryker
     objects to this newsletter on the ground that it is irrelevant, Reply at 7 n.6, but the Court overrules that objection.

14   It is unclear from the record whether VanVleet is a director of Stryker or Stryker CMF.

15   It is unclear from the record whether Lewis' title is Associate Human Resources Manager for Stryker or Stryker CMF.

16   Stryker objects on the basis of Rules 602 and 701 to Trosper's testimony that Michelle Lewis signed his employment
     agreement "on behalf of Howmedica and [executed] his confidentiality agreement on behalf of Stryker Corporation." Reply
     at 10 n.9 (referring to Trosper Decl. ¶ 3). Stryker's personal knowledge objections are overruled. Trosper has sufficient
     personal knowledge, as a signatory of both the Confidentiality Agreement and the employment offer letter, to assert at
     least his understanding of Lewis' role in the execution of the documents.

17   The record makes clear that Howmedica does not have its own website. Raanan Decl. ¶ 6. A search for
     www.howmedica.com directs the user to the Stryker webpage for orthopedic devices. *Id.* Stryker objects to Trosper's
     assertion that Howmedica does not maintain its own website "on the grounds that this purported evidence" is "irrelevant."
     Reply at 13 n.11. The Court overrules this objection as moot because the Court does not rely on the fact that Howmedica
     does not have its own website in reaching its conclusion on Stryker's motion.

18   Stryker does not directly address whether Blondia and Furgason are managers of both Howmedica and Stryker, but
     simply notes that "Plaintiff provides no evidence as to the roles these individuals play [.]" Reply at 9–10.

19   Howmedica is headquartered in Mahwah, New Jersey. Shinevare Decl. ¶¶ 3–4.

20   In light of the foregoing evidence, the Court is not convinced by Stryker's assertion that Stryker had absolutely "no input
     on hiring and firing" at Howmedica. Mot. at 10.

21   Stryker has no persuasive rebuttal to these arguments except to say that although Stryker and Howmedica share a "small
     number" of employees, Mot. at 8, "Trosper can again point to no evidence proving common management between the
     two corporate entities." *Id.*

22   Trosper requests that the hearing on Defendant's motion be continued to "allow reasonable discovery into the duties of
     the shared executives if the court finds that the mere existence of common managers does not support a finding of a

genuine issue of material fact." Opp'n at 3 n.8. In light of how the Court concludes the "common management" factor weighs in favor of finding an employment relationship, the Court denies Trosper's request as moot.

23    In its Reply, Stryker objects to Trosper's statement that he "was an employee of Howmedica and Stryker Corporation from April 2007 until May 2011," Trosper Decl. ¶ 1, on the ground that this constitutes "improper opinion testimony and/or conclusion." Reply at 1 n.1. The Court overrules the objection because Trosper has sufficient personal knowledge to provide a lay witness opinion as to his belief concerning what his employee status was with respect to each corporation.

24    In his Opposition, Trosper raises three alternative theories to support a finding that Stryker is Trosper's employer, and also suggests that because Howmedica is merely Stryker's "agent," Stryker can be held liable for Howmedica's actions as the principal. The Court acknowledges that California law is unsettled as to what precise test regarding the existence of an employer relationship applies to claims under California Labor Code § 2802. *See, e.g., Vernon,* 116 Cal.App. 4th at 129 (recognizing that the precise test under California law for determining the existence of employer-employee relationships is in flux). Nonetheless, the Court need not reach Trosper's other arguments because summary judgment must be denied on the basis of the integrated enterprise test.

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    11

Tab 13

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

102 S.Ct. 1127
Supreme Court of the United States

Anne B. ZIPES, et al., Petitioners,
v.
TRANS WORLD AIRLINES, INC.
INDEPENDENT FEDERATION OF
FLIGHT ATTENDANTS, Petitioner,
v.
TRANS WORLD AIRLINES, INC., et al.

Nos. 78-1545, 80-951.
|
Argued Dec. 2, 1981.
|
Decided Feb. 24, 1982.

Class action was brought by female flight attendants alleging unlawful sex discrimination in grounding all female flight attendants who became mothers. The United States District Court for the Northern District of Illinois granted summary judgment, and the Court of Appeals for the Seventh Circuit, 582 F.2d 1142, upheld finding of unlawful employment discrimination, but held that claims of most of the members of the class were barred by failure to timely file charges with the Equal Employment Opportunity Commission. On remand, the District Court approved settlement. The Court of Appeals, 630 F.2d 1164, affirmed. On certiorari, the Supreme Court, Justice White, held that: (1) filing timely charge of discrimination with the Equal Employment Opportunity Commission is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling, and (2) retroactive seniority contrary to collective bargaining agreement could be awarded over objection of union that had not itself been found guilty of discrimination.

Reversed in part and affirmed in part.

Justice Powell, with whom Chief Justice Burger and Justice Rehnquist joined, filed opinion concurring in part and concurring in judgment in part.

**1128    *385 Syllabus*

In 1970, the union then representing flight attendants employed by respondent Trans World Airlines, Inc. (TWA), brought a federal-court class action alleging that TWA practiced unlawful sex discrimination in violation of Title VII of the Civil Rights Act of 1964 by its policy of grounding all female flight attendants who became mothers while their male counterparts who became fathers were permitted to continue flying. Subsequently, individual members of the class (petitioners in No. 78-1545) were appointed as class representatives to replace the union, which was found to be an inadequate representative. The District Court later denied TWA's motion to exclude class members who had not filed charges with the Equal Employment Opportunity Commission (EEOC) within the time limit specified in Title VII, holding that while such filing requirement is a jurisdictional prerequisite not subject to waiver, any violation by TWA continued against all the class members until TWA changed its challenged policy. The court also granted the plaintiff class' motion for summary judgment on the issue of TWA's liability for violating Title VII. The Court of Appeals affirmed the grant of summary judgment and held that timely filing of EEOC charges was a jurisdictional prerequisite, but declined to extend the "continuing violation" theory so as to include in the plaintiff class those terminated employees who failed to file timely EEOC charges. However, the court stayed its mandate pending the filing of petitions in this Court, which, in turn, deferred consideration of the petitions pending completion of settlement proceedings in the District Court. In such proceedings, the District Court designated two subclasses: Subclass A, consisting of women who were terminated on or after March 20, 1970, and those who were discharged earlier but who had accepted reinstatement in ground positions, and Subclass B, consisting of all other members of the class, whose claims the Court of Appeals had found to be jurisdictionally barred for failure to satisfy the timely-filing requirement. The flight attendants'current *386 tendants' attendants'current(petitioner **1129 in No. 80-951) was permitted to intervene and object to the proposed settlement. On the basis of the Court of Appeals' stay of its mandate in its jurisdictional decision, the District Court rejected the union's challenge to its jurisdiction over Subclass B. It also approved the settlement and awarded restoration of retroactive seniority. The Court of Appeals affirmed, rejecting the union's contention that, because of the Court of Appeals' earlier opinion, the District Court lacked jurisdiction to

approve the settlement or to order retroactive seniority with respect to Subclass B.

*Held* :

1. Filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. The structure of Title VII, the congressional policy underlying it, and the reasoning of this Court's prior cases all lead to this conclusion. Pp. 1132-1135.

2. The District Court had authority to award retroactive seniority to the members of Subclass B as well as Subclass A. Pp. 1135-1136.

(a) The union's contention in No. 80-951 that there was no finding of discrimination with respect to Subclass B and thus no predicate for relief under § 706(g) of Title VII is without merit. The District Court found unlawful discrimination against the plaintiff class as a whole, at a time when the class had not yet been divided into the two subclasses, and the court's summary judgment ran in favor of the entire class. Since the Court of Appeals erred in ruling that the District Court had no jurisdiction over claims by those who had not met the filing requirement and that those individuals should have been excluded from the class prior to the grant of summary judgment, there was no jurisdictional barrier to the District Court's finding of discrimination with respect to the entire class. P. 1135.

(b) Equally meritless is the union's contention that retroactive seniority contrary to the collective-bargaining agreement should not be awarded over the objection of a union that has not itself been found guilty of discrimination. Class-based seniority relief for identifiable victims of illegal discrimination is a form of relief generally appropriate under § 706(g). And, as made clear in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, once there has been a finding of discrimination by the employer, an award of retroactive seniority is appropriate even if there is no finding that the union has also illegally discriminated. Pp. 1135-1136.

No. 78-1545, 7th Cir., 582 F.2d 1142, reversed; No. 80-951, 7th Cir., 630 F.2d 1164, affirmed.

**Attorneys and Law Firms**

**\*387**  William A. Jolley, Kansas City, Mo., for petitioner in 80-951.

A. Raymond Randolph, Jr., Washington, D. C., Aram A. Hartunian, Arnold I. Shure, Kevin M. Forde, Chicago, Ill., for petitioners in 78-1545.

Laurence A. Carton, Chicago, Ill., for respondents.

**Opinion**

Justice WHITE delivered the opinion of the Court.

The primary question in these cases is whether the statutory time limit for filing charges under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* (1970 ed.) is a jurisdictional prerequisite to a suit in the District Court. Secondarily, we resolve a dispute as to whether retroactive seniority was a proper remedy in these Title VII cases.

**\*388**  I

In 1970, the Air Line Stewards and Stewardesses Association (ALSSA), then the collective-bargaining agent of Trans World Airlines (TWA) flight attendants, brought a class action alleging that TWA practiced unlawful sex discrimination in violation of  **\*\*1130** Title VII by its policy of grounding all female flight cabin attendants who became mothers, while their male counterparts who became fathers were permitted to continue flying. After collective bargaining eliminated the challenged practice prospectively, the parties in the case reached a tentative settlement. The settlement, which provided neither backpay nor retroactive seniority, was approved by the District Court. The Court of Appeals for the Seventh Circuit, however, found the union to be an inadequate representative of the class because of the inherent conflict between the interests of current and former employees. It remanded the case with instructions that the District Court name individual members of the class to replace ALSSA as the class representative. [1] *Air Line Stewards and Stewardesses Assn. v. American Airlines, Inc.*, 490 F.2d 636 (1973).

Upon remand, petitioners in No. 78-1545 were appointed as class representatives. TWA moved to amend its

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

answer to assert that the claims of plaintiffs and other class members were barred by Title VII's "statute of limitations" because they had failed to file charges with the Equal Employment Opportunity Commission (EEOC) within the statutory time **\*389** limit. 1 App. 89a.[2] Although the District Court granted the motion to amend, it noted that the "delay in pleading the defense of limitations may well ultimately constitute a waiver of the defense." *Id.*, at 101a.

Subsequently, on October 15, 1976, the District Court denied TWA's motion to exclude class members who had not filed timely charges with the EEOC. In support of its motion, TWA argued that instead of an affirmative defense analogous to a statute of limitations, timely filing with the EEOC is a jurisdictional prerequisite not subject to waiver by any action of the defendants. While the District Court agreed that the filing requirements of Title VII are jurisdictional, it denied the motion on the basis that any violation by the airline continued against all the class members until the airline changed the challenged policy. *Id.*, at 131a-132a. On October 19, 1976, the District Court granted the motion of the plaintiff class for summary judgment on the issue of TWA's liability for violating Title VII. *Id.*, at 133a-134a.

The Court of Appeals affirmed the order of October 18, 1976, granting summary judgment on liability, expressly holding that "TWA's no motherhood policy ... provides a clear example of sex discrimination prohibited by § 2000e-2(a)." *In re Consolidated Pretrial Proceedings in the Airline Cases*, 582 F.2d 1142, 1145 (1978). It declined, however, "to extend the continuing violation theory, as did the district court, so as to include in the plaintiff class those employees who were permanently terminated more than 90 days before the filing of EEOC charges." *Id.*, at 1149.

The Court of Appeals went on to hold that timely filing of EEOC charges was a jurisdictional prerequisite. Because TWA could not waive the timely-filing requirement, the **\*390** Court of Appeals found that approximately 92% of the plaintiffs' claims were jurisdictionally barred by the failure of those plaintiffs to have filed charges of discrimination with the EEOC within 90 days of the alleged unlawful employment practice. The Court of Appeals, however, stayed its mandate pending the filing of petitions in this Court. Petitions for certiorari were filed by the plaintiff class, **\*\*1131** No. 78-1545, and

by TWA, No. 78-1549. This Court granted motions to defer consideration of the petitions pending completion of settlement proceedings in the District Court. 442 U.S. 916, 99 S.Ct. 2834, 61 L.Ed.2d 282 (1979).

In connection with the settlement proceedings, the District Court designated two subclasses. Subclass A, consisting of some 30 women, comprised those who were terminated on or after March 2, 1970, as well as those who were discharged earlier, but who had accepted reinstatement in ground duty positions. Subclass B, numbering some 400 women, covered all other members of the class and consisted of those whose claims the Court of Appeals had found to be jurisdictionally barred for failure to satisfy the timely-filing requirement. 2 App. 3.

The proposed settlement divided \$3 million between the two groups. It also provided each class member with full company and union seniority from the date of termination. The agreement specified that "in the event of the timely objection of any interested person, it is agreed that the amount of seniority and credit for length of service for the compensation period will be determined by the Court in its discretion, pursuant to the provisions of Section 706(g), and all other applicable provisions of law, without contest or objection by TWA."[3] App. to Pet. for Cert. in No. 80-951, p. 29a.

**\*391** The Independent Federation of Flight Attendants (union), which had replaced ALSSA as the collective-bargaining agent for the flight attendants, was permitted to intervene and to object to the settlement. On the basis that the Court of Appeals had not issued the mandate in its jurisdictional decision, the District Court rejected the union's challenge to its jurisdiction over Subclass B. *Id.*, at 14a-15a. After holding three days of hearings, the District Court approved the settlement and awarded competitive seniority. It explicitly found that full restoration of retroactive seniority would not have an unusual adverse impact upon currently employed flight attendants in any way atypical of Title VII cases. *Id.*, at 18a-19a.

The union appealed. It argued that, because of the Court of Appeals' earlier opinion, the District Court lacked jurisdiction to approve the settlement or to order retroactive seniority with respect to Subclass B. The Court of Appeals affirmed, reasoning that "the principles favoring settlement of class action lawsuits remain the same regardless of whether the disputed legal issues center

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 588 of 898

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

on the jurisdiction of the court over the action." *Air Line Stewards and Stewardesses Assn. v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1169 (1980). It further explained that the question of jurisdiction as to Subclass B had not been finally determined because a challenge to its decision was pending before this Court and observed that the Courts of Appeals were split on the issue. The Court of Appeals noted that the District Court clearly had subject-matter jurisdiction over the claims of Subclass A. It concluded: "Where, as here, the jurisdictional question is not settled with finality, parties should not be forced to litigate the issue of jurisdiction if they can arrive at a settlement **\*392** that is otherwise appropriate for district court approval." *Ibid.*

The Court of Appeals also affirmed the award of seniority. According to the court, the settlement served the public policy of remedying past acts of sex discrimination and the consequences of those past acts. Moreover, "[t]he right to have its objections heard does not, of course, give the **\*\*1132** intervenor the right to block any settlement to which it objects." *Ibid.*[4]

The union petitioned for certiorari, No. 80-951. We granted its petition together with the petitions in No. 78-1545 and No. 78-1549, 450 U.S. 979, 101 S.Ct. 1511, 67 L.Ed.2d 813 (1981), but later removed the TWA case, No. 78-1549,[5] from the argument docket and limited the grant in No. 80-951. 451 U.S. 980, 101 S.Ct. 2309, 68 L.Ed.2d 836 (1981).

## II

The single question in No. 78-1545 is whether the timely filing of an EEOC charge is a jurisdictional prerequisite to bringing a Title VII suit in federal court or whether the requirement is subject to waiver and estoppel. In reaching its decision that the requirement is jurisdictional, the Court of Appeals for the Seventh Circuit relied on its reading of the statutory language, the absence of any indication to the contrary **\*393** in the legislative history, and references in several of our cases to the 90-day filing requirement as "jurisdictional."[6] Other Courts of Appeals that have examined the same materials have reached the opposite conclusion.[7]

**[1]** We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.[8] The structure of Title VII, the congressional policy underlying it, and the reasoning of our cases all lead to this conclusion.

The provision granting district courts jurisdiction under Title VII, 42 U.S.C. §§ 2000e-5(e) and (f), does not limit jurisdiction to those cases in which there has been a timely filing with the EEOC.[9] It **\*\*1133** contains no reference to the timely-filing **\*394** requirement. The provision specifying the time for filing charges with the EEOC appears as an entirely separate provision, and it does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.[10] The legislative history of the filing provision is sparse, but Senator Humphrey did characterize the time period for filing a claim as a "period of limitations," 110 Cong.Rec. 12723 (1964), and Senator Case described its purpose as preventing the pressing of "stale" claims, *id.*, at 7243, the end served by a statute of limitations.

Although subsequent legislative history is not dispositive, see *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980); *Cannon v. University of Chicago*, 441 U.S. 677, 686, n. 7, 99 S.Ct. 1946, 1952, n. 7, 60 L.Ed.2d 560 (1979), the legislative history of the 1972 amendments also indicates that Congress intended the filing period to operate as a statute of limitations instead of a jurisdictional requirement. In the final Conference Committee section-by-section analysis of H.R. 1746, the Equal Opportunity Act of 1972, 118 Cong.Rec. 7166, 7167 (1972), the Committee not only termed the filing period a "time limitation," but explained:

> "This subsection as amended provides that charges be filed within 180 days of the alleged unlawful employment practice. Court decisions under the present law have **\*395** shown an inclination to interpret this time limitation so as to give the aggrieved person the maximum benefit of the law; it is not intended that such court decisions should be in any way circumscribed by the extension of the time limitations in this subsection."[11]

This result is entirely consistent with prior case law. Although our cases contain scattered references to

the timely-filing requirement as jurisdictional, the legal character of the requirement was not at issue in those cases, and as or more often in the same or other cases, we have referred to the provision as a limitations statute. [12]

**\*396 \*\*1134** More weighty inferences however, are to be drawn from other cases. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), was a Title VII suit against an employer and a union. The District Court denied relief for unnamed class members on the ground that those individuals had not filed administrative charges under the provisions of Title VII and that relief for them was thus not appropriate. The Court of Appeals did not disturb this ruling, but we reversed, saying:

"The District Court stated two reasons for its denial of seniority relief for the unnamed class members. The first was that those individuals had not filed administrative charges under the provision of Title VII with the Equal Employment Opportunity Commission and therefore class relief of this sort was not appropriate. We rejected this justification for denial of class-based relief in the context of backpay awards in *Albemarle Paper* [*Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975),] and ... reject it here. This justification for denying class-based relief in Title VII suits has been unanimously rejected by the courts of appeals, and Congress ratified that construction by the 1972 amendments...." *Id.*, at 771, 96 S.Ct., at 1267 (footnote omitted).

**\*397** If the timely-filing requirement were to limit the jurisdiction of the District Court to those claimants who have filed timely charges with the EEOC, the District Courts in *Franks* and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), would have been without jurisdiction to adjudicate the claims of those who had not filed as well as without jurisdiction to award them seniority. We did not so hold. Furthermore, we noted that Congress had approved the Court of Appeals cases that awarded relief to class members who had not exhausted administrative remedies before the EEOC. It is evident that in doing so, Congress necessarily adopted the view that the provision for filing charges with the EEOC should not be construed to erect a jurisdictional prerequisite to suit in the district court.

In *Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), we announced a guiding principle

for construing the provisions of Title VII. Declining to read literally another filing provision of Title VII, we explained that a technical reading would be "particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Id.*, at 527, 92 S.Ct., at 619. That principle must be applied here as well.

The reasoning of other cases assumes that the filing requirement is not jurisdictional. In *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976), we rejected the argument that the timely-filing requirement should be tolled because the plaintiff had been pursuing a grievance procedure set up in the collective-bargaining agreement. We did not reach this decision on the basis that the 180-day period was jurisdictional. Instead, we considered the merits of a series of arguments that grievance procedures **\*\*1135** should toll the requirement. Such reasoning would have been gratuitous if the filing requirement were a jurisdictional prerequisite. [13]

**\*398** Similarly, we did not *sua sponte* dismiss the action in *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) on the basis that the District Court lacked jurisdiction because of plaintiff's failure to comply with a related Title VII time provision. Instead, we merely observed in a footnote that "[p]etitioner did not assert respondent's failure to file the action within 90 days as a defense." *Id.*, at 811, n. 9, 100 S.Ct., at 2489, n. 9.

By holding compliance with the filing period to be not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires, we honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer.

We therefore reverse the Court of Appeals in No. 78-1545.

III

**[2]** In No. 80-951, the union challenges on several grounds the District Court's authority to award, over the union's objection, retroactive seniority to the members of Subclass B. We have already rejected the union's first contention, namely, that the District Court had

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

no jurisdiction to award relief to those who had not complied with Title VII's filing requirement. The union also contends that in any event there has been no finding of discrimination with respect to Subclass B members and that the predicate for relief under § 706(g) is therefore missing. This contention is also without merit.

The District Court unquestionably found an unlawful discrimination against the plaintiff class, and the class at that **\*399** time had not been subdivided into Subclasses A and B. Summary judgment ran in favor of the entire class, including both those members who had filed timely charges and those who had not. The Court of Appeals affirmed the summary judgment order as well as the finding of a discriminatory employment practice. The court went on, however, to hold that the District Court had no jurisdiction over claims by those who had not met the filing requirement and that those individuals should have been excluded from the class prior to the grant of summary judgment. But as we have now held, that ruling is erroneous. The District Court did have jurisdiction over nonfiling class members. Thus, there was no jurisdictional barrier to its finding of discrimination with respect to the entire class. With the reversal of the Court of Appeals judgment in No. 78-1545 and our dismissal of No. 78-1549, which had challenged the affirmance of the summary judgment order, the order that found classwide discrimination remains intact and is final. The award of retroactive seniority to members of Subclass B as well as Subclass A is not infirm for want of a finding of a discriminatory employment practice.

 **[3]**   Equally meritless is the union's contention that retroactive seniority contrary to the collective-bargaining agreement should not be awarded over the objection of a union that has not itself been found guilty of discrimination. In **\*\*1136** *Franks v. Bowman Transportation Co.*, 424 U.S., at 764, 96 S.Ct., at 1264, we read the legislative history of Title VII as giving

> "emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole in so far as possible the victims of ... discrimination ...."

While recognizing that backpay was the only remedy specifically mentioned in the provision, we reasoned

that adequate relief might be denied without a seniority remedy. We concluded that the class-based seniority relief for identifiable victims **\*400** of illegal discrimination is a form of relief generally appropriate under § 706(g).

In *Franks*, the District Court had found both that the employer had engaged in discrimination and that the discriminatory practices were perpetuated in the collective-bargaining agreements with the unions. 424 U.S., at 751, 96 S.Ct., at 1257-58. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), however, makes it clear that once there has been a finding of discrimination by the employer, an award of retroactive seniority is appropriate even if there is no finding that the union has also illegally discriminated. In *Teamsters*, the parties agreed to a decree which provided that the District Court would decide "whether any discriminatees should be awarded additional equitable relief such as retroactive seniority." *Id.*, at 331, n. 4, 97 S.Ct., at 1852, n. 4. Although we held that the union had not violated Title VII by agreeing to and maintaining the seniority system, we nonetheless directed the union to remain in the litigation as a defendant so that full relief could be awarded the victims of the employer's post-Act discrimination. *Id.*, at 356, n. 43, 97 S.Ct., at 1865, n. 43. [14] Here, as in *Teamsters*, the settlement left to the District Court the final decision as to retroactive seniority.

In resolving the seniority issue, the District Court gave the union all the process that was due it under Title VII in our cases. The union was allowed to intervene. The District Court heard its objections, made appropriate findings, and determined that retroactive seniority should be awarded. The Court of Appeals agreed with that determination, and **\*401** we have eliminated from our consideration here the question whether on the facts of these cases the Court of Appeals and the District Court were in error in this respect.

Accordingly, the judgment in No. 78-1545 is reversed and the judgment in No. 80-951 is affirmed.

*So ordered.*

Justice STEVENS took no part in the consideration or decision of these cases.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 591 of 898

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)
102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

Justice POWELL, with whom THE CHIEF JUSTICE and Justice REHNQUIST join, concurring in No. 78-1545 and concurring in the judgment in No. 80-951.

The above cases arise out of the same protracted controversy, and the Court disposes of them in a single opinion. The only question in No. 78-1545 is whether the timely filing of an EEOC charge is a jurisdictional prerequisite to bringing a Title VII suit. I agree that timely filing is not jurisdictional and is subject to waiver and estoppel. Accordingly, I join Parts I and II of the Court's opinion.

I join only the judgment in No. 80-951. My concern with the Court's opinion is that it does not make clear that a timely charge, as well as a violation of Title VII, is a prerequisite to disturbing rights under a bona fide seniority system protected by **1137 § 703(h), 42 U.S.C. § 2000e-2(h). [1] This was made **402 clear in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 559, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), a case not discussed in the Court's opinion. [2] I nevertheless concur in the remand of No. 80-951, in which a settlement agreement was approved awarding retroactive competitive-status seniority under the standard of *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). This case has been in litigation since 1970, and in view of its complexity it is difficult to be certain as to "what happened and when." I believe, however, that one can conclude that the requirements of *Evans* were met.

As noted in the Court's opinion, *ante*, at 1135, the District Court's order finding classwide discrimination is now final. The District Court also entered an order finding that timely charges had been filed for all class members, and that order is similarly final. The timely-charge order was entered on October 15, 1976, three days before the entry of the order finding classwide discrimination. These orders were consolidated on appeal to the Court of Appeals for the Seventh Circuit. Although the October 18th order, finding discrimination, was affirmed, the Court of Appeals vacated the other order, holding that the members of Subclass B had failed to meet the jurisdictional requirements of Title VII because they had not filed timely claims. No District Court order was ever actually vacated because, on the motion of the parties, the Court of Appeals stayed its mandate, and the parties then reached a settlement. Today, the Court reverses that portion of the Court of Appeals' judgment that would have vacated the October 15th order. As a result, both the October 15th and October 18th orders, finding timely charges and classwide discrimination, are now final. **403 I therefore concur in the judgment of the Court affirming the award of retroactive competitive-status seniority under the standard of *Franks v. Bowman Transportation Co.* [3]

All Citations

455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432

Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 The class was defined as all female flight cabin attendants who were terminated from employment with TWA on or after July 2, 1965, for reasons of pregnancy. The Court of Appeals assumed the class to include only those who would have resumed flight duty after becoming mothers but for TWA's policy. *In re Consolidated Pretrial Proceedings in the Airline Cases*, 582 F.2d 1142, 1147, and n. 9 (CA7 1978). The class thus included both former employees and current employees, that is, both those who declined and those who accepted ground positions.

2 When suit was filed, 42 U.S.C. § 2000e-5(d) (1970 ed.) required charges to be filed within 90 days of the alleged unlawful employment practice. In 1972, this provision was amended to extend the time limit to 180 days and is now codified as § 2000e-5(e).

3 Section 706(g) of Title VII, 78 Stat. 253, as amended, 42 U.S.C. § 2000e-5(g) provides:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate...."

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

4       The Court of Appeals relied on language in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 779, n. 41, 96 S.Ct. 1251, 1271, n. 41, 47 L.Ed.2d 444 (1976):

> "[D]istrict courts should take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis from that point; and ... such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases."

5       In No. 78-1549, TWA contends (a) that the Court of Appeals erred in affirming summary judgment for plaintiffs on the issue of liability, (b) that TWA should be required to grant only prospective relief to plaintiffs, and (c) that the Court of Appeals erred in defining the subclass of plaintiffs who had filed timely charges with the EEOC. In view of our decision in No. 78-1545 and No. 80-951, we now dismiss the petition in No. 78-1549 as improvidently granted.

6       See *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 240, 97 S.Ct. 441, 449, 50 L.Ed.2d 427 (1976); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555, n. 4, 97 S.Ct. 1885, 1887, n. 4, 52 L.Ed.2d 571 (1977); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973).

7       See *Carlile v. South Routt School District Re 3-J*, 652 F.2d 981 (CA10 1981); *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584 (CA5 1981); *Leake v. University of Cincinnati*, 605 F.2d 255 (CA6 1979); *Hart v. J. T. Baker Chemical Corp.*, 598 F.2d 829 (CA3 1979); *Laffey v. Northwest Airlines, Inc.*, 185 U.S.App.D.C. 322, 567 F.2d 429 (1976).

8       One of the questions on which we granted certiorari in No. 80-951 was whether the Court of Appeals erred in affirming the District Court's approval of the settlement of jurisdictionally barred claims. In reaching its decision, the Court of Appeals for the Seventh Circuit explicitly declined to follow *McArthur v. Southern Airways, Inc.*, 569 F.2d 276 (CA5 1978) (en banc). *Air Line Stewards and Stewardesses Assn. v. TWA*, 630 F.2d 1164, 1168-1169 (1980). In *McArthur*, the Court of Appeals for the Fifth Circuit reversed the approval of a settlement agreement in a Title VII class action, holding that the District Court lacked jurisdiction because no plaintiff had filed a timely charge of discrimination with the EEOC. Because of our holding in No. 78-1545 that timely filing with the EEOC is not a jurisdictional prerequisite, this issue need not be resolved.

9       Title 42 U.S.C. § 2000e-5(f)(3), for example, reads:

> "Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office...."

10      Section 2000e-5(e), the amended version of the filing provision, reads simply: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ...."

11      The Senate Labor Committee's section-by-section analysis of the amendments explained that "[t]his subsection would permit ... a limitation period similar to that contained in the Labor-Management Relations Act, as amended." S.Rep.No. 92-415, p. 37 (1971), U.S.Code Cong. & Admin.News 1972, p. 2137. We have recognized that the National Labor Relations Act was "the model for Title VII's remedial provisions," *Teamsters v. United States*, 431 U.S. 324, 366, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977). Because the time requirement for filing an unfair labor practice charge under the National Labor Relations Act operates as a statute of limitations subject to recognized equitable doctrines and not as a restriction of the jurisdiction of the National Labor Relations Board, see *NLRB v. Local 264, Laborers' Int'l Union*, 529 F.2d 778, 781-785 (CA8 1976); *Shumate v. NLRB*, 452 F.2d 717, 720 (CA4 1971); *NLRB v. A. E. Nettleton Co.*, 241 F.2d 130, 133 (CA2 1957); *NLRB v. Itasca Cotton Mfg. Co.*, 179 F.2d 504, 506-507 (CA5 1950), the time limitations under Title VII should be treated likewise.

Moreover, when Congress in 1978 revised the filing requirement of the Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U.S.C. § 621 *et seq.* (1976 ed. and Supp.V), which was modeled after Title VII, see *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979), the House Conference Report explicitly stated that "the 'charge' requirement is not a jurisdictional prerequisite to maintaining an action under the ADEA and that therefore equitable modification for failing to file within the time period will be available to plaintiffs under this Act." H.R.Conf.Rep. 95-950, p. 12, U.S.Code Cong & Admin.News 1978, 504, 534.

102 S.Ct. 1127, 28 Fair Empl.Prac.Cas. (BNA) 1, 28 Empl. Prac. Dec. P 32,432...

12    As the Court of Appeals for the Fifth Circuit points out in its opinion in *Coke, supra,* at 588-589, references to the filing requirement as a statute of limitations have come to dominate in our opinions:

> "The trend of the Supreme Court cases is also significant. In the early cases, the Court in dicta referred to such time provisions using the label 'jurisdictional prerequisite.' *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In the 1976 *Robbins & Myers* decision the jurisdictional label was used once, but there were numerous references to 'tolling the limitations period,' 429 U.S., at 239, 97 S.Ct., at 448, and other labels obviously referring to a statute of limitations, as opposed to subject matter jurisdiction. See also *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), in which both labels are used. From and after late 1977, all nine justices have concurred in opinions containing dicta using the limitations label to the exclusion of the jurisdictional label. *Occidental Life Insurance Company v. EEOC,* 432 U.S. 355, 371-[3]72, 97 S.Ct. 2447, 2457, 53 L.Ed.2d 402 (1977); *United Air Lines, Inc. v. McDonald,* 432 U.S. 385, 391-[3]92, 97 S.Ct. 2464, 2468, 53 L.Ed.2d 423 (1977); *Mohasco Corp. v. Silver,* 447 U.S. 807, 818-823, 100 S.Ct. 2486, 2493-95, 65 L.Ed.2d 532 (1980); *Delaware State College v. Ricks,* [449] U.S. [250], 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)."

13    In *Robbins & Myers,* we also held that the expanded 180-day "limitations period," enacted by the 1972 amendments, was retroactive. 429 U.S., at 244, 97 S.Ct., at 451. This holding presupposes that the requirement is not jurisdictional. Moreover, in reaching this conclusion, we quoted from *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 316, 65 S.Ct. 1137, 1142-1143, 89 L.Ed. 1628 (1945): "[C]ertainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment." Several Courts of Appeals have read *Robbins & Myers* as implicitly approving equitable tolling. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d, at 588; *Hart v. J. T. Baker Chemical Corp.,* 598 F.2d, at 833; *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 108-109 (CA2 1978).

14    In noting that the union in *Teamsters* properly remained a defendant in the litigation, we cited to Federal Rule of Civil Procedure 19(a). The union here was not joined under Rule 19 when individuals replaced the union as class representatives, but intervened later. Cf. *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1095 (CA6 1974) (joinder under Rule 19(a) provides union with full opportunity to participate in litigation and formulation of proposed relief, although as practical matter union does not play role in litigation until court finds violation of Title VII).

1    In *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), timely charges of discrimination had been filed. Relief was awarded on the theory that current employees were merely being placed in the position they would have enjoyed, relative to the victims, had no discrimination ever taken place. In contrast, when the victims of discrimination have slept on their rights, it will often be unfair to award them full retroactive seniority at the expense of employees who may have accrued their present seniority in good faith. When timely charges have not been filed, a district court should consider these equities in determining whether to award competitive-status seniority, and the presence of a settlement between the employer and the plaintiffs should not affect the balancing of these equities. Under any other rule, employers will be able to settle Title VII actions, in part, by bargaining away the rights of current employees.

2    The Court refers to *United Air Lines v. Evans* twice, see *ante,* at 1132, n. 6, and at 1134, n. 12; both references are to terms used by the *Evans* Court in describing the timely-filing requirement.

3    I am not entirely content with this formalistic resolution of the "timely filing" issue. But, after almost 12 years of litigation, neither the parties nor the courts have addressed specifically whether the failure to file timely charges should affect the balance of the equities in awarding competitive-status seniority. Rather than prolong this disruptive litigation, it may well be in the best interest of all of the parties to approve the settlement-as the Court's judgment does today.

---

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   9

1

## **PROOF OF SERVICE**

2      I am employed in the City of San Francisco and County of San Francisco, State of

3   California.  I am over the age of eighteen years and not a party to the within-entitled action.  My

4   business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

5      On July 13, 2017, I served a copy of the within document(s):

6   **TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF
    DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE PERMANENTE
7   MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

8   on the interested parties:

9      ☐   VIA FAX:  By transmitting via facsimile the document(s) listed above to the fax
10         number(s) set forth below on this date before 5:00 p.m.

11     ☒   VIA U.S. MAIL:  I am readily familiar with the firm's practice of collection and
           processing of correspondence for mailing.  Under that practice such sealed
12         envelope(s) would be deposited with the U.S. postal service on the above date with
           postage thereon fully prepaid, at San Francisco, California.
13
14     ☐   VIA OVERNIGHT SERVICE:  By placing the document(s) listed above in a sealed
           UPS envelope and affixing a pre-paid air bill, and causing the envelope to be
15         delivered to a UPS agent for delivery.

16     ☐   VIA PERSONAL SERVICE:  By causing to be delivered the document(s) listed
           above to the person(s) at the address(es) set forth below.
17
       ☒   VIA E-MAIL:  By transmitting a PDF version of the document(s) by e-mail to the
18         person(s) set forth below using the e-mail address(es) indicated.

19

20   Jeremy L. Friedman                    Telephone:  510-530-9060
     Law Office of Jeremy L. Friedman      Facsimile:  510-530-9087
21   2801 Sylhowe Road                     Email: jlfried@comcast.net
     Oakland, CA 94610
22

23     I declare under penalty of perjury under the laws of the State of California that the above

24   is true and correct.

25     Executed on July 13, 2017, at San Francisco, California.

26                                         _____
27                                                   Janet Gogna

28

---

- 1 -

PROOF OF SERVICE

1 | GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
2 | AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
3 | amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
4 | San Francisco, CA 94111
Telephone: (415) 603-5000
5 | Facsimile: (415) 840-7210

6 | Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC.;
7 | KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

8

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | IN AND FOR THE COUNTY OF ALAMEDA

11

12 | LUNELL GAMBLE,                          Case No. RG16826717

13 |          Plaintiff,                     ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14 |      vs.                                DEPARTMENT 15

15 | KAISER FOUNDATION HEALTH PLAN,          **TABLE OF CONTENTS OF FEDERAL**
INC; KAISER FOUNDATION                      **AUTHORITIES IN SUPPORT OF**
16 | HOSPITALS, INC; and THE                 **DEFENDANTS KAISER**
PERMANENTE MEDICAL GROUP; all               **FOUNDATION HEALTH PLAN, INC;**
17 | doing business as KAISER PERMANENTE     **KAISER FOUNDATION HOSPITALS;**
MEDICAL CARE PROGRAM,                       **AND THE PERMANENTE MEDICAL**
18 |                                         **GROUP'S MOTION TO STRIKE**
                                            **ALLEGATIONS IN PLAINTIFF'S**
19 |          Defendants.                    **FIRST AMENDED COMPLAINT**

20 |                                         Date:      July 13, 2017
                                            Time:      9:00 a.m.
21 |                                         Judge:     Hon. Ioana Petrou
                                            Dept.:     15
22

23 |                                         **Reservation No. R-1844960**

24 |                                         Complaint Filed:    August 9, 2016

25

26

27

28

---

TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' *MOTION TO*
*STRIKE FAC ALLEGATIONS*

1  TO THE COURT, PLAINTIFF LUNELL GAMBLE AND TO HER ATTORNEYS OF

2  RECORD:

3       Pursuant to the Court's Order dated July 6, 2017, and Rule 3.1113(i) of the California

4  Rules of Court, Defendants KAISER FOUNDATION HEALTH PLAN, INC.; KAISER

5  FOUNDATION HOSPITALS; and THE PERMANENTE MEDICAL GROUP hereby lodge the

6  following federal authorities cited in their Memorandum of Points and Authorities in Support of

7  Motion to Strike Allegations in Plaintiff's First Amended Complaint filed on April 27, 2017 and

8  their Reply in Support of Motion to Strike Allegations in Plaintiff's First Amended Complaint

9  filed on June 28, 2017.

| Tab | Authority | Brief / Page |
|---|---|---|
| 1. | *Bacon v. Honda of America Mfg., Inc.,* 370 F.3d 565 (6th Cir. 2004) | Motion: p. 6 |
| 2. | *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343 (5th Cir. 2001) | Motion: p. 6 |
| 3. | *Chin v. Port Authority of New York & New Jersey,* 685 F.3d 135 (2d Cir. 2012) | Motion: p. 6 Reply: p. 6 |
| 4. | *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867 (1984) | Motion: p. 5 Reply: pp. 5, 6 |
| 5. | *Davis v. Coca-Cola Bottling Co. Consol.,* 516 F.3d 955 (11th Cir. 2008) | Motion: p. 6 |
| 6. | *Diaz v. AT&T,* 752 F.2d 1356 (9th Cir. 1985) | Reply: p. 6 |
| 7. | *Egbukichi v. Wells Fargo Bank,* 2017 U.S. Dist. LEXIS 47731 (D. Or. Mar. 29, 2017) | Reply: p. 6 |
| 8. | *Gay v. Waiters' & Dairy Lunchmen's Union,* 694 F.2d 531 (9th Cir. 1982) | Reply: p. 6 |
| 9. | *Gilty v. Village of Oak Park,* 919 F.2d 1247 (7th Cir. 1990) | Motion: p. 6 |

- 1 -
TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE FAC ALLEGATIONS

| Tab | Authority | Brief / Page |
|---|---|---|
| 10. | *Gusman v. Comcast Corp.*,<br>298 F.R.D. 592 (S.D. Cal. 2014) | Reply: p. 4 |
| 11. | *Heagney v. Univ. of Wash*,<br>642. F.2d 1157 (9th Cir. 1981) | Reply: p. 6 |
| 12. | *Int'l Bro. of Teamsters v. U.S.*,<br>431 U.S. 324 (1977) | Reply: pp. 3, 5, 6 |
| 13. | *Johnson v. United Continental Holdings, Inc.*,<br>2013 WL 1758760 (N.D. Cal. Apr. 24, 2013) | Reply: p. 6 |
| 14. | *Lowery v. Circuit City Stores, Inc.*,<br>158 F.3d 742, *vacated on other grounds*, 527 U.S. 1031 (1999) | Motion: p. 6 |
| 15. | *Lyons v. England*,<br>307 F.3d 1092 (9th Cir. 2002) | Reply: p. 6 |
| 16. | *Semsroth v. City of Wichita*,<br>304 Fed. Appx. 707 (10th Cir. 2008) | Motion: p. 6 |
| 17. | *Stallcop v. Kaiser Foundation Hospitals*,<br>820 F.2d 1044 (9th Cir. 1987) | Motion: p. 10<br>Reply: p. 9 |

DATED:  July 13, 2017

GRUBE BROWN & GEIDT LLP


BY: *Amanda Bolliger Crespo/jg*

AMANDA BOLLIGER CRESPO

Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN,
INC; KAISER FOUNDATION HOSPITALS;
and THE PERMANENTE MEDICAL
GROUP

TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO
STRIKE FAC ALLEGATIONS

Tab 1

370 F.3d 565
United States Court of Appeals,
Sixth Circuit.

Marc E. BACON, et al., Plaintiffs–Appellants,

v.

HONDA OF AMERICA MANUFACTURING,
INC., Defendant–Appellee.

No. 01–3520.
|
Argued: Dec. 4, 2002.
|
Decided and Filed: May 27, 2004.
|
Rehearing En Banc Denied September 17, 2004.

**Synopsis**

**Background:** Two African-American employees sued employer, alleging discriminatory procedures for promoting employees, in violation of Title VII, § 1981, and Ohio law. The United States District Court for the Southern District of Ohio, James L. Graham, Chief Judge, denied employees' motion to certify class, 205 F.R.D. 466, and granted summary judgment for employer. Employees appealed.

**Holdings:** The Court of Appeals, Boggs, Chief Circuit Judge, held that:

[1] proposed class satisfied numerosity requirement; but

[2] failed to satisfy commonality requirement; and

[3] failed to satisfy typicality requirement; and

[4] failure to promote employees was not result of discrimination.

Affirmed.

**Attorneys and Law Firms**

**\*567** Robert A. Steinberg (argued and briefed), Waite, Schneider, Bayless & **\*568** Chesley, Cincinnati, OH, Robert F. Laufman (briefed), Laufman & Gerhardstein,

Cincinnati, OH, John S. Marshall (briefed), Law Offices of John S. Marshall, Columbus, OH, Michael J. O'Hara (briefed), O'Hara, Ruberg, Taylor, Sloan & Sergent, Covington, KY, for Plaintiffs-Appellants.

Mary Ellen Fairfield (argued and briefed), James A. Wilson (briefed), Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant-Appellee.

Richard T. Seymour (briefed), Lieff, Cabraser, Heimann & Bernstein, Washington, DC, for Amici Curiae.

Before BOGGS, Chief Judge; GUY, Circuit Judge; and EDMUNDS, District Judge. [*]

**OPINION**

BOGGS, Chief Judge.

Plaintiffs, Marc Bacon and Terry Harden, brought this employment discrimination action against defendant Honda of America Manufacturing, Inc., seeking to represent a class of all current and former African–American employees at Honda's four manufacturing plants located in central Ohio. Plaintiffs appeal, asking for review of both the denial of class certification and the subsequent grant of summary judgment to Honda on all of plaintiffs' individual claims. Bacon and Harden allege that the company uses discriminatory procedures for promoting employees in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, Ohio Revised Code § 4112.99, and Ohio common law. The district court correctly determined that Bacon and Harden failed to meet the prerequisites for class certification and that they could not show that they were denied promotions for which they were eligible. For the reasons elaborated upon below, we affirm the decision of the district court in its entirety.

I

On August 19, 1999, Bacon and Harden (plaintiffs), who were employed as "nonexempt" production associates (PAs) for Honda, filed a class action complaint, alleging that Honda engaged in a pattern or practice of discrimination against African–American employees by denying them promotions. Relying on both disparate impact and disparate treatment theories to prove

Bacon v. Honda of America Mfg., Inc., 370 F.3d 565 (2004)

58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

liability, plaintiffs sought declaratory and injunctive relief, promotion to desired positions, back pay, and compensatory and punitive damages.

Honda has four manufacturing plants in central Ohio: Marysville Auto Plant (MAP); Marysville Motorcycle Plant (MMP); Anna Engine Plant (AEP); and East Liberty Plant (ELP). These four facilities have various purposes that range from manufacture of Accord and Acura automobiles, to production of Honda motorcycles, to building of engines and other components. In addition, Honda plants have quality departments, which are responsible for inspecting products coming off the line; purchasing departments; and various administrative offices, such as Human Resources. In all, there are thirty-nine departments at Honda.

Sixty percent of Honda's 12,700 employees are production associates, who are nonexempt [1] employees supervised by team leaders, the first supervisory level. Production staff share this secondary level of authority with team leaders. The next level of management is production coordinator, **\*569** an exempt [2] position, who reports to an assistant manager or department manager, who in turn reports to a senior manager or plant manager.

In general, production associates may seek promotion to team leader, [3] but only in the department in which they are currently working. Furthermore, an employee becomes eligible for promotion only after meeting minimum requirements for time working both in the department and for Honda in general. In addition, he or she must have a strong attendance record, typically ninety-eight percent or above, and a disciplinary record that shows no counseling by a manager within the past twelve months. Past performance evaluations are also taken into account and some departments require the production associate to pass a trade test and/or to have completed a certain number of special projects. A team leader must be willing to work any shift or to travel. *See Bacon v. Honda of Am. Mfg.,* 205 F.R.D. 466, 471–72 (S.D.Ohio 2001) (giving detailed description of Honda's production facilities and corporate structure).

The motion for class certification was filed in September 2000, and an evidentiary hearing was held in December 2000. On March 7, 2001, the district court denied the motion for class certification, finding that: (1)

plaintiffs did not satisfy the requirements of commonality, typicality, and adequacy of representation with respect to the disparate treatment claims under Fed.R.Civ.P. 23(a); (2) the predominance of monetary relief precluded certification of injunctive class under Rule 23(b)(2); (3) requirements for class certification under Rule 23(b)(3) were not met; and (4) Seventh Amendment concerns made bifurcation and certification of certain issues improper, or at least prevented that process from being the most fair and efficient way to litigate the claims. *Id.* at 490.

Honda moved for summary judgment on plaintiffs' individual claims. The plaintiffs filed a Rule 56(f) motion in response, requesting a revised discovery schedule and a new trial date. The district court denied the motion, although it allowed one additional deposition. On April 30, 2001, the district court granted summary judgment to Honda on the individual claims of Bacon and Harden. That order thoroughly addressed each of the plaintiffs' claims under both the disparate impact and disparate treatment theories. This appeal followed.

## II

### Class Action Certification

**[1]** This court reviews denial of class action certification for abuse of discretion. *Alkire v. Irving,* 330 F.3d 802, 810 (6th Cir.2003). In order for one or more litigants to represent all parties in a class, four prerequisites must be met: "(1) the class [must be] so numerous that joinder of all members is impracticable, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties [must] fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In this case the district court conducted the mandatory "rigorous analysis [to confirm] that the prerequisites of Rule 23(a) have been satisfied." **\*570** *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). We agree with its conclusion that the disparate treatment claim fails the second, and the disparate impact claim the third, part of the Rule 23(a) test.

### Numerosity

**[2]   [3]   [4]** There is no automatic cut-off point at which the number of plaintiffs makes joinder impractical,

58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

thereby making a class-action suit the only viable alternative. *In re Am. Med. Sys. Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). However, sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1). 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3:5, at 243–45 (4th ed.2002). The facts of the case guide a court's determination that the class is sufficiently large to make joinder impractical. *Gen. Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In this case, Bacon proposes a class of some 800 current and former African–American Honda employees, a number well beyond the point that joinder would be feasible. The requirement of Rule 23(a)(1) is met.

*Commonality*

[5]   In order to show disparate treatment, a potential class representative must show that the employer intentionally discriminated against a protected class and that there are questions of law or fact common to the class. *Falcon,* 457 U.S. at 162, 102 S.Ct. 2364 (Burger, C. J., concurring in part). The Supreme Court has noted that class certification is "appropriate ... [when] [i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue." *Califano v. Yamasaki* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (upholding class certification for litigation of an issue of interest to all social security beneficiaries). Variations in the circumstances of class members are acceptable, as long as they have at least one issue in common. *In re Am. Med.,* 75 F.3d at 1080 (citations omitted) (reversing a grant of certification because the putative plaintiffs had used many different models of a certain medical device, which had produced a range of side effects, so that the malfunction could not be attributed to a common cause). [4]

Bacon and Harden were responsible for satisfying the court's concerns related to whether:

(i) the nature of the alleged unlawful employment practice genuinely had a class-wide impact;

(ii) employment practices affecting the class were uniform or diverse, given factors such as size of the work force, number of plants involved; range of employment conditions, occupations, and work activities; geographic dispersion of the employees and extent of intra-company employee transfers;

(iii) members' treatment would be likely to involve common questions;

(iv) relevant employment and personnel policies and practices were centralized and uniform; and

(v) similar conditions prevailed throughout the time period covered by the allegations.

**\*571** *Stastny v. S. Bell Tel. and Tel. Co.,* 628 F.2d 267, 277 (4th Cir.1980) (citing *Harriss v. Pan Am. World Airways, Inc.,* 74 F.R.D. 24, 41 (N.D.Cal.1977)); *Newberg,* § 24:21, at 133–34 (requiring a specific showing of underlying facts that might raise an inference of a common pattern or practice through allegations of specific incidents of discrimination, supporting affidavits, or evidence at the class certification hearing).

[6]   Bacon and Harden are attempting to certify a class of all African–American workers at Honda's four Ohio facilities over the past twenty years who were involved in the company's promotion system. They assert that "company-wide subjective practices" and "similar promotion criteria" across departments satisfy the requirements of Rule 23(a)(2). Conclusory allegations and general assertions of discrimination are not sufficient to establish commonality. *Falcon,* 457 U.S. at 157, 102 S.Ct. 2364. Plaintiffs failed to show how hourly wage earners and salaried employees would have the same interests, especially in terms of promotion procedures in which at least some of the nonexempt employees would be competing to join the ranks of exempt management. They also did not demonstrate how differing promotion criteria for jobs as diverse as welding, accounting, and engine-building could discriminate against each African–American employee. Nor did they elaborate on why this court should disregard the objective criteria for promotion and find that all African–American employees were harmed by managers "who made subjective decisions."

We hold that plaintiffs have failed to produce sufficient evidence to convince us that the district court abused its discretion in finding that the factors enumerated above had not been met. We view with skepticism a class that encompasses 1) both workers and supervisors; 2) production-line workers and those in administrative positions; 3) workers in four plants with different production capabilities; and 4) workers and supervisors spread over more than 30 departments. Because class

Bacon v. Honda of America Mfg., Inc., 370 F.3d 565 (2004)
58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

members have such different jobs, we find it difficult to envisage a common policy regarding promotion that would affect them all in the same manner.

The only way Bacon and Harden can place such a diverse group under one umbrella is to demonstrate that Honda operated in a discriminatory fashion against all the workers in the class "through an *entirely* subjective decision-making process." *Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. 2364. If they can make this showing, then they can establish commonality and typicality. However, Honda's decision-making is not completely subjective: it also uses objective criteria for promotion, such as time in service, attendance records, and test scores. [5] Bacon and Harden rebut this by citing another Supreme Court case that held that mixed systems for determining promotions would "generally have to be subjective in nature." *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 989–90, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

We do not accept the argument that Honda's decision-making process is entirely subjective because, as a matter of fact, it is not. Plaintiffs cannot avoid the heavy lifting of showing eligibility for class certification by conflating two exceptions to separate rules for adjudicating discrimination cases. An entirely subjective decision-making process may, theoretically, allow **\*572** different kinds of employees to be in the same class —a question of class membership (*Falcon* ). For the entirely separate purpose of establishing a *prima facie* case of disparate impact, mixed objective and subjective standards may be considered to be purely subjective (*Watson* ). *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i).

The two exceptions are not interchangeable, however. Plaintiffs are trying to demonstrate eligibility for class membership, which is governed by the "entirely subjective" requirement in *Falcon.* They must prove that the potential members of the class actually have something in common: they are subject to random decision-making. As an entirely separate matter, the Court has been cognizant of the difficulties inherent in proving discrimination and therefore set a relatively low bar for establishing a *prima facie* case. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."). Therefore, counting mixed criteria as subjective furthers the goal of making sure that valid

claims get to a jury. The constructive subjectivity in *Watson* cannot substitute for the actual and complete subjectivity required for the exception in *Falcon* because the cases deal with two unrelated legal issues: class membership and the elements of a *prima facie* case. We hold that the *Falcon* requirement is not met because the plaintiffs have not shown that the wide range of class members are all subject to the same, exclusively-subjective, decision-making process.

Bacon and Harden rely on *Senter v. General Motors Corp.,* but the class in that case was more circumscribed: the class consisted of "all black employees who, during a period between July 2, 1965 and September 1, 1971, were denied an opportunity for promotion to [salaried] supervisory positions [from hourly positions] although possessing seniority and qualifications equivalent to white employees who were so promoted." *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976). In contrast, plaintiffs here want to certify a class of employees who worked at Honda over a period of twenty years in both hourly and salaried positions with different qualifications and varying levels of seniority. *Senter* focused on one transitional step in the career path of the plaintiffs over a six-year period: the jump from hourly wage earner to salaried employee. In contrast, plaintiffs are challenging Honda's practices for all promotions, regardless of department or starting point in the company hierarchy, and regardless of comparability in objective qualifications. Therefore, *Senter* can be distinguished from the facts of this case and does not compel us to find that the commonality factor has been met.

### *Typicality*

**[7]** Assuming, arguendo, that Honda's promotion procedures had a disparate impact on African–American employees, we hold that neither Bacon nor Harden is a typical member of the class. The typicality requirement is designed "to limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co.,* 446 U.S. at 330, 100 S.Ct. 1698. In order to meet the typicality requirement, the plaintiffs must show that their "injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff." *In re Am. Med.,* 75 F.3d at 1082 (quoting 1 Newberg, *supra,* at § 3–76). However, their personal choices, independent of any practices by Honda that have a disparate impact, have rendered them ineligible for promotion for the majority of their time at the

company. Therefore, Honda can assert legitimate **\*573** non-discriminatory reasons, or business reasons, for not promoting them, which would not be available as an explanation for discrimination against other African–American employees.

Honda's career track on the production line starts with production associates. The next rung up the ladder is team leader or production staff. From July 1994 to July 1999, 92% of promoted PAs were elevated to team leader or production staff in their home departments. The remaining 8% were promoted to a different type of work, such as quality control or administration. In 1992, MAP Assembly, where both plaintiffs worked for the majority of their tenure, changed its policy to no longer allow promotion directly from production associate to production staff; a line worker would have either to request promotion to team leader, transfer out of the department with the attendant one-year wait for eligibility, or seek promotion to administration or the quality department.

The position of team leader is not inherently desirable: it requires availability for overtime and imposes added responsibility for a marginal increase in pay. Therefore, advancement through transfer to a parallel track is desirable, but, like any career shift, involves overcoming an experience deficit in comparison to other candidates. Both named plaintiffs in this case chose to avoid seeking advancement through becoming a team leader and concentrated on acquiring positions in the quality department or administration. Because this strategy circumscribed their chances for advancement, we hold that they are not typical of African–American workers at Honda.

Bacon started working at Honda in 1988 and was first eligible for promotion in April 1990. He was eligible for 13 months until May 1991, when he transferred to a new department (MAP assembly). In 1993, when there were three promotions to team leader, Bacon was not eligible for consideration because he did not have the 100% attendance required for the position and had not completed an overtime special project (New Honda (NH) Circle) within the last 24 months, another prerequisite. From 1994–96, he did not express interest in a production team leader position and so was not eligible for consideration, and he did not take the required test in 1996. He transferred to a new department (MMP

Assembly) in 1997, rendering him ineligible for promotion until February 1998. In April 1998, the promotion process was changed: to be considered for elevation to team leader, an employee had to submit a pool interest form, which Bacon never did.

In order to be considered for a position in a non-production department, an employee had to fill out a career interest application (CIA), which was valid for one year. Bacon filled out CIAs in 1991 (during most of which time he was not eligible for any promotion), 1994, 1996, 1997, and 2000. Selection for interviews under this program was done by blind assessment of the application form. Bacon was selected for interviews on several occasions, including three times in the purchasing department, but not selected because other candidates had stronger educational backgrounds and job-related experience. Four African–Americans and twelve Caucasians were promoted through this process from 1993–2000.

Harden was hired in 1988 and became eligible for promotion in March 1990. He expressed interest in promotion to team leader or production staff, which remained a possibility for 15 months, until May 1991, when he requested, and was authorized, to transfer to another department (MAP assembly), making him ineligible for promotion for the next 12 months. In 1993, Harden indicated a desire for promotion to **\*574** production staff, which was no longer an option due to the change in policy in MAP Assembly, or to the quality department. He was not considered for promotion to team leader because he did not indicate interest; furthermore, he also did not meet the qualification of 100% attendance or participation in overtime special projects required for consideration.

Harden rejected the most obvious path to advancement and was not eligible to be considered for team leader until April 1996, when he indicated that he wanted to take the qualification test. He received a score of 63 on that exam, some ten points below the cutoff, and therefore was not eligible for a team leader position; he did not take the exam in 1997. In April 1998, the promotion process was changed and to be considered for elevation to team leader, an employee had to submit a pool interest form, which Harden did not do. In 1999, he did not see the notification, posted on September 21, of the October 8 deadline for submitting the requisite interest form to take

58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

the qualification test. He heard about the possibility from his wife around October 2, but was out on bereavement leave starting October 3 and did not return until October 21, when Honda determined that it was too late to sign up for the October 25 test. Harden joined this lawsuit on February 18, 2000.

Therefore, largely as a result of his personal promotion preference, Harden was eligible for promotion to team leader for only 15 months out of the ten years at issue in this case. He expressed interest in, and pursued, other avenues of advancement, most notably inclusion in the pool for employment in the quality department. Because he was pursuing a different career track, he was unable to compete with other candidates who had directly relevant experience. Harden was so often ineligible for promotion, particularly for the position of team leader that he was most likely to get, he cannot reasonably represent the interests of those who may have consistently applied for promotion and been turned down for discriminatory reasons.

In sum, to qualify for class certification, all the parts of Rule 23(a) must be met. On their class certification claim based on disparate treatment, plaintiffs cannot demonstrate a common issue of fact or law applicable to every member of the proposed class. On their disparate impact claim, plaintiffs cannot show that the facially neutral policies regarding promotion affected them in a typical way because they opted out of the most common and reliable path of advancement. The plaintiffs cannot meet the requirements of Rule 23(a)(2) and (3) and the district court correctly denied class certification.

We therefore do not consider the Rule 23(a)(4) issue of whether the plaintiffs' attorneys could fairly represent the class due to their involvement in parallel litigation against Honda. In light of the posture of this case, it would be inappropriate for us to address the split between the Second and Fifth Circuits concerning whether monetary damages can be sought in a Rule 23(b)(2) class action suit, and we do not decide any aspect of that question in this opinion. *Compare Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998) *with Robinson v. Metro N. Commuter R.R.,* 267 F.3d 147 (2d Cir.2001). We therefore turn to the plaintiffs' individual claims of discrimination under theories of disparate treatment and disparate impact.

## III

### Individual Claims

The district court granted summary judgment to Honda on Bacon's and Harden's claims of individual disparate treatment and disparate impact. We review a **\*575** grant of summary judgment *de novo. Pinney Dock & Transp. Corp. v. Penn Cent. Corp.,* 838 F.2d 1445, 1472 (6th Cir.1988). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### Disparate Treatment

[8]    The plaintiffs' claim of disparate treatment is analyzed under the well-known rubic established in *McDonnell Douglas. McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The same basic pattern is used in a claim concerning racial discrimination in promotion; specifically, each plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland,* 229 F.3d 559, 562–63 (6th Cir.2000). The district court provided a detailed analysis demonstrating how failure to establish a *prima facie* case warrants summary judgment on the individual claims and we need not belabor the issue, other than to affirm a few critical points of law.

*Pattern–or–Practice Method of Proof*
The district court found, based on the weight of authority outside the Sixth Circuit, that the pattern-or-practice method of proving discrimination, in which the plaintiff shows that the company had a policy of discriminating against a protected class, is not available to individual plaintiffs. *See, e.g., Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 761 (4th Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 711 (2d Cir.1998). All interpret the Supreme Court's discussion of the pattern-or-practice method of proof as being limited to class actions or suits by the government. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 359–60, 97 S.Ct. 1843, 52

58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

L.Ed.2d 396 (1977). Although plaintiffs argue on appeal that the district court improperly analyzed their pattern-or-practice basis for class certification, they have not specifically challenged the court's finding that the pattern-or-practice method of proof is not available to them on their individual claims.

**[9]** We therefore hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs. We subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case. *Lowery,* 158 F.3d at 761 (observing that "[t]he Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit charging employment discrimination. Rather, the Court has noted that there is a 'manifest' and 'crucial' difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination.") (citing *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984)). This reading has also been adopted by at least one district court in this circuit. *Herendeen v. Mich. State Police,* 39 F.Supp.2d 899, 905 (W.D.Mich.1999). However, pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework.

***576** *Exemption from Application Requirement*

**[10]** As demonstrated above, Bacon and Harden were not eligible for promotion for a sizable percentage of their tenure at Honda, and/or did not apply to be in the available promotion pools, as required in part two of the test for a *prima facie* case. They now argue that they should be exempt from such a requirement because, given the discriminatory nature of promotions at Honda, such an application would have been futile. Although it is true that failure to apply for a promotion may be excused, the circumstances must reveal "overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal employment practices, and [that] ... any application would have been futile and perhaps foolhardy." *Harless v. Duck,* 619 F.2d 611, 617–18 (6th Cir.1980) *(quoted in Kreuzer v. Brown,* 128 F.3d 359, 364 n. 2 (6th Cir.1997)). Plaintiffs cannot come close to meeting this standard. Not only did other African–Americans receive some of the promotions for which the plaintiffs

applied, but Bacon's supervisor expressed willingness to help him in his application to the purchasing department. Nor was the application process arduous; in most cases, all the plaintiffs had to do was fill out a form expressing interest. It is not unreasonable to expect plaintiffs to make such a minimal effort to preserve their rights.

Plaintiffs also rely on the holding in *Mauro v. Southern New England Telecomms., Inc.,* 208 F.3d 384, 386–87 (2d Cir.2000), that the application requirement did not apply when the plaintiff expressed interest in promotion to a class of positions but was unaware of specific positions because they were not posted. *See also Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1022 (6th Cir.2000) (recognizing exception to application requirement when employer does not notify employees of available promotion and does not provide formal mechanism for expressing interest in promotion). Although each production department only posted its promotion opportunities internally, the requirement of one-year's tenure in the department meant that all those eligible to respond had access to the announcement. Although it is true that submitting an application to the quality department and non-production pools was not tantamount to applying for a specific job, managers conducted a blind review of all eligible candidates, not knowing name, background, or racial profile. Those who were deemed qualified were then put in a pool and interviewed as vacancies occurred. Therefore, we see no basis for waiving the general requirement that a plaintiff must have applied for a position in order to assert that he was denied the position because of discrimination.

*Disparate Impact*

**[11] [12] [13]** Disparate impact analysis is used when an employer's facially neutral policy adversely affects a protected class. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). To show disparate impact, it is not necessary to show an intent to discriminate, but the plaintiff must demonstrate a connection between the challenged practice and the resulting disparities between protected and non-protected classes. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (clarifying that the "plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack"). Generally disparate impact analysis is used in a class action, but it may also form the basis of an individual claim. *See Gantt v. Wilson Sporting Goods Co.,* 143

58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

F.3d 1042, 1048 (6th Cir.1998) (ADEA context). **\*577** The district court determined that basic requirements of standing mean that an individual plaintiff must show that the facially neutral policy resulted in discrimination that resulted in personal injury. *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981). *See also Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1016–17 (1st Cir.1984); *Carpenter v. Bd. of Regents of Univ. of Wis. Sys.,* 728 F.2d 911, 915 (7th Cir.1984). Plaintiffs have not challenged this conclusion.

In *Warth v. Seldin,* the Supreme Court explained the basic principles of standing, which mandate that a plaintiff have a "personal stake in the outcome of the controversy" and that the plaintiff must have suffered some real or threatened injury. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quotation marks and citation omitted). From these basic principles, it is natural for us to hold that an individual plaintiff arguing a disparate impact theory must show that the challenged policy directly disadvantaged him in some fashion. *See Bowdish v. Cont'l Accessories, Inc.,* No. 91–1548, 1992 WL 133022, at \*5 (6th Cir. June 12, 1992) (noting an "individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her *individual* discharge was the result of discrimination") (unpublished opinion) (citing *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1253 n. 8 (7th Cir.1990)).

**[14]**   Bacon and Harden contend that Honda's requirements for attendance, time in department, testing, and overtime activities in determining eligibility for promotion disproportionately disadvantage African–Americans. Whatever the validity of those disparate impact claims, and the statistical evidence is complex and heavily disputed, we agree with the district court that the plaintiffs cannot show that the policies injured them personally, and therefore their claim must fail.

*Attendance*

**[15]**   Plaintiffs' expert found that more African–Americans than other employees were noted as being late or absent. Plaintiffs claim discrimination in "excusing" the absences, resulting in more African–Americans being ineligible for promotion due to Honda's stringent attendance requirements. Plaintiffs overlook the fact that the basic attendance records are generated by computer time clocks. Employees may expunge the record of tardiness or absence by applying personal or vacation

time to make up for the missing time. We have no explanation for the fact that fewer African–Americans chose to use their vacation time to make up for being late or unexpectedly absent, but see nothing in the record to indicate that disparity is the result of discrimination.

The only possible theory would be that Honda somehow induced blacks to be late more often than other employees in order to force them to deplete their vacation time until the point that they would opt to keep the attendance deficit on their records. Plaintiffs do not allege that the computers were somehow programmed to mark African–Americans as late, however, and we cannot think of any other way in which Honda even theoretically could create this difference.

Once the plaintiff establishes that a facially neutral policy has an adverse effect on a protected class, the burden of production and persuasion shifts to the employer to show that the challenged practice is a business necessity. *United States v. City of Warren,* 138 F.3d 1083, 1091–92 (6th Cir.1998). Therefore, even if we were to find a connection between the attendance policy and promotion opportunities for minority workers, Honda certainly has a legitimate **\*578** business reason for demanding near-perfect attendance from its employees. Plaintiffs could rebut this by offering an alternative that would not have the discriminatory impact but would nevertheless serve the employer's legitimate interests. *Wards Cove,* 490 U.S. at 660, 109 S.Ct. 2115. Bacon and Harden have not offered another system for making sure that the production line is always sufficiently staffed.

Nor have Honda's attendance requirements injured the plaintiffs; both men have generally maintained attendance records that would not have prevented them from being promoted. Bacon was counseled for not meeting the required 98% attendance level in 1997 but not at the managerial level. An employee is ineligible for promotion for one year after a managerial-level counseling, but a similar session with a lower-level supervisor does not preclude advancement. Even if Honda management abused the system by disproportionately counseling African–Americans at the managerial level, neither Bacon nor Harden was subjected to this treatment and therefore cannot raise it as part of an individual disparate impact claim.

*Time in Department*

[16] Honda requires every employee to work at the company for 18 months before being eligible for promotion. In addition, an employee must give up the right to promotion for 12 months after transferring from one department to another. Plaintiffs' statistical expert found a disparity between African–Americans and other employees in number of transfers and therefore they posit that this is a discriminatory requirement designed to keep African–Americans off the promotion roster. We agree that a documented record of *forced* transfers of African American employees would raise an inference of discrimination, but there is no evidence of that. The vast majority of transfers were requested by employees themselves, including both Bacon and Harden, in order to get a more desirable shift or position themselves for advancement. Employees involved in departmental reorganizations or assigned to special projects kept their departmental seniority. Dr. McClave, plaintiffs' statistical expert, did not distinguish between requested and other transfers in his analysis. The record gives no explanation for why African Americans might be more likely to request transfer, but that is a question for Honda management rather than this court. In terms of percentage, the difference between the percentage of African Americans in Honda's workforce (7.8%) and the percentage of African Americans requesting transfer (8.69%) does not diverge markedly.

The statement in plaintiffs' brief that "[t]ransfers were used to disqualify Bacon and Harden from certain promotions" is misleading. Appellant Br. at 17. Both men requested transfer, knowing the consequences in terms of promotion eligibility. Honda has a legitimate business reason for requiring familiarity with procedures and skills of a particular department before allowing promotion within that department. Under the burden-shifting pattern cited above, Bacon and Harden would have to propose a different method for ensuring familiarity with department techniques and procedures for those eligible for promotion, which they do not do. The periods of ineligibility for promotion resulting from their requested transfers cannot be attributed to discrimination on the part of Honda.

*Testing*

[17] At certain periods and in certain departments, Honda required testing to demonstrate sufficient knowledge to be eligible for promotion. Bacon and Harden allege that this testing resulted in discrimination.

However, nothing in the record **\*579** demonstrates that the tests resulted in a widely divergent pass rate for blacks and whites or that the subject matter of the tests was not business-related. Without such a showing, there is no basis for a disparate impact claim. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *United Black Firefighters Ass'n v. City of Akron,* No. 94–3961, 1996 WL 125043, at \*2 (6th Cir.1996) (unpublished opinion). Furthermore, Bacon passed the test that he took. Harden received a score of 63 on the team leader test, at a time when the cutoff for consideration was in the mid–70s, but passed other assessments to be eligible for promotion into the quality department.

The brief submitted on behalf of Bacon and Harden also alleges that they were "prevented from taking eligibility tests." Appellant Br. at 53. This is an overstatement. Harden missed the October 8, 1999 deadline to express interest in the October 25 sitting of the test. He was on bereavement leave, starting after October 3, and returned a few days before the test was administered. As a matter of business judgment, it might have been better for Honda to show some flexibility given Harden's difficult personal circumstances, but it was under no obligation to ignore the fact that Harden had not complied with the deadlines, which he knew about even before his sister's death. The record is vague on Bacon's reasons for not sitting for the test; in his deposition he merely states that he "has not had the opportunity to do so." If Honda had actively prevented him from doing so, his deposition testimony would have been more specific.

*NH Circles*

[18] Neither Bacon nor Harden participated actively in the overtime special projects that Honda regarded as the final prerequisite for consideration for promotion. The two may have had entirely legitimate reasons for doing so; in fact, Bacon at one point was attending college classes at night and therefore was not available. Nevertheless, Honda had a legitimate business reason for gauging commitment to the company by willingness to make an extra, compensated effort. In fact, the team leader position required availability for overtime, so this policy was an effective way of making sure that an employee was actually willing to put in extra hours. An employer cannot be held liable for disparate impact if a legitimate business policy results in workforce disparities. *Wards Cove,* 490 U.S. at 659, 109 S.Ct. 2115. Plaintiffs fail to suggest another equally effective system for Honda

to allow employees to signal their willingness to put in the extra effort that makes them strong candidates for additional responsibility and compensation.

## IV

**Discovery**

In January 2001, in response to Honda's motion for summary judgment, the plaintiffs sought further discovery on the merits of plaintiffs' individual claims under Federal Rule of Civil Procedure 56(f). Plaintiffs argued, as they do on appeal, that discovery had been focused on, and limited to, class certification issues. The district court denied the motion, stating that the discovery and scheduling orders "never indicated that the parties should not be proceeding with the merits discovery as well as the class certification discovery, with the exception of the magistrate judge's discovery order of October 20, 2000, which states that the parties should not 'be conducting discovery that is unrelated to the motion to certify during November and up to December 18.' " Plaintiffs were nonetheless permitted to depose Rick Gardner, the only individual who plaintiffs specifically asked to depose, and to supplement their response to the motion for summary judgment. The district court **\*580** also observed that much of the voluminous record submitted at the class

certification hearing also related to the individual claims of the plaintiffs.

We review a denial of discovery for abuse of discretion. *Hahn v. Star Bank,* 190 F.3d 708, 719 (6th Cir.1999). Given that the record in this case exceeds 3,800 pages and that the elements of Bacon and Harden's individual claims are directly related to their class action claims, we are hard put to imagine what further discovery would have accomplished in this matter.

## V

It is unfortunate when two qualified minority workers with strong work evaluations spend a significant number of years at a company and do not advance. This situation may require the considered attention of Honda management as a business matter. However, based on the record before us, the district court did not err in its rulings. Therefore we **AFFIRM** the district court's denial of class certification and grant of summary judgment to Honda.

**All Citations**

370 F.3d 565, 58 Fed.R.Serv.3d 590, 2004 Fed.App. 0155P

**Footnotes**

\*   The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

1   Hourly wage earners entitled to overtime

2   Salaried position with no overtime rights

3   Until 1992, production associates in MAP Assembly could also seek direct promotion to production staff, who are responsible for special projects and equipment-related tasks. After 1992, they had to become team leaders first.

4   The district court analyzed commonality separately for the disparate treatment and disparate impact claims. The court generously concluded that the clear instances in which Honda's facially neutral policies would not affect the putative class in a uniform manner could be ignored because they were "differences [that] are not critical to a finding of commonality on the disparate impact claim." *Bacon,* 205 F.R.D. at 478. For the purposes of clarity in this opinion, we assume, without deciding, that the district court was correct.

5   See discussion below in Section III, p. 21, rejecting the assertion that Honda subjectively applied these criteria.

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 2

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 610 of 898
Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)
86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

266 F.3d 343
United States Court of Appeals,
Fifth Circuit.

Audrey T. CELESTINE, Wilton Guillory;
Angel Ann Leblanc; Edwina M. Harris;
Patricia A. Pitre; et al., Plaintiffs–Appellants,
and
Hillery Randell; Jonathan
Anderson, Movants–Appellants,
and
Leo Reeder; Russell Metoyer; Daniel L.
Cox, Sr., Intervenors–Plaintiffs–Appellants,
v.
PETROLEOS DE VENEZUELLA
SA; et al., Defendants,
CITGO Petroleum Corp., Defendant–Appellee.

No. 00–30171.
|
Sept. 18, 2001.

African-American employees at petroleum plant brought suit against employer under Title VII, alleging a pattern and practice of racial discrimination in promotions and training. After denial of class certification was affirmed, 151 F.3d 402, and employees proceeded forward with a series of individual claims, the United States District Court for the Western District of Louisiana, James T. Trimble, Jr., J., granted summary judgment to employer. Employees appealed. The Court of Appeals, DeMoss, Circuit Judge, held that: (1) error in failing to provide full ten-day period for responding to summary judgment motion required by rule was harmless; (2) relevant period for assessing claims was period running from 180 days before filing of first EEOC claim, to date of filing of last such claim; (3) continuing violations doctrine could not be relied on to allow consideration of events outside that period; (4) employees failed to show intentional, pervasive, and regular discrimination sufficient to support hostile work environment claim; and (5) employees failed to make showing sufficient to withstand summary judgment on failure to train and promote claims.

Affirmed.

## Attorneys and Law Firms

**\*348** Rocco Calamusa, Jr., Robert L. Wiggins, Jr. (argued), Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Plaintiffs–Appellants.

Walter W. Christy (argued), Ellen Shirer Kovach, Leslie Weill Ehret, Frilot, Partridge, Kohnke & Clements, New Orleans, LA, William B. Swift, Swift, Spears & Harper, Lake Charles, LA, for Defendant–Appellee.

Appeal from the United States District Court for the Western District of Louisiana.

Before JONES, DeMOSS and BENAVIDES, Circuit Judges.

## Opinion

DeMOSS, Circuit Judge:

This case concerns allegations of workplace racism directed at African Americans at the CITGO Petroleum Corporation's ("CITGO") Lake Charles, Louisiana plant. After the district court denied class certification, the appellants proceeded forward with the action as a series of individual claims. The district court subsequently granted summary motion in favor of the defendant CITGO on these claims. Plaintiffs now appeal from this grant by the district court.

## BACKGROUND

On May 21, 1993, two hundred and six plaintiffs filed suit against CITGO alleging that a pattern and practice of racial discrimination existed in CITGO's hiring, promotions and training at its Lake Charles plant. These plaintiffs also brought Title VII hostile work environment claims. In September 1993, the plaintiffs filed a motion for the certification of a class estimated to contain more than 1,000 potential members. All of the members of the proposed class were either African American employees, both current and former, or unsuccessful applicants for employment at CITGO's sprawling Lake Charles complex. The district court referred the case to a magistrate judge for consideration of the class certification issue.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 611 of 898

Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

Following a hearing, the magistrate judge informed the parties that he was considering recommending to the district court a *sua sponte* grant of summary judgment to CITGO on the "hostile work environment" claims, and invited the plaintiffs to submit summary judgment evidence supporting their position. In total, forty-four plaintiffs came forward with evidence indicating the existence of a hostile work environment. The magistrate examined the summary judgment evidence offered by each of these forty-four individual plaintiffs and concluded that no reasonable trier of fact could find that the plaintiffs had established that there was intentional, pervasive, and regular racial discrimination of which CITGO's supervisors and management were aware and which CITGO permitted to continue. The magistrate judge therefore recommended that summary judgment be granted to CITGO on all forty-four of these hostile work environment **\*349** claims. On July 12, 1996, the district court accepted the magistrate judge's recommendation and granted summary judgment to CITGO on these claims.

During this same period, the magistrate judge recommended the denial of class certification on the Title VII racial discrimination for failure to hire, promote and train claims. The district court again accepted the magistrate judge's report, and denied class certification. The plaintiffs filed an interlocutory appeal to this Court, which affirmed the district court's denial of class certification. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 426 (5th Cir.1998). On October 2, 1998, this Court denied the appellants' motion for rehearing *en banc* on the class certification issue.

With class certification denied, this case proceeded forward as a series of individual claims. The claims of the three plaintiffs who worked in the refinery lab were consolidated, pursuant to Federal Rule of Civil Procedure 42(a). The refinery lab discrimination case was tried to a jury on October 18–20, 1999, and the jury returned a verdict in favor of defendant CITGO.

A second group of thirty-six failure to promote and train racial discrimination claims was also consolidated, with this group containing the claims of the refinery maintenance workers. CITGO filed a motion for partial summary judgment on the issue of temporal scope, asserting that the continuing violation doctrine, a device which would allow incidents of racial discrimination from

outside the relevant time period to be considered, did not apply. On January 3, 2000, the appellants filed their opposition to this motion.

CITGO filed a second motion for summary judgment on December 28, 1999, this time seeking outright summary judgment on each of the thirty-six refinery maintenance workers' failure to promote and train claims. On January 11, 2000, the district court granted both of CITGO's motions for summary judgment, ruling that the continuing violation doctrine was inapplicable and granting summary judgment on each of the failure to promote and hire discrimination claims.

These African American CITGO employee plaintiffs now appeal both the July 1996 grant of summary judgment on their hostile work environment claims and the January 2000 grant of summary judgment on their failure to promote and train claims. The October 1999 jury verdict in the refinery lab failure to promote and train case is not appealed.

## DISCUSSION

### *Standard of review*

**[1]  [2]  [3]  [4]  [5]**  A grant of summary judgment is reviewed *de novo. Hanks v. Transcon. Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). After a proper motion for summary judgment has been made, a nonmovant must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists for every element of a claim. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1196 (5th Cir.1986). For summary judgment purposes, all evidence produced by the nonmovant is taken as true and all inferences are drawn in the nonmovant's favor. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Pitts v. Shell Oil Co.,* 463 F.2d 331, 335 (5th Cir.1972). This Court reviews the evidentiary rulings of the district court "only for abuse of discretion." *EEOC v. Manville Sales Corp.,* 27 F.3d 1089, 1092–93 (5th Cir.1994).

**\*350** *The granting of summary judgment for CITGO under Federal Rule of Civil Procedure 56(c)*

Appellants object to the district court's January 11, 2000, grant of summary judgment on the failure to promote and train claims because they were not allotted the full ten days provided by Fed.R.Civ.P. 56(c) to respond to CITGO's motion for summary judgment.

CITGO filed a motion for summary judgment on December 28, 1999, seeking summary judgment on each of the thirty-six refinery maintenance workers' failure to promote and train claims. On December 29, 1999, the district court advised the appellants that their response to CITGO's motion for summary judgment was due within 15 days after service, and that due to the fast-encroaching trial scheduled for February 28, 2000, no extensions would be given. On January 11, 2000, appellants counsel filed a motion for an extension of time to respond to CITGO's motion for summary judgment seeking to extend the deadline until January 31, 2000.

The district court immediately responded by issuing an order denying the request for an extension of time to respond. That same day, January 11, the district court granted CITGO's motion for summary judgment on the failure to promote and train claims.

As computed under Fed.R.Civ.P. 6(a), [1] there were not the requisite ten days provided by Fed.R.Civ.P. 56(c) between the filing of the motion for summary judgment on December 28, 1999, and the district court's grant of summary judgment on January 11, 2000. For this reason, the appellants urge that the January 11, 2000, grant of summary judgment be reversed.

**[6]** This court has repeatedly explained that strict enforcement of the ten day notice requirement of Rule 56(c) is necessary because summary judgment is a final adjudication on the merits. *See, e.g., Powell v. United States,* 849 F.2d 1576, 1579 (5th Cir.1988); *Underwood v. Hunter,* 604 F.2d 367, 369 (5th Cir.1979). This Court has reasoned that because "a summary judgment forecloses any future litigation of a case, the district court must give proper notice to insure that the nonmoving party had the opportunity to make every possible factual and legal argument." *Powell,* 849 F.2d at 1579.

**[7]** **[8]** However, it is also possible for the district court's denial of this ten day period to be harmless error: "It appears clear that error in notice is harmless if the nonmoving party admits that he has no additional evidence anyway or if ... the appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact." *Powell,* 849 F.2d at 1581. The appellants do not point to any new evidence which they would have included in their response to CITGO's motion for summary judgment had they been allowed to respond on January 12 or 14, 2000, as they urge. In the absence of any new evidence which would have been presented to the district court if appellants had been allowed a full ten days to respond, the district court's error was harmless.

*The temporal scope of this action, for both the hostile work environment and racial discrimination claims*

**[9]** The district court concluded that the relevant time period for this lawsuit was April 29, 1992, to May 24, 1994. This **\*351** time frame applied to both the appellants' hostile work environment and failure to promote and train claims. Having defined the temporal scope of the lawsuit, the district court refused to look at incidents falling outside this period.

The method utilized by the district court in calculating this time period was clear and correct. As noted by the district court, the first EEOC charges lodged in this case were filed by Charlet McCain on October 26, 1992. A Title VII plaintiff must file a charge of discrimination with the EEOC no more than 180 days after the alleged discriminatory employment occurred. 42 U.S.C. § 2000e–5(e)(1). In "deferral states" this filing period is extended to 300 days if there is also a discrimination claim based on state law. However, it is undisputed that at the time the initial EEOC charges were filed in this case Louisiana was not a deferral state, and therefore the 180 filing period, rather than the 300 day period, applied. The district court was thus right to look at April 29, 1992, the date 180 days prior to the filing of the first Title VII claim, as the earliest date on which an incident of discrimination could be considered in this case.

Similarly, the "closing date" for this action of May 24, 1994, was also arrived at by looking at the dates on which EEOC charges were filed. May 24, 1994, was the date on which the last EEOC claim was filed against CITGO's Lake Charles facility. The appellants did not attempt

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

to amend their complaint or supplement their responses to interrogatories to include evidence of discriminatory acts occurring after this date. Therefore, the district court was acting within its discretion when it decided to exclude all evidence of discriminatory acts occurring after May 24, 1994. *Scott v. Univ. of Miss.,* 148 F.3d 493, 513 (5th Cir.1998), *overruled on other grounds, Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (excluding evidence of post-charge discrimination which was not included in an amended complaint); *Info. Res., Inc. v. United States,* 996 F.2d 780, 785 (5th Cir.1993) (holding that the district court did not abuse its discretion in excluding a post-charge claim where the plaintiff delayed supplementing discovery responses to include the claim until shortly before trial). Thus, only incidents occurring between April 29, 1992, and May 24, 1994, need be considered in this multiple plaintiff, non-class action lawsuit. Cf. *Crawford v. United States Steel Corp.,* 660 F.2d 663, 665 (5th Cir.1981) (holding that if one plaintiff has filed an EEOC charge, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement to join the Title VII suit).

 [10]    Despite the limited temporal scope established by the district court, the appellants have attempted to introduce acts of alleged discrimination dating from the mid–1970s to the mid–1990s. The appellants attempt to introduce these long-past incidents under the "continuing violation" doctrine, which has been endorsed for use by this court under limited circumstances. The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Messer v. Meno,* 130 F.3d 130, 135 (5th Cir.1997). The continuing violation doctrine is designed to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed  **\*352**  as part of this pattern or policy can be considered timely." *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344 (7th Cir.1999).

 [11]    [12]    Although there is no definitive standard for what constitutes a continuing violation, the plaintiff seeking to invoke this doctrine must demonstrate more than a series of discrete discriminatory acts: "He must

show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Huckabay v. Moore,* 142 F.3d 233, 239 (5th Cir.1998) (citations omitted). This court has identified at least three factors that may be considered in determining if a continuing violation exists: (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights? *Huckabay,* 142 F.3d at 239.

 [13]    Appellants seek to apply the continuing violation theory to both their hostile work environment and failure to promote and train claims. This would allow the appellants to introduce evidence of approximately 80 incidents of alleged racial discrimination that occurred prior to the time period designated by the district court for this lawsuit.

 [14]    The district court was entirely correct in refusing to apply the continuing violation theory to the appellants' racial discrimination for failure to promote and train claims. This court's decision in *Huckabay* makes clear that a one-time employment event, including the failure to hire, promote, or train and dismals or demotions, is "the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued." *Huckabay,* 142 F.3d at 240. These "discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment" and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine. *Id.* An employee who claims to be the victim of a racially motivated failure to promote or train is put on notice that his rights have been violated at the time the adverse employment decision occurs, and must therefore bring the claim within 180 days of the adverse decision.

 [15]    [16]    The appellants' hostile work environment claims are potentially more compatible with the continuing violation doctrine. However, the continuing violation doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation. *Huckabay,* 142 F.3d at

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 614 of 898

Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

239; *Berry v. Bd. of Supervisors of L.S.U.,* 715 F.2d 971, 981 (5th Cir.1983).* In addition, "the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period," such that a valid connection exists between them. *Martineau v. ARCO Chem. Co.,* 203 F.3d 904, 913 (5th Cir.2000).* Finally, "where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she can not reach back and base her suit on conduct that occurred outside the statute of limitations." *Hardin,* 167 F.3d at 344; *see also Webb v. Cardiothoracic Surgery Assocs.,* 139 F.3d 532, 537 (5th Cir.1998)* (explaining that, under the continuing violation doctrine, the plaintiff still must show a **\*353** series of acts, one or more of which fall within the limitations period).

Given these various restrictions on use of the continuing violation doctrine, the burden is upon each of the appellants[2] to offer evidence that they suffered race-base harassment both prior and during the filing period, that the incidents of harassment were related, and that the harassment was pursuant to an organized scheme. *Huckabay,* 142 F.3d at 238; *Berry,* 715 F.2d at 981.* The appellants fail to carry this burden for each of their claims. The appellants neglect the fact that they are before this Court as individual plaintiffs rather than as members of a class. Rather than describing each individual appellant's hostile work environment and explaining why application of the continuing violation doctrine would be appropriate for each appellant's claim, the appellants paint with wide brush strokes, making broad generalizations about the working conditions at CITGO over the last three decades. The appellants apparently want the continuing violation doctrine applied on a (non-existent) class-wide basis, rather than on a claim-by-claim basis. In no instance do the appellants take an individual hostile work environment claim and cite examples of racial harassment during the 180 day period, correlate this to similar racial incidents prior to the filing period, and identify a organized scheme underlying this harassment. It is apparent from the district court's grant of summary judgment and the appellee's brief that many of the appellants fail to identify any acts of alleged racial harassment at all during the limitations period. No appellant claims to have been the victim of severe and pervasive harassment during the limitations period, and no appellant identifies any organized scheme underlying the alleged harassment.

Because the appellants have failed to carry their burden in attempting to invoke the continuing violation doctrine, the district court did not err in refusing to consider alleged acts of harassment that occurred prior to April 29, 1992.

*Appellants' hostile work environment claims*

**[17]** **[18]** Appellants argue that they each established a prima facie case of a hostile work environment. A prima facie case of racial harassment alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term condition or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Watts v. Kroger Co.,* 170 F.3d 505, 509–10 (5th Cir.1999); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–720 (5th Cir.1986).* For harassment to affect a "term, condition, or privilege of employment" it must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts,* 170 F.3d at 509.

**[19]** However, this well-established five-part test has recently undergone a revision, with the Supreme Court ruling that in Title VII harassment cases, where the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four of the elements listed above. *Faragher v. City of* **\*354** *Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998).* Once the plaintiff makes the four-part showing that they have been harassed by a supervisor, the "employer is subject to vicarious liability to a victimized employee" for the supervisor's conduct.[3] *Id.*

**[20]** The magistrate judge and the district court reviewed the hostile work environment claims of forty-four individual appellants and concluded that no reasonable fact finder could find that the appellants had established that there was intentional, pervasive, and regular racial discrimination of which CITGO's supervisors and management were aware and which CITGO permitted to continue. The magistrate reviewed the individual hostile work environment claims in detail, concluding

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 615 of 898
Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)
86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

that all of them failed to make out a prima facie case because the alleged incidents took place outside of the limitations period, the complained of incidents were not severe or pervasive enough to constitute actionable racial harassment, or that CITGO was not aware of the harassment.

The appellants correctly point out that the district court's 1996 grant of summary judgment to CITGO on this set of hostile work environment claims predates *Faragher.* While the district court correctly applied the law as it stood at the time, it did not anticipate *Faragher.* The district court did not take into account that CITGO could be held vicariously liable for racial harassment by its supervisors, even if it was not aware of this racial harassment. However, a review of the record excerpts and briefs reveals only eight incidents of alleged racial harassment involving supervisory personnel during the relevant time period (between April 29, 1992, and May 24, 1994). Of these instances involving supervisory personnel, none can be said to be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts,* 170 F.3d at 509.

Aside from challenging the relevant time period defined by the district court and invoking the new rule of *Faragher,* the appellants offer no reason why the district court erred in finding that the hostile work environment plaintiffs had failed to make out their respective prima facie cases.

*Appellants' Title VII failure to promote and train claims*
On January 11, 2000, the district court granted summary judgment for CITGO and against 37 individual appellants claiming that they were discriminated against by being denied promotions and training because of their race in violation of Title VII. 42 U.S.C. §§ 2000e–2000e(17). Claiming that the district court applied an erroneous legal standard by "pigeonholing" the plaintiffs into the familiar burden-shifting framework of *McDonnell Douglas* and by forcing them to prove "better qualifications" as part of their prima facie case, these plaintiffs now appeal.

**[21]** **[22]** **[23]** In order to overcome a motion for summary judgment on a Title VII discrimination claim, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Haynes v. Pennzoil Co.,* 207 F.3d 296, 300 (5th Cir.2000); *Shackelford v.*

*Deloitte & Touche,* 190 F.3d 398, 404 (5th Cir.1999). A prima facie case of discrimination in a failure to promote or train case consists of four elements: (1) the employee is a member of the protected **\*355** class; (2) he sought and was qualified for the position; (3) he was rejected for the position; (4) the employer continued to seek applicants with the plaintiff's qualifications. *Haynes,* 207 F.3d at 300. The prima facie case, once established, raises an inference of intentional discrimination, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual. *Id.* Once a Title VII claim reaches this pretext stage, "the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Id.*

*A. The "pattern and practice" method of proof*
**[24]** **[25]** The district court properly invoked and applied this *McDonnell Douglas* burden-shifting scheme in analyzing the appellants' claims on summary judgment. Appellants, however, object to the application of *McDonnell Douglas,* arguing instead that the "pattern and practice" mode of proof for racial discrimination claims recognized in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358–59, 97 S.Ct. 1843, 1866–67, 52 L.Ed.2d 396 (1977), should have been applied to their claims. A pattern or practice case is not a separate and free-standing cause of action (as the appellants assert), but is really "merely another method by which disparate treatment can be shown." *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1219 (5th Cir.1995). The typical pattern or practice discrimination case is brought either by the government or as a class action to establish "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters,* 431 U.S. at 360, 97 S.Ct. 1843.

**[26]** The pattern and practice method of proof is almost exclusively used in class actions, with individual racial discrimination plaintiffs confined to the *McDonnell Douglas* framework. *Scarlett v. Seaboard Coast Line R.R. Co.,* 676 F.2d 1043, 1053 (5th Cir.1982) ("This is not a 'pattern and practice suit' by the government ... [n]or is this a private class action ... [a]n individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas.*"). The Supreme Court has never applied the

Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

*Teamsters* method of proof in a private, non-class suit and has recognized the distinction between individual racial discrimination claims and class actions:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.

*Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984).

While the Supreme Court has not explicitly stated that the pattern and practice method of proof may never be used in private non-class suits, other courts have reached this conclusion. *See, e.g., Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760 (4th Cir.1998), *vac. on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866–67 n. 6 (7th Cir.1985) ("Plaintiffs' use of 'pattern-or-practice' language also seems to be misplaced, since such suits, by their very nature, involve **\*356** claims of classwide discrimination, and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.") (citations omitted); *Axel v. Apfel,* 2000 WL 1593446, \*6 (D.Md.2000); *Herendeen v. Mich. State Police,* 39 F.Supp.2d 899, 905 (W.D.Mich.1999). Similarly, while the Fifth Circuit has not definitively ruled out the use of the *Teamsters* method of proof in a private, individual racial discrimination suit, this Court's precedents seem to support such an exclusion. *Scarlett,* 676 F.2d at 1053; *Mooney,* 54 F.3d at 1219–20 (upholding lower court's rejection of "pattern or practice" instruction because individual plaintiffs failed to show they were entitled to such an instruction).

Given the nature and purpose of the pattern and practice method of proof, this Court's precedents, and the precedents of other circuits, the district court did not err in refusing to apply the *Teamsters* method of proof as an independent method of proof to the appellants' individual claims in lieu of the *McDonnell Douglas* method at the summary judgment stage. [4]

**B. The prima facie case and the showing of "better qualifications"**

Appellants also contend that the district court misapplied *McDonnell Douglas* by requiring the appellants to show as part of their prima facie case that they were "better qualified" than the employees promoted or trained in their stead. Had the district court expanded the four-element prima facie case for racial discrimination through failure to promote or train this might be true. However, this is not what the district court did; the district court only asked for evidence that the plaintiff employee was "better qualified" than the employee given promotion or training in those instances where CITGO's proffered legitimate, non-discriminatory reason for its employment decision was that the plaintiff employee was less qualified than the employee awarded the promotion or training. In other words, the district court's request for evidence that the plaintiff employee was "better qualified" did not occur at the prima facie case stage of the three-part *McDonnell Douglas* analysis, but rather at the third stage, where the plaintiff is required to present evidence rebutting the defendant's proffered non-discriminatory explanation for its decision. Here, many of the appellants successfully made out their prima facie cases of racial discrimination, CITGO put forward that its decision not to promote or train these appellants was based on the superior qualifications of the other employee, and the appellants were left to rebut this proffered non-discriminatory reason. To succeed in doing so, the appellants were obliged to bring forward enough evidence on summary judgment so as to create a genuine issue of material fact on whether or not CITGO's explanation was pretextual. The district court ruled that the appellants failed to meet their burden under this third prong of the *McDonnell Douglas* framework by failing to introduce competent summary judgment evidence that CITGO's explanation was false or pretextual (i.e. evidence that the appellant was "better qualified").

**[27]**  This Court has ruled that a plaintiff may survive summary judgment and **\*357** take his case to the jury by providing evidence that he was "clearly better qualified" than the employee selected for the position at issue. *Scott,* 148 F.3d at 508; *Walther v. Lone Star Gas Co.,* 952

Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 617 of 898

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

F.2d 119, 123 (5th Cir.1992). The single question for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination, and evidence of the plaintiff's superior qualification is thus probative of pretext. *Deines v. Texas Dept. of Prot. & Regulatory Servs.,* 164 F.3d 277, 281 (5th Cir.1999). However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines,* 164 F.3d at 280–81.

[28] A review of the briefs and record excerpts reveals that none of the appellants presented competent summary judgment evidence that they were "clearly better qualified" for promotion or training. They therefore failed to even attempt to rebut CITGO's proffered non-discriminatory explanation, making the grant of summary judgment to CITGO proper.

*The affidavit of Dr. Andrew Hacker*

The appellants also appeal the district court's refusal to consider on summary judgment the affidavit of Professor Andrew Hacker, the appellants' expert on racial harassment. The district court struck this affidavit because (1) it did not contain relevant factual information regarding the actual work environment at CITGO, (2) it was not based upon personal knowledge as required by *Fed.R.Civ.P. 56(e), and (3)* it contained many inflammatory accusations leveled at CITGO and all of Calcasieu Parish in general without any specific reference whatsoever to the source of such a verbal attack. Dr. Hacker admits that his affidavit does not include data

showing a hostile work environment at CITGO, but nevertheless the affidavit concludes that racial harassment in Lake Charles is likely "the product of a culture of segregation, isolation and subordination pervasive in the area."

[29]   [30]   [31]   A district court has broad discretion to rule on the admissibility of expert's affidavits in the summary judgment context, and its ruling must be sustained unless manifestly erroneous. *Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 331 (5th Cir.1998). To be considered on summary judgment, an expert's affidavit must include materials upon which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion. *Id.* Because Dr. Hacker's conclusory affidavit does not give such insight into his reasoning process, the district court was within its discretion to exclude it.

CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court did not err in granting summary judgment or in excluding Dr. Hacker's affidavit. We, therefore, AFFIRM the district court's decision in its entirety.

AFFIRMED.

All Citations

266 F.3d 343, 86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799, 50 Fed.R.Serv.3d 1420

Footnotes

1   *Rule 6(a)* reads in relevant part that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation."

2   Contrary to the appellants' assertions, the burden is upon them to establish that the continuing violation doctrine applies. *Webb,* 139 F.3d at 537.

3   An affirmative defense is available to employers in certain circumstances under *Faragher,* provided that the supervisor's harassment did not culminate with any "tangible employment action" against the employee. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

4   This conclusion is based on precedent indicating that the *Teamsters* method is simply not available to plaintiffs that are not a part of a class action. *See Scarlett,* 676 F.2d at 1053 (indicating that to use this method the plaintiff must either be part of a class action or the suit must be instituted by the government under certain circumstances). As the plaintiffs

**Celestine v. Petroleos de Venezuela SA, 266 F.3d 343 (2001)**

86 Fair Empl.Prac.Cas. (BNA) 1462, 81 Empl. Prac. Dec. P 40,799...

are before us in their individual capacities, due to their failure to obtain class certification, the *Teamsters* method is not available to them. *Id.*

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 620 of 898

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

685 F.3d 135
United States Court of Appeals,
Second Circuit.

Howard CHIN, Richard Wong,
Sanrit Booncome, Michael Chung,
Plaintiffs–Appellees–Cross–Appellants,
The Port Authority Police Asian Jade Society of New
York & New Jersey Inc., Christian Eng, Nicholas
Yum, Alan Lew, David Lim, George Martinez,
Stanley Chin, Milton Fong, Plaintiffs–Appellees,
v.
The PORT AUTHORITY OF NEW YORK & NEW
JERSEY, Defendant–Appellant–Cross–Appellee.

Nos. 10–1904–cv(L), 10–2031–cv(XAP).
|
Argued: Oct. 17, 2011.
|
Decided: July 10, 2012.

**Synopsis**
**Background:** Eleven Asian Americans currently or
formerly employed as police officers by a bi-state
transportation agency brought action against the agency
under Title VII, alleging that they were passed over for
promotions because of their race. The United States
District Court for the Southern District of New York,
Miriam Goldman Cedarbaum, J., determined, after a
jury trial, that the agency violated Title VII by failing
to promote seven plaintiffs, and awarded those plaintiffs
back pay, compensatory damages, and equitable relief.
The agency appealed, and the four plaintiffs who did not
prevail at trial cross appealed.

**Holdings:** The Court of Appeals, Livingston, Circuit
Judge, held that:

[1] the pattern-or-practice method of proof was not
available to nonclass, private plaintiffs bringing a Title VII
claim;

[2] statistical evidence presented by plaintiffs' expert was
sufficient to prove plaintiffs' disparate impact claim;

[3] agency's promotion process could not be separated into
component parts for analysis;

[4] sufficient evidence supported finding that agency
intentionally discriminated against the Asian-American
employees;

[5] district court did not abuse its discretion in excluding
one of plaintiffs' experts;

[6] agency's failure to institute a litigation hold regarding
certain evidence did not constitute gross negligence per se,
abrogating *Pension Comm. of Univ. of Montreal Pension
Plan v. Banc of Am. Secs., LLC,* 685 F.Supp.2d 456; and

[7] district court did not abuse its discretion by concluding
that an adverse inference instruction was inappropriate.

Affirmed in part, vacated in part, and remanded.

**Attorneys and Law Firms**

**\*140** Karen R. King (Susanna M. Buergel, on the
briefs), Paul, Weiss, Rifkind, Wharton & Garrison LLP,
New York, New York, for Plaintiffs–Appellees–Cross–
Appellants and Plaintiffs–Appellees.

Kathleen Gill Miller (Milton H. Pachter & James M.
Begley, on the briefs), Port Authority of New York
and New Jersey, New York, New York, for Defendant–
Appellant–Cross–Appellee.

Before: McLAUGHLIN, CABRANES, and
LIVINGSTON, Circuit Judges.

**Opinion**

LIVINGSTON, Circuit Judge:

Plaintiffs-appellees, eleven Asian Americans currently or
formerly employed as police officers by the Port Authority
of New York and New Jersey ("Port Authority"), sued
the Port Authority under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e *et seq.,* alleging that
they were passed over for promotions because of their
race. The plaintiffs asserted three theories of liability for
discrimination: individual disparate treatment, pattern-
or-practice disparate treatment, and disparate impact.
After a nine-day trial, a unanimous jury found the

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

Port Authority liable for discrimination against seven of the plaintiffs under all three theories and awarded back pay and compensatory damages **\*141** to each of those seven plaintiffs. The district court (Miriam Goldman Cedarbaum, *Judge* ) also granted equitable relief to certain of the prevailing plaintiffs in the form of retroactive promotions, seniority benefits, and salary and pension adjustments corresponding with the hypothetical promotion dates that the jury apparently selected as a basis for calculating these plaintiffs' back pay awards.

On appeal, the Port Authority argues: (1) that evidence predating the onset of the statute of limitations should not have been admitted; (2) that the evidence was insufficient to support the jury's verdict with respect to each of the plaintiffs' theories; and (3) that the damages and equitable relief were premised on time-barred claims and were otherwise excessive. With regard to the plaintiffs' individual disparate treatment allegations, we hold that the district court properly admitted background evidence predating the onset of the limitations period and that there was sufficient evidence for a reasonable juror to conclude that the Port Authority discriminated against the seven prevailing plaintiffs within the limitations period. The district court erred, however, in: (1) submitting the pattern-or-practice disparate treatment theory to the jury in this private, nonclass action; and (2) concluding that the "continuing violation" doctrine applied to the plaintiffs' disparate impact theory so that the jury could award back pay and compensatory damages for harms predating the onset of the statute of limitations. We therefore vacate the back pay for four of the plaintiffs, whose awards correspond with hypothetical promotion dates beyond the limitations period, as well as the injunctive relief for three of the same plaintiffs, and we also vacate the award of compensatory damages for all seven prevailing plaintiffs. We remand for a new trial on damages as to all seven prevailing plaintiffs and for reconsideration of equitable relief to the extent such relief was premised on failures to promote occurring outside the limitations period.

The four plaintiffs who did not prevail at trial cross-appeal, arguing that the district court erred by excluding expert testimony from an industrial psychologist. One of these plaintiffs, cross-appellant Howard Chin, further argues that the district court erred in denying the plaintiffs' motion for sanctions in the form of an adverse inference instruction due to the Port Authority's destruction of promotion records. Finding no abuse of discretion in

the district court's determinations as to these matters, we affirm.

## BACKGROUND

The Port Authority is a bi-state transportation agency whose facilities are policed by its Public Safety Department. The eleven plaintiffs-appellees in this case are Asian Americans who were employed by that department as police officers. Christian Eng was hired in 1977, David Lim in 1980, Richard Wong in 1983, Milton Fong in 1985, Howard Chin and Alan Lew in 1987, Stanley Chin in 1988, George Martinez and Nicholas Yum in 1993, and Michael Chung and Sanrit Booncome in 1999. All of the plaintiffs were members of the Port Authority Police Asian Jade Society of New York & New Jersey Inc. ("Asian Jade Society"), a nonprofit organization comprised of Port Authority police officers of Asian or Pacific Islander origin, whose stated goal is to "promot[e] understanding, friendship and cooperation among members of the Port Authority police department."

### I. The Port Authority Police Department's Promotion Process

During the period relevant to this case, entry-level police officers in the Port Authority's **\*142** police department could be promoted to the rank of Sergeant, the first level in a hierarchy of supervisory positions (followed by Lieutenant, Captain, Inspector, Chief, and finally Superintendent of Police). To become eligible for promotion to Sergeant, a police officer was required (among other requirements) to pass an examination, which would place him on an "eligibility list" for a period of time. When such a list expired, the officer would have to pass the examination again to be placed on the new list. Three lists were in effect during the period relevant to this case: the 1996 List, the 1999 List, and the 2002 List.[1] These lists were "horizontal," which meant that the lists did not rank the officers, but merely established eligibility for promotion.

Each Port Authority facility's commanding officer (generally a Captain) was periodically asked to recommend eligible officers for promotion, at their discretion. The Port Authority did not dictate any criteria

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

for recommendation. Moreover, commanding officers were free to make recommendation decisions themselves, solicit input from the police officers' direct supervisors (generally Sergeants and Lieutenants), or delegate the responsibility entirely to the direct supervisors. A promotion folder was prepared for each recommended officer, which included a performance evaluation by a supervisor, a photograph of the officer, and his record of absences, commendations, awards, and disciplinary history.

Officers recommended in this way were typically considered by the Chiefs' Board, in which the Chiefs would collectively decide which officers to recommend to the Superintendent. The Chiefs' Board did not operate under any written guidelines, and from 1996 through September 2001, took no minutes or notes. Each Chief would vote regarding each recommended officer, and any officer who received a majority of votes from the Chiefs' Board would then be recommended to the Superintendent. This step in the process was not always necessary to promotion, however; for example, Acting Superintendent Joseph Morris did not use the Chiefs' Board at all during his tenure from September 2001 through April 2002.

The ultimate decision to promote an officer to Sergeant belonged solely to the Superintendent. In fact, the Superintendent occasionally promoted officers whom the Chiefs' Board had declined to recommend ahead of those recommended by the Board.

As of January 31, 2001, no Asian American had ever been promoted to Sergeant.

### II. Procedural History

On January 31, 2001, the Asian Jade Society filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on behalf of its members, claiming that the Port Authority had denied Asian American police officers promotions because of their race. On August 29, 2003, the EEOC determined that there was reasonable cause to believe the **\*143** Port Authority had violated Title VII, and on January 25, 2005, the Department of Justice issued a right-to-sue letter to the Asian Jade Society.[2] The eleven plaintiffs in this case filed suit on April 15, 2005, alleging that the Port Authority

had discriminated against Asian Americans in making promotions to Sergeant.

During discovery, the plaintiffs learned that the Port Authority had not implemented a document retention policy and that, as a result, at least thirty-two promotion folders used to make promotion decisions between August 1999 and August 2002 had been destroyed. The plaintiffs moved for sanctions, seeking an adverse inference against the Port Authority for spoliation. The district court denied the motion, reasoning that the plaintiffs had ample alternative evidence regarding the relative qualifications of the plaintiffs and that the Port Authority's destruction of the documents was "negligent, but not grossly so." *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J. ( Port Auth. I),* 601 F.Supp.2d 566, 570 (S.D.N.Y.2009).

On the eve of trial, the district court granted the Port Authority's motion to exclude testimony from one of the plaintiffs' expert witnesses: Dr. Kathleen Lundquist, an industrial psychologist who specializes in analyzing the reliability and validity of employee-selection procedures. Dr. Lundquist had prepared a report opining on the effectiveness of the Port Authority's promotion process, on whether it included safeguards to prevent bias and discrimination, and on the comparative qualifications of the plaintiffs relative to the qualifications of the officers who had been promoted. Citing Rule 702 of the Federal Rules of Evidence,[3] the district court concluded that Dr. Lundquist's testimony "would not assist the trier of fact" and was therefore excluded.

The nine-day trial began on March 11, 2009, and included testimony from twenty-two fact witnesses and four expert witnesses. All eleven of the plaintiffs testified regarding their personal backgrounds, education, experiences as police officers, attendance and disciplinary records, awards and commendations, and performance evaluations. Six Chiefs, one former Superintendent, the Superintendent at the time of trial, and three other Port Authority managers testified regarding the Port Authority's promotion procedure. Each side also presented a statistical expert and a damages expert.

Most relevant to this appeal, the plaintiffs' statistical expert, Dr. Christopher Cavanagh, presented two analyses that, in his view, demonstrated a high probability that Asian Americans had been discriminated against

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

in the Port Authority's promotion process. In his first study, Cavanagh compared the percentage of white police officers who held a supervisory position (out of all white police officers) with **\*144** the percentage of Asian Americans who held a supervisory position (out of all Asian American police officers) from 1996 through 2004. For each year, he used a Fisher Exact Test to calculate the likelihood that the difference between Asian American and white representation at the supervisory level (as compared to the representation of these groups at the nonsupervisory level) was due to chance. [4] From 1996 through 2000, the likelihood that the disparities were due to chance was about two percent or less; from 2001 through 2004, the likelihoods that the disparities were due to chance were between about five and eleven percent.

Cavanagh's second analysis compared the promotion rate for whites who were on the eligible lists to the promotion rate for Asian Americans who were on the eligible lists over the period from August 1996 through January 31, 2001 (the date on which the EEOC charge was filed). Of the 259 white officers on the lists over this period, 36 were promoted; of the 12 Asian Americans on the lists, none were promoted. Using the Fisher Exact Test, Cavanagh calculated that the likelihood this disparity would occur due to chance was about thirteen percent.

The district court instructed the jury regarding three theories of discrimination: (1) disparate impact; (2) pattern-or-practice disparate treatment; and (3) individual disparate treatment. After two-and-a-half days of deliberation, the jury returned a unanimous verdict, finding that seven of the eleven plaintiffs—Christian Eng, Milton Fong, Alan Lew, Stanley Chin, Nicholas Yum, George Martinez, and David Lim—had proven all three of their theories of liability, and awarding more than $1.6 million in total to those seven plaintiffs. The back pay awards corresponded precisely to certain hypothetical promotion dates suggested by the plaintiffs' damages expert. [5]

On the plaintiffs' motion, the district court also granted the seven prevailing plaintiffs equitable relief, including salary adjustments for pension purposes for Milton Fong, Stanley Chin, Alan Lew, George Martinez, Nicholas Yum, and David Lim, and retroactive promotions for Alan Lew, George Martinez, and Nicholas Yum. The hypothetical dates the district court used were October 31, 1999, for Fong, Chin, and Lew, and September 30,

2002, for Martinez, Yum, and Lim—corresponding with the hypothetical dates the jury apparently used as a basis for computing back pay. The court also ordered the Port Authority to take certain specific actions to prevent future violations.

The Port Authority filed a motion pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure to set aside the jury's verdict or, alternatively, for a new **\*145** trial and for remittitur. The Port Authority argued that: (1) the district court improperly admitted evidence pertaining to events prior to the onset of the statute of limitations period; (2) the jury was improperly instructed to consider events outside the limitations period for purposes of establishing liability; (3) there was insufficient evidence to find the Port Authority liable under any of the plaintiffs' three theories; (4) the jury instructions were erroneous and confusing with respect to the statute of limitations; and (5) the jury's damages included time-barred claims and were otherwise excessive.

The district court denied the Port Authority's motion in its entirety. *See Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J. (Port Auth. II),* 681 F.Supp.2d 456 (S.D.N.Y.2010). As pertinent to this appeal, the district court first held that background evidence from beyond the statute of limitations is admissible in support of a timely claim. *See id.* at 462. Next, the court concluded that the plaintiffs' individual disparate treatment claims were premised on "discrete acts" and thus that the Port Authority could be liable only for those acts within the statute of limitations. *See id.* at 463. The court concluded that the plaintiffs' disparate impact and pattern-or-practice disparate treatment theories of liability, however, were premised on the existence of an "ongoing discriminatory policy," and thus were subject to the "continuing violations" doctrine, so that the plaintiffs could recover for untimely discrete acts so long as they were the product of a discriminatory policy that continued into the statute-of-limitations period. *See id.* at 463–66. Third, the district court held that although Cavanagh's statistical evidence did not reach the conventional five-percent level of statistical significance, *see Smith v. Xerox Corp.,* 196 F.3d 358, 366 (2d Cir.1999) (noting that statistical significance at the five-percent level is generally "sufficient to warrant an inference of discrimination"), the jury had before it other evidence of discrimination sufficient to find for the plaintiffs on each of the theories of liability.

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 624 of 898

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

*See Port Auth. II,* 681 F.Supp.2d at 468–69. Finally, the district court declined to remit the jury's compensatory damages awards because other judges had upheld similar awards and because the awards did not "shock the judicial conscience." *Id.* at 470.

The Port Authority appeals, and argues before this Court that it is entitled to a new trial with respect to the seven prevailing plaintiffs because: (1) evidence predating the onset of the limitations period should not have been admitted; (2) the evidence at trial was insufficient to support the jury's verdict with respect to each of the plaintiffs' theories; and (3) the damages and equitable relief are premised on time-barred claims and are otherwise excessive.

The four plaintiffs who did not prevail at trial—Howard Chin, Richard Wong, Sanrit Booncome, and Michael Chung—cross-appeal, and argue here that they are entitled to a new trial because the district court erred by excluding Lundquist's testimony. Howard Chin further argues that he is entitled to a new trial because the district court improperly denied the plaintiffs an adverse inference instruction despite the Port Authority's destruction of promotion records.

## DISCUSSION

The plaintiffs argue that they are entitled to damages for injuries that occurred before the onset of the statute of limitations period because the "continuing violations" doctrine applies to two of their three theories of liability —pattern-or-practice disparate treatment and disparate impact. **\*146** We dispose of half of this argument at the outset of this opinion by holding that no such pattern-or-practice theory of liability is available to the private, non-class plaintiffs in this case. We next consider and affirm the district court's judgment with respect to the plaintiffs' two remaining theories of liability—individual disparate treatment and disparate impact—by holding that background evidence from outside the limitations period was admissible and that the evidence presented at trial was sufficient to sustain the jury's findings of liability on both theories. We then conclude, however, that the "continuing violations" doctrine does not apply to either theory in this case, and therefore vacate and remand for reconsideration of the damages and equitable relief granted by the district court to the prevailing

plaintiffs whose awards correspond (or may correspond) to hypothetical promotion dates preceding the onset of the limitations period. Finally, we consider the plaintiffs' cross-appeal, and hold that the district court did not abuse its discretion by excluding Lundquist's testimony or by denying the plaintiffs an adverse inference instruction.

**[1] [2] [3]** "A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice.' " *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992) (quoting and altering *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988)). "The district court's denial of a Rule 59 motion for a new trial is reviewed for abuse of discretion." *Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir.2010). "A district court has abused its discretion if it has (1) 'based its ruling on an erroneous view of the law,' (2) made 'a clearly erroneous assessment of the evidence,' or (3) 'rendered a decision that cannot be located within the range of permissible decisions.' " *Id.* (quoting *Sims v. Blot,* 534 F.3d 117, 132 (2d Cir.2008)). We review the denial of a motion for judgment as a matter of law *de novo. Lore v. City of Syracuse,* 670 F.3d 127, 150 (2d Cir.2012). "[W]hether conducting review *de novo* or under a less sweeping standard, we must disregard all errors and defects .... if there is no likelihood that the error or defect affected the outcome of the case." *Id.* (internal quotation marks omitted).

As a prerequisite to filing suit under Title VII, a private plaintiff must first file a timely charge with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1), (f)(1). Both parties agree that in this case, the plaintiffs' charge was due "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Accordingly, because the EEOC charge in this case was filed on January 31, 2001, only an unlawful employment practice that "occurred" after August 2, 2000, may give rise to liability. [6]

### *I. The Pattern–or–Practice Method of Proof*

As an initial matter, we address the question whether the method of proof described **\*147** in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and known as the "*Teamsters*" or "pattern-or-practice" method, was

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

available to the nonclass private plaintiffs in this case.[7] We conclude that it was not and that the judgment as to pattern or practice must for this reason be reversed. We emphasize, however, that evidence that the Port Authority engaged in a pattern or practice of discrimination—in the ordinary sense of those words, rather than in the technical sense describing a theory of liability for discrimination—remains relevant in assessing whether the plaintiffs proved discrimination using the individual disparate treatment and disparate impact methods of proof.

The phrase "pattern or practice" appears only once in Title VII—in a section that authorizes the government to pursue injunctive relief against an employer "engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" the statute. 42 U.S.C. § 2000e–6. Notwithstanding the Supreme Court's recognition in *Teamsters* that this language "was not intended as a term of art, and the words reflect only their usual meaning," *Teamsters,* 431 U.S. at 336 n. 16, 97 S.Ct. 1843, the phrase is often used in a technical sense to refer either to this unique form of liability available in government actions under § 2000e–6, *see, e.g., EEOC v. Shell Oil Co.,* 466 U.S. 54, 67–68 n. 19, 70, 80, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984), or to the burden-shifting framework set out in *Teamsters* and available both to the government in § 2000e–6 litigation and to class-action plaintiffs in private actions alleging discrimination, *see, e.g., Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2552 n. 7, 180 L.Ed.2d 374 (2011).

[4]  [5]  We begin with § 2000e–6. The building blocks of liability pursuant to this provision—which provides for prospective injunctive relief where the government establishes that an employer is engaged in a "pattern or practice of resistance to the full enjoyment" of rights secured by Title VII—differ from those that provide the foundation for typical, private-party Title VII litigation. To establish an employer's liability for discrimination in violation of Title VII, a private plaintiff ordinarily must show that an employer took an adverse employment action *against him or her* because of his or her race, or on account of another protected ground. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Aulicino v. N.Y. City Dep't of Homeless Servs.,* 580 F.3d 73, 80 (2d Cir.2009). In § 2000e–6 litigation, by contrast, the government need not demonstrate specific losses to specific individuals to establish that injunctive relief is appropriate. The

government must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts": it must prove that unlawful discrimination "was the company's standard operating procedure." *Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843. Once established, however, "a court's finding of a pattern or practice justifies an award of prospective relief" even absent proof of losses to specific individuals. *Id.* at 361, 97 S.Ct. 1843.

The parties here use the term "pattern or practice" to refer not to an element of a **\*148** § 2000e–6 claim, but to the method of proof that the Supreme Court endorsed in *Teamsters* for the adjudication of such claims. This method of proof, however, originated in the class action context, in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The Supreme Court in *Franks* determined that once the private plaintiffs in the class action there "carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the [employer] ..., the burden [was] upon [the employer] to prove that individuals who reappl[ied] were not in fact victims of previous hiring discrimination." *Id.* at 772, 96 S.Ct. 1251. The Court in *Franks* used the phrase "pattern and practice" to refer to the common question of fact (whether the employer had engaged in a practice of discriminatory hiring) to be litigated by class plaintiffs, and apparently viewed its holding as no more than an application of *McDonnell Douglas*' burden-shifting framework in the class-action context. *See Franks,* 424 U.S. at 773, 96 S.Ct. 1251 (citing *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817).

[6]  The *Teamsters* Court thereafter determined that the *Franks* burden-shifting framework for certain class actions should also apply to government "pattern or practice" suits brought under § 2000e–6:

Although not all class actions will necessarily follow the *Franks* model, the nature of a [§ 2000e–6] pattern-or-practice suit brings it squarely within our holding in *Franks.* The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy....

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 626 of 898

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

....

When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. The petitioners' contention in this case is that if the Government has not, in the course of proving a pattern or practice, already brought forth specific evidence that each individual was discriminatorily denied an employment opportunity, it must carry that burden at the second, "remedial" stage of trial. That basic contention was rejected in the *Franks* case....

The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in *Franks,* the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Teamsters,* 431 U.S. at 360–62, 97 S.Ct. 1843 (internal citation and footnotes omitted). Since *Teamsters,* this burden-shifting framework has been known as the "*Teamsters* method of proof" or the "pattern-or-practice method." *See, e.g., Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 355 (5th Cir.2001) ("A pattern or practice case is not a separate and free-standing cause of action ..., but is really merely another method by which disparate **\*149** treatment can be shown." (internal quotation marks omitted)); *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760 (4th Cir.1998) ("The courts of appeals have ... permitted pattern or practice class action suits using the *Teamsters* method of proof."), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). [8] In sum, unlike in a typical individual disparate treatment suit, "a plaintiff's burden under the pattern-or-practice method requires the plaintiff to prove only the existence of a discriminatory policy rather than all elements of a prima facie case of discrimination"—but "under the pattern-or-practice method, only prospective relief [is] available, unless the plaintiffs offer [ ] additional proof." *Semsroth v. City of Wichita,* 304 Fed.Appx. 707,

716 (10th Cir.2008) (describing the reasoning in *Lowery,* 158 F.3d at 761).

Permitting private plaintiffs to use the pattern-or-practice method of proof outside the class action context would require us to extend this method beyond its current application. This we decline to do. Such an extension would allow nonclass private plaintiffs who have shown a pattern or practice of discrimination (but have not made out a disparate impact claim) to shift the burden to employers to prove that they did not discriminate against a particular individual. But this would conflict with the Supreme Court's oft-repeated holding in the context of disparate-treatment, private nonclass litigation that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To be sure, proof that an employer engaged in a pattern or practice of discrimination may be of substantial help in demonstrating an employer's liability in the individual case. But such proof cannot relieve the plaintiff of the need to establish each element of his or her claim.

We note that the district court in this case did not instruct the jury that a finding of a pattern or practice of discrimination shifted the burden of persuasion. Rather, the verdict sheet instructed the jury that each individual plaintiff was required to prove by a preponderance of the evidence that he was discriminated against as part of the pattern or practice. This instruction only underscores, however, why there was no need for the jury to make a specific finding regarding a pattern or practice of discrimination in this private, nonclass suit, as opposed to determining directly whether each individual plaintiff had been intentionally discriminated against. Where, as here, there are only individual, nonclass disparate-treatment claims, a district court need not and should not instruct the jury that a common pattern of discrimination is an element of liability.

For these reasons, all of our sister circuits to consider the question have held that the pattern-or-practice method of proof is not available to private, nonclass plaintiffs. *See Semsroth v. City of Wichita,* 304 Fed.Appx. 707, 715 (10th Cir.2008); *Davis v. Coca–Cola Bottling Co. Consol.,* 516 F.3d 955, 967–69 (11th Cir.2008); *Bacon v. Honda of Am. Mfg.,* 370 F.3d 565, 575 (6th Cir.2004); *Celestine v.*

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 627 of 898

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

*Petroleos de Venezuela SA,* 266 F.3d 343, 355–56 (5th Cir.2001); **\*150** *Gilty v. Vill. of Oak Park,* 919 F.2d 1247, 1252 (7th Cir.1990); *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 761 (4th Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *see also Schuler v. PricewaterhouseCoopers, LLP,* 739 F.Supp.2d 1, 6 n. 2 (D.D.C.2010) ("Courts in every other Circuit that has touched on this issue have indicated that an individual plaintiff cannot maintain a pattern and practice claim.") (collecting cases); 1 Lex Larson et al., *Employment Discrimination* § 8.01[3], at 8–13 (2d ed. 2011) ("[C]ourts have refused to permit individuals to use the pattern or practice proof structure for claims of individual discrimination...."). We have suggested as much, albeit in dicta. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706, 711 (2d Cir.1998).

**[7]**   For the foregoing reasons, we now hold that the pattern-or-practice method of proof is not available to nonclass, private plaintiffs in cases such as the one before us. Evidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim. Outside the class context, however, private plaintiffs may not invoke the *Teamsters* method of proof as an independent and distinct method of establishing liability. The district court erred in submitting this method of proof to the jury as a basis on which it could hold the Port Authority liable.

*II. Admissibility and Sufficiency of Evidence*

*A. Admissibility of Evidence from Outside the Limitations Period*

**[8]**   **[9]**   Turning to the plaintiffs' individual disparate treatment and disparate impact claims, the Port Authority argues that the district court improperly admitted evidence of events prior to August 2, 2000, for purposes of liability and damages. It is well established, however, that so long as at least "one alleged adverse employment action ... occurred within the applicable filing period[,] ... evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.' " *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 176 (2d Cir.2005) (quoting and altering *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Such background evidence "may be considered to assess liability on the timely alleged act." *Id.* at 177; *see also Petrosino v. Bell Atl.,* 385 F.3d 210, 220 (2d Cir.2004) (applying this rule in the failure-to-promote context). In particular, we have noted that statistical studies may include data from outside the statute of limitations to prove timely discriminatory acts. *See Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 604 n. 5 (2d Cir.1986). [9] Title VII's statute of limitations therefore did not prohibit admission of the plaintiffs' evidence of discrimination before August 2, 2000.

*B. Sufficiency of the Evidence*

The Port Authority next argues that the plaintiffs' evidence of individual disparate treatment and disparate impact was insufficient as a matter of law, and that the district court therefore abused its discretion in declining to set aside the verdict. "In reviewing the sufficiency of the evidence in support of a jury's verdict, we **\*151** examine the evidence in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor." *Gronowski v. Spencer,* 424 F.3d 285, 291 (2d Cir.2005). We will overturn the verdict here "only if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the [Port Authority] that reasonable and fair minded men could not arrive at a verdict against [the Port Authority].' " *Id.* at 292 (quoting *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995)) (some internal quotation marks omitted).

**[10]**   **[11]**   **[12]**   With respect to a Title VII individual disparate treatment claim, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A plaintiff establishes a prima facie case by showing "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

*Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004). An employer may then rebut this prima facie case by offering a legitimate, nondiscriminatory business reason for its conduct. *See id.* A plaintiff ultimately prevails if he proves that the defendant's employment decision was based in whole or in part on intentional discrimination. *See id.*

[13]   [14]   To prevail under the disparate impact theory of liability, a plaintiff must show that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(k)(1)(A)(i). This requires a plaintiff to (1) "identify a specific employment practice" or policy, *Malave v. Potter,* 320 F.3d 321, 326 (2d Cir.2003); "(2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 160 (2d Cir.2001). "The statistics must reveal that the disparity is substantial or significant," and "must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Id.* (internal quotation marks omitted). To rebut a plaintiff's statistics, a defendant may introduce evidence showing that "either no statistically significant disparity in fact exists or the challenged practice did not cause the disparity." *Id.* at 161.

[15]   If the trier of fact determines that the plaintiffs have established a disparate impact violation of Title VII, each person seeking individual relief such as back pay and compensatory damages "need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of the proved discrimination.'" *Id.* at 159 (quoting *Teamsters,* 431 U.S. at 362, 97 S.Ct. 1843) (alteration omitted); *see id.* at 161–62. After such a showing, the employer bears the burden of persuading the trier of fact that its decision was made for lawful reasons; otherwise, the employee is entitled to individualized relief, which may include back pay, front pay, and compensatory damages for **\*152** "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3); *see Robinson,* 267 F.3d at 159–60.

The Port Authority challenges three aspects of the plaintiffs' evidence. First, the Port Authority argues that the plaintiffs' statistical evidence was fatally flawed and that without it the plaintiffs lack sufficient evidence to prove a disparate impact. Second, the Port Authority

contends that the plaintiffs did not show that the multiple-step promotion process was "not capable of separation for analysis," 42 U.S.C. § 2000e–2(k)(1)(B)(i), and therefore the plaintiffs were required but failed to identify the specific promotion practice that caused a disparate impact. Third, the Port Authority contends that the plaintiffs' anecdotal evidence of intentional discrimination consists of nothing more than personal affronts outside of the promotion context, and therefore that the plaintiffs' individual disparate treatment claims must fail for lack of evidence that any discrimination was intentional.

We disagree with all three of the Port Authority's arguments and hold that the plaintiffs introduced sufficient evidence to support the jury's verdict as to plaintiffs' disparate impact and individual disparate treatment claims.

*1. Statistical Evidence*

The Port Authority argues first that the statistical evidence presented by Dr. Cavanagh, the plaintiffs' expert witness, was insufficient to prove their disparate impact claim because Dr. Cavanagh's analyses impermissibly (1) relied on data predating the onset of the statute of limitations, (2) did not focus on the relevant pool of candidates eligible for promotion, and (3) failed to establish statistical significance. We address each of these contentions in turn.

First, the Port Authority is incorrect in asserting that Dr. Cavanagh's statistics were flawed because they relied in part on data predating the onset of the statute of limitations period. In *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court stated that evidence predating the 1972 enactment of Title VII was not only admissible but, "to the extent that proof is required to establish discrimination with respect to salary disparities created after 1972, evidence of pre-Act discrimination is quite probative." *Id.* at 402 n. 13, 106 S.Ct. 3000 (internal citation omitted). Moreover, we have made clear that a district court errs by "downgrading" statistical studies on the ground that they "relied in part on pre-statute of limitations data." *Rossini,* 798 F.2d at 604 n. 5.

The Port Authority next argues that Dr. Cavanagh's year-end demographic statistics were not sufficient to show a disparate impact because they simply compared the percentage of Asian Americans in supervisory positions with the percentage of Asian American officers, rather

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 629 of 898

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

than looking to the relevant pool for promotion (*i.e.,* the percentage of Asian Americans on the eligible lists). On this point, we agree.

**[16]** As we have said, "plaintiffs must identify the correct population for analysis. In the typical disparate impact case the proper population for analysis is the applicant pool or the *eligible* labor pool." *Smith v. Xerox Corp.,* 196 F.3d 358, 368 (2d Cir.1999) (emphasis added), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.,* 461 F.3d 134, 140 (2d Cir.2006). "In the context of promotions, we have held that the appropriate comparison is customarily between the [racial] composition of candidates *seeking to be promoted* and the [racial] composition of those actually promoted," at least so long **\*153** as the relevant data are available. *Malave,* 320 F.3d at 326 (emphasis added). The plaintiffs in this case did not allege that the eligibility test was discriminatory; rather, they alleged that discrimination entered the process at the discretionary stage after the eligible lists had already been drawn up. The relevant population for analysis, then, includes only those officers on the eligible lists. Dr. Cavanagh's year-end demographic analyses include *all* officers, and therefore do not meet the statistical standards prescribed by law.

**[17]** Putting aside these demographic analyses, then, we are left with Dr. Cavanagh's statistical analysis comparing the percentage of Asian Americans on the eligibility lists with the percentage of Asian Americans promoted from 1996 to January 31, 2001 (the date that the EEOC complaint was filed). None of the 12 Asians on the eligible lists were promoted during this period, in contrast to 36 out of 259 whites; according to Dr. Cavanagh's calculations, this difference would occur due to chance "a bit under 13 percent" of the time. The Port Authority argues that a due-to-chance figure of 13 percent is not statistically significant because "it is generally accepted that statistical significance is at a 5% level or less."

It is true that "we have ... looked to whether the plaintiff can show a statistically significant disparity of two standard deviations," which (in a normal distribution) requires statistical significance at approximately the 5–percent level. *Xerox,* 196 F.3d at 365. However, we have also said that "[t]here is no minimum statistical threshold requiring a mandatory finding that a plaintiff has demonstrated a violation of Title VII. Courts should take a 'case-by-case approach' in judging the significance

or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Waisome v. Port Auth. of N.Y. & N.J.,* 948 F.2d 1370, 1376 (2d Cir.1991) (quoting *Ottaviani v. State Univ. of N.Y. at New Paltz,* 875 F.2d 365, 372–73 (2d Cir.1991)); *see also Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 n. 3, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) ("[W]e have not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination...."); *accord Xerox,* 196 F.3d at 366.

In many (perhaps most) cases, if there is a 13–percent likelihood that a disparity resulted from chance, it will not qualify as statistically significant. In this case, the plaintiffs offered other evidence that reasonable jurors could have relied upon to find that an 87–percent likelihood that the disparity was not due to chance qualified as significant. First, *no* Asian Americans were promoted during the relevant period; requiring a statistical showing of 95–percent confidence would make it mathematically impossible to rely upon statistics in a case like this one, in which the relevant population included so few Asian Americans. *See Waisome,* 948 F.2d at 1379 ("[T]he lack of statistical significance in the ultimate promotion reflects only the small sample size."). Second, as the Port Authority acknowledges, the plaintiffs presented a substantial amount of evidence that reasonable jurors could have relied on to conclude that the plaintiffs were more qualified than some of the white officers who were promoted, including comparing length of service, attendance records, and disciplinary histories. In the context of this case, it would not be unreasonable for a juror to find Dr. Cavanagh's statistics significant despite only being significant at the 13–percent level.

Finally, despite the Port Authority's argument to the contrary, Dr. Cavanagh's **\*154** choice to limit his time frame to the period from 1996 through January 2001 (rather than, as defendant's expert did, extending the analysis into 2005) was not unreasonable. The plaintiffs' theory was that the Port Authority's failures to promote them caused a disparate impact through 2001, when the EEOC charge in this case was filed. Dr. Cavanagh's selected time frame was directly relevant to answering this question.

*2. Specific Employment Practice*

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

The Port Authority next argues that there was insufficient evidence to support the plaintiffs' disparate impact claim on the ground that plaintiffs either failed to identify a *specific* promotion practice resulting in a disparate impact on Asian Americans or failed to show that the Port Authority's promotion process could not be separated into component parts for analysis. According to the Port Authority, the promotion process involved three separate steps—recommendation by a commanding officer, approval by the Chiefs' Board, and selection by the Superintendent—and these steps were wholly capable of being separated from each other for the purpose of statistical analysis. For the following reasons, we disagree.

**[18]**  To make out a disparate impact claim (or, more generally, to rely on statistical evidence), a plaintiff must identify a specific discriminatory employment practice. *See Wal–Mart Stores, Inc. v. Dukes,* ―― U.S. ――, 131 S.Ct. 2541, 2555–56, 180 L.Ed.2d 374 (2011) ("[R]espondents have identified no 'specific employment practice'.... Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based disparity does not suffice."); *Watson,* 487 U.S. at 994, 108 S.Ct. 2777 ("Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."). Title VII, however, expressly provides that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i). Whether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case. *See McClain v. Lufkin Indus.,* 519 F.3d 264, 278 (5th Cir.2008); *cf. Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 74 (2d Cir.2004), *vacated on other grounds,* 544 U.S. 957, 125 S.Ct. 1731, 161 L.Ed.2d 596 (2005).

**[19]**  Here, the evidence amply demonstrated that recommendation by the Chief's Board could not be separated from the rest of the promotion process for the purpose of statistical analysis. Such recommendation was neither necessary nor sufficient for promotion, and the weight it carried in the process was both unclear and variable. For example, two candidates who were

not recommended by the Chiefs' Board in January 2003 were nonetheless promoted by the Superintendent later that month, even as others who received unanimous recommendations from the Chiefs were not promoted for a year, or two years. Another Superintendent did not bother to use the Chiefs' Board at all. Recommendation by the Chiefs' Board was therefore not capable of separation from the rest of the promotion process.

**[20]**  The commanding officers' recommendations were similarly inseparable from the Superintendent's ultimate decisions regarding promotions because they **\*155** played an indeterminate role in the integrated promotion process. For example, former Chief Thomas Farrell testified that he occasionally would ask for performance evaluations of everyone on the eligible list—not just those who were recommended by commanding officers—while other testimony indicated that commanding officers' recommendations were often important in the promotion process. We therefore agree with the district court that these "steps" in the promotion process were not capable of separation for analysis. *See Port Auth. II,* 681 F.Supp.2d at 464. Accordingly, the decisionmaking process involved in promotions to Sergeant was properly analyzed as one employment practice.

### 3. Proof of Intent

**[21]**  The Port Authority next argues that it was entitled to judgment as a matter of law on the plaintiffs' individual disparate treatment claims because many of the plaintiffs' anecdotes of intentional discrimination were merely "situations involving personal affront as opposed to examples of overt racism," and moreover, that "[n]one of the specific instances relied upon by plaintiffs took place in the context of promotion." Appellants' Reply Br. at 17. Even if we were to accept the Port Authority's characterization of these accounts of discrimination, however, the plaintiffs also provided evidence that they were better qualified for promotion than several white officers who were promoted instead. In conjunction with the plaintiffs' statistical evidence, we conclude that this anecdotal evidence of intent was sufficient for a reasonable jury to conclude that the Port Authority intentionally discriminated against the plaintiffs by failing to promote them.

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 631 of 898

### III. Damages and the Statute of Limitations

The Port Authority argues, finally, that it was improperly assessed back pay and compensatory damages for harms that were suffered by the plaintiffs prior to August 2, 2000. The district court disagreed because it believed that the "continuing violation" doctrine applied in the context of plaintiffs' disparate impact allegations so that damages could properly be awarded for failures to promote that occurred outside the limitations period. [10] We agree with the Port Authority and hold that the continuing violation doctrine does not apply to plaintiffs' disparate impact proof. As a result, we further conclude: (1) that the back pay awards to Eng, Lew, Stanley Chin, and Fong must be vacated, as well as the retroactive promotion of Lew and the salary and pension adjustments for Lew, Stanley Chin, and Fong; and (2) that the jury's compensatory damage awards with regard to all seven prevailing plaintiffs must also be vacated. We remand to the district court for a new trial on damages and for reconsideration of equitable relief to the extent such relief was premised on failures to promote occurring outside the limitations period.

#### A. The Continuing Violation Doctrine

It has been the law of this Circuit that "[u]nder the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely **156** even if they would be untimely standing alone." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp.,* ––– U.S. ––––, 131 S.Ct. 1325, 1329–30, 179 L.Ed.2d 379 (2011); *see also Patterson v. Cnty. of Oneida,* 375 F.3d 206, 220 (2d Cir.2004); *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir.1994). Applying this principle, the district court in this case concluded that the Port Authority could be liable, and assessed damages, for discriminatory failures to promote outside the statute of limitations because, pursuant to the plaintiffs' disparate impact theory, those failures to promote were the product of an ongoing discriminatory policy that continued after August 2, 2000, thus triggering the continuing-violation doctrine. *See Port Auth. II,* 681 F.Supp.2d at 463.

* * *

The Port Authority argues that the continuing-violation doctrine does not apply in this case because (1) the plaintiffs did not identify a specific, ongoing discriminatory policy or custom; and (2) under the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), failures to promote are "discrete acts" of discrimination and thus do not implicate the continuing-violation doctrine. Because we agree with the Port Authority's second argument, we do not address the first.

In *Morgan,* the Supreme Court unanimously rejected the Ninth Circuit's view that a series or pattern of "related discrete acts" could constitute one continuous "unlawful employment practice" for purposes of the statute of limitations. *Id.* at 111, 122 S.Ct. 2061. Rather, the Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113, 122 S.Ct. 2061. By a divided vote, however, the *Morgan* Court distinguished such discrete acts from an allegedly hostile work environment, which it held could be a continuing violation because its "very nature involves repeated conduct." *Id.* at 115, 122 S.Ct. 2061. "Such claims are based on the cumulative effect of individual acts," the Court wrote, noting that "a single act of harassment may not be actionable on its own." *Id.*

The plaintiffs argue that *Morgan*'s analysis of "discrete acts" cannot apply to disparate impact claims because such claims—like hostile work environment claims—are "necessarily based on the cumulative effect of a particular practice over time." Appellees' Br. at 28. It is true that *Morgan* involved only an individual disparate treatment claim premised on a series of related discrete acts, and therefore did not directly address whether the continuing-violation doctrine applies where an ongoing discriminatory policy results in discrete discriminatory acts both before and after the limitation date. *See Morgan,* 536 U.S. at 107, 122 S.Ct. 2061 (noting in passing that in the Ninth Circuit, pre-*Morgan,* another type of continuing violation could be established by showing "a systematic policy or practice of discrimination that operated, in part, within the limitations period," but neither endorsing nor

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 632 of 898

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

repudiating that category of continuing violations); *id.* at 115 n. 9, 122 S.Ct. 2061 ("We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here."). *Morgan*'s reasoning, however, demonstrates **\*157** that a plaintiff may recover for a failure to promote—regardless whether it was caused by an ongoing discriminatory policy—only if he files an EEOC charge within 180 or 300 days of that decision. [11]

**[22]** *Morgan* established that an employer's failure to promote is by its very nature a discrete act. "Discrete acts such as termination, *failure to promote,* denial of transfer, or refusal to hire are easy to identify," the Court wrote. *Id.* at 114, 122 S.Ct. 2061 (emphasis added); *see also Forsyth v. Fed'n Emp't & Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005), *abrogated on other grounds by Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007). Moreover, each discrete act necessarily "constitutes a separate actionable 'unlawful employment practice,' " *Morgan,* 536 U.S. at 114, 122 S.Ct. 2061—unlike the incidents that comprise a hostile work environment claim, which may not be individually actionable, *id.* at 115, 122 S.Ct. 2061. Both the employer and the aggrieved party may therefore rely on the clear and predictable statute of limitations when contemplating prospective litigation regarding failures to promote or other discrete acts. As Justice Ginsburg has explained:

> A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext.

*Ledbetter,* 550 U.S. at 649, 127 S.Ct. 2162 (Ginsburg, J., dissenting). Accordingly, under *Morgan,* every failure to promote is a discrete act that potentially gives rise to a freestanding Title VII claim with its own filing deadline.

**[23]** Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period.

This is the conclusion of every circuit to consider the question after *Morgan.* Each of our sister circuits has held that an allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claim are merely discrete acts. *See, e.g., Williams v. Giant Food Inc.,* 370 F.3d 423, 429 (4th Cir.2004) ("Nor does [the plaintiff's] allegation of a 20-year 'pattern or practice' of discrimination extend the applicable limitations periods."); *Davidson v. Am. Online, Inc.,* 337 F.3d 1179, 1185–86 (10th Cir.2003) (holding that claims cannot be premised on an untimely discrete act "even if the discrete act was part of a company-wide or systemic policy"); *cf. Tademe v. St. Cloud State Univ.,* 328 F.3d 982, 988 (8th Cir.2003) ( "Although [the plaintiff] argues that the district court failed to consider that he was asserting a pattern-or-practice of discrimination, *Morgan* makes clear that the failure to promote, refusal to hire, and termination are generally considered separate violations."); *Lyons v. England,* 307 F.3d 1092, 1107 & n. 8 (9th Cir.2002) (holding that an individual plaintiff's "assertion that this series of discrete acts flows from a company-wide, or systemic, discriminatory practice will not succeed in establishing the employer's liability for acts occurring outside the limitations **\*158** period," but distinguishing and declining to address class-wide pattern-or-practice claims).

This conclusion is not altered by the fact that the plaintiffs employ the disparate impact method of proof. To prevail on a disparate impact claim, a plaintiff must "demonstrate[ ] that a respondent *uses a particular employment practice that causes a disparate impact.*" 42 U.S.C. § 2000e–2(k)(1)(A)(i) (emphasis added). In *Lewis v. City of Chicago,* 560 U.S. 205, 130 S.Ct. 2191, 2197–99, 176 L.Ed.2d 967 (2010), the Supreme Court interpreted this language to mean that every "use" of an employment practice that causes a disparate impact is a separate actionable violation of Title VII with its own 180– or 300–day statute-of-limitations clock. *See id.* at 2197–99. Accordingly, under *Lewis* and *Morgan,* each time the Port Authority failed to promote one of the plaintiffs, that plaintiff had 180 days to challenge the decision.

**[24]** In an attempt to distinguish *Morgan,* the plaintiffs argue that they "challenge *the process* by which the Port Authority made promotion decisions, rather than any specific promotion decision." Appellees' Br. at 29. But this argument hurts rather than helps them. In *Lewis,*

the Supreme Court considered the case of an allegedly discriminatory examination used by the City of Chicago to make hiring decisions. The examination's scores and the City's plan to hire based on certain cutoff scores were announced outside the limitations period, but the actual hiring occurred within the limitations period. *See Lewis,* 130 S.Ct. at 2195–96. The Supreme Court explained that although "[i]t may be true that the City's ... decision to adopt the cutoff score (and to create a list of the applicants above it) gave rise to a freestanding disparate-impact claim[,] [i]f that is so, the City is correct that since no timely charge was filed attacking it, the City is now entitled to treat that past act as lawful." *Id.* at 2198–99 (citation and internal quotation marks omitted). If the process by which the Port Authority promoted police officers from its eligibility lists did not materially change within the limitations period, as the plaintiffs claim, then the Port Authority is entitled to treat the process as lawful. *See id.* at 2199. The process itself therefore cannot be challenged; rather, only specific failures to promote that occurred within the limitations period are actionable.

### B. Damages & Equitable Relief

The district court properly instructed the jury regarding the statute of limitations for plaintiffs' individual disparate treatment claims, and the jury indicated on the verdict sheet its express findings that the Port Authority made discriminatory decisions not to promote Eng, Fong, Lew, Stanley Chin, Yum, Martinez, and Lim "after August 2, 2000." Pursuant to the district court's conclusion that the continuing violation doctrine was applicable to plaintiffs' disparate impact proof, however, the jury was permitted to assess damages for failures to promote occurring outside the limitations period. [12] With this in mind, **\*159** we turn to the Port Authority's claim that the damages and equitable awards here were premised on time-barred claims and were otherwise excessive.

#### 1. Back Pay

The jury's back-pay awards correspond precisely to certain calculations of the plaintiffs' damages expert, such that both parties and the district court agreed below that the jury found that four of the prevailing plaintiffs (Eng, Lew, Stanley Chin, and Fong) would have been promoted on October 31, 1999, and the other three (Yum, Lim, and Martinez) would have been promoted on September 30, 2002.

**[25]** The Port Authority argues first that the jury could not award back pay to multiple plaintiffs dating back to the same date when fewer than that number of plaintiffs were actually promoted on that date. It points out that there were only three promotions on October 31, 1999, but the jury awarded back pay to four plaintiffs corresponding to a failure to promote on that date. Likewise, there were only two promotions on September 30, 2002, but the jury awarded back pay to three plaintiffs extending back to that date. The Port Authority urges that the back pay awards for this reason "suffer from a fundamental error of law" and must be vacated. Appellants' Br. at 46.

We disagree. Although in many circumstances an employer may have only a fixed, limited number of possible promotion slots such that relief would be limited accordingly, *see Dougherty v. Barry,* 869 F.2d 605, 614–15 (D.C.Cir.1989) (R.B. Ginsburg, J.), that is not the case here. The plaintiffs presented evidence that the Port Authority could and did create new Sergeant-level vacancies. For example, during cross-examination, Chief Farrell conceded that the Superintendent occasionally would not specify the number of new Sergeants he was looking for, and that from time to time the Port Authority created new Sergeant-level vacancies based on staffing needs. A reasonable jury could therefore have concluded that the Port Authority could have promoted three officers rather than two on September 30, 2002, and four officers rather than three on October 31, 1999.

Nevertheless, the back pay awards to Christian Eng, Alan Lew, Stanley Chin, and Milton Fong were improper because they were premised on a hypothetical promotion date outside the statute of limitations. As explained earlier, *see supra* section III.A, the district court should have instructed the jury that the Port Authority could be liable only for discriminatory failures to promote after August 2, 2000, and that individual remedies were limited accordingly. We therefore vacate the back pay awards to these four plaintiffs and remand to the district court for determination of their proper back-pay awards.

#### 2. Compensatory Damages

**[26]** The Port Authority next argues that the jury's compensatory damages awards were based on discriminatory acts **\*160** that predated the onset of the statute of limitations period. The plaintiffs do not contest this allegation, but rather embrace it, and defend the awards solely on the basis of the continuing violation

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

theory. *See* Appellees' Br. at 48 ("The compensatory damages awards correlate to each Plaintiff's seniority on the job—and thus, the duration of each Plaintiff's distress—awarding $250,000 to the two Plaintiffs who each had more than twenty-nine years on the job, $100,000 and $75,000 to the three Plaintiffs who had between twenty and twenty-five years on the job, and $15,000 to the two Plaintiffs who had sixteen years on the job."). "When '[i]t is not possible to ascertain what portions of the compensatory and punitive damages awards were attributable' to claims that were time-barred, the damages awards must be vacated" and remanded for a new trial on damages. *Annis v. Cnty. of Westchester,* 136 F.3d 239, 248 (2d Cir.1998) (quoting *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 485 (3d Cir.1997)). Because the jury may have included time-barred claims with respect to each of the plaintiffs, we vacate all seven prevailing plaintiffs' compensatory damages awards and remand for a new trial on damages. On remand, the district court should instruct the jury to award damages only for injuries stemming from a discriminatory failure to promote after August 2, 2000.

### 3. Equitable Relief

The Port Authority next argues that the district court's equitable relief of retroactive promotions and salary and pension adjustments should have been granted only *pro rata* under the theory that only a limited number of promotions were available on each day. *See Dougherty,* 869 F.2d at 614–15. But this argument fails with respect to equitable relief for the same reason it fails regarding back pay, *see supra* section III.B.1; on the evidence presented, a reasonable jury could have concluded that the Port Authority could promote more officers on a given date than it chose to.

The equitable relief should not, however, have extended retroactive promotions or salary or pension adjustments beyond the limitations period. The district court's award of salary and pension adjustments for Milton Fong, Stanley Chin, and Alan Lew, as well as the retroactive promotion of Alan Lew, must be vacated and remanded for reconsideration because the award of such equitable relief was premised on a hypothetical promotion date of October 31, 1999. On remand, the district court should determine the date, after August 2, 2000, that each of these three plaintiffs would have been promoted absent discrimination and may grant appropriate equitable relief accordingly.

## IV. Exclusion of Lundquist's Expert Testimony

**[27]**   **[28]**   We now turn to the cross-appeal. The four cross-appealing plaintiffs argue that the district court erred in excluding the expert testimony of Dr. Lundquist, who would have testified that the Port Authority's promotion procedure was so unstructured and subjective that it fell below professional standards, and who would have compared the qualifications of the plaintiffs with those of the officers who were actually promoted. Expert testimony is admissible if it "(a) will help the trier of fact to understand the evidence or to determine a fact in issue," so long as "(b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. A district court's exclusion of expert testimony is reviewed for abuse of discretion, and "[a] decision to admit or exclude expert scientific testimony **\*161** is not an abuse of discretion unless it is 'manifestly erroneous.' " *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995)). "Further, an erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.' " *Lore v. City of Syracuse,* 670 F.3d 127, 155 (2d Cir.2012) (quoting *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007)).

**[29]**   The district court did not abuse its discretion in concluding that it lacked evidence that Dr. Lundquist's testimony was based on established principles and methods and that, in any event, her testimony would not have provided assistance to the trier of fact beyond that afforded by the arguments of counsel, as required by Rule 702. On appeal, the plaintiffs argue that the district court failed to acknowledge the portion of Dr. Lundquist's testimony that compared the qualifications of the plaintiffs with those of the white officers who were promoted instead. But Dr. Lundquist's analysis as to the comparative qualifications of the plaintiffs was both brief and simple, relying mostly on various officers' years of experience, commendations, discipline, and absences. For each of the four plaintiffs who did not prevail, Dr. Lundquist merely summed up their qualifications in a few sentences and then compared each of them to two officers who were promoted instead but whose record suggested

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

that they may have been less qualified. For example, she compared both Michael Chung and Sanrit Booncome to a promoted officer named Gary Griffith, whom she described only as having "sixty-seven absences in 2000 alone."

The district court did not abuse its discretion in concluding that expert analysis was not required to help the jury understand such evidence. Indeed, the plaintiffs' attorneys made the same points in argument that were made in Dr. Lundquist's report. Chung and Booncome's qualifications were established in detail while they were on the stand, and their attorney brought out Gary Griffith's relative lack of experience and his significant number of absences through questioning of a former Superintendent. The plaintiffs' attorneys, moreover, emphasized throughout the trial the relative qualifications of the plaintiffs when compared with officers who were promoted. At the trial's conclusion, the plaintiffs' summation detailed the qualifications of each of the plaintiffs in almost exactly the same way as Dr. Lundquist's testimony would have, including occasionally comparing a plaintiff with someone who had been promoted. The district court therefore did not abuse its discretion in determining that Dr. Lundquist's testimony was not relevant expert testimony that would help the jury understand the facts at issue.

### V. Sanctions for Spoliation

Finally, cross-appealing plaintiff Howard Chin argues that the district court erred in denying the plaintiffs' motion requesting an adverse inference instruction due to the Port Authority's destruction of the promotion folders used to make promotions off of the 1999 eligible list.[13] *See Port Auth. I,* 601 F.Supp.2d 566 (S.D.N.Y.2009). The Port Authority does not dispute that, upon receiving notice of the filing of plaintiffs' EEOC charge in February 2001, it had an obligation to preserve the promotion folders yet failed to do so. It argues, however, that the district court did not abuse its discretion in denying an adverse inference instruction. We agree.

***162** **[30]** **[31]** "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed

evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002) (internal quotation marks omitted). If these elements are established, a district court may, at its discretion, grant an adverse inference jury instruction insofar as such a sanction would "serve [ ] [the] threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107 (2d Cir.2001). Our review of a district court's decision on a motion for discovery sanctions is limited to abuse of discretion, which includes errors of law and clearly erroneous assessments of evidence. *See Residential Funding Corp.,* 306 F.3d at 107. "[A]bsent a showing of prejudice, the jury's verdict should not be disturbed." *Id.* at 112.

**[32]** **[33]** **[34]** **[35]** Howard Chin argues that the Port Authority's failure even to issue a litigation hold regarding the promotion folders at any point between 2001 and 2007 amounted to gross, rather than simple, negligence. We reject the notion that a failure to institute a "litigation hold" constitutes gross negligence *per se. Contra Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,* 685 F.Supp.2d 456, 464–65 (S.D.N.Y.2010). Rather, we agree that "the better approach is to consider [the failure to adopt good preservation practices] as one factor" in the determination of whether discovery sanctions should issue. *Orbit Comm'ns, Inc. v. Numerex Corp.,* 271 F.R.D. 429, 441 (S.D.N.Y.2010). Moreover, as the district court recognized, *see Port Auth. I,* 601 F.Supp.2d at 570, a finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction. *See Residential Funding Corp.,* 306 F.3d at 109; *Byrnie,* 243 F.3d at 108. Even if we assume *arguendo* both that the Port Authority was grossly negligent and that the documents here were "relevant," we have repeatedly held that a "case-by-case approach to the failure to produce relevant evidence," at the discretion of the district court, is appropriate. *Residential Funding Corp.,* 306 F.3d at 108 (quoting *Reilly v. Natwest Mkts. Grp.,* 181 F.3d 253, 267 (2d Cir.1999)). In this case, the district court concluded that an adverse inference instruction was inappropriate in light of the limited role

Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2012)

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 636 of 898

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

of the destroyed folders in the promotion process and the plaintiffs' ample evidence regarding their relative qualifications when compared with the officers who were actually promoted. *See Port Auth. I,* 601 F.Supp.2d at 570–71. At trial, Howard Chin was able to establish his service record and honors, and Chief Charles Torres testified that Howard Chin was very smart and a good employee. Under these circumstances, the district court did not abuse its discretion in concluding that an adverse inference instruction was inappropriate.

## CONCLUSION

For the foregoing reasons, we affirm the district court's conclusion that the Port Authority is liable to Christian Eng, Nicholas Yum, Alan Lew, David Lim, George Martinez, Stanley Chin, and Milton Fong under both the individual disparate treatment **\*163** and disparate impact theories. We also affirm the denial of individual relief to Howard Chin, Richard Wong, Sanrit Booncome,

and Michael Chung. Because the district court erred in applying the continuing-violation exception to the plaintiffs' claims, however, we: (1) vacate the jury's back pay awards with respect to Christian Eng, Alan Lew, Stanley Chin, and Milton Fong; (2) vacate the jury's compensatory damage awards with respect to Christian Eng, Nicholas Yum, Alan Lew, David Lim, George Martinez, Stanley Chin, and Milton Fong; (3) vacate the retroactive promotion of Alan Lew; and (4) vacate the salary and pension adjustments for Alan Lew, Stanley Chin, and Milton Fong. We remand all of these remedies issues to the district court for a new trial solely on damages and for the reconsideration of equitable relief. On remand, individual relief should be awarded only insofar as it corresponds to discriminatory failures to promote committed after August 2, 2000.

### All Citations

685 F.3d 135, 115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

Footnotes

1   The 1996 List was in effect from August 1996 through August 1999, and included 178 officers, 7 of whom were Asian. Twenty-three officers were promoted from the 1996 List, none of whom was Asian. The 1999 List was in effect from August 1999 through August 2002, and included 220 officers, 10 of whom were Asian. Fifty-five officers were promoted from the 1999 List, 2 of whom were Asian (both of whom were promoted in December 2001). The 2002 List was in effect from August 2002 through the date the complaint was filed (April 15, 2005), and included 352 officers, 16 of whom were Asian. As of April 15, 2005, when the complaint in this case was filed, 45 officers had been promoted from the 2002 List, 1 of whom was Asian.

2   Ordinarily, a "right to sue" letter must be issued by the EEOC. However, where the respondent to a Title VII discrimination charge is a governmental agency and the EEOC has not dismissed the charge, the Attorney General is responsible for issuing the right-to-sue letter. *See* 29 C.F.R. § 1601.28(d).

3   Federal Rule of Evidence 702 provides:
    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

4   The Fisher Exact Test is a statistical significance test named for its author, R.A. Fisher. *See generally* R.A. Fisher, *On the Interpretation of [Chi–Squared] from Contingency Tables, and the Calculation of P,* 85 J. Royal Stat. Soc'y 87 (1922).

5   Four plaintiffs' back pay awards corresponded to hypothetical promotion dates of October 31, 1999: Christian Eng was awarded $35,445 in back pay and $250,000 in compensatory damages; Milton Fong was awarded $83,924 in back pay and $100,000 in compensatory damages; Alan Lew was awarded $189,859 in back pay and $75,000 in compensatory damages; and Stanley Chin was awarded $116,636 in back pay and $100,000 in compensatory damages. Three plaintiffs' back pay awards corresponded to hypothetical promotion dates of September 30, 2002: Nicholas Yum was awarded $141,663 in back pay and $15,000 in compensatory damages; George Martinez was awarded $145,861 in back pay and $15,000 in compensatory damages; and David Lim was awarded $119,234 in back pay and $250,000 in compensatory damages.

115 Fair Empl.Prac.Cas. (BNA) 720, 95 Empl. Prac. Dec. P 44,555

6   Although the district court and the parties appear to agree that 180 days prior to January 31, 2001 is August 3, 2000, by this Court's calculation the correct date is August 4, 2000, which would mean that only an unlawful employment practice that occurred after August 3, 2000 may give rise to liability. But because the one-day difference is not material to this appeal, we refer to August 2, 2000, as the relevant date throughout this opinion. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

7   The parties did not address this issue before the district court and do not raise it on appeal. Nonetheless, we are not bound by parties' effective stipulations on questions of law, *see U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 446–48, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), and in this case we exercise our discretion to consider this issue in order to provide guidance in a complicated area.

8   Although the *Teamsters* framework is not a freestanding cause of action, courts—including the Supreme Court— sometimes loosely refer to the *Teamsters* method of proof as a "pattern-or-practice claim." *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 n. 9, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here.").

9   To be clear, the district court retains discretion to determine whether evidence predating the onset of the statute of limitations period should be admitted under any applicable rule of evidence. *See Jute,* 420 F.3d at 177 n. 7; *Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1211 (2d Cir.1993).

10  The district court reached a similar conclusion with regard to plaintiffs' pattern-or-practice allegations but, for the reasons already stated, *see supra* Part I, we have concluded that this theory of liability was not properly submitted to the jury.

11  As *Morgan* notes, the 300–day limitations period, inapplicable here, applies in those states that have "an entity with the authority to grant or seek relief with respect to the alleged unlawful practice" and where an employee initially files a grievance with that entity. 536 U.S. at 109, 122 S.Ct. 2061.

12  We note that the jury was not properly instructed regarding the statute of limitations as it applied to the plaintiffs' disparate impact proof. "To find disparate impact," the district court instructed the jury, "you are not required to consider whether the Port Authority intended to discriminate, but whether the Port Authority's promotion practices were the cause of a disparity, if any, after August 2, 2000." When the jury asked for clarification regarding the timing, the district court told them simply, "There has to be an effect after August 2, 2000." This phrasing suggests that the jury could find disparate impact liability where the Port Authority used an employment practice only outside the limitations period that resulted in a disparate effect that then *passively persisted* into the limitations period. *Lewis,* however, makes clear that a disparate impact claim requires plaintiffs to plead and prove that defendants, within the limitations period, *used* an employment practice that had a disparate impact. 130 S.Ct. at 2197–99. In other words, the *cause*—not merely the effect—must occur within the limitations period. The district court's instruction was therefore erroneous. The Port Authority, however, does not challenge the jury's liability finding on this basis, but simply the award of damages and equitable relief for harms occurring before August 2, 2000. Accordingly, we deem the error waived. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998).

13  Howard Chin is the only one of the four cross-appealing plaintiffs who claims to have lost relevant evidence due to the Port Authority's destruction of the promotion folders.

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 4

Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 (1984)

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

104 S.Ct. 2794
Supreme Court of the United States

Sylvia COOPER, et al., Petitioners

v.

FEDERAL RESERVE BANK OF RICHMOND.

No. 83-185.
|
Argued March 19, 1984.
|
Decided June 25, 1984.

Equal Employment Opportunity Commission brought racial discrimination action against employer. Four former or present employees intervened, and suit was certified for class treatment. The United States District Court for the Western District of North Carolina, James B. McMillan, J., found discrimination in two pay grades, and appeal was taken. Combined was interlocutory appeal from order denying motion to dismiss individual action by class members who had not opted out. The Court of Appeals, 698 F.2d 633, found that class judgment was res judicata of the separate, individual actions. On certiorari, the Supreme Court, Justice Stevens, held that judgment in class action, which determined that employer did not engage in general pattern or practice of racial discrimination against certified class of employees, did not preclude class members from maintaining subsequent civil actions alleging individual claims of racial discrimination against employer.

Reversed and remanded.

Justice Marshall, J., concurred in judgment.

*Syllabus*[a1]

The Equal Employment Opportunity Commission brought an action in Federal **2795 District Court against respondent Federal Reserve Bank, alleging that one of respondent's branches (the Bank) violated § 703(a) of Title VII of the Civil Rights Act of 1964 by engaging in employment discrimination based on race during a specified time period. Subsequently, four of the Bank's employees (the Cooper petitioners) were allowed to intervene as plaintiffs, and they alleged that

the Bank's employment practices violated 42 U.S.C. § 1981, as well as Title VII, and that they could adequately represent a class of black employees against whom the Bank had discriminated. The District Court then certified the class pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), and ordered that notice be given to the class members. Among the recipients of the notice were the Baxter petitioners. At the trial both the Cooper petitioners and the Baxter petitioners testified, and the District Court held that the Bank had engaged in a pattern and practice of racial discrimination with respect to employees in certain specified pay grades but not with respect to employees above those grades, and found that the Bank had discriminated against two of the Cooper petitioners but not against the others. Thereafter, the Baxter petitioners moved to intervene, but the District Court denied the motion on the ground, as to one petitioner, that since she was a member of the class to which relief had been ordered, her rights would be protected in the later relief stage of the proceedings, and, as to the other petitioners, on the ground that they were employed in jobs above the specified grades for which relief would be granted. These latter Baxter petitioners then filed a separate action against the Bank in the District Court, alleging that each of them had been denied a promotion because of their race in violation of 42 U.S.C. § 1981. The District Court denied the Bank's motion to dismiss but certified its order for interlocutory appeal, which was then consolidated with the Bank's pending appeal in the class action. The Court of Appeals reversed on the merits in the class action, holding that there was insufficient evidence to establish a pattern or practice of racial discrimination in the specified grades, and that none of the Cooper petitioners had been discriminated against. The court further held that, under **868 the doctrine of res judicata, the judgment in the class action precluded the Baxter petitioners from maintaining their individual claims against the Bank.

Held: The Baxter petitioners are not precluded from maintaining their separate action against the Bank. While the Court of Appeals was correct in generally concluding that the Baxter petitioners, as members of the class represented in the class action, were bound by the adverse judgment in that action, the court erred on the preclusive effect it attached to that judgment. The judgment bars the class members from bringing another class action against the Bank alleging a pattern or practice of racial discrimination for the same time period and precludes the

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

class members in any other litigation with the Bank from relitigating the question whether the Bank engaged in such a pattern or practice of racial discrimination during that same time period. But the judgment is not dispositive of the individual claims of the Baxter petitioners. Assuming that they establish a prima facie case of discrimination, the Bank will be required to articulate a legitimate reason for each of the challenged employment decisions, and, if it meets that burden, the ultimate question regarding motivation in the Baxter petitioners' individual cases will be resolved by the District Court. Permitting the Baxter petitioners to bring a separate action will not frustrate the purposes of Rule 23. To deny such permission would be tantamount to requiring that every class member be permitted to intervene to litigate the merits of his individual claim. Moreover, whether the issues framed by the named parties should be expanded to encompass the individual claims of additional class members is a matter that should be decided in the first instance by the District Court. Nothing in Rule 23 requires that the District Court **2796 make a finding with respect to each and every matter on which there is testimony in a class action. Rule 23's purpose in providing a mechanism for the expeditious decision of common questions might be defeated by an attempt to decide a host of individual claims before any common question relating to liability has been resolved adversely to the defendant. Pp. 2799–2802.

698 F.2d 633 (4th Cir.1983), reversed and remanded.

**Attorneys and Law Firms**

*Eric Schnapper* argued the cause for petitioners. With him on the briefs were *John T. Nockleby, Jack Greenberg, O. Peter Sherwood,* and *Charles Stephen Ralston.*

**\*869** *Harriet S. Shapiro* argued the cause for the United States et al. as *amici curiae* urging reversal. With her on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Philip B. Sklover,* and *Vella M. Fink.*

*George R. Hodges* argued the cause and filed a brief for respondent.*

* Briefs of *amici curiae* urging affirmance were filed for Boeing Co. by *Jerome A. Hoffman, John M. Coleman,* and *Michael C. Hallerud;* and for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Stephen C. Yohay.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

The question to be decided is whether a judgment in a class action determining that an employer did not engage in a general pattern or practice of racial discrimination against the certified class of employees precludes a class member from maintaining a subsequent civil action alleging an individual claim of racial discrimination against the employer.

## I

On March 22, 1977, the Equal Employment Opportunity Commission commenced a civil action against respondent, the Federal Reserve Bank of Richmond.[1] Respondent operates a branch in Charlotte, N.C. (the Bank), where during the years 1974–1978 it employed about 350–450 employees in several departments. The EEOC complaint alleged that the Bank was violating § 703(a) of Title VII of the Civil Rights Act of 1964 by engaging in "policies and practices" that included "failing and refusing to promote blacks because of race." App. 9a.

Six months after the EEOC filed its complaint, four individual employees[2] were allowed to intervene as plaintiffs. In **\*870** their "complaint in intervention," these plaintiffs alleged that the Bank's employment practices violated 42 U.S.C. § 1981, as well as Title VII; that each of them was the victim of employment discrimination based on race; and that they could adequately represent a class of black employees against whom the Bank had discriminated because of their race. In due course, the District Court entered an order conditionally certifying the following class pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3):

"All black persons who have been employed by the defendant at its Charlotte Branch Office at any time since January 3, 1974 [6 months prior to the first charge filed by the intervenors with EEOC], who have been discriminated against in promotion, wages, job assignments and terms and conditions of employment because of their race."[3]

After certifying the class, the District Court ordered that notice be published in the Charlotte newspapers and mailed to each individual member of the class. The notice described the status of the litigation, and plainly stated

that members of the class "will be bound by the judgment or other determination" if they did not exclude themselves by sending a written notice to the Clerk. [4] Among the recipients of **2797 the *871 notice were Phyllis Baxter and five other individuals employed by the Bank. [5] It is undisputed that these individuals—the Baxter petitioners —are members of the class represented by the intervening plaintiffs and that they made no attempt to exclude themselves from the class.

At the trial the intervening plaintiffs, as well as the Baxter petitioners, testified. The District Court found that the Bank had engaged in a pattern and practice of discrimination from 1974 through 1978 by failing to afford black employees opportunities for advancement and assignment equal to *872 opportunities afforded white employees in pay grades 4 and 5. Except as so specified, however, the District Court found that "there does not appear to be a pattern and practice of discrimination pervasive enough for the court to order relief." App. to Pet. for Cert. 193a–194a. With respect to the claims of the four intervening plaintiffs, the court found that the Bank had discriminated against Cooper and Russell, but not against Moore and Hannah. Finally, the court somewhat cryptically stated that although it had an opinion about "the entitlement to relief of some of the class members who testified at trial," it would defer decision of such matters to a further proceeding. Id., at 194a.

Thereafter, on March 24, 1981, the Baxter petitioners moved to intervene, alleging that each had been denied a promotion for discriminatory reasons. With respect to Emma Ruffin, the court denied the motion because she was a member of the class for which relief had been ordered and therefore her rights would be protected in the Stage II proceedings to be held on the question of relief. With respect to the other five Baxter petitioners, the court also denied the motion, but for a different reason. It held that because all of them were employed in jobs above the grade 5 category, they were not entitled to any benefit from the court's ruling with respect to discrimination in grades 4 and 5. The District Court stated: "The court has found no proof of any classwide discrimination above grade 5 and, therefore, they are not entitled to participate in any Stage II proceedings in this case." Id., at 287a. The court added that it could "see no reason why, if any of the would be intervenors are actively interested in pursuing their claims, they cannot file a Section 1981 suit next week...." Id., at 288a.

**2798 A few days later the Baxter petitioners filed a separate action against the Bank alleging that each of them had been denied a promotion because of their race in violation of 42 U.S.C. § 1981. The Bank moved to dismiss the complaint on the ground that each of them was a member of the class *873 that had been certified in the Cooper litigation, that each was employed in a grade other than 4 or 5, and that they were bound by the determination that there was no proof of any classwide discrimination above grade 5. The District Court denied the motion to dismiss, but certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). The Bank's interlocutory appeal from the order was then consolidated with the Bank's pending appeal in the Cooper litigation.

The United States Court of Appeals for the Fourth Circuit reversed the District Court's judgment on the merits in the Cooper litigation, concluding that (1) there was insufficient evidence to establish a pattern or practice of racial discrimination in grades 4 and 5, and (2) two of the intervening plaintiffs had not been discriminated against on account of race. EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633 (4th Cir.1983). The court further held that under the doctrine of res judicata, the judgment in the Cooper class action precluded the Baxter petitioners from maintaining their individual race discrimination claims against the Bank. The court thus reversed the order denying the Bank's motion to dismiss in the Baxter action, and remanded for dismissal of the Baxter complaint. We granted certiorari to review that judgment, 464 U.S. 932, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983), [6] and we now reverse.

II

Claims of two types were adjudicated in the Cooper litigation. First, the individual claims of each of the four intervening plaintiffs have been finally decided in the Bank's favor. [7] Those individual decisions do not, of course, foreclose any other individual claims. Second, the class claim that the Bank followed "policies and practices" of discriminating *874 against its employees has also been decided. [8] It is that decision on which the Court of Appeals based its res judicata analysis.

There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 642 of 898

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

any subsequent litigation. See, e.g., Supreme Tribe of Ben–Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); Restatement of Judgments § 86 (1942); Restatement (Second) of Judgments § 41(1)(e) (1982); see also Fed.Rule Civ.Proc. 23(c)(3); see generally Moore & Cohn, Federal Class Actions—Jurisdiction and Effect of Judgments, 32 Ill.L.Rev. 555 (1938). Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply. A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting relief. A judgment in favor of the defendant extinguishes the claim, barring a subsequent action on that claim. A judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment.

### III

A plaintiff bringing a civil action for a violation of § 703(a) of Title VII of the Civil  **\*\*2799**  Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e–2(a), has the initial burden of establishing a prima facie case that his employer discriminated against him on account of his race, color, religion, sex, or national origin. A plaintiff meets this initial burden by offering evidence adequate to create an inference that he was denied an employment opportunity on the basis of a discriminatory criterion enumerated in Title VII.

[1]    [2]    **\*875**  A plaintiff alleging one instance of discrimination establishes a prima facie case justifying an inference of individual racial discrimination by showing that he (1) belongs to a racial minority, (2) applied and was qualified for a vacant position the employer was attempting to fill, (3) was rejected for the position, and (4) after his rejection, the position remained open and the employer continued to seek applicants of the plaintiff's qualifications. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once these facts are established, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). At that point, the presumption of discrimination "drops from the case," id., at 255, n. 10, 101 S.Ct., at 1095, n. 10, and the district court is in a position to decide the ultimate question in such a suit: whether the particular employment decision at issue was made on

the basis of race. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714–715, 103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403 (1983); Texas Dept. of Community Affairs v. Burdine, 450 U.S., at 253, 101 S.Ct., at 1093. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff," ibid., and in the final analysis the trier of fact "must decide which party's explanation of the employer's motivation it believes." United States Postal Service Board of Governors v. Aikens, 460 U.S., at 716, 103 S.Ct., at 1482.

[3]    In Franks v. Bowman Transportation Co, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the plaintiff, on behalf of himself and all others similarly situated, alleged that the employer had engaged in a pervasive pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees. In that class action we held that demonstrating the existence of a discriminatory pattern or practice established a presumption that the individual class members had been discriminated against on account of race. Id., at 772, 96 S.Ct., at 1268. Proving **\*876**  isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination; rather it must be established by a preponderance of the evidence that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977) (footnote omitted).[9]  While a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class. Id., at 361, 97 S.Ct., at 1867.

[4]    The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while "at the liability stage of a **\*\*2800**  pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking." Id., at 360, n. 46, 97 S.Ct., at 1867, n. 46. See generally, Furnco Construction Corp. v. Waters, 438 U.S. 567, 575, n. 7, 98 S.Ct. 2943, 2948 n. 7, 57 L.Ed.2d 957 (1978).

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

This distinction was critical to our holding in General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), that an individual employee's claim that he was denied a promotion on racial grounds did not necessarily make him an adequate representative of a class composed of persons who had allegedly been refused employment for discriminatory reasons. We explained:

"Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have **\*877** suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's Irving division, or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices." Id., at 157–158, 102 S.Ct., at 2371.

After analyzing the particulars of the plaintiff's claim in that case, we pointed out that if "one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action." Id., at 159, 102 S.Ct., at 2371. We further observed:

"In this regard it is noteworthy that Title VII prohibits discriminatory employment practices, not an abstract policy of discrimination. The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." Id., at 159, n. 15, 102 S.Ct., at 2372, n. 15.

Falcon thus holds that the existence of a valid individual claim does not necessarily warrant the conclusion that the individual plaintiff may successfully maintain a class action. It **\*878** is equally clear that a class plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved. The facts of this case illustrate the point.

The District Court found that two of the intervening plaintiffs, Cooper and Russell, had both established that they were the victims of racial discrimination but, as the Court of Appeals noted, they were employed in grades higher than grade 5 and therefore their testimony provided no support for the conclusion that there was a practice of discrimination in grades 4 and 5. [10] Given the burden of establishing a **\*\*2801** prima facie case of a pattern or practice of discrimination, it was entirely consistent for the District Court simultaneously to conclude that Cooper and Russell had valid individual claims even though it had expressly found no proof of any classwide discrimination above grade 5. It could not be more plain that the rejection of a claim of classwide discrimination does not warrant the conclusion that no member of the class could have a valid individual claim. "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." Furnco Construction Corp. v. Waters, 438 U.S., at 579, 98 S.Ct., at 2950–2951.

The analysis of the merits of the Cooper litigation by the Court of Appeals is entirely consistent with this conclusion. In essence, the Court of Appeals held that the statistical **\*879** evidence, buttressed by expert testimony and anecdotal evidence by three individual employees in grades 4 and 5, was not sufficient to support the finding of a pattern of bankwide discrimination within those grades. It is true that the Court of Appeals was unpersuaded by the anecdotal evidence; it is equally clear, however, that it did not regard two or three instances of discrimination as sufficient to establish a general policy. [11] It quite properly recognized that a "court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of **\*880** countless free-standing trees." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 934, 102 S.Ct. 3409, 3437, 73 L.Ed.2d 1215 (1982). Conversely, a piece of fruit may well be bruised without being rotten to the core.

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 644 of 898

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

The Court of Appeals was correct in generally concluding that the Baxter petitioners, as members of the class represented by the intervening plaintiffs in the Cooper litigation, are bound by the adverse judgment in that case. The court erred, however, in the preclusive effect it attached to that prior adjudication. That judgment (1) bars the class members from bringing another class action against the Bank alleging a pattern or practice of discrimination for the relevant time period and (2) precludes the class members in any other litigation with the Bank from relitigating the question whether the Bank engaged in a pattern and practice of discrimination against black employees during the relevant **2802 time period. The judgment is not, however, dispositive of the individual claims the Baxter petitioners have alleged in their separate action. Assuming they establish a prima facie case of discrimination under McDonnell Douglas, the Bank will be required to articulate a legitimate reason for each of the challenged decisions, and if it meets that burden, the ultimate questions regarding motivation in their individual cases will be resolved by the District Court. Moreover, the prior adjudication may well prove beneficial to the Bank in the Baxter action: the determination in the Cooper action that the Bank had not engaged in a general pattern or practice of discrimination would be relevant on the issue of pretext. See McDonnell Douglas, 411 U.S., at 804–805, 93 S.Ct., at 1825–1826.

The Bank argues that permitting the Baxter petitioners to bring separate actions would frustrate the purposes of Rule 23. We think the converse is true. The class-action device was intended to establish a procedure for the adjudication of common questions of law or fact. If the Bank's theory were adopted, it would be tantamount to requiring that every member of the class be permitted to intervene to litigate the merits of his individual claim.

**\*881** It is also suggested that the District Court had a duty to decide the merits of the individual claims of class members, at least insofar as the individual claimants became witnesses in the joint proceeding and subjected their individual employment histories to scrutiny at trial. [12] Unless these claims are decided in the main proceeding, the Bank argues that the duplicative litigation

that Rule 23 was designed to avoid will be encouraged, and that defendants will be subjected to the risks of liability without the offsetting benefit of a favorable termination of exposure through a final judgment.

This argument fails to differentiate between what the District Court might have done and what it actually did. The District Court did actually adjudicate the individual claims of Cooper and the other intervening plaintiffs, as well as the class claims, but it pointedly refused to decide the individual claims of the Baxter petitioners. Whether the issues framed by the named parties before the court should be expanded to encompass the individual claims of additional class members is a matter of judicial administration that should be decided in the first instance by the District Court. Nothing in Rule 23 requires as a matter of law that the District Court make a finding with respect to each and every matter on which there is testimony in the class action. Indeed, Rule 23 is carefully drafted to provide a mechanism for the expeditious decision of common questions. Its purposes might well be defeated by an attempt to decide a host of individual claims before any common question relating to liability has been resolved adversely to the defendant. We do not find the District Court's denial of the Baxter petitioners' motion for leave to intervene in the Cooper litigation, or its decision not to make findings regarding the Baxter petitioners' testimony in the Cooper litigation, to be inconsistent with Rule 23.

**\*882** The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice MARSHALL concurs in the judgment.

Justice POWELL took no part in the decision of this case.

**All Citations**

467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445, 39 Fed.R.Serv.2d 301

Footnotes

a1    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 645 of 898

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

1 The Bank is organized pursuant to a federal statute, 12 U.S.C. § 341, that enables it to sue and be sued, to appoint its own employees, and to define their duties.

2 Sylvia Cooper, Constance Russell, Helen Moore, and Elmore Hannah, Jr., sometimes referred to by the District Court as the "intervening plaintiffs" and by the parties as the "Cooper petitioners." In our order granting certiorari, we declined to review two questions that were presented by these parties. 464 U.S. 932, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983).

3 App. to Pet. for Cert. 200a (brackets in original). Certification was also sought for a class of female employees, but the District Court concluded that the evidence did not warrant the certification of a class with respect to the claims of sex discrimination. Id., at 200a, n. 1.

4 The actual text of the critical paragraphs of the notice read as follows:

"3. The class of persons who are entitled to participate in this action as members of the class represented by the plaintiff-intervenors, for whom relief may be sought in this action by the plaintiff-intervenors and who will be bound by the determination in this action is defined to include: all black persons who were employed by the Federal Reserve Bank of Richmond at its Charlotte Branch Office at any time since January 3, 1974.

"4. If you fit in the definition of the class in paragraph 3 you are a class member. As a class member, you are entitled to pursue in this action any claim of racial discrimination in employment that you may have against the defendant. You need to do nothing further at this time to remain a member of the class. However, if you so desire, you may exclude yourself from the class by notifying the Clerk, United States District Court, as provided in paragraph 6 below.

"5. If you decide to remain in this action, you should be advised that: the court will include you in the class in this action unless you request to be excluded from the class in writing; the judgment in this case, whether favorable or unfavorable to the plaintiff and the plaintiff-intervenors, will include all members of the class; all class members will be bound by the judgment or other determination of this action; and if you do not request exclusion, you may appear at the hearings and trial of this action through the attorney of your choice.

"6. If you desire to exclude yourself from this action, you will not be bound by any judgment or other determination in this action and you will not be able to depend on this action to toll any statutes of limitations on any individual claims you may have against the defendant. You may exclude yourself from this action by notifying the Clerk in writing that you do not desire to participate in this action. The Clerk's address is: Clerk, United States District Court, Post Office Box 1266, Charlotte, North Carolina 28232." App. 35a–37a.

5 In addition to Baxter, they were Brenda Gilliam, Glenda Knott, Emma Ruffin, Alfred Harrison, and Sherri McCorkle. All of these individuals, sometimes referred to as the "Baxter petitioners," stipulated that they received the notice. See id., at 95a.

6 As noted, n. 2, supra, our limited grant of certiorari does not encompass the questions raised by the Cooper petitioners concerning the Court of Appeals' disposition of the merits of their case.

7 Two of those claims were rejected by the District Court and two by the Court of Appeals; all four of those determinations are now equally final.

8 The District Court rejected all of the class claims except that pertaining to grades 4 and 5; the claim on behalf of that subclass was rejected by the Court of Appeals. Again, that distinction between subclasses is no longer significant for the entire class claim has now been decided.

9 Although Teamsters involved an action litigated on the merits by the Government as plaintiff under § 707(a) of the Act, it is plain that the elements of a prima facie pattern-or-practice case are the same in a private class action. See Teamsters v. United States, 431 U.S., at 358–360, 97 S.Ct., at 1866–1867.

10 The Court of Appeals wrote:

"In denying the motion the District Court stated that all intervenors 'in grades higher than grade 5' were not members of the class in whose favor the District Court had found 'classwide discrimination.' By this test, Cooper, Moore, Russell, Baxter, Gilliam, Knott and McCorckle were not members of the class in which discrimination was found and their testimony could not have been included within the District Court's term 'oral testimony of class members,' complaining of promotion out of either pay grade 4 or pay grade 5; only the testimony of Ruffin and Harrison met that qualifying standard." EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 644 (1983).

11 It wrote:

"The claim here is a pattern or practice of intentional discrimination against an entire group by treating it less favorably because of race. That is the typical disparate treatment case. This case should accordingly be properly treated as such. However, the result reached by us would not be substantially different whether the class action be considered as a disparate impact or a disparate treatment case." Id., at 639.

104 S.Ct. 2794, 35 Fair Empl.Prac.Cas. (BNA) 1, 34 Empl. Prac. Dec. P 34,445...

"This case accordingly presents quite a contrast with Teamsters where the 'oral testimony of class members' demonstrated 40 cases of specific instances of discrimination in support of the statistical evidence offered by plaintiffs or with that in our own case of Chisholm v. United States Postal Service, 665 F.2d 482, 495 (4th Cir.1981), where there were 20 'class members' testifying of individual discrimination. Here all we have is the testimony of but two class members testifying of individual discrimination in promotion out of either pay grade 4 or pay grade 5 on which a finding of discriminatory practices can be rested. This is even less of a presentation of oral testimony in support of a pattern of discrimination than that found wanting in Ste. Marie v. Eastern R. Ass'n, 650 F.2d 395, 405–06 (2d Cir.1981), where the Court declared that the small number of incidents of discrimination in promotion over a period of years in that case 'would be insufficient to support the inference of a routine or regular practice of discrimination ...,' or, in Goff v. Continental Oil Co., 678 F.2d 593, 597 (5th Cir.1982), where the Court held that 'even if all three witnesses' accounts of racial discrimination were true, this evidence would not have been enough to prove a pattern or practice of company-wide discrimination by Conoco.' It follows that these two incidents of failure to promote Ruffin or Harrison, even if regarded as discriminatory, (which we assume only arguendo), would not support the District Court's finding of a pattern of class discrimination in promotions out of grades 4 and 5." Id., at 643–644 (footnotes omitted).

12   We find the Bank's contention that the District Court actually found against the Baxter petitioner's on the basis of the testimony in the Cooper action wholly without merit.

---

                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 5

516 F.3d 955
United States Court of Appeals,
Eleventh Circuit.

Melvin DAVIS, Leander Foster, Michael A.
Fox, Randolph Hatcher, Terry R. Jackson,
Warren Law, Jr., Attress Logan, Lorenzo
Martin, Watson, Sgt., Plaintiffs–Appellants,

v.

COCA–COLA BOTTLING CO.
CONSOLIDATED, Defendant–Appellee.

No. 05–12988.
|
Feb. 6, 2008.

**Synopsis**

**Background:** Black employees brought suit to recover
under Title VII and civil rights statute for their employer's
alleged racial discrimination and retaliatory acts, and the
United States District Court for the Southern District
of Alabama, No. 02-00629-CV-CB-M, Charles R. Butler,
Jr., J., entered order dismissing "pattern or practice" claim
and granted employer's motion for summary judgment on
remaining claims, and employees appealed.

**Holdings:** The Court of Appeals, Tjoflat, Circuit Judge,
held that:

[1] individual black employees who were allegedly
discriminated against pursuant to alleged pattern or
practice of discrimination by company that employed
them could not prosecute a "pattern or practice" claim
for declaratory and injunctive relief against this alleged
practice without being certified as class representatives;

[2] actions of which black employees complained were
discrete acts, not acts that were part of hostile work
environment, on which statute of limitations began to run
when acts were committed;

[3] conclusory allegations in black employees' complaint
were insufficient to satisfy "notice" pleading standard;

[4] black employees failed to establish prima facie case of
discrimination; and

[5] "shotgun" pleading approach adopted by both parties
counseled against award of attorney fees.

Affirmed in part, vacated in part and remanded.

**Attorneys and Law Firms**

**\*961** Robert L. Wiggins, Jr., Wiggins, Childs, Quinn &
Pantazis, P.C., Roderick T. Cooks, Winston Cooks, LLC,
Birmingham, AL, for Plaintiffs–Appellants.

Gretchen W. Ewalt, Gregory P. McGuire, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C., Raleigh, NC, for
Defendant–Appellee.

Barbara L. Sloan, EEOC, Washington, DC, for Amicus
Curiae, EEOC.

Appeal from the United States District Court for the
Southern District of Alabama.

Before TJOFLAT and PRYOR, Circuit Judges, and
GEORGE [*], District Judge.

**Opinion**

TJOFLAT, Circuit Judge:

The plaintiffs in this employment discrimination case
brought under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §
1981, are seven employees and two former employees of
Coca–Cola Bottling Co. Consolidated ("CCBCC"). In
their complaint, they allege that CCBCC is maintaining
a "pattern or practice" of discrimination against
them and all other similarly situated employees on
account of their race, which is black, with respect to
hiring, promotion, pay, a racially hostile workplace
environment, and light work assignments. [1] After the case
proceeded through several rounds of pleadings, [2] partially
dispositive rulings on motions, [3] and considerable
discovery, plaintiffs' claims of race discrimination under
Title VII and § 1981 boiled down to claims that
CCBCC: has a pattern or practice of subjectively
hiring supervisors, in which qualified blacks are not
meaningfully considered; [4] preferred whites in **\*962**
awarding light work assignments; maintained a racially
hostile work environment; and twice retaliated against one

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

of the plaintiffs for complaining about race discrimination in the workplace.

The district court ruled on the legal sufficiency of these claims on CCBCC's motion for summary judgment. [5] First, the court dismissed plaintiffs' pattern or practice claims on the ground that a pattern or practice claim is available only as a class action and plaintiffs had not sought class certification. Next, the court granted CCBCC summary judgment on all of plaintiffs' individual hiring and light duty claims brought under Title VII as time-barred. Finally, the court granted summary judgment on all of plaintiffs' individual § 1981 claims. All but four § 1981 claims—two light duty claims and two retaliation claims—were found time-barred. They were dismissed on the merits, for lack of proof. [6]

Plaintiffs now appeal, arguing that the district court erred in holding that a pattern or practice claim (as it relates to the manner in which CCBCC hires supervisors) must be brought as a class action. They also argue that the court erred in dismissing their individual § 1981 claims as time-barred or for lack of proof and all of their Title VII claims as time-barred. [7] Finally, plaintiffs complain that the court overlooked several hiring claims that were not explicitly set out in their complaint but were called to the court's attention in their opposition to CCBCC's motion for summary judgment. We affirm the district court's judgment with the exception of two Title VII hiring claims, which we remand for further proceedings.

We begin by describing plaintiffs' employment—in particular, how CCBCC hired supervisors and assigned light work. We then move to the allegations of the complaint, the district court's summary judgment decision, and our analysis and disposition of the issues plaintiffs raise.

## I.

### A.

CCBCC is a soft drink production, bottling, and distribution corporation with operations throughout the southeast United States. Plaintiffs Melvin Davis, Leander Foster, Michael Fox, Randolph Hatcher, Terry Jackson, Warren Law, and Attress Logan are current employees

at CCBCC's Mobile, Alabama facility; Frederick Watson and Lorenzo Martin are former employees. *963 [8] The employees at the Mobile facility are assigned to divisions: production, sales, and truck maintenance. The sales division is subdivided by types of customers and routes: bulk, conventional, cold drink, and full-service. Most of the plaintiffs work in the sales division, delivering drinks to these customers.

Plaintiffs are non-supervisory employees. CCBCC's non-supervisory employees are members of a bargaining unit represented by Local 991 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("the union") and are paid by the hour. [9] A collective bargaining agreement regulates the terms and conditions of their employment, including the assignment of light work.

Supervisors are non-union and are paid salaries. Because they are non-union, the collective bargaining agreement does not regulate the terms and conditions of their employment. Before plaintiffs filed the EEOC charges that led to this litigation, CCBCC would fill a vacant supervisory position by word of mouth. Management would encourage specific non-supervisory employees to apply for the position and occasionally would solicit applications from outside the company. When the non-supervisory employees learned of a vacancy, some would apply. After all the applications were in, a panel of three—which would normally include the Mobile facility human resources manager, or a member of his staff, and the person responsible for supervising the open position—would interview the applicants. CCBCC ceased the word-of-mouth practice, and began posting vacancies, after plaintiffs filed their EEOC complaints. Plaintiffs Jackson, Logan, Fox, and Davis were interviewed for supervisory positions prior to filing their EEOC complaints and before CCBCC changed its word-of-mouth policy.

Regarding light work, the collective bargaining agreement provides that light work within an injured employee's medical restrictions can be assigned when such is available. CCBCC's supervisors determine whether and what type of light work might be available; human resources decides whether the available work fits the restrictions of the injured employee. [10]

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 650 of 898

B.

The complaint in this case contains three counts, two of which are relevant here.[11] Count I, brought under Title VII, alleges that CCBCC discriminates against its black non-supervisory employees, as a **964** class, by maintaining a pattern or practice of race discrimination as to "pay, raises, benefits, ability to advance, and right to be free of racial discrimination, harassment and intimidation, and other terms and conditions of employment." Count I asks that the maintenance of the pattern or practice be declared unlawful and enjoined, and seeks equitable and legal relief for each of the named plaintiffs. Count II incorporates the allegations and prayers for relief of Count I and alleges, in addition, that CCBCC's conduct "deprive[s] plaintiffs of the same ... contract[ ] [rights] as is enjoyed by similarly situated white persons in violation of 42 U.S.C. § 1981." The complaint contains no count in which a plaintiff alleges that he was, or is, a victim of one or more specific features of the above pattern or practice of race discrimination. Rather, the complaint implies—in Counts I and II and the prefatory allegations preceding Count I—that all nine plaintiffs, and all other black non-supervisory employees of CCBCC, have experienced, and are continuing to suffer from, all of the features of the alleged pattern or practice.

As we indicate in our introduction to this opinion, by the time the district court took CCBCC's motion for summary judgment under advisement,[12] plaintiffs' claims had been reduced essentially to those we address in this opinion. Plaintiffs' pattern or practice claim, which relates to CCBCC's method of hiring supervisors, had been dismissed because, in the court's view, a pattern or practice claim can only be maintained as a class action and plaintiffs had not sought class certification.[13] What remained of the pattern or practice claim, therefore, were the individual claims: each plaintiff contended that CCBCC had refused to promote him to a vacant supervisory position because of his race. The court granted CCBCC summary judgment on these claims as time-barred under both Title VII and § 1981.[14] The court then addressed plaintiffs' light work and retaliation claims, brought under Title VII and § 1981, and held that they were either time-barred or, like plaintiffs' individual hostile work environment claims, failed for lack of proof.[15]

We now turn to the issues this appeal presents. We begin with the question of whether the district court erred in ruling that plaintiffs, proceeding individually or collectively rather than as class action representatives, could not prosecute a pattern or practice claim.

II.

A.

[1]  [2]  [3]  Section 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a), entitles the Government[16] to bring a pattern or **965** practice claim on behalf of a class of similarly situated employees for declaratory and injunctive relief against an ongoing act of intentional discrimination in violation of Title VII.[17] A pattern or practice claim for such relief may also be brought under Title VII as a class action, pursuant to Federal Rule of Civil Procedure 23(b)(2), by one or more of the similarly situated employees. See Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984) ( "[I]t is plain that the elements of a prima facie pattern-or-practice case are the same in a private class action [as when the Government brings the claim]."). In addition to praying for declaratory and injunctive relief, the complaint may also seek back pay on behalf of individual class members who have been injured by the employer's discriminatory practice. 42 U.S.C. § 2000e–5(g)(1). We have referred to such complaint as presenting a "hybrid Rule 23(b)(2) class action." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1554 (11th Cir.1986).[18]

[4]  [5]  [6]  The court must address two issues before proceeding to adjudicate as a class action a pattern or practice claim. First, the court must determine whether the named plaintiff has standing to prosecute the claim on behalf of similarly-situated employees. See Murray v. U.S. Bank Trust Nat'l Ass'n, 365 F.3d 1284, 1288 n. 7 (11th Cir.2004). Only someone who claims he has been, or is likely to be, harmed by the ongoing discriminatory practice has an adequate stake in the litigation to satisfy the "case or controversy" requirement of Article III. See Flast v. Cohen, 392 U.S. 83, 99–101, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).[19] If the named plaintiff lacks **966** standing to sue, he cannot prosecute the pattern or

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

practice claim, and unless an employee who has been, or is likely to be, harmed by the discriminatory practice is substituted as the named plaintiff, the claim fails.

[7]   Second, assuming the named plaintiff has standing to sue, the court must determine whether Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy are satisfied, [20] and whether, as required by Rule 23(b)(2), the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief [ ] appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2).

[8]   [9]   If the court resolves these two issues in favor of proceeding with the class litigation and, at the conclusion of the first stage, finds that the employer has an ongoing practice of discrimination against the plaintiff class, declares the practice invalid and enjoins the practice, the case advances to the second stage. There, individual class members may seek redress for injuries sustained, perhaps in separate proceedings. *See* Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 361, 97 S.Ct. 1843, 1868, 1855, 52 L.Ed.2d 396 (1977). [21] Because the court's "finding of a pattern or practice changed the position of the employer to that of a proved wrongdoer," each class member seeking redress may rely on that finding as circumstantial evidence that the employer made the challenged employment decision with intent to discriminate. Id. at 359 n. 45, 97 S.Ct. at 1867.. *See also* Rutstein v. Avis Rent–A–Car Sys., Inc., 211 F.3d 1228, 1238 n. 18 (11th Cir.2000). In that case, the employer bears the burden of proving that the challenged decision, made when the discriminatory practice was in force, was not made in pursuit of that practice but was, instead, made because that claimant was unqualified for the benefit he sought. Cox, 784 F.2d at 1559.

[10]   If the court denies the plaintiffs relief in the first stage, however, because the named plaintiff failed to establish the alleged pattern or practice, the class claim is dismissed. [22] Hence, all that remains are the claims of the individual class members, and those claims will be litigated under the familiar *McDonnell Douglas* burden-shifting framework. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). [23]

*967  B.

1.

[11]   Plaintiffs argue that nothing in our precedent precludes them, as individuals, from prosecuting a pattern or practice claim for declaratory and injunctive relief without being certified as class representatives, [24] and that the district court therefore erred in dismissing their claim. [25] We acknowledge that our precedent does not explicitly foreclose plaintiffs' argument; plaintiffs give no indication, however, of comprehending why private pattern or practice claims for such relief must be litigated either as class actions or not at all.

Plaintiffs' complaint—to the extent it implicates CCBCC's practice of hiring supervisors—presented, in essence, a typical hybrid Rule 23(b)(2) class action. [26] That is to say, the complaint alleged that CCBCC's word-of-mouth practice of hiring supervisors is ongoing and applies to all black CCBCC employees who, like the named plaintiffs, are qualified to hold supervisory positions that go to white employees and white outsiders. And it all but stated that these black employees constituted a class and that the named plaintiffs were representing them. We say this because the complaint asked for the type of relief stage one of a Rule 23(b)(2) class action would afford —a declaration that the word-of-mouth hiring practice discriminated against blacks and an injunction against its continued use—relief that would inure to the benefit not only of the named plaintiffs but to similarly situated black employees as well. The complaint also presented the claims of the individual plaintiffs in the form of back pay and other monetary relief, stage two of a hybrid Rule 23(b)(2) class action.

*968  A Rule 23(b)(2) class certification would give the named plaintiffs standing to represent the claims of the unnamed class members for declaratory and injunctive relief. Without Rule 23(b)(2) certification, however, the named plaintiffs lack standing to pursue such relief for themselves, because the complaint did not allege a likelihood that they will be denied a supervisory position in the future. [27] *See* City of Los Angeles v. Lyons, 461 U.S. 95, 106 n. 7, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) (To have constitutional standing to seek injunctive relief, a "[plaintiff] would have to credibly allege that

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)
102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

he faced a realistic threat from the future application of the [defendant's] policy."). And as a prudential matter, absent Rule 23(b)(2) certification, they lack standing to represent the absent unnamed class members. [28] *United Food and Commercial Workers v. Brown Group,* 517 U.S. 544, 557, 116 S.Ct. 1529, 1536, 134 L.Ed.2d 758 (1996) (" '[T]he general prohibition on a litigant's raising another person's legal rights' is a 'judicially self-imposed limit on the exercise of federal jurisdiction,' not a constitutional mandate.") (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). In short, plaintiffs lacked standing to obtain the sort of declaratory and injunctive relief Title VII provides an employee class under Rule 23(b)(2)—the broad scope of relief Congress envisioned in enacting section 707(a) of the Civil Rights Act of 1964. [29]

The prudence of the general prohibition on third-party standing is particularly acute in the employment discrimination context. When a complaint appears, as here, to constitute a class action, the statute of limitations is tolled as of the date the complaint is filed, and it remains tolled until the court rejects class certification or the case comes to an end. *See American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 552–53, 94 S.Ct. 756, 765–66, 38 L.Ed.2d 713 (1974). Potential class members need to know where they stand; are they to become members of a certified class, or must they proceed with their own lawsuits? May they piggyback on the named plaintiffs' EEOC charges, or must they file their own? *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975).

Most important, perhaps, are the potential res judicata and collateral estoppel issues that would arise if the law permitted **\*969** an individual to prosecute a pattern or practice claim without formally representing all similarly-situated employees. As it stands, if a class is certified and the employer prevails on the pattern or practice issue, unnamed class members would be barred by res judicata from asserting the pattern or practice claim in a separate proceeding, even though they might retain their individual disparate treatment actions against the employer. If a class is not certified and the employee prevails, however, whether the unnamed class members would be barred by the doctrine of issue preclusion from proceeding against the employer would be problematical.

Here, plaintiffs sought declaratory and injunctive relief in their complaint, thus appearing to represent that they were prosecuting a pattern or practice claim on behalf of CCBCC's black non-supervisory employees at the Mobile facility. But they did not ask the court to certify the class. The court therefore assumed—and we speculate here because the record is silent on the point—that plaintiffs did not intend to seek certification, and entered an order, on CCBCC's first Rule 12(c) motion for judgment on the pleadings, holding that plaintiffs could not prosecute their pattern or practice claim as if they were prosecuting a class action under Rule 23(b)(2). Finally, by the time the court took CCBCC's motion for summary judgment under advisement, plaintiffs had all but formally abandoned their prayer for declaratory and injunctive relief on their pattern or practice claim. In sum, the district court did not err in dismissing plaintiffs' pattern or practice claim *qua claim.* [30]

2.

Anticipating our holding, plaintiffs argue that the pattern or practice allegations and the evidence they presented in support thereof were intended to perform two functions in addition to serving as the basis for an independent, free-standing claim: (1) to avoid the Title VII and § 1981 time-bars, and (2) to shift to the employer, as wrongdoer under both statutes, the burden of proving that its refusal to hire them as supervisors was not made in pursuit of its unlawful pattern or practice, but was made instead for a race-neutral reason. [31] We do not reach the second function because the **\*970** district court denied relief on plaintiffs' hiring claims on the ground that they were time-barred. [32] We do, however, reach the first function and determine the time-bar issues.

III.

[12]  Plaintiffs contend that CCBCC's pattern or practice of race discrimination constituted a "continuing violation." [33]  Accordingly, they argue, neither Title VII's 180–day limitations period nor § 1981's borrowed statutes of limitations—two years for hiring and four years for light work assignments—bars recovery for a hiring or light work event that occurred prior to these limitations periods. The district court held that these

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 653 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

events constituted discrete acts of discrimination, and therefore were subject to the relevant time bars.

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), involved claims by a former employee that his employer had engaged in discrete acts of race discrimination and retaliation and had maintained a racially hostile work environment. The Supreme Court held that if the act gives rise to a cause of action under Title VII, then it is subject to Title VII's 180–day limitations period. *Id.* at 114–15, 122 S.Ct. at 2073. The acts the employee complained of were actionable and occurred prior to the 180–day period, so they were barred. As for the hostile work environment claim that spanned the 180–day period, the Court held the claim actionable, even though some of the acts establishing the claim occurred outside that limitations period. *Id.* at 117, 122 S.Ct. at 2074.[34] This court has applied *Morgan*'s teaching to claims under § 1981 as well as Title VII. *Shields v. Fort James Corp.,* 305 F.3d 1280, 1282 (11th Cir.2002).

In this case, CCBCC's hiring decisions, light work assignments, and alleged retaliation constituted discrete acts, not acts that were part of a hostile work environment. In that plaintiffs' pattern or practice allegations could not avoid the Title VII and § 1981 time-bars applicable to these acts, the district court did not err in treating such acts as discrete acts under *Morgan* and in holding some of them time-barred.[35] What remains for our decision is **\*971** whether the court erred in holding three Title VII hiring claims time-barred and in rejecting on the merits three § 1981 light work claims, one of which was brought under Title VII as well, and two § 1981 retaliation claims.[36] In the next part, we **\*972** take up the three hiring claims. We also consider whether the court should have recognized sixteen hiring claims not explicitly asserted in plaintiffs' complaint but mentioned in memoranda plaintiffs filed in opposition to CCBCC's motion for summary judgment.[37]

### IV.

### A.

Plaintiffs Melvin Davis and Terry Jackson contend that the district court erred in holding their hiring claims

time-barred. Davis's claim is based on the hiring of John Gilbert, a white employee, to the position of Bulk Supervisor in "March of 2000."[38] Jackson has two claims: the first is based on the hiring of David Presnall, as Production Supervisor, in March 2000; the second is based on the hiring of Paul Schum, as Production Scheduler, in July 2000. Both Presnall and Schum are white. We consider these claims in sequence.

Davis's problem is that plaintiffs' opening brief does not challenge the Gilbert hiring at all. There is no mention of Davis's claim in the brief's Statement of Issues, Statement of Case, or Argument. The only mention of Davis by name is in the brief's Statement of Facts, in footnote 3, which repeats the complaint's allegation that "[i]n March 2000, John Gilbert, a white male, was promoted to a position as Bulk Account Manager." Appellants' Br. at 11, n. 3. CCBCC's answer brief says nothing at all about the Gilbert hiring. Plaintiffs' reply brief, though, devotes an entire section to the John Gilbert hiring in March 2000 to the position of Bulk Accounts Manager. The reply brief states for the first time that all of the plaintiffs, which necessarily would include Davis, "established a *prima facie* case" regarding Gilbert's March 2000 hiring (which was within Title VII's 180–day limitations period). Appellants' Reply Br. at 17.

**[13]**  It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned. *Asociacion de Empleados del Area Canalera v. Panama Canal Comm'n,* 453 F.3d 1309, 1316 n. 7 (11th Cir.2006). And presenting the argument in the appellant's reply does not somehow resurrect it. *Id.;* **\*973** *Lovett v. Ray,* 327 F.3d 1181, 1183 (11th Cir.2003). The district court denied Davis's claim as time-barred. We affirm the court's decision not on the ground that the claim is time-barred, but on the ground that the claim has been abandoned. We proceed now to a consideration of Jackson's claims.

**[14]  [15]  [16]**  In granting CCBCC summary judgment, the district court made no mention of Jackson's claims concerning the Presnall and Schum hirings. Rather, the court disposed of them *sub silentio* in stating that all of plaintiffs' hiring claims were time-barred.[39] Jackson argues that the two claims—both arising during Title VII's 180–day limitations period—were timely. CCBCC, in its answer brief, admits that the claims are timely. Appellee's Br. at 32. The question thus becomes whether

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 654 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

we remand Jackson's claims to the district court for further proceedings on the merits, or exercise our discretion to affirm the court's disposition of the claims on a ground the court did not explicitly consider. [40] *See United States v. Simmons,* 368 F.3d 1335, 1342 (11th Cir.2004) ("[W]e have the authority to affirm the district court, even if it is on a ground other than that upon which it based its decision."). We have examined the record and cannot say with confidence that Jackson's claims, viewed within the *McDonnell Douglas* framework, fail as a matter of law. [41] We therefore remand them to the district court for further proceedings.

**B.**

Plaintiffs fault the district court for summarily rejecting some sixteen hiring claims that were set out and argued in the memoranda they filed in opposition to CCBCC's motion for summary judgment, but were not explicitly pled in their complaint. The hirings at issue are the Presnall and **\*974** Schum hirings in March and July 2000, respectively. [42] The court rejected the claims with this cursory statement: "[t]o the extent plaintiffs seek to include additional [hiring] decisions not identified in the complaint, those additional claims are not properly brought in this action."

**[17]   [18]   [19]** Federal Rule of Civil Procedure 8(a) (2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The point is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). To that end, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002), it must provide "enough factual matter (taken as true) to suggest" intentional race discrimination. *See Twombly,* 127 S.Ct. at 1965. [43]

**[20]**   Plaintiffs argue that their complaint sufficiently pled sixteen individual claims—two for each plaintiff

(other than Jackson)—based on the Presnall and Schum hirings. The closest the complaint ever comes to pleading those sixteen claims, however, is when it states plaintiffs were "denied promotions ... and treated differently than similarly situated white employees solely because of [ ] race." That statement epitomizes speculation and therefore does not amount to a short and plain statement of their claim under Rule 8(a). *See id.* at 1964.

Plaintiffs attempt to get around this pleading problem by pointing out that, as alleged in their complaint, they could not cite discriminatory hirings of which they were unaware at the time the complaint was filed; therefore, the Presnall and Schum hirings could not have been cited as having been wrought by CCBCC's secretive hiring policy, which prevented them from knowing when a supervisor was hired. The best they could do, their argument goes, was allege discrimination as to the hirings of which they were actually **\*975** aware and state generally that they were discriminated against as to other, unknown hirings as well. Once they learned about the Presnall and Schum hirings, they were diligent in bringing those hirings to the court's attention, having done so in their responses to CCBCC's motion for summary judgment. [44] They urge that this satisfies the demands of Rule 8(a).

Plaintiffs also point out that they should not be expected to plead in their complaint more facts than necessary to satisfy their a prima facie case under *McDonnell Douglas.* Because a Title VII individual discrimination "prima facie case is designed to include only evidence that is *objectively verifiable* and either easily obtainable or within the plaintiff's possession," *Vessels v. Atlanta Independent School System,* 408 F.3d 763, 769 (11th Cir.2005), they should not be required to plead a claim based on a hiring unknown to them.

Plaintiffs' position is unavailing because plaintiffs possessed information about the Presnall and Schum hirings before they filed their complaint. The complaint cites those hirings but only in the context of Jackson's claims. If, as the remaining plaintiffs now contend, they would have applied for those supervisory positions had they known about them, the complaint should have alleged that and claimed that the hirings were discriminatory as to them. [45] It is clear, however, that no plaintiff other than Jackson brought claims based on the Presnall and Schum hirings.

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 655 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

## V.

Leander Foster and Warren Law argue that the district court erred in granting summary judgment denying on the merits their § 1981 claims of disparate treatment in CCBCC's denial of their requests for light duty. [46] Frederick Watson argues that the court erred in denying three claims. First, CCBCC refused his request for light work on account of his race. Second, CCBCC retaliated against him for filing an EEOC charge on August 1, 2000, by downgrading his job assignment in January 2001. Third, CCBCC discharged him in April 2001 for filing the August 1, 2000 EEOC charge and because of his race. The first claim was timely under § 1981 but not under Title VII; the second claim was not pled in the complaint but would have been timely under § 1981; and the third claim was timely under both § 1981 and Title VII. We first address Foster's and Law's arguments, then Watson's.

### A.

**[21]**  The district court denied Foster's and Law's light duty claims because they failed to establish two elements of a prima facie case under *McDonnell Douglas:* (1) that light work was available at the time they requested it, and (2) that the work was given to a similarly situated white employee. As evidence that the court erred as to the first element, they cite the EEOC "Determination[s]," attached to the complaint as Exhibits B and E, which state: "A union representative states that there is always enough work available to  **\*976**  allow for light duty assignments." [47]  We assume that the court took this statement into account and that it amounted to proof that light work was available at the time Foster and Law needed it. Their problem is that, as the collective bargaining agreement stipulated, an employee could not be given light work unless it was within his medical restrictions. The complaint does not allege that light work was available within their medical restrictions; nor did Foster or Law respond to CCBCC's motion for summary judgment with proof that it was. As the district court stated in its order granting summary judgment:

> [Plaintiffs] do not cite evidence concerning the nature or duration of their own medical limitations or compare those limitations to those of any of the

white co-employees who allegedly were given light duty assignments. They do not identify the types of light duty assignments they might have been able to perform nor offer evidence that any light duty work within their limitations was available at the time of their injuries.

It requires no citation of authority to conclude, as the district court did, that Foster and Law failed to establish their light work claims.

### B.

#### 1.

**[22]**  The district court denied Watson's light work claim without explication. The complaint describes the claim with the following language:

> On or about July 26, 1999, Watson suffered an on the job injury which required medical attention. Shortly after being injured, Watson requested to return to work on light duty status. [CCBCC] denied Watson's request on the basis that there were no light duty positions available. CCBCC has allowed several white employees who have sustained similar or worse injuries to return to work in a light duty status. Because Watson was not allowed to return to work in a light duty status, he was forced to apply for workers' compensation benefits, which only equaled sixty-five percent of his regular salary.

This claim was not time-barred; [48] thus, we assume that the court considered the claim on its merits and found it patently frivolous and therefore unworthy of comment.

Watson was injured while engaged in his Bulk Account Manager duties. [49]  Between  **\*977**  July 26, 1999, and the termination of his employment with CCBCC on April 17, 2001, Watson was attended to in Mobile by American Family Care and eight physicians of varying specialties. Watson returned to work in early August 1999, and continued working as a Bulk Account Manager—at his regular pay of $959 per week—with the aid of an assistant, who performed the tasks Watson could no longer handle.

This arrangement lasted until late October 1999. After that, and for a two week period, he was engaged in training a relief salesman. While doing this, he was paid as a Senior Salesman.

Watson's light work claim fails because, during the time he says he should have been given light work, he was back at work as a Bulk Account Manager, albeit with the assistance of a helper who did the things his disability precluded him from doing. By late October 1999, his ability to continue was doubtful, and by January, his physicians concluded that he was totally disabled, on a temporary basis. We find no basis in the record for vacating the court's judgment on this claim and remanding it for submission to a jury.

### 2.

**[23]** Watson claims that CCBCC retaliated against him —because of the EEOC charge he had filed on August 1, 2000—after he returned to work in January 2001. The retaliation consisted of what he labels "downgrading" his job assignment. CCBCC referred to it as light work because it fit his medical restrictions. The district court denied the claim on the ground that the complaint did not present it. Alternatively, the court found the claim meritless (1) for lack of a causal connection between the filing of the EEOC charge and the downgrading assignment in January and (2) because EEOC had a lawful reason for the job assignment. We agree with the district court that the claim fails on both grounds.

Plaintiffs' opening brief points to nothing in the complaint that reasonably could be read to allege this claim. Rather, the brief only addresses the merits of the claim, as if it had been well pled, and the record contains some evidence of the circumstances surrounding Watson's return to work.

In January 2000, Watson's physicians found him totally disabled. For fifty-two weeks, he was out of work, drawing temporary total disability workers' compensation benefits at the rate of $550 per week. He remained on temporary total disability until January 2001. By that time, according to his physicians, he had reached maximum recovery, with a permanent partial disability rating, as indicated in the margin. [50] He returned to work early that month under permanent restrictions: "No lifting or pulling in excess of 15 pounds on a frequent basis. No lifting or pulling in

excess of 30 pounds on an infrequent basis. No carrying in excess of 25 pounds with right arm. No carrying in excess of 15 pounds with left arm." [51] CCBCC assigned Watson temporary work that accommodated these restrictions. The work included, in his words, "scrubbing [soft drink] coolers." He scrubbed them "in the mall [and] at high schools on [his] hands and knees." He considered this work demeaning and **\*978** claims he was assigned to it in retaliation for having filed the EEOC charge on August 1, 2000, while he was out of work drawing temporary total disability benefits.

**[24]** **[25]** **[26]** **[27]** Employing the framework for deciding retaliation claims under Title VII (which governs retaliation claims under § 1981), [52] the court rejected Watson's retaliation claim on two grounds: (1) the filing of the EEOC charge was too remote to his return to work five months later to establish causation, and (2) CCBCC's reason for assigning Watson to the work at issue—that the decision was based on Watson's medical disability—was legitimate and unrebutted. Assuming for our purposes here that whether the filing of the charge was causally related to the work assignment presents an issue of fact sufficient to withstand summary judgment, we are convinced that CCBCC's unrebutted reason for the assignment is unassailable.

### 3.

**[28]** Watson claims that his discharge on April 17, 2001, was in further retaliation for having filed the August 1, 2000 EEOC charge and because of his race. The complaint states that

> On April 27, 2001, Watson was terminated allegedly because there were no positions available for him to fill with his physical limitations. During this same period, three less senior white employees received sales positions that Watson was qualified for and could have performed .... Watson was terminated in retaliation for his earlier opposition to race discrimination [, i.e., terminated for filing the EEOC charge on August 1, 2000].

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 657 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

The complaint contains nothing at all that reasonably could be read as an allegation that CCBCC terminated Watson's employment due to race. The district court, in its order granting summary judgment, therefore said nothing about Watson having alleged that his firing was racially motivated. The court did, however, recognize Watson's claim that the firing was retaliatory.

The court held the claim legally insufficient for the same reasons it rejected Watson's claim that the January 2001 downgraded assignment was retaliatory: lack of causation and a lawful, unrebutted reason for the termination. As for the latter claim, CCBCC reasonably concluded that work that Watson could perform given his medical restrictions was unavailable and **\*979** that it was not required—under Title VII—to create a job that would accommodate his limitations. [53] As a consequence, since the retaliatory downgrading claim fails for lack of proof, it follows that the employment termination claim fails as well.

VI.

A.

If the framers of the Federal Rules of Civil Procedure could read the record in this case—beginning with the plaintiffs' complaint and CCBCC's answer and continuing to the district court's final order granting CCBCC summary judgment—they would roll over in their graves. In fashioning the Rules, they assumed that complaints would be drafted as clearly and definitively as possible, so that the defendant could understand the cause(s) of action the plaintiff was asserting and frame a responsive pleading, and the district court, having a clear and definitive response before it, could recognize the parties' claims and defenses, identify the issues of fact to be litigated, and proceed to a just result. The framers also assumed that the lawyers appearing before the district courts would adhere to the standards of professional responsibility and conduct, and that, as officers of the court, would be aware that the federal courts constitute a scarce resource for resolving disputes and that their failure to adhere to these standards would likely yield countless untoward, and totally unacceptable, consequences.

This case confounds these assumptions. The complaint is a model "shotgun" pleading of the sort this court has been roundly, repeatedly, and consistently condemning for years, long before this lawsuit was filed. [54] And the defendant's answer is no better. Both pleadings were drafted by AV rated law firms whose appearances in district courts of this circuit, and in this **\*980** court, have been ubiquitous. [55] The steps counsel took in litigating their respective clients' interests—the pleading strategies they employed—were not taken out of ignorance; they were deliberate, calculated.

Plaintiffs' complaint, first amended complaint, and second amended complaint are nearly identical, each containing three counts. In part I.B, *supra,* we quoted from Count I what plaintiffs were contending: race discrimination in "pay, raises, benefits, ability to advance, and right to be free of racial discrimination, harassment and intimidation, and other terms and conditions of employment," [56] all in violation of Title VII. This all-encompassing discrimination gave the eight named plaintiffs (and the unnamed members of their class) untold causes of action, all bunched together in one count contrary to the requirements of Federal Rules of Civil Procedure 10(b). [57] With one exception—the "ability to advance," which became the foundation for plaintiffs' "promotion" claims—Count I failed explicitly to link a particular plaintiff to a particular cause of action. Count II incorporated the allegations of Count I and added nothing new except to allege that "[t]he effect of the defendant's discrimination as outlined [in Count I] has been to deprive the plaintiffs of the same right to make and enforce contracts as is enjoyed by similarly-situated white persons in violation of 42 U.S.C. § 1981 and 1981(a)." Thus, as in Count I, there was nothing in Count II to indicate which plaintiff possessed which cause(s) of action. [58]

No competent lawyer—whether skilled in Title VII litigation or not [59]—could compose **\*981** an answer to these sweeping and multifaceted acts of discrimination that would be in keeping with what the framers of the Rules envisioned in fashioning Rule 8(b). [60] Yet, CCBCC's attorneys framed one. They used the same shotgun strategy plaintiffs had employed. Their answer contained fourteen defenses. The first defense responded to the complaint paragraph by paragraph, admitting or denying the allegations thereof. The second through the

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 658 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

fourteenth defenses were affirmative defenses, and except for the seventh defense, consisted of only one sentence. These affirmative defenses did not respond to specific causes of action, because the drafter of the answer could not identify the specific causes of action each named plaintiff was purporting to allege. Consequently, the affirmative defenses referred to none of these plaintiffs by name. [61]

Faced with these pleadings, how the district court could have made heads or tails out of plaintiffs' allegations, and which affirmative defenses applied to which causes of action, is beyond us. It took several rounds of pleadings, namely CCBCC's Rule 12(c) motions and the parties' memoranda (dealing with those motions and responding to court orders requesting briefing on other points) for the court even to begin the process of narrowing the issues. In the end, as our preceding analysis of plaintiffs' arguments discloses, the court missed some claims altogether. [62] Plaintiffs could have brought this to the court's attention via a motion to alter or amend judgment, [63] but chose, instead, to stand pat and leave the matter to us. [64]

### B.

The unacceptable consequences of shotgun pleading are many. First, and perhaps foremost, shotgun pleading inexorably broadens the scope of discovery, much of which may be unnecessary. [65] Who benefits from that? Certainly not the defendant, especially if it compensates its counsel by the hour. Certainly not the plaintiff—unless his lawyer is trying to **\*982** attach some value to a frivolous claim. In time, the defendant will ask: "when is all of this to end?" Unless the court has intervened and required the attorneys to replead the case, unless the court has definitively identified the parties' claims and defenses and has squeezed the case down to its bare essentials, defense counsel will be unable to give the client an accurate answer. Plaintiffs' counsel knows this, of course, and that the defendant will want out of the case, to settle. So, the case settles, and the shotgun complaint has performed its designed service. So has defense counsel's acceptance of the shotgun complaint as an appropriate pleading. As we have observed,

Litigating a case framed by shotgun pleadings obviously harms one or both of the parties. Why, then, would a lawyer engage in shotgun pleading? Plaintiffs file shotgun complaints and include frivolous claims to extort the settlement of a meritorious claim; worse yet, they file shotgun complaints to extort the settlement of unmeritorious claims .... Extortion cuts both ways. Depending on his financial resources, a defendant may use a shotgun answer to obtain a settlement that waters down a meritorious claim. In either situation, the extorted settlement provides a financial benefit to the "prevailing" party and a windfall in the form of fees for the "prevailing" lawyer.

*Byrne v. Nezhat,* 261 F.3d 1075, 1130 (11th Cir.2001) (footnotes omitted).

Second, in addition to delaying a just disposition of the case at the undue expense of one or both of the parties, shotgun pleadings, if tolerated by the court, lessen the time and resources the court has available to reach and dispose of the cases and litigants waiting to be heard. [66] This is especially harmful to those who have no other forum for the vindication of their rights.

Third, shotgun pleadings wreak havoc on appellate court dockets. The case at hand is Exhibit A. Due to the nebulous pleadings in this case and the district court's failure to strip the case down and identify each claim and defense, we had to undertake that task from scratch. The briefs and oral argument were of no use until we scoured the record—including the memoranda the parties gave the district court in support of or in opposition to CCBCC's motions for judgment on the pleadings and, subsequently, for summary judgment—to determine whether what the parties stated in their respective briefs was accurate.

The unvarnished truth is that this court puts no credence in briefs written against a backdrop of a case disposed of on shotgun pleadings. We sift through the record for anything that will corroborate a brief's representation; it is not until that task is finished that we look to the briefs for assistance—namely, to determine whether the appellant has preserved the issues its opening brief presents. In this case, after searching the record, we were able to discard much of it as pure waste and thus **\*983** substantially reduce the length of this opinion. Had we not approached the appeal in this manner, there is no telling how many mistakes we might have made in identifying plaintiffs'

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 659 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

claims, the district court's treatment of those claims, and the issues plaintiffs preserved for appeal.

Fourth, the mischief shotgun pleadings causes undermines the public's respect for the courts—the ability of the courts to process efficiently, economically, and fairly the business placed before them. [67] At an increasing rate, civil litigants are avoiding the federal district courts; they go elsewhere, to other fora, for the resolution of their disputes, especially complicated commercial disputes. [68] The district courts' civil caseloads reflect this. The contemporary litigation culture has effectively reduced the federal court civil dockets, nationwide. [69] This is not surprising. The exponentially increasing transaction costs the parties must bear in order to resolve their civil disputes in the federal district courts is driving litigants away, especially those involved in complex commercial matters. This has a negative effect on the development of the rule of law in the federal courts. When issues that ought to be presented to the courts for clarification, and to stabilize the rule of law, are removed to non-judicial fora for resolution, the public bears the cost—in the form of more litigation and a judiciary unable to handle it.

Fifth, in Title VII cases, shotgun pleadings undercut the purpose of Congress's enactment of Title VII—to bring peace and equity to the workplace. It requires no subtle analysis to conclude that the wrangling and pure bitterness these pleadings engender does not foster good employer-employee relationships.

### C.

[29]   [30]   What happened in this case was easily avoidable—by a straightforward application of the Rules of Civil Procedure. First, defense counsel, faced with a complaint purporting to combine in one count multiple claims of eight plaintiffs, should have moved the court for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). [70] The court **984** would have granted the motion—"[w]here, as here, the plaintiff asserts multiple claims for relief, a more definite statement, if properly drawn, will present each claim for relief in a separate count, as required by Rule 10(b)." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 366 (11th Cir.1996). But counsel chose to reply in kind—by fashioning affirmative defenses that failed to

respond explicitly to the specific claims plaintiffs were independently asserting. In light of defense counsel's failure to request a repleader, "the court, acting sua sponte, should have struck the plaintiff's complaint, and the defendants' answer, and instructed plaintiff's counsel to file a more definite statement." *Id.* at 367. The necessity for doing so should have become starkly apparent on reading the complaint. [71]

[31]   The need for intervention was necessary for another reason, apart from the mess the shotgun pleadings were creating: plaintiffs' initial complaint, like its successors, appeared to allege a class action. Where a complaint alleges that the employer is engaging in a pattern or practice of race discrimination against a class of similarly situated employees and seeks declaratory and injunctive relief, the court must determine without delay whether plaintiffs are bringing a Rule 23(b) class action or not. [72] The rights of the putative unnamed class members may be affected—one way or another. In this case, had the court inquired of plaintiffs' counsel, and counsel stated that plaintiffs were not bringing a class action, the court would have entered an order stating explicitly that the case was not being prosecuted as a class action. [73] This would have informed the putative class members that if they had any claims against CCBCC, they would have to pursue them on their own.

### D.

[32]   [33]   Title VII authorizes the court to award "a reasonable attorney's fee" to the prevailing party in a Title VII case. [74] This authority extends to the court of appeals. Here, CCBCC is the prevailing party with the exception of two of Jackson's claims, which are being remanded for further proceedings. As to those claims, Jackson is the prevailing party. Given the manner in which both sides chose to litigate this case in the district court, a strategy that complicated our task to no end, we will deny a request for attorney's fees from either side.

### **985** VII.

For the reasons we have stated, the judgment of the district court is affirmed as to all claims except the two Terry Jackson claims we remand for further proceedings.

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 660 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

AFFIRMED, in part; VACATED, in part; and REMANDED.

**All Citations**

516 F.3d 955, 102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096, 21 Fla. L. Weekly Fed. C 384

Footnotes

\*    Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

1    Plaintiffs' complaint alleges "across-the-board" employment discrimination, *see e.g., Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 156–61, 102 S.Ct. 2364, 2370–72, 72 L.Ed.2d 740 (1982), and prays for declaratory and injunctive relief, back pay, and compensatory and punitive damages and demands a trial by jury.

2    This suit has had a convoluted history. Plaintiffs began it by filing a complaint in the district court on August 19, 2002, while the charges of discrimination they had filed with the Equal Employment Opportunity Commission ("EEOC") were still pending. Their original complaint contained the essence of the Title VII claims (which were not ripe) and the § 1981 claims now before us. Plaintiffs amended their complaint shortly after bringing suit, the defendant moved to dismiss it pursuant to Fed.R.Civ.P. 12(c), and the court granted the motion in part in November 2002. Nothing in the court's order, the amended complaint, or the defendant's Rule 12(c) motion is germane in this appeal. On January 3, 2003, the EEOC issued right-to-sue letters to seven of the nine plaintiffs, and on March 23, 2003, plaintiffs filed their second amended complaint. The issues here were framed by that complaint and the defendant's answer. Unless otherwise indicated, the complaint we refer to in this opinion is the second amended complaint, which we label the complaint.

3    These motions were, in the main, CCBCC's motions for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c).

4    Throughout this litigation, the parties and the district court have referred to the hiring of supervisors as "promotions." These employment decisions are not, either factually or legally, promotions; they are hirings, as indicated in part I.A, *infra.* CCBCC hires someone—a union member or a person from outside the company—to fill a management position that is clearly non-union. We therefore consider, and refer to, plaintiffs' "promotion" claims as hiring claims brought under Title VII and § 1981.

5    The court held some of plaintiffs' claims insufficient on CCBCC's motions for judgment on the pleadings, *see* Fed.R.Civ.P. 12(c), filed in response to plaintiffs' complaint and amended complaint. The complaint pertinent to this appeal is plaintiffs' second amended complaint. *See supra* note 2. We do not address these Rule 12(c) rulings because the claims those rulings held insufficient were re-alleged in the second amended complaint and were rejected either expressly or implicitly by the district court's order granting CCBCC's motion for summary judgment.

6    As explained in Part V.B.2, *infra,* the court dismissed one of Frederick Watson's retaliation claims because it was not pled in the complaint, but held alternatively that the claim failed as a matter of law.

7    Plaintiffs do not appeal the district court's dismissal of their hostile work environment claims, whether brought under Title VII or § 1981, for lack of proof.

8    To simplify discussion, we treat all plaintiffs as current employees unless otherwise indicated.

9    The record suggests that at least some sales positions are compensated, at least in part, by commission on sales.

10    In its answer to plaintiffs' complaint, CCBCC stated, in its ninth defense, that "some" of plaintiffs' claims "may be preempted by Section 301 of the Labor–Management Relations Act, 1947, 29 U.S.C. § 141," and, in its tenth defense, that "[t]hose claims ... that may be preempted by Section 301 ... fail to state claims upon which relief can be granted because they are barred under Section 301 due to Plaintiffs' failure to exhaust the contractual remedies provided for in their collective bargaining agreement." The record contains bits and pieces of evidence, none probative, that some plaintiffs pressed grievances on some unidentified claims, but the questions raised by these defenses were never presented to, or ruled on, by the district court. Hence, the section 301 issues are not before us.

11    Count III, based on Alabama tort law, incorporates Counts I and II and prays for compensatory and punitive damages for, among other things, negligent training and supervision of CCBCC management. Count III is not involved in this appeal.

12    *See* Fed.R.Civ.P. 56. CCBCC filed nine motions for summary judgment, one in response to each plaintiff's claims. For our purposes, these motions are treated as one motion.

13    The court had dismissed the pattern or practice claim in orders granting CCBCC's motions for judgment on the pleadings. *See supra* note 5. The court dismissed the claim once again on summary judgment, because the claim had been repled and was before the court at that time.

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

14    The court entered its order granting summary judgment on April 26, 2005. The suit had been filed on August 19, 2002. *See supra* note 2.

15    As indicated at note 7, *supra,* the hostile work environment claims are not involved in this appeal.

16    This right belonged to the Attorney General until it shifted to the EEOC on March 24, 1974. 42 U.S.C. § 2000e–6(c). Now the EEOC, upon reasonable cause, may sue private entities, and the Attorney General may sue governmental entities. 42 U.S.C. § 2000e–5(f)(1).

17    The Supreme Court noted long ago that "[t]he 'pattern or practice' language in § 707(a) of Title VII was not intended as a term of art." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977) (internal citation omitted). Regardless of what Congress may or may not have intended, the phrase has come through common usage to represent the sum total of the evils Congress intended to attack in § 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a). *See, e.g., Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876–77, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984). We use it thus.

18    A pattern or practice claim may be brought under § 1981 as well as Title VII, in which case Title VII's substantive rules inform the § 1981 rules of decision. *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1109 n. 4 (11th Cir.2001). In 1991, Congress amended § 1981—through the enactment of The Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 1981)—to enable plaintiffs to recover compensatory and punitive damages and to demand a trial by jury. Thus, in an employment discrimination suit brought, as here, under Title VII and § 1981, a plaintiff can obtain, in addition to declaratory and injunctive relief under both statutes, back pay under Title VII and § 1981, and compensatory and punitive damages under § 1981. The maintenance of a Rule 23(b)(2) class action for all the relief these two statutes together afford is problematical. *See Cooper v. Southern Co.,* 390 F.3d 695 (11th Cir.2004).

19    In particular, a plaintiff must claim facts consistent with the constitutional standing requirements. *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997) ("[The] irreducible constitutional minimum of standing requires: (1) that the plaintiffs have suffered an injury in fact—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)) (quotations omitted).

20    Rule 23(a) reads:

       One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

       Fed.R.Civ.P. 23(a).

21    Claims of individual class members might be tried together to the extent that they presented common issues of fact and the court deemed it efficient to try the claims as a group in order to avoid inconsistent fact findings on the same evidence.

22    A caveat to this statement is that if the court finds the alleged pattern or practice to have been maintained, but does not issue an injunction because the likelihood that the practice will continue is nil, the court may enter a declaratory judgment, and the case will proceed to the second stage as if injunctive relief had been entered as well.

23    On this point, our opinion in *Reynolds v. Roberts,* 202 F.3d 1303 (11th Cir.2000) (*Reynolds I*), is instructive. In that case, three classes of plaintiffs challenged the employer's discriminatory policies. *Id.* at 1306. After the beginning of trial, but before the district court made a finding on the issue of liability, the parties entered into settlement negotiations that ultimately resulted in a series of consent decrees. *Id.* at 1307. The court treated a consent decree as an admission of liability on the part of the employer, and ordered it to pay individual damages to certain class members without requiring each member to make out an individual case of discrimination. *Id.* at 1311. We did not agree that the consent decree established the employer's liability and held that "the members of the three plaintiff classes must prove that the [defendant] discriminated against them on account of their race when it failed to hire or promote them ... [and a] member will establish a prima facie case of racial discrimination if he or she satisfies the *McDonnell Douglas* test." *Id.* at 1319.

24    Plaintiffs contend that our holding in *Cox,* 784 F.2d 1546, stands as precedent for the proposition that an individual plaintiff, not preceding as a class representative, may bring a pattern or practice claim. Their opening brief says that in *Cox* this circuit held that "individual plaintiffs have the same substantive right to root out a pattern and practice of employment discrimination as do class plaintiffs." Appellant's Brief at 25.

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

Plaintiffs misconstrue *Cox,* which was a class action case, albeit an odd one. The district court de-certified a class but found as a matter of fact that the defendant employer perpetuated a discriminatory policy. *Id.* at 1558–59. We reversed the court's de-certification order, *id.* at 1558, and explained that the proposed class satisfied the requirements for certification because the members were similarly situated and therefore "were entitled to the presumption that the complained-of employment practices violated Title VII." *Id.* at 1559. The panel never said that Title VII entitles an individual plaintiff to seek declaratory or injunctive relief against a class-wide pattern or practice of discrimination.

25    The EEOC, as amicus curiae, agrees, and argues that a pattern or practice claim may be brought as an individual action or a class action as the plaintiff chooses.

26    This is true as to Count I, which seeks relief under Title VII, and Count II, which incorporates Count I and seeks relief under § 1981. Thus, in this subpart, we do not differentiate between the two counts.

27    In the case at hand, none of the plaintiffs has alleged that he will likely be denied a specific hiring, i.e., that a supervisory vacancy for which he would be qualified will become available at some future date. Whether this scenario is likely to occur is pure speculation.

28    This point is made clear by the holding in *Franks v. Bowman,* 424 U.S. 747, 755–56, 96 S.Ct. 1251, 1259–60, 47 L.Ed.2d 444 (1976). A class representative can have standing to continuing prosecuting a class action for relief on behalf of the class members even though he has settled his claim against the defendant and his own case is therefore moot.

29    Plaintiffs contend that the Rules Enabling Act, 28 U.S.C. § 2072, effectively forecloses the district courts from denying the right of a plaintiff to bring a pattern or practice claim individually, rather than as a class action representative. The Act prohibits the use of a procedural rule to "abridge, enlarge, or modify a substantial right." 28 U.S.C. § 2072(b). In plaintiffs' view, requiring a plaintiff to bring a pattern or practice claim as a class representative—or not at all—abridges the individual plaintiff's substantive right under Title VII to be free from a pattern or practice of discrimination based only on the technical requirements of Rule 23. What we have said in the preceding text indicates why a plaintiff cannot prosecute a pattern or practice *claim* alone. When proceeding alone, the plaintiff lacks third-party standing to represent the absent class members, and unless he can demonstrate a genuine likelihood that the pattern or practice will continue and deprive him of a protected right, he lacks constitutional standing.

30    Several of our sister circuits have already recognized the prudence of limiting a private pattern or practice claim to certified class actions. *See Bacon v. Honda,* 370 F.3d 565, 575 (6th Cir.2004); *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760–61 (4th Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 711 (2d Cir.1998).

31    Under the *McDonnell Douglas* framework, as described *infra,* once a plaintiff has established a prima facie case that the challenged employment decision was motivated by an intent to discriminate, the *burden of producing* a non-discriminatory reason for the decision is shifted to the employer, but the *burden of proving* that the non-discriminatory reason was the reason for the challenged action is not. In other words, the burden of proof on the issue of whether the employer was guilty of unlawful discrimination remains with the plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). By contrast, plaintiffs wanted to establish the alleged pattern or practice in order to shift the burden of proof on the motivation issue to CCBCC at trial. *See Teamsters,* 431 U.S. at 359, 97 S.Ct. at 1866. Thus, at trial, if plaintiffs introduced evidence showing that they and their similarly situated co-employees were all qualified for the supervisory vacancies at issue, as they alleged in their complaint, and that CCBCC had engaged in the pattern or practice alleged, they would have been able to withstand a defense motion for judgment as a matter of law made at the close of the evidence, and the court would have instructed the jury that, if it found the pattern or practice alleged, CCBCC had the burden of proving that the challenged employment decision was not made pursuant to such pattern or practice.

32    As we indicate in Part IV.A, *infra,* the court erred in dismissing three of the hiring claims as time-barred under Title VII. Since we have the authority to affirm a district court's judgment on a ground not reached by the court, we affirm the court's rejection of one of the hiring claims on the ground that the claim has been abandoned. Given the muddled record concerning the two other claims, we decline to consider affirming on a ground the court did not reach.

33    Plaintiffs so contend under the assumption that their pattern or practice claim was properly dismissed *qua claim.* This, however, would not render their pattern or practice evidence irrelevant; it could be used to establish a continuing violation that would avoid the time-bar.

34    The Court explicitly refrained from considering whether the 180–day limitations period, when applied in the pattern or practice class action context, would bar claims of the individual class members based on acts that occurred prior to that limitations period. *Id.* at 115 n. 9, 122 S.Ct. at 2073.

Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (2008)

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 663 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

35    The critical dates for determining whether a claim in this case was time-barred are as follows. The 180–day time-bar for the Title VII hiring, light work, and retaliation claims is measured from the date plaintiffs filed their EEOC charges, August 1, 2000. The discriminatory acts occurring before February 4, 2000, were therefore time-barred under Title VII. The two-year time-bar for the § 1981 hiring claims is measured from the date plaintiffs filed this lawsuit, August 19, 2002. The discriminatory hirings occurring before August 19, 2000, were therefore time-barred under § 1981. The four-year time-bar for the § 1981 light work and retaliatory claims is also measured from August 19, 2002. The light work and retaliatory claims occurring before August 19, 1998, were therefore time-barred under § 1981.

    Given these dates, the district court properly held the following failure-to-hire claims time-barred under both Title VII's 180–day and § 1981' s two-year limitations periods:

    Davis's and Martin's claims arising out of the February 1999 hiring of John Gilbert as Bulk Account Manager;

    Foster's, Fox's, and Law's claims arising out of the August 1, 1999 hiring of Jimmy Hassler; the July 1, 1999 hiring of Wyatt Gerald and the August 2, 1999 hiring of Keith Watson; Jackson's claim arising out of the December 21, 1998 hiring of Sheila Morris as a Training Supervisor;

    Logan's claim arising out of the June 15, 1999 hiring of Kim Welton as a Sales Representative.

    The district court properly held the following failure-to-hire claims time-barred under § 1981's two-year limitations period. The court erred, however, in dismissing them as time-barred under Title VII, as we explain in our discussion in Part IV, *infra*.

    Davis's claim arising out of the March 2000 hiring of John Gilbert.

    Jackson's claims arising out of the March 27, 2000 hiring of David Presnall and the July 28, 2000 hiring of Paul Schum. The district court properly held the following failure-to-assign light work claims time-barred under Title VII's 180–day limitations periods:

    Law's claim arising in June 1999;

    Watson's claim arising on or about July 26, 1999.

36    Plaintiff's opening brief cites claims which, it contends, were pled in the complaint and ignored by the district court in its order granting CCBCC summary judgment. The brief argues that they were sufficient to withstand summary judgment, and asks that they be remanded for trial. We list these claims below, as they appear in the complaint. They were brought under both Title VII and § 1981. They are meritless.

    CCBCC discriminated against black union employees by assigning them to "jobs and routes in black communities and to the more difficult assignments in defendant's bottling and production plants." These jobs were subject to the bidding process prescribed by the collective bargaining agreement. None of the plaintiffs alleged, nor in response to CCBCC's motion for summary judgment did he proffer evidence, that he was assigned such work and, if so, whether he bid for it. CCBCC discharged Lorenzo Martin because of his "race and for his opposition to racial discrimination" on an unspecified date prior to March 28, 2003, the day the plaintiffs filed their second amended complaint. *See supra* note 2. (Plaintiffs' original complaint was filed August 19, 2002, and contains no reference to Lorenzo Martin's discharge.) The Appendix to plaintiffs' opening brief cites, and attaches, the EEOC charge Martin filed on October 4, 2001, complaining of having been discharged on June 16, 2001, and EEOC's Determination regarding the charge. The Appendix states that these two documents were presented to the district court in opposition to CCBCC's motion to summary judgment: the EEOC charge at "R89–1"; and the Determination at "R36–Exh. G", an attachment to the second amended complaint. The record gives no indication that the charge was, in fact, presented to the district court. In the charge, Martin states that he was fired "for allegedly violating company policy in regard to sick days," by not calling his supervisor each day he was absent. "White employees [took] sick leave or other leave without having to notify their supervisor every day they were absent from work." He "believes" that the firing was in retaliation "for filing" his EEOC charge on August 1, 2000. If we err in stating that the charge was not before the district court on summary judgment, the error is of no moment. Martin's self-serving explanation for CCBCC's firing decision lacks probative value. Moreover, his statement about the white employees is rank hearsay and inadmissible for summary judgment purposes.

    CCBCC discriminated against Martin on a date not specified by assigning a white employee, instead of him, to a temporary position for eight weeks. The claim fails for alternative reasons. First, Martin did not defend the claim on summary judgment; he thus abandoned it. Second, the record is undisputed that Martin's supervisor did not want to take him from his route sales job for the temporary assignment because Martin was a "more dependable, and a better salesman" than the white employee, a patently non-discriminatory reason.

    CCBCC discriminated against Warren Law on account of his race when a supervisor told him that the company had a facial hair policy; Law had a short beard due to medical restrictions, which were on file. Law does not contend that he was required to shave his beard; his injury is that he felt threatened. This does not constitute an actionable claim.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 664 of 898

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

CCBCC discriminated against Michael Fox on July 20, 2000, by reassigning him "from the sales route he was working, which is considered a desired position," to "a more physically demanding route" and replacing him with a less qualified white employee. CCBCC, responding to the claim in moving for summary judgment, treated it as part of Fox's claim that CCBCC subjected him to a racially hostile work environment. Fox did not respond to this characterization of his claim; in fact, he did not respond to CCBCC's motion for summary judgment. The court denied it as part of its ruling on plaintiffs' racially hostile work environment claim, a claim not before us in this appeal. *See supra* note 7.

37    We note that after the court entered summary judgment, plaintiffs did not move the court pursuant to Fed.R.Civ.P. 59(e) to alter or amend its judgment so as to address the merits of these twenty-five claims.

38    The complaint states that in "March of 2000, John Gilbert, a white male, was promoted to a position as Bulk Account Manager" and that he "was no better qualified for this position than Davis."

39    In their opening brief, plaintiffs assert that the court failed to rule on Jackson's two claims, which would mean that we do not have a final judgment before us, i.e., "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1368 (11th Cir.1983) (quoting *Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). According to plaintiffs, however, that could not be the case, for, in the Statement of Jurisdiction, the brief states: "Jurisdiction exists as an appeal from a final judgment." Appellant's Br. at 1. CCBCC's answer brief, in the Statement of Jurisdiction, states: "The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291 ... as an appeal from a final judgment." Appellee's Br. at 1. To be sure, a partial final judgment entered pursuant to Fed.R.Civ.P. 54(b) would qualify as a final judgment under § 1291, but the court was not asked to and did not enter a Rule 54(b) judgment in this case. What we have, then, is a final judgment in which the court, in its sweeping statement that all Title VII claims are time-barred, included Jackson's claims *sub silentio.*

40    In its answer brief, CCBCC does not ask us to do this. It simply requests that we affirm the district court's ruling, referring us to their motion for summary judgment and the plaintiffs' consolidated response to the motion.

41    To establish a prima facie case of intentional discrimination, the plaintiff must show that (1) he is a member of a protected class, (2) was qualified and applied for the position at issue, (3) was rejected, and (4) the position was filled by a person outside the protected class. *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 768 (2005). Where, as in this case, the employer uses "an informal [hiring] system in which it does not post openings," *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 533 (11th Cir.1992), the plaintiff makes out a prima facie case by showing that the employer had a reason to think the employee was interested in the position. *See Walker v. Prudential Prop. & Cas. Ins. Co.,* 286 F.3d 1270, 1275–76 (11th Cir.2002). In remanding Jackson's claims to the district court, we intimate no view as to whether the claims are amenable to disposition on summary judgment.

42    The Argument section of plaintiffs' opening brief explicitly identifies the Presnall and Schum hirings, but, as noted in part IV.A, *supra,* makes no mention of the Gilbert hiring of March or April 2000. Accordingly, the Gilbert hiring is not before us.

43    In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court considered the pleading sufficiency of a claim under section 1 of the Sherman Act, 15 U.S.C. § 1. It held that a claim under section 1 of the Sherman Act, 15 U.S.C. § 1, must allege facts suggesting an agreement "in restraint of trade or commerce," and that a bald allegation of parallel conduct that may constitute circumstantial evidence of such an agreement is insufficient without more. *Id.* at 1965–66. We understand *Twombly* as a further articulation of the standard by which to evaluate the sufficiency of all claims brought pursuant to Rule 8(a). In that case, the Court retired the oft-cited standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), saying it "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 127 S.Ct. at 1969. The main Rule 8(a) standard now seems to be whether the "allegations plausibly suggest[ ] ([and are] not merely consistent with)" a violation of the law. *Id.* at 1966.

44    Plaintiffs responded to CCBCC's motion for summary judgment twice: on November 19, 2003, and January 3, 2005.

45    The drafter of the complaint knew how to allege in a non-speculative way specific claims of specific plaintiffs. For example, the complaint presented claims for Foster, Fox, and Law based on the respective hirings of Jimmy Hassler, Wyatt Gerald, and Keith Watson in 1999.

46    Foster brought his claim under Title VII as well as § 1981. Because the standards governing these claims are the same, *Crawford v. W. Elec. Co.,* 745 F.2d 1373, 1376 (11th Cir.1984), we refer to the claim as a § 1981 claim.

47    The record is silent as to whether Foster and Law presented the alleged wrongful denial of light work to the union in the context of a grievance.

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

48  CCBCC's answer brief does not deny that Watson's § 1981 light work claim was timely. Watson brought the claim under Title VII as well, but it was untimely, and plaintiffs' opening brief does not assert the contrary.

49  The injury was covered, as the parties agreed, by CCBCC's workers' compensation insurance and Alabama's Workers' Compensation statute. Ala.Code § 25–5–1 et seq. In early 2000, Watson, represented by counsel not associated with the firm that has represented plaintiffs throughout this litigation, sued CCBCC in the Circuit Court of Mobile County, Alabama, claiming that the injuries he sustained on July 26, 1999, rendered him permanently, partially disabled and seeking compensation therefore. Watson v. Coca Cola Bottling Co. Consol., No. CV–00–3285.51 (Montgomery Cir. Ct.2001). The case was tried to the court on April 9, 2001, and the court entered judgment for Watson on April 17, 2001, finding that he had sustained a permanent "injury to the body as a whole, that he [had] sustained a loss of earning capacity as a result of that injury, and that loss of earning capacity [was] in excess of 34.3%, thereby entitling him to the two hundred twenty dollars ($220.00) per week for the remaining two hundred forth-eight (248) weeks" out of a total of the 300 weeks of disability payments permitted by law. The facts stated in the text following this footnote are drawn for the most part from the circuit court's "Findings of Fact, Conclusions of Law and Judgment" and to some extent from Watson's deposition.

50  See supra note 48.

51  This quotation is taken from CCBCC's motion for summary judgment. Watson admitted in his deposition that these restrictions were imposed.

52  To make out a prima facie case of retaliation, a plaintiff must show that "(1) [he] engaged in statutorily protected expression; (2)[he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." Wideman v. Wal–Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir.1998). The challenged action must be materially adverse from the standpoint of a reasonable employee. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). To show the adverse action was causally related to the employee's protected expression, the plaintiff must prove "that the protected activity and the adverse action are not completely unrelated." Wideman, 141 F.3d at 1457 (quotation omitted). Although we interpret "the causal link requirement broadly," EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571 (11th Cir.1993), merely showing that the alleged adverse action occurred sometime after the protected expression does not establish the causation element—for temporal progression to be enough, the events must be in "very close" proximity. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) ("the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' ") (citations omitted).

53  Implicitly referring to the claim as quoted in the above text, the court concluded that the record contained no support for the claim. It said that the time between Watson's EEOC charge and CCBCC's alleged retaliatory response was insufficient to establish a prima facie case, "especially in light of the legitimate nondiscriminatory reason given and the plaintiff's failure to effectively rebut that reason." In other words, the record contained no proof that three white less senior employees were given jobs that Watson was qualified to perform despite his medical restrictions. Watson did identify, in responding to CCBCC's motion for summary judgment, three injured white employees who were given jobs they could perform within their medical restrictions, but he failed to show any similarity between these employees' situations and his—in terms of when they were afforded the light work, what it constituted, and whether it fit his restrictions.

54  See, e.g., United States ex el. Atkins v. McInteer, 470 F.3d 1350, 1354 n. 6 (11th Cir.2006); M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153, 1156 n. 1 (11th Cir.2006); Ambrosia Coal and Constr. Co. v. Morales, 368 F.3d 1320, 1330 n. 22 (11th Cir.2004); Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 nn. 9–10 (11th Cir.2002); Byrne v. Nezhat, 261 F.3d 1075, 1128–34 (11th Cir.2001); Magluta v. Samples, 256 F.3d 1282 (11th Cir.2001); BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1326–27 n. 6 (11th Cir.1998); GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1368 (11th Cir.1998); Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir.1997); Ibrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162 passim (11th Cir.1997); Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366–67 (11th Cir.1996); Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1567 (11th Cir.1995); Cesnik v. Edgewood Baptist Church, 88 F.3d 902, 905 (11th Cir.1996); Oladeinde v. City of Birmingham, 963 F.2d 1481, 1483–84 (11th Cir.1992); Pelletier v. Zweifel, 921 F.2d 1465, 1518 (11th Cir.1991); T.D.S. Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1543–44 n. 14 (11th Cir.1986) (Tjoflat, J., dissenting). This list is just a teaser—since 1985 we have explicitly condemned shotgun pleadings upward of fifty times.

55  We do not know how many times law firms have appeared in district courts of this circuit. What we do know is that, over the past decade, the firm (whose name has changed from time to time) representing plaintiffs has appeared in this court in 247 appeals. CCBCC's principal defense counsel is a member of a firm that has appeared in this court

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

in 195 appeals. *See generally,* http://www.martindale.com/Ogletree–Deakins–Nash–Smoak–Stewart/law–firm–22739–peer–review–ratings.htm; http://www. martindale.com/Wiggins–Childs–Quinn–Pantazis/law–firm–22230–people.htm.

56    When read as a whole, Count I, in its 121 paragraphs of allegations, portrayed CCBCC as a company that practices race discrimination from top to bottom, in every aspect of the terms and conditions of plaintiffs' employment. In short, race discrimination is the company's culture.

57    Rule 8(a)(2), as we observed in part IV.B, *supra,* requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b) instructs that "Each claim founded upon a separate transaction or occurrence ... shall be stated in a *separate count* ... whenever a separation facilitates the clear presentation of the matters set forth." Fed.R.Civ.P. 10(b) (emphasis added.). Plaintiffs' complaint failed to conform to these instructions. The complaint contained in *one count* a host of claims based on discrete acts of discrimination committed by CCBCC against different plaintiffs at different times. As we explained in *Fikes v. City of Daphne,* 79 F.3d 1079, 1082–83 (11th Cir.1996),

> These rules work together to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

> *Id.* at 1082–83 (quoting *T.D.S. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1543 n. 14 (11th Cir.1985) (Tjoflat, J., dissenting)).

58    The same was true of Count III, which after incorporating Counts I and II en toto, sought compensatory and punitive damages under Alabama tort law.

59    According to their representations in Martindale–Hubbell, all the lawyers in this case are skilled in civil litigation, including employment litigation. *See generally,* http://www.martindale.com.

60    Rule 8(b)(1) states, in pertinent part: "[A] party must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party." Fed.R.Civ.P. 8(b)(1).

61    Examples of defense counsel's apparent inability to comprehend exactly what claims a particular named plaintiff was presenting are CCBCC's ninth, tenth, and thirteenth defenses. We refer to the ninth and tenth defenses in note 10, *supra,* dealing with the application of section 301 of the Labor–Management Relations Act, where CCBCC referred to "some of the claims" and "those claims" without identifying any of the claims or plaintiffs asserting them. The thirteenth defense was equally ambiguous. It stated that: "Recovery for some or all of the Plaintiffs' claims is barred by the doctrine of laches."

62    CCBCC implicitly acknowledges in its brief that the court appears to have ignored Jackson's claims, which were not time-barred.

63    *See* Fed.R.Civ.P. 59(e).

64    Plaintiffs argued in their opening brief that the court erred in failing to recognize the claims they briefed in opposition to CCBCC's motion for summary judgment. Plaintiffs could have brought those claims to the court's attention via a motion for leave to amend their complaint pursuant to Fed.R.Civ.P. 15(a) before the court took CCBCC's motion under advisement. They evidently believed that such a motion would have been denied as untimely.

65    According to the declaration of Gregory P. McGuire, CCBCC's lead counsel, the fees charged by the court reporter for "all or any part of the transcript necessarily obtained for use in the case" amounted to $11,118.60.

66    Shotgun pleadings delay cases by:

> Wasting scarce judicial and parajudicial resources imped[ing] the due administration of justice, and, in a very real sense, amount to obstruction of justice. Although obstruction of justice is typically discussed in the context of criminal contempt, the concept informs the rules of law—both substantive and procedural—that have been devised to protect the courts and litigants (and therefore the public) from abusive litigation tactics, like shotgun pleadings. If use of an abusive tactic is deliberate and actually impedes the orderly litigation of the case, to wit: obstructs justice, the perpetrator could be cited for criminal contempt.

> *Byrne,* 261 F.3d at 1131–32 (11th Cir.1984) (alteration, quotation, and citation omitted).

67    The American Bar Association Model Rules of Professional Conduct, Rule 3.2, and the Alabama Rules of Professional Conduct, Rule 3.2, both provide that, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." This comment underscores both rules:

> Dilatory practices bring the administration of justice into disrepute .... It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

102 Fair Empl.Prac.Cas. (BNA) 865, 90 Empl. Prac. Dec. P 43,096...

Ala. Rules of Prof'l Conduct R. 3.2 cmt.

68   JAMS provides one of these alternative forums. It advertises as the nations largest provider of ADR services and has a cadre of arbitrators and mediators that includes 147 former judges. *See* http://www. jamsadr.com/neutrals/neutrals.asp.

69   Shotgun pleadings are a significant part of the contemporary litigation culture. They are fueled in no small part by the lawyers' fear that if they do not include everything but the kitchen sink in their pleadings, they may be sued for malpractice.

70   Rule 12(e) states in pertinent part:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must ... point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 10 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

> Fed.R.Civ.P. 12(e).

71   Moreover, in the long run, "the 'judicial work that results from shotgun pleadings is far more time consuming than the work required up front to prevent the case from proceeding beyond the pleadings until the issues are reasonably well defined.' " *Byrne,* 261 F.3d at 1130 n. 106 (quoting *Johnson Enter. of Jacksonville v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir.1998)).

72   As stated in Rule 23(c)(1)(A), "When a person sues ... as a representative of a class, the court must—at an early practical time—determine by order whether to certify the action as a class action."

73   We recognize that in dismissing plaintiffs' pattern or practice claim on the ground that a pattern or practice claim cannot be brought outside the class action context, the court implicitly held that this was not a class action case. The court made its ruling in response to CCBCC's motion for judgment on the pleadings. Absent such a motion, query whether the court would have addressed the class action issue before ruling on CCBCC's motion for summary judgment.

74   "In any action or proceeding under [Title VII] the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee (including expert fees) as part of the costs ...." 42 U.S.C. § 2000e-(5)(k).

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 6

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 669 of 898

Diaz v. American Telephone & Telegraph, 752 F.2d 1356 (1985)
36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

752 F.2d 1356
United States Court of Appeals,
Ninth Circuit.

Paul Silvestre DIAZ, Plaintiff-Appellant,

v.

AMERICAN TELEPHONE &
TELEGRAPH, Defendant-Appellee.

No. 83-2652.
|
Argued and Submitted Oct. 3, 1984.
|
Decided Jan. 29, 1985.

Mexican-American employee brought Title VII action against employer, alleging that he was denied promotion on basis of race or national origin. The United States District Court for the District of Arizona, Alfredo C. Marquez, J., granted employer's motion for summary judgment, and employee appealed. The Court of Appeals, Reinhardt, Circuit Judge, held that: (1) fact that person promoted to position sought by plaintiff was a member of same protected class as plaintiff did not preclude plaintiff from establishing a prima facie case, and (2) plaintiff was improperly denied discovery of statistical information relating to employer's hiring and promotion patterns in portion of region outside of city in which plaintiff was employed.

Reversed and remanded.

**Attorneys and Law Firms**

**\*1357** Kathleen C. Roberts, P.C., Tucson, Ariz., for plaintiff-appellant.

Ruth V. McGregor, Anne L. Tiffen, Fennemore, Craig von Ammon, Udall & Powers, Phoenix, Ariz., for defendant-appellee.

Appeal from the United States District Court for the District of Arizona.

Before BROWNING, ANDERSON, and REINHARDT, Circuit Judges.

**Opinion**

REINHARDT, Circuit Judge.

Paul Silvestre Diaz, a Mexican-American, brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982), alleging that the failure by his employer, American Telephone & Telegraph Company (AT & T), to promote him to the position of Operations Supervisor **\*1358** resulted from discrimination on the basis of race or national origin. During discovery, AT & T refused to provide certain employment statistics. Without ruling on Diaz's motion to compel discovery of these statistics, the district court granted AT & T's motion for summary judgment, ruling that, as a matter of law, the promotion of another Mexican-American, Rebecca Gonzales, to the challenged position precluded Diaz from establishing a *prima facie* case of discrimination. We hold that the summary judgment order was based on an erroneous legal premise. However, we do not review the record to see if we could affirm that order on any other ground because Diaz did not receive, and the record does not contain, all the material to which he was entitled in framing his opposition to the summary judgment motion. The requested statistical material was properly subject to discovery.

I. BACKGROUND

Paul Diaz has been employed since 1969 at the Tucson facility of AT & T, Long Lines Division, as a Communications Technician. At various times during his employment Diaz filled in temporarily as an Operations Supervisor. In March 1980, a permanent opening for Operations Supervisor at the Tucson facility became available. Again, Diaz filled in, this time for a period of three and one-half months, from mid-February to June 1, 1980.

As a policy, AT & T does not disseminate information about promotional opportunities directly to the potentially eligible employees. When the Operations Supervisor position at the Tucson facility became available, in accordance with AT & T's general hiring and promotion procedures the Tucson facility Operation Manager notified the Western Region personnel office of the job opening. Shortly afterwards, the personnel office compiled a list of all current job openings in the Western Region and sent the list to all Western Region supervisors.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 670 of 898

The supervisors then submitted lists of candidates they thought were qualified for the positions. The names of five candidates were submitted for the Tucson Operations Supervisor position, among them Rebecca Gonzales. The Operation Manager in Tucson, who was responsible for the ultimate promotion decision, was also responsible for selecting qualified candidates from the Tucson facility. He did not consider Diaz for the position although Diaz was deemed "promotable."

Because it became apparent to Diaz that, although he was serving temporarily as the Tucson Operations Supervisor, he was not going to be promoted to the position on a permanent basis, he filed a discrimination charge with the Arizona Civil Rights Division. His charge was filed on April 15, 1980. Thereafter, in late April or May, AT & T decided to promote Gonzales to the Operations Supervisor position. Gonzales's promotion, effective in early June 1980, was apparently AT & T's first promotion of a Mexican-American to that position at the Tucson facility. [1] Gonzales was subsequently replaced by Peter Todd, a white male, in October 1981, only a year after her appointment.

## II. PROMOTION OF A MEMBER OF PLAINTIFF'S PROTECTED CLASS

In order to prevail in a Title VII disparate treatment case, a plaintiff must first establish a *prima facie* case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision. If the defendant carries its burden, the plaintiff is then afforded an opportunity to demonstrate that the " 'assigned reason' was 'a pretext or **\*1359** discriminatory in its application.' " *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1341 (9th Cir.1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 807, 93 S.Ct. 1817, 1827, 36 L.Ed.2d 668 (1973)), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). In the present case, the district court did not examine AT & T's articulated nondiscriminatory reason-that Gonzales was better qualified-or consider whether Diaz's evidence sufficiently rebutted this defense [2] because it determined that Diaz could not, as a matter of law, establish a *prima facie* case. Its reason for reaching this conclusion was that the person ultimately hired was a member of the same protected class as Diaz.

[1]   In order to establish a *prima facie* case, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). One common way a plaintiff can establish an inference of discrimination is by demonstrating that the four requirements of the *McDonnell Douglas* test are met:

(1) that the plaintiff belongs to a class protected by Title VII;

(2) that the plaintiff applied and was qualified for a job for which the employer was seeking applicants;

(3) that, despite being qualified, the plaintiff was rejected; and

(4) that, after the plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of comparable qualifications.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

[2]   Under the traditional *McDonnell Douglas* test, the "inference of discrimination" is not dependent upon an examination of who, if anyone, was promoted instead of the plaintiff. Ordinarily, the fourth element of *McDonnell Douglas,* is met whenever the employer continues to consider other applicants whose qualifications are comparable to the plaintiff's after refusing to consider or rejecting the plaintiff. Diaz was deemed promotable but the Operation Manager did not consider him for the position although he subsequently considered comparably qualified applicants. [3] Thus, Diaz satisfied the fourth element of the *McDonnell Douglas* test as it is ordinarily understood and applied.

The district court's determination that Diaz failed to establish a *prima facie* case was based on its implicit conclusion that the Supreme Court's articulation of the *McDonnell Douglas* test should not be read literally. The district court held that the fourth element of *McDonnell Douglas* cannot be met unless the challenged position is filled by someone outside the plaintiff's protected class. Thus, the district court concluded that Diaz failed to meet the *McDonnell Douglas* standard. AT & T asks us to affirm the summary judgment order either by endorsing

Diaz v. American Telephone & Telegraph, 752 F.2d 1356 (1985)

36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

the district court's construction of *McDonnell Douglas* or by adopting a closely related line of reasoning. AT & T's alternative argument is that even if *McDonnell Douglas* is read as the Supreme Court apparently meant it to be, and even if, therefore, Diaz met that test, it is not sufficient in all instances simply to satisfy the *McDonnell Douglas* standard. AT & T contends, rather, that whenever the person who is selected for the position is a member of the same protected class, the plaintiff is precluded from **\*1360** establishing a *prima facie* case.[4] We reject the reasoning both of the district court and of AT & T.

In order to preclude a plaintiff from recovery in all cases in which the challenged position is filled by a member of the same protected class, we would have to assume that Title VII protects only group rights. It is, of course, true that Title VII was designed to deter and remedy discrimination on the basis of group characteristics and to remove barriers that favor certain groups over others. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 429-30, 91 S.Ct. 849, 852-53, 28 L.Ed.2d 158 (1971); *see also United Steelworkers v. Weber,* 443 U.S. 193, 207-09, 99 S.Ct. 2721, 2729-30, 61 L.Ed.2d 480 (1979) (private employer's race-conscious affirmative action plan, designed to eliminate "conspicuous racial imbalance" and traditional patterns of segregation, not barred by Title VII); *Johnson v. Transportation Agency,* 748 F.2d 1308, 1314 (9th Cir.1984) (public agency's affirmative action plan lawful and necessary to remedy long-standing imbalances in work force); *cf. Fullilove v. Klutznick,* 448 U.S. 448, 482, 100 S.Ct. 2758, 2776, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.) (Congress' remedial actions need not be "color-blind").[5] But, at the same time, Title VII's focus on the rights of individual members of protected classes is "unambiguous." *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 3496, 77 L.Ed.2d 1236 (1983) (quoting *Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 708, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978)). "It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Connecticut v. Teal,* 457 U.S. 440, 455, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130 (1982); *see also Peters v. Lieuallen,* 693 F.2d 966, 970 (9th Cir.1982) ("The fact that a particular screening device admits some members of a protected class into pool of job candidates

does not demonstrate an absence of discrimination."). Title VII protects individuals, as well as groups, from discrimination on the basis of group characteristics.

We have already made it clear in another context that a plaintiff is not precluded from bringing suit merely because a person of the same protected class is selected for the challenged position. In *Douglas v. Anderson,* 656 F.2d 528 (9th Cir.1981), we held that a plaintiff suing under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (1982), may establish a *prima facie* case under *McDonnell Douglas* even though the position was filled by a person who was also within the class protected by the ADEA. *See* 656 F.2d at 532 (requirement that person selected to fill challenged position not be a member of plaintiff's protected class "adds a gloss that is absent from *McDonnell Douglas* "). Other circuits have interpreted the fourth **\*1361** element of *McDonnell Douglas* in the same manner, both in ADEA cases, *see, e.g., Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 & n. 9 (1st Cir.1979), and in Title VII cases, *see, e.g., Jones v. Western Geophysical Co. of America,* 669 F.2d 280, 284 (5th Cir.1982) (Black plaintiff's replacement by another Black may have been a pretextual device and did not preclude finding "an inference of discrimination sufficient to satisfy the fourth element of *McDonnell Douglas* "). We see no reason to read *McDonnell Douglas* differently in the Title VII context than we do when suit is brought under the ADEA.

We need not now decide whether identity of class membership may ever be relevant to a determination whether a plaintiff has established a *prima facie* case under the *McDonnell Douglas* test. Rather, we need say only that, contrary to the district court's assumption, such identity does not automatically preclude a plaintiff from meeting the test. When the individual who was promoted receives the challenged position only after the plaintiff has filed a discrimination charge, the fact that both individuals are members of the same protected class does not rebut the otherwise established inference of discrimination. In the case before us, there is no bar to plaintiff's establishing a *prima facie* case under *McDonnell Douglas.*

**[3]** Contrary to AT & T's suggestion, we think it clear that a plaintiff who satisfies the four elements of *McDonnell Douglas* has necessarily established the requisite inference of discrimination. Equally important, however, it is possible for a plaintiff to establish a *prima*

Diaz v. American Telephone & Telegraph, 752 F.2d 1356 (1985)

36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

*facie* case without satisfying the *McDonnell Douglas* test. Compliance with that standard is only one method of establishing a *prima facie* case. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Gay v. Waiters' & Dairy Lunchmen's Union,* 694 F.2d 531, 550 (9th Cir.1982); *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1341 (9th Cir.1981). In *McDonnell Douglas* itself the Supreme Court noted that, because of the variations in factual situations, plaintiffs in some cases may seek to establish a *prima facie* case by other means. *See* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see also* Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L.Rev. 1449, 1454-59 (1984) (inappropriateness of *McDonnell Douglas* test in sexual harassment cases). A plaintiff may demonstrate an inference of discrimination in whatever manner is appropriate in the particular circumstances. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 n. 12 (1st Cir.1979). [6]

**[4]** The burden of establishing a *prima facie* case is not designed to be "onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. In order to establish a *prima facie* case of discrimination, the plaintiff need only provide evidence that *suggests* that the "employment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act." *Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866. Diaz presented substantial evidence to support the inference that AT & T acted in a discriminatory fashion. Although he has frequently filled in temporarily as an Operations Supervisor, Diaz has never been offered this position on a permanent basis. He is as qualified as other candidates who were considered for the job, *see supra* note 3, and may even be able to demonstrate that he was more qualified than the individual who was promoted, *see supra* note 2. Furthermore, Diaz has introduced evidence of AT & T's complete failure in the past to promote Mexican-Americans to the Position of Operations Supervisor in the Tucson facility. *See supra* **\*1362** note 1. The fact that AT & T eventually promoted a Mexican-American to the position that Diaz sought, after Diaz filed his state discrimination claim, does not automatically remove the presumption of discrimination created by this other evidence. *Cf. EEOC v. Brown & Root, Inc.,* 688 F.2d 338, 340 (5th Cir.1982) (female plaintiff who was replaced by another woman could establish an inference of discrimination without meeting traditional elements of *McDonnell Douglas* test).

The district court erred in holding that because the person promoted was a member of the same protected class as Diaz, Diaz was barred from establishing a *prima facie* case.

## III. DISCOVERY OF THE EMPLOYMENT STATISTICS

When we review a district court's order granting summary judgment, we normally examine the record to ascertain whether it provides any basis for affirmance. *See Jewel Companies v. Payless Drug Stores Northwest, Inc.,* 741 F.2d 1555, 1564-65 (9th Cir.1984). We affirm such orders when it is clear that, even if the evidence is viewed in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to prevail as a matter of law. *See Twentieth Century-Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327, 1328 (9th Cir.1983); Fed.R.Civ.P. 56(c). We can make these determinations because, ordinarily, summary judgment orders are not entered until after the non-moving party has had an opportunity to obtain through discovery whatever evidence is necessary or relevant (at least for the purposes of summary judgment) and to place that evidence in the record.

Diaz sought to use statistical data to support both his *prima facie* case and his argument that AT & T's articulated reason for hiring Gonzales instead of him was pretextual. Diaz filed a discovery motion, seeking to compel AT & T to provide him with information about its hiring and promotion patterns in its Western Region (covering the Western portion of the United States). AT & T claimed that the employment statistics for the portion of its Western Region outside of Tucson were irrelevant and refused to supply them. Because the district judge believed he could dispose of this case on the ground discussed in the preceding section of this opinion, he granted AT & T's summary judgment motion without ruling on the discovery motion.

When we review a case in which summary judgment was ordered but the non-moving party was improperly denied discovery, we are not in a position to view all the necessary evidence in the light most favorable to that party. In such a case, there is no purpose to reviewing the record to determine whether the order could be affirmed on a basis other than that relied upon by the district court, unless, of course, there is a separate and independent ground to which the material sought in discovery would

Diaz v. American Telephone & Telegraph, 752 F.2d 1356 (1985)

36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

be irrelevant. Here, the statistical data, if discoverable at all, would be relevant to the only other ground on which the district court's order might be affirmed. [7] Accordingly, we must next determine whether Diaz was entitled to the requested statistical information.

[5]  [6]  Statistical evidence is unquestionably relevant in a Title VII disparate treatment case. Statistical information is helpful in establishing a *prima facie* case "despite the fact that [it] may not be directly probative of any of the four specific elements set forth by *McDonnell Douglas.*" *Lynn,* 656 F.2d at 1342-43. In fact, summary judgment is patently inappropriate when a plaintiff needs statistical data to substantiate the inference of discrimination **\*1363** and has been denied the opportunity to discover this data. *See Cedillo v. International Association of Bridge & Structural Workers,* 603 F.2d 7, 12 (7th Cir.1979). A plaintiff is also entitled to use statistical evidence to show that a defendant's articulated nondiscriminatory reason for the employment decision in question is pretextual. *See McDonnell Douglas,* 411 U.S. at 804-05, 93 S.Ct. at 1825-26. [8]

[7]  [8]  Statistical data is relevant because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue. In some cases, statistical evidence alone may be sufficient to establish a *prima facie* case. *See O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 866 (9th Cir.1982) ("[s]tatistical data is one way to establish a *prima facie* case"). *But cf. Gay v. Waiters' & Dairy Lunchmen's Union,* 694 F.2d 531, 552 (9th Cir.1982) (statistical evidence alone is only rarely sufficient to establish a *prima facie* disparate treatment case); *Laborde v. Regents of University of California,* 686 F.2d 715, 718 (9th Cir.1982) (statistical evidence not necessarily sufficient to establish *prima facie* disparate treatment case), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1017 (1983). Even when not sufficient to establish a *prima facie* case, statistical evidence is helpful in showing that an employer's articulated reason for the employment decision is pretextual. In some cases it may be essential:

Statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it

is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.

... "In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved."

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1857 n. 20, 52 L.Ed.2d 396 (1977) (quoting *United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971)).

[9]  AT & T argues that even if statistical data is generally relevant in Title VII cases, information about its hiring and promotion patterns in the portion of the Western Region outside of Tucson is irrelevant. According to AT & T, the decision about Diaz cannot be considered in the context of this larger geographic labor market because (1) promotions outside of Tucson were made by decision makers other than the Operation Manager who made the challenged promotion decision, and (2) Diaz had told his supervisors he was unwilling to leave Tucson to accept a promotion.

Both of AT & T's arguments ignore the underlying purpose of statistical information-to provide otherwise unavailable indications of an employer's conscious or unconscious motives. Diaz contends that his employer, AT & T, engages in a region-wide policy of discrimination. The existence of a pattern of racial disparity in AT & T's employment decisions would allow for an inference about its motives. This would bolster Diaz's *prima facie* case and would support his contention that the articulated reason for AT & T's failure to promote Diaz is pretextual. Thus, Diaz is entitled to attempt to prove that such a pattern exists.

It is irrelevant whether the same Operations Manager made all of the hiring and promotion decisions about which Diaz **\*1364** seeks information. One way of reaching conclusions about an employer's motives is by ascertaining whether the employer's explicit or implicit policies encourage or permit discriminatory employment decisions by its supervisory personnel. The employer is responsible for such decisions, *see Miller v. Bank of*

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 674 of 898

Diaz v. American Telephone & Telegraph, 752 F.2d 1356 (1985)

36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

*America,* 600 F.2d 211, 213 (9th Cir.1979), because its policies control the manner in which its supervisory employees make them. We have previously recognized that the promotion patterns of the employer, as a whole, are relevant to such an analysis of motive. *See Lynn,* 656 F.2d at 1342 (defendant's university-wide tenure-granting pattern, not just tenure patterns in individual departments, relevant in disparate treatment case).

Similarly, it is irrelevant whether Diaz would have been willing to leave the Tucson area if he had been offered a promotion.[9] Even if Diaz could not use the Western Region statistics as evidence that *he* was discriminated against with regard to other potential promotions, the evidence of a pattern of racial disparity would nevertheless be of probative value with regard to his employer's motive. In *Lynn,* we evaluated statistical evidence about the defendant university's tenure-granting pattern from the time of its founding until the time of the complaint; we did not restrict ourselves to a consideration of tenure practices during the period in which the plaintiff was eligible for tenure. *See* 656 F.2d at 1342.

Furthermore, even if we assumed that the statistical information would be relevant only if it pertained to jobs in areas in which Diaz was willing to work, the Western Region statistics would not, on the basis of the record before us, be irrelevant. AT & T argues that Diaz refused to leave Tucson to accept a promotion. However, the only evidence before us that in any way supports this contention is the evidence that, in the past, Diaz had refused to leave Tucson to accept transfers to positions

at the same level as his current position. Diaz contends, however, that he would have been willing to leave Tucson to accept a promotion; nothing in the record before us serves to refute his argument.

AT & T refused to provide Diaz with relevant statistical information which might support both the *prima facie* inference of discrimination and Diaz's allegation that AT & T's articulated reason for failing to promote him was pretextual. Thus, we do not have before us all of the material that would be necessary before we could determine whether the summary judgment order could be affirmed on any of the potential grounds presented by the record.

## IV. CONCLUSION

The district court relied on an erroneous legal premise when it concluded that Diaz was precluded from establishing a *prima facie* case of discrimination. For that reason, and because Diaz was improperly denied the opportunity to discover material that is relevant to the only bases on which summary judgment could have been granted, we reverse.

REVERSED AND REMANDED.

## All Citations

752 F.2d 1356, 36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960, 40 Fed.R.Serv.2d 1428

## Footnotes

1    We reach this interpretation of the facts when, as we are required to do on a motion for summary judgment, we view the evidence in the light most favorable to the plaintiff. *See Twentieth Century-Fox Film Corp. v. MCA,* 715 F.2d 1327, 1328-29 (9th Cir.1983). In response to an interrogatory requesting the number and racial identification of Operations Supervisors at the Tucson facility since 1972, AT & T provided information only for the period after October 1979. AT & T did not provide any information to suggest that it had any Mexican-American Operations Supervisors at Tucson before Gonzales.

2    Diaz claims that AT & T's articulated reason for the decision is a pretext. He has attempted to show that the criteria under which Gonzales might have been "better qualified" do not match AT & T's description of the skills most essential for the job and that, because of his own supervisory experience, he was better qualified for the position than Gonzales.

3    Diaz alleged that he was at least as qualified as other candidates and the record does not require us to conclude that Diaz is wrong. Because we are reviewing a summary judgment order, we treat the other candidates as comparably qualified. *See supra* note 1.

4    AT & T relies on numerous inapplicable cases. Some of the cases demonstrate merely that a *prima facie* case *can* be shown if the position is filled by a nonmember of plaintiff's class. *See, e.g., Laborde v. Regents of the University of California,* 686 F.2d 715, 717 (9th Cir.1982); *Lynn,* 656 F.2d at 1340-41. In others the plaintiffs either failed to introduce

36 Fair Empl.Prac.Cas. (BNA) 1742, 36 Empl. Prac. Dec. P 34,960...

any evidence indicating that they applied for openings that actually existed and for which they were qualified, *see, e.g. Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 546 (9th Cir.1982); *Burnett v. Chickasaw Area Development Commission,* 662 F.2d 1210, 1213 (6th Cir.1981), *Nulf v. International Paper Co.,* 656 F.2d 553, 558 (10th Cir.1981), or could not prove that the employers' actions were discriminatory, *see, e.g., Coleman v. Braniff Airways, Inc.,* 664 F.2d 1282, 1285 (5th Cir.1982). With one possible exception, *see infra* note 6, these cases do not support AT & T's contention that a plaintiff who is a member of the same protected class as the individual who received the job cannot, as a matter of law, establish a *prima facie* case.

5   The Supreme Court's recent decision in *Firefighters Local Union No. 1784 v. Stotts,* --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), does not undermine the group-rights goals of Title VII. That decision simply holds that a court may not modify a pre-existing race-conscious consent decree in such a fashion that the resulting employment practices would divest another group of employees of entitlements under a bona fide seniority system.

6   Even when a panel of the District of Columbia Circuit phrased the fourth element of the *McDonnell Douglas* test as a requirement that "employees ... who were not members of the protected group were ... promoted," *Freeman v. Lewis,* 675 F.2d 398, 400 (D.C.Cir.1982), it noted that a plaintiff might be able to establish a *prima facie* case without satisfying the *McDonnell Douglas* test by presenting statistical or testimonial evidence of discrimination. *See id.* at n. 14.

7   AT & T has advanced only two grounds for summary judgment. First, as discussed in the preceding section of this opinion, AT&T contends that Diaz has not established a *prima facie* case. Second, according to AT & T, Diaz has failed to produce evidence sufficient to convince a factfinder that AT & T's articulated reason for hiring Gonzales instead of him was pretextual. But the requested statistical information is probative on both of these points. *See infra* note 8 and accompanying text.

8   In fact, the same statistical evidence that a plaintiff introduces to establish a *prima facie* case may be considered by the trier of fact on the issue of whether the defendant's explanation for the employment decision is pretextual. *See Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1094 n. 10; *Lynn,* 656 F.2d at 1346 n. 13.

9   Diaz seeks the Western Region statistics for two purposes. First, he intends to use them to demonstrate a discriminatory pattern in AT & T's employment practices. Second, Diaz may have been qualified for other Operations Supervisor openings, approximately four of which were available weekly in AT & T's Western Region. Because AT & T does not inform non-supervisory personnel about these openings, Diaz cannot specifically identify openings for which he was qualified but was not considered. If he was qualified for other openings that were available within 300 days prior to the time he filed his charge with the EEOC on June 14, 1980, *see* 42 U.S.C. § 2000e-5(e) (1982), the failure to promote Diaz in those instances could also form a basis for this suit. Diaz could not, however, maintain that he was qualified for those openings unless he were willing to leave the Tucson area.

---

Tab 7

2017 WL 1199737
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

Nnamdi EGBUKICHI and
Elizabeth Egbukichi, Plaintiffs,
v.
WELLS FARGO BANK, NA, Defendant.

Case No. 3:15-cv-2033-SI
|
Signed 03/29/2017

**Attorneys and Law Firms**

Keith D. Karnes, KARNES LAW OFFICES, 1860
Hawthorne Avenue Northeast, Suite 10, Salem, Oregon,
97301. Of Attorneys for Plaintiffs.

Philip S. Van Der Weele and Adam W. Holbrook,
K&L GATES LLP, One Southwest Columbia Street,
Suite 1900, Portland, Oregon, 97258. Of Attorneys for
Defendant.

**OPINION AND ORDER**

Michael H. Simon, United States District Judge

**\*1** Plaintiffs Nnamdi Egbukichi and Elizabeth
Egbukichi bring this lawsuit against Defendant Wells
Fargo Bank, NA, alleging violations of the Equal Credit
Opportunity Act, 15 U.S.C. § 1691 *et seq.*, ("ECOA")
and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*,
("FHA"). In Plaintiffs' original complaint, they argued
that they qualified for a modification of their loan with
Defendant under the Home Affordable Modification
Program ("HAMP"), but failed to allege that Defendant
had discriminated against them on the basis of race. [1]
Defendant moved to dismiss for failure to state a claim,
and the Court granted Defendant's motion with leave to
replead. Plaintiffs filed an Amended Complaint, alleging
that Defendant unlawfully discriminated against Plaintiffs
due to their race when Defendant, on several occasions,
refused to modify Plaintiffs' loan under HAMP. Plaintiffs
seek compensatory damages, punitive damages, and
attorney's fees. Defendant moves to dismiss Plaintiffs'
Amended Complaint for failure to state a claim and in the

alternative moves to strike Plaintiffs' allegations regarding
unidentified, similarly situated white applicants and
Defendant's pattern and practice of discrimination. For
the reasons stated below, the Court denies Defendant's
motion to dismiss and alternative motion to strike.

**STANDARDS**

A motion to dismiss for failure to state a claim may be
granted only when there is no cognizable legal theory to
support the claim or when the complaint lacks sufficient
factual allegations to state a facially plausible claim for
relief. *Shroyer v. New Cingular Wireless Servs., Inc.*,
622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the
sufficiency of a complaint's factual allegations, the court
must accept as true all well-pleaded material facts alleged
in the complaint and construe them in the light most
favorable to the non-moving party. *Wilson v. Hewlett-
Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-
Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.
2010). To be entitled to a presumption of truth, allegations
in a complaint "may not simply recite the elements of a
cause of action, but must contain sufficient allegations
of underlying facts to give fair notice and to enable
the opposing party to defend itself effectively." *Starr v.
Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable
inferences from the factual allegations must be drawn in
favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*,
513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need
not, however, credit the plaintiff's legal conclusions that
are couched as factual allegations. *Ashcroft v. Iqbal*, 556
U.S. 662, 678-79 (2009).

**\*2** A complaint must contain sufficient factual
allegations to "plausibly suggest an entitlement to relief,
such that it is not unfair to require the opposing party to
be subjected to the expense of discovery and continued
litigation." *Starr*, 652 F.3d at 1216. "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Iqbal*, 556
U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 556 (2007)).

**BACKGROUND**

CRITICAL

Plaintiffs, husband and wife, are of African descent and owners of real property ("the Property") that served as collateral for the loan that is the subject of this lawsuit. Second Am. Compl. (ECF 20) ¶¶ 3, 5. On June 25, 2008, Plaintiffs purchased the Property. *Id.* at ¶ 6. To finance their purchase, Plaintiffs borrowed $393,820 from Northwest Mortgage Group, Inc., signed a promissory note ("the Note"), and signed a trust deed to guarantee repayment. *Id.* at ¶ 7. By January 2010, Plaintiffs were in default on the Note, and Defendant had been assigned the right to service the Note. *Id.* at ¶¶ 8-9. On or about February 26, 2010, Plaintiffs requested that Defendant modify Plaintiffs' obligations on the Note. *Id.* at ¶ 10. On April 7, 2010, Defendant offered to modify Plaintiffs' obligations on certain specified terms. *Id.* at ¶ 11. In September 2010, Defendant was assigned Plaintiffs' Deed of Trust and employed Northwest Trustee Services, Inc. to conduct a non-judicial foreclosure on Plaintiffs' interest in the Property. [2] *Id.* at ¶¶ 12-13.

On or about October 25, 2010, Plaintiffs requested a HAMP modification from Defendant. *Id.* at ¶ 14. Defendant denied the request on November 29, 2010, but offered Plaintiffs a forbearance agreement on certain specified terms. *Id.* at ¶ 16. On or about March 30, 2011, and June 20, 2011, Plaintiffs made additional requests for a HAMP modification of their loan. *Id.* at ¶ 17. Defendant denied both requests. *Id.* at ¶ 19. In denying Plaintiffs' HAMP modification request, Defendant explained that based upon the documentation provided by Plaintiffs, Defendant could not create an affordable mortgage payment that met the requirements of the HAMP program. *Id.* at ¶ 20.

**\*3** In November 2011, Defendant filed a judicial foreclosure action against Plaintiffs' interest in the Property. *Id.* at ¶ 22. In April 2014, Defendant voluntarily dismissed that action. *Id.* at ¶ 23. In 2015, Defendant threatened to bring a non-judicial foreclosure against Plaintiffs and began the mediation process that is required under Oregon foreclosure law. *Id.* at ¶ 25. During mediation, Plaintiffs again requested and were again denied a HAMP modification. *Id.* at ¶ 29.

Plaintiffs allege that at all relevant times they were qualified for a HAMP modification on their loan and that in 2015 an employee of Defendant admitted that Plaintiffs were qualified for a HAMP modification. *Id.* at ¶¶ 15, 18, 27, 29. Plaintiffs also allege that Defendant refused

to consider all of Plaintiffs' income when evaluating the HAMP modification requests and improperly billed Plaintiffs for fees and costs for the various foreclosure actions that it began but did not complete. *Id.* at ¶¶ 21, 28. Plaintiffs further allege that Defendant discriminated against Plaintiffs because of their race when it denied their HAMP modification. *Id.* at ¶ 29. Plaintiffs also allege that Defendant provided HAMP modifications to similarly situated white applicants around the same time that Defendant denied Plaintiffs' request for modification. *Id.* at ¶ 30. Finally, Plaintiffs allege that Defendant has a pattern and practice of discriminating against racial minorities and is under a consent decree with the United States based on a past history of racial discrimination. *Id.* at ¶ 31.

## DISCUSSION

Because the allegations that Defendant moves to strike are pertinent to the sufficiency of Plaintiffs' ECOA and FHA claims, the Court addresses Defendant's alternative motion first.

### A. Defendant's Motion to Strike Plaintiffs' Allegations

Federal Rule of Civil Procedure ("FRCP") 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Defendant argues that two of Plaintiffs' allegations are either immaterial or impertinent and should be stricken. Specifically, Defendant argues that (1) Plaintiffs' allegation that similarly situated white applicants were approved while Plaintiffs' was denied is conclusory, and (2) Defendant's consent decree with the United States—which Plaintiffs claim is evidence of Defendant's intent to discriminate against Plaintiffs because of their race—is irrelevant.

#### 1. Similarly Situated White Applicants

Plaintiffs allege that Defendant provided HAMP modifications to similarly situated white applicants around the same time that Defendant denied Plaintiffs' request for a HAMP modification. Defendant argues that because Plaintiff does not identify or provide examples or details of any similarly situated white applicants who Defendant approved for a HAMP modification, the Court should strike Plaintiffs' allegation from the Complaint to preclude discovery on that issue.

The Court disagrees that this allegation is irrelevant or impertinent. Plaintiffs allege that they are African-American and that they were qualified for a HAMP loan modification but were denied on the basis of their race. Plaintiffs also allege that "white applicants of similar qualifications" were approved for loan modifications around the same time that Plaintiffs were denied. The alleged fact that the white applicants were as similarly qualified for a HAMP modification as Plaintiffs makes them similarly situated to Plaintiffs for purposes of Plaintiffs' claims. The allegation that the white applicants were approved while Plaintiffs were denied is relevant to Plaintiffs' allegation that Defendant discriminated against them on the basis of race.

**\*4** The Court also rejects Defendant's argument that Plaintiffs must specifically identify the purported similarly qualified white applicants at this stage of the litigation. Although potentially important at summary judgment or trial, the Court finds such specificity is not required in the complaint at the pleading stage and Plaintiffs' allegations are sufficient to survive a motion to dismiss. *See Cooper v. Cate*, 2011 WL 5554321, at \*11 (E.D. Cal. Nov. 15, 2011) (denying a motion to dismiss in an age discrimination case where the plaintiff alleged that the defendant "treated employees with [plaintiff's] rank and classification who were substantially younger than she more favorably that it treated her, including but not limited to, not redirecting them to out of class positions"); *Marziano v. Cty. of Marin*, 2010 WL 3895528, at \*9 (N.D. Cal. Oct. 4, 2010) (concluding in an employment discrimination case that "a general statement that similarly situated employees were treated more favorably ... with respect to a specific employment action" is enough to survive a motion to dismiss); *see also Frank v. Potter*, 2009 WL 2982876, at \*7 (S.D. Ohio Sept. 15, 2009) (rejecting the defendant's "critique [ ]" of the plaintiff's claims "on the basis that [the plaintiff] has 'failed to allege a single similarly-situated individual' " because the court "does not find a requirement at the pleadings stage that Plaintiff name names").

Similarly, here Plaintiffs meet the FHA pleading standard by alleging that Defendant discriminated against Plaintiffs on the basis of their race by denying them a loan modification for which they were qualified and that similarly situated white applicants were approved. Thus, Plaintiffs have "give [n] the defendant fair notice of what

the plaintiff[s'] claim is and the grounds upon which it rests," and need not "adduce a prima facie claim in the complaint itself—before discovery, often necessary to uncover a trail of evidence regarding the defendants' intent in undertaking allegedly discriminatory action, has taken place." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004).

The cases that Defendant cites are unpersuasive. The Court declines to follow the passing comment in *Domingo v. Donohue* that the plaintiff "provided no examples of similarly situated employees outside of his protected class." 2014 WL 605485 at \*10 (N.D. Cal. 2014). As noted, the Court does not find that such specific examples are required at the pleading stage. Further, unlike the plaintiffs in *Grimes v. Fremont Gen. Corp*, Plaintiffs timely filed their complaint and alleged that they were qualified for the loans they were denied. 785 F. Supp. 2d 269, 292 n.33 (S.D.N.Y. 2011) (dismissing the complaint as time-barred and noting that the claims also would fail on the merits in part because the plaintiffs failed to allege that they were qualified for fairly-administered loans).

### 2. Consent Decree

Plaintiffs also allege that Defendant has exhibited a pattern and practice of discriminating against racial minorities and that it is currently "under a consent decree with the United States due to its past history of discrimination." Second Am. Compl. ¶ 31. Plaintiffs do not raise a pattern-and-practice claim in this lawsuit. [3] Instead, Plaintiffs allege that Defendant's past history of discrimination is circumstantial evidence of Defendant's intent to discriminate against Plaintiffs based on their race.

**\*5** In a motion to dismiss, all material facts are accepted as true and construed in the light most favorable to the non-moving party. *Wilson*, 668 F.3d at 1140; *see also Starr*, 652 F.3d at 1216 (noting that if a defendant is fairly notified of the facts underlying the allegation "to enable [it] to defend itself effectively" the allegation will be entitled to a presumption of truth). Incidents occurring outside of the limitations period are not actionable, but evidence of those incidents may be admitted as relevant background evidence to support a related timely claim, or as evidence of motive. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). [4] Such incidents are relevant to determining

whether a plaintiff adequately states a claim for relief. Because Plaintiffs' factual allegation enabled Defendant to defend itself—Defendant submitted the consent decree as an exhibit to its motion to dismiss and argued that it was irrelevant—Plaintiffs' factual allegation, that Defendant has routinely discriminated against minorities, is entitled to a presumption of truth. As alleged, the existence of the consent decree is relevant to Plaintiffs' claim of racial bias. It is relevant to show motive and intent. That is all that is required of a factual allegation in a complaint.[5]

## B. The ECOA Claim
Under the ECOA, "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... *on the basis of* race." 15 U.S.C. § 1691 (a)(1) (emphasis added). Defendant moves to dismiss Plaintiffs' ECOA claims because (1) Plaintiffs failed to identify the specific protected class underlying the dispute; and (2) Plaintiffs failed to allege that Plaintiffs were discriminated against "on the basis" of a protected ground. Plaintiffs respond that they have properly alleged all the elements of an ECOA claim as required by courts, namely that they have alleged that (1) they are members of a protected class as African Americans; (2) they applied for the HAMP loan modification in 2010, 2011, and 2015; (3) they were qualified for the HAMP loan modification; and (4) Defendant denied the HAMP loan modification on each occasion despite Plaintiffs' qualification.

In the context of an FHA claim, the Ninth Circuit has instructed that pleadings "should be judged by the statutory elements of [a] claim rather than the structure of the prima facie case." *Gilligan v. Jamco Dev't Corp.*, 108 F.3d 246, 250 (9th Cir. 1997). The Third Circuit recently noted that with FHA and ECOA claims, "parties argue about whether the ... complaint establishes a prima facie case under these statutes, but that is not the focus at the Rule 12(b)(6) stage, as the prima facie case is an evidentiary standard." *Shahin v. PNC* Bank, 625 Fed.Appx. 68, 70 (3d Cir. 2015). In *Shahin*, the court dismissed the plaintiff's claims because "the complaint does not plausibly indicate that [the defendant] declined to provide a loan for any discriminatory reason." *Id.* at 70-71.

The FHA, similar to the ECOA, requires that the challenged housing decisions be "because of"[6] a protected status. The pleading requirements for other civil rights discrimination and retaliation statutes also include that the allegedly wrongful conduct was done because of protected status or conduct, or that persons who are not members of a protected class were treated better than persons who are members of the protected class. *See, e.g., McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (Americans with Disabilities Act); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (Title VII retaliation); *Jeter v. Hozhoni Found.*, 2013 WL 4431096, at *1 (D. Ariz. Aug. 16, 2013) (Age Discrimination in Employment Act).

**\*6** Thus, to state a claim for violations of ECOA, a plaintiff must allege facts that plausibly suggest: (1) the plaintiff was a member of a protected class; (2) the plaintiff applied for credit from the defendant; and (3) the plaintiff was denied credit on the basis of his or her protected class. Facts that might plausibly suggest that the denial of credit was because of or on the basis of an applicant's protected status may include: (1) that the applicant was qualified to receive credit and was denied credit despite being qualified; (2) facts demonstrating discriminatory animus or treatment by the defendant; or (3) that persons not within the protected class were granted extensions of credit by the defendant. Pleading such facts does not replace the requirement that a plaintiff plead that the alleged denial of credit was on the basis of the plaintiff's protected status.

Plaintiffs have alleged sufficient facts to support these allegations. Plaintiffs allege that they are African American. Thus, they are members of a protected class. Plaintiffs also allege that they were qualified for a HAMP modification, and that Defendant discriminated against Plaintiffs by denying their requests for HAMP modifications and refusing to consider all of their income, despite Defendant's acknowledgement that Plaintiffs were qualified for a modification. Plaintiffs also specifically allege that Defendant denied them a HAMP modification "due to their race." This allegation cures the deficiency identified by the Court in Plaintiffs' original complaint. Moreover, in their Amended Complaint, Plaintiffs allege additional facts that support their claim that Defendant denied them credit based on their protected status, namely that Defendant approved similarly qualified white applicants and Defendant has a pattern and practice of discriminating against minorities.

## C. The FHA Claim

Plaintiffs argue that Defendant's HAMP modification denials also violate the FHA. Under the FHA, it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race." 42 U.S.C. § 3605. Similar to its motion against Plaintiffs' ECOA claim, Defendant also moves to dismiss Plaintiffs' FHA claim arguing that Plaintiffs fail to sufficiently allege that Defendant denied Plaintiffs' loan modification on the basis of their race.

The FHA creates a private right of action for an "aggrieved person" subjected to "an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). "Aggrieved person" is defined to include any person who "claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i)(1). A "discriminatory housing practice" is any act made unlawful under 42 U.S.C. §§ 3604, 3605, 3607, or 3617. 42 U.S.C. § 3602(f). Under § 3605, it is unlawful for a person engaged in residential real estate transactions to discriminate against any person "because of race."

The Ninth Circuit has instructed that the "threshold for pleading discrimination claims under the [FHA] is low." *McGary*, 386 F.3d at 1262. In *McGary*, the Ninth Circuit reiterated that it has explicitly applied the pleading requirements stated in the Supreme Court's decision in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002), to FHA claims. *McGary*, 386 F.3d at 1262 (citing *Gilligan*, 108 F.3d at 248-49). In *Gilligan*, the Ninth Circuit held that for claims alleging violations of the FHA there is

a "powerful presumption against rejecting pleadings for failure to state a claim." 108 F.3d at 249 (quotation marks and citation omitted). Finally, the Supreme Court has recognized the FHA's "broad and inclusive compass" and has instructed courts to accord a "generous construction to the Act's complaint-filing provision." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995).

**\*7** Plaintiffs allege that Defendant "discriminated against Plaintiffs due to their race by refusing to modify Plaintiffs' loan under HAMP, despite the fact that Plaintiffs qualified for a HAMP modification." Second Am. Compl.¶ 29. Considering the generous FHA complaint construction standards directed by the Ninth Circuit, the Court finds that Plaintiffs have sufficiently alleged that they were discriminated against "because of their race" in connection with Defendant's denial of Plaintiffs' 2015 HAMP modification request. Plaintiffs' allegations regarding similarly situated white applicants and Defendant's consent decree further support this claim for relief.

## CONCLUSION

Defendant's Motion to Dismiss Plaintiffs' Amended Complaint or, Alternatively, to Strike Allegations (ECF 33) is DENIED.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 1199737

Footnotes

1    HAMP is a federally initiated loan modification program through the United States Department of Housing and Urban Development designed to lower monthly payments for people cannot make current monthly payments due to financial hardship. *See* HOME AFFORDABLE MODIFICATION PROGRAM: OVERVIEW, https://www.hmpadmin.com/portal/programs/hamp.jsp#l (last visited Mar. 29, 2017).

2    A deed of trust, or trust deed, is a deed executed under the Oregon Trust Deed Act ("OTDA"), Or. Rev. Stat. §§ 86.705 *et seq.*, that "conveys an interest in real property to a trustee in trust to secure the performance of an obligation the grantor or other person named in the deed owes to a beneficiary." Or. Rev. Stat. § 86.705(8). When a person borrows money to purchase a home in Oregon, the loan usually is memorialized in a promissory note. The borrower and lender also typically enter into a separately-memorialized security agreement—a mortgage or, more commonly in Oregon, a trust deed. *Brandrup v. ReconTrust Co.*, 353 Or. 668, 675 (2013). Oregon subscribes to the lien theory of mortgages. Thus, in Oregon, in the traditional security arrangement—the mortgage—the borrower conveys to the lender a lien on the property to secure the borrower's promise to repay. If the borrower defaults on the note, the lender or the lender's successor in interest may exercise its right to sell the property to satisfy the obligation, but must do so by bringing a judicial action

against the borrower. *Id.* at 676. The OTDA was enacted in 1959 to provide an alternative to judicial foreclosures. The nonjudicial alternative is available when the parties use a trust deed to secure the loan. A trust deed creates a lien on real property to secure an underlying obligation in the event of a default. The OTDA permits the trustee appointed under a trust deed to advertise and sell the property to the highest bidder without judicial involvement. *Id.*

3    As addressed in the previous motion to dismiss (ECF 19), for a pattern-and-practice claim to be sufficiently pleaded, the relevant question is not whether Defendant engaged in a pattern of discriminating against Plaintiffs, but whether Defendant had a widespread and systemic pattern and practice of discrimination against a number of similarly situated people. *See Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) ("As the Supreme Court explained, pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace." (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977))). Plaintiffs do not make such an allegation here.

4    "Although *Morgan* involved Title VII of the Civil Rights Act of 1964, the Supreme Court's analysis of the continuing violations doctrine is not limited to Title VII actions. It applies with equal force ... to actions arising under other civil rights laws." *Cherosky v. Henderson*, 330 F.3d 1243, 1246 n.3 (9th Cir. 2003) (applying *Morgan's* analysis of the continuing violations doctrine to the Rehabilitation Act); *see also Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 n.3 (9th Cir. 2007) (applying *Morgan* to FHA discrimination claims); *Colquitt v. Mfrs. & Traders Tr. Co.*, 144 F. Supp. 3d 1219, 1225-26 (D. Or. 2015) (applying *Morgan* to FHA discrimination claims based on alleged discriminatory loan modification denials).

5    By contrast, Plaintiffs do not allege any facts in their complaint relating to Defendant's officers' purported recent public statements that Plaintiffs quote in their response. Those statements are therefore irrelevant and not considered for purposes of this motion.

6    For purposes of this analysis, the Court does not find a material difference between "because of" and "on the basis of" in the context of pleading discrimination. The Court is not addressing at this time any difference that may arise relating to "but for" versus "mixed motive" causation standards.

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 8

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

694 F.2d 531
United States Court of Appeals,
Ninth Circuit.

James GAY, Leonard Whitman, Frederick McDowell, Douglas Lee, Gary Dennis and Loyal Graham, on behalf of themselves and all persons similarly situated, Plaintiffs-Appellants,

v.

WAITERS' AND DAIRY LUNCHMEN'S UNION, LOCAL NO. 30; Dining Room Employees Union, Local No. 9; Hotel and Restaurant Employees & Bartenders Union, Local No. 2; the St. Francis Hotel Corporation, a Delaware corporation; Hilton Hotels Corp., a Delaware corporation d/b/a San Francisco Hilton & Tower, Defendants-Appellees.

No. 80–4120.
|
Argued and Submitted Feb. 8, 1982.
|
Decided Aug. 24, 1982.
|
As Amended Dec. 2, 1982.

Action was brought for alleged discrimination by hotels in hiring, promoting and transferring of black males into waiter positions. The United States District Court for the Northern District of California, William W. Schwarzer, J., 489 F.Supp. 282, held that plaintiffs failed to establish prima facie case, and plaintiffs appealed. The Court of Appeals, Wallace, Circuit Judge, held that plaintiffs failed to establish a prima facie case.

Affirmed.

See also, 9 Cir., 549 F.2d 1330.

**Attorneys and Law Firms**

**\*534** B. E. Bergesen, III, Berkeley, Cal., for plaintiffs-appellants.

Cecily Waterman, Brobeck, Phleger & Harrison, San Francisco, Cal., argued, for defendants-appellees; Donald D. Connors, Jr., Anthony C. Piazza, San Francisco,

Cal., McKnight, Hudson, Lewis & Henderson, Memphis, Tenn., on brief.

Appeal from the United States District Court for the Northern District of California.

Before WALLACE and KENNEDY, Circuit Judges, and CROCKER, [*] District Judge.

**Opinion**

WALLACE, Circuit Judge:

**[1]** This case presents several significant issues concerning the order and allocation of proof, the proper role of statistical evidence, and the appropriate standard of appellate review in employment discrimination actions brought pursuant to 42 U.S.C. § 1981. Plaintiff-appellant Gay, along with three other black male waiters (the waiters), [1] filed the original complaint in this action on March 28, 1973, alleging discrimination on the basis of race in the hiring, promotion, and transfer of black male waiters and applicants by the Waiters' & Dairy Lunchmen's Union (the union) and several well-known San Francisco hotels and restaurants. The waiters sued individually and on behalf of a class of all similarly situated persons, seeking monetary and equitable relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Over five years ago we addressed the question whether this case could be maintained as a class action under Fed.R.Civ.P. 23(b)(2), reversing the district court's denial of the waiters' motion for class certification. [2] 549 F.2d 1330 (9th Cir. 1977). Following our remand to the district court, the waiters filed an amended complaint adding the Hilton Hotels Corporation (the Hilton) as a defendant and alleging new claims under section 1981. Subsequently, all Title VII claims were dismissed by the district court and all defendants except the Hilton and the St. Francis Hotels Corporation (the St. Francis) settled. The remaining claims were tried before the district court in October of 1979. On February 6, 1980, the district court entered judgment for the hotels on the waiters' individual and class claims, filing exhaustive findings of fact and conclusions of law in a thoughtful 30-page opinion. 489 F.Supp. 282 (N.D.Cal.1980). [3] The waiters appeal pursuant to 28 U.S.C. § 1291, and we affirm.

*535  I

The facts are well-summarized in the district court's opinion. We repeat only those which are relevant to the legal issues raised in this appeal.

The St. Francis and the Hilton are large, luxury hotels in downtown San Francisco. Each operates several restaurants, ranging in nature from simple coffee shops to elegant dinner restaurants, as well as banquet departments that provide food services for a variety of special functions and offer room service. The hiring practices of both hotels are similar. Preference is given to those currently employed as buspersons in filling waiter vacancies in any of the hotels' restaurants. When a vacancy is not filled by promotion, the personnel department notifies the union of the vacancy and posts a notice of opening in the hotel. Only occasionally, if at all, has the general public been notified of the existence of open waiter positions, either through newspaper advertisements or solicitations to employment agencies.

Both hotels insist that a person seeking employment as a waiter first file a written application with the personnel department. The St. Francis, however, generally refuses to schedule appointments with the personnel office for persons seeking waiter positions when no opening then exists. The district court found that applicants appearing for appointments with the St. Francis's personnel department were asked to complete written application forms, although written applications were accepted even when no waiter vacancies existed. 489 F.Supp. at 287. The Hilton ostensibly requires all applicants to file written applications with the personnel office prior to being considered for waiter positions. The record, however, clearly reveals that many applicants for waiter positions were hired by the Hilton's restaurant managers before the personnel department was notified of the vacancy, and that several were hired without being required to file written applications.

The hotels each receive approximately 6,000 applications per year, an average of between 12 and 15 applications for every waiter position which becomes open. Both retain written applications in an active file for a period between six months and one year. These retained applications, however, are only sporadically referred to when vacancies occur, 489 F.Supp. at 296, because the hotels consider

reference to previously filed applications time-consuming and inefficient, and typically fill open waiter positions very quickly. With few exceptions, applicants are hired only if a vacancy occurs within one to three days of their application. *Id.* n.10. All applicants are interviewed by the manager of the hotel restaurant seeking to fill a vacancy. The restaurant managers make the final hiring decisions based upon the interviews and their resulting impressions of such factors as prior job experience and job stability, appearance and demeanor. These criteria are not contained in any job description or other document, and their implementation is left entirely to the discretion of the individual restaurant managers. *Id.* at 300.

The waiters consist of four individual plaintiffs and four class plaintiffs. All the individual plaintiffs "were experienced waiters qualified for employment at either the St. Francis or the Hilton." *Id.* at 291. Three of the four individual plaintiffs worked at various times as banquet or extra banquet waiters at the St. Francis, one worked in a similar position at the Hilton, and one of the four worked at both hotels. The district court found that only one of the individual plaintiffs ever filed a written application for a permanent waiter position with either hotel. All made periodic oral requests for permanent positions; the district court expressly found that in some of the years in question, two of the individual plaintiffs made such oral requests repeatedly. However, the district court determined that with respect to both hotels, the evidence was insufficient to permit a finding as to the date of any of these oral job *536 requests; therefore, the district court found that it was not possible to determine from the record whether vacancies existed at the time that any of the individual plaintiffs orally requested permanent positions. *Id.* at 295– 96. Accordingly, the district court held that the waiters had failed to establish a prima facie case of intentional discrimination on their individual claims. *Id.*

Concluding that proof of intentional discrimination is required for section 1981 claims, *id.* at 299–300, the district court held that the class had failed to prove a prima facie case of an alleged pattern or practice of purposeful discrimination against black male waiter applicants. The district judge concluded that the circumstantial evidence was wanting and that the statistical presentation was insufficient to raise a prima facie case, *id.* at 311, and entered judgment for the hotels on the class claims.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

The waiters appeal the district court's judgment only with respect to their claims arising under 42 U.S.C. § 1981. Although their attack on the district court's judgment is limited to these claims, it is vigorous and extremely wide in scope. Among other things, the waiters contend that the district court erred in concluding that discrimination actions brought pursuant to section 1981 require proof of discriminatory intent. Assuming that proof of discriminatory intent is a requisite element in a prima facie section 1981 case, they then argue that their statistical evidence of racially-imbalanced hiring decisions, standing alone, was sufficient to establish a prima facie case of discriminatory intent. Alternatively, they argue that the district court erred by failing to consider, with respect to their individual claims, relevant testimonial and other circumstantial evidence of discrimination introduced during trial. Finally, the waiters insist that their statistical and circumstantial evidence of discrimination, viewed together, established a prima facie case of intentional discrimination as a matter of law on both the individual and class claims, and that this prima facie case was never rebutted by either of the hotels. They therefore ask us to reverse the district court's judgment and direct entry of judgment in their favor.

 **[2]**   The waiters' first argument, that a prima facie case of discrimination under section 1981 should not require proof of a discriminatory purpose, can be disposed of summarily. We held nearly two years ago that section 1981 is limited to claims of intentional discrimination. *Craig v. County of Los Angeles*, 626 F.2d 659 (9th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981) (*Craig* ). We have since followed *Craig* repeatedly. *See, e.g., Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 928 (9th Cir. 1982). The Second Circuit recently reached the same result, *Guardians Ass'n v. Civil Service Comm'n*, 633 F.2d 232, 268 (2d Cir. 1980), *cert. granted*, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), as did the Third Circuit *en banc*, *Croker v. Boeing Co.*, 662 F.2d 975, 989 (3d Cir. 1981). The Supreme Court has now taken this position. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

## II

In order to decide the remaining issues, we must first focus briefly on the relationship, and differences, between

Title VII and section 1981. Title VII prohibits employment discrimination on account of race, sex, religion, and national origin. 42 U.S.C. § 2000e–2(a). Section 1981, which provides that all persons "shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens," is limited to a prohibition of racial discrimination. *Runyon v. McCrary*, 427 U.S. 160, 167–68, 96 S.Ct. 2586, 2592–2593, 49 L.Ed.2d 415 (1976). Title VII and section 1981 are thus overlapping, but independent remedies for racial discrimination in employment. *Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). While some of the difficult issues the courts have faced recently could have been avoided had Congress repealed section 1981, at least as applied to employment, when it enacted Title VII in 1964, Congress chose not to do so. *Id.* at 459, 95 S.Ct. at 1719. It  **\*537**  is therefore the duty of the federal courts to apply these statutes in light of their separate language and legislative histories, promoting consistency between the two only to the extent that doing so does not conflict with the language or purpose of either.

 **[3]**   **[4]**   **[5]**   Our decision in *Craig* reflects the major differences between section 1981 and Title VII. The latter is an ambitious, prophylactic measure designed to outlaw artificial, unnecessary barriers to employment which act as "built-in head winds" against the progress of minority groups. Title VII was designed to bar not only overt employment discrimination, "but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). A prima facie "disparate impact" case under Title VII may therefore be established without any proof of intentional discrimination: where a business practice, neutral on its face, is shown to have a substantial, adverse impact on some group protected by Title VII, the plaintiff has made out a prima facie case, and the burden [4] shifts to the defendant to establish that the practice is justified by "business necessity." *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1275–80 (9th Cir. 1981). Good intent or absence of intent is no defense to such disparate impact Title VII claims. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977) (*Teamsters* ); *Griggs v. Duke Power Co., supra*, 401 U.S. at 432, 91 S.Ct. at 854.

Section 1981, on the other hand, does not embody the same broad, prophylactic purpose as does Title VII. There are very real historical and practical differences

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 687 of 898

Gay v. Waiters and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

between the two statutes. *Davis v. County of Los Angeles*, 566 F.2d 1334, 1348–51 (9th Cir. 1977) (Wallace, J., dissenting), *vacated as moot*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *see General Building Contractors Ass'n v. Pennsylvania, supra*, 102 S.Ct. at 3146–48. We therefore held in *Craig* that a prima facie case of racial discrimination in cases brought under section 1981, like cases brought under the equal protection clause and 42 U.S.C. § 1983, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), requires proof of intentional discrimination. *Craig, supra*, 626 F.2d at 668. A plaintiff suing under section 1981 may not avail himself of the more liberal *Griggs* standard for establishing a prima facie case of employment discrimination upon a showing of disparate impact alone.

**[6]    [7]**    A Title VII violation, of course, can be established by means other than an unrebutted showing of disproportionate impact. *See Teamsters, supra*, 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854 n.15. An alternative, equally valid theory of liability is that of "disparate treatment": that an individual was singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under the statute. By their very nature, these claims require proof of intentional discrimination. *Id.* ("[p]roof of discriminatory motive is critical"). Whether brought under Title VII, the equal protection clause or section 1981, therefore, claims of disparate racial treatment require proof of intentional racial discrimination. The district court correctly recognized this parallel between these otherwise dissimilar constitutional and statutory provisions. *See* 489 F.Supp. at 295.

**[8]    [9]    [10]    [11]    [12]**    The plaintiff in a Title VII disparate treatment case, like most civil plaintiffs, bears the ultimate burden of *persuasion* on the issue of discriminatory intent. **\*538** *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) ( *Burdine*). But the burden of *production*, sometimes referred to as the burden of going forward with evidence sufficient to avoid a directed verdict or judgment as a matter of law, shifts. *Id.* at 253–56, 101 S.Ct. at 1093–95. A prima facie case of disparate treatment under Title VII is established by proof of facts supporting an *inference* of intentional discrimination. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (*Furnco*). This initial burden of production is "not

onerous," *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093, and is met upon a "showing of actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon" race or another impermissible criterion. *Furnco, supra*, 438 U.S. at 576, 98 S.Ct. at 2949. The plaintiff's immediate burden of production may be discharged by proof of the four elements articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas*), [5] or by an alternative presentation of evidence supporting an inference of discrimination. The Supreme Court has consistently emphasized that the *McDonnell Douglas* criteria are not the only mode of establishing a prima facie case of intentional discrimination under Title VII. *See Burdine, supra*, 450 U.S. at 253–54 n.6, 101 S.Ct. at 1093–94 n.6; *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949; *Teamsters, supra*, 431 U.S. at 358, 97 S.Ct. at 1866; *McDonnell Douglas, supra*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13.

**[13]    [14]**    While Title VII disparate impact cases are of little help to us in this case, the reasoning used to analyze the required prima facie showing in a Title VII disparate treatment case is of great assistance because it is nearly identical to the inquiry necessary in a section 1981 case. Since a prima facie section 1981 case, like a prima facie disparate treatment case under Title VII, requires proof of intentional discrimination, the focus of the judicial inquiry must be whether the plaintiff has proven by a preponderance of evidence facts from which the court must infer, absent rebuttal, that the defendant was more likely than not motivated by a discriminatory animus. Under both statutes, the court must make a sensitive inquiry into the direct and circumstantial evidence of discrimination offered by the plaintiff in order to determine if the facts so proved allow a legally-permissible inference of discriminatory intent. Accordingly, it is not inappropriate to allow section 1981 claimants to avail themselves of Title VII discriminatory treatment standards in proving a prima facie case. *See Hudson v. IBM Corp.*, 620 F.2d 351, 354 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

Our statement in *Craig* that "equal protection rather than Title VII standards apply to employment discrimination claims brought under § 1981," *Craig, supra*, 626 F.2d at 668, is not to the contrary. The comment was part of

our reasoning that discriminatory intent is required in a section 1981 case. Thus in *Craig*, we were distinguishing the Title VII standards set down in *Griggs*, a disparate impact case, from the equal protection requirement of proving a discriminatory purpose established in *Washington v. Davis, supra*, 426 U.S. at 238–42, 96 S.Ct. at 2046–2048. We have since clearly stated that "the *McDonnell Douglas* criteria provide a useful guide to a plaintiff's burden in a section 1981 ... non-class employment discrimination suit." **\*539** *Tagupa v. Board of Directors*, 633 F.2d 1309, 1312 (9th Cir. 1980) (footnotes omitted). We hold, therefore, that a plaintiff may establish a prima facie case of intentional discrimination in employment under section 1981 upon proof of facts which would establish a prima facie case of disparate treatment under Title VII, pursuant to the four *McDonnell Douglas* elements or otherwise.

Yet we expressly do not hold that *Burdine, Furnco* and *McDonnell Douglas* must be blindly followed in all aspects of section 1981 cases. "[A] plaintiff's burden in a 1981 ... action may differ in some respects from that of a plaintiff in an action brought under Title VII ...." *Tagupa v. Board of Directors, supra*, 633 F.2d at 1312. The two statutes, as we stated earlier, are markedly dissimilar in several important respects. We here deal only with a plaintiff's burden to demonstrate a prima facie case under section 1981, and need go no further.

### III

**[15]** Before turning to the waiters' arguments on the merits we are confronted with the question of the appropriate standard of review for the issues raised in this appeal. Applying the criteria articulated in *McDonnell Douglas, supra*, 411 U.S. at 802 & n.13, and *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), the district court determined that the waiters failed to establish a prima facie case of intentional discrimination. 489 F.Supp. at 295–96 (individual claims); *id.* at 311 (class claims). The St. Francis characterizes this determination as a finding of fact, and argues that we may therefore reverse the district court's judgment consistent with Fed.R.Civ.P. 52(a) only if we conclude that this so-called finding was clearly erroneous.[6] The waiters, on the other hand, argue that the clearly erroneous standard properly applies to questions of fact resolved by the district court by

reference to the credibility of conflicting documentary, testimonial or circumstantial evidence, but that the determination whether an employment discrimination plaintiff has established a prima facie case of intentional discrimination under *McDonnell Douglas* is a question of law for the district court, reviewable on appeal free of the clearly erroneous standard. Thus, the question squarely presented is whether, in a section 1981 case alleging disparate treatment in employment, the district court's determination that the plaintiff failed to establish a prima facie case of intentional discrimination under *McDonnell Douglas* and its progeny is a finding of fact within the meaning of Fed.R.Civ.P. 52(a). If so, such a finding may be set aside or reversed on appeal only if the appellate court determines that the finding is clearly erroneous. A finding of fact is clearly erroneous only when, although there is evidence in the record to support it, the court of appeals is left with the "definite and firm conviction" that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Edinburgh Assurance Co. v. R. L. Burns Corp.*, 669 F.2d 1259, 1261 (9th Cir. 1982).

The answer to this inquiry is not crystal clear. There is some language in two cases which can be perceived as suggesting a rule different from that established by our earlier precedent. To see whether the conflict is real or only apparent, we must review our decisions on this issue.

In a series of cases beginning in 1977, we have applied the clearly erroneous standard to the district court's findings on the facts supporting the four *McDonnell Douglas* elements, as well as the factual question of the extent of any adverse impact demonstrated by the plaintiff's statistical evidence. *E.g., Chavez v. Tempe Union High School Dist.*, 565 F.2d 1087 (9th Cir. 1977); *White v. City of San Diego*, 605 F.2d 455 (9th Cir. 1979); **\*540** *McLean v. Phillips-Ramsey, Inc.*, 624 F.2d 70 (9th Cir. 1980) (per curiam); *Hagans v. Andrus*, 651 F.2d 622 (9th Cir.), *cert. denied*, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir. 1981). These factual findings include the four *McDonnell Douglas* elements themselves, which are, after all, factual determinations.[7] These cases lead to the conclusion that the district court's findings on what facts were established by a preponderance of the evidence must be accepted on appeal unless clearly erroneous, but that the court's determination whether the facts so proved were sufficient to establish an inference of discrimination, in other words

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

whether the plaintiff's proof established a prima facie case thus shifting the burden of production to the defendant, is a legal conclusion freely reviewable on appeal.

In these cases we applied the clearly erroneous standard of review to the facts found by the district court by reference to the credibility of conflicting documentary, testimonial and circumstantial evidence. In *Chavez v. Tempe Union High School Dist., supra*, a high school English teacher alleged that she was denied the position of language department chairperson on account of national origin in violation of Title VII. She raised both disparate treatment and disparate impact claims. 565 F.2d at 1090. The district judge determined that the plaintiff had failed to establish a prima facie case of disparate treatment based upon his finding that at the time of the plaintiff's application, the position had already been filled. *Id.* We affirmed. After concluding as a matter of law that "the failure to prove the existence of a job opening is a fatal defect in a prima facie case of overt discrimination," *id.* at 1091, we addressed the district court's findings of fact. We held that the district court "was not clearly erroneous in determining as a factual matter" that the principal's selections of department chairpersons were automatically approved. *Id.* We further held that the district court's finding of fact "as to the actual date of Chavez' application" was clearly erroneous, but that "the district judge's factual determination that at the time of Chavez' application, the position was already filled ... was not clearly erroneous." *Id.* at 1092. In view of our earlier holding that a prima facie disparate treatment case requires a showing of job availability, therefore, we held that Chavez had failed to establish a prima facie case. *Id.*

We did not, however, hold or imply that the district court's determination that the facts proved by the plaintiff were insufficient to establish a prima facie case was a finding of fact reversible only if clearly erroneous. Indeed, we distinguished between the district court's finding on the factual question of job availability and the court's "conclu[sion] as a matter of law that the [school] district had not violated Chavez' civil rights." *Id.* at 1090. We applied this same distinction to Chavez' disparate impact claim. Chavez argued that the neutral practices employed by the district, specifically the failure to advertise chairperson positions and the district's failure to follow its own standards for qualifications, had a disproportionate adverse impact on minorities. We pointed out that the facts showed that Chavez "had a

fair opportunity to obtain a position as acting department head," and that "Chavez ha[d] not shown that the failure of the district to follow its own standards had a disproportionately unfavorable impact on minorities." *Id.* at 1094. Accordingly, we "conclude[d] that Chavez ha[d] failed to establish a prima facie case of discrimination under Title VII ...." *Id.* at 1095. Thus, nothing in *Chavez* suggests that the determination whether the amount of disproportionate impact established by a *Griggs* plaintiff is sufficient to raise a prima facie case is a finding of fact subject to the clearly erroneous standard of review.

In *White v. City of San Diego, supra*, a female city accountant alleged that the city's failure to promote her violated Title VII on both disparate treatment and disparate impact theories of sexual discrimination. While addressing her disparate treatment **\*541** claim we again distinguished between the four factual *McDonnell Douglas* elements and the subsequent conclusion whether the plaintiff's proof of those or alternative facts was sufficient to permit an inference of intentional discrimination under *Furnco*. "Thus, however we view the City's subsequent ... hirings, they cannot, on these *facts*, raise an *inference* of discrimination on the basis of sex." 605 F.2d at 459 (emphasis added).

In our analysis of her *Griggs* disparate impact claim, we addressed the standard of review issue expressly. White argued that the clearly erroneous standard did not apply because her claim was that the trial court improperly applied the law to undisputed facts. *Id.* at 459. We concluded, however, that her claim was actually that the district court erred in weighing her statistical proof. The district court found that her statistics were unreliable and the sample sizes she offered were too small. *Id.* at 460. We appropriately deferred to the district court's fact-finding function with respect to this statistical evidence. *Id.* at 460–61. Thus, although we applied the clearly erroneous standard to the district court's "factual assessment" of statistical data, *id.*, we did not apply that standard to the district court's determination that the data failed to establish a prima facie case. *See also Frausto v. Legal Aid Society*, 563 F.2d 1324, 1328–29 (9th Cir. 1977) (concluding that the district court did not clearly err in finding that plaintiff's statistical data showed higher proportion of minority employees than in qualified, available population). We followed both *White* and *Chavez* in *Hagans v. Andrus, supra*, where we reviewed the district court's determination that the plaintiff failed

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

to establish a prima facie case as a freely reviewable conclusion of law, 651 F.2d at 624, but separately reviewed the court's findings of fact under the clearly erroneous standard. *Id.* at 626–27.

In two other cases we made the *Chavez* distinction clearly and expressly. In *McLean v. Phillips-Ramsey, Inc., supra*, a disparate treatment case, the district court dismissed the action at the close of the plaintiff's case-in-chief. "In support of its *conclusion* that McLean had not established a *prima facie* case, the district court *found* that" McLean had failed to prove several of the four factual *McDonnell Douglas* criteria. 624 F.2d at 71 (emphasis added). We reversed. We wrote that "[t]hese findings may not be disturbed unless clearly erroneous," *id.*, but "conclude[d] that the district court's findings [were] clearly erroneous." *Id.* In *Fernandez v. Wynn Oil Co., supra*, 653 F.2d at 1275, the district court found that the plaintiff had failed to demonstrate she was qualified for the position in question and, alternatively, that the individual eventually chosen for the job had superior qualifications. Citing *McLean*, we held that "[u]nless these findings are clearly erroneous, they must not be disturbed on appeal." *Id.* See also *Pack v. Energy Research & Development Adm'n*, 566 F.2d 1111, 1113 (9th Cir. 1977) (per curiam) (clearly erroneous standard applied to district court finding that plaintiff was considered for position sought). We then held that the record supported both findings. We did not, however, apply the clearly erroneous standard to the question whether these findings supported the district court's conclusion that no prima facie case had been made out. We deferred to the trial court's ability to resolve disputed issues of fact, but analyzed the legal issue without any reference to the clearly erroneous standard.

> Fernandez has therefore failed to demonstrate that the district court clearly erred in failing to find her qualified for the DIO position. If an applicant is not qualified for the job in question, she has failed to establish a prima facie case.

*Fernandez v. Wynn Oil Co., supra*, 653 F.2d at 1275 (citations omitted).

In sum, these cases establish that the district court's factual assessment of the plaintiff's evidence, including the court's findings as to whether the plaintiff has proved any or all of the four factual *McDonnell Douglas* criteria, may

not be upset on appeal unless clearly erroneous. They do not support the proposition that the district court's determination that the **\*542** plaintiff failed to establish a prima facie case is a finding of fact subject to the clearly erroneous standard of review. [8]

The first case which presents us with some difficulty is *Golden v. Local 55, Int'l Ass'n of Firefighters*, 633 F.2d 817 (9th Cir. 1980). Four rulings by the district court were contested on appeal. The third was that the union did not breach its duty of fair representation and, in the fourth, "the court found that the union had not violated Title VII." *Id.* at 820. Without citation of authority, we stated that "[t]he standard for reviewing rulings three and four is whether the findings are consistent with Fed.R.Civ.P. 52(a)." *Id.* Notwithstanding this statement, however, we appear to have applied a substantial evidence standard of review. "We find substantial evidence to support the conclusion of 'no Title VII violation' under both [disparate impact and disparate treatment] theories." *Id.* at 821. *See also id.* at 823 ("We find substantial evidence, however, to support the conclusion that no disparate impact was shown."). At any rate, *Golden* can be harmonized in part with our earlier cases. The district court found that the promotion examination in question "did not have a discriminatory impact on minorities." *Id.* at 823. Under *White v. City of San Diego, supra*, 605 F.2d at 460, this is a factual assessment of the weight of statistical data, subject to the clearly erroneous standard of review. In addition, the fact that two of our cases decided subsequent to *Golden* have followed the earlier holdings, *see Hagans v. Andrus, supra*, 651 F.2d at 622; *Fernandez v. Wynn Oil Co., supra*, 653 F.2d at 1273, demonstrates that this case does not present a complete departure from the weight of our precedent.

The only other case found in our circuit which may be read to apply the clearly erroneous standard to the district court's conclusion that the plaintiff has proved facts sufficient to establish a prima facie case of intentional discrimination is *Piva v. Xerox Corp.*, 654 F.2d 591 (9th Cir. 1981), which involved an allegation of disparate treatment based upon sex. [9] There, we first briefly summarized the shifting burdens of production involved in *McDonnell Douglas* lawsuits, and then wrote:

> In this circuit, the trial court's conclusions regarding the success or failure of the plaintiff and defendant in

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

meeting these burdens are reviewed under the clearly erroneous test. *Golden v. Local 55*, [*supra* ]. This standard of review is particularly appropriate where, as in this case, the underlying facts are in dispute and the validity of the proffered statistical evidence is in question. *See White v. City of San Diego*, [*supra* ].

*Id.* at 594 (footnote omitted). On its face, this language appears to be inconsistent with our prior line of cases from *Chavez* to *Fernandez.* Two authorities are cited: *Golden*, which as indicated earlier may be questionable precedent, and *White*, which is consistent with our holdings from *Chavez* to *Fernandez.* To attempt to harmonize in part, we could point to portions of *Piva* in which the clearly erroneous test was properly applied to the district court's findings on the *McDonnell Douglas* factual criteria. *See id.* at 595, 598. To this extent, *Piva* would be consistent with our earlier precedent. Nevertheless, there is an inconsistency in our cases, leaving us the burden to determine which to follow.

**[16]  [17]  [18]  [19]**  In order to decide this case, we choose to follow the longer and more established **\*543** line of cases. Applying the clearly erroneous standard to the district court's determination that an employment discrimination plaintiff failed to establish a prima facie case of disparate treatment appears to us to be inconsistent with the theoretical [10] and functional [11] role of the *McDonnell Douglas* burden-shifting procedure, with **\*544** the Supreme Court's analysis and holding in *Furnco*, [12] and with the purpose of Rule 52(a). [13] For these reasons, it could be argued that the vitality of *Golden* and *Piva* **\*545** are largely undercut by the reasoning of Supreme Court decisions and the logical application of a governing rule. [14] In addition, while we recognize the apparent conflict, it is unnecessary for our court to resolve the issue en banc to decide this case. If we freely review the district judge's conclusion that no prima facie case has been demonstrated and conclude that he was correct, we would, obviously, come to the same **\*546** conclusion if we followed the more restrictive clearly erroneous standard of review. Since the Supreme Court has stated that "[a] *McDonnell Douglas* prima facie showing is not the equivalent of a factual finding of discrimination," *Furnco, supra*, 438 U.S. at 579, 98 S.Ct. 2950, we are content in this case to apply the *de novo* standard of review.

IV

**[20]**  The waiters characterize this case as "emblematic of the 'modern' employment discrimination lawsuit." It is clear from the record that the waiters were unable to produce any "smoking gun" evidence of overt discrimination: they did not establish the existence of "all-white" departments, come forward with testimony of racial epithets or other clear indications of discriminatory motivation, or produce any direct evidence of intentional discrimination. This failure was not fatal to their case, however, since it is settled that a prima facie showing of disparate treatment may be made without any direct proof of discriminatory motivation. Yet we disagree with the waiters' basic argument on appeal: that the facts they did prove were sufficient to establish a prima facie case of disparate treatment as a matter of law. The waiters insist that their evidence demonstrated a "significant underrepresentation" of blacks by both hotels over the course of nearly a decade; the application of numerous "subjective employment practices" that "inevitably invite" discrimination; the treatment of black applicants in a way "that could only lead ... to discouragement and surrender"; and a "resolute refusal" by the hotels to "give a damn about the situation or to take any steps of a remedial nature." Yet the waiters have failed to meet their burden of demonstrating that any of the district court's material findings of fact were clearly erroneous, and have failed to convince us that the district court erred when it concluded from these facts that they failed to establish a prima facie case.

The district court found that the waiters were qualified for the positions sought, that they worked as banquet or extra banquet waiters at both hotels on a temporary or part-time basis and frequently made oral inquiries concerning permanent positions, but that they did not produce sufficient evidence to permit a finding as to the date when they orally applied. It was therefore "not possible ... to determine whether openings existed at the time when any of [the waiters] applied." 489 F.Supp. at 295. Based upon the waiters' own exhibits, the court found that the vast majority of black applicants did not apply for a waiter position at or about the time a non-black was hired. *Id.* In almost all cases, no black had applied for a waiter position ultimately filled by a non-black within one month of the successful non-black applicant. *Id.* at 295, 296.

**[21]**  These findings of fact are not disputed by the waiters. They argue that the district court erred in concluding

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 692 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

from these facts that they failed to establish a prima facie case of intentional discrimination. As an initial matter, the waiters argue that the district court incorrectly required them to establish that they had filed *written* applications. This argument is unpersuasive. The district court's opinion in no way relied upon the waiters' failure to prove that they had filed written applications. Somewhat similarly, the waiters argue that under *Teamsters* they need not have applied for the positions at all, in writing or otherwise, because they were deterred from doing so. This argument is also unpersuasive. *Teamsters*, a class action, provides a limited exception to the rule that the plaintiff in a disparate treatment lawsuit must demonstrate that he or she applied for the position sought. The necessary prerequisite to such a claim is proof of a "consistently enforced discriminatory policy" which discourages applicants from even attempting to apply. *Teamsters, supra*, 431 U.S. at 365, 97 S.Ct. at 1869. *See Tagupa v. Board of Directors, supra*, 633 F.2d at 1312 n.2. There was no such proof in this case.

The waiters' major argument is that their evidence was sufficient to satisfy *McDonnell Douglas.* They argue correctly that **\*547** the district court found that job openings did, in fact, exist. *See* 489 F.Supp. at 296 ("in the general period in which the individual claimants were interested in employment ... waiters were being hired"). The district court was not clearly erroneous in making this finding. In view of the fact that the St. Francis hired 390 waiters between 1970 and 1979, *see id.* at 308, and the Hilton hired 206 waiters between 1974 and 1979, *see id.* at 309, it would belie reality to find that there were no vacancies in waiter positions at the hotels. The waiters, however, insist that such a "general availability" of jobs is sufficient to satisfy the second *McDonnell Douglas* criterion—that the plaintiff "applied and was qualified for a job for which the employer was seeking applicants." They contend that where, as here, knowledge of job vacancies is not made generally available, applicants cannot be expected to make carefully-timed applications.

The waiters have cited some cases from other circuits which may support their position. In *East v. Romine, Inc.*, 518 F.2d 332, 338 (5th Cir. 1975), the court held that the plaintiff had established a prima facie case of intentional sex discrimination under *McDonnell Douglas* upon proof that (1) she was qualified for a position, (2) she applied for the job, and (3) openings were filled "within six months" after application. Although the waiters were

unable to establish the exact day upon which they applied, their proof clearly established the years in which they applied and that waiters were being hired regularly during those years. Two other cases upon which they rely contain language supporting their position, but are clearly distinguishable on the facts. In *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1016–17 (2d Cir. 1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), the Second Circuit reversed a judgment of the district court that the plaintiffs had failed to establish a prima facie case since no jobs were available when they applied. The court wrote that it was irrelevant that the plaintiffs "failed to apply often enough or at the correct times," *id.*, but only because the employer admitted routinely hiring persons for specific openings before they became available and were announced. In *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 347–48 (10th Cir. 1975), the court held that to establish a prima facie case, a plaintiff need not "point to a specific opening." However, the court expressly limited its holding to promotion cases. "Clearly this [job opening requirement] applies to new employment and is different from an employee who is seeking promotion. The former takes place on a particular day, whereas in the promotion area it invariably arises during a lengthy period of time." *Id.* at 348. Finally, a brief dictum in the Supreme Court's opinion in *Furnco* might appear to indicate that proof of "general job availability" is sufficient to establish a prima facie *McDonnell Douglas* case. The Court stated that the plaintiffs had established a prima facie case upon proof of, among other things, that they were "qualified in every respect for jobs which were *about to be open." Furnco, supra*, 438 U.S. at 576, 98 S.Ct. at 2949 (emphasis added).

These cases do not persuade us to dispense with the "job opening" requirement. *Chavez v. Tempe Union High School Dist., supra*, 565 F.2d at 1087. The function of the *McDonnell Douglas* prima facie case is to eliminate the two most common reasons why an applicant may be rejected: an absolute or relative lack of qualifications, or lack of an open position. *Teamsters, supra*, 431 U.S. at 358 n.44, 97 S.Ct. at 1866 n.44; *see also Burdine, supra*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. Upon proof of facts sufficient to disprove these two most common reasons for a rejection, courts infer, in light of their experience, that the employment decision was "more likely than not" based upon race. *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949. If we were to permit a prima facie case to be established solely upon proof that jobs, in general, were available within some unspecified time from the

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 693 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)
30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

unspecified date at which a plaintiff applied for a position, we would be permitting a plaintiff to raise an inference of discrimination where he or she has failed **\*548** to disprove one of the two common and neutral reasons for a rejection. Thus, we would be permitting an inference of discrimination in situations in which it was not "more likely than not" that the employment decision was based upon race.

Our cases are not to the contrary. In *Chavez v. Tempe Union High School Dist., supra*, 565 F.2d at 1087, where the position in question had already been filled when the plaintiff applied, we held that "the failure to prove the existence of a job opening" is a failure as a matter of law to make out a prima facie case of disparate treatment under *McDonnell Douglas. Id.* at 1091. In a failure to promote case, we observed that requiring the job to remain open in the same sense as in a failure to hire case would frustrate the *McDonnell Douglas* test. *Hagans v. Andrus, supra*, 651 F.2d at 625. We emphasized the "flexibility" of the *McDonnell Douglas* test and held that a position need not necessarily "remain open" under *McDonnell Douglas* when several applicants apply for a job that will necessarily be filled by one of them at a predetermined time. In one job application case, we did hold that there may be circumstances where, due to the specific facts involved, some flexibility is required in determining whether, as a practical matter, a job opening occurring after an application is made is an open position under *McDonnell Douglas. See McLean v. Phillips-Ramsey, Inc., supra*, 624 F.2d at 70. Nevertheless, absent this very narrow and specific exception, the job opening requirement of *Chavez* is the law of this circuit.

[22]   In this case, the waiters' own evidence demonstrated that "with only a few exceptions, waiters were hired within a few days of the date of their application." 489 F.Supp. at 296 (footnote omitted). Their own evidence showed that with even fewer exceptions, no black applicant applied at either of the hotels within a month of the date that a non-black was hired. Yet on direct examination, none of the individual plaintiffs was able to recall when he applied for permanent positions at either of the hotels. Having failed to establish the date upon which they applied, and having failed to establish that *any* black applicant applied at the time a job was open or, if the *McLean* exception were to apply, that a job vacancy occurred within a reasonable time, the plaintiffs failed to establish a prima facie case of intentional discrimination. The district court

correctly concluded that the waiters failed to prove that their inability to secure jobs at either hotel was "more likely than not" based upon racial discrimination.

[23]   With respect to the Hilton, this conclusion is reinforced by the evidence showing that none of the individual plaintiffs ever applied for waiter positions which were subsequently filled by non-blacks. This does not mean, however, as the Hilton argues, that the waiters failed to raise a prima facie case under our decision in *Tagupa v. Board of Directors, supra*, in which we held that the plaintiff had not applied for the position in question because he had failed to "complete the application process." 633 F.2d at 1312. There, the application materials the plaintiff furnished, in response to an advertisement, did not include any reference to the job qualifications sought by the employer and requested clearly in the advertisement. The Hilton argues that the individual plaintiffs failed to complete the application process under *Tagupa* simply because they failed to submit written applications. It is true that the district court found that "[a]ll applicants [at the Hilton] must file an application." 489 F.Supp. at 288. Insofar as this finding implies that the Hilton refused to consider a person for any waiter position in the absence of a written application, however, it is clearly erroneous. The Hilton's own witnesses testified that restaurant managers or department heads often sent prospective hirees to the personnel department before the personnel department ever learned of the existence of a job opening. Indeed, they even testified that the hotel's banquet department managers frequently hired waiters for permanent positions without ever notifying the personnel department of the existence of a job opening. Three of the **\*549** individual plaintiffs worked on a part-time basis in the Hilton's banquet department and, significantly, the Hilton does not challenge the district court's finding that all were qualified for permanent employment. Combined with the district court's finding that these individuals repeatedly inquired about permanent positions, this is sufficient to demonstrate that they applied for the job within the meaning of *Tagupa*.

[24]   Even had the waiters established a prima facie case, however, the evidence was sufficient to support the conclusion that the Hilton rebutted any inference of discrimination. Appellant Whitman "made oral job requests to the Hilton's banquet manager" during 1975, but received no offer. 489 F.Supp. at 290. This was his

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 694 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

sole effort to gain employment at the Hilton. Yet the plaintiffs' own evidence shows that no waiters were hired by the Hilton's banquet department in 1975. Appellant McDowell made repeated inquiries about a permanent job at the Hilton while working there as an extra banquet waiter during 1974. However, the banquet department hired only one new waiter during 1974, a black man. [15] Finally, appellant Dennis made oral inquiries at the Hilton beginning in October 1975, while working there as an extra banquet waiter. He also testified that he "was never able to file an application." 489 F.Supp. at 291. Yet the record shows that the Hilton refused to consider him for any further employment because of a dispute between him and a captain during a banquet. *Id.* Even more striking is the testimony of appellant McDowell that he was "treated wonderful" while working at the Hilton. This corroborates the testimony of the Hilton's own witnesses, including a black waiter and another black man (presently the manager of the Hilton's largest restaurant), that the Hilton had never discriminated against black applicants and had, in fact, been singled out for praise by black groups for its work in integration.

Nonetheless, even if we were to assume that the waiters applied for positions at both hotels which subsequently became vacant and were filled by non-blacks, *Chavez* establishes that a job opening must exist at the time of the application. In addition, even if this were an exception allowed by *McLean*, a job opening would need to be proven to exist at least within a reasonable time of the date of the application. The district court found that the hotels routinely filled open positions extremely quickly by hiring waiters from among those who had applied within the previous several days, but that no black applicant applied within a month of the hiring of a non-black. These findings establish that the waiters failed to prove the necessary link of timeliness between an application and a vacancy, and thus failed to establish a prima facie case.

The district court also concluded that, assuming a prima facie case were established, the hotels had articulated a legitimate, nondiscriminatory reason for their conduct. As we hold that no prima facie case was proven, we need not address this issue in any detail.

V

**[25]** The waiters' two remaining arguments pertain to both the individual and class claims. They maintain that (1) their statistical evidence, standing alone, was sufficient to establish a prima facie case of disparate treatment; and (2) even if not, the statistical proof in conjunction with the circumstantial evidence of discrimination presented was sufficient to establish such a prima facie case. As part of their second argument, the waiters contend that the district judge erred in failing to consider their statistical data with respect to their individual claims. As to this final challenge, the waiters are correct; the district judge erred.

**\*550** The district judge closely scrutinized the statistical evidence introduced by the waiters and credited the testimony of their expert witness, but did so only with respect to the class claims. With respect to the individual claims, the district court observed that the statistical proof "may be probative," but refused to consider it: "Inasmuch as the statistical proof in this case fails to establish a prima facie case on behalf of the class ... it is of no help to the individual claimants." 489 F.Supp. at 296 n.9. This was incorrect. We have repeatedly emphasized that proof of the four *McDonnell Douglas* criteria is not the only way to establish a prima facie case of disparate treatment, and that the *McDonnell Douglas* approach is to be applied flexibly. In addition, we have clearly held that, if reliable, generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit. *See, e.g., O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 866 (9th Cir. 1982); *Lynn v. Regents of the University of California*, 656 F.2d 1337, 1342–43 & 1342 n.3 (9th Cir. 1981); *Heagney v. University of Washington*, 642 F.2d 1157, 1164 (9th Cir. 1981); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 762 & n.10 (9th Cir. 1980); *White v. City of San Diego, supra*, 605 F.2d at 459–60. This is true whether or not the statistical data introduced is sufficient of itself to establish a prima facie case. Since the question is one of inferring discriminatory intent, the district court should make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (*Arlington Heights* ), including any reliable statistical data offered by the plaintiff, in order to determine whether the facts so proved constitute prima facie evidence of discriminatory intent. The legal standard to be applied is simply whether the facts proved are sufficient to permit the court to infer, absent explanation,

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 695 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)
30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

that the employment decision was more likely than not the product of intentional discrimination. *Furnco, supra*, 438 U.S. at 576, 98 S.Ct. at 2949; *White v. City of San Diego, supra*, 605 F.2d at 458. Of course, if the claim analyzed is individual rather than class, the statistics must be relevant to the particular plaintiff's claim. But all evidence, both direct and circumstantial, statistical and nonstatistical, relevant to that question should be assessed on a cumulative basis. *EEOC v. American National Bank*, 652 F.2d 1176, 1189 (4th Cir. 1981). This error does not, however, require reversal and remand for the district judge to determine whether adding the statistical data would demonstrate a prima facie case. The district judge has already passed upon the factual aspects of the statistical data. A legal question remains. On this record, we conclude that the district court's error was harmless. With respect to both the individual and class claims, neither the statistical data standing alone, nor in combination with the circumstantial evidence of discrimination offered by the waiters, was sufficient as a matter of law to establish a prima facie case of disparate treatment.

The district judge undertook an exhaustive analysis of the statistical evidence introduced by the waiters. He determined that the appropriate comparison was between the percentage of blacks hired by the hotels and the percentage of blacks in "a labor market consisting of all males, aged 21 to 64, in the civil labor force in the weighted San Francisco/Oakland SMSA as shown in the 1970 census." 489 F.Supp. at 307. The district judge appropriately focused on the reliability of this statistical data, and his factual assessment of the data was not clearly erroneous. *See White v. City of San Diego, supra*, 605 F.2d at 460–61. The district judge found that the relevant labor "pool" produced a black "availability figure" of 11.1%. 489 F.Supp. at 307. Because the waiters failed to support their claim that the hotels changed their hiring practices during the course of the lawsuit so as to increase the proportion of blacks hired as waiters, *id.* at 308, and because the bulk of the evidence presented by both sides related to events following the filing of the complaint, *id.* at 308 n.32, the district judge **\*551** analyzed the statistical data for the entire relevant period.[16] Based upon a comparison of the actual number of blacks hired and the expected number which would have been hired had the hotels hired at a rate equivalent to the proportion of blacks in the relevant labor pool, the district judge computed the so-called "Z statistic," which measures the

degree to which the expected results differ from the actual results. *Id.* at 308–09 & n.33.

This comparison revealed that the actual percentage of blacks hired by the St. Francis between 1970 and 1979 was 7.2%, while the percentage of blacks hired by the Hilton between 1974 and 1979 was 8.3%. Expressed in terms of standard deviations or the Z statistic, the variance between the percentage of blacks hired by the St. Francis and the black availability figure of 11.1% was 2.46; the correlative figure for the Hilton was 1.30. Expressed in terms of the probability of a random or chance occurrence, these standard deviations translate into a chance probability of 1.38% for the St. Francis, and 19.36% for the Hilton. *Id.*[17]

**[26]** The district court concluded that these statistical disparities were not sufficiently "gross and long-lasting" to support an inference of purposeful discrimination. 489 F.Supp. at 311. The waiters, however, argue that the court erred by looking for a single, fixed Z statistic as a "cut-off point" clearly delineating intentional from unintentional discrimination. This is correct only insofar as it is a statement of the law relating to statistical proof. It would be improper to posit a quantitative threshold above which statistical evidence of disparate racial impact is sufficient as a matter of law to infer discriminatory intent, and below which it is insufficient as a matter of law. Indeed, if any rule of law can be isolated from the Supreme Court's decisions in *Castaneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977), and *Hazelwood School Dist. v. United States, supra*, 433 U.S. at 307, 308 n.14, 97 S.Ct. at 2741 n.14, it is that for sufficiently large samples, a variance between expected and observed results of *greater than* 2 or 3 standard deviations is sufficient to make the data "suspect" for a social scientist. However, the statistical differences which the Court in these cases held were sufficient to support an inference of intentional discrimination, respectively 12 and 5 to 6 standard deviations, are far greater than those which would be "suspect" to the social scientist, and significantly greater than the 2.46 and 1.30 standard deviations found in this case. We agree with the Fourth Circuit that courts should be "extremely cautious" of drawing any inferences from standard deviations in the range of 1 to 3. *EEOC v. American National Bank, supra*, 652 F.2d at 1192. Indeed, the difference in this case between the expected result of 11.1% and the actual results of 7.2% and 8.3% "may be sufficiently **\*552** small to weaken the [waiters'] other proof." *Hazelwood School*

Gay v. Waiters and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

*Dist. v. United States, supra*, 433 U.S. at 311, 97 S.Ct. at 2743. The district court, therefore, properly concluded that the degree of disparate impact shown by the waiters' statistical data was insufficient to establish a prima facie case of intentional discrimination. Although statistical data may, in a proper case, be sufficient alone to raise a prima facie case, the statistics must be considerably more stark than those involved here.

Nonetheless, the waiters insist that a prima facie case is established if the statistical evidence introduced "rejects the random hypothesis." They argue that there are only three possible explanations for any specific rejection of a minority applicant: lack of qualifications, racial discrimination, or chance. Therefore, the waiters contend that since data indicating standard deviations of between 2 and 3 is "statistically significant," and reflects probabilities of random occurrence declining from 5% at 2 standard deviations to less than 1% at 3, such data is sufficient to reject chance as a possible explanation. Since the district court found that they were qualified, and rejected the hotels' attempts to impeach the waiters' statistical evidence by demonstrating a lack of qualified blacks in the general labor pool and a relative lack of blacks in the "applicant flow," *see* 489 F.Supp. at 312–15, the waiters argue that race—the only remaining explanation—has been shown to be "more likely than not."

We disagree. It must always be remembered that "[r]egardless of how devastating or reliable the statistics may look, the issue remains in [disparate treatment] cases whether a particular isolated historical event was discriminatory." *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980) (per curiam). The waiters make the same error of which they accuse the district court, namely taking a quantitative approach to the question of inferring discriminatory intent from statistical evidence. Their purely statistical analysis would almost completely blur the distinction between "impact" and "intent," and thus eliminate the legal difference between disparate impact and disparate treatment lawsuits. The latter would be transformed almost exactly into a duplicate of the statistically-oriented prima facie showing allowed under *Griggs v. Duke Power Co. See Teamsters, supra*, 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854 n.15.

**[27]**    This would be both improper and unwise. The question whether the facts proved are sufficient to permit a legal inference of discriminatory intent cannot properly be reduced into a mere battle of statistics. "Discriminatory impact," as shown by statistical evidence, is a starting point, and an important starting point, to that inquiry, but is rarely sufficient of itself. *Arlington Heights, supra*, 429 U.S. at 252, 97 S.Ct. at 556. Whatever the impact demonstrated by a plaintiff's statistical evidence is in fact, the legal question is whether that impact is sufficiently gross or stark that a court must infer that it was intended by the defendant. That an employer was aware of, or totally indifferent to the racially discriminatory impact of its hiring policies is not of itself sufficient to establish a prima facie case and shift the burden of explanation to the defendant. After all, discriminatory intent "implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator v. Feeny*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (footnotes and citation omitted). *See General Building Contractors Ass'n v. Pennsylvania, supra*, 102 S.Ct. at 3150.

**[28]**    In order to establish a prima facie case of disparate treatment based solely on statistical evidence, the plaintiff must produce statistics showing "a clear pattern, unexplainable on grounds other than race." *Arlington Heights, supra*, 429 U.S. at 252, 97 S.Ct. at 556. "But such cases are rare." *Id.* Absent a "stark" pattern, "impact alone is not determinative, and the [c]ourt must look to other evidence." *Id.* (footnotes **\*553** omitted). It is vitally important, therefore, to remember that "statistically significant" results are not necessarily "legally significant" results. As the district court recognized, "the probability of random occurrence of a value is not the obverse of the probability that is the result of deliberate action." 489 F.Supp. at 311 n.38. Simply put, statistics demonstrating that chance is *not* the more likely explanation are not by themselves sufficient to demonstrate that race *is* the more likely explanation for an employer's conduct.

Our review does not end with our conclusion that the waiters' statistical evidence, standing alone, was insufficient to establish a prima facie case. As we explained earlier, a plaintiff may establish a prima facie case of disparate treatment, even without direct proof of the four *McDonnell Douglas* elements, with a combination

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 697 of 898

Gay v. Waiters and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

of direct, circumstantial and statistical evidence of discrimination. Indeed, the best prima facie case utilizing statistical data, one allowing the strongest inference of intentional discrimination outside of the *McDonnell Douglas* framework, is that in which the plaintiff's statistical proof is "bolstered" by other circumstantial evidence of discrimination bringing "the cold numbers convincingly to life." *Teamsters, supra*, 431 U.S. at 339, 97 S.Ct. at 1856. Statistics "come in infinite variety .... [T]heir usefulness depends on all of the surrounding facts and circumstances." *Hazelwood School Dist. v. United States, supra*, 433 U.S. at 312, 97 S.Ct. at 2743, *quoting Teamsters, supra*, 431 U.S. at 340, 97 S.Ct. at 1856. We therefore turn to the waiters' final argument on the merits: that their statistical data, in conjunction with the circumstantial evidence of discrimination they produced at trial, was sufficient to establish a prima facie case of disparate treatment.

The waiters' argument revolves around five discrete types of circumstantial evidence of discrimination. First, the waiters ask us to inquire into the "historical context out of which the challenged practices arise." As a legal matter, the waiters are correct that such considerations are relevant and should be considered by the trier of fact. *See Hazelwood School Dist. v. United States, supra*, 433 U.S. at 309 n.15, 97 S.Ct. at 2742 n.15; *Arlington Heights, supra*, 429 U.S. at 267, 97 S.Ct. at 564. However, nothing in the record supports their contention that since the turn of the century, waiter jobs in San Francisco have been continually reserved for whites. The waiters rely only on secondary sources, probably hearsay, which were never introduced into evidence during trial.

Second, the waiters point to an asserted "series of obstacles" confronting applicants at the hotels, which they characterize as "something out of a Kafka novel." For instance, they refer to their trial testimony that security guards stationed immediately inside the hotel entrances often refused to let would-be applicants in, or only permitted them through after considerable difficulty. They also cite the testimony of appellant Whitman that he was given the "run-around" by the union and the hotels, each indicating that the other had to refer him before a job could be offered. These references are unpersuasive for several reasons. The district court was not required to, and did not, credit this testimony completely. *See* 489 F.Supp. at 300 ("some prospective applicants ... encounter[ed] difficulties" in attempting to apply). Moreover, nothing

in the record demonstrates that applicants at the Hilton encountered any of the asserted "obstacles"; one of the waiters' own testimony was that he encountered "no problems" in securing a job there. Finally, such isolated instances of "suspicious circumstances," even if proved, are of limited probative value. The record does not show any clear pattern of obstacles confronting black applicants as a class or any of the individual plaintiffs. Absent such a pattern, any inference of discrimination drawn from the isolated experiences they testified to is insignificant, and cannot appreciably bolster their weak statistical data.

The waiters, in addition, rely on three considerably more relevant types of circumstantial evidence of discrimination: the variety of "subjective employment practices" **\*554** utilized by the hotels, the "foreseeable adverse impact" of these practices, and the sharp increases in the number of black waiters hired by both hotels, particularly the St. Francis, after the trial date was set in 1976. With respect to the subjective employment practices, the waiters point to the district court's finding that the hotels employed "vague, unwritten" hiring criteria, including appearance, demeanor and job stability, the implementation of which was left to the discretion of the individual restaurant managers.[18] *See* 489 F.Supp. at 300. They add that by leaving hiring decisions to the restaurant managers, both hotels engaged in "decentralized hiring," and further that both utilized "word-of-mouth recruitment." They insist that such subjective employment practices are *per se* suspect because of their capacity for masking racial bias. *See Barnett v. W. T. Grant Co.*, 518 F.2d 543, 559 (4th Cir. 1975). With respect to the foreseeable adverse impact of these practices, the waiters contend that the hotels maintained the same hiring procedures with the knowledge that they had been challenged as racially discriminatory and had produced percentages of black waiters considerably less than the prevailing national rate. Finally, the waiters contend that the St. Francis's increased rate of black hires after the case was set for trial, particularly during 1979 in which 13 out of 29, or nearly 45% of those hired, were blacks, suggests that the hotel's earlier, lower rates were the product of intentional discrimination.

Insofar as the waiters may argue that any of these three types of circumstantial evidence alone compels an inference of intentional discrimination sufficient to establish a prima facie case, we disagree. For example, we have clearly held that the use of "subjective" employment

Gay v. Waiters and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

criteria is not *per se* unlawful. *Ward v. Westland Plastics, Inc., supra*, 651 F.2d at 1270. On the other hand, we reject the hotels' argument that this is sufficient to dispose of the waiters' claims. Even if, standing alone, each of these three types of circumstantial evidence fails to establish a prima facie case, the proper question is whether in combination they are sufficient to support an inference of intentional discrimination. Indeed, we have recently stated that "subjective decision-making strengthens an inference of discrimination from general statistical data ...." *O'Brien v. Sky Chefs, Inc., supra*, 670 F.2d at 867. *See also Davis v. Califano*, 613 F.2d 957, 965 (D.C.Cir.1979).

**[29]** **[30]** This circumstantial evidence, however, does not appreciably bolster the waiters' weak statistical proof. The district court stated that the hotels' "subjective" practices "may have tended to exclude blacks." 489 F.Supp. at 300. We agree that such subjective practices may provide "ready mechanisms for discrimination," *Smith v. Union Oil Co. of California*, 17 Fair Empl.Prac.Cas. 960, 991 (N.D.Cal.1977), because they may make it "easier for those who are of a mind to discriminate." *Alexander v. Louisiana*, 405 U.S. 625, 631, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972). Yet it is clear that while each of these practices could magnify whatever racially discriminatory predispositions existed within the hotels, their mere existence does not significantly aid the waiters' effort to prove facts allowing an inference that the defendants acted with discriminatory intent. The fact that hiring criteria or practices are subjective, and are thus susceptible to discriminatory application, is only marginally relevant to the question of discriminatory intent in the absence of proof that the criteria were, in fact, applied in a discriminatory manner. **\*555** [19] Holding otherwise would be the legal equivalent of the rule, overturned by the Supreme Court, that the foreseeable adverse impact of a neutral employment practice on a particular race is prima facie evidence of intentional discrimination. *See Personnel Administrator v. Feeny, supra*, 442 U.S. at 279, 99 S.Ct. at 2296. While a court should properly consider whether an employer has adhered to a particular practice with full knowledge of its foreseeable effects upon the racial balance of the work force, *see Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–2950, 61 L.Ed.2d 666 (1979), and should also consider especially dramatic increases in minority hiring as circumstantial evidence of prior intentional discrimination, *see Rich v. Martin Marietta Corp., supra*, 522 F.2d at 346, these are simply

factors to be considered in making a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights, supra*, 429 U.S. at 266, 97 S.Ct. at 563. Their weight depends upon all of the circumstances involved in the case. Having made such a sensitive inquiry, we conclude that the waiters' statistical and circumstantial evidence, properly viewed together, was markedly insufficient to establish a prima facie case of disparate treatment. Although it was error for the district court to refuse to review the waiters' statistical and circumstantial evidence with respect to the individual claims, the error was harmless; the waiters' evidence does not, as a matter of law, raise an inference that race was the more likely reason for their rejection.

VI

We emphasize that while the requirement of proving a prima facie case of disparate treatment is not an "onerous" burden, it is a burden nonetheless. Sanctioning too low a legal standard for inferring discriminatory motivation would encourage harassing, baseless lawsuits, force employers to justify their conduct upon only the slim reed of the highly speculative inference that an employer did not act "randomly" or utilized practices that were "susceptible" to discriminatory application, and would thrust the federal courts directly into the business of prescribing detailed, objective and mandatory hiring guidelines. This is a step we would not lightly take. *See Furnco, supra*, 438 U.S. at 578, 98 S.Ct. at 2950. Here, the waiters were unable to prove the four factual *McDonnell Douglas* criteria and avail themselves of the strong inference of discriminatory intent such proof entails. Their statistical and circumstantial evidence showed that the hotels, in particular the St. Francis, entered the decade of the 1970s with levels of black waiters considerably lower than those common in other cities and in the nation as a whole, hired black waiters through the remainder of the decade at a rate somewhat lower than that which would have reflected a work force balanced according to the racial lines of the surrounding communities, and maintained hiring procedures that could have exacerbated the imbalance. But all this simply demonstrates that the hotels did not quickly embrace the concept of affirmative action for minorities and did not go out of their way to ensure that their hiring practices would maximize the number of black and minority waiters hired. It does not demonstrate circumstances from which a court must

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 699 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

infer that the hotels more likely than not intended to discriminate against the individual black claimants or against black applicants **556** as a class. Neither Title VII nor section 1981 "impose[s] a duty [upon employers] to adopt a hiring procedure that maximizes hiring of minority employees." *Furnco, supra*, 438 U.S. at 577–78, 98 S.Ct. at 2949–2950.

AFFIRMED.

### All Citations

694 F.2d 531, 30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027, 30 Empl. Prac. Dec. P 33,026

## Footnotes

*    Honorable Myron D. Crocker, United States District Judge, Eastern District of California, sitting by designation.

1    The individual claim of a fifth waiter was dismissed by the district court on August 8, 1979, and is not at issue here.

2    The denial of a motion for class certification is no longer appealable prior to final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). On June 22, 1979, the district court in this case certified a plaintiff class consisting of all black males working or seeking employment as waiters who were denied employment or promotions, fired, or otherwise discriminated against on account of race by any of the defendants. Neither of the remaining defendants challenges this determination in this appeal.

3    The waiters in their amended complaint asserted a claim against the hotels under 42 U.S.C. § 1985(3) for an alleged conspiracy with the union. Following trial, the district court entered judgment for the hotels on this claim. *Gay v. Waiters' & Dairy Lunchmen's Union, Local 30*, 489 F.Supp. 282, 294 (N.D.Cal.1980). The waiters have not raised the issue on appeal.

4    We have stated that in rebutting a prima facie case in such disparate impact cases, "the employer bears some burden of justifying the business practice in terms of business need." *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1275 (9th Cir. 1981). We have alluded to this as a "burden of proof." *Id.* at 1271. In disparate treatment cases, on the other hand, it is clear that the burden which shifts to the defendant upon the establishment of a prima facie case is a burden of *production* only; the burden of persuasion remains with the plaintiff at all times. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (*Burdine*).

5    The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted).

6    The Hilton does not join the St. Francis in this argument, but instead maintains that the district court's findings on whether the plaintiff established the four factual *McDonnell Douglas* criteria, *see* Note 5, *supra*, cannot be disturbed unless clearly erroneous. The Hilton relies on our decision in *McLean v. Phillips-Ramsey, Inc.*, 624 F.2d 70, 71 (9th Cir. 1980) (per curiam). As the following text makes clear, we agree.

7    *See* Note 5, *supra*.

8    In other recent employment discrimination cases we have failed to mention the appropriate standard of review for this issue. *See, e.g., O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864 (9th Cir. 1982); *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981); *Lynn v. Regents of the University of California*, 656 F.2d 1337 (9th Cir. 1981); *Correa v. Nampa School Dist. No. 131*, 645 F.2d 814 (9th Cir. 1981).

9    *Contreras v. City of Los Angeles*, 656 F.2d 1267 (9th Cir. 1981), might also be read to support the use of the clearly erroneous standard, but the case actually applied the clearly erroneous standard only to factual inquiries. Even though we stated that "[w]e must first determine whether the district court's finding that appellants failed to present a prima facie case of discrimination is clearly erroneous," *id.* at 1272, we applied that standard only to the district judge's ruling on the proper interpretation of the plaintiff's statistical evidence. *Id.* at 1274–75.

10   The Supreme Court in *McDonnell Douglas* characterized the issue before it as the "order and allocation of proof" in disparate treatment lawsuits. *McDonnell Douglas, supra*, 411 U.S. at 800, 93 S.Ct. at 1823. This characterization is particularly relevant to our decision here. As the Second Circuit has recognized, *McDonnell Douglas* says nothing directly about the need to prove discriminatory intent. "[T]he evident thought was that proof of the four elements warranted an

Gay v. Waiters and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

inference of such intent unless the defendant presented at least some evidence in rebuttal." *Lieberman v. Gant*, 630 F.2d 60, 63 (2d Cir. 1980) (footnote omitted). We agree. The importance of *McDonnell Douglas* "lies, not in its specification of the discrete elements of proof there required," but rather in the principle that the employment discrimination plaintiff "must carry the initial burden by offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (*Teamsters* ).

Viewed in this light, the role of the *McDonnell Douglas* prima facie case is closely analogous to its role in general civil litigation: it presents the legal question whether the plaintiff has met his burden of production, coming forward with sufficient probative evidence to permit a rational jury, or court, to find the material facts in his favor, thus avoiding a directed verdict or motion for judgment as a matter of law. A prima facie case of intentional discrimination is established if the plaintiff proves facts "from which one can infer, if such actions remain unexplained, that it is more likely than not" that the defendant's conduct was racially motivated. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (*Furnco* ). As an inference, it can but need not result in an ultimate judgment for the plaintiff. In other words, a prima facie case under *McDonnell Douglas* is one in which the plaintiff has met his immediate burden of production, but not necessarily his ultimate burden of persuasion. *See Burdine, supra,* 450 U.S. at 253–56, 101 S.Ct. at 1093–95.

It is evident, therefore, that the legal and factual components of a district court's ruling on the *McDonnell Douglas* prima facie case are severable. The factual inquiry is relatively simple: what facts has the plaintiff proved? The second inquiry, a more difficult one, is a legal inquiry: are these facts sufficient to support an inference of intentional discrimination? By its very nature, therefore, this second inquiry involves the legal consequences attendant to the proof of certain basic or subsidiary facts, *i.e.,* the *legal sufficiency* of the evidence. The question whether the plaintiff has established a prima facie case is a question addressed to the district court not in its role as factfinder, but in its role as legal decisionmaker. The court must decide, at the close of the plaintiff's case-in-chief or otherwise, whether the plaintiff's evidence is legally sufficient to shift the burden of production to the defendant or, conversely, whether the defendant is entitled to judgment as a matter of law, without regard to whatever proof he has, or may, offer in rebuttal. *See Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir.), *cert. denied,* 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981).

This theoretical role of the prima facie case is logically and legally consistent with the Court's repeated admonitions that the four *McDonnell Douglas* elements are not "an inflexible formulation," *Teamsters, supra,* 431 U.S. at 358, 97 S.Ct. at 1866, and that the *McDonnell Douglas* model is not the only means of establishing a prima facie case of intentional discrimination. In several cases we have held that a plaintiff established a prima facie case even though the district court found that one or more of the *McDonnell Douglas* criteria had not been proved. *E.g., O'Brien v. Sky Chefs, Inc., supra,* 670 F.2d at 867 (qualifications); *Hagans v. Andrus, supra,* 651 F.2d at 624–26 (job opening); *McLean v. Phillips-Ramsey, Inc., supra,* 624 F.2d at 72 (job opening). If the district court's conclusion that no prima facie case had been established was reversible only if clearly erroneous, however, we would not have been free to rule that these plaintiffs had met their immediate burden of production as a matter of law. In other words, while we must defer to the facts found by the district court, deferring to the district court's conclusion whether a prima facie case has been raised would be inconsistent with *McDonnell Douglas* itself by operating, in effect, to "freeze" disparate treatment law to those four specific factual elements, which both the Supreme Court and this court have properly recognized were "never intended to be rigid, mechanized, or ritualistic." *Furnco, supra,* 438 U.S. at 577, 98 S.Ct. at 2949.

11   Applying the clearly erroneous standard as suggested in *Piva* would be inconsistent with the functional role of the *McDonnell Douglas* burden-shifting procedure. The three-step process governs the order and allocation of proof in Title VII disparate treatment cases; it is not an end in itself. Rather, it "is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra,* 438 U.S. at 577, 98 S.Ct. at 2949. Proof of the four *McDonnell Douglas* elements is prima facie, but not conclusive, proof of discriminatory intent because, in light of experience, courts "presume [that] these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.,* citing *Teamsters, supra,* 431 U.S. at 358 n.44, 97 S.Ct. at 1866 n.44. Thus, "the allocation of burdens and the creation of a presumption ... is intended *progressively to sharpen the inquiry* into the elusive factual question of intentional discrimination." *Burdine, supra,* 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8 (emphasis added).

Some language in *Burdine* suggests that a prima facie case of disparate treatment raises not an inference but rather a presumption of intentional discrimination, and that absent rebuttal, the trial court must enter judgment for the plaintiff. *See id.* at 254 & n.7, 101 S.Ct. at 1094 & n.7. It is not clear whether this language merely clarifies the use of the term "inference" in *Teamsters* and *Furnco,* or whether it elevates what was an inference into a "legally mandatory, rebuttable

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 701 of 898

Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (1982)

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

presumption." *Id.* However, the difference is not relevant to the appropriate standard of review. Whether an inference or a presumption, the *McDonnell Douglas* prima facie case involves the legal consequences attendant to proof of certain facts. If intentional discrimination is inferred or presumed it is because courts infer or presume from proof of certain facts that, absent explanation, the challenged employment decision was more likely than not the product of discriminatory animus. A prima facie case, even if a presumption, is a legal device operating to shift the burden of production. *See Legille v. Dann*, 544 F.2d 1, 5 (D.C.Cir.1976) ( "Rebuttable presumptions are rules of law attaching to proven evidentiary facts certain procedural consequences as to the opponent's duty to come forward with other evidence.") (footnotes omitted).

The inference or presumption created by proof of facts legally sufficient to shift the burden of production to the defendant is the first step in the "progressively sharpened inquiry" described in *Burdine.* As explained, however, it is not essentially a factual question. In light of their experience, and in order to allocate efficiently the proof introduced at trial, courts infer intentional discrimination from proof of certain basic or subsidiary facts. But if the defendant successfully meets his burden of production by articulating a legitimate, nondiscriminatory explanation for his conduct, the inference "is rebutted," *Burdine, supra*, 450 U.S. at 255, 101 S.Ct. at 1094, and "drops from the case." *Id.* at 255 n.10, 101 S.Ct. at 1094 n.10. Consequently, the prima facie *McDonnell Douglas* case is not the functional equivalent of a "finding of fact" of intentional discrimination. It is instead a ruling by the district court on the presumptive legal consequences of the facts proved by the plaintiff. Such determinations are not subject to the clearly erroneous standard of review. *See Pullman-Standard v. Swint*, ——U.S. ——, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982) ( "Discriminatory intent [under § 703(h) of Title VII] means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive.").

12    The Supreme Court clearly held in *Furnco* : "A *McDonnell Douglas* prima facie showing *is not the equivalent of a factual finding of discrimination* .... Rather, it is simply proof of actions taken by an employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco, supra*, 438 U.S. at 579–80, 98 S.Ct. at 2950–2951 (emphasis added). *Cf. Glasson v. City of Louisville*, 518 F.2d 899, 903 (6th Cir.) (whether termed ultimate facts or conclusions of law, determinations by district court which attach legal significance to historical facts are reviewable free of clearly erroneous standard), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Stevenot v. Norberg*, 210 F.2d 615, 619 (9th Cir. 1954) (same).

While the Court may not yet have decided the question conclusively, *see Burdine, supra*, 450 U.S. at 260 n.12, 101 S.Ct. at 1097 n.12, *Furnco* does provide significant guidance. Indeed, the balance of the Court's opinion in *Furnco* supports our position. The Court recited the facts of the case in detail, 438 U.S. at 569–72, 98 S.Ct. at 2945–2947, and observed that the court of appeals had not found any of the district court's findings of fact to be clearly erroneous, *id.* at 570, 98 S.Ct. at 2946. The Court treated other questions which would be factual matters under our decision in *McLean v. Phillips-Ramsey, Inc., supra*, such as whether the plaintiffs applied for or were qualified for the positions sought, as findings of fact subject to the clearly erroneous standard. 438 U.S. at 573 n.4, 98 S.Ct. at 2947 n.4. In addition, the Court wrote that "[f]rom these *factual findings*, the District Court *concluded* " that no prima facie case has been made out, *id.* at 572, 98 S.Ct. at 2947 (emphasis added), and that the court of appeals "was justified in concluding that as a matter of law respondents made out a prima facie case of discrimination under *McDonnell Douglas.*" *Id.* at 575, 98 S.Ct. at 2948. Finally, the Court wrote:

> We think the Court of Appeals went awry, however, in apparently equating a prima facie showing under McDonnell Douglas *with an ultimate finding of fact as to discriminatory refusal to hire under Title VII; the two are quite different and that difference has a direct bearing on the proper resolution of this case.* The Court of Appeals, as we read its opinion, thought Furnco's hiring procedures not only must be reasonably related to the achievement of some legitimate purpose, but also must be the method which allows the employer to consider the qualifications of the largest number of minority applicants. We think the imposition of that second requirement simply finds no support either in the nature of the prima facie case or the purpose of Title VII.

> *Id.* at 576–77, 98 S.Ct. at 2949 (emphasis added).

13    The district court's findings of fact are subject to the limited clearly erroneous standard of review because the trial court, not the court of appeals, is best equipped to make factual determinations. *See Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680, 691 (5th Cir. 1971). The cold, lifeless appellate record hardly permits us the same opportunity as the trial court "to judge of the credibility of the witnesses," Fed.R.Civ.P. 52(a), or to resolve factual disputes on which the evidence may admit alternative solutions. We do not lightly substitute our judgment for that of the district court on factual

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

matters because we are in a less favorable position to judge. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).

We have, therefore, generally limited application of the clearly erroneous standard to situations in which we should appropriately defer to the district judge's superior fact-finding expertise. We have properly attempted to avoid applying the clearly erroneous standard to situations in which the district court is not better equipped to make the determination at issue. As we suggested in our decision in *Lundgren v. Freeman*, 307 F.2d 104 (9th Cir. 1962), in which we held that Rule 52(a) applies even to findings of fact based upon written evidence alone, the clearly erroneous standard does not apply to inferences drawn by the district court by application of a legal standard to the facts which the district court has found. *Id.* at 113–15. And as we wrote more recently in *In re J. A. Thompson & Sons, Inc.*, 665 F.2d 941, 951 (9th Cir. 1982): "The 'clearly erroneous' standard of review is applied where a trial court resolves disputed issues of fact by reference to the credibility of conflicting evidence. It has no application where the trial judge applies a legal standard to undisputed facts."

14    Nor do we believe that *Pullman-Standard v. Swint*, ——U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (*Pullman-Standard* ), requires a different result. There, the Supreme Court held that a district court's finding on whether the differential impact of a seniority system reflected a discriminatory intent is a factual finding subject to the clearly erroneous standard of Rule 52(a). The case is not directly in point. It was not a section 1981 case or even a disparate treatment case; rather it concerned proof that differences in employment conditions under a seniority system resulted from an intent to discriminate. Section 703(h) of Title VII, which prohibits discriminatory seniority systems, provides an exception to the general rule that discrimination in employment can be shown under the disparate-impact theory, a theory that does not require a showing of intent. *See Pullman-Standard, supra*, 102 S.Ct. at 1784. The Court required a showing of actual intent to discriminate via the seniority system and stated that, in the context presented, discriminatory intent was not "a legal presumption to be drawn from a factual showing of something less than actual motive." *Id.* at 1791.

The issue whether actual discriminatory intent exists in the adoption or operation of a seniority system is not necessarily the same as the issue whether discriminatory intent has been proved under the Title VII disparate-treatment model or under section 1981. Moreover, the intent issue, in whichever context it arises, is not necessarily the same as the issue whether a prima facie case of discrimination has been made out by the plaintiff. Further, whether a prima facie case of discrimination has been made out is more properly defined as a legal presumption to be drawn from a variety of factual showings. The *Pullman-Standard* opinion specifically observes that actual intent to discriminate in connection with a seniority system is not a legal presumption to be drawn from some lesser showing. Finally, we would be hesitant to conclude that *Pullman-Standard* requires a different result in light of *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), which supports the argument that the appropriate standard of review is *de novo. See* Note 12, *supra*.

15    Two white waiters were promoted from busperson positions by the Hilton during 1974. The individual plaintiffs in this case cannot use these promotions to their advantage, however, because the hotels' preference for internal promotions is clearly a legitimate, nondiscriminatory policy which the waiters did not endeavor to prove merely a pretext for intentional discrimination.

16    The waiters do not challenge the admission of post-complaint statistics or the district court's analysis of the data for the entire period up to and including 1979.

17    Apparently, there is an error in the district court's figures for the St. Francis. For 1979, the district court wrote that the St. Francis hired 13 blacks for 29 positions filled, providing final figures of 38 blacks hired out of a total of 390 during 1970–1979. *See* 489 F.Supp. at 308. However, these figures would translate into a black percentage figure of 9.7% and a Z statistic of −0.82, as opposed to the respective 7.2% and −2.46 figures provided by the district court. Quite obviously, a variance of less than 1 standard deviation between an expected figure of 11.1% and an observed figure of 9.7% is far too low to permit a court to infer that the difference was intentional.

In order to correspond with the other figures provided by the district court, the St. Francis must have hired only 3 blacks in 1979, for a total of 28 blacks during 1970–1979. During oral argument, counsel for the St. Francis pointed out this apparent error, but failed to indicate what the correct figures were. The waiters have been inconsistent. On the one hand, they argue that the "sharp increase" in minority hiring by the St. Francis during 1979 should have been considered by the trial court; they rely on the larger figures in support of this argument. On the other hand, they rely on the smaller figures, and the corresponding larger Z statistic of 2.46, in support of their analysis of the statistical data. We need not, however, decide whether the district court made a computation error. In either event, we would come to the same conclusion.

30 Fair Empl.Prac.Cas. (BNA) 605, 29 Fair Empl.Prac.Cas. (BNA) 1027...

18    The waiters also argue that these subjective evaluations were made by "a predominantly white supervisorial staff." Not only is there nothing in the record to support this assertion, but it is patently false with respect to the Hilton. The Hilton's dining room managers include one Asian, one Hispanic, one Black and one Caucasian. Moreover, such proof would at best be of extremely limited probative value. The law does not infer that an individual will exercise or has exercised subjective, discretionary responsibilities in an intentionally discriminatory manner merely from the color of his skin. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 338–39 (10th Cir. 1975).

19    It may be that the subjective nature of an employer's hiring procedures or criteria is relevant to a demonstration of pretext by the employment discrimination plaintiff. *See Royal v. Missouri Highway & Trans. Comm'n*, 655 F.2d 159, 164 (8th Cir. 1981); *Lynn v. Regents of the University of California, supra*, 656 F.2d at 1344. This would be consistent with the principle that subjective hiring practices are not unlawful *per se* merely because they are susceptible to discriminatory application and, indeed, may be considered legitimate, nondiscriminatory reasons for an applicant's rejection. For example, few would doubt that appearance and demeanor are qualities the lack of which should provide a restaurant with a legitimate, neutral explanation for its failure to hire a given waiter applicant. However, we need not decide in this case to which particular stage or stages of a *McDonnell Douglas* lawsuit the subjectivity of hiring criteria is relevant.

---

**End of Document**                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 9

54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

919 F.2d 1247
United States Court of Appeals,
Seventh Circuit.

Selester GILTY, Plaintiff–Appellant,

v.

VILLAGE OF OAK PARK, Defendant–Appellee.

No. 89–2764.
|
Argued Sept. 6, 1990.
|
Decided Dec. 7, 1990.

Black police officer who was not promoted to sergeant and who was later discharged brought civil rights action against village. The United States District Court for the Northern District of Illinois, James B. Zagel, J., granted village's motion for summary judgment, and officer appealed. The Court of Appeals, Harlington Wood, Jr., Circuit Judge, held that, in view of fact that officer misrepresented his academic credentials in seeking promotion, officer did not have viable claim for disparate treatment or disparate impact in connection with promotion decision or for retaliatory discharge in connection with discharge decision.

Affirmed.

**Attorneys and Law Firms**

**\*1248** Armand L. Andry, Oak Park, for plaintiff-appellant.

Richard A. Martens, Chicago, for defendant-appellee.

Before WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.

**Opinion**

HARLINGTON WOOD, Jr., Circuit Judge.

In 1985, Selester Gilty misrepresented his academic credentials in order to gain a promotion. Now, some years and several misrepresentations later, he alleges racial discrimination in his employer's failure to promote him and later decision to discharge him. But Gilty's claims collapse of their own weight, and we affirm the

district court's grant of summary judgment in favor of his employer.

I.

Every three years the police department of the Village of Oak Park ("Village") constructs an "eligibility list" of those officers seeking promotion to the rank of sergeant. That list ranks names on the basis of a three-part examination: a written test (50%); a performance evaluation (30%); and an oral interview (20%). [1] For the next three years, the candidate at the top of the eligibility list will be promoted to the rank of sergeant as a vacancy arises.

Some time prior to 1985, Selester Gilty, a black officer, decided that he wanted to be a sergeant, and underwent the promotional examination necessary to be placed on the April 6, 1985, eligibility list. During his oral interview in March 1985, he represented to the Board of Fire and Police Commissioners of the Village of Oak Park ("Commission") that he held a bachelor's degree **\*1249** in psychology and that he was working on a master's degree in public administration. Those representations, as his employer later discovered, were false.

When the April 6, 1985, eligibility list was posted, Gilty ranked thirty-third on a list of fifty-one candidates. This rank was particularly difficult for him to understand in that he had received one of the eleven highest scores on the written test. His score on the performance evaluation, however, was quite low (22.977/30). Indeed, it was the lowest score for any officer in his division. Furthermore, four other black officers who had sought promotion had received among the lowest performance evaluation scores in their respective divisions. And on top of it all, Gilty was aware of no black person who was or ever had been a police sergeant or lieutenant in the Oak Park Police Department. [2]

On August 14, 1987, Gilty filed a complaint to redress what he considered to be racial discrimination, as manifested by the subjective performance evaluation completed by his white supervisors. Count I alleged a pattern and practice of disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Count II was entitled "Title VII—Disparate Impact" and simply alleged, "The promotion process

utilized by the defendant had a disproportionate and discriminatory impact on all Black candidates for sergeant including the plaintiff...." Gilty did not seek to represent a class.

Thereafter, on August 31, 1987, William Kohnke was appointed as the Village's new chief of police. Four to five months after arriving, Kohnke initiated the Integrated Criminal Apprehension Program ("ICAP") in his department. The purpose of ICAP was to improve the police force by integrating its elements. As part of ICAP, Kohnke asked all sworn officers to complete a form entitled "Profile of Training and Interest in Future Training" and also examined each officer's personnel file.

During this period, Kohnke began to suspect that at least one officer—Tom Stec, a white officer—had falsified his academic credentials. As a result of these suspicions, Kohnke compared the ICAP forms with information that officers had provided in the 1985 promotional examinations. If he found a discrepancy, or if he found no documentation in the officer's personnel file, Kohnke sent a letter requesting that the officer verify the academic experience or training. In all, Kohnke sent nineteen letters requesting verification.

One of Kohnke's letters was addressed to Gilty. On his ICAP form, Gilty had again stated that he held a bachelor's degree. But in response to Kohnke's letter, Gilty did not produce verification of his academic credentials. Of the original nineteen, only he and Stec were either unwilling or unable to back up their claims.

Kohnke undertook a formal interrogation of first Stec, and then Gilty, in March 1988. When they were unable to either verify their credentials or produce a credible explanation for their representations, both were charged with falsifying their academic credentials. Stec resigned. Gilty, on the other hand, amended his complaint to add a charge of retaliation under 42 U.S.C. § 2000e–3.

The district court, on the Village's motion for summary judgment, found Gilty's defense "incredible." *Gilty v. Village of Oak Park,* No. 87 C 7178, 1989 WL 84398 (N.D.Ill. July 19, 1989). The evidence clearly showed that in 1985 he did not have a bachelor's degree in psychology and was not pursuing a master's degree in public administration. He had attended the University of Illinois at Chicago Circle, but admitted that when he

withdrew in 1976 he was on academic probation and that his grade point average was somewhere in the range of 1.6 to 1.8 on a five-point scale (with a 2.0 average required for graduation). Moreover, the record indicates that Gilty was on probation every quarter following his first, was dropped twice for poor **\*1250** academic performance, had not declared a major in psychology, and withdrew while at least thirty-eight hours short of any degree.

As to his claim of pursuing a master's degree, Gilty had taken courses as a student at large in a nondegree program at Governor's State University. He was suspended, however, in December 1983 for his failure to maintain a 3.0 grade point average. At the time of his statements in 1985, he was not enrolled in a master's program anywhere.

When interrogated by Kohnke in March 1988, Gilty claimed that he had a bachelor's degree from Lewis University and that a document evidencing the degree would be provided upon request. No such document existed at the time, though, and Gilty knew it, because he had not passed that school's writing proficiency examination. In letters dated April 8, 1987; June 29, 1987; July 15, 1987; October 20, 1987; and December 22, 1987, the school advised him that he could not get a degree unless and until he passed a writing proficiency examination. During his interview with Kohnke, he nevertheless stated that he had passed the writing proficiency examination, although he knew at the time that he had taken and failed the examination on February 19, 1987; July 2, 1987; October 8, 1987; and March 21, 1988, only four days before. [3]

On July 18, 1988, the district court granted the Village's motion for summary judgment, largely on the basis of Gilty's own conduct. That decision is now before us on this appeal. [4] Relying on the same rationale as the district court, we affirm.

## II.

[1] [2] As always, we review de novo a district court's decision to grant a motion for summary judgment and apply the same standard as that employed by the district court. *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1188 (7th Cir.1990). When a party seeks relief under Title VII, that standard involves a tripartite order and allocation of the burden of persuasion.

See *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (disparate treatment); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425–26, 95 S.Ct. 2362, 2375–76, 45 L.Ed.2d 280 (1975) (disparate impact); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir.1989) (retaliation). Thus, Gilty, at a minimum, must be able to establish a prima facie case in order to withstand summary judgment. *Morgan v. Harris Trust & Sav. Bank,* 867 F.2d 1023, 1027–28 (7th Cir.1989); *see also United Assoc. of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1264, 1267–68 (7th Cir.1990). Gilty must also be able to rebut any nondiscriminatory explanation that the Village may offer. *See Kier v. Commercial Union Ins. Cos.,* 808 F.2d 1254, 1259 (7th Cir.), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987); *see also Fitzpatrick v. Catholic Bishop,* 916 F.2d 1254, 1256 (7th Cir.1990) ( "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion.").

A. *Disparate Treatment*

 [3]  To establish a prima facie case as to his disparate treatment (i.e., intentional discrimination) claim, Gilty may take one of two routes. He may either offer direct evidence of intentional discrimination or he may offer evidence of a combination of circumstances from which we may infer discriminatory intent. *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 569 (7th Cir.1989). The latter route, detailed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), generally involves four elements:

> **\*1251** 1. The plaintiff belongs to a class protected by Title VII;
>
> 2. The plaintiff applied and was qualified for a job for which the employer was seeking applicants;
>
> 3. The plaintiff, despite being qualified, was rejected; and
>
> 4. After the employer rejected the plaintiff, the position remained open and the employer continued to seek applicants from persons of comparable qualifications.

See *id.* at 802, 93 S.Ct. at 1824; *Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir.1985).

The district court opinion took the position that Gilty had chosen the *McDonnell Douglas* route, and analyzed his claim under the four-factor test listed above. The result was summary judgment in favor of the Village on the grounds that Gilty was not "qualified" for the position of police officer, much less sergeant, in view of his misrepresentations concerning his educational background. On appeal, Gilty's somewhat opaque briefs do not appear to argue that he did not misrepresent his academic credentials—a wise choice on this record. Instead, Gilty makes "even if I did" arguments, only two of which merit discussion.

 [4]  First, Gilty points out that the Village's knowledge of his lies and misrepresentations arose no sooner than 1988, a date well after the allegedly discriminatory performance evaluation had been made. In light of this fact, Gilty argues that the Village cannot now use this knowledge to explain, ex post facto, its 1985 decision. But his argument is specious.

 [5]  As do the rest of the *McDonnell Douglas* factors, the determination of whether a plaintiff is "qualified" requires an objective analysis. As such, an employer's knowledge or lack of knowledge is of no relevance at the prima facie stage of the case. *See Mister v. Illinois C.G.R.R.,* 832 F.2d 1427, 1437–38 (7th Cir.1987) (upholding dismissal of plaintiff's employment discrimination claim relying in part on ground that plaintiff lied about his employment history on his job application, even though it was "open to question whether the [employer] would have checked [the plaintiff's] history before hiring him"). [5]

Under an objective standard, Gilty simply cannot meet the quasi-standing elements set out in *McDonnell Douglas.* He does not argue, nor does case law support, the notion that "qualified" law enforcement officers need not be "truthful" law enforcement officers. *See, e.g., Grabinger v. Conlisk,* 320 F.Supp. 1213, 1219–20 (N.D.Ill.1970) (citing *Gardner v. Broderick,* 392 U.S. 273, 277–78, 88 S.Ct. 1913, 1915–16, 20 L.Ed.2d 1082 (1968)), *aff'd,* 455 F.2d 490 (7th Cir.1972). Instead, he argues that his office required only a high school diploma or its equivalent. But the point is not that Gilty needed, but did not have, a bachelor's degree or a master's degree. The point is that he lied. [6]

 **\*1252**  [6]  [7]  Gilty's second "even if I did" argument is to brush aside what he considers the narrow limitations of the *McDonnell Douglas* standard. Gilty tells us that

he has proffered "direct evidence" of discrimination. This case, he argues, is a "pattern and practice" case that challenges the Village's entire course of conduct toward the members of a protected class. And to that effect he puts forth substantial anecdotal evidence in which other black officers were the object of racial slurs or discriminatory conduct.

Gilty's general statement on the law is correct; a plaintiff is not required to use the *McDonnell Douglas* method. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Randle,* 876 F.2d at 569. But Gilty filed an individual claim; this is not a class action. Consequently, his evidence of a pattern and practice "can only be collateral to evidence of specific discrimination against the actual plaintiff." *Williams v. Boorstin,* 663 F.2d 109, 115 n. 38 (D.C.Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981); *see also Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866 n. 6 (7th Cir.1985) (noting that "pattern and practice" argument "seems to be misplaced" in nonclass suit); B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1322 & n. 95 (2d ed. 1983) ("Pattern-and-practice suits, by their very nature, involve claims of classwide discrimination."). Like our peers in *Boorstin,* we deplore whatever instances of racial discrimination have occurred at the Oak Park Police Department, and we applaud any efforts to redress those violations of civil rights, but we fail to see how Gilty's broad-based evidence is more than collaterally relevant to his individual claim. [7]

As the Supreme Court noted in *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984):

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while "at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking."

*Id.* at 876, 104 S.Ct. at 2799 (quoting *International Bhd. of Teamsters,* 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46). Constrained as we are by the nature of Gilty's own complaint, we must look for evidence of intentional discrimination directed at Gilty. But while Gilty has been diligent in his attempts to point out

incidents of discrimination directed against others, the record contains comparatively little evidence of incidents of discrimination directed against him.

Summarized in the light most favorable to him, that relatively small amount of evidence supports only the proposition that Gilty received a low score on the performance evaluation and that his superior was pleased to give him that score because Gilty was, in the superior's view, "worthless." This evidence, however, establishes nothing more than a personal dislike. It does not demonstrate that the Village intentionally used race-based considerations in evaluating Gilty. *Randle,* 876 F.2d at 570 (declining to find evidence of discrimination in statement when it was "simply not possible to tell whether the statement was racially motivated"). Nor does this evidence provide a basis for inferring a "causal link" between Gilty's race and his failure to be promoted. *See Morgan,* 867 F.2d at 1026. Insofar as Gilty's individual claims are concerned, his "direct" evidence of discrimination against others is hardly direct, and he has not made a prima facie showing of **\*1253** disparate treatment. [8] *See Robinson v. Montgomery Ward & Co.,* 823 F.2d 793, 797 (4th Cir.1987) ("At any rate, no evidence exists that [the defendant] ever addressed any racially derogatory remark to the plaintiff...."), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988); *cf. Minority Police Officers Ass'n v. City of South Bend,* 801 F.2d 964, 967 (7th Cir.1986) (rejecting equal protection challenge when "[n]o plaintiff has been able to point to a single instance in which one of the officers evaluating them had evidenced racial animosity against them *personally.*") (emphasis added); [9] *see also Morgan,* 867 F.2d at 1026 ("[s]ummary judgment will not be defeated simply because issues of motive or intent are involved").

**[8]** Even if one assumes that Gilty's conglomeration of evidence establishes a prima facie case of disparate treatment, *see United Assoc. of Black Landscapers,* at 1266, the disparate treatment claim must still fail in light of Gilty's failure to establish that he would have been promoted in the absence of the Village's alleged discrimination. "As in any tort case, statutory or otherwise, a plaintiff cannot win a discrimination case if the harm to him would have been the same whether or not the defendant had discriminated." *Washington v. Electrical Joint Apprenticeship & Training Committee,* 845 F.2d 710, 712 (7th Cir.) (plaintiff challenged oral interview portion of program application but not written

54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

examination), *cert. denied,* 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988); *see also Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Button v. Harden,* 814 F.2d 382, 383 (7th Cir.1987). Here, if Gilty had received a perfect score on the performance evaluation (30/30), he would have placed only fifth on the eligibility list. If Gilty had received the highest score given any candidate (28.845/30), he would have placed eighth on the eligibility list. Under those circumstances, a lack of disparate treatment, if it existed in the first place, would not have affected the final outcome because Gilty would not have been among the two candidates selected from the April 6, 1985, eligibility list. [10]

**\*1254** **B.** *Disparate Impact*

**[9]** **[10]** The prima facie showing necessary for a disparate impact (i.e., discriminatory effect) case is of a different sort. These claims involve allegations that a facially neutral test or employment practice "in fact impacts more harshly upon a protected group than upon others." *Griffin v. Board of Regents,* 795 F.2d 1281, 1287 (7th Cir.1986); *see also International Bhd. of Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Thus, unlike disparate treatment claims, a plaintiff need not prove discriminatory intent. *Id.* Instead, a plaintiff must show "that the policies and practices at issue have a substantially disproportionate impact on the protected class." *Griffin,* 795 F.2d at 1287 (citing *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375). Gilty has not made such an initial showing, and his disparate impact claim must therefore fail.

**[11]** As an initial matter, Gilty's complaint appears to be deficient. As a matter of law as well as a matter of common sense, one must first identify a specific employment practice before one can challenge it. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). In Gilty's complaint, however, the disparate impact count states only that "[t]he promotion process utilized by the defendants had a disproportionate and discriminatory impact on all Black candidates for sergeant including the plaintiff."

If we assume that Gilty's complaint has singled out the performance evaluation, then we come to the heart of Gilty's disparate impact woes. Disparate impact cases, because of their emphasis on consequences, necessarily require a focus on statistical evidence. B. SCHLEI & P. GROSSMAN, *supra,* at 1324. Gilty does present what he refers to as "the most basic of statistical proof," the complete absence of black supervisors in Oak Park's police department. The problem, though, is that we have held that underrepresentation statistics cannot make out a prima facie case of disparate impact. *Cox v. City of Chicago,* 868 F.2d 217, 222–23 (7th Cir.1989); *see also Wards Cove,* 109 S.Ct. at 2121–22. [11]

In disparate impact cases, it is eligibility rate, not underrepresentation, that is telling. A plaintiff's statistics should compare the racial composition of the pool of "qualified" applicants to the racial composition of, in this case, the sergeants in the Oak Park Police Department. *See Cox,* 868 F.2d at 222–23; *see also Wards Cove,* 109 S.Ct. at 2121–22. And while those calculations would not diminish the harsh reality of an absence of black supervisors, they would turn our attention to "qualified applicants," a pool that, at its broadest, includes the sixty-six officers requesting a performance evaluation, only five of whom were black. Moreover, only three of the fifty-one officers on the April 6, 1985, eligibility list were black. Those low numbers, in turn, severely impair the usefulness of the statistics that Gilty might have argued had he not used an incorrect analysis. *See, e.g., Soria v. Ozinga Bros.,* 704 F.2d 990, 995 (7th Cir.1983) (rejecting as too small a sample based on sixty-one drivers, of whom **\*1255** fifteen had been disciplined, including four who were discharged); *see also Washington,* 845 F.2d at 713; *Contreras v. City of Los Angeles,* 656 F.2d 1267, 1273 & n. 4 (9th Cir.1981) ("Statistics are not trustworthy when minor numerical variations produce significant percentage fluctuations."), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). [12]

Even if one assumes that the statistics that we might derive from the record cross that "threshold of reliability" that would allow them to establish a prima facie case, *Allen v. Seidman,* 881 F.2d 375, 378 (7th Cir.1989), Gilty must establish a causal connection between the specific employment practice that he challenges and the disparate impact. *Wards Cove,* 109 S.Ct. at 2124–25 (noting that causation is integral part of plaintiff's case in disparate impact suit). The evidence does not lead to such a connection, however. If one ranks the officers on the eligibility list on the basis of just the written examination and the oral interview (thereby removing the allegedly nonneutral employment practice), then Gilty moves from

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 710 of 898

Gilty v. Village of Oak Park, 919 F.2d 1247 (1990)
54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

thirty-third on the list to twentieth. Of the other two black officers on the list, one moves from forty-third to thirty-seventh and the other moves from forty-eighth to forty-ninth. Thus, Gilty cannot connect the performance evaluation to the lack of black sergeants; even without the scores that Gilty considers poisoned with discrimination, not one black officer would have been promoted.

Moreover, Gilty brings this suit as an individual, not on behalf of a class. As such, the foregoing is irrelevant to him unless he can establish that he is a "qualified" black applicant. But as we concluded earlier, Gilty is not "qualified" under the objective *McDonnell Douglas* test, and there is no reason to presume that the definition of "qualified" under *McDonnell Douglas* is any different than the definition of "qualified" under *Cox* and *Wards Cove.* If Gilty is to achieve individual relief, then he must establish that his individual circumstances entitle him to that relief. He cannot rely upon the qualifications of those not before this court to rescue him from the consequences of his own lack of qualification.

C. *Retaliation*

 **[12]**   Gilty's third and final claim topples for roughly the same reason as his disparate treatment and disparate impact claims. For assuming that Gilty has made out a prima facie case, he has failed to show that the Village's proffered explanation was pretextual. Nowhere in Gilty's briefs has he challenged the district court's conclusion, premised in part on the blatantly inconsistent nature of evidence obtained from Gilty himself, that Gilty falsified his academic credentials. Instead, Gilty relies, once again, on an "even if I did" argument.

In essence, Gilty claims that he was unfairly singled out. No one prior to 1988, he argues, had been charged with falsifying academic credentials. Moreover, he argues that subsequent to his being charged a white officer was promoted after being found liable for police brutality. [13] We need not detain ourselves very long in dismissing these arguments.

First, Gilty's present demise came as the result of the Village's comprehensive attempt to verify its officers' credentials. This investigation was made by a police chief who was new to the department and there is little to suggest that he even knew **\*1256**  about Gilty's

discrimination complaint. In all, letters were sent to nineteen officers requesting verification of academic or training credentials. Moreover, the new chief took similar action against the only other person who could not verify his claimed academic credentials—Tom Stec, a white officer. [14]  It stretches reason, in the face of this evidence, to find merit in Gilty's argument that the Village investigated, charged, and dismissed him in retaliation for this lawsuit. [15]

Second, Gilty's evidence concerning the officer charged with police brutality is, at best, sparse. We are given no real information as to the circumstances surrounding the charge of brutality, and simply refuse to make wholesale speculations. Gilty, after all, is entitled only to reasonable inferences in his favor. Moreover, an officer who is charged with police brutality does not appear to be similarly situated with one who is charged with falsifying academic credentials. *See Morgan,* 867 F.2d at 1026. Thus, the comparison, even if fully explored, would be of little probative value in light of the obviously more relevant comparison with Stec.

The Village has presented solid and unrebutted evidence that discrimination did not play a role in its decision to investigate, charge, and dismiss Gilty. Indeed, under the circumstances in this record, it was virtually impossible for the Village to have acted in any other manner. *See Boorstin,* 663 F.2d at 118.

III.

As the district court noted, if all of Gilty's evidence were true, "a number of black persons would have good cases under the Civil Rights Acts and Title VII." *Gilty, supra.* But Gilty's individual claims cannot rely upon the potentially meritorious claims of others as a substitute for Gilty's own lack of qualification. The judgment of the district court is

AFFIRMED. [16]

**All Citations**

919 F.2d 1247, 54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

Footnotes

1   The mechanics of this promotional process are governed by a settlement order dated August 12, 1983, and a settlement agreement incorporated therein. *See Gilty v. Fire & Police Commissioners,* No. 83 C 727 (N.D.Ill. Aug. 12, 1983).

2   As of 1989, that observation was no longer true—one black officer had become a sergeant and another a deputy chief.

3   On September 14, 1988, the Commission discharged Gilty from the Oak Park Police Department. Its written opinion, adopted September 24, 1988, concluded that Gilty had lied and found that his testimony was not credible.

4   Additionally before us are two motions by the Village concerning statements made by Gilty in his reply brief. The first is a motion to strike such statements. The second is a motion for sanctions.

5   Lest one think this conclusion anomalous, remember that the street is not one-way; Gilty cannot use the Village's lack of knowledge to excuse his own lack of qualification any more than the Village could use its own purported lack of knowledge to reduce Gilty's level of qualification. Moreover, if Gilty could make a prima facie case, then the Village would be required to offer a nondiscriminatory explanation for its actions. At that stage, however, the Village could not rely upon information obtained after Gilty's evaluation had been completed. *Eastland v. TVA,* 704 F.2d 613, 626 (11th Cir.1983), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984).

6   Moreover, Gilty must fail even under a subjective standard. For in order to succeed under *McDonnell Douglas,* he must establish that a job opening existed at the time of the Village's lack of knowledge. Yet nowhere in his briefs has he established that another officer was promoted prior to the time when the Village discovered his misrepresentations. Moreover, our search of the record reveals that two officers from the April 6, 1985, Eligibility List were promoted, but nowhere does the record disclose the dates of those promotions. For all we know, the job openings arose after the Village's knowledge of Gilty's indiscretions, and discrimination, even of the most grievous sort, cannot establish a prima facie case under the *McDonnell Douglas* standard unless a plaintiff can associate it with a job opening. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

7   In view of our conclusion that this type of evidence is of only collateral importance in Gilty's individual claim, we do not have to rule on the Village's motion to strike, which dealt in large part with statements supporting Gilty's pattern and practice claim. Moreover, we reject Gilty's argument that he should have been able to conduct continued discovery in search of more evidence of broad-based discrimination. It was entirely proper for the district court to deny his discovery requests in light of the limited relevance of the evidence that such discovery would produce.

8   To a certain extent, Gilty also relies on underrepresentation statistics to support his disparate treatment claim. But "[s]tatistics, all-important in class actions and adverse impact cases, are of relatively low importance in an individual disparate treatment case." B. SCHLEI & P. GROSSMAN, *supra,* at 15; *see also id.* at 1315 & n. 72 ("statistics are rarely determinative in individual disparate treatment cases"). Standing virtually alone, as they are in this case, statistics cannot establish a case of individual disparate treatment. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir.1984).

9   *Minority Police Officers* also rejects the argument that a subjective evaluation of black officers conducted by white officers is inherently discriminatory. 801 F.2d at 967.

10  Gilty's only potentially meritorious argument in response is that the entire performance evaluation was poisoned— white officers were receiving disproportionately high scores at the same time that the black officers were receiving disproportionately low scores. Gilty does not seem to have specifically spelled out this argument in his complaint or in response to the Village's motion for summary judgment, but it seems a crabbed interpretation of his claim to penalize him for that failure. Inflation and deflation of scores are really just two sides of the same coin. To hold to the contrary would limit Gilty to the argument that his supervisors evaluated black officers in a blatantly discriminatory manner and then, in a transformation worthy of Dr. Jekyll, evaluated the white officers without a hint of discrimination pervading their decisions.

The problem, though, is that Gilty has challenged only the performance evaluation. By not challenging the written examination and the oral interview components, he has admitted that 70% of the promotional process is valid. Furthermore, the officer ranked second on the promotional list had a total score of 90.304/100, whereas Gilty had a total score of only 82.267/100. Thus, Gilty must be able to explain a shift of at least 8.038 points, all of which have to come from the performance evaluation.

On the performance evaluation, however, the scores of the fifty-one officers on the eligibility list ranged from a low of 22.977/30 (Gilty's score) to a high of 28.845/30, a range of only 5.868 points. If Gilty had received the highest score given to any of the fifty-one officers, 28.845/30, he would still need to explain 2.170 points as overinflation of the scores of white officers. Moreover, even if Gilty had received a perfect score, a possibility for which there is no evidence, he would recover only 8.023 of the 8.038 points that he needs to illustrate causation.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

54 Fair Empl.Prac.Cas. (BNA) 901, 55 Empl. Prac. Dec. P 40,458

In sum, the various machinations necessary for Gilty to show that he might have been promoted appear to us quite substantial and, therefore, unlikely. And while we might be prepared to accept the idea that Gilty raised the inflation/deflation argument below, we are not prepared to accept his argument on blind faith. In response to a valid motion for summary judgment, it is not irrational for us to require Gilty to put forth evidence to support his claim of inflation, especially where, as here, such inflation would likely have to be significant.

At oral argument, we questioned Gilty's assertion of score inflation and asked if the record supported such a factual claim. In response, we were directed to the deposition testimony of a single black officer. That officer complained that he had received a lower score than a white officer on the performance evaluation even though the black officer had made more arrests and had patrolled outdoors in sub-zero temperatures. That statement, standing alone, does not lead to the inference of wholesale inflation of scores, and is insufficient to allow us to conclude that Gilty might have been promoted even without the Village's alleged discrimination.

**11**   As we have previously noted, the Court's decision in *Wards Cove* curtailed the scope of disparate impact liability under Title VII. *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1533 (7th Cir.1990).

**12**   The district court also rejected Gilty's statistical pool as too small, and as we have previously noted, "especially where statistical evidence is involved, great deference is due the district court's determination of whether the resultant numbers are sufficiently probative of the ultimate fact in issue." *Soria,* 704 F.2d at 994 n. 6; *see also G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 995 (7th Cir.1989).

**13**   Gilty also argues that the chief of police falsified his academic credentials. This argument derives solely from the "affidavits" of Belen and Margaret Zangrilli, but these affidavits were neither notarized nor made under the penalty of perjury and, therefore, did not comply with rule 56(e) of the Federal Rules of Civil Procedure. As such, we can simply ignore them. *See* 28 U.S.C. § 1746 (permits unsworn declarations only if made "under penalty of perjury" and verified as "true and correct"); *see also Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir.1985) (unsworn statement does not meet requirements of FED.R.CIV.P. 56(e)) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 1609 n. 19, 26 L.Ed.2d 142 (1970)).

**14**   Indeed, Stec was charged prior to Gilty.

**15**   Gilty's reply brief cites *Wilson v. Pfeiffer,* 31 Fair Emp.Prac.Cas. (BNA) 1154 (S.D.N.Y.1982), in support of his argument that the Village's reason for his termination may be pretextual. In that case, the district judge concluded that the employer's reason for discharging the plaintiff—his falsification of academic credentials and poor working relationship with his supervisor—could have been pretextual. The district court derived this conclusion from evidence suggesting that the plaintiff had received favorable reviews despite his lack of a master's degree, that the plaintiff's certification was not revoked in light of his "outstanding employment record," and that the investigation of the plaintiff's credentials did not begin until the plaintiff protested an allegedly discriminatory evaluation.

The facts in *Wilson* are clearly distinguishable, however. Gilty engaged in a more substantial course of misrepresentation. Moreover, the Commission's ruling in no way supports Gilty's argument that his misrepresentations were not relevant, even in the face of whatever favorable employment record he may have had; whatever the relevance of lying in *Wilson,* it is clear that lying is relevant in this case. Last, Kohnke uncovered Gilty's fraud after a comprehensive investigation as opposed to one that was apparently individualistic in nature, and treated both Stec and Gilty in exactly the same manner.

**16**   Our analysis of the Village's motion for sanctions reveals that many, if not all, of the objections concerning Gilty's reply brief are to minor technical flaws. Under these circumstances, we decline to award sanctions. Gilty's statements are hardly worthy of praise, but neither do they rise to such a level of grievousness as to merit our invocation of 28 U.S.C. § 1927 or FED.R.APP.P. 46(c). Moreover, while Gilty's appeal may lack merit, we do not believe that it was completely frivolous within the meaning of FED.R.APP.P. 38.

---

**End of Document**                                  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 10

298 F.R.D. 592
United States District Court,
S.D. California.

James GUSMAN, individually and on behalf
of all others similarly situated, Plaintiff,
v.
COMCAST CORPORATION, Defendant.

Civil No. 13–cv–1049–GPC (DHB).
|
Signed April 2, 2014.

**Synopsis**

**Background:** Consumer brought putative class action against telecommunications company, alleging violations of Telephone Consumer Protection Act (TCPA). Both parties moved for determination of discovery dispute.

**Holdings:** The District Court, David H. Bartick, United States Magistrate Judge, held that:

[1] although company's outbound dial list was relevant, request was too intrusive and burdensome, and thus, all information was not discoverable;

[2] production of additional documents related to company's specific express consent it obtained to contact customers was not appropriate; and

[3] customer's retainer and fee agreement was relevant, and thus, would be discoverable, subject to in camera review by court.

So ordered.

**Attorneys and Law Firms**

**\*594** Abbas Kazerounian, Jason A. Ibey, Matthew Michael Loker, Kazerounian Law Group, APC, Costa Mesa, CA, Joshua Swigart, Hyde & Swigart, San Diego, CA, Nicholas J. Bontrager, Todd M. Friedman, Law Offices of Todd M. Friedman, PC, Beverly Hills, CA, for Plaintiff.

Bryan A. Merryman, James Jonathan Hawk, White and Case LLP, Los Angeles, CA, Jaime A. Bianchi, White & Case LLP, Miami, FL, for Defendant.

## ORDER RESOLVING JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE

DAVID H. BARTICK, United States Magistrate Judge.

On March 5, 2014, Plaintiff James Gusman ("Plaintiff") and Defendant Comcast Corporation ("Comcast" or "Defendant") filed a Joint Motion for Determination of Discovery Dispute. (ECF No. 29.) The Court held a telephonic Discovery Conference on March 14, 2014 to discuss issues raised in the joint motion. (ECF No. 33.) Following the Discovery Conference, the parties submitted a Joint Status Report. (ECF No. 37.) Having considered the arguments of the parties and the applicable law, and for the reasons set forth herein, the Court **DENIES** Plaintiff's motion to compel Comcast to produce its outbound dial list and documentary evidence of prior express consent. Additionally, the Court **GRANTS IN PART** Comcast's motion to compel production of Plaintiff's retainer and fee agreements.

## I. BACKGROUND

Plaintiff commenced this putative class action on May 2, 2013 by filing a complaint alleging that Comcast violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (ECF No. 1.) Specifically, Plaintiff alleges that "[b]eginning in February 2013, Defendant began contacting Plaintiff, sometimes as many as ten times in a single day, with an automatic telephone dialing system ('ATDS' as defined by 47 U.S.C. § 227(a)(1) using an 'artificial or prerecorded voice' as prohibited by 47 U.S.C. [§ ] 227(b)(1)(A) in order to discuss Defendant's prescription services with Plaintiff." (*Id.* at 4:22–26.) Plaintiff further alleges he informed a representative on each occasion "that Plaintiff was not a current subscriber to Defendant's servicers nor had Plaintiff ever been a subscriber." (*Id.* at 5:4–6.) Plaintiff did not provide his cellular telephone number, which he obtained on or about February 1, 2013, to Comcast at any time. (*Id.* at 5:7–11.) Plaintiff further alleges Comcast's use of an ATDS to contact Plaintiff was not done for emergency purposes, the calls constitute solicitations under **\*595** the TCPA, and

"Plaintiff did not provide prior express consent to receive calls or messages on Plaintiff's cellular telephones." (*Id.* at 5:21–26.)

According to the operative Complaint, Plaintiff seeks to certify the following class: "[A]ll persons within the United States who received any unsolicited marketing and artificial or prerecorded voice messages from Defendant without prior express consent which message by Defendant or its agents was not made for emergency purposes, within the four years prior to the filing of this action." (*Id.* at 6:4–8.)

## II. DISCUSSION

### A. *Legal Standards*

**[1]** The threshold requirement for discoverability under the Federal Rules of Civil Procedure is whether the information sought is "relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). In addition, "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The relevance standard is thus commonly recognized as one that is necessarily broad in scope in order "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (citing *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

**[2]** However broadly defined, relevancy is not without "ultimate and necessary boundaries." *Hickman,* 329 U.S. at 507, 67 S.Ct. 385. Accordingly, district courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan,* 296 F.3d 732, 751 (9th Cir.2002); *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 942 (9th Cir.2009) ("District courts have broad discretion to control the class certification process, and '[w]hether or not discovery will be permitted ... lies within the sound discretion of the trial court.' ") (citing *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 209 (9th Cir.1975)). District courts also have broad discretion to limit discovery. For example, a court may limit the scope of any discovery method if it determines

that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i).

**[3]** **[4]** Generally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class. *Oppenheimer Fund,* 437 U.S. at 359, 98 S.Ct. 2380. Although discovery on the merits is usually deferred until it is certain that the case will proceed as a class action, the merits/certification distinction is not always clear. Facts that are relevant to the class determination frequently will overlap with those relevant to the merits of the case. *See Wal-Mart Stores Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011) (explaining that often the "rigorous analysis" under Rule 23(a) "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

### B. *Plaintiff's Motion to Compel*

Plaintiff seeks a court order compelling Comcast to produce (1) its outbound dial list of calls made to consumers using an ATDS (ECF No. 29 at 5:23–8:2), and (2) documentary evidence of prior express consent. (*Id.* at 8:4–10:25.)

#### 1. Outbound Dial List

Plaintiff's Request for Production No. 7[1] to Comcast states:

> Produce any and all DOCUMENTS relating to or regarding, and including, any and all reports for each outbound dial list to persons that YOU called on behalf of YOURSELF, and/or an third party, including **\*596** those outbound dial lists, in electronically searchable format (CSV for comma delimited format), generated by any autodialer campaign in which YOU or YOUR agents engaged since four ears prior the filing of this action to the date of responding to these document requests.

(ECF No. 29–1 at 13:8–14.)

Plaintiff claims Comcast's outbound dial list is discoverable in that it is relevant to Federal Rule of Civil Procedure 23(a) class certification requirements of

numerosity and commonality. (ECF No. 29 at 6:6–7:19.) Plaintiff also maintains the outbound dial list is relevant to the issue of manageability under Rule 23(b)(3). (*Id.* at 7:20–28.)

Comcast contends Plaintiff's request for the outbound dial list is overbroad in light of Comcast's 22 million subscribers and because the request fails to distinguish between different categories of calls, *i.e.,* collection calls versus marketing calls. (*Id.* at 16:10–17:6.) Comcast also contends the request is not limited to calls made from any particular type of dialing equipment or calls placed from the particular geographic division as the calls placed to Plaintiff. (*Id.* at 17:7–14.)

### a. *Numerosity*

**[5]**    Plaintiff contends "[t]he outbound dial list during the class period is relevant to the numerosity prerequisite because it will allow Plaintiff to explain to the Court approximately how many cellular telephone numbers were called during the class period, which information can be used to reasonably determine whether there are enough class members that resolving the claims outside the class action mechanism of recovery would be impracticable." (*Id.* at 6:6–12.) In support of its contention, Plaintiff relies on *Stemple v. QC Holdings, Inc.,* 2013 U.S. Dist. LEXIS 99582, at *6 (S.D.Cal. June 17, 2013). (ECF No. 29 at 6:13–16.)

The Court agrees with Plaintiff that Comcast's outbound dial list is reasonably calculated to determine the number of calls Comcast made to cell phones during the class period. Thus, the outbound dial list is relevant to numerosity. However, the Court concludes that Plaintiff has less intrusive and burdensome means available to him to obtain evidence which could be used to satisfy the Rule 23(a)(1) numerosity prerequisite. Indeed, carefully-drafted interrogatories or requests for admission, or Comcast's Rule 30(b)(6) deposition, can be utilized to obtain the relevant data to determine an approximate number of calls made to cell phones using an autodialer during the proposed class period.

One of Plaintiff's alternative proposals supports the Court's conclusion. In lieu of production of the outbound dial list, Plaintiff proposes that "Defendant's technology consultant ... scrub the outbound dial list for cellular

telephone numbers only and then inform Plaintiff's counsel of the total number of unique cell phones called during the class period and call frequency. This would obviate the need for actual production of the outbound dial list for pre-certification purposes." (*Id.* at 5:12–17.) Thus, Plaintiff concedes that production of the list is not necessary if Plaintiff were provided the total number of cell phones called and the call frequency. Such information is obtainable via much less burdensome discovery methods.

Comcast argues "[t]he breadth of [Plaintiff's request] is staggering." (*Id.* at 16:11.) While Comcast would have strengthened its position by articulating with specificity the burden it would face in producing its outbound dial list, the Court finds that production of the outbound dial list would impose an undue burden on Comcast in light of the other available means of obtaining the relevant information. As Plaintiff recognizes, "[t]he court is able to make common-sense assumptions in determining numerosity." *McCabe v. Crawford & Co.,* 210 F.R.D. 631, 644 (N.D.Ill.2002). Similarly, the Court here makes the common-sense assumption that given Comcast's 22 million subscribers, production of Comcast's call list over a four-year period will entail significant time and expense. In light of the actual information Plaintiff seeks to obtain, *i.e.,* number of cell phones called and call frequency, and the availability of other, less burdensome methods of discovering this information, the Court finds that requiring Comcast to expend the time and resources to produce the outbound dial list is not warranted.

**\*597**    The Court also concludes the request is also overbroad and unreasonably burdensome given the uncertain nature of Plaintiff's class allegations. As stated above, Plaintiff's operative Complaint seeks to certify a class of "all persons within the United States who received any unsolicited *marketing* and artificial or prerecorded voice messages from Defendant without prior express consent whose message by Defendant or its agents was not made for emergency purposes, within the four years prior to the filing of this action." (ECF No. 1 at 6:4–8 (emphasis added).) Comcast contends that *marketing* calls are not applicable in this case because Plaintiff did not receive marketing calls. Rather, Plaintiff received collection calls made to a phone number that had previously been assigned to a Comcast subscriber, but was later assigned to Plaintiff, a non-subscriber. Thus, according to Comcast, this case involves a "recycled" phone number. (ECF No. 29 at 15:2–5; ECF No. 29–2 at 2:13–3:2.) Although this

distinction goes to the merits of Plaintiff's allegations and will be decided at the proper time in this case, it is important for discovery purposes because the scope of Plaintiff's proposed class is not entirely clear. On one hand, the Court is bound by the class definition provided in the Complaint. *See Ortiz v. McNeil–PPC, Inc.,* 2009 WL 1322962, at *1, 2009 U.S. Dist. LEXIS 39584, at *2 (S.D.Cal. May 8, 2009). On the other hand, the "recycled" phone number facts presented by Comcast, which are not disputed by Plaintiff, do not justify imposing a significant burden on Comcast to produce an outbound dial list of *marketing* calls when it appears this case involves *collection* calls. [2]

Accordingly, although the outbound dial list is relevant to the issue of numerosity, under the circumstances of this case it is appropriate to **DENY** Plaintiff's request for the list because "the discovery sought ... can be obtained from some other source that is more convenient, less burdensome, or less expensive" and Plaintiff "has had ample opportunity to obtain the information by discovery in this action." FED. R. CIV. P. 26(b)(2)(C)(i)-(ii).

### b. *Commonality*

Plaintiff also contends Comcast's outbound dial list is relevant to Rule 23(a)(2)'s commonality prerequisite. (ECF No. 29 at 6:18–7:18.)

**[6]  [7]  [8]  [9]**   "Class certification requires a plaintiff to show 'there are questions of law or fact common to the class.' " *Knutson v. Schwan's Home Serv., Inc.,* 2013 WL 3746118, at *7, 2013 U.S. Dist. LEXIS 98735, at *20 (S.D.Cal. July 15, 2013) (citing FED. R. CIV. P. 23(a)(2)). "To satisfy commonality, a plaintiff must actively show the putative class 'suffered the same injury ... such that the ... class claims will share common questions of law or fact' with those of the named plaintiffs." *Id.* (citing *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). "Merely stating questions common to all putative class members is insufficient, however, because '[a]ny competently crafted class complaint literally raises common 'questions.' " *Id.* at *7, 2013 U.S. Dist. LEXIS 98735, at *20–21 (quoting *Wal–Mart,* 131 S.Ct. at 2551). "As a result, the test of commonality is not whether common questions exist, but whether common answers to critical questions of law and fact can be reached without impediment." *Id.* at *7, 2013

U.S. Dist. LEXIS 98735, at *21 (citing *Wal–Mart,* 131 S.Ct. at 2551). "Since the plaintiff carries the burden of demonstrating commonality, such proof may overlap with findings of merit of the plaintiff's claim." *Id.* at *7, 2013 U.S. Dist. LEXIS 98735, at *21 (citing *Wal–Mart,* 131 S.Ct. at 2551–52).

In *Knutson,* Judge Curiel stated:

> The common question is thus, "were we all called on our cellular telephones, by an autodialer or artificial or prerecorded voice, on behalf of [defendant], without having given express consent?" A list of numbers dialed by an autodialer on behalf of [defendant] for a singular purpose could be relevant to this inquiry, especially since Plaintiffs claim the cell phone numbers can be reliably identified within the list and **\*598** used in conjunction with evidence of lack of consent.

2013 WL 3746118, at *8, 2013 U.S. Dist. LEXIS 98735, at *22.

On remand in *Knutson,* the undersigned concluded that a truncated dial list was indeed relevant to the question of commonality because it would show, after being analyzed by the plaintiffs' consultants, whether the calls made by the defendant were made to the putative class members' cellular telephones. *Knutson v. Schwan's Home Service, Inc.,* 2013 U.S. Dist. LEXIS 103094, at *4 (S.D.Cal. July 23, 2013).

Similarly, here, Comcast's outbound dial list is relevant to the issue of whether the putative class members were called on their cellular phones by an ATDS. However, as with the issue of numerosity, the Court concludes, in its discretion, that production of the outbound dial list is unwarranted because "the discovery sought ... can be obtained from some other source that is more convenient, less burdensome, or less expensive" and Plaintiff "has had ample opportunity to obtain the information by discovery in this action." FED. R. CIV. P. 26(b)(2)(C)(i)-(ii). Specifically, Plaintiff is able to utilize less burdensome methods of discovery to determine whether Comcast made calls to cell phones using an ATDS without having prior express consent. Accordingly, although the outbound dial list is relevant to the issue of commonality, under the circumstances of this case it is appropriate to **DENY** Plaintiff's request for the list. [3]

### 2. Prior Express Consent Documentation

Plaintiff's Request for Production No. 12 states:

> Produce the DOCUMENTS that YOU used to determine whether the cellular telephone numbers to be called by YOU had provided their "prior express consent", as that term is used in 47 U.S.C. Section 227(b)[1](A), prior to making any attempt to call those numbers, including but not limited to any electronic notations in the outbound dial list that the called party provided "prior express consent," and including all DOCUMENTS that YOU may rely on at trial or other hearing in this case to establish "prior express consent" was provided to YOU since four years prior to the filing of this action to the date of responding to these document requests.

(ECF No. 29–1 at 14:20–28.)

Plaintiff seeks to compel Comcast to produce all documentary evidence of prior express consent, which Plaintiff characterizes as an affirmative defense rather than an element of his TCPA claim. (ECF No. 29 at 8:15–9:16.) Alternatively, Plaintiff seeks, at a minimum, "the blank customer contracts and other blank forms used by Defendant to purportedly obtain prior express consent." (*Id.* at 9:17–18.) Plaintiff claims "[t]hese blank contracts/forms will assist Plaintiff in demonstrating whether the language on the forms are sufficient to obtain prior express consent for Defendant to make automated and or prerecorded calls to the putative class members." (*Id.* at 9:20–24.) Absent this documentation, Plaintiff claims he will be prejudiced if Comcast later uses unproduced consent documents in opposing Plaintiff's anticipated motion for class certification. (*Id.* at 10:2–19.)

In opposition to Plaintiff's request, Comcast argues that because Plaintiff "has never been a Comcast subscriber [he] lacks standing to challenge the efficacy" of Comcast's subscriber agreements. (*Id.* at 13:23–24.) Comcast also contends that it is Plaintiff that must prove lack of consent as an element of his TCPA claim. (*Id.* at 20:5–14.) Comcast also argues disclosure of its subscriber's consent

documentation raises privacy concerns. (*Id.* at 20:16–21:6.) Finally, Comcast's counsel represented during the March 14, 2014 Discovery Conference that Comcast has already produced a screenshot showing that the prior subscriber had provided the phone number at issue as well as copies of its Agreement for Residential Services and its Customer Privacy Notice (*see id.* at 19:5–8), **\*599** and that Comcast does not expect to rely on any other documents on the issue of prior express consent.

**[10]** Upon consideration of this issue, the Court concludes that Comcast has satisfied its discovery obligation. Plaintiff agrees with Comcast that he was not a Comcast subscriber at the time he received the phone calls at issue. (ECF No. 1 at 5:4–6.) Moreover, Comcast has produced its Agreement for Residential Services and its Customer Privacy Notice. At this stage of the case it is premature to order Comcast to provide any more specific express consent documents, particularly in light of the fact that Plaintiff, at this juncture, has failed to clearly define the putative class definition. As discussed above, the Complaint alleges a class definition involving marketing calls; however, in the recently filed Joint Status Report (ECF No. 37), Plaintiff's class definition emphasis has morphed into an emphasis on debt collection calls. Because the class definition appears to be a moving target, it is inappropriate to require Comcast to provide additional express consent documentation until after Plaintiff has clearly defined his class definition in his formally filed class certification motion. In this regard, any surprise Plaintiff may experience when Comcast opposes class certification is a result of Plaintiff's own decisions which have left the class definition in flux.

Accordingly, Plaintiff's motion to compel Comcast to produce further documents regarding prior express consent is **DENIED.** In light of this ruling, the Court need not address at this stage the parties' conflicting positions on whether prior express consent is an affirmative defense to be established by Comcast or an element of Plaintiff's TCPA claim on which Plaintiff bears the burden of proof.

### C. Comcast's Motion to Compel

Comcast seeks an order compelling Plaintiff to produce his retainer and fee agreements with counsel in this case and in any other TCPA class actions initiated by Plaintiff. (ECF No. 29 at 22:1–25.)[4]

Defendant served the following document request on Plaintiff: "All DOCUMENTS CONCERNING any agreement with, or the terms pursuant to which [Plaintiff] retained, any attorney to represent [Plaintiff] in this action, including engagement letters or retention agreements between [Plaintiff] and any attorney CONCERNING this action." (ECF No. 29–2 at 5:24–26, 31:3–6.) Defendant served a separate request seeking the same type of documents with respect to any other putative class action initiated by Plaintiff. (*Id.* at 5:24–26, 31:14–18.)

Defendant claims the responsive documents are not privileged and that, "in putative class actions, retainer and fee agreements are relevant to 'the ability of named plaintiffs to protect the interest of potential class members and hence are a proper subject for discovery.' " (ECF No. 29 at 22:8–17 (quoting *Epstein v. Am. Reserve Corp.,* 1985 WL 2598, at *3, 1985 U.S. Dist. LEXIS 15842, at *3 (N.D.Ill. Sept. 18, 1985)).)

Plaintiff objected to both requests on grounds that they are (1) not relevant or reasonably calculated to lead to the discovery of admissible evidence; (2) overbroad as to scope and time and, therefore, unduly burdensome; (3) vague and ambiguous; and (4) seeking documents in violation of the attorney-client privilege. (*Id.* at 31:8–12, 21–24.)

**[11]** **[12]** "The Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine." *Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC,* 2009 WL 3857425, at *1–2, 2009 U.S. Dist. LEXIS 103045, at *5 (S.D.Cal. Nov. 4, 2009) (citing *Ralls v. United States,* 52 F.3d 223, 225 (1995); *United States v. Blackman,* 72 F.3d 1418, 1424 (9th Cir.1995); *In re Michaelson,* 511 F.2d 882 (9th Cir.1975)); *see* **\*600** *also Carrizosa v. Stassinos,* 2006 WL 2529503, at *1, 2006 U.S. Dist. LEXIS 66358, at *3 (N.D.Cal. Aug. 31, 2006) (stating that under Ninth Circuit law, fee agreements generally fall outside the scope of the attorney-client privilege). "Communications between attorney and client that concern the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." *Paul v. Winco Holdings, Inc.,* 249 F.R.D. 643, 654 (D.Idaho Feb. 27, 2008) (quoting *Clarke v. Am. Commerce Nat'l Bank,* 974

F.2d 127, 129 (9th Cir.1992)). However, "correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege." *Id.*

**[13]** Here, the Court concludes Plaintiff's retainer and fee agreement with counsel in this case is relevant to the Rule 23(a)(4) analysis of whether Plaintiff is an adequate representative of the class. *See Rolex Emps. Ret. Trust v. Mentor Graphics Corp.,* 136 F.R.D. 658, 666 (D.Or.1991); *Epstein,* 1985 WL 2598, at *2–3, 1985 U.S. Dist. LEXIS 15842, at *7 ("Fee agreements are relevant to the ability of named plaintiffs to protect the interest of potential class members and hence are a proper subject for discovery.") (citing *Klein v. Miller,* 82 F.R.D. 6, 8–9 (N.D.Tex.1978) ("[I]nquiry into Plaintiffs' ... fee arrangement is relevant to the question of Plaintiffs' ability to protect the interests of potential class members by adequate funding of this lawsuit, and the question of award of attorneys fees in the settlement of possible judgment of this lawsuit.")).

**[14]** Moreover, the attorney-client privilege generally does not preclude disclosure of fee agreements. *Epstein,* 1985 WL 2598, at *2–3, 1985 U.S. Dist. LEXIS 15842, at *7 ("[F]ee agreements are not ordinarily subject to the attorney-client privilege.") (citing *Klein,* 82 F.R.D. at 8–9). In resolving the instant dispute, the Court relies on a similar analysis performed by Magistrate Judge Barbara L. Major in *Stanley v. Bayer Healthcare LLC,* 2011 WL 5569761, at *4, 2011 U.S. Dist. LEXIS 132363, at *12–13 (S.D.Cal. Nov. 16, 2011). In that case, Judge Major concluded "it is clear that retainer agreements are not typically protected by attorney-client privilege." *Id.* at *4, 2011 U.S. Dist. LEXIS 132363, at *12. However, in light of the plaintiff's claim that the contents of her retainer agreement would reveal privileged communications, Judge Major ordered that an unredacted copy of the agreement be submitted to chambers for *in camera* review. *Id.*

The Court concludes that Plaintiff's retainer and fee agreement with counsel pertaining to the instant lawsuit is relevant to class certification and should be produced to the Court for *in camera* review to determine whether disclosure would reveal privileged communications. However, Comcast has not established the relevancy or need for Plaintiff's retainer and fee agreements pertaining

to other TCPA class actions. Accordingly, Comcast's motion to compel production of Plaintiff's retainer and fee agreements is **GRANTED IN PART** and **DENIED IN PART.**

### III. CONCLUSION [5]

Based on the foregoing, IT IS HEREBY ORDERED:

1. Plaintiff's motion to compel Comcast to produce its outbound dial list and additional documentation regarding prior express consent is **DENIED.**

2. Comcast's motion to compel Plaintiff to produce his retainer and fee agreement *601 pertaining to this case is **GRANTED IN PART.** On or before **April 11, 2014,** Plaintiff shall lodge directly with the chambers of the undersigned Magistrate Judge an unredacted copy of his retainer and fee agreement pertaining to this case.

3. Comcast's motion to compel Plaintiff to produce his retainer and fee agreements pertaining to other TCPA class actions is **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

298 F.R.D. 592

Footnotes

1   Plaintiff's Request for Production Nos. 8–10 contain similar language regarding production of Comcast's outbound dial list. (ECF No. 29–1 at 13:15–14:12.)

2   Plaintiff's counsel even acknowledged during the March 14, 2014 Discovery Conference that this case involves debt collection calls rather than marketing calls.

3   In light of the Court's ruling that Comcast need not produce its outbound dial list, the Court does not address the parties conflicting arguments regarding the application of the Cable Communications Act of 1984, 47 U.S.C. § 521 *et seq.*

4   Comcast's portion of the parties' joint motion also addressed Comcast's request for Plaintiff's cell phone records. (ECF No. 29 at 21:8–27.) However, on March 13, 2014, Comcast filed a status report indicating that this issue has been "resolved and Comcast withdraws its request that the Court compel Plaintiff to produce his cell phone records." (ECF No. 31 at 2:13–14.) Counsel for both parties confirmed during the March 14, 2014 Discovery Conference that this issue has been resolved.

5   The Court notes that it received and reviewed a joint statements from the parties, which was emailed to chambers on March 31, 2014, regarding Plaintiff's anticipated request for an extension of the class discovery cutoff and Plaintiff's deadline to file his motion for class certification. Initially, the Court advises that any request for extension must be properly filed via CM/ECF. Moreover, because Plaintiff's anticipated requested appears to be premised on an expectation that additional documents would be forthcoming from Comcast, given the Court's ruling on the instant discovery dispute, the Court does not believe that any extensions of the deadlines are warranted at this time.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 11

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

642 F.2d 1157
United States Court of Appeals,
Ninth Circuit.

Joanne M. HEAGNEY, Plaintiff-Appellant,

v.

The UNIVERSITY OF
WASHINGTON, Defendant-Appellee.

No. 78-3292.
|
Argued and Submitted Nov. 5, 1980.
|
Decided March 23, 1981.

Former state university employee brought employment discrimination suit alleging that the university paid her an unfairly low salary because of her sex. The United States District Court for the Western District of Washington, Walter T. McGovern, Chief Judge, rendered judgment for the university and former employee appealed. The Court of Appeals, Boochever, Circuit Judge, held that: (1) statistical evidence indicating that male employees received higher pay than female employees was not rendered inadmissible because of an approximately 22-month delay between the former employee's resignation and the collection of the salary data and the exclusion of this evidence was reversible error, and (2) unequal pay was not a sufficient justification to relieve the former employee of her duty to mitigate damages by remaining on the job and her resignation was not a constructive discharge.

Affirmed in part, reversed in part and remanded.

Van Dusen, Senior Circuit Judge, filed a concurring opinion.

**Attorneys and Law Firms**

**\*1158** Sidney J. Strong, Halverson, Strong, Moen & Chemnick, Seattle, Wash., for plaintiff-appellant.

Elsa Kircher Cole, Seattle, Wash., for defendant-appellee.

Appeal from the United States District Court for the Western District of Washington.

Before VAN DUSEN,[*] Senior Circuit Judge, and ANDERSON and BOOCHEVER, Circuit Judges.

**Opinion**

BOOCHEVER, Circuit Judge:

This is a sex discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. s 2000e et seq. Congress made the provisions of Title VII applicable to state and local governmental entities such as the University of Washington by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, s 2(1), 86 Stat. 103, effective March 24, 1972. Heagney alleges that the University paid her an unfairly low **\*1159** salary because of her sex, and is seeking damages for the period subsequent to March 24, 1972. She seeks the difference between her estimate of a nondiscriminatory salary and her actual salary from March 24, 1972 until March 15, 1973, when she left the University. Heagney also claims that she should be awarded the full value of a nondiscriminatory salary for the period since her resignation because she was "constructively discharged" from her job. Finally, she requests reinstatement at the University.

The Equal Employment Opportunity Commission investigated her complaint and attempted to reach a settlement with the University. These efforts failed and the commission granted Heagney a "Notice of Right to Sue." A magistrate tried the case in 1977, and issued his findings and conclusions on November 3, 1977. In August 1978 the district judge adopted the magistrate's findings and conclusions in their entirety, and entered judgment for the University. Heagney then brought this appeal.

Because we conclude that a relevant statistical report was erroneously excluded from evidence the case must be remanded to the district court for reconsideration on the issue of whether Heagney proved that she was underpaid because of her sex. The evidence supports the finding that Heagney was not constructively discharged, however, and we affirm that portion of the district court's opinion.

**I. FACTS**

Joanne Heagney has a bachelor's degree in chemistry from the University of Washington and has done some post-graduate work there. From 1962 until she resigned in

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 723 of 898

Heagney v. University of Washington, 642 F.2d 1157 (1981)

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

1973 she was employed at the Nuclear Physics Laboratory (NPL or the Lab), which is part of the University of Washington. Her primary duty at NPL was to design and fabricate targets used in nuclear physics experiments. Heagney initially held the job title of Radiochemist I; in 1965 she was promoted to Radiochemist II; and, finally, in November 1972 she was promoted to Materials Research Scientist.

Non-academic personnel at the University of Washington are categorized as either "classified" or "exempt." Exempt employees are those filling jobs with unique or unstandardized requirements. Although Heagney held titled positions, she was an exempt employee. Salaries of classified employees are covered by a Washington state personnel law and are set and adjusted by an administrative agency. Salaries for exempt employees were, during the time considered here, more discretionary. Heagney's salary was set by a supervisory committee of the NPL whose decisions were in turn approved by the College of Arts and Sciences and by the University's personnel department. The University provided the NPL with certain salary guidelines.

Heagney relied principally upon statistical evidence to prove her case of sex discrimination. First she attempted to show that as a group women exempt employees at the University received disproportionately lower salaries than men. She then attempted to show that this pattern carried over into her individual case at the Lab.

As part of her showing that women exempt employees generally received lower salaries than males, Heagney introduced the results of a study undertaken by the Equal Employment Opportunity Commission (EEOC). This study shows that among all 717 exempt employees at the University in 1973, 70 percent of the males made over $12,000, but only 28 percent of the females made over this amount.

Several witnesses also testified about statistics gathered by the Office of Civil Rights of the Department of Health, Education and Welfare. These statistics compared the pay of male and female exempt employees based on 1972-1973 data. Although never introduced into evidence, the data apparently show that women exempt employees, on average, made less than their male counterparts with similar job titles and occupational codes. Witnesses from both the University and the Office of Civil **\*1160** Rights

agreed that the salary data was deficient because job titles were so broad that they were not an accurate indication of the actual work content. For this reason the statistics did not provide a reliable basis for comparing work performed by females with work performed by males. The University's Director of Personnel Services criticized the EEOC statistics on the same grounds.

To avert an enforcement action, in 1974 the Office of Civil Rights and the University signed a conciliation agreement concerning employment practices at the University. As one of three required steps concerning exempt employees, the University agreed to retain an outside consulting firm to undertake an in-depth analysis of the salaries paid to exempt employees, and to recommend changes. The University hired the consulting firm of Robert Hayes and Associates as a result of the agreement.

At trial, Heagney made several attempts to introduce the May 1975 Hayes final report into evidence. The University objected on the grounds that the Hayes study was based upon 1975 salary data and was therefore irrelevant to the question of whether there was salary discrimination during the 1972-73 period when Heagney was a University employee covered by Title VII. The magistrate sustained the University's objection and kept the Hayes study out of evidence.

Heagney has made the unadmitted Hayes report part of the record on appeal. The report indicates that the Hayes firm standardized exempt jobs by ranking each job according to a point scale using such factors as initial eligibility requirements, supervisory responsibility, creativity required and other indicia of skill, training and job importance. Based on 1975 data, the report describes a salary curve the firm prepared for the University that would insure that jobs with similar point rankings would receive comparable salaries. The report also includes a table showing how the salaries of exempt jobs in January 1975 actually compared with this curve. In relation to the salary curve, the University paid 39.2 percent of the women exempt employees below what the report established as a minimum salary. The comparable figure for male employees was 19.8 percent. The table shows that the University overpaid 14.5 percent of its exempt male employees, while it overpaid only 4.6 percent of its female employees. Thus approximately twice the percent of women were underpaid than men and more than three times the percent of men were overpaid than women. The

Heagney v. University of Washington, 642 F.2d 1157 (1981)
Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 724 of 898
26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

study demonstrates a significant salary disparity between male and female exempt employees.

To show disparities in her own salary, Heagney introduced a survey prepared by Battelle Columbus Laboratories comparing salaries earned by scientists across the United States. The court found that Heagney's salary was about 73 percent of the national mean for an equivalent job description in the Battelle survey. Three male employees at NPL had salaries below, but closer to, the national mean than Heagney's salary for the type of work they did. Stowell had a salary that was 76 percent of the mean, Roth's was 78 percent, and Cheney's was 85 percent. In his oral opinion, the magistrate noted that the major problem he had with the use of this survey was classifying Heagney's job properly so she could be matched with the appropriate category in the survey.

Finally, Heagney introduced statistics showing the starting salary, rates of salary increase, and education and experience of male and female exempt employees at NPL. Tabulations showing the salary history of Heagney, three male employees, and Kellenbarger, another female employee, are summarized in the margin. [1] These statistics **\*1161** arguably indicate some inequity when Heagney's salary is compared with male employees at least during the period prior to the date that the Equal Employment Opportunity Act became applicable. [2]

At various times the Lab requested salary increases for Heagney and other exempt employees. For example, in 1968 Professor Vandenbosch wrote David Williams, the University's personnel director:

|  | Heagney | Kellenbarger (Female) | Cheney (Male) | Roth (Male) | Stowell (Male) |
|---|---|---|---|---|---|
| Oct. 1962 | $ 425 [*] |  |  |  |  |
| Jan. 1966 | 630 | $ 620 [*] |  |  |  |
| July 1966 | 661 | 651 | $ 900 [*] |  |  |
| June 1969 | 802 | 788 | 1021 | $ 740 [*] |  |
| Jan. 1970 | 882 | 867 | 1196 |  | $ 845 [*] |
| Mar. 1973 [**] | 1070 | 1004 | 1375 | 985 | 1048 |

I will make one last attempt to impress on you the inequity in the Chemists' (Heagney and Kellenbarger) pay scale. In addition to the fact that we are about 20% low compared to other institutions, some comparisons within our own Laboratory are also shocking. [3]

If the evidence summarized above shows a discriminatory pattern prior to the effective date of the legislation extending Title **\*1162** VII proscriptions to state governmental entities, March 24, 1972, it is necessary to

determine whether the pattern was carried forward after the effective date.

An examination of raises as a proportion of initial salary indicates that the male employees received increases similar to Heagney's. Thus if the evidence shows an initial inequality between Heagney's salary compared to the other exempt employees, the data indicate that Heagney did not appreciably narrow the gap through pay increases, although the gap did not widen. [4]

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 725 of 898

Heagney v. University of Washington, 642 F.2d 1157 (1981)
26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

The events which apparently precipitated the present suit began in June 1972, when the NPL gave Roth a 15.2 percent pay increase and Stowell 10 percent, but gave nothing to Heagney. She submitted a letter of resignation on September 1, 1972, and stated as a condition for further employment that she be granted a 30 percent pay raise. In response Professor Weitkamp asked for a 10 percent raise for Heagney and 5 percent for the rest of the exempt staff. Heagney then contacted Human Rights officials at the University, and several months later contacted the EEOC and HEW. The University approved the 10 percent raise for Heagney effective in October 1972, and later approved a 5 percent raise for the other exempt employees retroactive to October.

The University has maintained that its promotion policies were designed to award especially meritorious service. As an explanation of why Heagney may not have been paid more, the magistrate found that during the "latter part" of her employment Heagney's job enthusiasm slacked, she was not working a forty-hour week, and she may have had some conflict of interest between her job at NPL and a family-run business. Furthermore, her relationship with other personnel at the Lab had deteriorated.

In discussing Heagney's apparent personnel problems the magistrate, in his oral decision, stated

> In my judgment, these two problems (shortness of hours and inability to work with colleagues) arose from a common cause, and that cause was a growing dissatisfaction on the plaintiff's part with the degree of recognition she was receiving at the Lab for the work she was doing, perhaps primarily in terms of salary ....

He further found that many of Heagney's other personnel problems had been "magnified" at trial to more importance than they had when they occurred.

On the other hand, the magistrate found that Heagney was "highly skilled." She had received written commendations for her work. In 1971 Heagney had been invited to the Conference of Research Materials at Oak Ridge, Tennessee to give a paper describing her work. Professor Weitkamp noted that she had "achieved international recognition." She was "one of perhaps one or two dozen people in the United States who have made a professional specialty of fabricating such targets." When Heagney resigned Professor Bodansky of the NPL wrote her that her work had been "excellent" and they would welcome her back.

With regard to the statistical evidence the magistrate noted that none of it compared Heagney's job with the same type of job performed by other male employees. According to the magistrate, Heagney's job was unique. The district judge, in adopting the magistrate's findings and conclusions, noted that the magistrate "consistently based his legal conclusions on a finding that **\*1163** the Plaintiff's employment was unique and, as such, took her out from under the statistical evidence she advanced." Therefore, because Heagney's "proofs ... were based substantially, if not entirely, on statistical evidence" the judge did not believe that there was sufficient proof of sex discrimination. He agreed with the magistrate's conclusion that there was no sex discrimination involved in establishing Heagney's salary. The judge further found there was no evidence to support Heagney's charge that she was constructively discharged.

## II. PROOF OF SEX DISCRIMINATION

In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854-1855 n.15, 52 L.Ed.2d 396 (1977) the Court discussed the difference between Title VII "impact" cases and "treatment" cases. In a disparate impact case, a plaintiff must show that some facially neutral employment practice has a substantially disproportionate impact upon a group protected by Title VII. Examples of such outwardly neutral employment practices include height and weight requirements, see Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), or certain types of employment tests adversely affecting those of certain cultural backgrounds, see Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Once plaintiffs have shown the existence and impact of such a practice, which constitutes a prima facie case, the employer will be held liable unless the practice can be justified by "business necessity." Dothard, 433 U.S. at 329, 97 S.Ct. at 2727; Griggs, 401 U.S. at 430, 91 S.Ct. at 853.

A "treatment" case involves a situation where an employer treats an individual protected by Title VII differently

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 726 of 898

Heagney v. University of Washington, 642 F.2d 1157 (1981)

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

simply because of the person's minority status, religion or sex. In a treatment case, unlike an impact case, it is necessary to show an employer's intent to discriminate, but intent can be inferred from circumstantial evidence. Teamsters, 431 U.S. at 335 n.15, 97 S.Ct. at 1854-1855 n.15. Once a plaintiff has introduced evidence from which it appears more likely than not that the defendant had an intent to discriminate, a prima facie "treatment" case is established. An employer will be liable unless it can "articulate" reasons which justify disparate treatment. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Golden v. Local 55 of the International Association of Firefighters, 633 F.2d 817 at 821 (9th Cir. 1980). If an employer does articulate legitimate, nondiscriminatory reasons for disparate treatment, the employee can then show that these reasons were a pretext to hide bias. McDonnell Douglas, 411 U.S. at 804-05, 93 S.Ct. at 1825-1826.

[1] A plaintiff in a Title VII case can plead both theories. Although the disparate impact theory is ordinarily asserted in class actions, an individual claimant may seek relief under such a theory as well. Wright v. National Archives & Records Service, 609 F.2d 702, 711-12 (4th Cir. 1979) (en banc). Heagney alleges that categorizing certain employees as "exempt" is a neutral employment practice which the statistics indicate has a disproportionate impact upon the salaries of female employees. She reasons that she is a member of the class of persons which has been disadvantaged by this practice, therefore the University should be liable.

[2] [3] It is apparent, however, that the creation of jobs that are exempt from the Washington personnel law cannot be equated with such well-defined objective employment practices as personnel tests or minimal physical requirements. Classification of certain jobs as "exempt" only meant that the University had wider discretion to establish the employee salaries. Subjective employment decisions may result in discrimination, but the use of subjective criteria is not per se illegal. Ward v. Westland Plastics, Inc., No. 78-1666, slip op. at 4193 (9th Cir. Apr. 25, 1980). The gravamen of Heagney's complaint is that the lack of well-defined employment criteria allowed a pattern or practice of discrimination to exist. We therefore conclude that "impact" analysis is inappropriate and that Heagney was required to prove disparate treatment.

*1164 The magistrate and trial judge were both of the opinion that generalized statistical evidence including all exempt employees was of little relevance to Heagney's individual case. Generalized statistics are, however, undoubtedly relevant in cases alleging disparate treatment. In Teamsters, the government brought an action against a union and trucking company alleging that the defendants had engaged in purposeful discrimination against Negroes and Spanish-surnamed individuals. The government sought a general injunction and individual relief for those minority individuals who had been denied line-driver jobs. In proving its case, the government relied heavily upon statistical evidence showing that the company employed few Negro or Spanish-surnamed individuals as line drivers, and that those minorities the company did employ were paid less. The Court concluded that such statistics could serve to support a prima facie case of disparate treatment. 431 U.S. at 337-342, 97 S.Ct. at 1858.

After liability was established, the union and company argued at the remedial stage that the Court could not award individual relief to all persons who had sought line-driver jobs. In the defendants' view, relief could only be granted where some evidence of discrimination had been introduced regarding a particular claimant. The Court disagreed. Instead, the Court concluded that once the government had shown that the defendants had engaged in discrimination, that conclusion supported an inference that every individual member of the class had been the victim of discrimination, even if no evidence had been introduced in support of a particular individual's claim. 431 U.S. at 362-71, 97 S.Ct. at 1868-1873. Thus every individual member of the class harmed received the benefit of the general statistical showing, and the burden shifted to the employer to rebut that inference by offering some legitimate non-discriminatory reason.

[4] [5] The logical conclusion from the Supreme Court's opinion in Teamsters is that generalized statistics are relevant to an individual action under Title VII. If Heagney could demonstrate that the University regularly discriminated against its female exempt employees, such a showing, even if it were inadequate by itself to support a prima facie case, certainly would increase the probability that Heagney's own case was also part of this pattern or practice. This would be true even if her job were unique. Several circuits, including our own, have relied on general statistical evidence to support an individual's prima facie

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 727 of 898

Heagney v. University of Washington, 642 F.2d 1157 (1981)

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

case of sex discrimination. See Davis v. Califano, 613 F.2d 957, 962-63 (D.C.Cir.1979); Sweeney v. Board of Trustees of Keene State College, 569 F.2d 169, 177 (1st Cir.), vacated on other grounds, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); Kaplan v. International Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1358 (9th Cir. 1975). [5]

In Heagney's case the EEOC and Office of Civil Rights statistics which she introduced into evidence do not adequately indicate the nature of the work performed, or whether females were denied promotions or pay raises they were entitled to receive. No meaningful comparison of female and male salaries is possible from these statistics. [6] See **\*1165** Hagans v. Andrus, No. 79-4424, (9th Cir. Feb. 5, 1981); Pack v. Energy Research & Development Administration, 566 F.2d 1111, 1113 (9th Cir. 1977). Without more, the judge's ultimate conclusion that Heagney failed to prove sex discrimination is supported by the evidence.

The Hayes study, however, apparently adjusts for deficiencies in these earlier statistics by establishing a standardized basis for comparing job content with pay even though the job may be unique. The issues before this court, then, are whether the trial court erred by failing to admit the study, and if so, whether the error was harmless.

The magistrate excluded the Hayes study because it dealt with January 1975 data, not data from before March 15, 1973, when Heagney resigned. Under the circumstances, it is extremely unlikely that the approximately twenty-two month delay between Heagney's resignation and the salary data collected by Hayes had any significant impact on the probative force of the study as to the existence of conditions when Heagney was an employee. For example, the fact that a piece of property was in a certain physical condition either sometime before or after a particular event will support an inference that the same condition existed at the time the event occurred. See Conner v. Union Pacific Railroad, 219 F.2d 799, 802 (9th Cir. 1955), Annot., 7 A.L.R.3d 1302 (1966). While conditions subject to human decisions may be prone to more variations, the same inference would apply in the absence of a contrary explanation.

In this case, testimony by the University indicates that the Hayes study was undertaken because preliminary statistics, gathered in 1972-73 when Heagney was still a University employee, raised concerns about possible sex discrimination. In part, the purpose of the Hayes study was to confirm or deny any inferences raised by the statistics. Title VII became applicable to the University in March 1972. Equal Opportunity Act of 1972, Pub.L.No.92-261, s 2(1), 86 Stat. 103. It seems likely that the University would have become more conscious of possible liability for sex discrimination rather than less so, especially because the University was then under investigation by the federal Office of Civil Rights. Although a witness from the Office of Civil Rights testified that the problems they were concerned about at the University continued past 1973, there is little likelihood that discrimination would increase during the post-1973 period. This foundation was adequate to demonstrate that the Hayes data was probative as to the existence of conditions prior to the time when the study was prepared. See Kinsey v. First Regional Securities, Inc., 557 F.2d 830, 839 (D.C.Cir.1977). Rule 401 of the Federal Rules of Evidence defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Hayes report had a tendency to make it more probable that Heagney was discriminated against and as such was admissible. See Fed.R.Evid. 402. We conclude that it was error to exclude the Hayes study.

Finally, the evidence in this case is too close to conclude that the error in failing to admit the Hayes study was harmless. The Hayes study indicates that more female than male exempt employees were underpaid. The evidence from Heagney's individual case indicates that she may have been one of the women who were underpaid. This evidence included the salary comparison with male exempt employees, considering their educational attainments and experience, and at least three internal memoranda prepared by her supervisors, specifically noting that Heagney's salary was not only low for a chemist, but low in relation to other University employees and exempt staff members.

**\*1166** The EEOC found that there was probable cause to believe that there was sex discrimination involved in establishing Heagney's salary. The Office of Civil Rights also concluded that it appeared that sex discrimination was occurring. Against this background, the exclusion of the Hayes study was not harmless error and the case

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 728 of 898

Heagney v. University of Washington, 642 F.2d 1157 (1981)

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

must be remanded to determine whether Heagney was underpaid because of her sex.

On remand the University may wish to submit evidence challenging the results of the Hayes study. The court must then determine whether the evidence, including the Hayes study, establishes a prima facie case of discrimination. If so, the burden will be on the University to offer some legitimate nondiscriminatory reason for the disparate treatment. [7]

### III. CONSTRUCTIVE DISCHARGE

[6]    Since the issue may arise on remand we find it necessary to discuss Heagney's contention that she was constructively discharged.

If Heagney was constructively discharged she is entitled to recover back pay from the time of her resignation in 1973. In support of her argument Heagney relies upon Young v. Southwestern Savings & Loan Association, 509 F.2d 140, 144 (5th Cir. 1975), which held that forcing a plaintiff to attend a weekly religious ceremony created an intolerable working condition that forced the plaintiff to resign involuntarily.

The Fifth Circuit recently applied its Young decision to a factual situation quite similar to the instant case. In Bourque v. Powell Electrical Manufacturing Co., 617 F.2d 61 (5th Cir. 1980), a female plaintiff claimed that she was constructively discharged because she was not paid fairly. The court concluded that

> discrimination manifesting itself in the form of unequal pay cannot, alone, be sufficient to support a finding of constructive discharge .... Unequal pay is not a sufficient justification to relieve Ms. Bourque of her duty to mitigate damages by remaining on the job.

617 F.2d at 65-66. The court reasoned that, where possible, Title VII cases should be settled "within the context of existing employment relationships." Id.

In his oral decision the magistrate found that Heagney, other than showing that she was possibly underpaid, had not introduced evidence showing circumstances from which it could be inferred that the University made her employment conditions difficult or intolerable. This conclusion is supported by the evidence. We hold that Heagney failed to prove that she was constructively discharged. On remand, if the court does find that Heagney was underpaid because of her sex, she may recover the difference between the salary she should have made absent discrimination and the salary she actually made at NPL for the period between March 24, 1972 and March 15, 1973.

The decision of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.

VAN DUSEN, Senior Circuit Judge, concurring:
Recognizing that the panel is bound by Gunther v. County of Washington, 623 F.2d 1303 (9th Cir. 1979), rehearing denied, 623 F.2d 1317 (9th Cir. 1980), cert. granted, —- U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980). I concur in the judgment of the court but note my disagreement with the statutory construction in Gunther as stated in my dissenting opinion in International U. of Elec. v. Westinghouse Elec., 631 F.2d 1094, 1108 ff. (3d Cir. 1980), petitions for cert. filed, 49 U.S.L.W. 3410 (U.S. Nov. 14, 1980) (No. 80-781), 49 U.S.L.W. 3456 (U.S. Dec. 11, 1980) (No. 80-944).

### All Citations

642 F.2d 1157, 26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685, 7 Fed. R. Evid. Serv. 1713

---

Footnotes

*       The Honorable Francis L. Van Dusen, Senior United States Circuit Judge, Third Circuit, sitting by designation.

1       The following table summarizes the monthly salaries paid to Heagney, another female employee, and three male exempt employees. The lab apparently employed two other male exempt employees in supervisory jobs. The magistrate did not provide salary data for these two employees in his findings.

        The percentages used in this section are rounded off to the nearest one-tenth of a percent.

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

2   When Cheney began working at the lab in 1966 he did not have a college degree but had 11 years of experience. At the time Cheney was hired, Heagney had four years of experience at the lab, and a bachelor's degree in chemistry. Cheney was hired at a salary of $900 a month or almost 38 percent more than Heagney's monthly salary at that time.

> Roth had no experience other than previous part-time work at the lab when he was hired in 1969. He had a bachelor's degree in physics. Heagney, by the time Roth was hired, had been working at the lab seven years. Despite Roth's inexperience he was hired at a salary of $740 a month $62 a month less than Heagney or a salary equal to about 92 percent of Heagney's salary.

> Stowell, after obtaining a degree in business administration, began full-time work at the lab as an electronics technician, a classified position. He had three years of full-time experience and one and a-half years of part-time experience when he was hired as an exempt employee. As an exempt employee, Stowell began at $845 a month. At this time Heagney had over seven years of experience and was making only $37 a month more than Stowell. Stowell thus started at almost 96 percent of Heagney's salary.

> Shirley Kellenbarger, the other female exempt employee at NPL, had a master's degree in agronomy and 17 years (the EEOC report indicates that Kellenbarger had 12 years of experience). An internal memo prepared by the lab states that Kellenbarger had 9 years of experience) of work experience when she was hired in 1966. Her salary remained close to, but slightly below Heagney's salary between 1966 and 1973.

\*   Salary on date individual began working as an exempt employee at the NPL.

\*\*   Salary on date Heagney resigned.

3   In 1969 Professors Vandenbosch and Weitkamp wrote the chairman of the Physics Department:

> It is clear from the present salaries of these chemists ... (Heagney and Kellenbarger) that there is a considerable disparity between their salaries and those of the other exempt staff. We feel this disparity is excessive at present in view of the value of the work they perform. When one compares the chemists' salaries and the salaries of the classified staff, one is rather astonished to find that there are technical personnel who are better paid than these professional-level employees.

> In 1972, Professor Weitkamp wrote the chairman of the Physics Department:

> ... (S)he (Heagney) told us that she feels that fair remuneration would require an increase of about 30% in her salary. We see a good deal of merit in her viewpoint.... She has nearly ten years of professional experience; a machinist with several years' experience makes more, and yet has fewer responsibilities, far lower performance demands, and need only have completed high school, instead of college.

4   Comparing the pay raises of each female employee to each male employee, beginning with the time the male employee was first employed at the NPL and ending when Heagney resigned, indicates the following. Cheney's salary increased 52.8 percent between 1966 when he began working and 1973 when Heagney left, while Heagney's salary increased 61.8 percent and Kellenbarger's salary increased 54.2 percent during the same period. Roth and Heagney received comparable increases in the four years they were at the lab together. Roth received 33.1 percent in salary increases while Heagney received 33.4 percent. Kellenbarger's salary increased 27.4 percent during this period. In the three years that both Stowell and Heagney were exempt employees Stowell's salary increased 24 percent, Heagney's 21.3 percent and Kellenbarger's 15.8 percent.

5   In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825-1826, 36 L.Ed.2d 668 (1973), a case involving an individual claim of disparate treatment, the Court approved the use of generalized statistics, after the plaintiff had established a prima facie case, as a means of showing that an employer's stated reasons for differing treatment were a pretext to hide bias. McDonnell Douglas did not limit the use of such statistical evidence, however, to this stage of the proceedings. As noted in Teamsters, 431 U.S. at 358, 97 S.Ct. at 1866, McDonnell Douglas "did not purport to create an inflexible formulation." McDonnell Douglas further supports the conclusion that generalized statistics are relevant to proving an individual's claim of discrimination.

6   In Gunther v. County of Washington, 623 F.2d 1303, 1311 (9th Cir. 1979), cert. granted, —– U.S. ––––, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980) we held that Title VII is broader than the Equal Pay Act, Pub.L. No 88-38, 77 Stat. 56 (1963) (codified at 29 U.S.C. s 206(d)). Under Gunther, Heagney would not need to show that her work was the same as work performed by her male colleagues. The EEOC an OCR statistics do not provide any basis for comparison, however, and thus the probative value of the data is of little import in concluding that female employees were underpaid. The Hayes study, in contrast, does appear to provide some basis for making a meaningful comparison of male and female jobs. See Note, 54 St. John's L.Rev. 738 (1980).

7   McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

26 Fair Empl.Prac.Cas. (BNA) 438, 25 Empl. Prac. Dec. P 31,685...

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 12

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 732 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

97 S.Ct. 1843

Supreme Court of the United States

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, Petitioner,

v.

UNITED STATES et al.

T.I.M.E.-D.C., INC., Petitioner,

v.

UNITED STATES et al.

Nos. 75-636 and 75-672.

|

Argued Jan. 10, 1977.

|

Decided May 31, 1977.

Employment discrimination action was brought by the
United States against employer and union alleging
that employer had engaged in pattern or practice of
discriminating against Negroes and Spanish-surnamed
persons and that seniority system perpetuated effects
of past racial and ethnic discrimination. The United
States District Court for the Northern District of
Texas, at Lubbock, enjoined employer and union from
committing further violations of Civil Rights Act of
1964, and provided for individual relief, and all parties
appealed. The Court of Appeals, 517 F.2d 299, held that
relief ordered was inadequate, and the Supreme Court
granted petitions for certiorari. The Supreme Court, Mr.
Justice Stewart, held that (1) Government sustained its
burden of proving that employer engaged in system-
wide pattern or practice of employment discrimination;
(2) retroactive seniority could be awarded as relief for
post-Act discriminatees even if seniority system agreement
made no provision for such relief; (3) union's conduct
in agreeing to and maintaining seniority system did not
violate Civil Rights Act of 1968; (4) incumbent employee's
failure to apply for job did not necessarily bar award
of retroactive seniority; and (5) remand for remedial
hearing on individual minority members' rights to relief
was necessary.

Judgment of Court of Appeals vacated and case
remanded.

Mr. Justice Marshall filed opinion concurring in part and
dissenting in part in which Mr. Justice Brennan joined.

**1848** Syllabus[*]

***324** The United States instituted this litigation under
Title VII of the Civil Rights Act of 1964 against
petitioners, a nationwide common carrier of motor
freight, and a union representing a large group of
the company's employees. The Government alleged that
the company had engaged in a pattern or practice of
discriminating against Negroes and Spanish-surnamed
persons (hereinafter sometimes collectively "minority
members") who were hired as servicemen or local city
drivers, which were lower paying, less desirable jobs than
the positions of line drivers (over-the-road, long-distance
drivers), which went to whites, and that the seniority
system in the collective-bargaining agreements between
**1849** petitioners perpetuated ("locked in") the effects
of past racial and ethnic discrimination because under
that system a city driver or serviceman who transferred
to a line-driver job had to forfeit all the competitive
seniority he had accumulated in his previous bargaining
unit and start at the bottom of the line drivers' "board."
The Government sought a general injunctive remedy and
specific "make whole" relief for individual discriminatees,
which would allow them an opportunity to transfer
to line-driver jobs with full company seniority. Section
703(a) of Title VII makes it an unlawful employment
practice, inter alia, for an employer to fail or refuse
to hire any individual or otherwise discriminate against
him with regard to his employment because of his race
or national origin. Section 703(h) provides in part that
notwithstanding other provisions, it shall not be an
unlawful employment practice for an employer to apply
different employment standards "pursuant to a bona fide
seniority . . . system, . . . provided that such differences
are not the result of an intention to discriminate . . . ."
The District Court after trial, with respect to both the
employment discrimination and the seniority system in
the collective-bargaining agreements, held that petitioners
had violated Title VII and enjoined both the company
and the union from committing further violations thereof.
With respect to individual relief, the court determined that
***325** the "affected class" of discriminatees included all
minority members who had been hired as city drivers or
servicemen at every company terminal with a line-driver
operation, whether they were hired before or after Title
VII's effective date. The discriminatees thereby became
entitled to preference over all other line-driver applicants

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 733 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

in the future. Finding that members of the affected class had been injured in varying degrees, the court created three subclasses, and applied to each a different formula for filling line-driver jobs and for establishment of seniority, giving retroactive seniority to the effective date of the Act to those who suffered "severe injury." The right of any class member to a line-driver vacancy was made subject to the prior recall rights under the collective-bargaining agreement of line drivers who had been on layoff for not more than three years. Although agreeing with the District Court's basic conclusions, the Court of Appeals rejected the affected-class trisection, holding that the minority members could bid for future line-driver jobs on the basis of their company seniority and that once a class member became a line driver he could use his full company seniority even if it antedated Title VII's effective date, limited only by a "qualification date" formula, under which seniority could not be awarded for periods prior to the date when (1) a line-driver job was vacant, and (2) the class member met (or, given the opportunity, would have met) the line-driver qualifications. Holding that the three-year priority in favor of laid-off workers "would unduly impede the eradication of past discrimination," the Court of Appeals directed that when a not purely temporary line-driver vacancy arose a class member might compete against any line driver on layoff on the basis of the member's retroactive seniority. Held :

1. The Government sustained its burden of proving that the company engaged in a systemwide pattern or practice of employment discrimination against minority members in violation of Title VII by regularly and purposefully treating such members less favorably than white persons. The evidence, showing pervasive statistical disparities in line-driver positions between employment of the minority members and whites, and bolstered by considerable testimony of specific instances of discrimination, was not adequately rebutted by the company and supported the findings of the courts below. Pp. 1854-1858.

2. Since the Government proved that the company engaged in a post-Act pattern of discriminatory employment policies, retroactive seniority may be awarded as relief for post-Act discriminatees even if the seniority system agreement makes no provision for such relief. **1850 Franks v. Bowman Transportation Co., 424 U.S. 747, 778-779, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444. Pp. 1860-1861.

*326 3. The seniority system was protected by s 703(h) and therefore the union's conduct in agreeing to and maintaining the system did not violate Title VII. Employees who suffered only pre-Act discrimination are not entitled to relief, and no person may be given retroactive seniority to a date earlier than the Act's effective date. The District Court's injunction against the union must consequently be vacated. Pp. 1861-1865.

(a) By virtue of s 703(h) a bona fide seniority system does not become unlawful simply because it may perpetuate pre-Title VII discrimination, for Congress (as is manifest from the language and legislative history of the Act) did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees. Thus here because of the company's intentional pre-Act discrimination the disproportionate advantage given by the seniority system to the white line drivers with the longest tenure over the minority member employees who might by now have enjoyed those advantages were it not for the pre-Act discrimination is sanctioned by s 703(h). Pp. 1861-1864.

(b) The seniority system at issue here is entirely bona fide, applying to all races and ethnic groups, and was negotiated and is maintained free from any discriminatory purpose. Pp. 1864-1865.

4. Every post-Act minority member applicant for a line-driver position is presumptively entitled to relief, subject to a showing by the company that its earlier refusal to place the applicant in a line-driver job was not based on its policy of discrimination. Cf. Franks, supra, at 773 n. 32, 96 S.Ct., at 1268. Pp. 1865-1868.

5. An incumbent employee's failure to apply for a job does not inexorably bar an award of retroactive seniority, and individual nonapplicants must be afforded an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly. Pp. 1868-1873.

(a) Congress' purpose in vesting broad equitable powers in Title VII courts was "to make possible the 'fashion(ing) (of) the most complete relief possible,' " Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280. Measured against the broad prophylactic purposes of Title VII, the company's assertion that a

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 734 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

person who has not actually applied for a job can never be awarded seniority relief cannot prevail, for a consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. Pp. 1869-1871.

(b) However, a nonapplicant must still show that he was a potential **\*327** victim of unlawful discrimination and that he would have applied for a line-driver job but for the company's discriminatory practices. The known prospect of discriminatory rejection shows only that employees who wanted line-driving jobs may have been deterred from applying for them but does not show which of the nonapplicants actually wanted such jobs or were qualified. Consequently, the Government has the burden of proving at a remedial hearing to be conducted by the District Court which specific nonapplicants would have applied for line-driver jobs but for their knowledge of the company's discriminatory policies. Pp. 1870-1873.

6. At such hearing on remand the District Court will have to identify which of the minority members were actual victims of discrimination and, by application of the basic principles of equity, to balance their interest against the legitimate expectations of other employees innocent of wrongdoing. Pp. 1872-1875.

5 Cir., 517 F.2d 299, vacated and remanded.

**Attorneys and Law Firms**

Robert D. Schuler, Bloomfield Hills, Mich., for petitioner in No. 75-672.

**\*\*1851** L. N. D. Wells, Jr., Dallas, Tex., for petitioner in No. 75-636.

Lawrence G. Wallace, Washington, D. C., for respondents in both cases.

**Opinion**

**\*328** Mr. Justice STEWART delivered the opinion of the Court.

This litigation brings here several important questions under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. s 2000e et seq. (1970 ed. and Supp. V). The issues grow out of alleged unlawful

employment practices engaged in by an employer and a union. The employer is a common carrier of motor freight with nationwide operations, and the union represents a large group of its employees. The District Court and the Court of Appeals held that the employer had violated Title VII by engaging in a pattern and practice of employment discrimination against Negroes and Spanish-surnamed Americans, and that the union had violated the Act by agreeing with the employer to create and maintain a seniority system that perpetuated the effects of past racial and ethnic discrimination. In addition to the basic questions presented by these two rulings, other subsidiary issues must be resolved if violations of Title VII occurred issues concerning the nature of the relief to which aggrieved individuals may be entitled.

**I**

The United States brought an action in a Tennessee federal court against the petitioner T.I.M.E.-D.C., Inc. (company), pursuant to s 707(a) of the Civil Rights Act of 1964, 42 U.S.C. s 2000e-6(a).[1] The complaint charged that the **\*329** company had followed discriminatory hiring, assignment, and promotion policies against Negroes at its terminal in Nashville, Tenn.[2] The Government brought a second action against the company almost three years later in a Federal District Court in Texas, charging a pattern and practice of employment discrimination against Negroes and Spanish-surnamed persons throughout the company's transportation system. The petitioner International Brotherhood of Teamsters (union) was joined as a defendant in that suit. The two actions were consolidated for trial in the Northern District of Texas.

The central claim in both lawsuits was that the company had engaged in a pattern or practice of discriminating against minorities in hiring so-called line drivers. Those Negroes and Spanish-surnamed persons who had been hired, the Government alleged, were given lower paying, less desirable jobs as servicemen or local city drivers, and were thereafter discriminated against **\*\*1852** with respect to promotions and transfers.[3] In **\*330** this connection the complaint also challenged the seniority system established by the collective-bargaining agreements between the employer and the union. The Government sought a general injunctive remedy and specific "make whole" relief for all individual discriminatees, which would allow them an opportunity to

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 735 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

transfer to line-driver jobs with full company seniority for all purposes.

The cases went to trial [4] and the District Court found that **\*331** the Government had shown "by a preponderance of the evidence that T.I.M.E.-D.C. and its predecessor companies were engaged in a plan and practice of discrimination in violation of Title VII . . . ." [5] The court further found that the seniority system contained in the collective-bargaining contracts between the company and the union violated Title VII because it "operate(d) to impede the free transfer of minority groups into and within the company." Both the company and the union were enjoined from committing further violations of Title VII.

With respect to individual relief the court accepted the Government's basic contention that the "affected class" of discriminatees included all Negro and Spanish-surnamed incumbent employees who had been hired to fill city operations or serviceman jobs at every terminal that had a line-driver operation. [6] All of these employees, whether hired before or after the effective date of Title VII, thereby became entitled to preference over all other applicants with respect to consideration for future vacancies in line-driver jobs. [7] Finding that members of the affected class had been injured in different **\*1853** degrees, the court created three subclasses. Thirty persons who had produced "the most convincing evidence of discrimination and harm" were found to have suffered "severe injury." The court ordered that they be offered the opportunity to fill line-driver jobs with competitive seniority dating back to July 2, **\*332** 1965, the effective date of Title VII. [8] A second subclass included four persons who were "very possibly the objects of discrimination" and who "were likely harmed," but as to whom there had been no specific evidence of discrimination and injury. The court decreed that these persons were entitled to fill vacancies in line-driving jobs with competitive seniority as of January 14, 1971, the date on which the Government had filed its systemwide lawsuit. Finally, there were over 300 remaining members of the affected class as to whom there was "no evidence to show that these individuals were either harmed or not harmed individually." The court ordered that they be considered for line-driver jobs [9] ahead of any applicants from the general public but behind the two other subclasses. Those in the third subclass received no retroactive seniority; their

competitive seniority as line drivers would begin with the date they were hired as line drivers. The court further decreed that the right of any class member to fill a line-driver vacancy was subject to the prior recall rights of laid-off line drivers, which under the collective-bargaining agreements then in effect extended for three years. [10]

**\*333** The Court of Appeals for the Fifth Circuit agreed with the basic conclusions of the District Court: that the company had engaged in a pattern or practice of employment discrimination and that the seniority system in the collective-bargaining agreements violated Title VII as applied to victims of prior discrimination. 517 F.2d 299. The appellate court held, however, that the relief ordered by the District Court was inadequate. Rejecting the District Court's attempt to trisect the affected class, the Court of Appeals held that all Negro and Spanish-surnamed incumbent employees were entitled to bid for future line-driver jobs on the basis of their company seniority, and that once a class member had filled a job, he could use his full company seniority even if it predated the effective date of Title VII for all purposes, including bidding and layoff. This award of retroactive seniority was to be limited only by a "qualification date" formula, under which seniority could not be awarded for periods prior to the date when (1) a line-driving position was vacant, [11] and (2) the class member met **\*1854** (or would have met, given the opportunity) the qualifications for employment as a line driver. [12] Finally, **\*334** the Court of Appeals modified that part of the District Court's decree that had subjected the rights of class members to fill future vacancies to the recall rights of laid-off employees. Holding that the three-year priority in favor of laid-off workers "would unduly impede the eradication of past discrimination," id., at 322, the Court of Appeals ordered that class members be allowed to compete for vacancies with laid-off employees on the basis of the class members' retroactive seniority. Laid-off line drivers would retain their prior recall rights with respect only to "purely temporary" vacancies. Ibid. [13]

The Court of Appeals remanded the case to the District Court to hold the evidentiary hearings necessary to apply these remedial principles. We granted both the company's and the union's petitions for certiorari to consider the significant questions presented under the Civil Rights Act of 1964, 425 U.S. 990, 96 S.Ct. 2200, 48 L.Ed.2d 814.

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

II

In this Court the company and the union contend that their conduct did not violate Title VII in any respect, asserting first that the evidence introduced at trial was insufficient to show that the company engaged in a "pattern or practice" of employment discrimination. The union further contends that the seniority system contained in the collective-bargaining agreements in no way violated Title VII. If these contentions are correct, it is unnecessary, of course, to reach any of the issues concerning remedies that so occupied the attention of the Court of Appeals.

A

**[1]**   **[2]**   Consideration of the question whether the company engaged in a pattern or practice of discriminatory hiring practices **\*335** involves controlling legal principles that are relatively clear. The Government's theory of discrimination was simply that the company, in violation of s 703(a) of Title VII, [14] regularly and purposefully treated Negroes and Spanish-surnamed Americans less favorably than white persons. The disparity in treatment allegedly involved the refusal to recruit, hire, transfer, or promote minority group members on an equal basis with white people, particularly with respect to line-driving positions. The ultimate factual issues are thus simply whether there was a pattern or practice of such disparate treatment and, if so, whether the differences were "racially premised." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 n. 18, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668. [15]

**\*336** **[3]**   As the plaintiff, the Government bore the initial burden of making out a **\*\*1855** prima facie case of discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280; McDonnell Douglas Corp. v. Green, supra, 411 U.S., at 802, 93 S.Ct., at 1824. And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure the regular rather than the unusual practice. [16]

**\*337** **[4]**   We agree with the District Court and the Court of Appeals that the Government carried its burden of proof. As of March 31, 1971, shortly after the Government filed its complaint alleging systemwide discrimination, the company had 6,472 employees. Of these, 314 (5%) were Negroes and 257 (4%) were Spanish-surnamed Americans. Of the 1,828 line drivers, however, there were only 8 (0.4%) Negroes and 5 (0.3%) Spanish-surnamed persons, and all of the Negroes had been hired after the litigation had commenced. With one exception a man who worked as a line driver at the Chicago terminal from 1950 to 1959 the company and its predecessors did not employ a Negro on a regular basis as a line driver until 1969. And, as the Government showed, even in 1971 there were terminals in areas of substantial Negro population where all of the company's line drivers were white. [17] A great majority of the Negroes (83%) and Spanish-surnamed Americans **\*338** 78%) who did work for the company held **\*\*1856** the lower paying city operations and serviceman jobs, [18] whereas only 39% of the nonminority employees held jobs in those categories.

The Government bolstered its statistical evidence with the testimony of individuals who recounted over 40 specific instances of discrimination. Upon the basis of this testimony the District Court found that "(n)umerous qualified black and Spanish-surnamed American applicants who sought line driving jobs at the company over the years, either had their requests ignored, were given false or misleading information about requirements, opportunities, and application procedures, or were not considered and hired on the same basis that whites were considered and hired." Minority employees who wanted to transfer to line-driver jobs met with similar difficulties. [19]

**\*339** The company's principal response to this evidence is that statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures. But, as even our brief summary of the evidence shows, this was not a case in which the Government relied on "statistics alone." The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life.

**[5]**   In any event, our cases make it unmistakably clear that "(s)tatistical analyses have served and will continue to

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 737 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

serve an important role" in cases in which the existence of discrimination is a disputed issue. Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630. See also McDonnell Douglas Corp. v. Green, 411 U.S., at 805, 93 S.Ct., at 1825. Cf. Washington v. Davis, 426 U.S. 229, 241-242, 96 S.Ct. 2040, 2048-2049, 48 L.Ed.2d 597. We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases, see, e. g., Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567; Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074. Statistics are equally competent in proving employment discrimination. [20] *340 We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness **1857 depends on all of the surrounding facts and circumstances. See, e. g., Hester v. Southern R. Co., 497 F.2d 1374, 1379-1381 (CA5).

In addition to its general protest against the use of statistics in Title VII cases, the company claims that in this case the statistics revealing racial imbalance are misleading because they fail to take into account the company's particular business *341 situation as of the effective date of Title VII. The company concedes that its line drivers were virtually all white in July 1965, but it claims that thereafter business conditions were such that its work force dropped. Its argument is that low personnel turnover, rather than post-Act discrimination, accounts for more recent statistical disparities. It points to substantial minority hiring in later years, especially after 1971, as showing that any pre-Act patterns of discrimination were broken.

[6] The argument would be a forceful one if this were an employer who, at the time of suit, had done virtually no new hiring since the effective date of Title VII. But it is not. Although the company's total number of employees apparently dropped somewhat during the late 1960's, the record shows that many line drivers continued to be hired throughout this period, and that almost all of them were white. [21] To be sure, there were improvements in the company's hiring practices. The Court of Appeals commented that "T.I.M.E.-D.C.'s recent minority hiring progress stands as a laudable good faith effort to eradicate the effects of past discrimination in the area of hiring

and initial assignment." [22] 517 F.2d, at 316. But the District Court and the Court of Appeals found upon substantial evidence that the company had engaged in **1858 a course of discrimination that continued well after the effective date of Title VII. The company's later changes in its hiring and *342 promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it. Cf. Albemarle Paper Co. v. Moody, 422 U.S., at 413-423, 95 S.Ct., at 2369-2374. [23]

[7] [8] The District Court and the Court of Appeals, on the basis of substantial evidence, held that the Government had proved a prima facie case of systematic and purposeful employment discrimination, continuing well beyond the effective date of Title VII. The company's attempts to rebut that conclusion were held to be inadequate. [24] For the reasons we have summarized, *343 there is no warrant for this Court to disturb the findings of the District Court and the Court of Appeals on this basic issue. See Blau v. Lehman, 368 U.S. 403, 408-409, 82 S.Ct. 451, 454, 7 L.Ed.2d 403; Faulkner v. Gibbs, 338 U.S. 267, 268, 70 S.Ct. 25, 94 L.Ed. 62; United States v. Dickinson, 331 U.S. 745, 751, 67 S.Ct. 1382, 1386, 91 L.Ed. 1789; United States v. Commercial Credit Co., 286 U.S. 63, 67, 52 S.Ct. 467, 468, 76 L.Ed. 978; United States v. Chemical Foundation, Inc., 272 U.S. 1, 14, 47 S.Ct. 1, 6, 71 L.Ed. 131; Baker v. Schofield, 243 U.S. 114, 118, 37 S.Ct. 333, 334, 61 L.Ed. 626; Towson v. Moore, 173 U.S. 17, 24, 19 S.Ct. 332, 334, 43 L.Ed. 597.

B

The District Court and the Court of Appeals also found that the seniority system **1859 contained in the collective-bargaining agreements between the company and the union operated to violate Title VII of the Act.

For purposes of calculating benefits, such as vacations, pensions, and other fringe benefits, an employee's seniority under this system runs from the date he joins the company, and takes into account his total service in all jobs and bargaining units. For competitive purposes, however, such as determining the order in which employees may bid for particular jobs, are laid off, or are recalled from layoff, it is bargaining-unit seniority that controls. Thus, a line driver's seniority, *344 for purposes

of bidding for particular runs [25] and protection against layoff, takes into account only the length of time he has been a line driver at a particular terminal. [26] The practical effect is that a city driver or serviceman who transfers to a line-driver job must forfeit all the competitive seniority he has accumulated in his previous bargaining unit and start at the bottom of the line drivers' "board."

The vice of this arrangement, as found by the District Court and the Court of Appeals, was that it "locked" minority workers into inferior jobs and perpetuated prior discrimination by discouraging transfers to jobs as line drivers. While the disincentive applied to all workers, including whites, it was Negroes and Spanish-surnamed persons who, those courts found, suffered the most because many of them had been denied the equal opportunity to become line drivers when they were initially hired, whereas whites either had not sought or were refused line-driver positions for reasons unrelated to their race or national origin.

The linchpin of the theory embraced by the District Court and the Court of Appeals was that a discriminatee who must forfeit his competitive seniority in order finally to obtain a line-driver job will never be able to "catch up" to the seniority level of his contemporary who was not subject to discrimination. [27] Accordingly, this continued, built-in disadvantage to **\*345** the prior discriminatee who transfers to a line-driver job was held to constitute a continuing violation of Title VII, for which both the employer and the union who jointly created and maintain the seniority system were liable.

The union, while acknowledging that the seniority system may in some sense perpetuate the effects of prior discrimination, asserts that the system is immunized from a finding of illegality by reason of s 703(h) of Title VII, 42 U.S.C. s 2000e-2(h), which provides in part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin . . . ."

It argues that the seniority system in this case is "bona fide" within the meaning of s 703(h) when judged in light of its history, **\*1860** intent, application, and all of the circumstances under which it was created and is maintained. More specifically, the union claims that the central purpose of s 703(h) is to ensure that mere perpetuation of pre-Act discrimination is not unlawful under Title VII. And, whether or not s 703(h) immunizes the perpetuation of post-Act discrimination, the union claims that the seniority system in this litigation has no such effect. Its position in this Court, as has been its position throughout this litigation, is that the seniority system presents no hurdle to post-Act discriminatees **\*346** who seek retroactive seniority to the date they would have become line drivers but for the company's discrimination. Indeed, the union asserts that under its collective-bargaining agreements the union will itself take up the cause of the post-Act victim and attempt, through grievance procedures, to gain for him full "make whole" relief, including appropriate seniority.

The Government responds that a seniority system that perpetuates the effects of prior discrimination pre-Act or post-Act can never be "bona fide" under s 703(h); at a minimum Title VII prohibits those applications of a seniority system that perpetuate the effects on incumbent employees of prior discriminatory job assignments.

The issues thus joined are open ones in this Court. [28] We considered s 703(h) in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, but there decided only that s 703(h) does not bar the award of retroactive seniority to job applicants who seek relief from an employer's post-Act hiring discrimination. We stated that "the thrust of (s 703(h)) is directed toward **\*347** defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act." 424 U.S., at 761, 96 S.Ct., at 1263. Beyond noting the general purpose of the statute, however, we did not undertake the task of statutory construction required in this litigation.

(1)

**[9]**    Because the company discriminated both before and after the enactment of Title VII, the seniority system is

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 739 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

said to have operated to perpetuate the effects of both pre- and post-Act discrimination. Post-Act discriminatees, however, may obtain full "make whole" relief, including retroactive seniority under Franks v. Bowman, supra, without attacking the legality of the seniority system as applied to them. Franks made clear and the union acknowledges that retroactive seniority may be awarded as relief from an employer's discriminatory hiring and assignment policies even if the seniority system agreement itself makes no provision for such relief. [29] **1861 424 U.S., at 778-779, 96 S.Ct., at 1271. Here the Government has proved that the company engaged in a post-Act pattern of discriminatory hiring, assignment, transfer and promotion policies. Any Negro or Spanish-surnamed American injured by those policies *348 may receive all appropriate relief as a direct remedy for this discrimination. [30]

(2)

What remains for review is the judgment that the seniority system unlawfully perpetuated the effects of pre-Act discrimination. We must decide, in short, whether s 703(h) validates otherwise bona fide seniority systems that afford no constructive seniority to victims discriminated against prior to the effective date of Title VII, and it is to that issue that we now turn.

[10] The primary purpose of Title VII was "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens. McDonnell Douglas Corp. v. Green, 411 U.S., at 800, 93 S.Ct., at 1823. [31] See also *349 Albemarle Paper Co. v. Moody, 422 U.S., at 417-418, 95 S.Ct., at 2371-2372; Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147. Griggs v. Duke Power Co., 401 U.S., at 429-431, 91 S.Ct., at 852-853. To achieve this purpose, Congress "proscribe(d) not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Id., at 431, 91 S.Ct., at 853. Thus, the Court has repeatedly held that a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group. General Electric Co. v. Gilbert, 429 U.S. 125, 137, 97 S.Ct. 401, 408, 50 L.Ed.2d 343; Washington v. Davis, 426 U.S., at

246-247, 96 S.Ct., at 2050-2051; Albemarle Paper Co. v. Moody, supra, 422 U.S., at 422, 425, 95 S.Ct., at 2374, 2375; McDonnell Douglas Corp. v. Green, supra, 411 U.S., at 802 n. 14, 93 S.Ct., at 1824; Griggs v. Duke Power Co., supra.

One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination. [32] As the Court held in Griggs : "Under **1862 the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S., at 430, 91 S.Ct., at 853.

Were it not for s 703(h), the seniority system in this case would seem to fall under the Griggs rationale. The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrimination, *350 the line drivers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might by now have enjoyed those advantages had not the employer discriminated before the passage of the Act. This disproportionate distribution of advantages does in a very real sense "operate to 'freeze' the status quo of prior discriminatory employment practices." But both the literal terms of s 703(h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems extended a measure of immunity to them.

Throughout the initial consideration of H.R. 7152, later enacted as the Civil Rights Act of 1964, critics of the bill charged that it would destroy existing seniority rights. [33] The consistent response of Title VII's congressional proponents and of the Justice Department was that seniority rights would not be affected, even where the employer had discriminated prior to the Act. [34] An interpretive memorandum placed in the Congressional Record by Senators Clark and Case stated:

"Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 740 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

the title comes into effect the employer's obligation would be simply to fill future vacancies on a non-discriminatory basis. He would not be obliged or indeed, **\*351** permitted to fire whites in order to hire Negroes or to prefer Negroes for future vacancies, or, once Negroes are hired to give them special seniority rights at the expense of the white workers hired earlier." 110 Cong.Rec. 7213 (1964) (emphasis added). [35]

A Justice Department statement concerning Title VII placed in the Congressional Record by Senator Clark, voiced the same conclusion:

"Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by title VII. This would be true even in the case where owing to discrimination prior **\*\*1863** to the effective date of the title, white workers had more seniority than Negroes." Id., at 7207 (emphasis added). [36]

**\*352** While these statements were made before s 703(h) was added to Title VII, they are authoritative indicators of that section's purpose. Section 703(h) was enacted as part of the Mansfield-Dirksen compromise substitute bill that cleared the way for the passage of Title VII. [37] The drafters of the compromise bill stated that one of its principal goals was to resolve the ambiguities in the House-passed version of H.R. 7152. See, e. g., 110 Cong.Rec. 11935-11937 (1964) (remarks of Sen. Dirksen); id., at 12707 (remarks of Sen. Humphrey). As the debates indicate, one of those ambiguities concerned Title VII's impact on existing collectively bargained seniority rights. It is apparent that s 703(h) was drafted with an eye toward meeting the earlier criticism on this issue with an explicit provision embodying the understanding and assurances of the Act's proponents, namely, that Title VII would not outlaw such differences in treatment among employees as flowed from a bona fide seniority system that allowed for full exercise of seniority accumulated before the effective date of the Act. It is inconceivable that s 703(h), as part of a compromise bill, was intended to vitiate the earlier representations of the Act's supporters by increasing Title VII's impact on seniority systems. The statement of Senator Humphrey, noted in Franks, 424 U.S., at 761, 96 S.Ct., at 1262, confirms that the addition

of s 703(h) "merely clarifies (Title VII's) present intent and effect." 110 Cong.Rec. 12723 (1964).

**[11]** In sum, the unmistakable purpose of s 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII. As the legislative history shows, this was the intended result even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes. Although a seniority system inevitably tends to perpetuate the effects of **\*353** pre-Act discrimination in such cases, the congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act.

**[12]** **[13]** To be sure, s 703(h) does not immunize all seniority systems. It refers only to "bona fide" systems, and a proviso requires that any differences in treatment not be "the result of an intention to discriminate because of race . . . or national origin . . . ." But our reading of the legislative history compels us to reject the Government's broad argument that no seniority system that tends to perpetuate pre-Act discrimination can be "bona fide." To accept the argument would require us to hold that a seniority system becomes illegal simply because it allows the full exercise of the pre-Act seniority rights of employees of a company that discriminated before Title VII was enacted. It would place an affirmative obligation on the parties to the seniority agreement to **\*\*1864** subordinate those rights in favor of the claims of pre-Act discriminatees without seniority. The consequence would be a perversion of the congressional purpose. We cannot accept the invitation to disembowel s 703(h) by reading the words "bona fide" as the Government would have us do. [38] Accordingly, we hold that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate **\*354** pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees. [39]

**[14]** That conclusion is inescapable even in a case, such as this one, where the pre-Act discriminatees are incumbent employees who accumulated seniority in other bargaining units. Although there seems to be no explicit reference in the legislative history to pre-Act discriminatees already employed in less desirable jobs, there can be no rational

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 741 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

basis for distinguishing their claims from those of persons initially denied any job but hired later with less seniority than they might have had in the absence of pre-Act discrimination.[40] We rejected any such **\*355** distinction in Franks, finding that it had "no support anywhere in Title VII or its legislative history," 424 U.S., at 768, 96 S.Ct., at 1266. As discussed above, Congress in 1964 made clear that a seniority system is not unlawful because it honors employees' existing rights, even where the employer has engaged in pre-Act discriminatory hiring or promotion practices. It would be as contrary to that mandate to forbid the exercise of seniority rights with respect to discriminatees who held inferior jobs as with respect to later hired minority employees who previously were denied any **\*\*1865** job. If anything, the latter group is the more disadvantaged. As in Franks, " 'it would indeed be surprising if Congress gave a remedy for the one (group) which it denied for the other.' " Ibid., quoting Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 187, 61 S.Ct. 845, 849, 85 L.Ed. 1271.[41]

(3)

**[15]** The seniority system in this litigation is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it **\*356** does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational in accord with the industry practice, and consistent with National Labor Relations Board precedents.[42] It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful.

Because the seniority system was protected by s 703(h), the union's conduct in agreeing to and maintaining the system did not violate Title VII. On remand, the District Court's injunction against the union must be vacated.[43]

III

**[16]** Our conclusion that the seniority system does not violate Title VII will necessarily affect the remedy granted to individual employees on remand of this litigation to the District Court. Those employees who suffered only pre-Act discrimination are not entitled to relief, and no person may **\*357** be given retroactive seniority to a date earlier than the effective date of the Act. Several other questions relating to the appropriate measure of individual relief remain, however, for our consideration.

The petitioners argue generally that the trial court did not err in tailoring the remedy to the "degree of injury" suffered by each individual employee, and that the Court of Appeals' "qualification date" formula sweeps with too broad a brush by granting a remedy to employees who were not shown to be actual victims of unlawful discrimination. Specifically, the petitioners assert that no employee should be entitled to relief until the Government demonstrates that he was an actual victim of the company's discriminatory practices; that no employee who did not apply for a line-driver job should be granted retroactive competitive seniority; and that no employee should be elevated to a line-driver job ahead of any **\*\*1866** current line driver on layoff status. We consider each of these contentions separately.

A

The petitioners' first contention is in substance that the Government's burden of proof in a pattern-or-practice case must be equivalent to that outlined in McDonnell Douglas v. Green. Since the Government introduced specific evidence of company discrimination against only some 40 employees, they argue that the District Court properly refused to award retroactive seniority to the remainder of the class of minority incumbent employees.

In McDonnell Douglas the Court considered "the order and allocation of proof in a private, non-class action challenging employment discrimination." 411 U.S., at 800, 93 S.Ct., at 1823. We held that an individual Title VII complainant must carry the initial burden of proof by establishing a prima facie case of racial discrimination. On the specific facts there involved, we concluded that this burden was met by showing that a **\*358** qualified

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 742 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

applicant, who was a member of a racial minority group, had unsuccessfully sought a job for which there was a vacancy and for which the employer continued thereafter to seek applicants with similar qualifications. This initial showing justified the inference that the minority applicant was denied an employment opportunity for reasons prohibited by Title VII, and therefore shifted the burden to the employer to rebut that inference by offering some legitimate, nondiscriminatory reason for the rejection. Id., at 802, 93 S.Ct., at 1824.

[17]   [18]   The company and union seize upon the McDonnell Douglas pattern as the only means of establishing a prima facie case of individual discrimination. Our decision in that case, however, did not purport to create an inflexible formulation. We expressly noted that "(t)he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from (a plaintiff) is not necessarily applicable in every respect to differing factual situations." Id., at 802 n. 13, 93 S.Ct., at 1824. The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act. [44]

In Franks v. Bowman Transportation Co., the Court applied  *359  this principle in the context of a class action. The Franks plaintiffs proved, to the satisfaction of a District Court, that Bowman Transportation Co. "had engaged in a pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees." 424 U.S., at 751, 96 S.Ct., at 1257. Despite this showing, the trial court denied seniority relief to certain members of the class of discriminatees because not every individual had shown that he was qualified for the job he sought and that a vacancy had been available. We held that the trial court had erred in placing this burden on the individual plaintiffs. By "demonstrating the existence of a discriminatory hiring pattern and practice" the plaintiffs had made out a prima facie case of discrimination against the individual class members; the burden therefore shifted to the employer "to prove that individuals who reapply were not in fact victims of  **1867  previous hiring discrimination." Id., at 772, 96 S.Ct., at 1268. The Franks case thus illustrates another means by which a Title VII plaintiff's initial burden of

proof can be met. The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference. [45]

 *360  [19]   Although not all class actions will necessarily follow the Franks model, the nature of a pattern-or-practice suit brings it squarely within our holding in Franks. The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. See supra, at 1855, and n. 16. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination. [46]

 *361  If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure  **1868  the full enjoyment of the rights" protected by Title VII. [47]

[20]   When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. The petitioners' contention in this case is that if the Government has not, in the course of

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 743 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

proving a pattern or practice, already brought forth specific evidence that each individual was discriminatorily denied an employment opportunity, it must carry that burden at the second, "remedial" stage of trial. That basic contention was rejected in the Franks case. As was true of the particular facts in Franks, and as is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage *362 of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.

The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job[48] and therefore was a potential victim of the proved discrimination. As in Franks, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons. See 424 U.S., at 773 n. 32, 96 S.Ct., at 1268.

**[21]** In Part II-A, supra, we have held that the District Court and Court of Appeals were not in error in finding that the Government had proved a systemwide pattern and practice of racial and ethnic discrimination on the part of the company. On remand, therefore, every post-Act minority group applicant[49] for a line-driver position will be presumptively entitled to relief, subject to a showing by the company that its earlier refusal to place the applicant in a line-driver job was not based on its policy of discrimination.[50]

### B

**[22]** The Court of Appeals' "qualification date" formula for relief did not distinguish between incumbent employees who *363 had applied for line-driver jobs and those who had not. The appellate court held that where there has been a showing of classwide discriminatory practices coupled with a seniority system that perpetuates the effects of that discrimination, an individual member of the class need not show that he unsuccessfully applied for the position from which the class had been excluded. In support of its award of relief to all nonapplicants, the Court suggested that "as a practical matter . . . a member of the affected class may well have concluded that an application for transfer to an all White position such as (line driver) was not worth the candle." 517 F.2d, at 320.

**\*\*1869** The company contends that a grant of retroactive seniority to these nonapplicants is inconsistent with the make-whole purpose of a Title VII remedy and impermissibly will require the company to give preferential treatment to employees solely because of their race. The thrust of the company's contention is that unless a minority-group employee actually applied for a line-driver job, either for initial hire or for transfer, he has suffered no injury from whatever discrimination might have been involved in the refusal of such jobs to those who actually applied for them.

The Government argues in response that there should be no "immutable rule" that nonapplicants are nonvictims, and contends that a determination whether nonapplicants have suffered from unlawful discrimination will necessarily vary depending on the circumstances of each particular case. The Government further asserts that under the specific facts of this case, the Court of Appeals correctly determined that all qualified nonapplicants were likely victims and were therefore presumptively entitled to relief.

The question whether seniority relief may be awarded to nonapplicants was left open by our decision in Franks, since the class at issue in that case was limited to "identifiable applicants who were denied employment . . . after the effective date . . . of Title VII." 424 U.S., at 750, 96 S.Ct., at 1257. We now *364 decide that an incumbent employee's failure to apply for a job is not an inexorable bar to an award of retroactive seniority. Individual nonapplicants must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly.

### (1)

**[23]** Analysis of this problem must begin with the premise that the scope of a district court's remedial powers under Title VII is determined by the purposes of the

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 744 of 898
International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

Act. Albemarle Paper Co. v. Moody, 422 U.S., at 417, 95 S.Ct., at 2371. In Griggs v. Duke Power Co., and again in Albemarle, the Court noted that a primary objective of Title VII is prophylactic: to achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees. 401 U.S., at 429-430, 91 S.Ct., at 852-853; 422 U.S., at 417, 95 S.Ct., at 2371. The prospect of retroactive relief for victims of discrimination serves this purpose by providing the " 'spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' " of their discriminatory practices. Id., at 417-418, 95 S.Ct., at 2371-2372. An equally important purpose of the Act is "to make persons whole for injuries suffered on account of unlawful employment discrimination." Id., at 418, 95 S.Ct., at 2372. In determining the specific remedies to be afforded, a district court is "to fashion such relief as the particular circumstances of a case may require to effect restitution." Franks, 424 U.S., at 764, 96 S.Ct., at 1264.

[24] Thus, the Court has held that the purpose of Congress in vesting broad equitable powers in Title VII courts was "to make possible the 'fashion(ing) (of) the most complete relief possible,' " and that the district courts have " 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " **\*365** Albemarle, supra, 422 U.S., at 421, 418, 95 S.Ct., at 2373. More specifically, in Franks we decided that a court must ordinarily award a seniority remedy unless there exist reasons for denying relief " 'which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered.' " 424 U.S., at 771, 96 S.Ct., at 1267, quoting Albemarle, supra, 422 U.S., at 421, 95 S.Ct., at 2373.

[25] Measured against these standards, the company's assertion that a person who **\*\*1870** has not actually applied for a job can never be awarded seniority relief cannot prevail. The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are

unwilling to subject themselves to the humiliation of explicit and certain rejection.

If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. [51] When a person's **\*366** desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

In cases decided under the National Labor Relations Act, the model for Title VII's remedial provisions, Albemarle, supra, 422 U.S., at 419, 95 S.Ct., at 2372; Franks, supra, 424 U.S., at 769, 96 S.Ct., at 1266, the National Labor Relations Board, and the courts in enforcing its orders, have recognized that the failure to submit a futile application does not bar an award of relief to a person claiming that he was denied employment because of union affiliation or activity. In NLRB v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305, this Court enforced an order of the Board directing an employer to hire, with retroactive benefits, former employees who had not applied for newly available jobs because of the employer's well-known policy of refusing to hire union members. See In re Nevada Consolidated Copper Corp., 26 N.L.R.B. 1182, 1208, 1231. Similarly, when an application would have been no more than a vain gesture in light of employer discrimination, the Courts of Appeals have enforced Board orders reinstating striking workers despite the failure of individual strikers to apply for reinstatement when the strike ended. E. g., NLRB v. Park Edge Sheridan Meats, Inc., 323 F.2d 956 (CA2); NLRB v. Valley Die Cast Corp., 303 F.2d 64 (CA6); Eagle-Picher Mining & Smelting Co. v. NLRB, 119 F.2d 903 (CA8). See also Piasecki Aircraft Corp. v. NLRB, 280 F.2d 575 (CA3); **\*367** NLRB v. Anchor Rome Mills, 228 F.2d 775 (CA5); NLRB v. Lummus Co., 210 F.2d 377

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 13

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 745 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

(CA5). Consistent with the NLRA model, several Courts of Appeals have held in Title VII cases that a nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him. Acha v. Beame, 531 F.2d 648, 656 (CA2); Hairston v. McLean Trucking Co., 520 F.2d 226, 231-233 (CA4); **1871 Bing v. Roadway Express, Inc., 485 F.2d 441, 451 (CA5); United States v. N. L. Industries, Inc., 479 F.2d 354, 369 (CA8).

The denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination. Victims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups. A per se prohibition of relief to nonapplicants could thus put beyond the reach of equity the most invidious effects of employment discrimination those that extend to the very hope of self-realization. Such a per se limitation on the equitable powers granted to courts by Title VII would be manifestly inconsistent with the "historic purpose of equity to 'secur(e) complete justice' " and with the duty of courts in Title VII cases " 'to render a decree which will so far as possible eliminate the discriminatory effects of the past.' " Albemarle Paper Co. v. Moody, 422 U.S., at 418, 95 S.Ct., at 2372.

(2)

[26] To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily *368 claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he was qualified and would have applied for the job had it not been for those practices. Cf. Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. When this burden is met, the nonapplicant is in a position analogous to that of an applicant and is entitled to the presumption discussed in Part III-A, supra.

The Government contends that the evidence it presented in this case at the liability stage of the trial identified all nonapplicants as victims of unlawful discrimination "with a fair degree of specificity," and that the Court of Appeals' determination that qualified nonapplicants are presumptively entitled to an award of seniority should accordingly be affirmed. In support of this contention the Government cites its proof of an extended pattern and practice of discrimination as evidence that an application from a minority employee for a line-driver job would have been a vain and useless act. It further argues that since the class of nonapplicant discriminatees is limited to incumbent employees, it is likely that every class member was aware of the futility of seeking a line-driver job and was therefore deterred from filing both an initial and a followup application. [52]

*369 [27] We cannot agree. While the scope and duration of the company's discriminatory policy can leave little doubt that the **1872 futility of seeking line-driver jobs was communicated to the company's minority employees, that in itself is insufficient. The known prospect of discriminatory rejection shows only that employees who wanted line-driving jobs may have been deterred from applying for them. It does not show which of the nonapplicants actually wanted such jobs, or which possessed the requisite qualifications. [53] There are differences between city- and line-driving jobs, [54] for example, but the desirability of the latter is not so self-evident as to warrant a conclusion that all employees would prefer to be line drivers if given a free choice. [55] Indeed, a substantial number of white *370 city drivers who were not subjected to the company's discriminatory practices were apparently content to retain their city jobs. [56]

In order to fill this evidentiary gap, the Government argues that a nonapplicant's current willingness to transfer into a line-driver position confirms his past desire for the job. An employee's response to the court-ordered notice of his entitlement to relief [57] demonstrates, according to this argument, that *371 the employee would have sought a line-driver job when he first became qualified to fill one, but for his knowledge of the company's discriminatory policy.

**1873 This assumption falls short of satisfying the appropriate burden of proof. An employee who transfers

Case 4:17-cv-06621-YGR  Document 1-1  Filed 11/16/17  Page 746 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

into a line-driver unit is normally placed at the bottom of the seniority "board." He is thus in jeopardy of being laid off and must, at best, suffer through an initial period of bidding on only the least desirable runs. See supra, at 1858-1859, and n. 25. Non-applicants who chose to accept the appellate court's post hoc invitation, however, would enter the line-driving unit with retroactive seniority dating from the time they were first qualified. A willingness to accept the job security and bidding power afforded by retroactive seniority says little about what choice an employee would have made had he previously been given the opportunity freely to choose a starting line-driver job. While it may be true that many of the nonapplicant employees desired and would have applied for line-driver jobs but for their knowledge of the company's policy of discrimination, the Government must carry its burden of proof, with respect to each specific individual, at the remedial hearings to be conducted by the District Court on remand. [58]

## C

 [28]  The task remaining for the District Court on remand will not be a simple one. Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees were actual victims  *372  of the company's discriminatory practices. After the victims have been identified, the court must, as nearly as possible, " 'recreate the conditions and relationships that would have been had there been no' " unlawful discrimination. Franks, 424 U.S., at 769, 96 S.Ct., at 1266. This process of recreating the past will necessarily involve a degree of approximation and imprecision. Because the class of victims may include some who did not apply for line-driver jobs as well as those who did, and because more than one minority employee may have been denied each line-driver vacancy, the court will be required to balance the equities of each minority employee's situation in allocating the limited number of vacancies that were discriminatorily refused to class members.

Moreover, after the victims have been identified and their rightful place determined, the District Court will again be faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrongdoing. In the prejudgment consent decree, see n. 4, supra, the

company and the Government agreed that minority employees would assume line-driver positions that had been discriminatorily denied to them by exercising a first-priority right to job vacancies at the company's terminals. The decree did not determine what constituted a vacancy, but in its final order the trial court defined "vacancy" to exclude any position that became available while there were laid-off employees awaiting an opportunity to return to work. Employees on layoff were given a preference to fill whatever openings might occur at their terminals during a three-year period after they were laid off. [59]  *373  **1874  The Court of Appeals rejected the preference and held that all but "purely temporary" vacancies were to be filled according to an employee's seniority, whether as a member of the class *374  discriminated against or as an incumbent line driver on layoff. 517 F.2d, at 322-323.

As their final contention concerning the remedy, the company and the union argue that the trial court correctly made the adjustment between the competing interests of discriminatees and other employees by granting a preference to laid-off employees, and that the Court of Appeals erred in disturbing it. The petitioners therefore urge the reinstatement of that part of the trial court's final order pertaining to the rate at which victims will assume their rightful places in the line-driver hierarchy. [60]

 [29]   [30]   [31]   Although not directly controlled by the Act, [61]  the extent to  *375  which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place is limited by basic principles of equity. In devising and implementing remedies under Title VII, no less than in formulating any equitable decree, a  **1875  court must draw on the "qualities of mercy and practicality (that) have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329-330, 64 S.Ct. 587, 592, 88 L.Ed. 754. Cf. Phelps Dodge Corp. v. NLRB, 313 U.S., at 195-196, 61 S.Ct., at 852-853, modifying 113 F.2d 202 (CA2); 19 N.L.R.B. 547, 600; Franks, supra, 424 U.S., at 798-799, 96 S.Ct., at 1280-1281 (POWELL, J., concurring in part and dissenting in part). Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 747 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200-201, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (opinion of Burger, C. J.).

Because of the limited facts now in the record, we decline to strike the balance in this Court. The District Court did not explain why it subordinated the interests of class members to the contractual recall expectations of other employees on layoff. When it made that determination, however, it was considering a class of more than 400 minority employees, all of whom had been granted some preference in filling line-driver vacancies. The overwhelming majority of these were in the District Court's subclass three, composed of those employees with respect to whom neither the Government nor the company had presented any specific evidence on the question of unlawful discrimination. Thus, when the court considered the problem of what constituted a line-driver "vacancy" **\*376** to be offered to class members, it may have been influenced by the relatively small number of proved victims and the large number of minority employees about whom it had no information. On the other hand the Court of Appeals redefined "vacancy" in the context of what it believed to be a class of more than 400 employees who had actually suffered from discrimination at the behest of both the company and the union, and its determination may well have been influenced by that understanding. For the reasons discussed in this opinion, neither court's concept was completely valid.

**[32]** **[33]** After the evidentiary hearings to be conducted on remand, both the size and the composition of the class of minority employees entitled to relief may be altered substantially. Until those hearings have been conducted and both the number of identifiable victims and the consequent extent of necessary relief have been determined, it is not possible to evaluate abstract claims concerning the equitable balance that should be struck between the statutory rights of victims and the contractual rights of nonvictim employees. That determination is best left, in the first instance, to the sound equitable discretion of the trial court.[62] See Franks v. Bowman Transportation Co., supra, 424 U.S., at 779, 96 S.Ct., at 1271; Albemarle Paper Co. v. Moody, 422 U.S., at 416, 95 S.Ct., at 2371. We observe only that when the court exercises its discretion in dealing with the problem of laid-off employees in light of the facts developed at the hearings on remand, it should clearly state its reasons so that meaningful review may be had on appeal. See Franks,

supra, 424 U.S., at 774, 96 S.Ct., at 1269; Albemarle Paper Co. v. Moody, supra, 422 U.S., at 421 n. 14, 95 S.Ct., at 2373.

For all the reasons we have discussed, the judgment of the Court of Appeals is vacated, and the cases are remanded to the **\*377** District Court for further proceedings consistent with this opinion.

It is so ordered.

**\*\*1876** Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN joins, concurring in part and dissenting in part.

I agree with the Court that the United States proved that petitioner T. I. M. E.-D. C. was guilty of a pattern or practice of discriminating against blacks and Spanish-surnamed Americans in hiring line drivers. I also agree that incumbent minority-group employees who show that they applied for a line-driving job or that they would have applied but for the company's unlawful acts are presumptively entitled to the full measure of relief set forth in our decision last Term in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).[1] But I do not agree that Title VII permits petitioners to treat Negro and Spanish-surnamed line drivers differently from other drivers who were hired by the company at the same time simply because the former drivers were prevented by the company from acquiring seniority over the road. I therefore dissent **\*378** from that aspect of the Court's holding, and from the limitations on the scope of the remedy that follow from it.

As the Court quite properly acknowledges, ante, at 1862, the seniority provision at issue here clearly would violate Title VII absent s 703(h), 42 U.S.C. s 2000e-2(h), which exempts at least some seniority systems from the reach of the Act. Title VII prohibits an employer from "classify(ing) his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race, color, religion, sex or national origin." 42 U.S.C. s 2000e-2(a) (2) (1970 ed., Supp. V). "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Co., 401 U.S. 424,

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    16

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 748 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (emphasis added). Petitioners' seniority system does precisely that: It awards the choicest jobs and other benefits to those possessing a credential seniority which, due to past discrimination, blacks and Spanish-surnamed employees were prevented from acquiring. Consequently, "(e)very time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias." Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 988 (CA5 1969) (Wisdom, J.), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

As the Court also concedes, with a touch of understatement, "the view that s 703(h) does not immunize seniority systems that perpetuate the effects of prior discrimination has much support." Ante, at 1860, n. 28. Without a single dissent, six Courts of Appeals have so held in over 30 cases, [2] and **1877 two *379 other Courts of Appeals have indicated their agreement, also without dissent. [3] In an unbroken line of cases, the Equal Employment Opportunity Commission has reached the same *380 conclusion. [4] And the overwhelming weight of scholarly opinion is in accord. [5] Yet for the second time this Term, see General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), a majority of this Court overturns **1878 the unanimous conclusion of the Courts of Appeals and the EEOC concerning the scope of Title VII. Once again, I respectfully disagree.

*381 I

Initially, it is important to bear in mind that Title VII is a remedial statute designed to eradicate certain invidious employment practices. The evils against which it is aimed are defined broadly: "to fail . . . to hire or to discharge . . . or otherwise to discriminate . . . with respect to . . . compensation, terms, conditions, or privileges of employment," and "to limit, segregate, or classify . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status." 42 U.S.C. s 2000e-2(a) (1970 ed., Supp. V) (emphasis added). Section 703(h) carves out an exemption from these broad prohibitions. Accordingly, under longstanding principles of statutory construction, the Act should "be given a liberal interpretation . . . (and) exemptions from its sweep should be narrowed and limited

to effect the remedy intended." Piedmont & Northern R. Co. v. ICC, 286 U.S. 299, 311-312, 52 S.Ct. 541, 545 (1932); see also Spokane & Inland R. Co. v. United States, 241 U.S. 344, 350, 36 S.Ct. 668, 671, 60 L.Ed. 1037, 76 L.Ed. 1115 (1916); United States v. Dickson, 15 Pet. 141, 165, 10 L.Ed. 689 (1841) (Story, J.). Unless a seniority system that perpetuates discrimination falls "plainly and unmistakably within (the) terms and spirit" of s 703(h), A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945), the system should be deemed unprotected. I submit that whatever else may be true of the section, its applicability to systems that perpetuate past discrimination is not "plainly and unmistakably" clear.

The language of s 703(h) provides anything but clear support for the Court's holding. That section provides, in pertinent part:

"(I)t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to *382 discriminate because of race, color, religion, sex or national origin . . . ." (Emphasis added.)

In this case, however, the different "privileges of employment" for Negroes and Spanish-surnamed Americans, on the one hand, and for all others, on the other hand, produced by petitioners' seniority system are precisely the result of prior, intentional discrimination in assigning jobs; but for that discrimination, Negroes and Spanish-surnamed Americans would not be disadvantaged by the system. Thus, if the proviso is read literally, the instant case falls squarely within it, thereby rendering s 703(h) inapplicable. To avoid this result the Court is compelled to reconstruct the proviso to read: provided that such a seniority system "did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose." Ante, at 1865.

There are no explicit statements in the legislative history of Title VII that warrant this radical reconstruction of the proviso. The three documents placed in the Congressional Record by Senator Clark concerning seniority all were written many weeks before the Mansfield-Dirksen amendment containing s 703(h) was introduced. Accordingly, they do not specifically discuss the meaning of the proviso. [6] More importantly,

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 749 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

**\*383  \*\*1879**  none of the documents addresses the general problem of seniority systems that perpetuate discrimination. Not surprisingly, Congress simply did not think of such subtleties in enacting a comprehensive, pathbreaking Civil Rights Act.[7]  To my mind, this is dispositive. Absent unambiguous statutory language or an authoritative statement in the legislative history legalizing seniority systems that continue past wrongs, I do not see how it can be said that the s 703(h) exemption "plainly and unmistakably" applies.

## II

Even if I were to agree that this case properly can be decided on the basis of inferences as to Congress' intent, I still could not accept the Court's holding. In my view, the legislative history of the 1964 Civil Rights Act does not support the conclusion that Congress intended to legalize seniority systems that perpetuate discrimination, and administrative and legislative developments since 1964 positively refute that conclusion.

## A

The Court's decision to uphold seniority systems that perpetuate post-Act discrimination that is, seniority systems that treat Negroes and Spanish-surnamed Americans who become line drivers as new employees even though, after the effective date of Title VII, these persons were discriminatorily assigned to city-driver jobs where they accumulated seniority is explained in a single footnote. Ante, at 1861, n. 30. That footnote relies almost entirely on  **\*384**  United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571. But like the instant decision, Evans is devoid of any analysis of the legislative history of s 703(h); it simply asserts its conclusion in a single paragraph. For the Court to base its decision here on the strength of Evans is sheer bootstrapping.

Had the Court objectively examined the legislative history, it would have been compelled to reach the opposite conclusion. As we stated just last Term, "it is apparent that the thrust of (s 703(h)) is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act."[8]  Franks v. Bowman Transportation Co.,

424 U.S., at 761, 96 S.Ct., at 1263 (emphasis added). Congress was concerned with seniority expectations that had developed prior to the enactment of Title VII, not with expectations arising thereafter to the extent that those expectations were dependent on whites benefiting from unlawful discrimination. Thus, the paragraph of the Clark-Case Interpretive Memorandum dealing with seniority systems begins:

"Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective." 110 Cong.Rec. 7213 (1964) (emphasis added).

Similarly, the Justice Department memorandum that Senator Clark introduced explains:

**\*\*1880**  "Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected . . . by title VII. This  **\*385**  would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes. . . . Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title." Id., at 7207 (emphasis added).

Finally, Senator Clark's prepared answers to questions propounded by Senator Dirksen stated:

"Question. If an employer is directed to abolish his employment list because of discrimination what happens to seniority?

"Answer. The bill is not retroactive, and it will not require an employer to change existing seniority lists." Id., at 7217 (emphasis added).

For the Court to ignore this history while reaching a conclusion contrary to it is little short of remarkable.

## B

The legislative history of s 703(h) admittedly affords somewhat stronger support for the Court's conclusion with respect to seniority systems that perpetuate pre-Act discrimination that is, seniority systems that treat Negroes and Spanish-Surnamed Americans who become line drivers as new employees even though these persons were discriminatorily assigned to city-driver jobs where

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

they accumulated seniority before the effective date of Title VII. In enacting s 703(h), Congress intended to extend at least some protection to seniority expectations that had developed prior to the effective date of the Act. But the legislative history is very clear that the only threat to these expectations that Congress was seeking to avert was nonremedial, fictional seniority. Congress did not want minority group members who were hired after the effective date of the Act to be given superseniority simply because they were members of minority groups, nor did it want the use of seniority to be invalidated whenever it had a disparate **\*386** impact on newly hired minority employees. These are the evils and the only evils that the opponents of Title VII raised[9] and that the Clark-Case Interpretive Memorandum addressed.[10] As the Court acknowledges, "there seems to be no explicit reference in the legislative history to pre-Act discriminatees already employed in less desirable jobs." Ante, at 1864.

**\*\*1881** Our task, then, assuming still that the case properly can be decided on the basis of imputed legislative intent, is "to put to ourselves the question, which choice is it the more likely that Congress would have made," **\*387** Burnet v. Guggenheim, 288 U.S. 280, 285, 53 S.Ct. 369, 371, 77 L.Ed. 513 (1933) (Cardozo, J.), had it focused on the problem: would it have validated or invalidated seniority systems that perpetuate pre-Act discrimination? To answer that question, the devastating impact of today's holding validating such systems must be fully understood. Prior to 1965 blacks and Spanish-surnamed Americans who were able to find employment were assigned the lowest paid, most menial jobs in many industries throughout the Nation but especially in the South. In many factories, blacks were hired as laborers while whites were trained and given skilled positions;[11] in the transportation industry blacks could only become porters;[12] and in steel plants blacks were assigned to the coke ovens and blasting furnaces, "the hotter and dirtier" places of employment.[13] The Court holds, in essence, that while after 1965 these incumbent employees are entitled to an equal opportunity to advance to more desirable jobs, to take advantage of that opportunity they must pay a price: they must surrender the seniority they have accumulated in their old jobs. For many, the price will be too high, and they will be locked into their previous positions. [14] Even those willing to pay the price will **\*388** have to reconcile themselves to being forever behind subsequently hired whites who were not discriminatorily assigned. Thus equal opportunity will remain a distant dream for all incumbent employees.

I am aware of nothing in the legislative history of the 1964 Civil Rights Act to suggest that if Congress had focused on this fact it nonetheless would have decided to write off an entire generation of minority-group employees. Nor can I believe that the Congress that enacted Title VII would have agreed to postpone for one generation the achievement of economic equality. The backers of that Title viewed economic equality as both a practical necessity and a moral imperative.[15] They were well aware of the corrosive impact employment discrimination has on its victims, and on society generally.[16] They sought, therefore, "to eliminate those discriminatory practices and devices which have fostered racially stratified **\*\*1882** job environments to the disadvantage of minority citizens"; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973); see also Griggs v. Duke Power Co., 401 U.S., at 429-431, 91 S.Ct., at 852-853; Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); and "to make persons whole for injuries suffered on account of unlawful employment discrimination," Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). In **\*389** short, Congress wanted to enable black workers to assume their rightful place in society.

It is, of course, true that Congress was not willing to invalidate seniority systems on a wholesale basis in pursuit of that goal.[17] But the United States, as the plaintiff suing on behalf of the incumbent minority group employees here, does not seek to overturn petitioners' seniority system. It seeks only to have the "time actually worked in (minority) jobs (recognized) as the equal of (the majority group's) time," Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d, at 995, within the existing seniority system. Admittedly, such recognition would impinge on the seniority expectations white employees had developed prior to the effective date of the Act. But in enacting Title VII, Congress manifested a willingness to do precisely that. For example, the Clark-Case Interpretive Memorandum, see n. 6, supra, makes clear that Title VII prohibits unions and employers from using discriminatory waiting lists, developed prior to the effective date of the Title, in making selections for jobs or training programs after that date. 110 Cong.Rec. 7213 (1964). Such a prohibition necessarily

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

would disrupt the expectations of those on the lists. More generally, the very fact that Congress made Title VII effective shortly after its enactment demonstrates that expectations developed prior to passage of the Act were not considered sacrosanct, since Title VII's general ban on employment discrimination inevitably interfered with the pre-existing expectations of whites who anticipated benefiting from continued discrimination. Thus I am in complete agreement with Judge Butzner's conclusion **\*390** in his seminal decision in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (ED Va.1968): "It is . . . apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act." [18]

### C

If the legislative history of s 703(h) leaves any doubt concerning the section's applicability to seniority systems that perpetuate either pre- or post-Act discrimination, that doubt is entirely dispelled by two subsequent developments. The Court all but ignores both developments; I submit they are critical.

First, in more than a score of decisions beginning at least as early as 1969, the Equal Employment Opportunity Commission has consistently held that seniority systems that perpetuate prior discrimination are unlawful. [19] While the Court may have **\*\*1883** retreated, see General Electric Co. v. Gilbert, 429 U.S. 125, 141-142, 97 S.Ct. 401, 410-411, 50 L.Ed.2d 343 (1976), from its prior view that the interpretations of the EEOC are " 'entitled to great deference,' " Albemarle Paper Co. v. Moody, supra, 422 U.S., at 431, 95 S.Ct., at 2378, quoting **\*391** Griggs v. Duke Power Co., supra, 401 U.S., at 434, 91 S.Ct., at 855; I have not. Before I would sweep aside the EEOC's consistent interpretation of the statute it administers, I would require " 'compelling indications that it is wrong.' " Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973), quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). I find no such indications in the Court's opinion.

Second, in 1972 Congress enacted the Equal Employment Opportunity Act of 1972, Pub.L. 92-261, 86 Stat. 103, amending Title VII. In so doing, Congress made very clear that it approved of the lower court decisions invalidating seniority systems that perpetuate discrimination. That

Congress was aware of such cases is evident from the Senate and House Committee Reports which cite the two leading decisions, as well as several prominent law review articles. S.Rep. No. 92-415, p. 5 n.1 (1971); H.R.Rep. No. 92-238, p 8 n. 2 (1971). Although Congress took action with respect to other lower court opinions with which it was dissatisfied, [20] it made no attempt to overrule the seniority cases. To the contrary, both the Senate and House Reports expressed approval of the "perpetuation principle" as applied to seniority systems [21] and **\*392** invoked the principle to justify the Committees' recommendations to extend Title VII's coverage to state and local government employees, [22] and to expand the powers of the **\*\*1884** EEOC. [23] Moreover, the Section-by-Section Analysis of the **\*393** Conference Committee bill, which was prepared and placed in the Congressional Record by the floor managers of the bill, stated in "language that could hardly be more explicit," Franks v. Bowman Transportation Co., 424 U.S., at 765 n. 21, 96 S.Ct., at 1264, that, "in any areas where a specific contrary intention is not indicated, it was assumed that the present case law . . . would continue to govern the applicability and construction of Title VII." 118 Cong.Rec. 7166, 7564 (1972). And perhaps most important, in explaining the section of the 1972 Act that empowers the EEOC "to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e-2 or 2000e-3," 42 U.S.C. s 2000e-5(a) (1970 ed., Supp. V), the Section-by-Section Analysis declared:

"The unlawful employment practices encompassed by sections 703 and 704 which were enumerated in 1964 by the original Act, and as defined and expanded by the courts, remain in effect." 118 Cong.Rec. 7167, 7564 (1972) (emphasis added). [24]

We have repeatedly held: "When several acts of Congress are passed touching the same subject matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject." Tiger v. Western Investment Co., 221 U.S. 286, 309, 31 S.Ct. 578, 584, 55 L.Ed. 738 (1911); see NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) (subsequent legislation **\*394** entitled to "significant weight"); Red Lion Broadcasting Co. v. FCC, 395 U.S., at 380, 89 S.Ct., at 1801; United States v. Stafoff, 260 U.S. 477, 480, 43 S.Ct. 197, 199, 67 L.Ed. 358 (1923) (Holmes, J.); New York & Norfolk R. Co. v.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 752 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

Peninsula Produce Exchange, 240 U.S. 34, 39, 36 S.Ct. 230, 232, 60 L.Ed. 511 (1916) (Hughes, J.); United States v. Weeks, 5 Cranch 1, 8, 3 L.Ed. 19 (1809). Earlier this Term, we implicitly followed this canon in using a statute passed in 1976 to conclude that the Administrative Procedure Act, 5 U.S.C. ss 701-706, enacted in 1946, was not intended as an independent grant of jurisdiction to the federal courts. Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The canon is particularly applicable here for two reasons. First, because there is no explicit legislative history discussing seniority systems that perpetuate discrimination, we are required to " '(seize) every thing from which aid can be derived . . .,' " Brown v. GSA, 425 U.S. 820, 825, 96 S.Ct. 1961, 1964, 48 L.Ed.2d 402 (1976), quoting, United States v. Fisher, 2 Cranch 358, 386, 2 L.Ed. 304 (1805), if we are to reconstruct congressional intent. Second, because petitioners' seniority system was readopted in collective-bargaining agreements signed after the 1972 Act took effect, any retroactivity problems that ordinarily inhere in using a later Act to interpret an earlier one are not present here. Cf. **1885 Stockdale v. Insurance Cos., 20 Wall.

323, 331-332, 22 L.Ed. 348 (1874). Thus, the Court's bald assertion that the intent of the Congress that enacted the 1972 Act is "entitled to little if any weight," ante, at 1864, n. 39, in construing s 703(h) is contrary to both principle and precedent.

Only last Term, we concluded that the legislative materials reviewed above "completely (answer) the argument that Congress somehow intended seniority relief to be less available" than backpay as a remedy for discrimination. Franks v. Bowman Transportation Co., supra, 424 U.S., at 765 n. 21, 96 S.Ct., at 1264. If anything, the materials provide an even more complete answer to the argument that Congress somehow intended to immunize seniority systems that perpetuate past discrimination. To the extent that today's decision grants immunity to such systems, I respectfully dissent.

### All Citations

431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579

Footnotes

*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1      At the time of suit the statute provided as follows:

       "(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described."

       Section 707 was amended by s 5 of the Equal Employment Opportunity Act of 1972, 86 Stat. 107, 42 U.S.C. s 2000e-6(c) (1970 ed., Supp. V), to give the Equal Employment Opportunity Commission, rather than the Attorney General, the authority to bring "pattern or practice" suits under that section against private-sector employers. In 1974, an order was entered in this action substituting the EEOC for the United States but retaining the United States as a party for purposes of jurisdiction, appealability, and related matters. See 42 U.S.C. s 2000e-6(d) (1970 ed., Supp. V).

2      The named defendant in this suit was T.I.M.E. Freight, Inc., a predecessor of T.I.M.E.-D.C., Inc. T.I.M.E.-D.C., Inc., is a nationwide system produced by 10 mergers over a 17-year period. See United States v. T.I.M.E.-D.C., Inc., 517 F.2d 299, 304, and n. 6 (CA5). It currently has 51 terminals and operates in 26 States and three Canadian Provinces.

3      Line drivers, also known as over-the-road drivers, engage in long-distance hauling between company terminals. They compose a separate bargaining unit at the company. Other distinct bargaining units include servicemen, who service trucks, unhook tractors and trailers, and perform similar tasks; and city operations, composed of dockmen, hostlers, and city drivers who pick up and deliver freight within the immediate area of a particular terminal. All of these employees were represented by the petitioner union.

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

4   Following the receipt of evidence, but before decision, the Government and the company consented to the entry of a Decree in Partial Resolution of Suit. The consent decree did not constitute an adjudication on the merits. The company agreed, however, to undertake a minority recruiting program; to accept applications from all Negroes and Spanish-surnamed Americans who inquired about employment, whether or not vacancies existed, and to keep such applications on file and notify applicants of job openings; to keep specific employment and recruiting records open to inspection by the Government and to submit quarterly reports to the District Court; and to adhere to certain uniform employment qualifications respecting hiring and promotion to line driver and other jobs.

The decree further provided that future job vacancies at any company terminal would be filled first "(b)y those persons who may be found by the Court, if any, to be individual or class discriminatees suffering the present effects of past discrimination because of race or national origin prohibited by Title VII of the Civil Rights Act of 1964." Any remaining vacancies could be filled by "any other persons," but the company obligated itself to hire one Negro or Spanish-surnamed person for every white person hired at any terminal until the percentage of minority workers at that terminal equaled the percentage of minority group members in the population of the metropolitan area surrounding the terminal. Finally, the company agreed to pay $89,500 in full settlement of any backpay obligations. Of this sum, individual payments not exceeding $1,500 were to be paid to "alleged individual and class discriminatees" identified by the Government.

The Decree in Partial Resolution of Suit narrowed the scope of the litigation, but the District Court still had to determine whether unlawful discrimination had occurred. If so, the court had to identify the actual discriminatees entitled to fill future job vacancies under the decree. The validity of the collective-bargaining contract's seniority system also remained for decision, as did the question whether any discriminatees should be awarded additional equitable relief such as retroactive seniority.

5   The District Court's memorandum decision is reported at 6 FEP Cases 690 (1974) and 6 EPD P 8979 (1973-1974).

6   The Government did not seek relief for Negroes and Spanish-surnamed Americans hired at a particular terminal after the date on which that terminal first employed a minority group member as a line driver.

7   See n. 4, supra.

8   If an employee in this class had joined the company after July 2, 1965, then the date of his initial employment rather than the effective date of Title VII was to determine his competitive seniority.

9   As with the other subclasses, there were a few individuals in the third group who were found to have been discriminated against with respect to jobs other than line driver. There is no need to discuss them separately in this opinion.

10  This provision of the decree was qualified in one significant respect. Under the Southern Conference Area Over-the-Road Supplemental Agreement between the employer and the union, line drivers employed at terminals in certain Southern States work under a "modified" seniority system. Under the modified system an employee's seniority is not confined strictly to his home terminal. If he is laid off at his home terminal he can move to another terminal covered by the Agreement and retain his seniority, either by filling a vacancy at the other terminal or by "bumping" a junior line driver out of his job if there is no vacancy. The modified system also requires that any new vacancy at a covered terminal be offered to laid-off line drivers at all other covered terminals before it is filled by any other person. The District Court's final decree, as amended slightly by the Court of Appeals, 517 F.2d 299, 323, altered this system by requiring that any vacancy be offered to all members of all three subclasses before it may be filled by laid-off line drivers from other terminals.

11  Although the opinion of the Court of Appeals in this case did not specifically mention the requirement that a vacancy exist, it is clear from earlier and later opinions of that court that this requirement is a part of the Fifth Circuit's "qualification date" formula. See, e. g., Rodriquez v. East Texas Motor Freight, 505 F.2d 40, 63 n. 29, rev'd on other grounds, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453, cited in 517 F.2d, at 318 n. 35; Sagers v. Yellow Freight System, Inc., 529 F.2d 721, 731-734.

12  For example, if a class member began his tenure with the company on January 1, 1966, at which time he was qualified as a line driver and a line-driving vacancy existed, his competitive seniority upon becoming a line driver would date back to January 1, 1966. If he became qualified or if a vacancy opened up only at a later date, then that later date would be used.

13  The Court of Appeals also approved (with slight modification) the part of the District Court's order that allowed class members to fill vacancies at a particular terminal ahead of line drivers laid off at other terminals. See n. 10, supra.

14  Section 703(a) of Title VII, 42 U.S.C. s 2000e-2(a) (1970 ed. and Supp. V), provides:

"(a) It shall be an unlawful employment practice for an employer

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

15   "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, e. g., Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265-266, 97 S.Ct. 555, 563-565, 50 L.Ed.2d 450. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, e. g., 110 Cong.Rec. 13088 (1964) (remarks of Sen. Humphrey) ("What the bill does . . . is simply to make it an illegal practice to use race as a factor in denying employment. It provides that men and women shall be employed on the basis of their qualifications, not as Catholic citizens, not as Protestant citizens, not as Jewish citizens, not as colored citizens, but as citizens of the United States").

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See infra, at 1861. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Compare, e. g., Griggs v. Duke Power Co., 401 U.S. 424, 430-432, 91 S.Ct. 849, 853-854, 28 L.Ed.2d 158, with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-806, 93 S.Ct. 1817, 1824-1826, 36 L.Ed.2d 668. See generally B. Schlei & P. Grossman, Employment Discrimination Law 1-12 (1976); Blumrosen, Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972). Either theory may, of course, be applied to a particular set of facts.

16   The "pattern or practice" language in s 707(a) of Title VII, supra, at 1830 n. 1, was not intended as a term of art, and the words reflect only their usual meaning. Senator Humphrey explained:

"(A) pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature. There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, or if a company repeatedly and regularly engaged in acts prohibited by the statute.

"The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice . . . ." 110 Cong.Rec. 14270 (1964).

This interpretation of "pattern or practice" appears throughout the legislative history of s 707(a), and is consistent with the understanding of the identical words as used in similar federal legislation. See 110 Cong.Rec. 12946 (1964) (remarks of Sen. Magnuson) (referring to s 206(a) of the Civil Rights Act of 1964, 42 U.S.C. s 2000a-5); 110 Cong.Rec. 13081 (1964) (remarks of Sen. Case); id., at 14239 (remarks of Sen. Humphrey); id., at 15895 (remarks of Rep. Celler). See also United States v. Jacksonville Terminal Co., 451 F.2d 418, 438, 441 (CA5); United States v. Ironworkers Local 86, 443 F.2d 544, 552 (CA9); United States v. West Peachtree Tenth Corp., 437 F.2d 221, 227 (CA5); United States v. Mayton, 335 F.2d 153, 158-159 (CA5).

17   In Atlanta, for instance, Negroes composed 22.35% of the population in the surrounding metropolitan area and 51.31% of the population in the city proper. The company's Atlanta terminal employed 57 line drivers. All were white. In Los Angeles, 10.84% of the greater metropolitan population and 17.88% of the city population were Negro. But at the company's two Los Angeles terminals there was not a single Negro among the 374 line drivers. The proof showed similar disparities in San Francisco, Denver, Nashville, Chicago, Dallas, and at several other terminals.

18   Although line-driver jobs pay more than other jobs, and the District Court found them to be "considered the most desirable of the driving jobs," it is by no means clear that all employees, even driver employees, would prefer to be line drivers. See infra, at 1871-1872, and n. 55. Of course, Title VII provides for equal opportunity to compete for any job, whether it is thought better or worse than another. See, e. g., United States v. Hayes Int'l Corp., 456 F.2d 112, 118 (CA5); United States v. National Lead Co., 438 F.2d 935, 939 (CA8).

19   Two examples are illustrative:

George Taylor, a Negro, worked for the company as a city driver in Los Angeles, beginning late in 1966. In 1968, after hearing that a white city driver had transferred to a line-driver job, he told the terminal manager that he also would like to consider line driving. The manager replied that there would be "a lot of problems on the road . . . with different people, Caucasian, et cetera," and stated: "I don't feel that the company is ready for this right now. . . . Give us a little time. It will come around, you know." Mr. Taylor made similar requests some months later and got similar responses. He was never offered a line-driving job or an application.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 755 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

Feliberto Trujillo worked as a dockman at the company's Denver terminal. When he applied for a line-driver job in 1967, he was told by a personnel officer that he had one strike against him. He asked what that was and was told: "You're a Chicano, and as far as we know, there isn't a Chicano driver in the system."

20    Petitioners argue that statistics, at least those comparing the racial composition of an employer's work force to the composition of the population at large, should never be given decisive weight in a Title VII case because to do so would conflict with s 703(j) of the Act, 42 U.S.C. s 2000e-2(j). That section provides:

"Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . or national origin employed by any employer . . . in comparison with the total number or percentage of persons of such race . . . or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." The argument fails in this case because the statistical evidence was not offered or used to support an erroneous theory that Title VII requires an employer's work force to be racially balanced. Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though s 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population. See, e. g., United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 127 n. 7 (CA8). Considerations such as small sample size may, of course, detract from the value of such evidence, see, e. g., Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620-621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630, and evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would also be relevant. Ibid. See generally Schlei & Grossman, supra, n. 15, at 1161-1193.

"Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. . . . In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." United States v. Ironworkers Local 86, 443 F.2d, at 551. See also, e. g., Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 225 n. 34 (CA5); Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (CA4); United States v. Jacksonville Terminal Co., 451 F.2d, at 442; Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 426 (CA8); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (CA10).

21    Between July 2, 1965, and January 1, 1969, hundreds of line drivers were hired systemwide, either from the outside or from the ranks of employees filling other jobs within the company. None was a Negro. Government Exhibit 204.

22    For example, in 1971 the company hired 116 new line drivers, of whom 16 were Negro or Spanish-surnamed Americans. Minority employees composed 7.1% of the company's systemwide work force in 1967 and 10.5% in 1972. Minority hiring increased greatly in 1972 and 1973, presumably due at least in part to the existence of the consent decree. See 517 F.2d, at 316 n. 31.

23    The company's narrower attacks upon the statistical evidence that there was no precise delineation of the areas referred to in the general population statistics, that the Government did not demonstrate that minority populations were located close to terminals or that transportation was available, that the statistics failed to show what portion of the minority population was suited by age, health, or other qualifications to hold trucking jobs, etc. are equally lacking in force. At best, these attacks go only to the accuracy of the comparison between the composition of the company's work force at various terminals and the general population of the surrounding communities. They detract little from the Government's further showing that Negroes and Spanish-surnamed Americans who were hired were overwhelmingly excluded from line-driver jobs. Such employees were willing to work, had access to the terminal, were healthy and of working age, and often were at least sufficiently qualified to hold city-driver jobs. Yet they became line drivers with far less frequency than whites. See, e. g., Pretrial Stipulation 14, summarized in 517 F.2d at 312 n. 24 (of 2,919 whites who held driving jobs in 1971, 1,802 (62%) were line drivers and 1,117 (38%) were city drivers; of 180 Negroes and Spanish-surnamed Americans who held driving jobs, 13 (7%) were line drivers and 167 (93%) were city drivers).

In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers. As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from "the inexorable zero." Id., at 315.

24    The company's evidence, apart from the showing of recent changes in hiring and promotion policies, consisted mainly of general statements that it hired only the best qualified applicants. But "affirmations of good faith in making individual

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

selections are insufficient to dispel a prima facie case of systematic exclusion." Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536.

The company also attempted to show that all of the witnesses who testified to specific instances of discrimination either were not discriminated against or suffered no injury. The Court of Appeals correctly ruled that the trial judge was not bound to accept this testimony and that it committed no error by relying instead on the other overpowering evidence in the case. 517 F.2d, at 315. The Court of Appeals was also correct in the view that individual proof concerning each class member's specific injury was appropriately left to proceedings to determine individual relief. In a suit brought by the Government under s 707(a) of the Act the District Court's initial concern is in deciding whether the Government has proved that the defendant has engaged in a pattern or practice of discriminatory conduct. See infra, at 1867-1868.

25  Certain long-distance runs, for a variety of reasons, are more desirable than others. The best runs are chosen by the line drivers at the top of the "board" a list of drivers arranged in order of their bargaining-unit seniority.

26  Both bargaining-unit seniority and company seniority rights are generally limited to service at one particular terminal, except as modified by the Southern Conference Area Over-the-Road Supplemental Agreement. See n. 10, supra.

27  An example would be a Negro who was qualified to be a line driver in 1958 but who, because of his race, was assigned instead a job as a city driver, and is allowed to become a line driver only in 1971. Because he loses his competitive seniority when he transfers jobs, he is forever junior to white line drivers hired between 1958 and 1970. The whites, rather than the Negro, will henceforth enjoy the preferable runs and the greater protection against layoff. Although the original discrimination occurred in 1958 before the effective date of Title VII the seniority system operates to carry the effects of the earlier discrimination into the present.

28  Concededly, the view that s 703(h) does not immunize seniority systems that perpetuate the effects of prior discrimination has much support. It was apparently first adopted in Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (ED Va.). The court there held that "a departmental seniority system that has its genesis in racial discrimination is not a bona fide seniority system." Id., at 517 (first emphasis added). The Quarles view has since enjoyed wholesale adoption in the Courts of Appeals. See, e. g., Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 987-988 (CA5); United States v. Sheet Metal Workers Local 36, 416 F.2d, at 133-134, n. 20; United States v. Bethlehem Steel Corp., 446 F.2d 652, 658-659 (CA2); United States v. Chesapeake & Ohio R. Co., 471 F.2d 582, 587-588 (CA4). Insofar as the result in Quarles and in the cases that followed it depended upon findings that the seniority systems were themselves "racially discriminatory" or had their "genesis in racial discrimination," 279 F.Supp., at 517, the decisions can be viewed as resting upon the proposition that a seniority system that perpetuates the effects of pre-Act discrimination cannot be bona fide if an intent to discriminate entered into its very adoption.

29  Article 38 of the National Master Freight Agreement between the company and the union in effect as of the date of the systemwide lawsuit provided:

"The Employer and the Union agree not to discriminate against any individual with respect to his hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of his race, color, religion, sex, or national origin."

Any discrimination by the company would apparently be a "grievable" breach of this provision of the contract.

30  The legality of the seniority system insofar as it perpetuates post-Act discrimination nonetheless remains at issue in this case, in light of the injunction entered against the union. See supra, at 1852. Our decision today in United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571, is largely dispositive of this issue. Evans holds that the operation of a seniority system is not unlawful under Title VII even though it perpetuates post-Act discrimination that has not been the subject of a timely charge by the discriminatee. Here, of course, the Government has sued to remedy the post-Act discrimination directly, and there is no claim that any relief would be time barred. But this is simply an additional reason not to hold the seniority system unlawful, since such a holding would in no way enlarge the relief to be awarded. See Franks v. Bowman, Transportation Co., 424 U.S. 747, 778-779, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444. Section 703(h) on its face immunizes all bona fide seniority systems, and does not distinguish between the perpetuation of pre- and post-Act discrimination.

31  We also noted in McDonnell Douglas :

"There are societal as well as personal interests on both sides of this (employer-employee) equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." 411 U.S., at 801, 93 S.Ct., at 1823.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 757 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

32    Local 53 Asbestos Workers v. Vogler, 407 F.2d 1047 (CA5), provides an apt illustration. There a union had a policy of
      excluding persons not related to present members by blood or marriage. When in 1966 suit was brought to challenge this
      policy, all of the union's members were white, largely as a result of pre-Act, intentional racial discrimination. The court
      observed: "While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory,
      in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-
      Americans any real opportunity for membership." Id., at 1054.

33    E. g., H.R.Rep. No. 914, 88th Cong., 1st Sess., 65-66, 71 (1963) (minority report); 110 Cong.Rec. 486-488 (1964)
      (remarks of Sen. Hill); id., at 2726 (remarks of Rep. Dowdy); id., at 7091 (remarks of Sen. Stennis).

34    In addition to the material cited in Franks v. Bowman Transportation Co., 424 U.S., at 759-762, 96 S.Ct., at 1261-1263,
      see 110 Cong.Rec. 1518 (1964) (remarks of Rep. Celler); id., at 6549 (remarks of Sen. Humphrey); id., at 6564 (remarks
      of Sen. Kuchel).

35    Senators Clark and Case were the "bipartisan captains" responsible for Title VII during the Senate debate. Bipartisan
      captains were selected for each title of the Civil Rights Act by the leading proponents of the Act in both parties. They
      were responsible for explaining their title in detail, defending it, and leading discussion on it. See id., at 6528 (remarks of
      Sen. Humphrey); Vaas, Title VII: Legislative History, 7 B.C.Ind. & Com.L.Rev. 431, 444-445 (1966).

36    The full text of the statement is set out in Franks v. Bowman Transportation Co., supra, at 760 n. 16, 96 S.Ct., at 1262.
      Senator Clark also introduced a set of answers to questions propounded by Senator Dirksen, which included the following
      exchange:

      "Question. Would the same situation prevail in respect to promotions, when that management function is governed by
      a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for
      'last hired, first fired.' If the last hired are Negroes, is the employer discriminating if his contract requires they be first fired
      and the remaining employees are white?

      "Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens
      to be the 'last hired,' he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because
      of his race." 110 Cong.Rec. 7217 (1964). See Franks, supra, at 760 n. 16, 96 S.Ct., at 1262.

37    See Franks v. Bowman Transportation Co., supra, at 761, 96 S.Ct., at 1262; Vaas, supra, n. 35, at 435.

38    For the same reason, we reject the contention that the proviso in s 703(h), which bars differences in treatment resulting
      from "an intention to discriminate," applies to any application of a seniority system that may perpetuate past discrimination.
      In this regard the language of the Justice Department memorandum introduced at the legislative hearings, see supra, at
      1862, is especially pertinent: "It is perfectly clear that when a worker is laid off or denied a chance for promotion because
      under established seniority rules he is 'low man on the totem pole' he is not being discriminated against because of his
      race. . . . Any differences in treatment based on established seniority rights would not be based on race and would not
      be forbidden by the title." 110 Cong.Rec. 7207 (1964).

39    The legislative history of the 1972 amendments to Title VII, summarized and discussed in Franks, 424 U.S., at 764-765,
      n. 21, 96 S.Ct., at 1264; id., at 796-797, n. 18, 96 S.Ct., at 1263 (Powell, J., concurring in part and dissenting in part), in no
      way points to a different result. As the discussion in Franks indicates, that history is itself susceptible of different readings.
      The few broad references to perpetuation of pre-Act discrimination or "de facto segregated job ladders," see e. g., S.Rep.
      No. 92-415, pp. 5, 9 (1971); H.R.Rep. No. 92-238, pp. 8, 17 (1971), U.S.Code Cong. & Admin.News 1972, p. 2137, did
      not address the specific issue presented by this case. And the assumption of the authors of the Conference Report that
      "the present case law as developed by the courts would continue to govern the applicability and construction of Title VII,"
      see Franks, supra, at 765 n. 21, 96 S.Ct., at 1264, of course does not foreclose our consideration of that issue. More
      importantly, the section of Title VII that we construe here, s 703(h), was enacted in 1964, not 1972. The views of members
      of a later Congress, concerning different sections of Title VII, enacted after this litigation was commenced, are entitled to
      little if any weight. It is the intent of the Congress that enacted s 703(h) in 1964, unmistakable in this case, that controls.

40    That Title VII did not proscribe the denial of fictional seniority to pre-Act discriminatees who got no job was recognized
      even in Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (ED Va.), and its progeny. Quarles stressed the fact that the
      references in the legislative history were to employment seniority rather than departmental seniority. Id., at 516. In Local
      189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (CA5), another leading case in this area, the
      court observed:

      "No doubt, Congress, to prevent 'reverse discrimination' meant to protect certain seniority rights that could not have
      existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial
      grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but
      after his original rejection, even though the Negro might have had senior status but for the past discrimination." Id., at 994.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 758 of 898
International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

41    In addition, there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plantwide seniority systems. Then, as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a line of progression. See Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv.L.Rev. 1532, 1534 (1962); Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1602 (1969). The legislative history contains no suggestion that any one system was preferred.

42    See Georgia Highway Express, 150 N.L.R.B. 1649, 1651: "The Board has long held that local drivers and over-the-road drivers constitute separate appropriate units where they are shown to be clearly defined, homogeneous, and functionally distinct groups with separate interests which can effectively be represented separately for bargaining purposes. . . . In view of the different duties and functions, separate supervision, and different bases of payment, it is clear that the over-the-road drivers have divergent interests from those of the employees in the (city operations) unit . . . and should not be included in that unit."

43    The union will properly remain in this litigation as a defendant so that full relief may be awarded the victims of the employer's post-Act discrimination. Fed.Rule Civ.Proc. 19(a). See EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1095 (CA6).

44    The McDonnell Douglas case involved an individual complainant seeking to prove one instance of unlawful discrimination. An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the McDonnell Douglas formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

45    The holding in Franks that proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is consistent with the manner in which presumptions are created generally. Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof. See C. McCormick, Law of Evidence ss 337, 343 (2d ed. 1972); James, Burdens of Proof, 47 Va.L.Rev. 51, 61 (1961). See also Keyes v. School Dist. No. 1, 413 U.S. 189, 208-209, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548. These factors were present in Franks. Although the prima facie case did not conclusively demonstrate that all of the employer's decisions were part of the proved discriminatory pattern and practice, it did create a greater likelihood that any single decision was a component of the overall pattern. Moreover, the finding of a pattern or practice changed the position of the employer to that of a proven wrongdoer. Finally, the employer was in the best position to show why any individual employee was denied an employment opportunity. Insofar as the reasons related to available vacancies or the employer's evaluation of the applicant's qualifications, the company's records were the most relevant items of proof. If the refusal to hire was based on other factors, the employer and its agents knew best what those factors were and the extent to which they influenced the decision-making process.

46    The employer's defense must, of course, be designed to meet the prima facie case of the Government. We do not mean to suggest that there are any particular limits on the type of evidence an employer may use. The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy. In such cases the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result. See n. 20, supra, and cases cited therein.

47    The federal courts have freely exercised their broad equitable discretion to devise prospective relief designed to assure that employers found to be in violation of s 707(a) eliminate their discriminatory practices and the effects therefrom. See, e. g., cases cited in n. 51, infra. In this case prospective relief was incorporated in the parties' consent decree. See n. 4, supra.

48    Nonapplicants are discussed in Part III-B, infra.

49    Employees who initially applied for line-driver jobs and were hired in other jobs before the effective date of the Act, and who did not later apply for transfer to line-driver jobs, are part of the group of nonapplicants discussed infra.

50    Any nondiscriminatory justification offered by the company will be subject to further evidence by the Government that the purported reason for an applicant's rejection was in fact a pretext for unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S., at 804-806, 93 S.Ct., at 1825-1826.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 759 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

51    The far-ranging effects of subtle discriminatory practices have not escaped the scrutiny of the federal courts, which have provided relief from practices designed to discourage job applications from minority-group members. See, e. g., Franks v. Bowman Transportation Co., 495 F.2d 398, 418-419 (CA5) (public recruitment and advertising), rev'd on other grounds, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444; Carter v. Gallagher, 452 F.2d 315, 319 (CA8) (recruitment); United States v. Jacksonville Terminal Co., 451 F.2d, at 458 (posting of job vacancies and job qualification requirements); United States v. Local No. 86, Ironworkers, 315 F.Supp. 1202, 1238, 1245-1246 (WD Wash.) (dissemination of information), aff'd, 443 F.2d 544 (CA9). While these measures may be effective in preventing the deterrence of future applicants, they afford no relief to those persons who in the past desired jobs but were intimidated and discouraged by employment discrimination.

52    The limitation to incumbent employees is also said to serve the same function that actual job applications served in Franks: providing a means of distinguishing members of the excluded minority group from minority members of the public at large. While it is true that incumbency in this case and actual applications in Franks both serve to narrow what might otherwise be an impossible task, the statuses of nonincumbent applicant and nonapplicant incumbent differ substantially. The refused applicants in Franks had been denied an opportunity they clearly sought, and the only issue to be resolved was whether the denial was pursuant to a proved discriminatory practice. Resolution of the nonapplicant's claim, however, requires two distinct determinations: that he would have applied but for discrimination and that he would have been discriminatorily rejected had he applied. The mere fact of incumbency does not resolve the first issue, although it may tend to support a nonapplicant's claim to the extent that it shows he was willing and competent to work as a driver, that he was familiar with the tasks of line drivers, etc. An incumbent's claim that he would have applied for a line-driver job would certainly be more superficially plausible than a similar claim by a member of the general public who may never have worked in the trucking industry or heard of the company prior to suit.

53    Inasmuch as the purpose of the nonapplicant's burden of proof will be to establish that his status is similar to that of the applicant, he must bear the burden of coming forward with the basic information about his qualifications that he would have presented in an application. As in Franks, and in accord with Part III-A, supra, the burden then will be on the employer to show that the nonapplicant was nevertheless not a victim of discrimination. For example, the employer might show that there were other, more qualified persons who would have been chosen for a particular vacancy, or that the nonapplicant's stated qualifications were insufficient. See Franks, 424 U.S., at 773 n. 32, 96 S.Ct., at 1268.

54    Of the employees for whom the Government sought transfer to line-driving jobs, nearly one-third held city-driver positions.

55    The company's line drivers generally earned more annually than its city drivers, but the difference varied from under $1,000 to more than $5,000 depending on the terminal and the year. In 1971 city drivers at two California terminals, "LOS" and San Francisco, earned substantially more than the line drivers at those terminals. In addition to earnings, line drivers have the advantage of not being required to load and unload their trucks. City drivers, however, have regular working hours, are not required to spend extended periods away from home and family, and do not face the hazards of long-distance driving at high speeds. As the Government acknowledged at argument, the jobs are in some sense "parallel" some may prefer one job and some may prefer another.
       The District Court found generally that line-driver jobs "are considered the most desirable of the driving jobs." That finding that is not challenged here, and we see no reason to disturb it. We observe only that the differences between city and line driving were not such that it can be said with confidence that all minority employees free from the threat of discriminatory treatment would have chosen to give up city for line driving.

56    In addition to the futility of application, the Court of Appeals seems to have relied on the minority employees' accumulated seniority in non-line-driver positions in concluding that nonapplicants had been unlawfully deterred from applying. See 517 F.2d, at 318, 320. The Government adopts that theory here, arguing that a nonapplicant who has accrued time at the company would be unlikely to have applied for transfer because he would have had to forfeit all of his competitive seniority and the job security that went with it. In view of our conclusion in Part II-B, supra, this argument detracts from rather than supports a nonapplicant's entitlement to relief. To the extent that an incumbent was deterred from applying by his desire to retain his competitive seniority, he simply did not want a line-driver job requiring him to start at the bottom of the "board." Those nonapplicants who did not apply for transfer because they were unwilling to give up their previously acquired seniority suffered only from a lawful deterrent imposed on all employees regardless of race or ethnicity. The nonapplicant's remedy in such cases is limited solely to the relief, if any, to which he may be entitled because of the discrimination he encountered at a time when he wanted to take a starting line-driver job.

57    The District Court's final order required that the company notify each minority employee of the relief he was entitled to claim. The employee was then required to indicate, within 60 days, his willingness to accept the relief. Under the decision of the Court of Appeals, the relief would be qualification-date seniority.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 760 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

58    While the most convincing proof would be some overt act such as a pre-Act application for a line-driver job, the District Court may find evidence of an employee's informal inquiry, expression of interest, or even unexpressed unexpressed desire credible and convincing. The question is a factual one for determination by the trial judge.

59    Paragraph 9(a) of the trial court's final order provided:

"A 'vacancy' as used in this Order, shall include any opening which is caused by the transfer or promotion to a position outside the bargaining unit, death, resignation or final discharge of an incumbent, or by an increase in operations or business where, ordinarily, additional employees would be put to work. A vacancy shall not exist where there are laid off employees on the seniority roster where the opening occurs. Such laid off employees shall have a preference to fill such laid off positions when these again become open without competition from the individuals granted relief in this case. "However, if such layoff continues for three consecutive years the position will be deemed as 'vacant' with the right of all concerned to compete for the position, using their respective seniority dates, including those provided for in this Order." The trial court's use of a three-year recall right is apparently derived from provisions in the collective-bargaining agreements. Article 5 of the National Master Freight Agreement (NMFA) establishes the seniority rights of employees covered by the Agreement. Under Art. 5, "(s)eniority rights for employees shall prevail . . . . Seniority shall only be broken by discharge, voluntary quit, (or) more than a three (3) year layoff." s 1. As is evident, the three-year layoff provision in the NMFA determines only when an employee shall lose all of his accumulated seniority; it does not determine either the order of layoff or the order of recall. Subject to other terms of the NMFA, Art. 2, s 2, "(t)he extent to which seniority shall be applied as well as the methods and procedures of such application" are left to the Supplemental Agreements. Art. 5, s 1. The Southern Conference Area Over-the-Road Supplemental Agreement, covering line drivers in the Southern Conference, also provides for a complete loss of seniority rights after a three-year layoff, Art. 42, s 1, and further provides that in the event of a reduction in force "the last employee hired shall be laid off first and when the force is again increased, the employees are to be returned to work in the reverse order in which they were laid off," Art. 42, s 3.

This order of layoff and recall, however, is limited by the NMFA in at least two situations involving an influx of employees from outside a terminal. NMFA Art. 5, s 3(a)(1) (merger with a solvent company, s 5(b)(2) (branch closing with transfer of operations to another branch). In these cases the Master Agreement provides for "dovetailing" the seniority rights of active and laid-off employees at the two facilities involved. Ibid.; see also NMFA, Art. 15 (honoring Military Selective Service Act of 1967). The NMFA also recognizes that "questions of accrual, interpretation or application of seniority rights may arise which are not covered by the general rules set forth," and provides a procedure for resolution of unforeseen seniority problems. Art. 5, s 7. Presumably s 7 applies to persons claiming discriminatory denial of jobs and seniority in violation of Art. 38, which prohibits discrimination in hiring as well as classification of employees so as to deprive them of employment opportunities on account of race or national origin. See n. 29, supra. The District Court apparently did not consider these provisions when it determined the recall rights of employees on layoff.

60    In their briefs the petitioners also challenge the trial court's modification of the interterminal transfer rights of line drivers in the Southern Conference. See n. 10, supra. This question was not presented in either petition for certiorari and therefore is not properly before us. This Court's Rule 23(1)(c). Our disposition of the claim that is presented, however, will permit the trial court to reconsider any part of the balance it struck in dealing with this issue.

61    The petitioners argue that to permit a victim of discrimination to use his rightful-place seniority to bid on a line-driver job before the recall of all employees on layoff would amount to a racial or ethnic preference in violation of s 703(j) of the Act. Section 703(j) provides no support for this argument. It provides only that Title VII does not require an employer to grant preferential treatment to any group in order to rectify an imbalance between the composition of the employer's work force and the makeup of the population at large. See n. 20, supra. To allow identifiable victims of unlawful discrimination to participate in a layoff recall is not the kind of "preference" prohibited by s 703(j). If a discriminatee is ultimately allowed to secure a position before a laid-off line driver, a question we do not now decide, he will do so because of the bidding power inherent in his rightful-place seniority, and not because of a preference based on race. See Franks, 424 U.S., at 792, 96 S.Ct., at 1277 (Powell, J., concurring in part and dissenting in part).

62    Other factors, such as the number of victims, the number of nonvictim employees affected and the alternatives available to them, and the economic circumstances of the industry may also be relevant in the exercise of the District Court's discretion. See Franks, supra, at 796 n. 17, 96 S.Ct., at 1362 (Powell, J., concurring in part and dissenting in part).

1    In stating that the task nonapplicants face in proving that they should be treated like applicants is "difficult," ante, at 1869, I understand the Court simply to be addressing the facts of this case. There may well be cases in which the jobs that the nonapplicants seek are so clearly more desirable than their present jobs that proving that but for the employer's discrimination the nonapplicants previously would have applied will be anything but difficult.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 761 of 898

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977)
97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

Even in the present case, however, I believe the Court unnecessarily adds to the nonapplicants' burden. While I agree that proof of a nonapplicant's current willingness to accept a line-driver job is not dispositive of the question of whether the company's discrimination deterred the nonapplicant from applying in the past, I do not agree that current willingness "says little," see ante, at 1873, about past willingness. In my view, we would do well to leave questions of this sort concerning the weight to be given particular pieces of evidence in the district courts rather than attempting to resolve them through overly broad and ultimately meaningless generalizations.

2    Acha v. Beame, 531 F.2d 648 (CA2 1976); United States v. Bethlehem Steel Corp., 446 F.2d 652 (CA2 1971); Nance v. Union Carbide Corp., 540 F.2d 718 (CA4 1976), cert. pending, Nos. 76-824, 76-838; Patterson v. American Tobacco Co., 535 F.2d 257 (CA4), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); Russell v. American Tobacco Co., 528 F.2d 357 (CA4 1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976); Hairston v. McLean Trucking Co., 520 F.2d 226 (CA4 1975); United States v. Chesapeake & Ohio R. Co., 471 F.2d 582 (CA4 1972), cert. denied sub nom. Railroad Trainmen v. United States, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); Robinson v. Lorillard Corp., 444 F.2d 791 (CA4), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Griggs v. Duke Power Co., 420 F.2d 1225 (CA4 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Swint v. Pullman-Standard, 539 F.2d 77 (CA5 1976); Sagers v. Yellow Freight System, 529 F.2d 721 (CA5 1976); Sabala v. Western Gillette, Inc., 516 F.2d 1251 (CA5 1975), cert. pending, Nos. 75-788, 76-1060; Gamble v. Birmingham Southern R. Co., 514 F.2d 678 (CA5 1975); Resendis v. Lee Way Motor Freight, Inc., 505 F.2d 69 (CA5 1974); Herrera v. Yellow Freight System, Inc., 505 F.2d 66 (CA5 1974); Carey v. Greyhound Bus Co., 500 F.2d 1372 (CA5 1974); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (CA5 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (CA5 1974); Bing v. Roadway Express, Inc., 485 F.2d 441 (CA5 1973); United States v. Georgia Power Co., 474 F.2d 906 (CA5 1973); United States v. Jacksonville Terminal Co., 451 F.2d 418 (CA5 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Long v. Georgia Kraft Co., 450 F.2d 557 (CA5 1971); Taylor v. Armco Steel Corp., 429 F.2d 498 (CA5 1970); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (CA5 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); EEOC v. Detroit Edison Co., 515 F.2d 301 (CA6 1975), cert. pending, Nos. 75-220, 75-221, 75-239, 75-393; Palmer v. General Mills, Inc., 513 F.2d 1040 (CA6 1975); Head v. Timken Roller Bearing Co., 486 F.2d 870 (CA6 1973); Bailey v. American Tobacco Co., 462 F.2d 160 (CA6 1972); Rogers v. International Paper Co., 510 F.2d 1340 (CA8), summarily vacated and remanded, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); United States v. N. L. Industries, Inc., 479 F.2d 354 (CA8 1973); Gibson v. Longshoremen, 543 F.2d 1259 (CA9 1976); United States v. Navajo Freight Lines, Inc., 525 F.2d 1318 (CA9 1975).

The leading case in this line is a District Court decision, Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (ED Va. 1968).

3    Bowe v. Colgate, Palmolive Co., 489 F.2d 896 (CA7 1973); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (CA10 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).

I agree with the Court, ante, at 1860 n. 28, that the results in a large number of the Quarles line of cases can survive today's decision. That the instant seniority system "is rational, in accord with the industry practice, . . . consistent with NLRB precedents(,) . . . did not have its genesis in racial discrimination, and . . . was negotiated and has been maintained free from any illegal purpose," ante, at 1865, distinguishes the facts of this case from those in many of the prior decisions.

4    CCH Empl. Prac. Guide (1976) PP 6481, 6448, 6441, 6400, 6399, 6395, 6382; CCH EEOC Decisions (1973) PP 6373, 6370, 6366, 6365, 6355, 6334, 6313, 6272, 6223, 6217, 6214, 6211, 6197, 6195, 6188, 6176, 6169, 6044.

5    Blumrosen, Seniority & Equal Employment Opportunity: A Glimmer of Hope, 23 Rutgers L.Rev. 268 (1969); Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969); Fine: Plant Seniority and Minority Employees: Title VII's Effect on Layoffs, 47 U.Colo.L.Rev. 73 (1975); Gould, Seniority and the Black Worker: Reflections on Quarles and its Implications, 47 Texas L.Rev. 1039 (1969); Poplin, Fair Employment in a Depressed Economy: The Layoff Problem, 23 UCLA L.Rev. 177 (1975); S. Ross, Reconciling Plant Seniority with Affirmative Action and Anti-Discrimination in New York University, Twenty-Eighth Annual Conference on Labor 231 (1976); Developments in the Law Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1157-1164 (1971); Comment, Last Hired, First Fired Seniority, Layoffs, and Title VII: Questions of Liability and Remedy, 11 Colum.J.Law & Soc.Prob. 343 (1975); Note, The Problem of Last Hired, First Fired: Retroactive Seniority as a Remedy Under Title VII, 9 Ga.L.Rev. 611 (1975); Note, Last Hired, First Fired Layoffs and Title VII, 88 Harv.L.Rev. 1544 (1975); Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967); Comment, Title VII and Seniority Systems: Back to the Foot of the Line? 64 Ky.L.Rev. 114 (1975); Comment, Layoffs and Title VII: The Conflict Between Seniority and Equal Employment Opportunities, 1975 Wis.L.Rev. 791; 1969 Duke L.J. 1091; 46 N.C.L.Rev. 891 (1968).

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

6  The three documents, quoted in full in Franks v. Bowman Transportation Co., 424 U.S. 747, 759-761, nn. 15-16, 96 S.Ct. 1251, 1262, 47 L.Ed.2d 444 (1976), and in substantial part in today's decision, ante, at 1862, and n. 36, are (1) the Clark-Case Interpretive Memorandum, 110 Cong.Rec. 7212-7215 (1964); (2) the Justice Department Reply to Arguments Made by Senator Hill, id., at 7207; and (3) Senator Clark's Response to the Dirksen Memorandum, id., at 7216-7218. They were all placed in the Congressional Record of April 8, 1964, but were not read aloud during the debates. The Mansfield-Dirksen amendment was presented by Senator Dirksen on May 26, 1964. Id., at 11926.

  A few general statements also were made during the course of the debates concerning Title VII's impact on seniority, but these statements add nothing to the analysis contained in the documents. See id., at 1518 (Rep. Cellar); id., at 6549, 11848 (Sen. Humphrey); id., at 6563-6564 (Sen. Kuchel); id., at 9113 (Sen. Keating); id., at 15893 (Rep. McCulloch).

7  In amending Title VII in 1972, Congress acknowledged its own prior naivetEe:

  "In 1964, employment discrimination tended to be viewed as a series of isolated and distinguishable events, for the most part due to ill-will on the part of some identifiable individual or organization. . . . Experience has shown this view to be false." S.Rep. No. 92-415, p. 5 (1971).

  See H.R.Rep. No. 92-238, p. 8 (1971).

8  This understanding of s 703(h) underlies Franks' holding that constructive seniority is the presumptively correct remedy for discriminatory refusals to hire, even though awarding such seniority necessarily disrupts the expectations of other employees.

9  The most detailed attack on Title VII's effect on seniority rights was voiced in the minority report to the House Judiciary Committee Report, H.R.Rep.No. 914, 88th Cong., 1st Sess. (1963):

  "The provisions of this act grant the power to destroy union seniority. . . . (T)he extent of actions which would be taken to destroy the seniority system is unknown and unknowable.

  " . . . Under the power granted in this bill, if a carpenters' hiring hall, say, had 20 men awaiting call, the first 10 in seniority being white carpenters, the union could be forced to pass them over in favor of carpenters beneath them in seniority, but of the stipulated race." Id., at 71 (emphasis in original).

  The Senate opponents of the bill who discussed its effects on workers generally followed this line, although the principal argument advanced in the Senate was that Title VII would require preferential hiring of minorities. See 110 Cong.Rec. 487 (1964) (Sen. Hill); id., at 7091 (Sen. Stennis); id., at 7878 (Sen. Russell).

10  The Clark-Case Memorandum states:

  "Title VII would have no effect on established seniority rights. . . . Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged or indeed, permitted to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers." Id., at 7213.

  The remaining documents, see n. 6, supra, while phrased more generally, are entirely consistent with the focus of Senators Clark and Case.

11  E. g., Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (CA5 1974); United States v. N. L. Industries, Inc., 479 F.2d 354 (CA8 1973); Griggs v. Duke Power Co., 420 F.2d 1225 (CA4 1970).

12  E. g., Carey v. Greyhound Bus Co., 500 F.2d 1372 (CA5 1974); United States v. Jacksonville Terminal Co., 451 F.2d 418 (CA5 1971).

13  United States v. Bethlehem Steel Corp., 446 F.2d, at 655.

14  This "lock-in" effect explains why, contrary to the Court's assertion, ante, at 1864, there is a "rational basis for distinguishing . . . claims (of persons already employed in less desirable jobs) from those of persons initially denied any job." Although denying constructive seniority to the latter group will prevent them from assuming the position they would have occupied but for the pre-Act discrimination, it will not deter them from moving into higher paying jobs.

  In comparing incumbent employees with pre-Act discriminatees who were refused jobs, however, the Court assumes that s 703(h) must mean that the latter group need not be given constructive seniority if they are later hired. The only clear effect of s 703(h), however, is to prevent persons who were not discriminated against from obtaining special seniority rights because they are members of minority groups. See supra, at 1880, and n. 10. Although it is true, as the Court notes, ante, at 1864, n. 40, that in Quarles and United Papermakers the courts concluded that persons refused jobs prior to the Act need not be given fictional seniority, the EEOC, CCH EEOC Decisions (1973) P 6217, and several commentators, e. g., Cooper & Sobol, supra, n. 5; Note, supra, n. 5, 88 Harv.L.Rev., at 1544, have rejected this conclusion, and more recent decisions have questioned it, e. g., Watkins v. Steel Workers, 516 F.2d 41 (CA5 1975).

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

15   See, e. g., 110 Cong.Rec. 6547 (1964) (remarks of Sen. Humphrey); id., at 6562 (remarks of Sen. Kuchel); id., at 7203-7204 (remarks of Sen. Clark); H.R.Rep. No. 914, Pt. 2, 88th Cong., 1st Sess., 26-29 (1963).

16   See sources cited in n. 15, supra.

17   As one commentator has stated:

"(T)he statute conflicts with itself. While on the one hand Congress did wish to protect established seniority rights, on the other it intended to expedite black integration into the economic mainstream and to end, once and for all, the de facto discrimination which replaced slavery at the end of the Civil War." Poplin, supra, n. 5, at 191.

18   See also Gould, supra, n. 5, at 1042:

"If Congress intended to bring into being an integrated work force, . . . and not merely to create a paper plan meaningless to Negro workers, the only acceptable legislative intent on past discrimination is one that requires unions and employers to root out the past discrimination embodied in presently nondiscriminatory seniority arrangements so that black and white workers have equal job advancement rights."

19   See cases cited in n. 4, supra.

The National Labor Relations Board has reached a similar conclusion in interpreting the National Labor Relations Act, 29 U.S.C. s 151 et seq. In Local 269, Electrical Workers, 149 N.L.R.B. 769 (1964), enforced, 357 F.2d 51 (CA3 1966), the Board held that a union hiring hall commits present acts of discrimination when it makes referrals based on experience if, in the past, the union has denied nonunion members the opportunity to develop experience. See also Houston Maritime Assn., 168 N.L.R.B. 615 (1967), enforcement denied, 426 F.2d 584 (CA5 1970).

20   For example, the 1972 Act added to the definitional section of Title VII, 42 U.S.C. s 2000e (1970 ed., Supp. V), a new subsection (j) defining "religion" to include "religious observance and practice, as well as belief." This subsection was added "to provide the statutory basis for EEOC to formulate guidelines on discrimination because of religion such as those challenged in Dewey v. Reynolds Metal Company, 429 F.2d (324) (6th Cir. 1970), affirmed by an equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971)." 118 Cong.Rec. 7167 (1972) (Section-by-Section Analysis of H.R. 1746, the Equal Employment Opportunity Act of 1972, prepared by Sens. Williams and Javits). Dewey had questioned the authority of the EEOC to define "religion" to encompass religious practices. Dewey v. Reynolds Metals Co., 429 F.2d 324, 331 n. 1, 334-335 (CA6 1970).

21   After acknowledging the naive assumptions of the 1964 Civil Rights Act, see n. 7, supra, both Committee Reports went on to state:

"Employment discrimination as viewed today is a far more complex and pervasive phenomenon. Experts familiar with the subject now generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs, and the literature on the subject is replete with discussions of, for example, the mechanics of seniority and lines of progression, (and) perpetuation of the present effect of pre-act discriminatory practices through various institutional devices . . . . In short, the problem is one whose resolution in many instances requires not only expert assistance, but also the technical perception that the problem exists in the first instance, and that the system complained of is unlawful." S.Rep. No. 92-415, p. 5 (1971).

See H.R.Rep. No. 92-238, p. 8 (1971).

In addition in discussing "pattern or practice" suits and the recommendation to transfer the power to bring them to the EEOC, the House Report singled out several seniority cases, including United Papermakers, as examples of suits that "have contributed significantly to the Federal effort to combat employment discrimination." No. 92-238, supra, at 13, and n. 4.

It is difficult to imagine how Congress could have better "address(ed) the specific issue presented by this case," ante, at 1864, n. 39, than by referring to "the mechanics of seniority . . . (and) perpetuation of the present effect of pre-act discriminatory practices" and by citing Quarles and United Papermakers.

22   Both Reports stated that state and local governments had discriminated in the past and that "the existence of discrimination is perpetuated by both institutional and overt discriminatory practices . . . (such as) de facto segregated job labels." S.Rep. No. 92-415, supra, at 10; H.R.Rep. No. 92-238, supra, at 17, U.S.Code Cong. & Admin.News 1972, p. 2152. The same points were made in the debate in the House and Senate. 118 Cong.Rec. 1815 (1972) (remarks of Sen. Williams); 117 Cong.Rec. 31961 (1971) (remarks of Rep. Perkins).

23   The Senate Report stated:

"It is expected that through the administrative process, the Commission will continue to define and develop the approaches to handling serious problems of discrimination that are involved in the area of employment . . . (including seniority systems)." S.Rep. No. 92-415, supra, at 19.

The House Report argued:

97 S.Ct. 1843, 14 Fair Empl.Prac.Cas. (BNA) 1514, 14 Empl. Prac. Dec. P 7579...

   "Administrative tribunals are better equipped to handle the complicated issues involved in employment discrimination cases. . . . Issues that have perplexed courts include plant-wide restructuring of pay-scales and progression lines, seniority rosters and testing." H.R.Rep. No. 92-238, supra, at 10, U.S.Code Cong. & Admin.News 1972, p. 2146.

24    By enacting a new section defining the EEOC's powers with reference to ss 703 and 704 of the 1964 Act, Congress in 1972 effectively re-enacted those sections, and the judicial gloss that had been placed upon them. See 2A C. Sands, Sutherland's Statutes and Statutory Construction s 49.10 (1973) and cases cited; cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (finding that re-enactment in 1972 of backpay provision of 1964 Act "ratified" Courts of Appeals decisions awarding backpay to unnamed class members who had not filed charges with the EEOC).

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 13

2013 WL 1758760
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Eldridge JOHNSON, et al., Plaintiffs,

v.

UNITED CONTINENTAL
HOLDINGS, INC., et al., Defendants.

No. C–12–2730 MMC.
|
April 24, 2013.

**Attorneys and Law Firms**

Dow Wakefield Patten, Lauren Kubota, Spencer
Freeman Smith, Smith Patten, San Francisco, CA, for
Plaintiffs.

Donna Dangelo Melby, Jennifer Stivers Baldocchi,
Melinda A. Gordon, Paul Hastings LLP, Los Angeles,
CA, Gary T. Lafayette, Lafayette & Kumagai LLP, San
Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION TO DISMISS;
DENYING DEFENDANTS' MOTION TO
STRIKE; AFFORDING PLAINTIFFS LEAVE
TO FILE THIRD AMENDED COMPLAINT**

MAXINE M. CHESNEY, District Judge.

**\*1** Before the Court are two motions filed February
15, 2013 by defendants United Airlines, Inc. ("United"),
United Continental Holdings, Inc. ("UCH"), and
Continental Airlines, Inc. ("Continental"): (1) Motion
to Dismiss Second Amended Complaint With Prejudice;
and (2) Motion to Strike. Plaintiffs have filed opposition
to each motion; defendants have filed a reply to each
opposition. Having read and considered the papers filed
in support of and in opposition to the motions, the Court
rules as follows. [1]

**BACKGROUND**

Plaintiffs are twenty-three African–Americans, nineteen
of whom are employed by United as Captains, two of
whom are employed by Continental as Captains, and
two of whom are employed by United as Operations
Supervisors. Plaintiffs allege defendants violated (1) Title
VII, (2) 42 U.S.C. § 1981, and (3) the California Fair
Housing and Employment Act ("FEHA"), by failing to
promote plaintiffs on account of plaintiffs' race. Plaintiffs
also allege defendants violated Title VII and FEHA by
failing to promote eleven of the plaintiffs, in retaliation
for those plaintiffs' having engaged in protected activity.
Plaintiffs further allege defendants violated Title VII and
FEHA by subjecting one plaintiff to a hostile work
environment on account of said plaintiff's race.

Specifically, the operative complaint, the Second
Amended Complaint ("SAC"), contains seven causes of
action, as follows:

(1) First Claim, titled "Retaliation in Violation of [Title
VII]";

(2) Second Claim, titled "Retaliation in Violation of
[FEHA]";

(3) Third Claim, titled "Race Discrimination in Violation
of Title VII";

(4) Fourth Claim, titled "Violation of [FEHA]," in which
plaintiffs allege race discrimination;

(5) Fifth Claim, titled "Violation of 42 U.S.C. § 1981," in
which plaintiffs allege race discrimination;

(6) Sixth Claim, titled "Harassment in Violation of [Title
VII]"; and

(7) Seventh Claim, titled "Harassment in Violation of
[FEHA]."

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of
Civil Procedure can be based on the lack of a cognizable
legal theory or the absence of sufficient facts alleged under
a cognizable legal theory. *See Balistreri v. Pacifica Police
Dep't,* 901 F.2d 696, 699 (9th Cir.1990). Rule 8(a)(2),
however, "requires only 'a short and plain statement of

the claim showing that the pleader is entitled to relief.' " *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Fed.R.Civ.P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *See id.* Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See *id.* (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly,* 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *See Iqbal,* 556 U.S. at 678 (internal quotation and citation omitted).

**\*2** Additionally, a "court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." *See* Fed.R.Civ.P. 12(f).

## DISCUSSION

### A. Motion to Dismiss

Defendants argue that all claims, with the exception of the Sixth Claim, are subject to dismissal against all defendants. Additionally, defendants argue UCH should be dismissed from the action for reasons specific to said defendant, which argument the Court considers first.

### 1. All Claims: UCH

Each of plaintiffs' seven claims pertains to alleged wrongdoing by an employer. Defendants argue plaintiffs have failed to allege any facts to support a finding that UCH is plaintiffs' employer, and, with respect to the

Title VII and FEHA claims, that plaintiffs have failed to exhaust their administrative remedies as against UCH.

### a. Sufficiency of Factual Allegations

Plaintiffs do not allege UCH employs any plaintiff, but, rather, that United and Continental are "wholly-owned subsidiaries" of UCH, which itself is a "holding company." (*See* SAC ¶ 29.) In their opposition, plaintiffs rely on their allegations that UCH shares "common management," as well as "common control of labor relations" and "common ownership and financial control," with United and Continental (*see* SAC ¶¶ 33, 35, 36), and argue that such allegations are sufficient to support a claim that UCH and its two subsidiaries constitute a "single employer" under the "integrated enterprise" test. *See Anderson v. Pacific Maritime Ass'n,* 336 F.3d 924, 928 (9th Cir.2003) (discussing purpose and application of "integrated enterprise" test).

As the Ninth Circuit has explained, the "integrated enterprise" test "does not determine joint liability, but instead determines whether a defendant can meet the statutory criteria of an 'employer' for Title VII applicability," *see id.,* specifically, the statutory requirement that an "employer" have fifteen or more employees, *see id.* at 929. Under the "integrated enterprise" test, a "plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15–employee minimum standard." *See id.* Where a plaintiff's employer has at least fifteen employees, however, the "integrated enterprise test is inapplicable." *See id.* Here, there is no dispute that United has fifteen or more employees and that Continental has fifteen or more employees. Consequently, plaintiffs' reliance on the integrated enterprise test is misplaced.

In sum, there being no factual allegations in the SAC to support a finding that UCH employs any plaintiff or is otherwise liable to any plaintiff, the claims in the SAC against UCH are subject to dismissal.

In their opposition, plaintiffs seek leave to amend in the event the Court finds any claim is subject to dismissal for failure to state a claim. With respect to their claims against UCH, plaintiffs rely on a declaration submitted by one of the named plaintiffs, and argue, based thereon, that

plaintiffs can allege UCH "participated in the unlawful employment practices set forth in the [SAC]." (*See* Pls.' Opp to Defs.' Mot. to Dismiss, filed March 1, 2013 ["Pls.' Opp."], at 20:16–19.) In the cited paragraphs of said declaration, the declarant states he met with Continental's "senior management" during 2010, and that an individual named "Fred Abbott" stated at one such meeting that "none of the persons in the 'Minter group' would ever get promotions because they had decided to go the litigation route." (*See* Sherman Decl. ¶ 12.) [2]

 **\*3** Although plaintiffs fail to explain how the statement allegedly made by such individual is attributable to UCH or how UCH "participated" in any unlawful act, the Court will afford plaintiffs leave to amend their Title VII and § 1981 claims against UCH to plead, if they can do so, such additional facts. [3] In any such amended pleading, if plaintiffs wish to pursue claims against UCH, plaintiffs shall include sufficient factual allegations that, if true, would support a claim that UCH can itself be held liable. Moreover, in any amended pleading, plaintiffs shall clearly identify the specific claims, and the specific plaintiffs, for which plaintiffs seek to hold UCH liable. [4]

### b. Failure to Exhaust

Defendants correctly point out that none of the plaintiffs identified UCH as an alleged wrongdoer in their respective administrative charges filed with the Equal Employment Opportunity Commission ("EEOC") or the Department of Fair Employment and Housing ("DFEH"). Based on said omission, defendants seek dismissal of the Title VII and FEHA claims against UCH for failure to exhaust administrative remedies. [5]

As a "general rule," Title VII plaintiffs "may sue only those named in the EEOC charge." *See Sosa v. Hiraoka,* 920 F.2d 1451, 1458 (9th Cir.1990). The Ninth Circuit, however, has identified exceptions to the general rule, such as where an entity named in the EEOC charge and an unnamed entity are "substantially identical parties." *See id.* at 1459–60 (holding where defendants unnamed in EEOC charge were trustees who "governed" employer named in charge, plaintiff's claims against trustees were not subject to dismissal at pleading stage, as it appeared "trustees and the [named entity] could well be 'substantially identical parties' "). Although plaintiffs herein fail to identify any such exception, the Court will

afford plaintiffs leave to do so, in the event they amend to allege a Title VII claim against UCH.

With respect to FEHA, however, California courts have adopted the rule that if a defendant is not "listed in the administrative charge as an 'employer' or 'person' against whom the claim [is] made" or is not named "in the body of the [FEHA] complaint as the alleged perpetrator[ ]," the plaintiff has failed to exhaust administrative remedies with respect to such defendant. *See Medix Ambulance Service, Inc. v. Superior Court,* 97 Cal.App.4th 109, 115–18, 118 Cal.Rptr.2d 249 (2002) (citing California court cases applying said rule). Here, UCH was not mentioned in any administrative charge submitted by any of the plaintiffs. (*See* Baldocchi Decl. ¶ 5, Exs. A–W.) Accordingly, plaintiffs' FEHA claims, to the extent they are alleged against UCH, are subject to dismissal without leave to amend for failure to exhaust administrative remedies.

### 2. Retaliation Claims: United

Plaintiffs allege that eleven plaintiffs engaged in protected activity and that thereafter United retaliated against those eleven plaintiffs, specifically, Sal Crocker ("Crocker"), Annette Gadson ("Gadson"), Richard John ("John"), Eldridge Johnson ("Johnson"), Johnnie E. Jones, Jr. ("Jones"), Karl Minter ("Minter"), Ken Montgomery ("Montgomery"), Paul C. Noble ("Noble"), Glen Roane ("Roane"), Lester Tom ("Tom"), and Darryl Wilson ("Wilson"). In the First Claim, plaintiffs allege such conduct violated Title VII, and, in the Second Claim, plaintiffs allege such conduct violated FEHA.

 **\*4** Defendants argue the retaliation claims are subject to dismissal for failure to state a claim and, additionally, that certain portions of the claims are subject to dismissal for failure to exhaust administrative remedies.

### a. Sufficiency of Factual Allegations

To state a prima facie claim for retaliation under Title VII or FEHA, a plaintiff must allege: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer subjected the plaintiff to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Thomas v. City of Beaverton,* 379 F.3d 802, 811 (9th Cir.2004) (setting forth elements of prima facie Title VII retaliation claim); *Flait v. North American Watch Corp.,* 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d

522 (1992) (setting forth elements of prima facie FEHA retaliation claim).

Plaintiffs allege that the above-identified eleven plaintiffs engaged in protected activity when (1) in 2010, each filed an EEOC charge against United "related to discrimination in promotions" (*see* SAC at 15:1–4), (2) after the filing of his/her respective 2010 EEOC charge, each "traveled to the Northern District of California to meet with United's executives to challenge United's discriminatory practices" (*see* SAC ¶¶ 6–16; *see also, e.g .,* SAC ¶¶ 81, 96, 236), and (3) at some point thereafter, ten of the plaintiffs "continued to pursue changes ... by meeting with mid and upper level management in order to establish protocols that would assist in the eradication of racial disparity in the promotional practices at [United]" (*see* SAC ¶¶ 82, 97, 109, 123, 141, 164, 178, 191, 205, 220).

Defendants do not argue that plaintiffs have failed to sufficiently allege protected activity. Rather, defendants argue, plaintiffs have failed to give fair notice of the scope of each plaintiff's retaliation claim, given the SAC's failure to identify the particular adverse employment action(s) challenged by each plaintiff, and the SAC's failure to sufficiently allege a causal link between the protected activity and any adverse employment action. As discussed below, the Court agrees.

**(i) Causal Link**
Taking the issue of causation first, the Court observes that causation can be inferred from the proximity of the date the decision-maker learns of the protected activity and the date on which the adverse employment action occurs, *see, e.g., Yartzoff v. Thomas,* 890 F.2d 1371, 1376 (9th Cir.1987) (holding causation element established where adverse employment action occurred "less than three months" after plaintiff filed administrative claim), or from the decision-maker's having engaged in a "pattern of antagonism following the protected conduct," *see Porter v. California Dep't of Corrections,* 419 F.3d 885, 895–96 (9th Cir.2005) (holding causal link established where supervisors who knew of plaintiff's protected activity had, prior to subjecting plaintiff to adverse employment action, engaged in "pattern of antagonism," including "sneers," "intimidating glares," and "spitting" in plaintiff's food).

 **\*5** Here, plaintiffs do not rely on temporal proximity or a pattern of antagonism. Rather, plaintiffs argue they have pleaded direct evidence of a causal link, and, in

support thereof, rely on their allegation that some of the plaintiffs were told that a "Senior Vice President" had stated, "No one from the original United Coalition who filed EEOC complaints in 2010 will get promoted at UAL ." (*See* SAC ¶¶ 110, 124, 142, 165, 179, 192, 221;[6] *see also* SAC ¶¶ 83, 206 (similar comments).) As defendants point out, however, plaintiffs fail to allege the "Senior Vice President" or any other individual overheard to make a similar comment had a connection to any alleged adverse employment action; plaintiffs do not allege, for example, that any such speaker played a role in any decision not to promote a plaintiff. *Cf. Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998) (holding, in context of motion for summary judgment on gender discrimination claim, plaintiff created triable issue of fact where decision-maker stated he "did not want to deal with another female" and then hired male for position at issue).

Accordingly, plaintiffs have failed to sufficiently allege a causal link exists between the protected activity and any adverse employment action.

**(ii) Adverse Employment Actions**
In their Title VII retaliation claim, plaintiffs allege that United has "withheld all promotions and special assignments" from the eleven named plaintiffs "since February 2011." (*See* SAC ¶ 344.) In an attempt to set forth the factual basis for such conclusory assertion, plaintiffs incorporate by reference 336 paragraphs alleged earlier in the SAC. (*See* SAC ¶ 337.) In so doing, plaintiffs appear to rely primarily on two sections of the SAC, specifically, the section titled "Allegations of Individual Plaintiffs," in which plaintiffs set forth allegations specific to each named plaintiff, including allegations identifying at least one promotion for which each named plaintiff unsuccessfully applied (*see* SAC ¶¶ 76–336), and the section titled "Statement of Facts Applicable to All Claims,' in which plaintiffs set forth allegations that, generally, apply to all plaintiffs, including a list of fifty-three promotions and special assignments for which plaintiffs contend they "were precluded from applying" (*see* SAC ¶¶ 44–75).[7]

By incorporating the "Allegations of Individual Plaintiffs" section into their retaliation claims, plaintiffs have given sufficient notice as to the promotions identified in that section for which the eleven named plaintiffs unsuccessfully applied. Defendants do not argue to the

contrary. Defendants do, however, correctly observe that in the "Individual" allegations applicable to plaintiff Gadson, plaintiffs fail to identify any promotion for which Gadson unsuccessfully applied after she engaged in protected activity (*see* SAC ¶¶ 230–36), and, consequently, challenge any retaliation claim Gadson is basing thereon.

**\*6** Additionally, defendants challenge, in its entirety, the sufficiency of plaintiffs' incorporation of the "Statement of Facts Applicable to All Claims" section into the retaliation claims, and, in particular, plaintiffs' incorporation of the list of fifty-three promotions and special assignments as to which plaintiffs were allegedly "precluded from applying" because the positions either were not posted as open positions or were posted for short periods of time. (*See* SAC ¶¶ 71–74.) With respect to said incorporation, defendants argue, plaintiffs fail to give sufficient notice as to which plaintiffs were "precluded" from applying for which positions. The Court agrees.

Plaintiffs imply in the SAC that each plaintiff was qualified for each of the listed fiftythree positions and that each plaintiff wished to apply for each such position; no such inference, however, can reasonably be drawn.[8] Contrary to plaintiffs' argument, plaintiffs, by relying on the "the hundreds of years of combined experience the[ ] [p]laintiffs have" (*see* Pls.' Opp. at 15:16–20), cannot avoid alleging facts necessary to support a finding that each of the named plaintiffs is or was qualified for a particular position. Moreover, some of the fifty-three positions were open before any plaintiff had engaged in protected activity and, consequently, a decision not to post those positions when they became open cannot have been motivated by retaliation. (*See, e.g.,* SAC ¶ 74 (identifying "Area Manager" position available in 2009 at Dulles, Virginia).) As to other positions, plaintiffs fail to provide any dates or other facts to support a finding that the position became or remained open after plaintiffs had engaged in protected activity. (*See, e.g., id.* (identifying "Shift Manager Station Operations" position filled at Dulles, Virginia on unspecified date).)

As stated above, plaintiffs seek leave to amend any claim found to be deficiently pleaded. The Court will afford plaintiffs leave to amend their retaliation claims, with the one exception set forth in the following subsection, specifically, Johnson's claim under FEHA. In any amended pleading, if plaintiffs wish to pursue retaliation claims, plaintiffs shall identify the adverse

employment action(s) to which each plaintiff asserts he or she was subjected because of retaliatory animus, and shall allege sufficient facts to support a causal link between each such adverse employment action and each plaintiff's protected activity.

**b. Exhaustion**

Defendants argue that certain of plaintiffs' retaliation claims have not been exhausted, and, consequently, that such retaliation claims are subject to dismissal without leave to amend. The Court considers in turn each such category identified by defendants.

First, defendants seek dismissal of plaintiff Johnson's FEHA retaliation claim in its entirety. The DFEH has "certif[ied]" that Johnson failed to submit an administrative charge to the DFEH. (*See* Baldocchi Decl. Ex. I). Consequently, Johnson's retaliation claim, to the extent such claim is brought under FEHA, is subject to dismissal without leave to amend. *See Rojo v. Kliger,* 52 Cal.3d 65, 83, 276 Cal.Rptr. 130, 801 P.2d 373 (1990) (holding "exhaustion of the FEHA administrative remedy is a precondition to bringing a civil suit on a statutory cause of action").

**\*7** Second, defendants seek dismissal of all retaliation claims to the extent such claims are based on failures to receive "special assignments." (*See* SAC ¶ 344.) Defendants correctly point out that each of the plaintiffs on whose behalf such retaliation claims are brought had alleged in his/her respective administrative charge that he/she failed to receive one or more "promotions" or "positions" (*see, e.g.,* Baldocchi Decl. Ex. M (Minter's EEOC charge alleging he had unsuccessfully applied for "promotions" to nine specified "positions"), *id.* Ex. R (Roane's EEOC intake questionnaire alleging he unsuccessfully applied for "24 positions")), but that no plaintiff had alleged in his/her administrative charge that such plaintiff failed to receive a "special assignment." As the Ninth Circuit has held, however, "incidents of discrimination not included in an EEOC charge" may be considered in a civil action where the "new claims are like or reasonably related to the allegations contained in the EEOC charge." *See Sosa,* 920 F.2d at 1456; *see also Sandhu v. Lockheed Missiles & Space Co.,* 26 Cal.App.4th 846, 859, 31 Cal.Rptr.2d 617 (1994) (adopting, for purposes of FEHA, Title VII's "like or reasonably related" standard). In the SAC, plaintiffs allege that by failing to select them for "special assignments," defendants have

denied plaintiffs the "opportunity for advancement" (*see* SAC ¶ 65), and, in their opposition, plaintiffs assert that defendants require "special assignment experience for management employees" (*see* Pls.' Opp. at 12:3). Although such additional assertion is not pleaded in the SAC, plaintiffs may be able to allege facts showing failures to receive special assignments are "like or reasonably related to," *see Sosa*, 920 F.2d at 1456, the allegations made in plaintiffs' respective administrative charges. Consequently, plaintiffs will be afforded leave to amend plaintiffs' retaliation claims based on failures to receive special assignments. [9]

Third, defendants seek dismissal of the retaliation claims to the extent they are based on adverse employment actions that occurred after each plaintiff filed his or her administrative charge, which actions, given the timing thereof, could not have been alleged in an administrative charge. Contrary to defendants' argument, however, there is no bar to basing a civil action on adverse employment actions that occur after the filing of an administrative charge. Rather, a plaintiff may base a civil action on later-occurring adverse employment actions as long as they are "like or reasonably related to the allegations contained in the EEOC charge." *See Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir.2002) (internal quotation and citation omitted). [10] Here, plaintiffs' administrative charges arguably can be read as alleging United's continuing denial of promotions based on the same retaliatory animus that motivated the denials identified in their administrative charges, and, consequently, it would not necessarily be futile for plaintiffs to base their retaliation claims on adverse employment actions occurring after plaintiffs filed their respective administrative charges. *See, e.g., id.* at 1104–05 (holding, where plaintiffs alleged in 1996 administrative charge that defendant "systematically restricted the access of African–American employees to positions at the GS–13 level or above," plaintiffs could proceed in civil action with claims based on 1997 failures to promote them to available GS–13 positions).

**\*8** Lastly, defendants seek dismissal of the retaliation claims to the extent they are based on actions that occurred "before the relevant Title VII and FEHA limitations period began." (*See* Defs.' Mot. at 20:16.) Defendants are correct that a plaintiff cannot base a retaliation claim on an adverse employment action that occurred outside the relevant limitations period. *See*

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that unless plaintiff files timely administrative charge identifying "discrete retaliatory or discriminatory act," plaintiff will "lose the ability to recover for it"). At this stage of the proceedings, however, defendants' argument is premature; as discussed above, the SAC does not make clear which adverse employment actions are being asserted on behalf of each plaintiff, and, further, the dates on which some of the adverse employment actions occurred are not set forth in the SAC.

In sum, with the exception of Johnson's FEHA claim, the Court will not preclude plaintiffs from amending their retaliation claims. In any such amended pleading, however, to the extent plaintiffs base their retaliation claims on adverse employment actions not identified in an administrative charge, plaintiffs must set forth allegations sufficient to support a finding that each such adverse action is like or reasonably related to the allegations made in the administrative charge submitted by each plaintiff who is basing a retaliation claim thereon.

### 3. Disparate Treatment: United and Continental

In the Third, Fourth, and Fifth Claims, plaintiffs include a claim of "disparate treatment" (*see* SAC ¶ 382), specifically, that United and Continental subjected plaintiffs to adverse employment actions, such as failing to promote them to managerial positions, on account of discriminatory animus based on plaintiffs' race. Said claims are brought on behalf of the above-identified eleven plaintiffs, and, additionally, on behalf of Odie Briscoe ("Briscoe"), Mario Ecung ("Ecung"), Ken Haney ("Haney"), Terence Hartsfield ("Hartsfield"), Terry Haynie ("Haynie"), Anthony Manswell ("Manswell"), Leon Miller ("Miller"), Xavier Palmer ("Palmer"), David Ricketts ("Ricketts"), Fredrick Robinson ("Robinson"), Leo Sherman ("Sherman"), and Erwin Washington ("Washington"). In the Third Claim, plaintiffs allege such conduct violated Title VII, in the Fourth Claim, plaintiffs allege such conduct violated FEHA, and, in the Fifth Claim, plaintiffs allege such conduct violated § 1981.

Defendants argue the disparate treatment claims are subject to dismissal for failure to state a claim and, additionally, that certain portions of the claims are subject to dismissal for failure to exhaust administrative remedies.

### a. Sufficiency of Factual Allegations

In order to sufficiently state a claim for intentional discrimination, a plaintiff must allege facts sufficient to give the defendant "fair notice of what [the plaintiff's] claims are and the grounds upon which they rest." *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Applying this standard, the Supreme Court has held that a plaintiff alleging he was terminated due to discrimination on the basis of his age and national origin provided sufficient notice to the defendant and "state[d] claims upon which relief could be granted under Title VII and the ADEA," where the "complaint detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," *see id.,* specifically, the age and national origin of the decision-maker and the person to whom "the bulk" of the plaintiff's responsibilities had been transferred, *see id.* at 995–95.

**\*9** Here, in support of their Title VII disparate treatment claim, plaintiffs allege defendants have "engaged in a pattern and practice of intentional discrimination against [p]laintiffs and the classes in promotions, assignments, and compensation" (*see* SAC ¶ 383), [11] and immediately prior to such allegation, plaintiffs incorporate by reference the prior paragraphs of the SAC (*see* SAC ¶ 382). [12] The FEHA and § 1981 disparate treatment claims are pleaded in a manner substantially similar to the Title VII claim. (*See* SAC ¶¶ 404–05, 407, 410.)

With one exception, discussed below, the Court finds the prior paragraphs on which plaintiffs rely do not provide sufficient notice to defendants of the factual basis for their disparate treatment claims.

First, to the extent plaintiffs, by alleging they were subjected to disparate treatment with respect to "compensation" (*see* SAC ¶¶ 383, 405, 410), intend to state a distinct claim for relief, plaintiffs have failed to do so, for the reason that plaintiffs allege no facts in support of such a theory. [13]

Second, to the extent the disparate treatment claims are based on each plaintiffs' failure to receive one or more of the fifty-three promotions and special assignments listed in the "Statement of Facts Applicable to All Claims" section of the SAC and as to which plaintiffs claim they

were "precluded" from applying (*see* SAC ¶¶ 71–74), the Court, for the reasons stated above with respect to plaintiffs' retaliation claims, finds plaintiffs have failed to give sufficient notice as to which plaintiffs were "precluded" from applying for particular positions for which they were qualified.

Lastly, in the sections of the SAC in which allegations specific to each of the twenty-three plaintiffs are set forth, plaintiffs fail, with one exception, to include sufficient facts to state a disparate treatment claim on behalf of any plaintiff. As to some plaintiffs, the SAC fails to identify even one position or special assignment for which that plaintiff applied. (*See, e.g.,* SAC ¶¶ 331–36 (alleging facts specific to Sherman, but not alleging he applied for any promotion or special assignment).) Further, even in those instances in which the SAC identifies a specific promotion for which a plaintiff unsuccessfully applied, the SAC includes no facts to provide fair notice as to the basis of the claim that any such failure to select was on account of intentional racial discrimination; rather, the SAC includes only conclusory allegations of discrimination. (*See, e.g.,* SAC ¶¶ 84, 87 (alleging Johnson unsuccessfully applied for five positions and that he "is informed and believes that he was passed over for the five positions he applied for in 2011 as a result of race discrimination").)

As noted above, one exception exists. In the section of the SAC specific to Montgomery, plaintiffs allege that, in September 2011, said plaintiff applied and was interviewed for a position as Hub Operations Area Manager at Dulles, Virginia, but that three other persons, identified by name, were selected, two of whom are "Caucasian individuals with no tenure, less education than [ ] Montgomery, and minimal experience." (*See* SAC ¶ 225.) The Court finds such allegations are sufficient to give defendants "fair notice" of the basis of Montgomery's disparate treatment claims as based on said failure to promote, and are sufficient to state a "claim[ ] upon which relief could be granted." *See Swierkiewicz,* 534 U.S. at 514.

**\*10** Accordingly, with the exception of Montgomery's claim based on United's failure to promote him to the above-referenced position at Dulles, Virginia, plaintiffs have failed to allege sufficient facts to state a disparate treatment claim.

The Court will afford plaintiffs leave to amend their disparate treatment claims, with the one exception set

forth in the following subsection, specifically, Johnson's claim under FEHA. If plaintiffs wish to pursue disparate treatment claims in any such amended pleading, plaintiffs shall identify the adverse employment action or actions to which each plaintiff asserts he or she was subjected, and shall allege sufficient facts to provide fair notice of the basis of plaintiffs' allegation that any such adverse employment action was on account of discriminatory animus.

### b. Exhaustion

Defendants argue that claims based on certain of the alleged adverse employment actions have not been exhausted, and, consequently, that plaintiffs' Title VII and FEHA disparate treatment claims, to the extent based thereon, are subject to dismissal without leave to amend.

As an initial matter, as discussed above with respect to plaintiffs' retaliation claims, the Court will dismiss, without leave to amend, Johnson's disparate treatment claim under FEHA, for the reason that Johnson failed to submit an administrative charge to the DFEH. *See Rojo,* 52 Cal.3d at 83, 276 Cal.Rptr. 130, 801 P.2d 373.

Next, also as discussed above, to the extent defendants challenge plaintiffs' failure to identify in their administrative charges either adverse employment actions occurring after the filing of the charges or special assignments, the Court will afford plaintiffs leave to amend, as it appears plaintiffs may be able to allege such actions are like or reasonably related to the allegations contained in their administrative charges. Additionally, as discussed above, to the extent defendants contend plaintiffs cannot base their claims on actions occurring outside the applicable limitations period, the Court finds their argument premature.

Lastly, with respect to defendants' challenge to any claim based on disparate compensation, the Court, as discussed above, finds the SAC is ambiguous as to whether plaintiffs are asserting claims based on disparate compensation. To the extent plaintiffs wish to proceed with any such claim, plaintiffs, given that they did not allege any facts in their administrative filings concerning the existence of unequal compensation for like work, must include in their next amended complaint factual allegations sufficient to show that any alleged discrimination based on such disparate compensation is like or reasonably related to the

allegations in the administrative charge of any plaintiff on whose behalf such claim is alleged.

In sum, with the exception of Johnson's FEHA claim, the Court will not preclude plaintiffs from amending their Title VII and FEHA disparate treatment claims.

### 4. Disparate Impact: United and Continental

**\*11** The Third, Fourth, and Fifth Claims also include a claim of disparate impact. Defendants argue said claims are subject to dismissal for failure to state a claim and, additionally, that certain portions thereof are subject to dismissal for failure to exhaust.

### a. Sufficiency of Factual Allegations

"[D] isparate-i m pact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon v. Hernandez,* 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (internal quotation and citation omitted). To sufficiently state a disparate impact claim, a plaintiff must "allege facts identifying a specific, facially neutral employment policy," as well as facts "to show a causal relationship between such a practice and its adverse impact on [a protected group]." *See Hines v. California Public Utilities Comm'n,* 467 Fed. Appx. 639, 641 (9th Cir.2012).

Defendants argue plaintiffs have failed to give sufficient notice of the basis for their disparate impact claims. As discussed below, the Court agrees.

In the SAC, plaintiffs list two "policies and practices" upon which, it appears, the disparate impact claims are based: [14]

[1] Failure to consistently post job and promotional openings to ensure that all African–American Captains and African–American Operations Supervisors have notice of and opportunity to seek advancement, higher compensation, overtime, or more desirable assignments and training; [and]

Reliance upon unweighted, arbitrary and subjective criteria (used by a nearly all non-African-American upper-managerial workforce) in making

job assignments, compensation, and promotion decisions. Even where [d]efendants' policies state objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

(*See* SAC ¶¶ 375(a)–375(b).)
The first of the above-quoted "policies and practices" does not identify a specific policy. Rather, as pleaded, and particularly in light of plaintiffs' allegations that defendants allow employees to apply for "permanent mid or upper-level management position[s]" through the "Taleo system" (*see* SAC ¶ 66), plaintiffs are merely alleging that some open positions are posted and others are not. Noticeably absent from the SAC is the identification of a policy governing the circumstances under which certain jobs are posted and others are not. Additionally, plaintiffs fail to plead any facts to support their conclusory allegation that African–Americans are adversely affected by the non-posting of some positions, and such effect is not self-evident. Indeed, as one district court has observed, "[f]ailure to post a job would seem to make all applicants, regardless of race ..., unaware of the specific opening." *See Collette v. St. Luke's Roosevelt Hospital,* 132 F.Supp.2d 256, 278 (S.D.N.Y.2001) (holding plaintiff failed to state disparate impact claim based on employer's "failure to post available job openings" for management positions).

**\*12** The second of the above-quoted "policies and practices" is that persons who make employment decisions use subjective criteria and that such decision-makers "often" ignore defendants' "objective requirements" or apply those requirements in an "inconsistent" manner. (*See* SAC ¶ 70(b).) The Court finds said allegation is too vague to identify a specific employment practice. Indeed, as pleaded, plaintiffs appear to be alleging that individual decision-makers are, at least in part, *not* following defendants' stated policies.

Consequently, plaintiffs have failed to allege sufficient facts to state a disparate impact claim, and the Court will afford plaintiffs leave to amend their disparate impact claims, with the exceptions set forth in the following subsection, specifically, certain plaintiffs' disparate impact claims under Title VII or FEHA. In any amended pleading, if plaintiffs wish to pursue disparate impact claims, plaintiffs shall identify the specific facially neutral employment policy or practice being challenged and shall allege facts sufficient to show the existence of a causal

relationship between such policy or practice and an adverse impact on African–Americans.

**b. Exhaustion**

Defendants argue that no plaintiff has exhausted a disparate impact claim, and, consequently, the Title VII and FEHA disparate impact claims are subject to dismissal without leave to amend.

As plaintiffs correctly point out in their opposition, some of the plaintiffs did include in their administrative charges and/or their EEOC intake questionnaires allegations challenging defendants' failure to post "all" open positions and/or defendant's selection of persons for open positions "by a tap on the shoulder" or "hand-pick[ing]" without allowing others to apply. (*See, e.g.,* Baldocchi Decl. Exs. E, L, M.) Such allegations were made by the following thirteen plaintiffs in their respective EEOC charges and/or EEOC intake questionnaires, as well as in their respective DFEH charges: Briscoe, Ecung, Haney, Hartsfield, Manswell, Miller, Minter, Palmer, Ricketts, Robinson, Sherman, Washington, and Wilson. (*See id.* Exs. A, C, E, F, K, L, M, P, Q, S, T, V, W.) [15] As discussed above, plaintiffs are basing their disparate impact claims, at least in part, on defendants' not posting all open positions, and the Court has afforded plaintiffs leave to amend their disparate impact claims to, *inter alia,* specify the facially neutral practice or practices being challenged. Consequently, the Court finds, as to the above-identified thirteen plaintiffs, it is premature to determine whether they have exhausted their federal and state administrative remedies with respect to a disparate impact claim.

Equivalent allegations as to failures to post were made by an additional two plaintiffs, specifically, Haynie and Tom, but those allegations were made only in their respective EEOC charges and/or questionnaires, and not in their respective DFEH charges; [16] rather, in their respective DFEH charges, said two plaintiffs only alleged claims of intentional discrimination based on their respective failures to receive positions for which they did apply and were not selected. Plaintiffs have not argued that their allegations of intentional discrimination with respect to specified positions for which a plaintiff unsuccessfully applied are "like or reasonably related to," *see Lyons,* 307 F.3d at 1104, a disparate impact claim based on facially neutral policies pertaining to the staffing of positions that are not posted. Consequently, Haynie and Tom have

failed to exhaust their state administrative remedies with respect to plaintiffs' disparate impact claims, and further amendment of the FEHA disparate impact claim on their behalf would be futile. *See Schlosser v. Potter,* 248 Fed. Appx. 812, 818 (9th Cir.2007) (holding proposed amended complaint was "futile" where plaintiff "failed to exhaust his administrative remedies").

**\*13** The remaining eight plaintiffs, specifically, Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane, did not allege in their respective EEOC charges, EEOC intake questionnaires, or DFEH charges that defendants failed to post open positions and/or filled unposted positions by a "tap on the shoulder" system; nor did any of those eight plaintiffs include therein any other language indicating they were challenging a failure to obtain a position for which they did not apply.[17] Rather, in their administrative filings, said eight plaintiffs only alleged claims of intentional discrimination based on their respective failures to receive specific positions for which they did apply and were not selected. Consequently, for the reasons stated above, Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane have failed to exhaust either their federal or state administrative remedies with respect to plaintiffs' disparate impact claims, and further amendment of the Title VII or FEHA disparate impact claim on their behalf would be futile. *See id.*

In sum, with the exception of (1) the Title VII and FEHA claims of Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane, and (2) the FEHA claims of Haynie and Tom, the Court will afford plaintiffs leave to amend their Title VII and FEHA disparate impact claims.

### 5. FEHA: Application to Nonresidents of California

In reliance on the principle that FEHA does not apply to "nonresidents employed outside the state when the tortious conduct did not occur in California," *see Campbell v. Arco Marine, Inc.,* 42 Cal.App.4th 1850, 1860, 50 Cal.Rptr.2d 626 (1996), defendants argue that any FEHA claims brought on behalf of plaintiffs who do not reside in California must be dismissed because plaintiffs have failed to sufficiently allege that the non-California plaintiffs were subjected to tortious conduct in California.

Plaintiffs' FEHA claims are asserted in the Second Claim, which alleges retaliation and is brought on behalf of eleven plaintiffs, the Fourth Claim, which alleges disparate treatment and disparate impact and is brought on behalf of all twenty-three plaintiffs, and the Seventh Claim, which alleges harassment and is brought on behalf of Haynie only. As discussed above, plaintiffs' retaliation, disparate treatment, and disparate impact claims, to the extent such claims are brought under FEHA, have been dismissed, with the sole exception of Montgomery's disparate treatment claim as based on his failure to receive a promotion in 2011 to a position at Dulles, Virginia. The Seventh Claim is based on allegations that Haynie was subjected to a hostile work environment during the course of his employment (*see* SAC ¶¶ 276, 281–87), and has not been addressed earlier herein. Consequently, the Court next considers defendants' argument only to the extent it is made as to said remaining disparate treatment and harassment claims under FEHA.

In their opposition, plaintiffs state their FEHA claims "only deal with promotions and special assignments in the State of California." (*See* Pls.' Opp. at 9:12–13.) As pleaded, however, the FEHA disparate treatment claim incorporates by reference all prior allegations in the SAC, including the allegations pertaining to Montgomery's failure to receive a promotion in Virginia. In light of plaintiffs' above-quoted representation as to the scope of their FEHA claims, however, the Court will dismiss without leave to amend the FEHA claim brought on behalf of Montgomery pertaining to his failure to receive a promotion in Virginia.

**\*14** The Seventh Claim includes no facts suggesting that any allegedly harassing behavior occurred in California; indeed, the only geographic locations identified in the claim are outside California. (*See* SAC ¶ 278 (alleging, "Throughout his career [p]laintiff Haynie has worked in the Chicago region and the Northeast Region in various positions.").) Consequently, the Seventh Claim is subject to dismissal, and the Court will afford plaintiffs leave to amend, if they intend to proceed with the Seventh Claim, to allege the harassing conduct occurred in California.

Finally, to the extent plaintiffs include in any amended pleading a FEHA claim on behalf of other non-California residents, plaintiffs must include sufficient facts to support a finding that any such plaintiff is challenging tortious conduct occurring in California.

## B. Motion to Strike

As noted above, "redundant, immaterial, impertinent, or scandalous matter" may be stricken from a complaint. *See* Fed.R.Civ.P. 12(f). Defendants argue that certain allegations in the SAC are immaterial or impertinent and, consequently, should be stricken. The Court considers the challenged allegations in turn.

First, defendants argue that all references to promotions or special assignments should be stricken to the extent plaintiffs did not exhaust their administrative remedies and/or to the extent plaintiffs fail to identify one or more plaintiffs who applied for said positions or would have applied for said positions if posted. The claims remaining in the SAC, however, are Montgomery's disparate treatment claims under Title VII and § 1981 based on his failure to receive a specific promotion in Virginia in 2011, and Haynes' Title VII harassment claim, which was not challenged in defendants' motion to dismiss other than the inclusion therein of UCH as a defendant; both claims have been exhausted and are sufficiently alleged. Moreover, any argument that a claim is insufficiently pleaded must be made pursuant to Rule 12(b)(6), not Rule 12(f). *See Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 971, 974–75 (9th Cir.2010) (holding Rule 12(f) does not authorize district courts to strike claims on the ground they are "precluded as a matter of law").

Second, defendants argue that all allegations in the SAC pertaining to earlier incidents of discrimination by defendants should be stricken. Said allegations are that (1) defendants' current CEO stated, in 2010 at an event where an aircraft was named after an African–American pilot, that he was "not proud" of Continental's having failed to hire said pilot "because of the color of his skin" (*see* SAC ¶ 58), and that (2) United, as a result of a lawsuit filed in 1973, was subject to a "consent order" until 1995, at which time the consent decree was "terminated" without a finding that "employment discrimination" was "no longer a problem at United" (*see* SAC ¶ 49, 56; *see also* SAC ¶¶ 44–55 (alleging, as background, federal case in which consent decree was entered and subsequent lawsuit in which United was alleged to have violated terms of consent decree)). Irrespective of whether evidence to support such allegations ultimately will be held admissible at trial on the claims remaining in the SAC, or on any of the the dismissed claims if properly realleged, *see, e.g.,*

Fed.R.Civ.P. 403, 404, the Court declines to find at the pleading stage that the background allegations identified above should be stricken as immaterial or impertinent. Under some circumstances, prior practices, even those occurring many years in the past, could conceivably shed some light on present practices. *See, e.g., Pullman–Standard v. Swint,* 456 U.S. 273, 277–280, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (observing that district court, in resolving Title VII claims alleged in complaint filed in 1971, made findings of fact as to workplace and union practices occurring 30 years prior, and determined challenged practice "grew out of historical circumstances" unrelated to discrimination).

**\*15** Accordingly, the motion to strike will be denied.

## CONCLUSION

For the reasons stated above:

1. Defendants' motion to dismiss is hereby GRANTED in part and DENIED in part, as follows:

a. The First Claim is DISMISSED in its entirety, with leave to amend.

b. The Second Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is brought (i) on behalf of Johnson and (ii) against UCH.

c. The Third Claim is DISMISSED, with the exception of Montgomery's disparate treatment claim based on his failure to receive a promotion to Hub Operations Area Manager at Dulles, Virginia, in September 2011. Such dismissal is with leave to amend, except to the extent the claim is based on a theory of disparate impact and is brought on behalf of Crocker, Gadson, John, Johnson, Jones, Montgomery, Noble, and Roane.

d. The Fourth Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is (i) based on Montgomery's failure to receive a promotion to Hub Operations Area Manager at Dulles, Virginia, in September 2011, (ii) based on a theory of disparate impact and is brought on behalf of Crocker, Gadson, Haynie, John, Jones, Montgomery, Noble, Roane, and Tom, (iii) brought on behalf of Johnson, and (iv) brought against UCH.

e. The Fifth Claim is DISMISSED, with the exception of Montgomery's disparate treatment claim based on the failure to be promoted to Hub Operations Area Manager at Dulles, Virginia, in September 2011. Such dismissal is with leave to amend.

f. The Sixth Claim is DISMISSED to the extent it is alleged against UCH, with leave to amend.

g. The Seventh Claim is DISMISSED in its entirety. Such dismissal is with leave to amend except to the extent the claim is brought against UCH.

2. Defendants' motion to strike is hereby DENIED.

3. Any Third Amended Complaint shall be filed no later than May 20, 2013. In any Third Amended Complaint, plaintiffs may amend to cure the deficiencies noted in any or all of the claims identified above that have been dismissed with leave to amend. Plaintiffs may not, however, add new claims, new plaintiffs, or new defendants without leave of court. *See* Fed.R.Civ.P. 15(a)(2).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1758760

Footnotes

1    By order filed March 20, 2013, the Court took the matters under submission.

2    In what appears to be a typographical error, the declarant states the meeting at which Fred Abbott allegedly made the above-referenced comment occurred in November 2011 (*see id.*); other paragraphs in the declaration appear to indicate the meeting occurred in 2010 (*see id.* ¶¶ 11, 13).

3    As discussed below, it would be futile for plaintiffs to amend their FEHA claims against UCH.

4    The portions of the declaration on which plaintiffs rely appear, at best, to pertain to plaintiffs' retaliation claims.

5    Defendants do not seek dismissal of the § 1981 claim on this ground. *See Surrell v. California Water Service Co.,* 518 F.3d 1097, 1103 (9th Cir.2008) (holding Title VII requires exhaustion of administrative remedies "whereas § 1981 has no such requirement") (internal quotations and citation omitted).

6    One plaintiff allegedly heard about the above-referenced statement from "another [p]laintiff" (*see* SAC ¶ 110), and four allegedly heard about it from "another Captain" (*see* SAC ¶¶ 124, 142, 179, 192); other plaintiffs who allegedly heard about the statement do not identify the source in any fashion.

7    Plaintiffs' FEHA retaliation claim is pleaded in a manner substantially similar to their Title VII retaliation claim. (*See* SAC ¶¶ 347, 354.)

8    For example, there are no factual allegations in the SAC to suggest that Gadson, who presently works as an Airport Operation Supervisor, is qualified for the position of Assistant Chief Pilot, or that any plaintiff who is a Captain is qualified to be an Area Manager of an airport.

9    Defendants also seek dismissal of the retaliation claims to the extent they are based on "retaliatory compensation practices," noting the administrative charges do not identify such practices. (*See* Defs.' Mot. at 20:15.) The retaliation claims, however, are not based, at least as presently pleaded, on a theory that plaintiffs were subjected to "retaliatory compensation practices."

10   Defendants argue the Ninth Circuit's decision in *Lyons* is in error, and that the Court should instead follow an Eighth Circuit decision that rejects the reasoning set forth in *Lyons.* The Court, however, is bound by Ninth Circuit precedent.

11   The instant action is not brought on behalf of a putative class and, consequently, plaintiffs' reference to "the classes" is unclear.

12   In ¶ 382 of the SAC, plaintiffs state they are incorporating, in their Title VII claim, "paragraphs 1 through 321." (*See id.*) The reference to "321," however, appears to be a typographical error; the correct number would appear to be "381."

13   The SAC could be read to allege disparate compensation as an element of damages, as opposed to a distinct adverse employment action. In their opposition, plaintiffs refer only once to their allegations regarding "compensation" (*see* Pls.' Opp. at 15:10–11), and, in so doing, provide no clarity as to whether they are alleging differences in "compensation" as damages or an independent adverse employment action.

14   In a section of the SAC in which plaintiffs combine allegations of "intentional race discrimination" and "discriminatory impact," plaintiffs identify six "policies and practices." *See* SAC ¶ 375.) Four of said alleged policies are not facially neutral, specifically, '[r]eliance on racial stereotypes in making employment decisions," "[p]re-selection and grooming of non-

African-Americans for promotions," "[m]aintenance of largely raciallysegregated job categories and departments," and "[d]eterrence and discouragement of African–American Captains and African–American Operations Supervisors from seeking advancement" (*see* SAC ¶ 375(c)–375(f)), and thus appear to pertain solely to plaintiffs' claims for intentional race discrimination.

15  Wilson's allegations were made in his EEOC charge, which charge Wilson requested the EEOC file with the DFEH (*see id.* Ex. W); the Court will assume, in the absence of a showing to the contrary, said charge was sent to the DFEH. *See Downs v. Dep't of Water & Power,* 58 Cal.App.4th 1093, 1097, 68 Cal.Rptr.2d 590 (1997) ("The EEOC and the DFEH [have] each designated the other as its agent for receiving charges and agreed to forward to the other agency copies of all charges potentially covered by the other agency's statute.").

16  Neither Haynie nor Tom requested that the EEOC send his EEOC charge to the DFEH. Rather, Haynie requested his EEOC charge be sent to a Connecticut state agency (*see* Baldocchi Decl. Ex. G), and Tom requested his EEOC charge be sent to an Illinois state agency (*see id.* Ex. U).

17  As discussed above, Johnson did not file a DFEH charge; all other plaintiffs did.

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 14

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

158 F.3d 742
United States Court of Appeals,
Fourth Circuit.

Renee LOWERY; Lisa S.
Peterson, Plaintiffs–Appellees,
and
Shelby McKnight; Gregory Fleming;
Sonya Hairston; Dynelle Johnson; Nadra
Smith; Ponnette Smith; Sheila Smith;
Patricia Spencer; Edward Stokes, Plaintiffs,
v.
CIRCUIT CITY STORES,
INCORPORATED, Defendant–Appellant.
Chamber of Commerce of the United States
of America; Washington Legal Foundation;
Equal Employment Advisory Council; National
Retail Federation; Equal Employment
Opportunity Commission; NAACP Legal
Defense and Education Fund, Inc., Amici Curiae.
Shelby McKNIGHT; Gregory Fleming; Renee
Lowery; Nadra Smith; Ponnette Smith; Sheila
Smith; Patricia Spencer; Edward Stokes,
Lisa S. Peterson, Plaintiffs–Appellants,
and
Sonya Hairston; Dynelle Johnson, Plaintiffs,
v.
CIRCUIT CITY STORES,
INCORPORATED, Defendant–Appellee.
Chamber of Commerce of the United States
of America; Washington Legal Foundation;
Equal Employment Advisory Council; National
Retail Federation; Equal Employment
Opportunity Commission; NAACP Legal
Defense and Education Fund, Inc., Amici Curiae.
Shelby McKNIGHT; Renee Lowery;
Lisa S. Peterson, Plaintiffs–Appellees,
and
Gregory Fleming; Sonya Hairston; Dynelle Johnson;
Nadra Smith; Ponnette Smith; Sheila Smith;
Patricia Spencer; Edward Stokes, Plaintiffs,
v.
CIRCUIT CITY STORES,
INCORPORATED, Defendant–Appellant.

Equal Employment Opportunity
Commission; NAACP Legal Defense
and Education Fund, Inc., Amici Curiae.
Renee LOWERY, Plaintiff–Appellee,
and
Shelby McKnight; Gregory Fleming; Sonya
Hairston; Dynelle Johnson; Nadra Smith;
Ponnette Smith; Sheila Smith; Patricia Spencer;
Edward Stokes; Lisa S. Peterson, Plaintiffs,
v.
CIRCUIT CITY STORES,
INCORPORATED, Defendant–Appellant.

Nos. 97–1372, 97–1470, 97–1917 and 98–1170.
|
Argued April 9, 1998.
|
Decided Sept. 14, 1998.

African-American current and former employees brought
Title VII and § 1981 action against employer. Following
grant of employees' motion to certify class action and
entry of summary judgment in favor of employer as to
claims of three employees, the United States District
Court for the Eastern District of Virginia, James R.
Spencer, J., 168 F.R.D. 550, decertified class. Following
jury trial, the District Court entered judgment in favor
of employees on their claim that employer engaged in
pattern or practice of discrimination, entered judgment
in favor of two employees on their individual claims,
and awarded economic, compensatory, and punitive
damages to those two employees. The District Court,
1997 WL 328640, imposed permanent injunction against
employer. Employer and employees appealed. The Court
of Appeals, Hamilton, Circuit Judge, held that: (1)
District Court did not abuse its discretion in decertifying
class based on concerns of fairness and efficiency; (2)
individual employees could not bring private, non-class
cause of action for pattern or practice discrimination; (3)
certain employees failed to establish disparate treatment
under burden-shifting method of proof; (4) District
Court did not abuse its discretion in limiting employer's
communications with its African-American employees;
(5) District Court did not abuse its discretion in refusing
to compel discovery of information prepared by employees'
non-testifying consultants; (6) employer's conduct was
not so egregious as to warrant punitive damages under §
1981; (7) injunction, except for those portions applicable
to individual employee, provided for relief that was

overbroad; and (8) District Court abused its discretion in awarding employees attorney fees amounting to nearly $4 million.

Affirmed in part, vacated in part, and remanded with instructions.

## Attorneys and Law Firms

**\*748  ARGUED:** Andrew Lewis Frey, Mayer, Brown & Platt, Washington, D.C., for Appellant. David Jay Cynamon, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Appellees. **ON BRIEF:** Kenneth S. Geller, Donald M. Falk, Peter C. Choharis, Mark S. Davies, Mayer, Brown & Platt, Washington, D.C.; W. Stephen Cannon, Pamela G. Parsons, Teri C. Miles, Circuit City Stores, Inc., Richmond, Virginia, for Appellant. Phillip D. Bostwick, James B. Hamlin, Duane K. Young, Shaw, Pittman, Potts & Trowbridge, Washington, D.C.; Avis Buchanan, The Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, D.C.; John A. Gibney, Jr., Shuford, Rubin & Gibney, P.C., Richmond, Virginia, for Appellees. Robert J. Smith, Harry A. Rissetto, Mona C. Zeiberg, Morgan, Lewis & Bockius, L.L.P., Washington, D.C.; Stephen A. Bokat, Robin S. Conrad, Sussan L. Mahallati, National Chamber Litigation Center, Inc., Washington, D.C., for Amicus Curiae Chamber of Commerce. John J. Gallagher, Barbara Berish Brown, Neal D. Mollen, Kelly J. Koelker, Paul, Hastings, Janofsky & Walker, L.L.P., Washington, D.C.; Daniel L. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Foundation. Ann Elizabeth Reesman, Robert E. Williams, McGuiness & Williams, Washington, D.C., for Amicus Curiae Advisory Council; Robert P. Joy, Morgan, Brown & Joy, Boston, Massachusetts, for Amicus Curiae National Retail Federation. C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Paul D. Ramshaw, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae EEOC. Elaine R. Jones, Director/Counsel, Theodore M. Shaw, Norman J. Chachkin, **\*749**  Charles Stephen Ralston, NAACP Legal Defense and Education Fund, Inc., New York, New York, for Amicus Curiae Fund.

Before MURNAGHAN, WILKINS, and HAMILTON, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN and Judge WILKINS joined.

## OPINION

HAMILTON, Circuit Judge:

This case involves claims of racial discrimination brought by eleven African–American current and former employees (collectively, the Plaintiffs) individually and on behalf of all African–Americans employed at the Richmond, Virginia headquarters (HQ) of Appellant, Circuit City Stores, Inc. Circuit City appeals from a jury verdict finding that Circuit City engaged in a pattern or practice of racial discrimination and that Circuit City discriminated against plaintiffs Renee Lowery (Lowery) and Lisa Peterson (Peterson) on account of their race. Circuit City also appeals from the district court's grant of injunctive relief, punitive damages, costs and attorneys' fees. Finally, Circuit City appeals the district court's grant of a motion by Lowery to compel Circuit City's compliance with a portion of the injunctive relief ordered and the district court's award of her reasonable attorneys' fees and costs incurred in connection with her motion in an amount to be subsequently determined. The Plaintiffs cross-appeal the district court's decertification of their class action. We affirm in part, vacate in part, and remand with instructions.

### I

Circuit City owns and operates a rapidly growing chain of retail consumer electronic stores that by January 1996 employed 37,000 "associates" nationwide. By November 1996, Circuit City employed 3,500 people at its Richmond HQ, about 800 of whom were African–Americans. Several hundred other Circuit City employees work for a wholly-owned subsidiary called First North American National Bank (F NANB), which operates as a separate and distinct entity, providing consumer credit to Circuit City's customers.

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 782 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

Lowery, Peterson and the other nine Plaintiffs, Shelby McKnight, Gregory Fleming, Sonya Hairston, Dynelle Johnson, Nadra Smith, Ponnette Smith, Sheila Smith, Patricia Spencer and Edward Stokes, are African–American current and former employees of Circuit City and FNANB. The Plaintiffs filed this action in late 1995, alleging that Circuit City and FNANB (collectively, Circuit City) have a corporate culture of racial animus toward African–Americans, promulgated, fostered and condoned by a group of white senior managers. Plaintiffs claim that Circuit City's all-white management intentionally carried out their racial animus and stereotypical thinking through discriminatory promotion policies and practices that included, among other things: (1) excessively subjective procedures and criteria used to deny opportunities for promotion to qualified African–Americans; (2) making the existence of job promotion vacancies known only through informal networks of white employees rather than through formal job posting procedures; (3) requiring African–American employees to satisfy more onerous requirements for promotion than those required for white employees; and (4) maintaining more onerous performance standards for African–American employees than for similarly situated white employees.

### A. *Evidence of a Pattern or Practice of Racial Discrimination*

Circuit City's promotion practices are developed in Circuit City's Human Resources (HR) Division. Between 1984 and 1996, HR was headed by William Zierden, a former business professor from the University of Virginia. Zierden believed that large companies are hampered by bureaucracy, including "rigid systems of job descriptions and rigid [qualifications]" for the people to fill job openings. (J.A. 2680). Zierden accordingly implemented an HR system which Circuit City claims limits bureaucracy and gives employees and managers wide freedom of action. Circuit City produced evidence that **\*750** this philosophy has strong support among management experts.

Circuit City's management policy requires all managers and supervisors to attend a week-long "Managing Through People" seminar that instructs them in appropriate supervision. (J.A. 2194). Managers receive

training on promotions, including how to interview and evaluate employees. According to Circuit City, managers are warned not to use impermissible selection criteria, and are admonished that "Circuit City firmly believes all associates and customers should be treated with respect. We have policies in place to achieve this goal. Circuit City is an equal opportunity employer who has set policies and standards to comply with all federal and state laws which forbid discrimination." (J.A. 1723).

The Plaintiffs claim that Circuit City's management style has encouraged and fostered racial discrimination in promotions. According to the Plaintiffs, Circuit City: (1) has no written procedures indicating how managers and supervisors should go about promoting employees; (2) has no written procedures or practices requiring a review, either by HR or anyone else, of any promotion decision; (3) does not require promoters to post or advertise job openings, but permits them to announce an opening to a single candidate of the promoter's own choosing without notifying anyone else of the vacancy; and (4) when a job opening is posted, has no requirements about what the posting should contain. Furthermore, Plaintiffs allege that a promoter has unfettered discretion to use any procedures he or she desires when making a promotion decision. For example, a promoter has full discretion to establish the minimum qualifications necessary for a position and the weight to be given to the factors considered in making the decision. The Plaintiffs note that the majority of those making promotion decisions at HQ are white, and claim that the result of Circuit City's promotion policies is that only white employees are promoted above the assistant supervisor level.

Circuit City, on the other hand, argues that its promotion policies have produced a racially diverse work force. Circuit City claims that the percentage of African–American employees at HQ increased from 19.5 percent in 1992 to 22 percent in 1995, while the full-time African–American workforce outside the company averaged about 19 percent during this time. Circuit City notes that, of the 6,200 employees at HQ from 1992 to 1995, 1,564 were African–American, with about 100 in professional and managerial positions, and approximately 600 were members of other minorities. Moreover, Circuit City claims that, for each significant occupational category defined by the United States Census Bureau, Circuit City employs more African–Americans than the external labor pool would indicate. As an example, Circuit City mentions

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 783 of 898

Lowery v. Circuit City Stores, Inc.; 158 F.3d 742 (1998)
77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

that from 1992 to 1995, it hired 375 people within the "officials and managers" category; although the relevant pool was only 4 percent African–American, Circuit City hired over 9 percent African–Americans.

Circuit City also claims that the vast majority of job openings are posted in a company-wide publication, via E-mail, and over a vacancy hotline. Nevertheless, while company policy favors posting vacancies, it does not require it. Moreover, Circuit City does not have formal career paths or mandatory company-wide promotion criteria; instead, supervisors base promotions on many factors, including performance, length of service, time in position, and education. To be promoted, an employee generally must have served at least six months in his/her current position (three months in FNANB) without disciplinary action. However, these rules may be waived.

There is no measurement made by anyone at Circuit City, including HR, as to the effects of these promotion practices and procedures on African–Americans as compared to whites. Zierden could recall only four black managers at HQ during his tenure. Only two out of roughly fifty or sixty group managers and managers in the accounting division were African–American. At FNANB, there has never been an African–American director or manager, and only two AfricanAmericans have risen above the assistant supervisor rank to the level of supervisor.

**\*751** At trial, Plaintiffs attempted to demonstrate management's racial animus by introducing evidence that certain high level employees of Circuit City have made racially disparaging comments. For example, Zierden allegedly advised Larry Jones, an applicant for a position in HR, that "the caliber of minorities and blacks who are in the company, in Circuit City, would not meet the standards for a corporate headquarters type job, and in particular this type job." (J.A. 3145). He also allegedly said that blacks who worked in Circuit City's retail stores "had a propensity to steal." (J.A. 3145–46). As for blacks in decision-making roles at Circuit City, Zierden allegedly told Jones there were "few, if any," blacks in such jobs and "he didn't see that situation changing anytime soon because ... those people who would be maybe eligible to be promoted upward just weren't there." (J.A. 3148). Zierden allegedly made similar comments to others. Complaints about Zierden to Circuit City's CEO, Rick Sharp, allegedly had no effect.

The Plaintiffs also attempted to demonstrate management's racial animus by introducing evidence that Zierden "buried" two internal reports, known as the Booth and Cook Reports, that were critical of Circuit City's promotion policies and diversity results. In December 1990, Zierden instructed Karen Booth, an employee in HR, to perform a study of how well Circuit City manages diversity in its workplace. Booth's January 1991 report noted, among other things, that statistics on Circuit City's store employees showed that "[t]he promotion ratio for male and non-minority [sales] counselors are [sic] significantly higher than those for women and minorities." (J.A. 838). Booth concluded that "[i]t is my assumption that many female and minority associates look up the ladder and see no one there like themselves. They perceive no upward mobility beyond a certain level and they look for opportunities outside the company." (J.A. 864, 2641). Zierden allegedly directed Booth to retrieve all copies of the report that she had given to other managers, and never discussed the report with any other Circuit City executives. The Plaintiffs assert that Zierden never independently checked the accuracy of Booth's statistical findings, nor attempted any kind of statistical analysis of promotion rates between minorities and non-minorities or of differences in rates of salary growth between blacks and whites.

In May 1995, Circuit City retained Sarah Cook, a graduate student in psychology at the University of Virginia, to conduct a survey and prepare a written report on employee job satisfaction at FNANB. Cook worked on the project for approximately seven months, was paid approximately $6,500 by Circuit City, and produced a written report in January 1996. Cook's report noted, among other things, employee concerns that one had to belong to certain cliques in order to get promoted, and that minorities felt excluded. Comments by survey respondents included: "I hate to express this but race affects promotions" and "Minorities are constantly overlooked for promotions and will continue to be overlooked until someone takes legal action against FNANB." (J.A. 1106). Cook's report concluded that a sizeable number of associates perceived that minority associates are not treated equally to majority associates. Cook had recommended that Circuit City review its company policies and practices, but noted that the company's response was defensive and dismissive.

Circuit City never distributed the Cook report to its employees, but instead circulated a short memorandum purporting to summarize the survey's results. The memorandum said nothing about Cook's findings and recommendations about promotion procedures. Moreover, according to the Plaintiffs, Circuit City took no action concerning the complaints about promotions, and made no changes in its promotion practices.

### B. *Evidence of Individual Discrimination*

In addition to the allegation of a pattern or practice of discrimination, the Plaintiffs claimed they suffered individual discrimination due to their race. Plaintiff Lowery joined Circuit City in October 1989 as a management recruiter in HR after completing her MBA. Lowery's manager, Catharine Madden, gave Lowery high performance reviews through mid–1994, although it appears Madden gave most of her employees high **\*752** ratings. Lowery performed her recruiting responsibilities well, exceeding her numerical recruiting goals through July 1995, and became Circuit City's most senior and highly paid recruiter. Despite this success, however, Lowery unsuccessfully sought approximately seven promotions in seven years.

Circuit City produced evidence that, notwithstanding Lowery's recruiting skills, she had several problems throughout her tenure. Although Lowery performed well for some hiring managers, Circuit City claimed she neglected following up for others, and one recruiter even asked not to work with her again. Evidence was presented that she had problems training new recruiters, showed little leadership and, according to her peers, she was not a team player. Circuit City asserted that Lowery did not participate in staff meetings, volunteer to attend job fairs, or share resumes with other recruiters. She also allegedly lacked focus in interviews, and one African–American supervisor found Lowery's oral style rambling and unstructured. When Lowery asked how to improve her chances of being promoted, she allegedly failed to take the steps that were suggested.

Lowery also presented evidence of Circuit City's alleged animus towards minorities. Lowery discovered, years after the fact, that the words "velveteen ghetto" had been handwritten on her 1989 interview schedule. (J.A. 881, 2137–38). She testified at trial that, in 1991,

when she approached Austin Ligon, Vice President of Corporate Planning, about a position in his department, he suggested that she "could do better someplace else" at a company that was "more receptive to minorities and women." (J.A.2091). Later, in 1993, Zierden allegedly told her he believed that sales decreased in stores with black managers, and that stores with Hispanic managers soon had only Hispanic employees.

One of Lowery's claims involved her application in October 1994 for a promotion to Supervisor of Management Recruiting. Cynthia Turner, Lowery's new manager, wanted to promote one of the department's recruiters to the position. Turner interviewed everyone in the department including Lowery and Paige Bell, who, along with Lowery, had also expressed interest in the position. The promotion was offered to Paige Bell, and Lowery asserts this decision was because Bell was white. Lowery noted that, while she had an undergraduate business degree and an MBA, Bell had neither. Lowery also had more supervisory experience before joining Circuit City, and had more seniority. Jeanne Linton, then the director of recruiting, testified that Lowery was one of her top three recruiters, yet admitted that the other two top recruiters, both of whom were white, were promoted to supervisory positions within five years of starting with Circuit City, while Lowery has never been promoted during her seven years with the company.

Circuit City, on the other hand, claims Bell got the position because she was more organized than Lowery. For example, Circuit City produced evidence that, during her interview, Bell used an out line she had prepared which described ways to improve the department. Lowery, by contrast, allegedly rambled her way through the interview. Moreover, Circuit City claimed that there had been no complaints about Bell's recruiting style, that she participated in staff meetings and job fairs, and had once even managed the department while Madden was on leave and had earned her colleagues' respect.

Plaintiff Peterson also alleges she was passed up for promotion because of her race. Peterson joined FNANB in February 1993 as an account management representative. In July 1993 she entered FNANB's training program, which rotates associates through different departments every few months. In May 1994, Peterson rotated into an acting assistant supervisor position in the customer service mail department. It appears that

Peterson again rotated into that department some time later. When a regular position became available in that department, Peterson applied for the position. Peterson's supervisor, Jodi Bischoff, rejected Peterson in favor of Janet Whalen, who is white. However, when offered the position, Whalen turned it down. Nevertheless, Circuit City did not then offer the promotion to Peterson, but allegedly handpicked another employee, Denise Ramos, for the position. Peterson left FNANB soon thereafter.

**\*753** Peterson presented evidence that she was employed at FNANB at a time in which it grew from seven to 1,200 employees, and yet FNANB had no African–Americans among its twenty to thirty directors and managers, and had only two African–Americans among its thirty to forty lower-level supervisors. Throughout her employment she received consistently high performance evaluations, allegedly until she applied for promotion. According to Peterson, Whalen had less experience than she did because Whalen had only one rotation as an FNANB trainee; Whalen never received supervisory experience in the customer service mail department; and Whalen had no familiarity with the reports and monitoring expected of an assistant supervisor in that department.

According to Peterson, Ramos had no prior customer service experience, no knowledge of the operating functions of the bank, no background contacting customers, and no knowledge of the company's computer system. Witnesses for Circuit City also admitted that, when Ramos was selected for the position, she was struggling in her current assistant supervisory position in another department and could not keep pace with her duties.

Circuit City, on the other hand, presented evidence that Whalen was selected over Peterson because Whalen was better qualified. While Peterson did not possess the college degree that FNANB preferred for supervisory positions, Whalen was a college graduate and former assistant supervisor. Bischoff testified that Peterson was also rejected because her performance was deficient during her two rotations as assistant supervisor. Peterson had been repeatedly cautioned for wasting work time by socializing with her supervisees, had submitted late and inaccurate monthly reports, and had completely failed to distribute three other reports. Moreover, Peterson allegedly could not competently analyze reports to identify trends in customer behavior. Finally, Circuit City

alleges that Peterson received several oral warnings about her responsibilities, but she still neglected her supervisory role while she attempted to master the paperwork.

### C. *Proceedings in the District Court*

Plaintiffs filed this case in the United States District Court for the District of Maryland on October 31, 1995, alleging, pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17, that they represented a class of African–American current and former employees at HQ who were victims of Circuit City's intentional pattern or practice of racial discrimination in employment.[1] In all, Plaintiffs' complaint alleged fifty instances of discriminatory hiring, promotions and transfers at HQ. The Plaintiffs sought: (1) a declaration that Circuit City's actions violate Title VII and § 1981; (2) a permanent injunction prohibiting Circuit City from engaging in racially discriminatory conduct and requiring it to take measures to dismantle its racially discriminatory practices; (3) compensatory damages for financial loss, humiliation, embarrassment, emotional distress, mental anguish, deprivation of the right to contract on an equal basis with other persons regardless of race and deprivation of opportunities of promotion, compensation and transfer; (4) punitive damages; and (5) an award of attorneys' fees and expenses.

On November 29, 1995, the Maryland District Court transferred the case to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). On February 25, 1996, the district court dismissed the claims of Hairston and Johnson as time barred, leaving a suit aggregating forty-six claims by nine Plaintiffs.

On April 30, 1996, the district court granted the Plaintiffs' motion to certify the suit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2). The district court certified a mandatory, non-opt-out class composed of all African–Americans employed at HQ after April 18, 1992. The district court **\*754** found that the Plaintiffs satisfied the commonality, typicality, adequacy of representation, and numerosity requirements of Federal Rule of Civil Procedure 23(a) in alleging that subjective decision-making processes had caused racial discrimination against black Circuit City employees. Noting that Rule 23(b)(2) certification is typically granted in employment discrimination cases even where monetary

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

damages are requested, the district court certified the class in accordance with Rule 23(b)(2). However, the district court stated that the certification was conditional; if events so warranted, the district court reserved the ability to alter or decertify the class pursuant to Rule 23(c)(1).

On August 23, 1996, the district court, *sua sponte,* did in fact decertify the class because of what it deemed problems of fairness and efficiency. During discovery, the Plaintiffs had filed a list of forty-six non-named class members they planned to call as trial witnesses, and acknowledged the existence of perhaps 200 additional class members with claims. Plaintiffs moved to have the district court sever the issues and adopt a bifurcated trial plan whereby the case would be tried in two stages. In Stage 1, a jury (the Class Jury) would decide class-wide liability and punitive damages, along with liability and compensatory damages on the individual claims. In Stage 2, compensatory damages for class members would be determined. [2]

The district court determined that a class action would be unfair and inefficient. First, the determination in Stage 1 of punitive damages for the entire class would be based only on evidence of (1) disparate treatment as to the class and (2) actual harm and compensatory damages as to the named Plaintiffs. In other words, the Class Jury would make its determinations without the entire universe of information, including actual harm to the individual class members and Circuit City's legitimate, non-discriminatory reasons for allegedly adverse employment actions. The district court found this to be unfair to Circuit City. Second, the district court found the method of trying class members' claims to a series of two-week juries to be cumbersome and inefficient. Moreover, evidence Circuit City would bring forth to rebut individual claims in Stage 2 would be relevant and admissible in Stage 1, thus inviting the needless repetition of evidence. The district court concluded that the benefits of class certification—accelerated and efficient disposition—would not necessarily follow in the case, but unfairness to Circuit City would be a likely result.

The district court held that the trial of the individual Plaintiffs' claims would proceed to trial as scheduled, where the issues of individual liability, damages and punitive damages would be litigated. The district court held that the Plaintiffs would be allowed to produce evidence at trial of pattern or practice discrimination,

and Circuit City would be permitted to fully defend the pattern or practice claim. If there was a finding of pattern or practice discrimination, the district court stated that Circuit City would be collaterally estopped from denying the existence of such discrimination at subsequent trials. Finding this method of case management to be more fair and efficient, the district court decertified the class. However, the district court granted the Plaintiffs' motion to stay the order decertifying the class until the end of the trial.

**\*755** On October 23, 1996, the district court granted Circuit City's motions for summary judgment as to the claims of N. Smith, S. Smith and Spencer. Thus, nineteen claims by six Plaintiffs went to trial. Trial commenced on October 28, 1996, and lasted for one month. At the beginning of the trial, the district court re-emphasized the procedural posture of the case, stating "[t]his is a case involving six individual plaintiffs.... Don't misunderstand." (J.A.2042–43).

The majority of Plaintiffs' case focused on the pattern or practice of discrimination that allegedly resulted from Circuit City's insufficiently regimented management practices. The Plaintiffs presented the testimony of twenty-three African–American employees or former employees at Circuit City's HQ. Many of these witnesses testified they left Circuit City because they were frustrated by seeing whites get promoted while they stayed in non-managerial positions. Many witnesses testified they (1) often learned of promotions only after white co-workers had been selected by a white supervisor without posting or otherwise advertising the existence of the opportunity; (2) were ignored or intimidated for complaining about promotion procedures; (3) feared retaliation if they used Circuit City's "open door" procedures; (4) were subjected to racial slurs from their supervisors, or to remarks evidencing a corporate culture of stereotypical thinking and racial animus; and (5) received lower performance ratings, making them then ineligible for promotions, after Circuit City learned of their involvement in this action.

Plaintiffs also presented at trial the testimony of a statistical expert, Dr. Andrew Harless, a labor economist. In his written report and testimony during the trial, Harless opined that: (1) the promotion rates for black employees at HQ from April 1992 through December 1995 were substantially lower than the promotion rates for similarly-situated white employees; and (2) those

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 787 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

differences were at a statistically significant level well beyond that normally applied in academic and scientific research. Circuit City introduced its own statistical experts, Drs. Joan Haworth and Peter Kolesar, who refuted Harless' conclusions, and opined that his statistics showed no evidence of racial discrimination.

At the close of the Plaintiffs' case, Circuit City moved for judgment as a matter of law on the claims of the remaining six Plaintiffs and the issue of whether Circuit City had engaged in an intentional pattern or practice of racial discrimination. The district court granted Circuit City's motion for judgment as a matter of law on the claims of P. Smith, Fleming and Stokes, but denied their motions with regard to the claims by Lowery, Peterson, and McKnight. As for the pattern or practice issue, the district court held that it was "a classic situation where a jury needs to resolve the matter." (J.A. 2824).

On instructing the jury, the district court stated that the jury had to resolve the pattern or practice question before considering whether any of the specific claims of discrimination had been established. The district court submitted a special verdict form to the jury containing twenty-four questions. The first question inquired whether the jury found that Circuit City had engaged in a pattern or practice of racial discrimination in promotions against its former and present African–American employees at its Richmond, Virginia headquarters. The district court instructed the jury that, if they answered the question in the affirmative, they were permitted—but not required—to infer that individual promotion decisions were affected by the pattern or practice. The special verdict form then asked whether Circuit City had discriminated against the three remaining Plaintiffs in fifteen claims for discrimination as to promotion. Finally, the district court entered an order lifting the stay of its earlier decertification order.

After deliberating for two and one-half days, the jury returned a verdict on December 2, 1996. The jury unanimously found that (1) Circuit City had engaged in a pattern or practice of racial discrimination; (2) Circuit City had promoted Bell over Lowery because of race; and (3) Circuit City had promoted Whalen and Ramos over Peterson because of race. However, the jury rejected all of McKnight's claims, Lowery's other two claims, and Peterson's other eight claims. In **\*756** all, the jury found in favor of the Plaintiffs on three of fifteen claims.

On Lowery's successful claim, the jury awarded her $12,500 in economic and compensatory damages and $225,000 in punitive damages. On Peterson's two successful claims, the jury awarded her $4,200 in economic and compensatory damages and $47,000 in punitive damages. On December 3, 1996, the district court entered judgment, including a judgment in favor of Plaintiffs on a pattern or practice claim. On March 12, 1997, the district court denied Circuit City's post trial motion to set aside the award of economic, compensatory and punitive damages or, in the alternative, for a remittitur, and denied Circuit City's renewed motion for judgment as a matter of law.

After a hearing on Plaintiffs' motion for a permanent injunction, the district court imposed a permanent injunction which: (1) prohibited Circuit City from engaging in any act or practice that has the purpose or effect of discriminating against any African–American employee at HQ because of his or her race; (2) required Circuit City to promote persons at HQ without regard to their race on the basis of objective, job-related and racially neutral standards; (3) prohibited Circuit City from taking "any adverse employment action against any African American employee or prior employee" (J.A. 772); (4) required Circuit City to create and staff a Department of Diversity Management, the Director of which would be principally responsible for insuring that Circuit City complied with the terms of the injunction, and the hiring of whom would be subject to comment by the Plaintiffs and court approval; (5) required Circuit City to develop within ninety days a program of diversity management, including methods and procedures to be used to prevent and eliminate discrimination with respect to promotions; and (6) required Circuit City to develop within ninety days of the Director's hiring a revised program for promotions at HQ, subject to comment by the Plaintiffs and approval, modification or rejection by the district court.

The district court set forth specific requirements that the new promotion programs must meet, including: (1) the use of common, written procedures and guidelines governing promotion selections; (2) the analysis of job openings to identify the criteria for selection; (3) the preparation of position descriptions; (4) the posting and dissemination to all HQ employees of notices of all job vacancies; (5) the keeping of records of all promotions, including the race of each applicant; (6) the review by the Director of Diversity of all promotion recommendations; (7) the

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 788 of 898

establishment of career development and mentoring for all African–American employees at HQ; (8) the monitoring and measurement of the performance of all promoters; (9) the revision of procedures for granting merit reviews of all HQ employees; (10) the revision of procedures to handle racial discrimination complaints; (11) the creation of a new diversity management training program for all promoters. The district court also required various and detailed reports from Circuit City's new Diversity Director.

In a separate section of the injunction, Section B, the district court ordered Circuit City to promote Lowery immediately to the position of Supervisor of Management Recruiting, or an equivalent position, and pay her the difference in salary and benefits that she would have earned between the date of the jury verdict and the date of her promotion. [3]

The district court retained jurisdiction of the case for at least five years, and thereafter for as long as would be required to carry out the purposes of its order. Breach of the injunction would entitle the Plaintiffs to file a motion for enforcement and for appropriate sanctions. Finally, Plaintiffs' counsel would be allowed to apply to the court quarterly for fees and expenses reasonably incurred in the monitoring and enforcement of the order.

Circuit City filed a timely appeal from the district court's judgment on the pattern or practice claim, the award of economic, compensatory and punitive damages to Lowery and Peterson, the injunction, and the denial of Circuit City's renewed motion for judgment **757 as a matter of law. The Plaintiffs then cross-appealed from the district court's order decertifying the class action, the district court's orders dismissing the claims of the other six Plaintiffs, and the entry of judgment in favor of Circuit City on McKnight's claims. In addition, the Plaintiffs ask this Court to amend the pattern or practice judgment to include the entire class.

On June 25, 1997, the district court granted Plaintiffs' application for attorneys' fees and costs in the amount of $3,911,504. Relying mainly on its finding that Plaintiffs succeeded on the pattern or practice claim, "[a] significant issue in litigation which 'achieve[d] some of the benefit the parties sought in bringing suit,' " the district court stated that Plaintiffs obtained excellent results in their civil rights suit and their attorneys should recover a full compensatory fee. (J.A. 4370) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The district court rejected Circuit City's argument that, because only two of the original eleven Plaintiffs prevailed in the suit, and because the amount of damages awarded on only three out of fifty claims was very small, an award of attorneys' fees and costs of nearly $4 million was excessive. The district court made some minor adjustments in the number of hours billed, but essentially awarded full fees and costs to the Plaintiffs. Circuit City timely appealed this award of attorneys' fees and costs.

On July 15, 1997, we granted Circuit City's emergency motion to stay, pending appeal, all provisions of the injunction except those in Section B relating to Lowery.

On January 7, 1998, the district court granted a motion by Lowery to compel Circuit City's compliance with Section B of the injunction. The district court concomitantly ordered Circuit City to pay Lowery's "lawyers their reasonable attorneys' fees and costs incurred in connection with th[e] motion to compel compliance." (Supplemental J.A. 8). The district court then directed Lowery's attorneys to file fee and cost requests along with supporting documentation by January 16, 1998. Circuit City filed a notice of appeal from the district court's January 7, 1998 order. [4]

## II

**[1]** **[2]** We first consider the Plaintiffs' cross-appeal of the district court's order decertifying their class action. We review a district court's decision to decertify a class action for abuse of discretion. *See Kidwell v. Transportation Communications Int'l Union,* 946 F.2d 283, 305 (4th Cir.1991) (citing *Stott v. Haworth,* 916 F.2d 134, 139 (4th Cir.1990); *Zimmerman v. Bell,* 800 F.2d 386, 389 (4th Cir.1986)). Issues such as class action manageability are "properly committed to the district court's discretion, because that court generally has a greater familiarity and expertise with the practical and primarily factual problems of administering a lawsuit than does a court of appeals." *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (internal quotation marks and ellipses omitted).

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

**[3]**    The Plaintiffs first argue that the district court erroneously decertified the class action because, if the four requirements of Federal Rule of Civil Procedure 23(a) are satisfied, the district court is not at liberty to consider other factors in deciding whether to certify a class. In effect, Plaintiffs argue that, once the requirements of Rule 23(a) are met, the district court loses its discretion to certify or decertify the class. This argument, however, does not comport with either the language of Rule 23 or this court's precedent. First, Rule 23 states that an action "may" be maintained as a class action if the listed requirements are met. *See* Fed.R.Civ.P. 23(a) and (b). The Rule does not say that, once the requirements are met, the district court "must" certify and maintain the suit as a class action.

**[4]**    Second, we have previously held that district courts have broad discretion in deciding whether to certify a class. *See In re* **\*758** *Catawba Indian Tribe,* 973 F.2d 1133, 1136 (4th Cir.1992). This broad discretion necessarily implies that the district court may appropriately consider factors other than those listed in Rule 23 in determining whether to certify a class action. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, ――, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997) (stating that settlement is relevant to class certification); *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (considering principles of efficiency and economy of litigation); *Califano v. Yamasaki,* 442 U.S. 682, 702–03, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (stating that, when the district court is asked to certify a nationwide class, it is appropriate to consider both whether nationwide relief is appropriate and whether such a class would improperly interfere with other litigation in other judicial districts); *Boughton v. Cotter Corp.,* 65 F.3d 823, 827 (10th Cir.1995) (stating that, in a case where injunctive relief was requested and certification was otherwise legally permissible under Rule 23(b)(2), the district court did not abuse its discretion in refusing to certify the class because the relief sought was nonetheless primarily money damages); *In re A.H. Robins Co.,* 880 F.2d 709, 740 (4th Cir.1989) (holding it was proper in determining certification to consider whether certification would "foster settlement of the case with advantage to the parties and with great saving in judicial time and services"), *abrogated on other grounds by Amchem,* 117 S.Ct. at 2247–48. *See also* 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1785, at 119, 122 (2d ed.1986

and Supp.1998) (stating that, in exercising the "broad discretion" to decide whether to allow a suit to proceed as a class action, some courts have ruled it is appropriate to take account of considerations not expressly addressed in Rule 23, including manageability in Rule 23(b)(2) cases) (collecting cases, including *In re A.H. Robins, supra* ). *But see Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1105 (5th Cir.1993) ("[Q]uestions of manageability and judicial economy are ... irrelevant to 23(b)(2) class actions."). If, as the district court found here, other factors exist that militate against trying the case as a class action, it is appropriate for the district court to decertify the class. *See Stott,* 916 F.2d at 139 ("[A]n order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate.") (citing *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 273–76 (4th Cir.1980)). As set forth above, the district court has such broad discretion to certify a class because it is intimately familiar with such practical and factual intricacies of the suit. *See Central Wesleyan College,* 6 F.3d at 185.

**[5]**   **[6]**    Here, the district court had legitimate concerns that trying the suit as a class action would be unwieldy and unfair to Circuit City. First, the district court rightly questioned whether the Plaintiffs' proposed trial procedure would be an efficient or accelerated method of disposing of the claims. While holding two-week trials with separate juries on the class members' claims would have doubtlessly been more efficient and accelerated than bringing dozens of individual suits, that fact does not require the district court to certify a class action that would nevertheless be inefficient and cumbersome. [5] Second, the district court had legitimate concerns about fairness. The Plaintiffs' proposed trial method would allow the Stage 1 jury to determine punitive damages before the Stage 2 jury hears evidence of actual harm to the class members or Circuit City's proffered justifications for its adverse employment decisions. It would have been entirely possible that the evidence adduced in Stage 1 would have resulted in stiff punitive damages, while the evidence of actual harm presented in Stage 2 would have **\*759** shown that Circuit City's actions were not sufficient to merit compensatory damages, or even egregious enough to have merited punitive damages. We cannot conclude that such concerns led the district court to abuse its discretion in decertifying the class.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 790 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

The Plaintiffs also argue, as do several of the *amici curiae,* that decertification was inappropriate because (1) the statute of limitations began running against the class members; (2) each former class member will now have to retain counsel and file a separate suit; (3) class action procedure is an important tool for the effective enforcement of civil rights laws; and (4) courts routinely certify Title VII classes under Rule 23(b)(2). Similarly, *amici* NAACP and the EEOC argue that Rule 23(b)(2) was intended to facilitate the bringing of class actions in civil rights cases, and that class actions are a favored means for both ending systemic discrimination and obtaining full relief for all the victims of such discrimination. Although these statements may be absolutely true, they are beside the point. If we were to hold these factors to be the predominant considerations for certifying a civil rights class, then nearly every suit alleging a pattern or practice of discrimination would be certified for class action because these factors would exist in nearly every case. However, the Supreme Court has rejected the proposition that merely alleging a pattern or practice of discrimination automatically entitles plaintiffs to class certification. *See Falcon,* 457 U.S. at 155–57, 102 S.Ct. 2364; *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405–06, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

In conclusion, we hold that the district court's concerns about fairness and efficiency did not lead it to abuse its discretion in decertifying the class action.

III

Circuit City next argues that the judgment of the district court with respect to the Plaintiffs' § 1981 and Title VII claims must be reversed because individuals do not have a private, non-class cause of action for pattern or practice discrimination and the Plaintiffs failed to offer either direct evidence of discrimination or circumstantial evidence of discrimination sufficient to establish claims of disparate treatment under the *McDonnell Douglas* method of proof. The Plaintiffs, on the other hand, argue that an individual cause of action alleging a pattern or practice of discrimination by the employer should be permitted because "[t]here is absolutely no logical or legal reason why *any* plaintiff cannot prove his disparate treatment theory in a § 1981 and/or a Title VII claim" through a pattern or practice claim and, therefore, the method

of proof set forth in *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), is applicable. (Appellees' Br. at 15) (emphasis in original). We agree with Circuit City that individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII. We further agree, with the exception of plaintiffs Lowery and Peterson, that the Plaintiffs failed to offer either direct evidence of discrimination or circumstantial evidence of discrimination sufficient to establish claims of disparate treatment under the *McDonnell Douglas* method of proof. [6]

[7] [8] [9] [10] [11] [12] [13] Section 707 of Title VII, 42 U.S.C. § 2000e–6, allows the federal government, either through the EEOC or through the Attorney General, to bring a civil action directly against an employer charging systematic discrimination against a protected group. In these cases, the government has to demonstrate that there exists "a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII]...." 42 U.S.C. § 2000e–6(a). The government's burden in a pattern or practice action is to "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that racial discrimination [is] the company's standard operating **\*760** procedure—the regular rather than unusual practice." *Teamsters,* 431 U.S. at 335–36, 97 S.Ct. 1843 (footnote and internal quotation marks omitted). At this initial "liability" stage, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a *prima facie* case that such a policy existed. *See id.* at 360, 97 S.Ct. 1843. Once established, the burden of proof then shifts to the employer to demonstrate that the government's showing of a pattern or practice of discrimination is either inaccurate or insignificant. *See id.* If the employer fails to rebut the government's *prima facie* case, the resulting finding of a discriminatory pattern or practice gives rise to an inference that all employees subject to the policy were its victims and are entitled to appropriate remedies. *See id.* at 362, 97 S.Ct. 1843. Such a finding justifies an award of prospective relief, but the government may also seek individual relief for the victims of the discriminatory practice. *See id.* at 361, 97 S.Ct. 1843. In such a case, the district court usually conducts proceedings in a "remedial" stage to determine the scope of individual relief. To obtain relief for individual employees, the government

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 791 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

must demonstrate that the employees were actual victim of the policy. *See id.* at 362, 97 S.Ct. 1843. However, the burden still remains on the employer to prove that the employee was denied an employment opportunity for lawful reasons. *See id.* at 361–62, 97 S.Ct. 1843.

Although § 707 applies to suits brought by the government, the *Teamsters* decision implicitly endorsed the application of pattern or practice principles and rules of proof to class action lawsuits brought by private parties. *See id.* at 357–60, 97 S.Ct. 1843. The courts of appeals have seized on that endorsement and permitted pattern or practice class action suits using the *Teamsters* method of proof. *See, e.g., Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1559 (11th Cir.1986); *Sledge v. J.P. Stevens & Co.,* 585 F.2d 625, 637 (4th Cir.1978).

**[14]   [15]   [16]   [17]   [18]   [19]**   On the other hand, in a private, non-class action, where individual plaintiffs allege discrimination in violation of Title VII, the plaintiffs typically prove that discrimination by satisfying the shifting burden of proof scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. A plaintiff attempting to prove a Title VII claim of discrimination with circumstantial evidence must first establish a *prima facie* case. *See id.* at 802, 93 S.Ct. 1817. In order to establish a *prima facie* case of, for example, failure to promote, the plaintiff must show: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994); *Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 121 (4th Cir.1991). In a case such as this, where the plaintiffs are alleging that they were passed over for promotions because they were black, the fourth prong can be satisfied by a showing that the positions were filled by white applicants. *See Carter,* 33 F.3d at 458. Once the plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to the employer to rebut the plaintiff's *prima facie* case by articulating a legitimate, non-discriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. In a case such as the one before us, the employer may rebut the plaintiff's "*prima facie* case by demonstrating that the white selectee was

better qualified for the position." *Carter,* 33 F.3d at 458. If the employer articulates a legitimate, non-discriminatory reason for the employment action, the plaintiff bears the burden of proving that the employer's articulated reason is a pretext for discrimination. *See id.*

**[20]**   At this point, the issue before us is whether individuals have a private, non-class cause of action for pattern or practice discrimination and, thus, may avail themselves of the *Teamsters* method of proof. For the reasons stated below, we conclude that, although such plaintiffs may use evidence of a pattern or practice of discrimination to help **\*761** prove claims of individual discrimination within the *McDonnell Douglas* framework, individual plaintiffs are not entitled to the benefit of the *Teamsters* method of proof.

The Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit charging employment discrimination. Rather, the Court has noted that there is a "manifest" and "crucial" difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination. *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). In a class action pattern or practice case, the plaintiffs first litigate the common question of fact, i.e., whether the employer utilized a pattern or practice which discriminated against the class. *See id.* at 880, 104 S.Ct. 2794. When the class plaintiffs prove the existence of a discriminatory practice, then that finding benefits them in the adjudication of individual claims by creating a presumption that the individual class members were victims of the discriminatory practice. *See Teamsters,* 431 U.S. at 361–62, 97 S.Ct. 1843.

**[21]   [22]**   On the other hand, an individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Evidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a *prima facie* case, that the individual's adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination, *see Carter,* 33 F.3d at 458; *Alvarado,* 928 F.2d at 121, or that the employer's articulated reasons for the adverse action was

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 792 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

merely pretext, *see Carter,* 33 F.3d at 456, or to establish the plaintiff's ultimate burden. However, statistics alone cannot establish a *prima facie* case of individual disparate treatment, for all four elements of a *prima facie* case must be established. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131–32 (11th Cir.1984). The Supreme Court has never indicated that an inference of discrimination should arise in an individual case until the plaintiff has proved *all* elements of a *prima facie* case. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

We also note that class action pattern or practice suits differ from disparate treatment suits in the nature of their remedies. Class action pattern or practice suits primarily seek to redress widespread discrimination and the harm suffered by the group of individuals subjected to that discrimination. Accordingly, the relief typically sought in class action pattern or practice suits is injunctive and may include such aspects as, for example, affirmative action plans and the altering of a seniority system. *See* 1 Larson, *Employment Discrimination* § 8.01[3], at 8–14 (2d ed.1994). The need for such remedies can be determined without referring to matters such as the qualifications of a particular employee. On the other hand, in a private, non-class disparate treatment case, the plaintiff seeks to remedy individual harm. Accordingly, the relief typically sought involves reinstatement, hiring, back-pay, damages, etc. Such remedies typically require the examination of the circumstances surrounding a single employment action involving the plaintiff.

In sum, because the Supreme Court has never applied the *Teamsters* method of proof in a private, non-class action for employment discrimination, and because the nature of the proof and remedies in class and government pattern or practice actions differs vis-a-vis private, non-class actions, we decline to give individual plaintiffs a pattern or practice cause of action or allow them to use the *Teamsters* method of proof.

The relevant case law on the subject supports our conclusion. In *Scarlett v. Seaboard Coast Line R.R.,* 676 F.2d 1043 (5th Cir.1982), the Fifth Circuit rejected the plaintiffs' suggestion that they could use evidence of systematic discrimination *alone* to prove instances of individual discrimination, reasoning that individuals proceeding on circumstantial evidence of discrimination under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell*

*Douglas. See id.* at 1053. Despite **\*762** evidence of a pattern or practice of discrimination, the court of appeals held that the plaintiffs did not have a claim because they had failed to prove all the elements of an individual claim. *See id.* Later, in *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207 (5th Cir.1995), the Fifth Circuit stated, in the context of a private, non-class action suit, that "[a] 'pattern or practice' claim is not a separate cause of action, but merely another method by which disparate treatment can be shown." *Id.* at 1219. *See also Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866–67 n. 6 (7th Cir.1985) ("Plaintiffs' use of 'pattern-or-practice' language ... seems to be misplaced, since such suits, by their very nature, involve claims of classwide discrimination, and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.").

*Cox* and *Davis v. Califano,* 613 F.2d 957 (D.C.Cir.1979), cases cited by the Plaintiffs, are not in conflict with our holding. In *Cox,* the district court decertified the class, but nevertheless tried the individual plaintiffs' pattern or practice claims. *See Cox,* 784 F.2d at 1558. On appeal, the Eleventh Circuit approved of the pattern or practice claims, but only after it held that the district court had erroneously decertified the class. *See id.* at 1558–60. Thus, the pattern or practice claims in *Cox* were appropriately brought in the context of a class action case. *Cox* does not, however, stand for the proposition that individual plaintiffs may bring pattern or practice claims.

In *Davis,* the District of Columbia Circuit stated that "[s]tatistical proof may alone be used, without presentation of specific instances of discrimination, to establish a *prima facie* case of employment discrimination." *Davis,* 613 F.2d at 962. However, the court remanded the case for determination of whether the employee was denied promotion for lawful reasons and, presumably, for determination whether those reasons were merely pretextual. *See id.* at 966. Although we disagree with *Davis* that statistical evidence alone may be used to establish a *prima facie* case of employment discrimination, *see Carmichael,* 738 F.2d at 1131–32, *Davis* is consistent with our conclusion that private, non-class actions alleging employment discrimination would still follow the *McDonnell Douglas* proof scheme. "Even *Davis* ... recognizes that once statistics have established a pattern of discrimination, each individual plaintiff must still establish that he has been denied an employment

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

benefit in order to recover for particularized injuries." *Id.* at 1132 (internal alterations, ellipses and quotation marks omitted).

**[23] [24] [25] [26]** Because the Plaintiffs cannot avail themselves of the *Teamsters* method of proof, and because they do not have direct evidence of discrimination, we now turn to consider whether they established their disparate treatment claims under the *McDonnell Douglas* method of proof. We have carefully examined the evidence in the record and conclude that Plaintiffs Spencer, N. Smith, P. Smith, and Fleming failed to establish a *prima facie* case of discrimination under that method of proof. Additionally, S. Smith failed to establish a *prima facie* case with respect to one of her two separate claims. Spencer alleged she was twice passed over for Maintenance Coordinator because of her race. However, she did not present sufficient evidence that she applied for the position, or that she had the minimum qualifications necessary for the position. Both N. Smith and P. Smith alleged they were denied promotions to Customer Service Supervisor due to their race. However, they both failed to prove they were qualified for the position because neither had ever served as Customer Service Assistant Supervisor as Circuit City required. Fleming alleged he was denied a promotion to Real Estate Relocation Coordinator in the Real Estate Department because of his race. However, he failed to prove he was qualified for the position because he never obtained his real estate license as Circuit City required for that position. No reasonable evidence was introduced showing that the licensing requirement was imposed as a pretext for racial discrimination. S. Smith alleged she was discriminatorily passed over for promotion to Division Accounting Analyst. However, the record is clear that she voluntarily withdrew her application and, thus, did not apply for the position. **\*763** There is no indication it was futile to apply or that Circuit City somehow prevented her from applying. We, therefore, affirm the grant of summary judgment and judgment as a matter of law against these Plaintiffs.

**[27] [28]** As for Stokes' claim and S. Smith's remaining claim, even if they established a *prima facie* case, we conclude below that they failed to demonstrate that Circuit City's articulated reasons for passing them up for promotion were pretextual. Stokes alleged that Circuit City failed to promote him to a position of Supervisor in the Merchandise Payables Department because of his race. Circuit City articulated that Kevin Gremer was selected for the position because he was more qualified than the other applicants. Critically, while Stokes offered evidence of his qualifications, including his experience as a Specialist in the Merchandise Payables Department, he failed to offer any evidence that his qualifications were superior to Gremer's qualifications. Indeed, Stokes fails to offer any evidence of Gremer's qualifications or lack thereof. The mere assertion that Stokes was more qualified than Gremer is insufficient to establish pretext. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)* (stating that plaintiff can not rely on conclusory allegations to create factual dispute warranting trial); *Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir.1989)* ( "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

**[29]** S. Smith alleged she was passed over for promotion to Treasury Analyst because of her race. The job posting stated that the Treasury Department was "seeking a highly motivated and achievement-oriented team player with excellent communication and organizational skills." (J.A. 500). In addition, "[s]trong analytical and decision-making skills [were] essential" for the position. *Id.* After interviewing S. Smith, the promoter, Shelly Steadman, found that S. Smith's position as Specialist in the Merchandise Payables Department had not prepared her for the position of analyst in the Treasury Department. In addition, Steadman felt that S. Smith did not communicate with enough assertiveness. Steadman interviewed two other applicants—one white and one African–American—but felt that neither of them possessed the abilities needed for the position, either. After failing to fill the position, Steadman hired Janet Klingenburg as a temporary employee to prepare some reports that were in urgent need of completion. Klingenburg had a degree in accounting and was in the process of getting her accreditation as a Certified Public Accountant (CPA). She had been working as an actuary and, thus, possessed many of the analytical skills needed for the Treasury Analyst position. After preparing the report in a manner Circuit City described as "excellent," and demonstrating her assertiveness and communication, analytic and computer skills, Circuit City offered Klingenburg the Treasury Analyst position.

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 794 of 898

Circuit City stated that Klingenburg received the Treasury Analyst position because she was more qualified than S. Smith. S. Smith's response was that: (1) Klingenburg was new to Circuit City and, thus, not familiar with the Treasury Department; (2) CPA certification was not one of the posted job requirements; and (3)"assertiveness" was merely a subjective qualification used to discriminate against her because of her race. These responses did not sufficiently demonstrate that Circuit City's articulated reasons for selecting Klingenburg were pretextual. First, the job posting did not require familiarity with the Treasury Department, so it was not inappropriate to hire from outside Circuit City. Second, although the position did not require CPA certification, the fact that Klingenburg was seeking such certification demonstrated that she was a "highly motivated and achievement-oriented" person as the job posting requested. (J.A. 500). Finally, assertiveness is an inherent aspect of "excellent communication ... and decisionmaking skills." *Id.* We therefore conclude that S. Smith failed to demonstrate that Circuit City's articulated reasons for rejecting her in favor of Klingenburg were merely pretextual.

**\*764** Although a plaintiff in a Title VII action may sometimes be able to use statistical evidence of a pattern or practice of discrimination to help establish pretext, this is not such a case. Dr. Harless' statistical analysis of promotions at Circuit City failed to adequately control for factors other than race that could account for the disparity in promotions. One notable omission from Harless' study was the factor that educational level had on promotions at Circuit City. Even if a given educational level was not required for all positions at Circuit City, the record is clear—and common sense dictates—that for many positions educational background was crucial. However, the evidence in this case showed that, while fifty-five percent of HQ employees had college degrees, only thirty-three percent of Circuit City's African–American HQ employees were college graduates. Despite such a large disparity in the educational levels of employees at Circuit City's HQ, Harless failed to consider how educational level affected promotions. We conclude that the failure to consider this factor is sufficiently serious so as to weaken the statistical study's probativeness. *See Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (Brennan, J., concurring in part, adopted by the full Court).

In sum, we affirm the grant of summary judgment against S. Smith, Spencer and N. Smith, and affirm the grant of judgment as a matter of law against Stokes, Fleming and P. Smith. [7]

## IV

**[30]** Next, Circuit City complains that several actions taken by the district court in managing discovery precluded Circuit City from establishing an effective defense. We disagree. We review a district court's actions in managing discovery for abuse of discretion. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 929 (4th Cir.1995).

## A

**[31]** After the district court certified the class action, the parties moved for a clarification of the circumstances under which Circuit City could communicate directly with its African–American employees and former employees. The district court entered an order on May 31, 1996, limiting Circuit City's communications with African–American employees to non-litigation related matters, and prohibiting all other communications except with prior consent of class counsel or the district court. The order also prohibited discovery of class members other than the named Plaintiffs and those class members whom the Plaintiffs intended to call as witnesses at trial. The basis for the district court's limitations was Virginia Code of Professional Responsibility Disciplinary Rule 7–103, which prohibits attorneys from communicating with opposing parties except through opposing counsel. Circuit City complains that this limitation effectively barred Circuit City from communicating with African–American employees who wished to contradict the Plaintiffs' assertions, including employees who wanted to initiate the communication.

Although the district court's order limited *ex parte* communications between Circuit City and its African–American employees at HQ, the order also indicated that, if Circuit City wished to communicate with class members outside the given limitations, Circuit City could apply to the district court for permission to do so. Circuit City merely had to justify why the communication should be exempt from Rule 7–103. The record shows that Circuit

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 795 of 898

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (1998)

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

City made several such motions, and that the district court readily granted the motions when Circuit City explained why it was necessary to do so. The district court did not, however, grant those motions when Circuit City failed to outline a sufficiently important need for an exception to Rule 7–103.

**\*765** Circuit City points to no particular denial it alleges was erroneous, nor to any particular employee with whom it needed to communicate in order to establish an effective defense. Rather, Circuit City merely complains it was prohibited from communicating with any employee it wished. If there were employees with whom Circuit City needed to communicate, the procedures were available for Circuit City to gain permission to do so. The fact that Circuit City failed to utilize those procedures does not mean that the district court's limitations on *ex parte* communications precluded Circuit City from establishing an effective defense. Furthermore, because Circuit City has failed to identify any prejudice which resulted from the district court's limitations on communications, any error in imposing those limitations was harmless.

B

**[32]** Circuit City also claims it was precluded from establishing an effective defense because the district court refused to compel the discovery of certain information used by Plaintiffs' statistical expert, Dr. Harless. Circuit City wished to review the methods, data, sources, computer programs, data runs, and codes that Dr. Harless used in performing his statistical analysis of Circuit City's promotion decisions. In response to Circuit City's motion to compel disclosure of this information, the Plaintiffs demonstrated that the data runs, computer programs and codes used by Dr. Harless were produced and developed by other non-testifying consultants retained by the Plaintiffs. Because Circuit City did not demonstrate exceptional circumstances, the district court denied Circuit City's motion to compel discovery of this information. We hold that the district court did not abuse its discretion in refusing to compel this discovery.

Federal Rule of Civil Procedure 26(b) allows discovery of information held by non-testifying experts only upon a "showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."

Fed.R.Civ.P. 26(b)(4)(B). Circuit City directs us to no place in the record where it made such a showing and, in any event, the record demonstrates that Circuit City was able to obtain sufficient information by other means. Harless submitted a detailed expert report as required by the rules, setting forth each of his opinions and providing supporting reasons and exhibits. Circuit City was able to thoroughly examine Harless during his deposition about the bases of, and the methods used for, his analysis. In addition, Circuit City's statistical experts, Drs. Haworth and Kolesar, examined and refuted Dr. Harless' analysis. Given these facts, we cannot conclude the district court abused its "substantial discretion in managing discovery" by denying Circuit City access to this information. *See Lone Star Steakhouse,* 43 F.3d at 929.

In summary, we hold that the district court's limitations on communication with class members [8] and its refusal to compel discovery of Dr. Harless' data runs, computer programs, codes, etc., did not preclude Circuit City from establishing an effective defense.

V

Circuit City next argues that the district court erred in submitting the issue of punitive damages to the jury. We agree.

**[33]** **[34]** **[35]** **[36]** A plaintiff who brings a successful action under 42 U.S.C. § 1981 is entitled to equitable relief, compensatory damages and, "under certain circumstances," punitive damages. [9] *Stephens v. South Atlantic Canners, Inc.,* 848 F.2d 484, 489 (4th Cir.1988) (citing *Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). However, not every action under § 1981 warrants an award of punitive damages. *See id.* Punitive damages are only recoverable for conduct exhibiting "malice, an evil motive, or recklessness or callous **\*766** indifference to a federally protected right." *Id.* (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). It is an "extraordinary remedy," designed to punish and deter "particularly egregious conduct." *Stephens,* 848 F.2d at 489 (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). "Although any form of discrimination constitutes reprehensible and abhorrent conduct, not every lawsuit

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

under § 1981 calls for submission of this extraordinary remedy to a jury." *Id.* at 489–90.

**[37]**   In our view, there is simply insufficient evidence in the record to conclude that Circuit City's conduct toward Lowery and Peterson was so egregious that it was appropriate to submit the issue of punitive damages to the jury. The record is clear that Lowery and Peterson had problems that, at least partially, led to their being passed up for promotion. In light of this evidence, the extraordinary remedy of punitive damages was not appropriate, notwithstanding the jury's finding that Circuit City did not promote Lowery and Peterson because of their race. We conclude that the district court erred in submitting this issue to the jury and, consequently, vacate the award of punitive damages.

VI

**[38]**   Circuit City next complains of the injunction imposed by the district court, arguing the injunction is impermissibly over-broad. We review the district court's grant of a permanent injunction for abuse of discretion. *See Lone Star Steakhouse,* 43 F.3d at 939. As we explain below, we affirm the portions of the injunction contained in Section B that relate to Lowery. However, because we conclude that the remaining portions of the injunction inappropriately grant what amounts to class-wide relief, we hold that the district court abused its discretion in granting that relief and vacate those portions.

**[39]** **[40]** **[41]**   We have explained that the standard to be applied by the courts of this circuit in determining the appropriate remedy for racial discrimination is that the plaintiff should be placed in as near a position as possible to where he/she would have been now had the discrimination not occurred. *See Pecker v. Heckler,* 801 F.2d 709, 711 (4th Cir.1986). Being equitable relief, an injunction should be no broader than necessary to achieve its desired goals. *See Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Moreover, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (citing *Yamasaki,* 442 U.S. at 702, 99 S.Ct. 2545). Ordinarily, class-wide relief for disparate treatment discrimination is appropriate only where there is a properly certified class, *see Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 361 (1st

Cir.1989), although occasionally individual relief equates to classwide relief, *see, e.g., Thomas v. Washington County Sch. Bd.,* 915 F.2d 922, 925–26 (4th Cir.1990) (directing the district court to fashion what amounted to class-wide injunctive relief in a case where an individual plaintiff proved that the employer's hiring practices had a disparate impact on minorities). For several reasons, the district court's injunction violates these principles.

**[42]**   First, although the district court appropriately decertified the class action, the provisions of the injunction grant class-wide remedies. The injunction requires Circuit City to promote all persons at HQ without regard to their race, and requires Circuit City to set up a Department of Diversity Management and revise its program of promoting employees. To ensure that the provisions of the injunction are carried out, it includes labyrinthine provisions for reporting and enforcement. Many aspects of the new programs are subject to Plaintiffs' approval, for which Plaintiffs' counsel may apply quarterly for fees and expenses incurred in the monitoring and enforcement of the order. Oversight by the Plaintiffs and the district court would occur for at least five years, and possibly longer if it was deemed necessary to carry out the purposes of the injunction. Such sweeping remedies far surpass those needed—and are far more burdensome than **\*767** needed—to provide the prevailing Plaintiffs with complete relief.

**[43]**   Second, the Director of the Department of Diversity Management is required to establish a career development and mentoring program for all African–American employees. Not only is this class-wide relief, but the record clearly shows that minorities other than just African–Americans are also employed by Circuit City. Third, the district court admits that the breadth of its injunction was due to the verdict in favor of the Plaintiffs on the pattern or practice claim. Because, as we hold above, individuals may not bring a claim of pattern or practice discrimination, this "claim" cannot support an injunction which grants such broad and sweeping relief.

**[44]**   Fourth, the order essentially enjoins Circuit City from committing further violations of federal civil rights laws. This is the sort of go-thy-way-and-sin-no-more provision which we invalidated in *Davis v. Richmond, Fredericksburg & Potomac R.R.,* 803 F.2d 1322 (4th Cir.1986). The district court in that case enjoined the employer from "committing further violations of Title VII." *Id.* at 1328. We held that such an

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

injunction impermissibly subjects a defendant to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged. *See id.*

[45] Fifth, the injunction permanently enjoins Circuit City from taking "any adverse employment action against any African American employee." (J.A. 772). On its face, therefore, the injunction would prevent Circuit City from taking an adverse employment action against an African–American employee, even if the employee indisputably merited the adverse action and the action was undeniably nondiscriminatory.

[46] The injunction's provisions in Section B relating to Lowery, on the other hand, are broad enough to provide her with complete relief without being overly burdensome or expansive. These provisions require Circuit City to promote Lowery to the position of Supervisor of Management Recruiting or an equivalent position, and to pay her the difference in salary between what she earned and what she would have earned had she been appropriately promoted. In other words, these provisions place Lowery in as near a position as possible to where she would be now had the discrimination not occurred. *See Pecker,* 801 F.2d at 711. We, therefore, affirm the provisions in Section B of the injunction relating to Lowery, but vacate all other portions of the district court's injunction. We also affirm the district court's January 7, 1998 order granting Lowery's motion to compel Circuit City's compliance with Section B of the injunction and awarding Lowery her reasonable attorneys' fees and costs incurred in connection with that motion to be subsequently determined.

## VII

[47] Finally, Circuit City argued that the district court erroneously awarded in general the Plaintiffs attorneys' fees and costs. We review an award of costs and attorneys' fees for abuse of discretion. *See Reich v. Walter W. King Plumbing & Heating Contractor, Inc.,* 98 F.3d 147, 151 (4th Cir.1996) (citing *Pierce v. Underwood,* 487 U.S. 552, 557–63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

[48] Our court has recognized that the most critical factor in calculating a reasonable fee award is the degree of success obtained. *See McDonnell v. Miller Oil Co.,* 134 F.3d 638, 641 (4th Cir.1998) (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933). When the plaintiffs have achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. *See id.* (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933).

[49] Here, the district court justified its award of full attorneys' fees and costs on the Plaintiffs' success on their pattern or practice claim. However, because we hold above that individual plaintiffs may not bring a claim for pattern or practice discrimination, the jury's finding here cannot support a recovery of attorneys' fees for those Plaintiffs that did not otherwise succeed in this action. Furthermore, viewing the case as a whole, we conclude that the Plaintiffs in fact achieved a **\*768** very low degree of success. The Plaintiffs brought this suit as a class action, but the district court appropriately decertified the class action at the beginning of trial. The suit originally involved fifty claims filed by eleven Plaintiffs, but only fifteen claims of three Plaintiffs survived motions for dismissal, summary judgment and judgment as a matter of law. Of the fifty claims filed, the Plaintiffs prevailed on only three. In all, the Plaintiffs recovered only $16,700 in compensatory damages.

In light of the low degree of success the Plaintiffs enjoyed, we hold that district court abused its discretion in awarding the Plaintiffs all of their accrued attorneys' fees and costs amounting to nearly $4 million. *See McDonnell,* 134 F.3d at 641. We, therefore, vacate the award of attorneys' fees and remand to the district court for redetermination in light of this opinion.

## VIII

In summary, for the reasons stated above, we: (1) affirm the district court's order decertifying the class action; (2) vacate the judgment entered on the claim for pattern or practice of discrimination; (3) affirm the grant of summary judgment against N. Smith, S. Smith, and Spencer, and the grant of judgment as a matter of law against P. Smith, Fleming and Stokes; (4) affirm the verdicts in favor of Lowery and Peterson; (5) vacate the award of punitive damages; (6) affirm the provisions of the injunction relating to Lowery in Section B, but vacate all other provisions; (7) affirm the district court's grant of Lowery's motion to compel compliance with Section B of the injunction and award of reasonable attorneys' fees and

77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605...

costs in connection with that motion; and (8) vacate the general award of attorneys' fees and costs, and remand with instructions to redetermine costs and fees in a manner consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.*

**All Citations**

158 F.3d 742, 77 Fair Empl.Prac.Cas. (BNA) 1319, 74 Empl. Prac. Dec. P 45,605, 41 Fed.R.Serv.3d 1116

Footnotes

1   The original complaint only alleged claims under § 1981. In addition, Peterson filed her case separately, but the district court consolidated her case with that of the other ten plaintiffs. The Plaintiffs later amended their complaint to include class action claims under Title VII and to add Peterson as a plaintiff.

2   The Plaintiffs' proposed trial plan was as follows. In Stage 1, the Class Jury would determine: (1) class-wide liability, including whether Circuit City engaged in a pattern or practice of racial discrimination with respect to promotions or transfers at HQ; (2) class-wide punitive damages; (3) liability and compensatory damages for the named Plaintiffs. At the conclusion of Stage 1 the Class Jury would be discharged and, if appropriate, the court would grant declaratory and/or injunctive relief.

    If there was a finding of class-wide discrimination during Stage 1, then Stage 2 proceedings would commence. Notice of claims would be sent to class members, who would be allowed to file claims. The parties would be permitted to conduct limited discovery concerning these claims, and the class members' claims would be tried to a series of separate juries, each sitting for approximately two weeks, until the claims of all class members had been heard. These separate juries would determine whether each class member was a victim of Circuit City's discriminatory conduct and, if so, the amount of compensatory damages to be awarded to that class member. Finally, the court would determine and award each Plaintiff and class member receiving compensatory damages a portion of the total punitive damages approved by the court.

3   Because Peterson had left FNANB, the Plaintiffs' motion for a permanent injunction did not ask for, and the injunction did not grant, similar relief for Peterson.

4   After briefing and oral argument in the instant consolidated appeal, on July 21, 1998, the district court ordered Circuit City to pay Lowery $46,075.00 in attorneys' fees and costs in connection with her motion to compel Circuit City's compliance with Section B of the injunction. This fee and cost award is the subject of a separate appeal that is not part of the instant appeal.

5   We note that, in affirming the district court's decertification of the class due to concerns about case manageability, we do not mean to imply that the factors for certifying a Rule 23(b)(3) class should be imported into Rule 23(b)(2) classes. Nevertheless, because efficiency is one of the primary purposes of class action procedure, *see Falcon,* 457 U.S. at 159, 102 S.Ct. 2364 (citing *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)), we hold that in appropriate circumstances a district court may exercise its discretion to deny certification if the resulting class action would be unmanageable or cumbersome.

6   Our case law recognizes that "the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981." *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). Accordingly, our discussion below regarding the Plaintiffs' Title VII claims encompasses their claims under § 1981.

7   Circuit City argues that several errors in the district court's instructions necessitate reversal of Lowery and Peterson's individual discrimination claims. Circuit City also argues there was insufficient evidence for the jury to find in favor of Lowery and Peterson on their individual claims of discrimination. We have thoroughly reviewed these assignments of error and find them to be without merit. Accordingly, we affirm the district court's judgment with respect to Lowery and Peterson.

8   The class was not decertified until the beginning of the trial.

9   A plaintiff that successfully brings an action for violations of both § 1981 and Title VII may only recover damages under § 1981. *See* 42 U.S.C. § 1981a(a)(1).

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 15

307 F.3d 1092
United States Court of Appeals,
Ninth Circuit.

Wendell LYONS; Donald Tate; Robert L.
Claiborne; Rosevelt Willson, Plaintiffs–Appellants,

v.

Gordon R. ENGLAND, [*] Secretary
of the Navy, Defendant–Appellee.

No. 00–55343.
|
Argued and Submitted Sept. 10, 2001.
|
Withdrawn from Submission Nov. 14, 2001.
|
Resubmitted Oct. 2, 2002.
|
Filed Oct. 9, 2002.

Male African-American military veterans brought action against the Secretary of the Navy, alleging that they had been subjected to disparate treatment because of their race and that they had suffered retaliation, in violation of Title VII. The United States District Court for the Southern District of California, Thomas J. Whelan, J., granted summary judgment in favor of Secretary, and veterans appealed. The Court of Appeals, Betty B. Fletcher, Circuit Judge, held that: (1) veterans exhausted their administrative remedies with respect to challenged conduct that occurred after the filing of their Equal Employment Opportunity Commission (EEOC) charge; (2) veterans' pre-limitations period claims, based on the alleged discriminatory assignment of details, were time-barred; (3) veterans were permitted to offer evidence of their pre-limitations period claims as "background" evidence of their timely failure-to-promote claims; (4) two veterans successfully rebutted Secretary's proffered legitimate reasons for denying them promotions to deputy planning manager and program manager positions, and could proceed to trial on those claims; (5) veterans preserved a triable issue as to whether Secretary's reasons for denying them promotion to GS-13 positions were pretextual; and (6) veteran who received an average or mediocre performance rating failed to make out a prima facie case of unlawful retaliation.

Affirmed in part, reversed in part, and remanded.

**Attorneys and Law Firms**

**\*1100** Lynn H. Ball, San Diego, CA, for the appellants.

Patrick K. O'Toole, United States Attorney, Carol C. Lam, United States Attorney, Donald F. Shanahan, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California; Thomas J. Whelan, District Judge, Presiding. D.C. No. CV–98–00690–TJW.

Before: B. FLETCHER, T.G. NELSON, and BERZON, Circuit Judges.

**Opinion**

BETTY B. FLETCHER, Circuit Judge.

Plaintiffs-appellants Wendell Lyons, Donald Tate, Robert Claiborne, and Rosevelt Willson appeal a grant of summary judgment in favor of defendant-appellee Gordon R. England, Secretary of the Navy, against appellants' claims that appellee violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* during the course of their employment at the Naval Aviation Depot North Island, San Diego, California ("NADNI"). Appellants claim that appellee subjected African–American male employees at NADNI to unlawful disparate treatment by denying them favorable work assignments and job promotions over a period of several consecutive years. Appellant Tate additionally claims that appellee retaliated against him for filing charges with the Equal Employment Opportunity Commission ("EEOC").

The district court granted summary judgment in favor of appellee on all of the appellants' claims. The court ruled that appellee could not be held liable either for the discriminatory allocation of work assignments occurring outside of the 45–day limitations period in which federal employees must contact an Equal Employment Opportunity ("EEO") counselor regarding their claims, 29 C.F.R. § 1614.105(a)(1), or for management's failure to promote appellants to available positions subsequent to the filing of their EEOC charges. We affirm the district court's ruling that appellants' pre-limitations period claims are time-barred, but we reverse its ruling that

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 801 of 898

appellants failed to exhaust their administrative remedies. With regard to appellants' properly presented failure-to-promote claims arising out of incidents occurring before and after their charges were filed, we reverse summary judgment and remand for trial as to all appellants. However, we affirm the district court's decision to grant summary judgment denying Tate's claim of unlawful retaliation.

## I. BACKGROUND

Appellants are all African–American, male military veterans, each of whom has served for over 30 years at NADNI. Appellants allege that, from 1991 until the filing of their complaint in April 1998, appellee engaged in a pattern or practice of discrimination against African–American **\*1101** men through discriminatory work assignments and non-selection for promotion to positions at or above the GS–13 level.

In 1991, NADNI underwent a work reorganization, during which employees from the Engineering Department were reassigned to the Production Department, where appellants worked. Before the reorganization, both Tate and Lyons held the position of Program Manager. Appellants allege that, after the reorganization, they were removed to "non-career enhancing jobs" and replaced in their former positions by white males. Neither appellant has since been reinstated to his former managerial status.

Appellee responds that the responsibilities of Program Managers changed after the reorganization from mere tracking and reporting of production before 1991 to extensive product management and worker supervision after 1991. For this reason, appellee alleges that Program Manager positions became GS–13 positions, and appellants ceased to be eligible for them. Regardless, appellants Tate and Lyons continue to hold a GS–12 rating to the present day, while their replacements have obtained a GS–14 rating in the intervening years. Appellants allege that, since 1991, they have been denied favorable assignment to temporary "details" that would have helped them prepare for advancement to GS–13 positions.

A "detail" consists of an employee's temporary assignment to a position or set of duties without receiving an actual upgrade in pay or job status that would accompany a permanent promotion. Details are considered desirable to the extent they give employees an opportunity to gain experience relevant to positions to which they seek promotion. NADNI regulations governing the distribution of work details forbid any individual employee from holding a detail position for more than 120 days in any given year without being permanently reassigned to that position. In situations where employees possess the same degree of education, seniority, and positive work evaluation, the fact that one employee rather than another has previously been detailed to the same or a comparable position may weigh crucially in the determination of who ultimately is more deserving of promotion.

Appellants allege that NADNI routinely assigned employees to details as a means of preparing them for advancement to permanent positions when openings occurred. Appellants offered into evidence before the district court several examples of individuals, not within their protected class, who received promotions after first receiving favorable detail assignments. [1]

Appellants further allege that the manner in which these details were assigned routinely deviated from established NADNI procedures. To that end, appellants produced the testimony of Judith Groshek, a Director of Competency Management at NADNI from 1996 to 1997, who testified that supervisors at NADNI frequently failed to advertise available details and to properly record their assignment. In addition, appellants presented evidence that at least one white employee, David Williamson, had been assigned to a supervisory detail for two consecutive years (from April 1994 through November 1996) before **\*1102** receiving a permanent promotion to a GS–13 position. Appellants allege that, as a consequence of being denied access to such details, they were prevented from obtaining promotions.

In 1995, NADNI underwent yet another reorganization, requiring numerous reassignments of personnel and the elimination of several positions. In June 1996, appellants contend that management awarded two promotions on a non-competitive basis to persons not within their protected class. These alleged promotions filled the positions of Deputy Planning Manager and Program Manager. Appellee denies that appellants were qualified for these positions, since the positions were designated as GS–13 positions and no plaintiff held GS–13 status. Furthermore, appellee denies that these positions were assigned through non-competitive promotions; rather,

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 802 of 898

appellee alleges that the 1996 reassignments were merely personnel actions intended to document the effects of the reorganization that had occurred over a year earlier, and not promotions at all. In any case, it was these alleged promotions that prompted appellants to file their official charges of racial discrimination with the EEOC.

Appellants made initial contacts with an EEO counselor on June 20, 1996, and, by September 27, 1996, they had filed their formal charges with the EEOC. In those charges, they raised allegations of discrimination with regard to both the June 1996 promotions and the prior assignment of details stretching back to 1991. Appellants alleged disparate treatment by a pattern or practice of discrimination which systematically excluded black males from supervisory positions through the discriminatory allocation of details and promotions.

In December 1996, the EEOC issued a Notice of Acceptance letter, reporting that appellants' allegations of discrimination regarding their non-selection for the Deputy Planning Manager and Program Manager positions in June 1996 had been accepted for investigation. However, the EEOC requested additional information about appellants' other claims. On March 18, 1997, the EEOC issued its Notice of Amended Acceptance, reaffirming its decision to investigate the events of June 1996. The EEOC then indicated that appellants' allegations regarding an ongoing discriminatory policy in detail assignments and promotions extending between October 1991 and September 1996 would only be investigated as background to the June 1996 events.

In 1997, NADNI advertised five positions at the GS–13 level, and although all four appellants made applications, none were promoted. Several white male recipients of these promotions were also beneficiaries of pre-selection details that facilitated their permanent advancement to these positions. [2] Over the course of applying for a promotion to a GS–13 position from October 1996 to March 1997, appellant Lyons received reports from a NADNI staffing representative that he was among the "best qualified" applicants for the positions that he sought. However, he was never selected for any of these positions. Appellant Tate's name appears on a list of the top fifteen percent of candidates **1103 for the position of Program Superintendent, but he also was not promoted.

Appellants filed the current action in federal district court on April 10, 1998, alleging that they had been subjected to disparate treatment because of their race and that they had suffered retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1); 42 U.S.C. § 2000e–3(a). Tate additionally alleges that he was discriminated against in retaliation for filing an EEOC charge and for his participation in the present action when his supervisor, in August 1996 and then again in September 1998, presented him with a "fully successful" [3] performance evaluation. Appellee moved for summary judgment, and the district court issued an order granting summary judgment against appellants on each of their claims. Appellants now appeal.

## II. STANDARD OF REVIEW

[1]  [2]  We review the district court's order granting summary judgment *de novo. Strahan v. Kirkland,* 287 F.3d 821, 825 (9th Cir.2002). We "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir.1999) (en banc).

## III. DISCUSSION

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The employer is also prohibited "from retaliating against an applicant for employment because the applicant has opposed any unlawful employment practice, or has made a charge, testified, assisted, or participated in an employment discrimination investigation or proceeding." *Lam v. Univ. of Hawai'i,* 40 F.3d 1551, 1558–59 (9th Cir.1994) (citing 42 U.S.C. § 2000e–3(a)). We must decide (1) whether appellants have exhausted their administrative remedies with regard to challenged conduct occurring after the filing of their EEOC charge; (2) whether appellants are permitted to pursue claims, or otherwise to introduce evidence, based on conduct occurring outside the statutory limitations period; and (3) whether appellants have presented sufficient evidence to command reversal of summary judgment and remand

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

for trial on their remaining disparate treatment and harassment claims.

### A. *The administrative exhaustion requirement as applied to appellants' 1997 promotion claims*

**[3]** **[4]** **[5]** **[6]**    To establish federal subject matter jurisdiction, a plaintiff is required to exhaust his or her administrative remedies before seeking adjudication of a Title VII claim. *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1099 (9th Cir.2002); **\*1104** *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 (9th Cir.1994). Exhaustion of administrative remedies under Title VII requires that the complainant file a timely charge with the EEOC, thereby allowing the agency time to investigate the charge. *See* 42 U.S.C. § 2000e–5(b); *see also B.K.B.,* 276 F.3d at 1099. [4] "Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Green v. Los Angeles County Superintendent of Sch.,* 883 F.2d 1472, 1475–76 (9th Cir.1989) (internal quotation marks omitted); *see also Anderson v. Reno,* 190 F.3d 930, 938 (9th Cir.1999) (stating that "forcing an employee to begin the administrative process anew after additional occurrences of discrimination in order to have them considered by the agency and the courts would erect a needless procedural barrier") (internal quotation marks omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Therefore, we must conclude that the district court erred in denying jurisdiction over appellants' 1997 claims of discriminatory failure-to-promote "if [those claims] fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." *Farmer Bros.,* 31 F.3d at 899 (internal quotation marks and citation omitted) (emphasis in original).

The district court reasoned that the EEOC investigation of appellants' charges would not have included the 1997 allegations because those allegations concerned promotion to the GS–13 level rather than to particular jobs, and the EEOC would therefore not have been on notice that appellants' allegations of discrimination concerned the appellee's failure to promote them to *any* position at the GS–13 level or above. Because we find the district court's interpretation of appellants' EEOC

charges excessively narrow and over-technical, we reject its conclusion.

**[7]** **[8]**    We are required to construe appellants' EEOC charges " 'with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.' " *B.K.B.,* 276 F.3d at 1100 (citing *Kaplan v. Int'l Alliance of Theatrical & Stage Employees,* 525 F.2d 1354, 1359 (9th Cir.1975)). We will consider a plaintiff's claims to be reasonably related to allegations in the charge "to the extent that those claims are consistent with the plaintiff's original theory of the case," *B.K.B.,* 276 F.3d at 1100, as reflected in the plaintiff's factual allegations and his assessment as to why the employer's conduct is unlawful.

**[9]**    Appellants claimed in their EEOC charges that NADNI had "intentionally engaged in the systematic elimination of Black Males from the GS–13 and GS–14 levels of management" by denying qualified candidates selection for promotion and favorable details. In addition, appellants charged that they had been denied the opportunity to compete for two managerial positions to which promotions were awarded in June 1996. Appellants' 1996 EEOC charges did not include allegations of discrimination relating to NADNI's 1997 competitive promotions, nor could they possibly have done so. Nevertheless, the factual allegations recorded in appellants' EEOC charges reflect their original theory of the case: (1) that NADNI discriminated against them over the course of several **\*1105** years by denying them favorable details; (2) that, because they had been denied those details, they were disadvantaged in terms of their ability to obtain promotion to positions higher than GS–12; and (3) that NADNI had discriminated against them by issuing promotions to two specific GS–13 positions on a noncompetitive basis. On these facts, any additional EEOC investigation regarding the 1997 promotions would have been redundant because the appellants clearly articulated in their charges their theory that the appellee had systematically restricted the access of African–American employees to positions at the GS–13 level or above. The district court's conclusion to the contrary is in error.

### B. *Appellants' pre-limitations period allegations*

#### 1. Appellee's liability for time-barred acts

**[10]** **[11]** Appellants seek damages in compensation for an alleged pattern of discriminatory acts extending back to 1991. Under federal regulations promulgated by the EEOC, federal employees complaining of discrimination by a governmental agency "must consult a[n EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter," 29 C.F.R. § 1614.105(a), and they "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory," 29 C.F.R. § 1614.105(a)(1). [5] Although it does not carry the full weight of statutory authority, failure to comply with this regulation has been held to be fatal to a federal employee's discrimination claim. *See, e.g., Johnson v. United States Treasury Dept.,* 27 F.3d 415, 416 (9th Cir.1994) (per curiam) (affirming summary judgment based on plaintiff's failure to seek counseling before one year after the alleged incident of discrimination). Because appellants initially contacted an EEO counselor on June 20, 1996, we hold that appellants' claims arising out of incidents occurring before May 7, 1996 are time-barred.

The district court also ruled that the pre-limitations period claims were time-barred because it found that appellants failed to establish that the alleged discriminatory assignment of details formed part of a continuing violation that remained ongoing during the 45–day period. Appellants contest that ruling, but the question whether the district court committed error in its interpretation of our doctrine is no longer relevant due to an intervening decision by the Supreme Court overruling prior Ninth Circuit authority. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), *aff'g in part and rev'g in part Morgan v. Nat'l R.R. Passenger Corp.,* 232 F.3d 1008 (9th Cir.2000). In reviewing whether the district court properly granted summary judgment against appellants' claims based on the appellee's discriminatory allocation of details outside the limitations period, we are bound to apply current Supreme Court law.

**[12]** In *Morgan,* the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," 122 S.Ct. at 2072, while "a hostile work environment claim ... will not be time barred so long as all acts **\*1106** which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period," [6] *id.* at 2077.

Abner J. Morgan, Jr., brought claims of disparate treatment, retaliation, and hostile work environment racial harassment against Amtrak, alleging *inter alia* that he was repeatedly denied training opportunities, subjected to unwarranted disciplinary action, and unlawfully discharged. The district court granted summary judgment against Morgan's claims arising from allegations that occurred outside the limitations period, concluding that " '[b]ecause Morgan believed that he was being discriminated against at the time that all of these acts occurred, it would not be unreasonable to expect that Morgan should have filed an EEOC charge on these acts before the limitations period on these claims ran.' " *Morgan,* 232 F.3d at 1015 (quoting unpublished district court disposition). Morgan went to trial and lost on his remaining claims. We reversed the district court, holding that "[i]n light of the totality of the circumstances ... the pre-limitations conduct at issue ... [was] sufficiently related to the post-limitations conduct to invoke the continuing violation doctrine." *Id.* at 1016.

The Supreme Court's decision in *Morgan* invalidated our previous application of the continuing violation doctrine to discrete acts of discrimination and retaliation. Our ruling in the case had reversed summary judgment on the ground that Morgan had raised a genuine issue of fact as to whether a serial violation existed, linking the employer's pre- and post-limitations conduct. *Morgan,* 232 F.3d at 1017–18. We did not consider whether the employer had engaged in a systematic policy or practice of discrimination, and, as a consequence, the Supreme Court's decision did not directly overrule our construction of the latter theory. However, it did not specifically endorse that theory either. *See, e.g., Morgan,* 122 S.Ct. at 2069, 2072–73 (mentioning the "systematic" theory of continuing violation but making no ruling as to its viability). Instead, the Court elaborated a set of general principles regarding how courts ought to apply the Title VII filing deadlines.

**[13]** **[14]** Pointing to the mandatory language of the statute, the Court reasoned that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* at 2070 (internal quotation marks and citation omitted). Dismissing the respondent's argument that Title VII's protection against unlawful employment "practices" provided a statutory basis for our continuing violation doctrine, the Court clarified that it "interpret[s]

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 805 of 898
89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts." *Id.* at 2071. The Court emphasized that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," *id.* at 2073, and thereby concluded that "[e]ach incident of discrimination ... constitutes a *separate* actionable 'unlawful employment practice,' " *id.* (emphasis added). We must conclude from the Court's statements that when, as in the present case, a plaintiff pursues several disparate treatment claims, based **\*1107** on discrete discriminatory acts, the limitations period will begin to run for each individual claim from the date on which the underlying act occurs.[7] If a plaintiff chooses to bring separate claims based on each discriminatory act, his assertion that this series of discrete acts flows from a company-wide, or systematic, discriminatory practice will not succeed in establishing the employer's liability for acts occurring outside the limitations period because the Supreme Court has determined that each incident of discrimination constitutes a separate actionable unlawful employment practice.[8]

The Supreme Court declined to decide whether the filing limitations period should run, in all cases, from the time that the challenged act occurred or, in certain circumstances, from the time that the plaintiff became, or should have become, aware that the employer's conduct was discriminatory.[9] *See* **\*1108** *Morgan,* 122 S.Ct. at 2073 n. 7; *see also id.* at 2073–74 & n. 11 (rejecting the Seventh Circuit's notice requirement as applied to harassment claims). Here, appellants do not claim that they only became aware of the discriminatory nature of the detail assignments running from 1991 through 1995 as a consequence of the 1996 and 1997 promotions. Therefore, we need not resolve this ambiguity; we simply count backward 45 days from their initial contact with the EEO counselor.

**[15]**  We hold that appellants' pre-limitations period claims, based on the alleged discriminatory assignment of details, are time-barred for the reasons set forth by the Supreme Court in *Morgan.* A discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be brought within the statutory limitations period. We must now determine whether and to what extent appellants can

make use of evidence of discrimination occurring before the limitations period in order to prove that the appellee discriminated against them in awarding the challenged 1996 and 1997 promotions.

<center>2. Relevance of evidence of time-
barred acts to appellants' timely claims</center>

**[16]**  Our inquiry under *Morgan* does not end with the rejection of appellants' continuing violation argument. We must consider in addition what relevance appellants' evidence of time-barred discriminatory acts may have to the prosecution of their timely disparate treatment claims. The Supreme Court instructed in *Morgan* that

> The existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. *Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.*

*Id.* at 2072 (emphasis added). Thus, even if appellants were aware that the appellee had violated their rights through the prior discriminatory assignment of details, their timely failure to-promote claims are not barred. In fact, appellants are permitted to offer evidence of the pre-limitations discriminatory detail assignment scheme in the prosecution of their timely claims.

**\*1109**  The Supreme Court first announced the latter rule in *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), where it held that a female flight attendant, forced to resign after marrying, could not establish a continuing violation claim reaching back to her forced resignation based on the fact that the airline rehired her (within the statutory limitations period) without reinstating her previous seniority. *Id.* at 557–58, 97 S.Ct. 1885. The Court acknowledged that United's seniority system had a continuing effect on the plaintiff's pay and benefits. *Id.* at 558, 97 S.Ct. 1885. However, the Court reasoned that "the emphasis should not be placed on mere continuity; the critical question is whether any

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

present violation exists." [10]  *Id.* The Court asserted that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed." *Id.* Based on that rationale, the Court concluded that "a challenge to a neutral [seniority] system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer." *Id.* at 560, 97 S.Ct. 1885.

[17]    Of particular significance to the present case, the *Evans* majority indicated that a discriminatory act for which the employer's liability is time-barred "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." [11]  *Id.* at 558, 97 S.Ct. 1885. In the wake of *Morgan,* we must decide how courts should determine what particular evidence of time-barred acts may be taken into account as "background" evidence of present, actionable discrimination. Previously, under our continuing violation doctrine, we required a plaintiff, seeking to demonstrate that the past violation continued into the present, to show that pre-limitations period acts were reasonably, or "plausibly," related to acts occurring within the limitations period. *Morgan,* 232 F.3d at 1015; *Sosa v. Hiraoka,* 920 F.2d 1451, 1455–56 (9th Cir.1990). That test tended to limit the plaintiff's **\*1110** ability to introduce untimely acts by requiring specific showings that "related" discriminatory acts were perpetrated by a consistent group of actors against a particular plaintiff, or group of plaintiffs, and that the acts were similar in kind. *See, e.g., Sosa,* 920 F.2d at 1455–56. We held that evidence of acts that were "isolated, sporadic, or discrete" would not demonstrate a continuing violation. *See Morgan,* 232 F.3d at 1015. However, we conclude that, because it was formulated as a means to determine when to extend liability rather than what evidence is probative of discrimination, our prior reasonable-relation test does not provide an appropriate means to determine the admissibility of evidence of time-barred acts after *Morgan.*

[18]    [19]    [20]    [21]    [22]    [23]    [24]    We begin instead with the Court's statement in *Evans* that untimely evidence of the employer's discriminatory acts "may constitute *relevant* background evidence in a proceeding in which the status of a current practice is at issue." 431 U.S. at 558, 97 S.Ct. 1885 (emphasis added). "Relevant evidence" is defined by Rule 401 of the Federal Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In the context of a racial disparate treatment claim, admissible background evidence must be relevant to determine "the ultimate question: whether ...'the defendant intentionally discriminated against [the plaintiff]' because of his race." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). This determination will not impose the same limitations on the plaintiff's evidence as were previously imposed under our reasonable-relation test. [12]  The district court will sometimes be required to engage in Rule 403 balancing when determining the admissibility of evidence of time-barred acts, Fed.R.Evid. 403 (stating that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by its potential for unfair prejudice or confusion of the issues), bearing in mind that, in discrimination cases, probative evidence of wrongful intent will necessarily prejudice the defendant's case. [13]  At  **\*1111**  the initial stage of a case of disparate treatment, appropriate background evidence will be evidence, either direct or circumstantial, that, when combined with evidence of the employer's present conduct, "give[s] rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Once the employer has proffered a legitimate, nondiscriminatory reason to rebut the plaintiff's *prima facie* case, appropriate background evidence will be any evidence that tends to prove the employer's discriminatory intent or otherwise to disprove the proffered legitimate reason. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1127 (9th Cir.2000).

[25]    In support of their time-barred claims, appellants in the present action allege a pervasive pattern of racial discrimination at NADNI that eliminated African–American men from obtaining managerial positions above the GS–12 level by systematically denying them access to favorable details and to promotions. Appellants have supplied the names of several white-male workers who received favorable work details and were subsequently promoted to GS–13 positions. They

allege that NADNI supervisors allocated details on a noncompetitive basis, routinely failed to publicize detail opportunities and held white employees in detail positions for substantially longer periods than were appropriate according to NADNI policy. The latter practice is particularly significant, because fewer black employees could be given the chance to benefit from favorable details while whites were being retained in those positions for longer than the official maximum of 120 days. [14] Appellants also entered into the record below EEO counselor reports, documenting the workforce participation rates of whites, blacks, Hispanics, and Asians, at NADNI, from 1991 to 1995 in GS–12, 13, and 14 positions. These reports show a steady decline in African–American workforce participation at the GS–13 level. [15]

Because appellants failed to make timely contact with an EEO counselor following any of their exclusions from detail assignments or denials of promotion prior to 1996, they are unable to sustain claims based on any of the foregoing evidence. However, this evidence is relevant as background and may be considered by the trier of fact in assessing the defendant's liability for plaintiffs' denials of promotion in 1996 and 1997. Appellants may not offer this evidence on the theory that past acts of discrimination, for which legal action is **1112** now time-barred (e.g., discriminatory assignment of details), constitute a current violation simply because they continue to have a present effect. Consistent with the Supreme Court's ruling in *Evans,* appellants may not sustain a cause of action for relief from present injury caused by time-barred acts of discrimination. *See Evans,* 431 U.S. at 558, 97 S.Ct. 1885. However, appellants may offer the statistical evidence of NADNI's elimination of African–American employees from GS–13 positions, as well as evidence of the employer's violation of departmental policy in the course of maintaining white employees for excessively long periods of time in favorable detail positions, as indirect proof of the employer's intent to discriminate. This evidence may also be offered for its probative value in assessing whether the employer's justifications for its present conduct lack credibility.

C. *Appellants' failure-to-promote claims*

[26] [27] [28] [29] [30] To establish a prima facie case of disparate treatment under Title VII, a plaintiff must provide evidence that "give[s] rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145, 1148 (9th Cir.1997). Absent direct evidence of discrimination, a Title VII plaintiff may prove his case through circumstantial evidence, following the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Supreme Court held in *McDonnell Douglas* that the plaintiff can make out a *prima facie* case of discrimination by showing that (1) he belongs to a statutorily protected class, (2) he applied for and was qualified for an available position, (3) he was rejected despite his qualifications, and (4) after the rejection, the position remained available and the employer continued to review applicants possessing comparable qualifications. *Id.* at 802, 93 S.Ct. 1817. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. At the summary judgment stage, the "requisite degree of proof necessary to establish a *prima facie* case ... is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J. R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994); *accord Cordova,* 124 F.3d at 1148.

[31] [32] Once established, the *prima facie* case creates a rebuttable "presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. The burden of production then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the plaintiff's rejection." *Warren v. City of Carlsbad,* 58 F.3d 439, 442 (9th Cir.1995). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089.

[33] [34] [35] [36] [37] [38] If the employer sustains this burden, the plaintiff must then demonstrate that the proffered nondiscriminatory reason is merely a pretext for discrimination. *Id.* at 256, 101 S.Ct. 1089; *Warren,* 58 F.3d at 442. While the burden of persuasion remains at all times with the plaintiff, *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, this final burden shift does not necessarily impose a new burden of production. In *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court held that the factfinder may infer "the ultimate fact of intentional discrimination" without additional proof once the plaintiff has made out her *prima facie* case if the factfinder believes that the

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

employer's **\*1113** proffered nondiscriminatory reasons lack credibility, *id.* at 147, 120 S.Ct. 2097; *accord Chuang,* 225 F.3d at 1127 ("[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."). We have held, following *Reeves,* that the plaintiff can prove pretext either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Id.* (quoting *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220–22 (9th Cir.1998)). In addition, we look ultimately to the cumulative evidence, and so consider indirect with direct evidence to the extent that both are available. *Id.* "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Proj. Agr. Improv. & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001) (citing *Godwin,* 150 F.3d at 1222). However, we have held that "any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder," and for that reason "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination." *Warren,* 58 F.3d at 443 (internal quotation marks omitted).

### 1. 1996

**[39]** The district court held that appellants failed to make out a *prima facie* case of discriminatory failure-to-promote arising out of their nonselection for the positions of Deputy Planning Manager and Program Manager in June of 1996, because they failed to produce evidence of their qualification. In order to make out a *prima facie* case, a plaintiff must produce some evidence, giving rise to an inference of discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. We have said that the amount of evidence required at summary judgment is "very little," *Sischo–Nownejad v. Merced Cmty. Coll. Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991) (internal quotation marks omitted), and does not rise to the level of a preponderance of the evidence, *Wallis,* 26 F.3d at 889. A plaintiff's failure to offer evidence establishing a necessary

element of his *prima facie* case will ordinarily be fatal to his claim. However, the district court erred in this case by discounting evidence that was sufficient to sustain appellants' burden.

**[40]** Failure to produce evidence of qualification will typically prevent a plaintiff from satisfying either the second or the fourth prong of the *McDonnell Douglas* test. Here, appellants have satisfied the first prong of *McDonnell Douglas,* by establishing that, as African–Americans, they all belong to a protected class. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. They have also satisfied the third prong, by demonstrating that they suffered an adverse employment action (i.e., denial of promotion). *Id.* Appellee disputes whether any promotions took place, but we agree with the district court that a genuine issue of fact has been raised concerning whether the June 1996 assignments were indeed promotions. With regard to the fourth prong, it is undisputed that the positions at issue were filled by white employees of NADNI. Therefore, the only issue remaining concerning appellants' *prima facie* case is whether they have presented sufficient evidence from which the trier of fact could reasonably infer that they possessed the "minimum **\*1114** qualifications" for the positions, *Laborde v. Regents of the Univ. of Cal.,* 686 F.2d 715, 717 (9th Cir.1982), or that their qualifications were comparable with those of the persons awarded the positions.

**[41]** **[42]** The Supreme Court has cautioned that "[t]he prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.' " *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)); *see also Hicks,* 509 U.S. at 519, 113 S.Ct. 2742. To that end, we do not require that a plaintiff prove that he applied for an available position when making a failure-to-promote claim against the employer if the trier of fact could reasonably infer that promotions were not awarded on a competitive basis. *See Fadhl v. City and County of San Francisco,* 741 F.2d 1163, 1165–66 (9th Cir.1984) ("When an employer's discriminatory treatment consists of a failure to consider an applicant's qualifications, or in the use of evaluative criteria that are discriminatory, the applicant need not prove that he or she was qualified to fill the position sought in order to obtain some relief."), *abrogated on*

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 809 of 898

*other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see also Lockridge v. Bd. of Trustees of the Univ. of Ark.,* 294 F.3d 1010, 1014 (8th Cir.2002) (stating that "failure to apply is frequently excused where the employer has no formal application process or where the employee is unaware of the opportunity"), *reh'g granted,* 301 F.3d 958, 2002 WL 31004678 (8th Cir.2002); *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 533 (11th Cir.1992) (holding that the plaintiff need not establish that he applied for an available position where the employer neither posted job openings nor accepted applications) (citing *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984) (excusing plaintiff's failure to apply because "defendant used no formal procedures for posting notice of available promotions or for determining who would be offered the promotion [and instead] relied on 'word of mouth' and informal review procedures")).

**[43]  [44]**  Further, where, as here, the employer has not published the qualifications for positions that were awarded without a competitive application process, it would be unreasonable to require a plaintiff to present direct evidence of the actual job qualifications as part of his *prima facie* case. *See Shannon v. Ford Motor Co.,* 72 F.3d 678, 682 (8th Cir.1996) ("It would be ironic ... if a victim of discrimination were unable to vindicate her rights because she had the peculiar misfortune of being discriminated against in a way that necessarily prevented her from making her prima facie case."). In such a circumstance, a plaintiff may satisfy the second prong of *McDonnell Douglas* by providing circumstantial evidence of his qualification for the position. For the purpose of establishing a *prima facie* case, the plaintiff is not restricted to providing the bare minimum of evidence required by the *McDonnell Douglas* test, but may rely also on other circumstantial evidence that tends to raise an inference of discrimination. *See Wallis,* 26 F.3d at 889 ("In offering a *prima facie* case, of course, a plaintiff may present evidence going far beyond the minimum requirements."); *see also McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817 (stating that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations"); *Cordova,* 124 F.3d at 1148 (stating that the *McDonnell Douglas* test provides "[o]ne way" to raise an inference of discrimination).

**\*1115  [45]   [46]**  Appellants Lyons and Tate have demonstrated, as circumstantial evidence of their qualification, that they each held the position of Program Manager at NADNI prior to the 1991 reorganization. Appellee argues that the Program Manager position in 1991 differed materially from the position in 1996 because the latter required supervisory skills and a rating of GS–13. However, appellee has not explained how an employee's GS rating is relevant to his promotability; in fact, by conceding appellants' qualifications to apply for GS–13 positions in 1997, when no appellant held that rating, appellee undermines his own arguments with regard to the 1996 positions. In addition, we have recently held that, at summary judgment, a plaintiff's "self-assessment of his performance is relevant" in satisfying his minimal burden of showing qualification at the initial, *prima facie* case, stage of the *McDonnell Douglas* burden-shifting rationale. *See Aragon v. Repub. Silver State Disposal,* 292 F.3d 654, 660 (9th Cir.2002). Lyons and Tate allege that they have obtained experience, through their extended service at NADNI, performing many of the functions required by the Deputy Planning Manager and Program Manager positions, including the supervision of other employees. [16] While we do not rely on this evidence alone, we note it as relevant in combination with the other circumstantial evidence of qualification. We conclude based on this evidence that appellants Lyons and Tate have successfully raised a genuine dispute of fact as to whether they were sufficiently qualified for the Program Manager and Deputy Planning Manager positions. The district court's decision with regard to the remaining appellants' claims is affirmed, because the evidence regarding their employment experience fails to raise an inference that they were qualified for these positions. The burden now shifts to the employer to offer a legitimate nondiscriminatory reason for rejecting Lyons and Tate for promotion.

Appellee contends that the employees who received the disputed positions were previously GS–13s and were simply reclassified to these positions, without promotion, as part of a personnel reorganization at NADNI. The reason satisfies the employer's burden of production, requiring appellants to raise a genuine issue of fact as to whether the proffered reason is merely a pretext for discrimination.

**[47]**  In rebuttal, appellants have produced background evidence that the employer had previously maintained

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

a discriminatory system of detail assignments that disadvantaged black employees by denying them work experience that would have facilitated their promotion to positions above the GS–12 level. First, appellants have produced statistical evidence that the employer's policies steadily removed African–American employees from GS–13 positions, resulting in their total removal from such positions in the year directly proceeding the challenged promotion decisions. *See McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. 1817 (indicating that "statistics as to [the employer's] employment policy and practice may be helpful to a determination" as to whether a particular action by the employer was discriminatory); *accord Warren,* 58 F.3d at 443. Appellants also point to statistical evidence that the appellee systematically eliminated black employees from GS–13 **\*1116** positions in the mid–1990s. Second, appellants have produced the testimony of Judith Groshek in order to demonstrate that, as part of its discriminatory detail assignment system, the employer routinely ignored departmental procedures that were intended to protect workers' rights to obtain favorable work assignments on an equal basis.

A factual dispute exists as to how the 1996 positions were filled. Appellants' evidence discrediting the appellee's proffered legitimate reason is substantial and specific, showing that the employer subverted established procedures for assigning temporary details in order to prevent African–American employees from obtaining experience at positions above the GS–12 level just as appellants allege that the employer subverted established procedures for making promotions in 1996 for the same unlawful purpose. A reasonable trier of fact could infer that the employer decided not to assign the 1996 positions to appellants Lyons and Tate, both of whom had previously held a similar position at the GS–12 level, because it was motivated by discriminatory intent. Based on this evidence, we conclude that Lyons and Tate have successfully rebutted appellee's proffered legitimate reasons for denying them promotion to the Deputy Planning Manager and Program Manager positions. They may proceed to trial on these claims.

### 2. 1997

As discussed above, the district court dismissed appellants' failure-to-promote claims based on their applications for GS–13 positions in 1997 because it held that appellants

failed to exhaust their administrative remedies with regard to these claims. Because we reverse that holding, we must address the merits of the appellants' claims.

Appellee does not dispute appellants' qualifications to occupy any of these positions. Instead, appellee argues that appellants cannot succeed in establishing a *prima facie* case because two of the five positions for which appellants competed were awarded to African–American applicants. In the alternative, appellee argues that it legitimately denied the appellants' applications because none of them was the most qualified for any of the available jobs.

**[48] [49]** With regard to appellee's first argument, proof that the employer filled the sought position with a person not of the plaintiff's protected class is " 'neither a sufficient nor a necessary condition' of proving a Title VII case," *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 454 n. 1 (7th Cir.1999) (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996) (per curiam)), and it is not prescribed by the Supreme Court's original statement of the *prima facie* test, *see McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (stating that plaintiff may satisfy the fourth-prong of the *prima facie* case by showing "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"); *see also Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (stating that, at trial, the plaintiff "must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination"). We have held that *McDonnell Douglas* should be "read literally" to allow a plaintiff to establish a *prima facie* case of failure-to-promote discrimination "whenever the employer continues to consider other applicants whose qualifications are comparable to the plaintiff's after refusing to consider or rejecting the plaintiff," even where the employer fills the position with a member of the plaintiff's protected class. *Diaz v. Am. Tel. & Tel.,* 752 F.2d 1356, 1359 (9th Cir.1985).

**\*1117 [50] [51]** In the present case, whether the employer filled any particular position with a member of appellants' protected class is more properly considered as evidence produced by the employer to rebut an inference of discrimination rather than as evidence essential to appellants' *prima facie* case. However, even as rebuttal

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

evidence it will not necessarily be dispositive. *See, e.g., Jones v. W. Geophysical Co. of Am.,* 669 F.2d 280, 284–85 (5th Cir.1982) (holding that plaintiff's affidavits that replacement worker was notoriously unreliable were sufficient to raise an inference of discrimination even though the replacement was a member of plaintiff's protected class). Indeed, proof that the appellee filled two of five positions with applicants from appellants' protected class does nothing to impede appellants' ability to raise an inference of discrimination with regard to the other three positions, though it may say something generally about the employer's motive.

All appellants were pre-qualified by the appellee as a condition of their eligibility to apply for the five positions at issue in 1997. Tate was listed by NADNI supervisors as one of the top fifteen percent of applicants for one of the positions, and Lyons received written notification from management that he was among the "best qualified" applicants in the pool. Appellee cannot reasonably argue with regard to any of the appellants that their qualifications were not comparable to the qualifications of other applicants for the position among whom management made its ultimate decision. Therefore, all appellants have succeeded in making out a *prima facie* case of failure-to-promote discrimination, shifting the burden to the employer to offer a legitimate reason for their rejection.

**[52]** **[53]** Without indicating specific weaknesses in appellants' candidacies for promotion, appellee responds that appellants were not the best qualified applicants for any of the positions at issue. At summary judgment, "[o]ur place is not to weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial." *Glenn K. Jackson Inc. v. Roe,* 273 F.3d 1192, 1196 (9th Cir.2001). In such circumstances, whether appellants were as qualified as any of the promotion recipients is a factually intensive question best resolved by the jury. To rebut appellee's proffered nondiscriminatory reason for their denial of promotion, appellants present the employer's alleged discriminatory assignment of details as background evidence of an intention to discriminate against members of appellants' protected class. Appellee may respond to this evidence by pointing to the two African–American employees who received promotions to GS–13 level positions in 1997. However, while this evidence helps to frame the dispute over the appellee's employment practices, it does not

resolve it. Appellants' statistical evidence of the employer's systematic removal of black employees from supervisory positions is probative evidence of discriminatory intent, resulting in a factual dispute as to whether the employer discounted any appellant's candidacy or ignored his qualifications because of race. Though we discuss that evidence more thoroughly in the previous section, we find it equally relevant to appellants' rebuttal of the employer's proffered reason here. A reasonable trier of fact could infer that the employer continued to discriminate against appellants because of their race, even though it acknowledged that two of them were among the best qualified applicants for the available positions.[17] Based on the foregoing **\*1118** evidence, appellants have succeeded in preserving a triable issue as to whether the appellee's reasons for denying them promotion in 1997 were pretextual.

*D. Appellant Donald Tate's retaliation claim*

Tate alleges that the employer retaliated against him for filing an EEOC charge and civil complaint in the present action, as well as for filing prior EEOC charges, by awarding him a performance evaluation of "fully successful" on two separate occasions. According to appellee's own documentation, a performance rating of "fully successful" is the equivalent of an average, or mediocre, rating. Tate does not dispute this interpretation.

**[54]** Under Title VII, it is unlawful for an employer "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In order to prevail on a claim of unlawful retaliation, a plaintiff must establish (1) that he engaged in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between plaintiff's activity and the employment decision. *Hashimoto v. Dalton,* 118 F.3d 671, 679 (9th Cir.1997).

**[55]** **[56]** "Title VII does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer, or demotion." *Id.* at 675 (internal quotation marks omitted). Furthermore, this Circuit has previously held a negative job reference sufficient to sustain a claim of retaliation where that

Lyons v. England, 307 F.3d 1092 (2002)

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

Case 4:17-cv-06621-YGR    Document 1-1    Filed 11/16/17    Page 812 of 898

reference was disseminated to another potential employer. *See id.* at 674–76. However, in the present case, appellee's alleged discriminatory conduct has not yet matured into an adverse employment decision sufficient to satisfy the requirements of the prima facie case.

In *Kortan v. California Youth Authority,* 217 F.3d 1104 (9th Cir.2000), we held that a performance evaluation that was mediocre (rather than "sub-average") and that did not give rise to any further negative employment action did not violate Title VII. *Id.* at 1112–13. Tate does not allege that NADNI management has either relied upon the "fully successful" evaluations in making a further employment decision adverse to Tate or published these evaluations by making them available to other potential employers. Furthermore, Tate does not allege that his mediocre evaluations were accompanied by any meaningful change in work assignments, either in the form of relieving him of responsibilities or saddling him with additional, burdensome tasks. *Cf. Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) (holding that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under this section"); *see also Kortan,* 217 F.3d at 1113 (noting that *Yartzoff* concerned sub-average evaluations). Our precedent dictates that the evaluations at issue here do not rise to the level of an adverse employment action by the employer, and, as a result, Tate has failed to make out a *prima facie* case of unlawful retaliation.

Following the Supreme Court's recent decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), we affirm the district court's ruling that appellants' claims of disparate treatment arising out of detail assignments made prior to May of 1996 are time-barred. However, we reverse the court's summary judgment on appellants' timely failure-to-promote discrimination claims. We remand for trial on Lyons' and Tate's promotion claims, arising out of events occurring in 1996, and on all appellants' promotion claims arising out of the 1997 events. Appellants' evidence of discriminatory detail assignments occurring outside the limitations period cannot be used to sustain an independent cause of action for discrete acts of disparate treatment based on time-barred events, but appellants may offer it as relevant evidence of the employer's intent to discriminate both within the limitations period and following the filing of appellants' EEOC charges. We affirm the district court's summary judgment on Tate's retaliation claim. The court should award costs to the appellants.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. THE COURT SHALL AWARD COSTS TO THE APPELLANTS.**

**All Citations**

307 F.3d 1092, 89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272, 2002 Daily Journal D.A.R. 11,861

*1119 CONCLUSION

Footnotes

*     Gordon R. England is substituted for his predecessor John H. Dalton. Fed. R.App. P. 43(c)(2).

1     Specifically, appellants introduced evidence that Dale Vest, Alfred Jolly, and David Williamson were all non-competitively promoted to jobs at the GS–13 level after first being assigned to details that provided them with work experience relevant to those jobs. All three men are white, and all were alleged to have less seniority than appellants. Furthermore, appellants presented evidence that these details were assigned non-competitively. The district court made no findings regarding the sufficiency of appellants' proof in setting forth these allegations, and appellee does not challenge these allegations before our court.

2     For example, appellants allege that Dale Vest, *see supra* note 1, was a beneficiary of non-competitive details who obtained promotion through the competitive process followed in 1997. We note that two of these positions were given to African American applicants (one male and one female). Both of these individuals possessed college degrees and far less experience or seniority than any of the appellants. Appellants complain that NADNI supervisors unfairly assigned greater weight to college education, even though federal administrative regulations do not support such a weighting system for highly skilled positions at the GS–12 level and above where experience is generally required.

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

3    A "fully successful" performance rating is the equivalent of a satisfactory or average rating under NADNI policy. According to an internal memorandum distributed to NADNI supervisors and placed into evidence by appellants, a "fully successful" rating carries the following meaning: "Work accomplishments are of good quality. The individual produces the expected quantity of work. Results are in consonance with policy and schedules on work completion are met." Appellant Tate does not dispute the meaning of the rating, only whether he indeed deserved it, as opposed to a more exemplary rating, and whether this allegedly undeserved rating was given to him in retaliation for his EEOC filings.

4    As discussed in greater detail in Section III.B., federal employees are further required to consult with an EEO Counselor within 45–days of the alleged discriminatory incident as a condition precedent to filing a formal charge, in order to give the governmental agency an opportunity "to informally resolve the matter." 29 C.F.R. § 1614.105(a).

5    This deadline constitutes an administrative "requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (referring generally to the limitations period filing requirement under Title VII); *see also* 29 C.F.R. § 1614.105(a)(2) (stating that the complainant will not be required to comply with filing period if he can show "that he ... was not notified of the time limits and was not otherwise aware of them"). Appellants have made no case for equitable tolling here.

6    The Court's decision in *Morgan* pertained to the statutory requirement that a plaintiff (not including a federal employee) must file a charge within "one hundred and eighty days after the unlawful employment practice occurred" if filing directly with the EEOC, 300–days if filing with a state agency possessing the authority to process and remedy such claims under state law. 42 U.S.C. § 2000e–5(e). Although the circumstances in which 29 C.F.R. § 1614.105(a)(1) may be equitably tolled are no doubt broader than the tolling opportunities under the statute, we find that the mandatory nature of the federal regulation is sufficient to warrant full application of the *Morgan* rule.

7    This does not mean that claims based on discriminatory policies initiated outside the limitations period will be foreclosed. *See Morgan,* 122 S.Ct. at 2072 (stating that the existence of past discriminatory acts "does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed"). Following *Morgan,* when a plaintiff alleges a systematic violation, each individual act of discrimination occurring within the limitations period may form the basis of an actionable claim, even if the discriminatory policy was initiated outside the limitations period. *Cf. Bazemore v. Friday,* 478 U.S. 385, 395, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (per curiam) (holding, in a pattern-or-practice case, that plaintiffs may challenge a discriminatory salary structure initiated before the Act became applicable to public employees, because "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII").

8    We do not mean to suggest that after *Morgan* the same plaintiff would be precluded from bringing a class-wide pattern-or-practice claim based on a series of discrete acts, including, for example, separate incidents of an employer's failure-to-train and failure-to-promote the plaintiff because of his membership in a protected class. In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court held that the government successfully proved its case of pattern-or-practice discrimination based on the employer's "refusal to recruit, hire, transfer, or promote minority group members on an equal basis with white people," *id.* at 335, 337, 97 S.Ct. 1843. The Court noted in *Morgan* that it "ha[d] no occasion [ ] to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants." *Morgan,* 122 S.Ct. at 2073 n. 9. Therefore, the question of how Title VII's filing deadlines should be applied to pattern-or-practice claims based on a series of discriminatory acts, some of which occurred outside the limitations period, has been left unanswered by the Court, and we do not consider it here.

    The district court interpreted appellants' claims as separate causes of action for disparate treatment and ruled on each one individually. Nevertheless, appellants have produced substantial evidence of the kind typically used to prove a pattern or practice of discrimination. *See, e.g., Int'l Bhd. of Teamsters,* 431 U.S. at 337–38, 97 S.Ct. 1843 (discussing the government's combined use of statistical evidence and testimony from individual protected class members to prove pattern-or-practice discrimination); *see generally* 1 Lex K. Larson, *Employment Discrimination* § 9.03[1], at 9–13 (2d ed.2002) (stating that plaintiffs will typically rely upon statistical evidence of the employer's "past treatment of the protected group" and "testimony from protected class members detailing specific instances of discrimination" to establish a pattern or practice of intentional discrimination). In light of intervening Supreme Court authority affecting this case and our partial reversal of summary judgment, the district court should consider whether to exercise its discretion to allow appellants to amend their complaint to include a pattern-or-practice claim.

9    The Court in *Morgan* acknowledged that "[t]here may be circumstances where it will be difficult to determine when the time period should begin to run." 122 S.Ct. at 2073 n. 7. Because Morgan "believed that he was being discriminated against at the time that all these acts occurred," *id.* (internal quotation marks and citation omitted), a majority of Court declined to decide "whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have

89 Fair Empl.Prac.Cas. (BNA) 1793, 02 Cal. Daily Op. Serv. 10,272...

> been discovered," *id.* Justice O'Connor, joined by Chief Justice Rehnquist and Justice Breyer in a separate opinion, that "some version of the discovery rule applies to discrete-act claims." 122 S.Ct. at 2078 (O'Connor, J., concurring in part and dissenting in part).

> As the Court noted, we did not decide on what precise date the limitations period should begin to run because we held that the continuing violation applied to his pre-limitations claims. 122 S.Ct. at 2073 n. 7. We had previously held that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Abramson v. Univ. of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979). Like the Supreme Court in *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), we decided that the plaintiff's tenure rejection, though not a final termination, was the proper action from which the limitations period should run because the plaintiff's final termination was an inevitable consequence of the tenure decision, *Abramson,* 594 F.2d at 209–10; *accord Ricks,* 449 U.S. at 257–58, 101 S.Ct. 498. While *Abramson* drew a sharp line between the act and any injury it causes, it did not resolve the more subtle question of when the date of a plaintiff's notice that the act was discriminatory, and not the date of the act's occurrence, should be preferred.

10   The Court revisited this reasoning in *Ricks,* where it concluded that a plaintiff may not recover for a pre-limitations period tenure decision by claiming the subsequent termination as a present effect because "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." 449 U.S. at 257, 101 S.Ct. 498.

11   Prior to *Morgan,* the *Evans* rule was overshadowed (and its application substantially curtailed) by the availability of the continuing violation doctrine. *See, e.g., O'Rourke v. City of Providence,* 235 F.3d 713, 731–32 (1st Cir.2001) (holding that the district court erred by vacating judgment on the basis of improperly admitted evidence of pre-limitations acts, because "the evidence was necessary to prove a continuing violation," but declining to decide its admissibility under *Evans* ); *see also Anderson,* 190 F.3d at 936 (noting the *Evans* rule in passing, while holding that plaintiff's claims were timely under the continuing violation rule); *EEOC v. Local 350, Plumbers & Pipefitters,* 998 F.2d 641, 644–45 (9th Cir.1993) (distinguishing *Evans* on the theory that its rule only applies to facially neutral policies). In fact, the Court's instruction in *Evans* that "the critical question is whether any present violation exists," 431 U.S. at 558, 97 S.Ct. 1885, was interpreted by the circuit courts as the bedrock principle for the continuing violations doctrine, *see, e.g., Freeman v. Madison Metro. Sch. Dist.,* 231 F.3d 374, 381 (7th Cir.2000) (citing to *Evans* for the "well-established" proposition "that a Title VII plaintiff may recover for acts beyond the limitations period if she can demonstrate that such acts were part of a 'continuing violation' "); *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 760 (9th Cir.1980) (construing *Evans* merely to have "defined the nature of continuing violations" by clarifying that "continuing *impact* from past violations is not actionable") (emphasis in original).

12   For example, applying our prior reasonable-relation test to a typical race-based failure-to-promote claim, we would have barred evidence occurring outside the limitations period that the employer had rejected, on the basis of race, candidates for promotion other than the plaintiff. Such evidence would not have been probative of a continuing violation against the plaintiff himself. Plaintiffs have always been permitted to introduce such evidence when it is relevant to the question whether the employer intended to discriminate on the basis of race, provided that it satisfies the requirements of Rule 403 balancing. *See, e.g., Tennison v. Circus Circus Enters.,* 244 F.3d 684, 689–90 (9th Cir.2001). After *Morgan,* we will continue to view this evidence as probative of the employer's discriminatory intent, regardless of the fact that the employer had previously chosen a different victim. Similarly, under the continuing violation theory, a single derogatory racial remark made to the plaintiff by the employer or its agent would not have been admissible for the purpose of extending liability beyond the limitations period, because such a remark, standing alone, could not establish a continuing violation. After *Morgan,* courts may still admit such evidence not for the purpose of extending liability, but as relevant evidence of the employer's present discriminatory intent.

13   For example, in *Tennison v. Circus Circus Enterprises,* we held that the district court did not abuse its discretion by excluding testimony from plaintiffs' coworkers that they too were assaulted by plaintiff's accused sexual harasser prior to the period encompassing the plaintiffs' timely claims. 244 F.3d at 689–90. We found this testimony probative because it demonstrated that the employer had been on notice of the harasser's offensive behavior prior to plaintiffs' complaints and suggested that the employer's response to those complaints was inadequate. *Id.* at 690. However, we upheld the lower court's ruling because we agreed that admission of this testimony might have resulted in a "mini-trial," causing inefficient use of the court's time and confusion of the jury by focusing the court's attention on "remote events ... instead of recent events concerning Plaintiffs." *Id.* Our ruling in *Tennison* supports our current conclusion that, after *Morgan,* the admissibility of evidence of discrete, time-barred acts of discrimination is controlled primarily by the Federal Rules of Evidence.

14    For example, appellants allege that David Williamson, a white employee at NADNI, occupied a managerial detail for over two years, extending through the limitations period to the fall of 1996.

15    In 1991, African–Americans made up 5.4% of the GS–13 workers. Their participation rate fell to 3.8% of GS–13 workers in 1993 (i.e., 3 out of 80 positions) and to zero in 1995, when no black workers occupied GS–13 positions (though one black worker had achieved GS–14 status at that time). By contrast, the workforce participation of whites in GS–13 positions increased during the same period, from 81% in 1991 to 85.9% in 1995. Appellants did not introduce comparable evidence concerning work-force participation rates in 1996 and 1997.

16    For example, Tate has provided affidavit testimony that he received experience qualifying him for a supervisory position while serving in various positions, including as a Foreman, Program Manager, Program Analyst, and Production Controller Supervisor. Lyons has testified that he received relevant experience while serving as a Program Manager and during a temporary promotion to GS–13 status.

17    This inference is strengthened by the timing of the promotions, which is several months after appellants held their initial meeting with the EEO counselor. The trier of fact might infer that the employer's promotion of two African–American candidates was intended to mask prior discriminatory employment practices.

---

**End of Document**                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    16

Tab 16

304 Fed.Appx. 707
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Tenth
Circuit Rule 32.1. (Find CTA10 Rule 32.1)
United States Court of Appeals,
Tenth Circuit.

Greta SEMSROTH; Kim Warehime; and
Sara Voyles, on behalf of themselves and all
others similarly situated, Plaintiffs-Appellants,

v.

CITY OF WICHITA; and Chief Norman
Williams, individually and in his
official capacity, Defendants-Appellees.

No. 07-3155.
|
Dec. 22, 2008.

**Synopsis**
**Background:** Female city police officers brought Title
VII action against city and police chief, alleging that
during their tenure with the police department, their
supervisors discriminated and retaliated against them by
subjecting them to disparate treatment, disparate impact,
retaliation, and a hostile work environment. The United
States District Court for the District of Kansas, Monti L.
Belot, J., 2007 WL 1246223, granted summary judgment
to defendants. Officers appealed.

**Holdings:** The Court of Appeals, David M. Ebel, Circuit
Judge, held that:

[1] conduct of supervisors in calling female officer a
"bitch" did not constitute an adverse employment action;

[2] fact issue precluded summary judgment on retaliation
claim;

[3] harassment against female officer was based on her sex;

[4] sexual harassment against one officer was sufficiently
severe and pervasive to alter conditions of employment;
but

[5] conduct taken against other officer during her
pregnancy was not so severe and pervasive as to alter
employment conditions.

Affirmed in part, reversed in part, and remanded.

**Attorneys and Law Firms**

*710 Lawrence W. Williamson, Jr., Shores, Williamson
& Ohaebosim, Wichita, KS, for Plaintiffs-Appellants.

Kelly J. Rundell, Asst. City Attorney, City of Wichita,
Kansas, Wichita, KS, for Defendants-Appellees.

Before LUCERO, HOLLOWAY, and EBEL, Circuit
Judges.

ORDER AND JUDGMENT [*]

DAVID M. EBEL, Circuit Judge.

**1** Plaintiffs-Appellants appeal the district court's
decision to grant summary judgment to Defendants-
Appellees on their claims brought pursuant to Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e to
2000e-17. We have jurisdiction under 28 U.S.C. § 1291. We
AFFIRM in part, REVERSE in part, and REMAND.

I.

A. Factual Background

Officer Greta Semsroth, Officer Sara Voyles, and Officer
Kim Warehime (collectively, the "Officers") have all
served as officers with the Wichita Police Department
(the "Department") for at least the last seven years. [1]
The Officers alleged that during their tenure with
the Department, their supervisors discriminated and
retaliated against them by subjecting them to disparate
treatment, disparate impact, retaliation, and a hostile
work environment, all in violation of Title VII. Given
the distinct nature of their claims, we briefly explain
each officer's allegations separately. [2] Due to Title VII's

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 818 of 898
Semsroth v. City of Wichita, 304 Fed.Appx. 707 (2008)
105 Fair Empl.Prac.Cas. (BNA) 1027

timely filing requirements discussed below, we outline here only those allegations that involve events that fall within 300 days from when each officer filed her EEOC intake questionnaire.

#### i. Officer Semsroth

Officer Semsroth alleged that her superior officers and colleagues at the Department **\*711** repeatedly subjected her to sexual discrimination during her tenure with the Department. Six of Officer Semsroth's allegations involved conduct that fell within the 300-day window. First, she alleged that the Department failed to discipline other officers for referring to her in a derogatory fashion. Second, she alleged that other officers failed to respond to her requests for back up because of her gender. Third, she alleged that several supervisory officers "interrogated" her after several female officers held a women's luncheon to discuss their concerns regarding the Department. Fourth, she alleged beat the Department transferred her to a less desirable beat assignment in retaliation for meeting with the city's Affirmative Action Administrator. Fifth, she alleged that the Department retaliated against her by making negative notations in her personnel file. Lastly, she alleged that the Department refused to display an EEOC poster in spite of her several requests.

#### ii. Officer Voyles

Officer Voyles also alleged that her superior officers and colleagues at the Department subjected her to sexual discrimination. Two of those allegations involved conduct that occurred during the 300-day window. First, Voyles alleged that during her pregnancy, Lieutenant Bohannon made numerous comments regarding her weight and eating habits. Second, Voyles alleged that she was verbally reprimanded in front of media personnel after she complained about Lieutenant Bohannon's conduct.

#### iii. Officer Warehime

Officer Warehime made similar allegations of sexual discrimination in her EEOC intake questionnaire. Three of those allegations involved conduct that occurred during the 300-day window. First, Officer Warehime alleged that the Department subjected her to disparate disciplinary treatment arising from a charge of conduct unbecoming of an officer. Second, she alleged that three lieutenants interrogated her regarding a "women's luncheon" attended by female officers. Third, she alleged

that the Department denied her a temporary rotation after her attorney sent the Department a letter regarding her concerns about sexual discrimination.

### B. Procedural Background

**\*\*2** After filing their intake questionnaires with the EEOC, the Officers filed a class action in the United States District Court for the District of Kansas against the defendants. The district court denied the plaintiffs' motion for class certification and dismissed the claims against Chief Williams in his official capacity.[3] The district court then granted the defendants summary judgment on the plaintiffs' individual Title VII claims for disparate treatment, hostile work environment, and disparate impact. The plaintiffs now appeal that final decision.[4]

## II.

We review the district court's grant of summary judgment de novo. *Montes v. Vail Clinic, Inc.,* 497 F.3d 1160, 1163 (10th Cir.2007). Summary judgment is appropriate where "the pleadings, the discovery **\*712** and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). During our de novo review, we view the evidence in the record in the light most favorable to the nonmoving party, in this case, the Officers. *Jones v. U.P.S., Inc.,* 502 F.3d 1176, 1183 (10th Cir.2007).

## A.

Before considering the merits, we must first determine whether the Officers complied with three general prerequisites to bring a civil suit pursuant to Title VII. Prior to filing such a suit in federal court, plaintiffs must administratively exhaust their claims in a timely fashion by filing a charge with the EEOC. *Montes,* 497 F.3d at 1163. We address this requirement in three steps. First, we analyze whether the document each plaintiff filed with the EEOC constitutes a charge. Second, we determine which allegations included in the charge, if any, are timely. Third, we determine whether the federal claims are included within the scope of those timely allegations.

#### i. EEOC charge

While the contours of the requirement to file a charge may appear straightforward, we have not resolved what type of document constitutes a charge for the purposes of Title VII. The Officers contend that their EEOC intake questionnaires qualify as charge documents because they constitute requests for the EEOC to take action on the alleged discrimination. We partially agree. As discussed more completely below, Officer Semsroth and Officer Voyles took sufficient steps to reasonably indicate that they sought the EEOC to take action on their behalf based on the allegations included in their intake questionnaires. Accordingly, these documents constitute charges. The record, however, does not indicate that Officer Warehime took similar steps, and therefore, we dismiss her appeal because she did not file a charge with the EEOC.

Section 2000e-5(b) provides the EEOC with broad discretion to determine the information necessary in a charge. *See* 42 U.S.C. § 2000e-5(b); *Jones,* 502 F.3d at 1183-84. Pursuant to this discretion, the EEOC regulations dictate that a charge *should* contain the following information: (i) the name, address, and telephone number of the person bringing the charge; (ii) the name and address of the person the charge is brought against; (iii) a statement of the facts underlying the allegations; (iv) the number of employees employed by the relevant employer; and (v) a statement addressing whether charges have been brought before a state or local employment practices agency. 29 C.F.R. § 1601.12(a). The regulation also dictates, however, that strict compliance with these requirements is not necessary so long as the charge the Commission receives is "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Id.* § 1601.12(b); *see also Jones,* 502 F.3d at 1184.

**3** Against a similar regulatory backdrop, the Supreme Court recently addressed what constitutes a charge for the purposes of the Age Discrimination in Employment Act (ADEA). *See Federal Express Corp. v. Holowecki,* ---U.S. ----, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008).[5] The Court **713** held that a document constitutes a charge if it (i) provides the minimum information the regulations require, and (ii) can "be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee." *Id.* at

1157-58. Importantly, the Court explained that these requirements would allow the EEOC to fulfill its dual role of "enforcing antidiscrimination laws and disseminating information about those laws to the public." *Id.* at 1157. Moreover, the Court rejected an interpretation requiring only the minimal information mandated by the regulations because such a minimal standard would likely discourage individuals from seeking information from the EEOC due to concerns that the Commission would treat the information requests as charges. *Id.*

Before *Holowecki,* we had held that a document filed with the EEOC constitutes a charge where: (i) the document satisfies the requirements of § 1601.12; (ii) the evidence demonstrated that the complainant sought to activate the EEOC's administrative process; and (iii) the EEOC treated the document as a charge. *Jones,* 502 F.3d at 1183. The *Holowecki* Court's interpretation of what constitutes a charge, however, requires us to clarify two points regarding the factors discussed in *Jones.* With respect to the second factor, we must now evaluate whether a filing constitutes a complainant's request for remedial action from an *objective* viewpoint only. *See Holowecki,* 128 S.Ct. at 1158 ("[T]he filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes...."). With respect to the third factor, we now make plain that we do not require evidence that the EEOC actually treated a filing as a charge to construe that document as such. *See id.* at 1158-59. Instead, the EEOC's subsequent conduct merely informs our determination regarding whether the document can reasonably be construed as a request for agency action.

**[1]** With this standard in mind, we turn to consider whether each plaintiff filed a charge with the EEOC. The Officers each filed separate intake questionnaires with the EEOC in March 2004. These questionnaires are similarly formatted and contain all five types of information required by 29 C.F.R. § 1601.12. Standing alone, these questionnaires cannot reasonably be construed as "a request for the agency to take remedial action" because they relate only factual information about the Officers' allegations of discrimination and make no requests of the agency. *See, e.g., Holowecki,* 128 S.Ct. at 1159-60 (holding that an intake questionnaire constituted a charge because of an attached affidavit that stated "[p]lease force Federal Express to end their age discrimination plan so

105 Fair Empl.Prac.Cas. (BNA) 1027

we can finish out our careers absent the unfairness and hostile work environment...."). In addition, the language of the intake questionnaire form does not suggest that an employee requests action against her employer simply by filling out the form. Instead, the form merely requests information using statements like: "Please tell us the harm that you experienced" and "Why do you believe that your harm was for the [discriminatory] reason(s) stated in the previous question?"

**\*714 \*\*4** Our inquiry, however, does not end with the intake questionnaire. After submitting the questionnaires to the EEOC, each plaintiff received one or two letters from the EEOC. These letters informed the Officers that they had not filed charges as a result of the questionnaires and directed the Officers to take additional steps, including contacting the EEOC, if they wished to file a charge. The letters also indicated that if the Officers elected to file a charge, "it is likely the case would immediately be closed. A Dismissal/Right-to-Sue document would then be issued to you." The record indicates that only two of the Officers (Semsroth and Voyles) received Right-to-Sue letters.

**[2]** Given the discourse in the letters from the EEOC as well as the existence of the Right-to-Sue letters, we conclude that as a result of their subsequent actions, Officer Semsroth's and Officer Voyles's intake questionnaires reasonably constitute charges for the purposes of Title VII. The letters from the EEOC indicate that the Officers needed to take additional steps to demonstrate the requisite desire to start the EEOC administrative process and that if they did so, the EEOC would likely close their cases and issue Right-to-Sue letters. The presence of the Right-to-Sue letters suggests that Semsroth and Voyles in fact took the affirmative steps necessary to signal their desire to the EEOC to start its administrative process. We stress that the EEOC's subsequent conduct is not a necessary prerequisite for filing a charge. Here, we consider the EEOC's subsequent conduct only as evidence that Semsroth and Voyles must have contacted the EEOC subsequent to filing the intake questionnaire to request EEOC action, because the EEOC had advised these two plaintiffs that it would not issue right-to-sue letters to them in the absence of express requests for action. Accordingly, we conclude that Semsroth and Voyles filed charges with the EEOC.

**[3]** **[4]** The lack of a Right-to-Sue letter for Officer Wareheim, on the other hand, suggests that Officer Wareheim did not take the steps necessary to demonstrate a desire to start the EEOC process. The EEOC letter to Officer Wareheim notes that Wareheim met with an EEOC Senior Investigator, but nothing in the record suggests that Wareheim requested that the EEOC start its process during that interview. Without additional evidence, Officer Wareheim's intake questionnaire cannot be construed as a request for the EEOC to take action, and, accordingly, we conclude that Officer Wareheim failed to file a charge with the EEOC. We therefore dismiss her appeal. [6]

### ii. Timely allegations

A plaintiff's allegation is timely if she files her EEOC charge within 300 days of the alleged unlawful employment practice. [7] **\*715** *Croy v. Cobe Labs., Inc.,* 345 F.3d 1199, 1202 (10th Cir.2003). The Officers contend, however, that the district court wrongly applied the 300-day time limit because the continuing violations doctrine enables courts to consider allegations involving conduct that occurred beyond that period for purposes of the pattern or practice method of proof. In the past, we have noted that the continuing violations doctrine is viable *only* for hostile work environment claims, but the *Morgan* Court expressly left open whether the continuing violations doctrine applied to the pattern or practice method of proof. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 n. 9, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here."). Since *Morgan,* we have only applied the continuing violations doctrine to hostile work environment claims; however, we have not had the occasion to address the pattern or practice issue left open by the *Morgan* Court. We now conclude that the pattern or practice method of proof is available only to the government and class actions. Accordingly, we again decline to address whether the continuing violations doctrine applies to the pattern or practice method of proof.

**\*\*5** The pattern-or-practice method of proving discrimination has its origins in 42 U.S.C. § 2000e-6(a), which states that the Attorney General may bring a civil action against an employer on behalf of a protected group.

105 Fair Empl.Prac.Cas. (BNA) 1027

To prevail in such an action, the Government must prove that the employer "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by the subchapter." 42 U.S.C. § 2000e-6(a). In the seminal case on the pattern-or-practice method of proof, the Supreme Court implicitly extended this method of proof to class actions brought by private parties. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 357-60, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Supreme Court, however, has not extended this method of proof to claims brought by individual plaintiffs. *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 761 (4th Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999).

The pattern-or-practice method of proof and the method of proof used in a typical Title VII discrimination claim require different steps to prove a claim of discrimination. Pursuant to *Teamsters,* the pattern-or-practice method of proof involves two stages. At the first stage, the plaintiff must establish the employer's liability by "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters,* 431 U.S. at 360, 97 S.Ct. 1843. If the plaintiff carries this burden, then the employer may defend its liability by showing that the "[plaintiff's] proof is either inaccurate or insignificant ... [by] provid [ing] a nondiscriminatory explanation for the apparently discriminatory result." *Id.* at 360-61 & 360 n. 46, 97 S.Ct. 1843. If the defendant fails to establish a nondiscriminatory reason, then the second stage requires the court to fashion a proper remedy on the presumption that a violation has occurred. *Id.* at 361, 97 S.Ct. 1843. If the plaintiff does not provide any additional evidence, the court may impose only prospective remedies. *Id.* If the plaintiff demonstrates that the employer subjected a particular individual to an **\*716** adverse employment action, that employee may receive damages. *Id.* at 361-62, 97 S.Ct. 1843.

In contrast, a typical Title VII claim resolves issues of proof by relying on the burden-shifting method of proof from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff bears the initial burden and must demonstrate a prima facie case of discrimination in violation of Title VII. *Id.* at 802, 93 S.Ct. 1817. If the plaintiff successfully makes a prima facie claim, the burden shifts to the employer to "articulate some

legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* If the employer carries that burden of production, then the plaintiff must show that the employer's reason is merely a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817.

Several of our sister circuits, having noted the differences between these two methods of proof, have held that individual, private plaintiffs may not utilize the pattern-or-practice method of proof. For example, in *Lowery,* the Fourth Circuit distinguished these two methods of proof for two reasons. 158 F.3d at 761-62. First, the court noted that a plaintiff's burden under the pattern-or-practice method requires the plaintiff to prove only the existence of a discriminatory policy rather than all elements of a prima facie case of discrimination. *Id.* at 761. The court found this difference problematic because the Supreme Court has never allowed an *individual* plaintiff to shift the burden to the employer without first demonstrating all aspects of a prima facie case. *Id.* Second, the Fourth Circuit also distinguished these methods of proof based on the available remedies. *Id.* The court noted that under the pattern-or-practice method, only prospective relief was available, unless the plaintiffs offered additional proof. *Id.*; *see also Teamsters,* 431 U.S. at 361, 97 S.Ct. 1843. Because of these differences, and because the Supreme Court has never extended the pattern-or-practice method to individual plaintiffs, the court declined to allow individual plaintiffs to make their case using the pattern-or-practice method. *Lowery,* 158 F.3d at 761.

**\*\*6** Other circuits have followed the Fourth Circuit's lead. The Fifth Circuit held that the pattern-or-practice method was inappropriate for individual plaintiffs because the Supreme Court had not extended this method beyond class actions and cases brought by the Government. *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 356 (5th Cir.2001). The Sixth Circuit largely echoed *Lowery* when it held that "[w]e subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 575 (6th Cir.2004). The Seventh Circuit has also cautioned that language typical of the pattern-or-practice method was "misplaced" in an individual Title VII suit. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866 n. 6 (7th Cir.1985). *But see Davis v. Califano,* 613 F.2d 957, 963 (D.C.Cir.1979)

105 Fair Empl.Prac.Cas. (BNA) 1027

(suggesting that the rationale of a pattern or practice claim similarly applies in a cause of action brought by an individual).

**[5]**  In light of the distinctions between the two methods of proof, we agree with the strong majority of our sister circuits. The disparities between both of these methods of proof and the remedies available demonstrate that the pattern-or-practice method should be reserved for government actions or plaintiffs in class actions to establish the presence of a discriminatory policy, rather than to prove an individual **\*717** claim. *See Lowery, 158 F.3d at 761* ("The Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit charging employment discrimination. Rather, the Court has noted that there is a 'manifest' and 'crucial' difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination."). Therefore, we hold that individual plaintiffs may not utilize the pattern or practice method of proof in Title VII suits. Accordingly, only those allegations addressing conduct that occurred within the 300-day window are timely for the purposes of the disparate treatment, disparate impact, and retaliation claims.[8]

In the instant case, several of the Officers' allegations are untimely. Semsroth's EEOC administrative charge includes eight separate claims. Semsroth filed the charge on March 11, 2004, and therefore, the 300-day filing period began on May 16, 2003. Two of Semsroth's allegations-her allegations regarding being passed over for awards and her allegation regarding the picture of an award being placed in her locker-involved conduct that occurred before May 16, 2003, and thus, the district court properly excluded these allegations. The court also properly excluded the last two allegations in Semsroth's EEOC charge because the Officers did not include any mention of them in their response to the defendants' motion for summary judgment, and accordingly, these allegations were not before the district court.[9] Thus, the district court correctly allowed only four of the eight allegations included in Semsroth's administrative charge. These allegations include: (i) the Department retaliated against her by transferring her to a beat assignment with restricted experience and career advancement opportunities; (ii) a supervising officer told her that other officers referred to her as a "bitch" and then failed to discipline those officers; (iii) the

Department failed to take disciplinary action against an officer that failed to give Semsroth proper backup support during an emergency call; and (iv) a supervising officer "interrogated" her regarding a women's only luncheon for female police officers.

**\*\*7**  Voyles's EEOC charge included five separate allegations. She filed her charge on March 18, 2004, and her 300-day filing period therefore began on May 23, 2003. Three of these allegations involved conduct that occurred prior to May 23, 2003, and thus, are time barred. The district court properly allowed the remaining two allegations: (i) an allegation regarding a supervisor's negative and derogatory comments regarding Voyles's body and eating habits made while Voyles was pregnant; and (ii) an allegation regarding an oral reprimand from a supervisor in front of various media personnel.

### iii. Scope of exhausted claims

**[6]**  As a final matter on this issue, the Officers contend that the district court erroneously restricted the scope of their exhausted claims. The Officers assert that they exhausted any claim that is "reasonably related" to the allegations made in their EEOC charges. Unfortunately, the Officers cite abrogated case law to make their argument, and in light of more recent precedent, this argument lacks persuasive **\*718** force.[10] It is now well established that "each discrete [discriminatory] action constitutes its own unlawful practice for which administrative remedies must be exhausted." *Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir.2004)* (quotation marks omitted). Here, the district court restricted its analysis to the allegations the Officers exhausted by including them in their EEOC questionnaires, and therefore, we conclude that the district court properly declined to consider the additional allegations the Officers did not include in the EEOC questionnaires.

### B.

Shifting our attention to the merits, the Officers contend that the district court wrongly granted the defendants summary judgment because genuine issues of material fact remain regarding the Officers' Title VII claims. We agree only in part. After reviewing the record and construing the evidence in the light most favorable to the Officers,

we conclude that the district court correctly granted the defendants summary judgment on most of the Officers' Title VII claims. [11] But we REVERSE the district court's decision to grant the defendants summary judgment on Officer Semsroth's claims alleging retaliation and a hostile work environment. We, therefore, REMAND those two claims for trial.

### i. Disparate treatment

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (i) that she belongs to a protected class; (ii) that she suffered from an adverse employment action; and (iii) that her employer treated similarly situated employees differently. *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir.2005). Adverse employment action includes "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir.2007) (quotation marks omitted) (quoting *Hillig v. Rumsfeld,* 381 F.3d 1028, 1032-33 (10th Cir.2004)). In other words, "a mere inconvenience or an alteration of job responsibilities" will not constitute an adverse employment action.[12] *Id.* **\*719** (quotation marks omitted) To be similarly situated, employees must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala,* 472 F.3d 736, 745 (10th Cir.2006) (quotation marks omitted).

**\*\*8** **[7]** Turning to the instant case, it is clear that the district court properly granted the defendants summary judgment on all the disparate treatment claims.[13] Semsroth's two disparate treatment claims fail to establish a prima facie discrimination claim for two reasons. First, neither event constitutes an adverse employment action. Neither the record nor the Officers' brief indicates what adverse effect, if any, Semsroth's employment suffered due to the lack of disciplinary actions taken against *other officers.* Second, the record does not indicate that the Department treated Semsroth differently from other officers because Semsroth did not face disciplinary action in similar circumstances.

**[8]** Voyles also fails to establish a prima facie claim because she did not demonstrate that the reprimand she received constituted an adverse employment action. "A

written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status." *Haynes v. Level 3 Comm'cns, LLC,* 456 F.3d 1215, 1224 (10th Cir.2006). Here, Voyles presented no evidence that the reprimand affected her status. Accordingly, summary judgment on the Officers' disparate treatment claims was proper because they did not establish the required elements for a prima facie case.

### ii. Disparate impact

Unlike a disparate treatment claim, a disparate impact claim does not require a plaintiff to demonstrate intentional discrimination. *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1187 (10th Cir.2006). Instead, to establish a prima facie claim of disparate impact, a plaintiff must demonstrate that (i) a *specific* identifiable employment practice or policy caused (ii) a significant disparate impact on a protected group. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1312 (10th Cir.1999), *overruled on other grounds by Morgan,* 536 U.S. 101, 122 S.Ct. 2061; *see also* 42 U.S.C. § 2000e-2(k)(1)(A). This burden is not easily shouldered; a plaintiff "must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Boeing,* 456 F.3d at 1193 (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *superseded by statute on other grounds as recognized in Raytheon Co. v. Hernandez,* 540 U.S. 44, 52-53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)). If the plaintiff successfully bears this burden, then the burden shifts to the defendant "to show that the challenged practice is job related and consistent with business necessity." *Bullington,* 186 F.3d at 1312. If the defendant satisfies its burden, the final step requires the plaintiff to "suggest an alternative employment practice that serves the employer's legitimate employment **\*720** goals yet lacks the undesired discriminatory effect." *Id.*

In the instant case, the Officers object to "excessive subjectivity in promotions, discipline, hiring, and terminations." As noted above, only administratively exhausted claims are actionable. Here, the Officers' EEOC charges do not specifically reference specific employment practices that resulted in disparate impact, nor do they include any factual allegations that would give rise to a reasonable expectation of an administrative investigation for a claim of disparate impact. *See Jones,* 502 F.3d at 1186 (noting that we determine if a claim is administratively exhausted by analyzing "the scope of the administrative

105 Fair Empl.Prac.Cas. (BNA) 1027

investigation that can reasonably be expected to follow from the discriminatory *acts* alleged in the administrative charge"). Accordingly, the district court correctly granted defendants summary judgment on the Officers' disparate impact claims.

### iii. Retaliation

**\*\*9** Title VII explicitly prohibits retaliation against any employee who brings charges of discrimination. *See* 42 U.S.C. § 2000e-3. [14] In this case, only Semsroth exhausted a retaliation claim, alleging the Department retaliated against her for complaining to the Department's affirmative action administrator, Susan Leiker, about the unequal treatment the Department affords female officers. A few weeks after Semsroth raised this complaint, she was transferred to Beat 39. Beat 39 is not an assignment that any officer wants; it is referred to as a "banishment beat." Beat 39 provides diminished opportunities to gain experience and advance one's career because there are few calls on this beat, and there are no calls involving serious crime or high-profile incidents. Beat 39 also provides a more limited opportunity for overtime as compared to most other beats. Usually the Department assigns new officers to Beat 39, or an officer who is being disciplined.

"To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1224-25 (10th Cir.2008); *see also Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 549 (10th Cir.1999). First, the plaintiff "may directly show that retaliatory animus played a 'motivating part' in the employment decision." *Fye,* 516 F.3d at 1225. "If, however, the plaintiff is unable to" make that showing, "she may rely on the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Id.*; *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 247 n. 12, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality), *superseded in part on other grounds by* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B); *id.* at 260, 109 S.Ct. 1775 (White, J., concurring). Because Semsroth has established, under a mixed-motive theory, that a genuine issue of material fact exists as to whether retaliation played a motivating part in the Department's decision to transfer her to Beat 39, we need not consider Semsroth's

retaliation claim under the *McDonnell Douglas* burden-shifting analysis.

**\*721** To establish a mixed-motive claim, the plaintiff must "present [ ] evidence that directly shows that retaliation played a motivating part in the employment decision at issue." [15] *Fye,* 516 F.3d at 1226; *see also Kelley v. City of Albuquerque,* 542 F.3d 802, 819 n. 16 (10th Cir.2008) (noting "[a] 'mixed-motive' instruction is appropriate only in cases where direct evidence suggests forbidden animus was a motivating factor in the employment decision"). However, a plaintiff can make this showing using either direct or circumstantial evidence. *See Fye,* 516 F.3d at 1226. The "circumstantial evidence must be tied 'directly' to the retaliatory motive." *Id.* That is, "[s]uch circumstantial evidence must relate to a retaliatory reason for the employer's action." *Id.* at 1226-27 (quotation, alteration omitted).

**\*\*10** **[9]** Semsroth has met that burden here with the deposition testimony of Sergeant Wiley. Wiley testified that Semsroth's supervisor, Lieutenant Hanley, in deciding to transfer her to Beat 39, stated that he wanted to "[p]ut her out there, she won't have nothing to complain about." Wiley also indicated that Hanley's decision may have been motivated in part by Semsroth's troubled relationship with her co-workers. A reasonable jury could interpret Hanley's motivation-to insure that Semsroth would have nothing to complain about-as retaliation for the gender discrimination complaints she made to the City's affirmative action administrator, Leiker. *See Fye,* 516 F.3d at 1227 (considering, at summary judgment stage of litigation, whether reasonable jury could infer a retaliatory motive from the evidence presented). This evidence is, thus, sufficient to create a genuine issue of material fact that precludes summary judgment on this claim. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1512 (10th Cir.1997) (holding plaintiff presented sufficient evidence in support of his mixed-motive retaliation claim where two witnesses testified that "several people involved in the [challenged] promotion decision process had stated that Mr. Thomas would not be considered for promotion because of his discrimination complaint"); *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 n. 5 (10th Cir.1992) (holding plaintiff presented sufficient evidence to support her mixed-motive retaliation claim when warehouse supervisor testified that his supervisor held plaintiff's prior EEOC filing against her and had misrepresented a prior incident to those who decided not to promote plaintiff).

We, therefore, reverse the district court's decision granting defendants summary judgment on Officer Semsroth's retaliation claim and remand that claim to the district court for a trial.

#### iv. Hostile work environment

A plaintiff establishes a Title VII violation if she "proves that 'discrimination based on sex has created a hostile or abusive work environment.' " *Equal Employment Opportunity Comm'n v. PVNF, L.L.C.,* 487 F.3d 790, 798 (10th Cir.2007) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In considering whether the Officers asserted a claim of a sexually hostile work environment sufficient to **\*722** survive summary judgment, we look at "the totality of the circumstances ..., which is the touchstone of our analysis" of such claims. *PVNF,* 487 F.3d at 799 (quotation omitted); *see also Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Harsco Corp. v. Renner,* 475 F.3d 1179, 1187 (10th Cir.2007).

> To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

**\*\*11** *Harsco Corp.,* 475 F.3d at 1186 (quotation, alteration omitted). Thus, "[t]o survive summary judgment on a claim alleging a [sexually] hostile work environment, [the Officers] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that they were "targeted for harassment" because of their gender. *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 680 (10th Cir.2007) (quotation omitted).

"A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of [gender-based] enmity or sporadic [gender-based] slurs. Instead, there must be a steady barrage of opprobrious [gender-based] comments." *Id.* (quotation omitted). In determining whether the harassment is severe or pervasive, "we consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Id.* (quotation, alteration omitted). "The inquiry is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Tademy v. Union Pac. Corp.,* 520 F.3d 1149, 1162 (10th Cir.2008) (quotation omitted).

Both Voyles and Semsroth allege their work environment was sexually hostile.

#### a. Officer Semsroth

Semsroth alleges that her work environment was sexually hostile and thus violated Title VII. We must start our analysis by determining which of the allegations Semsroth asserts in support of this claim we can consider. As noted above, the continuing violation doctrine remains viable for hostile work environment claims. The *Morgan* Court made clear that the scope of actionable claims depended on "whether the acts about which an employee complains are part of the same actionable hostile work environment practice." 536 U.S. at 120, 122 S.Ct. 2061. To determine whether separate acts are part of the same practice, we look to the type, frequency, and timing of the acts, as well as to the perpetrator of the acts. *Duncan v. Manager, Dep't of Safety, City & County of Denver,* 397 F.3d 1300, 1309 (10th Cir.2005).

As previously addressed, Semsroth's actionable allegations include the following: (i) the Department retaliated against her by transferring her to a beat assignment with restricted experience and career advancement opportunities; (ii) a supervising officer told her that other officers referred to her as a "bitch" and then failed to discipline those officers; (iii) the Department failed to take disciplinary action against an officer who failed to give Semsroth proper backup support during an emergency call; and (iv) a supervising officer "interrogated" her regarding a women's-only

Case 4:17-cv-06621-YGR   Document 1-1   Filed 11/16/17   Page 826 of 898
Semsroth v. City of Wichita, 304 Fed.Appx. 707 (2008)
105 Fair Empl.Prac.Cas. (BNA) 1027

luncheon for female police officers. In addition, however, Semsroth **723** makes several other allegations that are sufficiently related to these actionable claims that they can be considered part of the same unlawful employment practice.

**\*\*12  [10]**   First, Semsroth testified in her deposition that Sergeant Watts admonished Semsroth to "let [her] hair down and go out and have beers with the guys." This allegation is sufficiently related to Semsroth's actionable claim that Sergeant Watts, along with Captain Tabor, Lieutenant Hanley, and Sergeant Chambers, failed to discipline Officer Nixon when he did not provide backup for Semsroth in October 2003. And it was Sergeant Watts who, along with Lieutenant Hanley and Sergeant Chambers, was involved in the decision, made soon after October 2003, to transfer Semsroth to the less desirable Beat 39.

**[11]**   Second, Semsroth contends that Lieutenant Hanley failed to discipline Officer Tucker after Tucker, in April 2003, placed a photo of a Department award in Semsroth's locker, mocking her for being passed over for such an award. Captain Tabor and Sergeant Chambers were also involved in informally investigating this incident. The failure to discipline Tucker is sufficiently related to Semsroth's exhausted allegation that, in October 2003, Hanley, as well as Watts, failed to discipline officers for calling Semsroth a "bitch."

**[12]**    Third, Semsroth alleges that the Department presented awards to male officers involved in a dangerous call in June 2002, but did not give Semsroth the same award, despite her also taking part in this call. Semsroth complained about this unequal treatment to Lieutenant Hanley and Captain Tabor. And it was Semsroth's complaints about being passed over for these awards that prompted Tucker to place the mocking photo in Semsroth's locker. These allegations are sufficiently related to Semsroth's allegations that Hanley failed to discipline Officer Tucker for using the photo of a Department award to mock her.

A reasonable jury could find that all three of these additional allegations were part of the same unlawful employment practice that involved Semsroth's other exhausted harassment allegations. *See Tademy,* 520 F.3d at 1160; *see also Duncan,* 397 F.3d at 1309. They

are temporally related, and they all involve the same supervisory officers. [16]

We now turn to the question of whether these actionable incidents of alleged sexual harassment are sufficient for Semsroth's hostile environment claim to survive summary judgment. We conclude they are.

Viewed in context and in the light most favorable to her, Semsroth's evidence establishes the following: Semsroth has been a police officer in the Department since September 2000. In June 2002, she was the only woman among the eight first responders to answer a call which involved a **\*724** suspect shooting at officers. Eventually eighty-six officers responded to this situation. All of the seven male first responders received a department award, counselling and administrative leave. Semsroth, the only woman, did not.

As a result, in April 2003, Semsroth complained to her supervisors about what she perceived to be the Department's unequal treatment of male and female officers. After her complaints, a male officer, Officer Tucker, took photos of the awards given to the male officers and placed those photos in Semsroth's locker, with a note telling her "[C]ut these out and pin them on your uniform as you feel you deserve, it's probably the closest you will ever get to the real thing." [17] Semsroth reported this incident to her supervisor, Sergeant Chambers, who, in turn, reported it to his supervisor, Captain Tabor. Tabor promised Semsroth "that there would be discipline," but no one conducted a formal investigation of Tucker's actions. Tabor, Hanley and Chambers did make Tucker apologize to Semsroth.

**\*\*13**   In mid-2003, male officers talking to Sergeant Watts and Lieutenant Hanley referred to Semsroth as a "bitch." Neither supervisor, however, apparently took any action against the male officers. [18] Instead, Watts and Hanley met with Semsroth, told her that other officers were calling her a "bitch," and "verbally counselled" her on how to handle the situation. Watts advised Semsroth to "let [her] hair down and go out and have beers with the guys."

In October 2003, Semsroth requested backup during a traffic stop. The dispatcher directed a male officer, Officer Nixon, to provide Semsroth with backup. Instead of doing

so, Nixon argued with Semsroth over the radio on the need for backup. Nixon never provided Semsroth with backup. When Semsroth complained to their supervisor, Sergeant Watts, that Nixon's failure to provide backup had jeopardized her safety, Watts responded that it was "just Nixon being Nixon." Watts agreed that Nixon should have provided her backup and said he would talk to Nixon, but Watts did not want Nixon to take it the wrong way.

A week later, Semsroth attended a women-officers-only lunch. Upon her return, Semsroth's supervisors interrogated her about the lunch.

Still another week later, Sergeant Watts and Lieutenant Hanley transferred Semsroth to Beat 39. As previously explained, Beat 39 was referred to as the banishment beat, a beat usually reserved for new officers or those being disciplined. It was a beat with diminished opportunities for career development. Watts and Hanley informed Semsroth that this transfer was "to get [her] kind of out and away ... 'cause [she] was having some turmoil with a couple *725 of male officers at the time." None of the male officers involved in this turmoil was transferred.

In light of this evidence, we must consider whether Semsroth has established the necessary elements to recover under her claim that her work environment was sexually hostile. *See Harris Corp.,* 475 F.3d at 1186 (listing elements). Semsroth, as a woman, is a member of a protected class. Her complaints to her supervisors establish that the harassment she perceived was unwelcome.

And, viewing the evidence in the light most favorable to Semsroth, her male supervisors and co-workers targeted her for harassment because of her gender. "[T]he critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not." *Id.; see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

[13] Here, the fact that Semsroth has presented evidence indicating that she was treated differently from similarly situated male officers supports this conclusion. *See Oncale,* 523 U.S. at 80-81, 118 S.Ct. 998. For instance, when there was a personality conflict between Semsroth and her male co-workers, it was Semsroth and not the

male officers who was transferred to the undesirable Beat 39.

In addition, evidence that Semsroth's supervisors used and tolerated the use of the word "bitch" further suggests that the harassment directed at Semsroth was based on her gender. "[W]e have characterized th[at] word as a 'sexual epithet[ ]' that courts have described as 'intensely degrading' " to women. *PVNF,* 487 F.3d at 799 (quoting *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996)); *see also Reeves v. C.H. Robinson Worldwide, Inc.,* 525 F.3d 1139, 1144 (11th Cir.2008). When a supervisor "tolerate[s] the use of the word 'bitch' to describe" a plaintiff, "a *jury* should decide whether these comments were made because of gender animus." *PVNF,* 487 F.3d at 799 (emphasis added); *see also Carter v. Chrysler Corp.,* 173 F.3d 693, 700 (8th Cir.1999) ("[G]ender-based insults, including the term 'bitch,' may give rise to an inference of discrimination based on sex.").

**\*\*14** Moreover, a supervisor's use of terms like "bitch" can itself be a form of differential treatment, particularly when the supervisor uses the term to refer to many women. *See Chavez v. Thomas & Betts Corp.,* 396 F.3d 1088, 1096 (10th Cir.2005) ("[E]vidence supports the reasonable inference that [a supervisor] treated men and women differently.... [The supervisor] regularly directed sexually charged, humiliating, and hostile comments towards women [and] ... regularly classified women as 'bitches.' "), *overruling on other grounds recognized in Metzler v. Fed. Home Loan Bank,* 464 F.3d 1164, 1171 n. 2 (10th Cir.2006).

Even if not all of these incidents of alleged harassment can easily be categorized as overtly based on gender, some certainly can be. In light of that, we can consider it more likely that the other actions taken against Semsroth that are not overtly gender-based may well stem from the same discriminatory hostility. *See Montes,* 497 F.3d at 1172; *Winsor,* 79 F.3d at 1000; *see also Herrera,* 474 F.3d at 682 n. 7.

[14] Viewed in the light most favorable to her, Semsroth's evidence also establishes that this harassment was sufficiently severe and pervasive that a jury could find that it altered Semsroth's employment conditions. In making this determination, we consider "the frequency of the conduct; its severity; whether it is physically **\*726** threatening or humiliating, or a mere offensive utterance;

105 Fair Empl.Prac.Cas. (BNA) 1027

and whether it unreasonably interferes with an employee's work performance." *Harsco Corp.,* 475 F.3d at 1187; *see also Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Much of this conduct occurred during a two-month period from October to December 2003. *See PVNF,* 487 F.3d at 799 (concluding evidence established pervasive harassment when the "bulk of it occurred during a relatively short period of time-[a] four-month period"). This suggests a pervasive pattern of harassment.

Of particular moment in considering the severity of the alleged harassment was the failure of Semsroth's supervisors to discipline Officer Nixon for failing to provide backup for Semsroth. *See, e.g., Dawson v. County of Westchester,* 373 F.3d 265, 273 (2d Cir.2004) (holding that the evidence could support the finding of a pervasively hostile work environment because corrections "officers must depend upon their co-workers for mutual protection ... in potentially dangerous situations [and], [i]n such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety ... assume greater, not lesser, significance") *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996) (evidence could support the finding of a hostile work environment where coworkers of a black corrections officer "put him in danger of physical harm [by] refusing to send requested back-up assistance"); *Apgar v. Wyoming,* No. 99-8029, 2000 WL 1059444, at *6 (10th Cir. Aug.2, 2000) (unpublished) (evidence could support the finding of a pervasively hostile work environment because, "[w]hile we would have a difficult time characterizing ... 'silent treatment' as severe and pervasive harassment in an office setting ... the behavior takes on an entirely different meaning in the law enforcement context [because] [l]aw enforcement officers must rely on their fellow officers while on duty"). Nixon's failure to provide backup could have put Semsroth in physical danger. And a jury could find that her supervisor's failure to address the issue adequately and discipline Nixon could create a risk that this conduct would be repeated. *See Tademy,* 520 F.3d at 1167 (holding that past disciplinary failures were related to later racist incidents because "employees might well ... conclude[ ] that they could engage in such behavior with minimal consequences").

**15 Semsroth's evidence, if believed, is therefore sufficient to establish more than an isolated or occasional incident of gender-based harassment. Rather, the evidence indicates a work environment that was permeated with gender-based intimidation and insult.

Lastly, Semsroth's evidence is sufficient for a jury to find the Department liable for this harassment under Title VII. An employer will be liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Further, the employer may be liable for a sexually hostile work environment "if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment." *Holmes v. Utah, Dep't of Workforce Servs.,* 483 F.3d 1057, 1069 (10th Cir.2007) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir.1998)); *see also PVNF,* 487 F.3d at 799 (suggesting employer would be on notice where plaintiff's "supervisor knew all about [the challenged] conduct and either chose to ignore it altogether or respond in only the most minimal of ways (e.g., forcing a half-hearted apology)"); *Winsor,* 79 F.3d at 1002 (concluding employer generally **727** failed to take remedial action where, despite plaintiff's numerous complaints, her manager suggested instead that she "grit her teeth and hang in there" because she was working in a tough business and a lot of her male counterparts were unhappy with plaintiff's success). "Actual knowledge is usually demonstrable where," as here, the evidence indicates that "the plaintiff has reported harassment to management-level employees." *Harsco Corp.,* 475 F.3d at 1188.

For all of these reasons, we conclude that Officer Semsroth's hostile work environment is sufficient to survive summary judgment. "It may be that a jury would agree with [the Department] that [Semsroth] was not subjected to a severe or pervasively hostile environment based on her sex, but that is not for this Court to decide." *PVNF,* 487 F.3d at 800.

### b. Officer Voyles

Officer Voyles, too, asserts a hostile work environment claim. We must, again, determine which of the allegations Voyles asserts in support of this claim we can consider. As previously addressed, Voyles made two timely and thus actionable allegations in her EEOC complaint: (i) an allegation regarding a supervisor's negative and

derogatory comments regarding Voyles's body and eating habits made while Voyles was pregnant; and (ii) an allegation regarding an oral reprimand from a supervisor in front of various media personnel. We focus on those allegations. [19]

[15]  The evidence, viewed in the light most favorable to Voyles, indicates that, during her pregnancy, her supervisor, Lieutenant Bohannon, would make derogatory remarks about Voyles's weight and her eating habits. Voyles complained about these remarks to Deputy Chief Stoltz, who responded that "that's kind of how [Bohannon] was."

**16  Voyles alleged that, during this same time period, Bohannon verbally reprimanded her in front of the media. In her deposition, however, Voyles instead testified that Bohannon stated, during a telephone conversation, that Voyles was being difficult. This conversation occurred in an open room where the media was gathered for a daily Department briefing. Although Voyles overheard this remark, she did not know if any members of the media heard it.

Although we do not engage in a simple counting exercise to determine the pervasiveness of the harassment, Voyles's claims constitute a few isolated incidents rather a hostile work environment. *Herrera,* 474 F.3d at 680 n. 3. Her allegations are not so severe or pervasive that a reasonable jury could find that they altered the conditions of her employment. *See Tademy,* 520 F.3d at 1162; *Herrera,* 474 F.3d at 680. It is beyond question that these experiences were unpleasant, and the breadth of the allegations made in this case suggests that the Department must remain vigilant to ensure discrimination does not take place; however, given the claims properly before this court, we must conclude that Voyles did not establish that these interactions created a hostile work environment that altered her conditions of employment. Accordingly, **\*728** summary judgment in the Department's favor on this claim was proper.

## III.

As a final matter, in their brief, the Officers contend that the district court improperly excluded their expert report and other summary judgment evidence. We review this contention for abuse of discretion, *Bryant v. Farmers Ins. Exchange,* 432 F.3d 1114, 1122 (10th Cir.2005), and we disagree that the district court erred. The district court excluded summary judgment evidence that violated the local rules or contained inadmissible content pursuant to the Federal Rules of Evidence. Accordingly, the district court did not abuse its discretion by excluding this evidence. *Id.*; *Hernandez v. George,* 793 F.2d 264, 266 (10th Cir.1986).

## IV.

The Officers' allegations and summary judgment evidence in this case are quite troubling. The allegations suggest that sexual discrimination remains a concern within the Department. Federal law prohibits such discrimination and we strongly regret the presence of any such misconduct. Nevertheless, in the instant case, for the most part the Officers fail to demonstrate that discriminatory motives played a role in the Department's employment decisions that were properly before the district court.

We REVERSE the district court's decision granting the defendants summary judgment on Officer Semsroth's retaliation and hostile-environment claims and REMAND those two claims for a trial. In all other respects, we AFFIRM the district court's decision granting the defendants summary judgment.

## All Citations

304 Fed.Appx. 707, 2008 WL 5328466, 105 Fair Empl.Prac.Cas. (BNA) 1027

## Footnotes

\*  This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

1  The district court dismissed Officer Heather Plush's Title VII claims for failure to exhaust administrative remedies. The Officers do not appeal this decision.

2   The district court's thoughtful and comprehensive memorandum and order discusses the facts of this case in great detail. *See Semsroth v. City of Wichita,* No. 04-1245-MLB, 2007 WL 1246223 (D.Kan. Apr.27, 2007). Accordingly, we will not repeat the district court's efforts and offer only a brief summary of the facts here.

3   The Officers do not appeal the district court's decision to deny their class certification motion.

4   The plaintiffs also pursued a 42 U.S.C. § 1983 claim against Chief Williams in his personal capacity. The district court granted Chief Williams summary judgment on this claim, and on appeal, the plaintiffs expressly waived any argument on that claim. Accordingly, we do not address this issue.

5   While the *Holowecki* Court addressed the ADEA, we cite cases addressing the ADEA's filing requirements in the Title VII context because "the filing provisions of the ADEA and Title VII are virtually *in haec verba,* the former having been patterned after the latter." *Montes,* 497 F.3d at 1164 n. 6 (internal quotation marks omitted) (quoting *E.E.O.C. v. Commercial Office Prods. Co.,* 486 U.S. 107, 123-24, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988)).

6   The Officers' Supplemental Brief contends that a charge filed with the EEOC by any of the Officers satisfies the charge requirements of Title VII via the "single filing rule." The single filing rule, however, does not save Officer Warehime's claims because the Officers' allegations of discrimination-involving different superior officers and different incidents-demonstrate that they are not similarly situated. *See, e.g., Foster v. Ruhrpumpen, Inc.,* 365 F.3d 1191, 1198-99 (10th Cir.2004) (applying the "single filing rule" where, *inter alia,* the plaintiffs were similarly situated because their age discrimination claims all involved the same termination event). Although both Officer Warehime and Officer Semsroth alleged they were interrogated regarding women's luncheons, those interrogations were separated by three months and there is no indication that the same superior officers conducted both interrogations. Thus, the single filing rule does not apply.

7   We have held that Kansas is a "deferral" state for the purposes of Title VII. *See Brown v. Unified Sch. Dist. 501, Topeka Pub. Schs.,* 465 F.3d 1184, 1186 (10th Cir.2006). Accordingly, pursuant to § 2000e-5(e)(1), the plaintiffs had to file their EEOC charges within 300 (rather than 180) days. 42 U.S.C. § 2000e-5(e)(1).

8   Due to the applicability of the continuing violations doctrine to hostile work environment claims, we address which allegations are timely for those claims below.

9   Plaintiffs arguably raised only one of these two allegations in their complaint, and the pretrial order did not include either allegation. Nor did Plaintiffs specifically address these allegations in their opening brief filed with this court.

10  The Officers' argument rests on *Ingels v. Thiokol Corp.,* 42 F.3d 616 (10th Cir.1994). We abrogated the holding in *Ingels,* however, after the Supreme Court handed down its decision in *Morgan. See Martinez v. Potter,* 347 F.3d 1208, 1210-11 (10th Cir.2003).

11  The Officers contend that we must apply a modified *McDonnell Douglas* burden-shifting framework to take into account the mixed motive approach the Supreme Court addressed in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). We doubt that the *Costa* Court modified that framework because the Court did not address or cite *McDonnell Douglas* in that opinion; however, we need not resolve that issue here. Both the *McDonnell Douglas* and the mixed motive approaches require a demonstration that a discriminatory motive played some role in the employment decision at issue. With two exceptions, the Officers failed to present evidence through any of these methods that a discriminatory motive played a role in the employment decisions at issue in the case at bar. We specifically address below the mixed-motive theory that applies to retaliation claims. Otherwise, as discussed below, the district court properly granted summary judgment under either approach.

12  We note, however, that the concept of an adverse employment action differs in the context of Title VII anti-retaliation claims. *See Piercy,* 480 F.3d at 1203 n. 12 (noting that *Burlington Northern & Santa Fe Railway v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), modified the contours of adverse employment action *only* for the purposes of retaliation claims).

13  For clarity's sake, we list here Semsroth's and Voyles's factual allegations that support their claims of disparate treatment. Semsroth has two actionable claims for disparate treatment relating to discipline: (i) supervisors telling Semsroth that other officers referred to her as a "bitch" and failing to discipline those officers for their comments; and (ii) supervisors failing to discipline a fellow officer for failing to provide backup to Semsroth. Voyles's one actionable claim for disparate disciplinary treatment relates to an oral reprimand from a supervisor in front of various media personnel.

14  Section 2000e-3(a) provides:

   It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

   42 U.S.C. § 2000e-3(a).

**15** "Once the plaintiff proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive." *Fye,* 516 F.3d at 1225. If the defendant is able to make this showing, the defendant will not be relieved of liability, but the plaintiff's remedies may be limited. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *see also Davey v. Lockheed Martin Corp.,* 301 F.3d 1204, 1213-14 (10th Cir.2002); *Medlock,* 164 F.3d at 553 n. 5.

**16** Semsroth further alleged several other incidents of potentially sexually-based harassment: (i) Sergeant Kennedy, every time he saw Semsroth, would call her dumb and blonde, and (ii) Officer Bartel referred to Semsroth as "hot." We do not consider these allegations, however, because they are not sufficiently related to Semsroth's actionable claims. These two allegations involve different officers than those involved in the rest of Semsroth's actionable allegations. *See Duncan,* 397 F.3d at 1313. And Semsroth testified in her deposition that, while she found these comments "annoying" and "inappropriate," she did not find them offensive. On the basis of this record, we cannot say that, even drawing every inference in her favor, a reasonable jury could find that these comments were part of the same unlawful employment practices that underlie Semsroth's actionable allegations of sexual harassment. *See Tademy,* 520 F.3d at 1160; *see also Duncan,* 397 F.3d at 1309.

**17** On appeal, Semsroth does not appear to dispute that the seven male officers who first responded to the call received awards because they each came under direct fire from the suspect, while she did not.

**18** Semsroth has proffered evidence that Lieutenant Hanley used the same term to refer to female officers. Co-defendant Heather Plush heard reports that Hanley told an entire squad that the women who filed this suit were "bitches" who "need[ed] to learn to get along." Plush also heard Hanley refer to a female officer as "a bitch" at the 2003 Department Christmas party. Although this evidence does not support a finding that Semsroth experienced a hostile work environment, because she does not allege that she knew of these comments, *see Tademy,* 520 F.3d at 1164, it may support a jury finding that Hanley condoned the use of the term by other officers or used it himself due to a discriminatory attitude towards women, *c.f. Morgan,* 536 U.S. at 113, 122 S.Ct. 2061; *Davidson v. Am. Online,Inc.,* 337 F.3d 1179, 1184 n. 2 (10th Cir.2003).

**19** In addition, Voyles alleges several other incidents of potentially sexually-based harassment, including: (i) an allegation that a fellow officer harassed her during a traffic stop; (ii) an allegation that she received disparate disciplinary treatment for failing to write a sufficient number of tickets in a given period; and (iii) an allegation that she received disparate disciplinary treatment for failing to attend the required number of community meetings. But we do not address these three additional allegations Voyles makes because they are unrelated to her two actionable claims.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tab 17

Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)

125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

820 F.2d 1044
United States Court of Appeals,
Ninth Circuit.

Stamatina STALLCOP, Plaintiff-Appellant,

v.

KAISER FOUNDATION HOSPITALS;
the Permanente Medical Group, Inc.;
Hospital & Institutional Workers
Union, Local 250, Defendant-Appellee.

No. 86–2343.
|
Argued and Submitted April 14, 1987.
|
Decided June 23, 1987.

Former employee brought action against former employer alleging wrongful discharge, fraudulent misrepresentation, intentional and negligent infliction of emotional distress, and violations of state equal employment laws. Action was removed. The United States District Court for the Northern District of California, Marilyn H. Patel, J., found claims preempted by Labor Management Relations Act and barred by limitations. Former employee appealed. The Court of Appeals, Hug, Circuit Judge, held that: (1) former employee's claims for wrongful discharge, fraudulent misrepresentation, intentional and negligent infliction of emotional distress were preempted and barred by limitations, and (2) state law equal employment claims were barred.

Affirmed.

**Attorneys and Law Firms**

*1046 Segundo Unpingco, San Jose, Cal., for plaintiff-appellant.

Morton H. Orenstein, Allen M. Kato, and Stewart Weinberg, San Francisco, Cal., for defendants-appellees.

Appeal from the United States District Court for the Northern District of California.

Before HUG, NELSON and NOONAN, Circuit Judges.

**Opinion**

HUG, Circuit Judge:

Stallcop filed a complaint in state court against Kaiser Foundation Hospitals and Permanente Medical Group ("Kaiser"), her former employers, alleging wrongful discharge, fraudulent misrepresentation, intentional and negligent infliction of emotional distress, and violations of California equal employment laws. She also alleged a cause of action against her former union for breach of the duty of fair representation.

Following removal to federal district court, Stallcop's claim against the union was dismissed and Kaiser's motion for summary judgment on the remaining claims was granted. The district court found that all of Stallcop's claims, except that of violation of California equal employment laws, were preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (1982). The district court then found that the relevant six-month statute of limitations had run on these section 301 claims, and that this time bar was not overcome by equitable considerations. Stallcop's age and sex discrimination claims under California law were dismissed for failure to exhaust administrative remedies. Summary judgment was granted to Kaiser on Stallcop's national origin claim because she failed to establish a prima facie case.

The issues we address are: (1) whether the case was properly removed to federal court; (2) whether the wrongful discharge, *1047 fraudulent misrepresentation, and emotional distress claims are preempted by section 301; (3) whether the statute of limitations should be equitably modified; and (4) whether granting summary judgment to the defendants on the California discrimination claims was proper.

We affirm the district court's judgment.

## I.

## FACTS

Throughout her employment with Kaiser, Stallcop was a member of the Hospital & Institutional Workers Union,

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 834 of 898

**Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)**
125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

Local 250 ("the Union"), which had an exclusive collective bargaining agreement with Kaiser.

Stallcop was first terminated on May 7, 1984, after receiving three letters of warning from her supervisor concerning poor work performance. She was reinstated on July 11, 1984 pursuant to a reinstatement agreement negotiated between her, the Union, and Kaiser. This written agreement required Stallcop to show "substantial improvement" in her work.

After her reinstatement, Stallcop again received notices of her inadequate job performance. Stallcop alleges that she was assigned additional work responsibilities in violation of an oral agreement in connection with the written reinstatement agreement. Stallcop was then terminated a second time on November 27, 1984, for unsatisfactory work performance.

Stallcop again challenged her termination. The Union represented her through Step 3 of the grievance procedure. On March 12, 1985, the Union sent Stallcop a letter telling her it would proceed no further with her case. Stallcop alleges that DeMello, a union business representative, told her she had one year in which to sue.

On March 22, 1985, Stallcop filed a complaint against the Union and Kaiser with the NLRB. It was denied April 15, 1985. On April 8, 1985, Stallcop filed a discrimination charge against Kaiser with the California Department of Fair Employment and Housing ("DFEH"), alleging she was terminated due to her Greek national origin. In August 1985, Stallcop received a "Notice of Closure" from the DFEH, informing her that the allegation of discrimination could not be sustained, and giving her notice of the right to sue.

In August 1985, Stallcop alleges she consulted with three different lawyers, all of whom told her the relevant statute of limitations was one year. She later consulted with other lawyers, and filed her complaint in state court on November 27, 1985. On December 20, 1985, Kaiser and the Union removed the action to federal district court.

## II.

### REMOVAL JURISDICTION

Since Stallcop did not object to removal to the district court, the relevant question is "not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs v. General Electric Credit Corp.,* 405 U.S. 699, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972) (quoted in *Harper v. San Diego Transit Corp.,* 764 F.2d 663, 666 n. 1 (9th Cir.1985)). The standard of review is therefore *de novo. Mobil Oil Corp. v. City of Long Beach,* 772 F.2d 534, 538 (9th Cir.1985).

**[1]**   Federal district courts have original jurisdiction in all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1982). On the face of the complaint, Stallcop alleges that the Union breached its duty of fair representation by failing to represent her interests properly in the grievance procedure. This action against the Union for breach of the duty of fair representation must be based on federal labor law, section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) (1982). *Vaca v. Sipes,* 386 U.S. 171, 177–78, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967). Since the action "arises under" a federal law, the federal court would have had original jurisdiction over Stallcop's suit.

### *1048   III.

### PREEMPTION UNDER SECTION 301

**[2]**   Whether preemption was proper is a question of subject matter jurisdiction, reviewable *de novo. Mobil Oil Corp.,* 772 F.2d at 538.

Stallcop's first four causes of action appear on their face to present only state law claims—wrongful discharge, fraudulent misrepresentation, and intentional and negligent infliction of emotional distress. The district court found, however, that federal jurisdiction existed because these claims were preempted by section 301 of the LMRA. [1]

**[3]   [4]**   The preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violation of a collective bargaining agreement. [2] *Franchise Tax Board v. Laborers Vacation Trust,* 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1982); *Fristoe v.*

Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)

125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

*Reynolds Metals Co.,* 615 F.2d 1209, 1212 (9th Cir.1980). All that is required for a cause of action to exist under section 301 is that the suit be based on an alleged breach of contract between an employer and a labor organization and that the resolution of the lawsuit be focused upon and governed by the terms of the contract. *Painting and Decorating Contractors Ass'n v. Painters and Decorators Joint Comm.,* 707 F.2d 1067, 1071 (9th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984), *cited in Williams v. Caterpillar Tractor Co.,* 786 F.2d 928, 935 (9th Cir.), *cert. granted,* 479 U.S. 960, 107 S.Ct. 455, 93 L.Ed.2d 401 (1986).

### A. *Wrongful Discharge*

**[5]** Stallcop's first cause of action is for wrongful discharge in violation of her employment agreement and of her oral agreement with Kaiser when she was reinstated after her initial discharge. Stallcop's complaint does not reveal that her employment is governed by a collective bargaining agreement, but this is not dispositive under the "artful pleading" doctrine. Under this doctrine, the court may investigate the true nature of the plaintiff's allegations; if the complaint actually raises a section 301 claim on the collective bargaining agreement, even though it is framed under state law, the claim is preempted. *Olguin v. Inspiration Consolidated Copper Co.,* 740 F.2d 1468, 1473 (9th Cir.1984), *cited in Williams,* 786 F.2d at 931 n. 1. Stallcop was, in fact, subject to a collective bargaining agreement, and the claim based upon it is preempted by section 301. *See Franchise Tax Board,* 463 U.S. at 23, 103 S.Ct. at 2853; *Fristoe,* 615 F.2d at 1212.

Stallcop contends that the wrongful termination alleged does not involve the interpretation of the collective bargaining agreement. Although the argument is not clearly made, she apparently contends that she was wrongfully discharged in violation of the oral agreement in connection with her reinstatement, and that this agreement is not part of the collective bargaining agreement. However, "any independent agreement of employment could be effective only as part of the collective bargaining agreement." *Olguin,* 740 F.2d at 1474. *Accord Bale v. General Telephone Co. of California,* 795 F.2d 775, 779 (9th Cir.1986); *cf.* **\*1049** *Williams,* 786 F.2d at 935–36 & n. 6 (contract involved was entered into outside of the collective bargaining unit).

**[6]** Stallcop also attempts to rely on the California tort of wrongful discharge. Her complaint does not plead such an

action. Furthermore, even if it did, the tort is preempted as well. The collective bargaining agreement guarantees the employer will discipline employees only upon just cause. Art. XXIX § 211. Thus, the agreement appears to provide "the same or greater protection of job security that state tort law seeks to provide for nonunionized employees; accordingly federal law preempts state law." *Olguin,* 740 F.2d at 1474. *See also Harper,* 764 F.2d at 668–69 (since the job security is the same, federal preemption jeopardizes no independent state right).

### B. *Other Causes of Action*

**[7]** Stallcop's cause of action for fraud is based upon representations Kaiser made in connection with the reinstatement agreement. As such, the fraud action depends upon an interpretation of the collective bargaining agreement, and is preempted by section 301. [3] *Bale,* 795 F.2d at 779–80; *Fristoe,* 615 F.2d at 1211–12.

**[8]** Stallcop's actions for intentional and negligent infliction of emotional distress grow out of her discharge. Her complaint details her receipt of letters of warning, her discharge and reinstatement, and her final discharge. Disciplinary actions and letters of warning are governed by the collective bargaining agreement. Resolution of her claims therefore necessarily entails examination and interpretation of the agreement, and these claims are also preempted. *Carter v. Smith Food King,* 765 F.2d 916, 921 (9th Cir.1985); *Olguin,* 740 F.2d at 1475–76; *cf. Tellez v. Pacific Gas & Electric,* 817 F.2d 536, 539 (9th Cir.1987) (actions for intentional and negligent infliction of emotional distress not preempted since they arose from conduct not covered by the collective bargaining agreement); *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367, 1369 n. 4 (9th Cir.1984) (same), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1986).

### C. *Once Preempted, Summary Judgment was Properly Granted Because the Claims were Time-barred*

**[9]** Stallcop's claims are a hybrid section 301 and fair representation claim. The six-month statute of limitations for making unfair labor practice charges under the NLRA is applicable to such claims. *DelCostello,* 462 U.S. at 169–70, 103 S.Ct. at 2293. Stallcop's claims accrued in March 1985 when she received the Union's letter notifying her it would pursue her grievance no further. *Carter,* 765 F.2d at

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 836 of 898

Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)

125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

919 n. 2. Since her complaint was not filed until November 1985, over eight months later, it is time-barred. [4]

## IV.

### EQUITABLE MODIFICATION OF THE STATUTE OF LIMITATIONS

**[10]** Stallcop argues that the statute of limitations should be equitably modified in this case. Such modification is applicable **\*1050** to the type of hybrid action present here. *See DelCostello,* 462 U.S. at 172, 103 S.Ct. 2294 (case remanded for district court to consider equitable tolling arguments). She believes modification is appropriate here because (1) she was not notified by the Union, Kaiser, the NLRB, or the three lawyers she originally consulted that there was a six-month statute of limitations, and (2) DeMello, a union business representative, told her she had one year in which to file suit and she reasonably relied on his representation. Stallcop's first basis cannot provide relief since none of the parties had a duty to inform her of the statute of limitations. [5] Her second contention, however, could possibly toll the limitations period.

There are two types of equitable modification, equitable tolling and equitable estoppel. Equitable tolling requires that Stallcop was excusably ignorant of the limitations period. *Naton v. Bank of California,* 649 F.2d 691, 696 (9th Cir.1981). Stallcop admitted that she consulted three lawyers within the six-month statutory period. She therefore gained the "means of knowledge" of her rights and can be charged with constructive knowledge of the law's requirements. *See Edwards v. Kaiser Aluminum & Chemical Sales, Inc.,* 515 F.2d 1195, 1200 n. 8 (5th Cir.1975). Equitable estoppel focuses on the defendant's actions. There must be evidence of an improper purpose by the defendant, or of the defendant's actual or constructive knowledge that its conduct was deceptive. *Naton,* 649 F.2d at 696. Stallcop failed to provide this evidence. She also concedes that DeMello's alleged misrepresentations were not intentionally or fraudulently made, and the district court relied on this concession to hold there was no basis for the application of equitable estoppel.

Therefore, the district court correctly held that there was no factual basis for applying equitable modification to the limitations period in this case.

## V.

### SUMMARY JUDGMENT OF DISCRIMINATION CLAIMS

The district court granted summary judgment against Stallcop's claim of national origin discrimination for failure to establish a prima facie case. Stallcop's claim of sex and age discrimination under California law was dismissed because she had not exhausted her state administrative remedies. This decision should be treated as a grant of a motion for summary judgment, since matters outside the pleading were presented to, and considered by, the court. Fed.R.Civ.P. 12(b).

A grant of summary judgment is reviewed *de novo. Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). The appellate court must determine, viewing the evidence in the light most favorable to the moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

**[11]** **[12]** Stallcop argues that it was improper for the district court to grant summary judgment on her national origin discrimination claim. She presents no specific facts, however, which would support a prima facie case. A party opposing a motion for summary judgment must produce "*specific* facts showing that there remains a genuine factual issue for trial." *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983) (quoting *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)). Stallcop relied entirely on a supervisor's statement, a year or two prior to her terminations, that she did not "know the English language," as proof of Kaiser's discriminatory conduct. As the district court noted, ethnicity and status as a non-English speaking person are not necessarily linked. Furthermore, **\*1051** derogatory ethnic statements, unless excessive and opprobrious, are insufficient to establish a case of national origin discrimination. *See Hill v. K–Mart Corp.,* 699 F.2d 776, 778 (5th Cir.1983); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-06621-YGR Document 1-1 Filed 11/16/17 Page 837 of 898

Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)

125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

**[13]** Stallcop contends that her failure to use the specific words "age" and "sex" should not preclude her action based on age and sex discrimination. She relies on *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir.1970). In *Sanchez,* the Fifth Circuit held that the scope of a civil action is limited to the scope of the EEOC complaint and investigation. *Id.* at 465–66. Stallcop contends that she told the DFEH investigator the totality of her employment problems at Kaiser. However, the charge Stallcop actually filed with the DFEH does not include any allegations of sex or age discrimination. Therefore, the DFEH obviously would have investigated only national origin discrimination. Thus, *Sanchez* is not controlling. As the district court held, Stallcop has not exhausted her state administrative remedies, and her action was therefore improper. Cal.Gov't Code § 12965(b) (West Supp.1987); *Commodore Home Systems, Inc. v. Superior Court,* 32 Cal.3d 211, 214, 185 Cal.Rptr. 270, 273, 649 P.2d 912, 915 (1982).

## VI.

## SANCTIONS

**[14]** Kaiser has requested that the court award double costs and/or attorneys' fees as a sanction for frivolous appeal. Fed.R.App.P. 38; 28 U.S.C. § 1912 (1982). Sanctions are not appropriate in this case because the law concerning the preemption of wrongful discharge claims is still developing, as evidenced by the Supreme Court's grant of certiorari in *Caterpillar, Inc. v. Williams* 479 U.S. 960, 107 S.Ct. 455, 93 L.Ed.2d 401 (1986).

The judgment of the district court is AFFIRMED.

## All Citations

820 F.2d 1044, 125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237, 44 Empl. Prac. Dec. P 37,426, 106 Lab.Cas. P 12,416, 2 IER Cases 1010

Footnotes

1    Section 301 of the LMRA, 29 U.S.C. § 185(a), provides:

      Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2    Stallcop contends that her claims could not be preempted because no federal remedy exists for her grievances, since they are barred by the statute of limitations. This argument is misdirected. The point is that federal law would provide her a remedy, had she complied with its procedural requirements. It would be anomalous to allow the preemption of actions based upon section 301 for the first six months after the action accrued, but prevent such preemption after that time. *Cf. Harper,* 764 F.2d at 669 (complaint construed under "artful pleading" doctrine as arising under section 301, then held to be time-barred under *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 155, 103 S.Ct. 2281, 2285, 76 L.Ed.2d 476 (1983)).

3    Stallcop also admitted in deposition that all of her claims, except for discrimination, essentially stem from the collective bargaining agreement.

4    Stallcop argues that it was inappropriate to bar her claims because they involved questions of intent or good faith, and summary judgment is rarely applicable in such situations. *See, e.g., White Motor Co. v. United States,* 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963). This argument is meritless. The content of her claims is immaterial to the district court's decision that they are procedurally barred.

    Stallcop also argues that the preemption of her state law claims and the granting of summary judgment destroyed her right of access to the courts, relying on *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In *Bill Johnson,* the Supreme Court held that the NLRB may not halt the prosecution of a state court lawsuit unless the suit lacks a reasonable basis in law or fact, and has been instituted out of a retaliatory motive. *Id.* at 748–49, 103 S.Ct. at 2172–73.

    *Bill Johnson* is obviously inapposite to the present case. Stallcop's case was not ordered withdrawn, totally preventing her access to the court. Her case was simply transferred to another court, where, partially on procedural grounds and partially on the merits, summary judgment was granted.

**Stallcop v. Kaiser Foundation Hospitals, 820 F.2d 1044 (1987)**

Case 4:17-cv-06621-YGR     Document 1-1     Filed 11/16/17     Page 838 of 898

125 L.R.R.M. (BNA) 3075, 44 Fair Empl.Prac.Cas. (BNA) 237...

5       Stallcop alleges that Kaiser, the Union, and the NLRB violated her due process rights by not notifying her about the statute of limitations. She raised this claim in the district court in her response to Kaiser's motion for summary judgment, but never raised it as a cause of action. Therefore, it is inappropriate for us to consider this claim.

---

**PROOF OF SERVICE**

I am employed in the City of San Francisco and County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 601 Montgomery Street, Suite 1150, San Francisco, CA 94111.

On July 13, 2017, I served a copy of the within document(s):

**TABLE OF CONTENTS OF FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANTS KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT**

on the interested parties:

☐     VIA FAX: By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒     VIA U.S. MAIL: I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on the above date with postage thereon fully prepaid, at San Francisco, California.

☐     VIA OVERNIGHT SERVICE: By placing the document(s) listed above in a sealed UPS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a UPS agent for delivery.

☐     VIA PERSONAL SERVICE: By causing to be delivered the document(s) listed above to the person(s) at the address(es) set forth below.

☒     VIA E-MAIL: By transmitting a PDF version of the document(s) by e-mail to the person(s) set forth below using the e-mail address(es) indicated.

Jeremy L. Friedman                   Telephone: 510-530-9060
Law Office of Jeremy L. Friedman     Facsimile: 510-530-9087
2801 Sylhowe Road                 Email: jlfried@comcast.net
Oakland, CA 94610

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 13, 2017, at San Francisco, California.

_____
Janet Gogna

- 1 -
PROOF OF SERVICE

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                          Honorable   Ioana Petrou          , Judge

Cause called for Motion: July 13, 2017.

No appearances were required.

With all briefing having been received the matter is now submitted.

Ruling on Demurrer and Motion to Strike Complaint Taken Under Submission

Minutes of     07/13/2017
Entered on     07/13/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By    *Tom B Williams*     Digital
                                           Deputy Clerk

**Minutes**

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department   15                     Honorable   Ioana Petrou              , Judge

Cause called for Motion: July 13, 2017.

No appearances were required.

With all briefing having been received the matter is now submitted.

Ruling on Demurrer and Motion to Strike Complaint Taken Under Submission

Minutes of    07/13/2017
Entered on    07/13/2017

        Chad Finke  Executive Officer / Clerk of the Superior Court

                              Digital
        By    _Tom B Williams_____

                                        Deputy Clerk

---

**Minutes**

M11493788

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                    Honorable   Ioana Petrou              , Judge

Cause called for Motion: July 13, 2017.

No appearances were required.

With all briefing having been received the matter is now submitted.

Ruling on Motion to Strike Complaint Taken Under Submission

Minutes of    07/13/2017
Entered on    07/13/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By    *Tom B Williams*  Digital

Deputy Clerk

**Minutes**

M11493789

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Gamble** | **No. RG16826717** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Kaiser Foundation Health Plan, Inc** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department    15                    Honorable  Ioana Petrou                , Judge

Cause called for Motion: July 13, 2017.

No appearances were required.

With all briefing having been received the matter is now submitted.

Ruling on Motion to Strike Complaint Taken Under Submission

Minutes of    07/13/2017
Entered on    07/13/2017

Chad Finke  Executive Officer / Clerk of the Superior Court

By  _Tom B Williams_ (Digital)
                                    Deputy Clerk

**Minutes**

M11493789

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Grube Brown & Geidt LLP
Attn:  Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>        Plaintiff/Petitioner(s)<br><br>VS.<br><br>Kaiser Foundation Health Plan, Inc<br>        Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Motion to Strike Complaint<br>Partial Grant |

The Motion to Strike Portions of Plaintiff's First Amended Complaint by Defendants Kaiser Foundation Health Plan Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, was set for hearing on July 13, 2017, at 9:00 a.m. in Department 15 before the Honorable Ioana Petrou.

The matter was argued and submitted.  Good cause appearing, IT IS HEREBY ORDERED THAT the motion is GRANTED, WITH LEAVE TO AMEND, as follows.

Defendants move to strike 11 sections of the First Amended Complaint alleging that Defendants engaged in a pattern and practice of race or gender discrimination against African-American Women. The Court first observes that Plaintiff has not alleged a claim for gender discrimination.  Furthermore, Plaintiff's DFEH charge alleged discrimination based on age and "color, race" only.  Therefore, Plaintiff may not allege any claims based on a pattern and practice of discrimination against women, African-American women (as opposed to African-Americans regardless of gender), or the disabled, because Plaintiff has not exhausted her administrative remedies as to any such claims.  (See, e.g., Okoli v. Lockheed Technical Operations Co. (1995) 36 Cal.App.4th 1607, 1617.)

Plaintiff may potentially prove her individual discrimination claims through evidence of pattern and practice discrimination.  (See, e.g., Ahuja v. Detica Inc. (D.D.C. 2010) 742 F.Supp.2d 96, 110; Diaz v. AT& T (9th Cir. 1985) 752 F.2d 1356, 1362; Fay v. Waiters' & Dairy Lunchmen's Union (9th Cir. 1982) 694 F.2d 531, 550; and Heagney v. University of Washington (9th Cir. 1981) 642 F.2d 1157, 1164.)  However, such evidence would only be admissible if the factual scenarios related to alleged discrimination against other employees are sufficiently similar to the facts and circumstances alleged by Plaintiff.  (See, e.g., Johnson v. United Cerebral Palsy/Spastic Children's Foundation (2009) 173 Cal.App.4th 740, 766-767.)  Plaintiff is given leave to amend to allege facts demonstrating that other employees have suffered discrimination by Defendant(s) under factual circumstances similar to those allegedly affecting Plaintiff.

The Court makes no ruling at this time about the scope of permissible discovery in this case or the admissibility of any evidence of disparate treatment at trial.

Plaintiff's request to reclassify this case as complex as DENIED.  This case involves a claim by one plaintiff for race and age discrimination and retaliation.  It doesn't meet any of the criteria for a complex case pursuant to California Rules of Court, Rule 3.400.

The portions of the First Amended Complaint set forth in the Notice of Motion are STRICKEN, WITH LEAVE TO AMEND as indicated above.  Defendants shall serve Notice of Entry of Order on Plaintiff.

---

Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

Dated:  07/31/2017

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 07/31/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 07/31/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Digital

Deputy Clerk

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Grube Brown & Geidt LLP
Attn: Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Gamble<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Kaiser Foundation Health Plan, Inc<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Demurrer and Motion to Strike Complaint<br>Sustained |

---

The Demurrer to Plaintiff's First Amended Complaint by Defendants Kaiser Foundation Hospitals ("Hospitals") and The Permanente Medical Group ("PMG"), was set for hearing on July 13, 2017, at 9:00 a.m. in Department 15 before the Honorable Ioana Petrou.

The matter was argued and submitted. Good cause appearing, IT IS HEREBY ORDERED THAT the demurrer is SUSTAINED, WITH LEAVE TO AMEND, as follows.

Defendants argue that Plaintiff failed to exhaust her administrative remedies against the Hospital and PMG because they were not named in her DFEH charge. Although it is true that Plaintiff's DFEH charge did not name "Kaiser Foundation Hospitals" or "The Permanente Medical Group" as respondents, neither did it name "Kaiser Foundation Health Plan Inc." (hereinafter "KFHP") as a respondent. Instead, Plaintiff's DFEH charge named as respondent "Kaiser National HRSC Health and Welfare Dept.", and "Kaiser National HRSC" as co-respondent. Plaintiff is given leave to amend to allege which of the three named Defendants in this case (Hospitals, PMG, or KFHP) Plaintiff intended to complain about in her DFEH charge. Even if the Court were to accept Plaintiff's allegation (in paragraph 8 of the First Amended Complaint) that all three named Defendants were part of an "integrated medical care services program", that would not excuse Plaintiff's failure to exhaust her administrative remedies by naming each Defendant against whom she is alleging FEHA claims in her DFEH charge. (See, e.g., Johnson v. United Continental Holdings Inc. (N.D. Cal. 2013) 2013 WL 1758760 and Medix Ambulance Service Inc. v. Superior Court (2002) 97 Cal.App.4th 109, 116.) Alternatively, Plaintiff is given leave to amend to attempt to allege facts excusing her failure to correctly identify any of the three named Defendants in her DFEH charge.

In addition, Plaintiff is given leave to amend to allege, if possible, facts supporting her allegation that all three named Defendants can be liable for her claims under a "single employer" theory of liability. Exhibits A-C to Defendants' Request for Judicial Notice - which was not opposed by Plaintiff - demonstrate that her employer (as defined by Government Code § 1296) was KFHP. (See Government Code § 12928.) In order to also hold Hospitals and PMG liable as her employers under a single employer theory of liability, Plaintiff must allege facts demonstrating that all three named Defendants have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. (See Morgan v. Safeway Stores Inc. (9th Cir. 1989) 884 F.2d 1211, 1213.) Plaintiff fails to allege such facts. The fact that Defendants have a contractual relationship with each other to provide services, funding, and facilities (as is alleged in First Amended Complaint paragraphs 5-8) is NOT a sufficient basis to impose liability on all three Defendants as Plaintiff's single employer. (See Rhodes v. Sutter Health (E.D. Cal. 2013) 949 F.Supp.2d 997 1003-1009.)

---

In amending, Plaintiff may allege one additional cause of action beyond those already asserted in her First Amended Complaint, for violation of 42 USC § 1981.

Defendants' Request for Judicial Notice is GRANTED as unopposed.

Defendants shall serve Notice of Entry of Order on Plaintiff.  Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

Dated:  07/31/2017

_facsimile_

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 07/31/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 07/31/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By

Digital

Deputy Clerk

1  GRUBE BROWN & GEIDT LLP
   HEATHER A. MORGAN (SB# 177425)
2  AMANDA BOLLIGER CRESPO (SB# 250292)
   heathermorgan@gbgllp.com
3  amandacrespo@gbgllp.com
   601 Montgomery Street, Suite 1150
4  San Francisco, CA 94111
   Telephone: (415) 603-5000
5  Facsimile: (415) 840-7210

6  Attorneys for Defendants
   KAISER FOUNDATION HEALTH PLAN, INC.;
7  KAISER FOUNDATION HOSPITALS; and
   THE PERMANENTE MEDICAL GROUP

8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF ALAMEDA

11

12  LUNELL GAMBLE,                          Case No. RG16826717

13          Plaintiff,                      ASSIGNED FOR ALL PURPOSES TO
                                            JUDGE IOANA PETROU
14      vs.                                 DEPARTMENT 15

15  KAISER FOUNDATION HEALTH PLAN,          **NOTICE OF ENTRY OF ORDER RE**
    INC; KAISER FOUNDATION                  **DEFENDANTS KAISER**
16  HOSPITALS, INC; and THE                 **FOUNDATION HEALTH PLAN, INC;**
    PERMANENTE MEDICAL GROUP; all           **KAISER FOUNDATION HOSPITALS;**
17  doing business as KAISER PERMANENTE     **AND THE PERMANENTE MEDICAL**
    MEDICAL CARE PROGRAM,                   **GROUP'S MOTION TO STRIKE**
18                                          **ALLEGATIONS IN PLAINTIFF'S**
            Defendants.                     **FIRST AMENDED COMPLAINT**
19
                                            Judge:      Hon. Ioana Petrou
20                                          Dept.:      15

21                                          Complaint Filed:    August 9, 2016

22

23

24

25

26

27

28

NOTICE OF ENTRY OF ORDER RE DEFENDANTS' MOTION TO STRIKE

1    TO PLAINTIFF AND TO HER COUNSEL OF RECORD:

2        Defendants Kaiser Foundation Health Plan, Inc; Kaiser Foundation Hospitals; and The

3    Permanente Medical Group's Motion to Strike Allegations in Plaintiff's First Amended

4    Complaint ("Motion") was heard on July 6, 2017, and July 13, 2017, and submitted in the above-

5    captioned matter to the Honorable Ioana Petrou.

6        On July 31, 2017, the Court granted Defendants' Motion with leave to amend.  A true and

7    correct copy of the Court's order is attached hereto as Exhibit "A."

8    DATED: August 1, 2017                    GRUBE BROWN & GEIDT LLP

9

10                                            BY: _____

11                                                 AMANDA BOLLIGER CRESPO

12                                            Attorneys for Defendants
                                             KAISER FOUNDATION HEALTH PLAN, INC;
13                                            KAISER FOUNDATION HOSPITALS; and THE
                                             PERMANENTE MEDICAL GROUP
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

NOTICE OF ENTRY OF ORDER RE DEFENDANTS' MOTION TO STRIKE

Exhibit A

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602_____

Grube Brown & Geidt LLP
Attn:  Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br>Kaiser Foundation Health Plan, Inc<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG16826717</u><br><br>Order<br><br>Motion to Strike Complaint<br>Partial Grant |

The Motion to Strike Portions of Plaintiff's First Amended Complaint by Defendants Kaiser Foundation Health Plan Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, was set for hearing on July 13, 2017, at 9:00 a.m. in Department 15 before the Honorable Ioana Petrou.

The matter was argued and submitted.  Good cause appearing, IT IS HEREBY ORDERED THAT the motion is GRANTED, WITH LEAVE TO AMEND, as follows.

Defendants move to strike 11 sections of the First Amended Complaint alleging that Defendants engaged in a pattern and practice of race or gender discrimination against African-American Women. The Court first observes that Plaintiff has not alleged a claim for gender discrimination.  Furthermore, Plaintiff's DFEH charge alleged discrimination based on age and "color, race" only.  Therefore, Plaintiff may not allege any claims based on a pattern and practice of discrimination against women, African-American women (as opposed to African-Americans regardless of gender), or the disabled, because Plaintiff has not exhausted her administrative remedies as to any such claims.  (See, e.g., Okoli v. Lockheed Technical Operations Co. (1995) 36 Cal.App.4th 1607, 1617.)

Plaintiff may potentially prove her individual discrimination claims through evidence of pattern and practice discrimination.  (See, e.g., Ahuja v. Detica Inc. (D.D.C. 2010) 742 F.Supp.2d 96, 110; Diaz v. AT& T (9th Cir. 1985) 752 F.2d 1356, 1362; Fay v. Waiters' & Dairy Lunchmen's Union (9th Cir. 1982) 694 F.2d 531, 550; and Heagney v. University of Washington (9th Cir. 1981) 642 F.2d 1157, 1164.)  However, such evidence would only be admissible if the factual scenarios related to alleged discrimination against other employees are sufficiently similar to the facts and circumstances alleged by Plaintiff.  (See, e.g., Johnson v. United Cerebral Palsy/Spastic Children's Foundation (2009) 173 Cal.App.4th 740, 766-767.)  Plaintiff is given leave to amend to allege facts demonstrating that other employees have suffered discrimination by Defendant(s) under factual circumstances similar to those allegedly affecting Plaintiff.

The Court makes no ruling at this time about the scope of permissible discovery in this case or the admissibility of any evidence of disparate treatment at trial.

Plaintiff's request to reclassify this case as complex as DENIED.  This case involves a claim by one plaintiff for race and age discrimination and retaliation.  It doesn't meet any of the criteria for a complex case pursuant to California Rules of Court, Rule 3.400.

The portions of the First Amended Complaint set forth in the Notice of Motion are STRICKEN, WITH LEAVE TO AMEND as indicated above.  Defendants shall serve Notice of Entry of Order on Plaintiff.

---

Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.


Dated:  07/31/2017

_____

Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number:  RG16826717
Order After Hearing Re: of 07/31/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 07/31/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

1

**PROOF OF SERVICE**

2      I am employed in the City of Los Angeles and County of Los Angeles, State of California.

3  I am over the age of eighteen years and not a party to the within-entitled action.  My business

4  address is 633 West 5th Street, Suite 3330, Los Angeles, CA 90071.

5      On August 1, 2017, I served a copy of the within document(s):

6  **NOTICE OF ENTRY OF ORDER RE DEFENDANTS KAISER FOUNDATION HEALTH**
   **PLAN, INC; KAISER FOUNDATION HOSPITALS; AND THE PERMANENTE**
7  **MEDICAL GROUP'S MOTION TO STRIKE ALLEGATIONS IN PLAINTIFF'S FIRST**
   **AMENDED COMPLAINT**

8

9  on the interested parties:

10    ☐   VIA FAX:  By transmitting via facsimile the document(s) listed above to the fax
               number(s) set forth below on this date before 5:00 p.m.

11
      ☒   VIA U.S. MAIL:  I am readily familiar with the firm's practice of collection and
12             processing of correspondence for mailing.  Under that practice such sealed
               envelope(s) would be deposited with the U.S. postal service on the above date with
13             postage thereon fully prepaid, at Los Angeles, California.

14    ☐   VIA OVERNIGHT SERVICE:  By placing the document(s) listed above in a sealed
               _____ envelope and affixing a pre-paid air bill, and causing the envelope to be
15             delivered to a _____ agent for delivery.

16    ☐   VIA PERSONAL SERVICE:  By causing to be delivered the document(s) listed
               above to the person(s) at the address(es) set forth below.
17

18    ☒   VIA E-MAIL:  By transmitting a PDF version of the document(s) by e-mail to the
               person(s) set forth below using the e-mail address(es) indicated, pursuant to the
19             parties' electronic service agreement.

20

21  Jeremy L. Friedman                        Telephone:  510-530-9060
    Law Office of Jeremy L. Friedman          Facsimile:  510-530-9087
22  2801 Sylhowe Road                         Email: jlfried@comcast.net
    Oakland, CA 94610
23
        I declare under penalty of perjury under the laws of the State of California that the above
24
    is true and correct.
25
        Executed on August 1, 2017 at Los Angeles, California.
26

27                                    _____
                                              Preston Thomas
28

1 | GRUBE BROWN & GEIDT LLP
HEATHER A. MORGAN (SB# 177425)
2 | AMANDA BOLLIGER CRESPO (SB# 250292)
heathermorgan@gbgllp.com
3 | amandacrespo@gbgllp.com
601 Montgomery Street, Suite 1150
4 | San Francisco, CA  94111
Telephone:  (415) 603-5000
5 | Facsimile:  (415) 840-7210

6 | Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC.;
7 | KAISER FOUNDATION HOSPITALS; and
THE PERMANENTE MEDICAL GROUP

ENDORSED
FILED
ALAMEDA COUNTY

AUG 31 2017

CLERK OF THE SUPERIOR COURT
By  TANIA PIERCE
Deputy

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| LUNELL GAMBLE, | Case No. RG16826717 |
| Plaintiff, | ASSIGNED FOR ALL PURPOSES TO JUDGE IOANA PETROU DEPARTMENT 15 |
| vs. | |
| KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM, | **NOTICE OF ENTRY OF ORDER RE DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Defendants. | Judge:     Hon. Ioana Petrou Dept.:      15 |
| | Complaint Filed:     August 9, 2016 |

NOTICE OF ENTRY OF ORDER RE DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE
PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

TO PLAINTIFF AND TO HER COUNSEL OF RECORD:

Defendants Kaiser Foundation Hospitals and The Permanente Medical Group's Demurrer to Plaintiff's First Amended Complaint was heard on July 13, 2017, and submitted in the above-captioned matter to the Honorable Ioana Petrou.

On July 31, 2017, the Court sustained the demurrer with leave to amend. A true and correct copy of the Court's order is attached hereto as Exhibit "A."

DATED: August 1, 2017                    GRUBE BROWN & GEIDT LLP


BY:    _____
            AMANDA BOLLIGER CRESPO

Attorneys for Defendants
KAISER FOUNDATION HEALTH PLAN, INC;
KAISER FOUNDATION HOSPITALS; and THE
PERMANENTE MEDICAL GROUP

- 1 -

NOTICE OF ENTRY OF ORDER RE DEFENDANTS KAISER FOUNDATION HOSPITALS AND THE
PERMANENTE MEDICAL GROUP'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

# Exhibit A

Attorney at Law
Attn:  Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Grube Brown & Geidt LLP
Attn:  Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble <br>             Plaintiff/Petitioner(s) <br><br> VS. <br><br> Kaiser Foundation Health Plan, Inc <br>             Defendant/Respondent(s) <br> (Abbreviated Title) | No. <u>RG16826717</u> <br><br> Order <br><br> Demurrer and Motion to Strike Complaint <br> Sustained |

The Demurrer to Plaintiff's First Amended Complaint by Defendants Kaiser Foundation Hospitals ("Hospitals") and The Permanente Medical Group ("PMG"), was set for hearing on July 13, 2017, at 9:00 a.m. in Department 15 before the Honorable Ioana Petrou.

The matter was argued and submitted.  Good cause appearing, IT IS HEREBY ORDERED THAT the demurrer is SUSTAINED, WITH LEAVE TO AMEND, as follows.

Defendants argue that Plaintiff failed to exhaust her administrative remedies against the Hospital and PMG because they were not named in her DFEH charge.  Although it is true that Plaintiff's DFEH charge did not name "Kaiser Foundation Hospitals" or "The Permanente Medical Group" as respondents, neither did it name "Kaiser Foundation Health Plan Inc." (hereinafter "KFHP") as a respondent.  Instead, Plaintiff's DFEH charge named as respondent "Kaiser National HRSC Health and Welfare Dept.", and "Kaiser National HRSC" as co-respondent.  Plaintiff is given leave to amend to allege which of the three named Defendants in this case (Hospitals, PMG, or KFHP) Plaintiff intended to complain about in her DFEH charge.  Even if the Court were to accept Plaintiff's allegation (in paragraph 8 of the First Amended Complaint) that all three named Defendants were part of an "integrated medical care services program", that would not excuse Plaintiff's failure to exhaust her administrative remedies by naming each Defendant against whom she is alleging FEHA claims in her DFEH charge.  (See, e.g., Johnson v. United Continental Holdings Inc. (N.D. Cal. 2013) 2013 WL 1758760 and Medix Ambulance Service Inc. v. Superior Court (2002) 97 Cal.App.4th 109, 116.)  Alternatively, Plaintiff is given leave to amend to attempt to allege facts excusing her failure to correctly identify any of the three named Defendants in her DFEH charge.

In addition, Plaintiff is given leave to amend to allege, if possible, facts supporting her allegation that all three named Defendants can be liable for her claims under a "single employer" theory of liability.  Exhibits A-C to Defendants' Request for Judicial Notice - which was not opposed by Plaintiff - demonstrate that her employer (as defined by Government Code § 1296) was KFHP.  (See Government Code § 12928.)  In order to also hold Hospitals and PMG liable as her employers under a single employer theory of liability, Plaintiff must allege facts demonstrating that all three named Defendants have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control.  (See Morgan v. Safeway Stores Inc. (9th Cir. 1989) 884 F.2d 1211, 1213.)  Plaintiff fails to allege such facts.  The fact that Defendants have a contractual relationship with each other to provide services, funding, and facilities (as is alleged in First Amended Complaint paragraphs 5-8) is NOT a sufficient basis to impose liability on all three Defendants as Plaintiff's single employer.  (See Rhodes v. Sutter Health (E.D. Cal. 2013) 949 F.Supp.2d 997 1003-1009.)

In amending, Plaintiff may allege one additional cause of action beyond those already asserted in her First Amended Complaint, for violation of 42 USC § 1981.

Defendants' Request for Judicial Notice is GRANTED as unopposed.

Defendants shall serve Notice of Entry of Order on Plaintiff.  Plaintiff shall have 30 days to amend, running from service of Notice of Entry of Order on Plaintiff by Defendants.  Defendants shall have 30 days thereafter to respond.

Dated:  07/31/2017

_____
Judge Ioana Petrou

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG16826717
Order After Hearing Re: of 07/31/2017

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 07/31/2017.

Chad Finke  Executive Officer / Clerk of the Superior Court

By

Digital

_____
Deputy Clerk

1     **PROOF OF SERVICE**

2            I am employed in the City of Los Angeles and County of Los Angeles, State of California.

3     I am over the age of eighteen years and not a party to the within-entitled action.  My business

4     address is 633 West 5th Street, Suite 3330, Los Angeles, CA 90071.

5            On August 1, 2017, I served a copy of the within document(s):

6     **NOTICE OF ENTRY OF ORDER RE DEFENDANTS KAISER FOUNDATION
      HOSPITALS AND THE PERMANENTE MEDICAL GROUP'S DEMURRER TO
7     PLAINTIFF'S FIRST AMENDED COMPLAINT**

8     on the interested parties:

9      ☐   VIA FAX:  By transmitting via facsimile the document(s) listed above to the fax
10          number(s) set forth below on this date before 5:00 p.m.

11     ☒   VIA U.S. MAIL:  I am readily familiar with the firm's practice of collection and
           processing of correspondence for mailing.  Under that practice such sealed
12          envelope(s) would be deposited with the U.S. postal service on the above date with
           postage thereon fully prepaid, at Los Angeles, California.
13

14     ☐   VIA OVERNIGHT SERVICE:  By placing the document(s) listed above in a sealed
           _____ envelope and affixing a pre-paid air bill, and causing the envelope to be
15          delivered to a _____ agent for delivery.

16     ☐   VIA PERSONAL SERVICE:  By causing to be delivered the document(s) listed
           above to the person(s) at the address(es) set forth below.
17
       ☒   VIA E-MAIL:  By transmitting a PDF version of the document(s) by e-mail to the
18          person(s) set forth below using the e-mail address(es) indicated, pursuant to the
           parties' electronic service agreement.
19

20     Jeremy L. Friedman              Telephone:  510-530-9060
21     Law Office of Jeremy L. Friedman    Facsimile:  510-530-9087
       2801 Sylhowe Road               Email: jlfried@comcast.net
22     Oakland, CA 94610

23            I declare under penalty of perjury under the laws of the State of California that the above

24     is true and correct.

25            Executed on August 1, 2017 at Los Angeles, California.

26                                    _____
27                                         Preston Thomas

28

-----

- 1 -
PROOF OF SERVICE

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse
Civil Division
1225 Fallon Street
Oakland, CA  94612

To:   Attorney at Law                                          Date:  09/06/2017
      Attn:  Friedman, Jeremy L.
      2801 Sylhowe Road
      Oakland, CA    94602____

Re:  No. RG16826717 - Gamble   VS.  Kaiser Foundation Health Plan, Inc

Your request to file Extension of Time has been rejected for the following reason:

      The filing fee was not included.

Chad Finke  Executive Officer / Clerk of the Superior Court

By   *Michelle Bank*
                                                Digital
                                         Deputy Clerk

20239856

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

**FILED**
**ALAMEDA COUNTY**

SEP 18 2017

CLERK OF THE SUPERIOR COURT
By _Sue Parker_
                          Deputy

SEP 15 2018

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

9  LUNELL GAMBLE                          )  Case No. RG16826717
                                          )
10     Plaintiff                          )  **STIPULATION AND [PROPOSED]**
                                          )  **ORDER EXTENDING TIME TO**
11  vs.                                   )  **FILE SECOND AMENDED**
                                          )  **COMPLAINT**
12  KAISER FOUNDATION HEALTH              )
    PLAN, INC; KAISER FOUNDATION          )
13  HOSPITALS, INC.; and THE              )
    PERMANENTE MEDICAL GROUP;             )
14  all doing business as KAISER          )
    PERMANENTE MEDICAL CARE               )
15  PROGRAM                               )
                                          )
16     Defendants                         )
                                          )
17  ─────────────────────────────────    )

18      Pursuant to Rule 3.1320 of the California Rules of Court, plaintiff Lunell Gamble

19  and defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The

20  Permanente Medical Group, by and through their attorneys of record, hereby stipulate to a

    45-day extension of time for plaintiff to file her Second Amended Complaint. This
21
    stipulation is based upon the following:
22
          1.      On July 31, 2017, this Court entered two orders in this case, sustaining
23
                  defendants' demurrer and motion to strike, with leave to amend;
24
          2.      Pursuant to the parties' agreement, the Court granted 30 days from service of
25
                  the orders by defendant to amend;
26
          3.      Defendants served plaintiff with the orders on August 1, 2017, and plaintiff's
27
                  amended complaint is due September 5, 2017;
28

4.   Plaintiff is conferring with defendants regarding the litigation following the Court's orders, and is considering pursuing this case as a class action;

5.   Plaintiff and defendants are interested in pursuing settlement discussions with a third-party mediator in this case, and would like to schedule a mediation session prior to the filing of a second amended complaint;

6.   Plaintiff and defendants believe that may be possible to schedule a mediation to occur in the latter part of September or early part of October, 2017; and

7.   Plaintiff and defendants therefore stipulate that plaintiff may have until October 20, 2017, in which to file an amended complaint in this action.

**IT IS SO STIPULATED**

Respectfully submitted,

Dated: September 5, 2017            LAW OFFICE OF JEREMY L. FRIEDMAN

By: _____
Jeremy L. Friedman
Attorney for plaintiff Sheila Kennedy

Dated: September 5, 2017            GRUBE BROWN AND GEIDT LLP

By: _____
Amanda Bolliger Crespo
Attorneys for Defendants THE PERMANENTE
MEDICAL GROUP, INC.; KAISER
FOUNDATION HEALTH PLAN, INC.; KAISER
FOUNDATION HOSPITALS

1

**[PROPOSED] ORDER**

2    Having considered the stipulation of the parties, and good cause appearing, it is

3  hereby **ORDERED** that plaintiff is granted until October 20, 2017, in which to file an

4  amended complaint in this action.

5    **IT IS SO ORDERED.**

6

7  Dated: September ___, 2017

8                                                    Hon. Ioana Petrou
                                                     Judge of the Superior Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorney at Law
Attn: Friedman, Jeremy L.
2801 Sylhowe Road
Oakland, CA   94602____

Grube Brown & Geidt LLP
Attn: Morgan, Heather Ann
633 West 5th St.
#3330
Los Angeles, CA   90071

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Gamble<br><br>                      Plaintiff/Petitioner(s)<br><br>       VS.<br><br>Kaiser Foundation Health Plan, Inc<br><br><br><br>                    Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16826717<br><br>NOTICE OF HEARING (AMENDED)<br><br>Civil Pre-Trial Settlement Conference on 05/11/2018 has been vacated and rescheduled. |

RECEIVED

SEP 8 2017

By_____

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:
Civil Pre-Trial Settlement Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Civil Pre-Trial Settlement Conference:
DATE: 05/11/2018   TIME: 09:30 AM   DEPARTMENT: 301
LOCATION: George E. McDonald Hall of Justice, First Floor
2233 Shoreline Drive, Alameda

The Court orders that all persons whose consent is necessary for a binding settlement are required to attend the Pretrial Settlement Conference.

Monetary sanctions may be imposed upon any party for not attending the settlement conference, or for attending but not possessing the required authority. (Local Rule 3.90)

Dated: 09/13/2017                    Chad Finke  Executive Officer / Clerk of the Superior Court

                                     By _____
                                                                      Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/14/2017.

                                     By _____
                                                                      Deputy Clerk

*14860843*

FILED
ALAMEDA COUNTY

SEP 1 5 2017

CLERK OF THE SUPERIOR COURT
By _____
Deputy

FILED
ALAMEDA COUNTY

SEP 1 5 2017

CLERK OF THE SUPERIOR COURT
By _____
Deputy

SEP 1 5 2017

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                          COUNTY OF ALAMEDA

9  LUNELL GAMBLE                    )   Case No. RG16826717
                                    )
10       Plaintiff                  )   **STIPULATION AND (PROPOSED)**
                                    )   **ORDER EXTENDING TIME TO**
11 vs.                              )   **FILE SECOND AMENDED**
                                    )   **COMPLAINT**
12 KAISER FOUNDATION HEALTH         )
   PLAN, INC; KAISER FOUNDATION     )
13 HOSPITALS, INC.; and THE         )
   PERMANENTE MEDICAL GROUP;        )
14 all doing business as KAISER     )
   PERMANENTE MEDICAL CARE          )
15 PROGRAM                          )
                                    )
16       Defendants                 )
                                    )
17 _____ )

18        Pursuant to Rule 3.1320 of the California Rules of Court, plaintiff Lunell Gamble

19 and defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The

20 Permanente Medical Group, by and through their attorneys of record, hereby stipulate to a

21 45-day extension of time for plaintiff to file her Second Amended Complaint. This

   stipulation is based upon the following:
22
          1.    On July 31, 2017, this Court entered two orders in this case, sustaining
23
                defendants' demurrer and motion to strike, with leave to amend;
24
          2.    Pursuant to the parties' agreement, the Court granted 30 days from service of
25
                the orders by defendant to amend;
26
          3.    Defendants served plaintiff with the orders on August 1, 2017, and plaintiff's
27
                amended complaint is due September 5, 2017;
28

4.   Plaintiff is conferring with defendants regarding the litigation following the Court's orders, and is considering pursuing this case as a class action;

5.   Plaintiff and defendants are interested in pursuing settlement discussions with a third-party mediator in this case, and would like to schedule a mediation session prior to the filing of a second amended complaint;

6.   Plaintiff and defendants believe that may be possible to schedule a mediation to occur in the latter part of September or early part of October, 2017; and

7.   Plaintiff and defendants therefore stipulate that plaintiff may have until October 20, 2017, in which to file an amended complaint in this action.

**IT IS SO STIPULATED**

Respectfully submitted,

Dated: September 5, 2017                    LAW OFFICE OF JEREMY L. FRIEDMAN

By:
Jeremy L. Friedman
Attorney for plaintiff Sheila Kennedy

Dated: September 5, 2017                    GRUBE BROWN AND GEIDT LLP

By:
Amanda Bolliger Crespo
Attorneys for Defendants THE PERMANENTE
MEDICAL GROUP, INC.; KAISER
FOUNDATION HEALTH PLAN, INC.; KAISER
FOUNDATION HOSPITALS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Having considered the stipulation of the parties, and good cause appearing, it is hereby **ORDERED** that plaintiff is granted until October 20, 2017, in which to file an amended complaint in this action.

**IT IS SO ORDERED.**

Dated: September 15, 2017

Hon. Ioana Petrou
Judge of the Superior Court

20503902

**FILED**
ALAMEDA COUNTY

OCT 2 0 2017

CLERK OF THE SUPERIOR COURT
By _____
JAMIE THOMAS, Deputy

1  Jeremy L. Friedman, CA Bar No. 142659
   LAW OFFICE OF JEREMY L. FRIEDMAN
2  2801 Sylhowe Road.
   Oakland, Ca. 94610
3  Tel: (510) 530-9060
   Fax: (510) 530-9087
4
   Attorney for plaintiff Lunell Gamble
5
             SUPERIOR COURT OF THE STATE OF CALIFORNIA
6
                        COUNTY OF ALAMEDA
7
8  LUNELL GAMBLE, on behalf of herself )   Case No. RG16826717
   as well as a class of similarly situated )
9  individuals,                          )   **SECOND AMENDED CLASS**
                                         )   **ACTION COMPLAINT**
10         Plaintiff                      )
                                         )   (Employment discrimination)
11 vs.                                   )
                                         )
12 KAISER FOUNDATION HEALTH             )   **DEMAND FOR JURY TRIAL**
   PLAN, INC; KAISER FOUNDATION         )
13 HOSPITALS, INC.; and THE             )
   PERMANENTE MEDICAL GROUP;            )
14 all doing business as KAISER         )
   PERMANENTE MEDICAL CARE              )
15 PROGRAM                              )
                                         )
16         Defendants                    )
17 _____

                          **INTRODUCTION**

18    1.  This is a class action against Kaiser Foundation Health Plan, Inc. ("Health Plan"),

19 Kaiser Foundation Hospitals ("Hospitals"), and The Permanente Medical Group ("Medical

20 Group"), all doing business as Kaiser Permenente ("Kaiser").  It is based upon the pattern

21 and practice of employment discrimination against African Americans throughout Kaiser's

22 Northern California region. As a class, Kaiser discriminates against African American

23 employees, including a subclass of older African American employees, by engaging in

24 gross disparities in the termination of such employees for purported cause; unlawful human

25 resources support for such discriminatory terminations, including  failure to conduct

26 reasonable investigations and take steps to stop self-discernable patterns of discriminations;

27 and retaliation against African Americans who take efforts internally or externally to

28 address Kaiser's discriminatory conduct.

FILED BY FAX

2.  Although a substantial percentage of Kaiser's workforce is comprised of African American employees, due to systemic discrimination by a predominately non-African American management, Kaiser's workforce is rigidly stratified with a disparate distribution by race, with African-Americans predominantly assigned to the lowest paying positions with the least chance of advancement, and predominantly excluded from higher paying and more secure supervisory and management positions – positions with the greatest influence and decision-making authority over reviews, promotions, retention, and termination.

3.  Class action treatment of plaintiff's claims of race discrimination at Kaiser is appropriate and necessary because Kaiser's racially stratified workforce is entrenched in a company-wide culture, it emerges through centralized human resources mechanisms, it is protected and perpetrated by unlawful discriminatory policies and practices applied uniformly in all facilities throughout the region, and it is ratified through knowledge and approval at the highest corporate levels.  Notwithstanding the particular circumstances of employment for any particular African American employee, Kaiser generally treats all members of the class in an identical or similar manner, subjecting each to the same discriminatory and retaliatory policies and practices.  In fact, Kaiser – as a wholly integrated matrix corporate entity – has instituted unlawful centralized equal employment opportunity ("EEO") policies and practices for the purposes of suppressing legitimate complaints of racial discrimination, creating false pretexts for its systemic discriminatory conduct, retaliating against employees who raise legitimate claims of racial discrimination, concealing its discriminatory pattern and practices from employees and government agencies, and misrepresenting its status as an EEO employer.

4. While employed at Kaiser, plaintiff Lunell Gamble was subjected to this pattern and practice of discriminatory treatment, and was unlawfully terminated pursuant to its company-wide discriminatory policies and practices.  Plaintiff is an African American woman over the age of 40, who was employed at Kaiser for more than 16 years with an exemplary record in Kaiser's Human Resources Services Center (HRSC). By the time of her discriminatory termination, plaintiff had reached the level of HR Specialist III in the

1   Health and Welfare Department, without a single incident of disciplinary action taken

2   against her. By the time of her termination, however, Ms. Gamble was subject to the pattern

3   and practice of discrimination, based upon her race and age, including a department that

4   employed a limited number of African American employees; an employment hierarchy that

5   was seemingly devoid of older, African American employees; harassment, unreasonable

6   scrutiny and hostile work environment by non-African American management; false

7   criticism of work performance as a pretext for termination; and disparate treatment with

8   respect to work assignments and evaluations.

9        5. Even though it had predetermined to terminate plaintiff, Kaiser provided Ms.

10   Gamble a "final written warning" threatening her with termination, without prior warning or

11   progressive discipline. After plaintiff attempted to perform her work and meet with senior

12   management over her discipline, Kaiser set plaintiff up for ultimate termination. Consistent

13   with the centralized control over systemic class-wide discriminatory policies and practices,

14   Kaiser neglected to provide industry-standard human resources support to Ms. Gamble in

15   connection with her termination; suppressed information indicating Ms. Gamble's

16   termination was part of a larger pattern of discriminatory treatment; failed to conduct a

17   reasonable inquiry or investigation into its discriminatory treatment of Ms. Gamble; and

18   made, and continues to make, false representations and other unreasonable tactics in defense

19   of its unlawful discrimination.

20        6. Plaintiff seeks to represent a class of African Americans, and a subclass of older

21   African Americans, who – during the maximum liability period determined for this action –

22   were employed at Kaiser in the northern California region, and were either (1) terminated in

23   their employment or (2) complained internally or to a governmental entity regarding race or

24   age discrimination. Plaintiff's class claims are brought pursuant to the California Fair

25   Employment and Housing Act (FEHA), California Government Code §12940 *et seq.*, and

26   federal civil rights statute, 42 U.S.C. §1981. She seeks to end Kaiser's discriminatory

27   practices and to provide monetary relief including punitive damages to those who have been

28   affected by these practices.

---

SECOND AMENDED CLASS ACTION COMPLAINT– Page 3

## THE PARTIES

7. Plaintiff Lunell Gamble is an African American woman who resides in California. She was employed at Kaiser Permanente from for more than 16 years, until her termination in July 2014.  Ms. Gamble worked initially as a temporary employee in the Human Resources department (then known as "Peoples Solutions"), and began permanent employment in July 1998 in that department, rising to the level of HR Specialist III.

8. Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a health care service plan, headquartered in Alameda County.  Health Plan enrolls members in individual and group plans, and in Northern California, provides hospital and medical services for its members through separate contracts with Medical Group and Hospitals.

9. Kaiser Foundation Hospitals, Inc., is a nonprofit corporation, headquartered in Alameda County; it operates hospitals and medical centers in California.  Hospitals receives its funding from Health Plan, and provides infrastructure and facilities for the benefit of Medical Group.

10. The Permanente Medical Group is a group of physicians organized as a professional corporation under California law.  Medical Group is privately owned and managed by its physician shareholders.  Medical Group contracts with Health Plan to provide medical services (both outpatient and inpatient) for Health Plan members in Northern California.

11. Medical Group, Hospitals, and Health Plan work in cooperation with each other to form the integrated medical care services program with the trade name, Kaiser Permanente Medical Care Program.  This enterprise is known to the general public, and is doing business as, "Kaiser Permanente."  With respect to its labor policies and procedures, and in particular with respect to its obligations under federal and state laws and regulations to investigate and take reasonable steps to stop discriminatory practices, all three entities collectively constitute a "single employer," and are referred to herein as "Kaiser." With respect to the matters asserted here, these entities have interrelated operations, common management, centralized control of labor relations and common financial control.

## ADMINISTRATIVE PROCESS

12. Plaintiff previously and timely filed an administrative charge of discrimination against her employer with the Department of Fair Employment and Education ("DFEH"). In that process, plaintiff complained about discrimination and retaliation she experienced, leading up to her termination in July 2014. Plaintiff was issued a right to sue letter on August 10, 2015 (although she did not receive it personally until much later). This action is timely filed according to the date the letter was issued.

13. In her administrative charge, plaintiff named the division in which she was last employed, Kaiser's National HRSC, and her department, Health and Welfare Department. These entities lie within Kaiser Foundation Health Plan, Inc. As with the EEOC, DFEH knows that Kaiser's corporate entities operate as a single employer with respect to its EEO obligations, and it conducted its investigation without regard to those corporate structures. Moreover, since the three named entities act as a single employer under FEHA (and Title VII), notice to any one division or department of Kaiser of Ms. Gamble's administrative complaint put all three entities, collectively, on notice.

14. Administrative and statutory claims of Ms. Gamble were tolled as a result of a class action that was filed against Kaiser, in Hill et al. v. Kaiser Foundation Health Plan, Case No. 3:10-cv-2833 LB, Northern District of California. EEOC charges were filed by named plaintiffs in that case on September 25, 2007, and the action was pending until December 10, 2013. During that time period, all limitation periods for filing administrative charges were tolled.

## CLASS ALLEGATIONS

### *The Class at Issue*

15. Plaintiff brings this action pursuant to Code of Civil Procedure §382 on behalf of a class of all African-Americans or persons of African descent or origin who were employed by Kaiser in the northern California region during the liability period established for this action, and who either (1) were involuntarily terminated from their position, or (2) made, or assisted in the making of, a complaint related to any employment issue, internally

---

1  with Kaiser, with any government agency (such as Equal Employment Opportunity

2  Commission, the Department of Fair Employment and Housing, or the Office of Federal

3  Contract Compliance Programs) or in a court of law.

4      16.  In addition to seeking class certification for the entire group of putative class

5  members, plaintiff will seek certification for similarly defined subclasses of older African

6  American employees.

7      17. The members of the class and each subclass are ascertainable, and they are

8  sufficiently numerous that joinder of all members is impracticable.

9      18. There is a community of interests among members of the class and subclass, in

10  that there are predominant questions of law and fact; Ms. Gamble's claims are

11  representative of claims typical of the class and subclass; and plaintiff and putative class

12  counsel can adequately represent the class.

13      19. Predominant common questions of law and fact include, among others:

14      a.    Whether Kaiser has a systemic racially-stratified workforce, created

15            through interrelated and correlated discriminatory employment

16            decisions on promotion, discipline and termination, carried out by a

17            group of supervisors and directors who are predominately non-African

18            Americans, and who – year after year – perpetuate a rigid, racially-

19            differentiated workforce.

20      b.    Whether there exists patterns of statistical disparities in the discipline

21            and termination of well-qualified African-American employees within

22            Kaiser's centralized employment processes.

23      c.    Whether Kaiser has entrenched its racially-stratified workforce by

24            directing, authorizing and training supervisors and directors to conceal

25            discriminatory actions and retaliate against those employees who might

26            assist the disclosure of false or trivial discipline as pretext for

27            discrimination, without regard to the specific facts and circumstances

28            of the individual employee or supervisor.

SECOND AMENDED CLASS ACTION COMPLAINT– Page 6

d.    Whether it is the policy and practice of Kaiser's centralized Human Resources department – and ultimately general counsel – to direct, authorize and assist supervisors and directors in their discriminatory and retaliatory employment actions, without regard to the specific facts and circumstances of the individual employee or supervisor, and in contravention of obligation of Human Resources and general counsel to protect employees from unlawful discrimination.

e.    Whether it is Kaiser's policy and practice to suppress and falsify information supporting complaints over employment actions, made internally and to administrative agencies and courts by African American employees, including unreasonable, one-sided, pre-determined internal investigations conducted by a select few individuals for the purpose of permitting, perpetuating and covering up discriminatory and retaliatory actions and patterns, without regard to the specific facts and circumstances of the individual employee or complaint.

f.    Whether Kaiser has an unlawful policy and practice of concealing and entrenching its discriminatory patterns and practices by making false and misleading representations and statements, and engaging in intentionally misleading conduct, to EEOC and OFCCP regarding its compliance with federal regulations, including the requirement that Kaiser conduct internal reviews and self-inquiry of statistical patterns, report disparities, propose remedial plans (including affirmative action plans) and monitor results over time.

g.    Whether Kaiser has purposefully engaged in company-wide efforts to misrepresent itself to employees, government agencies, in the courts and to the public as an EEO employer, included a public relations effort to promote a diversity department that is knowingly,

purposefully and intentionally limited to only existing managers – not covering the intermediate and promotion position workforce – and is responsible for only token representation of African Americans at highly visible positions in the organization.

h.    Whether Kaiser has an unlawful policy and practice of retaliating against African American employees who complain of discrimination, in order to reduce its liability to employees victimized by Kaiser's discriminatory employment decisions and to chill the exercise of rights by such employees in the future, without regard to specific facts and circumstances of the complaint; including elimination of positions, false bases for discipline, termination, job reassignment and changes to other terms and conditions of employment.

i.    Whether Kaiser has unlawful policies and practices in designating African American employees, and in particular, those class members who may have complaints against the company, as "not eligible for rehire," without regard to the specific facts and circumstances of the individual employee's employment, and indeed, pursuant to a practice over which Kaiser, at least until March of 2013, has been unwilling to manage through clear, uniform standards.

j.    Whether Kaiser has an unlawful policy and practice of abusing administrative and judicial processes to further the patterns and practices of racial discrimination and in retaliation against those African American employees, including unreasonable litigation tactics in defense of claims of discrimination regardless of the merits of the employees' claims or the substantial evidence indicating Kaiser violated the law.

k.    Whether Kaiser has a policy and practice of perpetuating, protecting and concealing unlawful discrimination and patterns of disparate

---

SECOND AMENDED CLASS ACTION COMPLAINT– Page 8

1    treatment by requiring employees who raise civil rights claims to agree

2    to confidentiality of the terms of settlement, without bargaining for

3    such an agreement at arms length, and without justification in work

4    product, attorney client privilege, trade secret or other basis for

5    confidentiality.

6    l.    Whether Kaiser's stand-alone litigation policy and practice – adopted

7    and applied by general counsel in cases brought under anti-

8    discrimination laws, without regard to specific facts and circumstances

9    – of requiring, as a condition of settlement, former employees to sign

10    agreements not to work at Kaiser in the future, is a violation of federal

11    and state civil rights laws; including whether plaintiffs are entitled to a

12    declaration that all such agreements are against public policy,

13    unenforceable and null and void.

14    m.    Whether Kaiser's stand-alone litigation policy and practice – adopted

15    and applied by general counsel in cases brought under anti-

16    discrimination laws – of requiring, as a condition of settlement, former

17    employees to negotiate against their own attorneys regarding statutory

18    attorneys' fees, through simultaneous lump sum or other devices

19    designed to create artificially a conflict between the employees and

20    their attorneys, in violation of anti-discrimination laws.

21    n.    Whether Kaiser's top management has been aware of discriminatory

22    patterns and practices, and unlawful retaliatory policies and practices,

23    and at least up until April of 2013, deliberately failed to institute any

24    meaningful efforts to comply with EEO laws, including the conscious

25    refusal to appoint a director-level manager with responsibility for EEO

26    compliance, and a refusal to inquire into and analyze its statistical

27    patterns of discrimination against African American and older African

28    American employees.

1    20.  Class certification is appropriate because Kaiser has acted and/or refused to act

2  on grounds generally applicable to the class and to the subclasses making appropriate

3  declaratory and injunctive relief with respect to plaintiffs and the class(es) as a whole.  The

4  members of the class and subclasses are entitled to injunctive relief to end Kaiser's

5  common, uniform, and unfair discriminatory personnel policies and practices.

6    21.  Class certification is also appropriate because common questions of fact and law

7  predominate over any questions affecting only individual members of the class and

8  subclasses, and because a class action is superior to other available methods for the fair and

9  efficient adjudication of this litigation.  The members of the class and subclasses have been

10  damaged and are entitled to recovery as a result of Kaiser's common, uniform, and unfair

11  discriminatory personnel policies and practices.

12  ***The Race-Age Subclasses at Issue***

13    22.  Plaintiff s also brings this action on behalf of subclasses consisting of all older

14  African Americans.

15    23.  The members of the race-age subclass are sufficiently numerous that joinder of

16  all members is impracticable.

17    24.  There are questions of law and fact common to the subclass and these questions

18  predominate over individual questions, including the same common factual and legal issues

19  identified herein.

20    25.  The claims alleged by plaintiff are typical of the claims of the race-age subclass,

21  and plaintiff and the members of these subclasses have been similarly affected by

22  defendants' wrongful conduct

23    26.  Plaintiff will fairly and adequately represent the interests of the race-age

24  subclasses.  Plaintiff has retained counsel with substantial expertise and experience in the

25  prosecution of employment litigation and class actions.

26    27.  Class certification is appropriate because Kaiser has acted and/or refused to act

27  on grounds generally applicable to the race-age subclasses, making appropriate declaratory

28  and injunctive relief with respect to plaintiff and the subclasses as a whole.  The members

1  of the race-age subclasses are entitled to injunctive relief to end Kaiser's common, uniform,

2  and unfair discriminatory personnel policies and practices.

3      28.  Class certification is also appropriate because common questions of fact and law

4  predominate over any questions affecting only individual members of the race-age

5  subclasses, because a class action is superior to other available methods for the fair and

6  efficient adjudication of this litigation.  The members of these subclasses have been

7  damaged and are entitled to recovery as a result of Kaiser's common, uniform, and unfair

8  discriminatory personnel policies and practices.

9                    **PATTERN AND PRACTICE ALLEGATIONS**

10     29.  Kaiser Permanente is one of the largest health maintenance organizations of its

11  kind, providing a system of integrated health care to more than 8 million members in eight

12  different regions nationwide, employing over 180,000 people.  In Northern California,

13  Kaiser serves approximately 3.2 million members at 21 medical centers and 160 offices,

14  employing thousands of people in non-physician capacities.   Using a centralized

15  employment opportunity system, people external to Kaiser and current employees are able

16  to apply for open positions throughout Kaiser's operations, including by region.  Current

17  employees are told they will be provided with opportunities for employment that are not

18  available to external applicants, including access to job postings prior to their disclosure to

19  the general public, and a system by which employees may post their resumes for other

20  Kaiser departments to match to openings for hiring decisions.

21     30.  Kaiser maintains a unique business and organization structure, with regional

22  oversight of Northern California non-physician operations by a single executive

23  management hierarchy.  Within each division of Kaiser's operations, the employer has

24  created departmental hierarchies of similar nature and structure, including: entry level

25  positions, trained or skilled-level positions, team leaders and sub-leads, supervisors and

26  office-level managers, and divisional directors and assistant directors.  Kaiser also

27  maintains uniform employment and personnel policies applicable to all of its employees,

28  with centralized human resources, general counsel, payroll services, and labor and other

---

SECOND AMENDED CLASS ACTION COMPLAINT– Page 11

1  employment data.  Regardless of the department or division, there are uniform policies and

2  procedures for employee orientation, supervisory management, salary and incentive options,

3  job classifications, human resources, progressive discipline, rules of conduct, and

4  requirements for transfers, promotions and terminations.

5       31.  Within each department or function of Kaiser's operations, the employer has

6  developed its own unique procedures, information systems and business technologies

7  requiring specialized training and adaptive capabilities.  Employees are told they need

8  establish in their work performances that they are trained in and proficient with those

9  unique processes in order to be retained and/or promoted within Kaiser.  Access to that

10  training uniformly depends upon the discretion of divisional management, however,

11  including influence and decision-making at the supervisory and team management levels.

12  Similarly, performance reviews, job classification decisions, pay and salary structure

13  changes, and disciplinary actions all depend upon the discretion of that same divisional

14  management.  Few objective requirements or measurements are used for employment

15  decisions, which instead are largely based on subjective judgments of the supervisors and

16  managers within Kaiser's operations.

17       32.  Kaiser's executive and divisional managements for positions in EEO job groups

18  2F and 2G are predominately neither African-American nor older African-Americans.

19  African-Americans are rarely promoted to supervisory or management positions capable of

20  influencing a significant proportion of the employer's decision-making.  As a result, the

21  decisions as to which employees receive specialized training, particular assignments, job

22  classifications, pay raises and incentives, transfer or promotions, positive performance

23  reviews and progressive disciplinary actions are made and influenced principally by non-

24  African-Americans.  Subjective judgments of Kaiser' stratified supervisory and

25  management system are often infected with conscious or unconscious prejudices and race

26  and/or race-age based stereotypes, which explains why so few African-Americans out of

27  Kaiser's large African-American employee population advance to supervisory and

28  management positions.

---

33. This pattern of unequal training, assignments, classifications, pay, discipline and advancement opportunities is not the result of random or non-discriminatory factors. Rather, it is the result of an on-going and continuous pattern and practice of intentional race and race-age discrimination in training, assignments, classifications, pay, discipline, performance reviews, terminations and promotions, and reliance on policies and practices that have an adverse impact on African-American and older African-American employees that cannot be justified by business necessity, and for which alternative policies and practices with less discriminatory impact could be utilized that equally serve any asserted justification. Plaintiff is informed and believes that such policies and practices include, without limitation:

    a.    Failure to consistently train African-Americans in the unique Kaiser processes and practices necessary for desirable assignments and advancement.

    b.    Reliance upon vague, arbitrary and subjective criteria utilized by a nearly non-African-American managerial workforce in making assignments, training, pay, performance review, discipline, promotion and termination decisions. Even where Kaiser's policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored at the discretion of management.

    c.    Reliance on race and race-age stereotypes in making employment decisions such as assignments, promotions, pay and training.

    d.    Pre-selection and "grooming" of non-African-American and younger, non-African-American employees for advancement, favorable assignments and training.

    e.    Maintenance of largely race and race-age segregated job categories and departments.

    f.    Deterrence and discouragement of African-Americans and older African-American employees from seeking advancement, training, and favorable assignments and pay.

g.  Giving African-American and older African-American employees lower compensation, lower job classifications and lower pay raise incentives than similarly situated non-African-American and younger, non-African-American employees.

h.  Providing unjustified negative performance reviews, false pretexts for disciplinary action, omission of positive job performance recognition and other adverse personnel actions to African-American and older African-American employees, in disproportion to the same actions taken against non-African-American employees.

i.  Providing less training and support to African-American and older African-American employees and managers than that given to non-African-American employees and managers.

j.  Providing less or refusing to make reasonable accommodations for disabilities and sick leave policies with respect to African-American and older African-American employees, and unlawfully discriminating against African-American-employees due to their disabilities because of both their disabilities and their race and/or race-age.

k.  Harassing African-American and older African-American employees interested in advancement and subjecting them to a hostile work environment.

l.  Maintaining and fostering a reputation for discriminatory conduct which deters African-Americans and older African-Americans from pursuing promotional opportunities with Kaiser;

m.  Establishing and maintaining arbitrary and subjective requirements for discipline and promotions which have the effect of excluding qualified African-Americans and older African-Americans and which have not been shown to have any significant relationship to job performance or to be necessary to the safe and efficient conduct of Kaiser's business;

1      n.    Failing and refusing to take adequate steps to eliminate the effects of its past

2             discriminatory practices; and

3      o.    Retaliating against African-American and older African-American employees

4             who complain of unequal treatment.

5    34.   Kaiser's racially stratified workforce and discriminatory patterns and practices

6 are propagated, entrenched and protected by centralized policies and practices directed at

7 the highest levels of Kaiser management. Although Kaiser operates many different

8 departments at many different locations throughout the Northern California Region, it has

9 centralized, company-wide policies and practices concerning supervisory training, human

10 resources, EEO reporting and compliance and Kaiser's response to EEO complaints. These

11 company-wide policies and practices include, among others:

12      a.    Directing, authorizing and training supervisors and directors to conceal

13             discriminatory actions and retaliate against those employees who might assist

14             the disclosure of false or trivial discipline as pretext for discrimination,

15             without regard to the specific facts and circumstances of the individual

16             employee or supervisor.

17      b.    Directing, authorizing and assist supervisors and directors in their

18             discriminatory and retaliatory employment actions, through a centralized

19             human resources department and, ultimately, the office of the general counsel,

20             in favor of supervisors and directors, and against the interests and complaints

21             of African American employees, without regard to the specific facts and

22             circumstances of the individual employee or supervisor, and in contravention

23             of obligation of Human Resources and general counsel to protect employees

24             from unlawful discrimination.

25      c.    Suppressing and falsifying information in connection with complaints over

26             employment actions made internally and to administrative agencies and courts

27             by African American employees, including unreasonable, one-sided, pre-

28             determined internal investigations conducted by a select few individuals for

1    the purpose of permitting, perpetuating and covering up discriminatory and

2    retaliatory actions and patterns, without regard to the specific facts and

3    circumstances of the individual employee or complaint.

4    f.    Concealing and entrenching discriminatory patterns and practices by making

5    false and misleading representations and statements, and engaging in

6    intentionally misleading conduct, to EEOC and OFCCP regarding its

7    compliance with federal regulations, including the requirement that Kaiser

8    conduct internal reviews and self-inquiry of statistical patterns, report

9    disparities, propose remedial plans (including affirmative action plans) and

10    monitor results over time.

11    g.    Misrepresent EEO practices and non-compliance to employees, government

12    agencies, in the courts and to the public, included a public relations effort to

13    promote a diversity department that is knowingly, purposefully and

14    intentionally limited to only existing managers – not covering the intermediate

15    and promotion position workforce – and is responsible for only token

16    representation of African Americans at highly visible positions in the

17    organization.

18    h.    Retaliating against African American employees who complain of

19    discrimination, in order to reduce its liability to employees victimized by

20    Kaiser's discriminatory employment decisions and to chill the exercise of

21    rights by such employees in the future, without regard to specific facts and

22    circumstances of the complaint; including elimination of positions, false bases

23    for discipline, termination, job reassignment and changes to other terms and

24    conditions of employment.

25    i.    Designating African American employees, and in particular, those employees

26    who may have complaints against the company, as "not eligible for rehire,"

27    without regard to the specific facts and circumstances of the individual

28    employee's employment, and indeed, pursuant to a practice over which

SECOND AMENDED CLASS ACTION COMPLAINT– Page 16

1    Kaiser, at least until March of 2013, has been unwilling to manage through

2    clear, uniform standards.

3    j.    Abusing administrative and judicial processes to further racial discrimination

4    and in retaliation against African American employees who complain about

5    the violation of their civil rights, including unreasonable litigation tactics in

6    defense of claims of discrimination regardless of the merits of the employees'

7    claims or the existence of substantial evidence of Kaiser's violations of law.

8    k.    Perpetuating, protecting and concealing unlawful discrimination and patterns

9    of disparate treatment by requiring employees who raise civil rights claims to

10    agree to confidentiality of the terms of settlement, without bargaining for such

11    an agreement at arms length, and without justification in work product,

12    attorney client privilege, trade secret or other basis for confidentiality.

13    l.    Kaiser's stand-alone litigation policy and practice – adopted and applied by

14    general counsel in cases brought under anti-discrimination laws, without

15    regard to specific facts and circumstances – requiring, as a condition of

16    settlement, former employees to sign agreements not to work at Kaiser in the

17    future, is a violation of federal and state civil rights laws; including whether

18    plaintiff is entitled to a declaration that all such agreements are against public

19    policy, unenforceable and null and void.

20    35.    Kaiser conceals, ratifies and protects its racially stratified workforce and

21    discriminatory and retaliatory patterns and practices through settlement tactics aimed at any

22    individual who pursued a claim of employment discrimination, and the attorneys who would

23    represent them in such claims. Such tactics are designed to discourage enforcement of rights

24    under FEHA and Section 1981, by creating artificial conflicts between employees and their

25    attorneys in the settlement of such claims. Although all meritorious claims will be resolved

26    through a settlement, rather than a trial, as a matter of policy and practice, Kaiser refuses to

27    make meaningful settlement offers until after the employees (and Kaiser) have incurred

28    substantial attorneys' fees. After that point, Kaiser will make only lump sum, simultaneous

SECOND AMENDED CLASS ACTION COMPLAINT– Page 17

1  settlement offers, or other offers structured to put plaintiffs and counsel in conflict. Such

2  offers are designed to encourage the attorneys to pressure the client to reduce expectations,

3  so there is more money in the pot for fees – an abhorrent conflict that would not arise other

4  than through Kaiser's tactics. Kaiser's policy and practice is also designed to put pressure

5  on the attorney, supported by threats of "unethical" behavior, if the attorney does not

6  compromise fees in order to maximize the client's recovery. As a whole, the scheme is

7  designed to discourage attorneys from accepting race discrimination cases, or litigating

8  them to a reasonable resolution. Such practices violate FEHA and §1981.

9     36. Because of its discriminatory policies and practices, Kaiser retains, promotes,

10  disciplines and terminates African Americans and older African Americans in statistically

11  significant disproportionate rates, based on the proportion of qualified African Americans

12  and older African Americans. This in turn has the effect of diminishing the pool of eligible

13  African Americans and older African Americans for promotion to supervisory, management

14  and executive positions.  Kaiser's pattern and practice of discrimination is so pervasive and

15  entrenched throughout that race and race-age discrimination and unlawful retaliation can be

16  said to be its modes of operations

17                    **WRONGFUL TERMINATION**

18     37. In 1997, plaintiff Gamble began working as a temporary employee (through a

19  company called Adecco), in Peoples' Solutions, then the name of the Human Resources

20  department for Kaiser.  On or about July 7, 1998, Ms. Gamble was hired as a permanent

21  employee in that department.  Like many other African American employees at Kaiser, she

22  performed her work according to the employer's needs, was well qualified and tried to

23  improve her employment position over the years.  By the time of her termination, she had

24  achieved the position of HR Specialist III, in the Benefits Department (the Health and

25  Welfare Department) of what had been renamed the HRSC.

26     38. In July 2012, Kaiser reorganized its Benefits Department, and plaintiff began

27  receiving supervision from a new manager – Rosa Grajeda – who had been transferred from

28  the Leaves Department.

39. From the beginning of her long tenure at Kaiser, and until her termination, Ms. Gamble did not receive any warnings or disciplinary actions related to her exemplary employment. Despite her qualifications and excellent work performance, Ms. Gamble was subject to the pattern and practice of discrimination, based upon her race and age. These included, but are not limited to the following:

a.  Ms. Gamble was one of the few African Americans to remain employed in the department, as other African American employees in that department, in Human Resources and throughout Kaiser were terminated for discriminatory reasons or forced to quit from dead-end positions at Kaiser. Ms. Gamble witnessed their replacement with younger, non-African American employees who were equally or less qualified to perform the work.

b.  Despite a pool of African American employees qualified for supervisory and management positions, Ms. Gamble was subject to an employment hierarchy that was seemingly devoid of older, African American employees at the higher levels. During her employment in Kaiser's Human Resources department, Kaiser employed no African American directors in that department, and few African Americans were given "lead" positions.

c.  After the departmental reorganization, Ms. Gamble was subject to constant harassment and unreasonable scrutiny by her manager, Ms. Grajeda. In October 2012, Ms. Grajeda followed plaintiff into the department's bathroom, and criticized plaintiff for not working as she spoke through the curtain in the vanity area. Plaintiff became both fearful of the manager, and appalled at her conduct, causing plaintiff to avoid using the department's bathroom from that point forward. Plaintiff complained to senior management, but no apology was made or corrective action taken.

d.  In approximately February 2013, plaintiff was subject to ridicule and embarrassment by Ms. Grajeda, who falsely accused plaintiff of receiving complaints from the entire department over her perfume. After offering to

1    communicate with her department over the matter, Ms. Grajeda admitted it

2    was only she that had complained.

3    e.    In Approximately March 2014, plaintiff was singled out from non-African

4    American employees and loudly scolded for laughing at work. This was done

5    openly to embarrass plaintiff in front of co-workers. Even though Kaiser

6    officially recognizes laughter as a part of its medical focus, and even though

7    other, non-African American employees are seen laughing, plaintiff was

8    criticized and made to feel inferior. Plaintiff was so upset by this incident that

9    she was required to leave her manager by the desk, and she was later called

10   into the manager's office for further criticism.

11   f.    Constant harassment and false criticism of work performance continued on a

12   nearly daily basis. Ms. Grajeda lacked the knowledge and experience

13   working in the Benefits department – knowledge and experience that plaintiff

14   had gained. And yet, in managing plaintiff's work performance, the lack of

15   understanding by the manager led to empty, false criticisms of the work.

16   g.    Throughout this period, Ms. Grajeda treated plaintiff and other older African

17   American employees with disparate treatment, including refused to assign

18   work to plaintiff commensurate with plaintiff's knowledge and skill levels,

19   criticisms of work by African American employees that were not made

20   against the same or even less quality work by younger, non-African

21   Americans, and overlooking transgressions or mistakes by younger, non-

22   African American employees.

23   40.  On July 18, 2014, plaintiff was given a "final written warning" threatening her

24   with termination, even though she had not received a prior written warning or any of the

25   progressive discipline Kaiser requires. Included in the written warning were false claims

26   regarding Ms. Gamble's work performance, including false accusations plaintiff had

27   "falsified" work records, and had acted with hostile aggression towards Ms. Grajeda. Each

28   claim was mere pretext for Kaiser's discrimination against older, African Americans.

41.   Pursuant to its pattern and practice of discrimination, Kaiser had already determined to terminate plaintiff's employment.  Following the final written warning, plaintiff attempted to perform her work and meet with senior management over her discipline.  Rather than providing an honest opportunity to perform the work, Kaiser set plaintiff up for ultimate termination, which occurred on July 29, 2014.

## DAMAGES

42. The hostile environment grew so intolerable that plaintiff suffered mental distress. Following plaintiff's attempt to address her unequal and unlawful treatment at Kaiser, and to assert her civil rights, plaintiff was subject to Kaiser's unlawful retaliatory policies and practices, including designation of plaintiff as not eligible for rehire; unreasonable, pre-determined one-sided investigations conducted outside the standards for workplace investigations for the purpose of covering up Kaiser's violations; unreasonable and abusive litigation tactics designed to punish plaintiff for asserting her rights; and efforts by Kaiser's office of the general counsel to make sure that plaintiff, in any settlement, agree to never apply to work at Kaiser again in the future.

43. As a direct and proximate result of defendants' actions as alleged herein, defendants have breached their duties imposed on all employers as established by statute.

44. As a direct and proximate result of the refusal to promote plaintiff's employment, plaintiff has suffered and will continue to suffer lost wages, salary increases, earnings capacity and other benefits of employment, in an amount to be proven at trial.

45. As a further proximate result of defendants' unlawful actions, plaintiff has suffered emotional pain, humiliation, mental anguish, and emotional distress.

46. The conduct of all of the defendants alleged above was deliberate, wilful and malicious.  Further, the actions taken against plaintiff were carried out with reckless disregard to the truth and the rights of plaintiff, and were despicable actions taken without privilege or justification.

## FIRST CAUSE OF ACTION
(Violation of California Government Code 12940, *et seq.*, California
Fair Employment and Housing Act, and the Civil Rights Act, 42 U.S.C. §1981
– Class Race and Subclass Race-Age Discrimination in Terminations )

47. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 46 of this complaint, as though fully set forth herein.

48. This claim is brought on behalf of plaintiff and the entire class and subclass.

49. All three Kaiser entities acting together as a single employer comprise an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d), and the Civil Rights Act, §1981.

50. Plaintiff is a member of a protected class as set forth in Government Code 12940 *et seq.*, and §1981 based on her race, and color, as she is an African-American. Plaintiff is also a member of a protected subclass based on race, and color, as she is an African American over the age of 40.

51. Kaiser has engaged in a pattern and practice of intentional discrimination against plaintiff and the class, as described herein, in that it has denied plaintiff and class members of the same retention and opportunities for retention afforded to similarly situated non-class employees, and it subjects plaintiff and class members to retaliation when they complain about the unlawful conduct.

52. Kaiser has engaged in a pattern and practice of intentional discrimination against the Ms. Gamble and the class and has terminated them in disparate rates when compared to the proportion of African Americans incumbent in the workforce.

53. The harms alleged herein occurred within the jurisdiction of this Court and the amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

54. The discriminatory treatment of plaintiff's employment and harassment, as set forth herein, were done with discriminatory motive, based on race, as well as a racial subclass of race/age, in violation of FEHA and public policy.

## SECOND CAUSE OF ACTION
(Violation of California Government Code 12940, *et seq.*,
California Fair Employment and Housing Act – Age Discrimination in Termination)

55. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 46 of this complaint, as though fully set forth herein.

56. All three Kaiser entities acting together as a single employer comprise an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d).

57. Plaintiff is a member of a protected class as set forth in Government Code 12940 *et seq.*, based on her age, as she is over the age of 40.

58. The harms alleged herein occurred within the jurisdiction of this Court and the amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

59. The discriminatory treatment of plaintiff's employment and harassment, as set forth herein, were done with discriminatory motive, based on age, in violation of FEHA and public policy.

## THIRD CAUSE OF ACTION
(FEHA, Cal. Government Code 12900, *et seq*, and §1981 – Class Claims for Disparate and Retaliatory Treatment for Making or Assisting in Complaints)

60. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 46 of this complaint, as though fully set forth herein.

61. This claim is brought on behalf of plaintiff and the entire class and subclass

62. All three Kaiser entities acting together as a single employer comprise an entity subject to suit under the Fair Employment and Housing Act (FEHA) in that defendant regularly employees five or more persons, pursuant to Cal. Govt. Code 12926(d), and the Civil Rights Act, §1981.

63. Plaintiff is a member of a protected class as set forth in Government Code 12940 *et seq.*, and §1981, based on her efforts and anticipated efforts to remedy the discrimination set forth in this complaint, as well as her membership in the protected classes and subclasses of African Americans, and older individuals, as described herein. Such efforts include complaints internal to Kaiser regarding her treatment by Kaiser, her efforts to remedy the

1  hostile environment that Kaiser creates for protected employees, her complaint to DFEH,

2  and the filing, and/or anticipated filing, of this lawsuit.

3      64.  Kaiser has engaged in a pattern and practice of intentional discrimination against

4  plaintiff and the class, as described herein, in that it has denied plaintiff and class members

5  of the same retention and opportunities for retention afforded to similarly situated non-class

6  employees, and it subjects plaintiff and class members to retaliation when they complain

7  about the unlawful conduct.

8      65.  Kaiser has engaged in a pattern and practice of intentional discrimination and

9  intentional retaliation against the class and subclass and has subjected African Americans –

10  and in particular, those who have asserted, are likely to assert or are likely to assist another

11  employee in the assertion of a complaint against Kaiser – to uniform retaliatory policies and

12  practices.  Such policies and practices, as described herein, include the manufacture of false

13  pretexts for discrimination;  propagation of false claims and false information during

14  required workplace investigations; abuse of administrative and judicial processes without

15  probable cause or for improper purposes; and demands that persons who exercise their

16  rights under EEO laws agree to not apply for work at Kaiser in the future, a demand that is

17  not negotiated at arms length, is unconscionable and is void as against public policy.

18      66. The harms alleged herein occurred within the jurisdiction of this Court and the

19  amount in controversy, exceeds the minimum jurisdictional amount required by this Court.

20      67. The discriminatory treatment of plaintiff's employment and harassment, as set

21  forth herein, were done with discriminatory motive, based on race, as well as a racial

22  subclass of race/age, in violation of FEHA, §1981, and public policy.

23                              **RELIEF ALLEGATIONS**

24      68.  Plaintiff and the class and subclasses she represents have no plain, adequate or

25  complete remedy at law to redress the wrongs for which they seek injunctive relief, and the

26  injunctive relief sought in this action is the only means of securing complete and adequate

27  relief. Plaintiff and the class she represents are now suffering and will continue to suffer

28  irreparable injury from defendants' discriminatory acts and omissions.

1    69.  Defendants' actions have caused and continue to cause plaintiff and all class and

2   subclass members substantial damages – including losses in earnings, promotional

3   opportunities and employment benefits – in an amount to be determined according to proof.

4    70.  Defendant acted or failed to act as herein alleged with malice or reckless

5   indifference to the protected rights of plaintiff and class and subclass members. Plaintiff,

6   class members and subclass members are thus entitled to recover punitive damages in an

7   amount to be determined according to proof.

8                          **PRAYER FOR RELIEF**

9   Wherefore, plaintiff and the class and subclasses pray for relief as follows:

10   1.    Certification of the class and subclasses as a class action on behalf of the

11         proposed plaintiff class and subclasses and designation of plaintiff as

12         representatives of the class and subclasses and counsel of record as Class

13         Counsel;

14   2.    All damages which plaintiff, the class and the subclass have sustained as a

15         result of defendants' conduct, including back pay, front pay, general and

16         special damages for lost compensation and job benefits that they would have

17         received but for the discriminatory practices of defendant, and for emotional

18         distress, humiliation, embarrassment, and anguish, according to proof;

19   3.    For plaintiff, all damages sustained as a result of defendant's conduct,

20         including back pay, front pay, general and specific damages for lost

21         compensation and job benefits they would have received but for the

22         discriminatory practices of defendants, and damages for emotional distress,

23         according to proof;

24   4.    Exemplary and punitive damages in an amount consistent with the law;

25   5.    A preliminary and permanent injunction against defendants and its partners,

26         officers, owners, agents, successors, employees, representatives, and any and

27         all persons acting in concert with them, that requires the following:

28

a.    desisting from engaging in each of the unlawful practices, policies, customs, and usages set forth in this complaint;

b.    creating a transparent and non-discriminatory employment policies and practices for the open, non-discriminatory retention to positions within the Northern California region;

c.    instituting an affirmative action policy to insure that African-Americans and older African-Americans receive the share of retention and promotion to positions they would have obtained were it not for Kaiser's discriminatory practices; and

d.    creating a monitoring and reporting system to insure that injunctive relief is fully implemented.

6.    A declaratory judgment that the practices complained of herein are unlawful and violative of 42 U.S.C. §1981, and the California Fair Employment and Housing Act, Government Code §§ 12940, *et. seq.*

7.    An order assigning plaintiff and the class and subclasses to those jobs they would have held but for defendant's discriminatory practices;

8.    An adjustment of the wage rates, benefits, and seniority rights for plaintiff and the class and subclasses to that level which plaintiffs and the class would be enjoying but for defendant's discriminatory practices;

9.    For prejudgment interest to the extent permitted by law;

10.    For costs and expenses of suit incurred herein, including reasonable attorneys' fees to the extent available by law; and

11.    For such other and further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

Dated: October 18, 2017          LAW OFFICE OF JEREMY L. FRIEDMAN

By: _____
    Jeremy L. Friedman
    Attorney for plaintiff Lunell Gamble

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

Dated: October 18, 2017          LAW OFFICE OF JEREMY L. FRIEDMAN

By: _____
    Jeremy L. Friedman
    Attorney for plaintiff Lunell Gamble

## PROOF OF SERVICE

Jeremy L. Friedman declares and states:

I have an office in Alameda county. I am over the age of eighteen years. My business address is 2801 Sylhowe Road, Oakland, CA, 94602.

I declare that on October 20, 2017, I did or will serve a copy of:

**Second Amended Complaint**

by electronic transmission to:

Grube Brown & Geidt LLP
Heather A. Borgan
Amanda Bolliger Crespo
601 Montgomery Street, Suite 1150
San Francisco, CA 94111
Kaiser Permanente _ Gamble_ Lunell E_Mails
<{F5300}.GBGLLP@bb6f1.imanage.work>

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of October, 2017, in Oakland, CA.

/s/Jeremy L. Friedman
Jeremy L. Friedman

---

SECOND AMENDED CLASS ACTION COMPLAINT– Page 21