Jeremy L. Friedman, CA Bar No. 142659
LAW OFFICE OF JEREMY L. FRIEDMAN
2801 Sylhowe Road
Oakland, CA 94610
Tel: (510) 530-9060
Fax: (510) 530-9087
jlfried@comcast.net

Attorney for plaintiffs and putative class

Merri A. Baldwin, CA Bar No. 141957
ROGERS JOSEPH O'DONNELL, a PLC
311 California Street, 10th floor
San Francisco, CA 94104
Tel: (415) 956-2828
Fax: (415) 956-6457
mbaldwin@rjo.com

Counsel for Responding Attorney Jeremy L. Friedman

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUNELL GAMBLE, and SHEILA KENNEDY, on behalf of themselves as well as a class of similarly situated individuals,<br><br>       Plaintiff<br><br>vs.<br><br>KAISER FOUNDATION HEALTH PLAN, INC; KAISER FOUNDATION HOSPITALS, INC.; and THE PERMANENTE MEDICAL GROUP; all doing business as KAISER PERMANENTE MEDICAL CARE PROGRAM<br><br>       Defendants<br>_____ | Case No. 4:17-cv-06621-YGR<br><br>**DECLARATION OF MICHAEL A. HIRST IN SUPPORT OF PLAINTIFFS' COUNSEL'S RESPONSE TO ORDER TO SHOW CAUSE**<br><br><br>Hon. Yvonne Gonzalez Rogers |

I, Michael A. Hirst, declare and state:

1. I am an attorney licensed to practice law in California. I make this declaration in support of plaintiffs' counsel's response to the Court's Order to Show Cause. It is based on my personal knowledge, and opinions expressed herein are based upon my knowledge and experience. If called as a witness hereto, I could and would testify competently to the following.

2. I was a Regent's Scholar at Hamilton College '80 in Clinton, New York, and a Harlan Fiske Stone Scholar at Columbia Law School '87 in New York, New York. I worked as an associate for McCutchen, Doyle, Brown, and Enersen (later Bingham McCutchen, and now Morgan Lewis) in San Francisco from 1987 to 1990. In 1990, I became an Assistant United States Attorney for the Eastern District of California.

3. In 1997, I was promoted to Co-Chief of the Civil Division and Chief of Affirmative Civil Litigation for the office. In that capacity, I supervised all civil cases brought by the United States in the 34 counties within the district, including all False Claims Act ("FCA") investigations and actions. I held that position for over 8 years, until I formed Hirst & Chanler LLP in 2005. In 2009, I formed Hirst Law Group, P.C. My practice, both for the majority of my time at the U.S. Attorney's Office and essentially exclusively since then in private practice, has specialized in representing plaintiffs in FCA cases and employment retaliation matters.

4. I have received numerous awards and recognitions for my work, including: multiple Sustained Superior Performance Awards from the U.S. Attorney's Office, a Director's Award from the United States Department of Justice presented to me by Attorney General Janet Reno in 2000, a nomination for the Attorney of the Year in 2004 through the National Association of Assistant United States Attorneys, and numerous awards from federal agencies, including the Inspector General's Integrity Award in 2006, the highest civilian award presented by the Department of Health and Human Services for "unwavering support and resolute prosecution of Health Care Fraud."

1    5. I was the sole government prosecutor in a complicated and extensive FCA qui tam

2    case against Tenet Healthcare, Inc., and Redding Medical Center, which resulted in the

3    largest recovery against a single hospital in U.S. history. Following that case, Attorney

4    General John Ashcroft wrote that I was an "exceptional litigator who has performed a

5    significant public service." Attorney General Ashcroft added: "The successful outcome in

6    this case significantly advanced the Department's efforts to combat fraudulent health care

7    practices." The case was the subject of a book, *Coronary* (Simon and Schuster, 2007), by

8    New York Times journalist and author Stephen Klaidman. I have also been featured in two

9    books by a client, entitled "Whistleblower" and "Retaliation" (Bay Tree Publishing 2010,

10   2013), in which whistleblower and now author Amy Block Joy described me as "gifted,"

11   and wrote that "[Hirst] had done brilliant work for me, for which I will always be grateful."

12       6. The cases on which I have worked in public and private practice have resulted in

13   total recoveries for relators, states, and the federal government of over $250,000,000 and

14   have been reported on television, radio, and newspapers throughout the country and abroad,

15   including on 60 Minutes, 20-20, CBS, NBC, ABC, Fox, NPR, in front page stories in the

16   New York Times and the Financial Times of London, in the Wall Street Journal, USA

17   Today, and other publications. I have regularly given presentations on the FCA in

18   conferences and programs throughout the United States, have taught classes on the FCA at

19   UC Davis School of Law, and have taught trial practices, federal civil litigation, and the

20   FCA in the International Law Program at UC Davis Extension.

21       7. In connection with my testimony in this declaration, I have reviewed the Court's

22   July 19, 2019 stay order, plaintiffs' counsel's August 23, 2019 statement of compliance, and

23   the Court's August 30, 2019 Order to Show Cause. I have also reviewed the terms of the

24   underlying retainer agreement with plaintiffs' attorney, both the initial agreement and

25   counsel's proposed revised agreement.

26       8. I am generally familiar with fee agreements between attorneys and their clients in

27   cases involving statutory fee-shifting, especially in FCA cases. In my experience, it is a

28   standard practice for attorneys in cases brought under statutes that provide for fees to

discuss in the retainer agreement the payment of attorneys' fees if the case is settled. In such cases, a contract for payment of statutory fees in settlement is usually not determined as a percentage of the total recovery. Instead, it is standard practice to (1) assign to the attorney the right to claim and negotiate statutory fees during settlement discussions, if defendants insist on negotiating such fees as part of a single, lump sum settlement, and (2) if unable to be resolved in settlement discussions, to authorize counsel to apply for and obtain payment of statutory fees as may be ordered by the court.

9. In my opinion, retainer agreements between attorneys and clients that address the payment of fees in settled cases do not create conflicts between the attorneys and clients. Instead, they are designed to anticipate and try to avoid the conflicts that arise when defendants insist on "lump sum" offers inclusive of both damages and fees. In FCA cases – where the damages are paid to the government, with a share then paid by the government to the whistleblower (called a "relator") – the government will not discuss attorneys' fees and will routinely require separate settlement discussions concerning the amount of damages and the amount of statutory fees. Even where the parties agree to simultaneous or global settlement discussions, with a client's consent, plaintiffs' attorneys can take measures to protect against conflicts between the attorney and client during negotiations, including basing fee claims on time records and other evidence or information going to the value of statutory fees, and presenting aggregate settlement demands that are made expressly on the basis of separate components for damages and fees.

10. Contract provisions assigning to the attorney the right to claim and negotiate attorneys' fees during settlement discussions – including specifying the means by which fees will be calculated in the event that the client directs the attorney to accept a settlement – are not only necessary to protect the attorneys' interests in fees, but are also necessary for the client to make informed settlement decisions. In the event the defendant makes a "lump sum" settlement offer – such as the Rule 68 Offer made in *Marek v. Chesny*, 473 U.S. 1 (1985) – the client can only evaluate whether to accept the settlement offer by "ascertain[ing] the [fees] then accrued." *Id*., at 7. This is generally done by reference to the

number of hours expended by the law firm, along with hourly rates and other adjustment factors applicable to statutory fees or otherwise specified in the retainer agreement. Similarly, when responding to a "lump sum" settlement offer with an aggregate counter-demand, the plaintiff will need to determine the amount of the attorney's fees that will comprise a share of that lump sum. A retainer agreement that specifies how the amount of those fees will be determined thus permits the client to know the exposure on fees and the amounts to offer in any counter-demands.

11. Even with an assignment of rights on statutory fees, clients always retain the right to direct the acceptance of a settlement, including a waiver of statutory fees. In my opinion, a contract provision that specifies what will happen if the client chooses to waive the statutory fees does not act as a "veto" on the client's settlement authority. Instead, it clarifies the amount of fees to be paid to the attorney, or the process by which such fees will be determined, if the client wants to discuss and then accept a lump sum settlement that waives statutory fees. This enables both the attorney and the client to know the amount of fees the attorney will be entitled to if the lump sum settlement offer is accepted. That does not create a conflict in my view; rather, it is an attempt to avoid the conflict that would otherwise result in connection with a lump-sum offer.

12. For example, assume damages in a case are $100,000 and statutory fees are $300,000. If a defendant insists on a lump sum settlement offer of $120,000 with a waiver of the fees, a rational client will be inclined to accept a higher payment of damages than the client would otherwise obtain. If the lawyer does not discuss with the client and contract for how such a waiver would be handled before the offer is communicated, a conflict would inevitably arise: the lawyer would like to be compensated for his work on the case, but the client would like to maximize his recovery. Avoiding that conflict (that may or may not be intentionally pursued by defense counsel) by addressing this eventuality in the retainer agreement helps preserve the attorney's relationship with the client.

13. This is not to say an assignment resolves all conflicts that may arise in settlement discussions. In the event that a dispute arises between the attorney and the client regarding

waiver of statutory fees during settlement discussions, the client should be advised to consult with independent counsel, the attorney should follow the client's wishes on settlement, and the dispute over payment of attorneys' fees should be resolved thereafter, by the parties (with independent counsel, if the client chooses), by the court where the case is pending, or before a neutral third party or other court of competent jurisdiction. All this should be spelled out in the retainer agreement.

14. In my opinion, permitting attorneys to contract for the right to claim, negotiate and potentially compromise statutory fees during global settlement is necessary to fulfill the Legislative purposes underlying an award of statutory fees for certain cases. In enacting statutory fee provisions such as those contained in the False Claims Act, Congress intended to attract attorneys to take on cases of important public policies even when the amount of the plaintiffs' monetary recovery is small (relative to the amount of fees and costs that might be required to litigate). Such statutes encourage meaningful litigation where the traditional private marketplace using a traditional percentage contingency fee model would fail to provide representation. Since the vast majority of litigation is resolved through settlement, and Congress wanted to encourage attorneys to take on these cases that might settle, it is both reasonable and expected that attorneys would contract with their clients to determine how statutory fees will be handled in a case that is settled. A rule that prohibits the attorney from entering into such an agreement would result in attorneys declining to take on low-value cases, or cases where the fees are otherwise expected to outpace the amount of damages, even when those cases embody significant public interests.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of September, 2019, at Davis, CA.

_____
Michael A. Hirst

waiver of statutory fees during settlement discussions, the client should be advised to consult with independent counsel, the attorney should follow the client's wishes on settlement, and the dispute over payment of attorneys' fees should be resolved thereafter, by the parties (with independent counsel, if the client chooses), by the court where the case is pending, or before a neutral third party or other court of competent jurisdiction. All this should be spelled out in the retainer agreement.

14. In my opinion, permitting attorneys to contract for the right to claim, negotiate and potentially compromise statutory fees during global settlement is necessary to fulfill the Legislative purposes underlying an award of statutory fees for certain cases. In enacting statutory fee provisions such as those contained in the False Claims Act, Congress intended to attract attorneys to take on cases of important public policies even when the amount of the plaintiffs' monetary recovery is small (relative to the amount of fees and costs that might be required to litigate). Such statutes encourage meaningful litigation where the traditional private marketplace using a traditional percentage contingency fee model would fail to provide representation. Since the vast majority of litigation is resolved through settlement, and Congress wanted to encourage attorneys to take on these cases that might settle, it is both reasonable and expected that attorneys would contract with their clients to determine how statutory fees will be handled in a case that is settled. A rule that prohibits the attorney from entering into such an agreement would result in attorneys declining to take on low-value cases, or cases where the fees are otherwise expected to outpace the amount of damages, even when those cases embody significant public interests.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 13th day of September, 2019, at Davis, CA.

_____
Michael A. Hirst

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Clerk of the Court for the Northern District of California, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeremy L. Friedman
Jeremy L. Friedman